Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re § § HIGHLAND CAPITAL MANAGEMENT, § L.P., § § Debtor. § | | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, § L.P., § § Plaintiff, § § v. § § HIGHLAND CAPITAL MANAGEMENT § FUND ADVISORS, L.P. § § Defendant. § | | Adv. No. 21-03004 |

## DEFENDANT'S MOTION FOR LEAVE TO AMEND ANSWER

TO THE HONORABLE COURT:

COMES NOW Highland Capital Management Fund Advisors, L.P., the defendant (the "Defendant") in the above styled and numbered adversary proceeding (the "Adversary Proceeding"), and files this its *Defendant's Motion for Leave to Amend Answer* (the "Motion"), respectfully stating as follows:

### I.  SUMMARY

1. This Adversary Proceeding concerns two promissory notes allegedly payable by the Defendant to Highland Capital Management, L.P. (the "Plaintiff") in the combined amounts of $7.4 million (the "Notes"). Now that the Defendant has access to former employees of the Plaintiff and to various books and records, the Defendant has learned that the Notes were unauthorized, represent a mutual mistake, and were never intended as debt, but rather that the Plaintiff was compensating the Defendant for the Plaintiff's own liability to the Defendant for causing a serious valuation error. Accordingly, and not having learned of these facts until recently, the Defendant respectfully seeks leave to assert resulting affirmative defenses.

### II.  PROCEDRUAL BACKGROUND

2. On January 22, 2021, the Plaintiff filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "Complaint"), thereby initiating this Adversary Proceeding.

3. On March 1, 2021, the Defendant filed its *Defendant's Original Answer* (the "Answer"). The Answer does not contain any affirmative defenses.

4. The agreed scheduling order entered in this Adversary Proceeding does not contain a deadline to amend operative pleadings. *See* Docket No. 13.

5. This Adversary Proceeding is non-core and the Defendant has not consented to the Bankruptcy Court's entry of final orders or judgment. The Defendant has asserted a right to trial by jury.

6. The Defendant has filed a motion for withdrawal of the reference, which motion remains pending, and this Motion is subject to, and without prejudice to, any and all arguments raised in support of the withdrawal of the reference.

### III. FACTUAL BACKGROUND

7. This Motion is supported by the Declaration of Dennis C. Sauter (the "Sauter Declaration"), attached hereto as Exhibit "A" and incorporated herein.

8. The Defendant is a registered advisor under the Investment Advisors Act of 1940. Sauter Declaration at ¶ 4. As such, the Defendant advises various independent funds which, in turn, are investment vehicles for a large number of investors. *See id.* One such fund was Highland Global Allocation Fund ("HGAF"). *Id.* at ¶ 24.

9. Prior to the end of February, 2021, and during all times relevant to the Notes, the Plaintiff and the Defendant were parties to that certain *Second Amended and Restated Shared Services Agreement* dated February 8, 2013 (the "Shared Services Agreement"). *Id.* at ¶ 6. This was standard business practices for the Plaintiff and various other affiliated companies, including other advisers, within the Plaintiff's "complex" of business: the Plaintiff would employ most of the employees and then share those employees with the Defendant and other "complex" entities, in exchange for payments by the Defendant and such other entities. *Id.* at ¶ 7. The Defendant otherwise had very few direct employees. *Id.* at ¶ 5. Thus, under the Shared Services Agreement, employees of the Plaintiff (many of whom were highly trained and specialized) provided many of the key services to the Defendant on an as-needed basis. *Id.* at ¶ 8. These services included legal, accounting, regulatory, compliance, IT, valuation, and tax services, among others. *Id.* at ¶ 8. Additionally, under the Shared Services Agreement the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored. *Id.* at ¶ 8.

10. In March, 2018, HGAF sold equity interests it held in TerreStar. *Id.* at ¶ 24. As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of

HGAF assets. *Id.* at ¶ 24. The Defendant was responsible for advising on the NAV. In turn, pursuant to the Shared Services Agreement, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies. *Id.* at ¶ 24.

