IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER
AND BRIEF IN SUPPORT THEREOF**

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

I.      SUMMARY ....................................................................................1

II.     TIMING ........................................................................................2

III.    BACKGROUND ............................................................................4

    A.      THE NOTES, THE ADVERSARY PROCEEDING, AND HCMFA'S DEFENSE..................4

    B.      WATERHOUSE'S DEPOSITION AND ADMISSION OF MISTAKE.....................................6

    C.      MR. KLOS' DEPOSITION AND CREATION OF THE NOTES .........................................13

    D.      MS. HENDRIX'S DEPOSITION AND LACK OF AUTHORITY TO SIGN THE NOTES........15

IV.     ARGUMENTS AND AUTHORITIES.............................................................19

V.      PRAYER....................................................................................23

## TABLE OF AUTHORITIES

### Cases

*Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004)........................................................20, 21

### Statutes and Rules

Tex. Bus. & Comm. Code Ann.  3.308(a) ....................................................................................1

Tex. Bus. & Comm. Code Ann. § 3.402(b) ...............................................................................7

Fed. R. Civ. P. 15(a)(2)...............................................................................................................20

**DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER
AND BRIEF IN SUPPORT THEREOF**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P. ("HCMFA" or the "Defendant"), the defendant in the above styled and numbered adversary proceeding (the "Adversary Proceeding") commenced by Highland Capital Management, L.P. (the "Debtor"), and files this its *Defendant's Second Motion for Leave to Amend Answer and Brief In Support Thereof* (the "Motion"), respectfully stating as follows:

## I.   SUMMARY[1]

1.      By this Motion, HCMFA requests leave to amend its answer to expressly deny that the Notes were signed.  HCMFA does not concede that this relief is required, as it has already denied that it signed the notes—Mr. Waterhouse purportedly signed them as maker.  However, the Uniform Commercial Code ("U.C.C.") appears to require a more express denial of signature.[2]

2.      This is not an ordinary note case.  The way that the Notes were signed, the fact that they did not go through "legal," the absence of evidence that anyone involved was told that the underlying transfers were loans—accounting personnel *assumed* the transfers to be loans— and the fact that the Debtor was liable to HCMFA for causing a valuation error that led to $7.4 million in liabilities, which was the purpose of the transfers; *i.e.* compensation, all demonstrates that the Notes are a mistake created by Debtor employees in good faith based on their assumptions, and not the facts.  Indeed, it is now apparent that Mr. Waterhouse did not sign the Notes or authorize his electronic signature.

---

[1]       This Motion is supported by the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer*, filed concurrently herewith, and cited to herein as HCMFA APP.

[2]       *See* TEX. BUS. & COMM. CODE ANN. 3.308(a).

3.      This case is an example of how one mistake and assumption snowballs and leads to another, which leads to another, and which leads to yet another, with a plaintiff now seeking to exploit these mistakes—its own mistakes, by the way—rather than looking at the actual facts:

Step 1.     Mr. Dondero went to Mr. Waterhouse and told Mr. Waterhouse to transfer $7.4 million to HCMFA. Mr. Dondero <u>never</u> told Mr. Waterhouse that this was a loan; just to transfer the funds. In fact, the transfers were compensation from the Debtor to HCMFA because the Debtor, through its negligence, created a $7.4 million liability of HCMFA to third parties. Mr. Dondero never told Mr. Waterhouse that the transfers were loans.

Step 2.     Mr. Waterhouse did <u>not</u> have the authority to enter into a loan of this size either for HCMFA or the Debtor. He simply told his controller to transfer the funds and put the matter out of his head.

Step 3.     That controller, pursuant to a multi-year course of conduct and many other inter-company promissory notes, asked a subordinate to paper the transfers as loans, <u>assuming</u> that they must be loans because intercompany transfers are usually booked as such and the auditors need paper notes.

Step 4.     The subordinate, who is not a lawyer, took a Word document form, years old, and populated it, instead of going through the legal department. And, instead of asking Mr. Waterhouse to sign the notes, she affixed a .jpg image of his signature to the Notes, <u>without</u> authority from him.

Step 5.     Now that there are notes in the system, and even though none of them know anything about it, accountants and auditors do what they do: they record and report the Notes, thereby breathing life into something that should never have been.

Step 6.     Complicating matters, there were prior promissory notes from HCMFA to the Debtor in the amounts of $6.3 million—similar to $7.4 million—such that persons subsequently reviewing books and records would naturally have assumed that HCMFA's books, which carried the Notes, were referring to these old notes and not something new, such that the mistake was not caught until after this litigation commenced.

## II.     <u>TIMING</u>

4.      NexPoint will first address timing issues, since the Debtor is certain, as it always does, to allege that NexPoint somehow delayed in asserting a right, conveniently ignoring that it had NexPoint's documents, that it had secured an injunction preventing Mr. Dondero from talking

to Debtor employees, and that it had instructed its key employees not to communicate with HCMFA regarding this litigation.  HCMFA APP 3-6.  The following dates are key:

(i)     April, 2021.  Mr. Sauter interviews Mr. Waterhouse, who basically informs him that, as he did not use electronic signatures in May, 2019, if a note has his signature, then he must have signed it.  *Id*. 7 (¶ 23).  HCMFA at that time has no reason to question this.  *See id*.

