1    IN THE UNITED STATES BANKRUPTCY COURT
2      FOR THE NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
4                 --o0o--
5

6  HIGHLAND CAPITAL MANAGEMENT,      )
   L.P.,                            )
7                                   )
              Plaintiff,            )
8                                   )
         vs.                        ) No. 21-03004-sgj
9                                   )
   HIGHLAND CAPITAL MANAGEMENT FUND )
10 ADVISORS, L.P.,                  )
                                    )
11            Defendants.           )
12  _____

13             DEPOSITION OF
14             KRISTIN HENDRIX
15             October 27, 2021
16  _____

17

18         DEPOSITION OF KRISTIN HENDRIX, produced as a
19  witness, duly sworn by me via videoconference at the
20  instance of the DEFENDANTS, was taken in the
21  above-styled and numbered cause on October 27, 2021,
22  from 10:11 A.M. to 1:19 P.M., before BRANDON D. COMBS,
23  CSR, RPR, in and for the State of Texas, reported by
24  computerized machine shorthand, at 500 North Akard
25  Street, 38th Floor, Dallas, Texas.

Kristin Hendrix - October 27, 2021

1                         APPEARANCES

2

3          MUNSCH, HARDT, KOPF & HARR, PC, 500 North

4   Akard Street, Suite 3800, Dallas, TX 75201, represented

5   by DAVOR RUKAVINA, Attorney at Law, appeared as counsel

6   on behalf of the Defendants.

7          Email: drukavina@munsch.com

8

9

10         PACHULSKI, STANG, ZIEHL & JONES, 780 Third

11  Avenue, 34th Floor, New York, NY 10017-2024, represented

12  by JOHN A. MORRIS, Attorney at Law, appeared as counsel

13  on behalf of the Plaintiff.

14         Email: jmorris@pszjlaw.com

15

16

17         STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,

18  Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney

19  at Law, appeared via videoconference as counsel on

20  behalf of the Defendants Jim Dondero, HCMS and HCRE

21  Partners.

22         Email: michael.aigen@stinson.com

23

24

25

Kristin Hendrix - October 27, 2021

1                         INDEX

2                                          PAGE

3      Examination by MR. RUKAVINA             6

4      Examination by MR. AIGEN               94

5      Further Examination by MR. RUKAVINA   110

6      Examination by MR. MORRIS             111

7

8  EXHIBITS                                  PAGE

9

10  Exhibit 1    Promissory Note, 5M, May 3      30

11

12  Exhibit 2    Promissory Note, 2.4M, May 2    30

13

14  Exhibit 3    Email from David Klos, May 2, 2019,   31
15               HCMLP to HCMFA loan

16

17  Exhibit 4    Promissory Note, 5M, May 3      42

18

19  Exhibit 5    Promissory Note, 2.4M, May 2    42

20

21  Exhibit 6    Promissory Note, 5M, May 3      43

22

23  Exhibit 7    Promissory Note, 2.4M, May 2    43

24

25  Exhibit 8    Info, HCMF loan 05.03.2019      56

Kristin Hendrix - October 27, 2021

| 1 | Exhibit 9 | Info, HCMF loan 05.02.2019 | 56 |
| 2 | | | |
| 3 | Exhibit 10 | Email from Scott Ellington, Dec 2, | 59 |
| 4 | | 2020, HCM - HCMFA financial | |
| 5 | | statements | |
| 6 | | | |
| 7 | Exhibit 11 | Email from John Morris to | 62 |
| 8 | | James Seery, Jan 6, 2021, | |
| 9 | | HCM information request | |
| 10 | | | |
| 11 | Exhibit 12 | Letter, Dec 3, 2020, Demand on | 65 |
| 12 | | Promissory Notes | |
| 13 | | | |
| 14 | Exhibit 13 | Promissory Note, $30,746,812.33, | 72 |
| 15 | | May 31 | |
| 16 | | | |
| 17 | Exhibit 14 | NPA $30.7M | 76 |
| 18 | | | |
| 19 | Exhibit 15 | HCMLP Notes Receivable | 83 |
| 20 | | | |
| 21 | Exhibit 16 | Email from Frank Waterhouse to | 85 |
| 22 | | Lauren Thedford, Oct 6, 2020, 15(c) | |
| 23 | | follow-up | |
| 24 | | | |
| 25 | | | |

Kristin Hendrix - October 27, 2021

| | | |
|---|---|---|
| 1 | **Exhibit 17    Email from James Seery to** | **88** |
| 2 | **James Dondero, Jan 7, 2021, demand** | |
| 3 | **on promissory note** | |
| 4 | | |
| 5 | **Exhibit 18    Email from Kristin Hendrix, Jan 12,** | **90** |
| 6 | **2021, NexPoint Note to HCMLP** | |

1              KRISTIN HENDRIX,

2     having been first duly sworn, testified as follows:

3                    EXAMINATION

4         Q.    (BY MR. RUKAVINA)  Good morning.  If you'll

5     state your name.

6         A.    Kristin Hendrix.

7         Q.    We're doing this both ways.  You're on the

8     Zoom remotely and they can see you, but I would ask

9     that you and I maintain eye contact.  Of course, if

10    someone is asking you on the Zoom, then maintain

11    contact with them, if that's okay with you.

12        A.    Sure.

13        Q.    Have you been deposed before?

14        A.    No.

15        Q.    So I'm sure your counsel explained to you,

16    but very quickly, you understand that you're testifying

17    under oath and penalty of perjury as though you were in

18    a court of law?

19        A.    Yes.

20        Q.    And you understand my job is to ask clear

21    questions that you understand?

22        A.    Yes.

23        Q.    And if for whatever reason you don't

24    understand my questions, please let me know or ask me

25    to rephrase; otherwise, I'm going to assume that you

Kristin Hendrix - October 27, 2021

1  understood my question; okay?

2      A.    Yeah.

3           MR. MORRIS:   Objection.

4      Q.    (BY MR. RUKAVINA)  Sometimes Counsel will

5  make objections.  Unless he instructs you not to

6  answer, you're still required to answer my questions.

7      A.    Okay.

8      Q.    Now, in preparation for this deposition, did

9  you read the deposition transcript or any part of it of

10  Frank Waterhouse?

11      A.    I did not.

12      Q.    Did anyone provide you a synopsis or summary

13  of it?

14      A.    Maybe a few bits and pieces, but...

15           MR. RUKAVINA:   Off the record for a second.

16           (Off the record.)

17      Q.    (BY MR. RUKAVINA)  What do you mean bits and

18  pieces?

19      A.    I don't recall anything specific that was

20  said, other than it was very long.

21      Q.    Did you talk to Frank Waterhouse about it?

22      A.    Did not.

23      Q.    Other than Highland's legal counsel, did you

24  talk to anyone else about -- or -- strike that.

25           Other than Highland's legal counsel, did you

Kristin Hendrix - October 27, 2021

1  talk to anyone about Frank Waterhouse's deposition from
2  last week?
3       A.   I did not.
4       Q.   Did you review -- strike that.
5            Did you see any of the video of
6  Mr. Waterhouse's deposition?
7       A.   Nope.
8       Q.   Same questions now for Mr. Seery, S-e-e-r-y.
9            Did you read any portion or the whole of
10 Mr. Seery's deposition from last week?
11      A.   I did not.
12      Q.   See any of the video?
13      A.   No.
14      Q.   Did you see any synopsis or summary of his
15 deposition?
16      A.   No.
17      Q.   Did you talk to him about his deposition?
18      A.   I did not.
19      Q.   Other than talking to Highland's counsel, did
20 you talk to anyone about Mr. Seery's deposition?
21      A.   No.
22      Q.   Other than talking to Highland's counsel, did
23 you talk to anyone about your deposition today?
24      A.   Just John Morris and Dave Klos.
25      Q.   When did you talk to Mr. Klos, K-l-o-s?

Kristin Hendrix - October 27, 2021

1    A.    First time about this was last Friday.  And
2  then again Monday this week.  And yesterday.  And this
3  morning.
4    Q.    Friday was there any lawyer present during
5  your discussion with Mr. Klos?
6    A.    Yes, every time Mr. Morris was present.
7        MR. RUKAVINA:  Is it your position that those
8  four discussions would be privileged, Counsel?
9        MR. MORRIS:  Yes.
10        MR. RUKAVINA:  Then we'll move on.
11    Q.    (BY MR. RUKAVINA)  So we've established the
12  four times you talked to Mr. Klos with counsel present.
13  Did you do anything else related to or in preparation
14  for today's deposition?
15    A.    Yes, probably went through and reviewed some
16  emails, documentation that I may have had that I need
17  to refresh memory on.
18    Q.    These documents and emails that you might
19  have reviewed, did you supplementally provide them to
20  counsel or anyone else?
21    A.    Yes.
22    Q.    This would have been in the last week or
23  10 days?
24    A.    Yes.
25    Q.    Prior to the last week or 10 days, are you

Kristin Hendrix - October 27, 2021

1  aware that my office served requests for production on
2  Highland?
3      A.   Yes.
4      Q.   And did you do anything prior to the last
5  week or 10 days to try to search both your personal
6  records and corporate records for any responsive
7  documents?
8      A.   Not that I recall.
9      Q.   Is that something that you understand legal
10 counsel was charged with?
11     A.   Yes.
12     Q.   Let's go briefly now about your background,
13 please.
14          Where do you live?
15     A.   I live in Denton, Texas.
16     Q.   And what is your date of birth, please?
17     A.   January 26, 1982.
18     Q.   And walk me through your educational
19 background, starting with any postsecondary, if any,
20 schooling or college or anything like that.
21     A.   Sure.  Graduated in 2004 from the University
22 of North Texas with a degree in finance.  Went on to
23 get my MBA from SMU in 2009.  And then went further and
24 got my CPA license I believe in 2015.
25     Q.   In the state of Texas?

Kristin Hendrix - October 27, 2021

1      A.    Yes.

2      Q.    And has your CPA license been current since

3  then?

4      A.    Sure has.

5      Q.    Have you faced any kind of disciplinary

6  action as a CPA?

7      A.    I have not.

8      Q.    Now, please walk me through your work

9  history.  Let's say starting with after you graduated

10 college.

11     A.    Sure.  December of 2005, which was shortly --

12 sorry, 2004, shortly after I graduated from

13 North Texas, I started at Highland.  It was my first

14 real job out of college.  I have been there ever since,

15 almost 17 years now.

16          Have worked in the corporate accounting

17 department the entire time.  Started off as the AP

18 associate, and worked my way up over the years and

19 currently am the controller.

20     Q.    So even when you were getting your MBA and

21 CPA you were employed by Highland?

22     A.    Yes.

23     Q.    Impressive.  You're the controller today you

24 mentioned?

25     A.    Yes.

Kristin Hendrix - October 27, 2021

1     Q.   That's -- when did you become the controller,
2  sometime February or March of this year?
3     A.   Yes.
4     Q.   Before you became the controller, what was
5  your role at Highland?
6     A.   Right before that I was assistant controller.
7  That was I believe April of 2020.  Before that, the
8  senior accounting manager, and I held that position for
9  years.
10    Q.   So in May of 2019 would you have been the
11 senior -- you said senior account?
12    A.   Senior accounting manager I believe was my
13 title.
14    Q.   And would that have been your title in May of
15 2017?
16    A.   Yes, I believe so.
17    Q.   And let's focus now on May 2019 as the senior
18 accounting manager.  How would you describe your role
19 at Highland in May of 2019?  What were your duties?
20    A.   Sure.  I helped with treasury management
21 function, cash forecasts and things like that.  And
22 oversaw the financial reporting from the last batch of
23 AP to all the way to financials and reporting on
24 audits.
25    Q.   Who did you report to in May of 2019?

Kristin Hendrix - October 27, 2021

1       A.   David Klos.

2       Q.   What was Mr. Klos' title to your

3  understanding back then?

4       A.   I believe he was the controller.

5       Q.   And do you have an understanding as to who

6  Mr. Klos reported to back then?

7       A.   Yes, Frank Waterhouse.

8       Q.   Frank Waterhouse.  Who was he in May of 2019?

9       A.   The CFO.

10      Q.   Is Mr. Klos still with Highland today?

11      A.   He is.

12      Q.   What is his role now?

13      A.   He's now CFO.

14      Q.   You mentioned treasury management as of 2019,

15  May.  What do you mean by treasury management?  What is

16  that?

17      A.   Generally speaking, we -- it's not just me as

18  one person.  We have checks and balances.

19           My team would be in charge of sending out

20  payments, reconciling bank statements, making sure

21  money is in the right accounts, creating cash forecasts

22  and reporting on those every week with the CFO and

23  oftentimes the CEO.

24           Generally that's everything that fell under

25  the umbrella.

Kristin Hendrix - October 27, 2021

1     Q.   And would your description of treasury
2  management be the same for the December 2020 period?
3     A.   Yes.
4     Q.   Who at Highland or which group at Highland in
5  December of 2020 would have been responsible for noting
6  that there are certain bills that need to be paid in
7  the near or subsequent future.
8          By way of, let's say, accounts payable or
9  promissory notes or taxes or anything like that?
10    A.   Can you repeat your question.
11    Q.   Sure.  So obviously, Highland was a pretty
12  sophisticated business; correct?
13    A.   Yeah.
14         MR. MORRIS:  Objection to the form.
15    Q.   (BY MR. RUKAVINA)  And had various accounts
16  payable; right?
17    A.   Yes.
18    Q.   And it had maybe, let's just say, certain
19  note obligations that it had to pay from time to time;
20  correct?
21         MR. MORRIS:  Objection to the form of the
22  question.  Do you mean Highland Capital?
23         MR. RUKAVINA:  I mean Highland Capital
24  Management; correct, I'm sorry.  The debtor.
25    Q.   (BY MR. RUKAVINA)  Can we say the debtor?

Kristin Hendrix - October 27, 2021

1    A.   Yes, you can say the debtor.

2    Q.   So when I say the debtor and you say the

3 debtor we understand each other to mean Highland

4 Capital Management, comma, LP; correct?

5    A.   Correct.

6    Q.   I apologize.  In the December 2020 period, I

7 would imagine that the debtor had its own -- that

8 was -- strike that.

9         We'll cut to the chase.

10         In December of 2020, the debtor was providing

11 services to various other entities affiliated with

12 Mr. Dondero; correct?

13    A.   Correct.

14    Q.   That would have included NexPoint Advisors,

15 LP?

16    A.   Correct.

17    Q.   And you're aware that NexPoint Advisors was

18 the obligor on at least one promissory note to the

19 debtor; correct?

20    A.   Correct.

21    Q.   And did the debtor in December 2020 provide

22 so-called treasury management services to NexPoint

23 Advisors?

24         MR. MORRIS:  Objection to the form of the

25 question.

Kristin Hendrix - October 27, 2021

1           THE WITNESS:  Yes.

2      Q.   (BY MR. RUKAVINA)  As part of that, in

3  December 2020, would it have been employees of the

4  debtor that would have scheduled for potential payment,

5  subject to approval by NexPoint, NexPoint's future

6  obligations as they were coming due?

7      A.   Yes, we would have scheduled, only with

8  approval.

9      Q.   And would that have included NexPoint's

10 obligations on the promissory note to Highland?

11     A.   Yes.

12     Q.   Back to your background briefly.

13          Do you have any legal training at all?

14     A.   I do not.

15     Q.   Do you have any courses, have you taken any

16 courses in drafting promissory notes?

17     A.   No.

18     Q.   Do you believe that your expertise as a

19 certified public accountant gives you any greater

20 qualification than anyone else to prepare a promissory

21 note?

22          MR. MORRIS:  Objection to the form of the

23 question.

24          THE WITNESS:  No.

25     Q.   (BY MR. RUKAVINA)  Have you ever prepared or

Kristin Hendrix - October 27, 2021

1   drafted a promissory note?

2       A.   That term is probably used loosely.  I have

3   not completely drafted a promissory note from scratch,

4   no.

5       Q.   And we'll go into the details.  Fair to say

6   that you have taken a form promissory note and revised

7   it?

8       A.   Absolutely.

9       Q.   Was this part of your job in May of 2019 at

10  Highland?

11      A.   Yes.

12      Q.   Going back to the May 2019 time frame, were

13  you part of a particular group at Highland, like

14  accounting or legal or compliance?

15      A.   Yes, corporate accounting.

16      Q.   Corporate accounting.  That's what you

17  described before about treasury management and

18  projections and forecasts?

19      A.   Yes.

20      Q.   In May of 2019, was it the practice at

21  Highland that corporate accounting would be responsible

22  for drafting intercompany promissory notes?

23      A.   Not necessarily drafting, but updating a

24  draft that had been previously produced and provided by

25  our legal team, yes.

Kristin Hendrix - October 27, 2021

1    Q.   And Highland in May -- the debtor in May of

2   2019 did have a legal department?

3    A.   Yes.

4    Q.   Kind of like the corporate accounting, there

5   was a separate legal department; correct?

6    A.   Correct.

7    Q.   And who would have been in charge of that

8   department in May of 2019?

9    A.   Scott Ellington, E-l-l-i-n-g-t-o-n.

10    Q.   In May of 2019 or by May of 2019 was there

11   any practice at Highland as to whether its legal

12   department would be involved with the drafting or

13   execution of any intercompany promissory notes?

14         MR. MORRIS:  Objection to the form of the

15   question.

16         THE WITNESS:  It depends on the note.

17    Q.   (BY MR. RUKAVINA)  What did it depend on?

18    A.   Our typical practice is if we have a loan

19   with certain affiliates that it's a demand note.  We

20   have a template that we have used for years that was

21   created by either our internal legal team or an outside

22   law firm, I'm not sure which.

23         The typical practice is always updating a few

24   things on that template, getting it executed, and

25   filing it in our audit folders.

Kristin Hendrix - October 27, 2021

1    Q.    By updating, what do you mean?

2    A.    There's a few things that would need

3 updating, the date.

4    Q.    Maker?

5    A.    Maker.

6    Q.    Amount?

7    A.    The dollar amount, the interest rate.

8    Q.    And is it your testimony that the corporate

9 accounting group would do these things on its own

10 without necessarily the involvement of the legal group?

11         MR. MORRIS:  Objection to the form of the

12 question.

13         THE WITNESS:  Generally, yes.

14    Q.    (BY MR. RUKAVINA)  Do you have any memory in

15 or before May of 2019 if the corporate -- I'm sorry, if

16 the legal group became involved in drafting or

17 executing any prior intercompany promissory notes?

18    A.    Yes.

19    Q.    Explain to me what you remember about that.

20    A.    I do know that they were involved with

21 drafting restructured notes.  So taking demand notes

22 and turning them into a 30-year amort note.

23         That was in 2017.  I know for sure that they

24 were involved in that because it was something

25 different.  We weren't just updating a demand note.

Kristin Hendrix - October 27, 2021

1    Q.   Is it your testimony that to the best of your

2  recollection by May of 2019 and in May of 2019 it would

3  have been the corporate accounting group that would

4  have handled routine intercompany demand notes?

5    A.   Yes.

6    Q.   And you can think of more than one instance

7  on which that happened?

8    A.   Yes.

9    Q.   And this is not a memory test, but going back

10 in time can you try to give an estimate of what year

11 that first started happening, that the corporate

12 accounting would handle the drafting or execution of

13 intercompany demand notes?

14   A.   As far as I can remember.

15   Q.   Is it your testimony that as -- maybe even

16 going back as far as 2005 there were intercompany

17 demand notes?

18   A.   Yes.

19   Q.   I don't know how to ask this question, but

20 was this a significant thing in corporate accounting or

21 just another routine deal when you handled demand

22 notes?

23       MR. MORRIS:  Objection to the form of the

24 question.

25       THE WITNESS:  This is a routine job duty that

1  we routinely did.

2      Q.   (BY MR. RUKAVINA)  Between 2005 and 2019, do

3  you remember any maker on these intercompany demand

4  notes actually being required to pay a demand note, in

5  other words, Highland making demand?

6      A.   Not that I can specifically recall.

7      Q.   Do you have any recollection as to what

8  happened to these intercompany demand notes over the

9  years between 2005 and 2019?

10      A.   Yeah.  Typically anytime specifically Jim

11  Dondero would need to move money between related

12  parties, he would pay down -- when I say him, he would

13  have us in corporate accounting move money around, pay

14  off notes, reissue new notes somewhere else.

15          So a way to move money around between his

16  entities.

17      Q.   So let's use just hypotheticals here so that

18  I'm not trying to pin you down to any specific fact.

19          But between 2005 and 2019, is it fair to say

20  that if some Dondero entity that's not the debtor

21  needed money and the debtor had money, then Dondero

22  would have the debtor lend money to that entity on a

23  demand note basis?

24      A.   So long as they have the cash available to do

25  so.

Kristin Hendrix - October 27, 2021

1  Q.   "They" being the debtor?

2  A.   Debtor, yes.

3  Q.   And is it fair to say, then, again

4  hypothetically without any specifics, that if the

5  debtor maybe from time to time needed money and one of

6  these other entities had cash, then Dondero would cause

7  that other entity to pay down the demand note?

8          MR. MORRIS:  Objection to the form of the

9  question.

10          THE WITNESS:  Can you repeat that.

11  Q.   (BY MR. RUKAVINA)  Sure.  So I think you

12  mentioned that from time to time these entities would

13  pay down these demand notes?

14  A.   To the debtor?

15  Q.   To the debtor.

16  A.   Yes.

17  Q.   And is that, hypothetically again, is that

18  because on occasion the debtor might have needed cash

19  and these entities had the cash, so Dondero would have

20  them pay back the note?

21          MR. MORRIS:  Objection to the form of the

22  question.

23          THE WITNESS:  Yes, that could be a reason.

24  Q.   (BY MR. RUKAVINA)  Can you think of any other

25  reason in those 14 years?

Kristin Hendrix - October 27, 2021

1      A.   If the debtor needed cash to lend to another

2  entity.

3      Q.   I see.  So again, it's all one big happy

4  family, and whoever needed cash, the cash moved around;

5  correct?

6      A.   Correct.

7      Q.   Was it Mr. Dondero that basically was the

8  only deciding person in each instance that you're aware

9  of in those 14 years as to when a note would be made or

10  repaid?

11      A.   I can't answer specifically to that.  Most of

12  my direction came from our CFO at the time,

13  Frank Waterhouse.  So what conversations he would have

14  with Jim Dondero, I can't answer to that.  But I would

15  suspect so, yes.

16      Q.   And in May of 2019 or by May of 2019, did you

17  communicate personally, by email or telephone, in

18  person, periodically with Jim Dondero?

19      A.   I can't say periodically, no.

20      Q.   Well, I'm not trying to put words in your

21  mouth.  Is it fair to say that you kind of -- your

22  communications stopped with Mr. Waterhouse and

23  Waterhouse communicated with Dondero, as opposed to you

24  regularly communicating with Dondero?

25      A.   That's typical, yes.

Kristin Hendrix - October 27, 2021

1      Q.   Can you think of any instances in which
2  Mr. Dondero gave you any instructions or you came to
3  him seeking any instructions, without some intermediary
4  between the two of you?
5      A.   No, usually Frank was present.
6      Q.   Would you categorize Mr. Waterhouse as kind
7  of guarding with jealousy his access to Mr. Dondero?
8           MR. MORRIS:  Objection to the form of the
9  question.
10          THE WITNESS:  No.
11     Q.   (BY MR. RUKAVINA)  What kind of boss was he
12 in May of 2019?  Was he laid back, or was he a jerk?
13 Was he demanding?  How would you characterize him in
14 May of 2019?
15          MR. MORRIS:  Objection to the form of the
16 question.
17          THE WITNESS:  I would say he was a good boss.
18     Q.   (BY MR. RUKAVINA)  You think he was competent
19 as far as his job went?
20     A.   Yes, very competent.
21     Q.   Do you think he was competent as far as his
22 job went in December of 2020?
23     A.   Yes.
24     Q.   January 2021?
25     A.   Yes.

Kristin Hendrix - October 27, 2021

1    Q.    Was he patient and understanding as a boss?

2    A.    Yes.

3    Q.    Okay.  Was he ever condescending or rude to

4  anyone in your presence?

5    A.    No.

6    Q.    So you're the controller today at Highland,

7  the debtor, the reorganized debtor; right?

8    A.    Yes.

9    Q.    And who do you report to?  You mentioned

10 Mr. Klos is the CFO?

11   A.    Yes.

12   Q.    And do you also report to Mr. Seery?

13   A.    Yes, I think everybody does.

14   Q.    And I don't need to know details, but I take

15 it you're on a salary from reorganized Highland?

16   A.    Yes.

17   Q.    Is any part of your compensation merit or

18 bonus based?

19   A.    It could potentially be.

20   Q.    Have you had any discussions with Mr. Seery

21 or Mr. Klos about some sort of bonus compensation?

22   A.    Yes.

23   Q.    Has anything been agreed to?

24   A.    Yes.

25   Q.    And again, I don't need to know the exact

Kristin Hendrix - October 27, 2021

1  numbers.  What would your bonus compensation consist

2  of?  How would it be decided?

3      A.   It's actually -- was decided when I agreed to

4  stay on the Highland team back in February 2021, so

5  it's in my employment agreement.

6      Q.   So what's your bonus compensation?

7      A.   I'm not sure I understand what you're asking.

8      Q.   So is the bonus discretionary on the part of

9  Highland?

10      A.   No, it's a set amount.

11      Q.   And what triggers it or governs the set

12  amount?

13      A.   Just it gets paid out on a certain date of

14  the year.  It's very straightforward, set out in my

15  employment agreement.

16      Q.   Is it irrespective of the performance of the

17  reorganized debtor?

18      A.   Yes.

19      Q.   So why do you call it a bonus instead of base

20  compensation?

21      A.   That's what it's called in my agreement.

22      Q.   So your base compensation and your bonus,

23  it's your testimony, you're going to earn it

24  irrespective of whether reorganized Highland does good

25  or bad with respect to its profitability?

Kristin Hendrix - October 27, 2021

1    A.    Correct.

2    Q.    And how Highland, reorganized Highland

3 collects these promissory notes is going to play no

4 part in your base and bonus compensation to your

5 understanding; is that correct?

6    A.    To my knowledge, yes.

7    Q.    So you have no direct or indirect stake in

8 the outcome of these litigations?

9    A.    No.

10    Q.    And you understand that I represent HCMFA and

11 NexPoint?

12    A.    Yes.

13    Q.    And these court reporters are not familiar

14 with some of our terminology.  NAP [verbatim], if we

15 say that, that means NexPoint; right?

16    A.    Uh-huh.

17    Q.    You have to say yes or no.

18    A.    Yes, NPA, NexPoint.

19    Q.    NPA.  And when we say NexPoint, you and I are

20 meaning NexPoint Advisors, LP; right?

21    A.    Yes.

22    Q.    And when we say HCMFA, we're meaning Highland

23 Capital Management Fund Advisors, LP, yes?

24    A.    Yes.

25    Q.    What is your understanding of the two

Kristin Hendrix - October 27, 2021

1   lawsuits, the one against HCMFA and the one against
2   NexPoint, that you're being deposed on today?
3       MR. MORRIS:  Objection to the form of the
4   question.
5       Q.   (BY MR. RUKAVINA)  Who is suing who and for
6   what?
7       A.   I don't know all the details.
8       Q.   So we've established that you've discussed
9   these lawsuits in the last week or a little bit more
10  with legal counsel.  I don't want to talk about that.
11      Prior to these recent discussions, did you
12  have any discussions with anyone at Highland about its
13  lawsuits against HCMFA and NexPoint on promissory
14  notes?
15      A.   Repeat that again.
16      Q.   Sure.  So remember we're excluding the recent
17  discussions in the last week or 10 days with counsel;
18  right?
19      A.   Okay.
20      Q.   Are you aware that in January of 2021 the
21  debtor sued NexPoint to collect on a promissory note?
22      A.   I'm aware that demand notices were sent.
23      Q.   So until recently you weren't aware that a
24  lawsuit had been filed?
25      A.   There's a lot of lawsuits filed.  I can't

Kristin Hendrix - October 27, 2021

1  keep track of what is what or what we're talking about
2  at certain times.
3      Q.   But you have no distinct memory of that?
4      A.   Correct.
5      Q.   And same question for the lawsuit that the
6  debtor filed against HCMFA in January.
7           Do you have any specific memory of that
8  lawsuit having been filed?
9      A.   Not specifically.
10     Q.   You mentioned that you're aware that on or
11 before January 2021, demand letters had been sent?
12     A.   Yes.
13     Q.   Did you play any role in either drafting
14 those demand letters or the decision to send them?
15     A.   No.
16     Q.   So going back to my question about these
17 lawsuits, do you have any memory of anyone asking
18 you -- again, excluding the last week or two.
19          Do you have any memory of anyone asking you
20 to do anything with respect to either or both of these
21 lawsuits?
22     A.   No.
23     Q.   You have no memory of Mr. Waterhouse,
24 Mr. Klos, Mr. Surgent, or Mr. Seery asking for any
25 background information or your input at all on these

Kristin Hendrix - October 27, 2021

1  two lawsuits?

2          MR. MORRIS:  Better not have been --

3          THE WITNESS:  No.

4      Q.   (BY MR. RUKAVINA)  Who did I say?  Did I

5  misspeak?  Okay.

6          Now we're going to have some exhibits here.

7          And do you have the labels?

8          Let's take a minute break off the record.

9          (Off the record.)

10     Q.   (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to

11 provide to you a promissory note in the original

12 principal amount of $5 million from HCMFA.  This is the

13 PDF version of this as filed with the Court for

14 collection.  It's going to be Exhibit 1.

15         (Whereupon, Exhibit 1 was marked for

16         identification.)

17     Q.   (BY MR. RUKAVINA)  Before you look at

18 Exhibit 1, I'm going to do the same thing for

19 Exhibit 2, which is a promissory note from HCMFA for

20 $2.4 million, dated May 2, 2019.

21         (Whereupon, Exhibit 2 was marked for

22         identification.)

23     Q.   (BY MR. RUKAVINA)  Again, Ms. Hendrix, these

24 are the PDF versions of these notes as filed with the

25 Court.  Sitting here today, do you remember anything

Kristin Hendrix - October 27, 2021

1    about either or both of these two promissory notes?

2        A.    Sure, yes.

3        Q.    What do you remember?

4        A.    I remember seeing them because I've recently

5    looked at them.  I see them all the time in our loan

6    tracking spreadsheets.  My team would have been

7    responsible for the whole process that I explained

8    before when it comes to a promissory note.

9        Q.    And --

10            MR. MORRIS:  Are you finished?

11            THE WITNESS:  Yes.

12        Q.    (BY MR. RUKAVINA)  And we have an email here

13    that might give some more context to that if I can find

14    it here.

15            This will be Exhibit 3.  This is an email

16    from David Klos to corporate accounting dated May 2,

17    2019.

18            (Whereupon, Exhibit 3 was marked for

19            identification.)

20        Q.    (BY MR. RUKAVINA)  Do you see this email,

21    ma'am?

22        A.    Yes.

23        Q.    Okay.  Corporate accounting, would that email

24    group have included you?

25        A.    Yes.

1    Q.   And this email says, Kristin, can you or

2   Hayley.  Do you think that Kristin was you?

3    A.   I do.

4    Q.   Do you remember receiving this email?

5    A.   Not explicitly.

6    Q.   So it says Blair.  Who would Blair be?

7    A.   Blair was our AP associate.

8    Q.   What is her last name?

9    A.   At this time it would have been Roeber,

10   R-o-e-b-e-r.

11    Q.   Okay.  And did it subsequently change?

12    A.   Yes, it's now Hillis, H-i-l-l-i-s.

13    Q.   Please send $2.4 million from HCMLP to HCMFA.

14   This is a new interco loan.  Kristin, can you or Hayley

15   please prep a note for execution.  I'll have further

16   instructions later today, but please process this

17   payment as soon as possible.

18        Did I read that correctly?

19    A.   Yes.

20    Q.   Do you have any memory of whether this email

21   relates to Exhibit 2, the $2.4 million promissory note?

22    A.   It seems like it does, same date, same

23   amount.

24    Q.   Do you have any memory, or in reviewing your

25   files did you see any similar email or document that

Kristin Hendrix - October 27, 2021

1 would have related to Exhibit 1, the $5 million
2 promissory note?
3     A.   Yes.  I believe there's another email for
4 that one.
5     Q.   And do you believe that you provided that to
6 counsel?
7     A.   Yes.
8     Q.   Recently or some time ago?
9     A.   Well, I don't think I provided it, so I'm not
10 sure when they got it.  I know it has been provided.
11     Q.   You know that it has?
12     A.   Uh-huh.
13     Q.   How do you know?
14     A.   Because I've seen it.
15     Q.   In the production that was produced to me?
16     A.   Yes.
17     Q.   And also from a David Klos?
18     A.   This one, or on the -- when I say this one,
19 on the $2.4 million or the 5-?
20     Q.   On the $5 million note.
21     A.   I'm not sure.
22     Q.   Okay.  Let me make sure I understand you
23 correctly.
24          Sitting here today you believe that there is
25 another email referencing the $5 million loan that has

Kristin Hendrix - October 27, 2021

1  been produced to my office?

2      A.    Yes.  I believe so.

3      Q.    Okay.  And going off memory, did it kind of

4  say the same thing as this Exhibit 3 except that it

5  referenced $5 million?

6          MR. MORRIS:  Objection to the form of the

7  question.

8          THE WITNESS:  Generally, should have said the

9  similar situation, yeah.

10     Q.    (BY MR. RUKAVINA)  So Mr. Klos says, this is

11 a new interco loan, for Exhibit 3.  Other than what he

12 told you, that this is an intercompany loan, did anyone

13 else tell you or did you have any other information on

14 May 2, 2019 that this was a loan?

15     A.    I don't specifically recall these

16 conversations, but I can tell you our normal practice

17 would be we would either likely be in a cash meeting --

18 and I say "we."  Would have been myself, Dave Klos,

19 Frank Waterhouse, potentially even Jim Dondero.

20         But I don't recall conversations on this

21 specific date.  But general practice is we would talk

22 about it.

23         Oftentimes, Frank would either call Dave or I

24 or stop by and tell us that, we need to send money to

25 an affiliate, paper up a new loan, let's get a wire out

Kristin Hendrix - October 27, 2021

1   the door, is typically how this works.

2      Q.  Is the answer generally the same for the

3   $5 million note?

4      A.  Yes.

5      Q.  So is it fair to say that typically,

6   obviously not every time, but typically your corporate

7   accounting group when it would see intercompany

8   transfers in large amounts would believe that they were

9   loans?

10        MR. MORRIS:  Objection to the form of the

11   question.

12        THE WITNESS:  Typically they were loans.

13   There's not really another way to get money from one

14   entity to another.  And if they were papered as a loan,

15   that means we were told to set it up that way.

16      Q.  (BY MR. RUKAVINA)  What do you mean papered

17   as a loan?  Aren't you papering it as a loan when

18   someone makes the promissory note?

19      A.  Yes, because we're told by somebody to do

20   that.

21      Q.  And in this instance, Mr. Klos on Exhibit 3

22   told the group that this was a loan; right?

23      A.  Correct.  But he would have spoken with

24   Frank Waterhouse or Jim Dondero prior to that, before

25   telling anybody to do that.

Kristin Hendrix - October 27, 2021

1  Q.   Okay.  And do you have any knowledge that he
2  did speak to Mr. Waterhouse or Mr. Dondero before
3  sending this email?
4  A.   Again, I don't have specific knowledge on the
5  exact conversations, but that's always how it has
6  worked.
7  Q.   That's how it was for 14 or 15 years;
8  correct?
9  A.   Yes.
10 Q.   But you're logically assuming that it
11 happened here.  You don't know that it happened here;
12 correct?
13      MR. MORRIS:  Objection to the form of the
14 question.
15      THE WITNESS:  I would have to be fairly
16 certain that it did, even though I can't recall
17 specific conversations.
18 Q.   (BY MR. RUKAVINA)  Did you ask Mr. Klos about
19 who told him that this is a new intercompany loan on
20 Exhibit 3?
21 A.   No.  It's quite possible I was involved in
22 the conversation.  I reported to him.  I wouldn't
23 question his authority.
24 Q.   Did you ask Mr. Klos who told him that the
25 $5 million deal was also an intercompany loan?

Kristin Hendrix - October 27, 2021

1      A.   I did not ask that specific question that I
2  can recall.

3      Q.   Did you ask Mr. Waterhouse whether either of
4  these transactions were loans?

5      A.   I'm sure Mr. Waterhouse is the one that told
6  us they were loans.  We wouldn't just paper up a loan,
7  send money out and call it a loan and account for it
8  that way, unless somebody specifically told us.

9      Q.   Do you have any memory of Mr. Waterhouse
10  orally or in writing or email or in any way, shape, or
11  form on or about May 2 or 3, 2019 telling you that the
12  2.4 million or $5 million transfers were intercompany
13  loans?

14      A.   No specific knowledge of exact conversations,
15  but I'm certain that those conversations were had
16  because that's the only way that we would have papered
17  up a loan, sent money out as a loan, had them on our
18  financials for two years.

19      Q.   So you're saying that this email, Exhibit 3,
20  from Mr. Klos was not enough, that there would have
21  been other things that happened to make you and other
22  people in your group confident that these were loans?

23      A.   Yes.

24      Q.   And these other things would have been in
25  person or by email?

Kristin Hendrix - October 27, 2021

1    A.   Most likely in person via phone call.

2    Q.   Okay.  So again, you have no specific memory

3   of it, but based on the 14-year pattern and conduct you

4   believe that you would have discussed these two

5   transfers with Mr. Waterhouse and he would have told

6   you these are loans?

7         MR. MORRIS:  Objection to the form of the

8   question.

9         THE WITNESS:  Correct.

10    Q.   (BY MR. RUKAVINA)  And then would he have

11   told you to take care of the promissory notes, or was

12   that Mr. Klos here in Exhibit 3?

13    A.   It could have been both.  It's clearly Dave

14   in this email, but Frank could have also said that to

15   me.

16    Q.   Now, do you -- strike that.

17         In May of 2019, did you know or were you told

18   why these $7.4 million were being transferred from the

19   debtor to HCMFA?

20    A.   Yes.  I do have recollection that -- I do

21   know that there were two big events in May 2019.

22   2.4 million was related to a TerreStar NAV error, with

23   one of the funds advised by HCMFA.  That's Global

24   Allocation Fund.

25         Similar with the $5 million loan.  There was

1 a consent fee that the advisor of the Global Allocation
2 Fund had promised to pay to shareholders of that fund,
3 and it was in the amount of $5 million roughly.
4          So both of these loans were for those
5 purposes respectfully.
6     Q.   And were you in May of 2019 also aware that
7 in addition to the $2.4 million, there was another more
8 than $5 million paid to that fund by HCMFA's insurer as
9 compensation for the NAV error?
10    A.   By the insurance company, yes.
11    Q.   So the $7.4 million, you understood then was
12 a loan as opposed to compensation to HCMFA?
13    A.   Yes.
14    Q.   Okay.  Did you understand in May of 2019 that
15 it had been the debtor and its valuation team that
16 caused that NAV error?
17          MR. MORRIS:  Objection to the form of the
18 question.
19          THE WITNESS:  I can't answer that.  I was not
20 involved with the activities leading up to the NAV
21 error.
22    Q.   (BY MR. RUKAVINA)  How do you know that the
23 $7.4 million were being transferred for the NAV error
24 and consent fee?
25    A.   Because I do know about both of those

Kristin Hendrix - October 27, 2021

1   instances and I do know that HCMFA needed to pay these
2   dollar amounts for both of those.
3       Q.   And you knew that in May of 2019?
4       A.   Yes.
5       Q.   How did you know that in May of 2019?
6       A.   It was lots of discussions had been going on
7   around both of these issues for months.  These weren't
8   surprises to anybody.
9       Q.   So although you weren't involved directly
10  with the NAV error issues, it was more or less common
11  knowledge in your accounting group?
12      A.   Correct.
13      Q.   Do you have any knowledge at all as to
14  whether Mr. Dondero decided to transfer these
15  $7.4 million not as a loan, but to compensate HCMFA for
16  the debtor's alleged liability?
17      A.   Have not heard of that.
18      Q.   Ever?
19      A.   Never.
20      Q.   But you also never heard Mr. Dondero say that
21  these $7.4 million were a loan; correct?
22      A.   That was not told to me directly.
23      Q.   Again, you're logically assuming that based
24  on many instances of intercompany transfers in the
25  14 years prior to that?

1          MR. MORRIS:  Objection to the form of the

2    question.  Mischaracterizes the testimony.

3          THE WITNESS:  Correct.

4      Q.  (BY MR. RUKAVINA)  I think you answered

5    correct?

6      A.  Correct.

7      Q.  And you mentioned that after these notes, you

8    saw them on internal financials and that reinforces

9    your view that these were loans?

10      A.  Correct.

11      Q.  But as of May 2 and 3, 2019, no one had told

12    you directly that these are loans?

13          MR. MORRIS:  Objection to the form of the

14    question.  It's in writing.

15          THE WITNESS:  That's not what I'm saying at

16    all.

17      Q.  (BY MR. RUKAVINA)  Other than Mr. Klos' email

18    or emails, no one told you on May 2 or May 3, 2019 that

19    you remember today that these were loans?

20      A.  It quite possibly could have been told to me

21    in addition to this email.

22      Q.  I understand.  You just have no memory of

23    that today; correct?

24      A.  Correct.

25      Q.  Is there anything that you can think of

Kristin Hendrix - October 27, 2021

1  sitting here today to refresh your memory on that

2  point?

3      A.   I do not think so.  I'm sure there was

4  conversation that unfortunately would not be in an

5  email.

6      Q.   Now, we have the Word documents, the Word

7  version of these two promissory notes, and you're going

8  to have rely on me that I printed these out as

9  Mr. Morris sent to me.  If I'm misleading you on that,

10  then I'm in trouble and your answers don't count.

11          So please assume that I didn't doctor these

12  and that I printed them out as they were prepared to

13  me; okay?

14      A.   Yes.

15      Q.   So Exhibit 4 will be the $5 million note and

16  Exhibit 5 will be the 2.4 million.

17          (Whereupon, Exhibits 4 & 5 were marked for

18          identification.)

19      Q.   (BY MR. RUKAVINA)  Before I ask about 4 and

20  5, to be fair to you and refresh your memory, I'm going

21  to provide you printouts of the metadata, metadata --

22  I'm not sure how to better say that -- for both notes.

23          And again I'm representing to you that I

24  printed out the metadata without doctoring it, so

25  please assume that's true, and if it's not, your

Kristin Hendrix - October 27, 2021

1   answers don't count and I'm in trouble.

2          6 will be the $5 million note, and 7 will be

3   the $2.4 million note.

4          (Whereupon, Exhibits 6 & 7 were marked for

5          identification.)

6      Q.   (BY MR. RUKAVINA)   Okay.  So Exhibit 4 and 5

7   are the Word documents.  Do you have any memory of you

8   doing anything with respect to these two Word

9   documents?

10     A.   I don't have specific memory, but generally

11  speaking, it was my job to update promissory note

12  templates and create promissory notes.

13     Q.   So do you believe that -- we discussed

14  earlier that your group would have used a template and

15  that it would have made changes reflecting the maker,

16  amount, date, interest rate.

17         Do you believe you were the one with respect

18  to 4 and 5 that updated that template to create 4

19  and 5?

20     A.   I'm sure that I was, yes.

21     Q.   Well, Exhibit 6 -- do you know what metadata

22  is?

23     A.   Sort of.

24     Q.   What's your understanding of what metadata

25  is?

Kristin Hendrix - October 27, 2021

1    A.    Just in context from speaking on it recently,
2 it's going to tell you who made changes to the
3 documents, is what I would assume.

4         MR. RUKAVINA:  Go off the record for one
5 second.

6         (Off the record.)

7    Q.    (BY MR. RUKAVINA)  So a little bit of error
8 on my part.  We'll have some more metadata, but we can
9 still talk about 6 and 7.

10        It says the author JFORSHEE, J-F-O-R-S-H-E-E.
11 Do you recall or do you know who that person was?

12   A.    I recognize the name, and it makes sense.
13 This says Strasburger is the company.  I think he was
14 one of the lawyers that we had used at some point in
15 time.

16   Q.    Strasburger is a law firm?

17   A.    Yes.

18   Q.    And then it says, so Exhibit 6 created May 3,
19 Exhibit 7 created May 2, modified, accessed.  Does that
20 to the best of your understanding comport with when
21 Exhibits 4 and 5 were actually created?

22   A.    Can you repeat that.

23   Q.    Yeah.  We'll wait for the rest of the
24 metadata.  But let's go back to 4 and 5.

25        In and by May 2019 I think you mentioned that

Kristin Hendrix - October 27, 2021

1  it was your job to, I think you said update promissory

2  notes?

3          MR. MORRIS:  Objection to the form of the

4  question.

5      Q.  (BY MR. RUKAVINA)  Let me take that question

6  back.

7          You testified earlier that your group would

8  have taken a template and used it to create or prepare

9  a new promissory note; right?

10     A.  Right.

11     Q.  How would you call that process?  What word

12  would you use for that process?

13     A.  Let's call it papering the loan.

14     Q.  In May of 2019, was it your job to paper the

15  loan?

16     A.  Yes.

17     Q.  Would anyone else at the corporate accounting

18  group have been responsible to paper a loan?

19     A.  At that time, I don't think so.  I think I

20  was the one doing it.

21     Q.  I think you mentioned that you think you

22  papered the loan, respecting Exhibits 4 and 5; correct?

23     A.  Correct.

24     Q.  You have no distinct present memory of

25  papering 4 and 5; correct?

Kristin Hendrix - October 27, 2021

1      A.    Correct.

2      Q.    Can you think of anyone else at the corporate

3   accounting group that would have papered 4 and 5?

4          MR. MORRIS:  Objection to the form of the

5   question.

6          THE WITNESS:  The only other person that

7   could have would either be Dave Klos or Hayley Eliason.

8      Q.    (BY MR. RUKAVINA)  What was Hayley's role in

9   May of 2019?

10     A.    She was the accountant.  I can't recall her

11  specific title.

12     Q.    Now, in May of 2019 when you papered a loan,

13  would you have consulted with either internal or

14  external legal before finishing that loan or presenting

15  it for signature or anything else?

16     A.    Not if it was just our standard demand note

17  that we already had a template on.

18     Q.    So would it have been your general course in

19  May of 2019, if you prepared Exhibits 4 and 5, not to

20  seek advice from internal or legal before proceeding

21  with these notes?

22     A.    With these two specific notes?

23     Q.    Yes.

24     A.    Yes.

25     Q.    If we flip the page, I'll represent to you

Kristin Hendrix - October 27, 2021

1  that Mr. Waterhouse's signature there appears on the
2  Word document as an image.
3      A.    Uh-huh.
4      Q.    Do you have any memory of whether there was
5  an image that someone would have affixed of
6  Mr. Waterhouse's signature to promissory notes?
7      A.    Yes.  We typically always -- he was
8  completely fine with having documentations -- sorry,
9  having documents signed or executed with his
10 e-signature.
11     Q.    Would these pictures of his signature have
12 been his e-signature in May of 2019?
13     A.    Yes.
14     Q.    So let's just clarify that because I don't
15 want there to be any confusion.
16         I know there's some computer programs out
17 there that are restrictive and have passwords before
18 any signature is printed.  And then there's some people
19 that use a stamp or an image; right?
20         MR. MORRIS:  Objection to the form of the
21 question.
22     Q.    (BY MR. RUKAVINA)  Are you following me?
23     A.    I follow you.
24     Q.    In May of 2019, did Mr. Waterhouse have any
25 specific program that would have to -- you would have

Kristin Hendrix - October 27, 2021

1  to go through before it would spit out his e-signature,
2  or was he fine with you and his staff using an image
3  like this?
4      A.   He was fine with using his e-signature, and
5  what is on these documents was that exact e-signature.
6  So I don't know if he had -- I don't know how it was
7  created originally.
8      Q.   The e-signature?
9      A.   E-signature.
10     Q.   Do you have any memory with respect to
11 Exhibits 4 and 5 of getting Mr. Waterhouse's specific
12 approval to use his e-signature?
13     A.   I don't have exact specific memory, same as
14 conversations on these loans.  But he would have had to
15 approve this loan in the dollar amount, the day.
16          He would have been the one directing us to
17 create these loans.  In past practice he has always
18 approved using his e-signature to execute documents.
19     Q.   How would he have approved Exhibits 4 and 5?
20 By that, I mean by email or memorandum?  How would he
21 have approved it in May of 2019?
22          MR. MORRIS:  Objection to the form of the
23 question.
24          THE WITNESS:  I would assume that, as I've
25 stated previously, these directions were coming

Kristin Hendrix - October 27, 2021

1  directly from him to paper a loan.  These changes that

2  are made are only to the dollar amount.  Interest rate

3  is pulled right off the IRS website.

4      That is his approval to paper a loan and in

5  fact execute or approve the loan.

6      Q.  (BY MR. RUKAVINA)  In May of 2019, would

7  Mr. Waterhouse -- what was his practice as far as using

8  an ink signature on documents as opposed to an

9  e-signature?  Did he have a practice?

10      MR. MORRIS:  Objection to the form of the

11  question.

12      THE WITNESS:  He has never specifically said,

13  on certain documents I would like to ink it with my

14  signature.  Probably at this time, 99 percent of the

15  stuff my team got his signature on was his e-signature.

16  I think it just depended on the group and what it was.

17      Q.  (BY MR. RUKAVINA)  So how would he authorize

18  you or your team to use his e-signature for any given

19  document in May of 2019?

20      MR. MORRIS:  Objection to the form of the

21  question.

22      THE WITNESS:  Through the conversations that

23  would have been had before these emails went out saying

24  paper loan.

25      Q.  (BY MR. RUKAVINA)  And -- okay.  So, and

Kristin Hendrix - October 27, 2021

1  after his e-signature was used either on these notes or
2  other documents in May of 2019, would you have brought
3  the documents back to him for any kind of verification?
4         MR. MORRIS:  Objection to the form of the
5  question.
6         THE WITNESS:  Probably not.  These are all
7  very standard.  We've papered hundreds of loans.  So I
8  think he trusted that we can handle updating a date and
9  a dollar amount on these loan templates.
10     Q.   (BY MR. RUKAVINA)  Do you know or believe, or
11  your recent review of documents, did it reveal an email
12  from Mr. Waterhouse to you specifically authorizing his
13  e-signature on Exhibits 4 and/or 5?
14     A.   Not that I recall seeing, no.
15     Q.   Sitting here today, do you have any memory of
16  Mr. Waterhouse orally or otherwise specifically
17  authorizing you to affix his e-signature to Exhibits 4
18  and/or 5?
19     A.   Specifically on these loans, no, I don't
20  recall those conversations.  But, again, our practice
21  has always been we have this discussion, he's under the
22  understanding that we're going to paper the loans, he's
23  always comfortable with using his e-signature.
24         This is not something me or my team would
25  have done without that authority and approval from him.

Kristin Hendrix - October 27, 2021

1    Q.   But you have no memory of that authority or
2  approval, specifically for 4 and 5?
3         MR. MORRIS:  Objection.  Asked and answered
4  about five times.
5         THE WITNESS:  Same as my answer I just gave.
6    Q.   (BY MR. RUKAVINA)  And I think you mentioned
7  that in your years at Highland your team papered
8  hundreds of loans?
9    A.   Yeah.
10   Q.   In your time at Highland, is it your
11 testimony that the accounting -- corporate accounting
12 department never made a mistake with respect to
13 anything that it did?
14        MR. MORRIS:  Objection to the form of the
15 question.
16        THE WITNESS:  No, I did not say that.
17   Q.   (BY MR. RUKAVINA)  Do you recall any mistakes
18 in your time at the corporate accounting group at
19 Highland that had been made, any significant mistakes?
20        MR. MORRIS:  Objection to the form of the
21 question.
22        THE WITNESS:  Significant mistakes, not that
23 I can recall.
24   Q.   (BY MR. RUKAVINA)  No accounts payable
25 mistakenly paid?

Kristin Hendrix - October 27, 2021

1        MR. MORRIS:  Objection to the form of the
2   question.
3        THE WITNESS:  I cannot specifically answer
4   that question with 17 years of work to recall, sorry.
5        MR. RUKAVINA:  Just take a quick break.  If
6   you need a restroom -- off the record.
7            (Off the record.)
8      Q.   (BY MR. RUKAVINA)  Going back to Exhibits 4
9   and 5.
10        Mr. Waterhouse signed these promissory notes.
11   Is there any particular reason why he signed them as
12   opposed to Dondero or someone else?
13      A.   No particular reason.  He's an officer for
14   both companies.  He's a signatory.
15      Q.   Who decided, if anyone, to your knowledge,
16   that he would be the one signing the notes, these two
17   notes?
18      A.   I don't know who would have decided that, but
19   typically if Frank specifically wanted Jim Dondero to
20   sign it, he would say, take it to Jim to sign.
21      Q.   Do you have a recollection of
22   Mr. Dondero -- strike that.
23        Do you have a recollection of Mr. Waterhouse
24   signing other promissory notes?
25      A.   Yes.  I know for sure he has signed other

Kristin Hendrix - October 27, 2021

1  promissory notes.  I can't tell you explicitly which

2  ones.

3          (Off the record.)

4      Q.   (BY MR. RUKAVINA)  Are you saying that in May

5  of 2019 -- strike that.

6          By May of 2019, was it not the standard

7  practice at the debtor that Mr. Dondero would sign

8  intercompany promissory notes?

9          MR. MORRIS:  Objection to the form of the

10 question.

11         THE WITNESS:  No, that's not standard

12 practice.  Just needed to be somebody -- somebody who

13 is a signer for the entity on the incumbency

14 certificate.

15     Q.   (BY MR. RUKAVINA)  Was there a standard

16 practice, or did you just describe the standard

17 practice that it was someone on the incumbency

18 certificate?

19     A.   That's correct, somebody on the incumbency

20 certificate.  Frank is a great prospect to sign, with

21 giving direction to set loans up, send money out.  Why

22 wouldn't he sign it.

23     Q.   Do you have any memory sitting here today of

24 Mr. Waterhouse telling you or agreeing that he would be

25 signing these two promissory notes for HCMFA?

Kristin Hendrix - October 27, 2021

1    A.    Not specifically, but he didn't need to tell
2  me.  He typically would tell me if he wanted Jim to
3  sign them.

4    Q.    Sitting here today, do you have any memory of
5  giving Mr. Waterhouse these two promissory notes after
6  they were prepared?

7    A.    I specifically don't remember walking into
8  his office and providing it to him, but he could have
9  found it on our shared drive if he wanted to.

10    Q.    Do you have any memory or in your recent
11  review of documents did you see any email to the effect
12  of you sending either or both of these promissory notes
13  to Mr. Waterhouse after they were papered up?

14    A.    I don't have any specific recollection,
15  again, but he had access to look at them.

16    Q.    On the shared drive?

17    A.    Yes.

18    Q.    In May -- I'm going to ask this question
19  multiple different ways, so let's start with kind of
20  the general.

21        In May or by May of 2019, was there a
22  repository, electronic or paper, where the debtor kept
23  original promissory notes that were owed -- where money
24  was owed to it?

25    A.    Original meaning paper?

Kristin Hendrix - October 27, 2021

1      Q.    Well, let's go back a little bit in time.

2             Would you agree that at some point prior to

3    2019 the standard course was that paper notes were ink

4    signed?

5             MR. MORRIS:  Objection to the form of the

6    question.

7             THE WITNESS:  I could not tell you

8    specifically when notes were or were not ink signed.

9      Q.    (BY MR. RUKAVINA)  Was there any repository,

10   to the best of your recollection, as of May 2019 where

11   any ink-signed original promissory notes were kept by

12   the debtor?

13     A.    No.  We always would scan them in, save them

14   on our shared drive.  Never had paper copies.

15     Q.    So that's -- fixing to ask that question

16   next.

17            So Exhibits 4 and 5, would they even have

18   been printed after they were papered up?

19            MR. MORRIS:  Objection to the form of the

20   question.

21            THE WITNESS:  Possibly.  Somebody could have

22   printed them.

23     Q.    (BY MR. RUKAVINA)  Do you remember printing

24   Exhibits 4 or 5 sitting here today?

25     A.    I don't recall printing them myself, no.

Kristin Hendrix - October 27, 2021

1    Q.    Would there have been a reason to print them

2  out if, as you said, the notes were stored

3  electronically?

4          MR. MORRIS:  Objection to the form of the

5  question.

6          THE WITNESS:  There could be a reason.  I

7  don't recall that I for any reason printed these

8  particular notes.

9    Q.    (BY MR. RUKAVINA)  So as of May 2019, is it

10 your testimony that notes that were papered up by the

11 corporate accounting group would have been saved

12 electronically on the system and not kept by way of

13 paper copies in some file?

14   A.    Correct.  That's right.

15   Q.    This is additional metadata.  And you

16 understand I have a bit of an accent.

17         What are we on?

18         (Off the record.)

19   Q.    (BY MR. RUKAVINA)  Ms. Hendrix, Exhibit 8 is

20 going to be additional metadata for the May 3, 2019,

21 note that we've been looking at, and Exhibit 9 will be

22 the same thing for the May 2 note that we've been

23 looking at.

24         That's 8.  That's 9.

25         (Whereupon, Exhibits 8 & 9 were marked for

Kristin Hendrix - October 27, 2021

1          identification.)

2      Q.   (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to

3  represent to you again that my office has faithfully

4  printed this metadata out without doctoring or changing

5  anything, and I ask you to assume that.  If I'm wrong

6  on that, then your answers don't count.

7          Ma'am, as I look at these two documents, it

8  says last modified by Kristin Hendrix.

9          Do you see that?

10     A.   Yes.

11     Q.   And that would have -- that could have only

12 been you; correct, in that department?

13     A.   I hope so, yes.

14     Q.   Seeing these two documents, can you agree

15 with me now that it was in fact you that papered up

16 Exhibits 4 and 5?

17         MR. MORRIS:  Objection.  Asked and answered.

18         THE WITNESS:  I would assume so since my name

19 is on it, yes.

20     Q.   (BY MR. RUKAVINA)  Both of these documents

21 say last printed -- I'm sorry.  If you see related

22 dates, it says last printed May 2, 2019, 11:27 A.M.  Do

23 you have any memory or any understanding as to why that

24 date would be there or what last printed might mean?

25     A.   I don't know why it says last printed the day

1  before it was created.  That doesn't make any sense.  I
2  have no idea.
3         Unless, the only thing I could think of is if
4  we changed this template.  When I say "this," the
5  $2.4 million loan, which was papered on the 2nd, and
6  then used it for the next day for the template to
7  update the date, possibly.  I have no idea.
8     Q.   Well, it may be -- and I understand that you
9  don't have any memory; we're speculating a little bit.
10        It may be, looking at Exhibits 8 and 9, that
11  the $2.4 million note was printed on May 2, and then
12  after having been used as the template for the
13  $5 million note, the $5 million note would not have
14  been printed.
15        Does that sound possible?
16        MR. MORRIS:  Objection to the form of the
17  question.
18        THE WITNESS:  Sure, it could be possible.
19     Q.   (BY MR. RUKAVINA)  But you don't have any
20  memory either way?
21     A.   No.  And when these were printed they're
22  printed to PDF, I believe, is probably what that means.
23     Q.   Okay.
24        We're going to switch gears a little bit now,
25  if you want to make a pile of those exhibits.

Kristin Hendrix - October 27, 2021

1  Obviously, you're welcome to use them anytime you need
2  to, but I think we're done with those notes.
3          Going to hand you what we're going to mark as
4  Exhibit 10, which is an email chain produced by the
5  debtor.
6          And I don't know how anyone on the video will
7  see it.  I apologize.  I'll have to send it to you
8  later.
9          (Whereupon, Exhibit 10 was marked for
10          identification.)
11      Q.   (BY MR. RUKAVINA)  Now, if you start with
12  this email chain, it starts on November 19, 2020 from
13  Jack Donohue to you, copying Mr. Seery and various
14  others.
15          Do you see that?
16      A.   Yes.
17      Q.   And Mr. Donohue is asking you to provide him
18  the financial records of HCMFA due to the funds owed
19  the debtor.
20          Do you see that?
21      A.   Yes.
22      Q.   Do you recall that email from Mr. Donohue to
23  you?
24      A.   Yes.
25      Q.   Do you recall any context or subsequent

Kristin Hendrix - October 27, 2021

1  discussions or how that email came to be, or do you
2  just recall getting that email?
3      A.   I just recall getting the email.
4      Q.   You write back, hi Jack, Scott Ellington is
5  going to follow up with the board on this request.
6          Do you see that?
7      A.   Yes.
8      Q.   Do you recall why you told Jack that
9  Mr. Ellington was going to follow up?
10     A.   From what I recall, I had asked Frank
11 Waterhouse if it was okay to send these financials
12 over, and he wanted me to check with Scott Ellington
13 and that was Scott's response.
14     Q.   And did he tell you why he wanted you to
15 check with Scott Ellington?
16     A.   Just to make sure that there were no issues
17 with sending them over.
18     Q.   Mr. Seery writes back, can I get this ASAP.
19 HCMFA is way overdue.
20         Do you see that?
21     A.   Yes.
22     Q.   And Mr. Seery writes again, it's about a week
23 later, and he says, this is an explicit direction from
24 me as CEO of HCMLP.  But it looks like you are the
25 recipient of that December 2 email; correct?

Kristin Hendrix - October 27, 2021

1     A.    Yes.

2     Q.    Do you remember him sending you that email

3   and copying those people?

4     A.    Yes.

5     Q.    Do you remember anything happening in that

6   week between his November 25 and December 2 email along

7   the same discussion lines?

8     A.    I don't remember anything.  I think I was

9   probably left out of any discussions, and if there were

10  any, it was with Scott Ellington and whomever he had

11  discussions with.

12    Q.    Then subsequent, on December 2, Mr. Seery

13  writes, all, Scott and I have spoken and agree that the

14  information should be provided to James immediately.

15          Would that have been James Romey, do you

16  think?

17    A.    Yes.

18    Q.    And who was James Romey?

19    A.    He also worked for DSI.

20    Q.    And then he writes, Kristin, please proceed

21  with James.  If anyone has any questions or issues,

22  please call me.

23          Do you see that?

24    A.    Yes.

25    Q.    Did you proceed with James Romey?

Kristin Hendrix - October 27, 2021

1      A.    I further made sure that Scott was okay, to
2  confirm.  He said yes, please do, and I did send them
3  to James Romey.
4      Q.    So Mr. Seery has some of it in this email
5  chain, but do you have any understanding as to why
6  either DSI or Mr. Seery in November of 2020 was asking
7  for the financial records of HCMFA?
8      A.    I do not, other than what's in this email.
9      Q.    Did you discuss with either DSI or Mr. Seery
10 or Mr. Waterhouse in November or December 2020 whether
11 the demand notes from HCMFA should be demanded, should
12 be called?
13     A.    I did not have discussions.
14     Q.    Next exhibit is Exhibit 11.  This is another
15 email chain.
16           And I apologize to the folks on the video.
17 I'll have to get it to you during some break.
18           MR. MORRIS:  Hold on one second.
19           MR. RUKAVINA:  Sure.  Off the record.
20           (Off the record.)
21           (Whereupon, Exhibit 11 was marked for
22           identification.)
23     Q.    (BY MR. RUKAVINA)  Exhibit 11, Ms. Hendrix,
24 if you'll go to the beginning of this email chain, is
25 an email on January 6, 2021, again from Mr. Donohue to

Kristin Hendrix - October 27, 2021

1  you, copying Waterhouse, Seery, a bunch of others.

2  Where he says, at the direction of Jim Seery,

3  please provide DSI with the requested information for

4  each entity below.

5  And you'll see the entity includes both of my

6  clients, NexPoint Advisors and HCMFA. And the

7  information includes bank statements, income

8  statements, balance sheets, cash flows.

9  Do you see that?

10  A.  Yes.

11  Q.  Do you recall this email?

12  A.  Vaguely, yes.

13  Q.  Did you have any concerns when you received

14  this email?

15  A.  Concerns about the email, no. I probably

16  checked with -- I would have checked with Frank to make

17  sure it was okay to send this first.

18  Q.  Frank Waterhouse?

19  A.  Yes.

20  Q.  Do you have any understanding as to why

21  Mr. Donohue requested bank statements, income

22  statements, balance sheets for NexPoint and/or HCMFA?

23  A.  I do not.

24  Q.  Did he or anyone at DSI tell you why they

25  were requesting that?

Kristin Hendrix - October 27, 2021

1      A.    Not that I can recall.

2      Q.    If we go forward in time, you'll see that

3  Mr. Waterhouse is writing back to Mr. Donohue.  And

4  then Mr. Seery interjects and says, these are HCMLP

5  business records.  Please provide them as requested by

6  Jack ASAP.

7            Do you see that?

8      A.    Yes.

9      Q.    And it looks like you were not privy to

10 subsequent communications where Frank and Jim were

11 talking back and forth about this.  You were not privy

12 to those, like you weren't blind copied or anything to

13 your recollection?

14     A.    No.

15     Q.    Did you in fact on or after January 6, 2021,

16 provide Mr. Donohue or anyone on his team the

17 information that he had requested as it relates to

18 NexPoint and/or HCMFA?

19     A.    Without going back to check, I couldn't

20 answer yes or no for certain.

21     Q.    So I think you mentioned when you received

22 the email from Mr. Donohue you would have checked with

23 Frank.  And what do you remember asking Frank or

24 checking with him about?

25     A.    I don't remember asking him specifically.  In

Kristin Hendrix - October 27, 2021

1  fact, it's possible that Frank just responded on his

2  own here to Jack.  Again, would have been a

3  conversation that I can't specifically recall.

4      Q.   Sure.  And you don't specifically remember

5  today providing Mr. Donohue any of that information;

6  right?

7      A.   Right.

8      Q.   You don't specifically remember today having

9  a discussion with Mr. Donohue or Seery or anyone else

10  at or about that time as to why they were wanting this

11  information?

12      A.   Correct.

13      Q.   Exhibit 12, Ms. Hendrix, is going to be the

14  December 3, 2020, letter by which Highland called the

15  notes.

16          MR. MORRIS:  Objection to the form of the

17  question if there was one.

18          (Whereupon, Exhibit 12 was marked for

19          identification.)

20      Q.   (BY MR. RUKAVINA)  Are you familiar with

21  Exhibit 12, Ms. Hendrix?

22      A.   No, I haven't seen this.

23      Q.   Prior to today, you don't remember seeing

24  this?

25      A.   No.

Kristin Hendrix - October 27, 2021

1    Q.   I think you're answering no?

2    A.   No, sorry, no.

3    Q.   On or before December 3, 2020, did anyone

4  discuss with you whether Highland should call the

5  demand notes that were outstanding by HCMFA?

6    A.   No.

7    Q.   Do you recall in December 2020 any discussion

8  with anyone at the debtor about the NexPoint

9  $30.7 million term note?

10    A.   Repeat your question again, please.

11    Q.   Sure.  So you're familiar, and we'll talk

12  about it in some detail, with the NexPoint

13  $30.7 million note?

14    A.   Yes.

15    Q.   And again, we'll talk about it, but at that

16  point in time that was a term note; correct?

17    A.   Correct.

18    Q.   Do you remember in the December 2020 or

19  November 2020 time frame discussing with anyone at the

20  debtor the status of that NexPoint note?

21    A.   Yes, we would have discussed this on a weekly

22  basis in our cash meetings that we would have had, as

23  identifying that there are payments due on these loans

24  in December.

25    Q.   What weekly cash meetings are you referring

Kristin Hendrix - October 27, 2021

1  to?

2      A.    We had a standing weekly cash meeting with

3  Frank Waterhouse, myself, Jim Seery.  I can't recall

4  everyone on it.  Some of the DSI folks.  We go through

5  cash forecasts.  It's a 13-week cash forecast.  We go

6  through it every week.

7          It's going to lay out incoming and outgoing

8  payments that are forecasted, of which these term loans

9  were in those forecasts, so they were discussed.

10     Q.    And Mr. Morris produced some of those to me

11 this morning.  I haven't had time to go through them.

12         But it is your recollection in November and

13 December of 2020 the fact of the NexPoint term note

14 being out there was known to Mr. Seery?

15     A.    Yes.

16     Q.    And the fact of an upcoming December 31,

17 2020, payment was known to Mr. Seery?

18     A.    Yes.

19     Q.    So with that background, in November and

20 December of 2020, do you remember discussing with

21 anyone anything to the effect of, oh, it really would

22 be better if NexPoint defaulted on that note so we

23 could call it?

24     A.    No.

25     Q.    Did Mr. Seery ever state to you anything in

Kristin Hendrix - October 27, 2021

1  November or December of 2020 about how the debtor might
2  monetize that NexPoint note?
3      A.   No.
4      Q.   Did he discuss with you any potential sale of
5  that promissory note?
6      A.   No.
7      Q.   Did DSI ever discuss with you in November or
8  December 2020 any potential sale of that note?
9      A.   No.
10     Q.   Or how to monetize that note?
11     A.   No.
12     Q.   So -- well, strike that.
13          Did Mr. Seery or anyone at DSI, or anyone at
14  all, in November or December of 2020 state any words to
15  you to the effect that they were hoping that NexPoint
16  would default on that note?
17     A.   Never.
18     Q.   Or that it would be in the debtor's interest
19  for NexPoint to default on that note?
20     A.   No.
21     Q.   In November or December of 2020, do you
22  recall having any discussions with Mr. Seery or anyone
23  at DSI as to the collectibility of that note?  And by
24  that I mean whether NexPoint can pay the note?
25     A.   I don't specifically recall.  It most likely

Kristin Hendrix - October 27, 2021

1　came up in cash conversations.

2　　　Q.　I think you were assistant controller back

3　then?

4　　　A.　Yes.

5　　　Q.　Would a discussion of a borrower's ability to

6　repay have been something within your general sphere of

7　responsibility in that time frame?

8　　　　　MR. MORRIS:　Objection to the form of the

9　question.

10　　　　　THE WITNESS:　It depends on who the borrower

11　is, and at that time we did -- we had knowledge over

12　that information, so yes.

13　　　Q.　(BY MR. RUKAVINA)　Well, you've seen some

14　instructions or requests from Mr. Seery to you and DSI

15　to you for financial information of NexPoint and HCMFA.

16　We've gone through those documents; right?

17　　　A.　Yes.

18　　　Q.　Does that refresh your memory that there was

19　any internal discussion that you were privy to about

20　the ability of HCMFA and/or NexPoint to pay these

21　notes?

22　　　A.　I don't recall that specifically being asked.

23　It could have.

24　　　Q.　Did you ever at any point in time have any

25　employment or officer or any title or role with

Kristin Hendrix - October 27, 2021

1 NexPoint Advisors, LP?

2    A.   No.

3    Q.   Were you ever the controller or assistant

4 controller for NexPoint Advisors LP?

5    A.   No.

6    Q.   Did you ever at any point in time have any

7 employment, officer or any title or role at HCMFA?

8    A.   No.

9    Q.   Were you ever the controller or assistant

10 controller of HCMFA?

11    A.   No.

12    Q.   So you might have indirectly provided

13 services to those two as part of shared services, but

14 never directly; is that fair?

15       MR. MORRIS:  Objection to the form of the

16 question.

17       THE WITNESS:  When you say never directly,

18 meaning I was not employed by those entities?

19    Q.   (BY MR. RUKAVINA)  Correct.

20    A.   That's correct.

21    Q.   Do you have any understanding -- first of

22 all, NexPoint did not make a payment on December 31,

23 2020; correct?

24    A.   Correct.

25    Q.   Okay.  Do you have any understanding of why

Kristin Hendrix - October 27, 2021

1  not?

2      A.    Yes.

3      Q.    What's your understanding?

4      A.    Either November 30 or December 1, 2020, I

5  received a phone call from Frank Waterhouse that said,

6  no payments are going from any of the Advisors to

7  Highland.

8      Q.    Can you be more specific with what he said?

9      A.    That's what he said.

10     Q.    So he said no payments from the Advisors to

11 Highland?

12     A.    Yes.

13     Q.    Did he reference the promissory note

14 expressly?

15     A.    No.

16     Q.    But no payments means?

17     A.    Nothing.

18     Q.    That would logically in your mind include the

19 promissory note?

20     A.    Yes.

21     Q.    Did you ask him why?

22     A.    No.

23     Q.    Did he tell you why?

24     A.    No.

25     Q.    Did you, prior to January 1, 2021, did you

Kristin Hendrix - October 27, 2021

1  hear from anyone as to why Mr. Waterhouse gave that
2  instruction?
3       A.    Not that I recall.
4       Q.    Did you, after that November 30 or December 1
5  phone call, did you follow up with him or anyone else
6  about the upcoming note payment?
7       A.    I didn't have any reason to.
8       Q.    I'm going to -- let me find you a document
9  for a moment.
10           Just so the record is complete, let's include
11  this promissory note.  It's going to be Exhibit 13.
12  This is the NexPoint promissory note.
13           (Whereupon, Exhibit 13 was marked for
14           identification.)
15       Q.    (BY MR. RUKAVINA)  I take it you've seen this
16  promissory note, Exhibit 13?
17       A.    Yes.
18       Q.    And I think you testified about this before,
19  but just to summarize to save time.
20           This would have been a note that you would
21  not have papered but would have gone through legal
22  because it was a roll-up.  Is that generally accurate?
23       A.    Yes.
24       Q.    And do you have any memory at all of having
25  anything to do with papering up this loan?

Kristin Hendrix - October 27, 2021

1     A.    Not that I recall.

2     Q.    Would you have had, after 2017 and before

3  2021, any role with respect to any payments or upcoming

4  payments on this note, any role at all?

5     A.    Yes.

6     Q.    What would have been your role or roles?

7     A.    That would have been taking direction from

8  Frank Waterhouse or possibly Jim Dondero saying, go

9  ahead and make these payments that are due on these

10 term notes.

11    Q.    Would you have recorded on any books or

12 records payments that actually were made?

13    A.    Not me personally.

14    Q.    Who would have?

15    A.    Our accountant, which could have been one of

16 two different people, depending on the time frame.

17    Q.    Would you have had any role with respect to

18 recording those payments or is that just something that

19 your group would have done?

20         MR. MORRIS:  Objection to the form of the

21 question.

22         THE WITNESS:  I would not have had a role.

23 My group would have.

24    Q.    (BY MR. RUKAVINA)  What about calculating

25 amortization and/or interest payments that are due or

Kristin Hendrix - October 27, 2021

1  upcoming?  Who would have done that, you or someone
2  else?
3       A.   Our accountant.
4       Q.   Do you have any memory of doing that?
5            MR. MORRIS:  Objection to the form of the
6  question.
7            THE WITNESS:  Not during 2017 through 2019.
8       Q.   (BY MR. RUKAVINA)  What about 2020?
9       A.   No.
10      Q.   Going back to that November 30 or December 1
11  telephone call, do you recall who initiated the call?
12      A.   To me?
13      Q.   The one between you and Mr. Waterhouse.
14      A.   Frank called me.
15      Q.   Frank called you.
16           And was it just to discuss -- or just to give
17  you that instruction, no payments from the Advisors, or
18  was there other things discussed?
19      A.   I could not tell you if something else was
20  discussed on that phone call.
21      Q.   Do you remember if it was a long phone call
22  or short?
23      A.   Couldn't tell you.
24      Q.   Do you remember where you were when he called
25  you?

Kristin Hendrix - October 27, 2021

1      A.    At my house.

2      Q.    Did you answer on a cell phone or landline?

3      A.    My cell phone.

4      Q.    Is there any chance in hell that your cell

5  phone would still have a record of that phone call,

6  like what time it was and how long it lasted?

7           MR. MORRIS:  Objection to the form of the

8  question.

9      Q.    (BY MR. RUKAVINA)  I apologize for using

10 hell.

11          MR. MORRIS:  And to foundation.

12          THE WITNESS:  I have no idea.

13     Q.    (BY MR. RUKAVINA)  Do you have your cell

14 phone with you right now?

15     A.    In the other room.

16     Q.    I might ask you during the break to just --

17 we'll take a short break before I'm done, and I'll ask

18 you if you've had a chance to look for November and

19 December 2020 phone logs between you and

20 Mr. Waterhouse.  I would ask you to do that, please.

21     A.    Sure.

22     Q.    And I apologize, I think you said you thought

23 it was a short telephone call?

24     A.    I have no idea.

25     Q.    Did the telephone call or Mr. Waterhouse's

Kristin Hendrix - October 27, 2021

1  instructions surprise you in any way?

2      A.   Nothing surprises me anymore, so no.

3      Q.   Did it surprise you back in November or

4  December of 2020?

5      A.   No.

6      Q.   Did it pique your curiosity?

7      A.   Nope.

8      Q.   Just another instruction from your boss?

9      A.   Yep.

10     Q.   Exhibit 14 is going to be a document that

11 we're not sure what it is and we're not sure who

12 prepared it.  It appears to be a ledger of charges

13 against and payments on this promissory note.

14          I'm just saying that so the people on the

15 phone know what it is, but you don't have to take what

16 I said as correct.

17          (Whereupon, Exhibit 14 was marked for

18          identification.)

19     Q.   (BY MR. RUKAVINA)  So Ms. Hendrix, Exhibit 14

20 was produced by the debtor.  And I'm going to ask you,

21 do you know what this is or have you seen it before?

22 Can you help us state what it is?

23     A.   This looks like it is an amortization

24 schedule of the NexPoint Advisors term loan.

25     Q.   Would this have been something that it

Kristin Hendrix - October 27, 2021

1  appears to you would have been maintained internally by

2  the debtor, or does it look like it might have been

3  prepared by DSI or someone else for some other reason?

4      A.   It looks like the debtor's amortization

5  schedule that they kept.

6      Q.   Did the debtor keep an amortization schedule

7  for the NexPoint promissory note, to your knowledge?

8      A.   Yes.

9      Q.   Did the debtor keep amortization schedules

10  for other term promissory notes?

11      A.   Yes.

12      Q.   In what format, like Excel spreadsheets or

13  Word documents?  What is your recollection for NexPoint

14  specifically?

15      A.   Excel.

16      Q.   Would that have been on the shared system or

17  something?

18      A.   Yes.

19      Q.   And who would have been responsible on an

20  ongoing basis to update the NexPoint amortization

21  schedule?

22          MR. MORRIS:  Objection to the form of the

23  question.

24          THE WITNESS:  Depends on what time you're

25  asking.

Kristin Hendrix - October 27, 2021

1    Q.    (BY MR. RUKAVINA)  Let's talk about the year

2  of 2020.

3    A.    That would have been Hayley Eliason, our

4  accountant at that time.

5    Q.    What about the year 2019?

6    A.    Still Hayley.

7         MR. RUKAVINA:  I'm going to just ask, to

8  preserve the record, Mr. Morris, if he hasn't already,

9  to produce any such Excel spreadsheet in the native

10  form.

11    Q.    (BY MR. RUKAVINA)  If we look at this,

12  Ms. Hendrix -- and I'm a little confused as to what

13  these entries mean.  Maybe you could help me.  But

14  columns that say interest paid, principal paid, total

15  paid, do you know what those columns mean?

16    A.    Exactly as they state.  These are interest

17  and principal payments made on the date that's listed,

18  and then you've got a total.

19    Q.    And then they're in brackets because they're

20  negative numbers?

21    A.    Correct.

22    Q.    So here's what I'm not understanding.  Go to

23  the second page.

24         You see there's an entry under interest paid

25  12/30/29 [verbatim] that says negative 530,000 and

1   change but it doesn't use brackets?

2       A.   It's a negative number.  It's just a

3   formatting issue.

4       Q.   What about also on that same page in the

5   other column, principal paid, 5/31/2020, it's a

6   positive number, 575,550.

7           MR. MORRIS:  Where are you?

8           MR. RUKAVINA:  On page 2 of this exhibit.

9           MR. MORRIS:  What date?

10          MR. RUKAVINA:  May 31, 2020.  And it's the

11  column over, principal paid.  It's a positive number,

12  575,000 and change.

13          MR. MORRIS:  Got it, thank you.

14      Q.   (BY MR. RUKAVINA)  Do you see that,

15  Ms. Hendrix?

16      A.   Yes.

17      Q.   Do you have an understanding of why that

18  number would be positive?

19      A.   Actually, I think this looks like an entry to

20  me where the interest is what we call picking.  So on

21  the anniversary date of this loan, which is May, from

22  what I can tell, the accrued interest total, which is

23  that 575-, is being rolled into principal.

24          That's what I can tell from looking at it.

25      Q.   Okay.  Do you have any understanding as to

Kristin Hendrix - October 27, 2021

1  why that would have been done or why that would have
2  been done on that day?
3          MR. MORRIS:  Objection to the form of the
4  question.
5          THE WITNESS:  Because that's the anniversary
6  date of the loan.  I would assume that that's how the
7  loan is written.
8      Q.   (BY MR. RUKAVINA)  And I think that that
9  Section 1 of the promissory note does say, the unpaid
10 principal balance of this note from time to time
11 outstanding shall bear interest.
12          At the rate of 6 percent per annum from the
13 date hereof until maturity date, compounded annually on
14 the anniversary of the date of this note.
15          Do you see that?
16          MR. MORRIS:  Objection to the form of the
17 question.
18          THE WITNESS:  Yeah, I see that.
19     Q.    (BY MR. RUKAVINA)  Assuming that this is the
20 correct amortization schedule for the NexPoint note,
21 and that the numbers in here are correct, if you look
22 at the second page under the column total paid there
23 are a number of entries for 2019.
24          Do you see that, the far right column?
25     A.    At the top, yes.

Kristin Hendrix - October 27, 2021

1     Q.   For example, 1.3 million, 2.1 million,
2   1.3 million.
3          Do you see that?
4     A.   Yes.
5     Q.   Assuming that that's correct, do you have any
6   memory or understanding whether in the year 2019, or
7   why NexPoint was making these payments on this
8   promissory note?
9     A.   Without going back and reading through emails
10  I can only assume that, from looking at this, Highland,
11  the debtor, would have needed cash, and so this is one
12  way of getting cash to the debtor.
13    Q.   This is kind of like what we discussed in the
14  beginning, that Mr. Dondero on a cash needed basis
15  would just transfer money between entities?
16    A.   Yes.
17    Q.   Do you have any memory in the first half of
18  2019 whether Highland, the debtor, had any particular
19  need for cash money at that time?
20    A.   We generally always had a need for cash, so
21  yes.
22    Q.   And so if NexPoint was transferring money
23  back to Highland on this note because Highland needed
24  the money, would those have been recorded as
25  prepayments by the debtor?

Kristin Hendrix - October 27, 2021

1          MR. MORRIS:  Objection to the form of the
2   question.
3          THE WITNESS:  Yes.
4      Q.   (BY MR. RUKAVINA)  Sitting here today, do you
5   have any reason to believe based on the formatting or
6   anything on Exhibit 14 that it's not the amortization
7   schedule as it was maintained by the debtor?
8      A.   I don't have any reason to not believe that
9   it was.
10     Q.   Going to show you a few documents that I'm
11  hopefully going to burn through, but you're certainly
12  entitled to take all the time that you need.
13         So first is going to be a document that
14  Mr. Morris produced this morning.  It's not Bates
15  labeled.  I don't know why.
16         MR. MORRIS:  As I said in my email, my
17  paralegal is sick and so I wanted you to have the
18  documents.  We'll Bates stamp them later, but we have a
19  written record from my email of what we produced to
20  you.
21         MR. RUKAVINA:  You're assuming that I read my
22  emails.
23         MR. MORRIS:  Sorry about that.  I confess,
24  sometimes I don't as well.
25     Q.   (BY MR. RUKAVINA)  So I'm going to hand you

Kristin Hendrix - October 27, 2021

1   Exhibit 15 and I'm going to represent to you that it's
2   the email that Mr. Morris sent to me today and I've not
3   doctored it in any way.
4           (Whereupon, Exhibit 15 was marked for
5           identification.)
6           MR. MORRIS:  Do you have the email that it
7   was attached to?
8           MR. RUKAVINA:  Somewhere.  I can find it at a
9   break.
10          MR. MORRIS:  I'll let the witness testify.
11  This was attached to an email.  Not my email, but
12  another email.  But I'll let the witness testify.
13          MR. RUKAVINA:  Off the record.
14          (Off the record.)
15      Q.   (BY MR. RUKAVINA)  So you have Exhibit 15.
16          And during the break we established, I don't
17  have a copy of it right now, but you sent Exhibit 15 on
18  August 29, 2020, to Mr. Dondero by email, copying
19  Mr. Waterhouse, as well as a couple of other
20  attachments; is that correct?
21      A.   Correct.
22      Q.   Do you recall what prompted you to send that
23  email and this attachment?
24      A.   Yes.
25      Q.   What?

Kristin Hendrix - October 27, 2021

1    A.    Frank Waterhouse called me on August 29, and
2  requested that I do so.
3    Q.    Did he tell you why?
4    A.    From what I recall, this was a time when Jim
5  was trying to come up with his bargain or pop land,
6  whatever he referenced it as.  This was all information
7  that Frank said he wanted.
8    Q.    Okay.  So going back to Exhibit 15, what I'm
9  interested in is NexPoint Advisors, the 23,846,000 and
10 change number.
11          Do you see that?
12   A.    Yes.
13   Q.    Where did that number -- or where did this
14 Exhibit 15 come from, if you understand my question?
15   A.    Sure.  These numbers should all be balances
16 off of the corresponding notes that each entity owed to
17 the debtor.
18   Q.    Did you or someone prepare Exhibit 15
19 specifically for that email?  Or was Exhibit 15 already
20 existing somewhere on the system?
21   A.    I believe that we prepared it specifically
22 for this request.
23   Q.    Do you recall who?
24   A.    It was either myself or our accountant.  I
25 don't recall who put it together.

Kristin Hendrix - October 27, 2021

1    Q.   Okay.  And where would that 23 million and
2  change number for NexPoint have come from, an
3  amortization schedule?
4    A.   Yes.
5    Q.   And what about Highland Capital Management
6  Fund Advisors?  You see $10.5 million and change demand
7  on Exhibit 15?
8    A.   Yes.
9    Q.   Where would that $10.5 million number have
10  come from, do you remember?
11    A.   The same.  It would have come off of the
12  amortization schedules for all of their notes.
13    Q.   How was there an amortization schedule for a
14  demand note?
15    A.   Because it's accruing interest.
16    Q.   So sitting here today, you expect there would
17  be some amortization schedule like Exhibit 14 but for
18  HCMFA?
19    A.   Yes.
20    Q.   Now we're going to have an exhibit [verbatim]
21  chain that's going to be marked as Exhibit 16.
22         (Whereupon, Exhibit 16 was marked for
23         identification.)
24         MR. RUKAVINA:  For the folks on the video,
25  Exhibit 16 is the email chain that Mr. Morris used last

Kristin Hendrix - October 27, 2021

1  week regarding the Section 15(c) document.

2      Q.   (BY MR. RUKAVINA)  Are you familiar with this

3  Exhibit 16 email chain, Ms. Hendrix?

4      A.   Yes.

5      Q.   Why are you familiar with it?

6      A.   Well, I'm copied on it, and I saw it

7  yesterday.

8      Q.   Do you have any memory -- well, that's a

9  stupid question.  But prior to yesterday, did you have

10  any memory of this?

11      A.   Yes.

12      Q.   And do you recall the context or the purpose

13  of this exhibit, or this email chain?

14      A.   From what I remember this is the time where

15  information was being prepared for the retail board to

16  re-up the debtor's shared services.

17      Q.   So, here -- you're certainly welcome to read

18  it in its entirety and if you feel like you want to or

19  need to, that's fine.  But I only have one question.

20  Well, one question with two subparts.

21          I'm looking at Ms. Lauren Thedford's,

22  T-h-e-d-f-o-r-d's, email October 6, 2000 [verbatim]

23  where she says, I see the below from the 6/30

24  financials.  NPA, due to HCMLP and affiliates as of

25  June 30, 2020.

Kristin Hendrix - October 27, 2021

1    Do you see that, ma'am?

2    A.    Yes.

3    Q.    23 million 683?

4    A.    Yes.

5    Q.    And you see, HCMFA due to HCMLP as of

6  June 30, 2020, 12,286,000?

7         MR. MORRIS:  Objection to the form of the

8  question.

9    Q.    (BY MR. RUKAVINA)  Strike that.

10        It says 12,286.  What do you take that 12,286

11  to mean?

12   A.    I think that's a typo and it should have

13  said -- well, there's several things wrong with this,

14  from looking at it.

15        She left off three zeros on the end of it.

16  Should have said 12,286,000.  Secondly, that amount is

17  our due to affiliates on HCMFA's books, not just due to

18  HCMLP.

19   Q.    That was going to be my question, why that

20  12,286,000 number didn't jive with the 10,530,000

21  number on Exhibit 15?

22   A.    Yes, there's another loan due to a different

23  affiliate.

24   Q.    So that $12,286,000 amount doesn't mean that

25  it's all due to Highland; is that correct?

Kristin Hendrix - October 27, 2021

1      A.    Correct.

2      Q.    Exhibit 17 is going to be the January 7, 2021

3  notice from the debtor to NexPoint about the default.

4            (Whereupon, Exhibit 17 was marked for

5            identification.)

6      Q.    (BY MR. RUKAVINA)  You've been handed

7  Exhibit 17.  Have you seen this document before?

8      A.    Not that I believe.

9      Q.    And I think we've asked this before, but just

10  to clarify.

11            Did anyone at the debtor, including Mr. Seery

12  or DSI, discuss with you after December 31, 2020 that

13  the payment had not been made and what, if anything,

14  the debtor should do about that?

15            MR. MORRIS:  Objection to the form of the

16  question.

17            THE WITNESS:  I can't recall specific

18  conversations that may or may not have been had around

19  that topic.

20      Q.    (BY MR. RUKAVINA)  Would -- so back then you

21  were the assistant controller, on January 7; right?

22      A.    Yes.

23      Q.    Do you think that back then Mr. Seery or DSI

24  would have sought your advice or input as to what they

25  should do about the missed payment?

Kristin Hendrix - October 27, 2021

1      A.    No.

2            MR. MORRIS:  Objection to the form of the

3  question.

4            THE WITNESS:  No.

5      Q.    (BY MR. RUKAVINA)  That would have been

6  outside of your purview?

7      A.    Yes.

8      Q.    And you see in this notice in the middle, it

9  says an amount due as of January 8 in the $24,471,000

10 range.

11           Do you see that?

12     A.    Yes.

13     Q.    Do you have any idea, I take it you don't,

14 where that number came from?

15           MR. MORRIS:  Objection to the form of the

16 question.

17           THE WITNESS:  I don't know who provided that

18 number or where it came from.

19     Q.    (BY MR. RUKAVINA)  Do you have any

20 understanding as to why that number is higher than the

21 number on Exhibit 15?

22     A.    My guess would be that Exhibit 15 is just

23 principal balances.

24     Q.    Okay.

25           Exhibit 18, please.

Kristin Hendrix - October 27, 2021

1          (Whereupon, Exhibit 18 was marked for
2          identification.)
3      Q.   (BY MR. RUKAVINA)  Exhibit 18, Ms. Hendrix,
4  is an email chain between you and Mr. Waterhouse on
5  January 12, 2021.  Do you remember this email chain?
6      A.   No.
7      Q.   Do you remember on January 12 Mr. Waterhouse
8  emailing you, asking when the last amort payment due
9  and what the amount was for NexPoint?
10     A.   No.
11     Q.   When was the last time -- well, strike that.
12          Do you remember ever seeing this email
13  between then and today?
14     A.   No.
15     Q.   Do you have any present memory of any
16  communications with Mr. Waterhouse on or about
17  January 12, 2021 regarding the NexPoint default or
18  note?
19     A.   Not specific, no.
20     Q.   Any general memory?
21     A.   Not that I can pinpoint, no.
22     Q.   Were you aware that on or about January 14
23  NexPoint transferred about $1.4 million and change to
24  the debtor?
25     A.   Yes.

Kristin Hendrix - October 27, 2021

```
1      Q.    Were you aware of it then?

2      A.    Was I aware of what?

3      Q.    That transfer of $1.4 million and change.

4      A.    On January 14?

5      Q.    Yes.

6      A.    Yes.

7      Q.    Did you facilitate that transfer?

8      A.    Yes.

9      Q.    Who told you to make that transfer?

10     A.    Frank Waterhouse.

11     Q.    Did he tell you why?

12     A.    Nope.

13     Q.    He just said make the transfer?

14     A.    Yes.

15     Q.    Did he tell you that it was on account of the

16  NexPoint note?

17     A.    Yes.

18     Q.    Did he tell you how to, if at all, to credit

19  that note for that amount?

20     A.    No.

21     Q.    Sitting here today, you have no memory other

22  than that Frank Waterhouse told you to transfer some

23  $1.4 million on the NexPoint note?

24     A.    Right.

25     Q.    And do you recall, was that oral or written
```

Kristin Hendrix - October 27, 2021

1    or how would that have been?

2         A.    That was a phone call.

3         Q.    Do you recall who initiated the phone call?

4         A.    Frank called me.

5         Q.    Was that the only topic discussed in that

6    phone call to your memory?

7         A.    Yes.

8         Q.    Did you ask him why the payment or

9    anything -- did you ask him anything at all?

10        A.    No.

11        Q.    And after you made the payment -- or I'm

12   sorry, after you caused the payment to be made, did you

13   take any further steps with respect to the NexPoint

14   note?

15        A.    I forwarded the payment confirmation, showing

16   that the money was sent from NexPoint Advisors to

17   Highland, forwarded that payment confirmation from the

18   bank to Jack Donohue at DSI, letting him know.

19        Q.    Did you let Mr. Donohue or anyone at DSI know

20   about the transfer before the transfer was made?

21        A.    No.

22        Q.    And you sent that by email to Mr. Donohue?

23        A.    Yes.

24        Q.    Did Mr. Donohue thereafter have any

25   discussion with you about that in any way?

Kristin Hendrix - October 27, 2021

1      A.    I have no idea.

2      Q.    He didn't ask what this was for or anything

3  like that?

4      A.    He may have asked what the amount

5  represented.  I can't specifically recall.  But it's

6  possible.

7      Q.    Okay.  Do you recall any discussion about

8  that time, January 14, with Mr. Donohue or

9  Mr. Waterhouse or anyone as to whether that payment

10  would in any way relieve NexPoint of the default or

11  would not relieve NexPoint of the default?

12      A.    No.

13      Q.    Ms. Hendrix, I believe that I am done.  I

14  would like you, however, because it's important, to

15  check your phone.  Would you like a short, five-minute

16  restroom break and just check --

17      A.    Yeah, and I might need help figuring out how

18  to do that.

19      Q.    I'm not saying that it's possible, but I'm

20  going to ask you on the record to look for that

21  November 30 or December 1, 2020 phone call.

22      MR. MORRIS:  We're happy to do that.

23      Q.    (BY MR. RUKAVINA)  But what I would like if

24  you find it, I would like you to tell me the time, the

25  date and the length of that call.

Kristin Hendrix - October 27, 2021

```
1        A.    Okay.
2        Q.    Thank you.
3              We'll be back in five minutes.
4              (Off the record.)
5        Q.    (BY MR. RUKAVINA)  Ms. Hendrix, during the
6   break did you look at your phone?
7        A.    I did.
8        Q.    Did you find anything?
9        A.    Sadly, it only goes back to October 5 of
10  2021.
11       Q.    Not surprised.  Thank you.
12             Have I been courteous to you today?
13       A.    Yes.
14             MR. RUKAVINA:  I pass the witness.
15             MR. MORRIS:  Thank you.
16             MR. AIGEN:  Are we ready to move forward?
17             MR. MORRIS:  Yes.  You're a little dark
18  there.
19             MR. RUKAVINA:  Can we increase the volume on
20  that thing?
21             (Off the record.)
22                        EXAMINATION
23       Q.    (BY MR. AIGEN)  Good afternoon, Ms. Hendrix.
24  My name is Michael Aigen.  I represent Mr. Dondero,
25  HCMS and HCRE Partners in several of the adversary
```

Kristin Hendrix - October 27, 2021

1  proceedings today.

2      I'm going to try to ask you some questions

3  about these adversary proceedings.  I'll try to make it

4  as quick as possible so we don't keep you here.

5      You understand that you're still under oath;

6  is that correct?

7      A.   Correct.

8      Q.   First topic I want to ask you about is one of

9  the defenses in this case related to an oral agreement.

10 Let me start off with this question.

11      Are you aware that some of the defendants in

12 these adversary proceedings have raised a defense that

13 there was a subsequent oral agreement allowing the

14 notes at issue to be potentially forgiven if certain

15 events occurred?

16     A.   I've recently been made aware that this came

17 up, yes.

18     Q.   When you say recently, approximately when?

19     A.   Within the last week.

20     Q.   And where did you learn that from?

21     A.   In my speakings with John Morris just

22 preparing for today.

23         MR. AIGEN:  And John, I'm going to assume

24 that those conversations are privileged?

25         MR. MORRIS:  That's a very fair assumption.

Kristin Hendrix - October 27, 2021

1  Q.  (BY MR. AIGEN)  Other than the conversation
2  you just referred to with Mr. Morris, have you ever had
3  any other conversations with anyone about this alleged
4  oral agreement that Defendants are contending occurred?
5  A.  No.
6  Q.  So prior to that conversation with Mr. Morris
7  you weren't even aware of this alleged defense related
8  to an oral agreement.  Is that fair to say?
9  A.  That's right.
10  Q.  This is a similar question but slightly
11  different, just to sort of finish this topic.  I'm not
12  asking about this oral agreement as a defense, I'm just
13  asking more generally.
14      Other than this conversation, were you aware
15  generally of any conversations that anyone had where
16  the notes at issue might be forgiven if certain events
17  occurred?
18      MR. MORRIS:  Objection to the form of the
19  question.
20      THE WITNESS:  No.
21  Q.  (BY MR. AIGEN)  Is it fair to say that you
22  haven't had any conversations about this subsequent
23  oral agreement with anyone other than Mr. Morris?
24  A.  That's fair.
25  Q.  You never discussed it with Mr. Seery?

Kristin Hendrix - October 27, 2021

1      A.    No.

2      Q.    Never discussed it with Mr. Klos?

3      A.    No.  Well, sorry, Mr. Klos was present when

4  John and I talked about it.  But that's it.

5      Q.    Have you ever made any investigation or

6  effort in order to determine if this oral agreement

7  actually occurred?

8      A.    No.

9      Q.    If there was such an oral agreement to

10  potentially forgive the notes, do you believe that you

11  would have known about such an oral agreement as part

12  of your duties and responsibilities?

13      A.    Yes, I would hope so.

14      Q.    Why do you say that?

15      A.    That's something that should be disclosed in

16  audited financial statements, and me and my team are

17  responsible for preparing those financial statements

18  and presenting them to the auditors as fair and

19  accurate.

20      Q.    And is it fair to say that this oral

21  agreement should have been disclosed to PwC if it was

22  determined that it was material?

23      A.    Yes.

24      Q.    And have you done any sort of analysis to

25  determine whether the oral agreement at issue here

Kristin Hendrix - October 27, 2021

1   would have been material for purposes of a PwC audit?

2        A.   I've not done any work, just finding out

3   about it, but from what it sounds like, it would be

4   material.

5        Q.   That's your opinion, that it would have been

6   material; is that fair to say?

7        A.   Fair.

8        Q.   Have you had any discussions with anyone else

9   about whether the oral agreement would have been

10  material?

11       A.   No.

12       Q.   Changing topics a little bit here, are you

13  aware --

14            (Off the record.)

15       Q.   (BY MR. AIGEN)  Are you aware that a few of

16  the loans at issue here, specifically related to HCMS

17  and HCRE, were term loans as opposed to demand loans?

18       A.   Yes.

19       Q.   And are you aware that for those particular

20  loans, there were payments that were supposed to be

21  made but weren't on December 31, 2020?

22       A.   Yes.

23       Q.   Do you have any understanding as to why those

24  payments weren't made with respect to the HCMS and HCRE

25  term loans on December 31, 2020?

Kristin Hendrix - October 27, 2021

1    A.    Yes.

2    Q.    Can you tell me why?

3    A.    Sure.  It goes along with the same statement

4  as HCMFA and NPA and the phone call that I got from

5  Frank Waterhouse saying there's no payments coming from

6  any of the affiliates to the debtor.

7    Q.    I may have written that down wrong when you

8  talked about that before, but I believe your earlier

9  testimony when you described that conversation was that

10 there was no more payments coming from the Advisors,

11 not affiliates.

12         Let me ask you then, what was the

13 conversation?  Was it no more payments from affiliates

14 or Advisors?

15   A.    It could have been either.  I probably did

16 say Advisors.  But regardless, those payments would

17 have been directed to me to be made, either by Frank

18 Waterhouse or Jim Dondero.

19         And I would assume that nobody directed me to

20 make those payments because we weren't making any

21 payments from Jim's related parties.  I don't know for

22 a fact, but that's what I would assume.  Those were all

23 under the same umbrella.

24   Q.    And again, let's back up a second.

25         When you refer to Advisors, fair to say that

Kristin Hendrix - October 27, 2021

1  that does not include HCMS and HCRE; is that correct?

2      A.   When I say Advisors, I am referring to HCMFA

3  and NPA.

4      Q.   And when you use the term "affiliates,"

5  you're referring to all four; is that correct?

6      A.   Correct.

7      Q.   Just want to make sure we're on the same

8  page.

9          When you answered the previous question you

10  started to get into assumptions and things like that.

11  Let me start off with what your specific recollection

12  of that phone call was.  Tell me as best as you can

13  what you remember Frank telling you?

14      A.   I remember it as being no payments from the

15  Advisors to the debtor.

16      Q.   So you don't remember the instruction being,

17  don't make payments from the affiliates.  It was, don't

18  make payments from the Advisors; is that correct?

19      A.   Correct.

20      Q.   So is it fair to say that you don't remember

21  any instructions telling you not to make any payments

22  from HCMS or HCRE?

23      A.   That's fair.

24      Q.   So if that is the case, why weren't payments

25  made from HCMS or HCRE for December 31, 2020, payment?

1    A.    Sure.   Typically what would have happened is

2 Frank would be talking to Jim Dondero about making

3 these payments and getting his approval to do so,

4 because Jim Dondero is, you know, directing payments

5 out of these entities.

6         I have never -- had never been given the

7 direction to effectuate those payments by anybody.

8    Q.    Is it fair to say, then, that you're not

9 aware of any instructions from anyone saying that the

10 HCMS and HCRE payments should not be made on

11 December 31, 2020?

12    A.    That's fair.

13    Q.    So the reason the payments weren't made is

14 because you never got an affirmative instruction to

15 actually make that payment; is that correct?

16    A.    Correct.

17    Q.    And you're not aware of Mr. Dondero

18 instructing anyone that HCMS and HCRE should not have

19 made the December 31, 2020, payments; is that correct?

20    A.    I'm not aware personally, no.   Correct.

21    Q.    You say personally.   In any way are you aware

22 of such a specific instruction?

23    A.    No.

24    Q.    If that payment was to be made, who at the

25 debtor would have been responsible for making those

Kristin Hendrix - October 27, 2021

1  payments on behalf of HCMS and HCRE?

2          MR. MORRIS:  Objection to the form of the

3  question.

4          THE WITNESS:  The corporate accounting team.

5      Q.  (BY MR. AIGEN)  And that included you?

6      A.  Yes.

7      Q.  And in December of 2020, were you aware that

8  those payments were due on December 31, 2020?

9      A.  Yes.

10     Q.  Did you make any attempts or efforts to

11  determine whether Mr. Dondero wanted those payments to

12  be made?

13     A.  I did not, no.

14     Q.  Why not?

15     A.  That would have been something that Frank

16  Waterhouse would have done directly with Jim Dondero

17  himself.

18     Q.  Did you have any conversations with anyone

19  about whether the December 31 payments for HCMS and

20  HCRE would be made in December of 2020?

21     A.  Not that I can recall.

22     Q.  And you didn't think it was your

23  responsibility to check on those payments and find out

24  if they should have been made?

25     A.  Right, correct.

Kristin Hendrix - October 27, 2021

1    Q.    And is that because it's only your job to
2  make payments that you're told to specifically make; is
3  that correct?

4    A.    Yes, in this case, that is correct.

5    Q.    Is it fair to say then that as part of your
6  job responsibilities you've never made a payment to
7  anyone without being specifically told by Mr. Dondero
8  and Mr. Waterhouse?

9    A.    Sorry, say that again.

10   Q.    As part of your job responsibilities, have
11  you ever made a payment to anyone without the specific
12  instruction of Mr. Waterhouse or Mr. Dondero?

13        MR. MORRIS:  Objection to the form of the
14  question.

15        THE WITNESS:  Yes, we make payments all the
16  time.

17   Q.    (BY MR. AIGEN)  So why is this different in
18  that this payment was not made without the specific
19  instructions from Mr. Waterhouse and Mr. Dondero, even
20  though you believed the payment was due on December 31,
21  2020?

22   A.    The difference between making a loan payment
23  and making normal course -- or sorry, normal, ordinary
24  course, you know, overhead expense payments is that
25  something like that is not necessarily what we would

Kristin Hendrix - October 27, 2021

1   take to Jim Dondero to approve.

2           He doesn't have time to approve every single

3   overhead payment that we're making out of every single

4   entity.  That's what Frank is for.

5           Something that's once a year that's more

6   material in amount, such as a loan payment, that is

7   something that needs to get approved by Jim Dondero.

8       Q.   You say needs to get approved.  What's your

9   basis for that, something in a policy manual, something

10  someone told you?

11      A.   It's a policy that my team followed.  I don't

12  think that it's written in an actual manual anywhere,

13  but anything that's not ordinary course needs to get

14  approved by Jim Dondero.

15      Q.   Is that something that's written in a policy

16  anywhere?

17      A.   Not that I know of.

18      Q.   Were you ever told that payments in the

19  ordinary course can be made without Mr. Dondero's

20  approval but loan payments cannot?

21      A.   Yes, I do recall years ago that Frank and I,

22  possibly Jim, this was years ago, had a conversation

23  that anything ordinary course is up to Frank to

24  approve.  And this is, quite frankly, up to Frank.

25          Whatever he felt Jim needed to sign off on,

Kristin Hendrix - October 27, 2021

1  that's what Jim would sign off on.  This was not my

2  responsibility to make that decision.

3      Q.   And in December -- prior to the December 31,

4  2020, due date you didn't have any conversations with

5  anyone about whether this -- these payments that were

6  due should be made; is that correct?

7      A.   Correct.

8      Q.   And you didn't try to check with anyone to

9  see whether anyone wanted these payments to be made; is

10  that correct?

11      A.   Correct.

12      Q.   Subsequent to the payment being missed, did

13  you ever have any conversations with anyone about why

14  the payment was not made?

15      A.   Not that I recall.

16      Q.   So is it fair to say that sitting here today

17  you have no idea why the payments were not made for

18  HCMS and HCRE on December 31, 2020?

19          MR. MORRIS:  Objection to the form of the

20  question.

21          THE WITNESS:  I don't have any specific

22  evidence telling me why they weren't.  I can make

23  assumptions but that's not going to help.

24      Q.   (BY MR. AIGEN)  Well, did you ever have any

25  conversations with anyone about why those payments were

Kristin Hendrix - October 27, 2021

1 not made?

2     A.    No.

3     Q.    You have no idea why they weren't made other

4 than just speculation; is that fair to say?

5     A.    Correct.

6         MR. MORRIS:  Objection.  Asked and answered.

7         THE WITNESS:  Correct.

8     Q.  (BY MR. AIGEN)  And are you aware that with

9 respect to those two loans, some payments were actually

10 made in the next month, in January of 2021?

11     A.    Yes.

12     Q.    What role, if any, did you have with respect

13 to those payments?

14     A.    Frank Waterhouse would call me and tell me to

15 have my team effectuate a wire.

16     Q.    And you say would call you.  Do you remember

17 this conversation or are you just assuming it occurred?

18         MR. MORRIS:  Objection to the form of the

19 question.

20         THE WITNESS:  If we sent a payment out, Frank

21 would have told me to do it.  I would not have done it

22 on my own.

23     Q.  (BY MR. AIGEN)  Sitting here today, do you

24 have a specific recollection of the conversation where

25 someone told you to make the January 2021 payments?

Kristin Hendrix - October 27, 2021

1    A.   I can't tell you the exact date, but, yes, I
2  do have a recollection of Frank calling or emailing me
3  to have, I believe it was the HCRE wire sent out for
4  their payment.
5    Q.   What about the HCMS payment?
6    A.   I don't recall that one as much.
7    Q.   Other than the payment being made, do you
8  have any recollection of any other conversations about
9  why the payment was being made?
10    A.   No.
11    Q.   Are you aware of any conversations that
12  anyone had regarding whether these payments would
13  deaccelerate loans?
14    A.   No.
15    Q.   Is that something you would normally be part
16  of, conversations like that?
17    A.   No.
18    Q.   Changing topics here.  Not sure if this is an
19  area that you know anything about.
20         Are you familiar with the term, as it's used
21  at Highland, NAV ratio trigger period?
22    A.   No.
23    Q.   This may go very quick.  If I represent to
24  you that it's a term that's used in the -- in the
25  fourth amended limited partnership agreement for

Kristin Hendrix - October 27, 2021

1  Highland Capital Management, would that refresh your
2  recollection at all?
3       A.   No.
4       Q.   Fair to say, then, that you have no knowledge
5  as to whether NAV ratio trigger period was ever reached
6  at any time prior to bankruptcy buyouts?
7       A.   No, I don't know.
8       Q.   Have you ever had any conversations with
9  Nancy Dondero?
10      A.   I have not.
11      Q.   Never met her?
12      A.   No.  I may have exchanged an email with her
13  on an invoice, but that's the extent of it.  No
14  conversations.
15      Q.   In the years leading up to the bankruptcy of
16  Highland Capital, was there any time period where
17  Highland was unable to pay its salaries?
18      A.   Salaries?
19      Q.   Salaries of its employees?
20      A.   No.
21      Q.   In the time leading up to the Highland
22  bankruptcy, was there any time period where Highland
23  wasn't able to pay bonuses owed to any of its
24  employees?
25      A.   Not that I know of.  Not that I can recall.

Kristin Hendrix - October 27, 2021

1      Q.   Are you aware of any time period leading up
2  to the Highland bankruptcy where Highland was unable to
3  pay its bills?
4      A.   There's times where we would be in a cash
5  flow crunch and we would stretch our AP, but eventually
6  it would get paid.
7      Q.   And I think this is the last topic and we can
8  probably move through this pretty quickly.
9           Are you aware of any loans made by Highland
10 to any of its employees or officers that were forgiven
11 in part or all?
12     A.   Yes.
13     Q.   Which officers or employees are you aware of?
14     A.    I recall there were two employees.  I can't
15 remember one of them, but I believe another, the second
16 one, was Paul Adkins.  Again, I'm just recalling this
17 was years ago.
18     Q.   And these two are the only ones you're aware
19 of?
20     A.   Or I'm sorry, not Paul Adkins, Tim Lawler.
21 It's possible Paul Adkins was the other one, but I
22 can't tell you for sure.
23     Q.   Tim Lawler and some other employee that you
24 can't remember the name of are the only two that you're
25 aware of?

Kristin Hendrix - October 27, 2021

1    A.    Yes.

2    Q.    This other employee, I know you don't

3  remember the name.  Is there any other description that

4  you can give me, what their position was, how long they

5  worked, or is it just you remember those loans?

6    A.    I just remember we had two employee loans.

7    Q.    Approximately when was this?

8    A.    I couldn't even tell you.  All the years just

9  commingle together.

10    Q.    More than five years ago?

11    A.    Yes.

12    Q.    More than 10 years ago?

13    A.    I couldn't say.

14         MR. AIGEN:  Why don't we take a five-minute

15  break and then I'll either be done or have just a few

16  wrap-up questions.

17         MR. RUKAVINA:  Okay.

18         (Off the record.)

19               FURTHER EXAMINATION

20    Q.    (BY MR. RUKAVINA)  Ms. Hendrix, in May of

21  2019, would you on behalf of Highland alone,

22  unilaterally, have the authority to lend to HCMFA 2.4-

23  and/or $5.0 million?

24    A.    No.

25    Q.    And would you have had any authority on

Kristin Hendrix - October 27, 2021

1  behalf of HCMFA in May of 2019 to bind HCMFA to such
2  notes?
3       A.   No.
4       Q.   Thank you, ma'am.
5                      EXAMINATION
6       Q.   (BY MR. MORRIS)  Ms. Hendrix, can you get out
7  of your pile, Exhibit Number 3.
8            And this is the email from Dave Klos to
9  corporate accounting on May 2nd concerning the
10 $2.4 million that was going to be transferred from
11 HCMLP to HCMFA?
12      A.   Yes.
13      Q.   And how did Mr. Klos characterize that
14 transfer?
15      A.   He called it a new intercompany loan.
16      Q.   What does a new intercompany loan mean to
17 you?
18      A.   That means we are creating a new loan
19 document, sending money out, tracking it as a
20 brand-new, fresh loan.
21      Q.   And he sent this email to an email group
22 called corporateaccounting@hcmlp.com.  Do I have that
23 right?
24      A.   Yes.
25      Q.   Were you included in that email group?

Kristin Hendrix - October 27, 2021

1    A.    I was.

2    Q.    Can you identify everybody else who you

3  recall being in that email group?

4    A.    Yes.

5    Q.    Who else was in that email group?

6    A.    Dave Klos, Frank Waterhouse, myself, Hayley

7  Eliason, and Blair Roeber.

8    Q.    Okay.  Did Mr. Waterhouse ever tell anybody,

9  to the best of your knowledge, in May 2019 that the

10  transaction should not be booked as a loan?

11    A.    No, not to my knowledge.

12    Q.    You testified earlier that there was, you

13  recall, a similar email the next day with respect to a

14  $5 million transaction.

15          Do you recall that?

16    A.    Yes.

17    Q.    Do you recall if that email also went to

18  corporate accounting?

19    A.    I believe so, yes.

20    Q.    And to the best of your knowledge, would

21  Mr. Waterhouse have been informed on May 3, 2019, that

22  the transaction was being booked by the corporate

23  accounting department as a loan?

24    A.    Yes.

25    Q.    Did Mr. Waterhouse tell you at that time or

Kristin Hendrix - October 27, 2021

1  at any time thereafter that it was a mistake to book it
2  as a loan?
3      A.   No.
4      Q.   Did Mr. Waterhouse tell you at that time or
5  at any time thereafter that he didn't intend to sign
6  the promissory notes?
7      A.   No.
8          MR. RUKAVINA:  Objection.  To the last
9  question, objection to form.
10         Go ahead.
11     Q.   (BY MR. MORRIS)  Okay.  The promissory notes,
12  to be clear, are the two promissory notes that you
13  testified to earlier that have been marked as exhibits
14  in this deposition for $5 million and $2.4 million
15  respectively.
16         With that definition as promissory notes, did
17  Mr. Waterhouse ever tell you at any time that it was a
18  mistake to sign those notes?
19         MR. RUKAVINA:  I'll object to the form.
20         Go ahead.
21         THE WITNESS:  No.
22     Q.   (BY MR. MORRIS)  Did Mr. Waterhouse or
23  anybody -- withdrawn.  I'll go back to the first
24  question.
25         Did Mr. Waterhouse or anybody in the world

Kristin Hendrix - October 27, 2021

1  ever tell you at any time since May of 2019 that it was
2  a mistake to issue the promissory notes as we've
3  defined them?
4      A.    No.
5      Q.    Did Mr. Waterhouse or anybody in the world
6  tell you that Mr. Waterhouse wasn't authorized to affix
7  his signature to those promissory notes?
8          MR. RUKAVINA:  And I'll object.  Assumes
9  facts not in evidence, i.e., the signature.  That's
10  what I've been objecting to.
11          But go ahead and answer.
12          THE WITNESS:  Say it again.
13      Q.    (BY MR. MORRIS)  Did Mr. Waterhouse or
14  anybody in the world tell you at any time that he
15  wasn't authorized to have his signature affixed to the
16  promissory notes?
17          MR. RUKAVINA:  Same objection.
18          THE WITNESS:  No.
19      Q.    (BY MR. MORRIS)  Did you have anything to do
20  with Highland's annual audit?
21      A.    Yes.
22      Q.    What role did you play with respect to
23  Highland's annual audit?
24      A.    I personally was in charge of completely
25  writing the entire audit report for the debtor and for

Kristin Hendrix - October 27, 2021

1  HCMFA.  I oversaw all other aspects of the audit my
2  team carried out.
3          Any requests from the auditors, emails with
4  questions, any issues that arose, all of that went
5  through me.
6      Q.   And did Mr. Waterhouse play a role in
7  relation to the annual audit?
8      A.   Yes.
9      Q.   What is your understanding of
10 Mr. Waterhouse's role?
11     A.   Let's see.  He was in charge of reviewing the
12 financial statements as they were done, so he saw the
13 end product.  He would sign off on the management rep
14 letter.  He signed engagement letters.
15          If there were any big issues, those got --
16 those would be brought to Frank's attention for sure.
17     Q.   Okay.  And are you a CPA?
18     A.   Yes.
19     Q.   And are you familiar with management rep
20 letters?
21     A.   Yes.
22     Q.   What is your understanding of what a
23 management rep letter is?
24     A.   That's basically telling the auditors that
25 everything in the audited financial report is accurate

Kristin Hendrix - October 27, 2021

1   to the best of their knowledge, they've presented

2   everything that they have fair and accurately, they're

3   not withholding any information.

4        Q.   And do you recall that the -- Highland's 2018

5   audit was completed in early June 2019?

6        A.   Yes.

7        Q.   And did you cause the two promissory notes

8   that we're talking about here to be delivered to

9   PricewaterhouseCoopers in connection with the audit?

10        A.   Yes.

11        Q.   And were those two promissory notes delivered

12   to PricewaterhouseCoopers because they constituted

13   subsequent events?

14        A.   Yes.

15        Q.   Do you recall whether those promissory notes

16   were described in Highland's 2018 audited financial

17   statements?

18        A.   Yes.

19        Q.   And did Mr. Waterhouse or Mr. Dondero ever

20   tell you at any time that there was a mistake in the

21   audited financial statements?

22        A.   No.

23        Q.   Did they ever tell you -- did Mr. Waterhouse

24   or Mr. Dondero or anybody in the world ever tell you at

25   any time that the two notes were mischaracterized in

Kristin Hendrix - October 27, 2021

1  the 2018 audited financial statements of Highland
2  Capital?
3      A.    No.
4      Q.    Do you know whether HCMFA also had its annual
5  financial statements audited by PricewaterhouseCoopers?
6      A.    Yes.
7      Q.    Did you play any role in connection with that
8  audit?
9      A.    Yes.
10     Q.    What role did you play in connection with
11  HCMFA's audit of the 2018 financial statements?
12     A.    Same exact role as with the debtors --
13     Q.    And --
14     A.    -- writing the audit report, overseeing all
15  other audit functions.
16     Q.    And did you and your group cause HCMFA to
17  deliver to PricewaterhouseCoopers the two promissory
18  notes that we've been discussing from May 2019?
19     A.    Yes.
20     Q.    Did Mr. Waterhouse or Mr. Dondero or anybody
21  in the world ever tell you that it was a mistake to
22  deliver those promissory notes to PwC in connection
23  with HCMFA's 2018 audit?
24     A.    No.
25     Q.    Were those notes delivered -- withdrawn.

Kristin Hendrix - October 27, 2021

1          Were those notes delivered to
2    PricewaterhouseCoopers because they constituted
3    subsequent events in connection with the 2018 audit?
4        A.    Yes.
5        Q.    Do you recall whether PricewaterhouseCoopers
6    included as a liability on HCMFA's balance sheet the
7    obligations reflected in the two promissory notes at
8    issue?
9            MR. RUKAVINA:  Objection.  Best evidence.
10           Answer.
11           THE WITNESS:  On the 2018 financials?
12       Q.   (BY MR. MORRIS)  Correct.
13       A.   Those would not have been included as
14   liabilities in the 2018 financials.
15       Q.   Do you know if HCMFA completed their audit
16   for 2019?
17       A.   No.
18       Q.   Okay.  Did the notes appear in HCMFA's 2018
19   audited financials under the subsequent events section?
20       A.   Yes.
21           MR. RUKAVINA:  Objection.  Best evidence.
22           Go ahead.
23       Q.   (BY MR. MORRIS)  Did Mr. Dondero or -- did
24   Mr. Waterhouse or Mr. Dondero or anybody in the world
25   ever tell you that it was a mistake to include

Kristin Hendrix - October 27, 2021

1  reference to these notes in HCMFA's 2018 audited
2  financial statements?
3          MR. RUKAVINA:  Same objection.
4          THE WITNESS:  No.
5      Q.   (BY MR. MORRIS)  Okay.  Do you recall, did
6  anybody in the world ever tell you that the
7  transactions described in Exhibit 3 and the other
8  document that you recall should never have been booked
9  as a loan?
10      A.   No.
11      Q.   Did anybody in the world tell you that you
12  made a mistake when you created those promissory notes?
13      A.   No.
14      Q.   Can you pull out what was marked as
15  Exhibit 16.
16          Do you understand that the Advisors provide
17  services to certain retail funds?
18      A.   Yes.
19      Q.   And do you recall that the services are
20  subject to an agreement that's subject to annual
21  review?
22      A.   Yes.
23      Q.   So looking at Exhibit 16, did you understand
24  that the retail board had asked Highland to disclose --
25  I'll just read it from the document on page 2,

1   Bates number ending 881.

2           There's an email from Ms. Thedford that says,

3   quote, are there any material amounts -- withdrawn.

4           Are there any material outstanding amounts

5   currently payable or due in the future, open paren,

6   e.g., notes, close paren, to HCMLP by HCMFA or NexPoint

7   Advisors or any other affiliate that provides services

8   to the funds?

9           Do you see that?

10      A.   Yes.

11      Q.   And were you generally aware that that was

12  part of the annual renewal process?

13      A.   Yes.

14      Q.   And you made some comments earlier about

15  Ms. Thedford's response on the first page.

16          Do you recall that?

17      A.   Yes.

18      Q.   And you actually were able to correct certain

19  mistakes that you perceived in her response.

20          Do I have that right?

21      A.   Correct.

22      Q.   Do you know -- do you see where it says,

23  HCMFA due to HCMLP as of June 30, 2020, let's just call

24  it $12.3 million.

25          Do you see that?

Kristin Hendrix - October 27, 2021

1     A.    Yes.

2     Q.    And above that there is a reference to the

3  6/30 financials.

4          Do you see that?

5     A.    I do.

6     Q.    Do you know what the reference to the 6/30

7  financials is?

8     A.    Yes.

9     Q.    And what is that reference?

10     A.    That is referencing the amounts on the

11  balance sheet at 6/30 that we provided for the 15(c)

12  materials to the board.

13     Q.    Okay.  And does that $12.3 million include,

14  to the best of your knowledge, the principal amount of

15  the two notes that we were talking about?

16     A.    Yes.

17          MR. RUKAVINA:  Objection.  Best evidence.

18          THE WITNESS:  Yes.

19     Q.    (BY MR. MORRIS)  And how do you know that?

20     A.    Because I kept their financials, I know for a

21  fact that it included all of their outstanding notes

22  and it most certainly included these two notes that

23  we've been talking about today.

24     Q.    And to the best of your recollection did

25  HCMFA provide the 6/30 financials to the retail board?

Kristin Hendrix - October 27, 2021

1      A.    Yes.

2      Q.    And to the best of your knowledge did

3  Mr. Dondero or Mr. Waterhouse or anybody in the world

4  ever tell you that the financial statements that were

5  provided to the retail board were erroneous in any way?

6      A.    No.

7      Q.    Did Mr. Dondero or Mr. Waterhouse or anybody

8  in the world ever tell you that the 6/30 financials

9  that were given to the retail board should not have

10 included the $7.4 million principal amount on the two

11 promissory notes?

12         MR. RUKAVINA:  Objection.  Best evidence.

13         Answer.

14         THE WITNESS:  No.

15     Q.    (BY MR. MORRIS)  Do you know whether -- are

16 you at all familiar with the Advisors' actual response

17 to the retail board in October 2020?

18     A.    Say that again, please.

19     Q.    So this email string is October 2020; right?

20     A.    Right.

21     Q.    And do you understand that this is kind of a

22 discussion between Mr. Waterhouse and Ms. Thedford as

23 to how to respond?

24     A.    Yes.

25     Q.    Have you ever seen the actual response that

Kristin Hendrix - October 27, 2021

1  was given to the retail board?

2      A.   I likely did.  I can't tell you for certain

3  that I was on the correspondence.

4      Q.   Do you recall any discussion at any time that

5  the $12.3 million number in Ms. Thedford's email should

6  be changed in the final report to the retail board?

7      A.   I don't believe so.

8      Q.   Did anybody ever tell you at any time that

9  the $12.3 million number was incorrect?

10      A.   No.

11      Q.   Did anybody ever tell you at any time that

12  that number wrongly included the $7.4 million reflected

13  in the two notes?

14      A.   No.

15      Q.   Okay.  Do you recall that earlier that

16  summer -- we looked at Exhibit 15?

17      A.   Yep.

18      Q.   And that was an attachment to an email that

19  you personally sent to Mr. Dondero.  We saw that

20  before?

21      A.   Right.

22      Q.   And this Exhibit 15, which was attached to

23  your email, identifies amounts due and owing from

24  NexPoint Advisors; right?

25      A.   Right.

Kristin Hendrix - October 27, 2021

1   Q.   And it identifies amounts due and owing for a
2   number of different entities, including HCMFA; right?
3   A.   Correct.
4   Q.   Do you know whether the amount included for
5   HCMFA on Exhibit 15 included the principal amount due
6   on the two promissory notes?
7   A.   It does.
8   Q.   Did Mr. Dondero or Mr. Waterhouse ever ask
9   you why -- withdrawn.
10       Did Mr. Dondero or Mr. Waterhouse ever ask
11   you how the $10.5 million number was calculated?
12   A.   No.
13   Q.   Did Mr. Dondero or Mr. Waterhouse ever
14   suggest to you that the number was incorrect?
15   A.   No.
16   Q.   Did Mr. Dondero or Mr. Waterhouse or anybody
17   in the world ever question the number that you gave to
18   Mr. Dondero in the summer of 2020 concerning the
19   principal amount due by HCMFA to HCMLP?
20   A.   No.
21   Q.   Have you ever made a payment -- withdrawn.
22       Have you ever caused a payment to be made in
23   connection with an intercompany loan without receiving
24   the prior approval from either Frank Waterhouse or
25   Mr. Dondero?

Kristin Hendrix - October 27, 2021

1      A.    No.

2      Q.    Has anybody ever said to you that you made a

3   mistake in applying a payment against principal or

4   interest due on an intercompany loan?

5      A.    No.

6      Q.    We saw this morning, and we produced to

7   Mr. Rukavina and he mentioned earlier, 13-week

8   forecasts?  Do you understand that?

9      A.    Yes.

10     Q.    Did you review the 13-week forecasts

11  recently?

12     A.    Yes.

13     Q.    And we're talking specifically about the

14  13-week forecasts for the November/December 2020 time

15  period.  Do you understand that?

16     A.    Yes.

17     Q.    Based on your review of those forecasts, did

18  those forecasts specifically identify the principal and

19  interest that were due on the three term notes as of

20  December 28, 2020?

21     A.    Yes.

22     Q.    And what was the purpose of creating the

23  13-week forecasts?

24     A.    Sure.  That was to keep everybody informed

25  who was on the cash call, Frank Waterhouse, Jim Seery

Kristin Hendrix - October 27, 2021

1 and others, keep everybody informed of upcoming

2 payments that were due on term loans well in advance.

3        Everybody knew about it. It was out there

4 for everybody to see that was on these cash calls.

5    Q. Now, is it your understanding that

6 Mr. Waterhouse -- withdrawn.

7        Did you email these forecasts -- withdrawn.

8        Did anybody email these forecasts to the best

9 of your recollection in late 2020?

10    A. Yes.

11    Q. And was it sent to the corporate accounting

12 group that we saw earlier?

13    A. It was probably sent to Frank, Seery, the DSI

14 guys that were involved with the cash call.

15    Q. Okay. And so did you participate in the

16 creation of the 13-week forecasts?

17    A. Yes.

18    Q. What role did you play in the creation of the

19 13-week forecasts?

20    A. I was responsible for creating the entire

21 thing.

22    Q. Okay. And based on the work that you did,

23 was one of the purposes to make sure that

24 Mr. Waterhouse was aware of all payments that were

25 coming due under the intercompany notes?

Kristin Hendrix - October 27, 2021

1      A.    Yes.

2      Q.    And was that information that was included on

3   the reports to Mr. Waterhouse?

4      A.    Yes.

5      Q.    And do you recall whether there were any

6   specific discussions in November or December of 2020

7   concerning those payments -- withdrawn.  That wasn't a

8   good question.

9           Did Mr. Waterhouse or -- withdrawn.

10          Did anybody on behalf of HCMS or HCRE ever

11  instruct you to make the payments that were due under

12  their term notes?

13     A.    No.

14     Q.    Did anybody on behalf of NexPoint ever

15  instruct you to make a payment that was due at year end

16  with respect to the NexPoint term note?

17     A.    No.

18     Q.    Were you authorized to make those payments

19  without the prior approval of either Mr. Waterhouse or

20  Mr. Dondero?

21     A.    No.

22     Q.    I think you testified that there were certain

23  payments that were made in January 2001 under each of

24  the three term notes.

25          Do I have that right?

Kristin Hendrix - October 27, 2021

1     A.    Correct.

2           MR. RUKAVINA:  2021.

3           MR. MORRIS:  Thank you very much.

4     Q.   (BY MR. MORRIS)  With that amendment, do you

5     understand my question?

6     A.    Yes.

7     Q.    Do you know why the three payments were made

8     in January of 2021 on each of three term notes?

9     A.    Because Frank Waterhouse instructed me to do

10    so.

11    Q.    And he had not instructed you to make those

12    payments prior to that time?

13    A.    Correct.

14    Q.    Did you have to prompt Frank Waterhouse in

15    January of 2021 to make those payments?

16    A.    No.

17    Q.    So based on the 13-week forecast that you

18    prepared and delivered to Mr. Waterhouse, is it your

19    understanding that Mr. Waterhouse knew as early as mid

20    November 2020 that payments would be due under the

21    three term notes at the end of the year?

22    A.    Yes.

23    Q.    And, in fact, did HCMS and HCRE and NexPoint

24    timely make their installment payments that were due at

25    year end 2018?

Kristin Hendrix - October 27, 2021

1    A.    Yes.

2    Q.    And was that done because HCMLP received the

3  instructions of somebody authorized to give the

4  instruction on behalf of those entities?

5    A.    Yes.

6    Q.    Did HCMS and HCRE and NexPoint timely make

7  the installment payments that were due at year end

8  2019?

9    A.    Yes.

10    Q.    And why did they make those payments?

11    A.    Because we were provided instruction and

12  authorization to do so.

13    Q.    Okay.  And is the only reason that the

14  payment wasn't made at year end 2020 because nobody on

15  behalf of the Advisors -- withdrawn.

16        Is the only reason that no payment was made

17  at the end of 2020 is because no one on behalf of

18  NexPoint, HCRE, or HCMS directed HCMLP to make those

19  payments?

20    A.    Correct.

21        MR. AIGEN:  Objection.  Form.

22    Q.    (BY MR. MORRIS)  And you testified earlier to

23  a call that you had with Mr. Waterhouse.  I think you

24  said it was either November 30 or December 1.

25        Do you recall that?

Kristin Hendrix - October 27, 2021

1    A.    Yes.

2    Q.    And did you personally continue to prepare

3  the 13-week forecasts after your conversation with

4  Mr. Waterhouse?

5    A.    Yes.

6    Q.    And did those 13-week forecasts continue to

7  include the payments that were due under the three term

8  notes at the year end?

9    A.    Yes.

10    Q.    And that's information that you gave to

11  Mr. Waterhouse; is that right?

12    A.    Right.

13    Q.    Mr. Rukavina elicited from you the fact that

14  payments of principal hadn't been made on demand notes

15  that were executed in favor of Mr. Dondero's

16  affiliates.

17         Do you recall that?

18    A.    Yes.

19    Q.    Okay.  Was that a topic of conversation with

20  PricewaterhouseCoopers at any time?

21    A.    Yes.

22    Q.    Can you tell me about that conversation?

23    A.    Sure.  As part of our annual audit, the

24  auditors would, you know, make sure that our

25  receivables are collectible.  And if they thought for

Kristin Hendrix - October 27, 2021

1   any reason they weren't, then they were going to raise
2   an issue, a going concern issue.
3           That came up several years in a row with
4   HCMFA.
5      Q.   Do you recall that the three term notes at
6   issue here were all signed on May 31, 2017?
7      A.   Yes.
8      Q.   And all of those term notes involved a
9   roll-up of previously issued demand notes; is that
10  right?
11     A.   Correct.
12     Q.   Do you know why in -- at the end of May 2017
13  NexPoint, HCRE, and HCMS rolled up their demand notes
14  into individualized term notes?
15     A.   Yes.
16     Q.   What is your understanding as to why that
17  happened?
18     A.   That would get the auditors a little bit more
19  comfort over our outstanding loans, ensuring that we
20  have an amortization schedule, an underlying contract,
21  showing that payments will be coming in every year on
22  these outstanding receivables.
23     Q.   Okay.  As the person responsible for
24  preparing Highland's audit, did anybody ever tell you
25  at any time that any of the notes were not valid

Kristin Hendrix - October 27, 2021

1  obligations of the maker?

2      A.   No.

3      Q.   As the person responsible for Highland's

4  audit, did anybody ever tell you at any time that any

5  of the notes at issue should not have been signed?

6      A.   No.

7      Q.   As the person responsible for Highland's

8  audit, did anybody ever tell you at any time that any

9  of the notes at issue were signed by mistake?

10     A.   No.

11     Q.   Did anybody ever tell you at any time that --

12 withdrawn.

13         As the person responsible for Highland's

14 audit, did anybody ever tell you at any time that

15 Mr. Dondero didn't approve of any of the notes?

16     A.   No.

17     Q.   As the person responsible for Highland's

18 audit, did anybody ever tell you at any time that

19 the -- any of the notes at issue were subject to an

20 oral agreement?

21     A.   No.

22     Q.   As the person responsible for Highland's

23 audit, did anybody ever tell you at any time that any

24 of the notes were amended?

25     A.   No.

Kristin Hendrix - October 27, 2021

1    Q.   As the person responsible for Highland's
2  audit, did anybody ever tell you at any time that any
3  of the notes would be forgiven?
4    A.   No.
5    Q.   During your 15 years at Highland, has an
6  intercompany loan ever been forgiven in whole or in
7  part?
8    A.   No.
9    Q.   During your -- withdrawn.
10       Can you recall any note that Highland ever
11 held as the payee that was forgiven in whole or in part
12 in the five years prior to bankruptcy, go back to 2014?
13   A.   No.
14   Q.   Is it your understanding as the person
15 responsible for Highland's audit that the forgiveness
16 of notes, if they were in a material amount, would have
17 had to have been disclosed in the audited financial
18 statements?
19   A.   Yes.
20   Q.   So is it fair to say that any evidence of the
21 forgiveness of material amounts would have been
22 disclosed in Highland's financial statements?
23   A.   Yes.
24       MR. MORRIS:  I have no further questions.
25       MR. RUKAVINA:  I have none.

Kristin Hendrix - October 27, 2021

1          MR. AIGEN:  None.

2          MR. RUKAVINA:  Okay.  Thank you very much.

3          (Whereupon, the deposition adjourned at

4          1:19 P.M.)

5                    --oOo--

6          I declare under penalty of perjury that the

7     foregoing is true and correct.  Subscribed at

8     _____, Texas, this _____ day  of

9     _____, 2021.

10

11

12    _____

13    KRISTIN HENDRIX

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

1

2    I, BRANDON D. COMBS, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause;

7    That said deposition was taken in shorthand by

8    me, a disinterested person, at the time and place

9    therein stated, and that the testimony of the said

10    witness was thereafter reduced to typewriting, by

11    computer, under my direction and supervision;

12    That before completion of the deposition,

13    review of the transcript was not requested.  If

14    requested, any changes made by the deponent (and

15    provided to the reporter) during the period allowed are

16    appended hereto.

17    I further certify that I am not of counsel or

18    attorney for either or any of the parties to the said

19    deposition, nor in any way interested in the event of

20    this cause, and that I am not related to any of the

21    parties thereto.

22    DATED: November 1, 2021

23

24    _____

25    Brandon Combs, Certified Shorthand
     Reporter No. 10927 in and for the

HCMFA APP 0584

Kristin Hendrix - October 27, 2021

1                    State of Texas
                     Dickman Davenport, Inc. Cert 312
2        4228 North Central Expressway
         Suite 101, Dallas, TX 75206
3        (214) 855-5100    (800) 445-9548
         Email: info@dickmandavenport.com
4        www.dickmandavenport.com
         My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A**

**A.M** 1:22 57:22
**ability** 69:5,20
**able** 108:23
120:18
**above-styled** 1:21
**Absolutely** 17:8
**accent** 56:16
**access** 24:7 54:15
**accessed** 44:19
**account** 12:11
37:7 91:15
**accountant** 16:19
46:10 73:15
74:3 78:4 84:24
**accounting** 11:16
12:8,12,18
17:14,15,16,21
18:4 19:9 20:3
20:12,20 21:13
31:16,23 35:7
40:11 45:17
46:3 51:11,11
51:18 56:11
102:4 111:9
112:18,23
126:11
**accounts** 13:21
14:8,15 51:24
**accrued** 79:22
**accruing** 85:15
**accurate** 72:22
97:19 115:25
**accurately** 116:2
**action** 11:6
**activities** 39:20
**actual** 104:12
122:16,25
**addition** 39:7
41:21
**additional** 56:15
56:20
**adjourned** 134:3
**Adkins** 109:16

**advance** 126:2
**adversary** 94:25
95:3,12
**advice** 46:20
88:24
**advised** 38:23
**advisor** 39:1
**Advisors** 1:10
15:14,17,23
27:20,23 63:6
70:1,4 71:6,10
74:17 76:24
84:9 85:6 92:16
99:10,14,16,25
100:2,15,18
119:16 120:7
123:24 129:15
**Advisors'** 122:16
**affiliate** 34:25
87:23 120:7
**affiliated** 15:11
**affiliates** 18:19
86:24 87:17
99:6,11,13
100:4,17
130:16
**affirmative** 101:14
**affix** 50:17 114:6
**affixed** 47:5
114:15
**afternoon** 94:23
**ago** 33:8 104:21
104:22 109:17
110:10,12
**agree** 55:2 57:14
61:13
**agreed** 25:23
26:3
**agreeing** 53:24
**agreement** 26:5
26:15,21 95:9
95:13 96:4,8,12
96:23 97:6,9,11

**109:20,21**
97:21,25 98:9
107:25 119:20
132:20
**ahead** 73:9
113:10,20
114:11 118:22
**Aigen** 2:18 3:4
94:16,23,24
95:23 96:1,21
98:15 102:5
103:17 105:24
106:8,23
110:14 129:21
134:1
**Akard** 1:24 2:4
**alleged** 40:16
96:3,7
**Allocation** 38:24
39:1
**allowed** 135:15
**allowing** 95:13
**amended** 107:25
132:24
**amendment** 128:4
**amort** 19:22 90:8
**amortization** 73:25 76:23
77:4,6,9,20
80:20 82:6 85:3
85:12,13,17
131:20
**amount** 19:6,7
26:10,12 30:12
32:23 39:3
43:16 48:15
49:2 50:9 87:16
87:24 89:9 90:9
91:19 93:4
104:6 121:14
122:10 124:4,5
124:19 133:16
**amounts** 35:8
40:2 120:3,4
121:10 123:23

**124:1 133:21**
**analysis** 97:24
**and/or** 50:13,18
63:22 64:18
69:20 73:25
110:23
**anniversary** 79:21 80:5,14
**annual** 114:20,23
115:7 117:4
119:20 120:12
130:23
**annually** 80:13
**annum** 80:12
**answer** 7:6,6
23:11,14 35:2
39:19 51:5 52:3
64:20 75:2
114:11 118:10
122:13
**answered** 41:4
51:3 57:17
100:9 106:6
**answering** 66:1
**answers** 42:10
43:1 57:6
**anybody** 35:25
40:8 101:7
112:8 113:23
113:25 114:5
114:14 116:24
117:20 118:24
119:6,11 122:3
122:7 123:8,11
124:16 125:2
126:8 127:10
127:14 131:24
132:4,8,11,14
132:18,23
133:2
**anymore** 76:2
**anytime** 21:10
59:1
**AP** 11:17 12:23
32:7 109:5

**apologize** 15:6
59:7 62:16 75:9
75:22
**appear** 118:18
**APPEARANC...** 2:1
**appeared** 2:5,12
2:19
**appears** 47:1
76:12 77:1
**appended** 135:16
**applying** 125:3
**approval** 16:5,8
48:12 49:4
50:25 51:2
101:3 104:20
124:24 127:19
**approve** 48:15
49:5 104:1,2,24
132:15
**approved** 48:18
48:19,21 104:7
104:8,14
**approximately** 95:18 110:7
**April** 12:7
**area** 107:19
**arose** 115:4
**ASAP** 60:18 64:6
**asked** 51:3 57:17
60:10 69:22
88:9 93:4 106:6
119:24
**asking** 6:10 26:7
29:17,19,24
59:17 62:6
64:23,25 77:25
90:8 96:12,13
**aspects** 115:1
**assistant** 12:6
69:2 70:3,9
88:21
**associate** 11:18
32:7
**assume** 6:25

42:11,25 44:3
48:24 57:5,18
80:6 81:10
95:23 99:19,22
**Assumes** 114:8
**assuming** 36:10
40:23 80:19
81:5 82:21
106:17
**assumption**
95:25
**assumptions**
100:10 105:23
**attached** 83:7,11
123:22
**attachment**
83:23 123:18
**attachments**
83:20
**attempts** 102:10
**attention** 115:16
**attorney** 2:5,12
2:18 135:18
**audit** 18:25 98:1
114:20,23,25
115:1,7 116:5,9
117:8,11,14,15
117:23 118:3
118:15 130:23
131:24 132:4,8
132:14,18,23
133:2,15
**audited** 97:16
115:25 116:16
116:21 117:1,5
118:19 119:1
133:17
**auditors** 97:18
115:3,24
130:24 131:18
**audits** 12:24
**August** 83:18
84:1
**author** 44:10
**authority** 36:23

50:25 51:1
110:22,25
**authorization**
129:12
**authorize** 49:17
**authorized** 114:6
114:15 127:18
129:3
**authorizing**
50:12,17
**available** 21:24
**Avenue** 2:11,17
**aware** 10:1 15:17
23:8 28:20,22
28:23 29:10
39:6 90:22 91:1
91:2 95:11,16
96:7,14 98:13
98:15,19 101:9
101:17,20,21
102:7 106:8
107:11 109:1,9
109:13,18,25
120:11 126:24

**B**

**back** 13:3,6
16:12 17:12
20:9,16 22:20
24:12 26:4
29:16 44:24
45:6 50:3 52:8
55:1 60:4,18
64:3,11,19 69:2
74:10 76:3 81:9
81:23 84:8
88:20,23 94:3,9
99:24 113:23
133:12
**background**
10:12,19 16:12
29:25 67:19
**bad** 26:25
**balance** 63:8,22
80:10 118:6

121:11
**balances** 13:18
84:15 89:23
**bank** 13:20 63:7
63:21 92:18
**bankruptcy** 1:1
108:6,15,22
109:2 133:12
**bargain** 84:5
**base** 26:19,22
27:4
**based** 25:18 38:3
40:23 82:5
125:17 126:22
128:17
**basically** 23:7
115:24
**basis** 21:23 66:22
77:20 81:14
104:9
**batch** 12:22
**Bates** 82:14,18
120:1
**bear** 80:11
**beginning** 62:24
81:14
**behalf** 2:6,13,20
102:1 110:21
111:1 127:10
127:14 129:4
129:15,17
**believe** 10:24
12:7,12,16 13:4
16:18 33:3,5,24
34:2 35:8 38:4
43:13,17 50:10
58:22 82:5,8
84:21 88:8
93:13 97:10
99:8 107:3
109:15 112:19
123:7
**believed** 103:20
**best** 20:1 44:20
55:10 100:12

112:9,20 116:1
118:9,21
121:14,17,24
122:2,12 126:8
**better** 30:2 42:22
67:22
**big** 23:3 38:21
115:15
**bills** 14:6 109:3
**bind** 111:1
**birth** 10:16
**bit** 28:9 44:7 55:1
56:16 58:9,24
98:12 131:18
**bits** 7:14,17
**Blair** 32:6,6,7
112:7
**blind** 64:12
**board** 60:5 86:15
119:24 121:12
121:25 122:5,9
122:17 123:1,6
**bonus** 25:18,21
26:1,6,8,19,22
27:4
**bonuses** 108:23
**book** 113:1
**booked** 112:10
112:22 119:8
**books** 73:11
87:17
**borrower** 69:10
**borrower's** 69:5
**boss** 24:11,17
25:1 76:8
**brackets** 78:19
79:1
**brand-new**
111:20
**Brandon** 1:22
135:2,25
**break** 30:8 52:5
62:17 75:16,17
83:9,16 93:16
94:6 110:15

**briefly** 10:12
16:12
**brought** 50:2
115:16
**bunch** 63:1
**burn** 82:11
**business** 14:12
64:5
**buyouts** 108:6

**C**

**calculated**
124:11
**calculating** 73:24
**call** 26:19 34:23
37:7 38:1 45:11
45:13 61:22
66:4 67:23 71:5
72:5 74:11,11
74:20,21 75:5
75:23,25 79:20
92:2,3,6 93:21
93:25 99:4
100:12 106:14
106:16 120:23
125:25 126:14
129:23
**called** 26:21
62:12 65:14
74:14,15,24
84:1 92:4
111:15,22
**calling** 107:2
**calls** 126:4
**Capital** 1:6,9
14:22,23 15:4
27:23 85:5
108:1,16 117:2
**care** 38:11
**carried** 115:2
**case** 95:9 100:24
103:4
**cash** 12:21 13:21
21:24 22:6,18
22:19 23:1,4,4

34:17 63:8
66:22,25 67:2,5
67:5 69:1 81:11
81:12,14,19,20
109:4 125:25
126:4,14
**categorize** 24:6
**cause** 1:21 22:6
116:7 117:16
135:6,20
**caused** 39:16
92:12 124:22
**cell** 75:2,3,4,13
**Central** 136:2
**CEO** 13:23 60:24
**Cert** 136:1
**certain** 14:6,18
18:19 26:13
29:2 36:16
37:15 49:13
64:20 95:14
96:16 119:17
120:18 123:2
127:22
**certainly** 82:11
86:17 121:22
**certificate** 53:14
53:18,20 135:1
**certified** 16:19
135:2,25
**certify** 135:3,17
**CFO** 13:9,13,22
23:12 25:10
**chain** 59:4,12
62:5,15,24
85:21,25 86:3
86:13 90:4,5
**chance** 75:4,18
**change** 32:11
79:1,12 84:10
85:2,6 90:23
91:3
**changed** 58:4
123:6
**changes** 43:15

44:2 49:1
135:14
**changing** 57:4
98:12 107:18
**characterize**
24:13 111:13
**charge** 13:19
18:7 114:24
115:11
**charged** 10:10
**charges** 76:12
**chase** 15:9
**check** 60:12,15
64:19 93:15,16
102:23 105:8
**checked** 63:16,16
64:22
**checking** 64:24
**checks** 13:18
**clarify** 47:14
88:10
**clear** 6:20 113:12
**clearly** 38:13
**clients** 63:6
**close** 120:6
**collect** 28:21
**collectibility**
68:23
**collectible** 130:25
**collection** 30:14
**collects** 27:3
**college** 10:20
11:10,14
**column** 79:5,11
80:22,24
**columns** 78:14,15
**Combs** 1:22
135:2,25
**come** 84:5,14
85:2,10,11
**comes** 31:8
**comfort** 131:19
**comfortable**
50:23
**coming** 16:6

48:25 99:5,10
126:25 131:21
**comma** 15:4
**comments** 120:14
**commingle** 110:9
**commission**
136:4
**common** 40:10
**communicate**
23:17
**communicated**
23:23
**communicating**
23:24
**communications**
23:22 64:10
90:16
**companies** 52:14
**company** 39:10
44:13
**compensate**
40:15
**compensation**
25:17,21 26:1,6
26:20,22 27:4
39:9,12
**competent** 24:18
24:20,21
**complete** 72:10
**completed** 116:5
118:15
**completely** 17:3
47:8 114:24
**completion**
135:12
**compliance**
17:14
**comport** 44:20
**compounded**
80:13
**computer** 47:16
135:11
**computerized**
1:24
**concern** 131:2

**concerning** 111:9
124:18 127:7
**concerns** 63:13
63:15
**condescending**
25:3
**conduct** 38:3
**confess** 82:23
**confident** 37:22
**confirm** 62:2
**confirmation**
92:15,17
**confused** 78:12
**confusion** 47:15
**connection** 116:9
117:7,10,22
118:3 124:23
**consent** 39:1,24
**consist** 26:1
**constituted**
116:12 118:2
**consulted** 46:13
**contact** 6:9,11
**contending** 96:4
**context** 31:13
44:1 59:25
86:12
**continue** 130:2,6
**contract** 131:20
**controller** 11:19
11:23 12:1,4,6
13:4 25:6 69:2
70:3,4,9,10
88:21
**conversation**
36:22 42:4 65:3
96:1,6,14 99:9
99:13 104:22
106:17,24
130:3,19,22
**conversations**
23:13 34:16,20
36:5,17 37:14
37:15 48:14
49:22 50:20

69:1 88:18
95:24 96:3,15
96:22 102:18
105:4,13,25
107:8,11,16
108:8,14
**copied** 64:12
86:6
**copies** 55:14
56:13
**copy** 83:17
**copying** 59:13
61:3 63:1 83:18
**corporate** 10:6
11:16 17:15,16
17:21 18:4 19:8
19:15 20:3,11
20:20 21:13
31:16,23 35:6
45:17 46:2
51:11,18 56:11
56:24 111:9
102:4 111:9
112:18,22
126:11
**corporateacco...**
111:22
**correct** 14:12,20
14:24 15:4,5,12
15:13,16,19,20
18:5,6 23:5,6
27:1,5 29:4
35:23 36:8,12
38:9 40:12,21
41:3,5,6,10,23
41:24 45:22,23
45:25 46:1
53:19 56:14
57:12 60:25
65:12 66:16,17
70:19,20,23,24
76:16 78:21
80:20,21 81:5
83:20,21 87:25
88:1 95:6,7
100:1,5,6,18,19

101:15,16,19
101:20 102:25
103:3,4 105:6,7
105:10,11
106:5,7 118:12
120:18,21
124:3 128:1,13
129:20 131:11
134:7
**correctly** 32:18
33:23
**correspondence**
123:3
**corresponding**
84:16
**counsel** 2:5,12,19
6:15 7:4,23,25
8:19,22 9:8,12
9:20 10:10
28:10,17 33:6
135:17
**count** 42:10 43:1
57:6
**couple** 83:19
**course** 6:9 46:18
55:3 103:23,24
104:13,19,23
**courses** 16:15,16
**court** 1:1 6:18
27:13 30:13,25
**courteous** 94:12
**CPA** 10:24 11:2
11:6,21 115:17
**create** 43:12,18
45:8 48:17
**created** 18:21
44:18,19,21
48:7 58:1
119:12
**creating** 13:21
111:18 125:22
126:20
**creation** 126:16
126:18
**credit** 91:18

**crunch** 109:5
**CSR** 1:23
**curiosity** 76:6
**current** 11:2
**currently** 11:19
120:5
**cut** 15:9

---

**D**

**D** 1:22 135:2
**Dallas** 1:3,25 2:4
2:18 136:2
**dark** 94:17
**date** 10:16 19:3
26:13 32:22
34:21 43:16
50:8 57:24 58:7
78:17 79:9,21
80:6,13,13,14
93:25 105:4
107:1
**dated** 30:20
31:16 135:22
**dates** 57:22
**Dave** 8:24 34:18
34:23 38:13
46:7 111:8
112:6
**Davenport** 136:1
**David** 3:14 13:1
31:16 33:17
**DAVOR** 2:5
**day** 48:15 57:25
58:6 80:2
112:13 134:8
**days** 9:23,25 10:5
28:17
**deaccelerate**
107:13
**deal** 20:21 36:25
**debtor** 14:24,25
15:1,2,3,7,10
15:19,21 16:4
18:1 21:20,21
21:22 22:1,2,5

22:14,15,18
23:1 25:7,7
26:17 28:21
29:6 38:19
39:15 53:7
54:22 55:12
59:5,19 66:8,20
68:1 76:20 77:2
77:6,9 81:11,12
81:18,25 82:7
84:17 88:3,11
88:14 90:24
99:6 100:15
101:25 114:25
**debtor's** 40:16
68:18 77:4
86:16
**debtors** 117:12
**Dec** 4:3,11
**December** 11:11
14:2,5 15:6,10
15:21 16:3
24:22 60:25
61:6,12 62:10
65:14 66:3,7,18
66:24 67:13,16
67:20 68:1,8,14
68:21 70:22
71:4 72:4 74:10
75:19 76:4
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:19,20
103:20 105:3,3
105:18 125:20
127:6 129:24
**decided** 26:2,3
40:14 52:15,18
**deciding** 23:8
**decision** 29:14
105:2
**declare** 134:6
**default** 68:16,19

88:3 90:17
93:10,11
**defaulted** 67:22
**defendants** 1:11
1:20 2:6,20
95:11 96:4
**defense** 95:12
96:7,12
**defenses** 95:9
**defined** 114:3
**definition** 113:16
**degree** 10:22
**deliver** 117:17,22
**delivered** 116:8
116:11 117:25
118:1 128:18
**demand** 4:11 5:2
18:19 19:21,25
20:4,13,17,21
21:3,4,5,8,23
22:7,13 28:22
29:11,14 46:16
62:11 66:5 85:6
85:14 98:17
130:14 131:9
131:13
**demanded** 62:11
**demanding** 24:13
**Denton** 10:15
**department**
11:17 18:2,5,8
18:12 51:12
57:12 112:23
**depend** 18:17
**depended** 49:16
**depending** 73:16
**depends** 18:16
69:10 77:24
**deponent** 135:14
**deposed** 6:13
28:2
**deposition** 1:13
1:18 7:8,9 8:1,6
8:10,15,17,20
8:23 9:14

113:14 134:3
135:4,7,12,19
**describe** 12:18
53:16
**described** 17:17
99:9 116:16
119:7
**description** 14:1
110:3
**detail** 66:12
**details** 17:5
25:14 28:7
**determine** 97:6
97:25 102:11
**determined**
97:22
**Dickman** 136:1
**difference** 103:22
**different** 19:25
54:19 73:16
87:22 96:11
103:17 124:2
**direct** 27:7
**directed** 99:17,19
129:18
**directing** 48:16
101:4
**direction** 23:12
53:21 60:23
63:2 73:7 101:7
135:11
**directions** 48:25
**directly** 40:9,22
41:12 49:1
70:14,17
102:16
**disciplinary** 11:5
**disclose** 119:24
**disclosed** 97:15
97:21 133:17
133:22
**discretionary**
26:8
**discuss** 62:9 66:4
68:4,7 74:16

Kristin Hendrix - October 27, 2021

88:12
**discussed** 28:8
38:4 43:13
66:21 67:9
74:18,20 81:13
92:5 96:25 97:2
**discussing** 66:19
67:20 117:18
**discussion** 9:5
50:21 61:7 65:9
66:7 69:5,19
92:25 93:7
122:22 123:4
**discussions** 9:8
25:20 28:11,12
28:17 40:6 60:1
61:9,11 62:13
68:22 98:8
127:6
**disinterested**
135:8
**distinct** 29:3
45:24
**DISTRICT** 1:2
**DIVISION** 1:3
**doctor** 42:11
**doctored** 83:3
**doctoring** 42:24
57:4
**document** 32:25
47:2 49:19 72:8
76:10 82:13
86:1 88:7
111:19 119:8
119:25
**documentation**
9:16
**documentations**
47:8
**documents** 9:18
10:7 42:6 43:7
43:9 44:3 47:9
48:5,18 49:8,13
50:2,3,11 54:11
57:7,14,20

69:16 77:13
82:10,18
**doing** 6:7 43:8
45:20 74:4
**dollar** 19:7 40:2
48:15 49:2 50:9
**Dondero** 2:20 5:2
15:12 21:11,20
21:21 22:6,19
23:7,14,18,23
23:24 24:2,7
34:19 35:24
36:2 40:14,20
52:12,19,22
53:7 73:8 81:14
83:18 94:24
99:18 101:2,4
101:17 102:11
102:16 103:7
103:12,19
104:1,7,14
108:9 116:19
116:24 117:20
118:23,24
122:3,7 123:19
124:8,10,13,16
124:18,25
127:20 132:15
**Dondero's**
104:19 130:15
**Donohue** 59:13
59:17,22 62:25
63:21 64:3,16
64:22 65:5,9
92:18,19,22,24
93:8
**door** 35:1
**draft** 17:24
**drafted** 17:1,3
**drafting** 16:16
17:22,23 18:12
19:16,21 20:12
29:13
**drive** 54:9,16
55:14

drukavina@m...
2:7
**DSI** 61:19 62:6,9
63:3,24 67:4
68:7,13,23
69:14 77:3
88:12,23 92:18
92:19 126:13
**due** 16:6 59:18
66:23 73:9,25
86:24 87:5,17
87:17,22,25
89:9 90:8 102:8
103:20 105:4,6
120:5,23
123:23 124:1,5
124:19 125:4
125:19 126:2
126:25 127:11
127:15 128:20
128:24 129:7
130:7
**duly** 1:19 6:2
135:4
**duties** 12:19
97:12
**duty** 20:25

───── **E** ─────

**E-l-l-i-n-g-t-o-n**
18:9
**e-signature** 47:10
47:12 48:1,4,5
48:8,9,12,18
49:9,15,18 50:1
50:13,17,23
**e.g** 120:6
**earlier** 43:14
45:7 99:8
112:12 113:13
120:14 123:15
125:7 126:12
129:22
**early** 116:5
128:19

**earn** 26:23
**educational**
10:18
**effect** 54:11
67:21 68:15
**effectuate** 101:7
106:15
**effort** 97:6
**efforts** 102:10
**either** 18:21
29:13,20 31:1
34:17,23 37:3
46:7,13 50:1
54:12 58:20
62:6,9 71:4
84:24 99:15,17
110:15 124:24
127:19 129:24
135:18
**electronic** 54:22
**electronically**
56:3,12
**Eliason** 46:7 78:3
112:7
**elicited** 130:13
**Ellington** 4:3
18:9 60:4,9,12
60:15 61:10
**email** 2:7,14,22
3:14 4:3,7,21
5:1,5 23:17
31:12,15,20,23
32:1,4,20,25
33:3,25 36:3
37:10,19,25
38:14 41:17,21
42:5 48:20
50:11 54:11
59:4,12,22 60:1
60:2,3,25 61:2
61:6 62:4,8,15
62:24,25 63:11
63:14,15 64:22
82:16,19 83:2,6
83:11,11,12,18

83:23 84:19
85:25 86:3,13
86:22 90:4,5,12
92:22 108:12
111:8,21,21,25
112:3,5,13,17
120:2 122:19
123:5,18,23
126:7,8 136:3
**emailing** 90:8
107:2
**emails** 9:16,18
41:18 49:23
81:9 82:22
115:3
**employed** 11:21
70:18
**employee** 109:23
110:2,6
**employees** 16:3
108:19,24
109:10,13,14
**employment** 26:5
26:15 69:25
70:7
**engagement**
115:14
**ensuring** 131:19
**entire** 11:17
114:25 126:20
**entirety** 86:18
**entities** 15:11
21:16 22:6,12
22:19 70:18
81:15 101:5
124:2 129:4
**entitled** 82:12
**entity** 21:20,22
22:7 23:2 35:14
53:13 63:4,5
84:16 104:4
**entries** 78:13
80:23
**entry** 78:24 79:19
**erroneous** 122:5

error 38:22 39:9
  39:16,21,23
  40:10 44:7
established 9:11
  28:8 83:16
estimate 20:10
event 135:19
events 38:21
  95:15 96:16
  116:13 118:3
  118:19
eventually 109:5
everybody 25:13
  112:2 125:24
  126:1,3,4
evidence 105:22
  114:9 118:9,21
  121:17 122:12
  133:20
exact 25:25 36:5
  37:14 48:5,13
  107:1 117:12
Exactly 78:16
Examination 3:3
  3:4,5,6 6:3
  94:22 110:19
  111:5
example 81:1
Excel 77:12,15
  78:9
exchanged
  108:12
excluding 28:16
  29:18
execute 48:18
  49:5
executed 18:24
  47:9 130:15
executing 19:17
execution 18:13
  20:12 32:15
exhibit 3:10,12
  3:14,17,19,21
  3:23,25 4:1,3,7
  4:11,14,17,19

4:21 5:1,5
  30:14,15,18,19
  30:21 31:15,18
  32:21 33:1 34:4
  34:11 35:21
  36:20 37:19
  38:12 42:15,16
  43:6,21 44:18
  44:19 56:19,21
  59:4,9 62:14,14
  62:21,23 65:13
  65:18,21 72:11
  72:13,16 76:10
  76:17,19 79:8
  82:6 83:1,4,15
  83:17 84:8,14
  84:18,19 85:7
  85:17,20,21,22
  85:25 86:3,13
  87:21 88:2,4,7
  89:21,22,25
  90:1,3 111:7
  119:7,15,23
  123:16,22
  124:5
exhibits 3:8 30:6
  42:17 43:4
  44:21 45:22
  46:19 48:11,19
  50:13,17 52:8
  55:17,24 56:25
  57:16 58:10,25
  113:13
existing 84:20
expect 85:16
expense 103:24
expertise 16:18
expires 136:4
Explain 19:19
explained 6:15
  31:7
explicit 60:23
explicitly 32:5
  53:1
expressly 71:14

Expressway
  136:2
extent 108:13
external 46:14
eye 6:9

### F

faced 11:5
facilitate 91:7
fact 21:18 49:5
  57:15 64:15
  65:1 67:13,16
  99:22 121:21
  128:23 130:13
facts 114:9
fair 17:5 21:19
  22:3 23:21 35:5
  42:20 70:14
  95:25 96:8,21
  96:24 97:18,20
  98:6,7 99:25
  100:20,23
  101:8,12 103:5
  105:16 106:4
  108:4 116:2
  133:20
fairly 36:15
faithfully 57:3
familiar 27:1
  65:20 66:11
  86:2,5 107:20
  115:19 122:16
family 23:4
far 20:14,16
  24:19,21 49:7
  80:24
favor 130:15
February 12:2
  26:4
fee 39:1,24
feel 86:18
fell 13:24
felt 104:25
figuring 93:17
file 56:13

filed 28:24,25
  29:6,8 30:13,24
files 32:25
filing 18:25
final 123:6
finance 10:22
financial 4:4
  12:22 59:18
  62:7 69:15
  97:16,17
  115:12,25
  116:16,21
  117:1,5,11
  119:2 122:4
  133:17,22
financials 12:23
  37:18 41:8
  60:11 86:24
  118:11,14,19
  121:3,7,20,25
  122:8
find 31:13 72:8
  83:8 93:24 94:8
  102:23
finding 98:2
fine 47:8 48:2,4
  86:19
finish 96:11
finished 31:10
finishing 46:14
firm 18:22 44:16
first 6:2 9:1
  11:13 20:11
  63:17 70:21
  81:17 82:13
  95:8 113:23
  120:15
five 51:4 94:3
  110:10 133:12
five-minute
  93:15 110:14
fixing 55:15
flip 46:25
Floor 1:25 2:11
flow 109:5

flows 63:8
focus 12:17
folders 18:25
folks 62:16 67:4
  85:24
follow 47:23 60:5
  60:9 72:5
follow-up 4:23
followed 104:11
following 47:22
follows 6:2
forecast 67:5
  128:17
forecasted 67:8
forecasts 12:21
  13:21 17:18
  67:5,9 125:8,10
  125:14,17,18
  125:23 126:7,8
  126:16,19
  130:3,6
foregoing 134:7
  135:4
forgive 97:10
forgiven 95:14
  96:16 109:10
  133:3,6,11
forgiveness
  133:15,21
form 14:14,21
  15:24 16:22
  17:6 18:14
  19:11 20:23
  22:8,21 24:8,15
  28:3 34:6 35:10
  36:13 37:11
  38:7 39:17 41:1
  41:13 45:3 46:4
  47:20 48:22
  49:10,20 50:4
  51:14,20 52:1
  53:9 55:5,19
  56:4 58:16
  65:16 69:8
  70:15 73:20

74:5 75:7 77:22
78:10 80:3,16
82:1 87:7 88:15
89:2,15 96:18
102:2 103:13
105:19 106:18
113:9,19
129:21
**format** 77:12
**formatting** 79:3
82:5
**forth** 64:11
**forward** 64:2
94:16
**forwarded** 92:15
92:17
**found** 54:9
**foundation** 75:11
**four** 9:8,12 100:5
**fourth** 107:25
**frame** 17:12
66:19 69:7
73:16
**Frank** 4:21 7:10
7:21 8:1 13:7,8
23:13 24:5
34:19,23 35:24
38:14 52:19
53:20 60:10
63:16,18 64:10
64:23,23 65:1
67:3 71:5 73:8
74:14,15 84:1,7
91:10,22 92:4
99:5,17 100:13
101:2 102:15
104:4,21,23,24
106:14,20
107:2 112:6
124:24 125:25
126:13 128:9
128:14
**Frank's** 115:16
**frankly** 104:24
**fresh** 111:20

**Friday** 9:1,4
**function** 12:21
**functions** 117:15
**fund** 1:9 27:23
38:24 39:2,2,8
85:6
**funds** 38:23
59:18 119:17
120:8
**further** 3:5 10:23
32:15 62:1
92:13 110:19
133:24 135:17
**future** 14:7 16:5
120:5

**G**
**gears** 58:24
**general** 34:21
46:18 54:20
69:6 90:20
**generally** 13:17
13:24 19:13
34:8 35:2 43:10
72:22 81:20
96:13,15
120:11
**getting** 11:20
18:24 48:11
60:2,3 81:12
101:3
**give** 20:10 31:13
74:16 110:4
129:3
**given** 49:18
101:6 122:9
123:1
**gives** 16:19
**giving** 53:21 54:5
**Global** 38:23
39:1
**go** 10:12 17:5
44:4,24 48:1
55:1 62:24 64:2
67:4,5,11 73:8

78:22 107:23
113:10,20,23
114:11 118:22
133:12
**goes** 94:9 99:3
**going** 6:25 17:12
20:9,16 26:23
27:3 29:16 30:6
30:10,14,18
34:3 40:6 42:7
42:20 44:2
50:22 52:8
54:18 56:20
57:2 58:24 59:3
59:3 60:5,9
64:19 65:13
67:7 71:6 72:8
72:11 74:10
76:10,20 78:7
81:9 82:10,11
82:13,25 83:1
84:8 85:20,21
87:19 88:2
93:20 95:2,23
105:23 111:10
131:1,2
**good** 6:4 24:17
26:24 94:23
127:8
**governs** 26:11
**graduated** 10:21
11:9,12
**great** 53:20
**greater** 16:19
**group** 14:4 17:13
19:9,10,16 20:3
31:24 35:7,22
37:22 40:11
43:14 45:7,18
46:3 49:16
51:18 56:11
73:19,23
111:21,25
112:3,5 117:16
126:12

**guarding** 24:7
**guess** 89:22
**guys** 126:14

**H**
**H-i-l-l-i-s** 32:12
**half** 81:17
**hand** 59:3 82:25
**handed** 88:6
**handle** 20:12
50:8
**handled** 20:4,21
**happened** 20:7
21:8 36:11,11
37:21 101:1
131:17
**happening** 20:11
61:5
**happy** 23:3 93:22
**HARDT** 2:3
**HARR** 2:3
**Hayley** 32:2,14
46:7 78:3,6
112:6
**Hayley's** 46:8
**HCM** 4:4,9
**HCMF** 3:25 4:1
**HCMFA** 3:15 4:4
27:10,22 28:1
28:13 29:6
30:12,19 32:13
38:19,23 39:12
40:1,15 53:25
59:18 60:19
62:7,11 63:6,22
64:18 66:5
69:15,20 70:7
70:10 85:18
87:5 99:4 100:2
110:22 111:1,1
111:11 115:1
117:4,16
118:15 120:6
120:23 121:25
124:2,5,19

131:4
**HCMFA's** 39:8
87:17 117:11
117:23 118:6
118:18 119:1
**HCMLP** 3:15
4:19 5:6 32:13
60:24 64:4
86:24 87:5,18
111:11 120:6
120:23 124:19
129:2,18
**HCMS** 2:20
94:25 98:16,24
100:1,22,25
101:10,18
102:1,19
105:18 107:5
127:10 128:23
129:6,18
131:13
**HCRE** 2:20
94:25 98:17,24
100:1,22,25
101:10,18
102:1,20
105:18 107:3
127:10 128:23
129:6,18
131:13
**hear** 72:1
**heard** 40:17,20
**held** 12:8 133:11
**hell** 75:4,10
**help** 76:22 78:13
93:17 105:23
**helped** 12:20
**Hendrix** 1:14,18
5:5 6:1,6 30:10
30:23 56:19
57:2,8 62:23
65:13,21 76:19
78:12 79:15
86:3 90:3 93:13
94:5,23 110:20

111:6 134:13
**hereof** 80:13
**hereto** 135:16
**hi** 60:4
**higher** 89:20
**Highland** 1:6,9
10:2 11:13,21
12:5,19 13:10
14:4,4,11,22,23
15:3 16:10
17:10,13,21
18:1,11 21:5
25:6,15 26:4,9
26:24 27:2,2,22
28:12 51:7,10
51:19 65:14
66:4 71:7,11
81:10,18,23,23
85:5 87:25
92:17 107:21
108:1,16,17,21
108:22 109:2,2
109:9 110:21
117:1 119:24
133:5,10
**Highland's** 7:23
7:25 8:19,22
114:20,23
116:4,16
131:24 132:3,7
132:13,17,22
133:1,15,22
**Hillis** 32:12
**history** 11:9
**Hold** 62:18
**hope** 57:13 97:13
**hopefully** 82:11
**hoping** 68:15
**house** 75:1
**hundreds** 50:7
51:8
**hypothetically**
22:4,17
**hypotheticals**
21:17

**I**

**i.e** 114:9
**idea** 58:2,7 75:12
75:24 89:13
93:1 105:17
106:3
**identification**
30:16,22 31:19
42:18 43:5 57:1
59:10 62:22
65:19 72:14
76:18 83:5
85:23 88:5 90:2
**identifies** 123:23
124:1
**identify** 112:2
125:18
**identifying** 66:23
**image** 47:2,5,19
48:2
**imagine** 15:7
**immediately**
61:14
**important** 93:14
**Impressive** 11:23
**include** 71:18
72:10 100:1
118:25 121:13
130:7
**included** 15:14
16:9 31:24
102:5 111:25
118:6,13
121:21,22
122:10 123:12
124:4,5 127:2
**includes** 63:5,7
**including** 88:11
124:2
**income** 63:7,21
**incoming** 67:7
**incorrect** 123:9
124:14
**increase** 94:19
**incumbency**

53:13,17,19
**INDEX** 3:1
**indirect** 27:7
**indirectly** 70:12
**individualized**
131:14
**Info** 3:25 4:1
**info@dickman...**
136:3
**information** 4:9
29:25 34:13
61:14 63:3,7
64:17 65:5,11
69:12,15 84:6
86:15 116:3
127:2 130:10
**informed** 112:21
125:24 126:1
**initiated** 74:11
92:3
**ink** 49:8,13 55:3
55:8
**ink-signed** 55:11
**input** 29:25
88:24
**installment**
128:24 129:7
**instance** 1:20
20:6 23:8 35:21
**instances** 24:1
40:1,24
**instruct** 127:11
127:15
**instructed** 128:9
128:11
**instructing**
101:18
**instruction** 72:2
74:17 76:8
100:16 101:14
101:22 103:12
129:4,11
**instructions** 24:2
24:3 32:16
69:14 76:1

100:21 101:9
103:19 129:3
**instructs** 7:5
**insurance** 39:10
**insurer** 39:8
**intend** 113:5
**interco** 32:14
34:11
**intercompany**
17:22 18:13
19:17 20:4,13
20:16 21:3,8
34:12 35:7
36:19,25 37:12
40:24 53:8
111:15,16
124:23 125:4
126:25 133:6
**interest** 19:7
43:16 49:2
68:18 73:25
78:14,16,24
79:20,22 80:11
85:15 125:4,19
**interested** 84:9
135:19
**interjects** 64:4
**intermediary**
24:3
**internal** 18:21
41:8 46:13,20
69:19
**internally** 77:1
**investigation**
97:5
**invoice** 108:13
**involved** 18:12
19:16,20,24
36:21 39:20
40:9 126:14
131:8
**involvement**
19:10
**irrespective**
26:16,24

**IRS** 49:3
**issue** 79:3 95:14
96:16 97:25
98:16 114:2
118:8 131:2,2,6
132:5,9,19
**issued** 131:9
**issues** 40:7,10
60:16 61:21
115:4,15

**J**

**J-F-O-R-S-H-...**
44:10
**Jack** 59:13 60:4,8
64:6 65:2 92:18
**James** 4:8 5:1,2
61:14,15,18,21
61:25 62:3
**Jan** 4:8 5:2,5
**January** 10:17
24:24 28:20
29:6,11 62:25
64:15 71:25
88:2,21 89:9
90:5,7,17,22
91:4 93:8
106:10,25
127:23 128:8
128:15
**jealousy** 24:7
**jerk** 24:12
**JFORSHEE**
44:10
**Jim** 2:20 21:10
23:14,18 34:19
35:24 52:19,20
54:2 63:2 64:10
67:3 73:8 84:4
99:18 101:2,4
102:16 104:1,7
104:14,22,25
105:1 125:25
**Jim's** 99:21
**jive** 87:20

Kristin Hendrix - October 27, 2021

jmorris@pszjl...
2:14
job 6:20 11:14
17:9 20:25
24:19,22 43:11
45:1,14 103:1,6
103:10
John 2:12 4:7
8:24 95:21,23
97:4
JONES 2:10
June 86:25 87:6
116:5 120:23

**K**

K-l-o-s 8:25
keep 29:1 77:6,9
95:4 125:24
126:1
kept 54:22 55:11
56:12 77:5
121:20
kind 11:5 18:4
23:21 24:6,11
34:3 50:3 54:19
81:13 122:21
Klos 3:14 8:24,25
9:5,12 13:1,6
13:10 25:10,21
29:24 31:16
33:17 34:10,18
35:21 36:18,24
37:20 38:12
46:7 97:2,3
111:8,13 112:6
Klos' 13:2 41:17
knew 40:3 126:3
128:19
know 6:24 19:20
19:23 20:19
25:14,25 28:7
33:10,11,13
36:11 38:17,21
39:22,25 40:1,5
43:21 44:11

47:16 48:6,6
50:10 52:18,25
57:25 59:6
76:15,21 78:15
82:15 89:17
92:18,19 99:21
101:4 103:24
104:17 107:19
108:7,25 110:2
117:4 118:15
120:22 121:6
121:19,20
122:15 124:4
128:7 130:24
131:12
knowledge 27:6
36:1,4 37:14
40:11,13 52:15
69:11 77:7
108:4 112:9,11
112:20 116:1
121:14 122:2
known 67:14,17
97:11
KOPF 2:3
Kristin 1:14,18
5:5 6:1,6 32:1,2
32:14 57:8
61:20 134:13

**L**

L.P 1:6,10
labeled 82:15
labels 30:7
laid 24:12
land 84:5
landline 75:2
large 35:8
lasted 75:6
late 126:9
Lauren 4:22
86:21
law 2:5,12,19
6:18 18:22
44:16

Lawler 109:20
109:23
Lawn 2:17
lawsuit 28:24
29:5,8
lawsuits 28:1,9
28:13,25 29:17
29:21 30:1
lawyer 9:4
lawyers 44:14
lay 67:7
leading 39:20
108:15,21
109:1
learn 95:20
ledger 76:12
left 61:9 87:15
legal 7:23,25 10:9
16:13 17:14,25
18:2,5,11,21
19:10,16 28:10
46:14,20 72:21
lend 21:22 23:1
110:22
length 93:25
let's 10:12 11:9
12:17 14:8,18
21:17 30:8
34:25 44:24
45:13 47:14
54:19 55:1
72:10 78:1
99:24 115:11
120:23
letter 4:11 65:14
115:14,23
letters 29:11,14
115:14,20
letting 92:18
liabilities 118:14
liability 40:16
118:6
license 10:24
11:2
limited 107:25

lines 61:7
listed 78:17
litigations 27:8
little 28:9 44:7
55:1 58:9,24
78:12 94:17
98:12 131:18
live 10:14,15
LLP 2:17
loan 3:15,25 4:1
18:18 31:5
32:14 33:25
34:11,12,14,25
35:14,17,17,22
36:19,25 37:6,7
37:17,17 38:25
39:12 40:15,21
45:13,15,18,22
46:12,14 48:15
49:1,4,5,24
50:9 58:5 72:25
76:24 79:21
80:6,7 87:22
103:22 104:6
104:20 111:15
111:16,18,20
112:10,23
113:2 119:9
124:23 125:4
133:6
loans 35:9,12
37:4,6,13,22
38:6 39:4 41:9
41:12,19 48:14
48:17 50:7,19
50:22 51:8
53:21 66:23
67:8 98:16,17
98:17,20,25
106:9 107:13
109:9 110:5,6
126:2 131:19
logically 36:10
40:23 71:18
logs 75:19

long 7:20 21:24
74:21 75:6
110:4
look 30:17 54:15
57:7 75:18 77:2
78:11 80:21
93:20 94:6
looked 31:5
123:16
looking 56:21,23
58:10 79:24
81:10 86:21
87:14 119:23
looks 60:24 64:9
76:23 77:4
79:19
loosely 17:2
lot 28:25
lots 40:6
LP 15:4,15 27:20
27:23 70:1,4

**M**

ma'am 31:21
57:7 87:1 111:4
machine 1:24
maintain 6:9,10
maintained 77:1
82:7
maker 19:4,5
21:3 43:15
132:1
making 13:20
21:5 81:7 99:20
101:2,25
103:22,23
104:3
management 1:6
1:9 12:20 13:14
13:15 14:2,24
15:4,22 17:17
27:23 85:5
108:1 115:13
115:19,23
manager 12:8,12

Kristin Hendrix - October 27, 2021

12:18
manual 104:9,12
March 12:2
mark 59:3
marked 30:15,21
  31:18 42:17
  43:4 56:25 59:9
  62:21 65:18
  72:13 76:17
  83:4 85:21,22
  88:4 90:1
  113:13 119:14
material 97:22
  98:1,4,6,10
  104:6 120:3,4
  133:16,21
materials 121:12
maturity 80:13
MBA 10:23
  11:20
mean 7:17 13:15
  14:22,23 15:3
  19:1 35:16
  48:20 57:24
  68:24 78:13,15
  87:11,24
  111:16
meaning 27:20
  27:22 54:25
  70:18
means 27:15
  35:15 58:22
  71:16 111:18
meeting 34:17
  67:2
meetings 66:22
  66:25
memorandum
  48:20
memory 9:17
  19:14 20:9 29:3
  29:7,17,19,23
  32:20,24 34:3
  37:9 38:2 41:22
  42:1,20 43:7,10

45:24 47:4
  48:10,13 50:15
  51:1 53:23 54:4
  54:10 57:23
  58:9,20 69:18
  72:24 74:4 81:6
  81:17 86:8,10
  90:15,20 91:21
  92:6
mentioned 11:24
  13:14 22:12
  25:9 29:10 41:7
  44:25 45:21
  51:6 64:21
  125:7
merit 25:17
met 108:11
metadata 42:21
  42:21,24 43:21
  43:24 44:8,24
  56:15,20 57:4
Michael 2:18
  94:24
michael.aigen...
  2:22
mid 128:19
middle 89:8
million 30:12,20
  32:13,21 33:1
  33:19,20,25
  34:5 35:3 36:25
  37:12,12 38:18
  38:22,25 39:3,7
  39:8,11,23
  40:15,21 42:15
  42:16 43:2,3
  58:5,11,13,13
  66:9,13 81:1,1
  81:2 85:1,6,9
  87:3 90:23 91:3
  91:23 110:23
  111:10 112:14
  113:14,14
  120:24 121:13
  122:10 123:5,9

123:12 124:11
mind 71:18
minute 30:8
minutes 94:3
mischaracteriz...
  116:25
Mischaracterizes
  41:2
misleading 42:9
missed 88:25
  105:12
misspeak 30:5
mistake 51:12
  113:1,18 114:2
  116:20 117:21
  118:25 119:12
  125:3 132:9
mistakenly 51:25
mistakes 51:17
  51:19,22
  120:19
modified 44:19
  57:8
moment 72:9
Monday 9:2
monetize 68:2,10
money 13:21
  21:11,13,15,21
  21:21,22 22:5
  34:24 35:13
  37:7,17 53:21
  54:23 81:15,19
  81:22,24 92:16
  111:19
month 106:10
months 40:7
morning 6:4 9:3
  67:11 82:14
  125:6
Morris 2:12 3:6
  4:7 7:3 8:24 9:6
  9:9 14:14,21
  15:24 16:22
  18:14 19:11
  20:23 22:8,21

24:8,15 28:3
  30:2 31:10 34:6
  35:10 36:13
  38:7 39:17 41:1
  41:13 42:9 45:3
  46:4 47:20
  48:22 49:10,20
  50:4 51:3,14,20
  52:1 53:9 55:5
  55:19 56:4
  57:17 58:16
  62:18 65:16
  67:10 69:8
  70:15 73:20
  74:5 75:7,11
  77:22 78:8 79:7
  79:9,13 80:3,16
  82:1,14,16,23
  83:2,6,10 85:25
  87:7 88:15 89:2
  89:15 93:22
  94:15,17 95:21
  95:25 96:2,6,18
  96:23 102:2
  103:13 105:19
  106:6,18 111:6
  113:11,22
  114:13,19
  118:12,23
  119:5 121:19
  122:15 128:3,4
  129:22 133:24
mouth 23:21
move 9:10 21:11
  21:13,15 94:16
  109:8
moved 23:4
multiple 54:19
MUNSCH 2:3

N

name 6:5 32:8
  44:12 57:18
  94:24 109:24
  110:3

Nancy 108:9
NAP 27:14
native 78:9
NAV 38:22 39:9
  39:16,20,23
  40:10 107:21
  108:5
near 14:7
necessarily 17:23
  19:10 103:25
need 9:16 14:6
  19:2 21:11
  25:14,25 34:24
  52:6 54:1 59:1
  81:19,20 82:12
  86:19 93:17
needed 21:21
  22:5,18 23:1,4
  40:1 53:12
  81:11,14,23
  104:25
needs 104:7,8,13
negative 78:20,25
  79:2
never 40:19,20
  49:12 51:12
  55:14 68:17
  70:14,17 96:25
  97:2 101:6,6,14
  103:6 108:11
  119:8
new 2:11 21:14
  32:14 34:11,25
  36:19 45:9
  111:15,16,18
NexPoint 5:6
  15:14,17,22
  16:5 27:11,15
  27:18,19,20
  28:2,13,21 63:6
  63:22 64:18
  66:8,12,20
  67:13,22 68:2
  68:15,19,24
  69:15,20 70:1,4

Kristin Hendrix - October 27, 2021

70:22 72:12
76:24 77:7,13
77:20 80:20
81:7,22 84:9
85:2 88:3 90:9
90:17,23 91:16
91:23 92:13,16
93:10,11 120:6
123:24 127:14
127:16 128:23
129:6,18
131:13
**NexPoint's** 16:5
16:9
**Nope** 8:7 76:7
91:12
**normal** 34:16
103:23,23
**normally** 107:15
**North** 1:24 2:3
10:22 11:13
136:2
**NORTHERN** 1:2
**note** 3:10,12,17
3:19,21,23 4:14
5:3,6 14:19
15:18 16:10,21
17:1,3,6 18:16
18:19 19:22,25
21:4,23 22:7,20
23:9 28:21
30:11,19 31:8
32:15,21 33:2
33:20 35:3,18
42:15 43:2,3,11
45:9 46:16
56:21,22 58:11
58:13,13 66:9
66:13,16,20
67:13,22 68:2,5
68:8,10,16,19
68:23,24 71:13
71:19 72:6,11
72:12,16,20
73:4 76:13 77:7

80:9,10,14,20
81:8,23 85:14
90:18 91:16,19
91:23 92:14
127:16 133:10
**notes** 4:12,19
14:9 16:16
17:22 18:13
19:17,21,21
20:4,13,17,22
21:4,8,14,14
22:13 27:3
28:14 30:24
31:1 38:11 41:7
42:7,22 43:12
45:2 46:21,22
47:6 50:1 52:10
52:16,17,24
53:1,8,25 54:5
54:12,23 55:3,8
55:11 56:2,8,10
59:2 62:11
65:15 66:5
69:21 73:10
77:10 84:16
85:12 95:14
96:16 97:10
111:2 113:6,11
113:12,16,18
114:2,7,16
116:7,11,15,25
117:18,22,25
118:1,7,18
119:1,12 120:6
121:15,21,22
122:11 123:13
124:6 125:19
126:25 127:12
127:24 128:8
128:21 130:8
130:14 131:5,8
131:9,13,14,25
132:5,9,15,19
132:24 133:3
133:16

**notice** 88:3 89:8
**notices** 28:22
**noting** 14:5
**November** 59:12
61:6 62:6,10
66:19 67:12,19
68:1,7,14,21
71:4 72:4 74:10
75:18 76:3
93:21 127:6
128:20 129:24
135:22
**November/Dec...**
125:14
**NPA** 4:17 27:18
27:19 86:24
99:4 100:3
**number** 79:2,6
79:11,18 80:23
84:10,13 85:2,9
87:20,21 89:14
89:18,20,21
111:7 120:1
123:5,9,12
124:2,11,14,17
**numbered** 1:21
**numbers** 26:1
78:20 80:21
84:15
**NY** 2:11
─────────────
**O**
**oOo--** 1:4
**Oak** 2:17
**oath** 6:17 95:5
**object** 113:19
114:8
**objecting** 114:10
**objection** 7:3
14:14,21 15:24
16:22 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 38:7

39:17 41:1,13
45:3 46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
65:16 69:8
70:15 73:20
74:5 75:7 77:22
80:3,16 82:1
87:7 88:15 89:2
89:15 96:18
102:2 103:13
105:19 106:6
106:18 113:8,9
114:17 118:9
118:21 119:3
121:17 122:12
129:21
**objections** 7:5
**obligations** 14:19
16:6,10 118:7
132:1
**obligor** 15:18
**obviously** 14:11
35:6 59:1
**occasion** 22:18
**occurred** 95:15
96:4,17 97:7
106:17
**Oct** 4:22
**October** 1:15,21
86:22 94:9
122:17,19
**office** 10:1 34:1
54:8 57:3
**officer** 52:13
69:25 70:7
**officers** 109:10
109:13
**oftentimes** 13:23
34:23
**oh** 67:21
**okay** 6:11 7:1,7

25:3 28:19 30:5
31:23 32:11
33:22 34:3 36:1
38:2 39:14
42:13 43:6
49:25 58:23
60:11 62:1
63:17 70:25
79:25 84:8 85:1
89:24 93:7 94:1
110:17 112:8
113:11 115:17
118:18 119:5
121:13 123:15
126:15,22
129:13 130:19
131:23 134:2
**once** 104:5
**ones** 53:2 109:18
**ongoing** 77:20
**oOo--** 134:5
**open** 120:5
**opinion** 98:5
**opposed** 23:23
39:12 49:8
52:12 98:17
**oral** 91:25 95:9
95:13 96:4,8,12
96:23 97:6,9,11
97:20,25 98:9
132:20
**orally** 37:10
50:16
**order** 97:6
**ordinary** 103:23
104:13,19,23
**original** 30:11
54:23,25 55:11
**originally** 48:7
**outcome** 27:8
**outgoing** 67:7
**outside** 18:21
89:6
**outstanding** 66:5
80:11 120:4

Kristin Hendrix - October 27, 2021

121:21 131:19
131:22
**overdue** 60:19
**overhead** 103:24
104:3
**oversaw** 12:22
115:1
**overseeing**
117:14
**owed** 54:23,24
59:18 84:16
108:23
**owing** 123:23
124:1

**P**
**P.M** 1:22 134:4
**PACHULSKI**
2:10
**page** 3:2,8 46:25
78:23 79:4,8
80:22 100:8
119:25 120:15
**paid** 14:6 26:13
39:8 51:25
78:14,14,15,24
79:5,11 80:22
109:6
**paper** 34:25 37:6
45:14,18 49:1,4
49:24 50:22
54:22,25 55:3
55:14 56:13
**papered** 35:14,16
37:16 45:22
46:3,12 50:7
51:7 54:13
55:18 56:10
57:15 58:5
72:21
**papering** 35:17
45:13,25 72:25
**paralegal** 82:17
**paren** 120:5,6
**part** 7:9 16:2

17:9,13 25:17
26:8 27:4 44:8
70:13 97:11
103:5,10
107:15 109:11
120:12 130:23
133:7,11
**participate**
126:15
**particular** 17:13
52:11,13 56:8
81:18 98:19
**parties** 21:12
99:21 135:18
135:21
**Partners** 2:21
94:25
**partnership**
107:25
**pass** 94:14
**passwords** 47:17
**patient** 25:1
**pattern** 38:3
**Paul** 109:16,20
109:21
**pay** 14:19 21:4
21:12,13 22:7
22:13,20 39:2
40:1 68:24
69:20 108:17
108:23 109:3
**payable** 14:8,16
51:24 120:5
**payee** 133:11
**payment** 16:4
32:17 67:17
70:22 72:6
88:13,25 90:8
92:8,11,12,15
92:17 93:9
100:25 101:15
101:24 103:6
103:11,18,20
103:22 104:3,6
105:12,14

106:20 107:4,5
107:7,9 124:21
124:22 125:3
127:15 129:14
129:16
**payments** 13:20
66:23 67:8 71:6
71:10,16 73:3,4
74:17 76:13
78:17 81:7
98:20,24 99:5
99:10,13,16,20
99:21 100:14
100:17,18,21
100:24 101:3,4
101:7,10,13,19
102:1,8,11,19
102:23 103:2
103:15,24
104:18,20
105:5,9,17,25
106:9,13,25
107:12 126:2
126:24 127:7
127:11,18,23
128:7,12,15,20
128:24 129:7
129:10,19
130:7,14
131:21
**PC** 2:3
**PDF** 30:13,24
58:22
**penalty** 6:17
134:6
**people** 37:22
47:18 61:3
73:16 76:14
**perceived** 120:19
**percent** 49:14
80:12
**performance**
26:16
**period** 14:2 15:6

107:21 108:5
108:16,22
109:1 125:15
135:15
**periodically**
23:18,19
**perjury** 6:17
134:6
**person** 13:18
23:8,18 37:25
38:1 44:11 46:6
131:23 132:3,7
132:13,17,22
133:1,14 135:8
**personal** 10:5
**personally** 23:17
73:13 101:20
101:21 114:24
123:19 130:2
**phone** 38:1 71:5
72:5 74:20,21
75:2,3,5,5,14
75:19 76:15
92:2,3,6 93:15
93:21 94:6 99:4
100:12
**picking** 79:20
**pictures** 47:11
**pieces** 7:14,18
**pile** 58:25 111:7
**pin** 21:18
**pinpoint** 90:21
**pique** 76:6
**place** 135:8
**Plaintiff** 1:7 2:13
**play** 27:3 29:13
114:22 115:6
117:7,10
126:18
**please** 6:24 10:13
10:16 11:8
32:13,15,16
42:11,25 61:20
61:22 62:2 63:3
64:5 66:10

75:20 89:25
122:18
**point** 42:2 44:14
55:2 66:16
69:24 70:6
**policy** 104:9,11
104:15
**pop** 84:5
**portion** 8:9
**position** 9:7 12:8
110:4
**positive** 79:6,11
79:18
**possible** 32:17
36:21 58:15,18
65:1 93:6,19
95:4 109:21
**possibly** 41:20
55:21 58:7 73:8
104:22
**postsecondary**
10:19
**potential** 16:4
68:4,8
**potentially** 25:19
34:19 95:14
97:10
**practice** 17:20
18:11,18,23
34:16,21 48:17
49:7,9 50:20
53:7,12,16,17
**prep** 32:15
**preparation** 7:8
9:13
**prepare** 16:20
45:8 84:18
130:2
**prepared** 16:25
42:12 46:19
54:6 76:12 77:3
84:21 86:15
128:18
**preparing** 95:22
97:17 131:24

prepayments 81:25
presence 25:4
present 9:4,6,12 24:5 45:24 90:15 97:3
presented 116:1
presenting 46:14 97:18
preserve 78:8
pretty 14:11 109:8
previous 100:9
previously 17:24 48:25 131:9
Pricewaterhou... 116:9,12 117:5 117:17 118:2,5 130:20
principal 30:12 78:14,17 79:5 79:11,23 80:10 89:23 121:14 122:10 124:5 124:19 125:3 125:18 130:14
print 56:1
printed 42:8,12 42:24 47:18 55:18,22 56:7 57:4,21,22,24 57:25 58:11,14 58:21,22
printing 55:23,25
printouts 42:21
prior 9:25 10:4 19:17 28:11 35:24 40:25 55:2 65:23 71:25 86:9 96:6 105:3 108:6 124:24 127:19 128:12 133:12
privileged 9:8 95:24

privy 64:9,11 69:19
probably 9:15 17:2 49:14 50:6 58:22 61:9 63:15 99:15 109:8 126:13
proceed 61:20,25
proceeding 46:20
proceedings 95:1 95:3,12
process 31:7 32:16 45:11,12 120:12
produce 78:9
produced 1:18 17:24 33:15 34:1 59:4 67:10 76:20 82:14,19 125:6
product 115:13
production 10:1 33:15
profitability 26:25
program 47:25
programs 47:16
projections 17:18
promised 39:2
promissory 3:10 3:12,17,19,21 3:23 4:12,14 5:3 14:9 15:18 16:10,16,20 17:1,3,6,22 18:13 19:17 27:3 28:13,21 30:11,19 31:1,8 32:21 33:2 35:18 38:11 42:7 43:11,12 45:1,9 47:6 52:10,24 53:1,8 53:25 54:5,12 54:23 55:11

68:5 71:13,19 72:11,12,16 76:13 77:7,10 80:9 81:8 113:6 113:11,12,16 114:2,7,16 116:7,11,15 117:17,22 118:7 119:12 122:11 124:6
prompt 128:14
prompted 83:22
prospect 53:20
provide 7:12 9:19 15:21 30:11 42:21 59:17 63:3 64:5 64:16 119:16 121:25
provided 17:24 33:5,9,10 61:14 70:12 89:17 121:11 122:5 129:11 135:15
provides 120:7
providing 15:10 54:8 65:5
public 16:19
pull 119:14
pulled 49:3
purpose 86:12 125:22
purposes 39:5 98:1 126:23
purview 89:6
put 23:20 84:25
PwC 97:21 98:1 117:22

___

**Q**

qualification 16:20
question 7:1 14:10,22 15:25 16:23 18:15

19:12 20:19,24 22:9,22 24:9,16 28:4 29:5,16 34:7 35:11 36:14,23 37:1 38:8 39:18 41:2 41:14 45:4,5 46:5 47:21 48:23 49:11,21 50:5 51:15,21 52:2,4 53:10 54:18 55:6,15 55:20 56:5 58:17 65:17 66:10 69:9 70:16 73:21 74:6 75:8 77:23 80:4,17 82:2 84:14 86:9,19 86:20 87:8,19 88:16 89:3,16 95:10 96:10,19 100:9 102:3 103:14 105:20 106:19 113:9 113:24 124:17 127:8 128:5
questions 6:21,24 7:6 8:8 61:21 95:2 110:16 115:4 133:24
quick 52:5 95:4 107:23
quickly 6:16 109:8
quite 36:21 41:20 104:24
quote 120:3

___

**R**

R-o-e-b-e-r 32:10
raise 131:1
raised 95:12
range 89:10
rate 19:7 43:16

49:2 80:12
ratio 107:21 108:5
re-up 86:16
reached 108:5
read 7:9 8:9 32:18 82:21 86:17 119:25
reading 81:9
ready 94:16
real 11:14
really 35:13 67:21
reason 6:23 22:23,25 52:11 52:13 56:1,6,7 72:7 77:3 82:5 82:8 101:13 129:13,16 131:1
recall 7:19 10:8 21:6 34:15,20 36:16 37:2 44:11 46:10 50:14,20 51:17 51:23 52:4 55:25 56:7 59:22,25 60:2,3 60:8,10 63:11 64:1 65:3 66:7 67:3 68:22,25 69:22 72:3 73:1 74:11 83:22 84:4,23,25 86:12 88:17 91:25 92:3 93:5 93:7 102:21 104:21 105:15 107:6 108:25 109:14 112:3 112:13,15,17 116:4,15 118:5 119:5,8,19 120:16 123:4 123:15 127:5

129:25 130:17
131:5 133:10
**recalling** 109:16
**Receivable** 4:19
**receivables**
130:25 131:22
**received** 63:13
64:21 71:5
129:2
**receiving** 32:4
124:23
**recipient** 60:25
**recognize** 44:12
**recollection** 20:2
21:7 38:20
52:21,23 54:14
55:10 64:13
67:12 77:13
100:11 106:24
107:2,8 108:2
121:24 126:9
**reconciling** 13:20
**record** 7:15,16
30:8,9 44:4,6
52:6,7 53:3
56:18 62:19,20
72:10 75:5 78:8
82:19 83:13,14
93:20 94:4,21
98:14 110:18
**recorded** 73:11
81:24
**recording** 73:18
**records** 10:6,6
59:18 62:7 64:5
73:12
**reduced** 135:10
**refer** 99:25
**reference** 71:13
119:1 121:2,6,9
**referenced** 34:5
84:6
**referencing**
33:25 121:10
**referred** 96:2

**referring** 66:25
100:2,5
**reflected** 118:7
123:12
**reflecting** 43:15
**refresh** 9:17 42:1
42:20 69:18
108:1
**regarding** 86:1
90:17 107:12
**regardless** 99:16
**regularly** 23:24
**reinforces** 41:8
**reissue** 21:14
**related** 9:13
21:11 33:1
38:22 57:21
95:9 96:7 98:16
99:21 135:20
**relates** 32:21
64:17
**relation** 115:7
**relieve** 93:10,11
**rely** 42:8
**remember** 19:19
20:14 21:3
28:16 30:25
31:3,4 32:4
41:19 54:7
55:23 61:2,5,8
64:23,25 65:4,8
65:23 66:18
67:20 74:21,24
85:10 86:14
90:5,7,12
100:13,14,16
100:20 106:16
109:15,24
110:3,5,6
**remotely** 6:8
**renewal** 120:12
**reorganized** 25:7
25:15 26:17,24
27:2
**rep** 115:13,19,23

**repaid** 23:10
**repay** 69:6
**repeat** 14:10
22:10 28:15
44:22 66:10
**rephrase** 6:25
**report** 12:25 25:9
25:12 114:25
115:25 117:14
123:6
**reported** 1:23
13:6 36:22
**reporter** 135:1,3
135:15
**reporters** 27:13
**reporting** 12:22
12:23 13:22
**reports** 127:3
**repository** 54:22
55:9
**represent** 27:10
46:25 57:3 83:1
94:24 107:23
**represented** 2:4
2:11,18 93:5
**representing**
42:23
**request** 4:9 60:5
84:22
**requested** 63:3
63:21 64:5,17
84:2 135:13,14
**requesting** 63:25
**requests** 10:1
69:14 115:3
**required** 7:6 21:4
**respect** 26:25
29:20 43:8,17
48:10 51:12
73:3,17 92:13
98:24 106:9,12
112:13 114:22
127:16
**respectfully** 39:5
**respecting** 45:22

**respectively**
113:15
**respond** 122:23
**responded** 65:1
**response** 60:13
120:15,19
122:16,25
**responsibilities**
97:12 103:6,10
**responsibility**
69:7 102:23
105:2
**responsible** 14:5
17:21 31:7
45:18 77:19
97:17 101:25
126:20 131:23
132:3,7,13,17
132:22 133:1
133:15
**responsive** 10:6
**rest** 44:23
**restrictive** 47:17
**restroom** 52:6
93:16
**restructured**
19:21
**retail** 86:15
119:17,24
121:25 122:5,9
122:17 123:1,6
**reveal** 50:11
**review** 8:4 50:11
54:11 119:21
125:10,17
135:13
**reviewed** 9:15,19
**reviewing** 32:24
115:11
**revised** 17:6
**right** 12:6 13:21
14:16 25:7
27:15,20 28:18
35:22 45:9,10
47:19 49:3

56:14 65:6,7
69:16 75:14
80:24 83:17
88:21 91:24
96:9 102:25
111:23 120:20
122:19,20
123:21,24,25
124:2 127:25
130:11,12
131:10
**Roeber** 32:9
112:7
**role** 12:5,18
13:12 29:13
46:8 69:25 70:7
73:3,4,6,17,22
106:12 114:22
115:6,10 117:7
117:10,12
126:18
**roles** 73:6
**roll-up** 72:22
131:9
**rolled** 79:23
131:13
**Romey** 61:15,18
61:25 62:3
**room** 75:15
**roughly** 39:3
**routine** 20:4,21
20:25
**routinely** 21:1
**row** 131:3
**RPR** 1:23
**rude** 25:3
**Rukavina** 2:5 3:3
3:5 6:4 7:4,15
7:17 9:7,10,11
14:15,23,25
16:2,25 18:17
19:14 21:2
22:11,24 24:11
24:18 28:5 30:4
30:10,17,23

Kristin Hendrix - October 27, 2021

31:12,20 34:10
35:16 36:18
38:10 39:22
41:4,17 42:19
43:6 44:4,7
45:5 46:8 47:22
49:6,17,25
50:10 51:6,17
51:24 52:5,8
53:4,15 55:9,23
56:9,19 57:2,20
58:19 59:11
62:19,23 65:20
69:13 70:19
72:15 73:24
74:8 75:9,13
76:19 78:1,7,11
79:8,10,14 80:8
80:19 82:4,21
82:25 83:8,13
83:15 85:24
86:2 87:9 88:6
88:20 89:5,19
90:3 93:23 94:5
94:14,19
110:17,20
113:8,19 114:8
114:17 118:9
118:21 119:3
121:17 122:12
125:7 128:2
130:13 133:25
134:2

**S**

**S-e-e-r-y** 8:8
**Sadly** 94:9
**salaries** 108:17
108:18,19
**salary** 25:15
**sale** 68:4,8
**save** 55:13 72:19
**saved** 56:11
**saw** 41:8 86:6
115:12 123:19

125:6 126:12
**saying** 37:19
41:15 49:23
53:4 73:8 76:14
93:19 99:5
101:9
**says** 32:1,6 34:10
44:10,13,18
57:8,22,25
60:23 63:2 64:4
78:25 86:23
87:10 89:9
120:2,22
**scan** 55:13
**schedule** 76:24
77:5,6,21 80:20
82:7 85:3,13,17
131:20
**scheduled** 16:4,7
**schedules** 77:9
85:12
**schooling** 10:20
**Scott** 4:3 18:9
60:4,12,15
61:10,13 62:1
**Scott's** 60:13
**scratch** 17:3
**search** 10:5
**second** 7:15 44:5
62:18 78:23
80:22 99:24
109:15
**Secondly** 87:16
**section** 80:9 86:1
118:19
**see** 6:8 8:5,12,14
23:3 31:5,20
32:25 35:7
54:11 57:9,21
59:7,15,20 60:6
60:20 61:23
63:5,9 64:2,7
78:24 79:14
80:15,18,24
81:3 84:11 85:6

86:23 87:1,5
89:8,11 105:9
115:11 120:9
120:22,25
121:4 126:4
**seeing** 31:4 50:14
57:14 65:23
90:12
**seek** 46:20
**seeking** 24:3
**seen** 33:14 65:22
69:13 72:15
76:21 88:7
122:25
**Seery** 4:8 5:1 8:8
25:12,20 29:24
59:13 60:18,22
61:12 62:4,6,9
63:1,2 64:4
65:9 67:3,14,17
67:25 68:13,22
69:14 88:11,23
96:25 125:25
126:13
**Seery's** 8:10,20
**send** 29:14 32:13
34:24 37:7
53:21 59:7
60:11 62:2
63:17 83:22
**sending** 13:19
36:3 54:12
60:17 61:2
111:19
**senior** 12:8,11,11
12:12,17
**sense** 44:12 58:1
**sent** 28:22 29:11
37:17 42:9 83:2
83:17 92:16,22
106:20 107:3
111:21 123:19
126:11,13
**separate** 18:5
**served** 10:1

services 15:11,22
70:13,13 86:16
119:17,19
120:7
set 26:10,11,14
35:15 53:21
shape 37:10
shared 54:9,16
55:14 70:13
77:16 86:16
shareholders
39:2
sheet 118:6
121:11
sheets 63:8,22
short 74:22 75:17
75:23 93:15
shorthand 1:24
135:2,7,25
shortly 11:11,12
show 82:10
showing 92:15
131:21
sick 82:17
sign 52:20,20
53:7,20,22 54:3
104:25 105:1
113:5,18
115:13
signatory 52:14
signature 46:15
47:1,6,11,18
49:8,14,15
114:7,9,15
signed 47:9 52:10
52:11,25 55:4,8
115:14 131:6
132:5,9
signer 53:13
significant 20:20
51:19,22
signing 52:16,24
53:25
similar 32:25
34:9 38:25

96:10 112:13
single 104:2,3
sitting 30:25
33:24 42:1
50:15 53:23
54:4 55:24 82:4
85:16 91:21
105:16 106:23
situation 34:9
slightly 96:10
SMU 10:23
so-called 15:22
somebody 35:19
37:8 53:12,12
53:19 55:21
129:3
soon 32:17
sophisticated
14:12
sorry 11:12 14:24
19:15 47:8 52:4
57:21 66:2
82:23 92:12
97:3 103:9,23
109:20
sort 25:21 43:23
96:11 97:24
sought 88:24
sound 58:15
sounds 98:3
speak 36:2
speaking 13:17
43:11 44:1
speakings 95:21
specific 7:19
21:18 29:7
34:21 36:4,17
37:1,14 38:2
43:10 46:11,22
47:25 48:11,13
54:14 71:8
88:17 90:19
100:11 101:22
103:11,18
105:21 106:24

127:6
specifically 21:6
21:10 23:11
29:9 34:15 37:8
49:12 50:12,16
50:19 51:2 52:3
52:19 54:1,7
55:8 64:25 65:3
65:4,8 68:25
69:22 77:14
84:19,21 93:5
98:16 103:2,7
125:13,18
specifics 22:4
speculating 58:9
speculation
106:4
sphere 69:6
spit 48:1
spoken 35:23
61:13
spreadsheet 78:9
spreadsheets
31:6 77:12
staff 48:2
stake 27:7
stamp 47:19
82:18
standard 46:16
50:7 53:6,11,15
53:16 55:3
standing 67:2
STANG 2:10
start 54:19 59:11
95:10 100:11
started 11:13,17
20:11 100:10
starting 10:19
11:9
starts 59:12
state 1:23 6:5
10:25 67:25
68:14 76:22
78:16 136:1
stated 48:25

135:9
statement 99:3
statements 4:5
13:20 63:7,8,21
63:22 97:16,17
115:12 116:17
116:21 117:1,5
117:11 119:2
122:4 133:18
133:22
STATES 1:1
status 66:20
stay 26:4
steps 92:13
STINSON 2:17
stop 34:24
stopped 23:22
stored 56:2
straightforward
26:14
Strasburger
44:13,16
Street 1:25 2:4
stretch 109:5
strike 7:24 8:4
15:8 38:16
52:22 53:5
68:12 87:9
90:11
string 122:19
stuff 49:15
stupid 86:9
subject 16:5
119:20,20
132:19
subparts 86:20
Subscribed 134:7
subsequent 14:7
59:25 61:12
64:10 95:13
96:22 105:12
116:13 118:3
118:19
subsequently
32:11

sued 28:21
suggest 124:14
suing 28:5
Suite 2:4,17
136:2
summarize 72:19
summary 7:12
8:14
summer 123:16
124:18
supervision
135:11
supplementally
9:19
supposed 98:20
sure 6:12,15
10:21 11:4,11
12:20 13:20
14:11 18:22
19:23 22:11
26:7 28:16 31:2
33:10,21,22
37:5 42:3,22
43:20 52:25
58:18 60:16
62:1,19 63:17
65:4 66:11
75:21 76:11,11
84:15 99:3
100:7 101:1
107:18 109:22
115:16 125:24
126:23 130:23
130:24
Surgent 29:24
surprise 76:1,3
surprised 94:11
surprises 40:8
76:2
suspect 23:15
switch 58:24
sworn 1:19 6:2
135:4
synopsis 7:12
8:14

system 56:12
77:16 84:20

_____
T
_____

T-h-e-d-f-o-r-d's
86:22
take 25:14 30:8
38:11 45:5 52:5
52:20 72:15
75:17 76:15
82:12 87:10
89:13 92:13
104:1 110:14
taken 1:20 16:15
17:6 45:8 135:7
talk 7:21,24 8:1
8:17,20,23,25
28:10 34:21
44:9 66:11,15
78:1
talked 9:12 97:4
99:8
talking 8:19,22
29:1 64:11
101:2 116:8
121:15,23
125:13
taxes 14:9
team 13:19 17:25
18:21 26:4 31:6
39:15 49:15,18
50:24 51:7
64:16 97:16
102:4 104:11
106:15 115:2
telephone 23:17
74:11 75:23,25
tell 34:13,16,24
44:2 53:1 54:1
54:2 55:7 60:14
63:24 71:23
74:19,23 79:22
79:24 84:3
91:11,15,18
93:24 99:2

100:12 106:14
107:1 109:22
110:8 112:8,25
113:4,17 114:1
114:6,14
116:20,23,24
117:21 118:25
119:6,11 122:4
122:8 123:2,8
123:11 130:22
131:24 132:4,8
132:11,14,18
132:23 133:2
135:4
telling 35:25
37:11 53:24
100:13,21
105:22 115:24
template 18:20
18:24 43:14,18
45:8 46:17 58:4
58:6,12
templates 43:12
50:9
term 17:2 66:9
66:16 67:8,13
73:10 76:24
77:10 98:17,25
100:4 107:20
107:24 125:19
126:2 127:12
127:16,24
128:8,21 130:7
131:5,8,14
terminology
27:14
TerreStar 38:22
test 20:9
testified 6:2 45:7
72:18 112:12
113:13 127:22
129:22
testify 83:10,12
testifying 6:16
testimony 19:8

20:1,15 26:23
41:2 51:11
56:10 99:9
135:9
**Texas** 1:2,23,25
10:15,22,25
11:13 134:8
136:1
**thank** 79:13 94:2
94:11,15 111:4
128:3 134:2
**Thedford** 4:22
120:2 122:22
**Thedford's** 86:21
120:15 123:5
**thereto** 135:21
**thing** 20:20 30:18
34:4 56:22 58:3
94:20 126:21
**things** 12:21
18:24 19:2,9
37:21,24 74:18
87:13 100:10
**think** 20:6 22:11
22:24 24:1,18
24:21 25:13
32:2 33:9 41:4
41:25 42:3
44:13,25 45:1
45:19,19,21,21
46:2 49:16 50:8
51:6 58:3 59:2
61:8,16 64:21
66:1 69:2 72:18
75:22 79:19
80:8 87:12 88:9
88:23 102:22
104:12 109:7
127:22 129:23
**Third** 2:10
**thought** 75:22
130:25
**three** 87:15
125:19 127:24
128:7,8,21

130:7 131:5
**Tim** 109:20,23
**time** 9:1,6 11:17
14:19,19 17:12
20:10 22:5,5,12
22:12 23:12
31:5 32:9 33:8
35:6 44:15
45:19 49:14
51:10,18 55:1
64:2 65:10
66:16,19 67:11
69:7,11,24 70:6
72:19 73:16
75:6 77:24 78:4
80:10,10 81:19
82:12 84:4
86:14 90:11
93:8,24 103:16
104:2 108:6,16
108:21,22
109:1 112:25
113:1,4,5,17
114:1,14
116:20,25
123:4,8,11
125:14 128:12
130:20 131:25
132:4,8,11,14
132:18,23
133:2 135:8
**timely** 128:24
129:6
**times** 9:12 29:2
51:4 109:4
**title** 12:13,14
13:2 46:11
69:25 70:7
**today** 8:23 11:23
13:10 25:6 28:2
30:25 32:16
33:24 41:19,23
42:1 50:15
53:23 54:4
55:24 65:5,8,23

82:4 83:2 85:16
90:13 91:21
94:12 95:1,22
105:16 106:23
121:23
**today's** 9:14
**told** 34:12 35:15
35:19,22 36:19
36:24 37:5,8
38:5,11,17
40:22 41:11,18
41:20 60:8 91:9
91:22 103:2,7
104:10,18
106:21,25
**top** 80:25
**topic** 88:19 92:5
95:8 96:11
109:7 130:19
**topics** 98:12
107:18
**total** 78:14,18
79:22 80:22
**track** 29:1
**tracking** 31:6
111:19
**training** 16:13
**transaction**
112:10,14,22
**transactions** 37:4
119:7
**transcript** 7:9
135:13
**transfer** 40:14
81:15 91:3,7,9
91:13,22 92:20
92:20 111:14
**transferred**
38:18 39:23
90:23 111:10
**transferring**
81:22
**transfers** 35:8
37:12 38:5
40:24

**treasury** 12:20
13:14,15 14:1
15:22 17:17
**trigger** 107:21
108:5
**triggers** 26:11
**trouble** 42:10
43:1
**true** 42:25 134:7
**trusted** 50:8
**truth** 135:5,5,5
**try** 10:5 20:10
95:2,3 105:8
**trying** 21:18
23:20 84:5
**turning** 19:22
**two** 24:4 27:25
29:18 30:1 31:1
37:18 38:4,21
42:7 43:8 46:22
52:16 53:25
54:5 57:7,14
70:13 73:16
86:20 106:9
109:14,18,24
110:6 113:12
116:7,11,25
117:17 118:7
121:15,22
122:10 123:13
124:6
**TX** 2:4,18 136:2
**typewriting**
135:10
**typical** 18:18,23
23:25
**typically** 21:10
35:1,5,6,12
47:7 52:19 54:2
101:1
**typo** 87:12

_____

**U**

**Uh-huh** 27:16
33:12 47:3

**umbrella** 13:25
99:23
**unable** 108:17
109:2
**underlying**
131:20
**understand** 6:16
6:20,21,24 10:9
15:3 26:7 27:10
33:22 39:14
41:22 56:16
58:8 84:14 95:5
119:16,23
122:21 125:8
125:15 128:5
**understanding**
13:3,5 25:1
27:5,25 43:24
44:20 50:22
57:23 62:5
63:20 70:21,25
71:3 78:22
79:17,25 81:6
89:20 98:23
115:9,22 126:5
128:19 131:16
133:14
**understood** 7:1
39:11
**unfortunately**
42:4
**unilaterally**
110:22
**UNITED** 1:1
**University** 10:21
**unpaid** 80:9
**upcoming** 67:16
72:6 73:3 74:1
126:1
**update** 43:11
45:1 58:7 77:20
**updated** 43:18
**updating** 17:23
18:23 19:1,3,25
50:8

**use** 21:17 45:12
47:19 48:12
49:18 59:1 79:1
100:4
**usually** 24:5

**V**

**Vaguely** 63:12
**valid** 131:25
**valuation** 39:15
**various** 14:15
15:11 59:13
**verbatim** 27:14
78:25 85:20
86:22
**verification** 50:3
**version** 30:13
42:7
**versions** 30:24
**video** 8:5,12 59:6
62:16 85:24
**videoconference**
1:19 2:19
**view** 41:9
**volume** 94:19
**vs** 1:8

**W**

**wait** 44:23
**walk** 10:18 11:8
**walking** 54:7
**want** 28:10 47:15
58:25 86:18
95:8 100:7
**wanted** 52:19
54:2,9 60:12,14
82:17 84:7
102:11 105:9
**wanting** 65:10
**wasn't** 108:23
114:6,15 127:7
129:14
**Waterhouse** 4:21
7:10,21 13:7,8
23:13,22,23

24:6 29:23
34:19 35:24
36:2 37:3,5,9
38:5 47:24 49:7
50:12,16 52:10
52:23 53:24
54:5,13 60:11
62:10 63:1,18
64:3 67:3 71:5
72:1 73:8 74:13
75:20 83:19
84:1 90:4,7,16
91:10,22 93:9
99:5,18 102:16
103:8,12,19
106:14 112:6,8
112:21,25
113:4,17,22,25
114:5,6,13
115:6 116:19
116:23 117:20
118:24 122:3,7
122:22 124:8
124:10,13,16
124:24 125:25
126:6,24 127:3
127:9,19 128:9
128:14,18,19
129:23 130:4
130:11
**Waterhouse's**
8:1,6 47:1,6
48:11 75:25
115:10
**way** 11:18 12:23
14:8 21:15
35:13,15 37:8
37:10,16 56:12
58:20 60:19
76:1 81:12 83:3
92:25 93:10
101:21 122:5
135:19
**ways** 6:7 54:19
**we'll** 9:10 15:9

17:5 44:8,23
66:11,15 75:17
82:18 94:3
**we're** 6:7 27:22
28:16 29:1 30:6
35:19 50:22
58:9,24 59:2,3
76:11,11 85:20
93:22 100:7
104:3 116:8
125:13
**we've** 9:11 28:8
50:7 56:21,22
69:16 88:9
114:2 117:18
121:23
**website** 49:3
**week** 8:2,10 9:2
9:22,25 10:5
13:22 28:9,17
29:18 60:22
61:6 67:6 86:1
95:19
**weekly** 66:21,25
67:2
**welcome** 59:1
86:17
**went** 9:15 10:22
10:23 24:19,22
49:23 112:17
115:4
**weren't** 19:25
28:23 40:7,9
64:12 96:7
98:21,24 99:20
100:24 101:13
105:22 106:3
131:1
**wire** 34:25
106:15 107:3
**withdrawn**
113:23 117:25
120:3 124:9,21
126:6,7 127:7,9
129:15 132:12

133:9
**withholding**
116:3
**within-entitled**
135:6
**witness** 1:19 16:1
16:24 18:16
19:13 20:25
22:10,23 24:10
24:17 30:3
31:11 34:8
35:12 36:15
38:9 39:19 41:3
41:15 46:6
48:24 49:12,22
50:6 51:5,16,22
52:3 53:11 55:7
55:21 56:6
57:18 58:18
69:10 70:17
73:22 74:7
75:12 77:24
80:5,18 82:3
83:10,12 88:17
89:4,17 94:14
96:20 102:4
103:15 105:21
106:7,20
113:21 114:12
114:18 118:11
119:4 121:18
122:14 135:3
135:10
**word** 42:6,6 43:7
43:8 45:11 47:2
77:13
**words** 21:5 23:20
68:14
**work** 11:8 52:4
98:2 126:22
**worked** 11:16,18
36:6 61:19
110:5
**works** 35:1
**world** 113:25

114:5,14
116:24 117:21
118:24 119:6
119:11 122:3,8
124:17
**wouldn't** 36:22
37:6 53:22
**wrap-up** 110:16
**write** 60:4
**writes** 60:18,22
61:13,20
**writing** 37:10
41:14 64:3
114:25 117:14
**written** 80:7
82:19 91:25
99:7 104:12,15
**wrong** 57:5 87:13
99:7
**wrongly** 123:12
**www.dickman...**
136:4

**X**

**Y**

**yeah** 7:2 14:13
21:10 34:9
44:23 51:9
80:18 93:17
**year** 12:2 20:10
26:14 78:1,5
81:6 104:5
127:15 128:21
128:25 129:7
129:14 130:8
131:21
**years** 11:15,18
12:9 18:20 21:9
22:25 23:9 36:7
37:18 40:25
51:7 52:4
104:21,22
108:15 109:17
110:8,10,12

131:3 133:5,12
**Yep** 76:9 123:17
**yesterday** 9:2
86:7,9
**York** 2:11

**Z**

**zeros** 87:15
**ZIEHL** 2:10
**Zoom** 6:8,10

**0**

**05.02.2019** 4:1
**05.03.2019** 3:25

**1**

**1** 3:10 30:14,15
30:18 33:1 71:4
71:25 72:4
74:10 80:9
93:21 129:24
135:22
**1-31-23** 136:4
**1.3** 81:1,2
**1.4** 90:23 91:3,23
**1:19** 1:22 134:4
**10** 4:3 9:23,25
10:5 28:17 59:4
59:9 110:12
**10,530,000** 87:20
**10.5** 85:6,9
124:11
**10:11** 1:22
**10017-2024** 2:11
**101** 136:2
**11** 4:7 62:14,21
62:23
**11:27** 57:22
**110** 3:5
**111** 3:6
**12** 4:11 5:5 65:13
65:18,21 90:5,7
90:17
**12,286** 87:10,10
**12,286,000** 87:6
87:16,20,24

**12.3** 120:24
121:13 123:5,9
**12/30/29** 78:25
**13** 4:14 72:11,13
72:16
**13-week** 67:5
125:7,10,14,23
126:16,19
128:17 130:3,6
**14** 4:17 22:25
23:9 36:7 40:25
76:10,17,19
82:6 85:17
90:22 91:4 93:8
**14-year** 38:3
**15** 4:19 36:7 83:1
83:4,15,17 84:8
84:14,18,19
85:7 87:21
89:21,22
123:16,22
124:5 133:5
**15(c)** 4:22 86:1
121:11
**16** 4:21 85:21,22
85:25 86:3
119:15,23
**17** 5:1 11:15 52:4
88:2,4,7
**18** 5:5 89:25 90:1
90:3
**19** 59:12
**1982** 10:17

**2**

**2** 3:12,12,14,19
3:23 4:3 30:19
30:20,21 31:16
32:21 34:14
37:11 41:11,18
44:19 56:22
57:22 58:11
60:25 61:6,12
79:8 119:25
**2.1** 81:1

**2.4** 30:20 32:13
32:21 33:19
37:12 38:22
39:7 42:16 43:3
58:5,11 111:10
113:14
**2.4-** 110:22
**2.4M** 3:12,19,23
**2000** 86:22
**2001** 127:23
**2004** 10:21 11:12
**2005** 11:11 20:16
21:2,9,19
**2009** 10:23
**2014** 133:12
**2015** 10:24
**2017** 12:15 19:23
73:2 74:7 131:6
131:12
**2018** 116:4,16
117:1,11,23
118:3,11,14,18
119:1 128:25
**2019** 3:14 12:10
12:17,19,25
13:8,14 17:9,12
17:20 18:2,8,10
18:10 19:15
20:2,2 21:2,9
21:19 23:16,16
24:12,14 30:20
31:17 34:14
37:11 38:17,21
39:6,14 40:3,5
41:11,18 44:25
45:14 46:9,12
46:19 47:12,24
48:21 49:6,19
50:2 53:5,6
54:21 55:3,10
56:9,20 57:22
74:7 78:5 80:23
81:6,18 110:21
111:1 112:9,21
114:1 116:5

117:18 118:16
129:8
**2020** 4:4,11,22
12:7 14:2,5
15:6,10,21 16:3
24:22 59:12
62:6,10 65:14
66:3,7,18,19
67:13,17,20
68:1,8,14,21
70:23 71:4 74:8
75:19 76:4 78:2
79:10 83:18
86:25 87:6
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:20 103:21
105:4,18
120:23 122:17
122:19 124:18
125:14,20
126:9 127:6
128:20 129:14
129:17
**2021** 1:15,21 4:8
5:2,6 24:24
26:4 28:20
29:11 62:25
64:15 71:25
73:3 88:2 90:5
90:17 94:10
106:10,25
128:2,8,15
134:9 135:22
**21-03004-sgj** 1:8
**214** 136:3
**23** 85:1 87:3
**23,846,000** 84:9
**24,471,000** 89:9
**25** 61:6
**26** 10:17
**27** 1:15,21
**28** 125:20

**29** 83:18 84:1
**2nd** 58:5 111:9

**3**

**3** 3:10,14,17,21
4:11 31:15,18
34:4,11 35:21
36:20 37:11,19
38:12 41:11,18
44:18 56:20
65:14 66:3
111:7 112:21
119:7
**30** 3:10,12 71:4
72:4 74:10
86:25 87:6
93:21 120:23
129:24
**30-year** 19:22
**30,746,812.33**
4:14
**30.7** 66:9,13
**30.7M** 4:17
**31** 3:14 4:15
67:16 70:22
79:10 88:12
98:21,25
100:25 101:11
101:19 102:8
102:19 103:20
105:3,18 131:6
**3102** 2:17
**312** 136:1
**34th** 2:11
**3800** 2:4
**38th** 1:25

**4**

**4** 3:17 42:15,17
42:19 43:6,18
43:18 44:21,24
45:22,25 46:3
46:19 48:11,19
50:13,17 51:2
52:8 55:17,24

Kristin Hendrix - October 27, 2021

57:16
**42** 3:17,19
**4228** 136:2
**43** 3:21,23
**445-9548** 136:3

**5**

**5** 3:19 30:12 33:1
  33:20,25 34:5
  35:3 36:25
  37:12 38:25
  39:3,8 42:15,16
  42:17,20 43:2,6
  43:18,19 44:21
  44:24 45:22,25
  46:3,19 48:11
  48:19 50:13,18
  51:2 52:9 55:17
  55:24 57:16
  58:13,13 94:9
  112:14 113:14
**5-** 33:19
**5.0** 110:23
**5/31/2020** 79:5
**500** 1:24 2:3
**530,000** 78:25
**56** 3:25 4:1
**575-** 79:23
**575,000** 79:12
**575,550** 79:6
**59** 4:3
**5M** 3:10,17,21

**6**

**6** 3:3,21 4:8,22
  43:2,4,21 44:9
  44:18 62:25
  64:15 80:12
  86:22
**6/30** 86:23 121:3
  121:6,11,25
  122:8
**62** 4:7
**65** 4:11
**683** 87:3

**7**

**7** 3:23 5:2 43:2,4
  44:9,19 88:2,21
**7.4** 38:18 39:11
  39:23 40:15,21
  122:10 123:12
**72** 4:14
**75201** 2:4
**75206** 136:2
**75219** 2:18
**76** 4:17
**777** 2:17
**780** 2:10

**8**

**8** 3:25 56:19,24
  56:25 58:10
  89:9
**800** 136:3
**83** 4:19
**85** 4:21
**855-5100** 136:3
**88** 5:1
**881** 120:1

**9**

**9** 4:1 56:21,24,25
  58:10
**90** 5:5
**94** 3:4
**99** 49:14

# PROMISSORY NOTE

$5,000,000.00                                                                            May 3, 2019

   FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

   1. <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

   2. <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

   3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

   4. <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

   5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

   6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



EXHIBIT 1

HCMFA-AHC 0606

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

HCMFA APP 0607

# PROMISSORY NOTE

$2,400,000.00                                                                                    May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3.      <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.


EXHIBIT
2
CMFA/APP 0608

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

MAKER:

_____

FRANK WATERHOUSE

2

redacted



CONFIDENTIAL

D-HCMFA030908

# PROMISSORY NOTE

$5,000,000.00                                                                     May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



EXHIBIT
4
HCMFA AFP 0601

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

HCMFA APP 0612

# PROMISSORY NOTE

$2,400,000.00                                                          May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.  <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.  <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.  <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

HCMFA APP 0614

# PROMISSORY NOTE

$5,000,000.00

May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("*Payee*"), in legal and lawful tender of the United States of America, the **principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00)**, together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1. Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the **Internal Revenue Code**, per annum from the date hereof until maturity, compounded annually on **the anniversary** of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2. Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand.

3. Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4. Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind

EXHIBIT
10/27
Hendrix

## PROMISSORY NOTE

$2,400,000.00

May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1. Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2. Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand.

3. Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4. Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind

HCMFA APP 0616

EXHIBIT
7

Hendrix

# Info

## HCMF loan 05.03.2019

N: » NexPoint » Adversaries » 21-03004 HCMFA

### Convert File Formats

These buttons allow you to change the current file formats to a new or older format.



**Convert**

### ndOffice Echo Backup

You can explore the backup folder with unsaved documents

**Open Backup Folder**

### Protect Document

Control what types of changes people can make to this document.

**Protect Document ▾**

### Inspect Document

Before publishing this file, be aware that it contains:
- Document properties, e-mail collaboration information, author's name and related dates
- Footers
- Content that cannot be checked for accessibility issues because of the current file type

**Check for Issues ▾**

### Manage Document

Check in, check out, and recover unsaved changes.
- There are no unsaved changes.

**Manage Document ▾**

## Properties ▾

| | |
|---|---|
| Size | 61.5KB |
| Pages | 2 |
| Words | 618 |
| Total Editing Time | 0 Minutes |
| Title | PROMISSORY NOTE |
| Tags | Add a tag |
| Comments | Add comments |
| Template | Normal.dotm |
| Status | Add text |
| Categories | Add a category |
| Subject | Specify the subject |
| Hyperlink Base | Add text |
| Company | Strasburger |

### Related Dates

| | |
|---|---|
| Last Modified | 5/3/2019 2:03 PM |
| Created | 5/3/2019 2:03 PM |
| Last Printed | 5/2/2019 11:27 AM |

### Related People

| | |
|---|---|
| Manager | Specify the manager |
| Author | JFORSHEE |
| | Add an author |
| Last Modified By | Kristin Hendrix |

### Related Documents

Open File Location

**Show Fewer Properties**





EXHIBIT
1427
HCMFA APP 0617
Hendrix

# Info

## HCMF loan 05.02.2019

N: » NexPoint » Adversaries » 21-03004 HCMFA

### Convert File Formats



These buttons allow you to change the current file formats to a new or older format.

### ndOffice Echo Backup

You can explore the backup folder with unsaved documents

### Protect Document

Control what types of changes people can make to this document.

### Inspect Document

Before publishing this file, be aware that it contains:
- Document properties, e-mail collaboration information, author's name and related dates
- Footers
- Content that cannot be checked for accessibility issues because of the current file type

### Manage Document

Check in, check out, and recover unsaved changes.
- There are no unsaved changes.

**Convert**

**Open Backup Folder**

**Protect Document ▾**

**Check for Issues ▾**

**Manage Document ▾**

## Properties ▾

| | |
|---|---|
| Size | 61.5KB |
| Pages | 2 |
| Words | 621 |
| Total Editing Time | 5 Minutes |
| Title | PROMISSORY NOTE |
| Tags | Add a tag |
| Comments | Add comments |
| Template | Normal.dotm |
| Status | Add text |
| Categories | Add a category |
| Subject | Specify the subject |
| Hyperlink Base | Add text |
| Company | Strasburger |

### Related Dates

| | |
|---|---|
| Last Modified | 5/2/2019 11:31 AM |
| Created | 5/2/2019 11:26 AM |
| Last Printed | 5/2/2019 11:27 AM |

### Related People

Manager — Specify the manager



Author — JFORSHEE

Add an author

Last Modified By — Kristin Hendrix

### Related Documents

Open File Location

**Show Fewer Properties**







EXHIBIT 9

10/25

Hendrix

HCMFA APP 0618

**From:** Scott Ellington <SEllington@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Subject:** Re: HCM - HCMFA Financial Statements
**Date:** Wed, 2 Dec 2020 17:51:57 -0600
**Importance:** Normal

---

Yes please do.

Sent from my iPhone

On Dec 2, 2020, at 4:30 PM, Kristin Hendrix wrote:

Scott, can you confirm this is okay to proceed with providing?

Begin forwarded message:

**From:** James Seery
**Date:** December 2, 2020 at 4:27:43 PM CST
**To:** Kristin Hendrix
**Cc:** Jack Donohue , Bradley Sharp , Fred Caruso , James Romey , Frank Waterhouse , Scott Ellington , Greg Demo , Thomas Surgent
**Subject: Re: HCM - HCMFA Financial Statements**

All:

Scott and I have spoken and agree that the information should be provided to James immediately.

Kristen, please proceed with James. If anyone has any questions or issues, please call me.

Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery
**Date:** Wednesday, December 2, 2020 at 11:50 AM
**To:** Kristin Hendrix



10/27 **EXHIBIT**

10

Hendrix

HCMFA APP 0619

ACL-072954

**Cc:** Jack Donohue , Bradley Sharp , Fred Caruso , James Romey , Frank Waterhouse , Scott Ellington , Greg Demo
**Subject:** Re: HCM - HCMFA Financial Statements

This is an explicit direction from me as CEO of HCMLP to provide the requested information regarding HCFMA to James Romey.

If anyone has issued contrary direction at any time, that direction is superseded and void.

Please provide the information now.

Scott, please call me.

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery
**Date:** Wednesday, November 25, 2020 at 1:48 PM
**To:** Kristin Hendrix
**Cc:** Jack Donohue , Bradley Sharp , Fred Caruso , James Romey , Frank Waterhouse , Scott Ellington
**Subject:** Re: HCM - HCMFA Financial Statements

Can I get this ASAP.

HCFMA is way overdue.

Thank.

Sent from my iPhone

On Nov 25, 2020, at 10:56 AM, Kristin Hendrix wrote:


Hi Jack,

Scott Ellington is going to follow up with the board on this request.

Thanks,

Kristin

---

**From:** Jack Donohue
**Sent:** Thursday, November 19, 2020 11:38 AM
**To:** Kristin Hendrix
**Cc:** Jim Seery ; Bradley Sharp ; Fred Caruso ; James Romey
**Subject:** HCM - HCMFA Financial Statements

Kristin,

HCMFA APP 0620

ACL-072955

Jim Seery has asked me to review the financial records of HCMFA due to the funds owed the Debtor. Can you please send me the balance sheet, P&L and cash flow for 2019 and through 2020?

Thanks,

Jack

---

Jack M. Donohue, CPA

Development Specialists, Inc.

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

**http://DSIconsulting.com/**

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** 'James Seery' <jpseeryjr@gmail.com>, Frank Waterhouse
<FWaterhouse@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** RE: HCM - Information Request
**Date:** Wed, 6 Jan 2021 22:38:31 +0000
**Inline-Images:** image001.jpg

---

Confirmed.

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

---

**From:** James Seery [mailto:jpseeryjr@gmail.com]
**Sent:** Wednesday, January 06, 2021 5:37 PM
**To:** Frank Waterhouse
**Cc:** John A. Morris; Thomas Surgent
**Subject:** Re: HCM - Information Request

Adding Thomas

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery
**Date:** Wednesday, January 6, 2021 at 5:35 PM
**To:** Frank Waterhouse
**Cc:** John Morris
**Subject:** Re: HCM - Information Request

Frank:

I am the CEO of HCMLP and your direct supervisor. I have full authority over the Debtor's assets and operations. Indeed my appointment and authority has been court ordered by a court with full jurisdiction

HCMFA APP 0622

ACL-073046

over the Debtor and its assets.

I am entitled to all information on the HCMLP owned and maintained financial and information systems from wherever it came as well as any other information in the possession of the Debtor. To the extent that the Debtor has information pursuant to a shared service agreement, any other agreement, or any other part of its business (pre or post-petition), I am entitled to it, and you are required as CFO to provide to me or deliver it as I request.

For this one time, I am providing you the courtesy of a detailed response. I will even ask counsel to confirm my authority to give this direction. No third party consents are required by you or the Debtor.

I trust this letter allays your concerns.

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Frank Waterhouse
**Date:** Wednesday, January 6, 2021 at 5:22 PM
**To:** Jim Seery
**Subject:** RE: HCM - Information Request

Jim-

I wanted to follow up on our conversation in which you requested that I provide you with certain financial information relating to the entities below. In the first instance, I don't have access to any information relating to Dugaboy. As you know, I have access to this information because, other than Dugaboy, the Debtor continues to provide shared services. I expressed reservation about whether, pursuant to the Shared Services Agreement and my confidentiality obligations, I was permitted to provide the CEO of the Debtor with this financial information, as only a few of the shared services employees are permitted access to the financial information of the former affiliates of the Debtor. You responded by saying that I would be terminated today if I didn't comply.

I'm not a lawyer, and I want to do the right thing in terms of my obligations to these third parties, which is why I asked you if I was permitted to provide the information under a court order or something.

In thinking about it and your statement that I would be terminated, if Debtor's counsel gives me authority to provide this information and approves that it is legal without me obtaining consent of the Trustees or the appropriate representatives of the non-trusts, then I will provide the access.

I will be available to discuss at 4:30 as per your request.

Thanks

Frank

---

**From:** James Seery
**Sent:** Wednesday, January 6, 2021 3:31 PM

HCMFA APP 0623

**To:** Frank Waterhouse
**Subject:** FW: HCM - Information Request

Frank.

As discussed, after consulting with your personal counsel, please speak to me at 4:30pm Dallas time. I will send you and outlook.

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery <jpseeryjr@gmail.com>
**Date:** Wednesday, January 6, 2021 at 3:55 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>, Jack Donohue <JDonohue@DSIConsulting.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>, Bradley Sharp <bsharp@DSIConsulting.com>, Fred Caruso <fcaruso@DSIConsulting.com>, James Romey <jromey@DSIConsulting.com>, "Patrick J. O'Malley" <POMalley@DSIConsulting.com>, Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** Re: HCM - Information Request

My direction.

These are HCMLP business records. Please provided them as requested by Jack ASAP.

Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Date:** Wednesday, January 6, 2021 at 3:48 PM
**To:** Jack Donohue <JDonohue@DSIConsulting.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>, Bradley Sharp <bsharp@DSIConsulting.com>, Fred Caruso <fcaruso@DSIConsulting.com>, James Romey <jromey@DSIConsulting.com>, "Patrick J. O'Malley" <POMalley@DSIConsulting.com>
**Subject:** RE: HCM - Information Request

Jack-

I'm assuming you've received approval from these entities to release this information? Please send the approval over to us so we can review. If you haven't done so already, let us know and we will do our best to find out who exactly is representing these entities and can coordinate from there.

Thanks

HCMFA APP 0624

ACL-073048

Frank

**From:** Jack Donohue <JDonohue@DSIConsulting.com>
**Sent:** Wednesday, January 6, 2021 2:18 PM
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; Bradley Sharp <bsharp@DSIConsulting.com>; Fred Caruso <fcaruso@DSIConsulting.com>; James Romey <jromey@DSIConsulting.com>; Patrick J. O'Malley <POMalley@DSIConsulting.com>
**Subject:** HCM - Information Request

Kristin,

At the direction of Jim Seery, please provide DSI with the requested information for each entity below immediately.

Entity:

• Hunter Mountain Investment Trust

• NexPoint Advisors, LP

• Dugaboy Investment Trust

• Highland Capital Mgmt Services, Inc.

• NexPoint Real Estate Partners (f/k/a HCRE Partners, LLC)

• Highland Capital Mgmt Fund Advisors, LP

• NexPoint Real Estate Partners (f/k/a HCRE Partners, LLC)

• Highland Capital Mgmt Services, Inc.

Information:

• 2015 – 2020 bank statements (monthly)

• 2015 – 2020 detailed income statements (monthly or broken out by month)

• 2015 – 2020 detailed balance sheets (monthly or broken out by month)

• 2015 – 2020 cash flows (monthly or broken out by month)

Let know if DSI can assist in gathering the data faster.

Thanks,

Jack

Jack M. Donohue, CPA

Development Specialists, Inc.

HCMFA APP 0625

ACL-073049

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

http://DSIconsulting.com/

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Frank Waterhouse, CFO

      Re: Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| TOTALS | $7,400,000 | $7,577,344.55 | $110,308.52 | $7,687,653.07 |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019. Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021. Payee reserves all rights with respect to such amounts.



HCMFA APP 0627

expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

HCMFA APP 0628

## Appendix A

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

HCMFA APP 0629

# PROMISSORY NOTE

**$30,746,812.33**                                                                       **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1    Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    Final Payment Date.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same



shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    Prior Notes.   The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

HCMFA APP 0631

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

HCMFA APP 0632

redacted

D-NNI -029141

CONFIDENTIAL

EXHIBIT

10/27

14

HCMFA APP 0633

Hendrix

REDACTED

D-NNI-029142

CONFIDENTIAL

redacted

D-NNI -029143

CONFIDENTIAL

D-NNI -029144

redacted

CONFIDENTIAL

redacted

CONFIDENTIAL

D-NNI -029146

redacted

CONFIDENTIAL

D-NNI-029147

redacted

CONFIDENTIAL

redacted

D-NNL-02914R

CONFIDENTIAL

D-NNI -029149

redacted

CONFIDENTIAL

D-NNL_029150

redacted

CONFIDENTIAL

redacted

D-NNI_029151

CONFIDENTIAL

**HCMLP Notes Receivable**
**As of 7/31/2020**

| | | |
|---|---|---|
| NexPoint Advisors | $ 23,846,944 | 30 yr Amort (issued 2017) |
| Dugaboy | 17,788,532 | 30 yr Amort (issued 2017) |
| Highland Capital Management Services | 6,677,529 | 30 yr Amort (issued 2017) |
| HCRE | 5,938,670 | 30 yr Amort (issued 2017) |
| Trussway | 1,004,993 | Due upon maturity - 11/1/2021 |
| SSP Holdings, LLC | 2,037,898 | Due upon maturity - 11/22/2022 |
| Siepe | 2,334,606 | Equity conversion option |
| Highland Capital Management Fund Advisors | 10,530,971 | Demand |
| James Dondero | 8,911,977 | Demand |
| Multi-Strategy Credit Fund | 1,269,000 | Demand |
| HCRE | 4,859,929 | Demand |
| Highland Select Equity Fund | 3,000,000 | Demand |
| Highland Capital Management Korea | 3,760,000 | Due upon maturity - 4/21/2037 |
| Highland Capital Management Services | 934,331 | Demand |
| **Total Notes Receivable** | **$ 92,895,380** | |

Demand                          29,506,208


EXHIBIT
15
HCMFA_SBR_0041

redacted

redacted

2

CONFIDENTIAL



CONFIDENTIAL

HCMFA APP 0647

D-HCMFA290882

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

redacted

CONFIDENTIAL

HCMFA APP 0648

D-HCMFA290883

HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

Re: Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year. Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default. Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable. The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due immediately.** Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer



cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

HCMFA APP 0650

## Appendix A

| | |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

HCMFA APP 0651

redacted

CONFIDENTIAL

CONFIDENTIAL

HCMFA 00153-007579

1        IN THE UNITED STATES BANKRUPTCY COURT

2       FOR THE NORTHERN DISTRICT OF TEXAS

3           DALLAS DIVISION

4              --o0o--

5

6  HIGHLAND CAPITAL MANAGEMENT,    )

   L.P.,                       )

7                         )

           Plaintiff,   )

8                         )

          vs.          ) No. 21-03004-sgj

9                         )

   HIGHLAND CAPITAL MANAGEMENT FUND )

10 ADVISORS, L.P.,           )

                         )

11         Defendants.   )

12 _____

13           DEPOSITION OF

14            DAVID KLOS

15         October 27, 2021

16 _____

17

18       DEPOSITION OF DAVID KLOS, produced as a

19 witness, duly sworn by me via videoconference at the

20 instance of the DEFENDANTS, was taken in the

21 above-styled and numbered cause on October 27, 2021,

22 from 2:30 P.M. to 5:14 P.M., before BRANDON D. COMBS,

23 CSR, RPR, in and for the State of Texas, reported by

24 computerized machine shorthand, at 500 North Akard

25 Street, 38th Floor, Dallas, Texas.

David Klos - October 27, 2021

1                            APPEARANCES

2

3              MUNSCH, HARDT, KOPF & HARR, PC, 500 North

4     Akard Street, Suite 3800, Dallas, TX 75201, represented

5     by DAVOR RUKAVINA, Attorney at Law, appeared via

6     videoconference as counsel on behalf of the Defendants.

7              Email: drukavina@munsch.com

8

9

10             PACHULSKI, STANG, ZIEHL & JONES, 780 Third

11    Avenue, 34th Floor, New York, NY 10017-2024, represented

12    by JOHN A. MORRIS, Attorney at Law, appeared via

13    videoconference as counsel on behalf of the Plaintiff.

14             Email: jmorris@pszjlaw.com

15

16

17             STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,

18    Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney

19    at Law, appeared via videoconference as counsel on

20    behalf of the Defendants Jim Dondero, HCMS and HCRE

21    Partners.

22             Email: michael.aigen@stinson.com

23

24

25

David Klos - October 27, 2021

1                           INDEX

2                                                  PAGE

3    Examination by MR. RUKAVINA                      4

4    Examination by MR. AIGEN                        95

5    Examination by MR. MORRIS                      109

6    Further Examination by MR. RUKAVINA            127

7

8

9

10            (No exhibits marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          DAVID KLOS,

2    having been first duly sworn, testified as follows:

3                          EXAMINATION

4        Q.   (BY MR. RUKAVINA)  Sir, state your name for

5    the record, please.

6        A.   David Klos.

7        Q.   K-l-o-s?

8        A.   K-l-o-s.

9        Q.   What's your date of birth?

10       A.   May 6, 1982.

11       Q.   And where do you live?

12       A.   I live in Dallas.

13       Q.   What's your educational background?

14       A.   Undergraduate and graduate degrees.  I went

15   to undergrad at Boston College, graduate school at SMU,

16   with a degree in, Master's of Science in accounting and

17   MBA from SMU.

18       Q.   Do you hold any professional licenses?

19       A.   CPA in the state of Texas and, I don't know

20   if it's technically a license, but Series 27 from

21   FINRA.

22       Q.   And when did you get your CPA license?

23       A.   I don't recall specifically, but it would

24   have been probably in the '08, '09 time frame.

25       Q.   Is it current?

1    A.    As far as I know.

2    Q.    Have you ever been disciplined or threatened

3  with disciplinary proceedings?

4    A.    No.

5    Q.    And your relevant work experience, please,

6  starting with college and afterwards?

7    A.    Sure.  Out of grad school I started working

8  at Deloitte in Boston.  I worked at Deloitte for

9  approximately three and a half years, between the

10  Boston office and the Dallas office.

11        And then I began working at Highland Capital

12  Management in March of 2009 and I've been at Highland

13  since then.

14    Q.    And when you joined Highland in March of

15  2009, what was your title or your role at that time?

16    A.    My title, if I remember correctly, was

17  valuation senior analyst.  I'm not certain if that was

18  exactly it, but it was something along those lines.

19    Q.    Was it in the valuation group?

20    A.    Yes.

21    Q.    And then give me your -- today you're the CFO

22  of Highland; correct?

23    A.    Correct.

24    Q.    So give me the progression from valuation

25  analyst to CFO with, to the best of your recollection,

David Klos - October 27, 2021

1   the approximate year that you were promoted, et cetera?

2       A.   Sure.  I was in the valuation role from

3   basically March of 2009 to end of 2009.

4           I was then brought over to what we call the

5   corporate accounting team, so doing the accounting for

6   Highland Capital Management, LP and of the other

7   advisor-type entities, where I was primarily focused on

8   budgeting and forecasting, credit facility compliance.

9           That took from roughly 2010 until I think

10  middle of 2011, at which point I was moved over to the

11  fund accounting group, so doing hedge fund accounting,

12  which was a short role, really, for probably three or

13  four months.

14          At which point I was brought back to the

15  corporate team and also put in charge of the valuation

16  group.  I held that role in some way, shape, or form

17  more or less continuously for the next several years,

18  although certainly my role evolved and changed.

19          But in terms of the groups that I had

20  oversight over, those were the groups.  Like I said, my

21  role definitely evolved over time from 2011.

22      Q.   So by 2017 what was your title?

23      A.   So, yeah, by that time, I was, I believe,

24  controller.  I might have still been assistant

25  controller.

David Klos - October 27, 2021

1          There were a few title changes in between
2    there.  I think at one point I was manager, at one
3    point I was senior manager, at one point I was
4    assistant controller and at one point I was controller.
5          I can't remember the exact times of all of
6    those break points.
7    Q.    Let me pause you.  When you were assistant
8    controller, who was the controller?
9    A.    There was quite a bit of time where I was
10   assistant controller and we didn't have a controller.
11   I couldn't tell you the exact time frame, but there was
12   definitely an extended time frame.
13         And then in April of 2020, our existing chief
14   accounting officer left and I assumed his
15   responsibilities at that time.
16   Q.    Let me pause you.  That's a new term for me.
17   Chief accounting officer?
18   A.    Uh-huh.
19   Q.    Who was that person?
20   A.    The person that left?
21   Q.    The person that was the chief accounting
22   officer until April 2020.
23   A.    Cliff Stoops.
24   Q.    And do you have any idea or knowledge whether
25   at Highland that was like an officer-level position?

David Klos - October 27, 2021

1    A.   It was not.  It was more of a term of art, I
2  would describe it.  So it -- so, yeah --
3    Q.   To the best of your recollection, when did
4  you become the controller at Highland Capital
5  Management, LP?
6    A.   I couldn't pin down a specific date.  Like I
7  said, the responsibilities were very similar.  I would
8  guess the change from assistant controller to
9  controller was probably in the, most likely in the '16,
10  '17, maybe '18 time frame.
11    Q.   Can we agree that as of May 1, 2019, you were
12  the controller at Highland?
13    A.   Yes.
14    Q.   So let's focus on that time frame, May 2019,
15  and you're the controller.  Who do you report to at
16  Highland?
17    A.   Frank Waterhouse.
18    Q.   The CFO?
19    A.   Correct.
20    Q.   No one in between you and him?
21    A.   Correct.
22    Q.   So what -- explain to me the role between the
23  chief accounting officer and the chief financial
24  officer in that time frame, '19, '20?
25         MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1   question.

2           THE WITNESS:  Very little.  Like I said,

3   chief accounting officer was more of a term of art.

4   What that role actually had oversight of was our retail

5   fund accounting, institutional fund accounting,

6   operations, so loan settlement and treasury.

7           And probably another department or two that

8   I'm forgetting, but it did not have any oversight over

9   the corporate accounting group.

10      Q.   (BY MR. RUKAVINA)  And in May of 2019, as the

11  controller, what were -- what was your role or what

12  were your duties?

13      A.   In May of 2019 I was at that point still

14  overseeing the valuation group.  I was overseeing the

15  corporate accounting group, which my primary direct

16  report there was Kristin Hendrix, who really was the

17  day-to-day person.  But I certainly oversaw her.

18      Q.   By that you mean the person that answers to

19  you?

20      A.   Correct.  Sorry.  If I flipped that, I

21  apologize.  So I was overseeing that group, which had,

22  you know, fairly broad responsibilities.

23          In terms of, you know, accounting for the

24  Advisor, doing forecasts when they were called for,

25  performing the audit every year, managing cash,

David Klos - October 27, 2021

1  processing payroll, things of that nature.

2          And then at that time I was also put in

3  charge of one of the public REITs that was launching at

4  the time under the NexPoint flag.  And getting that

5  team started.

6      Q.   Did you mention that in May of 2019 you were

7  still involved with the valuation group?

8      A.   I did.

9      Q.   Did you have a title at the valuation group?

10     A.   Nothing distinct from my overall controller

11 title.  These titles were often, like I said, terms of

12 art, whether it was controller or chief accounting

13 officer.

14     Q.   What did the valuation group at Highland do?

15     A.   Well, valuation group was really a liaison

16 with both third-party pricing providers, pricing

17 services, brokers on the street, front office, members

18 at Highland.

19          To, you know, to work on valuing the

20 securities held across the platform, both for Highland

21 HCMLP managed funds as well as affiliated managed

22 funds.

23     Q.   So who did -- did you report to anyone at the

24 valuation group?  In other words, did it have its own

25 separate hierarchy kind of?

David Klos - October 27, 2021

1    A.    Frank Waterhouse.

2    Q.    And were --

3    A.    I should clarify too, that the valuation team

4  isn't ultimately responsible for the valuations

5  themselves, but they do act in this liaison role.

6    Q.    Perhaps that's my confusion.  Is there a

7  separate group that handles just valuation?

8    A.    No.

9    Q.    Is there an outside consultancy that handled

10 that in May of 2019?

11   A.    I don't know if I would call it consultancy,

12 but there was a third-party valuation service provider

13 that would do certain of the, call it illiquid, harder

14 to value securities.

15   Q.    So would you say that you were pretty busy in

16 April, May 2019?

17          MR. MORRIS:  Objection to the form of the

18 question.

19          THE WITNESS:  I've been busy throughout my

20 career.

21   Q.    (BY MR. RUKAVINA)  In April, May, June 2019,

22 how many hours a month do you estimate you worked for

23 Highland?

24          MR. MORRIS:  Objection to the form of the

25 question.

1        THE WITNESS:  I don't remember.  A
2    significant number.
3        Q.   (BY MR. RUKAVINA)  Certainly full-time?
4        A.   Absolutely.
5        Q.   Would you say that you were working more than
6    200 hours a month in that time frame for Highland?
7        A.   I don't know how many hours.  I should
8    clarify, we're using Highland very liberally.  When I
9    say Highland, supporting the entire apparatus,
10   platform.  Significant number of hours at that time,
11   and before and after.
12       Q.   And let's explore that a little bit.  You
13   mentioned one of the funds for NexPoint.  I'd like to
14   talk about NexPoint Advisors, LP, just NexPoint
15   Advisors, LP.
16       Did you ever have an official role or title
17   with NexPoint Advisors, LP?
18       A.   Not that I can remember.
19       Q.   Do you know if you were ever the controller
20   for that entity?
21       A.   I'm not certain.  I'm not certain.
22       Q.   But I take it that pursuant to the shared
23   services agreement you, as an employee of Highland,
24   were providing services on behalf of NexPoint?
25       MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1   question.

2          THE WITNESS:  I provided many of the same

3   services for NexPoint Advisors that I provided for

4   Highland, similar types of services.

5      Q.   (BY MR. RUKAVINA)  And briefly about Highland

6   Capital Management Fund Advisors, LP, HCMFA, did you

7   ever have like an official title or role with that

8   entity, to your knowledge?

9      A.   Again, not that I can remember.

10     Q.   Not to your knowledge, the controller ever of

11  that entity?

12     A.   I'm not certain whether I was or not.

13     Q.   But you provided services to that entity as

14  part of your role at Highland pursuant to shared

15  services?

16     A.   Similar to NexPoint as I described.

17     Q.   When you were controller of Highland, was

18  that an officer-level position at Highland?

19     A.   No.

20     Q.   When did you become the chief financial

21  officer of Highland?

22     A.   Chief financial officer?

23     Q.   Uh-huh.

24     A.   2021, March.

25     Q.   After Mr. Waterhouse was gone?

David Klos - October 27, 2021

1      A.    Yes.

2      Q.    And I'm going to ask you a little bit about

3 your compensation today at Highland.

4            You don't have to give me specific numbers

5 unless I ask you, please, but I take it you have a base

6 compensation?

7      A.    Yes, I have a base.

8      Q.    Do you have any bonus structure compensation?

9      A.    Yes, I have a bonus.

10     Q.    And what is that bonus number or whether it's

11 paid out based upon or contingent upon?

12           MR. MORRIS:   Objection to the form of the

13 question.

14           THE WITNESS:   As I understand, it's based on

15 my offer letter.

16     Q.    (BY MR. RUKAVINA)   On your what?

17     A.    My letter for extending an offer.

18     Q.    Tell me, what is your -- without having to

19 use express numbers, what is your bonus compensation?

20 When is it paid, et cetera?

21     A.    Yeah, so it's not too dissimilar from the

22 prior Highland plan that has semiannual installments

23 payable.  And then there's a, kind of an end of plan

24 bonus when -- I don't remember the specifics on exactly

25 what triggers that, but it's back-ended in the plan.

David Klos - October 27, 2021

1    Q.   Do you have an expectation as to when the

2  winding down and monetization of Highland and its

3  assets will be complete?

4    A.   That's very hard to speculate, especially

5  given the amount of litigation that's going on because

6  I don't know when that's going to play out and that's a

7  material asset.

8    Q.   Have you discussed with Mr. Seery how long

9  that might be?

10    A.   Not that I can specifically remember.

11    Q.   Do you believe it will be at least probably

12  two years, from today?

13    A.   I don't know.

14    Q.   This bonus compensation, does it or any

15  amount of it depend on how well Highland or the

16  claimant trust, how well they do vis-a-vis collecting

17  money from creditors?

18    A.   Not that I can think of.  I'd have to

19  probably go back and look and understand the back-end

20  piece to say definitively.

21    Q.   And back-end piece, does that mean whenever

22  the winding down is completed?

23    A.   Yeah, like I said, I'm not exactly -- I'm not

24  completely facile with the exact timing, if it's

25  completed 100 percent or 80 percent, what kind of

1  qualitative considerations go into that.  But
2  substantially completed.
3      Q.   Sitting here today, do you think or believe
4  that any portion of your compensation over the next
5  however long it takes to wind down Highland depends on
6  how much Highland recovers from the litigation
7  regarding promissory notes?
8      A.   I really take exception to that question
9  because the insinuation is that it's going to somehow
10 change my answers here, and it's absolutely not.
11         How litigation, it may or may not affect my
12 ultimate compensation, but that's not going to affect
13 one iota of the answers I give you today or at any
14 time, whether I'm on or off the record.
15     Q.   Fair enough.  So you're going to testify
16 today truthfully regardless of your compensation.  I
17 got you; right?  Correct?
18     A.   I didn't follow what you just asked me.
19     Q.   You're going to testify today truthfully
20 regardless of how these events may or may not affect
21 your compensation; right?
22     A.   It's such a loaded question I can't even
23 begin to answer that.
24     Q.   So sitting here today -- I want to ask you
25 the same question I did before, and your answer to me

```
 1   was that you took exception to the insinuation.  Now
 2   I'd like you to answer my question.
 3              Which is, sitting here today, do you believe
 4   that any part of your compensation in the future,
 5   however long it takes to wind down Highland, is going
 6   to depend on how well Highland does in these
 7   litigations concerning the notes?
 8        A.   I believe my ultimate compensation will
 9   depend on how long this process takes, which I don't
10   know, and ultimate recoveries to trust beneficiaries
11   under the plan.
12              And so I do expect that it will vary, but I
13   would reiterate my earlier comment.
14        Q.   So sitting here today, you understand that if
15   the trust beneficiaries recover more, then you might be
16   compensated more?
17        A.   That's possible.
18        Q.   Well, sir, I'm not trying to be a smart ass,
19   but --
20              MR. MORRIS:  Actually, you're coming awfully
21   close, just to be clear, so be careful, because I'm
22   offended as well.  But continue.
23              MR. RUKAVINA:  I'm entitled to ask the man
24   about his compensation.
25              MR. MORRIS:  Right.  And your clients have
```

1  $75 million, hard dollars at stake in this litigation,
2  so we should never believe anything that he says?  Is
3  that where we are now?
4      Q.   (BY MR. RUKAVINA)  Sir, again, what is your
5  bonus compensation as it relates to how well the
6  claimant trust does?  Do you remember or not?
7      A.   I don't know that that's even something that
8  I could know at this point.
9      Q.   In preparing for this deposition, I take it
10  you spoke to legal counsel, and I'm not entitled to
11  know that and I'm not asking that.
12          But did you talk to anyone else?
13      A.   I've spoken in general terms to Mr. Seery.
14      Q.   Okay.  Anyone else?
15      A.   I've spoken, again in general terms, to
16  Kristin Hendrix.
17      Q.   Anyone else?
18      A.   Not that I can think of.
19      Q.   Now, I understand you spoke to Ms. Hendrix
20  when legal counsel was present; right?
21      A.   Yes.
22      Q.   So let's exclude that conversation.
23          Did you have any conversations with
24  Ms. Hendrix regarding this deposition or this
25  litigation at which counsel was not present?

David Klos - October 27, 2021

1          A.    Not in any substance.

2          Q.    And when do you recall you might have had

3     those discussions with her?

4          A.    I'm not even sure.

5          Q.    Would it have been recently or like 9,

6     10 months ago?

7          A.    No, it would have been recently.

8          Q.    And with Mr. Seery, when did you have a

9     general conversation with Mr. Seery?

10         A.    I've had, you know, one or more general

11    conversations with Mr. Seery.  It's my understanding

12    that he was the 30(b)(6) witness, and he had questions

13    in preparation for his role in that.

14         Q.    So that would have been before last Thursday

15    that you talked to him?  I'll represent to you that

16    that's when his deposition was.

17         A.    Yeah, if I'm accepting that representation,

18    yes, prior to.

19         Q.    Other than that conversation with respect to

20    him preparing for the 30(b)(6), did you have a

21    discussion with him about this litigation as it might

22    relate to your deposition?

23         A.    I don't believe so in terms of relating to

24    this deposition.  We've talked at length about the

25    notes more generally.

David Klos - October 27, 2021

1      Q.   And we'll go through that I'm sure.

2           So other than the conversations with

3  Ms. Hendrix and Mr. Seery and, of course, with counsel

4  that I'm not entitled to know about, did you discuss

5  this deposition or what you might be asked today with

6  anyone else?

7      A.   No.

8      Q.   Okay.  Did you read all or any portions of

9  the deposition of Frank Waterhouse?

10     A.   Certainly didn't read all of it.  I have a

11 general understanding of the topics that were -- that's

12 a bad way to frame it.

13          I have a general understanding of a few

14 points that were covered in his deposition.

15     Q.   Were you provided -- were you provided the

16 exact pages of any of his deposition?

17          MR. MORRIS:  Objection.  Direct him not to

18 answer.

19          MR. RUKAVINA:  You're going to direct him not

20 to answer whether he read --

21          MR. MORRIS:  If you're asking him whether I

22 directed him to particular --

23          MR. RUKAVINA:  I didn't ask that.

24          MR. MORRIS:  Rephrase your question.

25     Q.   (BY MR. RUKAVINA)  Did you read any pages

David Klos - October 27, 2021

1  from Mr. Waterhouse's deposition?

2        MR. MORRIS:  Objection.  Asked and answered.

3        You can answer again.

4        THE WITNESS:  I don't recall -- I don't

5  recall reading it.

6     Q.   (BY MR. RUKAVINA)  So were you provided a

7  summary of his deposition?

8     A.   I have had discussions with Mr. Morris in

9  preparation for this deposition.

10    Q.   That's fine.  And we can stop there.

11         Did you read or -- did you read the whole or

12  any portion of Mr. Seery's deposition?

13    A.   No, I don't believe I -- no, I don't believe

14  so.

15    Q.   Is it the same answer, that whatever you

16  discussed would have been through counsel?

17    A.   Yes.

18    Q.   Did you see any of the videotape of either

19  Mr. Waterhouse's or Mr. Seery's deposition?

20    A.   No.

21    Q.   So let's talk about the NexPoint

22  $30.7 million note.

23         You're familiar with that note; right?

24         MR. MORRIS:  Objection to the form of the

25  question.

David Klos - October 27, 2021

1             THE WITNESS:  Before I answer that, I'd like
2    to see the note.
3         Q.   (BY MR. RUKAVINA)  It's in here.  I'm looking
4    for the exhibit number.  It's in here somewhere.
5         A.   Yes, I'm familiar with this note.
6         Q.   Are you familiar with anything having to do
7    with the negotiation or execution of this note?
8             MR. MORRIS:  Objection to the form of the
9    question.
10            THE WITNESS:  Can you repeat.
11        Q.   (BY MR. RUKAVINA)  Yes.  Let me rephrase it.
12            Did you have anything to do, back on or about
13   May 31, 2017, with the negotiation or execution of this
14   promissory note?
15            MR. MORRIS:  Objection to the form of the
16   question.
17            THE WITNESS:  Nothing with respect to the
18   negotiation --
19        Q.   (BY MR. RUKAVINA)  I'm sorry.
20        A.   In terms of the execution, I believe I
21   coordinated with internal counsel, who drafted the
22   note, and I can't remember -- I can't recall one way or
23   the other if I assisted in actually physically
24   receiving signatures.  I just don't remember.
25        Q.   Do you remember who that internal counsel

1  was?

2       A.   Yeah, it was Lauren Thedford, who is Highland
3  in-house counsel.

4       Q.   She's a lawyer?

5       A.   Yes.

6       Q.   Do you recall from that -- strike that.

7            Did you know on or about May 31, 2017 what
8  the purpose or reason behind Exhibit 13, this
9  promissory note, was?

10           MR. MORRIS:  Objection to the form of the
11  question.

12           THE WITNESS:  The purpose was to take
13  existing notes, which I believe were exclusively demand
14  notes, I'm not a hundred percent certain on that, and
15  roll them into a single note that would have a 30-year
16  amortization period.

17       Q.   (BY MR. RUKAVINA)  Do you know why that was
18  done?

19       A.   I believe it was done probably for a number
20  of reasons, one of which was to ensure some level of
21  cash flow back to Highland, when I say Highland,
22  Highland Capital Management, LP, on an annual basis.

23       Q.   Was that a concern at Highland Capital
24  Management, that it wasn't getting any level of cash
25  flow back?

David Klos - October 27, 2021

1    A.   It wasn't a concern of mine.  I don't know if
2  it was a concern of others.

3    Q.   Do you recall whether any auditor ever raised
4  that concern?

5    A.   The auditors did raise that in conjunction
6  with the audit that was concluding around this time.
7  So yes, they did raise it, you know, probably in the
8  May of 2017 time frame.

9    Q.   Do you know who decided that it would be a
10  30-year term note?  By that I mean 30 years.

11    A.   Jim Dondero.

12    Q.   Do you know if he decided that in connection
13  with discussions with anybody or, to your knowledge, he
14  just decided?

15    A.   As far as I know he just decided it.  I
16  believe there was a draft at one point that was for
17  20 years, and he wanted to do 30.

18    Q.   So this note is executed in May 31, 2017.
19  Did you have any further role prior to, let's say,
20  December 1, 2020 with respect to anything to do with
21  this promissory note?

22    A.   Sorry, tell me the date again.

23    Q.   From execution of the note until December 1,
24  2020?

25    A.   And the question was?

David Klos - October 27, 2021

1    Q.   Did you have any role in that time frame with
2  respect to this promissory note on behalf of Highland?
3         MR. MORRIS:  Objection to the form of the
4  question.
5         THE WITNESS:  I don't know how to answer
6  that, it's such an open-ended question.  I just don't
7  know how to respond to that.
8    Q.   (BY MR. RUKAVINA)  If payments were made on
9  this note, would you have any duty to record or credit
10 those payments?
11        MR. MORRIS:  Objection to the form of the
12 question.
13        THE WITNESS:  I wouldn't have personally in
14 my role, but my team would have been involved in the
15 recording of those.
16    Q.   (BY MR. RUKAVINA)  And when payments were due
17 on this note, did you personally have any role with
18 respect to doing anything to facilitate those payments?
19    A.   When payments were due did I have anything --
20 yes.
21    Q.   What was your role?
22    A.   So my role, as part of the corporate team,
23 part of our role is managing cash at the various
24 entities.  So I was involved in weekly cash meetings,
25 where things like upcoming, whether it's an obligation

1  or a receipt, would be put on people's radars.

2         And we would, in connection with the 30-year

3  notes such as this one from NexPoint, we would either

4  confer with Jim or -- certainly Jim.  Also likely his

5  accountant.

6         In terms of teeing them up to make sure that

7  they were prepared from a cash flow statement to make

8  the payment.

9      Q.   What do you mean by his accountant?

10     A.   Melissa Schroth.

11     Q.   What do you mean by his?  That's a new name

12  to me.  Who is Melissa Schroth?

13     A.   I find it hard to believe that she's a new

14  name to you.  But I think her title was executive

15  accountant, and she was the keeper of Jim's -- many of

16  Jim's trusts and personal entities.

17     Q.   Was she a Highland employee?

18     A.   She was.  And when I say Highland, I should

19  be clear, Highland Capital Management, LP.

20     Q.   So when you say Jim's accountant, she was

21  still a debtor employee, just that she handled

22  primarily Jim's personal matters?

23     A.   She was still a Highland Capital Management,

24  LP employee but she did Jim's personal matters.

25     Q.   Did you have any role at either Highland

1 Capital Management or NexPoint Advisors as to a

2 decision as to whether any prepayments on this note

3 would ever be made?

4       MR. MORRIS: Objection to the form of the

5 question.

6       THE WITNESS: Can you repeat.

7   Q. (BY MR. RUKAVINA) Let's start from scratch.

8       Do you have any memory of any payments being

9 made on this note, Exhibit 13, prior to their scheduled

10 dates of payment?

11   A. There were payments on -- and to be clear,

12 we're talking about the original 30.7- NexPoint

13 promissory note? There were payments that I recall

14 happening throughout 2019 on this note.

15   Q. And we can look at Exhibit 14.

16       MR. MORRIS: What number?

17       MR. RUKAVINA: 14, 1-4.

18   Q. (BY MR. RUKAVINA) And those are only

19 numbered because Ms. Hendrix, they were used for her

20 deposition.

21   A. Sure. Just trying to keep these in order, I

22 apologize. Got it.

23   Q. Do you recognize Exhibit 14?

24   A. Generally. I can't say that I can verify

25 that this is completely accurate. But it looks

David Klos - October 27, 2021

1  familiar to a loan amortization schedule.

2      Q.   Would it have been maintained by Highland?

3      A.   Yes.

4      Q.   And I'll tell you that no one has yet to

5  authenticate this with a hundred percent precision, so

6  I'm not asking you to ratify these numbers, but let's

7  assume that they are what they are.

8          This does purport to show on the second page

9  a number of transfers in 2019, which goes along with

10 your recent answer.

11         Do you see those, sir?

12     A.   I do.

13     Q.   In particular, 750,000, then 1.3 million,

14 300,000, 2.1 million, 630,000, 1.3 million.

15         You see all those, sir?

16     A.   Yes, I see every one.

17     Q.   Do you have any memory, without going into

18 those transfers of those dates to the dollar, do you

19 have any memory that those transfers were made?

20     A.   Yes.  Again, not a specific recollection of

21 where I was at the time, but yes, I know that these

22 transfers were made.

23     Q.   Do you know why they were made in those

24 amounts and on those dates?

25     A.   No, not without speculating.

David Klos - October 27, 2021

1    Q.    What would be your speculation if you were to
2  speculate?
3    A.    My speculation would be that it would be for
4  liquidity needs at HCMLP, Highland Capital Management,
5  LP, needing liquidity to operate.  Again, that's
6  speculation.  I don't know for a fact that that's true,
7  but that's what I would assume.
8    Q.    Who would have made those decisions in 2019
9  to transfer those funds?
10        MR. MORRIS:  Objection to the form of the
11  question.
12        THE WITNESS:  Yeah, it would have been either
13  Frank or Jim.  I can't say with certainty, but one of
14  the two.  When I say Jim, I should be clear,
15  Mr. Dondero.
16    Q.    (BY MR. RUKAVINA)  Between January and
17  July 2019, do you have any recollection that there was
18  any particular liquidity issue or need at Highland
19  Capital Management?
20    A.    Yeah, Highland was dealing with liquidity
21  problems throughout 2019.  Maybe not every single day
22  of the year, but we were continuously needing to bridge
23  liquidity.
24    Q.    And you joined Highland in 2009.  From that
25  point in time, 2009, through 2019, was there any

David Klos - October 27, 2021

1 practice at the enterprise of those businesses to
2 transfer funds between each other on a basis of when
3 one needed it and one had it?
4    A.   Yes, that was a fairly, generally speaking,
5 that was a fairly common practice, of using different
6 entities within the overall structure to bridge
7 liquidity.
8    Q.   Would that have been Mr. Dondero who, in the
9 final analysis, would have made those decisions?
10    A.   Maybe not a hundred percent, but I'd say
11 the -- if not a hundred percent, certainly most.
12    Q.   And who else might have participated,
13 Mr. Waterhouse?
14    A.   Potentially Mr. Waterhouse.  And the reason I
15 hedge on that a little bit is I don't think Frank would
16 have made any of these decisions on his own either.
17 But I may have heard them from Frank via Jim.
18    Q.   So in those same years, were you ever asked
19 by Mr. Dondero or Mr. Waterhouse as to whether funds
20 should be transferred from one entity to another for
21 liquidity purposes?
22    A.   Can you ask that again, please.
23    Q.   Yes.  Trying to understand, were you part of
24 those discussions as to whether these transfers should
25 be made, or did you just learn that a decision to make

David Klos - October 27, 2021

1  them had been made and you executed them?

2      A.   Both, depending on the circumstances.

3      Q.   So sometimes you would be brought into a

4  discussion?

5      A.   Yes.

6      Q.   And can you think of any particular example?

7      A.   Of when I was brought into the discussion of

8  whether to transfer?  I can't think of an individual

9  example but we met quite regularly with Jim on cash.

10         So to the extent that either he needed cash

11 on one of his entities, he might let us know that.  Or

12 to the extent that Highland needed cash, we might let

13 him know that and ask for basically his assistance in

14 helping us to meet our own cash needs.

15     Q.   And did he usually find a way to facilitate

16 the cash need either at one of his entities or at

17 Highland?

18     A.   I suppose until October 16 of 2019.

19     Q.   Yes.  Prior to bankruptcy, do you recall any

20 instance where one entity wasn't able to transfer funds

21 to another for liquidity purposes?

22     A.   I can't think of a specific situation.  But

23 I'm sure there were situations where -- you know, cash

24 was always something that was being juggled, so I don't

25 know that necessarily liquidity could be met the same

David Klos - October 27, 2021

1  day.

2          But eventually we were able to manage through

3  those situations, you know, oftentimes through some of

4  these loans.

5      Q.   In instances that you may remember when

6  Highland Capital Management needed liquidity, do you

7  know how Mr. Dondero decided from which other entity to

8  transfer the cash?

9      A.   I can't step into his brain and think about

10 his decision-making process, but if I was going to

11 oversimplify it I would speculate that it would be

12 based on who has cash in that moment.

13     Q.   Would he ask you or someone on your team who

14 had cash?

15     A.   At times, depending on which entity we're

16 talking about.  Because my team certainly didn't have

17 responsibility for every single entity in the

18 enterprise, but we did have responsibility for some.

19     Q.   And if your team -- so -- strike that.

20          So over the general -- talking about

21 generally now, over those 10 years when there were

22 these intercompany transfers for liquidity purposes,

23 how were they booked by the debtor, by Highland Capital

24 Management?

25          MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1  question.

2       THE WITNESS:  Help me on the direction.  So

3  this is money that Highland is receiving or money that

4  Highland is sending?

5       Q.   (BY MR. RUKAVINA)  Sending out.

6       A.   Sending out.  So this is -- in the scenario

7  that you're describing, this money that Highland is

8  sending out to meet some other corporate obligor's

9  liquidity needs?

10       Q.   Yes, sir.

11       A.   So those would be booked as a loan.  I

12  would -- I need to hedge a little bit because I'm not

13  a hundred percent certain, but I would say if not

14  exclusively via loans close to exclusively.

15       Q.   And would they -- strike that.

16       Would they usually be papered up with a

17  promissory note?

18       A.   Yes.

19       Q.   Now, why was that the general course during

20  10 years?  Was there a policy and procedure in place,

21  or would Dondero say book it as a loan, or was that

22  just the right thing to do from an accounting

23  perspective?

24       MR. MORRIS:  Objection to the form of the

25  question.

David Klos - October 27, 2021

1          THE WITNESS:  At the end of the day it's at
2    the direction of Jim Dondero, so I can't tell you
3    exactly why he wanted it to be done that way.  But that
4    was certainly the practice of how it was done in those
5    situations.
6          Q.   (BY MR. RUKAVINA)  To your knowledge, did Jim
7    Dondero ever tell you or anyone else that when Highland
8    is transferring funds to one of his affiliated entities
9    that it should always be booked as a loan?
10         A.   So remembering 10 years' worth of
11   conversations, I can't remember a specific instance
12   where he would have said, always book every single
13   transaction I direct you to do as a loan.  However,
14   that was the practice.
15         Q.   Different question.
16         Do you remember that in each instance, and
17   again, that might be unfair over 10 years, but do you
18   remember in each instance when Mr. Dondero said
19   transfer money from Highland to this other entity for
20   liquidity needs that he said book it as a loan?
21         MR. MORRIS:  Objection to the form of the
22   question.
23         THE WITNESS:  I can't recall with any
24   specificity what he may or may not have specifically
25   said so long ago.

1      Q.   (BY MR. RUKAVINA)  To your knowledge, was

2  there any written policy or procedure in place at

3  Highland Capital Management with respect to how

4  transfers from Highland to an affiliated entity should

5  be booked or treated?

6      A.   No written policy or procedure that I'm aware

7  of.

8      Q.   Is it fair to say that by May 2019, the

9  corporate accounting group had handled so many of these

10  transfers that it believed that if Highland was

11  transferring funds to another affiliated entity, it's

12  probably a loan?

13          MR. MORRIS:  Objection to the form of the

14  question.

15          THE WITNESS:  Yeah, I don't know that I can

16  answer that in terms of the corporate accounting team.

17  That just feels way too broad.

18          It was certainly the practice that when

19  somebody needed liquidity and it was appropriate from an

20  accounting perspective, that's how it would be booked.

21          And there was no reason to doubt that that was

22  the appropriate way to do it, particularly with

23  direction from either Frank or Jim.

24      Q.   (BY MR. RUKAVINA)  Is it your testimony that

25  in each instance that happened, that either Frank or

David Klos - October 27, 2021

1  Jim said, this is a loan, the "this" being the transfer
2  from Highland to an affiliated entity for liquidity
3  purposes?
4        MR. MORRIS:  Objection to the form of the
5  question.
6        THE WITNESS:  I can't recall with that level
7  of specificity if those words came out of Jim's mouth.
8  But with 0 percent doubt in my mind, every single one
9  of those loans was done with the authority of Jim or
10 Frank, or both.
11    Q.  (BY MR. RUKAVINA)  So going back to this
12 Exhibit 14, now I'm going to ask you about these
13 payments coming in.
14        Assuming that these payments were actually
15 made in 2019 --
16        And I think, John, you sent me this morning,
17 or maybe last night, some bank statements?
18        MR. MORRIS:  I actually sent all of the
19 backup for all payments made, I think, under the notes
20 at issue a week or two ago.
21    Q.  (BY MR. RUKAVINA)  How would -- so assuming
22 that these payments in 2019 that NexPoint made didn't
23 technically have to be made at that point in time, how
24 would Highland have booked these payments?
25    A.   So I can't tell the column headers, so you'll

David Klos - October 27, 2021

1  have to excuse me if I flip them.

2      Q.   They'll be on the first page.  Rip the page

3  off if you need to.

4      A.   First one is interest, second one is

5  principal.  On the far right is the actual amount of

6  the payment.  So, for example, March 29, 750,000.

7           And the -- the column that has the negative

8  411,000 is the application of interest and the 338- is

9  the application of principal.

10     Q.   So again, if Highland -- strike that.

11          If NexPoint made a payment that was not

12 technically due at that point in time, it would be

13 recorded as payments on principal and interest?

14     A.   It would be recorded as it's reflected in the

15 schedule.  So there's an application of interest and an

16 application of principal.

17     Q.   So based on your understanding and

18 experience, if that payment wasn't due at that time,

19 would it have been a prepayment by NexPoint?

20          MR. MORRIS:  Objection to the form of the

21 question.

22          THE WITNESS:  Yeah, I'm not sure that it's a

23 prepayment or not.  It's certainly a payment.  It's

24 certainly voluntary.  It's not spelled out under the

25 schedule.  I don't know that it's a per se, capital P,

David Klos - October 27, 2021

1  prepayment.  I'm just not certain.

2      Q.   (BY MR. RUKAVINA)  Well, maybe without

3  respect to these specific transfers.

4          Generally, generally, if one of the Dondero

5  affiliates made a payment that wasn't scheduled, how

6  would the debtor have accounted for that payment?

7      A.   It would have recorded the payment as a

8  reduction to either or both outstanding accrued

9  interest or principal.

10     Q.   You wouldn't call those prepayments?

11     A.   I don't know the definition of prepayment.

12  It's a payment.  It's off schedule, but I don't know

13  whether it's a per se prepayment.

14     Q.   Would that be something in your experience

15  that we would look at the promissory note to maybe

16  determine?

17         MR. MORRIS:  Objection to the form of the

18  question.

19         THE WITNESS:  I don't know.

20     Q.   (BY MR. RUKAVINA)  Well, remember, I'm asking

21  you the same question just in different ways.

22         Who decides at the debtor, or how does the

23  debtor decide, if an unscheduled payment is made, how

24  to apply it?

25         MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1  question.

2      Q.   (BY MR. RUKAVINA)  And his objection is

3  valid.  And just to give you a little bit of a fine

4  point, does someone look at the promissory note to

5  decide that?  Or is there some other rule or procedure

6  that someone looks at?

7          MR. MORRIS:  Objection to the form of the

8  question.

9          THE WITNESS:  So the person -- I don't know

10  that I can specifically name a person because the role

11  probably changed over time.

12          But either our corporate accountant, or the

13  corporate accountant's boss, which was Kristin Hendrix

14  for years, would have been responsible for recording and

15  tracking those payments.

16          So some combination of the corporate

17  accountant and Kristin would have applied those

18  payments, and that rolls up through my and Frank's

19  review ultimately.

20      Q.   (BY MR. RUKAVINA)  So if I can round off this

21  discussion, I think you told me a few minutes ago that

22  in each instance that Highland was transferring money

23  out to an affiliate.

24          Whether or not you remember Dondero or

25  Waterhouse saying it's a loan, it would have been a

1  loan because that's how it always was and it was always
2  authorized.  Generally correct?
3       MR. MORRIS:  Objection to the form of the
4  question.
5       THE WITNESS:  There were a few "always" and
6  "generallys" in there.  And like I said, when it came
7  to liquidity needs, my recollection is that these would
8  be handled via loans.
9     Q.   (BY MR. RUKAVINA)  And in reverse, if a
10 Dondero entity made a payment prior to a scheduled
11 payment on a note, generally there would be credit
12 against principal and/or interest provided on that
13 note?
14      MR. MORRIS:  Objection to the form of the
15 question.
16      THE WITNESS:  Generally speaking, yes, if the
17 payment was for payment on the note.
18    Q.   (BY MR. RUKAVINA)  Well, that goes back to my
19 question.
20      Do you know how these payments on Exhibit 14
21 in 2019 were determined to be payments on these notes,
22 as opposed to a transfer from NexPoint to Highland for
23 some other reason?
24    A.   What other reason would it be, if I can be so
25 bold.

David Klos - October 27, 2021

1    Q.   Can you think of any other reason in 2019?

2    A.   Well, Highland had -- Highland had shared

3  services and intercompany agreements with NexPoint, at

4  this time.

5         But these were not payments that could

6  possibly be confused with those payments.  These are

7  off cycle, they're larger amounts, and there's nothing

8  that they could be other than payments against the

9  loan.

10    Q.   So I asked you before, and I think you said

11 that you were speculating with respect to these

12 payments, that Highland needed money at that time.

13        Do you recall in 2019 any discussions with

14 anyone, Dondero or Waterhouse, to the effect that

15 NexPoint has excess cash so maybe NexPoint should

16 transfer some money to Highland?

17        MR. MORRIS:  Objection.  Asked and answered.

18        THE WITNESS:  Do I still answer?

19    Q.   (BY MR. RUKAVINA)  Yes.

20        MR. MORRIS:  Yes.

21        THE WITNESS:  And sorry, I got lost there.

22    Q.   (BY MR. RUKAVINA)  Yes.  So my predicate was

23 you testified before that you were assuming that these

24 payments were because of a cash need at Highland;

25 right?

David Klos - October 27, 2021

1    A.    Correct.

2    Q.    So with that predicate my question is, do you

3 recall discussing with Dondero or Waterhouse or with

4 anyone as to why NexPoint would be transferring money

5 to Highland at that time?

6    A.    Yes, I would have had conversations with

7 Mr. Dondero or Mr. Waterhouse.

8    Q.    And do you remember specifically in 2019 why

9 these transfers were made from NexPoint as opposed to

10 some other Dondero entity?

11    A.    Not with specificity, but certainly NexPoint

12 was generating cash at that time, and had the ability

13 to assist with Highland's liquidity.

14    Q.    So sitting here today, you've told me

15 generally and logically that you have no specific

16 memory why between January 2019 and August 2019, any of

17 these payments on Exhibit 14 were made by NexPoint?

18    A.    I have no specific memory, but I would say

19 with certainty that most or all of this was driven by

20 Highland HCMLP liquidity needs.

21    Q.    And most or all of this would have been

22 Highland in the first instance going to NexPoint and

23 saying, hey, can you send us some cash?

24    MR. MORRIS:  Objection to the form of the

25 question.

David Klos - October 27, 2021

1          THE WITNESS:  Yeah, the premise of that,
2  given that Mr. Dondero is in control of both sides,
3  it's a faulty premise.
4      Q.   (BY MR. RUKAVINA)  But you told me not that
5  long ago that in these weekly cash meetings that it
6  would be your team at Highland who would go to
7  Mr. Dondero and say Highland has a liquidity issue.
8          So wouldn't that liquidity issue have
9  originated with the Highland team?
10     A.   Mr. Dondero is the president of Highland.
11 He's the president of NexPoint.  We're employees of
12 Highland.  We're also shared services providers for
13 NexPoint.
14         The waters are very muddy in terms of who is
15 wearing what hat in that conversation.
16     Q.   But Mr. Dondero doesn't know that Highland
17 has a liquidity issue unless someone from the corporate
18 accounting group tells him, does he?
19         MR. MORRIS:  Objection to the form of the
20 question.  I hope that's not the case.
21         THE WITNESS:  He has the ability to know what
22 our cash position is at any given time, at that time.
23     Q.   (BY MR. RUKAVINA)  So why would you have
24 these weekly cash meetings with Mr. Waterhouse and
25 sometimes Mr. Dondero?

David Klos - October 27, 2021

1    A.    So these were cash forecasts, looking at
2  outlook.  I can tell you almost without exception,
3  maybe -- with maybe without exception, be speculating,
4  but those forecasts would be showing negative numbers
5  at Highland, virtually nonstop.
6          And so it was important, my opinion, but it
7  was probably important to Frank to make sure that he
8  was getting in front of Jim to make sure that those
9  needs were being addressed timely.
10    Q.   So I've asked that question.  I want to ask
11  you a different question.
12          For any of these payments between
13  January 2019 and August 2019 reflected on Exhibit 14,
14  do you have any personal knowledge as to whether they
15  were intended to be prepayments or not?
16          MR. MORRIS:  Objection to the form of the
17  question.
18          THE WITNESS:  I don't know whether they were
19  intended to be prepayments at that time.
20    Q.   (BY MR. RUKAVINA)  Sitting here today, seeing
21  this document as a CPA and as a sophisticated person,
22  do you read this Exhibit 14 to indicate that those
23  payments were booked as prepayments?
24          MR. MORRIS:  Objection to the form of the
25  question.

David Klos - October 27, 2021

1        THE WITNESS:  Again, the term "prepayments"
2   is the one I'm struggling with.  I can ascertain that
3   there are payments and they're off schedule.  But I
4   don't know that I can ascertain that they're
5   prepayments.
6        Q.   (BY MR. RUKAVINA)  Well, if a borrower makes
7   a payment that's ahead of schedule, how would that
8   generally be accounted for?
9        MR. MORRIS:  Objection to the form of the
10  question.
11       THE WITNESS:  It would be accounted for as a
12  reduction of principal or interest or some combination
13  of the two.
14       Q.   (BY MR. RUKAVINA)  Which would relieve the
15  borrower of having to make that at some point in the
16  future; right?
17       MR. MORRIS:  Objection to the form of the
18  question.
19       THE WITNESS:  No.  The borrower still owes
20  the money.  This is showing 23-point -- pick a date.
21  May 31, 23.034-.  That there's significant obligations
22  that are still outstanding.
23       Q.   (BY MR. RUKAVINA)  So on June 4, 2019 -- I'm
24  sorry, on June 19, 2019, the borrower made a
25  $2.1 million payment.  That's what this shows; correct?

David Klos - October 27, 2021

1    A.    I see that.

2    Q.    You're not saying that the borrower would

3  ever have to make that same $2.1 million payment again,

4  are you?

5    A.    No.  What I'm saying is, based on that 2.1-

6  payment -- and this is reading this cold.

7        But based on that 2.1- payment, 66,000 was

8  applied to interest, which left zero accrued interest

9  outstanding.  2.03- applied to principal, which left

10 24.7- and change still outstanding.

11   Q.    Well, I'm going to ask you about the

12 promissory note then, Exhibit 13, in particular

13 Section 3, where it says prepayment allowed.

14        And the first sentence says, may or -- pardon

15 me, maker may prepay in whole or in part the unpaid

16 principal or accrued interest of this note.

17        Do you see that, sir?

18   A.    Yes, I see that.

19   Q.    In your experience, can someone prepay

20 accrued interest?

21        MR. MORRIS:  Objection to the form of the

22 question.

23        THE WITNESS:  The document reads, maker may

24 prepay in whole or in part the unpaid principal or

25 accrued interest of this note.  So I read that to say

David Klos - October 27, 2021

1 that the maker may pay outstanding accrued interest, or
2 unpaid principal.

3     Q.  (BY MR. RUKAVINA)  But my question is, as I
4 understand accrued interest, it means interest that has
5 already occurred or accrued as of the date, like
6 today's date; right?

7     A.  Uh-huh.

8     MR. MORRIS:  Objection to the form of the
9 question.

10     Q.  (BY MR. RUKAVINA)  Do you agree with that?

11     Do you agree with that?  Accrued interest
12 means interest that has already come due, that has
13 actually happened because interest happens over time.

14     A.  Accrued interest --

15     MR. MORRIS:  Objection to the form of the
16 question.

17     Q.  (BY MR. RUKAVINA)  Why don't you start.  Why
18 don't you define for me accrued interest.

19     A.  Sure.  Accrued interest would be outstanding
20 and unpaid interest that -- sorry, it's hard to define
21 it without using the term.  But it's interest that's
22 accumulated in respect of a principal amount through a
23 given date.

24     Q.  So how do you prepay accrued interest?

25     A.  How do you prepay accrued interest.  Again,

David Klos - October 27, 2021

1 that's a little bit of a mental jumble.

2      Q.    Exactly.

3      A.    Well, what I'm...

4      Q.    To me one pays accrued interest.  But this
5 note says you can prepay accrued interest.  So I'm just
6 seeing whether you as a CPA, CFO and controller for
7 years agrees that one can prepay accrued interest?

8           MR. MORRIS:  Objection to the form of the
9 question.

10          THE WITNESS:  Frankly, I don't know if it's
11 possible.  That's not how I'm seeing it applied here,
12 based on the quick review of Exhibit 14.

13     Q.    (BY MR. RUKAVINA)  Well, the next sentence
14 says, any payments on this note shall be applied first
15 to unpaid accrued interest hereon, and then to unpaid
16 principal hereof.

17          Do you see that, sir?

18     A.    I see that.

19     Q.    Do you have any understanding based either on
20 your personal knowledge or in your expertise as a CPA
21 and a CFO as to what that sentence means?

22          MR. MORRIS:  Objection to the form of the
23 question.

24          THE WITNESS:  The way that I would read that
25 would be that for a payment, for example, pick a date,

David Klos - October 27, 2021

1   Exhibit 14 again, the $2.1 million payment on or about
2   June 19.  I see that a payment was made.
3           And it was -- it appears that there was
4   accrued and unpaid interest at that time of 66,000.  And
5   so the first 66,000 was applied to outstanding accrued
6   interest, to bring the balance to zero.
7           And the difference between that 66,000 and the
8   2.1 million was applied to principal.
9       Q.   (BY MR. RUKAVINA)  Do you believe, whether
10  from personal knowledge from this note, Exhibit 13, or
11  your experience at Highland or as a CPA, that one can
12  say that interest, accrued interest will be due on a
13  future date, it will accrue by that date, but I'm going
14  to pay it earlier as of that date?
15          MR. MORRIS:  Objection to the form of the
16  question.
17          THE WITNESS:  If I can rephrase back to you
18  just so I make sure I'm understanding the question.
19  You're saying could someone say, I would like to prepay
20  interest into the future.  It hasn't accrued yet, but
21  it will be accrued by end of year.
22          And I would like to be prepaid effectively
23  with respect to that interest, and then have the
24  remainder used to pay down principal.
25          The question is, can someone do that?

David Klos - October 27, 2021

```
 1        Q.   (BY MR. RUKAVINA)  Yes.
 2             MR. MORRIS:  I object to the question.
 3             THE WITNESS:  I suppose it's possible, but
 4   that certainly wasn't the practice if that makes sense.
 5        Q.   (BY MR. RUKAVINA)  That does make sense.  I'm
 6   still struggling, and again, I'm not trying to be a
 7   smart aleck.  I'm still struggling with the first
 8   sentence of paragraph 3, that maker may prepay accrued
 9   interest.
10             And it sounds like to me like you don't
11   necessarily have a definitive answer as to what that
12   might have meant either.
13             MR. MORRIS:  Objection to the form of the
14   question.
15             THE WITNESS:  I think the document speaks for
16   itself in that sentence.
17        Q.   (BY MR. RUKAVINA)  But have you seen
18   something like this, to your recollection, in other
19   Highland promissory notes?
20        A.   Something like what?
21        Q.   Prepaying accrued interest.
22        A.   Yes, I have seen that.
23        Q.   What's your memory?  Where have you seen
24   that?
25        A.   I can't remember a specific note, but I
```

1  believe that has been done in a specific circumstance.

2       Q.   So at least at Highland, you would believe

3  that that phrase, prepaying accrued interest, had some

4  established meaning at Highland?

5            MR. MORRIS:  Objection to the form of the

6  question.

7            THE WITNESS:  No, I don't agree with that.

8       Q.   (BY MR. RUKAVINA)  Okay.  You understand, of

9  course, that it's Highland's position that with respect

10 to this note, a payment was due on December 31 of 2020

11 that wasn't made; correct?

12      A.   Yes, it's my understanding -- if I can state

13 it back just so I make sure I'm getting it correctly.

14 It's my understanding that there was a payment due on

15 December 31, 2020, that wasn't made timely, yes.

16      Q.   Okay.  Do you know why that payment wasn't

17 made timely?

18      A.   By recollection, because Mr. Dondero had

19 directed people not to process payments from Highland

20 affiliates to Highland.

21      Q.   When did you learn of that?

22      A.   Early December 2020.

23      Q.   How did you learn of that?

24      A.   I don't specifically remember the

25 conversation, but I know I had conversations with both

David Klos - October 27, 2021

1  Kristin and Frank.  I can't remember if those were
2  individual or collective, but we understood that to be
3  the marching orders.
4      Q.  Did you hear Mr. Dondero say anything like
5  that?
6      A.  I did not.
7      Q.  Did Mr. Waterhouse tell you that Mr. Dondero
8  said something like that to him?
9      A.  Yes.
10     Q.  Okay.  Separately, do you remember whether
11 Ms. Hendrix told you that Mr. Waterhouse told her that,
12 or would it have been kind of at the same meeting?
13     A.  I don't remember specifically.  It would have
14 been all around the same time.
15     Q.  And to the best of your recollection, what
16 words -- strike that.
17         To the best of your recollection, did
18 Mr. Waterhouse include a reference to promissory notes
19 and the Advisors when he said that Dondero told him not
20 to make payments?
21         MR. MORRIS:  Objection to the form of the
22 question.
23         THE WITNESS:  I don't remember the specific
24 words that Mr. Waterhouse used.  My clear impression
25 was that it was a very global instruction.

1    And I should clarify also that, you know, at

2  this time, I think as we covered in my background.

3    At this point I had assumed the chief

4  accounting officer role, so I wasn't necessarily in

5  the -- in as much of the chain of command as I had been

6  previously to taking that role, where that sort of thing

7  might have come from Frank, to me, to Kristin.

8    By this time, Frank and Kristin were

9  communicating and I was sometimes in the loop, sometimes

10 not.

11    Q.   (BY MR. RUKAVINA)  Did Mr. Waterhouse tell

12 you why Dondero had told him that?

13    A.   I don't remember with any specificity.

14 However, my perception at the time was that at this

15 time the relationship between Mr. Dondero and Mr. Seery

16 was hopelessly broken, and that this was Jim Dondero,

17 you know, gearing up for a fight in the future.

18    Q.   Prior to December of 2020, had you prepared a

19 report showing potential overpayments that NexPoint and

20 HCMFA had made on account of shared services and

21 payroll reimbursement?

22    MR. MORRIS:  Objection to the form of the

23 question.

24    You can answer.

25    THE WITNESS:  I know the analysis that you're

1 talking about. I would not characterize it the way
2 that you characterized it.
3     Q. (BY MR. RUKAVINA) And we'll talk about this
4 more in November, so I really don't want to go into any
5 detail, unless you feel the need to.
6        But, so you did not prepare that analysis?
7        MR. MORRIS: Objection to the form of the
8 question.
9        THE WITNESS: I prepared an analysis that
10 differed from how you described it.
11     Q. (BY MR. RUKAVINA) How would you describe it,
12 in a nutshell?
13     A. I would describe it as I was asked to refresh
14 a spreadsheet using certain assumptions, based on the
15 direction of Frank Waterhouse, and I updated and I sent
16 him an email.
17     Q. Do you have any understanding that that
18 analysis was then shared with Mr. Dondero by
19 Mr. Waterhouse?
20     A. I know that now. I didn't know that at the
21 time.
22     Q. Do you have any understanding -- strike that.
23        Did you have any understanding that as of
24 early December 2020 the reason why Mr. Dondero said
25 what he said to Mr. Waterhouse was because that

David Klos - October 27, 2021

1 analysis, right or wrong, suggested that the Advisors

2 had made large overpayments?

3         MR. MORRIS:  Objection to the form of the

4 question.

5         THE WITNESS:  No, that's incorrect.

6     Q.   (BY MR. RUKAVINA)  Why is that incorrect?

7     A.   Because by recollection, to the best of my

8 recollection, that analysis didn't occur until after

9 Dondero had told Frank no more payments.

10     Q.   Is that the only reason why you might suspect

11 that what I just said was incorrect?

12         MR. MORRIS:  Objection to the form of the

13 question.

14         THE WITNESS:  Yeah, I don't know how to

15 answer that.

16     Q.   (BY MR. RUKAVINA)  I'm going back, when I

17 asked you, did Waterhouse tell you why Dondero gave the

18 direction, you said no.

19         MR. MORRIS:  Objection to the form of the

20 question.

21         THE WITNESS:  Sorry, I'm not sure.  If I

22 could have the question asked again, I'd be happy to

23 answer.

24     Q.   (BY MR. RUKAVINA)  I'll ask it again.

25         Mr. Waterhouse tells you that Mr. Dondero

David Klos - October 27, 2021

1  basically said no more payments; right?

2      A.   Yes.

3      Q.   And, but he did not tell you why Mr. Dondero

4  said that?

5      A.   Not that I can recall.

6      Q.   So he might have?

7      A.   He might have.  I don't specifically

8  remember.

9      Q.   Do you recall asking him or anyone else why

10  Dondero would have said that?

11          MR. MORRIS:  Objection.  Asked and answered.

12          THE WITNESS:  I don't recall specifically

13  asking.

14      Q.   (BY MR. RUKAVINA)  Do you recall telling

15  Mr. Seery that Dondero said anything like that?

16      A.   At what point in time?

17      Q.   Prior to December 31, 2020.

18      A.   No, I did not.  I did not say that to

19  Mr. Seery.

20      Q.   In your mind was there any present

21  understanding or concern that NexPoint therefore

22  wouldn't make a scheduled December 31, 2020, payment?

23      A.   Was there any concern that they wouldn't?

24      Q.   Yeah.

25      A.   I would never use the word "concern."  At

David Klos - October 27, 2021

1  that point I wasn't even on the team anymore, so I hate

2  to say it's other people's problem, but I had my hands

3  full with plenty of other things.  It wasn't something

4  I was thinking about.

5       Q.  Do you remember here today that prior to

6  December 31, 2020, you believed that NexPoint would not

7  make the scheduled payment?

8            MR. MORRIS:  Objection to the form of the

9  question.

10           THE WITNESS:  I had no idea whether NexPoint

11  was going to make the payment.

12      Q.  (BY MR. RUKAVINA)  Were you asked prior to

13  December 31, 2020 by Mr. Seery or anyone else as to

14  whether NexPoint was going to make that payment?

15      A.  Was I asked by Mr. Seery?  Not that I can

16  remember.

17      Q.  Prior to December 31, 2020, do you recall any

18  discussion with Mr. Seery about the NexPoint note?

19           MR. MORRIS:  I'm sorry, can I have the

20  question again.

21      Q.  (BY MR. RUKAVINA)  Prior to December 31,

22  2020, do you recall any discussion that you had with

23  Mr. Seery about this NexPoint note?

24      A.  Not that I can remember.  If there was, it

25  would have been in a cash meeting, but I don't remember

David Klos - October 27, 2021

1  at all.

2      Q.   So it might have been some detail as part of

3  a larger discussion, but you don't remember any

4  specific discussion just around this note?

5      A.   No.

6      Q.   When did you learn or how did you learn that

7  the December 31 payment had not been made?

8      A.   I'm not sure, but certainly after

9  December 31.

10     Q.   Do you recall if it was before or after

11 January 7?

12     A.   I think it was after.

13     Q.   The default letter from Highland is in here,

14 if you need to see it.  I'm just telling you it's the

15 January 7.

16          Do you recall having any role with respect to

17 drafting the default letter that went out to NexPoint

18 after the failed payment?

19     A.   No, none that I can remember.

20     Q.   How do you recall learning that the note had

21 been called by Highland?

22     A.   I honestly don't remember.  I think after the

23 fact.  I couldn't tell you how far after the fact.

24     Q.   Are you aware that on or about July -- I'm

25 sorry, January 14, 2021 NexPoint made a $1.4 million

David Klos - October 27, 2021

```
1   and change payment?
2        A.   Yeah, I'm aware that that payment happened.
3        Q.   When did you become aware of that payment?
4        A.   I think after it happened.
5        Q.   Can you tell us, was it days, weeks, months
6   later?
7        A.   It was that day.  And if I can expand, I
8   recall getting an email, seeing a large inflow to
9   Highland, to MLP because I was on an email distribution
10  list that had those payments.
11           And I think I emailed or called Kristin and
12  asked her, is this the NexPoint note, because it was a
13  large amount of money.  And she said yes.
14       Q.   Did she tell you anything more about that
15  payment, when it had been made, why, who authorized it?
16       A.   I had that information of when it had been
17  sent.  I had a wire confirm.
18       Q.   Only important thing to you is where did that
19  money come from?
20       A.   It wasn't important to me.  It was more
21  curiosity.
22       Q.   Did you have any discussions with anyone on
23  or about that time, January 14, 2021, as to why
24  NexPoint made that payment?
25       A.   Not that I can remember.
```

David Klos - October 27, 2021

1       Q.   Did you have any discussion with anybody on
2   or about that time, January 14, 2021, as to how HCMLP
3   should account for that payment?
4       A.   No.
5       Q.   Did you have any discussion with Mr. Seery at
6   all about whether that payment should or shouldn't
7   reinstate the note?
8       A.   No discussion that I can remember.
9       Q.   Is it fair to say that any of those
10  considerations would have been at that point in time
11  above your paygrade?
12          MR. MORRIS:  Objection to the form of the
13  question.
14          THE WITNESS:  Yeah, paygrade, I don't know
15  how to respond to that.  Like I said before, I wasn't
16  on the team at that point.  I wouldn't have been
17  involved in that determination regardless of my
18  compensation.
19      Q.   (BY MR. RUKAVINA)  So you know and you
20  remember that in early December 2020 Frank Waterhouse
21  told you that Dondero had directed no more payments by
22  the Advisors.  And you know that a payment was made on
23  January 14.
24          And that's pretty much the extent of your
25  knowledge about the missed December 31 payment?

1          MR. MORRIS:  Objection to the form of the
2   question.
3          THE WITNESS:  Yeah, it's a very broad
4   question.  In general terms, yes.
5      Q.  (BY MR. RUKAVINA)  Well, I'm not asking what
6   you learned since then.
7          I'm asking that as of, let's say, January 15,
8   2021 that would have been the extent of what you would
9   have known?
10     A.  Correct.  And if I can just restate and make
11  sure I understand what I'm saying.
12         It would have been my understanding that we
13  had had an instruction -- when I say "we," Kristin
14  Frank and by default the whole corporate team -- not to
15  make payments from these affiliated entities.
16         To my knowledge, none of those payments had
17  occurred since that point.  And then on or about
18  January 14, such a payment was made and I found out
19  about that by seeing a wire confirm.
20     Q.  Well, you mentioned a couple times that you,
21  in December 2020, you weren't part of that group
22  anymore.  So do you have any understanding as to why
23  Mr. Waterhouse would have told you in particular, you
24  being Mr. Klos, about that instruction from Dondero?
25     A.   Sure.  I still was participating in cash

1   meetings, even if it was almost in a nominal role,

2   because of some of my history that I had.  So I was

3   still participating in those meetings.

4          I've worked closely with Kristin for a long

5   time, so I may have caught up with her informally.  But

6   as far as day-to-day duties, I wasn't part of that team

7   anymore.

8       Q.   And is it your, did I understand you

9   correctly, is it your testimony that Mr. Waterhouse

10  informed the whole accounting group there, the

11  corporate accounting group, of Mr. Dondero's

12  instruction?

13      A.   I don't know specifically who he told, if he

14  told every single member of the team, but he certainly

15  told Kristin and Kristin was the head of the team.

16      Q.   And you don't recall anyone, after you heard

17  about that instruction, raising any concern to the

18  effect that NexPoint is going to default and be in

19  trouble if that payment isn't made?

20      A.   I don't remember any discussion to that

21  effect.

22      Q.   Do you remember anyone suggesting that they

23  ought to try to dissuade Mr. Dondero from that

24  direction?

25      A.   Not that I can remember.

 1      Q.   Do you remember any discussion at that
 2   approximate point in time for your cash meetings or
 3   anything else as to whether NexPoint had made any
 4   prepayments on the promissory note?
 5           MR. MORRIS:  Objection to the form of the
 6   question.
 7           THE WITNESS:  Yeah, it's very hard to -- by
 8   the way, I've said yeah a few times.  I want to make
 9   clear that that's just --
10      Q.   (BY MR. RUKAVINA)  That's not a yes?
11      A.   I apologize for that.
12      Q.   Understood.  Yeah means, it's not a yes.
13           MR. MORRIS:  It's a pause; it's an um.
14      Q.   (BY MR. RUKAVINA)  Germans call it flavoring
15   particle.
16      A.   Sorry, I got lost there.  If you can ask
17   again.
18      Q.   Yeah.  Do you recall in November or
19   December 2020 in your weekly meetings or anything else,
20   any discussion whatsoever concerning whether NexPoint
21   had made any prepayments on its note?
22      A.   No discussions of whether or not there had
23   been a prepayment that I can remember, no.
24      Q.   To the best of your knowledge sitting here
25   today -- strike that.

David Klos - October 27, 2021

1          For my next question, again we're assuming
2   that Exhibit 14 is what it appears to be.
3      A.   Sure, sure.
4      Q.   So with that qualification, to the best of
5   your knowledge, other than what's on Exhibit 14, can
6   you think of any other record or source or document
7   that would address whether any unscheduled payments by
8   NexPoint would or wouldn't be prepayments on the note?
9          MR. MORRIS:  Objection to the form of the
10  question.
11         THE WITNESS:  Again, with the struggle of the
12  prepayment, this is the document that I would expect to
13  explain how the payment was applied.
14     Q.   (BY MR. RUKAVINA)  But you yourself did not
15  play any role in deciding how the payment would be
16  applied?
17     A.   I'd hesitate to say no role, because the team
18  ultimately rolls up to me.
19     Q.   You personally?
20     A.   Me personally, I wouldn't have prepared these
21  schedules.
22     Q.   Or decided, you personally, as Mr. Klos, how
23  any unscheduled payments should be accounted for by
24  Highland?
25     A.   Correct, not without some -- some

David Klos - October 27, 2021

1  authoritative direction on how they should be applied.

2      Q.   And that authoritative direction would have

3  come from Mr. Waterhouse or Mr. Dondero?

4      A.   That's what I would expect.

5      Q.   Could it have come from anyone else that you

6  can think of here today?

7      A.   Not that I can think of.

8      Q.   Now we're going to switch gears and I think

9  we're going to stop discussing the NexPoint note, and

10 we're going to focus on the HCMFA two promissory notes.

11     A.   Sure.

12     Q.   So we're going to go back in time to

13 May 2019; okay?

14     A.   Sure.

15     Q.   And is it fair to say by -- that by May 2019

16 there were at least dozens if not hundreds of instances

17 of intercompany loans in the years leading up there

18 from Highland to one of the other entities?

19          MR. MORRIS:  Objection to the form of the

20 question.

21          THE WITNESS:  From Highland to one of the

22 other entities.  Can you help with other entities.

23     Q.   (BY MR. RUKAVINA)  Advisors, the trusts, any

24 of the Dondero entities?

25          MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1   question.

2           THE WITNESS:  Yes, there would have been many

3   loans over the years.

4       Q.   (BY MR. RUKAVINA)  And do I understand that

5   most, if not all, of those loans should have been

6   papered up with a written promissory note?

7           MR. MORRIS:  Objection to the form of the

8   question.

9           THE WITNESS:  Should have been.  To the

10  extent that they were for a promissory note, then yes.

11      Q.   (BY MR. RUKAVINA)  So in the May 2019 time

12  frame, was there a regular pattern or course or

13  procedure in place as to how a promissory note would be

14  physically prepared and presented for approval?

15          MR. MORRIS:  Objection to the form of the

16  question.

17          THE WITNESS:  Yeah, when you say a process,

18  can you please clarify that for me.

19      Q.   (BY MR. RUKAVINA)  Sure.  Let's look at these

20  two promissory notes and maybe that will help frame the

21  question.  And I apologize for not having them right

22  here.

23      A.   It might be --

24          MR. MORRIS:  1 and 2.

25          MR. RUKAVINA:  Yes.

1    Q.   (BY MR. RUKAVINA)  Are you familiar with
2  Exhibits 1 and 2, sir?
3    A.   Yes, I am.
4    Q.   Do you remember them from back -- strike
5  that.
6         Did you have any role, to your knowledge,
7  with the preparation of Exhibits 1 and/or 2?
8    A.   With the preparation of the documents?
9    Q.   Yeah.
10   A.   No.
11   Q.   But you did have some role with these
12  promissory notes?
13   A.   Yes.
14   Q.   And I'm trying to find that email as well.
15  There's an email here from you.  I'll have it in a
16  moment.  That will help frame the question.
17        MR. MORRIS:  Exhibit 3.
18   Q.   (BY MR. RUKAVINA)  Do you recall that email,
19  sir?
20   A.   Not specifically, but it's right in front of
21  me.  I'm certain that I wrote this email.
22   Q.   You have no reason to deny or reject its
23  authenticity?
24   A.   I have no reason to reject it or question it.
25   Q.   Just give me a second.  I don't understand

David Klos - October 27, 2021

1  what's going on with my exhibits.  I just don't
2  understand this.
3          (Off the record.)
4      Q.   (BY MR. RUKAVINA)  You have Exhibit 3 in
5  front of you?
6      A.   I do.
7      Q.   And it says, please send 2.4 million from
8  HCMLP to HCMFA.  This is a new interco.
9          Meaning intercompany; right?
10     A.   Correct.
11     Q.   This is a new intercompany loan.
12         Who told you that this was an intercompany
13  loan?
14     A.   Either Frank or Jim.  I would suspect Frank.
15     Q.   Do you have any present memory of him telling
16  you that with respect to this particular loan?
17     A.   I don't have a specific recollection, but
18  with a hundred percent certainty he or Jim would have
19  directed that.
20     Q.   Would they have directed the payment, or
21  would they have directed that it be papered as a loan,
22  or both?
23     A.   Both.
24     Q.   So in each instance -- well, let's take a
25  step back.

1          So certainly either Jim or Frank directed you
2     to transfer the $2.4 million; correct?
3          A.    Either Jim or Frank would have directed, yes.
4     There's 0 percent chance I would have sent this email
5     if I didn't feel a hundred percent confident that this
6     was authorized in the way that I described in the
7     email.
8          Q.    But can you also say with certainty that
9     either Dondero or Waterhouse also told you that this
10    transfer is an intercompany loan?
11         A.    With a hundred percent certainty, yes.  I
12    can't say that necessarily with respect to Dondero,
13    because I don't remember if I would have talked to him
14    specifically about it.  But, yes, this would have been
15    clear that it's a loan.
16         Q.    You say clear.  Did someone tell you that
17    it's a loan, or are you just, because of the prior
18    10 years of course and conduct, logically deciding that
19    it has to be a loan?
20              MR. MORRIS:  Objection to the form of the
21    question.
22              THE WITNESS:  So this is -- this is not just
23    a situation of past practice.  I would have known with
24    certainty that this was a loan and that's what was
25    authorized.

David Klos - October 27, 2021

1    Q.    (BY MR. RUKAVINA)  How would you have known
2  with certainty that it was a loan?
3    A.    I'll say in part because of past practice,
4  but also because of the nature of what the money was
5  going to be used for, and the background behind it.
6    Q.    So you knew that nature and that background?
7    A.    The nature and background of the 2.4 million,
8  yes.
9    Q.    So you've told me that in part -- I asked you
10  how did you know it was a loan.  You said in part past
11  practices, in part you knew the nature.  Anything else?
12    A.    I'm certain that given that I wrote this
13  email, which Frank is on, that I would have had a
14  conversation with Frank about what this was.
15    Q.    Was Jim Dondero in the corporate accounting
16  email?
17    A.    No, he wasn't.
18    Q.    So what is your understanding as to what this
19  $2.4 million was for?
20    A.    This related to -- well, to separate the
21  transaction, the 2.4- itself relates to a promissory
22  note.  That's what was executed.
23        HCMFA's use of the 2.4 million was to
24  reimburse a fund that it managed called Highland Global
25  Allocation Fund for a NAV error that had occurred

David Klos - October 27, 2021

1  within that fund.

2      Q.   Who made that NAV error?

3          MR. MORRIS:  Objection to the form of the

4  question.

5          THE WITNESS:  Yeah, it's hard to answer that.

6  So the Highland Capital Management Fund Advisors is the

7  advisor to the fund, so they're the responsible party

8  for making the fund whole in the instances of NAV

9  errors.

10     Q.   (BY MR. RUKAVINA)  And did HCMFA contract out

11 with Highland for valuation services?

12         MR. MORRIS:  Objection to the form of the

13 question.

14         THE WITNESS:  I don't specifically remember

15 if they contracted for valuation services, but if you

16 tell me that they did, I'll take that at face value.

17 So yes, HCMFA utilized HCMLP for valuation services.

18     Q.   (BY MR. RUKAVINA)  Do you have any memory of

19 what human being or beings made that NAV error?

20         MR. MORRIS:  Objection to the form of the

21 question.

22         THE WITNESS:  It's -- in respect to people,

23 not particularly.  In respect to parties, Houlihan

24 Lokey was the service provider that performed the

25 valuation that resulted in the NAV error.

David Klos - October 27, 2021

1        And as I described before, the valuation
2    function was housed at HCMLP by HCMLP employees
3    supporting that through, among other people, front
4    office, compliance, other parts of the organization as
5    well.
6        Q.   (BY MR. RUKAVINA)  So it was your
7    understanding that Highland was loaning $2.4 million to
8    HCMFA for HCMFA to compensate that fund?
9        A.   Yes.
10        Q.   Did you have any understanding that Highland
11    might have been, instead of loaning that money,
12    actually paying that money to HCMFA to compensate HCMFA
13    for Highland's valuation error?
14        A.   First, not Highland's valuation error.  But
15    second, no, there's no way that that would have been
16    what that payment was for.
17        Q.   Why can you say that there's no way that that
18    would have been what that payment was for?
19        A.   First, this wasn't the first NAV error that
20    ever occurred.  There had been other NAV errors.  There
21    were other NAV errors with respect to this valuation
22    that pertain to NexPoint Advisors.
23        There was no reimbursement from HCMLP to
24    NexPoint or HCMFA, regardless of any individual being
25    identified as the person.  That had just never occurred

David Klos - October 27, 2021

1  to my knowledge.

2           Second, the amount was to meet the liquidity

3  need of HCMFA.  It wasn't to -- it wasn't to

4  dollar-for-dollar make up for the NAV error.  It was

5  that's how much money HCMFA needed.

6           Third, it was definitely Dondero's practice

7  and preference to have expenses at HCMFA for tax

8  purposes.  So if this was compensation, he would

9  ultimately not really be benefiting from the deduction

10 so.

11          That would have been a strong preference of

12 his against having it be compensation.

13          So it would have been excruciatingly clear

14 that this was a loan for liquidity for HCMFA to make

15 the fund whole, just like it had in the past NAV

16 errors.

17     Q.   How did you know that HCMFA needed

18 $2.4 million for liquidity?

19     A.   At that point I was still part of the

20 corporate team, so I had a good sense of how much cash

21 HCMFA would have had at any given moment.  And at that

22 given moment it would not have had -- I'd be shocked if

23 it had even 2.4-.

24          Probably would have had probably between

25 a million and 2 million if I had to speculate.

1    Q.   Okay.  So you've given the reasons why this
2  was clearly a loan.

3         But you never heard Mr. Dondero say that this
4  was a loan, did you?

5    A.   I don't remember.  It's possible I did, but I
6  don't specifically remember.

7    Q.   Okay.  What about the $5 million loan on the
8  day after?  What was that $5 million for?

9    A.   That was similar but different.  So again,
10  HCMFA needed liquidity.  This time this was for --
11  related to that same fund.

12         So Highland Global Allocation Fund had
13  converted from an open-end fund, mutual fund, to a
14  closed-end mutual fund.

15         And pursuant to that conversion there was a,
16  I believe it was called a consent fee, for any
17  investors of that fund who consented to the conversion,
18  that they would receive a 3 percent fee payable by the
19  investment advisor.

20         And so at this time the bill came due on that
21  because the conversion had been completed, and the
22  accounting for how much that 3 percent was going to be
23  was complete.

24         HCMFA sure as hell didn't have 5 million
25  bucks.  Excuse my language.  Highland needed to pay

David Klos - October 27, 2021

1  HCMFA for the liquidity.  HCMFA made the payment to the

2  fund.  It wasn't dollar for dollar.  I think it was

3  like 5,019,000, or some such number.

4         But 5 million was the number that would allow

5  it to make that payment effectively to the investors of

6  Global Allocation Fund.

7      Q.    Do you have any understanding as to why

8  Highland, as opposed to some other entity, was

9  transferring $7.4 million?

10     A.    Highland as opposed to some other entity?

11     Q.    Uh-huh.

12     A.    Because Highland had the money.

13     Q.    But I think we've established earlier that in

14 the first seven months of 2019, Highland was having

15 constant liquidity issues?

16     A.    It was.

17     Q.    And that's part of the reason that NexPoint

18 was making unscheduled payments on its note; right?

19     A.    That's part of the reason NexPoint was making

20 unscheduled payments on its note, yes.

21     Q.    So your recollection is that HCMFA needed

22 $2.4 million for liquidity purposes and about

23 $5 million for the consent fee.  And Highland

24 transferred those funds because Highland had the funds?

25     A.    Yes.  And I should clarify that Highland only

David Klos - October 27, 2021

1  had the funds because Mr. Dondero repaid personal notes
2  to HCMLP on the same days.

3       So he paid 2.4 million on May 2, which
4  Highland turned around and reloaned.  And he paid 4.4-
5  on May 3, and Highland sent out 5-, so there's a
6  $600,000 difference.  And my recollection, he paid the
7  other 600,000 via note repayment within a few days.

8       Q.   So this would have been part of some broader
9  transaction in Mr. Dondero's mind?

10      A.   I would not characterize it that way.

11      Q.   You established that HCMFA needed money.  You
12  established that Highland temporarily had money because
13  Dondero provided it with money.

14      But you still don't know, sir, as a fact as
15  to whether that transfer was a loan or some other
16  payment from HCMFA -- I'm sorry from HCM, from debtor
17  to HCMFA?

18      MR. MORRIS:  Objection to the form of the
19  question.  Asked and answered a million times.  It's in
20  the documents you're showing him.

21      THE WITNESS:  It was a loan.

22      MR. MORRIS:  Come on, Davor.  With all due
23  respect, it's in the document.  It's on the document.

24      Q.   (BY MR. RUKAVINA)  I'm being courteous and
25  respectful to you and I'd ask the same in return; okay?

David Klos - October 27, 2021

1      A.   Absolutely.  I apologize if I haven't been.

2      Q.   Mr. Dondero, would you agree, was the only

3  person that had the authority at the debtor to

4  authorize a transfer of 2.4- and then $5 million?

5      A.   At the debtor?

6           MR. MORRIS:  Objection to the form of the

7  question.

8      Q.   (BY MR. RUKAVINA)  Yes, at the debtor.

9      A.   No.

10     Q.   Who else could have transferred 2.4 million

11  or $5 million?

12     A.   Those are two different questions.  But if

13  you're asking who had the authority, certainly Frank

14  did as well.

15     Q.   So Frank had the authority.  Perhaps my

16  question was inartful.

17          Do you believe that Mr. Waterhouse would have

18  decided to transfer $2.4 million or $5 million without

19  Mr. Dondero's approval?

20          MR. MORRIS:  Objection to the form of the

21  question.

22          THE WITNESS:  Generally speaking, no, but I

23  don't know exactly what the form of the approval.  But

24  he certainly wouldn't have done that on his own without

25  discussing with Dondero.

1   Q.   (BY MR. RUKAVINA)  Do you believe that
2   Mr. Waterhouse had the ability on behalf of the debtor
3   to loan $5 million without Mr. Dondero's approval?
4            MR. MORRIS:  Objection to the form of the
5   question.
6            THE WITNESS:  I think he had the technical
7   authority to.  However, I don't believe in practice
8   that he ever would.
9   Q.   (BY MR. RUKAVINA)  Same question, $2.4
10  million?
11  A.   Same answer.
12  Q.   We've established that you never really had a
13  direct employment or types of a role for NexPoint --
14  I'm sorry, for HCMFA; right?
15  A.   Again --
16  Q.   To the best of your recollection?
17  A.   Best of my recollection I can't remember how
18  the titles transferred over or whatever, but I don't
19  believe I did.
20  Q.   Do you know whether Mr. Waterhouse in 2019
21  had the authority, without Mr. Dondero's approval, to
22  borrow $7.4 million on behalf of HCMFA?
23            MR. MORRIS:  Objection to the form of the
24  question.
25            THE WITNESS:  He had the authority to enter

David Klos - October 27, 2021

1  into the note on behalf of HCMFA, yes.

2      Q.   (BY MR. RUKAVINA)  Was that something that he

3  would have done without Mr. Dondero's approval to your

4  understanding and practice at that time?

5          MR. MORRIS:  Objection to the form of the

6  question.

7          THE WITNESS:  Same answer that I gave before

8  with respect to Highland.

9      Q.   (BY MR. RUKAVINA)  So here's where I'm going

10  with all this.

11          Mr. Dondero's position, and tomorrow his

12  testimony will be, that he caused the $7.4 million to

13  be transferred not as a loan to HCMFA, but to

14  compensate HCMFA for various things including that NAV

15  error.

16          Other than perhaps you think he's lying,

17  would you have any knowledge, hearsay, document,

18  anything, to contradict Mr. Dondero's position?

19          MR. MORRIS:  Objection to the form of the

20  question.

21          THE WITNESS:  Yes.  I would point to the fact

22  that as it pertains to the $5 million note, if we're

23  separating issues, there's no other possibility of what

24  that money could be other than either a loan or equity.

25          It's not compensation.  Highland is under --

David Klos - October 27, 2021

| 1 | HCMLP has absolutely zero obligation in respect to that |
| 2 | consent fee.  So when Highland sends $5 million to HCMFA |
| 3 | there's nothing else that it can be.  That's Point 1. |
| 4 | Point 2, we're right in the middle of an audit |
| 5 | at this point.  Jim signs rep letters at this point. |
| 6 | He's being provided balance sheets throughout 2019 that |
| 7 | indicate the loans that Highland has on its books. |
| 8 | Balance sheets are being prepared in respect |
| 9 | of annual approvals for 15(c) for retail funds in the |
| 10 | fall.  Schedules are being created for bankruptcy after |
| 11 | we file in October. |
| 12 | Nobody says this is a mistake.  Frank is on |
| 13 | all of these emails.  Frank never questions it. |
| 14 | There's absolutely no evidence from that point |
| 15 | in time to whenever this defense got raised that would |
| 16 | indicate that anybody said that these weren't exactly |
| 17 | what they say they are. |
| 18 | Q.   (BY MR. RUKAVINA)  Are you aware that in |
| 19 | February or March 2019 some $5.2 million was paid from |
| 20 | insurance that HCMFA had to the fund for the NAV error? |
| 21 | A.   The amount sounds unfamiliar, but I'm aware |
| 22 | that insurance proceeds were paid from HCMFA to the |
| 23 | fund. |
| 24 | Q.   And do you think that it's impossible for a |
| 25 | sane, rational person to conclude that HCMFA had a |

1  claim against the debtor related to that NAV error?

2        MR. MORRIS:  Objection to the form of the

3  question.

4        THE WITNESS:  If it did, I don't know how

5  that's not insurance fraud for basically double

6  collecting insurance proceeds and then collecting it

7  again.

8     Q.   (BY MR. RUKAVINA)  So you believe, sir, that

9  if insurance pays a claim you have no more right to go

10  against a person who caused the fault?

11        MR. MORRIS:  Objection to the form of the

12  question.

13        THE WITNESS:  We can speak specifically here.

14  This is about a NAV error that an insurance company

15  reimbursed HCMFA for, which it then turned around and

16  paid for the fund.

17        So if it went to collect that same, let's use

18  round numbers, $5 million from Highland that it's

19  already collected from insurance, that sounds

20  inappropriate to me.

21     Q.   (BY MR. RUKAVINA)  Okay.  But you don't know

22  whether that's allowed in Texas law or not, do you?

23        MR. MORRIS:  Objection to the form of the

24  question.

25        THE WITNESS:  No, I don't know whether it's

David Klos - October 27, 2021

1  allowed under Texas law.

2      Q.   (BY MR. RUKAVINA)  So you don't know that if

3  you're hit by someone on the street and your medical

4  insurance pays your bills, you don't know that he still

5  has to pay you for the same bills?

6          MR. MORRIS:  Objection to the form of the

7  question.  I hope I don't miss my plane.

8      Q.   (BY MR. RUKAVINA)  You don't know that under

9  Texas law if someone hits you with their car and causes

10 you medical bills and your medical insurance pays those

11 bills, that you can still sue them for the same

12 damages?

13         MR. MORRIS:  Objection to the form of the

14 question.

15         THE WITNESS:  I'm not familiar at any level

16 of specificity with Texas law.

17     Q.   (BY MR. RUKAVINA)  Again, it just sounds

18 wrong to you that you could go after someone after

19 insurance pays, but you don't know legally one way or

20 the other?

21     A.   Correct.  I'm not a lawyer or expert in Texas

22 law.  It feels wrong, yes.

23     Q.   Okay.  Going back to this email of yours,

24 Exhibit 3, do you recall whether there was a similar

25 email with respect to the $5 million note?

David Klos - October 27, 2021

1    A.   Yes, I am.  I believe Kristin sent that one.

2    Q.   Kristin sent that one?

3    A.   I believe so.

4    Q.   To whom?

5    A.   Likely the same distribution group, but

6  that's speculation.

7    Q.   Did you see such an email in the last week or

8  two?

9    A.   I'm not certain, but probably.  I have seen

10  email communication on or around May 3, but I don't

11  know specifically who all was on the email.  I'm going

12  off what I would expect to see.

13        MR. MORRIS:  If you're really interested,

14  it's right here.  It was produced to you with

15  Bates 3763.  And if you'd like to question the witness.

16        MR. RUKAVINA:  When was it produced?

17        MR. MORRIS:  I can't tell you.  It's part of

18  the same package.

19    Q.   (BY MR. RUKAVINA)  So going back to this

20  Exhibit 3, sir, why did you ask Kristin, can you or

21  Hayley please prep a note for execution?  Why them?

22        Remember, I was asking about what the course

23  or procedure was at that point in time.

24    A.   Yeah, so nomenclature, procedure, process.

25        I would say the informal process for these

David Klos - October 27, 2021

1 types of loans, they were frequent in nature, would be

2 for someone on the corporate accounting team to prepare

3 a note and have it executed.

4 Q. Okay. That was the standard course back

5 then?

6 A. Again, I don't know what standard course

7 means. That was fairly typical.

8 Q. Why would you not have asked someone in the

9 Highland legal department to prepare a note?

10 A. Because this was a legally reviewed document

11 as far as the form of the agreement. It's a one-page,

12 two-paragraph form that had been used for a long time.

13 So the only thing that would change with

14 respect to these notes would be the date, the amount,

15 likely the rate. I can't think of anything else

16 offhand that would have changed from note to note.

17 Q. After you asked Ms. Hendrix to prepare this

18 note, did you have any further role with respect to the

19 papering, preparation, or execution of that note?

20 A. Not that I can remember.

21 Q. Would you have had any role in having either

22 or both of the notes actually signed electronically or

23 by ink by Mr. Waterhouse?

24 A. Likely not, no.

25 Q. Do you know who decided to have

David Klos - October 27, 2021

1  Mr. Waterhouse as opposed to Mr. Dondero sign these two
2  promissory notes?
3      A.   I don't.
4      Q.   On the $5 million note, do you remember if
5  you had any role with respect to its physical papering
6  or execution?
7      A.   Not that I recall.
8      Q.   To the best of your memory, your role would
9  have been done by instructing your team, hey, here is
10 these new loans, go paper it up; is that accurate?
11     A.   On the upfront side.  I suppose my role would
12 have also included on the back end making sure that the
13 actual payment had occurred.  But that would have been
14 doing that realtime, seeing the funds went out, and
15 that, most importantly, that the consent fee had been
16 paid from HCMFA to the transfer agent.
17     Q.   How did you or anyone on your team know -- so
18 obviously, you know it's a $2.4 million loan because
19 that's what Waterhouse or Dondero told you; right?
20          How did you know it was a $2.4 million loan?
21          MR. MORRIS:  Objection.  Asked and answered.
22          THE WITNESS:  I knew that the NAV error was
23 2 million, I think it was 398,000, somewhere in that
24 ballpark.  And that 2.4- had been authorized for that
25 purpose.

David Klos - October 27, 2021

1    Q.   (BY MR. RUKAVINA)  Do you know who decided
2  what the interest rate in this note would be, or that
3  it would be a demand note as opposed to a term note?
4    A.   I don't specifically know who made that
5  decision.  However, the common practice for fund
6  advisors was to put -- was for the rate to equal the, I
7  forget if it was the short-term or long-term AFR.
8         And for the note to be demand, that was just
9  the standard -- that was the standard.
10    Q.   And I think I asked this, but just if I
11  didn't.
12         For either or both of these two notes, the
13  2.4- and $5 million note, did you have any role with
14  respect to Mr. Waterhouse signing them?
15    A.   No, not that I can remember.  I don't think I
16  did.
17    Q.   And you don't remember doing anything to get
18  his signatures?
19    A.   Not that I recall.
20    Q.   Nor would that have been something that you
21  would expect that you would have a role with?
22    A.   Certainly not in this instance.  Maybe to the
23  extent that nobody else was around and it was time
24  sensitive, but that wouldn't have been the case with
25  these, I don't believe.

David Klos - October 27, 2021

1    Q.  Did you have any understanding in early May

2   of 2019 as to whether HCMFA was solvent or insolvent?

3         MR. MORRIS:  Objection to the form of the

4   question.

5         THE WITNESS:  Whether HCMFA was solvent or

6   insolvent?  I'm not a solvency expert, so I don't know

7   that I could even attempt to answer that.

8    Q.   (BY MR. RUKAVINA)  Did you have an

9   understanding as far as HCMFA goes on May 2, 2019, that

10  its liabilities exceeded its assets?

11   A.   I don't remember specifically where it stood

12  on assets versus liabilities.

13   Q.   Do you have any memory that by May 2, 2019,

14  the debtor had taken a couple prior demand notes from

15  HCMFA and made them not collectible prior to May 31,

16  2021?

17   A.   I know what you're referring to.  I wouldn't

18  characterize it that way.

19   Q.   How would you characterize it?

20   A.   I recall that there was a financial support

21  acknowledgment, I think it was the name of the

22  acknowledgment.

23         That described -- I can't remember if it

24  described those two notes specifically or just referred

25  to them, that there would not be collection sought on

David Klos - October 27, 2021

1  those until May 31 of 2021.

2      Q.   Do you remember why that document was done?

3      A.   My recollection, and it could have been done

4  for other reasons, but my recollection of it was that

5  it was primarily audit-driven.

6           For the auditors to be comfortable that these

7  notes weren't going to be just called and FA not have

8  the ability to pay them right away.

9      Q.   Because it's true in April or May of 2019

10  HCMFA didn't have the ability to pay those notes;

11  correct?

12     A.   It didn't have enough cash to pay those.

13     Q.   And I think you mentioned before that in

14  May 2019 the auditors at the Highland level were

15  talking about rolling up prior demand notes into term

16  notes so the debtor would at least get some regular

17  cash flow; correct?

18          MR. MORRIS:  Objection to the form of the

19  question.

20          THE WITNESS:  No.

21     Q.   (BY MR. RUKAVINA)  So you recall that -- I'm

22  sorry, that was 2017.  I was wrong; right?

23     A.   Correct.

24     Q.   So I guess here is my question, and I'm

25  struggling to understand this.

1      So why would Highland be loaning an
2 additional $7.4 million in early May of 2019 to HCMFA
3 when HCMFA already was then unable to repay its debts
4 to Highland?

5      MR. MORRIS:  Objection to the form of the
6 question.

7      THE WITNESS:  Yeah, I kind of reject the
8 premise of the question, and these are all controlled
9 by Jim.  And it's completely within his power at any
10 point in time to make any payment on any of the loans,
11 depending on where priorities sit.

12      So the idea that HCMFA -- that Highland would
13 be doing a credit analysis on HCMFA, determining that it
14 was unable to make that payment and, therefore, this is
15 a bad note, is a completely foreign, preposterous
16 concept at that time.

17      Q.   (BY MR. RUKAVINA)  And in May of 2019 isn't
18 it also, sir, the case that Mr. Dondero could have,
19 right or wrong, agree or disagree, said, that 7.4- is
20 going to compensate HCMFA for the NAV error as opposed
21 to being a loan?

22      A.   No.

23      Q.   That's not possible?

24      A.   No.

25      Q.   And why is that not possible?

David Klos - October 27, 2021

1     A.   As we discussed, the 5-, there's absolutely
2  no construct where that can be compensation for an NAV
3  error.  It's not a NAV error.  It's a consent fee.
4  Highland has absolutely no responsibility for that.
5          Highland also has no responsibility for the
6  2.4-, but if you want to assume that it did, that's
7  completely not the practice.  It was Jim's preference
8  to do these via loans, and that's how it was booked.
9     Q.   You're saying on the one hand Mr. Dondero can
10 absolutely control that one entity make a loan to
11 another, irrespective of credit worthiness, but he
12 can't decide that a transfer is compensation as opposed
13 to a loan?
14         MR. MORRIS:  Objection to the form of the
15 question.  Argumentative.
16         THE WITNESS:  If he wants to call
17 $7.4 million compensation to himself or to HCMFA, I
18 just don't know how he does that.  This is me being an
19 accountant.  I don't know how that's possible.
20         If he wants to pay himself a $7.4 million
21 bonus from HCMFA, fine, he has the power to do that.  If
22 he wants Highland to inject 7.4 million of equity into
23 HCMFA, he has the power to do that.
24         But sending the 7.4 million and calling it
25 something else, I don't know how he could do that.

1      Q.   (BY MR. RUKAVINA)  So it had to have been a
2  loan; correct?
3           MR. MORRIS:  Objection to the form of the
4  question.
5           THE WITNESS:  In these instances I know it to
6  have been a loan.
7      Q.   (BY MR. RUKAVINA)  Because of what
8  Mr. Waterhouse told you?
9           MR. MORRIS:  Objection to the form of the
10  question.  Asked and answered.
11           THE WITNESS:  Yeah, it was my understanding
12  that these were loans.
13      Q.   (BY MR. RUKAVINA)  You know these 7.4- to be
14  loans even though you never heard Mr. Dondero say that
15  to you?
16      A.   Yes, although to be fair, I don't know
17  whether I ever heard Mr. Dondero.  It's possible he did
18  say it.
19           MR. MORRIS:  Objection.  Withdrawn.
20      Q.   (BY MR. RUKAVINA)  You have no memory that on
21  or before May 4, 2019 you heard Mr. Dondero say that
22  the $2.4 million transfer and/or the $5 million
23  transfer to HCMFA were loans?
24      A.   I have no specific recollection, but such a
25  conversation is just off the reservation impossible.

David Klos - October 27, 2021

1  That there's no way -- there's no way -- there's no way
2  that it would have been described that way and there's
3  a hundred percent that it's loan.

4        Q.   Do you have any memory discussing prior --
5             MR. MORRIS:   Objection.   Asked and answered.
6  He's answered this a thousand times.

7        Q.   (BY MR. RUKAVINA)   Do you have any memory on
8  or before May 2, 2019 discussing the $2.4 million
9  transfer with Mr. Dondero at all?

10       A.   I do recall, I don't remember the time, but I
11 do remember discussing the NAV error in general terms
12 and the potential magnitude of that.   I don't remember
13 specifically when that occurred.

14       Q.   At least in your discussion with Mr. Dondero,
15 the $2.4 million loan or note was somehow linked to the
16 NAV error?

17       A.   Linked to the NAV error is strong.   It
18 related to the NAV error from the standpoint that
19 that's what Highland was loaning HCMFA the money for,
20 because HCMFA couldn't otherwise make the payment
21 itself.

22       Q.   You just said Highland was loaning the money
23 for.   Are you remembering now Mr. Dondero saying that
24 or are you just extrapolating?

25       A.   No, I'm explaining rationally what the

1  situation was.

2      Q.   Do you remember on or before May 3, 2019

3  discussing the $5 million transfer with Mr. Dondero?

4      A.   Again, in general terms.  I couldn't tell you

5  a time period, but this was something that, between

6  Frank and I, we had put on Jim's radar that this would

7  be a cash need in the future.  I couldn't specify

8  specifically when that happened.

9      Q.   Okay.  You have no present memory of

10  discussing that issue with Mr. Dondero on or before

11  May 3, 2019?  It must have happened but you have no

12  memory?

13          MR. MORRIS:  Objection to the form of the

14  question.

15          THE WITNESS:  We discussed that there would

16  be a consent fee payable from HCMFA.  We would have

17  discussed -- and again, I don't remember where I was,

18  what day it was, the specifics around the conversation.

19          But I know that we had conversations

20  pertaining to cash, because this was a large need for --

21  cash need for HCMFA to satisfy this, and this was an

22  important payment.

23          And neither HCMFA nor Highland had the

24  wherewithal to make that payment.  The only way that

25  those could make the payment was by Jim Dondero repaying

David Klos - October 27, 2021

```
 1   loans that he owed to HCMLP.  So we absolutely discussed
 2   that with Jim Dondero.
 3        Q.   (BY MR. RUKAVINA)  And with respect to
 4   everything that we just talked about and your
 5   recollection, you still don't remember Mr. Dondero
 6   saying to you or Mr. Waterhouse one way or the other
 7   that one or both of these transfers were loans?
 8             MR. MORRIS:  Objection to the form of the
 9   question.  Asked and answered.
10             THE WITNESS:  Yeah, again --
11        Q.   (BY MR. RUKAVINA)  Just yes or no.  This is a
12   yes-or-no question.
13             MR. MORRIS:  Let him answer the question.
14             MR. RUKAVINA:  If he'll answer the question
15   I'll stop asking him --
16             MR. MORRIS:  He's allowed --
17        Q.   (BY MR. RUKAVINA)  The answer [verbatim] is,
18   do you remember --
19        A.   I don't remember Jim's exact words two and a
20   half years ago in respect to authorizing these
21   payments.  So to answer your question, no, I don't
22   specifically remember him saying these are loans.
23             But every other fact around this tells me
24   that we did have that conversation and that was the
25   conclusion and that was the direction.
```

David Klos - October 27, 2021

1     Q.   So it's possible that Mr. Dondero told no one
2  that these were loans but because y'all have been doing
3  it this way for 10 years, that everyone, all of you
4  CPAs, understood that it had to be a loan?
5          MR. MORRIS:  Objection to the form of the
6  question.
7     Q.   (BY MR. RUKAVINA)  My question is, is that
8  possible?
9     A.   I really don't think it's possible.  I
10  suppose people say anything is possible.  Again, two
11  and a half years ago, I'm certain that that was the
12  intent at the time and I'm sure it was communicated as
13  such.  I just don't have a specific recollection.
14          MR. RUKAVINA:  Thank you.
15          I'll pass the witness.
16          MR. MORRIS:  Michael, do you have any
17  questions?
18          MR. AIGEN:  I do.  I assume you want me to
19  start now to do my best to be done at 5:00?
20          MR. MORRIS:  Yes, please.
21                     EXAMINATION
22     Q.   (BY MR. AIGEN)  Good afternoon, Mr. Klos.  My
23  name is Michael Aigen with the Stinson law firm.  I
24  represent Mr. Dondero, HCMS, and HCRE.
25          How are you today?

David Klos - October 27, 2021

1      A.    I'm very good, thank you.

2      Q.    First topic I wanted to ask you about is the
3 defense raised by some of the defendants related to an
4 oral agreement and condition subsequent.

5           So my question for you generally is, are you
6 aware that some of the defendants in these proceedings
7 have raised a defense that there was a subsequent oral
8 agreement allowing notes to be potentially forgiven if
9 certain events occur?

10     A.    Yeah, I'm generally aware of the defenses
11 sitting here today.

12     Q.    And how are you generally aware of this
13 defense?

14     A.    I don't know with specificity.  Potentially
15 through just document flow on the bankruptcy side,
16 potentially with conversations internally or with
17 counsel.  But I generally understand them to have been
18 raised, the defenses that is.

19     Q.    And I don't want to get into conversations
20 with counsel.  I'm not allowed to do that.

21          Let me ask you, have you had any
22 conversations with anyone other than counsel about this
23 subsequent oral agreement defense?

24     A.    I have had general conversations with
25 Mr. Seery about it.  And other than that, nothing

David Klos - October 27, 2021

1  substantive.

2      Q.   And what did you discuss about this with

3  Mr. Seery?

4      A.   I've discussed with him, I hate to phrase it

5  this way, the ridiculousness of the defense.  Under

6  oath.  I've discussed my general understanding of what

7  is being asserted as a defense.

8           Which is that there was some sort of an oral

9  agreement between Jim and his sister at some point in

10 the past pertaining to forgiveness of certain

11 promissory notes that was conditional upon Highland

12 monetizing any of three PE assets for any amount above

13 cost.

14     Q.   And is it fair to say that prior to these

15 lawsuits being brought, you weren't aware of any oral

16 agreements related to the promissory notes related to

17 potential forgiveness?

18     A.   That's correct.  Not that I can remember, and

19 I think I would remember.

20     Q.   And other than your conversations with

21 Mr. Seery and counsel, you haven't had any

22 conversations with anyone else about these alleged oral

23 agreements; is that fair to say?

24     A.   I'm not sure I understand the question.

25     Q.   You told me you may have had questions with

David Klos - October 27, 2021

1  counsel about these oral agreements defense, and you
2  told me about conversations with Mr. Seery, so I'm
3  trying to close that topic.
4          Was there anyone else you had any
5  conversations with about this alleged oral agreement?
6      A.   Like I said before, nothing of substance.
7  I've probably mentioned it in passing to other
8  employees, this is what I understand is being asserted
9  in this, but nothing of substance.
10     Q.   Do you have any personal knowledge as to
11 whether Mr. Dondero or Ms. Dondero entered into any
12 type of oral agreement prior to the bankruptcy?
13     A.   No, not other than what's been pled, or
14 whatever the terminology is.
15     Q.   I want to talk a little bit about, you
16 touched on earlier, you gave some testimony about how
17 in -- there were certain term loans that had payments
18 due in December or on or about December 31, 2020.
19         Do you remember talking about that?
20     A.   Yeah, generally.
21     Q.   And I don't know if you're specifically
22 referring to these loans, but is it also your
23 understanding that HCMS and HCRE also had payments that
24 were due on December 31, 2020?
25     A.   Yes.

1      Q.   Is it fair to say that if those payments were
2  to be made, it would have been Ms. Hendrix that would
3  have gone and effectuated those payments?
4           MR. MORRIS:  Objection to the form of the
5  question.
6           THE WITNESS:  Can you remind me the entities
7  again.
8      Q.   (BY MR. AIGEN)  Sorry.  HCMS and HCRE
9  Partners.
10     A.   HCMS, yes.  HCRE, I'm not sure, maybe.
11     Q.   Why might it have been different?
12     A.   I just don't recall who had the, you know,
13 kind of bank access to effectuate that payment.  I
14 think Kristin did but I'm not certain.
15     Q.   It wouldn't have been you; is that fair to
16 say?
17     A.   Correct.  It would not have been me.
18     Q.   And if Ms. Hendrix testified that the
19 instruction she received in December 2020 about not
20 making payments related only to the Advisors and not to
21 HMS or HCRE, would you have any reason to disagree with
22 her?
23          MR. MORRIS:  Objection to the form of the
24 question.
25          THE WITNESS:  Yeah, I was struggling with

1  that question.  There was a lot to it.  If you don't
2  mind.
3      Q.  (BY MR. AIGEN)  Okay.  I'll repeat it.  Maybe
4  that will help.
5          MR. MORRIS:  Why don't you ask him about his
6  knowledge, instead of Kristin's.  You had her as a
7  witness.
8          I'll continue to object.  I don't know why
9  you're asking him about her knowledge.
10          MR. AIGEN:  Do you want to keep coaching him?
11          MR. MORRIS:  No, I'm trying to coach you.
12          MR. AIGEN:  Oh, thanks.  That's good.
13  Appreciate if you stop coaching your witness.
14      Q.  (BY MR. AIGEN)  If Ms. Hendrix testified that
15  the instructions she received in December 2020
16  regarding not making any more payments related only to
17  the Advisors and not to HMS or HCRE, would you have any
18  reason to disagree with her?
19          MR. MORRIS:  Objection to the form of the
20  question.
21          THE WITNESS:  I have no reason to question
22  Kristin's testimony.  I'm sure she gave truthful
23  testimony.
24      Q.  (BY MR. AIGEN)  Are you aware or not of
25  whether Ms. Hendrix was told by Mr. Waterhouse not to

David Klos - October 27, 2021

1  make payments from certain entities in December of
2  2020?
3          MR. MORRIS:  Objection to the form of the
4  question.
5          THE WITNESS:  Yeah, I'm aware, and I think I
6  spoke to that earlier of the instruction that had come
7  down from Dondero through Frank to Kristin, and I was
8  certainly aware of it.
9          And I'm -- and I think I spoke to the fact
10 that, you know, certainly hearing it from a person who,
11 as I said before, wasn't really on the team at that
12 point, it was certainly my understanding that that was a
13 global instruction at the time.
14     Q.   (BY MR. AIGEN)  And I want to get into what
15 was actually said and what you remember, so let me ask
16 you this.
17          This instruction that came down started from
18 Jim and went to Frank.  Is that your understanding?
19     A.   That's my understanding.
20     Q.   You weren't there during that discussion I
21 assume; is that correct?
22     A.   Correct, I was not.
23     Q.   And then Frank gave an instruction to
24 Kristin; is that your recollection?
25          MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1  question.

2          THE WITNESS:  Yeah, it's my understanding

3  that Frank informed Kristin of that instruction.

4      Q.  (BY MR. AIGEN)  Were you there when Frank

5  provided this instruction to Kristin?

6      A.  I don't believe I was.

7      Q.  Then can I ask, how did you become aware that

8  Frank had given this instruction to Kristin?

9      A.  Through subsequent conversations with Frank

10 and Kristin.  As I said before, I don't recall if it

11 was the three of us or me and Frank or me and Kristin.

12 But subsequent conversations.

13     Q.  Are we talking about conversations back in

14 2020 or after the bankruptcy?

15         MR. MORRIS:  Objection to the form of the

16 question.

17         THE WITNESS:  During 2020, December of 2020.

18     Q.  (BY MR. AIGEN)  Sitting here today, can you

19 say with a hundred percent certainty that the

20 instruction related to all of the entities as opposed

21 to just Advisors?

22     A.  So as you pointed out, I was not party to the

23 direction, so I have no way of knowing with any sort of

24 specificity what the direction actually was.  I just

25 know how it was conveyed to me and how I understood it.

David Klos - October 27, 2021

1    Q.   When you say it was conveyed to you, are you
2  talking about subsequent discussions that you had with
3  Ms. Hendrix and Mr. Waterhouse after they talked to
4  each other?
5    A.   Yes.
6    Q.   Sitting here today, can you tell me for sure
7  that one of them told you that this instruction related
8  to all of the entities, as opposed to just the
9  Advisors?
10   A.   No, I can't say that with certainty, but I
11 think that that was the case.  But, again, I can't say
12 with certainty.
13   Q.   Would you defer to Mr. Waterhouse and
14 Ms. Hendrix over what the specific instructions were?
15       MR. MORRIS:  Objection to the form of the
16 question.
17       THE WITNESS:  Like I said, I wasn't part of
18 the conversation, so I would defer to people who
19 received the directions more directly.
20   Q.   (BY MR. AIGEN)  And you're not aware of
21 anything in writing or anything that reflects these
22 instructions on whether to pay or not to pay certain
23 payments in December of 2020?
24   A.   No, I'm not aware of anything in writing.
25   Q.   And let's change topics for a second here.

1        I want to throw out a term.  Are you familiar
2   with the term "NAV ratio trigger period" as it was used
3   in --
4        A.   In a very, very general sense, yes.
5        Q.   And in a general sense what does that term
6   mean to you?
7        A.   It's a term I recognize from the limited
8   partnership agreement of HCMLP.  It's a defined term in
9   that agreement.
10        Q.   To your knowledge, was the NAV ratio trigger
11   period ever reached or triggered prior to the Highland
12   bankruptcy?
13        A.   I don't know the definition, so I don't know
14   based on the definition whether it had or hadn't.
15        Q.   Sitting here today, though, it's not your
16   belief, based on your experience, that it was
17   triggered; is that fair to say?
18            MR. MORRIS:  Objection to the form of the
19   question.
20            THE WITNESS:  I don't know the consequence of
21   being in a trigger period, I guess is what -- how I'm
22   trying to answer your question.
23        Q.   (BY MR. AIGEN)  Have you ever had any
24   conversations with Nancy Dondero?
25        A.   Yes.

David Klos - October 27, 2021

1    Q.   Generally, how many and what was the
2  reasoning?
3    A.   Probably less than five.  I think maybe only
4  one or two that I can really remember.
5    Q.   At a high level what were those conversations
6  about?
7    A.   From my recollection of my conversations with
8  her, they pertained to the DRIP, which is a dividend
9  reinvestment program that I helped.
10   Q.   And approximately when were these
11  conversations?
12   A.   I don't know.  Sometime between 2017 and
13  probably 2019.  I couldn't tell you with any
14  specificity.  These were very informal.
15   Q.   Fair to say that you've never had any
16  conversations with Nancy Dondero about any of the loans
17  at issue in this case?
18   A.   No, no, no, I've never had a conversation
19  with her like that.
20   Q.   And fair to say that you've never had any
21  conversations with Nancy Dondero about compensation for
22  Jim or any other officers at Highland?
23   A.   Correct.
24        MR. AIGEN:  Why don't we go off the record
25  for two minutes.  I think I'm either done or about

David Klos - October 27, 2021

1  done.

2          (Off the record.)

3      Q.   (BY MR. AIGEN)  You understand you're still

4  under oath?

5      A.   Yes.

6      Q.   Are you aware of any loans that Highland has

7  made to any employees or officers that were forgiven in

8  all or in part?

9      A.   Yes.

10      Q.   Can you tell me who?

11      A.   I don't know that this will be a complete

12  list, but there were a few employees in the kind of

13  late aughts, maybe 2010, 2011 frame.

14      Q.   Do you know the names?

15      A.   One was Jack Yang.  Another, I'm not sure if

16  it was forgiven or not, that's why I'm hesitating, but

17  it was Tim Lawler.  I think his was forgiven in part or

18  in full, but I'm not a hundred percent certain.

19      Q.   And any other individuals that received loans

20  that were forgiven in part that you're aware of?

21      A.   Not that I recall, but there could be others.

22  Some of this is very, very old.

23      Q.   Changing topics here a little bit, I'm going

24  to combine two entities to try to speed this up.  If

25  you need to separate, that's fine.

David Klos - October 27, 2021

1      Can you just generally explain to me what
2  services Highland Capital Management provided for
3  HCMS and HCRE?
4      A.   For HCMS -- I do need to separate these a
5  little bit.  For HCMS, really full-service accounting,
6  tax, treasury, cash payments.  I said tax.  Valuation.
7  Nothing personnel-wise because they didn't have any
8  employees.
9      That's all I can think of right off the top
10 of my head, but I could be missing some.
11     Q.   And what about HCRE?  How is that different?
12     A.   Similar, except different types of assets.
13 So more real estate, so less heavy.
14     Maybe not necessarily differences in terms of
15 the types of services, but services would have, I'd
16 say, more cash activity, more variety of investments,
17 which triggers different types of activities going on
18 at those entities.
19     But similar in terms of tax operations,
20 making payments.  HCRE didn't have employees, so no
21 payroll.  So these would be the broad areas that I
22 would think about.
23     Q.   And you mentioned making payments.  Would one
24 of those services that Highland provided for these two
25 entities include making loan payments on the term loans

David Klos - October 27, 2021

1  like the term loans at issue in these proceedings?

2          MR. MORRIS:  Objection to the form of the

3  question.

4          THE WITNESS:  I think I mentioned before, I

5  couldn't remember whether or not Kristin was authorized

6  to make payments with respect to HCRE.  I think she

7  probably was, but I don't know that with certainty.

8          But, you know, for services, certainly Kristin

9  and her team would be responsible for making those

10 payments, subject to the proper authorization.

11     Q.  (BY MR. AIGEN)  And I'm sorry if I asked this

12 before.  If it wasn't Kristin for HCRE, do you have an

13 idea who it would have been?

14     A.   If not Kristin, it would have been Melissa

15 Schroth.

16     Q.   And how were those responsibilities split up?

17 What entities was Melissa Schroth responsible for?

18     A.   Generally speaking, Melissa was more

19 responsible for entities that were really, like -- I'm

20 going to use this in the most general sense, like Jim

21 entities, Jim's trusts, Jim personally.

22          And for HCRE it was kind of in the middle.

23 When it started out it kind of was more Jim world and

24 then over time it got more complex.

25          And as entities got more complex over time

David Klos - October 27, 2021

1  they tend to get transitioned from Melissa to corporate

2  accounting.  And when they got really complex over to

3  another group of fund accountants.

4        So this is one that was, at its beginning,

5  Melissa was the, called primary accountant.  And at

6  some point in time that transitioned to the corporate

7  accounting team.  I can't remember when the cash

8  process kind of cut over.

9     Q.   Is there a list somewhere saying Melissa is

10  responsible for these, Kristin for the others, or is it

11  just more of a pattern or matter of practice?

12     A.   More of a matter of practice.  If you're

13  responsible for an entity, you're responsible.  If

14  you're not, then you're not.

15        MR. AIGEN:  That's all the questions I have.

16  Thank you for your time.

17        THE WITNESS:  Thank you.

18                    EXAMINATION

19     Q.   (BY MR. MORRIS)  Just a few, Mr. Klos.  Let's

20  pick up where Mr. Aigen left off.

21        To the best of your knowledge, did HCMS have

22  a shared services agreement with Highland?

23     A.   No, it didn't that I'm aware of.

24     Q.   But you described certain services that HCMLP

25  provided to HCMS; is that right?

David Klos - October 27, 2021

1    A.   Yes.

2    Q.   Do you know whether HCMFA ever compensated --

3  do you know whether HCMS ever compensated HCMLP for any

4  of those services that HCMLP provided?

5    A.   No, it didn't.

6    Q.   You mentioned HCRE.  To the best of your

7  knowledge, did HCRE have a shared services agreement

8  with Highland Capital Management, LP?

9    A.   No, it didn't.

10    Q.   Did HCRE provide the services that --

11  withdrawn.

12        Did HCMLP provide the services to HCRE that

13  you just described?

14    A.   Yes.

15    Q.   Did HCRE ever compensate HCMLP for any of the

16  services that HCMLP provided?

17    A.   No.

18    Q.   Okay.  Mr. Rukavina asked you some questions

19  about payments that were made on the NexPoint loan in

20  the first half of 2019.

21        Do you remember that?

22    A.   Yes, generally.

23    Q.   Okay.  Notwithstanding those payments, did

24  your group continue to carry on its books and records

25  NexPoint's obligation to make the installment payment

1  that was due at the end of the year?

2     A.   Yes, we continued to track it through our

3  interest schedules and through cash.

4     Q.   So in the debtor's books and records is there

5  any evidence that the payments that were made in early

6  2019 were intended to relieve NexPoint's obligation to

7  make the installment payment due at the end of the

8  year?

9          MR. RUKAVINA:  Objection.  Best evidence.

10         THE WITNESS:  No, I don't believe so.

11    Q.   (BY MR. MORRIS)  Did you have a conversation

12 with anybody at any time in the year 2019 about whether

13 the payments made earlier in the year on behalf of

14 NexPoint would eliminate or suspend its obligation --

15 withdrawn.

16         Did you have any conversation with anybody --

17 I think I screwed up the dates.  Going to have to start

18 over.

19         Let me ask better questions.

20         You looked with Mr. Rukavina at certain

21 payments that were made in early 2019 with respect to

22 the NexPoint note.

23         Do I have that right?

24    A.   Yes.

25    Q.   Notwithstanding those payments, did NexPoint

David Klos - October 27, 2021

1  make the installment payment that was due at the end of

2  2019?

3          MR. RUKAVINA:  Objection.  Calls for a legal

4  conclusion.

5          THE WITNESS:  It did make the payment that

6  was due at the end of 2019.

7      Q.   (BY MR. MORRIS)  And the payment that it made

8  at the end of 2019, was that the annual installment

9  payment that was called for in the note itself?

10          MR. RUKAVINA:  Objection.  Legal conclusion.

11          THE WITNESS:  Yes, it was a payment pursuant

12  to the note.

13      Q.   (BY MR. MORRIS)  Did anybody ever tell you at

14  any time prior to the commencement of this lawsuit that

15  any prior payment by or on behalf of NexPoint relieved

16  it of any obligation to pay the installment payment due

17  at the end of 2020?

18      A.   No.

19      Q.   And did in fact -- is it your understanding

20  that Mr. Dondero specifically authorized Highland to

21  effectuate a payment on NexPoint's behalf in mid

22  January 2021?

23      A.   I don't have specific knowledge, but I know

24  that to have occurred.

25      Q.   Okay.  Did anybody ever tell you in 2021 --

1 | withdrawn.

2 |         Did anybody tell you in December 2020 or

3 | December -- or January 2021 that NexPoint didn't have

4 | to make the installment payment at year end 2020

5 | because of some prior prepayment?

6 |     A.   No.

7 |     Q.   Can you think of any reason -- withdrawn.

8 |         Did you ever hear Mr. Dondero -- withdrawn.

9 |         Did you ever see anything in writing where

10 | NexPoint ever contended, prior to February 1, 2021,

11 | that it had no obligation to make the payment due at

12 | the end of 2020 because of some prepayment issue?

13 |     A.   No, not that I remember.

14 |     Q.   Can you think of any reason why Mr. Dondero

15 | would have authorized a payment by NexPoint to HCMLP on

16 | account of the note in January of 2021 if he actually

17 | believed at that time that no obligation was due

18 | because of a prior prepayment?

19 |         MR. RUKAVINA:  Objection.  Speculation, lacks

20 | foundation.

21 |         THE WITNESS:  No.

22 |     Q.  (BY MR. MORRIS)  Does it make any sense to

23 | you as an accountant that you would pay a seven-figure

24 | sum of money that you didn't think was due and owing?

25 |     A.   No, that does not make sense to me.

HCMFA APP 0766

1      Q.    Can you get Exhibit 13, please.

2      A.    Got it.

3      Q.    You were asked some questions about

4  paragraph 3.

5            Do you see that?

6      A.    Yes.

7      Q.    Does paragraph 3 mention annual installment

8  payments at all?

9      A.    No, I'm not seeing it.

10     Q.    Does paragraph 3 state in any way that a

11 prepayment as described in that paragraph would relieve

12 the maker of the obligation to make annual installment

13 payments?

14     A.    No.

15     Q.    Can you turn to the next page and look at

16 paragraph 5.

17           Are you familiar with that paragraph at all?

18     A.    No.  I mean, I've seen it before, but this

19 is, as I said before, this is a provision that probably

20 would have been in most, if not all, of these types of

21 notes.

22     Q.    Can you get Exhibit 3, please.  This is your

23 email dated May 2, 2019.

24           Do I have that right?

25     A.    Yes.

1    Q.   And you sent it to the corporate accounting
2  email group; is that right?
3    A.   I did.
4    Q.   And to the best of your recollection, was
5  Mr. Waterhouse included in that email group?
6    A.   Yes, absolutely.
7    Q.   And did you instruct the corporate accounting
8  team to transfer $2.4 million from HCMLP to HCMFA on
9  May 2, 2019?
10    A.   Yes, specifically Blair, but yes, for the
11  team as well.
12    Q.   The whole team was aware of this?
13    A.   The whole team is on the email, and I'm
14  sending to Blair, who is the AP person, to please set
15  up the payment.
16    Q.   Is it fair to say that you're being
17  completely transparent here by including the entire
18  corporate accounting group on this email?
19    A.   Yes.
20    Q.   And did you tell the entire corporate
21  accounting group that this transaction would be a,
22  quote, new interco loan?
23    A.   Yes, that's what the email says.
24    Q.   Do you have any reason to believe that
25  Mr. Waterhouse didn't get this?

David Klos - October 27, 2021

1    A.    No, he got this.

2    Q.    And did Mr. Waterhouse tell you at any time

3 in the history of the world that this $2.4 million

4 should not have been booked as a loan?

5    A.    No.

6    Q.    Did Mr. Dondero tell you at any moment in the

7 history of the world that this transaction should not

8 have been booked as a loan?

9    A.    No.

10    Q.    You mentioned that there was an audit that

11 followed shortly thereafter?

12    A.    Yes.

13    Q.    Are you familiar with the debtor's audited

14 financial statements for the period ending 2018?

15    A.    Yes, generally.  Not total recall, but yes.

16    Q.    Are you aware that this loan was included as

17 a subsequent event in the debtor's audited financial

18 statements?

19    A.    Yes.

20          MR. RUKAVINA:  Objection.  Best evidence.

21    Q.    (BY MR. MORRIS)  Did Mr. Dondero or

22 Mr. Waterhouse or anybody ever tell you that the debtor

23 should not have included this $2.4 million loan in its

24 audited financial statements?

25          MR. RUKAVINA:  Objection.  Best evidence.

David Klos - October 27, 2021

```
 1            THE WITNESS:  No.
 2       Q.   (BY MR. MORRIS)  Okay.  And the next day
 3  there was another loan; right?
 4       A.   Yes.
 5       Q.   I'm going to show you here a document that's
 6  been produced.
 7            MR. RUKAVINA:  Would you email it to me and I
 8  can print it out for the court reporter.
 9            MR. MORRIS:  You want to come over here and
10  look --
11            MR. RUKAVINA:  I know it.  I'm just thinking
12  that we can append it to the record right now.
13            MR. MORRIS:  It's eight pages, so it's part
14  of a whole production.
15            MR. RUKAVINA:  But it's just one email?
16            MR. MORRIS:  Just one email that I'm talking
17  about.  So we're looking at Bates stamp D-CNL003763.
18            And I'll email it to you when we're done here.
19  And you're welcome to come over here if you'd like to
20  see it.
21       Q.   (BY MR. MORRIS)  Mr. Klos, can you take a
22  look at the email that I have on my screen.
23       A.   Yes.
24       Q.   And do you see that it's an email from
25  Kristin Hendrix to the corporate accounting group on
```

1  Friday, May 3?

2      A.   Yes.

3      Q.   And were you also included in the corporate

4  accounting email string?

5      A.   Yes.

6      Q.   Can you read the email out loud, please.

7      A.   It says, Blair, please set up a wire from

8  HCMLP to HCMFA for 5 million as a new loan,

9  parentheses, 4.4 million should be coming in from Jim

10  soon.  Hayley, please add this to your loan tracker.  I

11  will paper the loan.

12      Q.   So based on that email, did you understand on

13  May 3 that HCMLP was going to loan $5 million to HCMFA?

14      A.   Yes, HCMFA.

15      Q.   And did you understand that Kristin

16  specifically told the corporate accounting group that

17  she would take responsibility for papering the loan?

18      A.   Yes, that's what she says.

19      Q.   Do you recall whether Mr. Waterhouse ever

20  objected to any aspect of Kristin's email?

21      A.   He didn't.

22      Q.   Do you recall in the history of the world

23  whether Mr. Waterhouse ever told you that this

24  $5 million transaction should not have been booked as a

25  loan?

David Klos - October 27, 2021

1    A.    No.

2    Q.    Did anybody in the history of the world ever

3 raise a question to you as to whether or not Kristin

4 was authorized to paper the loan, as she describes it

5 in this particular email?

6    A.    No.

7    Q.    Do you know if this $5 million loan was also

8 included in the debtor's audited financial statements?

9         MR. RUKAVINA:  Objection.  Best evidence.

10        THE WITNESS:  Yes.  Again, subsequent event.

11   Q.    (BY MR. MORRIS)  Okay.  And did anybody in

12 the history of the world ever tell you that Highland

13 should not have included as a subsequent event in its

14 2018 audited financial statement this $5 million loan?

15   A.    No.

16        MR. RUKAVINA:  Objection.  Best evidence.

17        THE WITNESS:  No.

18   Q.    (BY MR. MORRIS)  Do you know if HCMFA had its

19 financial statements audited?

20   A.    It did.

21   Q.    And are you generally familiar with those

22 financial statements?

23   A.    Yes.

24   Q.    Are you aware that these two loans totaling

25 $7.4 million were included in HCMFA's audited financial

David Klos - October 27, 2021

1 statements as a subsequent event for the period ended

2 December 31, 2018?

3     A.   Yes.

4         MR. RUKAVINA:  Objection.  Best evidence.

5     Q.  (BY MR. MORRIS)  Did anybody in the history

6 of the world ever tell you that HCMFA should not have

7 included as a subsequent event the borrowing of the

8 money reflected in these loans?

9         MR. RUKAVINA:  Objection.  Best evidence.

10         THE WITNESS:  No, no one said that.

11     Q.  (BY MR. MORRIS)  Do you know if HCMFA

12 included these loans as a liability on its balance

13 sheet?

14     A.   It did.

15         MR. RUKAVINA:  Objection.  Move to strike.

16 Best evidence.

17     Q.  (BY MR. MORRIS)  Did anyone in the history of

18 the world ever tell you that HCMFA should not have

19 included these loans as a liability on its balance

20 sheet?

21         MR. RUKAVINA:  Objection.  Best evidence.

22         THE WITNESS:  No.

23     Q.  (BY MR. MORRIS)  Okay.  Do you recall that in

24 October of 2020 HCMFA and NexPoint made a report to the

25 retail board?

David Klos - October 27, 2021

1      A.    Yes.

2      Q.    And are you aware that that's part of the

3   annual review process?

4      A.    Yes, it's the 15(c) process.

5      Q.    By the way, as we're talking about these

6   issues, did Mr. Waterhouse have -- was he an officer of

7   HCMFA in 2019 and 2020?

8      A.    Yes.

9      Q.    And what's your understanding as to the

10  office he held?

11     A.    Treasurer, I believe.

12     Q.    And do you know if Mr. Dondero held an

13  officer position with respect to each of the Advisors?

14     A.    He did.

15     Q.    What position did he hold?

16     A.    I don't recall with certainty, but I believe

17  president.

18     Q.    As officers of those two entities, do you

19  have any knowledge as to whether they participated in

20  the communications with the retail board in the fall of

21  2020?

22     A.    I believe Jim and Frank both did.

23     Q.    And do you know whether the retail board

24  asked the Advisors for a report on all obligations due

25  and owing to HCMLP and affiliates?

David Klos - October 27, 2021

1      A.    They asked for financials, I believe as of
2    6/30 as part of that process.
3      Q.    And are you aware as to whether or not the
4    financials that were provided to the retail board
5    included, among other things, the $7.4 million in notes
6    that were -- that we're talking about here?
7      A.    Yes, those financials would have included
8    those amounts as liabilities to HCMLP.
9      Q.    Did Mr. Dondero or Mr. Waterhouse ever tell
10   you or anybody to your knowledge that the Advisors
11   should not have told the retail boards that they were
12   obligated to pay under those two notes?
13     A.    No.
14     Q.    Let's talk about loan forgiveness for a
15   moment.
16           How long have you been with the company?
17     A.    March of 2009.
18     Q.    At any time since you've been employed by
19   Highland, has Highland ever forgiven a promissory note
20   that it held where the maker was a corporate affiliate?
21     A.    Not that I can recall.
22     Q.    Have you ever heard prior -- has anybody ever
23   told you that before you joined the company, Highland
24   had ever forgiven in whole or in part any note that it
25   held where the maker was a corporate affiliate?

David Klos - October 27, 2021

1     A.    Not that I'm aware of.

2     Q.    You referred to a couple of loans that were

3 given to individuals earlier.

4          Do you remember that?

5     A.    Yes.

6     Q.    What's the biggest loan that you can recall

7 Highland ever forgiving?

8     A.    The largest one that I can remember was

9 a half-million dollars, 500,000.

10     Q.    So you have no knowledge of any loan ever

11 being forgiven where the principal amount forgiven

12 exceeded $500,000; is that right?

13     A.    Not that I'm aware of.

14     Q.    And when is the last loan that Highland

15 forgave in whole or in part to one of its officers or

16 employees that you can recall?

17     A.    I don't know a specific year, but it would

18 have been in the 2010, 2011 time frame.  Maybe 2012,

19 but I suspect '10 or '11.

20     Q.    So is it fair to say to the best of your

21 recollection and knowledge that Highland did not

22 forgive a single loan made to an officer or employee

23 for at least seven years prior to the petition date?

24     A.    There's none that I can think of.

25     Q.    Let's just turn our attention to

David Klos - October 27, 2021

1 December 2020.

2          Do you recall that you testified at length

3 about your understanding of the conversations with

4 Mr. Waterhouse and Ms. Hendrix?

5          Do you remember that?

6     A.    Yes.

7     Q.    Okay.  Are you aware of any instruction ever

8 made by Mr. Dondero or Mr. Waterhouse in November or

9 December 2020 in order to make the payments that were

10 due under the three term notes -- withdrawn.

11          There were three term notes that were due --

12 withdrawn.

13          There are three term notes at issue in this

14 case.  Do you understand that?

15     A.    Yeah, that's my understanding.

16     Q.    And one of them was issued by NexBank; is

17 that right?

18     A.    NexPoint Advisors.

19     Q.    Thank you for the clarification.

20          One was by HCRE?

21     A.    Correct.

22     Q.    And one was from HCMS; do I have that right?

23     A.    Yes.

24     Q.    And all three of those notes were executed as

25 of May 31, 2017; right?

David Klos - October 27, 2021

1    A.    Yeah, that was the effective date on all

2  three.

3    Q.    And they all rolled up previously outstanding

4  notes that were due and payable to Highland.

5          Do I have that right?

6    A.    Correct.  To the best of my recollection.

7    Q.    So we'll refer to those notes as the term

8  notes.  Is that okay?

9    A.    Sure.

10   Q.    Do you have any knowledge that Mr. Dondero or

11 Mr. Waterhouse ever instructed HCMLP to make the

12 installment payments that were due at the end of 2020

13 with respect to any of those term notes?

14   A.    No, I don't believe they provided that

15 instruction to make those payments.

16         MR. RUKAVINA:  Objection.  Move to strike.

17 Lacks foundation.

18         MR. MORRIS:  I'm asking him if he ever heard.

19         MR. RUKAVINA:  But he answered a different

20 question.  He answered a different question.

21   Q.    (BY MR. MORRIS)  Did you ever see anything in

22 writing where either Mr. Dondero or Mr. Waterhouse

23 directed HCMLP to make the annual installment payments

24 that were due at the end of 2020 with respect to any of

25 the term notes?

David Klos - October 27, 2021

```
1     A.    No.
2     Q.    Okay.  But to the best of your recollection,
3  in the 13-week forecast, those forecasts included the
4  installment payments that were due at the end of the
5  year; is that right?
6     A.    They did.
7     Q.    Did anybody ever tell you prior to
8  February 1, 2021, that your group had made a mistake by
9  not making the payment -- any of the payments that were
10 due under the term notes at the end of 2020?
11    A.    Not that I'm aware of.
12    Q.    Did anybody tell you prior to February 1,
13 2021, that the makers of the term notes expected
14 Highland to effectuate the payments that were due at
15 the end of the year without approval by Mr. Waterhouse
16 or Mr. Dondero?
17    A.    No.
18    Q.    Have you seen any protest in writing prior to
19 the commencement of the litigation by any of the makers
20 of the notes about a failure on the part of HCMLP to
21 perform its duties and make that payment at the end of
22 the year?
23    A.    No.
24          MR. MORRIS:  I have no further questions.
25          MR. RUKAVINA:  I have five minutes.
```

1          FURTHER EXAMINATION

2      Q.   (BY MR. RUKAVINA)  Go to Exhibit 16, please,

3  1-6.

4      A.   Sure.

5      Q.   Sir, this is an email string regarding that

6  Rule 15(c) that you were talking about.  I'm just going

7  to ask you about the top email, but you're welcome to

8  read the whole.

9      A.   Uh-huh.

10     Q.   You're copied on Mr. Waterhouse's email there

11 October 6, 2020; right?

12     A.   Yes, I'm on the email.

13     Q.   And Mr. Waterhouse writes, the HCMFA note is

14 a demand note.  You would have read that; right?

15     A.   Yes.

16     Q.   Did you ever correct Mr. Waterhouse when he

17 says the HCMFA note, as opposed to notes?

18     A.   No, that's not something I would have

19 corrected from Frank.

20     Q.   Do you recall right now that you might have,

21 when you read this, realized that he made a mistake?

22     A.   It would have been such a de minimus,

23 inconsequential mistake that I don't know that I would

24 have addressed it.

25     Q.   What about two sentences over, there was an

1 | agreement between HCMLP and HCMFA the earliest they
2 | could demand is May 2021.
3 |         Did you ever write to him and say that too
4 | was a mistake?
5 |     A.   I didn't write to him.
6 |     Q.   Did you realize back then when you read it
7 | that he had made a mistake?
8 |     A.   I'm not certain.
9 |     Q.   Did you -- and I'm not suggesting that you
10 | should have.  You're a busy man.  But did you attach
11 | any significance outside of the ordinary to this email
12 | exchange?
13 |         MR. MORRIS:  Objection to the form of the
14 | question.
15 |         THE WITNESS:  I struggle with how to answer
16 | that.  I saw that this note was in response to retail
17 | 15(c) follow-up on the Advisors.
18 |         At this point my role was different, where I
19 | was dealing with really the retail funds primarily.  So
20 | the fact that I'm even on this email is somewhat
21 | incidental.
22 |     Q.   (BY MR. RUKAVINA)  But surely on October 6,
23 | 2020 you knew that there were four HCMFA demand notes,
24 | didn't you?
25 |     A.   I'm sure I would have had access to that

David Klos - October 27, 2021

1  information.  I'm not sure that I was keeping track of
2  how many were outstanding at any given point in time.
3       Q.   And surely on October 6, 2020 you knew that
4  only two of them couldn't be demanded by May of 2021,
5  didn't you?
6       A.   Again, I don't know that I was even really
7  thinking about these notes at that time.
8       Q.   Even though you were preparing weekly cash
9  forecasts for Mr. Seery?
10      A.   I wasn't preparing a weekly cash forecast for
11  Mr. Seery.
12      Q.   Going to Exhibit 13, please.  Mr. Morris
13  asked you a couple questions about this.
14      A.   I'm sorry, 13?
15      Q.   Yes, sir.  And again, that paragraph 3 that
16  talks about prepayment.
17           Can you find anything in here, sir, that says
18  that a prepayment does not relieve the maker of any
19  regularly scheduled payment?
20      A.   Sorry, that's a lot to comprehend.  If you
21  could ask again.
22      Q.   Is there any provision that you can see here
23  that's to the effect that a prepayment will not relieve
24  the maker of any regularly scheduled payment?
25      A.   I don't see that specific provision.  I just

David Klos - October 27, 2021

1  read it for what is on the page.

2      Q.  Isn't it, sir, in your experience the case

3  that a promissory note, if it intended not to relieve

4  the borrower of regularly scheduled payments would say

5  that a prepayment does not relieve the borrower of

6  regularly scheduled payments?

7          MR. MORRIS:  Objection to the form of the

8  question.

9          THE WITNESS:  That's a legal question.  I

10  can't -- I don't know the answer.

11     Q.   (BY MR. RUKAVINA)  Do you remember seeing

12  promissory notes that say something like that?

13     A.   Not that I can recall.

14     Q.   You'd be surprised if that's what promissory

15  notes say?

16          MR. MORRIS:  Objection to the form of the

17  question.

18          THE WITNESS:  I don't know.

19     Q.   (BY MR. RUKAVINA)  And Mr. Morris asked you

20  about this.  I'm trying to burn through this so the man

21  can make his plane.

22          Section 2.1 talks about 30 equal annual

23  payments, annual installments.

24          You see that?

25     A.   Yes, I see that.

David Klos - October 27, 2021

1      Q.    And Mr. Morris asked you whether you see
2   anything in here that says that a prepayment relieves
3   an annual installment.
4            Do you remember that question?
5            MR. MORRIS:  Objection.  That's not what I
6   asked.
7            THE WITNESS:  I don't remember that question.
8      Q.    (BY MR. RUKAVINA)  Reading Section 2.1 and 3
9   together, what would a prepayment apply to other than
10  an annual installment?  Do you have a view on that?
11           MR. MORRIS:  Objection to the form of the
12  question.
13           THE WITNESS:  Again, I struggle with
14  prepayment.  But as I read Section 3, it would be
15  applied first to unpaid accrued interest and then to
16  unpaid principal.
17     Q.    (BY MR. RUKAVINA)  Have you ever in your
18  personal life prepaid a promissory note before -- have
19  you ever in your personal life prepaid a promissory
20  note prior to its maturity?
21           MR. MORRIS:  Objection to the form of the
22  question.
23           THE WITNESS:  I don't know.
24     Q.    (BY MR. RUKAVINA)  Sitting here today, with
25  your CPA, your MBA and you're a CFO of a large entity,

David Klos - October 27, 2021

```
1   you don't understand what a prepayment means?
2           MR. MORRIS:  Objection.  Argumentative.
3           I direct you not to answer.
4           You're going to have ask a different question.
5   That's an argumentative question and it's insulting.
6           MR. RUKAVINA:  What's the privilege on which
7   you're directing him not to answer?
8           MR. MORRIS:  I just said it's argumentative.
9           MR. RUKAVINA:  I'm trying to let you get to
10  your flight.
11          MR. MORRIS:  Ask a proper question.  Don't
12  make this about me.
13      Q.   (BY MR. RUKAVINA)  You were going to answer
14  my question, sir?
15          MR. MORRIS:  No, I'm directing him not to
16  answer.
17          MR. RUKAVINA:  Then we'll end this deposition
18  with a motion to compel.
19          MR. MORRIS:  Okay.  You do that.
20          MR. RUKAVINA:  I'm making a motion to compel.
21  We'll call the judge as soon as we land in New York
22  tomorrow.
23          MR. MORRIS:  You have to read the whole
24  question.  You can ask the question without the
25  verbiage; right?
```

David Klos - October 27, 2021

1      MR. RUKAVINA: And I asked you on the basis
2  of what privilege are you instructing your --
3      MR. MORRIS: Argumentative.
4      MR. RUKAVINA: That's not a privilege.
5      MR. MORRIS: Sir, you can rephrase your
6  question and end this right now by not being insulting
7  to my client.
8      Q. (BY MR. RUKAVINA) I was not trying to be
9  insulting, sir.
10      I'm asking you again, you do not, sitting
11  here today, have an understanding of what the word
12  "prepayment" for a promissory note means?
13      MR. MORRIS: Objection to the form of the
14  question.
15      You can answer that one.
16      THE WITNESS: In the context that you're
17  asking the question --
18      Q. (BY MR. RUKAVINA) No, I'm not asking any
19  context. Sitting here today, do you have an
20  understanding of what the word "prepayment" means when
21  it comes to a borrower/lender relationship?
22      MR. MORRIS: Objection to the form of the
23  question.
24      THE WITNESS: Yes, I have a general
25  understanding.

1      Q.   (BY MR. RUKAVINA)  What is your
2  understanding?
3      A.   That -- you can look at the note.
4      Q.   I'm not asking about the note.  We got to go
5  step by step.
6           What is your general understanding as to what
7  a prepayment means?
8           MR. MORRIS:  Objection to the form of the
9  question.
10          THE WITNESS:  It depends on the context and
11 it's going to depend on what the note says about
12 prepayments.  So I have a hard time answering that
13 question.
14     Q.   (BY MR. RUKAVINA)  So you would agree with me
15 that you have to look at the note before you can answer
16 that question?
17          MR. MORRIS:  Objection to the form of the
18 question.
19          THE WITNESS:  I would want to look at the
20 note before I answer the question, because prepayment
21 is a term that can be used as a defined term or in a
22 casual sense, and those two can sometimes get confused
23 and misconstrued.
24     Q.   (BY MR. RUKAVINA)  Would you agree with me
25 that in any and all circumstances a prepayment is a

David Klos - October 27, 2021

1  payment made prior to the time that it's due?

2      MR. MORRIS:  Objection to the form of the

3  question.

4      THE WITNESS:  Yes, in the most general sense

5  a prepayment, the prefix "pre" indicates that it's

6  before some other event.  So from that standpoint,

7  prepayment means it was to some extent paid early.

8      MR. RUKAVINA:  Thank you.

9      Pass the witness.

10     MR. MORRIS:  No further questions.

11     Michael?

12     MR. AIGEN:  No questions.

13     THE REPORTER:  Mr. Morris, do you want a copy

14  of the transcript?

15     MR. MORRIS:  I sure do.

16     THE REPORTER:  Mr. Aigen, do you want a copy

17  of the transcript?

18     MR. AIGEN:  Yes, we would also like a copy.

19     MR. MORRIS:  Yeah, and I'd like that rush.

20     (Whereupon, the deposition adjourned at

21     5:14 P.M.)

22                     --oOo--

23     I declare under penalty of perjury that the

24  foregoing is true and correct.  Subscribed at

25  _____, Texas, this ____ day  of

1  _____, 2021.

2

3

4  _____

5  DAVID KLOS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

1

2     I, BRANDON D. COMBS, a Certified Shorthand

3 Reporter, hereby certify that the witness in the

4 foregoing deposition was by me duly sworn to tell the

5 truth, the whole truth, and nothing but the truth in the

6 within-entitled cause;

7     That said deposition was taken in shorthand by

8 me, a disinterested person, at the time and place

9 therein stated, and that the testimony of the said

10 witness was thereafter reduced to typewriting, by

11 computer, under my direction and supervision;

12     That before completion of the deposition,

13 review of the transcript was not requested. If

14 requested, any changes made by the deponent (and

15 provided to the reporter) during the period allowed are

16 appended hereto.

17     I further certify that I am not of counsel or

18 attorney for either or any of the parties to the said

19 deposition, nor in any way interested in the event of

20 this cause, and that I am not related to any of the

21 parties thereto.

22     DATED: November 1, 2021

23

24 _____

25 Brandon Combs, Certified Shorthand
Reporter No. 10927 in and for the

HCMFA APP 0790

David Klos - October 27, 2021

1             State of Texas

              Dickman Davenport, Inc. Cert 312

2             4228 North Central Expressway

              Suite 101, Dallas, TX 75206

3             (214) 855-5100   (800) 445-9548

              Email: info@dickmandavenport.com

4             www.dickmandavenport.com

              My commission expires 1-31-23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David Klos - October 27, 2021

| A |
| --- |

**ability** 42:12
43:21 78:2 88:8
88:10
**able** 31:20 32:2
**above-styled**
1:21
**absolutely** 12:4
16:10 77:1 80:1
80:14 90:1,4,10
94:1 115:6
**accepting** 19:17
**access** 99:13
128:25
**account** 53:20
60:3 113:16
**accountant** 26:5
26:9,15,20
39:12,17 90:19
109:5 113:23
**accountant's**
39:13
**accountants**
109:3
**accounted** 38:6
45:8,11 64:23
**accounting** 4:16
6:5,5,11,11
7:14,17,21 8:23
9:3,5,5,9,15,23
10:12 33:22
35:9,16,20
43:18 53:4
62:10,11 70:15
74:22 84:2
107:5 109:2,7
115:1,7,18,21
117:25 118:4
118:16
**accrue** 49:13
**accrued** 38:8
46:8,16,20,25
47:1,4,5,11,14
47:18,19,24,25
48:4,5,7,15

49:4,5,12,20,21
50:8,21 51:3
131:15
**accumulated**
47:22
**accurate** 27:25
85:10
**acknowledgment**
87:21,22
**act** 11:5
**activities** 107:17
**activity** 107:16
**actual** 37:5 85:13
**add** 118:10
**additional** 89:2
**address** 64:7
**addressed** 44:9
127:24
**adjourned**
135:20
**advisor** 9:24 71:7
74:19
**advisor-type** 6:7
**advisors** 1:10
12:14,15,17
13:3,6 27:1
52:19 55:1
60:22 65:23
71:6 72:22 86:6
99:20 100:17
102:21 103:9
121:13,24
122:10 124:18
128:17
**affect** 16:11,12
16:20
**affiliate** 39:23
122:20,25
**affiliated** 10:21
34:8 35:4,11
36:2 61:15
**affiliates** 38:5
51:20 121:25
**AFR** 86:7
**afternoon** 95:22

**agent** 85:16
**ago** 19:6 34:25
36:20 39:21
43:5 94:20
95:11
**agree** 8:11 47:10
47:11 51:7 77:2
89:19 134:14
134:24
**agreement** 12:23
84:11 96:4,8,23
97:9 98:5,12
104:8,9 109:22
110:7 128:1
**agreements** 41:3
97:16,23 98:1
**agrees** 48:7
**ahead** 45:7
**Aigen** 2:18 3:4
95:18,22,23
99:8 100:3,10
100:12,14,24
101:14 102:4
102:18 103:20
104:23 105:24
106:3 108:11
109:15,20
135:12,16,18
**Akard** 1:24 2:4
**aleck** 50:7
**alleged** 97:22
98:5
**Allocation** 70:25
74:12 75:6
**allow** 75:4
**allowed** 46:13
81:22 82:1
94:16 96:20
137:15
**allowing** 96:8
**amortization**
23:16 28:1
**amount** 15:5,15
37:5 47:22
59:13 73:2

80:21 84:14
97:12 123:11
**amounts** 28:24
41:7 122:8
**analysis** 30:9
53:25 54:6,9,18
55:1,8 89:13
**analyst** 5:17,25
**and/or** 40:12
67:7 91:22
**annual** 23:22
80:9 112:8
114:7,12 121:3
125:23 130:22
130:23 131:3
131:10
**answer** 16:23,25
17:2 20:18,20
21:3,15 22:1
25:5 28:10
35:16 41:18
50:11 53:24
55:15,23 71:5
78:11 79:7 87:7
94:13,14,17,21
104:22 128:15
130:10 132:3,7
132:13,16
133:15 134:15
134:20
**answered** 21:2
41:17 56:11
76:19 85:21
91:10 92:5,6
94:9 125:19,20
**answering**
134:12
**answers** 9:18
16:10,13
**anybody** 24:13
60:1 80:16
111:12,16
112:13,25
113:2 116:22
119:2,11 120:5

122:10,22
126:7,12
**anymore** 57:1
61:22 62:7
**AP** 115:14
**apologize** 9:21
27:22 63:11
66:21 77:1
**apparatus** 12:9
**APPEARANC...**
2:1
**appeared** 2:5,12
2:19
**appears** 49:3
64:2
**append** 117:12
**appended** 137:16
**application** 37:8
37:9,15,16
**applied** 39:17
46:8,9 48:11,14
49:5,8 64:13,16
65:1 131:15
**apply** 38:24
131:9
**Appreciate**
100:13
**appropriate**
35:19,22
**approval** 66:14
77:19,23 78:3
78:21 79:3
126:15
**approvals** 80:9
**approximate** 6:1
63:2
**approximately**
5:9 105:10
**April** 7:13,22
11:16,21 88:9
**areas** 107:21
**argumentative**
90:15 132:2,5,8
133:3
**art** 8:1 9:3 10:12

ascertain 45:2,4
asked 16:18 20:5
  21:2 30:18
  41:10,17 44:10
  54:13 55:17,22
  56:11 57:12,15
  59:12 70:9
  76:19 84:8,17
  85:21 86:10
  91:10 92:5 94:9
  108:11 110:18
  114:3 121:24
  122:1 129:13
  130:19 131:1,6
  133:1
asking 18:11
  20:21 28:6
  38:20 56:9,13
  61:5,7 77:13
  83:22 94:15
  100:9 125:18
  133:10,17,18
  134:4
aspect 118:20
ass 17:18
asserted 97:7
  98:8
asset 15:7
assets 15:3 87:10
  87:12 97:12
  107:12
assist 42:13
assistance 31:13
assistant 6:24 7:4
  7:7,10 8:8
assisted 22:23
assume 28:7 29:7
  90:6 95:18
  101:21
assumed 7:14
  53:3
assuming 36:14
  36:21 41:23
  64:1
assumptions

54:14
attach 128:10
attempt 87:7
attention 123:25
attorney 2:5,12
  2:18 137:18
audit 9:25 24:6
  80:4 116:10
audit-driven
  88:5
audited 116:13
  116:17,24
  119:8,14,19,25
auditor 24:3
auditors 24:5
  88:6,14
aughts 106:13
August 42:16
  44:13
authenticate 28:5
authenticity
  67:23
authoritative
  65:1,2
authority 36:9
  77:3,13,15 78:7
  78:21,25
authorization
  108:10
authorize 77:4
authorized 40:2
  59:15 69:6,25
  85:24 108:5
  112:20 113:15
  119:4
authorizing
  94:20
Avenue 2:11,17
aware 35:6 58:24
  59:2,3 80:18,21
  96:6,10,12
  97:15 100:24
  101:5,8 102:7
  103:20,24
  106:6,20

109:23 115:12
116:16 119:24
121:2 122:3
123:1,13 124:7
126:11
awfully 17:20

**B**
back 6:14 15:19
  22:12 23:21,25
  36:11 40:18
  49:17 51:13
  55:16 65:12
  67:4 68:25
  82:23 83:19
  84:4 85:12
  102:13 128:6
back-end 15:19
  15:21
back-ended
  14:25
background 4:13
  53:2 70:5,6,7
backup 36:19
bad 20:12 89:15
balance 49:6
  80:6,8 120:12
  120:19
ballpark 85:24
bank 36:17 99:13
bankruptcy 1:1
  31:19 80:10
  96:15 98:12
  102:14 104:12
base 14:5,7
based 14:11,14
  32:12 37:17
  46:5,7 48:12,19
  54:14 104:14
  104:16 118:12
basically 6:3
  31:13 56:1 81:5
basis 23:22 30:2
  133:1
Bates 83:15

117:17
began 5:11
beginning 109:4
behalf 2:6,13,20
  12:24 25:2 78:2
  78:22 79:1
  111:13 112:15
  112:21
beings 71:19
belief 104:16
believe 6:23
  15:11 16:3 17:3
  17:8 18:2 19:23
  21:13,13 22:20
  23:13,19 24:16
  26:13 49:9 51:1
  51:2 74:16
  77:17 78:1,7,19
  81:8 83:1,3
  86:25 102:6
  111:10 115:24
  121:11,16,22
  122:1 125:14
believed 35:10
  57:6 113:17
beneficiaries
  17:10,15
benefiting 73:9
best 5:25 8:3
  52:15,17 55:7
  63:24 64:4
  78:16,17 85:8
  95:19 109:21
  110:6 111:9
  115:4 116:20
  116:25 119:9
  119:16 120:4,9
  120:16,21
  123:20 125:6
  126:2
better 111:19
biggest 123:6
bill 74:20
bills 82:4,5,10,11
birth 4:9

bit 7:9 12:12 14:2
  30:15 33:12
  39:3 48:1 98:15
  106:23 107:5
Blair 115:10,14
  118:7
board 120:25
  121:20,23
  122:4
boards 122:11
bold 40:25
bonus 14:8,9,10
  14:19,24 15:14
  18:5 90:21
book 33:21 34:12
  34:20
booked 32:23
  33:11 34:9 35:5
  35:20 36:24
  44:23 90:8
  116:4,8 118:24
books 80:7
  110:24 111:4
borrow 78:22
borrower 45:6,15
  45:19,24 46:2
  130:4,5
borrower/lender
  133:21
borrowing 120:7
boss 39:13
Boston 4:15 5:8
  5:10
brain 32:9
Brandon 1:22
  137:2,25
break 7:6
bridge 29:22
  30:6
briefly 13:5
bring 49:6
broad 9:22 35:17
  61:3 107:21
broader 76:8
broken 53:16

brokers 10:17
brought 6:4,14
    31:3,7 97:15
bucks 74:25
budgeting 6:8
burn 130:20
businesses 30:1
busy 11:15,19
    128:10

**C**

call 6:4 11:11,13
    38:10 63:14
    90:16 132:21
called 9:24 58:21
    59:11 70:24
    74:16 88:7
    109:5 112:9
calling 90:24
Calls 112:3
capital 1:6,9 5:11
    6:6 8:4 13:6
    23:22,23 26:19
    26:23 27:1 29:4
    29:19 32:6,23
    35:3 37:25 71:6
    107:2 110:8
car 82:9
career 11:20
careful 17:21
carry 110:24
case 43:20 86:24
    89:18 103:11
    105:17 124:14
    130:2
cash 9:25 23:21
    23:24 25:23,24
    26:7 31:9,10,12
    31:14,16,23
    32:8,12,14
    41:15,24 42:12
    42:23 43:5,22
    43:24 44:1
    57:25 61:25
    63:2 73:20

88:12,17 93:7
93:20,21 107:6
107:16 109:7
111:3 129:8,10
casual 134:22
caught 62:5
cause 1:21 137:6
    137:20
caused 79:12
    81:10
causes 82:9
Central 138:2
Cert 138:1
certain 5:17
    11:13 12:21,21
    13:12 23:14
    33:13 38:1
    54:14 67:21
    70:12 83:9
    95:11 96:9
    97:10 98:17
    99:14 101:1
    103:22 106:18
    109:24 111:20
    128:8
certainly 6:18
    9:17 12:3 20:10
    26:4 30:11
    32:16 34:4
    35:18 37:23,24
    42:11 50:4 58:8
    62:14 69:1
    77:13,24 86:22
    101:8,10,12
    108:8
certainty 29:13
    42:19 68:18
    69:8,11,24 70:2
    102:19 103:10
    103:12 108:7
    121:16
CERTIFICATE
    137:1
Certified 137:2
    137:25

certify 137:3,17
cetera 6:1 14:20
CFO 5:21,25
    8:18 48:6,21
    131:25
chain 53:5
chance 69:4
change 8:8 16:10
    46:10 59:1
    84:13 103:25
changed 6:18
    39:11 84:16
changes 7:1
    137:14
Changing 106:23
characterize 54:1
    76:10 87:18,19
characterized
    54:2
charge 6:15 10:3
chief 7:13,17,21
    8:23,23 9:3
    10:12 13:20,22
    53:3
circumstance
    51:1
circumstances
    31:2 134:25
claim 81:1,9
claimant 15:16
    18:6
clarification
    124:19
clarify 11:3 12:8
    53:1 66:18
    75:25
clear 17:21 26:19
    27:11 29:14
    52:24 63:9
    69:15,16 73:13
clearly 74:2
client 133:7
clients 17:25
Cliff 7:23
close 17:21 33:14

98:3
closed-end 74:14
closely 62:4
coach 100:11
coaching 100:10
    100:13
cold 46:6
collect 81:17
collected 81:19
collectible 87:15
collecting 15:16
    81:6,6
collection 87:25
collective 52:2
college 4:15 5:6
column 36:25
    37:7
combination
    39:16 45:12
combine 106:24
Combs 1:22
    137:2,25
come 47:12 53:7
    59:19 65:3,5
    76:22 101:6
    117:9,19
comes 133:21
comfortable 88:6
coming 17:20
    36:13 118:9
command 53:5
commencement
    112:14 126:19
comment 17:13
commission
    138:4
common 30:5
    86:5
communicated
    95:12
communicating
    53:9
communication
    83:10
communications

121:20
company 81:14
    122:16,23
compel 132:18,20
compensate 72:8
    72:12 79:14
    89:20 110:15
compensated
    17:16 110:2,3
compensation
    14:3,6,8,19
    15:14 16:4,12
    16:16,21 17:4,8
    17:24 18:5
    60:18 73:8,12
    79:25 90:2,12
    90:17 105:21
complete 15:3
    74:23 106:11
completed 15:22
    15:25 16:2
    74:21
completely 15:24
    27:25 89:9,15
    90:7 115:17
completion
    137:12
complex 108:24
    108:25 109:2
compliance 6:8
    72:4
comprehend
    129:20
computer 137:11
computerized
    1:24
concept 89:16
concern 23:23
    24:1,2,4 56:21
    56:23,25 62:17
concerning 17:7
    63:20
conclude 80:25
concluding 24:6
conclusion 94:25

112:4,10
**condition** 96:4
**conditional** 97:11
**conduct** 69:18
**confer** 26:4
**confident** 69:5
**confirm** 59:17
61:19
**confused** 41:6
134:22
**confusion** 11:6
**conjunction** 24:5
**connection** 24:12
26:2
**consent** 74:16
75:23 80:2
85:15 90:3
93:16
**consented** 74:17
**consequence**
104:20
**considerations**
16:1 60:10
**constant** 75:15
**construct** 90:2
**consultancy** 11:9
11:11
**contended**
113:10
**context** 133:16
133:19 134:10
**contingent** 14:11
**continue** 17:22
100:8 110:24
**continued** 111:2
**continuously**
6:17 29:22
**contract** 71:10
**contracted** 71:15
**contradict** 79:18
**control** 43:2
90:10
**controlled** 89:8
**controller** 6:24
6:25 7:4,4,8,8

7:10,10 8:4,8,9
8:12,15 9:11
10:10,12 12:19
13:10,17 48:6
**conversation**
18:22 19:9,19
43:15 51:25
70:14 91:25
93:18 94:24
103:18 105:18
111:11,16
**conversations**
18:23 19:11
20:2 34:11 42:6
51:25 93:19
96:16,19,22,24
97:20,22 98:2,5
102:9,12,13
104:24 105:5,7
105:11,16,21
124:3
**conversion** 74:15
74:17,21
**converted** 74:13
**conveyed** 102:25
103:1
**coordinated**
22:21
**copied** 127:10
**copy** 135:13,16
135:18
**corporate** 6:5,15
9:9,15 25:22
33:8 35:9,16
39:12,13,16
43:17 61:14
62:11 70:15
73:20 84:2
109:1,6 115:1,7
115:18,20
117:25 118:3
118:16 122:20
122:25
**correct** 5:22,23
8:19,21 9:20

16:17 40:2 42:1
45:25 51:11
61:10 64:25
68:10 69:2
82:21 88:11,17
88:23 91:2
97:18 99:17
101:21,22
105:23 124:21
125:6 127:16
135:24
**corrected** 127:19
**correctly** 5:16
51:13 62:9
**cost** 97:13
**counsel** 2:6,13,19
18:10,20,25
20:3 21:16
22:21,25 23:3
96:17,20,22
97:21 98:1
137:17
**couple** 61:20
87:14 123:2
129:13
**course** 20:3 33:19
51:9 66:12
69:18 83:22
84:4,6
**court** 1:1 117:8
**courteous** 76:24
**covered** 20:14
53:2
**CPA** 4:19,22
44:21 48:6,20
49:11 131:25
**CPAs** 95:4
**created** 80:10
**credit** 6:8 25:9
40:11 89:13
90:11
**creditors** 15:17
**CSR** 1:23
**curiosity** 59:21
**current** 4:25

**cut** 109:8
**cycle** 41:7

**D**

**D** 1:22 137:2
**D-CNL003763**
117:17
**Dallas** 1:3,25 2:4
2:18 4:12 5:10
138:2
**damages** 82:12
**date** 4:9 8:6
24:22 45:20
47:5,6,23 48:25
49:13,13,14
84:14 123:23
125:1
**dated** 114:23
137:22
**dates** 27:10 28:18
28:24 111:17
**Davenport** 138:1
**David** 1:14,18
4:1,6 136:5
**Davor** 2:5 76:22
**day** 29:21 32:1
34:1 59:7 74:8
93:18 117:2
135:25
**day-to-day** 9:17
62:6
**days** 59:5 76:2,7
**de** 127:22
**dealing** 29:20
128:19
**debtor** 26:21
32:23 38:6,22
38:23 76:16
77:3,5,8 78:2
81:1 87:14
88:16 116:22
**debtor's** 111:4
116:13,17
119:8
**debts** 89:3

**December** 24:20
24:23 51:10,15
51:22 53:18
54:24 56:17,22
57:6,13,17,21
58:7,9 60:20,25
61:21 63:19
98:18,18,24
99:19 100:15
101:1 102:17
103:23 113:2,3
120:2 124:1,9
**decide** 38:23 39:5
90:12
**decided** 24:9,12
24:14,15 32:7
64:22 77:18
84:25 86:1
**decides** 38:22
**deciding** 64:15
69:18
**decision** 27:2
30:25 86:5
**decision-making**
32:10
**decisions** 29:8
30:9,16
**declare** 135:23
**deduction** 73:9
**default** 58:13,17
61:14 62:18
**defendants** 1:11
1:20 2:6,20
96:3,6
**defense** 80:15
96:3,7,13,23
97:5,7 98:1
**defenses** 96:10
96:18
**defer** 103:13,18
**define** 47:18,20
**defined** 104:8
134:21
**definitely** 6:21
7:12 73:6

definition 38:11
104:13,14
definitive 50:11
definitively 15:20
degree 4:16
degrees 4:14
Deloitte 5:8,8
demand 23:13
86:3,8 87:14
88:15 127:14
128:2,23
demanded 129:4
deny 67:22
department 9:7
84:9
depend 15:15
17:6,9 134:11
depending 31:2
32:15 89:11
depends 16:5
134:10
deponent 137:14
deposition 1:13
1:18 18:9,24
19:16,22,24
20:5,9,14,16
21:1,7,9,12,19
27:20 132:17
135:20 137:4,7
137:12,19
describe 8:2
54:11,13
described 13:16
54:10 69:6 72:1
87:23,24 92:2
109:24 110:13
114:11
describes 119:4
describing 33:7
detail 54:5 58:2
determination
60:17
determine 38:16
determined
40:21

determining
89:13
Dickman 138:1
differed 54:10
difference 49:7
76:6
differences
107:14
different 30:5
34:15 38:21
44:11 74:9
77:12 99:11
107:11,12,17
125:19,20
128:18 132:4
direct 9:15 20:17
20:19 34:13
78:13 132:3
directed 20:22
51:19 60:21
68:19,20,21
69:1,3 125:23
directing 132:7
132:15
direction 33:2
34:2 35:23
54:15 55:18
62:24 65:1,2
94:25 102:23
102:24 137:11
directions 103:19
directly 103:19
disagree 89:19
99:21 100:18
disciplinary 5:3
disciplined 5:2
discuss 20:4 97:2
discussed 15:8
21:16 90:1
93:15,17 94:1
97:4,6
discussing 42:3
65:9 77:25 92:4
92:8,11 93:3,10
discussion 19:21

31:4,7 39:21
57:18,22 58:3,4
60:1,5,8 62:20
63:1,20 92:14
101:20
discussions 19:3
21:8 24:13
30:24 41:13
59:22 63:22
103:2
disinterested
137:8
dissimilar 14:21
dissuade 62:23
distinct 10:10
distribution 59:9
83:5
DISTRICT 1:2
dividend 105:8
DIVISION 1:3
document 44:21
46:23 50:15
64:6,12 76:23
76:23 79:17
84:10 88:2
96:15 117:5
documents 67:8
76:20
doing 6:5,11 9:24
25:18 85:14
86:17 89:13
95:2
dollar 28:18 75:2
75:2
dollar-for-dollar
73:4
dollars 18:1
123:9
Dondero 2:20
24:11 29:15
30:8,19 32:7
33:21 34:2,7,18
38:4 39:24
40:10 41:14
42:3,7,10 43:2

43:7,10,16,25
51:18 52:4,7,19
53:12,15,16
54:18,24 55:9
55:17,25 56:3
56:10,15 60:21
61:24 62:23
65:3,24 69:9,12
70:15 74:3 76:1
76:13 77:2,25
85:1,19 89:18
90:9 91:14,17
91:21 92:9,14
92:23 93:3,10
93:25 94:2,5
95:1,24 98:11
98:11 101:7
104:24 105:16
105:21 112:20
113:8,14 116:6
116:21 121:12
122:9 124:8
125:10,22
126:16
Dondero's 62:11
73:6 76:9 77:19
78:3,21 79:3,11
79:18
double 81:5
doubt 35:21 36:8
dozens 65:16
draft 24:16
drafted 22:21
drafting 58:17
DRIP 105:8
driven 42:19
drukavina@m...
2:7
due 25:16,19
37:12,18 47:12
49:12 51:10,14
74:20 76:22
98:18,24 111:1
111:7 112:1,6
112:16 113:11

113:17,24
121:24 124:10
124:11 125:4
125:12,24
126:4,10,14
135:1
duly 1:19 4:2
137:4
duties 9:12 62:6
126:21
duty 25:9

**E**
earlier 17:13
49:14 75:13
98:16 101:6
111:13 123:3
earliest 128:1
early 51:22 54:24
60:20 87:1 89:2
111:5,21 135:7
educational 4:13
effect 41:14
62:18,21
129:23
effective 125:1
effectively 49:22
75:5
effectuate 99:13
112:21 126:14
effectuated 99:3
eight 117:13
either 21:18 26:3
26:25 29:12
30:16 31:10,16
35:23,25 38:8
39:12 48:19
50:12 68:14
69:1,3,9 79:24
84:21 86:12
105:25 125:22
137:18
electronically
84:22
eliminate 111:14

email 2:7,14,22
54:16 59:8,9
67:14,15,18,21
69:4,7 70:13,16
82:23,25 83:7
83:10,11
114:23 115:2,5
115:13,18,23
117:7,15,16,18
117:22,24
118:4,6,12,20
119:5 127:5,7
127:10,12
128:11,20
138:3
emailed 59:11
emails 80:13
employed 122:18
employee 12:23
26:17,21,24
123:22
employees 43:11
72:2 98:8 106:7
106:12 107:8
107:20 123:16
employment
78:13
ended 120:1
ensure 23:20
enter 78:25
entered 98:11
enterprise 30:1
32:18
entire 12:9
115:17,20
entities 6:7 25:24
26:16 30:6
31:11,16 34:8
61:15 65:18,22
65:22,24 99:6
101:1 102:20
103:8 106:24
107:18,25
108:17,19,21
108:25 121:18

entitled 17:23
18:10 20:4
entity 12:20 13:8
13:11,13 30:20
31:20 32:7,15
32:17 34:19
35:4,11 36:2
40:10 42:10
75:8,10 90:10
109:13 131:25
equal 86:6
130:22
equity 79:24
90:22
error 70:25 71:2
71:19,25 72:13
72:14,19 73:4
79:15 80:20
81:1,14 85:22
89:20 90:3,3
92:11,16,17,18
errors 71:9 72:20
72:21 73:16
especially 15:4
established 51:4
75:13 76:11,12
78:12
estate 107:13
estimate 11:22
et 6:1 14:20
event 116:17
119:10,13
120:1,7 135:6
137:19
events 16:20 96:9
eventually 32:2
evidence 80:14
111:5,9 116:20
116:25 119:9
119:16 120:4,9
120:16,21
evolved 6:18,21
exact 7:5,11
15:24 20:16
94:19

exactly 5:18
14:24 15:23
34:3 48:2 77:23
80:16
**Examination** 3:3
3:4,5,6 4:3
95:21 109:18
127:1
example 31:6,9
37:6 48:25
exceeded 87:10
123:12
exception 16:8
17:1 44:2,3
excess 41:15
exchange 128:12
exclude 18:22
exclusively 23:13
33:14,14
excruciatingly
73:13
excuse 37:1 74:25
executed 24:18
31:1 70:22 84:3
124:24
execution 22:7,13
22:20 24:23
83:21 84:19
85:6
executive 26:14
exhibit 22:4 23:8
27:9,15,23
36:12 40:20
42:17 44:13,22
46:12 48:12
49:1,10 64:2,5
67:17 68:4
82:24 83:20
114:1,22 127:2
129:12
exhibits 3:10
67:2,7 68:1
existing 7:13
23:13
expand 59:7

expect 17:12
64:12 65:4
83:12 86:21
expectation 15:1
expected 126:13
expenses 73:7
experience 5:5
37:18 38:14
46:19 49:11
104:16 130:2
expert 82:21 87:6
expertise 48:20
expires 138:4
explain 8:22
64:13 107:1
explaining 92:25
explore 12:12
express 14:19
**Expressway**
138:2
extended 7:12
extending 14:17
extent 31:10,12
60:24 61:8
66:10 86:23
135:7
extrapolating
92:24

_____
**F**
FA 88:7
face 71:16
facile 15:24
facilitate 25:18
31:15
facility 6:8
fact 29:6 58:23
58:23 76:14
79:21 94:23
101:9 112:19
128:20
failed 58:18
failure 126:20
fair 16:15 35:8
60:9 65:15

91:16 97:14,23
99:1,15 104:17
105:15,20
115:16 123:20
fairly 9:22 30:4,5
84:7
fall 80:10 121:20
familiar 21:23
22:5,6 28:1
67:1 82:15
104:1 114:17
116:13 119:21
far 5:1 24:15
37:5 58:23 62:6
84:11 87:9
fault 81:10
faulty 43:3
February 80:19
113:10 126:8
126:12
fee 74:16,18
75:23 80:2
85:15 90:3
93:16
feel 54:5 69:5
feels 35:17 82:22
fight 53:17
file 80:11
final 30:9
financial 8:23
13:20,22 87:20
116:14,17,24
119:8,14,19,22
119:25
financials 122:1
122:4,7
find 26:13 31:15
67:14 129:17
fine 21:10 39:3
90:21 106:25
**FINRA** 4:21
firm 95:23
first 4:2 37:2,4
42:22 46:14
48:14 49:5 50:7

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 72:14,19,19 | 33:24 34:21 | 30:15,17 35:23 | 93:7 | 105:24 127:2 |
| 75:14 96:2 | 35:13 36:4 | 35:25 36:10 | | 134:4 |
| 110:20 131:15 | 37:20 38:17,25 | 44:7 52:1 53:7 | **G** | **goes** 28:9 40:18 |
| **five** 105:3 126:25 | 39:7 40:3,14 | 53:8 54:15 55:9 | **gearing** 53:17 | 87:9 |
| **flag** 10:4 | 42:24 43:19 | 60:20 61:14 | **gears** 65:8 | **going** 14:2 15:5,6 |
| **flavoring** 63:14 | 44:16,24 45:9 | 68:14,14 69:1,3 | **general** 18:13,15 | 16:9,12,15,19 |
| **flight** 132:10 | 45:17 46:21 | 70:13,14 77:13 | 19:9,10 20:11 | 17:5 20:19 |
| **flip** 37:1 | 47:8,15 48:8,22 | 77:15 80:12,13 | 20:13 32:20 | 28:17 32:10 |
| **flipped** 9:20 | 49:15 50:13 | 93:6 101:7,18 | 33:19 61:4 | 36:11,12 42:22 |
| **Floor** 1:25 2:11 | 51:5 52:21 | 101:23 102:3,4 | 92:11 93:4 | 46:11 49:13 |
| **flow** 23:21,25 | 53:22 54:7 55:3 | 102:8,9,11 | 96:24 97:6 | 55:16 57:11,14 |
| 26:7 88:17 | 55:12,19 57:8 | 121:22 127:19 | 104:4,5 108:20 | 62:18 65:8,9,10 |
| 96:15 | 60:12 61:1 63:5 | **Frank's** 39:18 | 133:24 134:6 | 65:12 68:1 70:5 |
| **focus** 8:14 65:10 | 64:9 65:19,25 | **Frankly** 48:10 | 135:4 | 74:22 79:9 |
| **focused** 6:7 | 66:7,15 69:20 | **fraud** 81:5 | **generally** 19:25 | 82:23 83:11,19 |
| **follow** 16:18 | 71:3,12,20 | **frequent** 84:1 | 27:24 30:4 | 88:7 89:20 |
| **follow-up** 128:17 | 76:18 77:6,20 | **Friday** 118:1 | 32:21 38:4,4 | 106:23 107:17 |
| **followed** 116:11 | 77:23 78:4,23 | **front** 10:17 44:8 | 40:2,11,16 | 108:20 111:17 |
| **follows** 4:2 | 79:5,19 81:2,11 | 67:20 68:5 72:3 | 42:15 45:8 | 117:5 118:13 |
| **forecast** 126:3 | 81:23 82:6,13 | **full** 57:3 106:18 | 77:22 96:5,10 | 127:6 129:12 |
| 129:1 | 84:11,12 87:3 | **full-service** 107:5 | 96:12,17 98:20 | 132:4,13 |
| **forecasting** 6:8 | 88:18 89:5 | **full-time** 12:3 | 105:1 107:1 | 134:11 |
| **forecasts** 9:24 | 90:14 91:3,9 | **function** 72:2 | 108:18 110:22 | **good** 73:20 95:22 |
| 44:1,4 126:3 | 93:13 94:8 95:5 | **fund** 1:9 6:11,11 | 116:15 119:21 | 96:1 100:12 |
| 129:9 | 99:4,23 100:19 | 9:5,5 13:6 | **generallys** 40:6 | **grad** 5:7 |
| **foregoing** 135:24 | 101:3,25 | 70:24,25 71:1,6 | **generating** 42:12 | **graduate** 4:14,15 |
| 137:4 | 102:15 103:15 | 71:7,8 72:8 | **Germans** 63:14 | 6:16 9:9,14,15 |
| **foreign** 89:15 | 104:18 108:2 | 73:15 74:11,12 | **getting** 10:4 | 9:21 10:7,9,14 |
| **forgave** 123:15 | 128:13 130:7 | 74:13,13,14,17 | 23:24 44:8 | 10:15,24 11:7 |
| **forget** 86:7 | 130:16 131:11 | 75:2,6 80:20,23 | 51:13 59:8 | 35:9 43:18 |
| **forgetting** 9:8 | 131:21 133:13 | 81:16 86:5 | **give** 5:21,24 14:4 | 61:21 62:10,11 |
| **forgive** 123:22 | 133:22 134:8 | 109:3 | 16:13 39:3 | 83:5 109:3 |
| **forgiven** 96:8 | 134:17 135:2 | **funds** 10:21,22 | 67:25 | 110:24 115:2,5 |
| 106:7,16,17,20 | **found** 61:18 | 12:13 29:9 30:2 | **given** 15:5 43:2 | 115:18,21 |
| 122:19,24 | **foundation** | 30:19 31:20 | 43:22 47:23 | 117:25 118:16 |
| 123:11,11 | 113:20 125:17 | 34:8 35:11 | 70:12 73:21,22 | 126:8 |
| **forgiveness** 97:10 | **four** 6:13 128:23 | 75:24,24 76:1 | 74:1 102:8 | **groups** 6:19,20 |
| 97:17 122:14 | **frame** 4:24 7:11 | 80:9 85:14 | 123:3 129:2 | **guess** 8:8 88:24 |
| **forgiving** 123:7 | 7:12 8:10,14,24 | 128:19 | **global** 52:25 | 104:21 |
| **form** 6:16 8:25 | 12:6 20:12 24:8 | **further** 3:6 24:19 | 70:24 74:12 | |
| 11:17,24 12:25 | 25:1 66:12,20 | 84:18 126:24 | 75:6 101:13 | **H** |
| 14:12 21:24 | 67:16 106:13 | 127:1 135:10 | **go** 15:19 16:1 | **half** 5:9 94:20 |
| 22:8,15 23:10 | 123:18 | 137:17 | 20:1 43:6 54:4 | 95:11 110:20 |
| 25:3,11 27:4 | **Frank** 8:17 11:1 | **future** 17:4 45:16 | 65:12 81:9 | **half-million** |
| 29:10 32:25 | 20:9 29:13 | 49:13,20 53:17 | 82:18 85:10 | |

123:9
**hand** 90:9
**handled** 11:9
  26:21 35:9 40:8
**handles** 11:7
**hands** 57:2
**happened** 35:25
  47:13 59:2,4
  93:8,11
**happening** 27:14
**happens** 47:13
**happy** 55:22
**hard** 15:4 18:1
  26:13 47:20
  63:7 71:5
  134:12
**harder** 11:13
**HARDT** 2:3
**HARR** 2:3
**hat** 43:15
**hate** 57:1 97:4
**Hayley** 83:21
  118:10
**HCM** 76:16
**HCMFA** 13:6
  53:20 65:10
  68:8 71:10,17
  72:8,8,12,12,24
  73:3,5,7,14,17
  73:21 74:10,24
  75:1,1,21 76:11
  76:16,17 78:14
  78:22 79:1,13
  79:14 80:2,20
  80:22,25 81:15
  85:16 87:2,5,9
  87:15 88:10
  89:2,3,12,13,20
  90:17,21,23
  91:23 92:19,20
  93:16,21,23
  110:2 115:8
  118:8,13,14
  119:18 120:6
  120:11,18,24

121:7 127:13
127:17 128:1
128:23
**HCMFA's** 70:23
  119:25
**HCMLP** 10:21
  29:4 42:20 60:2
  68:8 71:17 72:2
  72:2,23 76:2
  80:1 94:1 104:8
  109:24 110:3,4
  110:12,15,16
  113:15 115:8
  118:8,13
  121:25 122:8
  125:11,23
  126:20 128:1
**HCMS** 2:20
  95:24 98:23
  99:8,10 107:3,4
  107:5 109:21
  109:25 110:3
  124:22
**HCRE** 2:20
  95:24 98:23
  99:8,10,21
  100:17 107:3
  107:11,20
  108:6,12,22
  110:6,7,10,12
  110:15 124:20
**he'll** 94:14
**head** 62:15
  107:10
**headers** 36:25
**hear** 52:4 113:8
**heard** 30:17
  62:16 74:3
  91:14,17,21
  122:22 125:18
**hearing** 101:10
**hearsay** 79:17
**heavy** 107:13
**hedge** 6:11 30:15
  33:12

**held** 6:16 10:20
  121:10,12
  122:20,25
**hell** 74:24
**help** 33:2 65:22
  66:20 67:16
  100:4
**helped** 105:9
**helping** 31:14
**Hendrix** 9:16
  18:16,19,24
  20:3 27:19
  39:13 52:11
  84:17 99:2,18
  100:14,25
  103:3,14
  117:25 124:4
**hereof** 48:16
**hereon** 48:15
**hereto** 137:16
**hesitate** 64:17
**hesitating** 106:16
**hey** 42:23 85:9
**hierarchy** 10:25
**high** 105:5
**Highland** 1:6,9
  5:11,12,14,22
  6:6 7:25 8:4,12
  8:16 10:14,18
  10:20 11:23
  12:6,8,9,23
  13:4,5,14,17,18
  13:21 14:3,22
  15:2,15 16:5,6
  17:5,6 23:2,21
  23:21,22,23
  25:2 26:17,18
  26:19,23,25
  28:2 29:4,18,20
  29:24 31:12,17
  32:6,23 33:3,4
  33:7 34:7,19
  35:3,4,10 36:2
  36:24 37:10
  39:22 40:22

41:2,2,12,16,24
42:5,20,22 43:6
43:7,9,10,12,16
44:5 49:11
50:19 51:2,4,19
51:20 58:13,21
59:9 64:24
65:18,21 70:24
71:6,11 72:7,10
74:12,25 75:8
75:10,12,14,23
75:24,25 76:4,5
76:12 79:8,25
80:2,7 81:18
84:9 88:14 89:1
89:4,12 90:4,5
90:22 92:19,22
93:23 97:11
104:11 105:22
106:6 107:2,24
109:22 110:8
112:20 119:12
122:19,19,23
123:7,14,21
125:4 126:14
**Highland's** 42:13
  51:9 72:13,14
**history** 62:2
  116:3,7 118:22
  119:2,12 120:5
  120:17
**hit** 82:3
**hits** 82:9
**HMS** 99:21
  100:17
**hold** 4:18 121:15
**honestly** 58:22
**hope** 43:20 82:7
**hopelessly** 53:16
**Houlihan** 71:23
**hours** 11:22 12:6
  12:7,10
**housed** 72:2
**human** 71:19
**hundred** 23:14

28:5 30:10,11
33:13 68:18
69:5,11 92:3
102:19 106:18
**hundreds** 65:16

**I**

**idea** 7:24 57:10
  89:12 108:13
**identified** 72:25
**illiquid** 11:13
**important** 44:6,7
  59:18,20 93:22
**importantly**
  85:15
**impossible** 80:24
  91:25
**impression** 52:24
**in-house** 23:3
**inappropriate**
  81:20
**inartful** 77:16
**incidental** 128:21
**include** 52:18
  107:25
**included** 85:12
  115:5 116:16
  116:23 118:3
  119:8,13,25
  120:7,12,19
  122:5,7 126:3
**including** 79:14
  115:17
**inconsequential**
  127:23
**incorrect** 55:5,6
  55:11
**INDEX** 3:1
**indicate** 44:22
  80:7,16
**indicates** 135:5
**individual** 31:8
  52:2 72:24
**individuals**
  106:19 123:3

inflow 59:8
info@dickman...
138:3
informal 83:25
105:14
informally 62:5
information
59:16 129:1
informed 62:10
102:3
inject 90:22
ink 84:23
insinuation 16:9
17:1
insolvent 87:2,6
installment
110:25 111:7
112:1,8,16
113:4 114:7,12
125:12,23
126:4 131:3,10
installments
14:22 130:23
instance 1:20
31:20 34:11,16
34:18 35:25
39:22 42:22
68:24 86:22
instances 32:5
65:16 71:8 91:5
institutional 9:5
instruct 115:7
instructed
125:11
instructing 85:9
133:2
instruction 52:25
61:13,24 62:12
62:17 99:19
101:6,13,17,23
102:3,5,8,20
103:7 124:7
125:15
instructions
100:15 103:14

103:22
insulting 132:5
133:6,9
insurance 80:20
80:22 81:5,6,9
81:14,19 82:4
82:10,19
intended 44:15
44:19 111:6
130:3
intent 95:12
interco 68:8
115:22
intercompany
32:22 41:3
65:17 68:9,11
68:12 69:10
interest 37:4,8,13
37:15 38:9
40:12 45:12
46:8,8,16,20,25
47:1,4,4,11,12
47:13,14,18,19
47:20,21,24,25
48:4,5,7,15
49:4,6,12,12,20
49:23 50:9,21
51:3 86:2 111:3
131:15
interested 83:13
137:19
internal 22:21,25
internally 96:16
investment 74:19
investments
107:16
investors 74:17
75:5
involved 10:7
25:14,24 60:17
iota 16:13
irrespective
90:11
issue 29:18 36:20
43:7,8,17 93:10

105:17 108:1
113:12 124:13
issued 124:16
issues 75:15
79:23 121:6

**J**

Jack 106:15
January 29:16
42:16 44:13
58:11,15,25
59:23 60:2,23
61:7,18 112:22
113:3,16
Jim 2:20 24:11
26:4,4 29:13,14
30:17 31:9 34:2
34:6 35:23 36:1
36:9 44:8 53:16
68:14,18 69:1,3
70:15 80:5 89:9
93:25 94:2 97:9
101:18 105:22
108:20,21,23
118:9 121:22
Jim's 26:15,16,20
26:22,24 36:7
90:7 93:6 94:19
108:21
jmorris@pszjl...
2:14
John 2:12 36:16
joined 5:14 29:24
122:23
JONES 2:10
judge 132:21
juggled 31:24
July 29:17 58:24
jumble 48:1
June 11:21 45:23
45:24 49:2

**K**

K-l-o-s 4:7,8
keep 27:21

100:10
keeper 26:15
keeping 129:1
kind 10:25 14:23
15:25 52:12
89:7 99:13
106:12 108:22
108:23 109:8
Klos 1:14,18 4:1
4:6 61:24 62:2
95:22 109:19
117:21 136:5
knew 70:6,11
85:22 128:23
129:3
know 4:19 5:1
9:22,23 10:19
11:11 12:7,19
15:6,13 17:10
18:7,8,11 19:10
20:4 23:7,17
24:1,7,9,12,15
25:5,7 28:21,23
29:6 31:11,13
31:23,25 32:3,7
35:15 37:25
38:11,12,19
39:9 40:20
43:16,21 44:18
45:4 48:10
51:16,25 53:1
53:17,25 54:20
54:20 55:14
60:14,19,22
62:13 70:10
73:17 76:14
77:23 78:20
81:4,21,25 82:2
82:4,8,19 83:11
84:6,25 85:17
85:18,20 86:1,4
87:6,17 90:18
90:19,25 91:5
91:13,16 93:19
96:14 98:21

99:12 100:8
101:10 102:25
104:13,13,20
105:12 106:11
106:14 108:7,8
110:2,3 112:23
117:11 119:7
119:18 120:11
121:12,23
123:17 127:23
129:6 130:10
130:18 131:23
knowing 102:23
knowledge 7:24
13:8,10 24:13
34:6 35:1 44:14
48:20 49:10
60:25 61:16
63:24 64:5 67:6
73:1 79:17
98:10 100:6,9
104:10 109:21
110:7 112:23
121:19 122:10
123:10,21
125:10
known 61:9
69:23 70:1
KOPF 2:3
Kristin 9:16
18:16 39:13,17
52:1 53:7,8
59:11 61:13
62:4,15,15 83:1
83:2,20 99:14
101:7,24 102:3
102:5,8,10,11
108:5,8,12,14
109:10 117:25
118:15 119:3
Kristin's 100:6
100:22 118:20

**L**

L.P 1:6,10

lacks 113:19
125:17
land 132:21
language 74:25
large 55:2 59:8
59:13 93:20
131:25
larger 41:7 58:3
largest 123:8
late 106:13
launching 10:3
Lauren 23:2
law 2:5,12,19
81:22 82:1,9,16
82:22 95:23
Lawler 106:17
Lawn 2:17
lawsuit 112:14
lawsuits 97:15
lawyer 23:4
82:21
leading 65:17
learn 30:25 51:21
51:23 58:6,6
learned 61:6
learning 58:20
left 7:14,20 46:8
46:9 109:20
legal 18:10,20
84:9 112:3,10
130:9
legally 82:19
84:10
length 19:24
124:2
let's 8:14 12:12
18:22 21:21
24:19 27:7 28:6
61:7 66:19
68:24 81:17
103:25 109:19
122:14 123:25
letter 14:15,17
58:13,17
letters 80:5

level 23:20,24
36:6 82:15
88:14 105:5
liabilities 87:10
87:12 122:8
liability 120:12
120:19
liaison 10:15
11:5
liberally 12:8
license 4:20,22
licenses 4:18
life 131:18,19
limited 104:7
lines 5:18
linked 92:15,17
liquidity 29:4,5
29:18,20,23
30:7,21 31:21
31:25 32:6,22
33:9 34:20
35:19 36:2 40:7
42:13,20 43:7,8
43:17 73:2,14
73:18 74:10
75:1,15,22
list 59:10 106:12
109:9
litigation 15:5
16:6,11 18:1,25
19:21 126:19
litigations 17:7
little 9:2 12:12
14:2 30:15
33:12 39:3 48:1
98:15 106:23
107:5
live 4:11,12
LLP 2:17
loaded 16:22
loan 9:6 28:1
33:11,21 34:9
34:13,20 35:12
36:1 39:25 40:1
41:9 68:11,13

68:16,21 69:10
69:15,17,19,24
70:2,10 73:14
74:2,4,7 76:15
76:21 78:3
79:13,24 85:18
85:20 89:21
90:10,13 91:2,6
92:3,15 95:4
107:25 110:19
115:22 116:4,8
116:16,23
117:3 118:8,10
118:11,13,17
118:25 119:4,7
119:14 122:14
123:6,10,14,22
loaning 72:7,11
89:1 92:19,22
loans 32:4 33:14
36:9 40:8 65:17
66:3,5 80:7
84:1 85:10
89:10 90:8
91:12,14,23
94:1,7,22 95:2
98:17,22
105:16 106:6
106:19 107:25
108:1 119:24
120:8,12,19
123:2
logically 42:15
69:18
Lokey 71:24
long 15:8 16:5
17:5,9 34:25
43:5 62:4 84:12
122:16
long-term 86:7
look 15:19 27:15
38:15 39:4
66:19 114:15
117:10,22
134:3,15,19

looked 111:20
looking 22:3 44:1
117:17
looks 27:25 39:6
loop 53:9
lost 41:21 63:16
lot 100:1 129:20
loud 118:6
LP 6:6 8:5 12:14
12:15,17 13:6
23:22 26:19,24
29:5 110:8
lying 79:16

——————
**M**
machine 1:24
magnitude 92:12
maintained 28:2
maker 46:15,23
47:1 50:8
114:12 122:20
122:25 129:18
129:24
makers 126:13
126:19
making 71:8
75:18,19 85:12
99:20 100:16
107:20,23,25
108:9 126:9
132:20
man 17:23
128:10 130:20
manage 32:2
managed 10:21
10:21 70:24
Management 1:6
1:9 5:12 6:6 8:5
13:6 23:22,24
26:19,23 27:1
29:4,19 32:6,24
35:3 71:6 107:2
110:8
manager 7:2,3
managing 9:25

25:23
March 5:12,14
6:3 13:24 37:6
80:19 122:17
marching 52:3
marked 3:10
Master's 4:16
material 15:7
matter 109:11,12
matters 26:22,24
maturity 131:20
MBA 4:17
131:25
mean 9:18 15:21
24:10 26:9,11
104:6 114:18
meaning 51:4
68:9
means 47:4,12
48:21 63:12
84:7 132:1
133:12,20
134:7 135:7
meant 50:12
medical 82:3,10
82:10
meet 31:14 33:8
73:2
meeting 52:12
57:25
meetings 25:24
43:5,24 62:1,3
63:2,19
Melissa 26:10,12
108:14,17,18
109:1,5,9
member 62:14
members 10:17
memory 27:8
28:17,19 42:16
42:18 50:23
68:15 71:18
85:8 87:13
91:20 92:4,7
93:9,12

mental 48:1
mention 10:6
  114:7
mentioned 12:13
  61:20 88:13
  98:7 107:23
  108:4 110:6
  116:10
met 31:9,25
Michael 2:18
  95:16,23
  135:11
michael.aigen...
  2:22
mid 112:21
middle 6:10 80:4
  108:22
million 18:1
  21:22 28:13,14
  28:14 45:25
  46:3 49:1,8
  58:25 68:7 69:2
  70:7,19,23 72:7
  73:18,25,25
  74:7,8,24 75:4
  75:9,22,23 76:3
  76:19 77:4,10
  77:11,18,18
  78:3,10,22
  79:12,22 80:2
  80:19 81:18
  82:25 85:4,18
  85:20,23 86:13
  89:2 90:17,20
  90:22,24 91:22
  91:22 92:8,15
  93:3 115:8
  116:3,23 118:8
  118:9,13,24
  119:7,14,25
  122:5
mind 36:8 56:20
  76:9 100:2
mine 24:1
minimus 127:22

minutes 39:21
  105:25 126:25
misconstrued
  134:23
missed 60:25
missing 107:10
mistake 80:12
  126:8 127:21
  127:23 128:4,7
MLP 59:9
moment 32:12
  67:16 73:21,22
  116:6 122:15
monetization
  15:2
monetizing 97:12
money 15:17
  33:3,3,7 34:19
  39:22 41:12,16
  42:4 45:20
  59:13,19 70:4
  72:11,12 73:5
  75:12 76:11,12
  76:13 79:24
  92:19,22
  113:24 120:8
month 11:22 12:6
months 6:13 19:6
  59:5 75:14
morning 36:16
Morris 2:12 3:5
  8:25 11:17,24
  12:25 14:12
  17:20,25 20:17
  20:21,24 21:2,8
  21:24 22:8,15
  23:10 25:3,11
  27:4,16 29:10
  32:25 33:24
  34:21 35:13
  36:4,18 37:20
  38:17,25 39:7
  40:3,14 41:17
  41:20 42:24
  43:19 44:16,24

45:9,17 46:21
  47:8,15 48:8,22
  49:15 50:2,13
  51:5 52:21
  53:22 54:7 55:3
  55:12,19 56:11
  57:8,19 60:12
  61:1 63:5,13
  64:9 65:19,25
  66:7,15,24
  67:17 69:20
  71:3,12,20
  76:18,22 77:6
  77:20 78:4,23
  79:5,19 81:2,11
  81:23 82:6,13
  83:13,17 85:21
  87:3 88:18 89:5
  90:14 91:3,9,19
  92:5 93:13 94:8
  94:13,16 95:5
  95:16,20 99:4
  99:23 100:5,11
  100:19 101:3
  101:25 102:15
  103:15 104:18
  108:2 109:19
  111:11 112:7
  112:13 113:22
  116:21 117:2,9
  117:13,16,21
  119:11,18
  120:5,11,17,23
  125:18,21
  126:24 128:13
  129:12 130:7
  130:16,19
  131:1,5,11,21
  132:2,8,11,15
  132:19,23
  133:3,5,13,22
  134:8,17 135:2
  135:10,13,15
  135:19
motion 132:18,20

mouth 36:7
Move 120:15
  125:16
moved 6:10
muddy 43:14
MUNSCH 2:3
mutual 74:13,14

_____

**N**

name 4:4 26:11
  26:14 39:10
  87:21 95:23
names 106:14
Nancy 104:24
  105:16,21
nature 10:1 70:4
  70:6,7,11 84:1
NAV 70:25 71:2
  71:8,19,25
  72:19,20,21
  73:4,15 79:14
  80:20 81:1,14
  85:22 89:20
  90:2,3 92:11,16
  92:17,18 104:2
  104:10
necessarily 31:25
  50:11 53:4
  69:12 107:14
need 29:18 31:16
  33:12 37:3
  41:24 54:5
  58:14 73:3 93:7
  93:20,21
  106:25 107:4
needed 30:3
  31:10,12 32:6
  35:19 41:12
  73:5,17 74:10
  74:25 75:21
  76:11
needing 29:5,22
needs 29:4 31:14
  33:9 34:20 40:7
  42:20 44:9

negative 37:7
  44:4
negotiation 22:7
  22:13,18
neither 93:23
never 18:2 56:25
  72:25 74:3
  78:12 80:13
  91:14 105:15
  105:18,20
new 2:11 7:16
  26:11,13 68:8
  68:11 85:10
  115:22 118:8
  132:21
NexBank 124:16
NexPoint 10:4
  12:13,14,14,17
  12:24 13:3,16
  21:21 26:3 27:1
  27:12 36:22
  37:11,19 40:22
  41:3,15,15 42:4
  42:9,11,17,22
  43:11,13 53:19
  56:21 57:6,10
  57:14,18,23
  58:17,25 59:12
  59:24 62:18
  63:3,20 64:8
  65:9 72:22,24
  75:17,19 78:13
  110:19 111:14
  111:22,25
  112:15 113:3
  113:10,15
  120:24 124:18
NexPoint's
  110:25 111:6
  112:21
night 36:17
nomenclature
  83:24
nominal 62:1
nonstop 44:5

David Klos - October 27, 2021

**North** 1:24 2:3 138:2
**NORTHERN** 1:2
**note** 21:22,23 22:2,5,7,14,22 23:9,15 24:10 24:18,21,23 25:2,9,17 27:2 27:9,13,14 33:17 38:15 39:4 40:11,13 40:17 46:12,16 46:25 48:5,14 49:10 50:25 51:10 57:18,23 58:4,20 59:12 60:7 63:4,21 64:8 65:9 66:6 66:10,13 70:22 75:18,20 76:7 79:1,22 82:25 83:21 84:3,9,16 84:16,18,18 85:4 86:2,3,3,8 86:13 89:15 92:15 111:22 112:9,12 113:16 122:19 122:24 127:13 127:14,17 128:16 130:3 131:18,20 133:12 134:3,4 134:11,15,20
**notes** 16:7 17:7 19:25 23:13,14 26:3 36:19 40:21 50:19 52:18 65:10 66:20 67:12 76:1 84:14,22 85:2 86:12 87:14,24 88:7 88:10,15,16 96:8 97:11,16

114:21 122:5 122:12 124:10 124:11,13,24 125:4,7,8,13,25 126:10,13,20 127:17 128:23 129:7 130:12 130:15
**Notwithstanding** 110:23 111:25
**November** 54:4 63:18 124:8 137:22
**number** 12:2,10 14:10 22:4 23:19 27:16 28:9 75:3,4
**numbered** 1:21 27:19
**numbers** 14:4,19 28:6 44:4 81:18
**nutshell** 54:12
**NY** 2:11

_____
**O**

**o0o--** 1:4
**Oak** 2:17
**oath** 97:6 106:4
**object** 50:2 100:8
**objected** 118:20
**objection** 8:25 11:17,24 12:25 14:12 20:17 21:2,24 22:8,15 23:10 25:3,11 27:4 29:10 32:25 33:24 34:21 35:13 36:4 37:20 38:17,25 39:2,7 40:3,14 41:17 42:24 43:19 44:16,24 45:9 45:17 46:21 47:8,15 48:8,22

49:15 50:13 51:5 52:21 53:22 54:7 55:3 55:12,19 56:11 57:8 60:12 61:1 63:5 64:9 65:19 65:25 66:7,15 69:20 71:3,12 71:20 76:18 77:6,20 78:4,23 79:5,19 81:2,11 81:23 82:6,13 85:21 87:3 88:18 89:5 90:14 91:3,9,19 92:5 93:13 94:8 95:5 99:4,23 100:19 101:3 101:25 102:15 103:15 104:18 108:2 111:9 112:3,10 113:19 116:20 116:25 119:9 119:16 120:4,9 120:15,21 125:16 128:13 130:7,16 131:5 131:11,21 132:2 133:13 133:22 134:8 134:17 135:2
**obligated** 122:12
**obligation** 25:25 80:1 110:25 111:6,14 112:16 113:11 113:17 114:12
**obligations** 45:21 121:24
**obligor's** 33:8
**obviously** 85:18
**occur** 55:8 96:9
**occurred** 47:5 61:17 70:25

72:20,25 85:13 92:13 112:24
**October** 1:15,21 31:18 80:11 120:24 127:11 128:22 129:3
**offended** 17:22
**offer** 14:15,17
**offhand** 84:16
**office** 5:10,10 10:17 72:4 121:10
**officer** 7:14,17,22 8:23,24 9:3 10:13 13:21,22 53:4 121:6,13 123:22
**officer-level** 7:25 13:18
**officers** 105:22 106:7 121:18 123:15
**official** 12:16 13:7
**oftentimes** 32:3
**Oh** 100:12
**okay** 18:14 20:8 51:8,16 52:10 65:13 74:1,7 76:25 81:21 82:23 84:4 93:9 100:3 110:18 110:23 112:25 117:2 119:11 120:23 124:7 125:8 126:2 132:19
**old** 106:22
**one-page** 84:11
**oOo--** 135:22
**open-end** 74:13
**open-ended** 25:6
**operate** 29:5
**operations** 9:6 107:19

**opinion** 44:6
**opposed** 40:22 42:9 75:8,10 85:1 86:3 89:20 90:12 102:20 103:8 127:17
**oral** 96:4,7,23 97:8,15,22 98:1 98:5,12
**order** 27:21 124:9
**orders** 52:3
**ordinary** 128:11
**organization** 72:4
**original** 27:12
**originated** 43:9
**ought** 62:23
**outlook** 44:2
**outside** 11:9 128:11
**outstanding** 38:8 45:22 46:9,10 47:1,19 49:5 125:3 129:2
**overall** 10:10 30:6
**overpayments** 53:19 55:2
**oversaw** 9:17
**overseeing** 9:14 9:14,21
**oversight** 6:20 9:4,8
**oversimplify** 32:11
**owed** 94:1
**owes** 45:19
**owing** 113:24 121:25

_____
**P**

**P** 37:25
**P.M** 1:22,22 135:21

**PACHULSKI**
2:10
**package** 83:18
**page** 3:2 28:8
37:2,2 114:15
130:1
**pages** 20:16,25
117:13
**paid** 14:11,20
76:3,4,6 80:19
80:22 81:16
85:16 135:7
**paper** 85:10
118:11 119:4
**papered** 33:16
66:6 68:21
**papering** 84:19
85:5 118:17
**paragraph** 50:8
114:4,7,10,11
114:16,17
129:15
**pardon** 46:14
**parentheses**
118:9
**part** 13:14 17:4
25:22,23 30:23
46:15,24 58:2
61:21 62:6 70:3
70:9,10,11
73:19 75:17,19
76:8 83:17
103:17 106:8
106:17,20
117:13 121:2
122:2,24
123:15 126:20
**participated**
30:12 121:19
**participating**
61:25 62:3
**particle** 63:15
**particular** 20:22
28:13 29:18
31:6 46:12

61:23 68:16
119:5
**particularly**
35:22 71:23
**parties** 71:23
137:18,21
**Partners** 2:21
99:9
**partnership**
104:8
**parts** 72:4
**party** 71:7
102:22
**pass** 95:15 135:9
**passing** 98:7
**pattern** 66:12
109:11
**pause** 7:7,16
63:13
**pay** 47:1 49:14
49:24 74:25
82:5 88:8,10,12
90:20 103:22
103:22 112:16
113:23 122:12
**payable** 14:23
74:18 93:16
125:4
**paygrade** 60:11
60:14
**paying** 72:12
**payment** 26:8
27:10 37:6,11
37:18,23 38:5,6
38:7,12,23
40:10,11,17,17
45:7,25 46:3,6
46:7 48:25 49:1
49:2 51:10,14
51:16 56:22
57:7,11,14 58:7
58:18 59:1,2,3
59:15,24 60:3,6
60:22,25 61:18
62:19 64:13,15

68:20 72:16,18
75:1,5 76:16
85:13 89:10,14
92:20 93:22,24
93:25 99:13
110:25 111:7
112:1,5,7,9,11
112:15,16,21
113:4,11,15
115:15 126:9
126:21 129:19
129:24 135:1
**payments** 25:8
25:10,16,18,19
27:8,11,13
36:13,14,19,22
36:24 37:13
39:15,18 40:20
40:21 41:5,6,8
41:12,24 42:17
44:12,23 45:3
48:14 51:19
52:20 55:9 56:1
59:10 60:21
61:15,16 64:7
64:23 75:18,20
94:21 98:17,23
99:1,3,20
100:16 101:1
103:23 107:6
107:20,23,25
108:6,10
110:19,23
111:5,13,21,25
114:8,13 124:9
125:12,15,23
126:4,9,14
130:4,6,23
**payroll** 10:1
53:21 107:21
**pays** 48:4 81:9
82:4,10,19
**PC** 2:3
**PE** 97:12
**penalty** 135:23

people 51:19
71:22 72:3
95:10 103:18
**people's** 26:1
57:2
**percent** 15:25,25
23:14 28:5
30:10,11 33:13
36:8 68:18 69:4
69:5,11 74:18
74:22 92:3
102:19 106:18
**perception** 53:14
**perform** 126:21
**performed** 71:24
**performing** 9:25
**period** 23:16
93:5 104:2,11
104:21 116:14
120:1 137:15
**perjury** 135:23
**person** 7:19,20
7:21 9:17,18
39:9,10 44:21
72:25 77:3
80:25 81:10
101:10 115:14
137:8
**personal** 26:16
26:22,24 44:14
48:20 49:10
76:1 98:10
131:18,19
**personally** 25:13
25:17 64:19,20
64:22 108:21
**personnel-wise**
107:7
**perspective**
33:23 35:20
**pertain** 72:22
**pertained** 105:8
**pertaining** 93:20
97:10
**pertains** 79:22

petition 123:23
**phrase** 51:3 97:4
**physical** 85:5
**physically** 22:23
66:14
**pick** 45:20 48:25
109:20
**piece** 15:20,21
**pin** 8:6
**place** 33:20 35:2
66:13 137:8
**Plaintiff** 1:7 2:13
**plan** 14:22,23,25
17:11
**plane** 82:7
130:21
**platform** 10:20
12:10
**play** 15:6 64:15
**please** 4:5 5:5
14:5 30:22
66:18 68:7
83:21 95:20
114:1,22
115:14 118:6,7
118:10 127:2
129:12
**pled** 98:13
**plenty** 57:3
**point** 6:10,14 7:2
7:3,3,4 9:13
18:8 24:16
29:25 36:23
37:12 39:4
45:15 53:3
56:16 57:1
60:10,16 61:17
63:2 73:19
79:21 80:3,4,5
80:5,14 83:23
89:10 97:9
101:12 109:6
128:18 129:2
**pointed** 102:22
**points** 7:6 20:14

policy 33:20 35:2
 35:6
portion 16:4
 21:12
portions 20:8
position 7:25
 13:18 43:22
 51:9 79:11,18
 121:13,15
possibility 79:23
possible 17:17
 48:11 50:3 74:5
 89:23,25 90:19
 91:17 95:1,8,9
 95:10
possibly 41:6
potential 53:19
 92:12 97:17
potentially 30:14
 96:8,14,16
power 89:9 90:21
 90:23
practice 30:1,5
 34:4,14 35:18
 50:4 69:23 70:3
 73:6 78:7 79:4
 86:5 90:7
 109:11,12
practices 70:11
pre 135:5
precision 28:5
predicate 41:22
 42:2
preference 73:7
 73:11 90:7
prefix 135:5
premise 43:1,3
 89:8
prep 83:21
prepaid 49:22
 131:18,19
preparation
 19:13 21:9 67:7
 67:8 84:19
prepare 54:6

84:2,9,17
prepared 26:7
 53:18 54:9
 64:20 66:14
 80:8
preparing 18:9
 19:20 129:8,10
prepay 46:15,19
 46:24 47:24,25
 48:5,7 49:19
 50:8
prepaying 50:21
 51:3
prepayment
 37:19,23 38:1
 38:11,13 46:13
 63:23 64:12
 113:5,12,18
 114:11 129:16
 129:18,23
 130:5 131:2,9
 131:14 132:1
 133:12,20
 134:7,20,25
 135:5,7
prepayments
 27:2 38:10
 44:15,19,23
 45:1,5 63:4,21
 64:8 134:12
preposterous
 89:15
present 18:20,25
 56:20 68:15
 93:9
presented 66:14
president 43:10
 43:11 121:17
pretty 11:15
 60:24
previously 53:6
 125:3
pricing 10:16,16
primarily 6:7
 26:22 88:5

128:19
primary 9:15
 109:5
principal 37:5,9
 37:13,16 38:9
 40:12 45:12
 46:9,16,24 47:2
 47:22 48:16
 49:8,24 123:11
 131:16
print 117:8
prior 14:22 19:18
 24:19 27:9
 31:19 40:10
 53:18 56:17
 57:5,12,17,21
 69:17 87:14,15
 88:15 92:4
 97:14 98:12
 104:11 112:14
 112:15 113:5
 113:10,18
 122:22 123:23
 126:7,12,18
 131:20 135:1
priorities 89:11
privilege 132:6
 133:2,4
probably 4:24
 6:12 8:9 9:7
 15:11,19 23:19
 24:7 35:12
 39:11 44:7
 73:24,24 83:9
 98:7 105:3,13
 108:7 114:19
problem 57:2
problems 29:21
procedure 33:20
 35:2,6 39:5
 66:13 83:23,24
proceedings 5:3
 96:6 108:1
proceeds 80:22
 81:6

process 17:9
 32:10 51:19
 66:17 83:24,25
 109:8 121:3,4
 122:2
processing 10:1
produced 1:18
 83:14,16 117:6
production
 117:14
professional 4:18
program 105:9
progression 5:24
promissory 16:7
 22:14 23:9
 24:21 25:2
 27:13 33:17
 38:15 39:4
 46:12 50:19
 52:18 63:4
 65:10 66:6,10
 66:13,20 67:12
 70:21 85:2
 97:11,16
 122:19 130:3
 130:12,14
 131:18,19
 133:12
promoted 6:1
proper 108:10
 132:11
protest 126:18
provide 110:10
 110:12
provided 13:2,3
 13:13 20:15,15
 21:6 40:12
 76:13 80:6
 102:5 107:2,24
 109:25 110:4
 110:16 122:4
 125:14 137:15
provider 11:12
 71:24
providers 10:16

43:12
providing 12:24
provision 114:19
 129:22,25
public 10:3
purport 28:8
purpose 23:8,12
 85:25
purposes 30:21
 31:21 32:22
 36:3 73:8 75:22
pursuant 12:22
 13:14 74:15
 112:11
put 6:15 10:2
 26:1 86:6 93:6

───────

**Q**

qualification
 64:4
qualitative 16:1
question 9:1
 11:18,25 13:1
 14:13 16:8,22
 16:25 17:2
 20:24 21:25
 22:9,16 23:11
 24:25 25:4,6,12
 27:5 29:11 33:1
 33:25 34:15,22
 35:14 36:5
 37:21 38:18,21
 39:1,8 40:4,15
 40:19 42:2,25
 43:20 44:10,11
 44:17,25 45:10
 45:18 46:22
 47:3,9,16 48:9
 48:23 49:16,18
 49:25 50:2,14
 51:6 52:22
 53:23 54:8 55:4
 55:13,20,22
 57:9,20 60:13
 61:2,4 63:6

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 64:1,10 65:20 | 96:3,7,18 | 31:19 34:23 | records 110:24 | 97:16,16 99:20 |
| 66:1,8,16,21 | raising 62:17 | 36:6 41:13 42:3 | 111:4 | 100:16 102:20 |
| 67:16,24 69:21 | rate 84:15 86:2,6 | 56:5,9,12,14 | recover 17:15 | 103:7 137:20 |
| 71:4,13,21 | ratify 28:6 | 57:17,22 58:10 | recoveries 17:10 | relates 18:5 |
| 76:19 77:7,16 | ratio 104:2,10 | 58:16,20 59:8 | recovers 16:6 | 70:21 |
| 77:21 78:5,9,24 | rational 80:25 | 62:16 63:18 | reduced 137:10 | relating 19:23 |
| 79:6,20 81:3,12 | rationally 92:25 | 67:18 82:24 | reduction 38:8 | relationship |
| 81:24 82:7,14 | reached 104:11 | 85:7 86:19 | 45:12 | 53:15 133:21 |
| 83:15 87:4 | read 20:8,10,20 | 87:20 88:21 | refer 125:7 | relevant 5:5 |
| 88:19,24 89:6,8 | 20:25 21:11,11 | 92:10 99:12 | reference 52:18 | relieve 45:14 |
| 90:15 91:4,10 | 44:22 46:25 | 102:10 106:21 | referred 87:24 | 111:6 114:11 |
| 93:14 94:9,12 | 48:24 118:6 | 116:15 118:19 | 123:2 | 129:18,23 |
| 94:13,14,21 | 127:8,14,21 | 118:22 120:23 | referring 87:17 | 130:3,5 |
| 95:6,7 96:5 | 128:6 130:1 | 121:16 122:21 | 98:22 | relieved 112:15 |
| 97:24 99:5,24 | 131:14 132:23 | 123:6,16 124:2 | reflected 37:14 | relieves 131:2 |
| 100:1,20,21 | reading 21:5 | 127:20 130:13 | 44:13 120:8 | reloaned 76:4 |
| 101:4 102:1,16 | 46:6 131:8 | receipt 26:1 | reflects 103:21 | remainder 49:24 |
| 103:16 104:19 | reads 46:23 | receive 74:18 | refresh 54:13 | remember 5:16 |
| 104:22 108:3 | real 107:13 | received 99:19 | regarding 16:7 | 7:5 12:1,18 |
| 119:3 125:20 | realize 128:6 | 100:15 103:19 | 18:24 100:16 | 13:9 14:24 |
| 125:20 128:14 | realized 127:21 | 106:19 | 127:5 | 15:10 18:6 |
| 130:8,9,17 | really 6:12 9:16 | receiving 22:24 | regardless 16:16 | 22:22,24,25 |
| 131:4,7,12,22 | 10:15 16:8 54:4 | 33:3 | 16:20 60:17 | 32:5 34:11,16 |
| 132:4,5,11,14 | 73:9 78:12 | recognize 27:23 | 72:24 | 34:18 38:20 |
| 132:24,24 | 83:13 95:9 | 104:7 | regular 66:12 | 39:24 42:8 |
| 133:6,14,17,23 | 101:11 105:4 | recollection 5:25 | 88:16 | 50:25 51:24 |
| 134:9,13,16,18 | 107:5 108:19 | 8:3 28:20 29:17 | regularly 31:9 | 52:1,10,13,23 |
| 134:20 135:3 | 109:2 128:19 | 40:7 50:18 | 129:19,24 | 53:13 56:8 57:5 |
| questions 19:12 | 129:6 | 51:18 52:15,17 | 130:4,6 | 57:16,24,25 |
| 77:12 80:13 | realtime 85:14 | 55:7,8 68:17 | reimburse 70:24 | 58:3,19,22 |
| 95:17 97:25 | reason 23:8 | 75:21 76:6 | reimbursed | 59:25 60:8,20 |
| 109:15 110:18 | 30:14 35:21 | 78:16,17 88:3,4 | 81:15 | 62:20,22,25 |
| 111:19 114:3 | 40:23,24 41:1 | 91:24 94:5 | reimbursement | 63:1,23 67:4 |
| 126:24 129:13 | 54:24 55:10 | 95:13 101:24 | 53:21 72:23 | 69:13 71:14 |
| 135:10,12 | 67:22,24 75:17 | 105:7 115:4 | reinstate 60:7 | 74:5,6 78:17 |
| quick 48:12 | 75:19 99:21 | 123:21 125:6 | reinvestment | 83:22 84:20 |
| quite 7:9 31:9 | 100:18,21 | 126:2 | 105:9 | 85:4 86:15,17 |
| quote 115:22 | 113:7,14 | record 4:5 16:14 | reiterate 17:13 | 87:11,23 88:2 |
| | 115:24 | 25:9 64:6 68:3 | REITs 10:3 | 92:10,11,12 |
| **R** | reasoning 105:2 | 105:24 106:2 | reject 67:22,24 | 93:2,17 94:5,18 |
| radar 93:6 | reasons 23:20 | 117:12 | 89:7 | 94:19,22 97:18 |
| radars 26:1 | 74:1 88:4 | recorded 37:13 | relate 19:22 | 97:19 98:19 |
| raise 24:5,7 | recall 4:23 19:2 | 37:14 38:7 | related 70:20 | 101:15 105:4 |
| 119:3 | 21:4,5 22:22 | recording 25:15 | 74:11 81:1 | 108:5 109:7 |
| raised 24:3 80:15 | 23:6 24:3 27:13 | 39:14 | 92:18 96:3 | 110:21 113:13 |

David Klos - October 27, 2021

123:4,8 124:5
130:11 131:4,7
**remembering**
34:10 92:23
**remind** 99:6
**rep** 80:5
**repaid** 76:1
**repay** 89:3
**repaying** 93:25
**repayment** 76:7
**repeat** 22:10 27:6
100:3
**rephrase** 20:24
22:11 49:17
133:5
**report** 8:15 9:16
10:23 53:19
120:24 121:24
**reported** 1:23
**reporter** 117:8
135:13,16
137:1,3,15
**represent** 19:15
95:24
**representation**
19:17
**represented** 2:4
2:11,18
**requested** 137:13
137:14
**reservation**
91:25
**respect** 19:19
22:17 24:20
25:2,18 35:3
38:3 41:11
47:22 49:23
51:9 58:16
68:16 69:12
71:22,23 72:21
76:23 79:8 80:1
80:8 82:25
84:14,18 85:5
86:14 94:3,20
108:6 111:21

121:13 125:13
125:24
**respectful** 76:25
**respond** 25:7
60:15
**response** 128:16
**responsibilities**
7:15 8:7 9:22
108:16
**responsibility**
32:17,18 90:4,5
118:17
**responsible** 11:4
39:14 71:7
108:9,17,19
109:10,13,13
**restate** 61:10
**resulted** 71:25
**retail** 9:4 80:9
120:25 121:20
121:23 122:4
122:11 128:16
128:19
**return** 76:25
**reverse** 40:9
**review** 39:19
48:12 121:3
137:13
**reviewed** 84:10
**ridiculousness**
97:5
**right** 16:17,21
17:25 18:20
21:23 33:22
37:5 41:25
45:16 47:6 55:1
56:1 66:21
67:20 68:9
75:18 78:14
80:4 81:9 83:14
85:19 88:8,22
89:19 107:9
109:25 111:23
114:24 115:2
117:3,12

123:12 124:17
124:22,25
125:5 126:5
127:11,14,20
132:25 133:6
**Rip** 37:2
**role** 5:15 6:2,12
6:16,18,21 8:22
9:4,11 11:5
12:16 13:7,14
19:13 24:19
25:1,14,17,21
25:22,23 26:25
39:10 53:4,6
58:16 62:1
64:15,17 67:6
67:11 78:13
84:18,21 85:5,8
85:11 86:13,21
128:18
**roll** 23:15
**rolled** 125:3
**rolling** 88:15
**rolls** 39:18 64:18
**roughly** 6:9
**round** 39:20
81:18
**RPR** 1:23
**Rukavina** 2:5 3:3
3:6 4:4 9:10
11:21 12:3 13:5
14:16 17:23
18:4 20:19,23
20:25 21:6 22:3
22:11,19 23:17
25:8,16 27:7,17
27:18 29:16
33:5 34:6 35:1
35:24 36:11,21
38:2,20 39:2,20
40:9,18 41:19
41:22 43:4,23
44:20 45:6,14
45:23 47:3,10
47:17 48:13

49:9 50:1,5,17
51:8 53:11 54:3
54:11 55:6,16
55:24 56:14
57:12,21 60:19
61:5 63:10,14
64:14 65:23
66:4,11,19,25
67:1,18 68:4
70:1 71:10,18
72:6 76:24 77:8
78:1,9 79:2,9
80:18 81:8,21
82:2,8,17 83:16
83:19 86:1 87:8
88:21 89:17
91:1,7,13,20
92:7 94:3,11,14
94:17 95:7,14
110:18 111:9
111:20 112:3
112:10 113:19
116:20,25
117:7,11,15
119:9,16 120:4
120:9,15,21
125:16,19
126:25 127:2
128:22 130:11
130:19 131:8
131:17,24
132:6,9,13,17
132:20 133:1,4
133:8,18 134:1
134:14,24
135:8
**rule** 39:5 127:6
**rush** 135:19

___

**S**

**sane** 80:25
**satisfy** 93:21
**saw** 128:16
**saying** 39:25
42:23 46:2,5

49:19 61:11
90:9 92:23 94:6
94:22 109:9
**says** 18:2 46:13
46:14 48:5,14
68:7 80:12
115:23 118:7
118:18 127:17
129:17 131:2
134:11
**scenario** 33:6
**schedule** 28:1
37:15,25 38:12
45:3,7
**scheduled** 27:9
38:5 40:10
56:22 57:7
129:19,24
130:4,6
**schedules** 64:21
80:10 111:3
**school** 4:15 5:7
**Schroth** 26:10,12
108:15,17
**Science** 4:16
**scratch** 27:7
**screen** 117:22
**screwed** 111:17
**se** 37:25 38:13
**second** 28:8 37:4
67:25 72:15
73:2 103:25
**Section** 46:13
130:22 131:8
131:14
**securities** 10:20
11:14
**see** 21:18 22:2
28:11,15,16
46:1,17,18
48:17,18 49:2
58:14 83:7,12
113:9 114:5
117:20,24
125:21 129:22

129:25 130:24
130:25 131:1
**seeing** 44:20 48:6
48:11 59:8
61:19 85:14
114:9 130:11
**seen** 50:17,22,23
83:9 114:18
126:18
**Seery** 15:8 18:13
19:8,9,11 20:3
53:15 56:15,19
57:13,15,18,23
60:5 96:25 97:3
97:21 98:2
129:9,11
**Seery's** 21:12,19
**semiannual**
14:22
**send** 42:23 68:7
**sending** 33:4,5,6
33:8 90:24
115:14
**sends** 80:2
**senior** 5:17 7:3
**sense** 50:4,5
73:20 104:4,5
108:20 113:22
113:25 134:22
135:4
**sensitive** 86:24
**sent** 36:16,18
54:15 59:17
69:4 76:5 83:1
83:2 115:1
**sentence** 46:14
48:13,21 50:8
50:16
**sentences** 127:25
**separate** 10:25
11:7 70:20
106:25 107:4
**Separately** 52:10
**separating** 79:23
**Series** 4:20

**service** 11:12
71:24
**services** 10:17
12:23,24 13:3,4
13:13,15 41:3
43:12 53:20
71:11,15,17
107:2,15,15,24
108:8 109:22
109:24 110:4,7
110:10,12,16
**set** 115:14 118:7
**settlement** 9:6
**seven** 75:14
123:23
**seven-figure**
113:23
**shape** 6:16
**shared** 12:22
13:14 41:2
43:12 53:20
54:18 109:22
110:7
**sheet** 120:13,20
**sheets** 80:6,8
**shocked** 73:22
**short** 6:12
**short-term** 86:7
**shorthand** 1:24
137:2,7,25
**shortly** 116:11
**show** 28:8 117:5
**showing** 44:4
45:20 53:19
76:20
**shows** 45:25
**side** 85:11 96:15
**sides** 43:2
**sign** 85:1
**signatures** 22:24
86:18
**signed** 84:22
**significance**
128:11
**significant** 12:2

12:10 45:21
**signing** 86:14
**signs** 80:5
**similar** 8:7 13:4
13:16 74:9
82:24 107:12
107:19
**single** 23:15
29:21 32:17
34:12 36:8
62:14 123:22
**sir** 4:4 17:18 18:4
28:11,15 33:10
46:17 48:17
67:2,19 76:14
81:8 83:20
89:18 127:5
129:15,17
130:2 132:14
133:5,9
**sister** 97:9
**sit** 89:11
**sitting** 16:3,24
17:3,14 42:14
44:20 63:24
96:11 102:18
103:6 104:15
131:24 133:10
133:19
**situation** 31:22
69:23 93:1
**situations** 31:23
32:3 34:5
**smart** 17:18 50:7
**SMU** 4:15,17
**solvency** 87:6
**solvent** 87:2,5
**somebody** 35:19
**somewhat** 128:20
**soon** 118:10
132:21
**sophisticated**
44:21
**sorry** 9:20 22:19
24:22 41:21

45:24 47:20
55:21 57:19
58:25 63:16
76:16 78:14
88:22 99:8
108:11 129:14
129:20
**sort** 53:6 97:8
102:23
**sought** 87:25
**sounds** 50:10
80:21 81:19
82:17
**source** 64:6
**speak** 81:13
**speaking** 30:4
40:16 77:22
108:18
**speaks** 50:15
**specific** 8:6 14:4
28:20 31:22
34:11 38:3
42:15,18 50:25
51:1 52:23 58:4
68:17 91:24
95:13 103:14
112:23 123:17
129:25
**specifically** 4:23
15:10 34:24
39:10 42:8
51:24 52:13
56:7,12 62:13
67:20 69:14
71:14 74:6
81:13 83:11
86:4 87:11,24
92:13 93:8
94:22 98:21
112:20 115:10
118:16
**specificity** 34:24
36:7 42:11
53:13 82:16
96:14 102:24

105:14
**specifics** 14:24
93:18
**specify** 93:7
**speculate** 15:4
29:2 32:11
73:25
**speculating**
28:25 41:11
44:3
**speculation** 29:1
29:3,6 83:6
113:19
**speed** 106:24
**spelled** 37:24
**split** 108:16
**spoke** 18:10,19
101:6,9
**spoken** 18:13,15
**spreadsheet**
54:14
**stake** 18:1
**stamp** 117:17
**standard** 84:4,6
86:9,9
**standpoint** 92:18
135:6
**STANG** 2:10
**start** 27:7 47:17
95:19 111:17
**started** 5:7 10:5
101:17 108:23
**starting** 5:6
**state** 1:23 4:4,19
51:12 114:10
138:1
**stated** 137:9
**statement** 26:7
119:14
**statements** 36:17
116:14,18,24
119:8,19,22
120:1
**STATES** 1:1
**step** 32:9 68:25

134:5,5
Stinson 2:17
  95:23
stood 87:11
Stoops 7:23
stop 21:10 65:9
  94:15 100:13
street 1:25 2:4
  10:17 82:3
strike 23:6 32:19
  33:15 37:10
  52:16 54:22
  63:25 67:4
  120:15 125:16
string 118:4
  127:5
strong 73:11
  92:17
structure 14:8
  30:6
struggle 64:11
  128:15 131:13
struggling 45:2
  50:6,7 88:25
  99:25
subject 108:10
Subscribed
  135:24
subsequent 96:4
  96:7,23 102:9
  102:12 103:2
  116:17 119:10
  119:13 120:1,7
substance 19:1
  98:6,9
substantially
  16:2
substantive 97:1
sue 82:11
suggested 55:1
suggesting 62:22
  128:9
Suite 2:4,17
  138:2
sum 113:24

summary 21:7
supervision
  137:11
support 87:20
supporting 12:9
  72:3
suppose 31:18
  50:3 85:11
  95:10
sure 5:7 6:2 19:4
  20:1 26:6 27:21
  31:23 37:22
  44:7,8 47:19
  49:18 51:13
  55:21 58:8
  61:11,25 64:3,3
  65:11,14 66:19
  74:24 85:12
  95:12 97:24
  99:10 100:22
  103:6 106:15
  125:9 127:4
  128:25 129:1
  135:15
surely 128:22
  129:3
surprised 130:14
suspect 55:10
  68:14 123:19
suspend 111:14
switch 65:8
sworn 1:19 4:2
  137:4

——————
**T**
take 12:22 14:5
  16:8 18:9 23:12
  68:24 71:16
  117:21 118:17
taken 1:20 87:14
  137:7
takes 16:5 17:5,9
talk 12:14 18:12
  21:21 54:3
  98:15 122:14

talked 19:15,24
  69:13 94:4
  103:3
talking 27:12
  32:16,20 54:1
  88:15 98:19
  102:13 103:2
  117:16 121:5
  122:6 127:6
talks 129:16
  130:22
tax 73:7 107:6,6
  107:19
team 6:5,15 10:5
  11:3 25:14,22
  32:13,16,19
  35:16 43:6,9
  57:1 60:16
  61:14 62:6,14
  62:15 64:17
  73:20 84:2 85:9
  85:17 101:11
  108:9 109:7
  115:8,11,12,13
technical 78:6
technically 4:20
  36:23 37:12
teeing 26:6
tell 7:11 14:18
  24:22 28:4 34:2
  34:7 36:25 44:2
  52:7 53:11
  55:17 56:3
  58:23 59:5,14
  69:16 71:16
  83:17 93:4
  103:6 105:13
  106:10 112:13
  112:25 113:2
  115:20 116:2,6
  116:22 119:12
  120:6,18 122:9
  126:7,12 137:4
telling 56:14
  58:14 68:15

tells 43:18 55:25
  94:23
temporarily
  76:12
tend 109:1
term 7:16 8:1 9:3
  24:10 45:1
  47:21 86:3
  88:15 98:17
  104:1,2,5,7,8
  107:25 108:1
  124:10,11,13
  125:7,13,25
  126:10,13
  134:21,21
terminology
  98:14
terms 6:19 9:23
  10:11 18:13,15
  19:23 22:20
  26:6 35:16
  43:14 61:4
  92:11 93:4
  107:14,19
testified 4:2
  41:23 99:18
  100:14 124:2
testify 16:15,19
testimony 35:24
  62:9 79:12
  98:16 100:22
  100:23 137:9
Texas 1:2,23,25
  4:19 81:22 82:1
  82:9,16,21
  135:25 138:1
thank 95:14 96:1
  109:16,17
  124:19 135:8
thanks 100:12
Thedford 23:2
thereto 137:21
thing 33:22 53:6
  59:18 84:13
things 10:1 25:25

57:3 79:14
  122:5
think 6:9 7:2
  15:18 16:3
  18:18 26:14
  30:15 31:6,8,22
  32:9 36:16,19
  39:21 41:1,10
  50:15 53:2
  58:12,22 59:4
  59:11 64:6 65:6
  65:7,8 75:2,13
  78:6 79:16
  80:24 84:15
  85:23 86:10,15
  87:21 88:13
  95:9 97:19
  99:14 101:5,9
  103:11 105:3
  105:25 106:17
  107:9,22 108:4
  108:6 111:17
  113:7,14,24
  123:24
thinking 57:4
  117:11 129:7
Third 2:10 73:6
third-party
  10:16 11:12
thousand 92:6
threatened 5:2
three 5:9 6:12
  97:12 102:11
  124:10,11,13
  124:24 125:2
throw 104:1
Thursday 19:14
Tim 106:17
time 4:24 5:15
  6:21,23 7:9,11
  7:12,15 8:10,14
  8:24 10:2,4
  12:6,10 16:14
  24:6,8 25:1
  28:21 29:25

36:23 37:12,18
39:11 41:4,12
42:5,12 43:22
43:22 44:19
47:13 49:4
52:14 53:2,8,14
53:15 54:21
56:16 59:23
60:2,10 62:5
63:2 65:12
66:11 74:10,20
79:4 80:15
83:23 84:12
86:23 89:10,16
92:10 93:5
95:12 101:13
108:24,25
109:6,16
111:12 112:14
113:17 116:2
122:18 123:18
129:2,7 134:12
135:1 137:8
**timely** 44:9 51:15
51:17
**times** 7:5 32:15
61:20 63:8
76:19 92:6
**timing** 15:24
**title** 5:15,16 6:22
7:1 10:9,11
12:16 13:7
26:14
**titles** 10:11 78:18
**today** 5:21 14:3
15:12 16:3,13
16:16,19,24
17:3,14 20:5
42:14 44:20
57:5 63:25 65:6
95:25 96:11
102:18 103:6
104:15 131:24
133:11,19
**today's** 47:6

**told** 39:21 42:14
43:4 52:11,11
52:19 53:12
55:9 60:21
61:23 62:13,14
62:15 68:12
69:9 70:9 85:19
91:8 95:1 97:25
98:2 100:25
103:7 118:16
118:23 122:11
122:23
**tomorrow** 79:11
132:22
**top** 107:9 127:7
**topic** 96:2 98:3
**topics** 20:11
103:25 106:23
**total** 116:15
**totaling** 119:24
**touched** 98:16
**track** 111:2 129:1
**tracker** 118:10
**tracking** 39:15
**transaction**
34:13 70:21
76:9 115:21
116:7 118:24
**transcript** 135:14
135:17 137:13
**transfer** 29:9
30:2 31:8,20
32:8 34:19 36:1
40:22 41:16
69:2,10 76:15
77:4,18 85:16
90:12 91:22,23
92:9 93:3 115:8
**transferred**
30:20 75:24
77:10 78:18
79:13
**transferring** 34:8
35:11 39:22
42:4 75:9

**transfers** 28:9,18
28:19,22 30:24
32:22 35:4,10
38:3 42:9 94:7
**transitioned**
109:1,6
**transparent**
115:17
**Treasurer**
121:11
**treasury** 9:6
107:6
**treated** 35:5
**trigger** 104:2,10
104:21
**triggered** 104:11
104:17
**triggers** 14:25
107:17
**trouble** 62:19
**true** 29:6 88:9
135:24
**trust** 15:16 17:10
17:15 18:6
**trusts** 26:16
65:23 108:21
**truth** 137:5,5,5
**truthful** 100:22
**truthfully** 16:16
16:19
**try** 62:23 106:24
**trying** 17:18
27:21 30:23
50:6 67:14 98:3
100:11 104:22
130:20 132:9
133:8
**turn** 114:15
123:25
**turned** 76:4
81:15
**two** 9:7 15:12
29:14 36:20
45:13 65:10
66:20 77:12

83:8 85:1 86:12
87:24 94:19
95:10 105:4,25
106:24 107:24
119:24 121:18
122:12 127:25
129:4 134:22
**two-paragraph**
84:12
**TX** 2:4,18 138:2
**type** 98:12
**types** 13:4 78:13
84:1 107:12,15
107:17 114:20
**typewriting**
137:10
**typical** 84:7

——————
**U**
**Uh-huh** 7:18
13:23 47:7
75:11 127:9
**ultimate** 16:12
17:8,10
**ultimately** 11:4
39:19 64:18
73:9
**um** 63:13
**unable** 89:3,14
**undergrad** 4:15
**Undergraduate**
4:14
**understand**
14:14 15:19
17:14 18:19
30:23 47:4 51:8
61:11 62:8 66:4
67:25 68:2
88:25 96:17
97:24 98:8
106:3 118:12
118:15 124:14
132:1
**understanding**
19:11 20:11,13

37:17 48:19
49:18 51:12,14
54:17,22,23
56:21 61:12,22
70:18 72:7,10
75:7 79:4 87:1
87:9 91:11 97:6
98:23 101:12
101:18,19
102:2 112:19
121:9 124:3,15
133:11,20,25
134:2,6
**understood** 52:2
63:12 95:4
102:25
**unfair** 34:17
**unfamiliar** 80:21
**UNITED** 1:1
**unpaid** 46:15,24
47:2,20 48:15
48:15 49:4
131:15,16
**unscheduled**
38:23 64:7,23
75:18,20
**upcoming** 25:25
**updated** 54:15
**upfront** 85:11
**use** 14:19 56:25
70:23 81:17
108:20
**usually** 31:15
33:16
**utilized** 71:17

——————
**V**
**valid** 39:3
**valuation** 5:17,19
5:24 6:2,15
9:14 10:7,9,14
10:15,24 11:3,7
11:12 71:11,15
71:17,25 72:1
72:13,14,21

David Klos - October 27, 2021

107:6
valuations 11:4
value 11:14
  71:16
valuing 10:19
variety 107:16
various 25:23
  79:14
vary 17:12
verbatim 94:17
verbiage 132:25
verify 27:24
versus 87:12
videoconference
  1:19 2:6,13,19
videotape 21:18
view 131:10
virtually 44:5
vis-a-vis 15:16
voluntary 37:24
vs 1:8

**W**

want 16:24 44:10
  54:4 63:8 90:6
  95:18 96:19
  98:15 100:10
  101:14 104:1
  117:9 134:19
  135:13,16
wanted 24:17
  34:3 96:2
wants 90:16,20
  90:22
wasn't 23:24
  24:1 31:20
  37:18 38:5 50:4
  51:11,15,16
  53:4 57:1,3
  59:20 60:15
  62:6 70:17
  72:19 73:3,3
  75:2 101:11
  103:17 108:12
  129:10

Waterhouse 8:17
  11:1 13:25 20:9
  30:13,14,19
  39:25 41:14
  42:3,7 43:24
  52:7,11,18,24
  53:11 54:15,19
  54:25 55:17,25
  60:20 61:23
  62:9 65:3 69:9
  77:17 78:2,20
  84:23 85:1,19
  86:14 91:8 94:6
  100:25 103:3
  103:13 115:5
  115:25 116:2
  116:22 118:19
  118:23 121:6
  122:9 124:4,8
  125:11,22
  126:15 127:13
  127:16
Waterhouse's
  21:1,19 127:10
waters 43:14
way 6:16 20:12
  22:22 31:15
  34:3 35:17,22
  48:24 54:1 63:8
  69:6 72:15,17
  76:10 82:19
  87:18 92:1,1,1
  92:2 93:24 94:6
  95:3 97:5
  102:23 114:10
  121:5 137:19
ways 38:21
we'll 20:1 54:3
  125:7 132:17
  132:21
we're 12:8 27:12
  32:15 43:11,12
  64:1 65:8,9,10
  65:12 79:22
  80:4 117:17,18

121:5 122:6
we've 19:24
  75:13 78:12
wearing 43:15
week 36:20 83:7
weekly 25:24
  43:5,24 63:19
  129:8,10
weeks 59:5
welcome 117:19
  127:7
went 4:14 58:17
  81:17 85:14
  101:18
weren't 61:21
  80:16 88:7
  97:15 101:20
whatsoever
  63:20
wherewithal
  93:24
wind 16:5 17:5
winding 15:2,22
wire 59:17 61:19
  118:7
withdrawn 91:19
  110:11 111:15
  113:1,7,8
  124:10,12
within-entitled
  137:6
witness 1:19 9:2
  11:19 12:1 13:2
  14:14 19:12
  21:4 22:1,10,17
  23:12 25:5,13
  27:6 29:12 33:2
  34:1,23 35:15
  36:6 37:22
  38:19 39:9 40:5
  40:16 41:18,21
  43:1,21 44:18
  45:1,11,19
  46:23 48:10,24
  49:17 50:3,15

51:7 52:23
53:25 54:9 55:5
55:14,21 56:12
57:10 60:14
61:3 63:7 64:11
65:21 66:2,9,17
69:22 71:5,14
71:22 76:21
77:22 78:6,25
79:7,21 81:4,13
81:25 82:15
83:15 85:22
87:5 88:20 89:7
90:16 91:5,11
93:15 94:10
95:15 99:6,25
100:7,13,21
101:5 102:2,17
103:17 104:20
108:4 109:17
111:10 112:5
112:11 113:21
117:1 119:10
119:17 120:10
120:22 128:15
130:9,18 131:7
131:13,23
133:16,24
134:10,19
135:4,9 137:3
137:10
word 56:25
  133:11,20
words 10:24 36:7
  52:16,24 94:19
work 5:5 10:19
worked 5:8 11:22
  62:4
working 5:7,11
  12:5
world 108:23
  116:3,7 118:22
  119:2,12 120:6
  120:18
worth 34:10

worthiness 90:11
wouldn't 25:13
  38:10 43:8
  56:22,23 60:16
  64:8,20 77:24
  86:24 87:17
  99:15
write 128:3,5
writes 127:13
writing 103:21
  103:24 113:9
  125:22 126:18
written 35:2,6
  66:6
wrong 55:1 82:18
  82:22 88:22
  89:19
wrote 67:21
  70:12
www.dickman...
  138:4

**X**

**Y**

y'all 95:2
Yang 106:15
yeah 6:23 8:2
  14:21 15:23
  19:17 23:2
  29:12,20 35:15
  37:22 43:1
  55:14 56:24
  59:2 60:14 61:3
  63:7,8,12,18
  66:17 67:9 71:5
  83:24 89:7
  91:11 94:10
  96:10 98:20
  99:25 101:5
  102:2 124:15
  125:1 135:19
year 6:1 9:25
  29:22 49:21
  111:1,8,12,13

113:4 123:17
126:5,15,22
**years** 5:9 6:17
15:12 24:10,17
30:18 32:21
33:20 34:17
39:14 48:7
65:17 66:3
69:18 94:20
95:3,11 123:23
**years'** 34:10
**yes-or-no** 94:12
**York** 2:11 132:21

---

**Z**

**zero** 46:8 49:6
80:1
**ZIEHL** 2:10

---

**0**

**0** 36:8 69:4
**08** 4:24
**09** 4:24

---

**1**

**1** 8:11 24:20,23
66:24 67:2,7
80:3 113:10
126:8,12
137:22
**1-31-23** 138:4
**1-4** 27:17
**1-6** 127:3
**1.3** 28:13,14
**1.4** 58:25
**10** 19:6 32:21
33:20 34:10,17
69:18 95:3
123:19
**100** 15:25
**10017-2024** 2:11
**101** 138:2
**109** 3:5
**11** 123:19
**127** 3:6
**13** 23:8 27:9

46:12 49:10
114:1 129:12
129:14
**13-week** 126:3
**14** 27:15,17,23
36:12 40:20
42:17 44:13,22
48:12 49:1
58:25 59:23
60:2,23 61:18
64:2,5
**15** 61:7
**15(c)** 80:9 121:4
127:6 128:17
**16** 8:9 31:18
127:2
**17** 8:10
**18** 8:10
**19** 8:24 45:24
49:2
**1982** 4:10

---

**2**

**2** 66:24 67:2,7
73:25 76:3 80:4
85:23 87:9,13
92:8 114:23
115:9
**2.03-** 46:9
**2.1** 28:14 45:25
46:3 49:1,8
130:22 131:8
**2.1-** 46:5,7
**2.4** 68:7 69:2
70:7,19,23 72:7
73:18 75:22
76:3 77:10,18
78:9 85:18,20
91:22 92:8,15
115:8 116:3,23
**2.4-** 70:21 73:23
77:4 85:24
86:13 90:6
**2:30** 1:22
**20** 8:24 24:17

**200** 12:6
**2009** 5:12,15 6:3
6:3 29:24,25
122:17
**2010** 6:9 106:13
123:18
**2011** 6:10,21
106:13 123:18
**2012** 123:18
**2017** 6:22 22:13
23:7 24:8,18
88:22 105:12
124:25
**2018** 116:14
119:14 120:2
**2019** 8:11,14 9:10
9:13 10:6 11:10
11:16,21 27:14
28:9 29:8,17,21
29:25 31:18
35:8 36:15,22
40:21 41:1,13
42:8,16,16
44:13,13 45:23
45:24 65:13,15
66:11 75:14
78:20 80:6,19
87:2,9,13 88:9
88:14 89:2,17
91:21 92:8 93:2
93:11 105:13
110:20 111:6
111:12,21
112:2,6,8
114:23 115:9
121:7
**2020** 7:13,22
24:20,24 51:10
51:15,22 53:18
54:24 56:17,22
57:6,13,17,22
60:20 61:21
63:19 98:18,24
99:19 100:15
101:2 102:14

102:17,17
103:23 112:17
113:2,4,12
120:24 121:7
121:21 124:1,9
125:12,24
126:10 127:11
128:23 129:3
**2021** 1:15,21
13:24 58:25
59:23 60:2 61:8
87:16 88:1
112:22,25
113:3,10,16
126:8,13 128:2
129:4 136:1
137:22
**21-03004-sgj** 1:8
**214** 138:3
**23-point** 45:20
**23.034-** 45:21
**24.7-** 46:10
**27** 1:15,21 4:20
**29** 37:6

---

**3**

**3** 46:13 50:8
67:17 68:4
74:18,22 76:5
82:24 83:10,20
93:2,11 114:4,7
114:10,22
118:1,13
129:15 131:8
131:14
**30** 24:10,17
130:22
**30-year** 23:15
24:10 26:2
**30(b)(6)** 19:12,20
**30.7** 21:22
**30.7-** 27:12
**300,000** 28:14
**31** 22:13 23:7
24:18 45:21

51:10,15 56:17
56:22 57:6,13
57:17,21 58:7,9
60:25 87:15
88:1 98:18,24
120:2 124:25
**3102** 2:17
**312** 138:1
**338-** 37:8
**34th** 2:11
**3763** 83:15
**3800** 2:4
**38th** 1:25
**398,000** 85:23

---

**4**

**4** 3:3 45:23 91:21
**4.4** 118:9
**4.4-** 76:4
**411,000** 37:8
**4228** 138:2
**445-9548** 138:3

---

**5**

**5** 74:7,8,24 75:4
75:23 77:4,11
77:18 78:3
79:22 80:2
81:18 82:25
85:4 86:13
91:22 93:3
114:16 118:8
118:13,24
119:7,14
**5-** 76:5 90:1
**5,019,000** 75:3
**5.2** 80:19
**5:00** 95:19
**5:14** 1:22 135:21
**500** 1:24 2:3
**500,000** 123:9,12

---

**6**

**6** 4:10 127:11
128:22 129:3
**6/30** 122:2

David Klos - October 27, 2021

**600,000** 76:6,7
**630,000** 28:14
**66,000** 46:7 49:4
  49:5,7

---

**7**

**7** 58:11,15
**7.4** 75:9 78:22
  79:12 89:2
  90:17,20,22,24
  119:25 122:5
**7.4-** 89:19 91:13
**75** 18:1
**750,000** 28:13
  37:6
**75201** 2:4
**75206** 138:2
**75219** 2:18
**777** 2:17
**780** 2:10

---

**8**

**80** 15:25
**800** 138:3
**855-5100** 138:3

---

**9**

**9** 19:5
**95** 3:4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## <u>DECLARATION OF DAVOR RUKAVINA</u>

The undersigned, Davor Rukavina, hereby declares under penalty of perjury pursuant to the laws of the United States of America the following:

1.     My name is Davor Rukavina.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.

2.     I am an attorney duly licensed to practice law in the State of Texas.  I am lead counsel for Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>"), in the above styled and numbered Adversary Proceeding.

3.     Attached hereto as Exhibit "A" is a true and correct copy of the *Defendant's Second Set of Requests for Production to Plaintiff*, served by HCMFA on May 28, 2021.

4.     Attached hereto as Exhibit "B" is a true and correct copy of the *Debtor's Responses and Objections to Defendant's Second Set of Requests for Production*, served by Highland Capital Management, L.P. (the "Plaintiff"), on June 28, 2021.

5.     The first time that the Plaintiff produced the promissory notes the subject of this Adversary Proceeding, in their native Word format, was on October 26, 2021.

6.     I caused two of my employees, Julian Vasek and An Nguyen, both associates at Munsch Hardt under my direct supervision, to review the Plaintiff's production in this Adversary Proceeding for any e-mail from Mr. Frank Waterhouse to Ms. Kristin Hendrix authorizing her to affix his electronic signature to the promissory notes the subject of this Adversary Proceeding. After they originally found no such e-mail, I instructed them to search the production again just to be certain. Again, they reported to me that, after searching again, they found no such e-mail. I then personally reviewed all e-mails in said production from Mr. Waterhouse to anyone in April and May, 2019, and I found no such e-mail. Accordingly, I conclude that the Plaintiff's production to HCMFA in this Adversary Proceeding does not contain any e-mail by which Mr. Waterhouse authorized Ms. Hendrix to affix his electronic signature to said notes.

7.     Included in the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* at HCMFA APP 53-449 is a true and correct copy of a deposition of Frank Waterhouse, without exhibits, taken in this Adversary Proceeding on October 19, 2021.

8.     Included in the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* at HCMFA APP 450-653 is a true and correct copy of a deposition of Kristin Hendrix, with exhibits, taken in this Adversary Proceeding on October 27, 2021.

9.     Included in the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* at HCMFA APP 654-813 is a true and correct copy of a deposition of David Klos, taken in this Adversary Proceeding on October 27, 2021.

10.     I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.

Executed: November 30, 2021.


 /s/ Davor Rukavian_____
DAVOR RUKAVINA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S SECOND SET OF REQUESTS FOR PRODUCTION TO PLAINTIFF

**To:    Highland Capital Management, L.P., by and through its counsel of record, John Morris, Esq., Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067**

Pursuant to Federal Rule of Civil Procedure 34, as made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7034, defendant Highland Capital Management Fund Advisors, L.P. hereby serves upon plaintiff Highland Capital Management, L.P. this its *Second Set of Requests for Production to Plaintiff* (the "Requests").  Responses to the Requests must be served on or before **June 28, 2021**, on the following:

Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
3800 Ross Tower
500 N. Akard St.
Dallas, Texas 75201

EXHIBIT "A"

HCMFA APP 0817

Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7034, electronically stored information should be produced in native format.

## I.    DEFINITIONS

In responding to these Requests, you are instructed to use the following definitions:

"Communication(s)" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) by any means, including but not limited to any meeting, conversation, discussion, conference, correspondence, message, or other written or oral transmission, exchange, or transfer of information in any form between two or more persons, including in person or by telephone, facsimile, telegraph, telex, electronic mail or other medium.  The term also includes any Document transmitted or exchanged during such transmittal of information.

"Complaint" means the *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate*, filed by the Debtor in this Adversary Proceeding.

"Debtor" means Highland Capital Management, L.P. and includes all agents and representatives thereof.

"Document" means all handwritten, typed, or printed matter of any kind, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise, including, without limitation, agreements, correspondence, forecasts, memoranda, e-mails, notes, jottings, speeches, press releases, diaries, examinations, statistics, letters, telegrams, minutes, time records, payroll records, expense records, contracts, reports, studies, training manuals, canceled checks, statements, receipts, delivery tickets, returns, summaries, work orders, pamphlets, books, prospectuses, statement of operations, inter-office and intra-office communications, internal and external audit reports, internal and external accounting reports, offers, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, printed matter, computer print-outs, teletypes, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing, graphic or aural records of representations of any kind, including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures, and electronic, mechanical or electronic records or representations of any kind, including, without limitation, emails, tapes, cassettes, digital images, digital videos, videotapes, audiotapes, laser disks, disks (including CD-ROM disks), plans or other representations of anything concerning, describing, referring or relating, directly or indirectly, in whole or in part, to the subject matter of the discovery request at issue.

"HCMFA" means Highland Capital Management Fund Advisors, L.P. and includes all agents and representatives thereof.

---

"NAV Error" means the NAV error in the Highland Global Allocation Fund referred to in that certain April 7, 2019 memo from HCMFA to the Securities and Exchange Commission that was provided to John Morris by Davor Rukavina attached to an email dated May 24, 2021.

"Notes" means those certain alleged promissory notes attached as Exhibits 1 and 2 to the Complaint.

"Related" or "related to" means, without limitation, the following: effect, concern, refer to, reflect, evidence, display, contain, show, prove, encompass, support, demonstrate, involve, and/or include, in any way legally, logically, or factually connected to the matter referred to, or have a tendency to prove or disprove the matter referred to.

## II.    REQUESTS FOR PRODUCTION

**REQUEST NO. 8**

The Debtor's compliance manual.

**RESPONSE:**

**REQUEST NO. 9**

All Microsoft Word copies of the Notes, including metadata.

**RESPONSE:**

**REQUEST NO. 10**

All email communications related to preparation of the Notes.

**RESPONSE:**

**REQUEST NO. 11**

All email communications with external auditors related to the Notes.

**RESPONSE:**

HCMFA APP 0819

**REQUEST NO. 12**

All email communications related to the NAV Error.

**RESPONSE:**

**REQUEST NO. 13**

All email communications related to any insurance claim related to the NAV Error.

**RESPONSE:**

**REQUEST NO. 14**

All email communications related to the payment obligations of HCMFA to Highland Global Allocation Fund for the NAV Error.

**RESPONSE:**

Dated at Dallas, Texas this 28th day of May, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

HCMFA APP 0820

## **CERTIFICATE OF SERVICE**

       The undersigned hereby certifies that, on this the 28th day of May, 2021, he caused a true and correct copy of this document to be served by e-mail on John Morris, Esq., counsel of record for the Debtor/Plaintiff.

                 /s/  Davor Rukavina
                 Davor Rukavina

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03004 |
| v. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



HCMFA APP 0822

### DEBTOR'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
### SECOND SET OF REQUESTS FOR PRODUCTION

Highland Capital Management, L.P., ("Plaintiff" or the "Debtor") hereby responds to *Defendant's Second Set of Requests for Production to Plaintiff* (the "Requests")[2] served by Highland Capital Management Fund Advisors, L.P. ("HCMFA" or "Defendant") in the above-captioned adversary proceeding (the "Adversary Proceeding"). The Debtor's responses and objections to the Requests (the "Responses") are made pursuant to Federal Rules of Civil Procedure ("FRCP") 26, 33, and 34 as made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

### GENERAL OBJECTIONS

Unless otherwise specified, the following general objections and caveats are applicable to each and every Response and are incorporated into each Response as though set forth in full:

1.      The Responses contained herein are based upon information presently known and ascertained by the Debtor.

2.      The Debtor objects to the Requests to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other privilege or immunity. The inadvertent disclosure or production of any document that is protected from discovery by any privilege or immunity shall not constitute a waiver of any such privilege or immunity. All references in these objections and responses to the Debtor's agreement to produce documents shall be construed to mean non-privileged documents.

3.      The Debtor objects to the Requests to the extent they request information that is not reasonably or readily available to it, in its possession, custody or control, or is more

---

[2] Capitalized terms not defined herein shall have the meanings set forth in the Requests.

HCMFA APP 0823

readily available to HCMFA from another source or for which the burden of obtaining such information is not substantially greater for HCMFA than it is for the Debtor.

4.   All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

5.   The Debtor objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

6.   The Debtor's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

7.   These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

HCMFA APP 0824

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

## REQUEST FOR PRODUCTION NO. 8:

The Debtor's compliance manual.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

The Debtor objects to Request for Production No. 8 on the grounds that it is vague, overly broad, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1).

## REQUEST FOR PRODUCTION NO. 9:

All Microsoft Word copies of the Notes, including metadata.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

The Debtor objects to Request for Production No. 9 to the extent the term "metadata" is vague.  Subject to the General Objections and this specific objection, the Debtor will conduct a reasonable search for, and produce, documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 10:

All email communications related to preparation of the Notes.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 10, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

## REQUEST FOR PRODUCTION NO. 11:

All email communications with external auditors related to the Notes.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 11:

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 11, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 12:**

All email communications related to the NAV Error.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 12, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 13:**

All email communications related to any insurance claim related to the NAV Error.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

The Debtor objects to Request for Production No. 13 on the grounds that it is vague, overly broad, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1).  Subject to the General Objections and these specific objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 13 to the extent they are relevant to the NAV Error and the Notes, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 14:**

All email communications related to the payment obligations of HCMFA to Highland Global Allocation Fund for the NAV Error.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

HCMFA APP 0826

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 14, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

HCMFA APP 0827

Dated: June 28, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:  jpomerantz@pszjlaw.com
          ikharasch@pcszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
_____
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*