11.     The Plaintff made a mistake in calculating the NAV (the "NAV Error"). *Id.* at ¶ 25. The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund. *Id.* at ¶ 25. The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. *Id.* at ¶ 25. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF. *Id.* at ¶ 26.

12.     The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. *Id.* at ¶ 27. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments. *Id.* at ¶ 28. The Defendant is unsure as to the flow of funds; *i.e.* whether the Plaintiff paid HGAF directly or through the Defendant, and is awaiting discovery from the Plaintiff on that point. Either way, the Plaintiff accepted, and paid, approximately $7.5 million to compensate for the NAV Error that it caused.

13. Frank Waterhouse ("Waterhouse") was the Chief Financial Officer of both the Plaintiff and the Defendant. *Id.* at ¶ 29. Waterhouse prepared and signed the Notes. Interestingly, Waterhouse did not sign the Notes in a representative capacity for the Defendant, but rather as:

**MAKER:**

*[signature]*

_____
FRANK WATERHOUSE

This was highly unusual and indicates that the Plaintiff's legal department did not prepare the Notes. It is also highly unusual that the Notes were not signed by Jim Dondero or by the general partner of the Defendant.

14. Waterhouse was not authorized to execute the Notes on behalf of the Defendant, and he was not authorized to lend funds by the Plaintiff. *Id.* at ¶ 22. It appears that what happened is that Waterhouse, either for some internal accounting purpose or because funds were flowing from the Plaintiff to the Defendant, believed that some document was necessary or that what was being funded was a loan, so he unilaterally, and in mistake, prepared and signed the Notes. *Id.* at ¶ 30. In short, Waterhouse made a mistake, there was no loan, there was no return consideration for any loan, and the Notes, if anything, are a mutual mistake and are void. *Id.* at ¶ 30 & 32.

15. The Defendant only learned of these facts in April, 2021, and was therefore unable to assert defenses and affirmative defenses based on these facts at the time that it filed its Answer. *Id.* at ¶ 21. This is because the Defendant's own employees had no knowledge of the facts and circumstances surrounding the Notes; the Plaintiff, through its CEO Mr. Seery, had prohibited employees of the Plaintiff from discussing matters with the Defendant that may relate to controversies or litigation under penalty of termination; the Defendant did not have access to all

of its books and records, as they were in the possession of the Plaintiff pursuant to the Shared Services Agreement; and an injunction from the Bankruptcy Court prohibited Mr. Dondero from "indirectly" communicating with the Plaintiff's employees (Mr. Dondero controls the Defendant). *Id.* at ¶¶ 13-17.

16. By mid-April, 2021, the Plaintiff has terminated most of its employees, those employees formed their own company, and the Defendant retained that company to provide services to the Defendant basically in continuation of the services provided by the Plaintiff pursuant to the Shared Services Agreement. *Id*. at ¶¶ 19-20. Additionally, the Plaintiff provided many, but not all, of the Defendant's books and records to the Defendant. *See id*. Thus, it was not until then that the Defendant was meaningfully able to talk to persons with some knowledge regarding the facts and circumstances surrounding the Notes and to review its books and records to determine that the NAV Error had occurred and that the Plaintiff paying for the resulting damages was compensation by the Plaintiff for its own error, as opposed to a loan from the Plaintiff to the Defendant. *Id*. at ¶¶ 21-22.

17. The Defendant also notes that the Plaintiff, on its schedules, did not schedule the Notes even though it scheduled various other promissory notes owed by its affiliates. *See* Docket No. 247 at 13 of 74. Additionally, on April 15, 2019, the Plaintiff agreed to extend the date that certain demand notes payable by the Defendant to the Plaintiff could be demanded to May 31, 2021, as the Defendant expected to be unable to pay those notes. *See* Sauter Declaration at ¶ 31. It is illogical and highly improbable that, notwithstanding that admission and acknowledgement, the Plaintiff would nevertheless loan the Defendant $7.4 million some two weeks later. Rather, as the evidence suggests, Waterhouse made a mistake in not realizing that the funds being paid by the Plaintiff to the Defendant were in compensation for the NAV Error and not a loan.