(ii)    May 28, 2021.  HCMFA serves a request for production on the Debtor, which includes "[a]ll Microsoft Word copies of the Notes, including Metada."  *Id*. 819.

(iii)   The Debtor does not produce the same.  *Id*. 815 (¶ 5).  As late as October 19, 2021, as HCMFA is deposing Mr. Waterhouse—the person who purportedly signed the Notes—the Debtor is still refusing to produce the original Word documents of the Notes.[3]

(iv)    October 19, 2021.  The Debtor and HCMFA depose Mr. Waterhouse, who testifies that he does not remember signing the Notes and, if he authorized someone to affix his electronic signature to the Notes (even though he was not sure this was being done in May, 2019), then there would be an e-mail from him to an administrative assistant so authorizing.  *See* Discussion, *infra*, at pp. 12-16.

(v)     October 25, 2021.  The Debtor finally produces the original of the Notes.  HCMFA APP 815 (¶ 5).  This confirms that the signature of Mr. Waterhouse is not even an electronic signature, but rather a .jpg image of his signature affixed to the Word version (not even the .pdf version) of the Notes.  *See* Discussion, *infra*, at pp. 20-21.

(vi)    October 27, 2021.  HCMFA deposes Mr. Klos and Ms. Hendrix and learns that Ms. Hendrix affixed Mr. Waterhouse's signature to the Notes, apparently assuming that this was authorized, but without actual authority to do so.  No document authorizing Ms. Hendrix to so do has been produced.  *See* Discussion, *infra*, at pp. 19-23.  *See* HCMFA APP 815 (¶ 6).

5.      Through no fault of HCMFA, it was not until the completion of these depositions that HCMFA learned that Mr. Waterhouse did not sign the Notes and that he did not authorize his

---

[3]     "John, I also asked you for the Word versions of these notes so we could look at the properties, and you have not provided them.  Are you intending to?

MR. MORRIS:  No."

HCMFA APP 198 (146:12-17).

electronic signature to the Notes. In that respect, discovery worked as it should, and HCMFA should now have the ability to amend its Answer accordingly.

### III. BACKGROUND FACTS

#### A. THE NOTES, THE ADVERSARY PROCEEDING, AND HCMFA'S DEFENSE

6. On January 22, 2021, the Plaintiff filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "Complaint"), thereby initiating this Adversary Proceeding. By the Complaint, the Debtor seeks to recover on two demand promissory notes allegedly issued by HCMFA (the "Notes") and signed by Frank Waterhouse ("Waterhouse"): (i) a note dated May 2, 2019 in the amount of $2.4 million; and (ii) a note dated May 3, 2019 in the amount of $5 million.

7. Each of the Notes, in its body, defines "maker" as HCMFA. On the signature pares, however, the Notes say:

**MAKER:**

FRANK WATERHOUSE

8. Mr. Waterhouse does not sign the Notes in any representative capacity, such as "Treasurer" or "Chief Financial Officer." (Dkt. No. 1 at exh. 1 & 2).

9. On May 22, 2021, HCMFA filed its *Defendant's Motion for Leave to Amend Answer* (Dkt. No. 32), and on July 2, 2021, the Court entered its *Order Granting Defendant's Motion to Amend* (Dkt. No. 45). Accordingly, on July 6, 2021, HCMFA filed its *Defendant's Amended Answer* (Dkt. No. 48), asserting various affirmative defenses, including that Waterhouse did not have authority to execute the Notes on behalf of HCMFA and that, therefore, HCMFA did not sign the Notes. (Dkt. No. 48 at pp. 5-7).

10.     The purpose of this prior amendment was to assert that the Notes were executed by mistake, which is also relevant to the present Motion. Pursuant to a Shared Services Agreement, HCMFA contracted with the Debtor, for pay, for the Debtor to provide various valuation services to HCMFA as it advises various funds. HCMFA APP 13-25. The Debtor made a mistake relating to a valuation issue for one of those funds, Highland Global Allocation Fund, and specifically the valuation of TerreStar. *Id*. 325-330 (273:10-278:13). This mistake led to liability at HCMFA of $7.4 million. *See id*. It is HCMFA's position that this was the Debtor's liability under the Shared Services Agreement, as the Debtor breached the standard of care and its duties as specified in the agreement. *See, e.g., id*. 18 (§ 6.01). Soon thereafter, as HCMFA needed money (both to pay the remaining portion of that liability and to pay a $5 million consent fee to the investors of a fund), Highland transferred these sums ($7.4 million) to HCMFA. *Id*. 334-35 (282:24-283:5). This was done at the direction of Mr. Dondero, who believed that it was proper for Highland to transfer these funds to compensate HCMFA for Highland's valuation error, and not as a loan from the Debtor to HCMFA.[4] HCMFA APP 334-35 (282:12-283:7).