## IV.    DISCUSSION

18.    Attached hereto as Exhibit "B" is the Defendant's proposed Amended Answer, incorporating new defenses or affirmative defenses resulting from the knowledge of the facts above.

19.    Federal Rule of Civil Procedure 15, as made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7015, provides for leave to amend a pleading, which leave "[t]he court should freely give [] when justice so requires." FED. R. CIV. P. 15(a)(2).

20.    The Court must "possess a 'substantial reason' to deny a request for leave to amend." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).  The Fifth Circuit has outlined five "consideration" guiding the Rule 15 inquiry: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Id*.

21.    <u>No Undue Delay</u>.  There has been no undue delay.  The Defendant filed its Answer only some seventy (80) days ago.  This Adversary Proceeding has been pending for four (4) months.  The Defendant has not filed a prior motion for leave to amend.  And, most importantly, as evidenced by the Sauter Declaration, the Defendant had no way of knowing of these defenses and affirmative defenses until the termination of the Shared Services Agreement and the ability of the Defendant to communicate with former employees of the Plaintiff who, prior to that time, were under instructions to not discuss matters of a potential litigation nature with the Defendant under penalty of termination, and to have access to its books and records.  Thus, it was not until April, 2021, that the Defendant was even able to learn of these defenses to the Notes or the facts and circumstances surrounding the Notes.

22. <u>No Bad Faith or Dilatory Motive</u>. There is no bad faith or dilatory motive for the same reasons as above; the Defendant only recently learned of its defenses, the Defendant moved for leave promptly after learning of them; and leave to amend is not sought to avoid summary judgment or continue trial.

23. <u>No Repeated Failures to Cure By Prior Amendments</u>. This is the Defendant's first motion to amend.

24. <u>No Undue Prejudice</u>. There is no undue prejudice to the Plaintiff. Discovery is ongoing and depositions have not been scheduled. The Defendant is agreeable to further extending discovery. The Plaintiff will have every reasonable opportunity to test the new defenses, and all underlying witness and documents related to the same are available.

25. <u>No Futility of the Amendment</u>. The Defendant's defense is not futile:

(i) it is supported by *prima facie* evidence by the Sauter Declaration;

(ii) the amount of the Notes, one for $5 million and one for $2.4 million, is almost identical to the ultimate $5,186,496 payment by the Defendant on February 15, 2019 and the $2,398,842 May 21, 2019 payment by the Defendant;

(iii) the fact that the Plaintiff did not schedule the Notes, while scheduling many others, is evidence that the Plaintiff itself did not consider the Notes legitimate (or know of their existence);

(iv) the fact that Waterhouse signed the Notes, and not in a representative capacity for the Defendant, whereas all other notes are prepared by the Plaintiff's legal department and signed by other agents in representative capacities, is evidence that Waterhouse made a mistake or did not understand what was going on, and had no authority or clearance to bind the Defendant to the Notes, and that, perhaps, the

Notes were done for some draft, or accounting, or temporary purpose with no intention or expectation, even on the part of Waterhouse, that the Notes ever be legitimate.

26. The Defendant is not suggesting that the merits of its defenses be tried through this Motion; only that its defenses and the Motion are not "futile."

27. Accordingly, as no substantial reason exists to deny the amendment, the Court should "freely" grant leave to the Defendant to amend its Answer.

## V.  PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that the Court enter an order: (i) granting this Motion; (ii) granting the Defendant leave to file the Amended Answer attached hereto as Exhibit "B"; and (iii) granting the Defendant such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 22d day of May, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that he discussed the relief requested herein with Jeff Pomerantz, Esq. and John Morris, Esq., on March 21, 2021, but that, as of the filing hereof, he has not heard back regarding whether the Plaintiff opposes said relief.

/s/  Davor Rukavina
Davor Rukavina

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 22d day of May, 2021, true and correct copies of this document and the exhibits hereto were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record.

/s/  Davor Rukavina
Davor Rukavina