11.     As detailed below, that is when the errors and assumptions began: The Debtor's (and HCMFA's) Chief Financial Officer, Frank Waterhouse ("Waterhouse"), perhaps assumed that, when Mr. Dondero told him to transfer the funds, it was a loan, even though Mr. Dondero never told him that it was a loan; the Debtor's controller, David Klos ("Klos"), when told to transfer the funds by Mr. Waterhouse, assumed that this was a loan and assumed that promissory notes should be prepared; and Kristin Hendrix ("Hendrix"), Mr. Klos' subordinate, prepared the Notes as instructed by Mr. Klos, and purported to electronically sign Mr. Waterhouse's name to

---

[4]     This is further evidenced because the source of the funds that the Debtor used to pay HCMFA came from funds paid into the Debtor by Mr. Dondero. Clearly Mr. Dondero knew what was going on, and clearly he intended the subsequent transfer to be compensation. Otherwise he could have just transferred funds to HCMFA directly.

the Notes. All of these individuals, in the accounting group and not the legal group, simply assumed that funds flowing from the Debtor to HCMFA must be loans, and therefore that the loans must be "papered up" for accounting and audit purposes, as had been done many, many times in the prior fifteen years.

12.     The Debtor will point out instances where HCMFA carried the Notes as liabilities on its books and records. There is evidence of that, but there is also evidence otherwise. That is not conclusive, however, or even necessarily persuasive to the jury—of course the same accounting personnel who *assumed* that the transfers were loans would then carry the resulting (mistaken) Notes on the books and records.

**B.     WATERHOUSE'S DEPOSITION AND ADMISSION OF MISTAKE**

13.     As noted, Mr. Waterhouse signed the Notes as "maker." Certainly, his signature does not indicate any representative capacity such as "treasurer" or as "CFO." In the body of the Notes, "Maker" is defined as HCMFA. Thus, there is ambiguity and, more importantly, *prima facie* liability for Mr. Waterhouse.

14.     Here, the Texas U.C.C. contemplates this potential and directly applies, providing as follows:

> (1) If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.

> (2) Subject to Subsection (c), the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity, or (ii) the represented person is not identified in the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.

TEX. BUS. & COMM. CODE ANN. § 3.402(b).   The comments to the U.C.C. explain with an

analogous situation:

> Case # 3. The name "Richard Roe" is written on the note and immediately below
> that name Doe signs "John Doe" without indicating that Doe signed as agent.
>
> In each case Doe is liable on the instrument to a holder in due course without notice
> that Doe was not intended to be liable. In none of the cases does Doe's signature
> unambiguously show that Doe was signing as agent for an identified principal. A
> holder in due course should be able to resolve any ambiguity against Doe.
>
> But the situation is different if a holder in due course is not involved. In each case
> Roe is liable on the note. Subsection (a). If the original parties to the note did not
> intend that Doe also be liable, imposing liability on Doe is a windfall to the person
> enforcing the note. Under subsection (b)(2) Doe is prima facie liable because his
> signature appears on the note and the form of the signature does not unambiguously
> refute personal liability. But Doe can escape liability by proving that the original
> parties did not intend that he be liable on the note. This is a change from former
> Section 3-403(2)(a).

U.C.C. cmt. 3.

15.     Mr. Waterhouse was asked at length about his potential personal liability on the

Notes:

> Q.   Okay.  But back then when you signed this, did it ever cross your mind that
> you were the maker on these notes?
>
> A.   No.
>
> Q.    Back then when you signed this document, did it ever cross your mind that
> you could be a co-obligor on these notes?
>
> A.   No.  I didn't receive $7.4 million, I mean...
>
> *        *        *
>
> Q.    So putting all other issues aside, if the law -- if the law says that you were
> liable for those notes because of how you signed them, then would you agree with
> me that these notes are a mistake?
>
> MR. MORRIS:  Objection to the form of the question.
>
> MS. DANDENEAU:  Objection to the form.

A.   Yes.

HCMFA APP 357-59 (305:16-307:4).

16.   Given that the law makes Mr. Waterhouse *prima facie* liable for the Notes, even though that was not his intention, the Notes are a mistake and Mr. Waterhouse admitted that they are a mistake.  More to the point however, Mr. Waterhouse testified extensively regarding whether he signed (or did not sign) the Notes.  This is important because, when HCMFA first interviewed Mr. Waterhouse regarding the Notes (once he was no longer prohibited by the Debtor from communicating with HCMFA regarding litigation matters), Mr. Waterhouse stated that, if the Notes bear his signatures, then he must have signed them as he did not use an electronic signature in May, 2019.  HCMFA APP 7 (¶ 23).  In other words, even though HCMFA had reason to believe that the Notes were a mistake, it had no reason at that time to believe that Mr. Waterhouse did not actually sign the Notes.

17.   This changed when HCMFA deposed Mr. Waterhouse on October 19, 2021.  The deposition began with Mr. Waterhouse repeatedly testifying that he did not recall signing the Notes, even though the signatures were his.  "I don't recall specifically signing this, but this is my signature."  HCMFA APP 193 (141:4-7).  In other words, as he had told HCMFA in April, 2021, given that the signature is his, he must have signed the Notes.  As detailed below, however, once Mr. Waterhouse reviewed the Notes and confirmed that they contain his electronic signatures, it became clear that he did not sign the Notes and, equally as importantly, that he did not authorize his electronic signature to the Notes.

18.   First, Mr. Waterhouse confirmed some background facts.  He confirmed that he, as the CFO for the Debtor and an officer of HCMFA, would not have had the authority on his own to cause the Debtor to lend, or HCMFA to borrow, $7.4 million [subject to objection].  Only Mr.

Dondero would have had that authority [subject to objection]. HCMFA APP 322-25 (270:18-273:9). Mr. Waterhouse admitted that, as a result of the TerreStar valuation error, shareholders in funds advised by HCMFA had damages of between $7 and $8 million. *Id*. 329-30 (277:7-278:13). Mr. Waterhouse confirmed that Mr. Dondero told him to transfer funds from the Debtor to HCMFA:

> I testified earlier, that I had a conversation with Mr. Dondero for -- for these amounts attributable to – it was either the error -- you know, the error, and in that conversation he said, go get the money from Highland.

*Id*. 334-35 (282:24-283:5).

19. Critically, Mr. Waterhouse could not remember if Mr. Dondero told him this was a loan. *Id*. 336 (284:4-6). Mr. Waterhouse did not remember if Mr. Dondero told him to have promissory notes prepared. *Id*. 336 (284:18-20). Regarding the genesis of the Notes, Mr. Waterhouse testified:

> Q. Okay. And would you have signed two promissory notes obligating HCMFA to pay Highland $7.4 million without Mr. Dondero's prior knowledge and approval?
>
> MS. DEITSCH-PEREZ: Object to the form.
>
> A. You know, from -- from what I recall around these notes, you know, I don't recall specifically Mr. -- Mr. Dondero saying to – to make this a loan. So my conversation with Mr. Dondero around the culmination of the NAV error as related to TerreStar which was a -- a – I think it was a year and a half process. I don't know, it was a multi-month process, very laborious, very difficult. When we got to the end, I had a conversation with Mr. Dondero on where to, you know, basically get the funds to reimburse the fund, and I recall him saying, get the money from Highland.
>
> Q. And so he told you to get the money from Highland; is that right?
>
> A. That is what I recall -- in my conversation with him, that is -- that is what I can recall.

HCMFA APP 196-97 (144:14-145:22). Asked if he would disagree with Mr. Dondero that Mr.

Dondero never told him to make the transfers loans, Mr. Waterhouse testified [subject to

objection]: "all I recall is he said, get the money from Highland." *Id*. 370 (318:3-10). Continuing:

> And you don't remember discussing with Mr. Dondero what the terms of those two
> promissory notes should be?
>
> A. I don't recall -- I testified all I recall is he said, get the money from Highland.
> I don't -- the -- the terms of the note, I don't recall ever having a discussion around
> the terms of the note, but since I don't draft the notes, that -- there could have been
> a conversation with other people later.

*Id*. 371 (319:7-16).

20.     When asked whether it was possible that, "when Mr. Dondero told you to transfer

the funds from Highland, you just assumed on your own that those would be loans without him

actually telling you that those would be loans," Mr. Waterhouse testified [subject to objection] that

"I don't know." HCMFA APP 339 (287:4-13). Asked again whether, seeing $7.4 million being

transferred out of the Debtor, whether it is possible that he assumed this to be a loan, Mr.

Waterhouse answered [subject to objection]:

> I don't know. As I testified earlier, I had conversations with Mr. Dondero about -
> - about the -- the -- the moneys that were needed for the NAV error. And I recall
> him saying go get it from Highland -- or get it from Highland.

*Id*. 340-41 (288:19-289:8). In fact, Mr. Waterhouse confirmed that it was on his "initiative" to

have the Notes drafted [subject to objection]. *Id*. 342 (290:4-16). And, Mr. Waterhouse believed

that the legal team would be involved with drafting the notes. *Id*. 342 (290:15-16).

21.     Mr. Waterhouse did not recall if the Notes were presented to him on paper form to

sign. *Id*. 344-45 (292:14-293:17). Mr. Waterhouse testified:

> I signed very few documents via email. I can't say that it never happened, but
> people either stopped by my office and physically walked in documents for
> signature that we discussed face-to-face.

*Id*. 345-46 (293:25-294:5). And, before signing documents, Mr. Waterhouse would usually have the legal department or the compliance department sign off on the document. *Id*. 346-348 (294:16-296:7). When asked again if he remembered signing the Notes, Mr. Waterhouse testified [subject to objection]:

> They would -- they would have been presented physically on paper most likely or someone would have left it. But, I mean, again, I don't -- I don't recall."

*Id*. 348 (296:8-18). And, Mr. Waterhouse confirmed that, back then, he used an "ink pen" to sign documents, as he told HCMFA in April, 2019. *Id*. 348 (296:19-25).

22. When presented with the Notes and asked whether he believed that he ink-signed them, Mr. Waterhouse answered:

> These -- these -- these signatures are identical, now that I stare at them, and I mean, they are so close -- I mean, they're identical that, I mean, even with my chicken scratch signature, I don't know if I can -- you know, I do this 100 times, could I do that as -- as precisely as I see between the two notes.

*Id*. 350 (298:2-17). Pressed further regarding whether he "actually signed either or both notes":

> Is -- I don't -- I don't recall specifically. As I said before, my assistant did have a -- an electronic signature, and that was used from time to time. It wasn't as common practice back in 2019. It definitely was more common practice when we had to work from home and remotely for COVID because it that made it almost impossible to, right, provide wet signatures since we're all working from home remotely.
>
> Q. Well, going just for these two promissory notes, Mr. Waterhouse, in light of your inability to remember any details, are you sure you actually signed either or both of those notes?
>
> MS. DANDENEAU: Objection to form.
>
> A. I don't recall specifically signing -- actually physically signing these notes. As I said before, I don't recall doing that. This -- this looks like my signature, but yet these two signatures are identical.
>
> Q. So you don't recall physically signing them, and I take it you don't recall electronically signing them either?

A. I don't recall. You know, Highland has all my emails. If that occurred, you know, you know, I don't have any of these records is what I'm saying. I don' t have any of those records.

*Id.* 350-52 (298:300:4).

23. Regarding the possibility that Mr. Waterhouse electronically signed the Notes, as rare as that may have been in May, 2019, Mr. Waterhouse testified as follows:

And help me here. I'm not very technologically astute. When you -- and I – I recognize that you do it rarely, but when you sign a document electronically, do you believe that there is an electronic record of you having authorized or signed a document electronically?

MR. MORRIS: Objection to the form of the question.

I -- I don't know the tech answer to that, but, you know, since I don't have – I don't ever attach my signature block electronically, my assistant would have done that, and if that is done over email like we did several times -- you know, multiple, multiple times over COVID, she would attach my signature block and then email it out to whatever party.

Q.  What was your assistant's name in May 2019?

A.  It was Naomi Chisum.

Q.  Is she the only one? I'm sorry, was she your only assistant that would have maybe facilitated logistically something like you just described?

A.  You know, she was out on maternity leave at some point. I don't -- I don't recall those dates where she was out for maternity leave. There was -- there were folks backing her up. I don't recall specifically who those -- who those, you know, administrative assistants were, and I don't recall specifically if she was out during this time on maternity leave.

*Id.* 372-73 (320:11-321:20).

24. Aside from providing valuable testimony regarding the genesis of the Notes, for purposes of the present Motion Mr. Waterhouse testified: (i) that he does not remember signing the Notes in person or electronically; (ii) he rarely signed documents in May, 2019 electronically; (iii) he would have expected that documents he signed were approved by the legal department; (iv) the Notes strongly appear to be signed electronically; and (v) if signed electronically, he would

have sent an e-mail authorizing the same. Interestingly, he also testified that it would have been his "assistant" to sign his name electronically; not Ms. Hendrix, a mid-level manager and not an "administrative" assistant.

25.    No such e-mail authorizing Mr. Waterhouse's electronic signature has been produced by the Debtor. HCMFA APP 815 (¶ 6).

**C.    MR. KLOS' DEPOSITION AND CREATION OF THE NOTES**

26.    HCMFA deposed Mr. Klos on October 27, 2021. In May, 2021, Mr. Klos was the controller for the Debtor. HCMFA APP 661 (8:11-13). It is Mr. Klos who directed Ms. Hendrix to prepare the Notes. *Id*. 721 (68:4-13). Mr. Klos discussed how funds would be transferred from one affiliated entity to another as needed for liquidity:

> And you joined Highland in 2009. From that point in time, 2009, through 2019, was there any practice at the enterprise of those businesses to transfer funds between each other on a basis of when one needed it and one had it?
>
> A. Yes, that was a fairly, generally speaking, that was a fairly common practice, of using different entities within the overall structure to bridge liquidity.

*Id*. 682-83 (29:24-30:7). Klos also testified as to the standard practice that, where the Debtor was transferring funds out, the transfer would be booked as a loan:

> So over the general -- talking about generally now, over those 10 years when there were these intercompany transfers for liquidity purposes, how were they booked by the debtor, by Highland Capital Management?
>
> MR. MORRIS: Objection to the form of the question.
>
> THE WITNESS: Help me on the direction. So this is money that Highland is receiving or money that Highland is sending?
>
> Q. (BY MR. RUKAVINA) Sending out.
>
> A. Sending out. So this is -- in the scenario that you're describing, this money that Highland is sending out to meet some other corporate obligor's liquidity needs?
>
> Q. Yes, sir.

A. So those would be booked as a loan. I would -- I need to hedge a little bit because I'm not a hundred percent certain, but I would say if not exclusively via loans close to exclusively.

Q. And would they -- strike that. Would they usually be papered up with a promissory note?

A. Yes.

Q. Now, why was that the general course during 10 years? Was there a policy and procedure in place, or would Dondero say book it as a loan, or was that just the right thing to do from an accounting perspective?

MR. MORRIS: Objection to the form of the question.

THE WITNESS: At the end of the day it's at the direction of Jim Dondero, so I can't tell you exactly why he wanted it to be done that way. But that was certainly the practice of how it was done in those situations.

*Id*. 685-87 (32:20-34:5).

27.     Thus Mr. Klos believed that the underlying transfers were loans, in part because he

believed that Mr. Waterhouse would have told him that (but could not recall for certain), and in

part because of past practice. *Id*. 722-23 (69:1-70:14). Mr. Klos described the usual course at the

Debtor with respect to papering intercompany loans:

Q. (BY MR. RUKAVINA) So going back to this Exhibit 3, sir, why did you ask Kristin, can you or Hayley please prep a note for execution? Why them? Remember, I was asking about what the course or procedure was at that point in time.

A. Yeah, so nomenclature, procedure, process. I would say the informal process for these types of loans, they were frequent in nature, would be for someone on the corporate accounting team to prepare a note and have it executed.

Q. Okay. That was the standard course back then?

A. Again, I don't know what standard course means. That was fairly typical.

Q. Why would you not have asked someone in the Highland legal department to prepare a note?

A. Because this was a legally reviewed document as far as the form of the agreement. It's a one-page, two-paragraph form that had been used for a long time.

So the only thing that would change with respect to these notes would be the date, the amount, likely the rate. I can't think of anything else offhand that would have changed from note to note.

Q. After you asked Ms. Hendrix to prepare this note, did you have any further role with respect to the papering, preparation, or execution of that note?

A. Not that I can remember.

Q. Would you have had any role in having either or both of the notes actually signed electronically or by ink by Mr. Waterhouse?

A. Likely not, no.

*Id*. 736-37 (83:19-84:24).

28.      The point is simple: when professional accountants at the Debtor saw funds flowing from the Debtor to an affiliate, such as HCMFA, they *assumed* that the funds were a loan and papered it as such, as this is how it had been done for many years on many occasions.

## D.      MS. HENDRIX'S DEPOSITION AND LACK OF AUTHORITY TO SIGN THE NOTES

29.      HCMFA deposed Ms. Hendrix on October 27, 2021.  In May, 2019, Ms. Hendrix was the senior accounting manager at the Debtor.  HCMFA APP 461 (12:4-16).  At that time, she reported to Mr. Klos, who reported to Mr. Waterhouse.  *Id*. 461-62 (12:25-13:9).  While Ms. Hendrix never drafted a promissory note from scratch, in May, 2019, part of her job was taking a form note and revising it.  *Id*. 466 (17:5-11).  At that time, it was the corporate accounting group at the Debtor, not the legal group, that was responsible for updating draft promissory notes so as to create new ones.  *Id*. 466 (17:20-25).  As Ms. Hendrix testified:

Our typical practice is if we have a loan with certain affiliates that it's a demand note. We have a template that we have used for years that was created by either our internal legal team or an outside law firm, I'm not sure which. The typical practice is always updating a few things on that template, getting it executed, and filing it in our audit folders.

*Id.* 467 (18:18-25). The corporate accounting group, not the legal group, did this "updating." *Id.* 468-69 (19:1-13; 20:1-5). And Ms. Hendrix confirmed the general purpose of the intercompany notes:

> Typically anytime specifically Jim Dondero would need to move money between related parties, he would pay down -- when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.

*Id.* 470 (21:10-16). Stated differently, at that time "it's all one big happy family, and whoever needed cash, the cash moved around." *Id.* 472 (23:3-6).

30.   In May, 2019, Mr. Klos sent one or two e-mails to Ms. Hendrix—emails on which Mr. Waterhouse but not Mr. Dondero or the legal department were copied—informing her that there were new intercompany loans and asking her to prepare notes for execution. *Id.* 481-82 (32:13-33:4). This instruction comported with the general practice:

> So is it fair to say that typically, obviously not every time, but typically your corporate accounting group when it would see intercompany transfers in large amounts would believe that they were loans?
>
> MR. MORRIS: Objection to the form of the question.
>
> THE WITNESS: Typically they were loans. There's not really another way to get money from one entity to another. And if they were papered as a loan, that means we were told to set it up that way.

*Id.* 484 (35:5-15). That is "how it was for 14 or 15 years." *Id.* 485 (36:7-9).

31.   Ms. Hendrix confirmed that the $2.4 million Note was "related to a TerreStar NAV error" and the $5 million Note was for the "consent fee." *Id.* 487-88 (38:17-39:5). Ms. Hendrix was never "told to [her] directly" that the funds were a loan, but she [subject to objection] "assum[ed] that based on many instances of intercompany transfers in the 14 years prior." *Id.* 489 (40:20-25).

32.     Ms. Hendrix confirmed that she prepared the Notes from Word documents originally created by outside counsel.  *Id*. 491 (42:15-43:20).  However, Ms. Hendrix had no memory of papering the Notes.  *Id*. 494 (45:21-46:1).  It would have been her practice to not consult the legal group in preparing the Notes.  *Id*. 495 (46:12-24).  Ms. Hendrix confirmed that, to sign Mr. Waterhouse's name to the Notes, she used an electronic picture of his signature, which she then affixed to the Word documents, the same as the undersigned counsel does below:



33.     On the question of whether Mr. Waterhouse authorized Ms. Hendrix to affix his signature to the Notes, Ms. Hendrix testified "I don't have exact specific memory."  *Id*. 497 (48:10-15).  Again, she appears to have assumed that Mr. Waterhouse must have approved the Notes and, therefore, her using his signature:

> He was fine with using his e-signature, and what is on these documents was that exact e-signature.

*     *     *

> But he would have had to approve this loan in the dollar amount, the day. He would have been the one directing us to create these loans.  In past practice he has always approved using his e-signature to execute documents.

*Id*. 497(48:4-18).  When pressed about *how* Mr. Waterhouse would have authorized his electronic signature to be used, Ms. Hendrix testified as follows [subject to objection]:

> I would assume that, as I've stated previously, these directions were coming directly from him to paper a loan.  These changes that are made are only to the dollar amount.  Interest rate is pulled right off the IRS website.  That is his approval to paper a loan and in fact execute or approve the loan.

*Id*. 497-98 (48:24-49:5).

34.     Then, when asked [subject to objection] "after his e-signature was used either on these notes or other documents in May of 2019, would you have brought the documents back to him for any kind of verification," Ms. Hendrix testified:

> Probably not.  These are all very standard.  We've papered hundreds of loans.  So I think he trusted that we can handle updating a date and a dollar amount on these loan templates.

*Id*. 499 (50:1-9).

35.     Ms. Hendrix also testified [subject to objection], differently from Mr. Waterhouse, that "[p]robably at this time, 99 percent of the stuff my team got his signature on was his e-signature." *Id*. 498 (49:12-16).  And, the following exchange is significant:

> Q. (BY MR. RUKAVINA) Do you know or believe, or your recent review of documents, did it reveal an email from Mr. Waterhouse to you specifically authorizing his e-signature on Exhibits 4 and/or 5?
>
> A. Not that I recall seeing, no.
>
> Q. Sitting here today, do you have any memory of Mr. Waterhouse orally or otherwise specifically authorizing you to affix his e-signature to Exhibits 4 and/or 5?
>
> A. Specifically on these loans, no, I don't recall those conversations.  But, again, our practice has always been we have this discussion, he's under the understanding that we're going to paper the loans, he's always comfortable with using his e-signature.  This is not something me or my team would have done without that authority and approval from him.

*Id*. 499 (50:15-25).

36.     And, there is no evidence that Ms. Hendrix ever showed the Notes to Waterhouse after preparing them:

> Q. Sitting here today, do you have any memory of giving Mr. Waterhouse these two promissory notes after they were prepared?
>
> A. I specifically don't remember walking into his office and providing it to him, but he could have found it on our shared drive if he wanted to.

Q. Do you have any memory or in your recent review of documents did you see any email to the effect of you sending either or both of these promissory notes to Mr. Waterhouse after they were papered up?

A. I don't have any specific recollection, again, but he had access to look at them.

Q. On the shared drive?

A. Yes.

*Id*. 503 (54:4-17). Scanning in the Notes and then saving them to the system, is hardly a substitute for showing or giving them to the man who is personally liable on them to the tune of $7.4 million.

37.     Ms. Hendrix *assumed* that the transfers were loans and *assumed* that Mr. Waterhouse authorized her to affix his signature to the Notes because she *assumed* that he approved of the Notes. But her testimony directly conflicts with his: whereas he testified that he rarely used electronic signatures in May, 2019, and would have had to send an e-mail authorizing the same, and would have expected that the legal department would approve a note prior to his signature, she testified that he routinely did this at that time pursuant to some generalized authority and that the accounting department routinely papered notes.

38.     The fact remains that, notwithstanding her good faith, Ms. Hendrix created erroneous notes (as they appear to make Mr. Waterhouse the "maker" and to make him jointly and severally liable), and she was not authorized—at least there is no evidence that she was authorized—to affix images of Mr. Waterhouse's signature to the Notes or, if there was some generalized authority that she believed Mr. Waterhouse gave her, then the condition precedent— that the legal department approve the Notes—was not satisfied.

## IV.     ARGUMENTS AND AUTHORITIES

39.     This Motion is necessarily driven by the facts; hence the lengthy discussion of recent discovery proceedings above. From those facts, the following sequence emerges:

(i)     Mr. Dondero told Mr. Waterhouse to transfer the fuds, and Mr. Waterhouse does not recall Mr. Dondero telling him that this was a loan, perhaps assuming this to be the case.

(ii)    Mr. Waterhouse told Mr. Klos to process the transfers, and perhaps he also told him that the funds are a loan. Either way, pursuant to standard practice, Mr. Klos believed that the funds were a loan and instructed others to paper up the Notes, without any instruction from Mr. Dondero that the transfers were a loan.

(iii)   Ms. Hendrix then, again pursuant to standard practice, took an old form for a note and populated it with new details and created the Notes.

(iv)    Mr. Waterhouse did not sign the Notes. Instead, Ms. Hendrix affixed pictures of his signature on the Notes. She did not then provide the Notes to him.

(v)     There is no evidence that Mr. Waterhouse authorized Ms. Hendrix to do so. Neither Mr. Waterhouse nor Ms. Hendrix remembers any such express authorization. Moreover, Mr. Waterhouse confirmed that, if he authorized an electronic signature, he would have e-mailed such authority to his administrative assistant. Ms. Hendrix was not his administrative assistant. And, Mr. Waterhouse confirmed that he would only sign a note if the legal department approved the note, which did not occur here.

40.     HCMFA therefore submits that Ms. Hendrix, in good faith and acting pursuant to an established course and pattern, was not authorized to affix Mr. Waterhouse's signature to the Notes. Instead, she *assumed* that, as Mr. Waterhouse had authorized the Notes, she was authorized to sign them for him. And, despite Mr. Waterhouse's expectations, none of this went through the legal department. Hence the result, where Mr. Waterhouse signed as "maker" and is *prima facie* jointly liable, something that he confirmed was a mistake. But it is the same note—if that is a mistake, then so is the whole note.

41.     Importantly, the Scheduling Order does not provide for a deadline to seek leave to amend the operative pleadings. *See* Docket No. 67. This means that, unlike the heightened "good cause" standard under Rule 16, the more lenient standard of Rule 15 applies to this Motion. That rule provides that "[t]he court should freely give [leave] when justice so requires." FED. R. CIV. P. 15(a)(2). The Court must "possess a 'substantial reason' to deny a request for leave to amend." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004). The Fifth Circuit has outlined five

"considerations" guiding the Rule 15 inquiry: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Id.*

42.     There has been no undue delay.  As discussed above and evidenced with the Appendix, HCMFA did not know that Mr. Waterhouse did not sign the Notes until his deposition, as he had previously told HCMFA that he assumed he must have signed the Notes since the Notes bear his signature.  It is the Debtor who delayed in producing the original Notes, requested in May, 2021, until late October, 2021, going so far as to even say that it would not produce the originals on October 19, 2021 (a decision which, to its credit, it subsequently reversed).  Had the Debtor produced the originals in May or June, as requested, it would have been obvious that the signatures were electronic signatures, and perhaps HCMFA would have reasonably questioned any authority to sign, but this did not happen due to the Debtor' delay.  And, it was not until HCMFA deposed Mr. Waterhouse, Ms. Hendrix, and Mr. Klos that the facts were learned.  There is nothing that HCMFA could have done to expedite this process.  On the contrary, discovery worked as it should have.

43.     There is no bad faith or dilatory motive.  All of HCMFA's defenses are made in good faith and are supported by the evidence.  That evidence may be subject to dispute and to contradictory evidence, but then that is the point of a trial.  Certainly, there is enough testimony and evidence to support the defense that Mr. Waterhouse did not sign the Notes or authorize their signing.  Nor is HCMFA trying to "weasel" its way out of a debt: the Debtor, through its negligence, caused a $7.4 million liability to HCMFA.  It was just and proper for the Debtor to compensate HCMFA, which it did.  None of this is "invented" after the fact or presented in bad faith.

44.     There are no repeated failures to cure deficiencies.  True, this is the second motion to amend the answer.  But, the first motion was necessitated by the simple fact that HCMFA did not have access to its books and records (then still under the control of the Debtor), and the Debtor had prohibited its employees, including Mr. Waterhouse, from discussing litigation matters with HCMFA.  In many ways, that first motion should not have to count against HCMFA.  Either way, for the same reasons as discussed above with respect to timing, HCMFA did not know and could not have known about this defense until the end of October, 2021, meaning that there was no prior "deficiency" to now cure.

45.     There is no undue prejudice to the Debtor.  Trial is not set.  All of the people with knowledge of the Notes have been deposed, and if the Debtor needs additional discovery, then it can readily take it.  The Debtor certainly believes that it already has strong arguments as to why HCMFA's defenses have no merit, as it will no doubt present in opposition to this Motion.  And, as the Debtor has had possession of the originals of the Notes all of this time, and as Ms. Hendrix and Mr. Klox are still the Debtor's employees, as was Mr. Waterhouse through February, 2021, none of what is stated in this Motion should come as a surprise to the Debtor, as much as the Debtor may disagree with HCMFA's position and arguments.

46.     Finally, the amendment is not futile.  Texas law provides for a recognized defense when a promissory note is not signed.  *See* TEX. BUS. & COMM. CODE ANN. § 3.401(a).

47.      Mr. Waterhouse, Mr. Klos, and Ms. Hendrix have each given testimony that raises serious doubt regarding whether Mr. Waterhouse actually signed the Notes or authorized his electronic signature—something that the Court cannot adjudicate at this stage.  The Debtor will have every opportunity to argue at trial why the defense is wrong, and it will have every opportunity to present its evidence.

48. Accordingly, as no substantial reason exists to deny the amendment, and the interests of justice support freely granting leave, the Court should grant leave to the Defendant to amend its Answer.

## V. **PRAYER**

WHEREFORE, PREMISES CONSIDERED, HCMFA respectfully requests that the Court enter an order: (i) granting this Motion; (ii) granting HCMFA leave to file the Amended Answer attached hereto as Exhibit "A"; and (iii) granting HCMFA such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 30th day of November, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
      Davor Rukavina, Esq.
      Texas Bar No. 24030781
      Julian P. Vasek, Esq.
      Texas Bar No. 24070790
      3800 Ross Tower
      500 N. Akard Street
      Dallas, Texas 75201-6659
      Telephone: (214) 855-7500
      Facsimile: (214) 855-7584
      Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## **CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that he discussed the relief requested herein with John Morris, Esq., counsel of record for the Debtor, who informed the undersigned that the Debtor opposes said relief.

/s/ Davor Rukavina
Davor Rukavina

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 30th day of November, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record.

/s/ Davor Rukavina
Davor Rukavina