Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Debtor. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. No. 21-03004 |

**DEFENDANT'S APPENDIX IN SUPPORT OF**
**SECOND MOTION FOR LEAVE TO AMEND ANSWER**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P. ("HCMFA" or the

"Defendant"), the defendant in the above styled and numbered adversary proceeding (the

"Adversary Proceeding") commenced by Highland Capital Management, L.P. (the "Debtor"), and

files this its *Defendant's Appendix In Support of Second Motion for Leave to Amend Answer* (the

"Appendix"), filed in support of the *Defendant's Second Motion for Leave to Amend Answer and Brief In Support Thereof* (the "Motion"), as follows:

| No. | | Description | Range |
|-----|---|-------------|-------|
| 1 | | Declaration of Dennis C. Sauter, Jr. | 1-52 |
| | 1 | Second Amended and Restated Shared Services Agreement | 13-25 |
| | 2 | Amended and Restated Shared Services Agreement | 26-44 |
| | 3 | E-mail Chain | 45-48 |
| | 4 | Order Granting Debtor's Motion for a Preliminary Injunction Against James Dondero | 49-52 |
| 2 | | October 19, 2021 Deposition of Frank Waterhouse | 53-449 |
| 3 | | October 27, 2021 Deposition of Kristin Hendrix | 450-653 |
| 4 | | October 27, 2021 Deposition of David Klos | 654-813 |
| 5 | | Declaration of Davor Rukavina | 814-828 |
| | A | Defendant's Second Set of Requests for Production to Plaintiff | 817-821 |
| | B | Debtor's Responses and Objections to Defendant's Second Set of Requests for Production | 822-828 |

RESPECTFULLY SUBMITTED this 30th day of November, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
        Davor Rukavina, Esq.
        Texas Bar No. 24030781
        Julian P. Vasek, Esq.
        Texas Bar No. 24070790
        3800 Ross Tower
        500 N. Akard Street
        Dallas, Texas 75201-6659
        Telephone: (214) 855-7500
        Facsimile: (214) 855-7584
        Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 30th day of November, 2021, true and correct copies of this document, with the exhibits referenced herein (redacted) were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record, and in unredacted format by e-mail on John Morris, Esq., counsel of record for the Plaintiff.

/s/ Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03005 |
| | § | |
| NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

## <u>DECLARATION OF DENNIS C. SAUTER, JR.</u>

I, Dennis C. Sauter, Jr., hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

HCMFA APP 0001

# I.     INTRODUCTION

1.     My name is Dennis C. Sauter, Jr. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration. I have personal knowledge of the facts stated in this Declaration, or such facts are known to me from my review of the books and records of Highland Capital Management Fund Advisors, L.P. ("HCMFA") and/or NexPoint Advisors, L.P. ("NexPoint").

2.     I am an attorney licensed to practice law in the State of Texas, and have been such since 2001. I am in-house counsel for both HCMFA and NexPoint, and have been since at least January 1, 2021, which is why I am aware of both of these adversary proceedings. I have been responsible for managing outside counsel in both of these adversary proceedings since their filing, and I remain so responsible.

3.     While I provided limited legal services to Highland Capital Management, L.P. (the "Debtor") and its affiliated entities as outside counsel before I became in-house counsel, those services were limited to real estate transactions having nothing to do with the facts discussed in this Declaration.

4.     I am executing this Declaration in Support of the motions of both HCMFA and NexPoint to amend their answers in the above styled and numbered adversary proceedings initiated by the Debtor.

5.     I am aware that both HCMFA and NexPoint previously sought and obtained permission to amend their answers in these adversary proceedings. Nevertheless, due to very recent events and discovery, HCMFA and NexPoint have determined that it is advisable to again amend their answers to assert certain defenses or affirmative defenses, which should by now have become clear to the Debtor as a result of very recent discovery, in order that justice may be done, that they may assert all available defenses and affirmative defenses, and that the trier of fact in

these adversary proceedings will have all relevant claims, defenses, and facts before it. Specifically:

(i) HCMFA seeks to explicitly assert that Frank Waterhouse ("Waterhouse") did not sign the two promissory notes that the Debtor has sued HCMFA on in adversary proceeding no. 21-03004; and

(ii) NexPoint seeks to explicitly assert that it had prepaid the promissory note in question in adversary proceeding no. 21-03005 and that, accordingly, the December 31, 2020 payment had been satisfied by prepayment.

## II. BACKGROUND

6. HCMFA and NexPoint are registered advisors under the Investment Advisors Act of 1940. As such, they advise various independent funds which, in turn, are investment vehicles for a large number of investors.

7. HCMFA and NexPoint have always had very few employees. During 2019, for example, HCMFA had only 7 to 9 employees.

8. Instead, most of the services needed by HCMFA to transact its business were provided by the Debtor pursuant to that certain *Second Amended and Restated Shared Services Agreement* dated February 8, 2013 (the "HCMFA Agreement"), a true and correct copy of which is attached hereto as Exhibit 1, while most of the services needed by NexPoint to transact its business were provided by the Debtor pursuant to that certain *Amended and Restated Shared Services Agreement* dated January 1, 2018 (the "NexPoint Agreement," with the HCMFA Agreement, the "Shared Services Agreements"), a true and correct copy of which is attached hereto as Exhibit 2.

9. This was standard business practice for the Debtor and various other affiliated companies, including other advisers, within the Debtor's "complex" of business: the Debtor would

employ most of the employees and then share those employees with HCMFA, NexPoint, and other "complex" entities, in exchange for payments by such entities.

10.     Thus, under the Shared Services Agreements, employees of the Debtor (many of whom were highly trained and specialized) provided many key services to HCMFA and NexPoint on an as-needed basis.     These services included legal, accounting, treasury, regulatory, compliance, IT, and tax services, among others.     Additionally, under the Shared Services Agreements, the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored on the Debtor's servers.

11.     On January 22, 2021, the Debtor filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "HCMFA Complaint") against HCMFA, seeking to recover on two alleged promissory notes, each dated May 2, 2019 (the "HCMFA Notes"): (i) a note for $5 million; and (ii) a note for $2.4 million.  HCMFA timely answered.

12.     On January 22, 2021, the Debtor also filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "NexPoint Complaint," with the HCMFA Complaint, the "Complaints") against NexPoint, seeking to recover on an alleged promissory note dated May 31, 2017 in the original principal amount of $30,746,812.33 (the "NexPoint Note," with the HCMFA Notes, the "Notes").  NexPoint timely answered.

13.     At the time that the Debtor filed the Complaints, I promptly undertook an internal review of the background facts concerning the Notes.  I had no knowledge of them, since I had not been employed by HCMFA or NexPoint at the time that they were allegedly executed, and the few direct employees of HCMFA and NexPoint likewise had limited knowledge of the Notes.  I also discussed the Notes with James Dondero, president of HCMFA and NexPoint, and formerly the CEO of the Debtor, and Mr. Dondero recalled only high-level details of the Notes.  My review of

the limited books and records of HCMFA and NexPoint that were not then in the possession of the Debtor did not reveal any background facts regarding the Notes.

14.     Normally, I would have discussed the Notes with employees of the Debtor who also provided services to HCMFA and NexPoint pursuant to the Shared Services Agreements in order to assess what defenses or affirmative defenses to the Complaint existed. However, in this instance I was precluded from doing so.

15.     First, attached hereto as Exhibit 3 is a true and correct copy of an e-mail exchange between myself and Mr. James Seery dated September 17, 2020. Mr. Seery was and remains the Chief Executive Officer of the Debtor. As stated in Exhibit 2, Mr. Seery informed me that Debtor employees had been instructed not to discuss with me anything that is "inimical" to the interests of the Debtor, and that they would be terminated if they did so. This e-mail communication comports with other communications between myself and Mr. Seery where he cautioned me not to discuss with Debtor employees matters that may be adverse to the Debtor.

16.     Second, by the time of the filing of the Complaints, the Court had entered a preliminary injunction against Mr. Dondero, a true and correct copy of which is attached hereto as Exhibit 4. That injunction prohibited Mr. Dondero from "directly or indirectly . . . communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided." As the information concerning the Notes was background information and not related to "services currently provided," I was concerned that, if I discussed the Notes with the Debtor's employees, the Debtor would argue that either Mr. Dondero or I was violating the Court's injunction.

17.     In sum, after the Complaints were filed, the employees of HCMFA or NexPoint knew very little about the Notes, and I was precluded from contacting the people that would have known information about the notes, *i.e.* the Debtor's employees, to discuss what they may have

HCMFA APP 0005

known. I also had very limited access to HCMFA's and NexPoint's books and records, and, even if I had had full access, I would not have known what relevant books and records to search for in the many millions of files without first obtaining a generalized background of the facts regarding the Notes from Debtor employees.

18. The situation changed by mid-April, 2021. As of late February, 2021, the Debtor terminated the Shared Services Agreements and terminated most of its former employees. Many of those employees then formed their own company, Skyview Group, which then contracted with HCMFA and NexPoint to continue providing essentially the same services that they had previously provided under the Shared Services Agreements. Additionally, the Debtor provided access to HCMFA and NexPoint to many of its books and records (although not all). Thus, as of March, 2021, I was able to communicate with most former Debtor employees and to access many books and records without fear of violating any court order.

19. March, 2021, was exceedingly busy, to say the least. With the termination of the Shared Services Agreements, HCMFA, NexPoint, other entities for which I am in-house counsel, and I were preoccupied with transitioning the services that the Debtor had been providing for more than a decade to a new entity, using new infrastructure, moving into new offices, setting up new networks, etc., all for the primary goal of ensuring a smooth and uninterrupted continuity of business and services provided by HCMFA and NexPoint and others to third parties.

20. By mid-April, 2021, the situation had calmed down to the point that I was able to discuss the Notes with former employees, most importantly Waterhouse and Will Mabry ("Mabry"). Mabry in particular was able to provide me internal documents and memoranda that I had not previously known about to that helped with the factual background of the Notes.

21. From these discussions and documents, I was able to better understand the factual background concerning the HCMFA Notes, ultimately concluding at the time that the Notes were

signed by mistake by Waterhouse without authority from HCMFA, had no consideration, and were never intended to be debt instruments of HCMFA. I testified as to these matters before based on my understanding, and HCMFA obtained leave to amend its answer to assert these defenses.

### III.    FACTS PERTINENT TO HCMFA

22.    With respect to the HCMFA Notes, those notes appear to be signed by Waterhouse. At the time of those alleged Notes, Waterhouse was the Chief Financial Officer of the Debtor. At that time, he was also either the Chief Financial Officer, or Treasurer, of HCMFA (either way, an officer level position at HCMFA).

23.    In the April, 2021 timeframe, when I discussed the HCMFA Notes with Waterhouse, I asked him whether he had signed those two notes. At that time, he told me that he believed that he had, because he had not been electronically signing documents in May, 2019 and the signatures on the notes looked like they were his. Although he did not remember many, if any, of the facts and circumstances concerning the HCMFA Notes, given that he told me that he believed he signed those notes because the signatures looked like they were his and because he signed a lot of documents and could not remember each one particularly, I did not have reasonable grounds to believe that Waterhouse had not in fact signed the HCMFA Notes or authorized his signature to be affixed to the HCMFA Notes. And, I was not prepared to assert a defense in which I did not have a good faith belief.

24.    This changed in late October, 2021. On October 19, 2021, the Debtor and HCMFA deposed Waterhouse, including in connection with the HCMFA Notes. In that deposition, and among other things, Waterhouse testified that (and I am paraphrasing): (i) he did not remember signing the HCMFA Notes or giving anyone permission to sign his name to the same; (ii) his signatures on the HCMFA Notes appeared to be electronic signatures; and (iii) in May, 2019, he

HCMFA APP 0007

sometimes signed documents electronically, but if he did so, he would have sent an e-mail to Kristen Hendrix ("Hendrix") authorizing and instructing her to sign his name to a document.

25.     Although I understand that HCMFA had requested the originals of the HCMFA Notes previously from the Debtor in discovery, I understand that those native documents were not produced until October 25, 2021. I understand that, when produced, those originals showed that Waterhouse's signature was indeed an electronic signature on both of the HCMFA Notes and, unlike various electronic signatures that employ some control process or matrix certifying authenticity, here both signatures were merely pictures of his signatures. Indeed, one can copy and paste that same picture on to any document without any control or approval needed by Waterhouse, as I do below (below is the picture copied from the HCMFA Notes, originally in Word with the signature picture in "picture" format, probably .jpg).



26.     Then, on October 27, 2021, HCMFA deposed Hendrix. In that deposition, and among other things, Hendrix testified that (and I am paraphrasing): (i) she prepared the HCMFA Notes from a Word document template, by inputting various details into the document and adding Waterhouse's signature picture; (ii) she does not remember Waterhouse authorizing her to affix his signature, although she believes that this was likely the case; (iii) she does not remember printing out the documents and presenting them to Waterhouse for approval or signature; and (iv) she does not remember whether the HCMFA Notes were printed out at all or if they were simply saved in their original electronic format on the Debtor's system.

27.     Importantly, Hendrix remained an employee of the Debtor after the Debtor terminated most employees around February, 2021. Thus, neither I nor anyone else with HCMFA or NexPoint was able to talk to her directly regarding the Notes, and neither I nor, to my

knowledge, anyone else working with or for HCMFA or NexPoint did so.  In other words, her deposition was the first time that HCMFA and NexPoint learned what she had to say of relevance to the Notes.

28.     Additionally, as noted above, Waterhouse testified that, if he had authorized Hendrix or someone else to electronically sign his name to a document, he would have done so through an e-mail.  I understand from Munsch Hardt that the Debtor has produced no such e-mail in discovery.

29.     Therefore, HCMFA now believes that Waterhouse never in fact signed the HCMFA Notes or authorized Hendrix or anyone else to sign his name to the HCMFA Notes, and HCMFA finds it advisable and appropriate to amend its answer to explicitly assert this defense.

30.     HCMFA did not know, and could not reasonably have known, about this defense until the end of October, 2021, after the Hendrix deposition transcript was prepared.  HCMFA did not delay in any way in seeking to assert this defense.  As noted above, had Waterhouse not told me in April, 2021 that he assumed that he signed the HCMFA Notes because the signatures looked like his, or had he given me any indication that he had not in fact signed the HCMFA Notes, then HCMFA would have asserted this defense sooner.  As is, however, it was not until discovery in late October, 2021 that HCMFA learned that Waterhouse apparently did not sign the HCMFA Notes or authorize his electronic signature, and HCMFA did not delay thereafter in promptly seeking to amend its answer.

31.     HCMFA therefore respectfully requests leave to amend its answer to expressly plead that the HCMFA Notes were never in fact signed.

## IV.     FACTS PERTINENT TO NEXPOINT

32.     The NexPoint note was in the original principal amount of $30,746,812.33.  The note required an annual payment of principal and interest.  By December 31, 2020, the amount due

on the NexPoint note was approximately $24,471,804.98. Thus, even though the NexPoint Note was dated May 31, 2017 and had a thirty (30) year amortization, meaning that there should have been only three (3) annual payments by December 31, 2020 (2017, 2018, and 2019), the amount of the NexPoint Note was significantly lower than it should have been.

33. This was one of the issues I discussed with Waterhouse in April, 2021 when I was able to finally discuss the Notes with him. In particular, I asked him why the amount due on the NexPoint Note was significantly less than it appeared that it should have been based on its original principal amount and annual payments. Waterhouse did not know the answer to that question, but informed me that the payment ledger kept by the Debtor for that note should have the answer.

34. Like HCMFA, NexPoint deposed Hendrix on October 27, 2021. During that deposition, it was learned that a document the Debtor produced, bates-labeled D-NNL-029141, was the internal Debtor-maintained payment ledger for the NexPoint Note. The Debtor had produced this document before, in early June, 2021, but there were two problems: (i) NexPoint did not know that this document was *the* payment ledger for the NexPoint Note; and (ii) NexPoint had no context or ability to know what the entries on the document meant.

35. Indeed, Mr. James Seery, at his deposition on October 19, 2021, while confirming that the Debtor did maintain a payment ledger for the NexPoint Note and that the Debtor had produced the same, was unable to state whether document D-NNL-029141 was that ledger and, in fact, testified as to his belief that this document "is something else." If the CEO and CRO of the Debtor was unsure what document D-NNL-029141 was, then NexPoint cannot reasonably be expected to know that that document was the official payment ledger until the October 27, 2019 deposition of Hendrix. Indeed, it was the Hendrix deposition that confirmed the existence of the prepayment defense because Hendrix testified that (I am paraphrasing): (i) if the Debtor needed

cash, then one of its affiliates, such as NexPoint, would transfer the Debtor funds; (ii) this occurred in 2019; and (iii) such transfers would have been recorded by the Debtor as prepayments.

36.     NexPoint believes that that ledger proves that NexPoint had in fact prepaid the December 31, 2020 obligation under the NexPoint Note, such that there was no failure by NexPoint to make that payment and therefore no grounds to accelerate the NexPoint Note.  That also explains why the principal amount of the NexPoint Note was significantly less than it would have been without prepayments.

37.     NexPoint did not delay in seeking to expressly assert this prepayment defense.  The payment ledger was a document of the Debtor that, prior to discovery, NexPoint did not have access to and, in fact, was prohibited by the Debtor from even trying to access.  Once that document was produced by the Debtor in discovery, NexPoint used it at the appropriate depositions which, for scheduling reasons and by the agreement of the parties, did not occur until late October, 2021. As soon as logistically possible thereafter, NexPoint sought to assert this defense.  While NexPoint questioned why the amount due on the NexPoint Note was significantly less, and while I personally sought an answer from Waterhouse (who did not know), that does not necessarily mean that the NexPoint Note was prepaid, as it could have been forgiven in part or otherwise treated, and NexPoint did not want to raise a defense without evidence to support the defense which, like I say above, did not come to light until late October, 2021, through discovery.

38.     NexPoint therefore respectfully requests that it be granted leave to amend its answer to assert an additional defense that the December 31, 2020 payment on the NexPoint Note had been prepaid and that there was therefore no default in the failure to make the same, and no right to accelerate the NexPoint Note.

Signed: November 17, 2021

_____
DENNIS C. SAUTER, JR.

# SECOND AMENDED AND RESTATED
# SHARED SERVICES AGREEMENT

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "***Agreement***") is entered into to be effective as of 8th day of February, 2013 (the "***Effective Date***") by and among Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("***HCMFA***"), and any affiliate of HCMFA that becomes a party hereto.  Each of the signatories hereto is individually a "***Party***" and collectively the "***Parties***".

## RECITALS

A.      During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

## AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

## ARTICLE I
## DEFINITIONS

"***Actual Cost***" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"***Affiliate***" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person.  The term "***control***" (including, with correlative meanings, the terms "***controlled by***" and "***under common control with***") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"***Agreement***" has the meaning set forth in the preamble.

"***Allocation Percentage***" has the meaning set forth in Section 4.01.

"***Applicable Margin***" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"***Change***" has the meaning set forth in Section 2.02(a).

"***Change Request***" has the meaning set forth in Section 2.02(b).

"***Code***" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

EXHIBIT 1

"*Effective Date*" has the meaning set forth in the preamble.

"*Governmental Entity*" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*Liabilities*" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"*Loss*" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "*Loss*" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"*New Shared Service*" has the meaning set forth in Section 2.03.

"*Party*" or "*Parties*" has the meaning set forth in the preamble.

"*Person*" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"*Quarterly Report*" has the meaning set forth in Section 5.01.

"*Recipient*" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"*Service Provider*" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"*Service Standards*" has the meaning set forth in Section 6.01.

"*Shared Assets*" shall have the meaning set forth in Section 3.02.

"*Shared Services*" shall have the meaning set forth in Section 2.01.

"*Subsidiary*" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"*Tax*" or "*Taxes*" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"*Term*" has the meaning set forth in Section 7.01.

HCMFA APP 0014

ARTICLE II
SHARED SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "*Shared Services*"), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02    Changes to the Shared Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "*Change*").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "*Change Request*") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Shared Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "*New Shared Service*").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "*Shared Service*" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

3

HCMFA APP 0015

ARTICLE III
SHARED ASSETS

Section 3.01    Shared IP Rights.  Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "*Shared IP Rights*") pursuant to third party intellectual property Agreements ("*Third Party IP Agreements*"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02    Other Shared Assets.  Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "*Future Shared Assets*" and collectively with the Shared IP Rights, the "*Shared Assets*").

ARTICLE IV
COST ALLOCATION

Section 4.01    Actual Cost Allocation Formula.  The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "*Allocation Percentage*" means:

(a)    To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)    To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)    All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02    Non-Cash Cost Allocation.  The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01    Quarterly Statements.  Within thirty (30) days following the end of each calendar qaurter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

4

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "*Quarterly Report*").

Section 5.02    Settlement Payments.    At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03    Determination and Payment of Cost and Revenue Share.

(a)    Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)    Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04    Taxes.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient. Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied. Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings. Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to

5

HCMFA APP 0017

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

        (c)     The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE VI
## SERVICE PROVIDER RESPONSIBILITIES

        Section 6.01    <u>Service Provider General Obligations</u>.  Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "***Service Standards***").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

        Section 6.02    <u>Books and Records; Access to Information</u>.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

        Section 6.03    <u>Return of Property and Equipment</u>.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE VII
## TERM AND TERMINATION

        Section 7.01    <u>Term</u>.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "***Term***"), unless terminated earlier in accordance with Section 9.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

6

Section 7.02    Termination.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

<div align="center">

ARTICLE VIII
LIMITED WARRANTY

</div>

Section 8.01    Limited Warranty.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

<div align="center">

ARTICLE IX
MISCELLANEOUS

</div>

Section 9.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

<div align="center">

7

</div>

HCMFA APP 0019

Section 9.05    Governing Law.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06    Assignment.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08    Counterparts.   This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09    Successors and Assigns; No Third Party Beneficiaries.   This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10    Notices.   All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

If to HCMLP, addressed to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

If to HCMFA, addressed to:

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

Section 9.11    Expenses.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

8

Section 9.12 <u>Waiver</u>. No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13 <u>Severability</u>. If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties. All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14 <u>Arbitration; Jurisdiction</u>. Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided, however</u>, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service. The arbitrator(s) shall be duly licensed to practice law in the State of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15 <u>General Rules of Construction</u>. For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

9

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

10

HCMFA APP 0022

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   Strand Advisors, Inc., its general partner

By: _____
Name:  James Dondero
Title:   President


HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

By:   Strand Advisors XVI, Inc., its general partner

By: _____
Name:  Brian Mitts
Title:   Assistant Secretary

11

HCMFA APP 0023

## Annex A

### Shared Services

Compliance

        General compliance

        Compliance systems

Facilities

        Equipment

        General Overhead

        Office Supplies

        Rent & Parking

Finance & Accounting

        Book keeping

        Cash management

        Cash forecasting

        Credit facility reporting

        Financial reporting

        Accounts payable

        Accounts receivable

        Expense reimbursement

        Vendor management

HR

        Drinks/snacks

        Lunches

        Recruiting

IT

        General support & maintenance (OMS, development, support)

        Telecom (cell, phones, broadband)

        WSO

Legal

        Corporate secretarial services

        Document review and preparation

        Litigation support

        Management of outside counsel

Marketing and PR

        Public relations

Tax

        Tax audit support

        Tax planning

        Tax prep and filing

Investments

        Investment research on an ad hoc basis as requested by HCMFA

Valuation Committee

<u>Trading</u>

Trading desk services

<u>Operations</u>

Trade settlement

HCMFA APP 0025

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.   As used in this Agreement, the following terms shall have the following meanings:

EXHIBIT 2

HC

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

2

HCMFA APP 0027

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01    General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

HCMFA APP 0028

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

       (b)    *Legal/Compliance/Risk Analysis*. Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

       (c)    *Tax*. Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

       (d)    *Management of Clients and Accounts*. Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

       (e)    *Valuation*. Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

       (f)    *Execution and Documentation*. Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

       (g)    *Marketing*. Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

       (h)    *Reporting*. Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

HCMFA APP 0029

       (i)    *Administrative Services*.  The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

       (j)    *Shared Employees*.  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

       (k)    *Ancillary Services*.  Assistance and advice on all things ancillary or incidental to the foregoing; and

       (l)    *Other*.  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

    Section 2.03   <u>Shared Employees</u>.

       (a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

HCMFA APP 0030

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" or, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

HCMFA APP 0031

      (i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

      (j)    The Staff and Services Provider shall require that each Shared Employee:

      (i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

      (ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

      (iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

      (iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

      (v)    to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

      (vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

      (k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

    Section 2.04   Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

    Section 2.05   Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

HCMFA APP 0032

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07    Third Parties.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations. Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

HCMFA APP 0034

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

HCMFA APP 0035

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

11

HCMFA APP 0036

Section 6.02   Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   Indemnification by the Management Company.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

HCMFA APP 0037

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to a Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; provided that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

13

HCMFA APP 0038

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

# ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

# ARTICLE VIII

## MISCELLANEOUS

Section 8.01    Amendments. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    Assignment and Delegation.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 8.02, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this Section 8.02, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of Section 8.02(a) other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; provided that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; provided that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03   Non-Recourse; Non-Petition.

(a)   The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)   Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)   Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)   The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)   The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

HCMFA APP 0040

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

HCMFA APP 0041

Section 8.09    Third Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture. Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties. Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor. Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement. The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices. Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

NexPoint Advisors, L.P.
200 Crescent Court
Suite 700
Dallas, TX 75201

HCMFA APP 0042

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

HCMFA APP 0043

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

NEXPOINT ADVISORS, L.P.

By: NexPoint Advisors GP, LLC, its General Partner

By: _____
Name: Frank Waterhouse
Title: Treasurer


HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By: _____
Name: Frank Waterhouse
Title: Treasurer

HCMFA APP 0044

## Rukavina, Davor

| | |
|---|---|
| **From:** | James Seery <jpseeryjr@gmail.com> |
| **Sent:** | Thursday, September 17, 2020 4:17 PM |
| **To:** | DC Sauter |
| **Cc:** | Gregory V. Demo |
| **Subject:** | Re: Acis Settlement |

DC

I believe your concerns regarding the release are misplaced as it does not bind entities that HCMLP does not control. Greg can walk you through the language, but I do not believe it requires adjustment nor does it create any liability. To the contrary, it reduces liability.

With regard to the HCMLP employee prohibitions, no employee whether legal or non-legal can work on any matter that is inimical to the interests of HCMLP. I ,as CEO, and the Independent Board will make the determination as to whether an action violates the prohibition, and a breach of the prohibition will lead to termination for cause. I believe that most of the employees have been informed of this requirement and are following the directive.

With regard to transactional matters, HCMLP employees will continue to work with you on those issues that do not run afoul of the prohibition above. If there is a particular matter where you are taking a potentially adversarial action vis a vis HCMLP, please let me know what it is. We can then consider whether a customized operating protocol for that issue is needed or whether you will simply be on your own. I will make the determination with the advice of counsel. We do not believe the Texas rules of professional responsibility apply in this situation.

Please let me know what matter you are considering with respect to the immediately preceding paragraph, and we will consider how to best address your concerns.

Best. Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** DC Sauter <DSauter@NexPointadvisors.com>
**Date:** Thursday, September 17, 2020 at 4:56 PM
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** Greg Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

Jim/Greg, follow up on my email below. I have a few items that have been placed on my plate, and I really need to understand who I can speak with and the extent to which they are permitted to share information with me.



1



O: 972.628.4117  |  C: 469.877.6440

**From:** DC Sauter
**Sent:** Tuesday, September 15, 2020 8:55 AM
**To:** 'James Seery' <jpseeryjr@gmail.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

My apologies for copying Isaac.  I was under the mistaken impression that he would have assisted in the settlement.

In my view, the requested clarification is beneficial to Strand, HCMLP, and the other "HCMLP Entities."  The documents purport to release ACIS from claims on behalf of, among others, any entity that is "managed" by HCMLP and "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns" of any "HCMLP Entity."  Those "HCMLP Entities" lack the authority to bind a whole host of parties in that laundry list, which could result in claims against HCMLP, Strand, and the other "HCMLP Entities" by both the "ACIS Released Parties," who will claim they didn't receive the benefit of the bargain, and the parties on whose behalf the "HCMLP Parties" purported to release claims who didn't consent to the release.

Additionally, I'd like to visit with you all regarding the board's position that prohibits certain HCMLP personnel from working on certain matters.

First, I am unclear whether the prohibition applies to only HCMLP legal personnel or whether it applies to all HCMLP employees.  Please clarify.

Second, as you may know, virtually all of these matters are falling into my lap, and in most cases I lack any knowledge about them.  It would help me tremendously if current HCMLP employees, and particularly the legal personnel, could provide me with transactional background to assist in the transition of the matter.  While I understand the board's concern with Judge Jernigan's order, I don't believe that the Texas Disciplinary Rules of Professional Conduct mandate or even permit an attorney licensed in the State of Texas to refuse to cooperate with a former client in the transfer of a matter to a new attorney.  Rule 1.15(d) states that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned." The comments to that rule provide additional clarity:  "In every instance of withdrawal and even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client."  T.D.R.P.C. Rule 1.15, comment 9.  Proper steps may include providing information to new counsel or even continuing to represent the client for a limited time to meet impending deadlines. *Microsoft Corp. v. Commonwealth Sci. & Indus. Research Org.*, 2007 U.S. Dist. LEXIS 91550 *23-24 fn. 11 (E.D. Tex. Dec. 13, 2007).  Even if the board insists that the HCMLP legal personnel cannot continue to represent others in non-HCMLP matters or matters adverse to HCMLP (irrespective of any conflict of interest analysis of whether those attorneys may continue to represent HCMLP in those matters), the ethical rules require that the attorneys provide assistance in transferring those matters to me or others.

Finally, I routinely handle, and am routinely asked to handle, legal matters that relate to real estate for entities owned or controlled by HCMLP (Park West, the Arizona assets, the Maple Ave. property, to name a few).  I am not an HCMLP employee, and it's my understanding that NexPoint Advisors, L.P. is not compensated for the time I spend on HCMLP matters.  I'm not suggesting that this arrangement should change, but it feels from my perspective that the board's position is only working in one direction.  In other words, if I understand the board's position correctly, I can work on both NexPoint and HCMLP matters, but the HCMLP legal employees may only work on HCMLP-related matters.  It has also put a significant amount of additional work on my plate.  I would like to understand two things.  First, what is the scope of my authority in these matters, and what is the proper protocol vis-à-vis you, DSI, and the board?  I have tried to take the conservative approach in keeping you all informed and asking for consent or approval where I thoughts it

HCMFA APP 0046

appropriate.  I assume this is how you'd like to continue to handle things, but I would like confirmation of that.  Second, I have heard that you all were working to transfer a couple of the legal personnel (perhaps Thedford and Post) to HCMFA so they could assist with the work load (particularly in the areas where I don't have a significant amount of experience).  I'd like to know where that stands and when relief can be expected.

I'm available most of today and tomorrow to discuss.

**D.C. Sauter**

# NEXPOINT

O: 972.628.4117  |  C: 469.877.6440

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Tuesday, September 15, 2020 7:01 AM
**To:** DC Sauter <DSauter@NexPointadvisors.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Re: Acis Settlement

DC.  We will discuss and revert to you.  Neither Isaac nor anyone else at HCMLP is permitted to work on any issues related to the settlement and release other than as directed by me.

Thanks

Sent from my iPad

> On Sep 14, 2020, at 7:08 PM, DC Sauter <DSauter@nexpointadvisors.com> wrote:
>
> Greg,
>
> I've been asked to review the attached release on behalf of HCMFA and the closed-end funds.  I'm concerned that the language below creates an ambiguity as to whether the closed-end funds and HCMFA have released claims against the ACIS parties:
>
> 1.  The release by Strand, which also serves as the general partner of HCMFA; and
> 2.  The release by each "HCMLP Entity" of its "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns."
>
> We would like the final sentence in paragraph 1.a. of the Release to be revised to specifically identify HCMFA and the closed-end funds as parties not covered by the release.  Please let me know if you'd like to discuss in more detail.
>
>
> **D.C. Sauter** | General Counsel, Real Estate
>
> <image001.jpg>
>
> 300 Crescent Court  |  Suite 700  |  Dallas, Texas 75201
> O: 972.628.4117  |  C: 469.877.6440  |  F: 972.628.4147
> dsauter@nexpointadvisors.com  |  www.NexPointGroup.com

HCMFA APP 0047

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

\<Acis - Release (EXECUTION VERSION).pdf\>

HCMFA APP 0048



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 11, 2021**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | § Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § No. 20-03190-sgj |
| | § |
| JAMES D. DONDERO, | § |
| | § |
| Defendant. | § |

### ORDER GRANTING DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
### AGAINST JAMES DONDERO

This matter having come before the Court on *Plaintiff Highland Capital Management,*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

19340542101011 EXHIBIT 4

*L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 2] (the "<u>Motion</u>"), filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "<u>Debtor</u>") in the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>"), and the plaintiff in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>"); and this Court having considered (a) the Motion, (b) *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Injunctive Relief* [Adv. Pro. Docket No. 1] (the "<u>Complaint</u>"), (c) the arguments and law cited in the *Debtor's Amended Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 3] (the "<u>Memorandum of Law</u>," and together with the Motion and Complaint, the "<u>Debtor's Papers</u>"), (d) *James Dondero's Response in Opposition to Debtor's Motion for a Preliminary Injunction* [Adv. Pro. Docket No. 52] (the "<u>Opposition</u>") filed by James Dondero, (e) the testimonial and documentary evidence admitted into evidence during the hearing held on January 8, 2021 (the "<u>Hearing</u>"), including assessing the credibility of Mr. James Dondero, (f) the arguments made during the Hearing, and (g) all prior proceedings relating to the Motion, including the December 10, 2020 hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against James Dondero* [Adv. Pro. Docket No. 6] (the "<u>TRO Hearing</u>"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest;

2

HCMFA APP 0050

and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted in support thereof, establish good cause for the relief granted herein, and that (1) such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate and reorganization process; (2) the Debtor is likely to succeed on the merits of its underlying claim for injunctive relief; (3) the balance of the equities tip in the Debtor's favor; and (4) such relief serves the public interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. James Dondero is preliminarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents, in whatever capacity they are acting; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned, controlled or managed by the Debtor, and the pursuit of the Plan or any

3

HCMFA APP 0051

alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[2]

3.      James Dondero is further preliminarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

4.      James Dondero is further preliminarily enjoined and restrained from communicating (in person, telephonically, by e-mail, text message or otherwise) with Scott Ellington and/or Isaac Leventon, unless otherwise ordered by the Court.

5.      James Dondero is further preliminarily enjoined and restrained from physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas, Texas, or any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel.  If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

6.      James Dondero is ordered to attend all future hearings in this Bankruptcy Case by Webex (or whatever other video platform is utilized by the Court), unless otherwise ordered by the Court.

7.      This Order shall remain in effect until the date that any plan of reorganization or liquidation resolving the Debtor's case becomes effective, unless otherwise ordered by the Court.

---

[2] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from (1) seeking judicial relief upon proper notice or from objecting to any motion filed in this Bankruptcy Case, or (2) communicating with the committee of unsecured creditors (the "UCC") and its professionals regarding a pot plan.

HCMFA APP 0052

```
 1                WATERHOUSE - 10-19-21

 2         IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
 3                  DALLAS DIVISION
        ------------------------------
 4    IN RE:

 5                              Chapter 11
      HIGHLAND CAPITAL
 6    MANAGEMENT, L.P.,         CASE NO.
                                19-34054-SGI11
 7
              Debtor.
 8    ------------------------------
      HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
              Plaintiff,
10    vs.                        Adversary
                                 Proceeding No.
11    HIGHLAND CAPITAL MANAGEMENT   21-03000-SGI
      FUND ADVISORS, L.P.; NEXPOINT
12    ADVISORS, L.P.; HIGHLAND
      INCOME FUND; NEXPOINT
13    STRATEGIC OPPORTUNITIES FUND;
      NEXPOINT CAPITAL, INC.; and
14    CLO HOLDCO, LTD.,

15            Defendants.
        ------------------------------
16

17         REMOTE VIDEOTAPED DEPOSITION OF

18               FRANK WATERHOUSE

19             October 19, 2021

20

21

22

23

24    Reported by:  Susan S. Klinger, RMR-CRR, CSR

25    Job No: 201195
```

```
 1                    WATERHOUSE - 10-19-21

 2

 3

 4                         October 19, 2021

 5                         9:30 a.m.

 6

 7

 8

 9        Remote Deposition of FRANK WATERHOUSE,

10    held before Susan S. Klinger, a Registered

11    Merit Reporter and Certified Realtime Reporter

12    of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            WATERHOUSE - 10-19-21

 2   A P P E A R A N C E S:

 3   (All appearances via Zoom.)

 4   Attorneys for the Reorganized Highland Capital

 5   Management:

 6        John Morris, Esq.

 7        Hayley Winograd, Esq.

 8        PACHULSKI STANG ZIEHL & JONES

 9        780 Third Avenue

10        New York, New York  10017

11   Attorneys for the Witness:

12        Debra Dandeneau, Esq.

13        Michelle Hartmann, Esq.

14        BAKER McKENZIE

15        1900 North Pearl Street

16        Dallas, Texas  75201

17   Attorneys for NexPoint Advisors, LP and

18   Highland Capital Management Fund Advisors,

19   L.P.:

20        Davor Rukavina, Esq.

21        An Nguyen, Esq.

22        MUNSCH HARDT KOPF & HARDD

23        500 North Akard Street

24        Dallas, Texas  75201-6659

25
```

1              WATERHOUSE - 10-19-21

2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,

3   and HCMS:

4        Deborah Deitsch-Perez, Esq.

5        Michael Aigen, Esq.

6        STINSON

7        3102 Oak Lawn Avenue

8        Dallas, Texas  75219

9

10  Attorneys for Dugaboy Investment Trust:

11       Warren Horn, Esq.

12       HELLER, DRAPER & HORN

13       650 Poydras Street

14       New Orleans, Louisiana 70130

15

16  Attorneys for Marc Kirschner as the trustee for

17  the litigation SunTrust:

18       Deborah Newman, Esq.

19       QUINN EMANUEL URQUHART & SULLIVAN

20       51 Madison Avenue

21       New York, New York  10010

22

23  Also Present:

24       Ms. La Asia Canty

25

```
 1              WATERHOUSE - 10-19-21

 2                  I N D E X

 3

 4   WITNESS                              PAGE

 5   FRANK WATERHOUSE

 6   EXAMINATION BY MR. MORRIS              10

 7   EXAMINATION BY MR. RUKAVINA           256

 8   EXAMINATION BY MS. DEITSCH-PEREZ      352

 9   EXAMINATION BY MR. MORRIS            377

10   EXAMINATION BY MR. RUKAVINA          387

11   EXAMINATION BY MS. DEITSCH-PEREZ     393

12

13              E X H I B I T S

14   No.                                 Page

15   Exhibit 2  NPA et al Amended Complaint   142

16   Exhibit 33 6/3/19 Management            91

17              Representation

18   Exhibit 34 HCMLP Consolidated Financial  94

19              Statements

20   Exhibit 35 HCMFA Incumbency Certificate  151

21   Exhibit 36 Email string re 15(c)        170

22   Exhibit 39 HCMLP Operating Results 2/18  226

23   Exhibit 40 Summary of Assets and        236

24              Liabilities

25   Exhibit 41 12/19 Monthly Operating Report 258
```

1            WATERHOUSE - 10-19-21

2  Exhibit 45 HCMFA Consolidated Financial      135

3            Statements

4  Exhibit 46 NexPoint 2019 Audited             218

5            Financials

6

7  Exhibit A1 Emails 11/25                       328

8  Exhibit A2 Emails 12/31                       338

9  Exhibit A6 Emails 1/12                        341

10 Exhibit A7 Promissory Notes                   297

11 Exhibit A9 Email, 8/31                        307

12 Exhibit A10 Acknowledgment from HCMLP         302

13 Exhibit A11 HCMLP Schedule 71A                309

14

15

16

17

18

19

20

21

22

23

24

25

1      WATERHOUSE - 10-19-21

2      P R O C E E D I N G S

3      VIDEOGRAPHER:  Good morning,

4   Counselors.  My name is Scott Hatch.  I'm a

5   certified legal videographer in association

6   with TSG Reporting, Inc.

7      Due to the severity of COVID-19 and

8   following the practice of social

9   distancing, I will not be in the same room

10   with the witness.  Instead, I will record

11   this videotaped deposition remotely.  The

12   reporter, Susan Klinger, also will not be

13   in the same room and will swear the witness

14   remotely.

15      Do all parties stipulate to the

16   validity of this video recording and remote

17   swearing, and that it will be admissible in

18   the courtroom as if it had been taken

19   following Rule 30 of the Federal Rules of

20   Civil Procedures and the state's rules

21   where this case is pending?

22      MR. HORN:  Yes.

23      MS. DANDENEAU:  Yes.

24      MR. MORRIS:  Yes.  John Morris.  I

25   would just try to do a negative notice

```
 1          WATERHOUSE - 10-19-21
 2    here, as we did yesterday.  If anybody has
 3    a problem with what was just stated, can
 4    you state your objection now?
 5          Okay.  No response, so everybody
 6    accepts the stipulation and the instruction
 7    that was just given.
 8          VIDEOGRAPHER:  Thank you.  This is
 9    the start of media labeled Number 1 of the
10    video recorded deposition of Frank
11    Waterhouse In Re: Highland Capital
12    Management, L.P., in the United States
13    Bankruptcy Court for the Northern District
14    of Texas, Dallas Division, Case Number
15    21-03000-SGI.
16          This deposition is being held via
17    video conference with participants
18    appearing remotely due to COVID-19
19    restrictions on Tuesday, October 19th, 2021
20    at approximately 9:32 a.m.  My name is
21    Scott Hatch, legal video specialist with
22    TSG Reporting, Inc. headquartered at 228
23    East 45th Street, New York, New York.  The
24    court reporter is Susan Klinger in
25    association with TSG Reporting.
```

1      WATERHOUSE - 10-19-21

2      Counsel, please introduce

3 yourselves.

4      MR. MORRIS:  John Morris, Pachulski

5 Stang Ziehl & Jones for the reorganized

6 Highland Capital Management, L.P., the

7 plaintiff in these actions.

8      MS. DANDENEAU:  Deborah Dandeneau

9 from Baker McKenzie.  My partner, Michelle

10 Hartmann, is also in the room with me,

11 representing Frank Waterhouse individually.

12      MS. DEITSCH-PEREZ:  Deborah

13 Deitsch-Perez from Stinson, LLP,

14 representing Jim Dondero, Nancy Dondero,

15 HCRA, and HCMS.

16      MR. HORN:  Warren Horn with Heller,

17 Draper & Horn in New Orleans representing

18 Dugaboy Investment Trust.

19      MR. RUKAVINA:  Davor Rukavina with

20 Munsch Hardt Kopf & Harr in Dallas

21 representing NexPoint Advisors, LP and

22 Highland Capital Management Fund Advisors,

23 L.P.

24      MR. AIGEN:  Michael Aigen from

25 Stinson, and I represent the same parties

```
 1                WATERHOUSE - 10-19-21

 2        as Deborah Deitsch-Perez.

 3              MS. NEWMAN:  This is Deborah Newman

 4        from Quinn Emanuel.  We represent the

 5        litigation -- Marc Kirschner as the trustee

 6        for the litigation SunTrust.

 7              MR. MORRIS:  I think that is

 8        everybody.

 9              VIDEOGRAPHER:  Thank you.  Will the

10        court reporter please swear in the witness.

11                     FRANK WATERHOUSE,

12     having been first duly sworn, testified as

13     follows:

14                     EXAMINATION

15     BY MR. MORRIS:

16        Q.    Please state your name for the

17     record.

18        A.    My name is Frank Waterhouse.

19        Q.    Good morning, Mr. Waterhouse.  I'm

20     John Morris, as you know, from Pachulski Stang

21     Ziehl & Jones.  You understand that my firm and

22     I represent Highland Capital Management, L.P.;

23     is that right?

24        A.    Yes.

25        Q.    Okay.  And do you understand that
```

```
 1                WATERHOUSE - 10-19-21

 2    we're here today for your deposition in your

 3    individual capacity?

 4         A.    Yes.

 5         Q.    Did you review and -- did you

 6    receive and review a subpoena that Highland

 7    Capital Management, L.P., served upon you?

 8         A.    Yes.

 9         Q.    You have been deposed before; right?

10         A.    Yes.

11         Q.    How many times have you been

12    deposed?

13         A.    About three or four times.

14         Q.    Okay.  And I defended you in one

15    deposition; isn't that right?

16         A.    That is correct.

17         Q.    So the general ground rules for this

18    deposition are largely the same as the

19    depositions you have given before.  And that is

20    I will ask you a series of questions, and it is

21    important that you allow me to finish my

22    question before you begin your answer; is that

23    fair?

24         A.    Yes.

25         Q.    And it is important that I allow you
```

1                    WATERHOUSE - 10-19-21

2  to finish your answers before I begin a

3  question, but if I fail to do that, will you

4  let me know?

5      A.    I can certainly do that.

6      Q.    Okay.  Do you understand that this

7  deposition is being videotaped?

8      A.    Yes.

9      Q.    You understand that I may seek to

10  use portions of the videotape in a court of

11  law?

12      A.    I did not know that, until you just

13  said that.

14      Q.    Okay.  And you are aware of that now

15  before the deposition begins substantively; is

16  that right?

17      A.    Yes.

18      Q.    So unlike I think the other

19  depositions that you have given, this one is

20  being given remotely.  So that presents some

21  unique challenges, at least as compared to a

22  deposition that is taken in-person.

23           From time to time we're going to put

24  documents up on the screen, Mr. Waterhouse.

25  And it is important that I give you the

Page 13

```
1              WATERHOUSE - 10-19-21
2  opportunity to review any portion of the
3  document that you think you need in order to
4  fully and completely answer the question.
5         So I would ask you to let me know if
6  there is a portion of a document that you need
7  to see in order to fully and completely answer
8  the question.  Can you do that for me?
9  A.    Yes.
10        MS. DANDENEAU:  Mr. Morris, I would
11        just note that we do have hard copies of
12        the documents that you sent, so if you can
13        just refer to the exhibit number as
14        reflected in the documents that you sent,
15        Mr. Waterhouse will be able to look at the
16        hard copies of those documents.
17        MR. MORRIS:  I appreciate that,
18        and -- and I will encourage him to do so.
19        There will be other documents that we did
20        not send to you that we'll be using today
21        though.
22  Q.    Okay.  With that as background, if
23  there is anything that I ask you, sir, that you
24  don't understand, will you let me know?
25  A.    Yes.
```

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Okay.  Are you currently employed?

 3        A.    Yes.

 4        Q.    By whom?

 5        A.    The Skyview Group.

 6        Q.    When did you become employed by the

 7   Skyview Group?

 8        A.    I believe March 1st of 2021.

 9        Q.    Do you have a title at Skyview?

10        A.    Yes.

11        Q.    What is your title?

12        A.    My title is chief financial officer.

13        Q.    Do you report to anybody in your

14   role as CFO?

15        A.    I don't, no.

16        Q.    No.  Is there a president or a CEO

17   of Skyview?

18        A.    Yes.

19        Q.    Who is that?

20        A.    That is Scott Ellington.

21        Q.    But you don't report to

22   Mr. Ellington; is that right?

23        A.    I don't think so.

24        Q.    Does Skyview Group --

25              MS. DANDENEAU:  Excuse me, we --
```

1          WATERHOUSE - 10-19-21

2      A.    I -- I -- I might.  I just -- I

3  don't recall.

4      Q.    Okay.  Does Skyview Group provide

5  any services to any entity directly or

6  indirectly owned or controlled by Jim Dondero?

7      A.    Yes.

8      Q.    Can you name -- is that pursuant to

9  written contracts?

10      A.    Yes.

11      Q.    And do you know how many contracts

12  exist?

13      A.    Approximately six or so.

14      Q.    And is the Skyview Group made up of

15  individuals who were formerly employees of

16  Highland Capital Management, L.P.?

17      A.    No.

18      Q.    Do you know how many -- how many --

19  how many employees does Skyview have?

20      A.    Approximately 35.

21      Q.    And can you tell me how many of

22  those 35 are former officers, directors, or

23  employees of Highland Capital Management, L.P.?

24      A.    I don't know the exact number.

25      Q.    Is it more than 20?

1              WATERHOUSE - 10-19-21

2      A.    Yes.

3      Q.    Is it more than 30?

4      A.    I don't know.

5      Q.    Can you tell me what portion of

6  Skyview -- Skyview's revenue is derived from

7  entities that are directly or indirectly owned

8  or controlled by Jim Dondero?

9              MS. DANDENEAU:  Mr. Morris, I mean,

10         you called Mr. Waterhouse here individually

11         for purposes of his testimony in connection

12         with the noticed litigation.  I have given

13         you some leeway to ask him some background

14         information about Skyview Group, but this

15         is not a substitute for a deposition in

16         connection with any other pending disputes

17         that exist.  And -- and we agreed to accept

18         the subpoena on the basis of he -- this is

19         testimony that he is giving in connection

20         with the noticed litigation.

21              I really think that you are now

22         going a little bit far afield from the

23         purpose of this deposition.

24              MR. MORRIS:  Okay.  It is -- I'm not

25         intending to use these -- the answers to

1                    WATERHOUSE - 10-19-21

2       these questions for any purpose other than

3       this litigation.  I think you understand

4       fully why I'm asking the questions, and I

5       just have a couple more, if you will bear

6       with me.

7             MS. DANDENEAU:  Okay.

8             MS. DEITSCH-PEREZ:  Can we have an

9       agreement that an objection by one is an

10      objection for any other party here?

11            MR. MORRIS:  Sure.  I would -- I

12      would encourage that, sure.

13            MS. DEITSCH-PEREZ:  Thank you.

14            MR. MORRIS:  It can't be sustained

15      or overruled more than one time, so...

16      Q.   Mr. Waterhouse, can you answer my

17  question, please.

18            MS. DANDENEAU:  Do you want to

19      repeat it, Mr. Morris, for his benefit?

20            MR. MORRIS:  Sure.

21      Q.   Can you -- can you tell me the

22  approximate portion of Skyview's revenue that

23  is derived from entities that are directly or

24  indirectly owned or controlled by Mr. Dondero?

25      A.   I don't know the exact number.

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Is it more than 75 percent?

 3        A.    Yes.

 4        Q.    Is it more than 90 percent?

 5        A.    I don't know.

 6        Q.    Okay.  Can I refer to Highland

 7   Capital Management, L.P., as Highland?

 8        A.    Yes.

 9        Q.    All right.  And you previously

10   served as Highland's CFO; correct?

11        A.    Yes.

12        Q.    When did you join Highland?

13        A.    I don't recall the exact date.

14        Q.    Can you tell me what year?

15        A.    2006.

16        Q.    When did you -- in what year did you

17   become Highland's CFO?

18        A.    I don't recall the exact date.

19        Q.    I'm not asking you for the exact

20   date.  I'm asking you if you recall the year in

21   which you were appointed CFO.

22        A.    I don't recall the exact year.

23        Q.    Can you tell me which years it is

24   possible that you were appointed to CFO of

25   Highland?
```

1                  WATERHOUSE - 10-19-21

2        A.    2011 or 2012.

3        Q.    Did you serve as Highland's CFO on a

4   continuous basis from in or around 2011 or 2012

5   until early 2021?

6        A.    Yes.

7        Q.    During that entire time you reported

8   directly to Jim Dondero; correct?

9        A.    I -- I don't know.

10        Q.    Is there anybody else you reported

11   to -- withdrawn.

12             Did you report to Mr. Dondero for

13   some portion of the time that you served as

14   CFO?

15        A.    Yes.

16        Q.    Is there a portion of time that you

17   don't recall who you reported to?

18        A.    Yes.

19        Q.    What portion of time do you have in

20   your mind when you can't recall who you

21   reported to?

22        A.    From the 2011 to -- for

23   approximately a year or two.

24        Q.    Okay.  So is it fair to say that you

25   reported to Mr. Dondero in your capacity as CFO

```
1                 WATERHOUSE - 10-19-21

2     from at least 2014 until the time you left

3     Highland?

4               MS. DANDENEAU:  Objection to form.

5          A.    I don't want to speculate the exact

6     or what year that changed or -- so I would like

7     to stick with my testimony.

8          Q.    Can you recall when you began

9     reporting to Mr. Dondero?

10         A.    I don't recall.

11         Q.    Can you -- can you give me an

12    estimate of what year you think you might have

13    began reporting to Mr. Dondero?

14         A.    I will go back to my prior

15    testimony.

16         Q.    Okay.  There is no -- you have no

17    ability to tell me when you began reporting to

18    Mr. Dondero.

19               Do I have that right?

20               MS. DANDENEAU:  Objection to form.

21         A.    I don't recall.

22         Q.    Okay.  Do you recall who you might

23    have reported to before you began reporting to

24    Mr. Dondero?

25         A.    Yes.
```

1           WATERHOUSE - 10-19-21

2      Q.    Who might you have reported to in

3   your capacity as CFO before you started

4   reporting to Mr. Dondero?

5      A.    That would have been Patrick Boyce.

6      Q.    Are you aware that Highland filed

7   for bankruptcy on October 19th, 2019?

8      A.    Yes.

9      Q.    And we refer to that as the petition

10  date?

11     A.    Yes.

12     Q.    Okay.  Do you hold any professional

13  licenses, sir?

14     A.    Yes.

15     Q.    Can you tell me what professional

16  licenses you hold?

17     A.    I'm a certified public accountant.

18     Q.    Okay.  Anything else?

19     A.    No.

20     Q.    Do you have any other professional

21  licenses or certificates?

22     A.    When you say "professional license,"

23  that is not education?

24     Q.    Tell me -- sure.  Anything other

25  than a driver's license.

1                    WATERHOUSE - 10-19-21

2              Do you have any other license or

3    certificate or certification?

4         A.    Are you asking, like, where I went

5    to school and the --

6         Q.    I am not.  I am not.  I didn't say

7    education.  I didn't ask about degrees.

8              Do you know what a license is?

9         A.    Well, yeah, I mean, a license is

10   something you get after you receive a certain

11   level of proficiency.

12        Q.    Do you have any licenses or

13   certifications other than your CPA?

14              MS. DANDENEAU:  Objection, form.

15              I assume you mean professional

16        licenses, Mr. Morris; correct?

17        Q.    Can you answer my question, sir?

18        A.    Mr. Morris, I'm thinking.  I

19   don't -- I don't think I have any others.

20        Q.    Are you familiar with an entity

21   called Highland Capital Management Fund

22   Advisors?

23        A.    Yes.

24        Q.    Were you ever -- can we refer to

25   that entity as HCMFA?

```
 1                    WATERHOUSE - 10-19-21
 2        A.    Yes.
 3        Q.    Were you ever employed by HCMFA?
 4        A.    Not that I recall.
 5        Q.    Were you ever -- did you ever hold
 6   the title of an officer or director of HCMFA?
 7        A.    Yes.
 8        Q.    What title did you hold?
 9        A.    Treasurer.
10        Q.    When did you become the treasurer of
11   HCMFA?
12        A.    I don't recall.
13        Q.    Can you tell me the year?
14        A.    I don't -- I don't know the year.
15        Q.    Can you approximate the year in
16   which you became the treasurer of HCMFA?
17        A.    I don't know.
18        Q.    Can you tell me if it was before or
19   after 2016?
20        A.    I don't recall.
21        Q.    Are you still the -- do you know if
22   you're still the treasurer of HCMFA today?
23        A.    Today, I am the acting treasurer for
24   HCMFA.
25        Q.    Is there a distinction between
```

1                    WATERHOUSE - 10-19-21

2    treasurer and acting treasurer?

3         A.    I said "acting treasurer" as I am an

4    employee of Skyview, as you previously

5    stated -- or asked.

6         Q.    But you are the treasurer of HCMFA

7    today; correct?

8         A.    I am -- I am the acting treasurer

9    for HCMFA.

10         Q.    How did you become the treasurer of

11    HCMFA?

12         A.    Are you asking how I became the

13    treasurer of HCMFA today?

14         Q.    How did you become appointed to

15    serve as the treasurer of HCMFA?

16         A.    Well, in -- in -- in what time

17    capacity?

18         Q.    The first time that you were

19    appointed.

20         A.    First time.  I believe I was asked

21    to serve as treasurer for HCMFA the first time.

22         Q.    By who?  Who asked you to do that?

23         A.    I don't recall.

24         Q.    Is there anything that would refresh

25    your recollection as to who appointed you as

1          WATERHOUSE - 10-19-21

2    the treasurer of CF- -- HCMFA for the first

3    time?

4          A.    I don't -- I mean, there would be

5    some documents, some legal documents.  I don't

6    know where those are.

7          Q.    How many times have you been

8    appointed the treasurer of HCMFA?

9          A.    I don't know.

10          Q.    Was it more than once?

11          A.    I don't know.

12          Q.    Can you tell me any period of time

13    since 2016 that you did not hold the title of

14    treasurer of HCMFA?

15                MS. DANDENEAU:  Objection to form.

16          A.    I don't recall.

17          Q.    What are your duties and

18    responsibilities as the treasurer of HCMFA?

19          A.    My duties are to do the best job

20    that I can as the -- as an accountant and

21    finance guy.

22          Q.    What specific duties and

23    responsibilities do you have as the treasurer

24    of HCMFA?

25          A.    My duties are to do the best job

1           WATERHOUSE - 10-19-21

2   that I can as the accounting and finance person

3   for HCMFA.

4       Q.    As the accounting and finance person

5   for HCMFA, do you have any particular areas of

6   responsibility?

7       A.    Yeah, it is to manage the accounting

8   and finance function for HCMFA.

9       Q.    Would that include -- do you have

10  responsibility for overseeing HCMFA's annual

11  audit?

12      A.    Can I please elaborate on my prior

13  question?

14      Q.    Of course.  You -- you are giving

15  answers.  I'm asking questions.

16      A.    Okay.  Yes, so the -- it -- like I

17  said, it is to manage the accounting finance

18  aspect, but I am, as we discussed, the

19  treasurer.  That is -- being treasurer is what

20  gives me that -- that management function.

21      Q.    Does anybody report to you in your

22  capacity as treasurer of HCMFA?

23      A.    I don't believe so.

24      Q.    Does HCMFA have a chief financial

25  officer?

```
 1                 WATERHOUSE - 10-19-21

 2       A.    I don't -- I don't know.

 3       Q.    You don't know?

 4             You're the treasurer of HCMFA but

 5  you don't know if HCMFA has a chief financial

 6  officer.

 7             Do I have that right?

 8       A.    That's right.

 9       Q.    Okay.  Have you heard of a company

10  called NexPoint Advisors?

11       A.    Yes.

12       Q.    We will refer to that as NexPoint.

13  Okay?

14       A.    Okay.

15       Q.    Were you ever employed by NexPoint?

16       A.    I don't recall.

17       Q.    Did you ever hold any title with

18  respect to the entity known as NexPoint?

19       A.    Yes.

20       Q.    What titles have you held in

21  relation to NexPoint?

22       A.    Treasurer.  I think it was only

23  treasurer.

24       Q.    Can you tell me the approximate year

25  you became the treasurer of NexPoint?
```

1                    WATERHOUSE - 10-19-21

2         A.     I don't know.

3         Q.     Are you still the treasurer of

4  NexPoint today?

5         A.     I am the acting treasurer for

6  NexPoint.

7         Q.     When did your title change from

8  treasurer to acting treasurer?

9         A.     I don't know.

10        Q.     Did your duties and responsibilities

11 change at all when your title was changed from

12 treasurer to acting treasurer?

13        A.     I don't -- I don't believe so.

14        Q.     Why did --

15        A.     I still manage the finance and

16 accounting function for NexPoint.

17        Q.     Why did your title change from

18 treasurer to acting treasurer?

19        A.     I don't -- I'm using the term

20 "acting treasurer" as I'm a Skyview employee.

21 I don't -- I don't know -- again, I am a -- as

22 I am the Skyview employee.

23        Q.     Okay.

24        A.     And we -- we provide officer

25 services.

```
1                    WATERHOUSE - 10-19-21

2        Q.    And you serve as an officer of

3    HCMFA; correct?

4        A.    I think we went over that with my

5    testimony.  Yes, I'm the acting treasurer for

6    HCMFA.

7        Q.    And you are an officer of NexPoint;

8    correct?

9        A.    I think -- I am the acting treasurer

10   for NexPoint Advisors.

11       Q.    And -- and who appointed you acting

12   treasurer of NexPoint Advisors?

13       A.    I don't recall specifically.

14       Q.    Do you have any recollection of who

15   might have appointed you the treasurer of

16   NexPoint?

17       A.    I mean, it -- it -- I don't recall

18   exactly who it was.

19       Q.    Who were the possibilities?

20             MS. DEITSCH-PEREZ:  Object to the

21       form.

22       Q.    You can answer.

23       A.    Someone in the legal group for

24   NexPoint.  The other officers as well.

25       Q.    Have you heard of a company called
```

```
 1               WATERHOUSE - 10-19-21

 2   Highland Capital Management Services, Inc.?

 3        A.    Yes.

 4        Q.    We will refer to that as HCMS.

 5   Okay?

 6        A.    HCMS.  Okay.

 7        Q.    Were you ever employed by HCMS?

 8        A.    No.

 9        Q.    Have you ever held any titles in

10   relation to HCMF -- I apologize -- HCMS?

11        A.    Yes.

12        Q.    What titles have you held in

13   relation to HCMS?

14        A.    Treasurer and acting treasurer.

15        Q.    When did you first become treasurer

16   or acting treasurer of HCMS?

17        A.    I don't recall the exact dates.

18        Q.    Can you recall -- can you

19   approximate the year that you became the

20   treasurer of HCMS?

21        A.    I don't -- I don't know.

22        Q.    Are you still the treasurer of HCMS

23   today?

24        A.    I am the acting treasurer for HCMS.

25        Q.    And are your duties and
```

```
1              WATERHOUSE - 10-19-21
2    responsibilities as the acting treasurer for
3    HCMS and the acting treasurer for NexPoint the
4    same as your duties and responsibilities in
5    your role as the acting treasurer of HCMFA?
6         A.    More or less.
7         Q.    Have you ever heard of a company
8    called HCRE Partners, LLC?
9         A.    Yes.
10        Q.    And do you understand that that
11   entity is now known today as NexPoint Real
12   Estate Partners?
13        A.    I did not know that.
14        Q.    All right.  Can we refer to HCRE
15   Partners as HCRE?
16             MS. DANDENEAU:  Objection to form.
17             Did you mean NexPoint Real Estate
18        Partners, Mr. Morris?
19             MR. MORRIS:  No.
20             MS. DANDENEAU:  Oh.
21             MR. MORRIS:  He said he wasn't
22        familiar that it was succeeded by that
23        entity.  So --
24             MS. DANDENEAU:  Okay.
25             MR. MORRIS:  -- let's go with what
```

1                   WATERHOUSE - 10-19-21

2         the witness knows.

3         Q.    You're familiar with an entity

4    called HCRE Partners, LLC; correct?

5         A.    Yes.

6         Q.    Okay.  So that is the entity that we

7    will refer to as HCRE.  If you're aware of any

8    successor, that is great.  If not, let's just

9    define it as such.

10              Have you ever been employed by HCRE

11   or any entity that you know to have succeeded

12   HCRE?

13        A.    No.

14        Q.    Did you ever serve as an officer or

15   director of HCRE or any successor?

16        A.    Not that I recall.

17        Q.    Okay.  Can we refer to NexPoint and

18   HCMFA as the advisors?

19        A.    Yes.

20        Q.    In general, the advisors provided

21   investment advisory services to certain retail

22   funds; correct?

23        A.    Yes.

24        Q.    And we will refer to the retail

25   funds that are served by the advisors

```
1                    WATERHOUSE - 10-19-21
2    collectively as the retail funds; is that okay?
3         A.    Okay.
4         Q.    Each of the retail funds is governed
5    by a board; correct?
6         A.    Yes.
7         Q.    And do you know the people who serve
8    on the boards of the retail funds?
9              MS. DANDENEAU:  Objection to form.
10        A.    I don't know all of them.
11        Q.    Do you know whether the same people
12   serve on the board of each of the retail funds
13   as we've defined that term?
14        A.    Which -- so when you say "retail
15   funds" -- again, I want to be -- what retail
16   funds are you referring to, because there are
17   -- there are several distinctions?
18              What retail funds are you using when
19   you refer to them?
20        Q.    That is why -- that is why I tried
21   to define the terms.  So let me do it again.
22              Retail funds for the purposes of
23   this deposition means any retail fund to which
24   either of the advisors provides advisory
25   services.  Okay?
```

1                    WATERHOUSE - 10-19-21

2          A.    Okay.

3          Q.    Okay.  So do you know whether the

4     same people serve on the board of each of the

5     retail funds?

6          A.    I don't know.

7          Q.    Were you ever employed by any of the

8     retail funds?

9          A.    No.

10         Q.    No?

11         A.    No.

12         Q.    Okay.  Do you have any title with

13    respect to any of the retail funds?

14         A.    Yes.

15         Q.    What titles do you hold --

16    withdrawn.

17               Do you have the same titles with

18    respect to all of the retail funds or do

19    they -- or just something else?

20               MS. DANDENEAU:  Objection to form.

21         Q.    Withdrawn.

22               Do you have the same title with

23    respect to each of the retail funds?

24         A.    No.

25         Q.    Tell me which title you have with

1          WATERHOUSE - 10-19-21

2   respect to each retail fund.

3          Actually, let's do it a different

4   way.  I withdraw the question.

5          Can you give me one title you have

6   in relation to any retail fund?

7      A.    Yes.

8      Q.    What title -- what title can you

9   give me?

10      A.    Principal executive officer.

11      Q.    Do you serve as principal executive

12   officer for each of the retail funds?

13      A.    No.

14      Q.    Can you identify for me the retail

15   funds in which you serve as the principal

16   executive officer?

17      A.    Yes.  Highland Funds 1, Highland

18   Funds 2, Highland Income Fund, Highland Global

19   Allocation Fund.

20      Q.    I'm sorry, you said "Global

21   Allocation Fund"?

22      A.    Yes.

23          VIDEOGRAPHER:  Excuse me,

24      Mr. Morris.  This is the videographer.  I'm

25      concerned about the lighting in the

1          WATERHOUSE - 10-19-21

2     witness' camera.

3          Do you want to go off the record and

4     make some adjustments?

5          MR. MORRIS:  Sure, but just for this

6     purpose.  I don't want to take a break.  We

7     just started.

8          MS. DANDENEAU:  Yeah, that is fine.

9     That is fine.  We're going to put you on

10    mute.

11         MR. MORRIS:  All right.

12         MS. DANDENEAU:  I'm going to try to

13    open up some of the shades.

14         VIDEOGRAPHER:  We're going off the

15    record at 10:08 a.m.

16    (Recess taken 10:08 a.m. to 10:11 a.m.)

17         VIDEOGRAPHER:  We are back on the

18    record at 10:11 a.m.

19    Q.    Mr. Waterhouse, when did you become

20 the principal executive officer of the four

21 retail funds that you just identified?

22    A.    I don't recall.

23    Q.    Do you recall the approximate year

24 that you became the principal executive officer

25 of the four funds?

```
1                 WATERHOUSE - 10-19-21

2        A.    2021.

3        Q.    Did you ever hold any title with

4   respect to any of the four funds you have just

5   identified other than principal executive

6   officer?

7        A.    I don't recall.

8        Q.    Is it possible that you held a

9   position or a title with the four funds you

10  just identified prior to 2021?

11       A.    Yes.

12       Q.    But you don't recall if you did or

13  not; do I have that right?

14       A.    No.  You -- I thought you asked, did

15  I hold other titles.

16       Q.    Did you hold any title at the four

17  retail funds for which you now serve as

18  principal executive officer at any time prior

19  to 2021?

20       A.    Yes.

21       Q.    What titles did you hold?

22       A.    I don't recall all the titles.

23       Q.    Do you recall any of the titles?

24       A.    Yes.

25       Q.    What titles do you recall holding at
```

1                    WATERHOUSE - 10-19-21

2    those four retail funds before 2021?

3        A.    Principal executive officer.

4        Q.    Were you the principal executive

5    officer of the four retail funds that you have

6    identified?

7        A.    Sorry, could you repeat the

8    question?

9        Q.    Were you the principal executive

10   officer for each of the four retail funds that

11   you have identified?

12       A.    Yes.

13       Q.    When did you become the principal

14   executive -- withdrawn.

15             Can you give me the approximate year

16   that you became the principal executive officer

17   for each of the four retail funds you've

18   identified?

19       A.    I don't recall.

20       Q.    What are your duties and

21   responsibilities as the principal executive

22   officer of these four retail funds?

23       A.    It is to manage the finance and

24   accounting positions.

25       Q.    So at the same time you serve as the

1          WATERHOUSE - 10-19-21

2    treasurer of the advisors, you also serve as

3    the principal executive officer of these four

4    retail funds; correct?

5          A.    Yes.

6          Q.    Did you ever hold any title with

7    respect to any other retail fund?

8          A.    Not that I recall.

9          Q.    During the period that you served as

10   Highland's CFO, from time to time Highland

11   loaned money to certain of its officers and

12   employees; correct?

13         A.    Yes.

14         Q.    During the period that you served as

15   Highland's CFO, from time to time Highland

16   loaned money to certain --

17         A.    Let me -- let me retract that,

18   sorry, that -- you asked during the time I was

19   CFO, Highland loaned moneys to employees.  I

20   don't -- I don't recall that during my tenure

21   of CFO.

22         Q.    You have no recollection during the

23   time that you were the CFO of Highland of

24   Highland ever loaning any money to any officer

25   or director of Highland?

1          WATERHOUSE - 10-19-21

2     A.    I don't recall during my tenure of

3 Highland or my -- as CFO of Highland -- yeah,

4 if there are any loans as CFO of Highland.

5     Q.    I'm just talking about officers and

6 employees right now.  You have no recollection

7 of Highland ever making a loan to any of its

8 officers or employees during the time that you

9 served as CFO.  Do I have that right?

10          MS. DANDENEAU:  Objection to form.

11     A.    So I thought you were saying

12 officers and employees as CFO, right, so there

13 were -- I mean, okay, yes.

14     Q.    I would ask you to listen carefully

15 to my question.  If I -- if I'm not clear, let

16 me know, but I'm really trying to be as clear

17 as I can.

18     A.    I'm listening as carefully as I can,

19 and you are asking very specific questions in a

20 timeline.  And I'm trying to answer your

21 questions as specifically as I can, and I

22 apologize if -- if I'm going back.  I am -- you

23 are asking very specific questions.  Thank you.

24     Q.    During the period that you served as

25 Highland's CFO, from time to time Highland

```
1               WATERHOUSE - 10-19-21

2    loaned money to certain corporate affiliates;

3    correct?

4               MS. DANDENEAU:  Objection to form.

5         A.    What are corporate affiliates?

6         Q.    How about the ones that are in

7    Highland's audited financial statements under

8    the section entitled Loans to Affiliates.  Why

9    don't we start with those.  Do you have any

10   understanding of what the phrase "affiliates"

11   means?

12              MS. DANDENEAU:  Objection to form.

13        A.    I understand what affiliates are,

14   yet affiliates can have different meanings in

15   different contexts, so...

16        Q.    Why don't you -- why don't you tell

17   me what your understanding of the term

18   "affiliate" is in relation to Highland Capital

19   Management, L.P.

20        A.    Is that a -- it depends on the

21   context.

22        Q.    How about the context of making

23   loans?

24              MS. DANDENEAU:  Objection to form.

25        A.    I didn't make the determination of
```

1                    WATERHOUSE - 10-19-21

2    who an affiliate was or is at the time those --

3    I didn't -- that wasn't my job to make a

4    determination of who an affiliate is.

5        Q.    All right.  So as the CFO of

6    Highland, do you have any ability right now to

7    tell me which companies that were directly or

8    indirectly owned and/or controlled by

9    Mr. Dondero in whole or in part received loans

10   from Highland Capital Management, L.P.?

11              MS. DANDENEAU:  Objection to form.

12              MS. DEITSCH-PEREZ:  Objection, form.

13       A.    Yes.

14       Q.    Okay.  Identify every entity that

15   you can think of that was directly or

16   indirectly owned and/or controlled by

17   Mr. Dondero in whole or in part that received a

18   loan from Highland Capital Management, L.P.

19              MR. RUKAVINA:  Objection, legal

20       conclusion.

21       A.    NexPoint Advisors, Highland Capital

22   Management Fund Advisors, HCM Services,

23   Dugaboy.  Sorry, I don't think -- Dugaboy

24   doesn't fit that definition.  You said owned

25   and controlled.  I don't think that that

```
 1                   WATERHOUSE - 10-19-21
 2   definition --
 3        Q.    I said owned and/or controlled.
 4        A.    I don't -- again, I'm not -- I'm not
 5   the legal expert.  I don't think it controls --
 6   he controls Dugaboy, so again, I'm not the
 7   legal person.
 8        Q.    I'm not asking you for a legal
 9   conclusion, sir.  I'm asking you for your
10   knowledge, okay, as the CFO -- the former CFO
11   of Highland Capital Management, other than
12   NexPoint, HCMFA, and HCMF -- HCMS, can you
13   think of any other entities that were owned
14   and/or controlled directly or indirectly in
15   whole or in part by Jim Dondero who received a
16   loan from Highland Capital Management, L.P.?
17               MS. DANDENEAU:  Objection to form.
18        A.    HCRE.
19        Q.    Any others?
20        A.    That is -- that is all I can think
21   of.
22        Q.    And you're aware that from time to
23   time while you were the CFO, Highland loaned
24   money to Jim Dondero; correct?
25        A.    Yes.
```

1          WATERHOUSE - 10-19-21

2      Q.    Okay.  Can we refer to the four

3  entities that you just named and Mr. Dondero as

4  the affiliates?

5      A.    So that would be Jim Dondero,

6  NexPoint Advisors, Highland Capital Management

7  Fund Advisors, and HCRE.

8      Q.    And HCMS?

9      A.    And HCMS, okay.

10     Q.    And can we refer to the loans that

11  were given to each of those affiliates as the

12  affiliate loans?

13     A.    Yes.

14     Q.    And is it fair to say that each of

15  the affiliates were the borrowers under the

16  affiliate loans as we're defining the term?

17          MR. RUKAVINA:  Objection, legal

18      conclusion.

19     A.    The borrowers are whoever were on

20  the notes.  I don't -- I don't know.  I'm not

21  the legal person.

22     Q.    But you --

23     A.    I don't know.

24     Q.    You do know, as Highland's former

25  CFO, that each of the affiliates that you have

Page 45

1                    WATERHOUSE - 10-19-21
2  identified tendered notes to Highland; correct?
3             MR. RUKAVINA:  Hey, John, will you
4        just give me a running objection to legal
5        conclusion to HCM --
6             MR. MORRIS:  No.  No, if you want to
7        object --
8             MR. RUKAVINA:  I will object every
9        time.  Object to legal conclusion.
10            MR. MORRIS:  That is fine.
11  A.     Sorry, can you repeat the question?
12  Q.     Are you aware that each of the --
13  that each of the affiliates, as we have defined
14  the term, gave to Highland a promissory note in
15  exchange for the loans?
16            MR. RUKAVINA:  Objection to the
17        extent that calls for a legal conclusion.
18  A.     I don't.
19  Q.     No, you don't know that?
20  A.     No, they didn't -- you said they
21  exchanged a promissory note for a loan.  I
22  don't -- I don't understand that question, so I
23  said no.
24  Q.     At the time of the bankruptcy
25  filing, did Highland have in its possession

1                    WATERHOUSE - 10-19-21

2    promissory notes that were signed by each of

3    the affiliates?

4         A.    Yes.

5         Q.    To the best of your knowledge,

6    during the time that you served as Highland's

7    CFO, did Highland disclose to its outside

8    auditors all of the loans that were made to

9    affiliates?

10              MR. RUKAVINA:  Objection, that calls

11         for a legal conclusion.

12              MS. DEITSCH-PEREZ:  I also couldn't

13         hear you, John, because there was some

14         garbling on -- on the -- on the call.

15              MR. MORRIS:  Folks, I've got to tell

16         you this is not going well, and I'm

17         reserving my right --

18              MS. DANDENEAU:  John, it was just

19         the end of that question.  It was just the

20         end of that question.  I couldn't hear it

21         either.  Sorry, if you could repeat it,

22         please.

23              MR. MORRIS:  That is less than an

24         hour into this, but folks are trying to run

25         out the clock, and so I'm just going to

```
1              WATERHOUSE - 10-19-21
2        state that now.
3              MS. DANDENEAU:  You know, and,
4        Mr. Morris, I really object to that.  I
5        mean --
6              MR. MORRIS:  Okay.
7              MS. DANDENEAU:  -- Mr. Waterhouse
8        just told you he's trying to listen to your
9        questions and answer them carefully, and
10       you have no basis for saying that.
11             MR. MORRIS:  Okay.
12             MS. DANDENEAU:  This does not --
13       this is not an experienced witness, so he's
14       trying to do the best he can.
15       Q.    Mr. Waterhouse, during the time that
16  you served as Highland's CFO, did Highland
17  disclose to its outside auditors all of the
18  loans that it made to each of the affiliates
19  that you have identified?
20             MR. RUKAVINA:  Objection, legal
21       conclusion.
22       A.    Yes.
23       Q.    To the best of your knowledge, while
24  you were Highland's CFO, were all of the
25  affiliate loans described in Highland's audited
```

1                    WATERHOUSE - 10-19-21

2    financial statements?

3                    MR. RUKAVINA:  Objection, legal

4         conclusion.

5         A.    When an audit was performed, any

6    loans that were made by Highland to the

7    affiliates were disclosed to auditors.

8         Q.    Are you aware of any loan that was

9    made to any affiliate that was not disclosed to

10   the auditors?

11        A.    I'm not aware.

12        Q.    To the best of your knowledge, did

13   each of the affiliates who were --

14   (inaudible) -- loaned from Highland execute a

15   promissory note in connection with that loan?

16                    MR. RUKAVINA:  Objection, legal

17        conclusion.

18        A.    Sorry, you -- halfway through the

19   question it got muffled.

20             Can you repeat that again?

21        Q.    To the best of your knowledge, did

22   every affiliate execute a promissory note in

23   connection with each loan that it obtained from

24   Highland?

25                    MR. RUKAVINA:  Objection, legal

1                    WATERHOUSE - 10-19-21

2        conclusion.

3        A.    Yes.

4        Q.    You are not aware of any loan that

5    any affiliate ever obtained from Highland where

6    the affiliate did not give a promissory note in

7    return; is that fair?

8        A.    Yes, I'm not aware.

9        Q.    And to the best of your knowledge,

10    did Highland loan to each affiliate an amount

11    of money equal to the principal amount of each

12    promissory note?

13            MR. RUKAVINA:  Objection, legal

14        conclusion.

15        A.    Yes.

16        Q.    During the time that you served as

17    CFO, did Highland ever loan money to

18    Mark Okada?

19        A.    I -- I don't recall.

20        Q.    Did you ever see any promissory

21    notes executed by Mark Okada?

22        A.    I don't recall.

23        Q.    Do you know if Highland ever forgave

24    any loan that it ever made to Mr. Okada?

25        A.    I don't recall.

1          WATERHOUSE - 10-19-21

2      Q.    Do you recall if Mr. Okada paid back

3  all principal and interest due and owing under

4  any loan he obtained from Highland?

5          MS. DEITSCH-PEREZ:  Objection to

6      form.

7          MS. DANDENEAU:  Objection to form.

8      A.    I don't recall.

9      Q.    Do you recall whether -- during your

10  time as CFO, whether Highland ever loaned money

11  to Jim Dondero?

12      A.    Yes.

13      Q.    To the best of your knowledge, did

14  Mr. Dondero sign and deliver to Highland a

15  promissory note in connection with each loan

16  that he obtained from Highland?

17      A.    If you are referring to the

18  promissory notes that, you know, part of

19  Highland's records, yes.

20      Q.    Okay.  You're not aware of any loan

21  that Mr. Dondero took from Highland that wasn't

22  backed up by -- by a promissory note with a

23  face -- with a principal amount equal to the

24  amount of the loan; correct?

25      A.    Am I aware that Jim Dondero took a

1        WATERHOUSE - 10-19-21

2   loan?

3        Q.    Without giving a -- let me ask a

4   better question.  I'm sorry, Mr. Waterhouse.

5             Are you aware of any loan that

6   Mr. Dondero obtained from Highland where he

7   didn't give a promissory note in return?

8        A.    I'm not aware.

9        Q.    During the time that you served as

10  Highland's CFO, did Highland ever forgive any

11  loans, in whole or in part, that it made to

12  Mr. Dondero?

13       A.    Not that I'm aware.

14       Q.    At the time that you served as

15  Highland's CFO, did Highland ever forgive any

16  loan, in whole or in part, that it made to any

17  affiliate as we've defined the term today?

18       A.    Not that I'm aware.

19       Q.    During the time that you served as

20  Highland's CFO, did Highland ever forgive, in

21  whole or in part, any loan that it ever made to

22  any officer or employee?

23       A.    Highland forgave loans to officers

24  and employees.  It may not have been at the

25  time when my title was CFO.

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  And so I appreciate the

3   distinction.

4              Is it fair to say that, to the best

5   of your knowledge, Highland did not forgive a

6   loan that it made to an officer or employee

7   after 2013?

8              MS. DANDENEAU:  Objection to form.

9        A.    I don't recall.

10       Q.    To the best of your knowledge, did

11  Highland disclose to its auditors every

12  instance where it forgave, in whole or in part,

13  a loan that it had made to one of its officers

14  or employees?

15       A.    No.

16       Q.    Can you think of -- can you -- can

17  you identify any loan to an officer or employee

18  that was forgiven by Highland, in whole or in

19  part, that was not disclosed to Highland's

20  outside auditors?

21       A.    Look, I don't recall all of the

22  loans and the loan forgiveness.  I just know as

23  part of the audit process there is a

24  materiality concept.

25              So if there were loans to employees

```
1                    WATERHOUSE - 10-19-21

2    that were of -- you know, that were deemed

3    immaterial, those items may not have been

4    disclosed by the team to the auditors.

5         Q.    I appreciate that.

6               Do you have an understanding as to

7    what the level of materiality was?

8         A.    I don't recall.

9         Q.    As the CFO of Highland, to the best

10   of your knowledge, did Highland disclose to its

11   outside auditors every loan that was forgiven,

12   in whole or in part, that was material as that

13   term was defined by the outside auditors?

14        A.    Yes.

15        Q.    And do you recall where -- do you

16   recall where the definition of materiality can

17   be found for -- for this particular purpose?

18              MS. DANDENEAU:  Objection to form.

19        A.    No.  You -- I don't determine

20   materiality.

21        Q.    Okay.  I'm just asking you if you

22   can help me understand where it is, but I think

23   we will find it in a few minutes.

24              You are aware that Highland has

25   commenced lawsuits against each of the
```

```
1                    WATERHOUSE - 10-19-21

2    affiliates, as we've defined the term, to

3    collect under certain promissory notes; is that

4    right?

5         A.    Yes.

6         Q.    And are you familiar with the notes

7    that are issue -- at issue in the lawsuits?

8              MS. DANDENEAU:  Objection to form.

9         A.    Generally familiar.

10        Q.    Can we refer to the lawsuits that

11   Highland has commenced against the affiliates

12   collectively as the lawsuits?

13        A.    Yes.  And, again, the affiliates are

14   NexPoint, HCMFA, HCMS, and HCRE.

15        Q.    And Mr. Dondero?

16        A.    Okay.  See, that is a new -- and now

17   Mr. Dondero is included in your affiliate

18   definition.

19        Q.    I just --

20        A.    I thought affiliates -- I thought

21   affiliates were just the four prior entities,

22   so I just want to be clear.

23        Q.    I appreciate that.  So let's --

24   let's keep them separate and let's refer to the

25   four corporate entities as the affiliates, and
```

1           WATERHOUSE - 10-19-21

2  Mr. Dondero we will call Mr. Dondero.  Okay?

3       A.    Okay.  Thank you.  As you can see,

4  Mr. Morris, there is a lot of entities -- a lot

5  here.  I just want to be clear.

6       Q.    Okay.  Now, the affiliates of

7  Mr. Dondero signed promissory notes that are

8  not subject to the lawsuit.

9            Do you understand that?

10           MS. DANDENEAU:  Objection to form.

11      A.    The affiliates and Mr. Dondero

12  signed --

13      Q.    You know what?  I will skip it.

14  That is okay.  Okay.

15           From time to time while you were

16  Highland's CFO, payments were applied against

17  principal and interests that were due under the

18  notes that were tendered by the affiliates and

19  Mr. Dondero; correct?

20           MR. RUKAVINA:  Objection to the

21       extent that calls for a legal conclusion.

22      A.    Yes.

23      Q.    Did Highland have a process where --

24  whereby payments would be applied against

25  principal and interest against the notes that

1              WATERHOUSE - 10-19-21

2    were given by the affiliates and Mr. Dondero?

3         A.    Yes.

4         Q.    Can you describe the process for me?

5         A.    The process, payment should be

6    applied as laid out in the -- in the promissory

7    note.

8         Q.    From time to time were payments made

9    that were not required under the promissory

10   notes?

11             MS. DANDENEAU:  Objection to form.

12        A.    Yes.

13        Q.    Who was responsible for deciding

14   when and how much the payments would be made

15   with respect to each of the notes that were

16   issued by the affiliates and Mr. Dondero?

17        A.    Who was responsible for deciding how

18   much was paid prior to the due date?

19        Q.    Yes.

20        A.    I don't know.

21        Q.    Did you approve of each payment that

22   was made against principal and interest on the

23   notes that were given by the affiliates and

24   Mr. Dondero?

25             MS. DANDENEAU:  Objection to form.

```
 1              WATERHOUSE - 10-19-21

 2       A.    Did I approve the payments?  I

 3   approve -- I approve -- if there was cash -- if

 4   there was cash being repaid on a note payment,

 5   yes, I approved in the general sense of being

 6   made aware of the payment and the amount.

 7       Q.    And are you the person who

 8   authorized Highland's employees to effectuate

 9   those payments?

10       A.    Yes.

11       Q.    When you gave the instruction to

12   effectuate the payment, did you obtain

13   Mr. Dondero's prior approval?

14       A.    I mean, it -- I mean, it -- it

15   depends.

16       Q.    Can you think of any instance where

17   you directed Highland's employees to make a

18   payment of principal or interest against any

19   note that was tendered by an affiliate or

20   Mr. Dondero that Mr. Dondero did not approve of

21   in advance?

22       A.    I can't recall specifically.

23       Q.    Can you identify -- withdrawn.

24             Did Mr. Dondero ever tell you that a

25   payment that was made against principal and
```

```
 1                   WATERHOUSE - 10-19-21
 2    interest due under one of the notes that was
 3    tendered by an affiliate or himself should not
 4    have been made?
 5         A.    Yes.
 6         Q.    Can you identify the payment for me?
 7         A.    It would be for -- for NexPoint
 8    Advisors.
 9         Q.    Okay.  And when did Mr. Dondero tell
10    you that a payment that you had initiated on
11    behalf of NexPoint should not have been made?
12         A.    I wasn't initiating payment.  It was
13    in the context of the -- I think you used this
14    term, "the advisors," so NexPoint Advisors and
15    Highland Capital Management Fund Advisors had
16    overpaid on certain agreements with Highland
17    Capital Management, L.P.  And as a part of that
18    process, the advisors -- what I was told at the
19    time were in talks and negotiations and
20    discussions with Highland Capital Management,
21    L.P., on offsets in relation to those
22    overpayments.
23         Q.    When did this conversation take
24    place?
25              MS. DANDENEAU:  Objection to form.
```

1                    WATERHOUSE - 10-19-21

2          A.     I don't recall specifically.

3          Q.     Do you recall what year it was?

4          A.     Yes.

5          Q.     What year did the conversation with

6     Mr. Dondero take place that you just described?

7          A.     2020.

8          Q.     Okay.  Do you remember if it was

9     December 2020?

10         A.     It -- it -- I don't -- I don't

11    recall what month specifically, but it would

12    have been November or December.

13         Q.     And we're talking here about a

14    payment of principal and/or interest that was

15    due -- withdrawn.

16                We're talking here about a payment

17    of principal and interest that was applied

18    against NexPoint's note; correct?

19                MS. DANDENEAU:  Objection to form.

20         A.     I don't recall what that payment

21    consisted of.

22         Q.     Is it possible that the payment you

23    have in mind related to the shared services

24    agreement?

25                MS. DANDENEAU:  Objection to form.

Page 60

1              WATERHOUSE - 10-19-21

2      A.    No.

3      Q.    Are you certain that the payment --

4  that the payment that you have in mind related

5  to the promissory note that NexPoint issued in

6  favor of Highland?

7              MS. DANDENEAU:  Objection to form.

8      A.    Yes.

9      Q.    Okay.  Other than that one payment,

10 can you identify any other instance where

11 Mr. Dondero told you that a payment should not

12 have been applied against principal and

13 interest under any promissory note tendered by

14 any affiliate or Mr. Dondero?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Objection to

17        form.

18     A.    Not that I recall.

19     Q.    Thank you very much.

20             Do you know if Mr. Dondero approved

21 in advance of each loan made to each affiliate

22 and himself during the time that you were the

23 CFO?

24             MS. DEITSCH-PEREZ:  Object to the

25        form.

1              WATERHOUSE - 10-19-21

2      A.    Yes, generally.

3      Q.    Can you identify any loan that was

4   ever made to an affiliate or to Mr. Dondero

5   that Mr. Dondero did not approve of in advance?

6      A.    Other than the ones that are in

7   dispute, I'm not aware.

8      Q.    Do you believe that Mr. Dondero did

9   not approve of each of the loans that are in

10  dispute in advance of the time that the loan

11  was made?

12             MS. DANDENEAU:  Objection to form.

13     A.    Given what is in the dispute, you

14  know, and -- and -- and the way things might --

15  yeah, I mean...

16     Q.    I am not asking about the dispute,

17  and it was probably my mistake to follow you

18  there.

19             Were you aware of every loan made by

20  Highland to each of its affiliates and

21  Mr. Dondero while you were the CFO at the time

22  each loan was made?

23     A.    Was I aware of every loan, yes.

24     Q.    Okay.  And if you put yourself back

25  in time, do you recall that any of the loans

1          WATERHOUSE - 10-19-21

2    that were made to one of the affiliates or

3    Mr. Dondero during the time that you were the

4    CFO was made without Mr. Dondero's prior

5    knowledge and approval?

6         A.    Not that I recall.

7         Q.    Thank you.  In fact, do you -- as

8    the CFO, would you have allowed Highland to

9    loan money to an affiliate or to Mr. Dondero

10   without obtaining Mr. Dondero's prior approval?

11             MS. DANDENEAU:  Objection to form.

12        A.    I can't -- there was so many times

13   over the years, I can't speak for every single

14   one, but generally, yes, I -- I spoke to him.

15        Q.    You -- you never -- you never --

16   withdrawn.  I will just take that.

17             Can you recall any payment that was

18   ever made against principal and interest on a

19   note that was issued in favor of Highland by an

20   affiliate or Mr. Dondero that you personally

21   did not know about in advance?

22        A.    There are so many through the years,

23   I don't -- I don't -- I don't recall every

24   single one.

25        Q.    Okay.  Can you identify any payment

```
1                    WATERHOUSE - 10-19-21
2    that was made against principal and interest on
3    any note tendered by any affiliate or
4    Mr. Dondero that you didn't know about in
5    advance?
6         A.    I don't recall.
7         Q.    Other than Mr. Dondero -- withdrawn.
8               Did anybody at Highland have the
9    authority to make a payment against principal
10   and interest due under a loan given to the
11   affiliates and Mr. Dondero without your
12   knowledge and approval?
13              MS. DANDENEAU:  Objection to form.
14        A.    Sorry, there was -- to make a
15   payment on an affiliate loan, what you are
16   saying would it require my knowledge and
17   approval, yes.
18        Q.    Okay.  I appreciate that.  Thank
19   you.
20              Did anybody at Highland have the
21   authority, to the best of your knowledge, to
22   effectuate a loan to an affiliate without
23   Mr. Dondero's prior knowledge and approval?
24              MS. DANDENEAU:  Objection to form.
25        A.    I can't speak for all, but
```

```
 1              WATERHOUSE - 10-19-21
 2   generally, yes.
 3        Q.    Did you personally communicate with
 4   Mr. Dondero to let him know each time a payment
 5   of principal or interest was being made against
 6   any note that was tendered by an affiliate or
 7   Mr. Dondero to Highland?
 8        A.    I don't -- are you saying, did I let
 9   Mr. Dondero know if a payment was made on any
10   affiliate or loan to Mr. Dondero?  I mean,
11   not -- not every -- no.
12        Q.    Let me ask it this way:  Did you
13   have a practice of informing Mr. Dondero when
14   payments were made against principal and
15   interest on any note that was tendered by an
16   affiliate or Mr. Dondero?
17             MS. DEITSCH-PEREZ:  Objection to
18        form.
19             MS. DANDENEAU:  Objection to form.
20        A.    No, I did not.
21        Q.    Did Mr. Dondero ever tell you that a
22   payment of principal or interest had been made
23   against a note that was tendered by an
24   affiliate or himself that he had been unaware
25   of?
```

1          WATERHOUSE - 10-19-21

2     A.    Not that I recall.

3     Q.    Are you aware that Mr. Dondero and

4   the affiliates -- withdrawn.

5          Are you aware that Mr. Dondero

6   NexPoint, HCRE, and HCMS all contend that they

7   do not have to pay on any of the notes they

8   issued because they are subject to an oral

9   agreement between Mr. Dondero and Nancy

10  Dondero, in her capacity as the trustee of the

11  Dugaboy Investment Trust?

12          MS. DANDENEAU:  Objection to form.

13    A.    I didn't -- I didn't -- I didn't

14  know that it was all notes.

15    Q.    Okay.  Are you -- did you ever learn

16  that there was an oral agreement between Jim

17  Dondero and Nancy Dondero pertaining to any

18  notes issued by any affiliate or Mr. Dondero?

19          MS. DEITSCH-PEREZ:  Object to the

20      form.

21    A.    Yes.

22    Q.    Do you have any understanding as to

23  the terms of that agreement?

24    A.    Yes.

25    Q.    What is your understanding of the

1                 WATERHOUSE - 10-19-21

2    terms of the agreement?

3         A.    That there were certain milestones

4    that had to be reached.

5         Q.    Do you have any understanding of the

6    terms of the agreement between Mr. Dondero and

7    Nancy Dondero concerning any of the notes

8    issued by the affiliates or Mr. Dondero other

9    than that there have to be milestones reached?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12        A.    There are milestones, I found out

13    yesterday, or there was some --

14              MS. DANDENEAU:  Okay.  I'm just

15         going to object to the extent that you

16         learned anything in conversations with

17         counsel, please don't reveal -- that is

18         privileged, and don't reveal any privileged

19         communications.

20              THE WITNESS:  Okay.

21        A.    So I'm not aware of anything else.

22        Q.    Do you know what the milestones

23    were?

24              MS. DANDENEAU:  Objection to form.

25        A.    I don't.

```
1              WATERHOUSE - 10-19-21
2        Q.    Do you know anything about -- do you
3   know what promissory notes the agreement
4   covered?
5        A.    I don't.
6        Q.    Do you know if -- if Jim and Nancy
7   Dondero entered into one agreement or more than
8   one agreement?
9              MS. DEITSCH-PEREZ:  Object to the
10        form.
11       A.    I don't know.
12       Q.    Do you know if the agreement is in
13  writing?
14       A.    I don't know.
15       Q.    How did you learn of the existence
16  of the agreement?
17             MS. DANDENEAU:  Objection to form.
18        Again --
19       A.    I don't -- I don't recall who told
20  me.
21       Q.    You have no recollection of who told
22  you about this agreement between Jim and Nancy
23  Dondero?
24             MS. DEITSCH-PEREZ:  Object to the
25        form.
```

1                    WATERHOUSE - 10-19-21

2       A.    I don't recall.

3       Q.    Do you recall how you learned of the

4  agreement?

5              Was it in a meeting?  Was it in a

6  phone call?  Was it in an email?

7       A.    I don't recall.

8       Q.    Do you recall when you learned of

9  the agreement?

10      A.    Not specifically.

11      Q.    Do you recall what year you learned

12  of the agreement?

13      A.    In -- look, I mean, there are so

14  many notes.  I may be getting -- I believe it

15  was 2020.

16      Q.    All right.  I'm not asking about

17  notes, sir.  I'm asking about the agreement

18  that you testified you knew about between Jim

19  and Don- -- Nancy Dondero.  Okay.

20              Do you understand my question now?

21  Should I ask my question again?

22      A.    Yeah, sure.  Go ahead.

23      Q.    I'm going to use the word

24  "agreement" to refer to the agreement that

25  Mr. Dondero and Nancy Dondero entered into

1          WATERHOUSE - 10-19-21

2    where you understood that certain milestones

3    had to be reached.  Okay?

4          A.    Uh-huh.

5                MS. DANDENEAU:  Objection.

6                MS. DEITSCH-PEREZ:  Object to the

7          form.

8                MR. MORRIS:  Just defining a term,

9          what is the objection.

10               MS. DEITSCH-PEREZ:  The objection --

11               MR. MORRIS:  I will move on.  I will

12         move on.

13               MS. DEITSCH-PEREZ:  John --

14         Q.    Sir, are you okay with that

15    definition of agreement?

16         A.    Okay.

17         Q.    Okay.  So you don't recall who --

18    who informed you of the existence of the

19    agreement; is that right?

20         A.    I don't recall.

21         Q.    You don't recall who told you the

22    terms of the agreement.

23               Do I have that right?

24         A.    Correct.

25         Q.    And you don't recall if you learned

1                    WATERHOUSE - 10-19-21

2     about the agreement in a meeting, through an

3     email, or through a phone call.

4              Do I have that right?

5         A.    I don't recall.

6         Q.    Can you tell me when you learned of

7     the agreement?

8         A.    I don't -- I don't -- I don't

9     remember specifically.

10        Q.    Can you tell me if you learned of

11    the agreement before or after the petition

12    date?

13        A.    It would have been -- it would have

14    been after.

15        Q.    Can you tell me if you learned of

16    the agreement before or after January 9th,

17    2020?

18        A.    It would have been after.

19        Q.    Can you tell me if you learned of

20    the agreement before or after you left Highland

21    Capital Management in February of 2021?

22        A.    I don't -- I don't -- I don't know.

23        Q.    It is possible that you learned of

24    it while you were a Highland employee.

25              Do I have that right?

1              WATERHOUSE - 10-19-21

2        A.    I don't remember the -- I mean, it

3   was sometime in 2021.  I don't remember when.

4        Q.    All right.  So to the best of your

5   recollection, it was in 2021 but you don't

6   recall if it was before or after you ceased to

7   be a Highland employee.

8              Do I have that right?

9        A.    Yeah, I mean, it was -- it was

10  likely after I was -- after I left Highland

11  because, if I put myself back into the last

12  days of -- of 2021, it was -- you know, the

13  communications with Mr. Dondero were -- were --

14  were -- there weren't as many communications

15  because of the circumstances.

16       Q.    And so based on that you believe

17  that it is most likely that you learned of this

18  agreement sometime after you left Highland

19  employment?

20       A.    I wouldn't use the term "most

21  likely."  I don't recall specifically.  I don't

22  recall.

23       Q.    Do you recall ever telling Jim Seery

24  about this agreement?

25       A.    No, I don't -- I didn't tell

1             WATERHOUSE - 10-19-21

2    Jim Seery.

3         Q.    Did you tell anybody at DSI about

4    this agreement?

5         A.    No.

6         Q.    Did you tell any of Highland's

7    independent directors about this agreement?

8         A.    No.

9         Q.    Did you tell anybody at Pachulski

10   Stang Ziehl & Jones about this agreement?

11        A.    No.

12        Q.    Did you tell any employee of

13   Highland about this agreement?

14        A.    No.

15            MS. DANDENEAU:  Mr. Morris, it has

16        been an hour and a half.  Is this a good

17        time for a break?

18            MR. MORRIS:  Sure.

19        Q.    Mr. Waterhouse, I will just remind

20   you that during the break please don't speak

21   with anybody about the deposition, the

22   substance of your testimony or anything else

23   concerning the deposition.  Okay?

24        A.    Yes.

25            MR. MORRIS:  So it is 11:02.  We're

```
1              WATERHOUSE - 10-19-21

2      at 11:02 your time.  Let's come back, I

3      guess, at 15 -- at 11:15 your time.

4              VIDEOGRAPHER:  We're going off the

5      record at 11:02 a.m.

6      (Recess taken 11:02 a.m. to 11:20 a.m.)

7              VIDEOGRAPHER:  We are back on the

8      record at 11:20 a.m.

9      Q.    Mr. Waterhouse, did you speak with

10   anybody during the break about this deposition?

11     A.    No.

12             MS. DANDENEAU:  Other than -- other

13     than his counsel.

14     Q.    Did you speak to your counsel about

15   the substance of your deposition today?

16     A.    No, I didn't bring it up.

17     Q.    I didn't ask you if you brought it

18   up.  I asked you if you had any conversation

19   with your lawyer about the substance of your

20   deposition.

21             MS. DANDENEAU:  Yes, he did.

22     Q.    Can you tell me what the -- you

23   discussed?

24             MS. DANDENEAU:  No, I object to

25     that.  He's not going to answer.  That is a
```

1          WATERHOUSE - 10-19-21

2    privileged conversation.

3          MR. MORRIS:  So I just want to make

4    sure that I understand.  During the break

5    you spoke with your client about the

6    substance of this deposition; is that

7    right?

8          MS. DANDENEAU:  Yes, John.

9          MR. MORRIS:  And you refuse -- you

10   refuse to let your client tell me what was

11   discussed; is that right?

12         MS. DANDENEAU:  That's correct.

13         MR. MORRIS:  You know, I had given

14   the instruction prior to the break not to

15   speak with counsel.  I would have

16   appreciated --

17         MS. DANDENEAU:  No, you didn't --

18   actually, that is not true, Mr. Morris.

19   You said not to speak with anyone.  We

20   never have interpreted that to mean

21   conversations with counsel.  That's never

22   been -- I have never, ever heard that

23   instruction.

24         MR. MORRIS:  Okay.  We will -- we

25   will -- we will deal with it when and if we

1                    WATERHOUSE - 10-19-21

2          have to.

3          Q.    Mr. Waterhouse, after learning about

4      the agreement, did you ask anybody if the

5      agreement was reflected in a writing?

6                    MS. DANDENEAU:  Objection to form.

7          A.    No.

8          Q.    Did you ask anybody if the terms of

9      the agreement were memorialized anywhere?

10                   MS. DANDENEAU:  Objection to form.

11                   MR. MORRIS:  What is the --

12         A.    No.

13                   MS. DANDENEAU:  Well, because you

14              keep talking about this agreement and I --

15              I -- I think, Mr. Morris, that is really

16              not clear what you mean by "the agreement."

17              And maybe you can just go back and restate

18              what that is.

19                   MR. MORRIS:  Okay.  Your client has

20              agreed with me twice on the definition, but

21              I will try one more time.

22         Q.    Mr. Waterhouse, do you understand

23     that when I use the term "agreement," I'm

24     referring to the agreement between Jim and

25     Nancy Dondero concerning certain promissory

```
 1                   WATERHOUSE - 10-19-21
 2    notes where you learned that one of the terms
 3    of the agreement was milestones reached?
 4          A.    Okay.
 5          Q.    And did you understand that that was
 6    the -- the agreement that we were referring to
 7    every time we used the word "agreement" in this
 8    deposition?
 9          A.    I don't know anything about this
10    agreement.  So, look, I do -- it -- I don't
11    know whether --
12          Q.    Let's -- let's try this again.
13          A.    Yeah.  Look, I don't know what this
14    agreement relates.
15              MS. DEITSCH-PEREZ:  John, John --
16          Q.    Let me try --
17              MS. DEITSCH-PEREZ:  John, please let
18          the witness finish.
19              MR. MORRIS:  Please stop.  Please
20          stop.  Please stop talking.
21              MS. DEITSCH-PEREZ:  No, you stop.
22          Let the witness --
23              MR. MORRIS:  Stop talking.
24              MS. DEITSCH-PEREZ:  -- finish -- you
25          interrupted him.
```

```
 1              WATERHOUSE - 10-19-21
 2          MR. MORRIS:  You know what, you
 3      guys, this is really wrong.  It is really,
 4      really wrong.  Okay?
 5          I had the witness agree not once,
 6      but twice to the definition of agreement.
 7      Okay?  I'm going to try and do it a third
 8      time.
 9          MS. DANDENEAU:  No, but, please,
10      John, really --
11          MR. MORRIS:  No, please stop
12      talking.  Please.  It is my deposition.
13      Object to questions.
14          MS. DANDENEAU:  No, but also you
15      instructed him that -- that if you were
16      going -- if you were interrupting him, that
17      he should remind you that you're
18      interrupting him and -- and --
19          MR. MORRIS:  Let him do that.  Let
20      him do that.
21          MS. DANDENEAU:  Okay.  Well, you --
22          MR. MORRIS:  Please stop talking.
23      A.   Okay.  I don't know any of the
24  details of these agreements.  I don't know
25  anything about them.  I heard -- someone -- I
```

1          WATERHOUSE - 10-19-21

2    don't know who, I don't know when, as you

3    asked, sometime in '21, someone told me about

4    this -- or I don't honestly know -- I don't

5    even recall exactly how I was made aware of

6    this, but I was.  I don't know -- I don't know

7    any of these details, and I'm getting -- again,

8    there is, you know, I -- I -- I had a passing

9    conversation with -- with Jim at some point

10   on -- on some -- on the executive comp, and I'm

11   getting confused of what is what, because

12   again, I don't know any of these details.

13        Q.    Okay.  Let me try again,

14   Mr. Waterhouse, and I apologize.

15             Are you aware of any agreement

16   between Jim Dondero and Nancy Dondero

17   concerning any promissory note that was given

18   to Highland by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    I've heard of an agreement.  That

22   is -- that is -- I mean, if you are using aware

23   as heard, sure.

24        Q.    And you understand that one of the

25   terms of the agreement is that it was based on

```
1                WATERHOUSE - 10-19-21
2    milestones that had to be reached; is that
3    right?
4              MS. DANDENEAU:  Objection to form.
5         A.    That was one of the words that was
6    used when I heard about it, yes.
7         Q.    And when you heard about this
8    agreement that had a term in it concerning
9    milestones reached, did you ask the person who
10   was telling you about the agreement whether or
11   not it was in writing?
12        A.    I did not.
13        Q.    Did you ask any questions at all?
14             MS. DANDENEAU:  Objection to form.
15        A.    Not that I recall.
16        Q.    But do you understand that going
17   forward, we're going to refer to the agreement
18   as the agreement that you just described that
19   you were --
20             MS. DANDENEAU:  Object to the form.
21        A.    Yes.
22        Q.    Okay.  You don't have any personal
23   knowledge concerning the terms of the
24   agreement; correct?
25             MS. DEITSCH-PEREZ:  Object to the
```

1                    WATERHOUSE - 10-19-21

2        form.

3        Q.    You can answer.

4        A.    I don't -- I heard about the

5    agreement.  I don't know anything -- I heard

6    there was an agreement.  That is -- again, as I

7    testified before -- I said before, heard about

8    it, don't know the details.  I believe it was

9    sometime this year.

10        Q.    Do you have any personal knowledge

11    about the terms of the agreement, sir?

12              MS. DANDENEAU:  Objection to form.

13        A.    Other than what I have previously

14    discussed, I don't -- I don't know.

15        Q.    Did -- did Mr. Dondero tell you

16    about the existence of the agreement?

17        A.    I don't recall.

18        Q.    Do you recall the source of your

19    information when you learned about the

20    agreement?

21        A.    No, I don't -- I don't recall.  I

22    don't remember.  I just -- I heard about it

23    generally.  I don't remember -- I don't

24    remember who, how, if, how.  I don't remember.

25        Q.    You know, Mr. Waterhouse, I just

1              WATERHOUSE - 10-19-21

2    want to be clear that I never would have asked

3    you to appear at this deposition if your name

4    hadn't been included in responses to discovery

5    as to somebody with knowledge about the -- who

6    was told about the existence of the agreement.

7              That is what prompted me do this,

8    and I really do feel compelled to tell you that

9    I otherwise would never have called you as a

10   witness.  So I regret that you're being put

11   through this today.  I had no intention of

12   burdening you or taking your time, but that is

13   the reason that we issued the subpoena is

14   because certain of the defendants identified

15   you as somebody --

16             MS. DEITSCH-PEREZ:  Mr. Morris, you

17      are here to ask questions, not to have --

18             MR. MORRIS:  I feel badly for the

19      guy.  I really do.

20             MS. DEITSCH-PEREZ:  I'm sure you do.

21             MR. MORRIS:  I do.  Stop.

22             MS. DEITSCH-PEREZ:  You stop.

23             MR. MORRIS:  I'm allowed.

24             MS. DEITSCH-PEREZ:  No, you're not

25      allowed to have a chat with the witness.

```
1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  Well, I hope that you

3    appreciate what I'm saying here,

4    Mr. Waterhouse.

5             MS. DANDENEAU:  All right.  Let's go

6         ahead and ask questions, and again, you're

7         entitled to probe his -- his knowledge

8         of -- whatever knowledge he has about

9         this -- this agreement and --

10            MR. MORRIS:  That is what I'm doing.

11            MS. DANDENEAU:  -- he will answer

12        the questions to the best that he can.

13            MR. MORRIS:  That is what I'm doing.

14       Q.    Mr. Waterhouse, I take it you do not

15   know which promissory notes issued by which

16   affiliates or Mr. Dondero are the subject of

17   this agreement; do I have that right?

18       A.    Yes, I don't -- I don't know.

19       Q.    Do you know of any way to determine

20   which promissory notes issued by the affiliates

21   and Mr. Dondero are the subject of this

22   agreement other than asking Jim or Nancy

23   Dondero?

24            MS. DANDENEAU:  Objection to form.

25       A.    I don't know.
```

1                        WATERHOUSE - 10-19-21

2          Q.    Did you ever make --

3          A.    I don't know anything about these

4    agreements.

5          Q.    Did you ever make any effort to

6    determine which promissory notes are subject to

7    this agreement?

8          A.    No.

9          Q.    Did you ever ask anybody which

10   promissory notes are subject to this agreement?

11         A.    No.

12         Q.    Do you know if there is a list

13   anywhere of the promissory notes that are

14   subject to this agreement?

15         A.    I'm not aware.

16         Q.    Have you ever seen the terms of the

17   agreement written down anywhere?

18         A.    No.

19         Q.    Have you ever asked anybody whether

20   the terms of the agreement were written down

21   anywhere?

22         A.    I have not.

23         Q.    Did learning about the agreement

24   cause you to do anything in response?

25               MS. DANDENEAU:  Objection to form.

1              WATERHOUSE - 10-19-21

2        A.    No.

3        Q.    Did anybody ever describe to you the

4   nature of the milestones that you referred to

5   earlier?

6        A.    No, I don't -- I don't have any

7   details of this.

8        Q.    That is fine.

9              PricewaterhouseCoopers served as

10  Highland's outside auditors prior to the

11  petition date; correct?

12       A.    Yes.

13       Q.    You refer to PricewaterhouseCoopers

14  as PwC?

15       A.    Yes.

16       Q.    PricewaterhouseCoopers audited

17  Highland's financial statements on an annual

18  basis; correct?

19       A.    During my -- during my time as -- as

20  CFO, yes, PricewaterhouseCoopers was the

21  auditor.

22       Q.    Do you know why Highland had its

23  annual financial statements audited each year?

24       A.    Generally.

25       Q.    Tell me your general understanding

1                    WATERHOUSE - 10-19-21

2     as to the reason why Highland had its annual

3     financial statements audited each year.

4          A.    From -- from time to time, they were

5     used -- or asked for, as part of diligence or

6     transactions or -- or things of that nature.

7          Q.    And were they given to third parties

8     for purposes of diligence or transactions from

9     time to time?

10         A.    As far as I'm aware, yes.

11         Q.    And was it your understanding as the

12    CFO that the third parties who received the

13    financial statements in diligence or

14    transactions was going to rely on those?

15              MS. DANDENEAU:  Objection to form.

16         A.    I don't know -- I don't know gen --

17    I don't know specifically what they were going

18    to rely on.  You know, we would get requests

19    for audited financial statements.  I don't know

20    what they were relying on.

21         Q.    And --

22         A.    You would have to ask them.

23         Q.    Did you personally play a role in

24    PwC's annual audit and the conduct of the

25    audit?

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection to form.

3      A.     During my tenure as CFO, I played a

4   very minimal role.

5      Q.     What was the minimal role that you

6   played?

7      A.     You know, again, it was -- it was to

8   check in with the team, to make sure that, you

9   know, audit -- the deadlines were being hit,

10  information was being presented to the auditors

11  in a -- in a timely fashion, but, you know,

12  other than that, it was a very capable team

13  that are still current employees of Highland

14  and, you know, they -- they conducted 99

15  percent of -- look, I don't want to give

16  percentages.  I mean, this is -- but I -- I --

17  I played a minimal role towards the end.

18          Before during my earlier years as

19  CFO, I did more, and then as time went on, I

20  did less in it.

21      Q.     Okay.  Was there a person at

22  Highland who was responsible for overseeing

23  Highland's participation in PwC's audit during

24  the time that you were the CFO?

25      A.     Yeah.  I mean, there was -- there

1               WATERHOUSE - 10-19-21

2  was a -- there was a point -- it varies.  It

3  varies by year, in function, in time and, you

4  know, depending on the request, but yes, I

5  mean, there is -- there is -- there is

6  generally a point person of communication.

7       Q.   And who was the point person from

8  2016 until the time you left Highland?

9       A.   I don't -- I don't know

10  specifically, but it would have been, you

11  know -- you know, someone on the corporate

12  accounting team.

13       Q.   And was there a head of the

14  corporate accounting team?

15       A.   Yes, so -- yes.

16       Q.   Who was the head of corporate

17  accounting for the five years prior to the time

18  you left Highland?

19       A.   I don't -- if you're asking from

20  2016 on, I don't -- it was Dave Klos, but,

21  again, there was -- there was changes to the

22  team and the reporting structure.  I don't

23  remember exactly when that happened during --

24  you know, over the last -- since 2016.

25       Q.   Did the folks who participated and

Page 88

1              WATERHOUSE - 10-19-21

2   ran the audit all report to you, directly or

3   indirectly?

4        A.    Yes.

5        Q.    And did you have any responsibility

6   for making sure that the audit report was

7   accurate before it was finalized?

8        A.    Yeah.  I mean, you know, that --

9   that is -- my responsibility to the auditors

10  was -- again, is -- and the CFO is to -- we are

11  providing accurate financial statements; right?

12            And -- and -- and as part of any

13  audit, we disclose all relevant information as

14  part of any audit.

15       Q.    Okay.  And as the CFO, did you take

16  steps to make sure that the audit report was

17  accurate?

18       A.    I mean, I would say in a general

19  sense, yes.  But, again, I mean, I had a

20  very -- I had a very capable and competent

21  team.  I wasn't managing them.

22            You know, part of what I do is I let

23  the team -- I want managers to grow.  I want

24  managers to have rope.  And that is -- you

25  know, I'm not a stand-behind-you type of guy.

1               WATERHOUSE - 10-19-21

2    If you -- if you talk to my team members, I'm

3    not micromanaging people.  I want people to

4    learn and grow in their function so they can go

5    on and do bigger and better things with their

6    careers.

7               And so, yes, generally I was

8    responsible for it, but I wanted the team to

9    learn and grow and be responsible for the bulk

10   of the audit.

11        Q.    Did you personally review each audit

12   report before it was finalized to satisfy

13   yourself that it was accurate?

14        A.    I don't -- I don't recall, you know,

15   for every single -- we're talking 2016, there

16   would have been three years, 2016 to '17, '18.

17   I don't -- we're -- we're going back

18   five years-plus.  I don't -- you know, I don't

19   recall.

20        Q.    Did you have a practice that you

21   employed to make sure that you were satisfied

22   that Highland's audit reports were true and

23   accurate to the best of your knowledge?

24        A.    I mean, our -- the practice was set

25   up with our -- the -- the practice to put

1                    WATERHOUSE - 10-19-21

2    together accurate audited or accurate financial

3    statements is to your control environment.

4                    So, you know, the -- so the practice

5    was to maintain a stable control environment

6    which then the output is -- is accurate

7    financial statements.

8                    So -- so, you know, if I was

9    comfortable that the control environment was

10   operating, then, you know, that would dictate

11   how I would -- you know, what I might or might

12   not do in a given year.

13        Q.    Okay.  Do you recall ever being

14   uncomfortable with the control environment

15   during the period that you served as CFO?

16        A.    Yeah.  I mean, look, yes, there are

17   times -- you know, nothing is perfect.  So

18   there were -- there were times when, yes, you

19   know -- there are times I learned I was

20   uncomfortable with the control environment, and

21   that is part of the management of the process

22   and having, you know -- and -- and working

23   through whatever obstacles present themselves.

24        Q.    Okay.  Were you ever uncomfortable

25   with the control process as it related to

```
 1                WATERHOUSE - 10-19-21

 2   reporting and disclosures of loans to

 3   affiliates and Mr. Dondero?

 4           MS. DANDENEAU:  Objection to form.

 5      A.    I don't -- I don't recall --

 6      Q.    So you don't recall --

 7      A.    -- the --

 8           MS. DANDENEAU:  Mr. Morris --

 9      A.    I don't recall being uncomfortable.

10   But, again, we're going back several years.  I

11   don't -- you know, the practice in an audit is

12   to disclose all information to the auditors.

13   And I don't -- I don't recall.

14      Q.    As part of the process of the audit,

15   did you sign what is sometimes referred to as a

16   management representation letter?

17      A.    Yes.

18           MR. MORRIS:  Can we put up on the

19         screen a document that we have premarked as

20         Exhibit 33.

21           (Exhibit 33 marked.)

22           MS. DANDENEAU:  Mr. Morris, that is

23         not in the binder; correct?

24           MR. MORRIS:  Correct.

25      Q.    So you will see, Mr. Waterhouse,
```

1              WATERHOUSE - 10-19-21

2    this is a letter dated June 3rd.  And if we

3    could go to the signature page.

4              And do you see that you and

5    Mr. Dondero signed this document?

6        A.    Yes.

7        Q.    That is your signature; right?

8        A.    Yes.

9              MR. MORRIS:  Okay.  Can you go back

10        to the top.

11             MS. DANDENEAU:  Mr. Morris, can you

12        have somebody post this in the chat so that

13        we have can have a copy of this, please.

14             MR. MORRIS:  Yeah, sure.  Asia, can

15        you do that, please.

16        Q.    Okay.  Do you see at the bottom of

17    the second paragraph there is a reference to

18    materiality?

19        A.    Yes.

20        Q.    Okay.  It says, Materiality used for

21    purposes of these representations is

22    $1.7 million.

23             Do you see that?

24        A.    I do.

25        Q.    And did PwC set that level of

1                    WATERHOUSE - 10-19-21

2    materiality?

3         A.    Yes.

4         Q.    And for purposes of the audit, did

5    PwC set the level of materiality each year?

6         A.    Yes.

7         Q.    Did that number change over time?

8         A.    I'm not aware of what materiality is

9    every single year, so -- but, you know, this

10   number would likely fluctuate.

11        Q.    Okay.  I'm going to go back to a

12   question I asked you earlier today.  And that

13   is in connection -- this letter is issued in

14   connection with the audit for the period ending

15   12/31/2018; correct?

16        A.    Yes.

17        Q.    Okay.  And is it fair to say that if

18   any -- actually, withdrawn.  I'm going to take

19   it outside of this.

20             If Highland ever forgave the loan to

21   any affiliate or any of its officers or

22   employees, in whole or in part, to the best of

23   your knowledge, would that forgiveness have

24   been disclosed in the audited financial

25   statements if it exceeded the level of

1          WATERHOUSE - 10-19-21

2    materiality that PwC established?

3              MS. DANDENEAU:  Objection to form.

4         A.    So, again, during my tenure as CFO,

5    and -- Highland -- it was -- it is required to

6    disclose any affiliate loans that are in excess

7    of materiality.

8              Now, the forgiveness of those loans

9    may or may not -- I mean, since materiality

10   fluctuates every year, a -- you know, if a loan

11   was forgiven, it may or may not, you know --

12   and, look, I would want to consult the guidance

13   around this.

14             It is not something we do -- you

15   know, it is not -- you know, GAAP can be and

16   disclosures can be very specialized so, again,

17   we want to consult the guidance.  But we would

18   see if and what would need to be disclosed if

19   it were deemed immaterial.

20        Q.    Did you and Mr. Dondero sign

21   management representation letters of this type

22   in each year in which you served as Highland's

23   CFO?

24        A.    I -- I -- I will speak for myself.

25   I signed them.  There may have been others that

Page 95

1                  WATERHOUSE - 10-19-21

2      signed as well.  I don't -- I don't recall.

3          Q.    But to the best of your knowledge,

4      you, personally, signed a management

5      representation letter in connection with

6      Highland's audit each year that you served as

7      the CFO; correct?

8          A.    I would say generally speaking,

9      Mr. Morris.  I don't recall for every single

10     year, you know, generally, but I would want to

11     refer to all the rep letters and see who signed

12     them.

13         Q.    Do you recall Highland having its

14     financial statements audited in any year during

15     the period that you were a CFO where you didn't

16     sign the management representation letter?

17         A.    I don't recall.  But, John, we're

18     going back five, six, seven, eight, nine,

19     decade.  I don't -- I don't remember.

20         Q.    I don't want to go back that many

21     decades, but I'm just asking you if you recall

22     that there was you didn't sign it?

23         A.    I -- I -- I don't, but my memory

24     is -- again, I -- I -- I can't tell you what I

25     did in 2012.  I mean, I think generally, yes,

1          WATERHOUSE - 10-19-21

2   but I don't -- I don't know for sure, and I

3   would want to rely on the document.

4        Q.    Let me ask the question a little bit

5   differently then.

6             Do you have any reason to believe

7   that Highland had its annual financial audit

8   and you did not sign a management

9   representation letter in connection with that

10  audit?

11            MS. DANDENEAU:  Objection to form.

12       A.    I don't believe it would, but,

13  again, I would want to -- I don't recall and I

14  would want to confirm it to -- to make, you

15  know, an affirmative -- to give an affirmative

16  answer.

17       Q.    Do you know whether PwC required

18  management to sign management representation

19  letters?

20            MS. DANDENEAU:  Objection to form.

21       A.    Yes.  I mean, it -- management

22  representation letters are signed by

23  management.

24       Q.    Okay.  And do you know -- do you

25  have any understanding as to why PwC requires

1                    WATERHOUSE - 10-19-21

2    management to sign management representation

3    letters?

4              MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    I don't know why PwC's -- what PwC's

7    specific practice is.  I know generally what

8    management representation letters are.

9         Q.    Okay.  Do you personally -- I'm not

10   asking about PwC.  I'm asking for you -- I'm

11   asking about you, do you have an understanding

12   as to why the auditor asks for management

13   representation letters?

14        A.    Okay.  So you're asking me in my

15   personal capacity, yes, I have a general

16   understanding of why.

17        Q.    Can you give me the general

18   understanding that you have as to why

19   management representation letters are required?

20        A.    They are -- they are required to --

21   they are -- they are one of the items required

22   in an audit to help verify completeness.

23        Q.    Do you have any -- any other

24   understanding as to why management

25   representation letters are required?

1          WATERHOUSE - 10-19-21

2     A.    That is -- that is -- other than

3  what I said, it is -- it is -- it is required

4  so -- to ensure that the -- you know, there

5  is -- there is completeness in what is being

6  audited.

7     Q.    Did you -- did you have a practice

8  whereby you and Mr. Dondero conferred about the

9  management representation letters before you

10 signed them?

11    A.    No.

12    Q.    Did you have a practice --

13 withdrawn.

14          Do you see just the next sentence

15 after the materiality, there is a sentence that

16 states:  We confirm, to the best of our

17 knowledge and belief, as of June 3rd, 2019, the

18 date of your report, the following

19 representations made to you during your audit.

20          Do you see that sentence?

21    A.    Yes.

22    Q.    Okay.  Did you understand when you

23 signed this letter that you were confirming the

24 representations that followed?

25    A.    When I signed this management

```
 1                  WATERHOUSE - 10-19-21

 2    letter -- representation letter, yes.

 3         Q.    Okay.  Did you discuss this letter

 4    with Mr. Dondero before you signed it?

 5         A.    I don't recall.

 6         Q.    Do you recall if Mr. Dondero asked

 7    you any questions before he signed the letter?

 8         A.    I don't recall.

 9         Q.    Do you recall if you asked

10    Mr. Dondero any questions before you signed

11    this letter?

12         A.    I don't recall.

13         Q.    Is it fair to say that Mr. Dondero

14    did not disclose to you the existence of the

15    agreement that we have -- as we've defined that

16    term prior to the time you signed this letter?

17              MS. DANDENEAU:  Objection to form.

18         A.    I don't think I understand the

19    question.  So, again, you are saying, did

20    Mr. Dondero not disclose to me the existence of

21    this letter?

22         Q.    No, I apologize.

23              Did Mr. Dondero disclose to you the

24    existence of the agreement prior to the time

25    you signed this letter on June 3rd, 2019?
```

1                    WATERHOUSE - 10-19-21

2          A.    The agreement -- the agreement that

3     we talked about earlier?

4          Q.    Correct.

5          A.    Look, as I said earlier, the first

6     time I heard of this agreement was sometime

7     this year.

8          Q.    Okay.  Can we turn -- let's just

9     look at a couple of items on the list.  If we

10    can go to page 33416.  Do you see in Number 35

11    it talks about the proper recording or

12    disclosure in the financial statements of ND

13    relationships and transactions with related

14    parties.

15               Do you see that?

16         A.    I do.

17         Q.    As the CFO, do you have any

18    understanding as to whether Dugaboy is a

19    related party?

20         A.    I don't recall.

21         Q.    Do you know whether any of the

22    affiliates are related parties?

23         A.     If -- if it was NexPoint, HCMFA,

24    HCMS, HCRE, yeah, if -- if that is the

25    affiliate definition, and there.  In ASC 850 --

WATERHOUSE - 10-19-21

1  again, I mean, I haven't looked at ASC 850 in

2  quite some time, but, you know, if -- if there

3  is a control language, you know, ASC 850, would

4  that -- that section in GAAP would -- would

5  pick up and define what are related parties.

6  

7  So, you know, like I said, if -- one

8  of the four entities I just described, if -- if

9  they are in that control definition of ASC 850,

10  they would be picked up in 35D.

11  Q.    Do you -- do you have any reason to

12  believe that they would be picked up in that

13  definition, based on your knowledge and

14  experience?

15  A.    I -- I believe that entities

16  controlled under GAAP are -- are affiliates.

17  Q.    Okay.  Would Mr. Dondero also

18  qualify as a related party for purposes of

19  Section 35D, to the best of your knowledge?

20  A.    Yeah, I don't -- I don't know.  I

21  would think -- I would have to read the code

22  section to see if someone personally -- is it

23  talking about related parties.  So, look, if

24  your own in control, yeah, I mean, I would have

25  to read the section.

1              WATERHOUSE - 10-19-21

2        Q.    To the best of your knowledge, was

3    the existence of the agreement ever disclosed

4    to PwC?

5        A.    I'm not -- I'm not aware.

6        Q.    Do you recall if the agreement was

7    ever disclosed in Highland's audited financial

8    statements?

9        A.    I don't -- I don't remember if it

10   was in every Highland's audited financial

11   statements during my tenure.  We would have to

12   read the financial statements to see what was

13   disclosed, but I'm not -- I mean, as I sit here

14   today, I'm not aware.

15       Q.    That is all I'm asking for.

16       A.    I'm not aware.

17       Q.    Can we go to the next page, please,

18   and look at 36.  36 says, we have disclosed to

19   you the identity of the partnership's related

20   party relationships and all the related party

21   relationships and transactions of which we are

22   aware.

23             Do you see that?

24       A.    Yes.

25       Q.    To the best of your knowledge, as of

                    WATERHOUSE - 10-19-21
1
2  June 3rd, 2019, did Highland disclose to PwC
3  the identity of the partnership's related
4  parties and all the related party relationships
5  and transactions of which it was aware?
6       A.    I mean, I can speak for myself as
7  signer of this representation letter.  I
8  disclosed what -- what, you know, what --
9  what -- what I knew.  Sorry, look, yes, so I --
10 I disclosed what I knew.
11      Q.    Okay.  Can we go to page 419.  Do
12 you see at the end there is a reference to
13 events that occurred since the end of the
14 fiscal year and the date of the letter?
15      A.    Yes.
16      Q.    And were you aware of that -- of
17 that provision of the management representation
18 letter before you signed the document?
19      A.    Yes.
20      Q.    Do you have an understanding as to
21 why PwC asked for that confirmation of that
22 particular part of the management
23 representation letter?
24      A.    It is -- it is -- it is just -- it
25 is a typical audit request.

1                    WATERHOUSE - 10-19-21

2        Q.    And do you understand -- do you have

3   an understanding that PwC wanted to know that

4   as of the date of the audit whether any

5   material changes had occurred since the end of

6   the fiscal year, using the definition of

7   materiality that is in this particular

8   management representation letter?

9        A.    It -- it is -- it is -- it is a --

10  it is as described.  It is just a poorly worded

11  question, so it is hard for me to say yes.

12       Q.    If I asked you this, I apologize,

13  but did you ever learn when the agreement was

14  entered into?

15       A.    I don't -- I don't -- like I said

16  before, I don't know or have any details of the

17  agreement.

18       Q.    Okay.  Did you ever ask anybody when

19  the agreement was entered into?

20       A.    I did not.

21       Q.    Let's look at the audited financial

22  statements.  We will put up on the screen a

23  document that has been premarked as Exhibit 34.

24            (Exhibit 34 marked.)

25            MS. DANDENEAU:  And again, if Ms. La

1              WATERHOUSE - 10-19-21

2        Canty could please put that in the chat

3        room, that would be great.

4              MR. MORRIS:  I will assure you we

5        will put every document in the chat room.

6        Q.    Now, I'm just going to ask you

7    questions that are related to the provisions of

8    this report that concern the affiliate loans,

9    but again, Mr. Waterhouse, if there is any part

10   of the document that you need to see or that

11   you think you might need to see in order to

12   refresh your recollection to answer any of my

13   questions, will you let me know that?

14       A.    Yes.

15       Q.    Because this is a pretty lengthy

16   document, but do you see that the cover page

17   here is the Highland consolidated financial

18   statements for the period ending December 31st,

19   2018?

20       A.    Yes.

21       Q.    If we can go to -- I think it is the

22   next one, looking for PwC's signature line.

23             MS. CANTY:  I'm sorry, John, did you

24   say something?

25             MR. MORRIS:  Yes, can we turn the

1                    WATERHOUSE - 10-19-21

2          page.  I think it is 215.  Yes, stop right

3          there, just above -- I'm sorry, I want to

4          see just the date of the report.

5          Q.    Okay.  Do you see at the bottom of

6     that page there, Mr. Waterhouse,

7     PricewaterhouseCoopers has signed this audit

8     report?

9          A.    Yes, I see their signature.

10         Q.    Okay.  And it is the dated same day

11    as your management representation letter; is

12    that right?

13         A.    It is -- yes, it is the same day.

14         Q.    Was that the practice to sign the

15    management representation letter on the same

16    day that the audit report was signed?

17         A.    Yes, that is typical in every audit.

18         Q.    Can we just scroll down to the

19    balance sheet on the next page.

20               Do you see that there is a line

21    there that says, Notes and Other Amounts Due

22    from Affiliates?

23         A.    Yes.

24         Q.    Does that line, to the best of your

25    knowledge, include the amounts that were due

1          WATERHOUSE - 10-19-21

2   under the affiliate under the notes signed by

3   the affiliates and Mr. Dondero?

4          MR. RUKAVINA:  Objection to the

5       extent that calls for a legal conclusion.

6       A.    I mean, I would want to see the

7   detail and the build to this $173,398,000, but,

8   yes, I mean, if -- if -- given what we

9   discussed before, you know, it -- it should

10  capture that.

11      Q.    And -- and while you were the CFO of

12  Highland, were all notes held by Highland that

13  were issued by an affiliate or Mr. Dondero

14  carried as assets on Highland's balance sheets?

15          MS. DANDENEAU:  Objection to form.

16          MS. DEITSCH-PEREZ:  Object to form.

17      A.    I don't -- I don't know how else

18  they would be carried.

19      Q.    Okay.  Can you think of any -- are

20  you aware of any promissory note issued by an

21  affiliate or Mr. Dondero that was not carried

22  on Highland's audited financial balance sheets?

23      A.    I'm -- I'm -- I'm not aware.

24      Q.    Okay.  Are you aware of any category

25  of asset on Highland's balance sheet in which

```
 1                 WATERHOUSE - 10-19-21

 2    any of the promissory notes issued by an

 3    affiliate or Mr. Dondero would have been

 4    included?

 5                 MS. DANDENEAU:  Objection to form.

 6         A.    Sorry, am I aware of any asset of an

 7    affiliate being included --

 8         Q.    That -- let me -- let me try again.

 9                 Do you see there is a number of

10    different assets that are described on this

11    balance sheet?

12         A.    Yes.

13         Q.    One of the assets that is described

14    is Notes and Other Amounts Due from Affiliates;

15    right?

16         A.    Yes.

17         Q.    And it is reasonable to conclude

18    that the notes from the affiliates and

19    Mr. Dondero are included in that line item;

20    right?

21         A.    Yes, based on this description.

22    Again, I would want to see a build of this to

23    100 percent confirm, but based on the

24    description, the asset description, it is -- it

25    is likely.
```

```
 1                    WATERHOUSE - 10-19-21

 2                    Now, does that mean absolute?  I

 3      don't know.

 4           Q.    Do you have any reason to believe

 5      that the promissory notes would have been

 6      carried on the balance sheet in a category

 7      other than Notes and Other Amounts Due from

 8      Affiliates?

 9           A.    If they were deemed -- no.  If they

10      were deemed an affiliate, you know, under GAAP,

11      they should be carried in that line.

12      Otherwise, it would go into another line.

13           Q.    Okay.  And do you see the total

14      asset base as of December 31st, 2018, was

15      approximately $1.04 billion?

16           A.    Yes.

17           Q.    Is my math correct that the Notes

18      and Other Amounts Due from Affiliates

19      constituted approximately 17 percent of

20      Highland's assets as of the end of 2018?

21           A.    Well, so how are you defining

22      Highland?

23           Q.    Highland Capital Management, L.P.,

24      the entity that this audit is subject to -- or

25      the subject of.
```

1                    WATERHOUSE - 10-19-21

2        A.     On a consolidated or unconsolidated

3   basis?

4        Q.     I'm looking at the balance sheet.

5   It is a consolidated balance sheet.  Okay?

6               Does the Notes and Other Amounts Due

7   from Affiliates constitute approximately

8   17 percent of the total assets of Highland

9   Capital Management, L.P., on a consolidated

10  basis?

11              MS. DANDENEAU:  Objection to form.

12       A.     I don't have a calculator in front

13  of me but I will take your math, if you are

14  taking the 173 divided by the billion.

15       Q.     Okay.

16       A.     If that is accurate, yes.  But,

17  again, on a consolidated basis.

18       Q.     And on an unconsolidated basis the

19  percentage would be higher; correct?

20       A.     I -- no.  I don't know.

21       Q.     Well, okay.  That is fair.

22              MR. MORRIS:  Can we turn to

23       page 241, please.

24       Q.     Do you see that this is a section of

25  the audit report that is entitled Notes and

1          WATERHOUSE - 10-19-21

2    Other Amounts Due from Affiliates?

3         A.    Sorry, I can't see the -- the --

4         Q.    It is at the top.

5         A.    Notes and Other Amounts Due from

6    Affiliates, yes, I see that.  I don't -- I

7    don't have a page number, but I'm on a page

8    that says at the top:  Notes and Other Amounts

9    Due from Affiliates.

10        Q.    Okay.  And that is the same title of

11   the line item on the balance sheet that we just

12   looked at; right?  Notes and Other Amounts Due

13   from Affiliates?

14        A.    Yes.

15        Q.    And is it your understanding, based

16   on your experience and knowledge as the CFO,

17   that this is the section of the narrative that

18   ties into the line item that we just looked at?

19        A.    Yes.

20        Q.    And is this section of the audit

21   report intended to describe and disclose all of

22   the material facts concerning the Notes and

23   Other Amounts Due from Affiliates?

24             MS. DANDENEAU:  Objection, form.

25        A.    This -- these notes -- these notes

1                    WATERHOUSE - 10-19-21

2   of the financial statements are -- the purpose

3   is to disclose any material items in relation

4   to that balance sheet line item.

5        Q.    Okay.  And all of the information,

6   to the best of your knowledge, that is set

7   forth in this section of the audit report was

8   provided by Highland; correct?

9        A.    Yes, it would have been provided by

10  the corporate accounting team.

11       Q.    Okay.  And the corporate accounting

12  team, did that team report to you in the

13  organizational structure?

14       A.    Yes.

15       Q.    And did you have any concerns about

16  the controls that were in place to make sure

17  that the information provided with respect to

18  Notes and Other Amounts Due from Affiliates was

19  accurate and complete?

20             MS. DANDENEAU:  Objection to form.

21       A.    Not that I recall.

22       Q.    Okay.  Do you recall ever being

23  concerned that any portion of the Notes and

24  Other Amounts Due from Affiliates in any audit

25  report was inaccurate, incomplete, or not

```
 1                  WATERHOUSE - 10-19-21

 2   reliable?

 3        A.    I didn't -- I had concerns about,

 4   you know, like I talked about before, of there

 5   were -- there were potentially issues in the

 6   control environment.  But as far as it relates

 7   to the audited financial statements, any -- the

 8   team would work with the auditors to disclose

 9   all -- all notes in Highland's possession.

10            And any -- any notes that were

11   deemed material by the auditor, right, these

12   were disclosed in these -- in this section, you

13   know, in -- in the notes to the consolidated

14   financial statements as you presented.

15        Q.    Do you recall ever having a

16   conversation with anybody at any time

17   concerning the accuracy of the section of audit

18   reports that relates to Notes and Other Amounts

19   Due from Affiliates?

20            MS. DANDENEAU:  Objection to form.

21        A.    You know, as -- as -- I didn't have

22   direct conversations with

23   PricewaterhouseCoopers as I had, you know --

24   I -- I had the team that managed this.

25            Again, I wasn't anywhere chose to
```

```
1                    WATERHOUSE - 10-19-21

2    being the point person of this audit.  And I

3    can't recall, you know, when -- you know, I

4    don't even know if I was ever the point person

5    during my tenure as CFO.

6              I don't know if PwC had any concerns

7    when they were performing those audit

8    procedures.  They may have and they may have --

9    and it may not have been communicated to me.  I

10   don't know.

11             MR. MORRIS:  All right.  I move to

12        strike.

13        Q.   And I'm going to ask you to listen

14   carefully to my question.

15             Did you -- do you recall ever having

16   a conversation with anybody at any time

17   concerning the accuracy of the reporting

18   provided in the audited financial statement on

19   the topic of Notes and Other Amounts Due?

20             MS. DANDENEAU:  Objection to form.

21        A.   I don't recall for this, but that

22   doesn't mean that it didn't exist.

23        Q.   Okay.  But you have no reason to

24   believe, as you sit here right now, that you

25   ever discussed with anybody concerns over the
```

1                 WATERHOUSE - 10-19-21

2   accuracy of the section of the audit reports

3   called Notes and Other Amounts Due from

4   Affiliates; correct?

5             MS. DANDENEAU:  Object to the form.

6             MS. DEITSCH-PEREZ:  Objection to

7        form.

8        A.    I don't recall having any

9   conversations.  But, again, I mean, this is --

10  this is two years ago.

11       Q.    I'm just asking for your

12  recollection, sir.

13       A.    Yes.

14       Q.    If you don't recall, this will --

15       A.    Yeah.

16       Q.    (Overspeak) -- if you don't

17  recall --

18       A.    Yeah, I don't -- I don't recall.

19       Q.    Do you know who was responsible for

20  drafting the audit report?

21       A.    Are you asking the actual Highland

22  employee responsible?  I mean, it was

23  Highland's responsibility, so, I mean, that

24  is --

25       Q.    Right.

1                    WATERHOUSE - 10-19-21

2          A.     -- Highland's responsibility.

3   Highland's responsibility.

4          Q.     Who, at Highland, was responsible

5   for drafting this section of the audit report?

6          A.     I -- I don't know the answer to

7   that.  Again, there was a team who worked on

8   this.  And I don't know, you know, whether it

9   was the staff or the manager.

10                 Again, this is where I let the teams

11  manage.  And, you know, there may be a

12  corporate accountant who worked on this.  I

13  just -- you know, I wasn't part of that process

14  to give that person experience.  I don't know.

15         Q.     Do you recall having any

16  communications with anybody at any time

17  concerning this section of the report?

18         A.     Yeah, I don't recall.

19         Q.     Do you recall whether you ever told

20  anybody at any time that any aspect of this

21  section of the report was inaccurate or

22  incomplete?

23         A.     I don't recall.

24         Q.     As you sit here today, do you have

25  any reason to believe that this section of the

1                   WATERHOUSE - 10-19-21

2    audit report is incomplete or inaccurate in any

3    way?

4                   And I'm happy to give you a moment

5    to -- to look at it, if you would like.

6                   MS. DANDENEAU:  Objection to form.

7                   MS. DEITSCH-PEREZ:  Same.

8         A.    I mean, I would have to look at -- I

9    would have to look at the bill to the note

10   schedule to make sure I know you presented me

11   with materiality, but again, there might be a

12   note as of 12/31/18 that somehow was -- was

13   under materiality not disclosed.  I don't -- I

14   don't know.  I would need more information.

15        Q.    Okay.  But without more information,

16   you have no reason to believe anything this

17   section is inaccurate; correct?

18                  MS. DANDENEAU:  Objection to form.

19        A.    I don't.  I mean, you know, this was

20   part of the audit.

21        Q.    Thank you.  Now, you will see if we

22   could scroll just a little bit more that each

23   of the first five paragraphs concerns

24   specifically the four affiliates that we've

25   been discussing and Mr. Dondero.

1                    WATERHOUSE - 10-19-21

2                    MR. MORRIS:  If we could go the

3          other way, La Asia.  We don't need Okada.

4          We're going to have to thread the needle.

5          Okay.  Good, perfect.

6          Q.    Do you see those five paragraphs

7    certain the four affiliates and Mr. Dondero as

8    we've been referring to today?

9          A.    Yes.

10         Q.    Okay.  And do you see at the end of

11   every paragraph it states, quote:  A fair value

12   of a partnership's outstanding notes receivable

13   approximates the carrying value of the notes

14   receivable?

15         A.    Yes, I see that.

16         Q.    Do you have an understanding of what

17   that means?

18         A.    Yes.

19         Q.    What is your understanding of that

20   sentence?

21         A.    It is the -- again, the -- the fair

22   value, right, which is -- which is what the --

23   what Highland could sell that asset for.  This

24   statement is comparing the fair value of the

25   notes to the carrying value, so the carrying

1              WATERHOUSE - 10-19-21

2    value is the line item that you showed me

3    earlier that is in Notes and Other Amounts Due

4    from Affiliates.

5        Q.    Okay.  Is another way to say this is

6    that the fair market value of the notes equals

7    the principal amount and -- withdrawn.

8              Is the fair way to interpret this

9    that the fair market value of the notes equals

10   all remaining unpaid principal and interest due

11   under the notes?

12             MS. DANDENEAU:  Object to the form.

13             MS. DEITSCH-PEREZ:  Objection, form.

14       A.    I don't know the answer to that,

15   because I don't recall where -- where any --

16   where -- in what line item was the interest

17   component reported.

18       Q.    All right.  Well, if we look in this

19   audit report, you will see in the middle of the

20   first paragraph, for example, it states that as

21   of December 31st, 2018, total interest and

22   principal due on outstanding promissory notes

23   was approximately $5.3 million.

24             Do you see that?

25       A.    I do.

1          WATERHOUSE - 10-19-21

2     Q.     Is that the carrying value or the

3 fair value?

4     A.     That would be the carrying value --

5     Q.     And is the last --

6     A.     -- in my opinion.

7     Q.     Okay.  And it is in your opinion as

8 the chief financial officer of Highland during

9 the period of time that you described; right?

10 It is an educated opinion?

11     A.     I'm reading this at face value.  I'm

12 taking that as that is carrying value.

13     Q.     Okay.  And does the last sentence

14 say that the carrying value is roughly

15 approximate to the fair market value?

16          MS. DANDENEAU:  Objection to form.

17          MS. DEITSCH-PEREZ:  Objection, form.

18     A.     Again, this note to the financial

19 statement is specific to notes and other

20 amounts due from affiliates.

21     Q.     Correct.

22     A.     If the interest component is

23 reported elsewhere on the balance sheet, you

24 know, it -- it -- it could be off.  Again, I

25 don't have the detail.  I don't know, but yes,

1                WATERHOUSE - 10-19-21

2    look, I mean, if you -- I mean, if you are

3    saying the 5.3 million is in the notes and

4    other amounts due from affiliates, then the

5    last statement is saying the fair value

6    approximates 5.3 million.  That is what that

7    last sentence is saying.

8         Q.    Do you see in the middle of the

9    first paragraph -- not in the middle, the next

10   to last sentence there is a statement that the

11   partnership will not demand payment on amounts

12   that exceed HCMFA's excess cash availability

13   prior to May 31st, 2021.

14              Do you see that?

15        A.    I do.

16        Q.    Do you know when Highland agreed not

17   to demand payment as described in that

18   sentence?

19        A.    I don't know specifically.

20        Q.    Do you know why Highland agreed not

21   to demand payment on HCMFA's notes until May

22   2021?

23        A.    Yes.

24        Q.    Why was that decision made?

25        A.    You know, well, it -- it -- that

1                    WATERHOUSE - 10-19-21

2    decision was made as to not put HCMFA into a

3    position where it didn't have sufficient assets

4    to pay for the demand note.

5          Q.    And at the time the agreement was

6    entered into, pursuant to which the partnership

7    wouldn't demand payment, did HCMFA have

8    insufficient assets to satisfy the notes if a

9    demand had been made?

10               MS. DANDENEAU:  Objection to form.

11         A.    I don't have HCMFA's financial

12   statements in front of me as of 12/31/18.

13         Q.    Was there a concern that HCMFA would

14   be unable to satisfy its demands under the

15   notes if demand was made?

16               MS. DANDENEAU:  Objection to form.

17         A.    Well, there is -- I don't recall --

18   I mean, there is something, right, in place to

19   basically not demand payment until May 31, 2021

20   as detailed here.

21         Q.    And who made the decision to enter

22   into -- who made the decision on behalf of

23   Highland not to demand payment until May 31st,

24   2021?

25         A.    I'm trying to remember.  I don't

1               WATERHOUSE - 10-19-21

2  remember exactly -- I don't remember if it was

3  myself or -- or Jim Dondero who -- who -- there

4  was -- there was something signed, from what I

5  recall, that -- that -- that backed up this

6  line item in the -- in the notes I'm -- look,

7  I'm, I'm --

8      Q.   We will get to that.

9      A.   You --

10     Q.   I'm just --

11     A.   You have -- I mean --

12     Q.   We're going to give that to you.

13  I'm going to give that to you.

14     A.   You -- you -- you have all the

15  documents.  I don't have the documents, and

16  that is what makes it so hard.  I don't have

17  any documents to prepare for this deposition;

18  right?  You have all -- I don't -- I don't -- I

19  don't remember, but, you know, again, it would

20  probably be myself or Jim.

21     Q.   Do you know if Highland received

22  anything in return for its agreement not to

23  make a demand for two years?

24     A.   I don't -- I don't think it referred

25  anything.

```
 1                WATERHOUSE - 10-19-21
 2       Q.    And did you and Mr. Dondero discuss
 3   HCMFA's ability to satisfy the notes if a
 4   demand was made at the time this agreement was
 5   entered into?
 6             MS. DANDENEAU:  Objection to form.
 7       A.    I don't -- I don't -- I don't recall
 8   having a specific conversation, if I did, or --
 9   or David Klos.
10       Q.    Okay.  I'm just asking if you recall
11   any conversations that you had.
12       A.    I don't recall.
13       Q.    Okay.  Do you know why Highland
14   loaned the money to HCMFA that is the subject
15   of the notes described in this paragraph?
16       A.    I don't remember specifically why
17   5.3 million was loaned.  I mean, I -- it would
18   have to be put in the context.
19       Q.    Do you have any recollection at all
20   as to why Highland ever loaned any money to
21   HCMFA?
22       A.    Yes.
23             MS. DANDENEAU:  Objection to form.
24       Q.    What do you remember about that?
25       A.    There was a Highland Global
```

1                    WATERHOUSE - 10-19-21

2    Allocation Fund, which was a -- a fund managed

3    by Highland Capital Management Fund Advisors.

4    There was a -- we -- I'm just telling you,

5    there was -- there was -- there was a -- a

6    ultimately a NAV error found in this fund while

7    it was an open-ended fund and, you know, there

8    were amounts owed by the advisor in -- in

9    relation to that NAV error.

10                   There were also, for the same fund,

11   that same fund was ongoing an

12   open-end-to-close-end conversion, and as part

13   of that proposal, shareholders who voted for

14   the conversion received compensation from the

15   advisor.

16        Q.    All right.  Now, the events that

17   you're describing occurred in the spring of

18   2019; right?

19        A.    These started back -- I think, I

20   mean --

21        Q.    I apologize.

22        A.    -- that -- I mean, the answer to

23   that is no.

24        Q.    I apologize, the loans that were

25   made in connection with the events that you're

```
 1                    WATERHOUSE - 10-19-21

 2    describing occurred in May 2019; right?

 3                    MR. RUKAVINA:  Objection to the

 4         extent that calls for a legal conclusion.

 5         A.    I don't recall specifically what

 6    amounts of money were moved when, for what

 7    purpose.

 8         Q.    Okay.  Fair enough.  Going to the

 9    next paragraph, do you recall that NexPoint

10    Advisors had obtained a number of loans from

11    Highland, and they rolled up those loans into

12    one note in approximately 2017?

13         A.    This is for NexPoint Advisors?

14         Q.    Yes.

15         A.    I -- I mean, I don't -- I don't

16    recall the NexPoint Advisors loan being a

17    roll-up loan, but --

18         Q.    Do you know why?

19         A.    But, look, if you have documents

20    that show -- I mean, look, I just don't recall.

21         Q.    Okay.  That is fair.  Do you know

22    why -- do you have any recollection as to why

23    Highland loaned money to NexPoint?

24         A.    Yes.

25         Q.    Why did High -- why do you recall --
```

1                    WATERHOUSE - 10-19-21

2    what is the reason you recall Highland lending

3    money to NexPoint?

4         A.    I mean, I was just -- I just -- I

5    just recall.  I mean, I just -- I don't

6    remember why.

7         Q.    I understand.  And I'm asking you if

8    you recall --

9         A.    Oh, why -- I thought you say --

10   NexPoint Advisors was launching a fund which

11   is -- I believe that the legal name is NexPoint

12   Capital, Inc.  And it -- it provided a

13   co-invest into that fund.

14              And, from what I remember, the --

15   the -- that NexPoint borrowed money from

16   Highland at the time to make that co-invest.

17        Q.    So this was an investment that

18   NexPoint was required to make; is that right?

19              MS. DANDENEAU:  Objection to form.

20        A.    I don't know if it was required to

21   make, I don't recall that, or if it just made

22   it.

23        Q.    Okay.  But your recollection is that

24   NexPoint made an investment and they borrowed

25   money from Highland to finance the investment.

1          WATERHOUSE - 10-19-21

2          Do I have that right?

3     A.    Yes.

4     Q.    How about HCRE?  Do you know why

5  HCRE borrowed money from Highland?

6     A.    I don't remember specifically.

7     Q.    Do you remember generally?

8     A.    Generally, yeah -- I mean, yes.

9     Q.    Can you tell me your general

10  recollection as to why Highland loaned money to

11  HCRE?

12     A.    For -- for -- for investment

13  purposes.

14     Q.    So HCRE made the investment and it

15  obtained a loan, or loans, from Highland in

16  order to finance that investment or those

17  investments.

18          Do I have that right?

19     A.    I mean, I -- you know, generally.

20     Q.    Okay.  How about Highland Management

21  Services, Inc.?

22          Do you have any recollection as to

23  why HCMS borrowed money from Highland?

24     A.    Generally.

25     Q.    What is your general recollection as

1           WATERHOUSE - 10-19-21

2    to why HCMS borrowed money from Highland?

3         A.    For -- for investment purposes.

4         Q.    So it is the same thing, HCMS wanted

5    to make investments and it borrowed money from

6    Highland in order to finance those investments;

7    is that right?

8         A.    I mean, yes, generally.  I mean, I

9    can't -- I don't -- on the services, there --

10   there are several loans in these schedules.

11   You know, I can't remember why every single one

12   of these were made, but I would say, yeah, I

13   mean, generally.

14        Q.    Okay.  I appreciate that.

15             MR. MORRIS:  Let's go to the page

16        with Bates No. 251.  La Asia, are you

17        there?

18             MS. CANTY:  Sorry, John.  It went

19        out for a minute.  Can you say that again.

20        I don't know what is going on.

21             MR. MORRIS:  The page with Bates

22        No. 251, can we go to that.

23             MS. CANTY:  Yes, sorry.

24             MR. MORRIS:  Keep going to the

25        bottom.  Yeah, there you go.

1              WATERHOUSE - 10-19-21

2         Q.    Do you see, Mr. Waterhouse, that

3    there is a section there called Subsequent

4    Events?

5         A.    I do.

6         Q.    And does this relate to the last

7    sentence above the signature line on the

8    management representation letter that we talked

9    about earlier where you made the representation

10   that you disclosed subsequent events?

11        A.    I mean, it relates to it, but not in

12   its entirety.

13        Q.    Okay.

14             MR. MORRIS:  If we can scroll up to

15        capture the entirety of this section right

16        here.

17        Q.    And what do you mean by that, sir?

18             MR. MORRIS:  Yeah, right there.

19        Perfect.

20        A.    There are -- there are different

21   subsequent events in -- under GAAP.  So there

22   are -- and -- and -- so what we see in the

23   notes to the financial statements are one type

24   of subevent.

25        Q.    Okay.  And -- and would the type of

1                    WATERHOUSE - 10-19-21

2    subsequent event relating to affiliate loans be

3    captured in this section if they were -- if

4    they were made after the end of the fiscal year

5    and prior to the issuance of the audit report?

6         A.    Yes, if they were deemed material or

7    disclosable.

8         Q.    Okay.  I appreciate that.

9              Do you see the next to the last

10   entry there?  It says, Over the course of 2019

11   through the report date, HCMFA issued

12   promissory notes to the partnership in the

13   aggregate amount of $7.4 million?

14        A.    Yes.

15        Q.    And does that refresh your

16   recollection that those are the notes that

17   related to the NAV error that you mentioned

18   earlier?

19        A.    I don't -- I don't remember the

20   exact.  Again, there are -- I mentioned two

21   line items; right?

22        Q.    Yes.

23        A.    I mean, it was the GAAP conversion

24   process plus the -- the NAV error.  I don't

25   have the details.  I don't recall specifically

1                    WATERHOUSE - 10-19-21

2    if -- you know, what -- if that 7.4 million was

3    solely attributable to the NAV error.

4         Q.    Okay.  But there is no question that

5    Highland told PricewaterhouseCoopers that over

6    the course of 2019 HCMFA issued promissory

7    notes to the partnership in the aggregate

8    amount of $7.4 million; correct?

9         A.    In the course of the audit, we would

10   have produced all promissory notes in our

11   possession, including the ones that are

12   detailed here.

13        Q.    Do you recall that you signed the

14   two promissory notes that are referenced in

15   that provision?

16             MS. DANDENEAU:  Objection to form.

17        A.    I didn't recall initially but I've

18   been reminded.

19        Q.    Okay.  And -- and do you recall that

20   those notes are dated May 2nd and May 3rd,

21   2019?

22        A.    Yes.

23        Q.    So that was just a month before the

24   audit was completed; correct?

25        A.    Yes.  I think we had a June 3rd

1                    WATERHOUSE - 10-19-21

2      date, right, if -- if my memory serves me

3      right.

4           Q.    Yes, I will represent to you that

5      your memory is accurate in that regard.

6                 Did anybody ever instruct you as the

7      CFO to correct this statement that we're

8      looking at in subsequent events?

9           A.    So let me understand.  You're saying

10     when I was CFO at Highland Capital did anyone

11     ever ask me to correct the -- over the course

12     of 2019 through the report date HCMFA issued

13     promissory notes, this statement?

14          Q.    Right.

15          A.    Not that I'm aware.

16          Q.    While you were the CFO of Highland,

17     did anybody ever tell you that that sentence

18     was wrong?

19          A.    Not that I'm aware.

20          Q.    Highland -- withdrawn.

21                HCMFA disclosed these notes in its

22     own audited financial statements; right?

23                MR. RUKAVINA:  Objection, form.

24          A.    I assume that these would be

25     material -- if these are material financial

1                   WATERHOUSE - 10-19-21

2   statements, yes, they -- they -- they should be

3   and they were likely disclosed.

4        Q.    Now, there is no statement

5   concerning the 2019 notes about the forbearance

6   that we looked at in the affiliated note

7   section of the report; right?

8              MS. DANDENEAU:  Objection to form.

9        Q.    I'll withdraw.  That was bad.

10             Do you recall when we were looking

11  at the paragraph concerning HCMFA earlier it

12  had that disclosure about the agreement whereby

13  Highland wouldn't ask for demand on the -- on

14  the HCMFA notes?

15       A.    Yes.

16       Q.    That forbearance disclosure is not

17  made with respect to the 2019 notes; right?

18       A.    Not -- look, not that I can recall,

19  unless -- unless it was done at a subsequent

20  day.

21       Q.    Right.  And it is not in the

22  subsequent event section that we're looking at

23  right now where the 2019 notes are described;

24  right?

25       A.    Right.  But this is through

1                    WATERHOUSE - 10-19-21

2    June 3rd.  It could have been done on June 4th.

3    I don't -- I don't -- I don't recall.

4         Q.    Okay.

5              MR. MORRIS:  Can we put up on the

6         screen the HCMFA audit report.  And while

7         we're --

8              MS. DANDENEAU:  What exhibit is

9         this?

10              MR. MORRIS:  La Asia, what number is

11         that?

12              MS. CANTY:  45.

13              MR. MORRIS:  So this will be marked

14         as Exhibit 45.

15              (Exhibit 45 marked.)

16              MS. CANTY:  Yeah, and I will put it

17         in the chat.

18              MS. DANDENEAU:  Thank you.

19         Q.    Okay.  All right.  Do you see that

20    this is the consolidated financial statements

21    for HCMFA for the period ending 12/31/18?

22         A.    Yes.

23         Q.    As the treasurer of HCMFA at the

24    time, did you have to sign a management

25    representation letter similar to the one that

1           WATERHOUSE - 10-19-21

2    we looked at earlier for Highland?

3        A.    I would imagine I would have been

4    asked to.  I don't recall if I did.

5        Q.    Do you recall ever being asked by an

6    auditor to sign a management representation

7    letter and then not doing it?

8        A.    No.

9              MR. MORRIS:  Can we just scroll down

10             again.  I just want to see the date of the

11             document.

12       A.    I mean, let me -- you know, there

13   are different versions to management

14   representation letters I will qualify.

15             Yes, there are certain -- from time

16   to time auditors can make representations

17   that -- in the rep letter that is being

18   proposed that are inaccurate or out of scope or

19   things like that and they've asked for

20   signature.

21             In that context, yes.  I mean, you

22   know -- I mean, if I have been asked to sign

23   and make those representations and those

24   representations are invalid, yes, I would not,

25   I mean, I -- I wouldn't sign that.

1              WATERHOUSE - 10-19-21

2        Q.    Okay.  PricewaterhouseCoopers served

3    as HCMFA's outside auditors as well; correct?

4        A.    Yes.

5        Q.    Do you see that this audit report is

6    signed on June 3rd, 2019, just like the

7    Highland audit report?

8        A.    That is correct.

9        Q.    And did the process of -- of

10   preparing HCMFA's audit report, was that the

11   same process that Highland followed when it did

12   its audit report at this time?

13       A.    I mean, it is a different entity.

14   There are different assets.  You know, it --

15   it -- it is -- as you saw, Highland's

16   financials are on a consolidated basis.  This

17   is different, so it is under the same control

18   environment and team.

19       Q.    Okay.  I appreciate that.  So the

20   same control environment and team participated

21   in the preparation of the audit for Highland

22   and for HCMFA at around the same time; correct?

23       A.    Yes.

24             MR. MORRIS:  Can we go to page 17 of

25        the report.  I don't have the Bates number.

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Okay.  Do you see that just like

 3  Highland's audited financial report, HCMFA's

 4  audited financial report also has a section

 5  related to subsequent events?

 6      A.    Yes.

 7      Q.    And am I reading this correctly that

 8  just as Highland had done, HCMFA disclosed in

 9  its audited financial report a subsequent event

10  that related to the issuance of promissory

11  notes to Highland in the aggregate amount of

12  $7.4 million in 2019?

13      A.    That is what I see in the report.

14      Q.    And you were the treasurer of HCMFA

15  at the time; right?

16      A.    Yes, to the best of my knowledge.

17      Q.    And did anybody ever tell you prior

18  to the time of the issuance of this audit

19  report that that sentence relating to HCMFA's

20  2019 notes was inaccurate or wrong in any way?

21      A.    Not that I recall.

22      Q.    As you sit here right now, has

23  anybody ever told you that that sentence is

24  inaccurate or wrong in any way?

25      A.    Not that I recall.
```

1          WATERHOUSE - 10-19-21

2     Q.    I apologize if I asked you this

3  already, but has anybody ever told you at any

4  time that you are not authorized to sign the

5  promissory notes that are the subject of the

6  sentence we're looking at?

7     A.    Not that I recall.

8     Q.    Did anybody ever tell you at any

9  time that you had made a mistake when you

10  signed the promissory notes that are the

11  subject of this sentence?

12     A.    Say that again.  Did anyone ever say

13  that I made a mistake?

14     Q.    Let me ask the question again.

15          Did anybody ever tell you at any

16  time that you made a mistake when you signed

17  the two promissory notes in Highland's favor on

18  behalf of HCMFA in 2019?

19     A.    Not that I recall.

20          MR. MORRIS:  Let's just look at the

21          promissory notes quickly.  Can we please

22          put up Document Number 1, and so this is in

23          the pile that y'all have.  We'll just go

24          for a few more minutes and we can take our

25          lunch break.

1              WATERHOUSE - 10-19-21

2        Q.    All right.  So I don't know if you

3   have seen this before, sir.  Do you see that

4   this is a complaint against HCMFA?

5        A.    Yes, I am looking at it on the

6   screen.

7        Q.    Okay.  And have you ever seen this

8   document before?

9        A.    I went through some of these

10  documents with my counsel here yesterday.

11            MR. MORRIS:  All right.  Can we go

12       to Exhibit 1 of this document.

13       Q.    Do you see Exhibit 1 is a

14  $2.4 million promissory note back in 2019?

15       A.    Yeah, I found it in the book.  Yes,

16  I have it here in front of me.

17       Q.    And this is a demand note, right, if

18  you look at Paragraph 2?

19       A.    Yes.

20       Q.    And this is a note where the maker

21  is HCMFA, and Highland is the payee; right?

22       A.    Yes.

23            MR. MORRIS:  And if we can scroll

24       down, can we just see Mr. Waterhouse's

25       signature.

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Is that your signature, sir?

 3        A.    Yes, it is.

 4        Q.    And did you sign this document on or

 5   around May 2nd, 2019?

 6        A.    I don't recall specifically signing

 7   this, but this is my signature.

 8        Q.    Okay.  And do you recall that

 9   Highland transferred $2.4 million to HCMFA at

10   or around the time you signed this document?

11        A.    I don't recall specifically.  I

12   would want to, as I sit here today, go back and

13   confirm that, but again, presumably that --

14   that -- that did happen.

15        Q.    You wouldn't have signed this

16   document if you didn't believe that HCMFA

17   either received or was going to receive

18   $2.4 million from Highland; is that fair?

19        A.    I mean, it -- if -- if -- if there

20   wasn't a transfer of value, yeah, I mean, you

21   know, I would have no reason to -- to sign a

22   note.

23        Q.    And -- and Highland wouldn't have

24   given this note to PricewaterhouseCoopers if --

25   withdrawn.
```

1          WATERHOUSE - 10-19-21

2          HCMFA wouldn't have given this note

3    to PricewaterhouseCoopers if it hadn't received

4    the principal value of -- of the note in the

5    form of a loan; correct?

6          MR. RUKAVINA:  Objection, legal

7       conclusion, speculation and form.

8       A.    Again, we -- what we provided to PwC

9    were, as part of the audit, any promissory

10   notes executed and outstanding.  You know, as a

11   part of the audit, they, you know, they -- they

12   have copies of all the bank statements,

13   things -- things of that sort.

14          MR. MORRIS:  Okay.  Can we go to

15       Exhibit 2.

16          (Exhibit 2 marked.)

17       Q.    Do you see that this is a promissory

18   note dated May 3rd, 2019 in the amount of

19   $5 million?

20       A.    Yes.

21       Q.    Do you believe this is also a demand

22   note if you look at Paragraph 2?

23       A.    Yes.

24       Q.    And do you see that HCMFA is the

25   maker, and Highland is the payee?

1                  WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And if we go to the bottom, can we

4    just confirm that that is your signature?

5        A.    Yes.

6        Q.    And together these notes are the

7    notes that are referred to both in Highland and

8    HCMFA's audited financial reports in the

9    subsequent event sections; correct?

10             MS. DANDENEAU:  Objection to form.

11       A.    They -- they -- they totaled

12   $7.4 million, so presumably, yes.

13       Q.    Okay.  And you were authorized to

14   sign these two notes; correct?

15             MR. RUKAVINA:  Objection, legal

16       conclusion.

17       A.    Yeah.  I mean, I'm -- I was the

18   officer of -- of HCMFA.  You know, I -- I'm not

19   the legal expert on -- on what that -- what

20   that confers to me or what it doesn't.  I mean,

21   that is my signature on the notes.

22       Q.    And you believed you were authorized

23   to sign the notes; is that fair?

24       A.    I signed a lot of documents in my

25   capacity, just because it is operational in

1                    WATERHOUSE - 10-19-21

2    nature.  So, you know, to me this was just

3    another document, to be perfectly honest.

4         Q.    Sir, would you have signed

5    promissory notes with the principal amount of

6    $7.4 million if you didn't believe you were

7    authorized to do so?

8              MS. DANDENEAU:  Objection to form.

9         Q.    Are you frozen?

10        A.    No.  I'm just -- you know, it is --

11   you know, again, I typically don't sign

12   promissory notes, and I don't recall why I

13   signed these, but -- you know, but I did.

14        Q.    All right.  So listen carefully to

15   my question.  Would you have ever signed

16   promissory notes with a face amount of

17   $7.4 million without believing that you were

18   authorized to do so?

19        A.    No.  I mean, I'm -- I'm putting my

20   signature on there, so no.

21        Q.    Okay.  And would you have signed two

22   promissory notes obligating HCMFA to pay

23   Highland $7.4 million without Mr. Dondero's

24   prior knowledge and approval?

25              MS. DEITSCH-PEREZ:  Object to the

1                     WATERHOUSE - 10-19-21

2          form.

3          A.    You know, from -- from what I recall

4     around these notes, you know, I don't recall

5     specifically Mr. -- Mr. Dondero saying to -- to

6     make this a loan.

7                So my conversation with Mr. Dondero

8     around the culmination of the NAV error as

9     related to TerreStar which was a -- a -- I

10    think it was a year and a half process.  I

11    don't know, it was a multi-month process, very

12    laborious, very difficult.

13               When we got to the end, I had a

14    conversation with Mr. Dondero on where to, you

15    know, basically get the funds to reimburse the

16    fund, and I recall him saying, get the money

17    from Highland.

18         Q.    And so he told you to get the money

19    from Highland; is that right?

20         A.    That is what I recall -- in my

21    conversation with him, that is -- that is what

22    I can recall.

23         Q.    Do you know who drafted these notes?

24         A.    I don't.

25         Q.    Did you ask somebody to draft the

1          WATERHOUSE - 10-19-21

2   notes?

3        A.    I didn't ask -- I don't specifically

4   ask people to draft notes really.  I mean,

5   again, you know, the legal group at Highland is

6   responsible and has always been responsible for

7   drafting promissory notes.

8        Q.    So based on your -- based on the

9   practice, you believe that somebody from the

10  Highland's legal department would have drafted

11  these notes.  Do I have that right?

12          MS. DEITSCH-PEREZ:  Object to the

13      form.  John, I also asked you for the Word

14      versions of these notes so we could look at

15      the properties, and you have not provided

16      them.  Are you intending to?

17          MR. MORRIS:  No.

18      Q.    Can you answer my question, sir?

19      A.    Again, I --

20          MS. DANDENEAU:  Do you want him to

21      repeat it?

22      A.    Yeah, why don't you repeat it?

23      Q.    Sure.  Mr. Waterhouse, based on the

24  practice that you have described in your

25  understanding, do you believe that these notes

1                WATERHOUSE - 10-19-21

2    would have been drafted by somebody in the

3    legal department?

4                MS. DEITSCH-PEREZ:  Object to the

5        form.

6        A.    Yes.

7        Q.    Okay.  And do you know who would

8    have instructed -- do you have any knowledge as

9    to who would have instructed the legal

10   department to draft these notes?

11               MS. DEITSCH-PEREZ:  Object to the

12       form.

13       A.    It was whoever was working -- I

14   mean, it was likely someone on the team.  I

15   mean, I don't remember exactly on every note or

16   every document, but, again, a lot of these

17   things of this nature -- they're operational in

18   nature -- were handled by the team.

19               The team knows to -- I mean, we

20   don't draft documents.  We're not lawyers.

21   We're not attorneys.  It is not what I do or

22   accountants do.

23               So they are always instructed to go

24   and -- and go to the legal team to get

25   documents like this drafted.  Also, when you go

1          WATERHOUSE - 10-19-21

2     to the legal team, the -- you know, we always

3     loop in compliance.  And compliance -- when you

4     go to the legal team, compliance is part of

5     legal team.  They're made aware of -- of -- of

6     these types of transactions.

7          Q.    And do you believe that you had

8     the -- withdrawn.

9               Did you ever tell Mr. Dondero --

10    (inaudible) -- did you see those?

11         A.    Sorry.

12              MS. DEITSCH-PEREZ:  I did not hear

13         the end of that question.

14         Q.    Did you ever tell Mr. Dondero that

15    you signed these two notes?

16         A.    I don't recall ever -- no, I don't

17    recall having a conversation with him.

18         Q.    Did you ever discuss these two notes

19    with him at any time?

20         A.    The conversation, I recall, was what

21    I described earlier.  And that is the only time

22    I recall ever discussing this.

23         Q.    Okay.  But the corporate accounting

24    group had a copy of this -- of these two notes.

25    And pursuant to the audit process, the

```
 1                  WATERHOUSE - 10-19-21

 2    corporate accounting group gave the two notes

 3    to PricewaterhouseCoopers in connection with

 4    the audit; correct?

 5                  MS. DANDENEAU:  Objection to form.

 6         A.     Yes.  I mean, that is -- yeah, I

 7    mean, they -- unless the legal team can also

 8    retain copies of items like this.  I mean, I

 9    don't know everything that they would retain as

10    well.

11                  The legal team would also, if they

12    had documents as part of audits, turn that over

13    to the auditors as well.  So it could have been

14    the corporate accounting team.  It could be

15    someone on the legal team.

16         Q.     All right.  So you didn't -- you

17    didn't draft this note; right?

18         A.     I -- I -- I did not.

19         Q.     But somebody at Highland did; is

20    that fair?

21                  MS. DEITSCH-PEREZ:  Object to the

22         form.

23         A.     I don't know.  I mean, we can go to

24    the legal team.  I don't -- I'm not sitting

25    behind someone in legal.  Maybe they went to
```

1              WATERHOUSE - 10-19-21

2    outside counsel.  I have no idea.

3         Q.    Did you have any reason to believe

4    you weren't authorized to sign this note,

5    either of these two notes?

6         A.    I think I have already answered that

7    question.

8         Q.    Okay.  You didn't give these notes

9    to PricewaterhouseCoopers; correct?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't recall giving these to

12   PricewaterhouseCoopers.

13        Q.    And in the practice that you have

14   described, somebody in the corporate accounting

15   group would have given these two notes to

16   PricewaterhouseCoopers; correct?

17             MS. DANDENEAU:  Objection to form.

18        A.    I think I've answered that.  I said

19   either the corporate accounting team or maybe

20   the legal team.

21             MR. MORRIS:  Okay.  Why don't we

22        take our lunch break here.

23             VIDEOGRAPHER:  We're going off the

24        record at 1:04 p.m.

25        (Recess taken 1:04 p.m. to 1:49 p.m.)

1          WATERHOUSE - 10-19-21

2          VIDEOGRAPHER:  We are back on the

3     record at 1:49 p.m.

4     Q.   Mr. Waterhouse, did you speak with

5  anybody during the break about the substance of

6  this deposition?

7     A.   I spoke to -- to Deb and Michelle.

8     Q.   About the substance of the

9  deposition?

10    A.   Yes.

11    Q.   Can you tell me what you talked

12  about?

13          MS. DANDENEAU:  No.  We object on

14     the basis of privilege.

15    Q.   Okay.  You are going to follow your

16  counsel's objection here?

17    A.   Yes.

18    Q.   Okay.

19          MR. MORRIS:  Can we put up on the

20     screen Exhibit 35.

21          (Exhibit 35 marked.)

22    Q.   Are you able to see that document,

23  sir?

24    A.   Yes.

25    Q.   Have you ever seen an incumbency

1          WATERHOUSE - 10-19-21

2   certificate before?

3          A.    I have.

4          Q.    Do you have a general understanding

5   of what an incumbency certificate is?

6          A.    I have a general understanding.

7          Q.    What is your general understanding?

8          A.    You know, those -- my general

9   understanding is that the incumbency

10  certificate basically lists folks that can --

11  are like authorized signers.

12         Q.    Okay.  And do you see that this is

13  an incumbency certificate for Highland Capital

14  Management Fund Advisors, L.P.?

15         A.    Yes.

16         Q.    Okay.  And if we could scroll down

17  just a little bit, do you see that it's dated

18  effective as of April 11th, 2019?

19         A.    Yes, I see that.

20         Q.    Okay.  And is that your signature in

21  the middle of the signature block?

22         A.    Yes, it is.

23         Q.    And by signing it, did you accept

24  appointment as the treasurer of HCMFA effective

25  as of April 11th, 2019?

```
 1              WATERHOUSE - 10-19-21
 2       A.    Again, I'm not the legal -- I don't
 3   know if this makes me the treasurer or the
 4   appointment.  I don't know -- I don't know
 5   that, so I don't -- I don't know if that
 6   document -- again, I think -- again, I'm not
 7   the legal expert.  I think isn't there --
 8   aren't there other legal documents that detail
 9   who the officers are that could be incorporated
10   or things like that?  Again, I don't want to
11   play armchair attorney here.
12       Q.    I'm not asking you for a legal
13   conclusion.  I'm asking you for your knowledge
14   and understanding.  When you signed this
15   document, did you understand that you were
16   accepting an appointment as the treasurer of
17   HCMFA?
18             MS. DANDENEAU:  Objection to form.
19             MS. DEITSCH-PEREZ:  Objection, form.
20       A.    Again, I don't think this -- that
21   wasn't my understanding.  I don't think this
22   makes -- this document makes me the treasurer.
23       Q.    What do you think this document --
24   why did you sign this document?
25             MS. DEITSCH-PEREZ:  Objection to
```

1                    WATERHOUSE - 10-19-21

2          form.

3                    MR. MORRIS:  You're objecting to the

4          form of the question when I asked him why

5          did you sign the document?  What is the

6          basis for the objection?

7                    MS. DEITSCH-PEREZ:  Because, John, I

8          think that it does call for a legal

9          conclusion other than -- with him saying

10         because somebody told me to sign this

11         document.  But if you want to go there,

12         that is fine.

13                   MR. MORRIS:  Okay.

14                   MS. DANDENEAU:  I don't think --

15         he's already said he's not a lawyer.

16                   MR. MORRIS:  I'll allow the witness

17         to answer this question.

18         Q.    Why did you sign this document, sir?

19         A.    I mean, our -- our legal group would

20    bring by these incumbency certificates from

21    time to time.  I have no idea why they're being

22    updated, and I was asked to sign.

23         Q.    Did you ask anybody, what is this

24    document?

25         A.    No.

1                    WATERHOUSE - 10-19-21

2         Q.    Did anybody tell you why they needed

3    you to sign the document?

4         A.    Not that I can recall.

5         Q.    You testified earlier that you

6    understood that you served as the acting

7    treasurer for HCMFA; correct?

8         A.    Yes.

9         Q.    How did you become the acting

10   treasurer of HCMFA?

11              MS. DANDENEAU:  Objection to form.

12        A.    I don't -- I don't know the legal --

13   I don't know the legal mechanic of how I became

14   the acting treasurer.

15        Q.    I'm not asking for the legal

16   mechanic.  I'm asking you as the person who

17   is --

18              MS. DANDENEAU:  John, you said --

19              MR. MORRIS:  Stop.

20              MS. DANDENEAU:  -- how did you

21         become the treasurer.  That is --

22              MR. MORRIS:  Please stop.

23              MS. DANDENEAU:  That is a legal

24         question.

25              MR. MORRIS:  I am not asking any

```
 1                    WATERHOUSE - 10-19-21

 2          legal questions, to be clear.  I'm asking

 3          for this witness' understanding as to how

 4          he became the acting treasurer of HCMFA.

 5          If he doesn't know, he can say he doesn't

 6          know, but this legal stuff is nonsense, and

 7          I really object to it.

 8          Q.    Sir, I'm asking you a very simple

 9     question.

10                    MS. DANDENEAU:  Argumentative.

11          Q.    You testified -- you testified that

12     you became the acting treasurer of HCM --

13     HCMFA; correct?

14          A.    Yes.

15          Q.    How did that happen?

16                    MS. DANDENEAU:  Again, object to

17          form.

18                    MR. MORRIS:  I can't wait to do this

19          in a courtroom.  Good God.

20          Q.    Go ahead, sir.

21          A.    I don't know the exact process of

22     how that happened.

23          Q.    Do you have any idea whether signing

24     this document was part of the process?

25                    MR. MORRIS:  You know what --
```

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection.

3          MR. MORRIS:  -- withdrawn.  You guys

4    want to do this, I can't wait.  I can't

5    wait.  This is the craziest stuff ever.

6          MS. DANDENEAU:  John, he said he's

7    not a lawyer, and you are asking him for a

8    legal conclusion, and he says he doesn't

9    know, and you persist.

10         MR. MORRIS:  Okay.

11         MS. DANDENEAU:  So you can ask these

12   questions --

13         MR. MORRIS:  Did anyone -- please

14   stop talking.

15         MS. DANDENEAU:  -- at another

16   point -- no, no, no, I'm entitled to talk,

17   too; right?  If you're going to make these

18   accusations as if we're trying to stonewall

19   you, this is not the witness to ask that

20   question.

21         MR. MORRIS:  I can't -- I can't

22   wait -- I can't wait to do this in a

23   courtroom.  I will just leave it at that.

24         MS. DANDENEAU:  That's right, I'm

25   sure you can't.

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Did anyone ever tell you, sir, that

 3  even though you were the acting treasurer of

 4  HCMFA, that you were not authorized to sign the

 5  two promissory notes that we looked at before

 6  lunch?

 7       A.    I'm not sure I understand the

 8  question.  I wasn't -- I mean, I'm -- I'm the

 9  current acting treasurer.

10       Q.    Did anybody ever tell you at any

11  time that even though you were the acting

12  treasurer of HCMFA, that you were not

13  authorized to sign the two promissory notes

14  that we looked at before lunch?

15             MS. DANDENEAU:  Objection to form.

16       A.    Not that I recall.

17       Q.    Did anybody ever tell you at any

18  time that you were not authorized to sign the

19  two promissory notes that we looked at before

20  lunch?

21       A.    Not that I recall.

22       Q.    Did anybody ever tell you at any

23  time that you should not have signed the two

24  promissory notes that we looked at before

25  lunch?
```

1     WATERHOUSE - 10-19-21

2   A.  Not that I recall.

3   Q.  Did you ever tell anybody at any

4 time that you weren't authorized to sign the

5 two promissory notes that we looked at before

6 lunch?

7   A.  Not that I recall.

8   Q.  Did you ever tell anybody at any

9 time that you made a mistake when you signed

10 the two promissory notes that we looked at

11 before lunch?

12   A.  Not that I recall.

13   Q.  As you sit here right now, do you

14 have any reason to believe that you were not

15 authorized to sign the two documents that we

16 looked at before lunch?

17     MS. DANDENEAU:  Objection to form.

18   A.  If -- if this is the -- the valid

19 incumbency certificate, I mean, this does --

20 this does detail who the signers are.

21   Q.  Okay.  And looking at that document,

22 does that give you comfort that you were

23 authorized to sign the two promissory notes

24 that we looked at before lunch?

25     MS. DEITSCH-PEREZ:  Object to the

1              WATERHOUSE - 10-19-21

2       form.

3              MS. DANDENEAU:  Objection, form.

4       A.    Yes.

5       Q.    As of October 20th -- withdrawn.

6              I'm trying to take your mind back to

7       a year ago, October 2020.  Do you recall at

8       that time that the boards of the retail funds

9       were making inquiries about obligations that

10      were owed by the advisors to Highland in

11      connection with their 15(c) review?

12             MS. DANDENEAU:  Objection to form.

13      A.    I don't -- I don't recall.

14      Q.    As of October 2020, you had no

15      reason to believe you weren't authorized to

16      sign the two promissory notes that we just

17      looked at; correct?

18             MS. DANDENEAU:  Objection, form.

19             MS. DEITSCH-PEREZ:  Objection to

20        form.

21      A.    I didn't think about it in October

22      of 2020, but I mean --

23      Q.    Did you have any reason to believe

24      at that time that you weren't authorized to

25      sign the two notes that we just looked at?

```
1              WATERHOUSE - 10-19-21
```

2      A.     Not that I'm aware, no.

3      Q.     Did you have any reason to believe a

4   year ago that you made a mistake when you

5   signed those two notes?

6      A.     Not that I'm aware.

7      Q.     A year ago you believed that HCMFA

8   owed Highland the unpaid principal amounts that

9   were due under those two notes; correct?

10     A.     They're -- they're promissory notes

11  that were -- as you presented, that were --

12  that were executed.  Whether they're valid or

13  if there's other reasons, I didn't -- I don't

14  know.

15     Q.     I'm not asking you whether they're

16  valid or not.  I'm asking you for your state of

17  mind.  A year ago you believed that HCMFA

18  was -- was obligated to pay the unpaid

19  principal amount under the two notes that you

20  signed; correct?

21     A.     Yeah, I'm -- I'm -- yes.

22     Q.     Thank you.  Are you aware -- you're

23  aware that -- that in 2017, NexPoint issued a

24  note in favor of Highland in the approximate

25  amount of $30 million; correct?

1               WATERHOUSE - 10-19-21

2      A.    I'm -- I'm -- I'm generally aware.

3      Q.    Okay.  And are you generally aware

4  that from time to time, after the note was

5  issued by NexPoint, that moneys were applied to

6  principal and interest that were due under the

7  NexPoint note?

8      A.    Yes, I'm generally aware.

9      Q.    Okay.  And did anybody ever tell you

10  that the payments that were made against the

11  NexPoint notes were made by mistake?

12      A.    Yes.

13      Q.    And is it the one payment that we

14  talked about earlier today?

15      A.    We talked about a lot of things

16  today.  What payment are we talking about?

17      Q.    Okay.  Who told you that any payment

18  made against the NexPoint note was made by

19  mistake?

20      A.    D.C. Sauter.

21      Q.    When did Mr. Sauter tell you that?

22      A.    I don't -- I don't remember

23  specifically.

24      Q.    Do you remember what payments --

25      A.    Sometime -- sometime this year.

1                  WATERHOUSE - 10-19-21

2        Q.     Sometime in 2021?

3        A.     Yes.

4        Q.     Do you remember what payment he was

5    referring to?

6        A.     It was the -- the payment made in

7    January of 2021 or -- yeah, January of -- of

8    this -- January of 2021.

9        Q.     Okay.  So did anybody ever tell you

10   at any time that any payment that was made

11   against principal --

12       A.     And -- and -- and -- hold on, and it

13   may have been other -- again, it may have been

14   that payment or -- or there may have been what

15   he was explaining, a misapplication of prior

16   payments as well.

17       Q.     Can you -- can you give me any

18   specificity -- withdrawn.

19              Withdrawn.  Can you tell me

20   everything that Mr. Sauter told you about --

21   about errors in relation to payments made

22   against principal and interest due under the

23   NexPoint note?

24              MS. DANDENEAU:  Can I just --

25              MR. RUKAVINA:  Hold on.  Hold on.

1          WATERHOUSE - 10-19-21

2          I'm going to object here, and I'm going to

3          instruct the witness not to answer

4          depending on the discussion that you had --

5          Mr. Waterhouse, I'm the lawyer for

6          NexPoint, and as everyone here knows, D.C.

7          Sauter is in-house counsel.

8               So if you and Mr. Sauter were having

9          a factual discussion and him preparing his

10         affidavit, et cetera, then go ahead and

11         answer that.  But if you were having a

12         discussion as to our legal strategy in this

13         lawsuit, or anything having to do with

14         that, then do not answer that.

15              And if you need to talk to either

16         your counsel or me about that, then we need

17         to have that discussion now.

18         A.    Okay.  Yeah, I don't -- I don't

19    really know how to make that distinction, so

20    maybe I need to talk to counsel before I

21    answer, or if I can answer.

22         Q.    Let me just ask you this question:

23    Did -- did you have any conversation with

24    Mr. Sauter about any payment of principal and

25    interest prior to the time that you left

```
1               WATERHOUSE - 10-19-21
2    Highland's employment, or did it happen after
3    you left Highland's employment?
4         A.   I don't -- I don't recall if -- I
5    don't recall.  I mean, it was sometime in 2021.
6    I don't remember if it was before or after I
7    was let go from Highland.
8         Q.   Okay.  So -- so nobody told you
9    prior to 2021 that any error or mistake was
10   made in the application of payments against
11   principal and interest due on the NexPoint
12   note.  Do I have that right?
13        A.   Yeah, I don't -- I don't recall this
14   being in 2020.
15        Q.   Okay.  And it didn't happen in 2019;
16   correct?
17        A.   I don't recall that happened.
18        Q.   And it didn't happen in 2018;
19   correct?
20        A.   I don't -- I don't recall that
21   happening.
22        Q.   And it didn't happen in 2017;
23   correct?
24        A.   I don't recall.
25        Q.   But -- but you believe the
```

1                    WATERHOUSE - 10-19-21

2    conversation took place in 2021.  You just

3    don't remember if it was before or after you

4    left Highland's employment.  Do I have that

5    right?

6         A.    It was sometime this year.  I

7    don't -- I don't remember.

8         Q.    Okay.  Did you report this

9    conversation to Mr. Seery at any point?

10        A.    I don't believe so.

11        Q.    Did you report this conversation to

12   anybody at DSI at any time?

13        A.    I don't recall.

14        Q.    Do you have -- you don't have a

15   recollection of ever doing that; correct?

16        A.    Yeah, that's right.  I don't recall

17   doing that.

18        Q.    Do you recall telling anybody at

19   Pachulski Stang about the conversation you

20   recall with Mr. Sauter?

21        A.    No, I don't -- I don't recall.

22        Q.    Did you tell any of the independent

23   board members about your conversation with

24   Mr. Sauter?

25        A.    I don't recall.

1          WATERHOUSE - 10-19-21

2     Q.    Did you tell any of the employees at

3  Highland before you left Highland's employment

4  about this call that you had with Mr. Sauter?

5          MS. DANDENEAU:  Objection to form.

6     A.    No, I don't -- no, I don't recall.

7     Q.    NexPoint -- to the best of your

8  knowledge, did NexPoint ever file a proof of

9  claim against Highland to try to recover moneys

10 that were mistakenly paid against the principal

11 and interest due under the note?

12    A.    Okay.  Hold on.  You are saying did

13 NexPoint Advisors file a proof of claim to

14 Highland for errors related to payments under

15 the NexPoint note to Highland?

16    Q.    Correct.

17    A.    I'm -- I'm -- I'm not -- I'm not

18 aware.

19    Q.    Are you aware --

20    A.    I'm not the legal person here, I

21 don't know.

22    Q.    I'm just asking for your knowledge,

23 sir.

24    A.    Yeah, I don't know.  I'm not aware.

25    Q.    Are you aware of any claim of any

1          WATERHOUSE - 10-19-21

2    kind that NexPoint has ever made to try to

3    recover the amounts that it contends were -- or

4    that Mr. Sauter contend were mistakenly applied

5    against principal and interest due under the

6    NexPoint note?

7         A.    I'm not aware.

8               MS. DANDENEAU:  Objection to form.

9         Q.    Okay.  The advisors' agreements with

10   the retail funds are subject to annual renewal;

11   correct?

12        A.    Yes.

13        Q.    And do you participate in the

14   renewal process each year?

15        A.    Yes.

16        Q.    What role do you play in the renewal

17   process?

18        A.    I'm -- I'm asked by the retail board

19   to walk-through the advisors financials.

20        Q.    And do you do that in the context of

21   a board meeting?

22        A.    Yes, it is -- yes, it is typically

23   done in a board meeting.

24        Q.    And do you recall the time --

25   does -- does the renewal process happen around

1                    WATERHOUSE - 10-19-21

2    the same time each year?

3         A.    Yes, it is -- it is around the same

4    time every year.

5         Q.    And what -- what time period of the

6    year does the renewal process occur?

7         A.    Approximately the September

8    timeframe.

9         Q.    During that process, in your

10   experience, does the board typically conduct

11   its own diligence and ask for information?

12        A.    Does the board ask for lots of -- I

13   mean, just -- I mean, lots of information as a

14   part of that -- that -- as part of that board

15   meeting and that process.

16        Q.    Okay.  And do you recall that the

17   process in 2020 spilled into October?

18        A.    Yes.  Yes.

19        Q.    Okay.  And as part of the process in

20   2020, the retail board asked -- asked what are

21   referred to as 15(c) questions; right?

22        A.    I guess I don't want to be -- they

23   asked 15(c) -- are you saying they asked 15(c)

24   questions and this is why it went into October

25   or --

1              WATERHOUSE - 10-19-21

2        Q.    No, I apologize.

3              Do you have an understanding of

4   what -- of what 15(c) refers to in the context

5   of the annual renewal process?

6        A.    Yes, generally.

7        Q.    All right.  What is your general

8   understanding of the term "15(c)" in the

9   context of the annual renewal process?

10       A.    I -- I think 15(c) is the section

11  that -- that -- you know, that -- that the

12  board has to evaluate every year, the retail

13  board.  They have to, you know, go through,

14  evaluate, and go through that approval process

15  on a yearly basis.

16       Q.    Okay.

17            MR. MORRIS:  Can we put up on the

18       screen Exhibit 36, please.

19            (Exhibit 36 marked.)

20            MR. MORRIS:  I guess let's just

21       start at the bottom so Mr. Waterhouse can

22       see what is here.

23       Q.    You see this begins with an email

24  from Blank Rome to a number of people.

25            MR. MORRIS:  And if we can scroll

```
 1                 WATERHOUSE - 10-19-21

 2        up -- keep going just a little bit.

 3        Q.    You will see that there is an email

 4   from Lauren Thedford to Thomas Surgent and

 5   others where she reports that she was attaching

 6   and reproducing below additional 15(c)

 7   follow-up questions from the board.

 8               Do you see that?

 9        A.    Yes.

10        Q.    And do you see Question No. 2 asks

11   whether there are any material outstanding

12   amounts currently payable or due in the future

13   (e.g., notes) to HCMLP by HCMFA or NexPoint

14   Advisors or any other affiliate that provides

15   services to the funds?

16               Do you see that?

17        A.    Yes.

18        Q.    And -- and did you -- do you recall

19   that in -- in October of 2020 the retail boards

20   were asking for that information?

21        A.    I don't recall it, but there --

22   they're obviously asking in this email.

23        Q.    Okay.

24               MR. MORRIS:  Can we scroll up a

25        little bit, please.
```

1              WATERHOUSE - 10-19-21

2        Q.    And then do you see that

3    Ms. Thedford includes you on the email string

4    on Tuesday, October 6th, at 5:52?

5        A.    Yes.

6        Q.    And she asks you and Dave Klos and

7    Kristin Hendrix for advice on that particular

8    Request No. 2 that I have just read; right?

9        A.    Yes.

10       Q.    Okay.  Can you tell me who

11   Ms. Thedford is?

12       A.    She was an attorney that was in the

13   legal group.

14       Q.    At Highland Capital Management,

15   L.P.?

16       A.    I'm -- I'm -- I'm -- I don't

17   remember if she was an employee of Highland or

18   any of the advisors.

19       Q.    Okay.  Do you know if she served as

20   the corporate secretary for both HCMFA and

21   NexPoint?

22       A.    Yes.

23       Q.    And -- okay.

24             Do you know whether Ms. Thedford

25   held any positions in relation to the retail

1                    WATERHOUSE - 10-19-21

2    funds as we defined that term?

3         A.   Yes.

4         Q.   What is your understanding of the

5    positions that Ms. Thedford held at the retail

6    funds?

7         A.   I -- I recall her being an officer.

8    I don't recall her title.

9         Q.   Okay.  Is she still an officer at

10   any of the retail funds today?

11        A.   No.

12        Q.   Do you know when she ceased to be an

13   officer of the retail funds?

14        A.   Approximately.

15        Q.   And when did she approximately cease

16   to be an officer of the retail funds?

17        A.   It was in -- it was in early of

18   2021.

19        Q.   Okay.  Do you know when she became

20   an officer of the retail funds?

21        A.   I don't recall.

22        Q.   To the best of your recollection,

23   was she an officer of the retail funds in

24   October of 2020?

25        A.   I believe so.

Page 174

1              WATERHOUSE - 10-19-21

2       Q.    Okay.  Do you know what title she

3    held in her capacity as an officer, if any?

4       A.    I told you I don't remember.

5       Q.    Okay.  So she sends this email to

6    you at 5:52 p.m. on October 6th.

7             And if we can scroll up to the

8    response, you responded a minute later with a

9    one-word answer:  Yes.

10            Do you see that?

11      A.    Yes.

12      Q.    And -- and yes is -- yes was in

13   response to the retail board's Question No. 2,

14   right, whether there are any material

15   outstanding amounts currently payable or due in

16   the future?

17      A.    Yes.

18            MR. MORRIS:  And can we scroll up to

19       see what happened next.

20      Q.    So Ms. Thedford writes back to you a

21   few minutes later and she asks whether you

22   could provide the amounts.

23            Do you see that?

24      A.    Yes.

25      Q.    And then you respond further and you

1                    WATERHOUSE - 10-19-21

2    refer her to the balance sheet that was

3    provided to the board as part of the 15(c)

4    materials.

5             Do you see that?

6        A.   Yes.

7        Q.   And -- and did the advisors provide

8    to the board certain balance sheets in 2020 in

9    connection with the 15(c) review?

10       A.   Yes, they did.

11       Q.   Okay.  And were the amounts that

12   were outstanding or that were to be due in the

13   future by the advisors to Highland included in

14   the liability section of the balance sheet that

15   was given to the retail board?

16       A.   Yes.  Notes would be reflected as

17   liabilities.

18       Q.   Okay.  And --

19       A.   If I'm understanding your question

20   correctly.

21       Q.   You are.  And -- and -- and those

22   liabilities you -- you were -- you believed

23   were responsive to the retail board's question;

24   correct?

25       A.   Yes.

1              WATERHOUSE - 10-19-21

2      Q.    Okay.  And then if we can scroll up,

3  you see Ms. Thedford responds to you

4  nine minutes later with a draft response.

5            Do you see that?

6      A.    Yes.

7      Q.    And she says that she is taking from

8  the 6/30 financials certain information about

9  amounts that were due to HCMLP and affiliates

10  as of June 30th, 2020.

11            Do you see that?

12      A.    I do.

13      Q.    Okay.  And did you believe, as the

14  treasurer of NexPoint and HCMFA and as the CFO

15  of Highland, that the information that

16  Ms. Thedford obtained from the 6/30 financials

17  was accurate and responsive in relation to the

18  retail fund board's question?

19      A.    I just want to make sure I

20  understand the question.

21            Are you saying that the financial

22  information provided to the retail board as

23  part of the 15(c) process, which included

24  financial statements as of June 30th of 2021,

25  did I feel like those were responsive to their

```
1              WATERHOUSE - 10-19-21

2   questions?

3        Q.   Yes.

4        A.   Yes.

5        Q.   Thank you.

6             MS. DEITSCH-PEREZ:  John, it is not

7        in the chat yet.  Can you just make sure it

8        gets put in there.

9             MR. MORRIS:  Sure.

10             MS. CANTY:  I put it in there.  I

11        think maybe I just sent it directly, so let

12        me make sure it says to everyone.  But I

13        did put it in there.  I will try again.

14             MR. MORRIS:  Thank you, La Asia.

15             MS. DANDENEAU:  What number is it.

16             MR. MORRIS:  What, the Bates number?

17             MS. DEITSCH-PEREZ:  No, the --

18        this -- yeah, 36 is not in the chat.

19             MR. MORRIS:  Okay.  We'll get it.

20             MS. DANDENEAU:  I think that

21        Ms. Canty just sent it to me originally.

22        Sorry.

23             MR. MORRIS:  Okay.  We will get it

24        there.

25             MS. CANTY:  Okay.  It is there now
```

1           WATERHOUSE - 10-19-21

2       for everyone.

3              MS. DEITSCH-PEREZ:  Got it.  Thank

4       you.

5       Q.    Do you recall if the proposed

6    response that Ms. Thedford crafted was

7    delivered to the retail board with the -- with

8    the yellow dates having been completed?

9       A.    I don't know.

10             MR. MORRIS:  Davor, I'm going to ask

11         that the advisors and -- the advisors of

12         both HCMFA and NexPoint produce to me any

13         report that was given to the retail board

14         concerning the promissory notes at issue,

15         including the obligations under the notes.

16      Q.    Do you know -- do you know if

17   ultimately NexPoint informed the retail board

18   in response to its question that NexPoint owed

19   Highland approximately 23 or $24 million?

20             MS. DANDENEAU:  Objection to the

21         form.

22      A.    Sorry, are you asking, did NexPoint

23   tell the retail board that it owed Highland?

24      Q.    Let me ask a better question,

25   Mr. Waterhouse.

1                    WATERHOUSE - 10-19-21

2            Did -- do you know if anybody ever

3    answered the retail board's question that was

4    Number 2?

5        A.    I don't -- I can't say for sure.

6        Q.    Okay.  Do you recall -- I think you

7    testified earlier that you walked through the

8    advisors' financials with the retail board;

9    correct?

10       A.    Yes.

11       Q.    And as part of that process, did you

12   disclose to the retail board the obligations

13   that NexPoint and HCMFA had to Highland under

14   promissory notes?

15       A.    The retail board, as I stated

16   earlier, receives financial information,

17   balance sheet, income statement information

18   from the advisors.  That information is

19   provided to the retail board in connection with

20   the 15(c) process.

21           So any notes between the advisors

22   and the Highland would be -- anything would be

23   detailed in those financial statements.

24       Q.    Do you recall in 2020 ever speaking

25   with the retail board about the advisors'

1          WATERHOUSE - 10-19-21

2   obligations under the notes to Highland?

3          MS. DANDENEAU:  Objection to form.

4          MS. DEITSCH-PEREZ:  Object to the

5      form.

6   A.    I don't recall specifically.

7   Q.    Do you have any general recollection

8   of discussing with the retail board the

9   advisors' obligations to Highland under the

10  notes that they issued?

11         MS. DANDENEAU:  Object to the form.

12         MS. DEITSCH-PEREZ:  Object to the

13     form.

14  A.    I just recall generally just -- it

15  is just -- I present the financial statements,

16  and if they have questions, I answer their

17  questions and walk them through.

18         I don't recall what they asked.  I

19  don't recall where the discussion went.  I

20  don't recall anything of that nature.

21  Q.    Okay.  Do you know if anybody on

22  behalf of HCMF -- HCMFA ever told the retail

23  board that HCMFA had no obligations under the

24  two 2019 notes that you signed?  Withdrawn.

25         Do you know whether anybody on

1          WATERHOUSE - 10-19-21

2    behalf of HCMFA ever told the retail boards

3    that you weren't authorized to sign either of

4    the two 2019 notes?

5          MS. DANDENEAU:  Objection to form.

6    A.    I'm not aware.

7    Q.    Are you aware of anybody on behalf

8    of HCMFA ever telling the retail boards that

9    your execution of the two 2019 notes was a

10   mistake?

11          MS. DANDENEAU:  Objection to form.

12   A.    I'm not aware.

13   Q.    Are you aware of anybody on behalf

14   of HCMFA ever telling the retail boards that

15   HCMFA did not have to pay the amounts reflected

16   in the two notes that you signed in 2019?

17   A.    I'm not aware.

18   Q.    Do you know whether anybody ever

19   told the retail boards -- withdrawn.

20          Do you know whether anybody ever

21   told the retail boards that Highland has

22   commenced a lawsuit to recover on the two notes

23   that you signed in 2019?

24   A.    I'm not aware.

25   Q.    Are you aware of anybody informing

1                    WATERHOUSE - 10-19-21

2    the retail boards that Highland has sued to

3    recover on the NexPoint note?

4         A.    I'm not aware.

5         Q.    Do you know whether anybody ever

6    told the retail board that Highland had

7    declared a default with respect to the two

8    HCMFA notes that you signed in 2019?

9         A.    I'm not aware.

10        Q.    Are you aware of anybody ever

11   informing the retail boards that Highland had

12   declared a default under the NexPoint note?

13        A.    I'm not aware.

14        Q.    Are you aware of anybody telling the

15   retail board that Highland made a demand for

16   payment under the 2019 notes that you signed on

17   behalf of HCMFA?

18        A.    I'm not aware.

19        Q.    Let's -- let's see if there is a

20   response to Ms. Thedford's email, if we can

21   scroll up.

22              Do you see you responded to

23   Ms. Thedford five minutes after she provided

24   the draft response to you?

25        A.    Yes.

```
1              WATERHOUSE - 10-19-21

2     Q.    Okay.  And do you see that Dustin

3   Norris is copied on this email?

4     A.    Yes, he is.

5     Q.    Great.  Do you know whether

6   Mr. Norris held any positions at either of the

7   advisors as of October 6, 2020?

8     A.    I will go back to -- I'm not the

9   legal expert of what appoints you or how or

10  why, but you did see Dustin's name on the

11  incumbency certificate that you produced

12  earlier.

13    Q.    Do you know what his title was in

14  October of 2020?

15          MS. DANDENEAU:  Objection to form.

16    A.    I don't -- I don't recall.

17    Q.    Was he -- did he have a title with

18  each of the advisors, to the best of your

19  recollection?

20    A.    I don't recall.

21    Q.    Do you know why he is included on

22  this email string?

23    A.    I didn't add Dustin.  It looks like

24  Lauren did.  I don't know why she added him or

25  not.  You would have to ask her.
```

1             WATERHOUSE - 10-19-21

2      Q.    Does Mr. Norris play a role in

3   formulating the advisors' responses to the

4   questions asked by the retail board in

5   connection with the 15(c) annual review?

6             MS. DANDENEAU:  Objection to form.

7      A.    He -- Dustin Norris is there in the

8   board meetings.  But -- so he has a role, yes.

9      Q.    Okay.  And does Mr. Norris hold any

10  positions, to the best of your knowledge, in

11  relation to any of the retail funds?

12     A.    I don't -- I don't believe he does.

13     Q.    How about Mr. Post, do you know

14  whether Mr. Post holds any position in either

15  of the advisors?

16     A.    I mean, he -- he -- yes.

17     Q.    What is your understanding of the

18  positions that Mr. Post holds in relation to

19  the advisors?

20            MS. DANDENEAU:  Objection to form.

21     A.    He is an employee of NexPoint

22  Advisors.  He is also the chief compliance

23  officer for -- for NexPoint.

24     Q.    Who is the chief compliance officer

25  for HCMFA, if you know?

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection to form.

3     A.    That would be Jason as well.

4     Q.    Okay.  Now, looking at your

5  response, you noted initially that nothing was

6  owed under shared services.  Do I have that

7  right in substance?

8     A.    Yeah.  I think I'm being responsive

9  to Lauren's question here, whether any of the

10 shared service invoices are outstanding.

11    Q.    Right.

12    A.    Yes.

13    Q.    And that is because -- and that is

14 because the retail the retail board has asked

15 for the disclosure of all material obligations

16 that were owed to HCMLP either then or in the

17 future; isn't that right?

18         MS. DANDENEAU:  Objection to form.

19    Q.    We can go back down and look.

20    A.    Look, I don't know if that's a

21 material item, I mean, again, but sure.

22    Q.    Okay.  But there were no shared

23 services outstanding; correct?

24         MS. DANDENEAU:  Objection to form.

25    A.    That is what this email seems to

1              WATERHOUSE - 10-19-21

2   indicate.

3        Q.    And you wouldn't have written it if

4   you didn't believe it to be true at the time;

5   correct?

6        A.    Correct.

7        Q.    And when you referred to shared

8   services outstanding, what you meant there was

9   that neither NexPoint nor HCMFA owed Highland

10   any money under the shared services agreements

11   that they had with Highland as of October 6th,

12   2020; right?

13        A.    I don't know if it is as of October

14   6, 2020 or if it was from -- like through the

15   financials -- through the date of the

16   financials as of June 30.

17        Q.    Okay.  And then you noted that

18   HCMA -- the HCMFA note is a demand note; right?

19        A.    Yes.

20        Q.    And then you referred Ms. Thedford

21   to Kristin Hendrix for the term of the NexPoint

22   note.  Do I have that right?

23        A.    Yes.

24        Q.    And then you refer to that agreement

25   that is referenced in the 2018 audited

1          WATERHOUSE - 10-19-21

2    financials about Highland's agreement not to

3    make demand upon HCMFA until May 2021; correct?

4          A.    Correct.

5          Q.    And then -- and then the next thing

6    you write is that the attorneys think that BK

7    doesn't change that, but don't know for sure at

8    the end of the day.

9                Do you see that sentence?

10         A.    Yes.

11         Q.    Which attorneys were you referring

12   to?

13         A.    I don't remember.

14         Q.    Did you have a conversation with

15   attorneys concerning whether the bankruptcy

16   would change or alter in any way the agreement

17   not to make a demand under the HCMFA note?

18         A.    Look, yeah, I mean, I don't

19   specifically remember, but generally, I mean,

20   it is in this email.  I don't -- I don't -- I

21   don't -- I don't remember who I talked to or,

22   you know, was it inside counsel, outside

23   counsel, but obviously I talked to somebody.

24         Q.    Do you have any recollection --

25         A.    Well, I don't even know if it's --

1                    WATERHOUSE - 10-19-21

2  actually, it may not even have been me.  I say

3  the attorneys in, you know, a lot of -- like I

4  talked about the team.

5           It could have been someone on the

6  team, like, hey, we need to run this down, and

7  maybe they talked to attorneys again and

8  relayed that information to me.

9           So I really don't know if I spoke or

10 someone else did or -- or, I mean, and maybe it

11 wasn't even from corporate accounting.  Maybe

12 it was, you know, other -- I'm kind of

13 summarizing, you know, again, so I don't really

14 know -- I can't really say for sure.  I don't

15 remember how I came about of this knowledge.

16     Q.    I appreciate your efforts,

17 Mr. Waterhouse, but I will just tell you that

18 if I ask a question and you don't know the

19 answer or you don't recall, I'm happy to accept

20 that.  I don't -- I don't want you to

21 speculate, so I want to be clear about that.

22 So I appreciate it.

23           Let me just ask you simply:  Do you

24 know what attorneys -- can you identify any of

25 the attorneys who thought that the bankruptcy

1              WATERHOUSE - 10-19-21

2     process didn't change the agreement?

3          A.    I don't recall.

4          Q.    Okay.  Perfect.

5                And then let's look at the last

6     sentence.  It says, quote:  The response should

7     include, as I covered in the board meeting,

8     that both entities have the full faith and

9     backing from Jim Dondero, and to my knowledge

10    that hasn't changed.

11               Do you see that?

12         A.    Yes.

13         Q.    Okay.  Prior to October 6th, 2020,

14    had you told the retail board that HCMFA and

15    NexPoint have the full faith and backing from

16    Jim Dondero?

17         A.    Yes.

18         Q.    Do you remember in the context in

19    which you told the retail board that?

20         A.    I mean, generally, yes.

21         Q.    Tell me what you recall.

22         A.    So we were walking through the

23    financials from the advisors; right?  So as I

24    described to you, you have got HCMFA and NPA.

25    And these -- the financials, you know, show

1                   WATERHOUSE - 10-19-21

2   they have liabilities on them that exceed

3   assets.

4              So the retail board has asked, okay,

5   you know, how -- you know, if -- if these

6   liabilities come due or they're payable, you

7   know, how does that come about?

8              And, you know, the response is,

9   well, the advisors have the -- the full faith

10  and backing from -- from Jim Dondero.

11      Q.    And how did you know that the

12  advisors had the full faith and backing from

13  Jim Dondero?  What was the basis for that

14  statement that you made to the retail board?

15      A.    I talked to Jim about it at some

16  point in the past.

17      Q.    And did you tell Mr. Dondero that

18  you were going to inform the retail board that

19  the advisors had his full faith and backing

20  before you actually told that to the retail

21  board?

22      A.    I don't recall having that

23  conversation.

24      Q.    Do you recall if you ever informed

25  Mr. Dondero that you had disclosed or told the

1                    WATERHOUSE - 10-19-21

2    retail board that the advisors had the full

3    faith and backing of Mr. -- Mr. Dondero?

4             MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    I don't recall discussing that with

7    him at the time.

8         Q.    When you told this to the board, was

9    Mr. Dondero participating in the discussion?

10        A.    Not that I recall.

11        Q.    Withdrawn.  Was it not -- withdrawn.

12             Do you recall whether -- when you

13   covered this issue with the board, was that in

14   a -- a Zoom call or a Webex call?  Was it a

15   telephone call?  Was it in-person?  Like where

16   were you physically in relation to the board?

17        A.    I believe I was at home.

18        Q.    Okay.  Can you identify every person

19   that you recall who was present for this

20   disclosure other than -- other than the board

21   members themselves?

22             MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't recall everyone on the call.

25        Q.    Can you identify anybody who was on

1          WATERHOUSE - 10-19-21

2   the call?

3        A.    Other than the board members?

4        Q.    Yes.

5        A.    Lauren Thedford.  I mean, there

6   are -- there are many -- my section is just one

7   of many sections that are just -- you know, as

8   you can appreciate, this is a long board

9   meeting.

10             I can't recall specifically, really

11  even generally, or who was on when this was

12  discussed.  But Lauren was typically on for the

13  entire time.

14       Q.    I apologize if I asked you this, but

15  do either of Mr. Norris or Mr. Post hold any

16  positions relative to the retail funds?

17       A.    I think you asked me this already,

18  John.

19       Q.    Okay.  I just don't recall.  Can you

20  just refresh my recollection if I did, in fact,

21  ask you the question?

22       A.    I don't believe -- if we can go

23  back.  I don't believe Mr. Norris has a title

24  at the retail funds.  Mr. -- and Mr. Post is

25  the CCO of the advisor, the advisors.

1              WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you know if either of them

3    have a position with the retail board -- with

4    the retail funds?

5        A.    I don't believe Mr. Norris has a

6    position with the retail funds.

7        Q.    All right.  What about Mr. Post?

8        A.    Mr. Post is the CCO of the advisors.

9        Q.    Okay.  Does he hold any position --

10       A.    I don't believe so.

11       Q.    -- with the retail funds?

12       A.    I don't believe so.

13       Q.    Okay.

14       A.    I don't know if being the CCO for

15   the advisor conveys something for the retail

16   funds.  Again, I am not -- that is the legal

17   compliance part of it.  I don't know.

18       Q.    Why did you tell the retail board

19   that the advisors have the full faith and

20   backing from Mr. Dondero?

21            MS. DANDENEAU:  Objection to form.

22       A.    It is -- it is -- it is what has

23   been discussed with them prior.

24       Q.    And were you -- were you trying to

25   give them comfort that even though the

1                    WATERHOUSE - 10-19-21

2    liabilities exceeded the assets that the

3    advisors would still be able to meet their

4    obligations as they become due?

5              MS. DANDENEAU:  Objection to form.

6              MS. DEITSCH-PEREZ:  Object form.

7         A.    I -- I can't -- I don't remember

8    specifically the conversation, but generally --

9    you know, generally, yes.  And that is why --

10   but, you know, again, in this email saying, you

11   know, I am sure I qualified it with the retail

12   board, you know, as I said I like -- you know,

13   to my knowledge, that hasn't changed.  But,

14   again, generally -- generally that is what I

15   remember.

16        Q.    Okay.  Do you recall if in the

17   advisors' response to the retail board's

18   question if the response included any statement

19   concerning Mr. Dondero and -- and the full

20   faith and backing that he was giving to the

21   advisors?

22             MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't -- I don't remember

25   specifically what was provided.

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.

3        A.    And I don't really -- I don't really

4    remember generally either.

5        Q.    Okay.

6              MR. MORRIS:  So -- so, again, I'm

7              just going to ask Mr. Rukavina if your

8              clients can produce as soon as possible the

9              15(c) response, the written response that

10             the advisors made, if any, to the board's

11             Question No. 2.

12             I'm not looking for the whole

13             response, but I certainly want the response

14             to Question No. 2.

15       Q.    Do you have a general understanding

16   as to the amount by which -- withdrawn.

17             Did -- did the assets of --

18   withdrawn.

19             Did the liabilities of HCMFA exceed

20   its assets in 2020?

21             MS. DANDENEAU:  Objection to form.

22             MS. DEITSCH-PEREZ:  Objection, form.

23       A.    I believe I have already answered

24   that question earlier, I think.  I believe I

25   said yes.

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  And did the liabilities of

3    NexPoint exceed its assets in 2020?

4              MS. DEITSCH-PEREZ:  Objection to

5        form.

6        A.    I don't believe so.

7        Q.    Okay.  So -- so it was only one of

8    the two advisors who had liabilities that

9    exceeded the value of the assets.

10             Do I have that right?

11             MS. DEITSCH-PEREZ:  Objection to

12       form.

13             MS. DANDENEAU:  Form.

14       A.    Yes.

15       Q.    And do you know, ballpark, the

16   amount by which the value of HCMFA's

17   liabilities exceeded their assets in 2020?

18             MS. DANDENEAU:  Objection to form.

19       A.    I don't -- I don't recall.

20             MR. MORRIS:  I had specifically

21       requested in discovery the audited

22       financial reports for both advisors and

23       NexPoint.  I think I may have gotten one

24       for NexPoint but I'm still waiting for the

25       balance.  And I'm going to renew my request

1                    WATERHOUSE - 10-19-21

2          for those documents too.

3          Q.    Let's go to the next exhibit, which

4     is Number 10.  So I think it is in your stack,

5     Mr. Waterhouse.

6               MR. MORRIS:  And we can take the one

7          down from the screen and put up Number 10

8          for everybody.

9               (Exhibit 10 marked.)

10         Q.    And I don't know if you have ever

11    seen this before, but I'm really putting it up

12    on the screen for purposes of turning to the

13    very last page of the document.

14              So this is a document that we have

15    been -- that we premarked as Exhibit 10.  And

16    we're turning to the last page of the document,

17    which is a document that was filed in the

18    adversary proceeding 21-3004.  And -- no, I

19    apologize, I think we -- right there.  Perfect.

20              And it is page 31 of 31.

21              MR. MORRIS:  I think there may have

22         been some something erroneously stapled to

23         the hard copy that I gave you folks, but

24         I'm looking for page 31 of 31 in the

25         document that begins with the first page of

1          WATERHOUSE - 10-19-21

2          Exhibit 10.

3          Q.    Do you have that, Mr. Waterhouse?

4          A.    I don't have it yet.  I'm looking.

5          Q.    All right.  If you look at the top

6     right-hand corner, you will see it says page

7     hopefully something of 31?

8          A.    Yes, I've got it now.

9          Q.    Okay.  You have got 31 of 31.  You

10     can take a moment to read that, if you would

11     like.

12         A.    (Reviewing document.)  Okay.

13         Q.    Have you ever seen this before?

14         A.    I don't know if I have seen this

15     specific document, but, you know, I've --

16     I'm -- I'm aware of it.

17         Q.    And is this the document that you

18     had in mind when you sent that email to

19     Ms. Thedford that we just looked at where you

20     said that Highland had agreed not to make a

21     demand upon HCMFA until May 2021?

22         A.    Honestly, I don't -- it wasn't this

23     document.  I mean, it's something like this,

24     yes.  I mean, yes.

25         Q.    Well --

1                    WATERHOUSE - 10-19-21

2        A.    It is something like this, but I

3    don't think it was this specific document.

4        Q.    Well, but this document does say in

5    the last sentence that Highland agreed not to

6    seek -- not to demand payment from HCMFA prior

7    to May 31, 2021; right?

8        A.    Yes.

9        Q.    And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13       A.    Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16       Q.    No.  Let me try again.

17             Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21       A.    I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24       Q.    Okay.  And do you think that the

25   audit is referring to this particular document?

```
 1                    WATERHOUSE - 10-19-21

 2         A.    I don't know.

 3         Q.    All right.  This document is dated

 4   April 15, 2019.  Do you see that?

 5         A.    I do.

 6         Q.    And do you remember that the audit

 7   was completed on June 3rd, 2019?

 8         A.    Yes.

 9         Q.    And do you recall that the audited

10   financials -- and I'm happy to pull them up if

11   you would like, but do you recall that the

12   audited financials included a reference to the

13   agreement pursuant to which Highland agreed not

14   to make a demand until May 31st, 2021?

15         A.    Yes, I remember.

16         Q.    And as part of the process, would

17   you have expected the corporate accounting team

18   to have provided a copy of this document to

19   PwC?

20               MS. DANDENEAU:  Objection to form.

21         A.    Yes, I would have expected something

22   like this, or again, you know, some document

23   that basically states -- states the deferral

24   till May 31 of 2020.

25         Q.    Okay.
```

1          WATERHOUSE - 10-19-21

2      A.    May 31 of 2021, excuse me.

3      Q.    And this document states the

4  deferral that you just described; correct?

5      A.    It does.

6      Q.    And this document states the

7  deferral that was described in the audited

8  financial statements that we looked at before;

9  correct?

10     A.    It does.

11           MR. MORRIS:  Okay.  Can we scroll

12      down just a little bit to see who signed on

13      behalf of the acknowledgment there.

14     Q.    Okay.  So Mr. Dondero signed this

15  document on behalf of both HCMFA and Highland;

16  do you see that?

17     A.    I do.

18     Q.    Okay.  Did you discuss this document

19  or the -- withdrawn.

20           Did you discuss the concept of the

21  deferral with Mr. Dondero in the spring of

22  2019?

23     A.    I think I testified I don't recall.

24     Q.    Okay.  Do you know whose idea it was

25  to issue the acknowledgment in this form?

1                    WATERHOUSE - 10-19-21

2        A.    I don't recall.

3              MR. MORRIS:  Can we scroll back up

4        to the document, please.

5        Q.    Do you see in the beginning it says,

6   reference is made to certain outstanding

7   amounts loaned from Highland to HCMFA for

8   funding ongoing operations.

9              Do you see that?

10       A.    Yes.

11       Q.    And were you aware as the CFO of

12  Highland and as the treasurer of HCMFA that as

13  of April 15, 2019, Highland had made certain

14  loans to HCMFA to fund HCMFA's ongoing

15  operations?

16       A.    Yes.

17       Q.    And were you aware that those loans

18  were payable on demand and remained outstanding

19  as of December 31st, 2018?

20       A.    Yes.

21       Q.    And were you aware that those

22  amounts were payable on demand, and they

23  remained outstanding as of April 15, 2019?

24             MS. DEITSCH-PEREZ:  Object to the

25       form.

1          WATERHOUSE - 10-19-21

2      A.    Well, this -- this document dated

3   April 15, 2019 says they have been deferred to

4   May 31, 2021.

5      Q.    Right.  But I'm just sticking to the

6   first paragraph where they refer to the

7   outstanding amounts.  And in the end it says

8   the -- it remained outstanding on December

9   31st, 2018, and I think you told me that you

10  understood that, and then I'm just trying to

11  capture the last piece of it.

12          Did you understand that there were

13  amounts outstanding from the loan that Highland

14  made to HCMFA to fund ongoing operations as of

15  April 15th, 2019?

16     A.    Yes.

17     Q.    Thank you.  Let's look at the next

18  sentence.  HCMFA expects that it may be unable

19  to repay such amounts should they become due

20  for the period commencing today and continuing

21  through May 31st, 2021.

22          Do you see that?

23          MS. DANDENEAU:  Objection to form.

24     A.    I do.

25     Q.    As the CFO -- withdrawn.

1                    WATERHOUSE - 10-19-21

2               As the treasurer of HCMFA, did you

3      believe that -- do you believe that statement

4      was true and accurate at the time it was

5      rendered?

6         A.    I mean, it -- it -- the answer to

7      that is I really didn't have any -- I didn't

8      have an opinion really.

9         Q.    Did you do anything to educate

10     yourself in April of 2019 on the issue of

11     whether HCMFA could repay the amounts that it

12     owed to Highland should they become due?

13        A.    I don't believe so.

14        Q.    Did you at any time form any

15     opinions as to HCMFA's ability to repay all

16     amounts due to Highland should they become due?

17        A.    Not really.  I guess I don't...

18        Q.    Well, you told the retail board that

19     HCMFA's liabilities exceeded their assets in

20     2020; correct?

21        A.    Yes.

22        Q.    Based on the work that you did to

23     prepare for the retail board, did you form any

24     view as to whether HCMFA would be unable to

25     repay the amounts that it owed to Highland

1               WATERHOUSE - 10-19-21

2   should they become due?

3               MS. DANDENEAU:  Objection to form.

4       A.    I mean, I -- when you look at that,

5   to answer you, completely, you know, again,

6   if -- the response I gave the retail board was,

7   you know, the -- the advice -- HCMFA advisors

8   have the -- have the full faith and backing of

9   Jim Dondero.  So I didn't form an opinion of

10  whether the advisor could pay it or not.

11      Q.    Did you form any view as to whether

12  the advisors could repay the amounts that it

13  owed to Highland should they become due without

14  the full faith and backing of Mr. Dondero?

15              MS. DANDENEAU:  Objection to form.

16              MS. DEITSCH-PEREZ:  Form.

17      A.    I mean, if you -- if you -- if you

18  take that last statement out, I mean, it would

19  be difficult for HCMFA to pay back demand notes

20  at that time.

21      Q.    And it was precisely for that reason

22  that you told the retail board that -- that the

23  retail -- that the advisors had the full faith

24  and backing of Mr. Dondero; correct?

25              MS. DANDENEAU:  Objection to form.

1                WATERHOUSE - 10-19-21

2        A.    I mean, yes, as the mouthpiece, I

3    was relaying information.

4        Q.    Okay.  And you relayed that

5    information with the knowledge and approval of

6    Mr. Dondero; correct?

7              MS. DEITSCH-PEREZ:  Object to the

8         form.

9        A.    As I stated in the email, I don't

10   believe, and I think I testified I don't

11   believe I had conversations with Mr. Dondero at

12   the time of that board meeting.

13       Q.    Did you tell the retail board that

14   the advisors had the full faith and backing of

15   Mr. Dondero without Mr. Dondero's prior

16   approval?

17       A.    Yeah, I -- I -- yes, I'm -- like I

18   said, I think I testified earlier, I'm sure I

19   qualified it as well.

20       Q.    What do you mean by that?

21             MS. DANDENEAU:  Objection to form.

22       A.    Again -- again, like I said in the

23   email, it has the full faith and backing of Jim

24   Dondero unless that has changed.

25       Q.    Actually that is not what you said,

1                WATERHOUSE - 10-19-21

2    so let's put the email back up.

3         A.    It is -- it is -- it is in the

4    email.

5         Q.    Let's put the email back up.  You

6    didn't say unless it has changed.  You said you

7    believe it hasn't changed; right?

8         A.    Okay.  And to my knowledge that

9    hasn't changed, that is what it says.

10        Q.    That's right.

11        A.    But, again, I mean, that is -- I

12   don't know everything.  And I'm not in every

13   conversation.  I'm not -- to presume that I am,

14   is -- and you have to put myself -- as you

15   started this out, Mr. Morris, I was at home in

16   October of 2020 with COVID -- or, you know,

17   under these COVID times that we described is

18   very difficult.

19             We have all been working at home for

20   really the first time ever, undergoing

21   processes, procedures, control environments

22   that have been untested, and there is poor

23   communication.

24             So I am relaying, as I'm telling you

25   now, what is in the email.  And unless

1                    WATERHOUSE - 10-19-21

2    something has changed -- to my knowledge, it

3    hasn't changed, but it could have changed.

4        Q.    When you say that the advisors have

5    the full faith and backing from Mr. Dondero,

6    did you intend to convey that, to the extent

7    the advisors were unable to satisfy their

8    obligations as they become due, Mr. Dondero

9    would do it for them?

10               MS. DANDENEAU:  Object to the form.

11               MS. DEITSCH-PEREZ:  Object to the

12         form.

13               And, John, we have given you a lot

14         of leeway here but this does not seem

15         relevant to this case.  You seem sort of

16         taking a complete sort of diversion into

17         the allegations and the complaint just

18         filed on Friday, and so I would ask you to

19         move on because --

20               MR. MORRIS:  And I will tell you --

21         I will tell you that I have never read that

22         complaint cover-to-cover.  I have nothing

23         to do with the prosecution of those claims.

24         And this issue that we're talking about

25         right now is related solely to the

```
1                    WATERHOUSE - 10-19-21

2          promissory notes that your clients refuse

3          to pay.

4                    So I'm going to continue to ask my

5          questions, and I would ask the court

6          reporter to read back my last question.

7                         (Record read.)

8                    MS. DEITSCH-PEREZ:  And then I

9          believe there were objections to form.

10         Q.    You can answer the question.

11         A.    Yes.

12         Q.    Thank you very much, sir.

13                   MR. MORRIS:  Can we go back to the

14         other document, please?

15         Q.    Mr. Waterhouse, do you know if this

16    document was ever shared with the retail board?

17         A.    I don't recall.

18         Q.    Did you ever share it with the

19    retail board?

20         A.    I don't recall.

21         Q.    Did you ever tell the retail board

22    about the substance of this document?

23         A.    I don't recall.

24         Q.    Did you ever tell the retail board

25    that Highland had agreed not to make a demand
```

1              WATERHOUSE - 10-19-21

2    against HCMFA until May 2021?

3         A.    I don't recall.

4         Q.    Do you know whether anybody on

5    behalf of the advisors ever informed the retail

6    board that Highland had agreed on April 15,

7    2019, not to make a demand against HCMFA under

8    the promissory notes?

9         A.    I don't recall.

10        Q.    Did you instruct Ms. Thedford or

11   anybody else responding to the retail board's

12   15(c) inquiry to disclose this document?

13        A.    Did I instruct Ms. Thedford or

14   anyone else to -- to -- to produce this, to

15   disclose this document?  Is that what you -- I

16   just want to make sure.

17        Q.    Uh-huh.

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Did you instruct anybody to inform

20   the retail board, in response to their question

21   as part of the 15(c) process, to -- to tell the

22   retail board about Highland's agreement not to

23   make a demand until 2021?

24              MS. DANDENEAU:  Objection to form.

25        A.    I don't recall.

1                    WATERHOUSE - 10-19-21

2        Q.    Did you ever inform PwC that HCMFA's

3    liabilities exceeded its assets?

4             MS. DANDENEAU:   Object to the form.

5        A.    I don't -- I don't think I told

6    them.  I mean, they -- they audited the

7    financial statements.

8        Q.    Did -- do you know if anybody on

9    behalf of Highland ever informed

10   PricewaterhouseCoopers that HCMFA may be unable

11   to repay amounts owing to Highland, should they

12   become due?

13            MS. DANDENEAU:   Objection to form.

14       A.    Yes.  Again, I think I testified

15   earlier that -- that this was communicated to

16   the auditors.

17       Q.    Ideally --

18       A.    I don't know who exactly did that.

19   I don't recall doing it, but, yeah, it was --

20   it was communicated.  And that is why -- I

21   mean, there is a disclosure in the financial

22   statements; right?

23       Q.    There is, and that disclosure

24   relates to the last sentence of this document;

25   correct?

1                    WATERHOUSE - 10-19-21

2         A.    Yes.

3         Q.    Do you recall looking in the

4    document and seeing anything that was disclosed

5    with respect to the sentence above that?

6         A.    No.

7         Q.    Do you know whether anybody on

8    behalf of Highland ever informed

9    PricewaterhouseCoopers that HCMFA expects that

10   it may be unable to repay amounts due and owing

11   to Highland should they become due?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  I think that is the third time.

14        A.    I don't recall.  Again, as I said,

15   we -- all of this was given to the auditors.

16        Q.    Do you know if Highland received

17   anything of value in exchange for its agreement

18   not to demand payment on amounts owed by HCMFA

19   prior to May 31st, 2021?

20              MS. DEITSCH-PEREZ:  Object to the

21         form.  That is the second time.

22              MS. DANDENEAU:  Object to the form.

23        A.    I have answered this question.

24              MR. RUKAVINA:  Hold on.  Object to

25         legal conclusion.  Go ahead.

1                    WATERHOUSE - 10-19-21

2        A.     I have answered this question

3    before.

4        Q.     And the answer was no?

5        A.     I'm not aware.

6        Q.     Now, this acknowledgment can't

7    possibly apply to the two notes that you signed

8    on behalf of HCMFA because those notes were

9    signed on May 2nd and May 3rd, 2019; is that

10   right?

11              MS. DANDENEAU:  Objection to form.

12       A.     Unless there is a drafting error.

13       Q.     Okay.  Are you aware of a drafting

14   error?

15       A.     I'm not aware.  I didn't -- I wasn't

16   part of -- I didn't sign this note or this

17   acknowledgment.  I didn't draft it.

18       Q.     But you do see it is dated April 15,

19   2019; right?

20       A.     Yes.

21       Q.     And this was a document that was

22   actually included by the advisors in a pleading

23   they filed with the Court; right?

24              MR. RUKAVINA:  Well, I don't know

25        that so I object to form.

1                    WATERHOUSE - 10-19-21

2         Q.    Okay.   Let's go to the first page of

3    the document and just confirm that.

4              MR. AIGEN:  Mr. Morris, I just note

5         that you already said there was some error

6         with the document that is listed as

7         exhibit --

8              MR. MORRIS:  No.  No, no, no.

9              MS. DEITSCH-PEREZ:  Oh, okay.

10             MR. MORRIS:  What I said is that

11        there is a few pages that were mistakenly

12        stapled to the end of the document.

13             MS. DEITSCH-PEREZ:  Okay.

14             MR. MORRIS:  There is no problem

15        with this document.

16             MS. DEITSCH-PEREZ:  And just so

17        we're clear that the document -- the pages

18        that start with defendant's amended answer

19        are not intended to be part of this

20        document?

21             MR. MORRIS:  That's correct.

22             MS. DEITSCH-PEREZ:  And that the --

23        but it is your representation that the rest

24        of the document is -- is -- is correct

25        because we don't -- we don't have any way

1            WATERHOUSE - 10-19-21

2       of verifying that, we're just --

3            MR. MORRIS:  You do, actually.  You

4       could just go to Docket No. 21-3004.

5            MS. DEITSCH-PEREZ:  If you want to

6       stop this deposition so we can go and pull

7       that document up, we're happy to do it.  So

8       I am just asking you for your

9       representation.

10           MR. MORRIS:  Sure.  I gave that.

11           MS. DEITSCH-PEREZ:  Okay.

12      Q.    So do you see that this is a

13 document that was actually filed with the Court

14 by Highland Capital Management Fund Advisors?

15      A.    No.  I get with the first page in

16 the section.  Maybe I'm looking at the wrong

17 thing.  It says, Highland Capital Management.

18      Q.    Don't worry about it.  Don't worry

19 about it.

20      A.    Maybe I went back -- okay.

21           MR. MORRIS:  All right.  Can we put

22      up on the screen Exhibit 2.

23           (Exhibit 2 marked.)

24           MR. MORRIS:  I think it is

25      Exhibit 1.

```
1                WATERHOUSE - 10-19-21

2           MS. DANDENEAU:  I'm sorry, John, did

3       you say Exhibit 2 or Exhibit 1?

4           MR. MORRIS:  It is Exhibit 2 in the

5       binders so it is premarked Exhibit 2.  And

6       now I'm asking -- right there -- going to

7       Exhibit 1 to the document that was marked

8       as Exhibit 2.

9           MS. DANDENEAU:  Got it.  In the

10      binder there is no --

11          MS. DEITSCH-PEREZ:  There is no

12      Exhibit 1.

13          MR. MORRIS:  All right.  So look at

14      the one on the screen.

15      Q.   Do you see, Mr. Waterhouse, that

16  this is a promissory note dated May 31st, 2017,

17  in the approximate amount of $30.7 million?

18      A.   Yes.

19      Q.   And do you see that the maker of the

20  note is NexPoint?

21      A.   Yes.

22      Q.   And that Highland is the payee; is

23  that right?

24      A.   Yes.

25      Q.   Okay.  And do you see in Paragraph 2
```

1          WATERHOUSE - 10-19-21

2    this is an annual installment note?

3         A.    Can you scroll down.

4         Q.    Sure.

5               MR. MORRIS:  Can we scroll down --

6         yeah, there you go.

7         A.    Right there, yeah.  Yes.

8               MR. MORRIS:  And can we scroll down

9         to the signature line.

10        Q.    And do you recognize that as

11   Mr. Dondero's signature?

12        A.    Yes.

13        Q.    And is this the promissory note that

14   we talked about earlier where NexPoint had made

15   certain payments in the aggregate amount of

16   about 6 to $7 million against principal and

17   interest?

18        A.    I don't recall discussing the

19   aggregate principal amounts of 6 to $7 million,

20   but -- so I don't -- I don't recall that prior

21   discussion with those amounts.

22        Q.    All right.  Let's take a look.

23   NexPoint always included this promissory note

24   as a liability on its audited financial

25   statements; right?

1          WATERHOUSE - 10-19-21

2     A.    Yes.

3     Q.    And NexPoint had its financial

4  statements audited; isn't that correct?

5     A.    Yes.

6     Q.    And was the process of NexPoint's

7  audit similar to the process you described

8  earlier for Highland and HCMFA?

9     A.    Yes, it is similar.

10    Q.    Okay.

11          MR. MORRIS:  Can we put up

12       NexPoint's audited financials and let

13       everybody know what exhibit number it is,

14       La Asia?

15          MS. CANTY:  It is going to be

16       Exhibit 46.

17          (Exhibit 46 marked.)

18    Q.    And do you see, sir, that we've put

19  up NexPoint Advisors' consolidated financial

20  statements and supplemental information for the

21  period ending December 31st, 2019?

22    A.    Yes.

23    Q.    Did you participate in the process

24  whereby these audited financial statements were

25  issued?

1                    WATERHOUSE - 10-19-21

2          A.     I didn't participate directly, as

3     I've described before, about the -- the team

4     performing the audit.

5          Q.     Do you recall when the audit of

6     NexPoint's financial statements for the period

7     ending December 31st, 2019 was completed?

8          A.     Yes.

9          Q.     And when do you recall it being

10    completed?

11         A.     In January of 2021.

12         Q.     Do you know why the 2019 audit

13    report wasn't completed until January of 2021?

14         A.     Yes.

15         Q.     Why was the NexPoint audit report

16    for the period ending 12/31/19 not completed

17    until January 2021?

18         A.     Because we had to deal with working

19    from home from -- with COVID, and on top of all

20    of our daily responsibilities and job duties

21    at -- at providing -- at Highland providing

22    services to NexPoint, we had to do all of this

23    extra work for a bankruptcy that was filed in

24    October of 2019.

25              MR. MORRIS:  Can we go to the

1          WATERHOUSE - 10-19-21

2     balance sheet on page 3?  Okay.  Stop right

3     there.

4          Q.    Do you see under the liabilities

5     section, the last item is note payable to

6     affiliate?

7          A.    Yes.

8          Q.    And is that the note that we just

9     looked at?

10          MS. DANDENEAU:  Objection to form.

11          Q.    Withdrawn.

12          Is that the approximately

13     $30 million note that we just looked at that

14     was dated from 2017?

15          MS. DANDENEAU:  Objection to form.

16          A.    I believe no.

17          Q.    Okay.  You're not aware of any other

18     note that was outstanding from NexPoint to

19     Highland as of the end of the year 2019, other

20     than that one $30 million note; right?

21          A.    I don't recall.

22          Q.    And as of the end of 2019, the

23     principal amount that was due on the note was

24     approximately $23 million; right?

25          MS. DEITSCH-PEREZ:  Object to the

```
 1                 WATERHOUSE - 10-19-21

 2        form.

 3        A.    Approximately.

 4        Q.    And does that refresh your

 5   recollection that between the time the note was

 6   executed and the end of 2019, that NexPoint had

 7   paid down approximately $7 million?

 8        A.    Yes.  If we are just doing the math,

 9   yes.

10        Q.    Okay.  Did NexPoint complete its

11   audit from 2020?

12        A.    Sorry, you kind of broke up.  Do

13   NexPoint complete?

14        Q.    The audit of its financial

15   statements for the period ending December 31st,

16   2020?

17        A.    No.

18        Q.    No, it's not complete?

19        A.    No, it is not complete.

20        Q.    Did HCMFA complete its audit for the

21   year ending December 31st, 2020?

22        A.    No.

23              MR. MORRIS:  Can we go to page 15,

24        please, the paragraph at the bottom.

25        Q.    Do you see that NexPoint has
```

1          WATERHOUSE - 10-19-21

2    included under notes payable to Highland a

3    reference to the amounts that were outstanding

4    as of the year-end 2019 under the note that we

5    looked at just a moment ago?

6          A.    Yes.  Are you talking about the

7    second paragraph?

8          Q.    I'm actually talking about first

9    paragraph.  Do you understand that the first

10   paragraph is a reference to the 2017 note, and

11   the amounts that were -- the principal amount

12   that was outstanding as of the end of 2019?

13             MS. DANDENEAU:  Objection to form.

14        John, do you mean the first paragraph of

15        that page?

16             MR. MORRIS:  No, the first paragraph

17        under notes payable to Highland.

18        A.    Yeah, I see the paragraph, and

19   again, this is what I answered earlier.  I

20   believe so, just because I don't -- again, this

21   is a number in a balance sheet, and without

22   matching it up and seeing the detail with the

23   schedule like I kind of talked about for

24   Highland's financial statements, it is a little

25   bit more difficult to tie everything in

1              WATERHOUSE - 10-19-21

2    perfectly together.

3         Q.    Okay.  But you're not aware of any

4    note that was outstanding at the end of 2019

5    from NexPoint to Highland other than whatever

6    principal was still due and owing under the

7    $30 million note issued in 2017; correct?

8         A.    Well, it -- I don't -- there is

9    reference in the second paragraph.  I don't --

10   I don't -- I don't recall what that is

11   referring to, so I don't -- I don't know.

12        Q.    Well, if you listen carefully to my

13   question, right, I'm asking about notes that

14   were outstanding at the end of 2019, and if we

15   look at the paragraph you just referred to, it

16   says that during the year there were new notes

17   issued totaling $1.5 million, but by the end of

18   the year, no principal or interest was

19   outstanding on the notes.

20             Do you see that?

21        A.    Oh, I do, yes.

22        Q.    So does that refresh your

23   recollection that there were no notes

24   outstanding from NexPoint to Highland other

25   than the principal remaining under the original

1           WATERHOUSE - 10-19-21

2    $30 million 2017 note that we looked at a

3    moment ago?

4         A.    Well, we're at the bottom of the

5    page.  Is there anything on page 16?

6         Q.    That is a fair question, sure.  That

7    is it.

8         A.    Okay.  So it appears that that is

9    the only note that is detailed in the notes in

10   the financial statement.

11        Q.    And you don't have any memory of any

12   other note other than the 2017 note, right,

13   being outstanding as of the end of the year?

14        A.    I deal with thousands of

15   transactions every year.  I don't really have a

16   very specific memory for what exactly was

17   outstanding.

18             MR. MORRIS:  Why don't we take a

19        break now.  We've been going for a little

20        while.  It's 3:26.  Let's come back at

21        3:40.

22             VIDEOGRAPHER:  We're going off the

23        record at 3:26 p.m.

24        (Recess taken 3:26 p.m. to 3:39 p.m.)

25             VIDEOGRAPHER:  We are going back on

1          WATERHOUSE - 10-19-21

2          the record at 3:39 p.m.

3          Q.    All right.  Mr. Waterhouse, we -- I

4     don't think we have a lot more here.

5               To the best of your knowledge and

6     recollection, were all affiliate loans and all

7     loans made to Mr. Dondero recorded on

8     Highland's books and records as assets of

9     Highland?

10               MS. DANDENEAU:  Object to the form,

11          asked and answered.

12          A.    To my knowledge, yes.

13          Q.    Okay.  Can you recall any loan to

14     any affiliate or Mr. Dondero that was not

15     recorded on Highland's books and records as an

16     asset?

17          A.    Like during my time as CFO?  I don't

18     recall.

19          Q.    How about after the time that you

20     were CFO?  Did you recall that there was a loan

21     by Highland to an affiliate or to Mr. Dondero

22     that hadn't been previously recorded on

23     Highland's books as an asset?

24               MS. DANDENEAU:  Objection to form.

25          A.    I guess I don't understand the

1          WATERHOUSE - 10-19-21

2    question.  I left Highland as of -- I'm not

3    aware of -- I left Highland in February --

4    probably the last day of February of 2021.

5          Q.    Okay.

6          A.    I'm not -- I'm not aware of any --

7    I'm not aware of anything past that date.

8          Q.    Okay.  While you were the CFO at

9    Highland, did Highland prepare in the ordinary

10   course of business a document that reported

11   operating results on a monthly basis?

12         A.    Yes.

13         Q.    And are you generally familiar with

14   the monthly operating reports?

15         A.    Yeah.  You are referring to the

16   reports that we filed to the Court every month?

17         Q.    I apologize, I'm not.  I'm taking

18   you back to the pre-petition period.  There was

19   a report that I have seen that I'm going to

20   show you, but I'm just asking for your

21   knowledge.

22              MR. MORRIS:  Let's put it up on the

23         screen, Exhibit 39.

24              (Exhibit 39 marked.)

25         Q.    Do you see this is a document that

1                    WATERHOUSE - 10-19-21

2      is called operating results?

3           A.    Yeah, that's the title of it.

4           Q.    Okay.  And was a report of operating

5      results prepared by Highland on a monthly basis

6      during the time that you served as CFO?

7           A.    No.

8           Q.    Are you familiar with a document of

9      this type?  And we can certainly look at the

10     next page or two to refresh your recollection.

11          A.    I'm just looking at the title.  I

12     don't really -- again, as I discussed before, I

13     don't have any records or documents or emails

14     or appointments or anything that I was able to

15     use prior to -- prior to this deposition, so

16     I'm doing the best I can.

17          Q.    Okay.  You don't need to apologize.

18     I'm just asking you if you are familiar with

19     the document called Operating Results that was

20     prepared on a monthly basis at Highland?

21                MS. DEITSCH-PEREZ:  Object to the

22          form.

23          Q.    If you're not, you're not.

24          A.    I don't believe this was prepared on

25     a monthly basis.

1        WATERHOUSE - 10-19-21

2     Q.    Okay.  Do you see that this one

3  is -- is dated February 2018?

4     A.    Yes.

5     Q.    Do you have -- do you believe --

6  have you ever seen a document that was

7  purporting to report operating results for

8  Highland?

9         MS. DANDENEAU:  Objection to form.

10    A.    Yes.

11    Q.    Okay.  And when you say that you

12 don't believe it was produced on a monthly

13 basis, was it produced on any periodic bases to

14 the best of your recollection?

15    A.    I believe it was -- it was prepared

16 on an annual basis.

17    Q.    Okay.

18        MR. MORRIS:  Can we look at the next

19    page.

20    Q.    Do you see that there is a statement

21 here called:  Significant items impacting

22 HCMLP's balance sheet?

23        And it is dated February 2018.

24    A.    Yes.

25    Q.    Do you recall that there was a

```
 1              WATERHOUSE - 10-19-21

 2   report that Highland prepared that identified

 3   significant items impacting the balance sheet?

 4        A.    A report that was prepared.

 5        Q.    Let me ask a better question:  Did

 6   Highland prepare reports to the best of your

 7   recollection that identified significant items

 8   that impacted its balance sheet?

 9        A.    Well, so Highland prepared a -- a

10   monthly close package.  And maybe I'm

11   getting -- and -- and maybe change names at one

12   time or maybe I'm just -- again, just

13   misremembering -- but in that, yes, there is a

14   page that would detail just changes in -- you

15   know, just changes month over month on the

16   balance sheet.

17        Q.    Okay.  And maybe it is my fault.

18   Maybe I didn't know the proper name for it.

19   But let's use the phrase "monthly close

20   package."

21              Did Highland prepare a monthly close

22   package in the ordinary course of business

23   during the time that you served as CFO?

24              MS. DANDENEAU:  Objection to form.

25        A.    Yes.
```

1              WATERHOUSE - 10-19-21

2        Q.    And did the monthly close package

3   that Highland prepared include information

4   concerning significant items that impacted

5   Highland's balance sheet?

6        A.    Yes, it had a page like that is --

7   that is on the screen that detailed items

8   like -- of that nature.

9        Q.    And do you know who -- was there

10  anybody at Highland who was responsible for

11  overseeing the preparation of the monthly

12  reporting package?

13       A.    That would have been -- again, it

14  varies over time during my tenure as CFO.

15  It -- it varied over -- over time, but -- but

16  typically a -- a corporate accounting manager.

17       Q.    And who were the corporate

18  accounting managers during your tenure as CFO?

19       A.    It would have been Dave Klos and

20  Kristin Hendrix.

21       Q.    And did the corporate accounting

22  manager deliver to you drafts of the monthly

23  close package before it was finalized?

24       A.    Sometimes.

25       Q.    Was that the practice even if there

1                    WATERHOUSE - 10-19-21

2    were exceptions to the practice?

3         A.    The practice meaning that they

4    sometimes lured them to me?

5         Q.    That that was the expectation even

6    if circumstances prevented that from happening

7    from time to time.

8                    MS. DEITSCH-PEREZ:  Object to the

9         form.

10        A.    I -- I would say it started out that

11   way but over the years it -- it was not

12   enforced.

13        Q.    Okay.  So you were -- you reviewed

14   and approved monthly -- monthly reporting

15   packages for a certain period of time and then

16   over time you stopped doing that.

17                    Do I have that right?

18                    MS. DANDENEAU:  Objection to form.

19        A.    Yes, I mean, if you're talking about

20   a formal meeting where we sit down and go

21   through and approve it.  I would say that was

22   standard practice a decade -- you know, early

23   on.  And as time went on that -- that -- that

24   practice wasn't followed.

25        Q.    Okay.

1              WATERHOUSE - 10-19-21

2       A.    And, quite frankly, I don't even

3    know if these were -- these were sent to me

4    even in any capacity.

5       Q.    What was the purpose of preparing

6    the monthly reporting package -- withdrawn.

7              What was the purpose of preparing

8    the monthly close package?

9              MS. DEITSCH-PEREZ:  Object to the

10        form.

11      A.    The -- the original purpose was so

12   that it would just -- it would be a report that

13   was reviewed monthly with senior management.

14      Q.    Who was included in the idea of

15   senior management?

16      A.    You know, I think originally when

17   this was conceived that would have been like

18   Jim Dondero and Mark Okada.

19      Q.    Were monthly reporting -- withdrawn.

20             Were monthly close packages prepared

21   to the best of your knowledge until the time

22   you left Highland?

23      A.    To my knowledge -- I don't know,

24   actually.  I mean, to my knowledge, I believe

25   it was being -- that was still being done.  I

```
1              WATERHOUSE - 10-19-21

2    don't know because, again, I wasn't reviewing

3    them.  I hadn't reviewed a close package for --

4    for a long time.  But I believe the standard

5    practice that was still being carried out.

6         Q.   Did you ever have any discussions

7    with the debtor's independent board concerning

8    any promissory notes that were issued by any of

9    the affiliates or Mr. Dondero?

10        A.   I can't -- I can't -- I can't recall

11   specifically.

12        Q.   Did you speak with the independent

13   board from time to time?

14        A.   Yes, from -- from -- from time to

15   time I had discussions with the independent

16   board members, you know, either -- either, you

17   know, by themselves or wholly, you know, as --

18   as a -- as a combined work.

19        Q.   Okay.  Before we talk about

20   Mr. Seery, do you recall ever having a

21   conversation with Mr. Nelms or Mr. Dubel

22   concerning any promissory note that was

23   rendered by one of the affiliates or

24   Mr. Dondero to Highland?

25        A.   I don't recall any conversations
```

1              WATERHOUSE - 10-19-21

2    specifically.

3        Q.    Do you know if the topic was ever

4    discussed, even if you don't remember it

5    specifically?

6              MS. DANDENEAU:  Objection to form.

7        A.    It -- it -- it may have.  I don't

8    know.  I don't recall.

9        Q.    Do you recall ever discussing any

10   promissory note issued by any of the affiliates

11   or Mr. Dondero with James Seery?

12       A.    I don't -- I don't recall

13   specifically.

14       Q.    Do you recall generally ever

15   discussing the topic of promissory notes issued

16   by any of the affiliates or Mr. Dondero to

17   Highland with Mr. Seery?

18       A.    Nothing -- nothing is really jumping

19   out at me.

20       Q.    Do you recall if you ever told

21   Mr. Seery that any of the affiliates or

22   Mr. Dondero didn't have an obligation to pay

23   all amounts due and owing under their notes?

24       A.    I don't recall having that

25   conversation.

```
1                    WATERHOUSE - 10-19-21

2         Q.    Did you ever tell Mr. Seery that you

3    had any reason to believe that the amounts

4    reflected in the notes issued by the affiliates

5    and Mr. Dondero were invalid for any reason?

6         A.    I don't -- I don't recall.

7         Q.    Did you tell Mr. Dondero -- did you

8    tell Mr. Seery that you thought the promissory

9    notes issued by the advisors and Mr. Dondero

10   that were outstanding as of the petition date

11   were assets of the estate?

12        A.    I don't recall having a specific

13   conversation about those -- you know, those

14   notes outstanding as -- as of the petition date

15   being assets on the estate.  I mean, we put

16   together -- you know, they're in the books and

17   records of the financial statements.  I don't

18   recall having a specific conversation.

19        Q.    Did you ever prepare any documents

20   that were delivered to Mr. Seery that concerned

21   the promissory notes issued by any of the

22   affiliates or Mr. Dondero?

23              MS. DANDENEAU:  Objection to form.

24        A.    Did I produce any that concerned --

25   you mean did I just -- did I give Mr. Seery
```

1                  WATERHOUSE - 10-19-21

2    anything that -- that said I have concerns over

3    these notes?

4         Q.    No.   Let me try again.   Maybe it was

5    my question.

6              Did you ever give Mr. Seery any

7    information concerning any of the notes that

8    were issued by any of the affiliates or

9    Mr. Dondero?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't recall if I did or not.  I

12   don't -- I don't remember.  I mean, you have my

13   emails.  You may have asked.  Again, I don't --

14   I don't know.

15             MR. MORRIS:  Can we put up the

16        document that has been premarked as Exhibit

17        39?

18             MS. DANDENEAU:  John, that is this

19        document, isn't it?

20             MR. MORRIS:  Oh, yeah, it might be,

21        as a matter of fact.  Let's go to Number

22        40.

23             (Exhibit 40 marked.)

24        Q.    During the bankruptcy,

25   Mr. Waterhouse, did you prepare documents that

```
1                    WATERHOUSE - 10-19-21

2    were filed with the bankruptcy court?

3          A.    I didn't -- I didn't prepare them

4    personally.

5          Q.    Did people prepare them under your

6    direction?

7          A.    Yes.  There were members of the team

8    that prepared them, and they worked in -- you

9    know, there were members of DSI that were

10   involved in the process as well.

11         Q.    To the best of your knowledge, did

12   DSI rely on the employees of Highland for the

13   information that they used to prepare the

14   bankruptcy filings?

15         A.    Yes.  The books and records were

16   with the Highland personnel.

17         Q.    Okay.  And do you see on the screen

18   here, there is a document that we have marked

19   as Exhibit 40 that is -- that is titled Summary

20   of Assets and Liabilities?

21         A.    Uh-huh.

22         Q.    Okay.  And do you recall reviewing

23   any summary of assets and liabilities before it

24   was filed with the bankruptcy court?

25         A.    Yes, I recall reviewing this at a
```

1              WATERHOUSE - 10-19-21

2    high level.

3         Q.    And did you believe that it was

4    accurate at the time it was filed?

5         A.    I didn't have any other reason to

6    believe otherwise.

7         Q.    Okay.  Do you see that the total

8    value of all properties listed in Part 1 is

9    approximately $410 million?

10             MS. DEITSCH-PEREZ:  Objection to

11        form.

12        A.    Yes, it is in 1c.

13        Q.    Yes.

14        A.    Yes, I see that.

15        Q.    Okay.  If we go to the second page,

16   now I think I may just have excerpts here, just

17   so everybody is clear, but if we scroll down to

18   the second page, you will see that there is

19   a -- a little further.  There you go.  You will

20   see there is a reference to Item 71, notes

21   receivable.

22             Do you see that?

23        A.    I do.

24        Q.    And that was a reference to the

25   notes receivable from the affiliates and

```
1                WATERHOUSE - 10-19-21

2    Mr. Dondero, among others; is that right?

3              MS. DANDENEAU:  Objection to form.

4       A.     Yes.  The affiliate notes and the

5    Dondero notes were in this amount, but they

6    weren't -- again, like you said, and among

7    others.

8       Q.     Okay.  We will look at the

9    specificity because I'm not playing gaming

10   here, but do you know if the $150 million of

11   notes receivable was included within the

12   $410 million of total value of the debtor's

13   assets?

14             MS. DANDENEAU:  Objection to form.

15      A.     I -- I -- I believe so.

16      Q.     Right.  And so is it fair to say

17   that as of the date this document was prepared,

18   the notes receivable were more than one-third

19   of the value of the debtor's assets?

20             MS. DEITSCH-PEREZ:  Object to the

21        form.

22             MS. DANDENEAU:  Object to the form.

23      A.     Again, if you are just taking the

24   math, 150 divided by whatever the $400 million

25   number is above, then yes, you get there.
```

```
1              WATERHOUSE - 10-19-21

2      Q.    Okay.

3      A.    You know, but as of the time of this

4  filing, that is what was put in this filing,

5  right, but, you know, I mean, numbers --

6  numbers change, facts and circumstances change.

7      Q.    But as the CFO of Highland, the

8  debtor in bankruptcy, did you believe that this

9  number accurately reflected the total amount

10  due under the notes receivable?

11      A.    That is what we had in our books and

12  records.

13      Q.    Okay.  And did you believe as the

14  CFO that the books and records accurately

15  reported the then value of the debtor's assets?

16              MS. DANDENEAU:  Objection to form.

17      A.    We didn't -- as part of this filing,

18  there was no fair value measurement or

19  anything.  These were just accounting entries

20  for the promissory notes.  There is no analysis

21  for impairment or fair market value adjustments

22  or anything of that nature.  This is purely

23  taking numbers and putting them in our form.

24      Q.    Did you do any impairment analysis

25  at any time while you were employed by
```

1                    WATERHOUSE - 10-19-21

2    Highland?

3         A.    Yes, we did do impairment analysis

4    on -- on assets.

5         Q.    Okay.  Did you ever do an impairment

6    analysis on any of the promissory notes that

7    were given to Highland by any of the affiliates

8    or Mr. Dondero?

9         A.    Not that I recall.

10        Q.    Under what circumstances do you

11   prepare impairment analyses?

12        A.    As -- as -- if you're preparing

13   financials in accordance with GAAP, generally

14   accepted accounting principles, if you're

15   preparing full GAAP financials, you should be

16   preparing -- you should be undergoing on a

17   periodic basis any fair market value

18   adjustments to assets.

19              As I was instructed at the time of

20   the petition date, we weren't producing GAAP

21   financials.  So this wasn't something I was

22   worried about nor concerned about.

23        Q.    Okay.  Were NexPoint and HCMFA and

24   Highland's audited financial statements

25   prepared in accordance with GAAP?

```
1                    WATERHOUSE - 10-19-21

2         A.    The audited financials -- yes,

3    audited financial statements are prepared in

4    accordance with GAAP.

5         Q.    Do you recall whether any of

6    Highland or HCMFA or NexPoint ever made a fair

7    market value adjustment to any of the notes

8    issued by any of the affiliates or Mr. Dondero

9    to Highland?

10        A.    I do not recall that happening, but

11   the -- it is because under -- under GAAP,

12   the -- the treatment of liabilities is

13   different than assets.

14        Q.    Okay.  So then let's just focus on

15   Highland's audited financial statements.

16              The last audited financial

17   statements were for the period ending December

18   31st, 2018; correct?

19        A.    That is my understanding.

20        Q.    And you had -- you had an obligation

21   to disclose anything to PricewaterhouseCoopers

22   concerning any subsequent events between the

23   end of 2018 and June 3rd, 2019; correct?

24              MS. DANDENEAU:  Objection to form.

25              MS. DEITSCH-PEREZ:  Form.
```

1                WATERHOUSE - 10-19-21

2        A.     Correct.

3        Q.     Okay.  To the best of your

4   knowledge, as Highland's CFO, did Highland ever

5   make any fair market value adjustments to any

6   of the promissory notes that were carried on

7   its balance sheet and that were issued by any

8   of the affiliates or Mr. Dondero?

9        A.     I think I answered that question

10  earlier.  I don't recall doing that for any of

11  the -- those -- those notes.  So it would have

12  included the audit for the -- for the 2018

13  period.

14       Q.     Okay.

15             MR. MORRIS:  Can we go to the next

16       page.

17       Q.     Do you see this is a note a list of

18  notes receivable?  Do you see that?

19       A.     Yes, I do.

20       Q.     And do you see that this ties into

21  the page that we were just looking?

22       A.     I'm sorry, can we go back to the

23  prior page?  I mean, it was at 150,331,222.  It

24  was on the prior page.  Next page.  Yes, it

25  agrees.

1              WATERHOUSE - 10-19-21

2      Q.    Okay.  So now let's look at that

3  schedule.  So this was the face amount of all

4  of the promissory notes that Highland held at

5  the time this document was filed with the

6  bankruptcy court; right?

7      A.    Yes.

8      Q.    There is a footnote there that says,

9  doubtful or uncollectible accounts are

10  evaluated at year-end.

11            Do you see that?

12      A.    I do.

13      Q.    Okay.  And is it fair to say that as

14  of the year-end 2018, the year before this,

15  that to the extent any of these notes were

16  outstanding at that time, they weren't deemed

17  to be doubtful or uncollectible?

18      A.    Yeah.  For the 2018 audit, there

19  weren't any -- there weren't any adjustments to

20  fair value.

21      Q.    Okay.  And during the bankruptcy, do

22  you recall that Highland subsequently reserved

23  for the Hunter Mountain Investment Trust note?

24      A.    Yes.

25      Q.    Why did Highland -- were you

1        WATERHOUSE - 10-19-21

2   involved in the decision to reserve the Hunter

3   Mountain Investment Trust note?

4        A.    I was not.

5        Q.    Do you know why Highland decided to

6   reserve for the Hunter Mountain Investment

7   Trust note?

8        A.    I don't know yet decision was made.

9   I believe it was made by someone at DSI.

10       Q.    Okay.  I'm just asking if you know

11  why.

12             Did you ever ask anyone why they

13  reserved for that particular note?

14       A.    I don't recall.

15       Q.    Do you know whether the debtor

16  reserved for any other note on this list during

17  the bankruptcy?

18       A.    Again, I don't recall.  I wasn't

19  part of any process of -- again, like any fair

20  value adjustments or anything to that degree.

21  Like I said, a lot of that was done by DSI and

22  it was kind of out of our court.

23       Q.    Okay.  Do you know if any note

24  receivable on this list was ever deemed by the

25  debtor to be doubtful or uncollectible?

1              WATERHOUSE - 10-19-21

2        A.    I don't -- I don't have a

3   recollection of every filing, so I don't know.

4        Q.    Did you ever have a discussion with

5   anybody at any time about whether any of the

6   notes receivable on this list should be deemed

7   to be doubtful or uncollectible?

8        A.    No.  As I previously stated, we were

9   told we didn't have to keep GAAP financials.

10  We weren't having -- you know, there is no

11  underlying audits being performed, so I mean,

12  it wasn't something I worried about.

13            MR. MORRIS:  I move to strike.

14        Q.    Did you ever have a conversation

15  with anybody about any of the notes receivable

16  and whether they should be deemed to be

17  doubtful or uncollectible?  Did you have the

18  conversation, yes or no?

19            MS. DANDENEAU:  Objection to form.

20        A.    I don't recall.

21        Q.    Do you recall ever telling anybody

22  that you believed any of the notes receivable

23  on this list should be doubtful -- should be

24  deemed to be doubtful or uncollectible?

25            MS. DANDENEAU:  Objection to form.

1          WATERHOUSE - 10-19-21

2       A.    I don't recall.  I mean, it may have

3   happened, you know, again, when we initially

4   getting DSI up to speed and going through

5   financials, it may have happened, but I don't

6   recall specifically.

7       Q.    While you were the CFO of Highland

8   during the time that the company was in

9   bankruptcy, did you have any reason to believe

10  that any of the notes receivable on this list

11  other than Hunter Mountain Investment Trust

12  should have been characterized as doubtful or

13  uncollectible?

14          MS. DANDENEAU:  Objection to form.

15          MS. DEITSCH-PEREZ:  Form.

16      A.    I didn't know.  I didn't form an

17  opinion.  Bankruptcy was new to me.  It still

18  is new to me, even after going through this.

19  So I really didn't know what to expect nor

20  really -- you know, I didn't know.

21          MR. MORRIS:  I move to strike.

22      Q.    During the period of Highland's

23  bankruptcy when you were serving as CFO, did

24  you have any reason to believe any of the notes

25  on this list were doubtful or uncollectible?

1           WATERHOUSE - 10-19-21

2           MS. DEITSCH-PEREZ:  This is like the

3      fifth time you've asked it.  Object to the

4      form.

5           MR. MORRIS:  I'm moving to strike,

6      if you haven't noticed, because he's not

7      answering the question.

8           MS. DEITSCH-PEREZ:  He was answering

9      the question, you just didn't like it, like

10     the answer.

11          MR. MORRIS:  Good Lord.

12     Q.     Go ahead, Mr. Waterhouse.

13     A.     Again, I don't -- we brought up a

14  myriad of issues at the start of the bankruptcy

15  case.  I don't recall if this was one of them,

16  but, again, there are a lot of things we

17  couldn't change.  Even, you know, I was told

18  status quo, blah, blah, blah, right, there is a

19  stay, you can't -- you know, I don't recall

20  specifically, but that doesn't mean it didn't

21  happen.

22          MR. MORRIS:  I move to strike.

23     Q.     During the time that Highland was in

24  bankruptcy and you served as CFO, did you have

25  any reason to believe that any of the notes

1                    WATERHOUSE - 10-19-21

2      receivable on this list were doubtful or

3      uncollectible?

4                    MS. DEITSCH-PEREZ:  Object to the

5             form.

6      A.      Potentially.

7      Q.      Did you ever tell anybody that?

8      A.      As I just stated like five times,

9      yes, we -- at the beginning after filing and we

10     were getting DSI and others up to speed, you

11     know, we had a myriad of discussions of a lot

12     of things and this was likely one of them.  I

13     don't -- but I don't recall specifically we

14     talked --

15     Q.      I don't want to know -- I don't want

16     to know what was --

17                   MS. DEITSCH-PEREZ:  Wait, wait.

18            Excuse me.  Mr. Morris, you did not let him

19            finish his answer.

20     A.      I spoke -- we had -- we were

21     bringing Fred Karesa and Brad Sharp (phonetic)

22     up to speed on all of these items, contracts,

23     and investments and going through -- we had

24     hours and hours and hours of discussion.  And

25     then not only do I have to repeat this not

1                    WATERHOUSE - 10-19-21

2    once, twice, three, four times with -- you

3    know, I mean, we -- I don't -- I don't remember

4    the sum culmination of all these discussions.

5    They all kind of blend together.

6              MR. MORRIS:   Okay.   I move to strike

7         and I will try one more time.

8         Q.    Did you ever tell anybody at DSI

9    that you believed any of the notes receivable

10   on this list were doubtful or uncollectible?

11             MS. DANDENEAU:   Object to form.

12        A.    Potentially.

13        Q.    Potentially you told them or

14   potentially they were doubtful or

15   uncollectible?

16        A.    Potentially I told them that we

17   needed to look at the value of these -- of

18   these assets.

19        Q.    Okay.   Did you -- okay.   It is

20   potential that you told them and it is

21   potentially that you didn't; right?

22             MS. DANDENEAU:   Objection to form.

23        A.    I've gone through that.   I don't

24   recall specifically.

25        Q.    So you should just -- I don't want

1              WATERHOUSE - 10-19-21

2    to tell what you to do.  Do you have --

3              MS. DANDENEAU:  Good.

4         Q.    Other than -- other than telling

5    them that they should look at the values, do

6    you have any recollection whatsoever of ever

7    having told anybody at DSI that any of the

8    notes receivable on this page were doubtful or

9    uncollectible?

10             MS. DEITSCH-PEREZ:  Object to the

11        form.

12             MS. DANDENEAU:  Objection.

13        A.    I recall having general discussions

14   about everything on our balance sheet which

15   would have included these -- these notes

16   receivable.

17        Q.    Okay.

18        A.    I don't recall specifically where

19   those discussions delved into.

20        Q.    Do you recall any discussion at all

21   on the topic of whether any of these notes on

22   this list were doubtful or uncollectible?

23             MR. AIGEN:  Mr. Morris, how on earth

24        is that question different from the

25        question that you just asked for the last

1          WATERHOUSE - 10-19-21

2    five times?  I mean, really I thought you

3    were -- (overspeak.)

4          MR. MORRIS:  Because he never

5    answered it.

6          MS. DEITSCH-PEREZ:  Are you

7    listening to him?

8          MR. MORRIS:  You know --

9          MS. DEITSCH-PEREZ:  He basically

10   said that he had a conversation with DSI

11   that went over all of this stuff and that

12   conversation could have included the notes

13   but he doesn't recall specifically.

14         What more do you want him -- to ask

15   of him?

16         MR. MORRIS:  I want him -- I would

17   love him to say -- I would like him to

18   testify to the truth, and that is he has no

19   recollection.

20         MS. DEITSCH-PEREZ:  Well, the truth

21   as you would like to see it, but -- but he

22   is testifying truthfully.  And I -- and, by

23   the way, I move to strike that comment --

24         MR. MORRIS:  Okay.

25         MS. DEITSCH-PEREZ:  -- because it

Page 253

```
1              WATERHOUSE - 10-19-21

2         suggests that he has not testified

3         truthfully.

4              MR. MORRIS:  I will ask my question

5         again.  And if at any time you want to

6         direct him not to answer, that is your

7         prerogative.

8         Q.   Mr. Waterhouse, do you have any

9    recollection at all of ever telling anybody

10   from DSI that any of these notes were doubtful

11   or uncollectible?

12             MS. DANDENEAU:  Object to form.

13        A.   I don't remember specifically.

14        Q.   Do you remember generally that

15   specific topic?

16        A.   We generally talked about assets,

17   values.  If -- we had discussions of that and

18   collectability in nature.  I mean, of Highland,

19   the funds, the CLOs, the entire complex.  We

20   had discussions like that, which is, you know,

21   as you look at a billion dollar consolidated

22   balance sheet.

23             So I generally remember -- this is

24   billions of dollars, including these assets --

25   having discussions of this -- of this type.
```

1            WATERHOUSE - 10-19-21

2       Q.    Do you believe that an affiliate

3  loan on this list was doubtful or

4  uncollectible?  Would you have told that to

5  DSI?

6            MS. DANDENEAU:  Objection to form.

7            MS. DEITSCH-PEREZ:  Object to form.

8       A.    If we had, like -- again, if we --

9  if -- if we weren't preparing financial

10  statements in accordance with GAAP, and -- you

11  know, if DSI at that point -- they were --

12  again, I was new to bankruptcy.

13            The CRO is -- we are delegating

14  everything to the CRO.  All the decisionmaking.

15  Remember -- remember when you and I went into

16  Delaware Court and we were saying DSI basically

17  does everything, remember this, Mr. Morris?

18            You were my counsel at the time, and

19  basically we're running everything through DSI.

20  That was what this was like in the early part.

21            Everything was communicated through

22  DSI.  So DSI says this.  DSI says that.  That

23  is what we're doing, and we're pointing out

24  things to them.

25            Now, they decide what direction this

1                 WATERHOUSE - 10-19-21

2    goes.

3         Q.    Did you point out that any of

4    these --

5         A.    I don't recall specifically.

6         Q.    Okay.  At any time that you served

7    as Highland's CFO, did you ever point out to

8    DSI that any of these loans were doubtful or

9    uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12              MS. DANDENEAU:  Objection.

13        A.    If you're asking me if I had a

14   conversation with DSI, if any of these loans

15   were doubtful or uncollectible, I don't recall

16   specifically.

17        Q.    Do you recall that the debtor filed

18   on the docket monthly operating reports?

19        A.    Yes.

20        Q.    You prepared those personally,

21   didn't you?

22              MS. DEITSCH-PEREZ:  Objection to

23         form.

24        A.    I didn't personally prepare them,

25   the team did with DSI.

1              WATERHOUSE - 10-19-21

2      Q.    But you signed them; correct?

3      A.    My signature is on the MORs.

4      Q.    And you signed them as the preparer

5  of the document; correct?

6      A.    Yes, I did this pursuant to DSI's

7  instructions.

8      Q.    Okay.  You wouldn't have signed the

9  document if you didn't believe it to be

10  accurate; correct?

11      A.    If I had reason to believe it

12  wasn't, presumably I wouldn't have signed it.

13      Q.    Okay.  And do you have any reason to

14  believe right now that any monthly operating

15  report that has your signature on it was

16  inaccurate in any way?

17              MS. DEITSCH-PEREZ:  Object to the

18       form.

19      A.    My understanding of the monthly

20  operating reports is we were filing them in

21  accordance with the standards set by the Court.

22  It wasn't -- you know, again, I don't -- you

23  know, it wasn't GAAP.  It wasn't these other

24  standards, so I testified I didn't have

25  experience in this.  The CRO was running the

1          WATERHOUSE - 10-19-21

2    show.  I followed their advice.

3         Q.    But you assured yourself that

4    everything in the report was accurate before

5    you signed them; correct?

6              MS. DANDENEAU:  Objection to form.

7         A.    I trusted the guidance from the CRO

8    and their team and their experience and their

9    guidance for doing this for many, many, many

10   years to -- to -- to categorize and put things

11   in ways on the form.

12             You know, my team had -- had not

13   filled out these forms before and needed all of

14   this guidance.  I'm not an expert in this.  I

15   have oversight of it.  I signed the form.  DSI

16   told me to.

17        Q.    And you and your team are the source

18   of the information that DSI used to create the

19   reports; correct?

20             MS. DANDENEAU:  Objection to form.

21        A.    The books and records reside with

22   the -- with -- with the corporate accounting

23   team.

24        Q.    Okay.  And the corporate accounting

25   team was the corporate accounting team that was

```
1                    WATERHOUSE - 10-19-21
2    under your direction; correct?
3         A.    Yes.
4         Q.    So -- so your team was responsible
5    for maintaining Highland's books and records;
6    correct?
7         A.    I'm sorry, my team was responsible?
8         Q.    Correct.
9         A.    Yes.  They -- they -- they were
10   the -- the -- the general ledger of Highland,
11   that responsibility was with the corporate
12   accounting team.
13        Q.    The corporate accounting group
14   reported to you; correct?
15        A.    Yes.
16              MR. MORRIS:  Can we put up 41,
17        please.
18              (Exhibit 41 marked.)
19        Q.    All right.  You will see that this
20   is a report that is dated January 31st, 2020,
21   but it is for the month ending December 2019.
22              Do you see that?
23        A.    I do.
24        Q.    And you signed this report in your
25   capacity as the chief financial officer of
```

1              WATERHOUSE - 10-19-21

2    Highland; correct?

3         A.    Yes.

4         Q.    And you're the preparer -- you're

5    identified as the preparer of the report;

6    correct?

7         A.    That is correct.

8         Q.    Do you recall participating in the

9    preparation of monthly operating reports?

10        A.    As I testified earlier, it was put

11   together, you know, with the team.  The team

12   worked with DSI to put these monthly operating

13   reports together.  We had no experience at this

14   time of the monthly operating reports or things

15   of this nature.

16             MR. MORRIS:  Can you turn to the

17        next page, please.

18        Q.    Do you see a line item under assets

19   due from affiliates?

20        A.    Yes, I do.

21        Q.    Okay.  And to the best of your

22   knowledge and understanding, as the person who

23   is identified as the preparer of this report,

24   does that line item include the affiliate loans

25   that we've been talking about?

1          WATERHOUSE - 10-19-21

2      A.    Again, I would have to see, just

3  like we did with the financial statements of

4  Highland and NexPoint, I would have to see a

5  detailed build, but, you know, if you look at

6  the other line items, you know, the only other

7  place it could be would be in -- in other

8  assets.

9      Q.    Okay.  And as a matter of

10 arithmetic, is it fair to say that is the value

11 of the assets due from affiliates was more than

12 25 percent of the value of Highland's total

13 assets as of 12/31/2019?

14          MS. DANDENEAU:  Objection to form.

15     A.    I'm really not doing the mental math

16 right now, so I've been going at this depo for

17 hours, so I'm really not -- you know --

18     Q.    All right.  No problem.

19     A.    -- these are millions of dollars.

20     Q.    Let's look at the Footnote 1,

21 please.  Do you see there is a reference to the

22 Hunter Mountain note?

23     A.    Yes, I see that in Footnote 1.

24     Q.    Okay.  And that's the reserve that

25 was taken against that note?

1               WATERHOUSE - 10-19-21

2       A.    Yes, that is what this indicates.

3       Q.    Okay.  And were you aware that the

4   reserve was being taken on that it was?

5       A.    I was -- I was aware, yeah, at some

6   point, yes.

7       Q.    Okay.  And are you aware of any

8   reserve being taken with respect to any other

9   note that was issued in favor of Highland?

10       A.    Again, as I testified, we didn't go

11   through an analysis on -- on -- on the other

12   notes.

13       Q.    Can we turn --

14       A.    I believe -- I believe it says that

15   in Footnote 1, fair value has not been

16   determined with respect to any of the notes.

17              So this footnote -- footnotes, look,

18   there has been no determination.

19       Q.    Okay.  The determination was made in

20   the audited financial statements just six

21   months earlier; right?  We saw that earlier?

22       A.    That was as of 12/31/18.  I mean,

23   things -- circumstances -- there's a bank --

24   circumstances change, things change -- things

25   change over time, you know, facts and

```
 1                 WATERHOUSE - 10-19-21

 2    circumstances change.  Again, you have to do an

 3    analysis.

 4         Q.    Okay.  And you do recall that in

 5    Highland's 2018 financial statement, all of the

 6    notes issued by affiliates and Mr. Dondero that

 7    were due at year-end had a fair value equal to

 8    the carrying value; correct?  We looked at

 9    that?

10         A.    Yes.  That was in the -- in the

11    disclosure for the -- for the affiliate notes,

12    yes.

13         Q.    And -- and you were obligated to

14    share with PwC any subsequent events between

15    the end of 2018 and the date that you signed

16    your management representation letter on June

17    3rd, 2019; correct?

18              MS. DEITSCH-PEREZ:  Object to the

19         form.

20         A.    Yes.  I -- I -- I signed the

21    management, you know, my signature is in the

22    management representation letter -- I hope I'm

23    answering your question -- that is dated in

24    June with the representations made in that

25    management representation letter.
```

1          WATERHOUSE - 10-19-21

2     Q.    Okay.  And there was nothing that

3  caused PricewaterhouseCoopers to include in

4  subsequent events any adjustment to the

5  conclusion that the fair value of the affiliate

6  notes and the notes issued by Mr. Dondero

7  equaled the carrying value; correct?

8          MS. DANDENEAU:  Objection to the

9     form.

10    A.    That is correct.  That is what was

11 in the -- in the -- in the footnotes.

12    Q.    Okay.  So are you aware of anything

13 that occurred between June 3rd, 2019 and

14 December 31st, 2019 that would have caused the

15 fair value of the notes to differ from the

16 carrying value?

17    A.    Yeah.  Highland filed for

18 bankruptcy, things changed -- I mean, there was

19 a bankruptcy filed in October of -- of -- of

20 2019, right, the petition date that we've

21 described earlier.

22          I mean, I had a -- I guess looking

23 back naively, I thought we were going to get an

24 audit from PwC for year-ended 2019, and when we

25 had discussions with PwC, they were like, are

1                    WATERHOUSE - 10-19-21

2    you crazy, we're not auditing this.  Values

3    change, all these things change, bankruptcy

4    changes the entire scenario.  I mean -- and

5    they're like, we're not -- we're not touching

6    this.

7                    And so, you know, I was like, okay,

8    sorry, I get it, okay, no an audit.

9                    I mean, it is -- you know, and --

10   you know, and we weren't preparing GAAP

11   financial statements.

12                   Again, I didn't know what we were

13   doing in relation to our financial statements,

14   but these were the discussions I was having at

15   the time.  And yeah, I mean, filing bankruptcy

16   from what I got from outside auditors and

17   others involved changed things dramatically.

18        Q.    Okay.  Highland wasn't the obligor

19   under any of the notes that we're talking

20   about; correct?

21        A.    No.

22        Q.    So --

23        A.    That's right.

24        Q.    So can you identify any fact that

25   would cause the fair value to deviate from the

1                    WATERHOUSE - 10-19-21

2    carrying value during the seven-month period

3    between June 3rd and the end of the year, 2019?

4              MS. DANDENEAU:  Objection to form.

5        A.    No.  I mean, I'm putting myself back

6    at that time, right.  Hindsight is 2020, but we

7    didn't do an analysis, but we would have done a

8    fulsome analysis and looked at all of the facts

9    and circumstances at the time, but asset values

10   change.  You know, there could have been a

11   market crash in hindsight in 2020, which --

12   which affected entities' abilities.

13             There could have been all of these

14   things, right, that -- that happen.  It is --

15   it is easy to look back in hindsight, but when

16   you are looking at this in -- in realtime, the

17   analysis is different, and again, we didn't do

18   an analysis.

19       Q.    Okay.  You didn't do an analysis.

20             Do I have that right?

21       A.    I don't -- I don't recall doing one

22   or maybe -- you know, I don't recall doing one.

23             MR. MORRIS:  Okay.  I'm going to

24        take a break.  I may be done, so the time

25        now is -- is 4:30 your time.  Let's just

1               WATERHOUSE - 10-19-21

2       take a short break until 4:40 your time.

3               MS. DANDENEAU:  Okay.

4               VIDEOGRAPHER:  We're going off the

5       record, 4:31 p.m.

6       (Recess taken 4:31 p.m. to 4:43 p.m.)

7               VIDEOGRAPHER:  We are back on the

8       record at 4:43 p.m.

9               MR. MORRIS:  I have no further

10      questions.

11              MR. RUKAVINA:  Okay.

12      Mr. Waterhouse, I will go next.

13                      EXAMINATION

14  BY MR. RUKAVINA:

15      Q.   Sir, my name is Davor Rukavina.  I'm

16  the lawyer for --

17              MR. MORRIS:  Hey, Davor, just before

18      you begin, I just want to put on the record

19      Highland's objection to documents that were

20      produced to me 10 minutes before the

21      deposition began.

22              MR. RUKAVINA:  What the basis of

23      your objection?

24              MR. MORRIS:  That they were due

25      quite some time ago, and the fact that you

1          WATERHOUSE - 10-19-21

2          had -- I just think it's appropriate to --

3          to dump documents on somebody 10 minutes

4          before the deposition.  I just think

5          that's --

6               MR. RUKAVINA:  Well, these are

7          documents Highland produced.  I'm not aware

8          of any rule I have to give you advance

9          documents when I know for the record that

10         other than the exhibits that you sent to us

11         last week, most of the exhibits you used

12         today you did not provide to me prior to

13         this deposition.

14              MR. MORRIS:  No, but the documents

15         were produced by me in -- in litigation,

16         right?

17              MR. RUKAVINA:  I'm going to use

18         primarily, John, the documents that you

19         produced to me today, but you may.

20              MR. MORRIS:  Primarily.  I've got --

21         I've got my objection.  You have got your

22         response.  Proceed.

23         Q.    Mr. Waterhouse, again, I represent

24    the advisors, HCMFA and NexPoint Advisors.

25              Do you understand that?

```
1              WATERHOUSE - 10-19-21

2       A.    Yes.

3       Q.    You and I have never met or talked

4  before today, have we?

5       A.    No, I have -- I have heard your

6  voice on calls before.

7       Q.    Okay.

8             MR. RUKAVINA:  Madam Court Reporter,

9        I will use a few exhibits today.  My

10       associate, Mr. Nguyen, will find some way

11       to get them to you.  I don't know how to do

12       that, but it looks like you guys do.

13             I am going to use numbers as well.

14       But to differentiate them from Mr. Morris

15       we're going to mark mine with the prefix A

16       for advisors.

17             Do you understand?

18             COURT REPORTER:  Yes.

19             MR. RUKAVINA:  Okay.  Perfect.

20       Q.    Okay.  So, Mr. Waterhouse, let's

21  start with those two HCMFA notes that you were

22  asked about, one for 5 million and one for

23  2.4 million.

24             Do you recall those notes?

25       A.    Yes.
```

1                WATERHOUSE - 10-19-21

2       Q.     Were you ever the CFO of HCMFA?

3       A.     I don't recall.

4       Q.     So to the best of your recollection,

5  you were still an officer of HCMFA in 2019,

6  just that your title was treasurer?

7              MR. MORRIS:  Object to the form of

8         the question.  There is no leading here.

9         He works for your client.

10             MS. DANDENEAU:  That is not -- that

11        is not true.

12             MR. MORRIS:  He's the treasurer --

13        he is the treasurer of your client.  I

14        don't -- I'm going to object every time you

15        try to lead, so...

16             MR. RUKAVINA:  Totally fine to

17        object.

18             MR. MORRIS:  Okay.

19      Q.     Please answer my question,

20  Mr. Waterhouse.

21      A.     I'm sorry, could you repeat?  There

22  was...

23      Q.     Yes.  You were -- you testified

24  earlier that in 2019 you were an officer of

25  HCMFA; correct?

1          WATERHOUSE - 10-19-21

2     A.    Yes, I testified that I was the

3  treasurer and I didn't know if that incumbency

4  certificate, you know, was one that appointed

5  me as a treasurer, but yes.

6     Q.    I'm just trying to confirm that

7  sitting here today, to the best of your

8  recollection, at that time you were -- your

9  title was treasurer.  It was not chief

10 financial officer.

11    A.    I don't recall that being my title.

12    Q.    Okay.  And in May of 2019, however,

13 I think you testified you were the chief

14 financial officer of the debtor; correct?

15         MR. MORRIS:  Objection to the form

16    of the question.

17    A.    Yes, I was -- yes.

18    Q.    Okay.  As such, in May of 2019, did

19 you have the authority, to your understanding,

20 to unilaterally loan $5 million or $2.4 million

21 to anyone on behalf of the debtor?

22         MR. MORRIS:  Objection to the form

23    of the question.

24    A.    Sorry, can you repeat that?

25    Q.    Yes.  So in your capacity as the

1        WATERHOUSE - 10-19-21

2   chief financial officer of the debtor, Highland

3   Capital Management, L.P., in May of 2019, did

4   you believe that you unilaterally, just Frank

5   Waterhouse, had the authority to loan on behalf

6   of the debtor to anyone $5 million and

7   $2.4 million?

8             MR. MORRIS:  Objection to the form

9        of the question.

10  A.    No.

11  Q.    Is it because loans of that amount

12  would have had to be approved by someone else?

13  A.    Yes.

14  Q.    Who in '20 -- in May of 2019, if

15  Highland wanted to loan 5 million or

16  $2.4 million to someone, what would have been

17  the internal approval procedure?

18            MR. MORRIS:  Objection to the form

19       of the question.

20  A.    If -- if we had loans of that nature

21  that needed to be made due to their size, we

22  would have gotten approval from the -- the

23  president of Highland.

24  Q.    And who that was individual?

25  A.    It was James Dondero.

```
 1                  WATERHOUSE - 10-19-21
 2       Q.    Okay.  Now, I'm going to ask you a
 3   similar question but for a different entity.
 4             In May of 2019, as the treasurer of
 5   HCMFA, did you believe that you unilaterally
 6   had the ability to cause HCMFA to become the
 7   borrower of a $5 million loan and a
 8   $2.4 million loan?
 9             MR. MORRIS:  Objection to the form
10        of the question.
11       A.    No.
12       Q.    What would -- what would the
13   approval have taken place -- strike that.
14             What would the approval process have
15   been like in May of 2019 at HCMFA for HCMFA to
16   take out a $7.4 million loan?
17             MR. MORRIS:  Objection to the form
18        of the question.
19       A.    The process would have been similar
20   to what we just discussed on -- for Highland to
21   make a loan to others.  So, again, you know,
22   we -- we would have -- either myself or someone
23   on the team would have discussed this with
24   the -- the president and owner of -- of HCMFA.
25       Q.    And who was that individual?
```

1              WATERHOUSE - 10-19-21

2        A.    That was James -- Jim Dondero.

3        Q.    So do I understand that in May of

4    2019, on behalf of both the lender, Highland,

5    and the borrower, HCMFA, Mr. Dondero would have

6    had to approve $7.4 million in loans?

7              MR. MORRIS:  Objection to the form

8         of the question.

9        A.    Yes.

10       Q.    You mentioned when Mr. Morris was

11   asking you the NAV error, N-A-V error, with

12   respect to TerreStar, without writing us a

13   novel, unless you feel like you have to, can

14   you summarize what that NAV error was?  What

15   happened?

16       A.    There was a -- in the Highland

17   Global Allocation Fund, it owned at the time an

18   equity interest in a company called TerreStar.

19   And TerreStar is -- at the time was a private

20   company, and it may still be today.  Again, I'm

21   putting myself back then as a private company.

22             We had -- sorry, I don't mean we --

23   the fund and the advisor used Houlihan Lokey

24   to -- to value that investment.  And during

25   that time there was some trades that were

1                    WATERHOUSE - 10-19-21

2    executed at market levels that were much lower

3    than the Houlihan Lokey model.

4                    And based on information and

5    discussions with the portfolio managers and,

6    you know, principals that were very familiar

7    with TerreStar, it was determined that those

8    trades were non-orderly and they were not

9    considered in the valuation as consulted with

10   Houlihan Lokey and PricewaterhouseCoopers at

11   the time.

12                   Subsequent to a -- I can't remember

13   the exact circumstances of why the SEC got

14   involved.  I think it was due to this -- this

15   investment became a material position in the

16   fund.  It triggered an SEC, kind of, inquiry.

17   And as part of that inquiry, they questioned

18   the valuation methodology.  "They" meaning the

19   SEC.

20                   And at the culmination of that

21   process -- this is all summarized -- the value

22   that was -- that ultimately had to be used in

23   the fund's NAV was different than -- materially

24   different than what the original valuation at

25   Houlihan Lokey provided.

1                    WATERHOUSE - 10-19-21

2              And given that there was this fund

3    was, as we discussed -- I don't know if we

4    discussed it, but it was an open-ended fund

5    that was going -- that was converting to a

6    close-end fund.

7              Due to the fact that it was an

8    open-ended fund, you had to recalculate NAV and

9    see what the impact was on people -- on

10   investors coming in and out of the fund and if

11   there is a detrimental impact and to calculate

12   what that -- what that impact was and if there

13   was any amounts owed to the fund pursuant to

14   the error.

15       Q.    Were you personally involved

16   internally at either Highland or HCMFA with

17   these investigations and discussions with the

18   SEC?

19       A.    I was.

20       Q.    Which other key people or senior

21   people at Highland were involved, to your

22   recollection?

23       A.    Myself, Thomas Surgent, David Klos,

24   Lauren Thedford, Jason Post.

25       Q.    Mr. Dondero, was he --

1        WATERHOUSE - 10-19-21

2        A.    I believe Cliff Stoops.  I'm trying

3   to think.  And maybe that is -- that is -- that

4   is -- that is all kind I can recall at the

5   moment.

6        Q.    Do you recall whether it was

7   determined that the fund suffered losses as a

8   result of this error?

9        A.    The -- the fund -- the -- the --

10  because the open-ended nature of the fund,

11  there were losses that were attributable to

12  investors.  Meaning they -- they would have

13  redeemed and got a less money or -- or they

14  subscribed in and maybe because they didn't get

15  enough shares and then they later sold and then

16  they were harmed in that fashion.

17             And there is -- there is -- there

18  were very -- there were very detailed

19  calculations and, you know, all these different

20  scenarios that we had to -- I'm sorry, I keep

21  saying "we" -- that the individuals involved

22  had to calculate and quantify.

23       Q.    Well, do you recall whether HCMFA

24  admitted certain fault and liability for this

25  error?

1               WATERHOUSE - 10-19-21

2     A.    I don't recall specifically.

3     Q.    Do you recall whether HCMFA caused

4  any funds to be paid to the investors and the

5  fund the subject of the NAV error?

6     A.    Yes.

7     Q.    Do you recall the approximate amount

8  of funds, moneys paid to the investors and the

9  fund?

10    A.    It was -- it was approximately

11  $7 million.

12    Q.    If I was to suggest 7.8 million,

13  would that ring more true or are you sticking

14  with your original answer?

15    A.    It was -- it was approximately 7 --

16  7 to $8 million.  Again, I don't remember the

17  exact number, but it was in that ballpark.

18    Q.    So regardless of whether HCMFA

19  accepted fault or liability, it caused some

20  $7 million or more to be paid out to affected

21  investors in the fund?

22          MR. MORRIS:  Objection to the form

23     of the question.

24    A.    And I want to make sure I'm

25  understanding your question because there is a

1          WATERHOUSE - 10-19-21

2  lot of different entities that are going on to

3  my head.

4          I think what you are saying is based

5  on this error, shareholders were harmed by this

6  approximately $7.8 million -- by approximately

7  $7.8 million.  Is that what you are asking?

8     Q.    Yes, sir.

9     A.    Yes, that was -- again, I don't have

10  the exact numbers.  If I take -- it was -- it

11  was in that ballpark, and there is a detail

12  calculation and write-up that could, that --

13  that exists someplace.

14     Q.    Now, at that time, at the time that

15  the NAV error occurred, was there a contract in

16  place between HCMFA and the debtor pursuant to

17  which the debtor was providing services to

18  HCMFA?

19          MR. MORRIS:  Objection to the form

20     of the question.

21     A.    Yes.

22     Q.    Was that contract generally called a

23  shared services agreement?

24     A.    It was generally called that, but

25  there were -- there were -- I mean, it -- it --

1                    WATERHOUSE - 10-19-21

2      it depends on who you talk to, but yes,

3      generally, there were -- there are multiple

4      agreements.

5           Q.    Pursuant to one or more of those

6      agreements, was the debtor providing certain

7      services to HCMFA?

8                MR. MORRIS:  Objection to the form

9           of the question.

10          A.    Yes.

11          Q.    And can you at a very high level

12     summarize in 2018 and 2019 what those services

13     were?

14          A.    Yes, there was a -- yes.

15          Q.    Okay.  Please -- please go -- go

16     through a short summary.

17          A.    There was a -- a cost reimbursement

18     agreement between Highland Capital Management

19     Fund Advisors and Highland Capital Management,

20     L.P.  That agreement was for what we referred

21     to as front office services, so investment

22     management, things of that nature.

23               There was I think what most people

24     refer to as the shared services agreement that

25     was -- that agreement was between Highland

1          WATERHOUSE - 10-19-21

2     Capital Management Fund Advisors and Highland

3     Capital Management for back office services.

4          Q.    And can you summarize what you mean

5     by back office services?

6          A.    Those services were for accounting,

7     finance, tax, valuation, HR, IT, you know,

8     legal compliance, things of -- things of those

9     nature -- or things of that nature, excuse me.

10         Q.    So in the spring of 2019, do you

11    recall whether HCMFA took the position that it

12    was actually Highland that caused the NAV error

13    to occur pursuant to the valuation services

14    that Highland was providing?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    I do not recall.

18         Q.    Did you ever have any discussions

19    with anyone, Jim Dondero or anyone in the first

20    half of 2019 as to whether Highland, the

21    debtor, that is, had any liability to HCMFA

22    related to the NAV error?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I do not recall.

1              WATERHOUSE - 10-19-21

2       Q.      And then you mentioned that the fund

3    was being closed and some compensation related

4    to that.  Can you -- can you elaborate?  What

5    were you referring to?

6       A.      Right.  So the advisor, pursuant to

7    board approval, put a proposal in front of the

8    shareholders of the Highland Global Allocation

9    Fund to convert it from an open-ended fund to a

10   closed-end fund.

11              So an open-ended fund, when

12   shareholders subscribe to the fund or redeem

13   into the fund, they do it at NAV.

14              When it is -- when you have a

15   closed-end fund, closed-end funds are -- are

16   publicly-traded, like on the New York Stock

17   Exchange, exchanges like that, and -- and

18   shareholders or investors, they're not --

19   they're -- they're not subscribing and

20   redeeming with the fund.  They are like shares

21   of Apple.

22              Those shares of the Highland Global

23   Allocation Fund trade on an exchange, and that

24   is how you, you know, that is how, you know,

25   you become an equity owner in the fund or you

```
1                    WATERHOUSE - 10-19-21

2    sell your shares and you are no longer an

3    equity owner.

4              As part of that proposal, the

5    advisor told shareholders if you -- if you vote

6    for this proposal to -- to convert it from an

7    open-ended fund to a closed-end fund, we will

8    pay you some amounts of money.  I forgot -- a

9    certain number of points.  I think it was

10   like -- it was like two to three points or

11   something -- something like that.

12        Q.    Okay.  You mentioned when Mr. Morris

13   was asking you, going back to those two

14   promissory notes, you will recall the 5 million

15   and 2.4 million, you mentioned something to the

16   effect that Mr. Dondero told -- told you to pay

17   some moneys out of Highland.  Do you remember

18   that discussion with Mr. Morris?

19        A.    I do.

20        Q.    So, to the best of your

21   recollection, did you have a discussion with

22   Mr. Dondero about making some payments in May

23   of 2019 out of Highland?

24        A.    I recall, as I testified earlier,

25   that I had a conversation with Mr. Dondero
```

1              WATERHOUSE - 10-19-21

2   for -- for these amounts attributable to -- it

3   was either the error -- you know, the error,

4   and in that conversation he said, go get the

5   money from Highland.  I believe that is what I

6   testified earlier, and that -- that is my

7   recollection.

8        Q.    Do you recall if that was an

9   in-person meeting or some other mode for the

10  meeting?

11       A.    I -- I -- I recall that being

12  in-person.

13       Q.    Do you recall if anyone else was

14  present, or was it just you and Mr. Dondero?

15       A.    I recall just he and I.

16       Q.    And the moneys that he told you to

17  find from -- or get from Highland, was that in

18  the amount of $5 million and $2.4 million?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    I believe so, but I would have to go

22  back and look and see when those moneys were

23  actually paid into the -- into the fund and,

24  you know, when those transfers were done.  If

25  they were all done around that same time, then

1            WATERHOUSE - 10-19-21

2  yes, I would say it was -- it was all related

3  to that.

4        Q.    Did Mr. Dondero tell you that those

5  funds would be a loan from Highland to HCMFA?

6        A.    I don't recall.

7            MR. MORRIS:  Objection to the form

8        of the question.

9        Q.    Now, and forgive me, I'm probably

10  the only non-American born here, but I speak

11  reasonably well in English.  I don't recall,

12  does that mean you don't remember or does that

13  mean it didn't happen?

14            MR. MORRIS:  Objection to the form

15        of the question.

16        A.    It -- it means I don't -- I don't

17  remember.

18        Q.    Did Mr. Dondero tell you to have

19  those two promissory notes prepared?

20        A.    I don't recall.

21        Q.    When you -- again, when you say, I

22  don't recall today, that means that sitting

23  here today, you just don't remember one way or

24  the other.  Is that accurate?

25        A.    Yes.

1                    WATERHOUSE - 10-19-21

2       Q.    Is it possible that you, having

3   heard what Mr. Dondero said and seeing funds

4   being transferred, assumed that that would be a

5   loan without him actually telling you that

6   would be a loan?

7            MR. MORRIS:  Objection to the form

8       of the question.

9       A.    Sorry, I want to make sure -- did I

10  ask the amounts that were transferred that I --

11  that -- that I assumed that that was a loan?

12      Q.    Well, let me -- let me take -- let

13  me try again.

14            So you have established already that

15  there were quite a number of promissory notes

16  back and forth -- I'm sorry, quite a number of

17  promissory notes with affiliated companies and

18  individuals owing Highland money; right?

19      A.    Yes.

20      Q.    And you have established that there

21  were many transactions and transfers going back

22  and forth over the years; right?

23            MS. DANDENEAU:  Objection to form.

24      A.    In -- yes, in my capacity as CFO and

25  my employment, yes, that is -- yes.

1          WATERHOUSE - 10-19-21

2     Q.    And that's part of the reason why

3  you just can't remember some of the details

4  today because this -- this happened years ago,

5  and there were a number of transactions.  Is

6  that accurate?

7          MS. DANDENEAU:  Objection to the

8     form.

9          MR. MORRIS:  Objection to the form

10     of the question.

11     A.    I mean, I deal with thousands of --

12  of -- of -- of transactions, you know, whether

13  it has -- the processing of transactions, you

14  know, if it has got, you know, more -- more

15  zeros, you know, behind it than others.

16          When you look at thousands of

17  transactions over the years for funds and

18  advisors and -- and, you know, financial

19  statements, I mean, it is -- it is very hard

20  going back in -- in -- in my -- you know,

21  14-ish year career at -- at Highland to

22  remember a lot of those details, especially

23  when I don't have any records or books or

24  anything like that, and -- and going back many

25  years.

1          WATERHOUSE - 10-19-21

2      Q.    And that is fine.  That -- that --

3  that is why I asked the question.

4          Is it possible in May of 2019 when

5  Mr. Dondero told you to transfer the funds from

6  Highland, you just assumed on your own that

7  those would be loans without him actually

8  telling you that those would be loans?

9          MR. MORRIS:  Objection to the form

10      of the question.

11     A.    I don't know.

12     Q.    I'm sorry, you --

13     A.    I said I don't know.

14     Q.    Okay.  Well, as the -- as the CFO

15  for Highland, if you saw $7.4 million going

16  out, you would feel some responsibility to

17  account for that, wouldn't you?

18          MR. MORRIS:  Objection to the form

19      of the question.

20     A.    Yes.

21     Q.    Is it fair to say that those would

22  be in the range large enough to rise up to your

23  level?

24          MR. MORRIS:  Objection to the form

25      of the question.

1            WATERHOUSE - 10-19-21

2       A.    If -- I don't know if I understand

3    your question.  Those amounts would arise to my

4    level where I would be involved or...

5       Q.    You would want to know what a

6    transfer for that amount, $7.4 million, was all

7    about, as the CFO of Highland, wouldn't you?

8            MR. MORRIS:  Objection to the form

9       of the question.

10      A.    Yes, I make it -- I mean, I -- I

11   review all sorts of payments, I mean, even

12   smaller dollar payments on a periodic basis,

13   you know, to -- to -- to understand and to make

14   sure that we are paying things in a -- you

15   know, in -- in -- in an informed way.  And, you

16   know -- and we're -- and we're paying things

17   pursuant to vendor contracts and things like

18   that.

19      Q.    So as part of that, is it possible

20   that seeing $7.4 million go out you would have

21   promissory notes made in order to keep a paper

22   trail, assuming that those were loans, when

23   perhaps they were never intended to be loans by

24   Mr. Dondero?

25            MR. MORRIS:  Objection to the form

1                    WATERHOUSE - 10-19-21

2         of the question.

3         A.    I don't know.  As I testified

4    earlier, I had conversations with Mr. Dondero

5    about -- about the -- the -- the moneys that

6    were needed for the NAV error.  And I recall

7    him saying go get it from Highland -- or get it

8    from Highland.

9         Q.    Well, why did you sign those

10   promissory notes and why didn't you have him

11   sign them?

12             MR. MORRIS:  Objection to the form

13        of the question.

14        A.    I don't know.  I don't know.

15        Q.    You mentioned earlier that you

16   typically don't sign promissory notes.  Am I

17   remembering your testimony correctly?

18             I mean, promissory notes on behalf

19   of the entities.  Not yourself, obviously.

20        A.    Yes, that is what I said earlier.

21        Q.    Do you recall any other promissory

22   notes in the million-plus range that you had

23   ever signed before on behalf of any entity?

24        A.    There is -- there has been a lot of

25   transactions over the years.  I don't -- I

```
 1              WATERHOUSE - 10-19-21

 2    don't -- I don't recall generally.  I don't --

 3    I don't recall.

 4         Q.    So -- but to the best of your

 5    recollection, it was on your initiative,

 6    following your discussion with Mr. Dondero,

 7    that you had someone draft those two promissory

 8    notes; is that correct?

 9              MR. MORRIS:  Objection to the form

10         of the question.

11         A.    Yes, we would have -- the team, as I

12    stated earlier, we don't draft promissory

13    notes.  "The team" meaning the accounting and

14    finance team.

15              So the team would have worked with

16    the legal group at Highland to draft any notes.

17         Q.    Do you believe or do you have any

18    recollection as to whether you would have done

19    that pursuant to an email or telephone call or

20    in-person meeting?

21              MR. MORRIS:  Objection to the form

22         of the question.

23         A.    Are you asking if I would have -- if

24    those notes would have been drafted pursuant to

25    an email or phone call?
```

1              WATERHOUSE - 10-19-21

2       Q.    Strike that.

3             Do you recall whether you sent an

4    email to anyone asking them to draft those two

5    promissory notes?

6       A.    I don't recall because, again,

7    once -- I would have instructed -- likely

8    instructed the team to -- to work with the

9    legal group to draft these documents.

10            I -- I -- I -- yeah, I didn't -- I

11   mean, that is more an operational-type

12   procedure.  So, you know, a manager or a

13   controller or working with legal.  You know,

14   they -- they can certainly handle that task to

15   get that -- you know, to request that from

16   legal.

17      Q.    And who on your team do you think

18   you would have asked to do that?

19            MR. MORRIS:  Objection --

20      Q.    Who would have been the logical

21   person or people, if you don't remember their

22   name today?

23            MR. MORRIS:  Objection to the form

24       of the question.

25      A.    It -- it -- there is only two

1          WATERHOUSE - 10-19-21

2    managers of the group.  That would have been

3    Dave Klos or Kristin Hendrix.

4            Dave was the -- one of his duties

5    was managing the valuation team, and so he was

6    intimately involved with this process.  So, you

7    know...

8        Q.    Okay.

9        A.    I don't recall specifically but, I

10   mean, my general -- you know, I -- I -- I

11   likely would have talked to Dave first about it

12   versus someone like Kristin who hadn't been

13   intimately involved.

14       Q.    And -- and do you have a view as to

15   whether it is most likely that you would have

16   done that by email or in-person or how would

17   you believe you would have communicated that to

18   Mr. Klos?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    I likely would have done that in

22   person.  Again, if things of this nature

23   that -- again, you have to put ourselves back

24   to, we have been working on this very stressful

25   project for many, many months.  And once the

1          WATERHOUSE - 10-19-21

2    go-ahead was to -- you know, we see the light

3    at the end of the tunnel with wrapping this up

4    and making shareholders whole -- sorry to say

5    "we" -- you know, the -- so the folks that are

6    involved in it.

7                I like to talk to people

8    face-to-face and -- and -- and go to -- and go

9    to their desk, because that shows if I'm going

10   to their desk that -- that is something that I

11   want done, you know.

12        Q.    And do you remember, Mr. Waterhouse,

13   getting those two promissory notes in paper

14   format or by email before they were executed?

15           MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall.

18        Q.    For whatever was the ordinary course

19   back then in May 2019, would you expect to have

20   received them only on paper or would you have

21   expected to have received them in Word document

22   or PDF document by email?

23           MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I -- I didn't sign -- I signed very

```
1                    WATERHOUSE - 10-19-21

2    few documents via email.  I can't say that it

3    never happened, but people either stopped by my

4    office and physically walked in documents for

5    signature that we discussed face-to-face.

6                    Or documents were -- if -- if --

7    if -- if -- let's say I wasn't there or I

8    wasn't available, documents were dropped off.

9    I had -- I had some in- and outboxes in front

10   of my -- my office there at the Crescent.

11                   Documents would be dropped off for

12   signature.  There would be a cover sheet that

13   would be -- have been applied to those

14   documents detailing, you know, who dropped it

15   off, the purpose, why, what time.

16                   And then, you know, as I stated, I

17   don't draft documents and I always go to the

18   legal group and the compliance group to make

19   sure that they're in the loop.  And there is

20   a -- a box or section that says, Has legal

21   reviewed or approved, or something to that

22   nature.

23                   Again, I don't -- I don't have

24   access to that cover sheet anymore, but it

25   was -- it was something to that effect.
```

1                    WATERHOUSE - 10-19-21

2              And my assistant, you know, if she

3     was there, she would review that -- you know,

4     whatever was being dropped off.  And if that

5     has legal, you know, reviewed or -- reviewed or

6     approved it, if that wasn't -- if that stuff

7     hadn't been done, it was like she would just

8     tell them like, go -- go -- go to the legal

9     group, because --

10       Q.    Let me -- let me pause --

11             MS. DANDENEAU:  Let him finish.

12             MR. MORRIS:  Thank you.  Go ahead.

13       A.    I take -- go to the legal group

14    because that -- that was my -- you know, I

15    didn't -- I didn't review anything that -- that

16    they weren't -- you know, or there wasn't some

17    representation made to me that they had

18    reviewed, approved in some capacity.

19             Again, my -- my -- my goal, as CFO,

20    is to provide transparency and make sure that

21    groups like compliance and other things -- and

22    the other group in legal are -- are in -- you

23    know, their -- they're made aware of

24    transactions of -- you know, that are crossing

25    my desk.

1          WATERHOUSE - 10-19-21

2          Because I'm not in every

3    conversation.  They're not in every

4    conversation -- meaning legal compliance -- and

5    I just want to make sure that -- that everyone

6    is in sync to, you know, to -- to the extent

7    possible.

8         Q.    So if we summarize, you don't

9    specifically remember signing these two notes,

10   but most likely it would have been that they

11   would have presented -- been presented to you

12   physically on paper?

13         MR. MORRIS:  Objection to the form

14      of the question.

15         A.    They would -- they would have been

16   presented physically on paper most likely or

17   someone would have left it.  But, I mean,

18   again, I don't -- I don't recall.

19         Q.    I understand.  Understand.

20         When you signed -- when you signed

21   documents, when you personally signed

22   documents, did you typically use a ink pen or

23   did you use a stamp?

24         A.    No, I -- I -- I use a -- an -- an

25   ink pen.

1          WATERHOUSE - 10-19-21

2      Q.    Do you know -- was there a file at

3  Highland kept anywhere with ink-signed

4  originals of a promissory notes in general or

5  these two promissory notes specifically?

6          MR. MORRIS:  Objection to the form

7      of the question.

8      A.    Sorry, I just want to make sure I

9  understand your question.  Are you saying is

10 there a file somewhere that has ink-signed

11 originals of these two promissory notes?

12     Q.    Yes.

13     A.    I would -- I would assume they're

14 some place.  I mean --

15     Q.    Well, was there a -- was there a

16 place where Highland generally kept originals

17 of promissory notes owed to it?

18     A.    I wouldn't -- no.

19         MR. RUKAVINA:  Mr. Nguyen, would you

20 please pull up my A7, alpha 7.

21     Q.    These are the two promissory notes,

22 Mr. Waterhouse.

23         (Exhibit A7 marked.)

24     Q.    And please -- Mr. Waterhouse, please

25 command my associate to scroll down as you need

1          WATERHOUSE - 10-19-21

2   to, but I want you to take a very close look at

3   your two signatures here and tell me whether

4   you believe, in fact, that you ink signed them

5   or whether you --

6             MS. DANDENEAU:  Mr. Rukavina,

7        Mr. Waterhouse has the copies.

8             MR. RUKAVINA:  Perfect.  Then you

9        can take this down, Mr. Nguyen.

10       A.    These -- these -- these signatures

11  are identical, now that I stare at them, and I

12  mean, they are so close -- I mean, they're

13  identical that, I mean, even with my chicken

14  scratch signature, I don't know if I can -- you

15  know, I do this 100 times, could I do that

16  as -- as precisely as I see between the two

17  notes.

18       Q.    Well, that is why I ask.

19  Mr. Waterhouse, now that you have examined

20  them, does it seem like it is more likely that

21  you actually electronically signed these?

22             MR. MORRIS:  Objection to the form

23        of the question.

24       A.    Is -- I don't -- I don't recall

25  specifically.  As I said before, my assistant

```
1              WATERHOUSE - 10-19-21

2    did have a -- an electronic signature, and that

3    was used from time to time.  It wasn't as

4    common practice back in 2019.  It definitely

5    was more common practice when we had to work

6    from home and remotely for COVID because it

7    that made it almost impossible to, right,

8    provide wet signatures since we're all working

9    from home remotely.

10        Q.    Well, going just for these two

11   promissory notes, Mr. Waterhouse, in light of

12   your inability to remember any details, are you

13   sure you actually signed either or both of

14   those notes?

15             MS. DANDENEAU:  Objection to form.

16        A.    I don't recall specifically

17   signing -- actually physically signing these

18   notes.  As I said before, I don't recall doing

19   that.  This -- this looks like my signature,

20   but yet these two signatures are identical.

21        Q.    So you don't recall physically

22   signing them, and I take it you don't recall

23   electronically signing them either?

24        A.    I don't recall.  You know, Highland

25   has all my emails.  If that occurred, you know,
```

1          WATERHOUSE - 10-19-21

2   you know, I don't have any of these records is

3   what I'm saying.  I don't have any of those

4   records.

5          Q.    That is why I'm asking you these

6   questions in great detail because I don't have

7   those emails.  I'm trying to -- I'm hoping that

8   you will give me some names or some details so

9   I can go look for more emails, but again, you

10  don't remember any -- any individual, other

11  than Mr. Dondero that we've discussed, you

12  don't remember any individual with whom you

13  discussed these promissory notes prior to their

14  execution?

15          MR. MORRIS:  Objection to the form

16      of the question.

17      A.    I don't recall discussing it with

18  anybody else.

19      Q.    Okay.

20      A.    I mean, prior --

21      Q.    I understand.

22      A.    You know, there was no one else --

23  there was no one else in that meeting that I

24  recall with Mr. Dondero.

25      Q.    Now, when you established that by

```
1              WATERHOUSE - 10-19-21

2   May of 2019 --

3        A.    And -- and from what I recall, and

4   the reason why I was by myself is -- is, you

5   know, I don't -- I don't want to speculate, I'm

6   sorry.

7        Q.    Okay.  We have established that by

8   May of 2019, in your view, the liabilities of

9   HCMFA exceeded its assets; correct?

10       A.    Yeah.  I mean, again, I don't have

11  financial statements in front of me, but I

12  think, if I recall, we'd have to go through the

13  testimony with Mr. Morris, I believe that was

14  the case.

15       Q.    In fact, you will recall that in

16  April of 2019, Mr. Dondero signed a document

17  that extended the demand feature of two prior

18  notes to May 31, 2019.  Do you recall that?

19            MS. DEITSCH-PEREZ:  I think you

20       might -- maybe have the court reporter read

21       that back.  You might have misspoke.

22            (Record read.)

23            MR. RUKAVINA:  And I did misspeak.

24       Q.    I meant to say to May 31, 2021.  Do

25  you recall that, sir?
```

1                    WATERHOUSE - 10-19-21

2            MR. MORRIS:  Objection to the form

3      of the question.

4      A.    Yes.

5            MR. RUKAVINA:  And, Mr. Nguyen, just

6      so that the record is clear, will you please

7      pull up my Exhibit Alpha 10, A10.

8            (Exhibit A10 marked.)

9      Q.    You don't have this one in front of

10     you, Mr. Waterhouse?  This is the one that

11     Mr. Morris used earlier.  Do you see that

12     document, sir?

13     A.    Yes, I do.

14     Q.    And this is what you were testifying

15     about before when Mr. Morris was asking you.

16     Do you remember that?

17     A.    Yes.

18     Q.    So here is my question for you,

19     Mr. Waterhouse:  As the chief financial officer

20     of Highland, was it prudent for Highland less

21     than three weeks later to be lending

22     $7.2 million to an insolvent entity that

23     couldn't even then pay its debts back to

24     Highland?

25            MS. DANDENEAU:  Objection to form.

1                    WATERHOUSE - 10-19-21

2                    MR. MORRIS:  Objection to the form

3          of the question.

4          A.    Sorry, I just want to make sure --

5    are you asking me, did you say, was it prudent

6    for Highland to loan $7.4 million to HCMFA a

7    few weeks after this document was executed?

8          Q.    Yes, and at a time when HCMFA's

9    liabilities exceeded its assets.

10                    MR. MORRIS:  Objection to the form

11         of the question.

12         A.    I don't -- it is odd.  I don't know.

13                    MR. RUKAVINA:  You can take this

14   exhibit down, Mr. Nguyen.

15         Q.    Do you recall asking anyone,

16   Mr. Dondero or -- or anyone outside as to

17   whether Highland ought to be lending

18   $7.4 million to HCMF regarding HCMF's

19   creditworthiness?

20                    MR. MORRIS:  Objection to the form

21         of the question.

22         A.    I don't recall.

23         Q.    Did you receive personally any of

24   that $7.4 million?

25         A.    No.

1                  WATERHOUSE - 10-19-21

2      Q.    Did you even --

3          MR. MORRIS:  I didn't hear that

4     question, sir.

5          MR. RUKAVINA:  The one that he

6     answered, John, or my new one?

7          MR. MORRIS:  No, no, your question,

8     Davor.

9          MR. RUKAVINA:  I had asked him

10    whether he received any of the

11    $7.4 million.  He said no.

12         MR. MORRIS:  Yeah.  I thought there

13    was a question after that.  Maybe I was

14    mistaken.  I apologize.

15         MR. RUKAVINA:  I had started a new

16    question, so here, let me start the new

17    question again.

18     Q.    Did you personally receive any

19  direct benefit from those two notes for

20  $7.4 million?

21     A.    No.

22     Q.    Did you ever personally consider

23  yourself obligated to repay either or both of

24  those notes?

25     A.    No.

1          WATERHOUSE - 10-19-21

2          MR. RUKAVINA:  Pull up those notes

3     again, Mr. Nguyen.

4          Q.    You can have them in front of you,

5     Exhibit 7, Mr. Waterhouse, whatever is easier

6     for you.  If you go to your signature page, my

7     question to you is, why did you not include

8     your title as treasurer by your name, Frank

9     Waterhouse?

10          MS. DANDENEAU:  Objection to form.

11          A.    I didn't -- I didn't draft this

12     document.

13          Q.    So you relied on whoever drafted it

14     to draft it correctly?

15          A.    Yes.

16          Q.    Okay.  But back then when you signed

17     this, did it ever cross your mind that you were

18     the maker on these notes?

19          A.    No.

20          Q.    Back then when you signed this

21     document, did it ever cross your mind that you

22     could be a co-obligor on these notes?

23          A.    No.  I didn't receive $7.4 million,

24     I mean...

25          Q.    But can you say that HCMFA received

1          WATERHOUSE - 10-19-21

2    $7.4 million?

3          A.    I would have to go back and look and

4    check in, you know, the -- the financial

5    records and the bank statements.

6               MR. RUKAVINA:  You can take this

7    exhibit down, Mr. Nguyen.

8          Q.    Mr. Waterhouse, I'm not trying to be

9    a smart-ass, but if the law says that because

10   of the way that you signed this promissory

11   note, if that is what the law says, that that

12   made you personally -- personally liable, then

13   you would agree with me that that was never

14   your intent?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    That was never -- I wouldn't sign a

18   note and not get consideration in return.

19        Q.    So putting all other issues aside,

20   if the law -- if the law says that you were

21   liable for those notes because of how you

22   signed them, then would you agree with me that

23   these notes are a mistake?

24              MR. MORRIS:  Objection to the form

25        of the question.

1              WATERHOUSE - 10-19-21

2              MS. DANDENEAU:  Objection to the

3         form.

4         A.    Yes.

5         Q.    So do you agree with me that it's

6    odd -- I think that is the word you used --

7    that Highland would be loaning $7.4 million a

8    few weeks after that extension to an entity

9    whose liabilities exceeded its assets, and you

10   would agree with me that it was never your

11   intention to be in any way liable for these two

12   promissory notes; correct?

13             MR. MORRIS:  Objection to the form

14        of the question.

15        A.    Sorry, you -- you asked a lot there.

16             MR. RUKAVINA:  I will strike it and

17   I will move on.

18             Let's go to -- pull up Exhibit 9,

19   please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20   9, A9.

21             (Exhibit A9 marked.)

22        Q.    Sir, take a moment to look at this,

23   but this is an email, and you will see attached

24   July 31, 2020 affiliate notes.

25             Do you see that attachment?

1              WATERHOUSE - 10-19-21

2      A.    Yes.

3      Q.    Okay.  And do you see an entry for

4   Highland Capital Management Fund Advisors?

5           MR. MORRIS:  I'm sorry, hold on.

6      Where are you looking?

7           MR. RUKAVINA:  Last page, John.

8           MR. MORRIS:  Is it the page on the

9      screen?

10          MR. RUKAVINA:  Oh, I'm sorry.

11     Mr. Nguyen just did it.  Yes, the last page

12     there.

13          MR. MORRIS:  Thank you.

14     Q.    Do you see an entry there for HCMFA?

15     A.    Yes.

16     Q.    About $10.5 million.

17          Do you see that?

18     A.    I do.

19     Q.    And, now, do you have any

20   explanation for why if HCMFA owed $7.4 million,

21   plus the 5.3 million that had been extended,

22   why that amount was only 10.5 million?

23     A.    I don't know.  Okay.

24          MR. RUKAVINA:  Close this one and

25     pull up, Mr. Nguyen, the schedules,

```
1              WATERHOUSE - 10-19-21

2       schedule of assets.  What exhibit is this

3       of ours, Mr. Nguyen?

4              MR. NGUYEN:  This is A11.

5              MR. RUKAVINA:  Oh, this will be A11.

6              (Exhibit A11 marked.)

7       Q.    You don't have this in front of you,

8    Mr. Waterhouse?

9       A.    Okay.

10      Q.    This is what Mr. Morris used

11   earlier.  Do you remember looking at this with

12   Mr. Morris?

13      A.    Yes.

14             MR. RUKAVINA:  You might have to

15      zoom in a little.  Okay.

16      Q.    Now, I see Affiliate Note A, B, and

17   C.

18             Do you have any recollection as to

19   why the names of the affiliates are omitted?

20      A.    I don't.  I testified earlier that,

21   you know, the team worked with DSI in providing

22   these.  I -- I don't -- I don't know.

23      Q.    Can we deduce -- is it logical to

24   deduce that Affiliate Note A would be NexPoint

25   given its size of $24.5 million?
```

```
1                    WATERHOUSE - 10-19-21

2               MR. MORRIS:  Objection to the form

3          of the question.

4          A.    I mean, it -- it is a -- it is -- it

5     is approximate.

6          Q.    Well, can we -- can we deduce -- or,

7     I'm sorry, strike that.

8               Can you, sitting here today,

9     logically conclude that Affiliate Note B or C

10    represents HCMFA?

11              MR. MORRIS:  Objection to the form

12         of the question.

13         A.    I don't know.  I don't know.  I

14    can't.

15         Q.    Okay.  As of the petition date, we

16    have established that HCMFA, under promissory

17    notes, owed $7.4 million and $5.3 million to

18    the debtor; correct?

19              MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Okay.  And by my reckoning, that

23    would be somewhere approaching $13 million.

24              MR. MORRIS:  Objection to the form

25         of the question.
```

1                    WATERHOUSE - 10-19-21

2        Q.    It would be $12.7 million.  Is that

3   generally correct?

4        A.    Sorry, the amounts were 7.4, 5.3.

5        Q.    Yes.

6        A.    Okay.  Yeah, that -- that -- I can

7   do that math, yes.

8        Q.    Do you have any explanation or any

9   understanding of why there is no similar entry

10  listed here on the schedule of assets filed

11  with the bankruptcy court?

12            MR. MORRIS:  Objection to the form

13       of the question.

14       A.    I don't know.  We have to look at

15  the supporting schedules, like I talked about

16  other -- presumably there is -- there is a

17  build to the schedule that would provide the

18  detail.

19       Q.    Well, that was going to be my next

20  question.  You anticipated it.

21            MR. RUKAVINA:  You can -- you can

22       take this down, Mr. Nguyen.

23       Q.    Do you believe that whenever you and

24  your team provided the underlying data to the

25  financial advisor that the actual names of the

1          WATERHOUSE - 10-19-21

2  affiliates for Affiliate Note A, B, and C would

3  have been listed there?

4      A.    Are you asking we provided the names

5  to the financial advisor?  I don't -- I don't

6  understand who the financial advisor is.

7      Q.    I'm sorry, DSI.

8          Let me ask the question this way,

9  Mr. Waterhouse.

10          Whenever you provided information

11  about the affiliate notes to DSI, do you

12  believe that you would have included the actual

13  names of the affiliates, you or your team, or

14  that you would have done the Affiliate Note A,

15  Note B, Note C?

16          MR. MORRIS:  Objection to the form

17      of the question.

18          MS. DANDENEAU:  Objection to the

19      form.

20      A.    We -- like I testified earlier, when

21  we were -- we gave everything to -- to DSI.  We

22  were giving all of our records, all of our

23  files, everything to DSI.  We weren't redacting

24  information or saying, hey, here is a note,

25  here is Affiliate Note A or B.

1              WATERHOUSE - 10-19-21

2              I mean, it was -- our job and our

3     focus -- and I testified in court back in 2019;

4     right -- was -- was to be transparent and, you

5     know, get DSI up to speed on -- on the matters

6     at Highland.  So I can't see us redacting at

7     that point.

8              MR. RUKAVINA:  Mr. Nguyen, will you

9          please pull up Mr. Morris' Exhibit 36.

10         Just the very first page, the very top

11         email.  You might zoom in a little bit.

12         Q.   Now, you recall being asked about

13    this by Mr. Morris?

14         A.   Yes, I do.

15         Q.   And you wrote:  The HCMFA note is a

16    demand note.

17              You wrote that; right?

18         A.   Yes.

19         Q.   And, in fact, weren't there by that

20    point in time several notes?

21         A.   Yes, there were.  Again, I don't --

22    I don't remember everything specifically.  I

23    mean --

24         Q.   I understand.  I understand.

25              So this is an example where -- where

1                   WATERHOUSE - 10-19-21

2    you might have made a mistake by referring to a

3    singular instead of a plural; right?

4         A.    Yes.

5         Q.    Okay.  And you -- you wrote -- a

6    couple of sentences later, you wrote:  There

7    was an agreement between HCMLP and HCMFA the

8    earliest they could demand is May 2021.

9              You wrote that; right?

10        A.    Yes.

11        Q.    But I think you -- you agreed with

12   Mr. Morris that that can't possibly apply to

13   the May 2019 notes, can it?

14             MR. MORRIS:  Objection to the form

15        of the question.  That is not what he

16        testified to.

17        Q.    Let me ask -- let me ask a different

18   question.

19             Sitting here today -- or if you can

20   answer me from your memory on October 6,

21   2020 -- did the April acknowledgment that

22   extended the maturity date apply to the

23   May 2019 notes also?

24        A.    I don't recall specifically.

25        Q.    Well, you recall that the notes that

1              WATERHOUSE - 10-19-21

2    you signed were demand notes; right?

3         A.    Yes.

4         Q.    Do you find it logical, based on

5    your experience, that had they intended to have

6    a different or a set maturity date, you would

7    have instructed that that set maturity date be

8    included instead of a demand feature?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Sorry, just want to make sure I

12   understand.  You are saying that -- that the

13   $5 million note, the $2.4 million note, if

14   those were supposed to be a term note, that I

15   would have made sure that those were a term

16   note?

17        Q.    I'm saying -- I'm saying,

18   Mr. Waterhouse, that on May the 2nd and May the

19   3rd, 2019, if you intended that those two

20   promissory notes could not be called until May

21   2021, would you have included such language in

22   those two promissory notes?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I guess -- I'm sorry, I don't recall

1                    WATERHOUSE - 10-19-21

2    putting language in those May notes.  I don't

3    remember what language you are referring to.

4         Q.    Well, let's read this again.

5              There was an agreement between HCMLP

6    and HCMFA the earliest they could demand is May

7    2021.

8              Do you recall that agreement?

9         A.    Yes, that was the agreement we

10   looked at earlier; correct?

11        Q.    Okay.  Yes.

12             Do you -- do you understand now that

13   that agreement that we looked at earlier also

14   applied to the May 2019 notes that you signed?

15        A.    I don't -- I don't know.

16        Q.    But as of October 6, 2020, you're

17   writing that there is one demand note and

18   you're categorizing that demand note as not

19   being demandable on May 2021; correct?

20        A.    Yes.

21        Q.    And you know now that you made at

22   least one mistake in this email; correct?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.    Yes.

1                    WATERHOUSE - 10-19-21

2              MR. RUKAVINA:  You can pull this

3         down, Mr. Nguyen.

4         Q.    So, Mr. Waterhouse, you don't

5    remember Mr. Dondero telling you to make these

6    loans or not.  HCMLP was loaning $7.4 million

7    to someone that their assets were less than

8    their liabilities.

9              We don't see on the July list of

10   notes, where there is $12.7 million of notes,

11   we don't see that on the bankruptcy schedules,

12   and we have this Exhibit 36 where you are

13   confused.

14             Are you prepared to tell me, sir,

15   today that you might have made a mistake in

16   executing those two promissory notes?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    I -- I don't know.

20        Q.    And if it turns out that you're

21   personally liable for those promissory notes,

22   it would certainly be a mistake, wouldn't it?

23             MS. DANDENEAU:  Objection to the

24        form.

25             MR. MORRIS:  Join.

1          WATERHOUSE - 10-19-21

2     A.    Yes.

3     Q.    If Mr. Dondero testifies that he

4  never told you to make these loans, would you

5  disagree with his testimony?

6          MR. MORRIS:  Objection to the form

7     of the question.

8     A.    Like I testified earlier with my

9  conversation with Mr. Dondero, all I recall is

10  he said, get the money from Highland.

11    Q.    And if Mr. Dondero testifies that

12  he, in consultation with other senior personnel

13  at Highland, decided that Highland needed to

14  pay HCMFA $7.4 million as compensation for the

15  NAV error and not a loan, would you have any

16  reason to disagree with Mr. Dondero?

17         MR. MORRIS:  Objection to the form

18    of the question.

19    A.    If that was -- if that was his

20  intent, yes, it would -- I would --

21    Q.    Do you have any reason to disagree

22  with him?

23         MR. MORRIS:  Objection to the form

24    of the question.

25    A.    If that was his intent, I don't

```
1                    WATERHOUSE - 10-19-21

2     know.  I don't know how I disagree with that.

3          Q.    And just to confirm, you don't

4     remember ever asking Mr. Dondero whether you

5     should have two promissory notes prepared?

6          A.    No.

7          Q.    And you don't remember discussing

8     with Mr. Dondero what the terms of those two

9     promissory notes should be?

10         A.    I don't recall -- I testified all I

11    recall is he said, get the money from Highland.

12    I don't -- the -- the terms of the note, I

13    don't recall ever having a discussion around

14    the terms of the note, but since I don't draft

15    the notes, that -- there could have been a

16    conversation with other people later.

17         Q.    Do you have any memory of whether

18    after the notes were drafted, but before you

19    signed them, that you communicated with

20    Mr. Dondero in any way to just confirm or -- or

21    get his blessing or ratification to signing

22    those notes?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I don't recall.
```

1          WATERHOUSE - 10-19-21

2     Q.     Again, the only thing you remember,

3  sitting here today, was Mr. Dondero said, get

4  the money from Highland, and that is it, that

5  is all you remember?

6          MR. MORRIS:  Objection to the form

7     of the question.

8     A.     I testified to that several times.

9  This was over two years ago.  A lot has

10  happened.  That is all I recall.

11     Q.     And help me here.  I'm not very

12  technologically astute.  When you -- and I -- I

13  recognize that you do it rarely, but when you

14  sign a document electronically, do you believe

15  that there is an electronic record of you

16  having authorized or signed a document

17  electronically?

18          MR. MORRIS:  Objection to the form

19     of the question.

20     A.     I -- I don't know the tech answer to

21  that, but, you know, since I don't have -- I

22  don't ever attach my signature block

23  electronically, my assistant would have done

24  that, and if that is done over email like we

25  did several times -- you know, multiple,

1                    WATERHOUSE - 10-19-21

2      multiple times over COVID, she would attach my

3      signature block and then email it out to

4      whatever party.

5          Q.    What was your assistant's name in

6      May 2019?

7          A.    It was Naomi Chisum.

8          Q.    Is she the only one?  I'm sorry, was

9      she your only assistant that would have maybe

10     facilitated logistically something like you

11     just described?

12         A.    You know, she was out on maternity

13     leave at some point.  I don't -- I don't recall

14     those dates where she was out for maternity

15     leave.  There was -- there were folks backing

16     her up.  I don't recall specifically who

17     those -- who those, you know, administrative

18     assistants were, and I don't recall

19     specifically if she was out during this time on

20     maternity leave.

21              I do know that that she was out for

22     a period of time, or who knows, or she could

23     have been on vacation that day or, you know, I

24     don't know.

25         Q.    Switching gears now, the two

```
1                    WATERHOUSE - 10-19-21

2      complaints that have been filed that is against

3      HCMFA and NexPoint, did you see any drafts of

4      those complaints before they were filed?

5                    MR. MORRIS:  Objection to the form

6              of the question, and to the extent that you

7              had any communications with counsel or you

8              were shown drafts of the complaints by

9              counsel while you were employed by

10             Highland, I direct you not to answer.

11      A.     I -- I reviewed documents yesterday

12     with counsel here.  I believe that is the first

13     time I have ever seen those.

14      Q.     Okay.  Did you ever discuss with

15     Mr. Seery these two lawsuits before or after

16     they were filed?

17      A.     I don't recall.

18      Q.     Were you ever interviewed by legal

19     counsel, to your knowledge, about these

20     promissory notes before the complaints were

21     filed?  Without going into what was said, were

22     you ever interviewed by legal counsel?

23                    MR. MORRIS:  Objection to the form

24             of the question.

25      A.     I don't recall.
```

1              WATERHOUSE - 10-19-21

2        Q.    Obviously with COVID, it changed,

3   but -- but before COVID, did you used to meet

4   with Mr. Seery from time to time in-person?

5        A.    Yeah, I mean, so before COVID -- so

6   we're talking kind of late March, early April,

7   right, there was about -- I don't remember the

8   specific date when the board for Highland was

9   appointed.  I believe it was around February of

10  2020, so maybe there was a month-and-a-half,

11  two-month window where we were meeting

12  in-person or, you know, like we were actually

13  in the office, excuse me, we were in the

14  office.

15             And, you know, when they were first

16  appointed, the board members and Mr. Seery

17  were -- were definitely down here more

18  in-person.

19       Q.    Did you ever see Mr. Seery taking

20  written notes of -- of his meetings with you or

21  others?

22       A.    I don't recall.

23       Q.    Do you recall on any Zoom or video

24  conference with Mr. Seery, seeing him take

25  notes, written notes?

1          WATERHOUSE - 10-19-21

2     A.     The Zoom calls we had, I don't

3  recall having seen video or, you know, or if it

4  was on Zoom, I just remember it being -- well,

5  no, you know what, there were some -- you know,

6  I take that back.

7          So there were -- there were some

8  times that I did remember seeing Mr. Seery

9  on -- on some of the Zoom calls.

10     Q.     Well, let me --

11     A.     I don't -- sorry, I'm thinking.  I'm

12  thinking -- I'm going back.  I'm trying to

13  process this.

14     Q.     I can make it much quicker,

15  Mr. Waterhouse.  I have heard -- I have heard

16  that Mr. Seery is a copious note taker.

17          Do you have any knowledge about

18  that?

19     A.     No.

20     Q.     Okay.  Switching gears yet again,

21  and this will be last theme.  Do you need a

22  restroom break, or are you good to go for

23  another half an hour?

24          MS. DEITSCH-PEREZ:  I need a

25          restroom break.

1          WATERHOUSE - 10-19-21

2          MR. RUKAVINA:  Can we make it five

3     minutes?

4          THE WITNESS:  Five minutes would be

5     great.

6          VIDEOGRAPHER:  We're going off the

7     record at 5:53 p.m.

8     (Recess taken 5:53 p.m. to 5:59 p.m.)

9          VIDEOGRAPHER:  We are back on the

10    record at 5:59 p.m.

11    Q.    Mr. Waterhouse, I had asked you

12 earlier about contracts between HCMFA and the

13 debtor, and now I'm going to talk about

14 contracts between the debtor and NexPoint

15 Advisors.  Okay?

16    A.    Okay.

17    Q.    Now, were there contracts similar to

18 the ones with HCMFA that NexPoint had in the

19 nature of employee reimbursement and shared

20 services?

21    A.    Yes, they -- NexPoint Advisors and

22 Highland Capital Management Fund Advisors had

23 cost reimbursement and shared services

24 agreements with Highland Capital Management,

25 L.P.

1                    WATERHOUSE - 10-19-21

2         Q.    And was that shared services

3    agreement, to the best of your understanding,

4    in place as of December 31, 2020?

5         A.    It was -- it was terminated at some

6    point, and I remember the contracts had

7    different termination dates, but I think the --

8    the date of termination was January 31st of

9    2021, after the termination was put in.

10              So yeah, it would be in place at the

11   end of the year of December -- it would be in

12   place at December 31st, 2020.

13        Q.    And pursuant to that agreement as of

14   December 31st, 2020, was the debtor providing

15   what you would describe as back office services

16   to NexPoint?

17        A.    Yes.

18        Q.    Would those have included accounting

19   services?

20        A.    Yes.

21        Q.    And as part of those accounting

22   services, would the debtor have assisted

23   NexPoint with paying its bills?

24              MR. MORRIS:  Objection to the form

25        of the question.

1           WATERHOUSE - 10-19-21

2      A.    Yes.

3      Q.    So let's break that up.  You were a

4  treasurer of NexPoint as well in December of

5  2020?

6            MR. MORRIS:  Objection to the form

7       of the question.

8      A.    Yes.

9      Q.    Okay.  And in December of 2020, did

10  NexPoint have its own bank accounts?

11     A.    Yes.

12     Q.    And did it use those bank accounts

13  to pay various of its obligations?

14     A.    Yes.

15     Q.    Did employees of the debtor have the

16  ability to cause transfers to be made from

17  those bank accounts on behalf of NexPoint?

18     A.    Yes.

19     Q.    And is that one of services that the

20  debtor provided NexPoint, basically ensuring

21  that accounts payable and other obligations

22  would be paid?

23     A.    Yes.

24            MR. MORRIS:  Objection to the form

25       of the question.

1                    WATERHOUSE - 10-19-21

2         Q.    You answered yes?

3         A.    Yes.

4         Q.    And the payments, though, whose

5    funds would they be made from?

6         A.    From the bank account of NexPoint

7    Advisors.  If they were NexPoint advisor

8    obligations, it would be made from NexPoint

9    Advisors' bank account.

10        Q.    So let's pull up Exhibit Alpha 1.

11   You should have that -- it is my Tab 1 or my

12   Exhibit 1.

13               (Exhibit A1 marked.)

14        Q.    So this is a -- this is a series of

15   emails, Mr. Waterhouse.  Let's look at the

16   first page here, November 25, 2020, between

17   Kristin Hendrix and yourself.

18               Do you see that, sir?

19        A.    I do.

20        Q.    And do you see where Ms. Hendrix

21   writes:  NPA.

22               Do you know what NPA stood for?

23        A.    Yes.

24        Q.    And what does it stand for?

25        A.    NexPoint Advisors.

1                  WATERHOUSE - 10-19-21

2        Q.    And was that how you-all internally

3    at Highland refer to NexPoint Advisors, L.P.?

4        A.    I mean, yes, amongst other things.

5        Q.    And she writes at the bottom of her

6    email:  Okay to release?

7              Do you see that?

8        A.    Yes, I do.

9        Q.    So what --

10             MR. MORRIS:  Hold on one second.

11             Okay.  Go ahead.

12             MR. RUKAVINA:  Yeah.

13       Q.    So what is -- what is Ms. Hendrix

14   here on November 25 asking of you?

15       A.    She is asking me -- so she -- these

16   are -- these are payments -- typically we would

17   do an accounts payable run every week at the

18   end of every Friday.  But looking at this date,

19   it is Wednesday, November 25th, which means, to

20   me, it is likely Thanksgiving weekend.

21             So this is the day before

22   Thanksgiving, so this is the last kind of --

23   kind of day before the holidays and vacation

24   and things of that nature.  So it is

25   effectively the Friday of that week.

1          WATERHOUSE - 10-19-21

2               So she is -- she is putting in all

3     the payments for the week because we batch

4     payments weekly.  And these are the payments

5     that go out that week, and she is informing me

6     of the payments and -- you know, again, at the

7     bottom of the email, she is asking for my okay

8     to -- to release these payments in the wire

9     system.

10          Q.    So these would be accounts payable

11    of NexPoint?

12          A.    I mean, it would be accounts payable

13    for all of these entities listed on this email.

14          Q.    And who was Ms. Hendrix employed by

15    in November and December of 2020?

16          A.    Highland Capital Management.

17          Q.    Okay.  So -- so part of the services

18    that NexPoint had contracted with was for

19    Highland to ensure that NexPoint timely paid

20    its accounts payable; is that accurate?

21               MR. MORRIS:  Objection to the form

22          of the question.  You have got to be

23          kidding me.

24          Q.    Is that accurate?

25          A.    Yes.

1              WATERHOUSE - 10-19-21

2       Q.    And did NexPoint rely on employees

3   of the debtor to ensure that NexPoint's

4   accounts payable were timely paid?

5            MR. MORRIS:  Objection to the form

6       of the question.

7       A.    Yes.

8            MR. RUKAVINA:  Let's flip to the

9       next page, Mr. Nguyen, if you will please

10      scroll to the next page.

11      Q.    So this is an email similar to the

12  prior one, November 30th.

13            Do you see where it says, NPA HCMFA,

14  USD $325,000 one-day loan?

15            Do you see that, sir?

16      A.    I do.

17      Q.    Do you have any memory of what that

18  was?

19      A.    I don't recall what that -- what

20  that payment was for.

21      Q.    Did it sometimes occur that one

22  advisor would, on very short-terms, make loans

23  to another advisor?

24      A.    Yes.  This -- this -- this occurred

25  from -- from -- from time to time.  It actually

1                     WATERHOUSE - 10-19-21

2    looking at -- I'm -- I'm looking at the date of

3    this email.  It is November 30th.  It is the

4    last day of the month.

5                HCMFA has obligations it needs to

6    pay to its broker-dealer, which is HCFD.  And

7    it likely was short funds to make those

8    obligations under that -- under its agreement,

9    and so it provided a one-day loan because on

10   the next business day on 12/1 -- or the next

11   business day in December, it would receive

12   management fees from the underlying funds that

13   it managed and it would be able to pay back

14   that loan to NexPoint Advisors.

15        Q.    So -- so here Ms. Hendrix was

16   seeking your approval to transfer $325,000 from

17   NexPoint to HCMFA for a one-day loan; is that

18   correct?

19        A.    That is correct.

20        Q.    Let's flip to the next page, sir.

21              MR. RUKAVINA:  And, Mr. Nguyen, if

22        you will please scroll down.

23        Q.    Now we have as an entry for

24   $325,000, 11/30 loan payment.

25              Do you see that, sir?

1              WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And that is probably the loan that

4   was approved on the prior page?

5        A.    Yes, most likely.

6        Q.    So is it also true, sir, that in

7   addition to accounts payable debtor employees

8   would be assisting NexPoint with respect to

9   paying back its debt?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I mean, yes, for loans of this

13   nature, yes.

14        Q.    Well, what about long term loans?

15   Was it reasonable for NexPoint to expect debtor

16   employees to ensure that NexPoint timely paid

17   its obligations under long-term notes?

18             MR. MORRIS:  Objection to the form

19        of the question.

20             MS. DANDENEAU:  Objection to form.

21        A.    I mean, that is one of the things

22   that the Highland personnel did provide to the

23   advisors.  Yes, we would -- we would -- over

24   the years, yes, we -- we -- we -- we did do

25   that generally.  Again, I don't remember

```
 1                    WATERHOUSE - 10-19-21

 2    specifically but, yes, generally we -- you

 3    know, we did do that.

 4         Q.    So do you recall -- and we can pull

 5    it up, if need be -- that under the NexPoint

 6    note that Mr. Morris asked you about earlier,

 7    the one for more than $30 million, that

 8    NexPoint was obligated to make an annual

 9    payment of principal and interest?

10               MR. MORRIS:  Objection to the form

11         of the question.

12         A.    Yes, it was -- yes, it -- it was an

13    amortizing note.  It was -- you know, from what

14    we reviewed earlier, it was payable by

15    December 31st of each year.  So -- but are --

16    are you asking me --

17         Q.    I'm just asking you, sir, if you

18    recall the note.

19         A.    Yes, the $30 million note, yes, we

20    reviewed it earlier, yes.

21         Q.    And do you recall Mr. Morris had you

22    go through the fact that NexPoint had made

23    payments in years prior to 2020 on that note?

24         A.    I do.

25         Q.    And do you believe that employees of
```

1            WATERHOUSE - 10-19-21

2    the debtor would have played any role in

3    NexPoint having made those prior payments?

4            MR. MORRIS:   Objection to the form

5        of the question.

6    A.    Yes.

7    Q.    And what role in years prior to 2020

8    would employees of the debtor have had with

9    respect to NexPoint making that annual payment?

10   A.    We -- we -- we would have -- I keep

11   saying "we."  The team would have calculated

12   any amounts due under that loan and other

13   loans, as -- as standard course.

14            We would -- since we provided

15   treasury services to the advisors, we would

16   inform the -- the -- the -- we informed

17   Mr. Dondero of any cash obligations that are

18   forthcoming, whether we do cash projections.

19            If, you know, any of these payments

20   would have -- or, you know, the sum total of

21   all of these payments, including any note

22   payments, if there were any cash shortfalls, we

23   would have informed Mr. Dondero of any cash

24   shortfalls.  We could adequately plan, you

25   know, in instances like that.

1          WATERHOUSE - 10-19-21

2          Or, sorry, we -- I say "we" -- I

3 keep saying "we" -- I keep wearing my -- again,

4 my -- my treasurer hat.

5          But, yes, it is to -- it is to

6 inform Mr. Dondero of the obligations of the

7 advisors in terms of cash and obligations that

8 are -- are upcoming and that -- and that are --

9 are scheduled to be paid.

10     Q.     And would those obligations that are

11 upcoming and scheduled to be paid prior to 2020

12 have incurred the annual payment on that

13 NexPoint $30 million note?

14          MS. DANDENEAU:  Objection to form.

15          MS. DEITSCH-PEREZ:  Davor, I think

16      you misspoke.  You might want to just

17      repeat the question.

18     Q.     Okay.  Let me repeat the question,

19 sir.

20          Prior to 2020, those services that

21 you just described, would that -- on behalf of

22 the debtor, would that have included NexPoint's

23 payments on the $30 million note?

24     A.     Yes.

25     Q.     So someone at the debtor in treasury

1                    WATERHOUSE - 10-19-21

2    or accounting would have sent some schedule or

3    a reminder that a payment would be coming due

4    in the future.  Is that generally the practice?

5         A.    Yes, we would -- you know, again, I

6    didn't -- I didn't micromanage the teams, but

7    we had a -- a corporate accounting calendar

8    that we use as kind of a tickler file to keep

9    track of payments.

10                I actually, you know, don't know how

11   actively they're using that in -- in prior to

12   2020, but it was actively used at some point.

13                We did look at NexPoint cash

14   periodically and cash for the other advisors as

15   well and payments.  You know, we -- payments

16   like this would have appeared in our cash

17   projections, in the advisor's cash projections.

18                And, again, as like I said earlier,

19   they would have appeared there, so there would

20   be time to plan for making any of these

21   payments.

22        Q.    And based on your experience, would

23   it have been reasonable for NexPoint to rely on

24   the debtors' employees to inform NexPoint of an

25   upcoming payment due on the $30 million

1                    WATERHOUSE - 10-19-21

2    promissory note?

3              MR. MORRIS:  Objection to form of

4         the question.

5              MS. DANDENEAU:  Objection to form.

6    A.    Yes.  Yes, they did.  I mean, but I

7    mean, but I don't think these -- these notes

8    were any secret to anybody.

9    Q.    I understand, and I'm not suggesting

10   otherwise.

11             MR. RUKAVINA:  Please pull up Alpha

12   2, Mr. Nguyen.

13             (Exhibit A2 marked.)

14   Q.    Now, this document is similar to the

15   ones we've seen before as of December 31, 2020,

16   and I don't see under NTA anything there for

17   paying the promissory note to Highland.

18             Do you see anything like that?

19   A.    I do not.

20             MR. RUKAVINA:  You can pull that --

21   that exhibit down, Mr. Nguyen.

22   Q.    You are aware, of course, by now

23   that, in fact, NexPoint failed to make the

24   payment due December 31, 2020, are you not?

25   A.    I am aware, and yes, I do understand

1          WATERHOUSE - 10-19-21

2    it.

3          Q.    Were you aware that Highland

4    accelerated that $30 million promissory note?

5          A.    I am aware.

6          Q.    Were you aware of that acceleration

7    at the time that it occurred?

8          A.    I don't remember specifically.

9          Q.    Do you recall whether anyone asked

10   you -- prior to the acceleration, anyone asked

11   you at Highland, what Highland should do with

12   respect to the missed payment?

13         A.    Did anyone ask me what Highland

14   should do about the missed payment?

15         Q.    Yes, before acceleration.

16               MR. MORRIS:  Objection to the form

17         of the question.

18         A.    I mean, what -- what I recall is

19   there was the -- sorry, are you asking me --

20               MS. DANDENEAU:  Why don't you just

21         repeat the question, Mr. Rukavina.

22         Q.    Let me try again, Mr. Waterhouse,

23   let me try again.

24               I am saying you're the CFO of

25   someone, in this case, Highland, and the

```
1                    WATERHOUSE - 10-19-21

2    borrower failed to make the required payment.

3    Are you with me so far?

4         A.    I am.

5         Q.    Did anyone then ask you, what should

6    we do with respect to our rights against the

7    borrower that missed the payment?

8         A.    Not that I recall.

9         Q.    Did you play a role in the decision

10   to accelerate that $30 million promissory note?

11        A.    I did not.

12        Q.    Do you recall whether Mr. Seery ever

13   asked you before the acceleration as to whether

14   he should accelerate the note?

15        A.    I don't recall.

16        Q.    And you don't recall when you

17   learned of the acceleration itself?

18             MR. MORRIS:  Objection to the form

19        of that question.

20        A.    It was -- it was sometime in

21   early -- in early 2021.  I don't remember

22   specifically.

23        Q.    But do you recall whether it was

24   after the acceleration had already been

25   transmitted?
```

1              WATERHOUSE - 10-19-21

2              MS. DANDENEAU:  Objection to the

3      form of the question.

4      A.    I don't recall.

5      Q.    Do you recall in early to mid

6  January of 2021, after the default, discussing

7  the default with Mr. Dondero?

8      A.    I do recall discussing with

9  Mr. Dondero after December 31, 2020?

10     Q.    Yes, the fact of the default.

11     A.    I don't recall.

12             MR. RUKAVINA:  Let's pull up my

13  Exhibit 6, Alpha 6.

14             (Exhibit A6 marked.)

15             MR. RUKAVINA:  And, Mr. Nguyen, if

16     you will please scroll down.

17     Q.    This email chain begins with you

18  writing to Ms. Hendrix on January the 12th:

19  NexPoint note to HCMLP.

20             Do you see that, sir?

21     A.    I do.

22     Q.    Were you discussing this same

23  $30 million note we're talking about right now

24  with Ms. Hendrix?

25     A.    Yes.

1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  Do you recall what prompted

3    you to send that email to her?

4          A.    Yes, I had -- I had a conversation

5    with Jim.

6          Q.    Okay.  And what -- what did you

7    discuss with Jim that led to this email chain?

8          A.    He -- he called me and he said he

9    wanted to make payment on the NexPoint note,

10   and I didn't -- I didn't know the -- the amount

11   offhand, so I reached out to Kristin and got

12   the details and relayed that to him.

13         Q.    And you see you sent that email to

14   her at 11:15 a.m.  Does that help you remember

15   when you had this discussion with Mr. Dondero?

16   In other words, was it that morning or the day

17   before, or can you -- can you --

18         A.    No, it was -- it was that morning.

19         Q.    And do you recall how you had that

20   conversation with him?

21               MR. MORRIS:  Objection to the form

22         of the question.

23         Q.    By telephone, by email, in-person?

24         A.    Yeah, he -- he called me.  I was at

25   home.  We were working from home here in

1                    WATERHOUSE - 10-19-21

2     December of 2020.  He called me from home.  He

3     said he was in court.  He wanted to -- he asked

4     about, you know, making payment on the note and

5     the amount, and so I didn't have those numbers

6     in front of me, so I said I would get back to

7     him.  I wanted all the details, so here is

8     this -- so I reached out to Kristin.

9          Q.    And then she gave you that

10    $1,406,000 figure?

11               MR. RUKAVINA:  Mr. Nguyen, if you

12    will scroll up, please.

13         A.    Yes.  Yeah, she -- the $1,406,112.

14         Q.    And do you recall whether you

15    conveyed that amount to Mr. Dondero?

16         A.    Yes.  I -- I called him back and

17    gave him -- gave him this amount.

18         Q.    Are you aware of whether NexPoint,

19    in fact, then made that 1 million 406 and

20    change payment?

21         A.    Yes, they did.

22         Q.    Did you discuss with Mr. Dondero at

23    that time, either the first conference or the

24    second conference that day -- strike that.

25               When you conveyed the number to

1              WATERHOUSE - 10-19-21

2    Mr. Dondero, was -- was it also on January

3    12th?

4         A.    Sorry, when I conveyed the

5    $1.4 million number?

6         Q.    Yes.

7         A.    Yes, yes, it was that -- it was --

8         Q.    So you had --

9         A.    It was that point.

10        Q.    Well, to the best of your

11   recollection, you had a conference with

12   Mr. Dondero by the telephone in the morning,

13   and then another conference with him by

14   telephone after 11:40 a.m. that morning?

15        A.    Yeah, I can't remember -- yeah, it

16   was either that morning or it could have been,

17   you know, early afternoon, but again, I

18   remember calling him back, relaying this

19   information to him, and he said, okay, pay --

20   you know, make -- make this payment.

21        Q.    And during either of those two

22   calls, did you tell Mr. Dondero anything to the

23   effect that making those -- I'm sorry, making

24   that payment would not de-accelerate the

25   promissory note?

1              WATERHOUSE - 10-19-21

2         A.    No.

3         Q.    Did you tell him anything to the

4    effect that making that payment would not cure

5    the default?

6         A.    No.

7         Q.    Did you discuss that in any way with

8    him?

9         A.    No, I did not.

10         Q.    Did he say why he wanted to have

11    that $1.4 million payment made?

12              MR. MORRIS:  Objection to the form

13         of the question.

14         A.    He -- he -- he didn't go into

15    specifics.

16         Q.    Did he say anything to you to the

17    effect that if NexPoint makes that payment,

18    then the note will be de-accelerated?

19              MR. MORRIS:  Objection to the form

20         of the question.

21         A.    I don't recall.

22              MR. RUKAVINA:  You can put this one

23         down, Mr. Nguyen.

24         Q.    And, again, when you say you don't

25    recall, you mean you don't remember right now

1              WATERHOUSE - 10-19-21

2   either way; correct?

3       A.    Yeah, I don't remember.  I don't

4   remember us discussing that.

5       Q.    Now -- and we're almost done, I

6   promise.  I'm just going to -- I don't know how

7   to ask this question, so I'm just going to try

8   to do my best.

9              Prior to the default on December 31,

10  2020, did Mr. Seery ever tell you any words to

11  the effect that you or someone at Highland

12  should ensure that NexPoint doesn't make its

13  payment?

14      A.    No.

15      Q.    Did you have any hint or any belief

16  that anyone at NexPoint -- I'm sorry, strike

17  that.

18             Did you have any reason to believe

19  that anyone with Highland was actively trying

20  to get NexPoint to make that default by not

21  paying on December 31?

22             MR. MORRIS:  Objection to the form

23       of the question.

24      A.    Are you asking, did any Highland

25  employees actively work to make -- to

1        WATERHOUSE - 10-19-21

2   somehow --

3        Q.    Yes.  Let me take a step back.  Let

4   me take a step back.

5             So you are aware now that as a

6   result of that default, what was still some

7   25-year note was accelerated and became

8   immediately due.  You are aware of that now;

9   right?

10       A.    Yes.

11       Q.    And can you see how someone at

12  Highland might actually have been pleased with

13  that development?

14            MR. MORRIS:  Objection to the form.

15       Q.    Not that they were --- not that they

16  were pleased, but you can see how someone at

17  Highland might have been pleased with that

18  development?

19            MR. MORRIS:  Objection to the form

20       of the question.

21            MS. DANDENEAU:  Object to form.

22       A.    I don't know how they would have

23  reacted to that.

24       Q.    Okay.  But you're not -- you're not

25  aware of any instructions or any actions being

```
1                    WATERHOUSE - 10-19-21
2    given or taken at Highland by Mr. Seery, the
3    independent board, DSI, that -- that would have
4    basically led Highland to ensure that NexPoint
5    would fail to make that payment?
6         A.    I'm not aware.
7         Q.    In other words, there wasn't a trick
8    or a settlement; right?
9              MS. DEITSCH-PEREZ:  Objection to
10        form.
11             MS. DANDENEAU:  Object to form.
12             MR. MORRIS:  Object to form.
13        A.    I'm not aware.
14             Look, I'm not aware.  I'm not in
15   every conversation.  I mean, and I'm just --
16   again, I'm sitting at home.  It is the end of
17   the year.  Again, I'm not aware.
18        Q.    That is a perfectly legitimate
19   answer.  I don't know why -- why you think
20   otherwise.
21             Okay.  Just give me one second to
22   compose my thoughts.
23             MS. DEITSCH-PEREZ:  While you're
24        taking your one second, why don't we take
25        three minutes.  I will be right back.
```

1              WATERHOUSE - 10-19-21

2          VIDEOGRAPHER:  Do we want to go off

3      the record?

4          MR. RUKAVINA:  Yes.

5          VIDEOGRAPHER:  All right.  We're

6      going off the record at 6:27 p.m.

7      (Recess taken 6:27 p.m. to 6:30 p.m.)

8          VIDEOGRAPHER:  We are back on the

9      record at 6:30 p.m.

10          MR. HORN:  Is Deb back?

11          MS. DANDENEAU:  Are you asking about

12      me?  I'm here.

13          MR. HORN:  Oh, okay.  I don't see

14      you, sorry.

15      Q.    Actually, yeah, Mr. Waterhouse, so

16   when you had --

17          MS. DANDENEAU:  Are you asking about

18      Deb Dandeneau or Deborah?  I mean, there

19      are a lot -- as we talked about, a lot of

20      Debs.  I'm here.

21          MS. DEITSCH-PEREZ:  I'm here.

22          MR. HORN:  Yes, I was asking about

23      DDP.

24          MS. DEITSCH-PEREZ:  Oh, DDP is here.

25          MR. HORN:  Okay.  Here we go.  I'm

1          WATERHOUSE - 10-19-21

2    going back on mute.

3          MS. DANDENEAU:  Get the right

4    nomenclature.

5    Q.    Mr. Waterhouse, on January 12th,

6  2021, when you had those talks with Mr. Dondero

7  about the $1.4 million payment, did you have a

8  communication or a conversation with Mr. Seery

9  about that payment after January 12th, 2021?

10   A.    I don't recall.

11   Q.    Well, in response to Mr. Dondero

12  reaching out to you, do you recall on that day,

13  January 12th, talking to Mr. Seery or anyone at

14  Highland other than the email chain we just saw

15  about Mr. Dondero's call with you?

16   A.    Did I talk to -- I spoke with

17  Kristin -- I don't know if I spoke to her.  I

18  likely spoke to Kristin Hendrix because we had

19  to get the wire on NexPoint's behalf to make

20  the payment to Highland.

21   Q.    So it is true, then, that -- that

22  employees of the debtor did actually cause that

23  payment to be made when it was made after

24  January 12th?

25   A.    Yes, I mean, we -- we -- as I

1          WATERHOUSE - 10-19-21

2   testified earlier, we provided that accounting

3   finance treasury function as -- under the

4   shared services agreement.  And so once I

5   got the -- I talked to Jim, got the approval to

6   make this payment, we have to then make the

7   payment, or the team does, and so the payment

8   was made.

9       Q.    Okay.  But -- okay.  And -- and

10  sitting here right now, after Jim called you,

11  you don't remember talking to anyone other than

12  the -- the couple of people you mentioned,

13  talking to anyone about something to the effect

14  that, hey, Jim wants to make this payment now?

15          MR. MORRIS:  Objection to the form

16      of the question.

17      A.    I don't -- I don't recall.

18      Q.    And does that include legal counsel?

19          Without going into any detail, on

20  January 12th or before that payment was made,

21  did you consult with legal counsel about

22  anything having to do with the $1.4 million

23  payment?

24      A.    I don't recall.

25      Q.    Okay.  Thank you, sir, for your

1              WATERHOUSE - 10-19-21

2    time.

3              MR. RUKAVINA:  Pass the witness.

4              MR. MORRIS:  I just have a few

5         questions, if I may.

6              MS. DEITSCH-PEREZ:  Don't you go at

7         the end?

8              MR. MORRIS:  Oh, I apologize.  He is

9         your witness.  I'm surprised you want to

10        ask him questions, but go right ahead.

11             MS. DEITSCH-PEREZ:  Just have a

12        couple of things.

13             MR. RUKAVINA:  And I will just

14        object to that, that he's our witness.

15        That's not --

16             MR. MORRIS:  I'm not talking to you.

17        I'm not talking to you.

18             MS. DANDENEAU:  Also, Mr. Morris, it

19        is -- it is --

20             MS. DEITSCH-PEREZ:  He is not my

21        witness.  He's been subpoenaed by you.

22        Okay?

23             That is no offense, Mr. Waterhouse,

24        I'm -- I'm not -- okay.  Anyway.

25                        EXAMINATION

1          WATERHOUSE - 10-19-21

2  BY MS. DEITSCH-PEREZ:

3      Q.    Good evening.  I'm very sorry to be

4  going last and I know you have had a long and

5  taxing day, so I thank you for indulging me.

6          The kinds of services that you

7  describe that the -- that Highland provided for

8  NexPoint, did Highland also provide similar

9  services to that to HCRE and HCMS?

10     A.    Yes.

11         MR. MORRIS:  Objection to the form

12     of the question.

13     Q.    What kind of services did Highland

14  provide to HCRE and HCMS?

15         MR. MORRIS:  Objection to the form

16     of the question.

17         MS. DEITSCH-PEREZ:  What is your

18     objection, John?

19         MR. MORRIS:  It is vague and

20     ambiguous.  Unlike the advisors and

21     NexPoint, they actually had shared services

22     agreements.

23         MS. DEITSCH-PEREZ:  I got -- I

24     understand your objection.  That is fine.

25     Q.    Let's take them one at a time.

1          WATERHOUSE - 10-19-21

2          What kinds of services did Highland

3  provide to HCRE?

4          MR. MORRIS:  Objection to the form

5      of the question.

6      A.   HCMS, Highland employees provided

7  accounting services, treasury management

8  services, potentially legal services.  I

9  don't -- but I wouldn't have been directly

10  involved in that.  But as far as the teams that

11  I manage, it was accounting, treasury, things

12  of that nature.

13      Q.   Okay.  And that was for HCM, LLP --

14      A.   And -- and, sorry, it would also be

15  any asset valuation if needed as well.

16      Q.   Okay.  We went back and forth on

17  each other and I apologize, so just to clarify.

18          You were talking about the services

19  that Highland Capital Management provided to

20  HCMS; is that right?

21      A.   HCMS.  So, again, yes.  And

22  accounting, treasury, valuation, and also tax

23  services too.

24      Q.   Okay.

25      A.   Tax services.  Look, I'm expanding

1          WATERHOUSE - 10-19-21

2    this, their HR services as well.

3         Q.    Okay.  And did that include bill

4    paying?

5              MR. MORRIS:  Objection to the form

6         of the question.

7         Q.    Did the services that HCM provided

8    to HCMS include bill paying?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes.

12        Q.    And did the services that HCMLP

13   provided to HCMS include scheduling upcoming

14   bills?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes.

18        Q.    And did HCMLP regularly pay -- cause

19   to be paid the payments on loans HCMS had from

20   HCMLP?

21             MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Yes.

24        Q.    Typically -- if there is a

25   typically, how far in advance of due dates did

1           WATERHOUSE - 10-19-21

2    HCMLP cause HCMS to pay its bills?

3           MR. MORRIS:  Objection to the form

4        of the question.

5        A.    I mean, it -- it -- it depend -- it

6    depended on the nature of the payment and the

7    vendor, but, you know, if there were -- if

8    there were larger scheduled payments, you know,

9    I would like to give at least 30 days notice.

10          And that is -- that is kind of my

11   rule of thumb so no one is surprised.

12       Q.    Okay.  And was it generally HCMLP's

13   practice to timely pay HCMS' bills?

14          MR. MORRIS:  Objection to the form

15       of the question.

16       A.    It -- it -- it -- that depended on

17   the nature of the payment.

18       Q.    Okay.  And can you explain what you

19   mean by that?

20       A.    Yeah, I mean if -- if it was -- I

21   mean -- if there was some professional fees

22   that weren't -- you know, they were due but

23   they weren't urgent, those fees may not be paid

24   as timely as others that have a due date or --

25   or things like that.

1              WATERHOUSE - 10-19-21

2       Q.    Okay.  Are loan payments the kinds

3   of thing that HCMLP would pay on time because

4   of potential consequences of not paying on

5   time?

6              MR. MORRIS:  Objection to the form

7         of the question.

8       A.    Yes.  As I testified earlier, we

9   would want to give, you know, notice on -- on

10  -- on larger payments and -- and things of that

11  nature so we didn't miss due dates.

12      Q.    Okay.  And over the course of time,

13  did HCMLP generally pay HCMS' loan payments in

14  a timely fashion?

15             MR. MORRIS:  Objection to the form

16        of the question.

17      A.    I can't remember specifically, but

18  generally, yes.

19      Q.    Okay.  Now, did HCMLP provide

20  similar services to HCRE that you have

21  described it provided to HCMS?

22             MR. MORRIS:  Objection to the form

23        of the question.

24      A.    Yes, but I don't think it -- it

25  provided -- I don't think it provided HR

1          WATERHOUSE - 10-19-21

2    services.

3        Q.    Can you describe the accounting and

4    treasury services that HCMLP provided for HCRE?

5        A.    Yeah, it -- it would provide

6    bookkeeping services on a -- on a periodic

7    basis.  It would make payments, you know, as

8    needed.

9        Q.    Okay.  So did it provide --

10       A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12       Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16            MR. MORRIS:  Objection to the form

17       of the question.

18       A.    Yes.

19       Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22            MR. MORRIS:  Objection to the form

23       of the question.

24       A.    Yes.

25       Q.    Did HCMLP make loan payment -- the

1                    WATERHOUSE - 10-19-21

2    loan payment that was due from HCMS to HCMLP in

3    December of 2020?

4                    MR. MORRIS:  Objection to the form

5        of the question.

6        A.    I don't believe that payment --

7    payment was made.

8        Q.    Okay.  And when HCMLP caused HCMS in

9    the past to make loan payments, whose money did

10   it use to make those payments?

11                   MR. MORRIS:  Objection to the form

12       of the question.

13       A.    It was the -- the money in HCMS's

14   operating account would be made to that --

15   those moneys would be used to make payment to

16   Highland Capital Management.

17       Q.    Okay.  And Highland -- is it correct

18   that Highland Capital Management personnel had

19   the access to HCMS's accounts to be able to

20   cause such payments to be made?

21       A.    Yes, Highland personnel had access

22   to those accounts.

23       Q.    Okay.  And so now for HCRE, whose

24   money was used when HCMLP caused HCRE

25   payments -- loan payments to Highland to be

1          WATERHOUSE - 10-19-21

2    made?

3          MR. MORRIS:  Objection to the form

4       of the question.

5       A.    It was -- it was cash in HCRE's bank

6    account that would be used to make payments to

7    Highland Capital Management.

8       Q.    Okay.  And so did Highland Capital

9    Management have access to HCRE's funds in order

10   to be able to make such payments?

11         MR. MORRIS:  Objection to the form

12      of the question.

13      A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16      Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18      A.    It --

19      Q.    In December of 2020.

20      A.    It was not.

21      Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25         MR. MORRIS:  Objection to the form

1          WATERHOUSE - 10-19-21

2      of the question.

3      A.    I -- I don't recall.

4      Q.    Do you have any reason to believe

5  that either HCRE or HCMS simply didn't have the

6  funds on hand to make the December 2020

7  payments?

8      A.    I don't know.

9      Q.    I guess I'm asking, do you have any

10  reason to believe that they didn't have the

11  funds?

12      A.    We managed cash for so many

13  different entities and funds, and I don't

14  recall, you know, where the cash position was

15  for HCRE and HCMS at 12/31/2020.

16      Q.    Okay.

17      A.    I just don't recall, and I don't --

18  and I don't remember what the loan payment

19  obligations were from HCRE to Highland, and

20  from HCMS to Highland.  I don't recall.  I

21  don't recall, I mean...

22      Q.    Let me come at it a different way.

23  Were the -- were the payments that would

24  otherwise have been due in December of 2020

25  made in January of 2021 for HCMS and HCRE?

1          WATERHOUSE - 10-19-21

2          A.     I believe the HCRE payment was made

3     in January of 2021.  I don't recall any

4     payments being made from HCMS to Highland.

5          Q.     If it -- how is it the HCRE payment

6     came to be made?  Why did you make it -- why

7     did HCM make the payment in January of 2021?

8          A.     Jim -- Jim called me and instructed

9     me to -- to make the payment on behalf of HCRE,

10    Jim Dondero -- Jim Dondero.

11         Q.     Did he seem upset that -- that the

12    payment had not been made?

13         A.     Yeah.  On the note that was, you

14    know, that was the term note, yes, he -- he was

15    displeased that the -- that the payment had not

16    been made by year-end.

17         Q.     Okay.  And did you make the -- cause

18    the payment to be made as -- as requested?

19         A.     Yes.

20         Q.     And did anyone else from HCM

21    participate with you in causing the payment to

22    be made to -- on the HCRE loan?

23         A.     Yes.  It would have been Kristin

24    Hendrix.  I -- again, I don't -- as I testified

25    earlier, I'm not an officer of HCRE.  I don't

1          WATERHOUSE - 10-19-21

2    believe I'm an authorized signer.  So I

3    can't -- other personnel have to make payment

4    from HCRE to -- to -- to -- to Highland.

5          Q.    Okay.  And in the conversation

6    that -- that you had with Mr. Dondero when he

7    requested the payment to be made, did you say

8    to him words to the effect, Jim, this loan is

9    going to stay in default, what are you making

10   the payment for, anything like that?

11         A.    No.

12         Q.    In fact, did you have the impression

13   from him that he thought that the loan would

14   be -- the default would be cured by making the

15   payment?

16               MR. MORRIS:  Objection to the form

17         of the question.

18         A.    Did I get the impression from Jim

19   Dondero that the loan would be cured if the

20   payment from HCRE --

21         Q.    Yeah, if that is what he thought.

22               MR. MORRIS:  Objection to the form

23         of the question.

24         A.    I didn't get any impression from him

25   on that at the time.

1        WATERHOUSE - 10-19-21

2        Q.    Do you know whether there was an

3   HCMS term loan that had a payment due in

4   December of 2020?

5        A.    I don't recall.

6        Q.    Okay.  And so the reason you don't

7   recall whether or not there was a payment in

8   January of 2021 is because you just don't

9   remember whether there was such a loan at all?

10            MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't remember.  There is -- there

13   is so many notes, and I mean, demands, and I

14   don't -- I don't remember.  It's a lot to keep

15   track in your head.

16        Q.    I understand, and -- and I hear your

17   frustration when you have explained that the

18   debtor has your documents and you don't, and so

19   I fully appreciate it, and this is no knock on

20   you.  It's a knock on somebody else on this

21   call.

22            MR. MORRIS:  I move to strike.  That

23        was pretty obnoxious, but go ahead.

24        Q.    Okay.  But so, Mr. Waterhouse, if --

25   if a payment on the HCMS loan was made in

1                     WATERHOUSE - 10-19-21

2    January of 2021, do you think it was part of

3    the same conversation where Jim Dondero said,

4    hey, why didn't that get paid, please make

5    that -- get that payment done?

6                MR. MORRIS:   I object to the form of

7          the question.

8          A.    Yes.  Likely it would have been -- I

9    mean, again, I don't recall a payment being

10   made, but, you know, again, I don't remember

11   everything.

12         Q.    Okay.  Did -- at the time you were

13   communicating with Kristin Hendrix about the

14   payment being made, whichever payments were

15   made in January, did she say anything to you

16   about the payments not curing the loan

17   defaults?

18         A.    No.

19         Q.    Okay.  All right.  So I'm going to

20   take you back to very early in the deposition

21   when Mr. Morris was asking you about the --

22   the -- the -- the agreement with respect to

23   the -- the forgiveness element of the loans, so

24   that is just to orient you.

25                Do you remember that there was a

```
 1                  WATERHOUSE - 10-19-21

 2      time that you and Mr. Dondero were

 3      communicating about potential means of

 4      resolving the Highland bankruptcy by what was

 5      colloquially referred to as a pot plan?

 6          A.    Yes.

 7          Q.    Okay.  And can you tell me generally

 8      when that was?

 9          A.    Like mid -- mid 2020, sometime in

10      2020, mid 2020.

11          Q.    Okay.  And did the process of trying

12      to figure out what the numbers should be

13      involve looking at what one should pay for the

14      Highland assets?

15              MR. MORRIS:  Objection to the form

16          of the question.

17          A.    Yes.

18          Q.    Okay.  And did there come a time

19      when you were proposing some potential numbers

20      and Mr. Dondero said something to you like,

21      well, why are you including payment for the

22      related party notes, those, you know, were

23      likely to be forgiven as part of my deferred

24      executive compensation?

25              MR. MORRIS:  Objection to the form
```

1            WATERHOUSE - 10-19-21

2      of the question.

3      A.    Yes, we did have that conversation.

4      Q.    Okay.  Was that conversation in

5  connection with trying to figure out the right

6  numbers for a pot plan?

7      A.    Yeah.  I mean, it was -- it was -- I

8  mean, Jim -- Jim would ask for, you know,

9  most -- most recent asset values, you know, for

10  Highland, and -- and myself and the team

11  provided those to him, so it was in that

12  context.

13      Q.    Okay.  And does that refresh your

14  recollection that these communications were in

15  2020 rather than 2021?

16            MR. MORRIS:  Objection to the form

17      of the question.

18      A.    The -- the -- the executive

19  compensation discussions were definitely in

20  2020.

21      Q.    Okay.  Now, did you ever make

22  proposals that took into account Jim's comment

23  that the notes were likely to end up forgiven

24  as part of his compensation?

25            MR. MORRIS:  Objection to the form

```
 1                    WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes, we -- the team and myself put

 4   together, you know, asset summaries of Highland

 5   at various times for all the assets of

 6   Highland, and not including the notes.

 7        Q.    Okay.  And were those presentations

 8   communicated to -- to Mr. Seery?

 9        A.    No.  Well, look, I didn't tell -- I

10   didn't tell Mr. Seery.  I don't know what

11   Mr. Dondero did with the information.

12        Q.    Okay.

13        A.    I did not have conversations with

14   Mr. Seery.

15        Q.    Okay.  Do you know who saw the

16   presentations that you put together that didn't

17   include the value of the related party notes?

18        A.    We're talking presentations -- these

19   are -- these are Excel spreadsheets?

20        Q.    Uh-huh.

21        A.    I don't know who -- these were given

22   to -- to Jim Dondero.  I don't know what was

23   done with them after that.

24        Q.    Okay.  You also mentioned earlier

25   that sometime during your tenure at Highland
```

1                    WATERHOUSE - 10-19-21

2    you knew of the practice of giving forgivable

3    loans to executives.

4              MR. MORRIS:  Objection to the form

5         of the question.

6         Q.    Can you -- can you tell me what you

7    recall about that practice?

8              MR. MORRIS:  Objection to the form

9         of the question.

10        A.    Yes, so there were -- there were --

11   during my tenure at Highland, there were loans

12   or -- given to employees that were later

13   forgiven at a future date and time.

14        Q.    Okay.  And when the loans were

15   given, did the notes, to your recollection, say

16   anything about the potential forgiveness term?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    When you say "did the notes," did

20   the promissory notes detail the forgiveness?

21        Q.    Yes.

22        A.    Not that I recall.

23        Q.    And until such time as whatever was

24   to trigger the forgiveness occurred, were the

25   notes bona fide notes as far as you were

1               WATERHOUSE - 10-19-21

2   concerned?

3          MR. MORRIS:  Objection to the form

4     of the question.

5     A.   Yes, similar to -- yes.

6     Q.   Okay.  You were going to say similar

7   to what?

8     A.   Mr. Morris earlier today showed

9   notes of the financial statements about various

10  affiliate loans.  I -- I -- I do recall these

11  notes because I -- at that time personally

12  worked on the -- the financial statements of

13  Highland.  That was, you know, in my role as a

14  corporate accountant.

15          And there were -- those loans

16  were -- to the partners were detailed in the

17  notes to the financial statements, similar to

18  what we went through earlier today in the prior

19  testimony about what we saw with Highland

20  and -- and -- and the -- and HCMFA.

21     Q.   Is it fair to say that on Highland's

22  balance sheet there were any number of assets

23  that the value of which could be affected by

24  subsequent events?

25          MR. MORRIS:  Objection to the form

1          WATERHOUSE - 10-19-21

2      of the question.

3      A.    Yes.  I mean, yes, that -- there

4  are.  And that is -- yes.

5      Q.    Okay.  And is it typical accounting

6  practice that until there is some certainty

7  about those potential future events, that asset

8  value listed on -- on the books doesn't take

9  into account those potential future events?

10          MR. MORRIS:  Objection to the form

11      of the question.

12      A.    Yeah, if those -- yes.  If -- if

13  those future events, you know, at the time of

14  issuance are not known or knowable, like I

15  discussed earlier with, like, market practice,

16  asset dislocation, or, you know, I mean, things

17  like that, you -- I mean, it -- it could affect

18  its fair value --

19      Q.    Okay.

20      A.    -- in the future.

21      Q.    And am I correct you wouldn't feel

22  compelled to footnote in every possible change

23  in -- in an asset when those possibilities are

24  still remote?

25          MR. MORRIS:  Objection to the form

1                    WATERHOUSE - 10-19-21

2        of the question.

3        A.    The accounting standard is you have

4   to estimate to the best -- you know, to -- to

5   the best of your ability, the fair value of an

6   asset as of the balance sheet date under --

7   under GAAP.

8        Q.    Did -- strike that.

9              Okay.  Give me a minute.  I'm

10   close -- I'm close to done.  Let me just go off

11   and look at my notes for a second.  So take two

12   minutes.

13              VIDEOGRAPHER:  We're going off the

14        record at 7:02 p.m.

15        (Recess taken 7:02 p.m. to 7:03 p.m.)

16              VIDEOGRAPHER:  We are back on the

17        record at 7:03 p.m.

18        Q.    Mr. Waterhouse, is it generally your

19   understanding that people you work with now

20   have been asking the debtor for full and

21   unfettered access to their own former files?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes, I am -- I am generally aware.

25        Q.    Okay.  And do you think you could

1          WATERHOUSE - 10-19-21

2   have been better prepared for this deposition

3   if the debtor had complied with those requests?

4          MR. MORRIS:  Objection to the form

5      of the question.

6      A.    I -- I -- I most certainly -- yes.

7   I mean, again, these are multiple years,

8   multiple years ago, lots and lots of

9   transactions.

10         You know, we asked about NAV errors

11  and, you know, things like that and these

12  are -- it would make this process a lot more --

13  a lot easier and if we had -- if we had access

14  to that.

15     Q.    Okay.  And has the debtor -- is the

16  debtor suing you right now?

17     A.    Yes.

18     Q.    And is the debtor trying to renege

19  on deals that it had previously made with you?

20         MR. MORRIS:  Objection to the form

21      of the question.

22     A.    Sorry, I need to -- it is my

23  understanding that the litigation trust is

24  suing me.  And not being a lawyer, I don't

25  know -- is that the debtor?

1                    WATERHOUSE - 10-19-21

2              Is that -- I don't know the

3    relationship.  So, again, I'm not the lawyers.

4    I've said many times.  But my understanding is

5    the litigation trust is suing me.  I could be

6    wrong there.  I don't know.

7         Q.    Okay.  I understand.

8              Someone with some connection to the

9    Highland debtor has brought a claim against

10   you; is that fair?

11             MR. MORRIS:  Objection to the form

12        of the question.

13        A.    Yes.

14        Q.    Okay.  And is there also some motion

15   practice in the bankruptcy where the debtor or

16   someone associated with the debtor is

17   attempting to undo something that was

18   previously resolved with you?

19        A.    Yes.

20        Q.    And so in one action somebody is

21   associated with the debtors trying to --

22   threatening you with trying to take money from

23   you, and then in the other -- and trying to --

24   and in the other they are threatening not to

25   pay you things that had previously been agreed;

1          WATERHOUSE - 10-19-21

2    is that correct?

3              MR. MORRIS:  Objection to the form

4         of the question.

5         A.    I want to be -- yes, I -- there

6    is -- I'm being sued, again, on -- on something

7    that was agreed to with Mr. Seery and myself.

8    I don't -- I don't -- I don't own that claim.

9         Q.    Okay.

10        A.    To be transparent, I don't own that

11   claim.  So it is not my personal property.

12        Q.    Okay.

13        A.    And -- and being the nonlawyer, I

14   don't know how I can get sued for something

15   that I don't owe or, like, I don't own

16   anything.  I'm not the lawyer.  But, I mean, if

17   that is -- if I'm understanding the facts

18   correctly.

19        Q.    Okay.  And the lawsuit that was

20   filed that names you, that was just filed

21   this -- this past week; is that right?

22             MS. DANDENEAU:  Ms. Deitsch-Perez, I

23        do want to interrupt at this point because

24        just as I told Mr. Morris, that this is a

25        deposition about the noticed litigation.

1                    WATERHOUSE - 10-19-21

2              I really don't want to go -- go

3        afield --

4              MS. DEITSCH-PEREZ:  Yeah.

5              MS. DANDENEAU:  -- and open up a

6        whole new line of inquiry about the lawsuit

7        or the -- the motion and the bankruptcy

8        court.  We will be here all night.

9              MS. DEITSCH-PEREZ:  And I

10       understand.

11       Q.    My -- my point is:  Do you feel

12  like -- like there is some effort by these

13  parties related to the debtor to intimidate

14  you -- not that you -- I'm not saying you are

15  or you aren't.

16              But do you feel like there is some

17  effort to intimidate you and maybe an effort to

18  deter you from being as prepared as you might

19  be in this deposition?

20              MR. MORRIS:  Objection to the form

21       of the question.

22       A.    I was -- I was surprised by the

23  lawsuit, by me being named, because, again, I

24  don't own the asset and things like that.

25  Yeah, I just -- I want to move forward with my

```
 1                WATERHOUSE - 10-19-21

 2   life at Skyview.

 3             MS. DEITSCH-PEREZ:  Thank you.

 4             THE WITNESS:  Thank you.

 5                FURTHER EXAMINATION

 6   BY MR. MORRIS:

 7        Q.    If I may, I just have a few

 8   questions.

 9             Mr. Waterhouse, we saw a number of

10   documents that Mr. Rukavina put up on the

11   screen where Ms. Hendrix would send you a

12   schedule of payments that were due on behalf of

13   certain Highland affiliates.

14             Do you remember that?

15        A.    Yes.

16        Q.    And in each instance she asked for

17   your approval to make the payments; is that

18   right?

19        A.    Yes, she did.

20        Q.    And was that the -- was that the

21   practice in the second half of 2020 whereby

22   Ms. Hendrix would prepare a list of payments

23   that were due on behalf of Highland associates

24   and ask for approval?

25        A.    Yes.
```

1                    WATERHOUSE - 10-19-21

2          Q.     And I think you said that there was

3    a -- a --

4          A.     It was -- I think I testified to

5    this earlier when we talked about procedures

6    and policy, you know, again, I want to be

7    informed of -- of -- of -- of -- of any

8    payments that are going out.  I want to be made

9    aware of these payments, and that was just a

10   general policy, not just for 2020.

11         Q.     Okay.  So it went beyond 2020?

12         A.     Yes.

13         Q.     Is that right?

14         A.     Yes.

15         Q.     Okay.  And the corporate accounting

16   group would prepare a calendar that would set

17   forth all of the payments that were anticipated

18   in the -- in the three weeks ahead; is that

19   right?

20         A.     I -- like I testified earlier, we

21   had a corporate calendar that was set up, you

22   know, to -- to provide reminders or, you know,

23   of anything of any nature, whether it is

24   payments or -- or financial statements or, you

25   know, whatever it is, you know, to meet

1              WATERHOUSE - 10-19-21

2    deadlines.

3              I don't know how, as I testified

4    earlier, how much they were using that

5    calendar.

6         Q.   Okay.  But -- but you did get notice

7    and a request to approve the payments that were

8    coming due on behalf of Highland's affiliates.

9    Do I have that right?

10             MS. DANDENEAU:  Objection to form.

11        A.   I mean, generally, yes.  I mean, you

12   know, as we saw with these emails, generally, I

13   mean, did that encompass everything, no.

14        Q.   Okay.  Do you know why the

15   payment -- do you know why there was no payment

16   made by NexPoint at the end of 2020?

17        A.   Yes.  There was -- there was -- we

18   talked about these agreements between the

19   advisors and Highland, the shared services and

20   the cost reimbursement agreement.

21             And in late 2020, there were

22   overpayments, large overpayments that had been

23   made over the years on these agreements, and it

24   was my understanding that the advisors were --

25   were talking with -- like Jim Seery and others

1            WATERHOUSE - 10-19-21

2   to offset any obligations that the advisors

3   owed to Highland as offset to the overpayments

4   on these agreements.

5        Q.    Okay.  Did you participate in any of

6   those conversations?

7        A.    I did not.

8        Q.    Okay.  Do you know -- do you recall

9   that the -- at the end of November, the debtor

10  did notice to the advisors of their intent to

11  terminate the shared services agreements?

12       A.    Like I testified earlier, there

13  was -- the agreements weren't identical, from

14  what I recall, and there is one that had a

15  longer notice period, which I think had a

16  60-day notice period.  I don't recall which one

17  that was, so not all of them were -- notice

18  hadn't been given as of November 30th, for all

19  of the agreements.

20       Q.    Upon the receipt of the -- the

21  termination notices that you recall, do you

22  know if the advisors decided at that point not

23  to make any further payments of any kind to

24  Highland?

25            MR. RUKAVINA:  Objection, form.

```
1                    WATERHOUSE - 10-19-21

2        A.    No.  The advisors -- the advisors

3   had stopped making payments prior to that

4   notice.

5        Q.    Okay.  And how do you know that the

6   advisors stopped making -- making payments

7   prior to the notice?

8        A.    I had -- I had a conversation

9   with -- with Jim Dondero.

10       Q.    And did Mr. Dondero tell you that

11  the advisors would no longer make payments to

12  Highland?

13            MS. DEITSCH-PEREZ:  Object to the

14       form.

15       A.    Yes, he -- he -- again, he said

16  they -- they -- the advisors have overpaid on

17  these agreements, to not make any future

18  payments, and that there needs to be offsets,

19  and they're working on getting offsets to these

20  overpayment.

21       Q.    Do you know if anybody ever

22  instructed Highland's employees to make the

23  payment that was due by NexPoint at the end of

24  the year?

25       A.    Did anyone instruct Highland's
```

1                    WATERHOUSE - 10-19-21

2   employees to make that payment?

3        Q.   Correct.

4        A.   Anyone -- not that I'm aware.

5        Q.   Were any of Highland's employees

6   authorized to make the payments on behalf of

7   its affiliates -- withdrawn.

8             Was any of Highland's employees

9   authorized to effectuate the payment on behalf

10  of NexPoint that was due at the end of the year

11  without getting approval from either you or

12  Mr. Dondero?

13       A.   They had the -- they had the ability

14  to make the payment, but they didn't -- you

15  know, that -- that payment needed to be

16  approved.

17       Q.   Okay.  And it needed to be approved

18  by you or Mr. Dondero; is that right?

19       A.   I mean, I'm not going to make the

20  unilateral decision.

21       Q.   Is that a decision that you

22  understood had to be made by Mr. Dondero?

23       A.   Yes.  Sitting back in December of

24  2020, the -- that -- there was this off --

25  offset negotiation that -- that was happening,

```
1                WATERHOUSE - 10-19-21

2    so I mean, until those negotiations were

3    resolved, you know, there wasn't any

4    payments -- there weren't any payments.

5         Q.    And -- and there were no payments

6    until the negotiations were resolved because

7    that was the directive that you received from

8    Mr. Dondero; correct?

9         A.    I don't think he said -- I mean, I

10   think -- yeah, I mean -- I'm trying to recall

11   the conversation.  It was -- you know, there

12   is -- there is these negotiations.  There's --

13   there needs to be these offsets.  They're

14   talking with the debtor.  So, you know, until

15   this is resolved, right, I mean, depending on

16   how, whatever that resolution was, were we to

17   take any action.

18        Q.    Okay.  How about with respect to

19   HCMS, did HCMS have a term payment due at the

20   end of the year?

21        A.    Again, I don't -- I don't recall.

22        Q.    Okay.  You discussed briefly two

23   payments that were made in January of 2021, one

24   on behalf of NexPoint, and one on behalf of

25   HCMS.  Do I have that right?
```

1                    WATERHOUSE - 10-19-21

2          A.    No.  The two payments I recall were

3    NexPoint and HCRE.

4          Q.    Okay.  And those two payments --

5    thank you for the correction.  And those two

6    payments were made because Mr. Dondero

7    authorized those payments to be made; correct?

8          A.    Yes.

9          Q.    And they hadn't been made before

10   that because Mr. Dondero had not authorized

11   them to be made?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.

14         A.    Yes, because of these negotiations.

15         Q.    Okay.  Just a couple of more

16   questions.

17              Did anybody, to the best of your

18   knowledge, on behalf of HCMFA, ever tell the

19   SEC that HCMLP was responsible for the mistakes

20   that were made on the TerreStar valuation?

21         A.    Did anyone from Highland on HCMFA's

22   behalf tell the SEC that Highland -- that

23   Highland was responsible for there -- I just

24   want to make sure --

25         Q.    It was a little bit different, so

1            WATERHOUSE - 10-19-21

2    let me try again.

3        A.    These are very long questions, John.

4    I'm not trying to be --

5        Q.    That is good.  Do you know whether

6    anybody -- do you know whether anybody on

7    behalf of HCMS -- HCMFA ever told the SEC that

8    Highland was the responsible party for the

9    TerreStar valuation error?

10       A.    Not that I'm aware.

11       Q.    Okay.  Did anybody on behalf of

12   the -- on behalf of HCMFA ever tell the retail

13   board that Highland was responsible for the

14   TerreStar valuation error?

15       A.    Not that I'm aware.

16       Q.    Do you know if HCMFA made an

17   insurance claim with respect to the damages

18   that were incurred in relation to the TerreStar

19   valuation error?

20       A.    Yes.

21       Q.    And do you know why they made that

22   insurance claim?

23       A.    Because there was an error.  I

24   mean --

25       Q.    Was the insured's claim made -- was

```
1                WATERHOUSE - 10-19-21

2    the insurance claim made under HCMFA's policy?

3         A.    Yes.

4         Q.    Did HCMFA at any time prior to the

5    petition date -- withdrawn.

6               You were asked a couple of questions

7    where -- where you said that Mr. Dondero told

8    you that he was ascribing zero value to the

9    notes as part of a pot plan because he believed

10   that the notes were part of executive

11   compensation.

12              Do I have that right?

13              MS. DEITSCH-PEREZ:  Object to the

14        form.

15        A.    Yes.

16        Q.    Okay.  Have you ever heard that

17   before the time that Mr. Dondero told you that

18   in the conversation about the pot plan?

19        A.    Had I heard that prior to my

20   conversation with Mr. Dondero?

21        Q.    Yes.

22        A.    No, I had not heard that prior.

23        Q.    Okay.  And that was in the context

24   of his formulation of the settlement proposal;

25   is that right?
```

```
 1                    WATERHOUSE - 10-19-21

 2         A.    I mean, generally, yes.  You know,

 3   we were asked to provide asset values, right,

 4   and he was having settlement discussions.

 5   Again, I don't know who those went to

 6   ultimately.  I don't recall.

 7              MR. MORRIS:  I have no further

 8         questions.  Thank you very much for your

 9         patience.  I apologize for the late hour.

10              MS. DEITSCH-PEREZ:  John, you stay

11         on about your email when --

12              MR. RUKAVINA:  Hold on, I'm not

13         done.

14              MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15         still has questions.  Sorry.  I was going

16         to say both John and Davor, could you stay

17         on afterwards just to talk about the

18         requests.

19                    FURTHER EXAMINATION

20   BY MR. RUKAVINA:

21         Q.    Mr. Waterhouse, you were just now

22   testifying about a discussion you had with

23   Mr. Dondero where he said something like no

24   more payments.

25              Do you remember that testimony?
```

1              WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    Okay.  And was that late November or

4   early December of 2020?

5        A.    It was, I would say, first or second

6   week of November.

7        Q.    Okay.  Do you recall whether --

8   whenever you had that discussion, whether

9   Mr. Dondero had already been fired by the

10  debtor?

11       A.    Yes, I -- I believe he was not an

12  employee of the debtor anymore at that time.

13       Q.    And when you were discussing this

14  with Mr. Dondero and he said no more payments,

15  you were discussing the two shared services

16  agreements and employee reimbursement

17  agreements we testified -- you testified about

18  before; is that correct?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    That is correct.

22       Q.    And had your office or you -- and we

23  will talk at a future deposition about the

24  administrative claim.

25            But had -- by that time that you

1            WATERHOUSE - 10-19-21

2   talked to Mr. Dondero, had your office or you

3   done any estimate of what the alleged

4   overpayments were?

5            MR. MORRIS:  Objection to the form

6        of the question.

7        A.    Yes, we had -- there was a -- there

8   was a detailed analysis that was put together

9   by David Klos at the time.

10       Q.    And do you recall just generally

11  what the total amount for both advisors of the

12  overpayments was?

13       A.    It was in excess of $10 million.

14       Q.    Was it in excess of $14 million?

15            MR. MORRIS:  Objection to the form

16        of the question.

17       A.    I -- I remember it was an

18  eight-figure number.  I don't remember

19  specifically.

20       Q.    Okay.  And did you convey that

21  number to Mr. Dondero when you had that

22  conversation?

23       A.    Yes.

24       Q.    What was his reaction?

25       A.    I mean, he wasn't happy.

1          WATERHOUSE - 10-19-21

2     Q.    Is it fair to say he was upset?

3     A.    Yes.

4     Q.    Did Mr. Dondero ever expressly tell

5  you to not have NexPoint make the required

6  December 31, 2020, payment?

7     A.    Yes, I recall him saying don't make

8  the payment because it was being negotiated, as

9  I discussed with Mr. Morris, this offset

10 concept.  So there were obligations due by the

11 advisors to Highland, they should be offset

12 that -- you know, those obligations should be

13 offset by this -- by this overpayment.

14    Q.    And when did he tell you that?

15    A.    I would say -- I would say around --

16 probably December -- December-ish.

17    Q.    Early December, late December?

18    A.    I don't recall with as much

19 specificity as -- as -- as -- as stopping the

20 shared services payments, because we had

21 actually made one shared services payment in

22 November.  So that is why I need to remember

23 that one more clearly.  I don't remember where

24 exactly in December that conversation occurred.

25    Q.    Did Mr. Dondero expressly use the

1              WATERHOUSE - 10-19-21

2    word "NexPoint" when he was saying don't make

3    these payments?

4              MR. MORRIS:  Objection to the form

5         of the question, asked and answered.

6         A.   Yeah, we were -- we were discussing

7    advisor obligations.  So it was -- you know, it

8    was just obligations from the advisors.

9              And -- and he specifically talked

10   about the NexPoint payment as well.

11        Q.   Okay.  And it is your testimony that

12   he expressly told you not to make that NexPoint

13   December 31 payment?

14             MR. MORRIS:  Objection, asked and

15        answered twice.

16        A.   Yes, he -- he did, during that

17   conversation.

18        Q.   And did you ever follow up with him

19   after that about whether NexPoint should or

20   shouldn't make that payment?

21        A.   I did not.

22        Q.   Did you ever, on or about

23   December 31, 2020, remind him and say, hey,

24   this payment is due, what shall I -- what

25   should I do?

1            WATERHOUSE - 10-19-21

2      A.    I did not.

3      Q.    So sitting here today, you -- you

4  remember distinctly that Dondero in December of

5  2020 expressly told you not to have NexPoint

6  make that payment?

7            MR. MORRIS:  Objection, asked and

8       answered three times.

9      A.    Yes.

10     Q.    Can you say categorically it wasn't

11  just some general discussion where he told you

12  not to make payments?

13           MR. MORRIS:  Objection, asked and

14      answer four times.

15           MR. HORN:  Four times now.  Go for

16      five.

17     A.    Yes.

18     Q.    Did you tell Mr. Seery that?

19     A.    I don't believe I did.  I don't

20  recall.

21     Q.    And was this an in-person discussion

22  or telephone or email?  Do you remember?

23     A.    This was a phone -- a phone

24  conversation.

25     Q.    Okay.  Would you have a record of --

1                    WATERHOUSE - 10-19-21

2    on your cell phone of when that conversation

3    might have taken place?

4              I'm sorry, strike that.

5              Was that by cell phone?

6         A.    I believe -- yes, because we -- I

7    was at home.  I mean, I don't have a landline.

8    All I have is my cell phone.

9         Q.    Do you know whether your cell phone

10   still has records of conversations from

11   December 2020 on it?

12        A.    My call log doesn't go back that

13   far.

14        Q.    Okay.  Thank you.

15             MR. RUKAVINA:  I will pass the

16   witness.

17             MS. DEITSCH-PEREZ:  Just a couple

18        quick questions.

19                  FURTHER EXAMINATION

20   BY MS. DEITSCH-PEREZ:

21        Q.    With respect to HCRE and HCMS, am I

22   correct there was -- there was no direction not

23   to pay those loan payments?

24             MR. MORRIS:  Objection to the form

25        of the question.

1                    WATERHOUSE - 10-19-21

2        A.    Yes, I don't recall having

3    conversations about, you know, those -- those

4    entities.

5        Q.    And, in fact, what was the tone that

6    Mr. Dondero had when he talked to you about the

7    fact that HCRE and HCMS payments hadn't been

8    made when he found out that they hadn't been

9    paid?

10                MS. DANDENEAU:  Objection to form.

11                MR. MORRIS:  Objection to form.

12        Q.    What was the tone he took with you?

13        A.    Oh, it was -- it was -- it was -- it

14    was very negative.  I mean, I think he cursed

15    at me and he doesn't usually curse.

16        Q.    Okay.  And in your mind, is that

17    consistent with the fact that he was surprised

18    that those payments hadn't been made?

19                MR. MORRIS:  Objection to the form

20        of the question.

21        A.    Yes.

22        Q.    Okay.  Thank you.

23                MR. MORRIS:  I have nothing further.

24        Thank you so much, Mr. Waterhouse.

25                MR. HORN:  I have no questions.

1                    WATERHOUSE - 10-19-21

2            Thank you, Mr. Waterhouse.  We appreciate

3            your time.  I am logging off the discussion

4            and I will talk to y'all tomorrow.

5                    MR. MORRIS:  Super.

6                    VIDEOGRAPHER:  If there are no

7            further questions, this ends the

8            deposition -- excuse me.  This ends the

9            deposition, and we are going off the record

10           at 7:30 p.m.

11           (Deposition concluded at 7:30 p.m.)

12

13                          _____

14                          FRANK WATERHOUSE

15

16    Subscribed and sworn to before me

17    this     day of              2021.

18

19    ---------------------------------

20

21

22

23

24

25

1              WATERHOUSE - 10-19-21

2              C E R T I F I C A T E

3

4         I, SUSAN S. KLINGER, a certified shorthand

5    reporter within and for the State of Texas, do

6    hereby certify:

7         That FRANK WATERHOUSE, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11        I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand this 19th of October, 2021.

17

18   _____

19        Susan S. Klinger, RMR-CRR, CSR

20        Texas CSR# 6531

21

22

23

24

25

1          WATERHOUSE - 10-19-21

2    NAME OF CASE:  In re:  Highland Capital

3    DATE OF DEPOSITION:  October 19, 2021

4    NAME OF WITNESS:  Frank Waterhouse

5    Reason Codes:

6         1.  To clarify the record.

7         2.  To conform to the facts.

8         3.  To correct transcription errors.

9    Page____Line_____Reason_____

10   From_____to_____

11   Page____Line_____Reason_____

12   From_____to_____

13   Page____Line_____Reason_____

14   From_____to_____

15   Page____Line_____Reason_____

16   From_____to_____

17   Page____Line_____Reason_____

18   From_____to_____

19   Page____Line_____Reason_____

20   From_____to_____

21   Page____Line_____Reason_____

22   From_____to_____

23   Page____Line_____Reason_____

24   From_____to_____

25

Kristin Hendrix - October 27, 2021

1         IN THE UNITED STATES BANKRUPTCY COURT
2          FOR THE NORTHERN DISTRICT OF TEXAS
3                    DALLAS DIVISION
4                       --o0o--
5
6   HIGHLAND CAPITAL MANAGEMENT,      )
    L.P.,                             )
7                                     )
                 Plaintiff,           )
8                                     )
             vs.                      ) No. 21-03004-sgj
9                                     )
    HIGHLAND CAPITAL MANAGEMENT FUND  )
10  ADVISORS, L.P.,                   )
                                      )
11              Defendants.           )
12  _____
13                  DEPOSITION OF
14                 KRISTIN HENDRIX
15                 October 27, 2021
16  _____
17
18         DEPOSITION OF KRISTIN HENDRIX, produced as a
19  witness, duly sworn by me via videoconference at the
20  instance of the DEFENDANTS, was taken in the
21  above-styled and numbered cause on October 27, 2021,
22  from 10:11 A.M. to 1:19 P.M., before BRANDON D. COMBS,
23  CSR, RPR, in and for the State of Texas, reported by
24  computerized machine shorthand, at 500 North Akard
25  Street, 38th Floor, Dallas, Texas.

Kristin Hendrix - October 27, 2021

| 1 | APPEARANCES |
|---|---|
| 2 | |
| 3 | MUNSCH, HARDT, KOPF & HARR, PC, 500 North |
| 4 | Akard Street, Suite 3800, Dallas, TX 75201, represented |
| 5 | by DAVOR RUKAVINA, Attorney at Law, appeared as counsel |
| 6 | on behalf of the Defendants. |
| 7 | Email: drukavina@munsch.com |
| 8 | |
| 9 | |
| 10 | PACHULSKI, STANG, ZIEHL & JONES, 780 Third |
| 11 | Avenue, 34th Floor, New York, NY 10017-2024, represented |
| 12 | by JOHN A. MORRIS, Attorney at Law, appeared as counsel |
| 13 | on behalf of the Plaintiff. |
| 14 | Email: jmorris@pszjlaw.com |
| 15 | |
| 16 | |
| 17 | STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777, |
| 18 | Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney |
| 19 | at Law, appeared via videoconference as counsel on |
| 20 | behalf of the Defendants Jim Dondero, HCMS and HCRE |
| 21 | Partners. |
| 22 | Email: michael.aigen@stinson.com |
| 23 | |
| 24 | |
| 25 | |

Kristin Hendrix - October 27, 2021

|  |  |  |
|---|---|---|
| 1 | INDEX | |
| 2 | | PAGE |
| 3 | Examination by MR. RUKAVINA | 6 |
| 4 | Examination by MR. AIGEN | 94 |
| 5 | Further Examination by MR. RUKAVINA | 110 |
| 6 | Examination by MR. MORRIS | 111 |
| 7 | | |
| 8 | EXHIBITS | PAGE |
| 9 | | |
| 10 | Exhibit 1   Promissory Note, 5M, May 3 | 30 |
| 11 | | |
| 12 | Exhibit 2   Promissory Note, 2.4M, May 2 | 30 |
| 13 | | |
| 14 | Exhibit 3   Email from David Klos, May 2, 2019, | 31 |
| 15 |            HCMLP to HCMFA loan | |
| 16 | | |
| 17 | Exhibit 4   Promissory Note, 5M, May 3 | 42 |
| 18 | | |
| 19 | Exhibit 5   Promissory Note, 2.4M, May 2 | 42 |
| 20 | | |
| 21 | Exhibit 6   Promissory Note, 5M, May 3 | 43 |
| 22 | | |
| 23 | Exhibit 7   Promissory Note, 2.4M, May 2 | 43 |
| 24 | | |
| 25 | Exhibit 8   Info, HCMF loan 05.03.2019 | 56 |

Kristin Hendrix - October 27, 2021

1   Exhibit 9     Info, HCMF loan 05.02.2019              56
2
3   Exhibit 10    Email from Scott Ellington, Dec 2,       59
4                 2020, HCM - HCMFA financial
5                 statements
6
7   Exhibit 11    Email from John Morris to                62
8                 James Seery, Jan 6, 2021,
9                 HCM information request
10
11  Exhibit 12    Letter, Dec 3, 2020, Demand on           65
12                Promissory Notes
13
14  Exhibit 13    Promissory Note, $30,746,812.33,         72
15                May 31
16
17  Exhibit 14    NPA $30.7M                               76
18
19  Exhibit 15    HCMLP Notes Receivable                   83
20
21  Exhibit 16    Email from Frank Waterhouse to           85
22                Lauren Thedford, Oct 6, 2020, 15(c)
23                follow-up
24
25

Kristin Hendrix - October 27, 2021

| | | |
|---|---|---|
| 1 | Exhibit 17 | Email from James Seery to | 88 |
| 2 | | James Dondero, Jan 7, 2021, demand |
| 3 | | on promissory note |
| 4 | | |
| 5 | Exhibit 18 | Email from Kristin Hendrix, Jan 12, | 90 |
| 6 | | 2021, NexPoint Note to HCMLP |

Kristin Hendrix - October 27, 2021

1                          KRISTIN HENDRIX,

2        having been first duly sworn, testified as follows:

3                            EXAMINATION

4          Q.   (BY MR. RUKAVINA)  Good morning.  If you'll

5    state your name.

6          A.   Kristin Hendrix.

7          Q.   We're doing this both ways.  You're on the

8    Zoom remotely and they can see you, but I would ask

9    that you and I maintain eye contact.  Of course, if

10   someone is asking you on the Zoom, then maintain

11   contact with them, if that's okay with you.

12         A.   Sure.

13         Q.   Have you been deposed before?

14         A.   No.

15         Q.   So I'm sure your counsel explained to you,

16   but very quickly, you understand that you're testifying

17   under oath and penalty of perjury as though you were in

18   a court of law?

19         A.   Yes.

20         Q.   And you understand my job is to ask clear

21   questions that you understand?

22         A.   Yes.

23         Q.   And if for whatever reason you don't

24   understand my questions, please let me know or ask me

25   to rephrase; otherwise, I'm going to assume that you

Kristin Hendrix - October 27, 2021

1  understood my question; okay?

2      A.    Yeah.

3           MR. MORRIS:  Objection.

4      Q.   (BY MR. RUKAVINA)  Sometimes Counsel will

5  make objections.  Unless he instructs you not to

6  answer, you're still required to answer my questions.

7      A.    Okay.

8      Q.    Now, in preparation for this deposition, did

9  you read the deposition transcript or any part of it of

10 Frank Waterhouse?

11     A.    I did not.

12     Q.    Did anyone provide you a synopsis or summary

13 of it?

14     A.    Maybe a few bits and pieces, but...

15          MR. RUKAVINA:  Off the record for a second.

16          (Off the record.)

17     Q.    (BY MR. RUKAVINA)  What do you mean bits and

18 pieces?

19     A.    I don't recall anything specific that was

20 said, other than it was very long.

21     Q.    Did you talk to Frank Waterhouse about it?

22     A.    Did not.

23     Q.    Other than Highland's legal counsel, did you

24 talk to anyone else about -- or -- strike that.

25          Other than Highland's legal counsel, did you

Kristin Hendrix - October 27, 2021

1  talk to anyone about Frank Waterhouse's deposition from
2  last week?
3       A.   I did not.
4       Q.   Did you review -- strike that.
5            Did you see any of the video of
6  Mr. Waterhouse's deposition?
7       A.   Nope.
8       Q.   Same questions now for Mr. Seery, S-e-e-r-y.
9            Did you read any portion or the whole of
10 Mr. Seery's deposition from last week?
11      A.   I did not.
12      Q.   See any of the video?
13      A.   No.
14      Q.   Did you see any synopsis or summary of his
15 deposition?
16      A.   No.
17      Q.   Did you talk to him about his deposition?
18      A.   I did not.
19      Q.   Other than talking to Highland's counsel, did
20 you talk to anyone about Mr. Seery's deposition?
21      A.   No.
22      Q.   Other than talking to Highland's counsel, did
23 you talk to anyone about your deposition today?
24      A.   Just John Morris and Dave Klos.
25      Q.   When did you talk to Mr. Klos, K-l-o-s?

Kristin Hendrix - October 27, 2021

1    A.    First time about this was last Friday.  And
2  then again Monday this week.  And yesterday.  And this
3  morning.
4    Q.    Friday was there any lawyer present during
5  your discussion with Mr. Klos?
6    A.    Yes, every time Mr. Morris was present.
7         MR. RUKAVINA:  Is it your position that those
8  four discussions would be privileged, Counsel?
9         MR. MORRIS:  Yes.
10         MR. RUKAVINA:  Then we'll move on.
11    Q.    (BY MR. RUKAVINA)  So we've established the
12  four times you talked to Mr. Klos with counsel present.
13  Did you do anything else related to or in preparation
14  for today's deposition?
15    A.    Yes, probably went through and reviewed some
16  emails, documentation that I may have had that I need
17  to refresh memory on.
18    Q.    These documents and emails that you might
19  have reviewed, did you supplementally provide them to
20  counsel or anyone else?
21    A.    Yes.
22    Q.    This would have been in the last week or
23  10 days?
24    A.    Yes.
25    Q.    Prior to the last week or 10 days, are you

Kristin Hendrix - October 27, 2021

1  aware that my office served requests for production on
2  Highland?
3      A.    Yes.
4      Q.    And did you do anything prior to the last
5  week or 10 days to try to search both your personal
6  records and corporate records for any responsive
7  documents?
8      A.    Not that I recall.
9      Q.    Is that something that you understand legal
10  counsel was charged with?
11      A.    Yes.
12      Q.    Let's go briefly now about your background,
13  please.
14          Where do you live?
15      A.    I live in Denton, Texas.
16      Q.    And what is your date of birth, please?
17      A.    January 26, 1982.
18      Q.    And walk me through your educational
19  background, starting with any postsecondary, if any,
20  schooling or college or anything like that.
21      A.    Sure.  Graduated in 2004 from the University
22  of North Texas with a degree in finance.  Went on to
23  get my MBA from SMU in 2009.  And then went further and
24  got my CPA license I believe in 2015.
25      Q.    In the state of Texas?

Kristin Hendrix - October 27, 2021

1       A.    Yes.

2       Q.    And has your CPA license been current since

3   then?

4       A.    Sure has.

5       Q.    Have you faced any kind of disciplinary

6   action as a CPA?

7       A.    I have not.

8       Q.    Now, please walk me through your work

9   history.  Let's say starting with after you graduated

10  college.

11      A.    Sure.  December of 2005, which was shortly --

12  sorry, 2004, shortly after I graduated from

13  North Texas, I started at Highland.  It was my first

14  real job out of college.  I have been there ever since,

15  almost 17 years now.

16            Have worked in the corporate accounting

17  department the entire time.  Started off as the AP

18  associate, and worked my way up over the years and

19  currently am the controller.

20      Q.    So even when you were getting your MBA and

21  CPA you were employed by Highland?

22      A.    Yes.

23      Q.    Impressive.  You're the controller today you

24  mentioned?

25      A.    Yes.

Kristin Hendrix - October 27, 2021

1      Q.   That's -- when did you become the controller,
2  sometime February or March of this year?
3      A.   Yes.
4      Q.   Before you became the controller, what was
5  your role at Highland?
6      A.   Right before that I was assistant controller.
7  That was I believe April of 2020.  Before that, the
8  senior accounting manager, and I held that position for
9  years.
10      Q.   So in May of 2019 would you have been the
11  senior -- you said senior account?
12      A.   Senior accounting manager I believe was my
13  title.
14      Q.   And would that have been your title in May of
15  2017?
16      A.   Yes, I believe so.
17      Q.   And let's focus now on May 2019 as the senior
18  accounting manager.  How would you describe your role
19  at Highland in May of 2019?  What were your duties?
20      A.   Sure.  I helped with treasury management
21  function, cash forecasts and things like that.  And
22  oversaw the financial reporting from the last batch of
23  AP to all the way to financials and reporting on
24  audits.
25      Q.   Who did you report to in May of 2019?

Kristin Hendrix - October 27, 2021

1     A.    David Klos.

2     Q.    What was Mr. Klos' title to your

3  understanding back then?

4     A.    I believe he was the controller.

5     Q.    And do you have an understanding as to who

6  Mr. Klos reported to back then?

7     A.    Yes, Frank Waterhouse.

8     Q.    Frank Waterhouse.  Who was he in May of 2019?

9     A.    The CFO.

10     Q.    Is Mr. Klos still with Highland today?

11     A.    He is.

12     Q.    What is his role now?

13     A.    He's now CFO.

14     Q.    You mentioned treasury management as of 2019,

15  May.  What do you mean by treasury management?  What is

16  that?

17     A.    Generally speaking, we -- it's not just me as

18  one person.  We have checks and balances.

19          My team would be in charge of sending out

20  payments, reconciling bank statements, making sure

21  money is in the right accounts, creating cash forecasts

22  and reporting on those every week with the CFO and

23  oftentimes the CEO.

24          Generally that's everything that fell under

25  the umbrella.

Kristin Hendrix - October 27, 2021

1    Q.   And would your description of treasury
2 management be the same for the December 2020 period?
3    A.   Yes.
4    Q.   Who at Highland or which group at Highland in
5 December of 2020 would have been responsible for noting
6 that there are certain bills that need to be paid in
7 the near or subsequent future.
8         By way of, let's say, accounts payable or
9 promissory notes or taxes or anything like that?
10   A.   Can you repeat your question.
11   Q.   Sure.  So obviously, Highland was a pretty
12 sophisticated business; correct?
13   A.   Yeah.
14        MR. MORRIS:  Objection to the form.
15   Q.   (BY MR. RUKAVINA)  And had various accounts
16 payable; right?
17   A.   Yes.
18   Q.   And it had maybe, let's just say, certain
19 note obligations that it had to pay from time to time;
20 correct?
21        MR. MORRIS:  Objection to the form of the
22 question.  Do you mean Highland Capital?
23        MR. RUKAVINA:  I mean Highland Capital
24 Management; correct, I'm sorry.  The debtor.
25   Q.   (BY MR. RUKAVINA)  Can we say the debtor?

Kristin Hendrix - October 27, 2021

1    A.    Yes, you can say the debtor.

2    Q.    So when I say the debtor and you say the

3    debtor we understand each other to mean Highland

4    Capital Management, comma, LP; correct?

5    A.    Correct.

6    Q.    I apologize.  In the December 2020 period, I

7    would imagine that the debtor had its own -- that

8    was -- strike that.

9         We'll cut to the chase.

10        In December of 2020, the debtor was providing

11   services to various other entities affiliated with

12   Mr. Dondero; correct?

13   A.    Correct.

14   Q.    That would have included NexPoint Advisors,

15   LP?

16   A.    Correct.

17   Q.    And you're aware that NexPoint Advisors was

18   the obligor on at least one promissory note to the

19   debtor; correct?

20   A.    Correct.

21   Q.    And did the debtor in December 2020 provide

22   so-called treasury management services to NexPoint

23   Advisors?

24        MR. MORRIS:  Objection to the form of the

25   question.

Kristin Hendrix - October 27, 2021

1    THE WITNESS:  Yes.

2    Q.  (BY MR. RUKAVINA)  As part of that, in

3  December 2020, would it have been employees of the

4  debtor that would have scheduled for potential payment,

5  subject to approval by NexPoint, NexPoint's future

6  obligations as they were coming due?

7    A.  Yes, we would have scheduled, only with

8  approval.

9    Q.  And would that have included NexPoint's

10  obligations on the promissory note to Highland?

11    A.  Yes.

12    Q.  Back to your background briefly.

13    Do you have any legal training at all?

14    A.  I do not.

15    Q.  Do you have any courses, have you taken any

16  courses in drafting promissory notes?

17    A.  No.

18    Q.  Do you believe that your expertise as a

19  certified public accountant gives you any greater

20  qualification than anyone else to prepare a promissory

21  note?

22    MR. MORRIS:  Objection to the form of the

23  question.

24    THE WITNESS:  No.

25    Q.  (BY MR. RUKAVINA)  Have you ever prepared or

Kristin Hendrix - October 27, 2021

1  drafted a promissory note?

2       A.    That term is probably used loosely.  I have

3  not completely drafted a promissory note from scratch,

4  no.

5       Q.    And we'll go into the details.  Fair to say

6  that you have taken a form promissory note and revised

7  it?

8       A.    Absolutely.

9       Q.    Was this part of your job in May of 2019 at

10  Highland?

11       A.    Yes.

12       Q.    Going back to the May 2019 time frame, were

13  you part of a particular group at Highland, like

14  accounting or legal or compliance?

15       A.    Yes, corporate accounting.

16       Q.    Corporate accounting.  That's what you

17  described before about treasury management and

18  projections and forecasts?

19       A.    Yes.

20       Q.    In May of 2019, was it the practice at

21  Highland that corporate accounting would be responsible

22  for drafting intercompany promissory notes?

23       A.    Not necessarily drafting, but updating a

24  draft that had been previously produced and provided by

25  our legal team, yes.

Kristin Hendrix - October 27, 2021

1    Q.   And Highland in May -- the debtor in May of
2    2019 did have a legal department?
3    A.   Yes.
4    Q.   Kind of like the corporate accounting, there
5    was a separate legal department; correct?
6    A.   Correct.
7    Q.   And who would have been in charge of that
8    department in May of 2019?
9    A.   Scott Ellington, E-l-l-i-n-g-t-o-n.
10   Q.   In May of 2019 or by May of 2019 was there
11   any practice at Highland as to whether its legal
12   department would be involved with the drafting or
13   execution of any intercompany promissory notes?
14       MR. MORRIS:  Objection to the form of the
15   question.
16       THE WITNESS:  It depends on the note.
17   Q.   (BY MR. RUKAVINA)  What did it depend on?
18   A.   Our typical practice is if we have a loan
19   with certain affiliates that it's a demand note.  We
20   have a template that we have used for years that was
21   created by either our internal legal team or an outside
22   law firm, I'm not sure which.
23       The typical practice is always updating a few
24   things on that template, getting it executed, and
25   filing it in our audit folders.

1    Q.   By updating, what do you mean?

2    A.   There's a few things that would need
3  updating, the date.

4    Q.   Maker?

5    A.   Maker.

6    Q.   Amount?

7    A.   The dollar amount, the interest rate.

8    Q.   And is it your testimony that the corporate
9  accounting group would do these things on its own
10 without necessarily the involvement of the legal group?

11       MR. MORRIS:  Objection to the form of the
12 question.

13       THE WITNESS:  Generally, yes.

14    Q.   (BY MR. RUKAVINA)  Do you have any memory in
15 or before May of 2019 if the corporate -- I'm sorry, if
16 the legal group became involved in drafting or
17 executing any prior intercompany promissory notes?

18    A.   Yes.

19    Q.   Explain to me what you remember about that.

20    A.   I do know that they were involved with
21 drafting restructured notes.  So taking demand notes
22 and turning them into a 30-year amort note.

23       That was in 2017.  I know for sure that they
24 were involved in that because it was something
25 different.  We weren't just updating a demand note.

Kristin Hendrix - October 27, 2021

1    Q.   Is it your testimony that to the best of your
2  recollection by May of 2019 and in May of 2019 it would
3  have been the corporate accounting group that would
4  have handled routine intercompany demand notes?
5    A.   Yes.
6    Q.   And you can think of more than one instance
7  on which that happened?
8    A.   Yes.
9    Q.   And this is not a memory test, but going back
10 in time can you try to give an estimate of what year
11 that first started happening, that the corporate
12 accounting would handle the drafting or execution of
13 intercompany demand notes?
14   A.   As far as I can remember.
15   Q.   Is it your testimony that as -- maybe even
16 going back as far as 2005 there were intercompany
17 demand notes?
18   A.   Yes.
19   Q.   I don't know how to ask this question, but
20 was this a significant thing in corporate accounting or
21 just another routine deal when you handled demand
22 notes?
23       MR. MORRIS:  Objection to the form of the
24 question.
25       THE WITNESS:  This is a routine job duty that

Kristin Hendrix - October 27, 2021

1  we routinely did.

2      Q.   (BY MR. RUKAVINA)   Between 2005 and 2019, do

3  you remember any maker on these intercompany demand

4  notes actually being required to pay a demand note, in

5  other words, Highland making demand?

6      A.   Not that I can specifically recall.

7      Q.   Do you have any recollection as to what

8  happened to these intercompany demand notes over the

9  years between 2005 and 2019?

10     A.   Yeah.  Typically anytime specifically Jim

11 Dondero would need to move money between related

12 parties, he would pay down -- when I say him, he would

13 have us in corporate accounting move money around, pay

14 off notes, reissue new notes somewhere else.

15          So a way to move money around between his

16 entities.

17     Q.   So let's use just hypotheticals here so that

18 I'm not trying to pin you down to any specific fact.

19          But between 2005 and 2019, is it fair to say

20 that if some Dondero entity that's not the debtor

21 needed money and the debtor had money, then Dondero

22 would have the debtor lend money to that entity on a

23 demand note basis?

24     A.   So long as they have the cash available to do

25 so.

Kristin Hendrix - October 27, 2021

1      Q.    "They" being the debtor?

2      A.    Debtor, yes.

3      Q.    And is it fair to say, then, again

4  hypothetically without any specifics, that if the

5  debtor maybe from time to time needed money and one of

6  these other entities had cash, then Dondero would cause

7  that other entity to pay down the demand note?

8           MR. MORRIS:  Objection to the form of the

9  question.

10          THE WITNESS:  Can you repeat that.

11     Q.    (BY MR. RUKAVINA)  Sure.  So I think you

12 mentioned that from time to time these entities would

13 pay down these demand notes?

14     A.    To the debtor?

15     Q.    To the debtor.

16     A.    Yes.

17     Q.    And is that, hypothetically again, is that

18 because on occasion the debtor might have needed cash

19 and these entities had the cash, so Dondero would have

20 them pay back the note?

21          MR. MORRIS:  Objection to the form of the

22 question.

23          THE WITNESS:  Yes, that could be a reason.

24     Q.    (BY MR. RUKAVINA)  Can you think of any other

25 reason in those 14 years?

Kristin Hendrix - October 27, 2021

1    A.    If the debtor needed cash to lend to another
2  entity.
3    Q.    I see.  So again, it's all one big happy
4  family, and whoever needed cash, the cash moved around;
5  correct?
6    A.    Correct.
7    Q.    Was it Mr. Dondero that basically was the
8  only deciding person in each instance that you're aware
9  of in those 14 years as to when a note would be made or
10  repaid?
11    A.    I can't answer specifically to that.  Most of
12  my direction came from our CFO at the time,
13  Frank Waterhouse.  So what conversations he would have
14  with Jim Dondero, I can't answer to that.  But I would
15  suspect so, yes.
16    Q.    And in May of 2019 or by May of 2019, did you
17  communicate personally, by email or telephone, in
18  person, periodically with Jim Dondero?
19    A.    I can't say periodically, no.
20    Q.    Well, I'm not trying to put words in your
21  mouth.  Is it fair to say that you kind of -- your
22  communications stopped with Mr. Waterhouse and
23  Waterhouse communicated with Dondero, as opposed to you
24  regularly communicating with Dondero?
25    A.    That's typical, yes.

Kristin Hendrix - October 27, 2021

1    Q.    Can you think of any instances in which
2  Mr. Dondero gave you any instructions or you came to
3  him seeking any instructions, without some intermediary
4  between the two of you?
5    A.    No, usually Frank was present.
6    Q.    Would you categorize Mr. Waterhouse as kind
7  of guarding with jealousy his access to Mr. Dondero?
8          MR. MORRIS:  Objection to the form of the
9  question.
10          THE WITNESS:  No.
11    Q.    (BY MR. RUKAVINA)  What kind of boss was he
12  in May of 2019?  Was he laid back, or was he a jerk?
13  Was he demanding?  How would you characterize him in
14  May of 2019?
15          MR. MORRIS:  Objection to the form of the
16  question.
17          THE WITNESS:  I would say he was a good boss.
18    Q.    (BY MR. RUKAVINA)  You think he was competent
19  as far as his job went?
20    A.    Yes, very competent.
21    Q.    Do you think he was competent as far as his
22  job went in December of 2020?
23    A.    Yes.
24    Q.    January 2021?
25    A.    Yes.

Kristin Hendrix - October 27, 2021

```
1        Q.   Was he patient and understanding as a boss?
2        A.   Yes.
3        Q.   Okay.  Was he ever condescending or rude to
4   anyone in your presence?
5        A.   No.
6        Q.   So you're the controller today at Highland,
7   the debtor, the reorganized debtor; right?
8        A.   Yes.
9        Q.   And who do you report to?  You mentioned
10  Mr. Klos is the CFO?
11       A.   Yes.
12       Q.   And do you also report to Mr. Seery?
13       A.   Yes, I think everybody does.
14       Q.   And I don't need to know details, but I take
15  it you're on a salary from reorganized Highland?
16       A.   Yes.
17       Q.   Is any part of your compensation merit or
18  bonus based?
19       A.   It could potentially be.
20       Q.   Have you had any discussions with Mr. Seery
21  or Mr. Klos about some sort of bonus compensation?
22       A.   Yes.
23       Q.   Has anything been agreed to?
24       A.   Yes.
25       Q.   And again, I don't need to know the exact
```

Kristin Hendrix - October 27, 2021

1  numbers.  What would your bonus compensation consist
2  of?  How would it be decided?
3       A.   It's actually -- was decided when I agreed to
4  stay on the Highland team back in February 2021, so
5  it's in my employment agreement.
6       Q.   So what's your bonus compensation?
7       A.   I'm not sure I understand what you're asking.
8       Q.   So is the bonus discretionary on the part of
9  Highland?
10       A.   No, it's a set amount.
11       Q.   And what triggers it or governs the set
12  amount?
13       A.   Just it gets paid out on a certain date of
14  the year.  It's very straightforward, set out in my
15  employment agreement.
16       Q.   Is it irrespective of the performance of the
17  reorganized debtor?
18       A.   Yes.
19       Q.   So why do you call it a bonus instead of base
20  compensation?
21       A.   That's what it's called in my agreement.
22       Q.   So your base compensation and your bonus,
23  it's your testimony, you're going to earn it
24  irrespective of whether reorganized Highland does good
25  or bad with respect to its profitability?

Kristin Hendrix - October 27, 2021

1    A.    Correct.
2    Q.    And how Highland, reorganized Highland
3  collects these promissory notes is going to play no
4  part in your base and bonus compensation to your
5  understanding; is that correct?
6    A.    To my knowledge, yes.
7    Q.    So you have no direct or indirect stake in
8  the outcome of these litigations?
9    A.    No.
10    Q.    And you understand that I represent HCMFA and
11  NexPoint?
12    A.    Yes.
13    Q.    And these court reporters are not familiar
14  with some of our terminology.  NAP [verbatim], if we
15  say that, that means NexPoint; right?
16    A.    Uh-huh.
17    Q.    You have to say yes or no.
18    A.    Yes, NPA, NexPoint.
19    Q.    NPA.  And when we say NexPoint, you and I are
20  meaning NexPoint Advisors, LP; right?
21    A.    Yes.
22    Q.    And when we say HCMFA, we're meaning Highland
23  Capital Management Fund Advisors, LP, yes?
24    A.    Yes.
25    Q.    What is your understanding of the two

Kristin Hendrix - October 27, 2021

1  lawsuits, the one against HCMFA and the one against
2  NexPoint, that you're being deposed on today?
3          MR. MORRIS:  Objection to the form of the
4  question.
5      Q.  (BY MR. RUKAVINA)  Who is suing who and for
6  what?
7      A.  I don't know all the details.
8      Q.  So we've established that you've discussed
9  these lawsuits in the last week or a little bit more
10 with legal counsel.  I don't want to talk about that.
11         Prior to these recent discussions, did you
12 have any discussions with anyone at Highland about its
13 lawsuits against HCMFA and NexPoint on promissory
14 notes?
15     A.  Repeat that again.
16     Q.  Sure.  So remember we're excluding the recent
17 discussions in the last week or 10 days with counsel;
18 right?
19     A.  Okay.
20     Q.  Are you aware that in January of 2021 the
21 debtor sued NexPoint to collect on a promissory note?
22     A.  I'm aware that demand notices were sent.
23     Q.  So until recently you weren't aware that a
24 lawsuit had been filed?
25     A.  There's a lot of lawsuits filed.  I can't

Kristin Hendrix - October 27, 2021

1  keep track of what is what or what we're talking about
2  at certain times.
3       Q.   But you have no distinct memory of that?
4       A.   Correct.
5       Q.   And same question for the lawsuit that the
6  debtor filed against HCMFA in January.
7            Do you have any specific memory of that
8  lawsuit having been filed?
9       A.   Not specifically.
10      Q.   You mentioned that you're aware that on or
11  before January 2021, demand letters had been sent?
12      A.   Yes.
13      Q.   Did you play any role in either drafting
14  those demand letters or the decision to send them?
15      A.   No.
16      Q.   So going back to my question about these
17  lawsuits, do you have any memory of anyone asking
18  you -- again, excluding the last week or two.
19           Do you have any memory of anyone asking you
20  to do anything with respect to either or both of these
21  lawsuits?
22      A.   No.
23      Q.   You have no memory of Mr. Waterhouse,
24  Mr. Klos, Mr. Surgent, or Mr. Seery asking for any
25  background information or your input at all on these

1    two lawsuits?

2            MR. MORRIS:  Better not have been --

3            THE WITNESS:  No.

4        Q.   (BY MR. RUKAVINA)  Who did I say?  Did I

5    misspeak?  Okay.

6            Now we're going to have some exhibits here.

7            And do you have the labels?

8            Let's take a minute break off the record.

9            (Off the record.)

10       Q.   (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to

11   provide to you a promissory note in the original

12   principal amount of $5 million from HCMFA.  This is the

13   PDF version of this as filed with the Court for

14   collection.  It's going to be Exhibit 1.

15           (Whereupon, Exhibit 1 was marked for

16           identification.)

17       Q.   (BY MR. RUKAVINA)  Before you look at

18   Exhibit 1, I'm going to do the same thing for

19   Exhibit 2, which is a promissory note from HCMFA for

20   $2.4 million, dated May 2, 2019.

21           (Whereupon, Exhibit 2 was marked for

22           identification.)

23       Q.   (BY MR. RUKAVINA)  Again, Ms. Hendrix, these

24   are the PDF versions of these notes as filed with the

25   Court.  Sitting here today, do you remember anything

Kristin Hendrix - October 27, 2021

1    about either or both of these two promissory notes?

2        A.    Sure, yes.

3        Q.    What do you remember?

4        A.    I remember seeing them because I've recently

5    looked at them.  I see them all the time in our loan

6    tracking spreadsheets.  My team would have been

7    responsible for the whole process that I explained

8    before when it comes to a promissory note.

9        Q.    And --

10            MR. MORRIS:  Are you finished?

11            THE WITNESS:  Yes.

12        Q.    (BY MR. RUKAVINA)  And we have an email here

13    that might give some more context to that if I can find

14    it here.

15            This will be Exhibit 3.  This is an email

16    from David Klos to corporate accounting dated May 2,

17    2019.

18            (Whereupon, Exhibit 3 was marked for

19            identification.)

20        Q.    (BY MR. RUKAVINA)  Do you see this email,

21    ma'am?

22        A.    Yes.

23        Q.    Okay.  Corporate accounting, would that email

24    group have included you?

25        A.    Yes.

Kristin Hendrix - October 27, 2021

1      Q.    And this email says, Kristin, can you or

2    Hayley.  Do you think that Kristin was you?

3      A.    I do.

4      Q.    Do you remember receiving this email?

5      A.    Not explicitly.

6      Q.    So it says Blair.  Who would Blair be?

7      A.    Blair was our AP associate.

8      Q.    What is her last name?

9      A.    At this time it would have been Roeber,

10   R-o-e-b-e-r.

11     Q.    Okay.  And did it subsequently change?

12     A.    Yes, it's now Hillis, H-i-l-l-i-s.

13     Q.    Please send $2.4 million from HCMLP to HCMFA.

14   This is a new interco loan.  Kristin, can you or Hayley

15   please prep a note for execution.  I'll have further

16   instructions later today, but please process this

17   payment as soon as possible.

18          Did I read that correctly?

19     A.    Yes.

20     Q.    Do you have any memory of whether this email

21   relates to Exhibit 2, the $2.4 million promissory note?

22     A.    It seems like it does, same date, same

23   amount.

24     Q.    Do you have any memory, or in reviewing your

25   files did you see any similar email or document that

Kristin Hendrix - October 27, 2021

1  would have related to Exhibit 1, the $5 million
2  promissory note?
3      A.   Yes.  I believe there's another email for
4  that one.
5      Q.   And do you believe that you provided that to
6  counsel?
7      A.   Yes.
8      Q.   Recently or some time ago?
9      A.   Well, I don't think I provided it, so I'm not
10  sure when they got it.  I know it has been provided.
11      Q.   You know that it has?
12      A.   Uh-huh.
13      Q.   How do you know?
14      A.   Because I've seen it.
15      Q.   In the production that was produced to me?
16      A.   Yes.
17      Q.   And also from a David Klos?
18      A.   This one, or on the -- when I say this one,
19  on the $2.4 million or the 5-?
20      Q.   On the $5 million note.
21      A.   I'm not sure.
22      Q.   Okay.  Let me make sure I understand you
23  correctly.
24           Sitting here today you believe that there is
25  another email referencing the $5 million loan that has

1  been produced to my office?

2      A.   Yes.  I believe so.

3      Q.   Okay.  And going off memory, did it kind of

4  say the same thing as this Exhibit 3 except that it

5  referenced $5 million?

6          MR. MORRIS:  Objection to the form of the

7  question.

8          THE WITNESS:  Generally, should have said the

9  similar situation, yeah.

10     Q.   (BY MR. RUKAVINA)  So Mr. Klos says, this is

11 a new interco loan, for Exhibit 3.  Other than what he

12 told you, that this is an intercompany loan, did anyone

13 else tell you or did you have any other information on

14 May 2, 2019 that this was a loan?

15     A.   I don't specifically recall these

16 conversations, but I can tell you our normal practice

17 would be we would either likely be in a cash meeting --

18 and I say "we."  Would have been myself, Dave Klos,

19 Frank Waterhouse, potentially even Jim Dondero.

20         But I don't recall conversations on this

21 specific date.  But general practice is we would talk

22 about it.

23         Oftentimes, Frank would either call Dave or I

24 or stop by and tell us that, we need to send money to

25 an affiliate, paper up a new loan, let's get a wire out

Kristin Hendrix - October 27, 2021

1  the door, is typically how this works.

2      Q.   Is the answer generally the same for the

3  $5 million note?

4      A.   Yes.

5      Q.   So is it fair to say that typically,

6  obviously not every time, but typically your corporate

7  accounting group when it would see intercompany

8  transfers in large amounts would believe that they were

9  loans?

10          MR. MORRIS:   Objection to the form of the

11  question.

12          THE WITNESS:   Typically they were loans.

13  There's not really another way to get money from one

14  entity to another.  And if they were papered as a loan,

15  that means we were told to set it up that way.

16      Q.   (BY MR. RUKAVINA)  What do you mean papered

17  as a loan?  Aren't you papering it as a loan when

18  someone makes the promissory note?

19      A.   Yes, because we're told by somebody to do

20  that.

21      Q.   And in this instance, Mr. Klos on Exhibit 3

22  told the group that this was a loan; right?

23      A.   Correct.  But he would have spoken with

24  Frank Waterhouse or Jim Dondero prior to that, before

25  telling anybody to do that.

Kristin Hendrix - October 27, 2021

1    Q.   Okay.  And do you have any knowledge that he
2 did speak to Mr. Waterhouse or Mr. Dondero before
3 sending this email?
4    A.   Again, I don't have specific knowledge on the
5 exact conversations, but that's always how it has
6 worked.
7    Q.   That's how it was for 14 or 15 years;
8 correct?
9    A.   Yes.
10    Q.   But you're logically assuming that it
11 happened here.  You don't know that it happened here;
12 correct?
13         MR. MORRIS:  Objection to the form of the
14 question.
15         THE WITNESS:  I would have to be fairly
16 certain that it did, even though I can't recall
17 specific conversations.
18    Q.   (BY MR. RUKAVINA)  Did you ask Mr. Klos about
19 who told him that this is a new intercompany loan on
20 Exhibit 3?
21    A.   No.  It's quite possible I was involved in
22 the conversation.  I reported to him.  I wouldn't
23 question his authority.
24    Q.   Did you ask Mr. Klos who told him that the
25 $5 million deal was also an intercompany loan?

Kristin Hendrix - October 27, 2021

1    A.   I did not ask that specific question that I
2  can recall.

3    Q.   Did you ask Mr. Waterhouse whether either of
4  these transactions were loans?

5    A.   I'm sure Mr. Waterhouse is the one that told
6  us they were loans.  We wouldn't just paper up a loan,
7  send money out and call it a loan and account for it
8  that way, unless somebody specifically told us.

9    Q.   Do you have any memory of Mr. Waterhouse
10 orally or in writing or email or in any way, shape, or
11 form on or about May 2 or 3, 2019 telling you that the
12 2.4 million or $5 million transfers were intercompany
13 loans?

14    A.   No specific knowledge of exact conversations,
15 but I'm certain that those conversations were had
16 because that's the only way that we would have papered
17 up a loan, sent money out as a loan, had them on our
18 financials for two years.

19    Q.   So you're saying that this email, Exhibit 3,
20 from Mr. Klos was not enough, that there would have
21 been other things that happened to make you and other
22 people in your group confident that these were loans?

23    A.   Yes.

24    Q.   And these other things would have been in
25 person or by email?

Kristin Hendrix - October 27, 2021

1        A.    Most likely in person via phone call.

2        Q.    Okay.  So again, you have no specific memory

3    of it, but based on the 14-year pattern and conduct you

4    believe that you would have discussed these two

5    transfers with Mr. Waterhouse and he would have told

6    you these are loans?

7              MR. MORRIS:  Objection to the form of the

8    question.

9              THE WITNESS:  Correct.

10       Q.    (BY MR. RUKAVINA)  And then would he have

11   told you to take care of the promissory notes, or was

12   that Mr. Klos here in Exhibit 3?

13       A.    It could have been both.  It's clearly Dave

14   in this email, but Frank could have also said that to

15   me.

16       Q.    Now, do you -- strike that.

17             In May of 2019, did you know or were you told

18   why these $7.4 million were being transferred from the

19   debtor to HCMFA?

20       A.    Yes.  I do have recollection that -- I do

21   know that there were two big events in May 2019.

22   2.4 million was related to a TerreStar NAV error, with

23   one of the funds advised by HCMFA.  That's Global

24   Allocation Fund.

25             Similar with the $5 million loan.  There was

Kristin Hendrix - October 27, 2021

1  a consent fee that the advisor of the Global Allocation
2  Fund had promised to pay to shareholders of that fund,
3  and it was in the amount of $5 million roughly.
4           So both of these loans were for those
5  purposes respectfully.
6      Q.   And were you in May of 2019 also aware that
7  in addition to the $2.4 million, there was another more
8  than $5 million paid to that fund by HCMFA's insurer as
9  compensation for the NAV error?
10     A.   By the insurance company, yes.
11     Q.   So the $7.4 million, you understood then was
12  a loan as opposed to compensation to HCMFA?
13     A.   Yes.
14     Q.   Okay.  Did you understand in May of 2019 that
15  it had been the debtor and its valuation team that
16  caused that NAV error?
17          MR. MORRIS:  Objection to the form of the
18  question.
19          THE WITNESS:  I can't answer that.  I was not
20  involved with the activities leading up to the NAV
21  error.
22     Q.   (BY MR. RUKAVINA)  How do you know that the
23  $7.4 million were being transferred for the NAV error
24  and consent fee?
25     A.   Because I do know about both of those

Kristin Hendrix - October 27, 2021

1    instances and I do know that HCMFA needed to pay these
2    dollar amounts for both of those.
3         Q.   And you knew that in May of 2019?
4         A.   Yes.
5         Q.   How did you know that in May of 2019?
6         A.   It was lots of discussions had been going on
7    around both of these issues for months.  These weren't
8    surprises to anybody.
9         Q.   So although you weren't involved directly
10   with the NAV error issues, it was more or less common
11   knowledge in your accounting group?
12        A.   Correct.
13        Q.   Do you have any knowledge at all as to
14   whether Mr. Dondero decided to transfer these
15   $7.4 million not as a loan, but to compensate HCMFA for
16   the debtor's alleged liability?
17        A.   Have not heard of that.
18        Q.   Ever?
19        A.   Never.
20        Q.   But you also never heard Mr. Dondero say that
21   these $7.4 million were a loan; correct?
22        A.   That was not told to me directly.
23        Q.   Again, you're logically assuming that based
24   on many instances of intercompany transfers in the
25   14 years prior to that?

Kristin Hendrix - October 27, 2021

1          MR. MORRIS:  Objection to the form of the
2  question.  Mischaracterizes the testimony.
3          THE WITNESS:  Correct.
4      Q.  (BY MR. RUKAVINA)  I think you answered
5  correct?
6      A.  Correct.
7      Q.  And you mentioned that after these notes, you
8  saw them on internal financials and that reinforces
9  your view that these were loans?
10     A.  Correct.
11     Q.  But as of May 2 and 3, 2019, no one had told
12  you directly that these are loans?
13         MR. MORRIS:  Objection to the form of the
14  question.  It's in writing.
15         THE WITNESS:  That's not what I'm saying at
16  all.
17     Q.  (BY MR. RUKAVINA)  Other than Mr. Klos' email
18  or emails, no one told you on May 2 or May 3, 2019 that
19  you remember today that these were loans?
20     A.  It quite possibly could have been told to me
21  in addition to this email.
22     Q.  I understand.  You just have no memory of
23  that today; correct?
24     A.  Correct.
25     Q.  Is there anything that you can think of

1   sitting here today to refresh your memory on that
2   point?
3       A.   I do not think so.  I'm sure there was
4   conversation that unfortunately would not be in an
5   email.
6       Q.   Now, we have the Word documents, the Word
7   version of these two promissory notes, and you're going
8   to have rely on me that I printed these out as
9   Mr. Morris sent to me.  If I'm misleading you on that,
10  then I'm in trouble and your answers don't count.
11           So please assume that I didn't doctor these
12  and that I printed them out as they were prepared to
13  me; okay?
14      A.   Yes.
15      Q.   So Exhibit 4 will be the $5 million note and
16  Exhibit 5 will be the 2.4 million.
17           (Whereupon, Exhibits 4 & 5 were marked for
18           identification.)
19      Q.   (BY MR. RUKAVINA)  Before I ask about 4 and
20  5, to be fair to you and refresh your memory, I'm going
21  to provide you printouts of the metadata, metadata --
22  I'm not sure how to better say that -- for both notes.
23           And again I'm representing to you that I
24  printed out the metadata without doctoring it, so
25  please assume that's true, and if it's not, your

Kristin Hendrix - October 27, 2021

1  answers don't count and I'm in trouble.

2          6 will be the $5 million note, and 7 will be

3  the $2.4 million note.

4          (Whereupon, Exhibits 6 & 7 were marked for

5          identification.)

6      Q.   (BY MR. RUKAVINA)  Okay.  So Exhibit 4 and 5

7  are the Word documents.  Do you have any memory of you

8  doing anything with respect to these two Word

9  documents?

10     A.   I don't have specific memory, but generally

11 speaking, it was my job to update promissory note

12 templates and create promissory notes.

13     Q.   So do you believe that -- we discussed

14 earlier that your group would have used a template and

15 that it would have made changes reflecting the maker,

16 amount, date, interest rate.

17         Do you believe you were the one with respect

18 to 4 and 5 that updated that template to create 4

19 and 5?

20     A.   I'm sure that I was, yes.

21     Q.   Well, Exhibit 6 -- do you know what metadata

22 is?

23     A.   Sort of.

24     Q.   What's your understanding of what metadata

25 is?

A. Just in context from speaking on it recently, it's going to tell you who made changes to the documents, is what I would assume.

MR. RUKAVINA: Go off the record for one second.

(Off the record.)

Q. (BY MR. RUKAVINA) So a little bit of error on my part. We'll have some more metadata, but we can still talk about 6 and 7.

It says the author JFORSHEE, J-F-O-R-S-H-E-E. Do you recall or do you know who that person was?

A. I recognize the name, and it makes sense. This says Strasburger is the company. I think he was one of the lawyers that we had used at some point in time.

Q. Strasburger is a law firm?

A. Yes.

Q. And then it says, so Exhibit 6 created May 3, Exhibit 7 created May 2, modified, accessed. Does that to the best of your understanding comport with when Exhibits 4 and 5 were actually created?

A. Can you repeat that.

Q. Yeah. We'll wait for the rest of the metadata. But let's go back to 4 and 5.

In and by May 2019 I think you mentioned that

Kristin Hendrix - October 27, 2021

1  it was your job to, I think you said update promissory
2  notes?
3          MR. MORRIS:  Objection to the form of the
4  question.
5      Q.  (BY MR. RUKAVINA)  Let me take that question
6  back.
7          You testified earlier that your group would
8  have taken a template and used it to create or prepare
9  a new promissory note; right?
10     A.  Right.
11     Q.  How would you call that process?  What word
12  would you use for that process?
13     A.  Let's call it papering the loan.
14     Q.  In May of 2019, was it your job to paper the
15  loan?
16     A.  Yes.
17     Q.  Would anyone else at the corporate accounting
18  group have been responsible to paper a loan?
19     A.  At that time, I don't think so.  I think I
20  was the one doing it.
21     Q.  I think you mentioned that you think you
22  papered the loan, respecting Exhibits 4 and 5; correct?
23     A.  Correct.
24     Q.  You have no distinct present memory of
25  papering 4 and 5; correct?

Kristin Hendrix - October 27, 2021

1     A.    Correct.

2     Q.    Can you think of anyone else at the corporate

3 accounting group that would have papered 4 and 5?

4           MR. MORRIS:  Objection to the form of the

5 question.

6           THE WITNESS:  The only other person that

7 could have would either be Dave Klos or Hayley Eliason.

8     Q.    (BY MR. RUKAVINA)  What was Hayley's role in

9 May of 2019?

10    A.    She was the accountant.  I can't recall her

11 specific title.

12    Q.    Now, in May of 2019 when you papered a loan,

13 would you have consulted with either internal or

14 external legal before finishing that loan or presenting

15 it for signature or anything else?

16    A.    Not if it was just our standard demand note

17 that we already had a template on.

18    Q.    So would it have been your general course in

19 May of 2019, if you prepared Exhibits 4 and 5, not to

20 seek advice from internal or legal before proceeding

21 with these notes?

22    A.    With these two specific notes?

23    Q.    Yes.

24    A.    Yes.

25    Q.    If we flip the page, I'll represent to you

Kristin Hendrix - October 27, 2021

1  that Mr. Waterhouse's signature there appears on the
2  Word document as an image.
3      A.   Uh-huh.
4      Q.   Do you have any memory of whether there was
5  an image that someone would have affixed of
6  Mr. Waterhouse's signature to promissory notes?
7      A.   Yes.  We typically always -- he was
8  completely fine with having documentations -- sorry,
9  having documents signed or executed with his
10 e-signature.
11     Q.   Would these pictures of his signature have
12 been his e-signature in May of 2019?
13     A.   Yes.
14     Q.   So let's just clarify that because I don't
15 want there to be any confusion.
16          I know there's some computer programs out
17 there that are restrictive and have passwords before
18 any signature is printed.  And then there's some people
19 that use a stamp or an image; right?
20          MR. MORRIS:  Objection to the form of the
21 question.
22     Q.   (BY MR. RUKAVINA)  Are you following me?
23     A.   I follow you.
24     Q.   In May of 2019, did Mr. Waterhouse have any
25 specific program that would have to -- you would have

Kristin Hendrix - October 27, 2021

1  to go through before it would spit out his e-signature,

2  or was he fine with you and his staff using an image

3  like this?

4      A.   He was fine with using his e-signature, and

5  what is on these documents was that exact e-signature.

6  So I don't know if he had -- I don't know how it was

7  created originally.

8      Q.   The e-signature?

9      A.   E-signature.

10     Q.   Do you have any memory with respect to

11 Exhibits 4 and 5 of getting Mr. Waterhouse's specific

12 approval to use his e-signature?

13     A.   I don't have exact specific memory, same as

14 conversations on these loans.  But he would have had to

15 approve this loan in the dollar amount, the day.

16          He would have been the one directing us to

17 create these loans.  In past practice he has always

18 approved using his e-signature to execute documents.

19     Q.   How would he have approved Exhibits 4 and 5?

20 By that, I mean by email or memorandum?  How would he

21 have approved it in May of 2019?

22          MR. MORRIS:  Objection to the form of the

23 question.

24          THE WITNESS:  I would assume that, as I've

25 stated previously, these directions were coming

Kristin Hendrix - October 27, 2021

1  directly from him to paper a loan.  These changes that
2  are made are only to the dollar amount.  Interest rate
3  is pulled right off the IRS website.
4         That is his approval to paper a loan and in
5  fact execute or approve the loan.
6      Q.   (BY MR. RUKAVINA)  In May of 2019, would
7  Mr. Waterhouse -- what was his practice as far as using
8  an ink signature on documents as opposed to an
9  e-signature?  Did he have a practice?
10        MR. MORRIS:  Objection to the form of the
11  question.
12        THE WITNESS:  He has never specifically said,
13  on certain documents I would like to ink it with my
14  signature.  Probably at this time, 99 percent of the
15  stuff my team got his signature on was his e-signature.
16  I think it just depended on the group and what it was.
17      Q.   (BY MR. RUKAVINA)  So how would he authorize
18  you or your team to use his e-signature for any given
19  document in May of 2019?
20        MR. MORRIS:  Objection to the form of the
21  question.
22        THE WITNESS:  Through the conversations that
23  would have been had before these emails went out saying
24  paper loan.
25      Q.   (BY MR. RUKAVINA)  And -- okay.  So, and

Kristin Hendrix - October 27, 2021

1  after his e-signature was used either on these notes or
2  other documents in May of 2019, would you have brought
3  the documents back to him for any kind of verification?
4          MR. MORRIS:  Objection to the form of the
5  question.
6          THE WITNESS:  Probably not.  These are all
7  very standard.  We've papered hundreds of loans.  So I
8  think he trusted that we can handle updating a date and
9  a dollar amount on these loan templates.
10         Q.   (BY MR. RUKAVINA)  Do you know or believe, or
11 your recent review of documents, did it reveal an email
12 from Mr. Waterhouse to you specifically authorizing his
13 e-signature on Exhibits 4 and/or 5?
14         A.   Not that I recall seeing, no.
15         Q.   Sitting here today, do you have any memory of
16 Mr. Waterhouse orally or otherwise specifically
17 authorizing you to affix his e-signature to Exhibits 4
18 and/or 5?
19         A.   Specifically on these loans, no, I don't
20 recall those conversations.  But, again, our practice
21 has always been we have this discussion, he's under the
22 understanding that we're going to paper the loans, he's
23 always comfortable with using his e-signature.
24         This is not something me or my team would
25 have done without that authority and approval from him.

Kristin Hendrix - October 27, 2021

1    Q.   But you have no memory of that authority or
2  approval, specifically for 4 and 5?
3         MR. MORRIS:  Objection.  Asked and answered
4  about five times.
5         THE WITNESS:  Same as my answer I just gave.
6    Q.   (BY MR. RUKAVINA)  And I think you mentioned
7  that in your years at Highland your team papered
8  hundreds of loans?
9    A.   Yeah.
10   Q.   In your time at Highland, is it your
11 testimony that the accounting -- corporate accounting
12 department never made a mistake with respect to
13 anything that it did?
14        MR. MORRIS:  Objection to the form of the
15 question.
16        THE WITNESS:  No, I did not say that.
17   Q.   (BY MR. RUKAVINA)  Do you recall any mistakes
18 in your time at the corporate accounting group at
19 Highland that had been made, any significant mistakes?
20        MR. MORRIS:  Objection to the form of the
21 question.
22        THE WITNESS:  Significant mistakes, not that
23 I can recall.
24   Q.   (BY MR. RUKAVINA)  No accounts payable
25 mistakenly paid?

Kristin Hendrix - October 27, 2021

1      MR. MORRIS:  Objection to the form of the

2  question.

3      THE WITNESS:  I cannot specifically answer

4  that question with 17 years of work to recall, sorry.

5      MR. RUKAVINA:  Just take a quick break.  If

6  you need a restroom -- off the record.

7      (Off the record.)

8   Q.   (BY MR. RUKAVINA)  Going back to Exhibits 4

9  and 5.

10     Mr. Waterhouse signed these promissory notes.

11  Is there any particular reason why he signed them as

12  opposed to Dondero or someone else?

13   A.   No particular reason.  He's an officer for

14  both companies.  He's a signatory.

15   Q.   Who decided, if anyone, to your knowledge,

16  that he would be the one signing the notes, these two

17  notes?

18   A.   I don't know who would have decided that, but

19  typically if Frank specifically wanted Jim Dondero to

20  sign it, he would say, take it to Jim to sign.

21   Q.   Do you have a recollection of

22  Mr. Dondero -- strike that.

23     Do you have a recollection of Mr. Waterhouse

24  signing other promissory notes?

25   A.   Yes.  I know for sure he has signed other

Kristin Hendrix - October 27, 2021

1  promissory notes. I can't tell you explicitly which
2  ones.
3          (Off the record.)
4      Q.   (BY MR. RUKAVINA)  Are you saying that in May
5  of 2019 -- strike that.
6          By May of 2019, was it not the standard
7  practice at the debtor that Mr. Dondero would sign
8  intercompany promissory notes?
9          MR. MORRIS:  Objection to the form of the
10  question.
11          THE WITNESS:  No, that's not standard
12  practice.  Just needed to be somebody -- somebody who
13  is a signer for the entity on the incumbency
14  certificate.
15      Q.   (BY MR. RUKAVINA)  Was there a standard
16  practice, or did you just describe the standard
17  practice that it was someone on the incumbency
18  certificate?
19      A.   That's correct, somebody on the incumbency
20  certificate.  Frank is a great prospect to sign, with
21  giving direction to set loans up, send money out.  Why
22  wouldn't he sign it.
23      Q.   Do you have any memory sitting here today of
24  Mr. Waterhouse telling you or agreeing that he would be
25  signing these two promissory notes for HCMFA?

Kristin Hendrix - October 27, 2021

1     A.    Not specifically, but he didn't need to tell

2    me.  He typically would tell me if he wanted Jim to

3    sign them.

4     Q.    Sitting here today, do you have any memory of

5    giving Mr. Waterhouse these two promissory notes after

6    they were prepared?

7     A.    I specifically don't remember walking into

8    his office and providing it to him, but he could have

9    found it on our shared drive if he wanted to.

10     Q.    Do you have any memory or in your recent

11    review of documents did you see any email to the effect

12    of you sending either or both of these promissory notes

13    to Mr. Waterhouse after they were papered up?

14     A.    I don't have any specific recollection,

15    again, but he had access to look at them.

16     Q.    On the shared drive?

17     A.    Yes.

18     Q.    In May -- I'm going to ask this question

19    multiple different ways, so let's start with kind of

20    the general.

21          In May or by May of 2019, was there a

22    repository, electronic or paper, where the debtor kept

23    original promissory notes that were owed -- where money

24    was owed to it?

25     A.    Original meaning paper?

Kristin Hendrix - October 27, 2021

1    Q.   Well, let's go back a little bit in time.

2         Would you agree that at some point prior to

3    2019 the standard course was that paper notes were ink

4    signed?

5         MR. MORRIS:  Objection to the form of the

6    question.

7         THE WITNESS:  I could not tell you

8    specifically when notes were or were not ink signed.

9    Q.   (BY MR. RUKAVINA)  Was there any repository,

10   to the best of your recollection, as of May 2019 where

11   any ink-signed original promissory notes were kept by

12   the debtor?

13   A.   No.  We always would scan them in, save them

14   on our shared drive.  Never had paper copies.

15   Q.   So that's -- fixing to ask that question

16   next.

17        So Exhibits 4 and 5, would they even have

18   been printed after they were papered up?

19        MR. MORRIS:  Objection to the form of the

20   question.

21        THE WITNESS:  Possibly.  Somebody could have

22   printed them.

23   Q.   (BY MR. RUKAVINA)  Do you remember printing

24   Exhibits 4 or 5 sitting here today?

25   A.   I don't recall printing them myself, no.

Kristin Hendrix - October 27, 2021

1    Q.   Would there have been a reason to print them
2  out if, as you said, the notes were stored
3  electronically?
4         MR. MORRIS:  Objection to the form of the
5  question.
6         THE WITNESS:  There could be a reason.  I
7  don't recall that I for any reason printed these
8  particular notes.
9    Q.   (BY MR. RUKAVINA)  So as of May 2019, is it
10  your testimony that notes that were papered up by the
11  corporate accounting group would have been saved
12  electronically on the system and not kept by way of
13  paper copies in some file?
14    A.   Correct.  That's right.
15    Q.   This is additional metadata.  And you
16  understand I have a bit of an accent.
17         What are we on?
18         (Off the record.)
19    Q.   (BY MR. RUKAVINA)  Ms. Hendrix, Exhibit 8 is
20  going to be additional metadata for the May 3, 2019,
21  note that we've been looking at, and Exhibit 9 will be
22  the same thing for the May 2 note that we've been
23  looking at.
24         That's 8.  That's 9.
25         (Whereupon, Exhibits 8 & 9 were marked for

```
 1              identification.)
 2       Q.   (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to
 3  represent to you again that my office has faithfully
 4  printed this metadata out without doctoring or changing
 5  anything, and I ask you to assume that.  If I'm wrong
 6  on that, then your answers don't count.
 7              Ma'am, as I look at these two documents, it
 8  says last modified by Kristin Hendrix.
 9              Do you see that?
10       A.   Yes.
11       Q.   And that would have -- that could have only
12  been you; correct, in that department?
13       A.   I hope so, yes.
14       Q.   Seeing these two documents, can you agree
15  with me now that it was in fact you that papered up
16  Exhibits 4 and 5?
17              MR. MORRIS:  Objection.  Asked and answered.
18              THE WITNESS:  I would assume so since my name
19  is on it, yes.
20       Q.   (BY MR. RUKAVINA)  Both of these documents
21  say last printed -- I'm sorry.  If you see related
22  dates, it says last printed May 2, 2019, 11:27 A.M.  Do
23  you have any memory or any understanding as to why that
24  date would be there or what last printed might mean?
25       A.   I don't know why it says last printed the day
```

1  before it was created.  That doesn't make any sense.  I
2  have no idea.
3        Unless, the only thing I could think of is if
4  we changed this template.  When I say "this," the
5  $2.4 million loan, which was papered on the 2nd, and
6  then used it for the next day for the template to
7  update the date, possibly.  I have no idea.
8     Q.   Well, it may be -- and I understand that you
9  don't have any memory; we're speculating a little bit.
10       It may be, looking at Exhibits 8 and 9, that
11  the $2.4 million note was printed on May 2, and then
12  after having been used as the template for the
13  $5 million note, the $5 million note would not have
14  been printed.
15       Does that sound possible?
16       MR. MORRIS:  Objection to the form of the
17  question.
18       THE WITNESS:  Sure, it could be possible.
19     Q.   (BY MR. RUKAVINA)  But you don't have any
20  memory either way?
21     A.   No.  And when these were printed they're
22  printed to PDF, I believe, is probably what that means.
23     Q.   Okay.
24       We're going to switch gears a little bit now,
25  if you want to make a pile of those exhibits.

Kristin Hendrix - October 27, 2021

1   Obviously, you're welcome to use them anytime you need
2   to, but I think we're done with those notes.
3            Going to hand you what we're going to mark as
4   Exhibit 10, which is an email chain produced by the
5   debtor.
6            And I don't know how anyone on the video will
7   see it.  I apologize.  I'll have to send it to you
8   later.
9            (Whereupon, Exhibit 10 was marked for
10           identification.)
11       Q.   (BY MR. RUKAVINA)  Now, if you start with
12  this email chain, it starts on November 19, 2020 from
13  Jack Donohue to you, copying Mr. Seery and various
14  others.
15           Do you see that?
16       A.   Yes.
17       Q.   And Mr. Donohue is asking you to provide him
18  the financial records of HCMFA due to the funds owed
19  the debtor.
20           Do you see that?
21       A.   Yes.
22       Q.   Do you recall that email from Mr. Donohue to
23  you?
24       A.   Yes.
25       Q.   Do you recall any context or subsequent

Kristin Hendrix - October 27, 2021

1  discussions or how that email came to be, or do you

2  just recall getting that email?

3      A.   I just recall getting the email.

4      Q.   You write back, hi Jack, Scott Ellington is

5  going to follow up with the board on this request.

6          Do you see that?

7      A.   Yes.

8      Q.   Do you recall why you told Jack that

9  Mr. Ellington was going to follow up?

10      A.   From what I recall, I had asked Frank

11  Waterhouse if it was okay to send these financials

12  over, and he wanted me to check with Scott Ellington

13  and that was Scott's response.

14      Q.   And did he tell you why he wanted you to

15  check with Scott Ellington?

16      A.   Just to make sure that there were no issues

17  with sending them over.

18      Q.   Mr. Seery writes back, can I get this ASAP.

19  HCMFA is way overdue.

20          Do you see that?

21      A.   Yes.

22      Q.   And Mr. Seery writes again, it's about a week

23  later, and he says, this is an explicit direction from

24  me as CEO of HCMLP.  But it looks like you are the

25  recipient of that December 2 email; correct?

Kristin Hendrix - October 27, 2021

1     A.    Yes.

2     Q.    Do you remember him sending you that email
3  and copying those people?

4     A.    Yes.

5     Q.    Do you remember anything happening in that
6  week between his November 25 and December 2 email along
7  the same discussion lines?

8     A.    I don't remember anything.  I think I was
9  probably left out of any discussions, and if there were
10  any, it was with Scott Ellington and whomever he had
11  discussions with.

12     Q.    Then subsequent, on December 2, Mr. Seery
13  writes, all, Scott and I have spoken and agree that the
14  information should be provided to James immediately.

15          Would that have been James Romey, do you
16  think?

17     A.    Yes.

18     Q.    And who was James Romey?

19     A.    He also worked for DSI.

20     Q.    And then he writes, Kristin, please proceed
21  with James.  If anyone has any questions or issues,
22  please call me.

23          Do you see that?

24     A.    Yes.

25     Q.    Did you proceed with James Romey?

Kristin Hendrix - October 27, 2021

1    A.    I further made sure that Scott was okay, to
2  confirm.  He said yes, please do, and I did send them
3  to James Romey.
4    Q.    So Mr. Seery has some of it in this email
5  chain, but do you have any understanding as to why
6  either DSI or Mr. Seery in November of 2020 was asking
7  for the financial records of HCMFA?
8    A.    I do not, other than what's in this email.
9    Q.    Did you discuss with either DSI or Mr. Seery
10 or Mr. Waterhouse in November or December 2020 whether
11 the demand notes from HCMFA should be demanded, should
12 be called?
13   A.    I did not have discussions.
14   Q.    Next exhibit is Exhibit 11.  This is another
15 email chain.
16       And I apologize to the folks on the video.
17 I'll have to get it to you during some break.
18       MR. MORRIS:  Hold on one second.
19       MR. RUKAVINA:  Sure.  Off the record.
20       (Off the record.)
21       (Whereupon, Exhibit 11 was marked for
22       identification.)
23   Q.    (BY MR. RUKAVINA)  Exhibit 11, Ms. Hendrix,
24 if you'll go to the beginning of this email chain, is
25 an email on January 6, 2021, again from Mr. Donohue to

1   you, copying Waterhouse, Seery, a bunch of others.

2           Where he says, at the direction of Jim Seery,

3   please provide DSI with the requested information for

4   each entity below.

5           And you'll see the entity includes both of my

6   clients, NexPoint Advisors and HCMFA.  And the

7   information includes bank statements, income

8   statements, balance sheets, cash flows.

9           Do you see that?

10      A.   Yes.

11      Q.   Do you recall this email?

12      A.   Vaguely, yes.

13      Q.   Did you have any concerns when you received

14  this email?

15      A.   Concerns about the email, no.  I probably

16  checked with -- I would have checked with Frank to make

17  sure it was okay to send this first.

18      Q.   Frank Waterhouse?

19      A.   Yes.

20      Q.   Do you have any understanding as to why

21  Mr. Donohue requested bank statements, income

22  statements, balance sheets for NexPoint and/or HCMFA?

23      A.   I do not.

24      Q.   Did he or anyone at DSI tell you why they

25  were requesting that?

1    A.    Not that I can recall.

2    Q.    If we go forward in time, you'll see that

3 Mr. Waterhouse is writing back to Mr. Donohue.  And

4 then Mr. Seery interjects and says, these are HCMLP

5 business records.  Please provide them as requested by

6 Jack ASAP.

7         Do you see that?

8    A.    Yes.

9    Q.    And it looks like you were not privy to

10 subsequent communications where Frank and Jim were

11 talking back and forth about this.  You were not privy

12 to those, like you weren't blind copied or anything to

13 your recollection?

14    A.    No.

15    Q.    Did you in fact on or after January 6, 2021,

16 provide Mr. Donohue or anyone on his team the

17 information that he had requested as it relates to

18 NexPoint and/or HCMFA?

19    A.    Without going back to check, I couldn't

20 answer yes or no for certain.

21    Q.    So I think you mentioned when you received

22 the email from Mr. Donohue you would have checked with

23 Frank.  And what do you remember asking Frank or

24 checking with him about?

25    A.    I don't remember asking him specifically.  In

Kristin Hendrix - October 27, 2021

1   fact, it's possible that Frank just responded on his
2   own here to Jack.  Again, would have been a
3   conversation that I can't specifically recall.
4        Q.    Sure.  And you don't specifically remember
5   today providing Mr. Donohue any of that information;
6   right?
7        A.    Right.
8        Q.    You don't specifically remember today having
9   a discussion with Mr. Donohue or Seery or anyone else
10  at or about that time as to why they were wanting this
11  information?
12       A.    Correct.
13       Q.    Exhibit 12, Ms. Hendrix, is going to be the
14  December 3, 2020, letter by which Highland called the
15  notes.
16            MR. MORRIS:  Objection to the form of the
17  question if there was one.
18            (Whereupon, Exhibit 12 was marked for
19            identification.)
20       Q.    (BY MR. RUKAVINA)  Are you familiar with
21  Exhibit 12, Ms. Hendrix?
22       A.    No, I haven't seen this.
23       Q.    Prior to today, you don't remember seeing
24  this?
25       A.    No.

Kristin Hendrix - October 27, 2021

1      Q.   I think you're answering no?

2      A.   No, sorry, no.

3      Q.   On or before December 3, 2020, did anyone

4  discuss with you whether Highland should call the

5  demand notes that were outstanding by HCMFA?

6      A.   No.

7      Q.   Do you recall in December 2020 any discussion

8  with anyone at the debtor about the NexPoint

9  $30.7 million term note?

10     A.   Repeat your question again, please.

11     Q.   Sure.  So you're familiar, and we'll talk

12 about it in some detail, with the NexPoint

13 $30.7 million note?

14     A.   Yes.

15     Q.   And again, we'll talk about it, but at that

16 point in time that was a term note; correct?

17     A.   Correct.

18     Q.   Do you remember in the December 2020 or

19 November 2020 time frame discussing with anyone at the

20 debtor the status of that NexPoint note?

21     A.   Yes, we would have discussed this on a weekly

22 basis in our cash meetings that we would have had, as

23 identifying that there are payments due on these loans

24 in December.

25     Q.   What weekly cash meetings are you referring

1   to?

2       A.   We had a standing weekly cash meeting with

3   Frank Waterhouse, myself, Jim Seery.  I can't recall

4   everyone on it.  Some of the DSI folks.  We go through

5   cash forecasts.  It's a 13-week cash forecast.  We go

6   through it every week.

7            It's going to lay out incoming and outgoing

8   payments that are forecasted, of which these term loans

9   were in those forecasts, so they were discussed.

10      Q.   And Mr. Morris produced some of those to me

11  this morning.  I haven't had time to go through them.

12           But it is your recollection in November and

13  December of 2020 the fact of the NexPoint term note

14  being out there was known to Mr. Seery?

15      A.   Yes.

16      Q.   And the fact of an upcoming December 31,

17  2020, payment was known to Mr. Seery?

18      A.   Yes.

19      Q.   So with that background, in November and

20  December of 2020, do you remember discussing with

21  anyone anything to the effect of, oh, it really would

22  be better if NexPoint defaulted on that note so we

23  could call it?

24      A.   No.

25      Q.   Did Mr. Seery ever state to you anything in

Kristin Hendrix - October 27, 2021

1  November or December of 2020 about how the debtor might
2  monetize that NexPoint note?
3       A.   No.
4       Q.   Did he discuss with you any potential sale of
5  that promissory note?
6       A.   No.
7       Q.   Did DSI ever discuss with you in November or
8  December 2020 any potential sale of that note?
9       A.   No.
10      Q.   Or how to monetize that note?
11      A.   No.
12      Q.   So -- well, strike that.
13           Did Mr. Seery or anyone at DSI, or anyone at
14  all, in November or December of 2020 state any words to
15  you to the effect that they were hoping that NexPoint
16  would default on that note?
17      A.   Never.
18      Q.   Or that it would be in the debtor's interest
19  for NexPoint to default on that note?
20      A.   No.
21      Q.   In November or December of 2020, do you
22  recall having any discussions with Mr. Seery or anyone
23  at DSI as to the collectibility of that note?  And by
24  that I mean whether NexPoint can pay the note?
25      A.    I don't specifically recall.  It most likely

Kristin Hendrix - October 27, 2021

1  came up in cash conversations.
2      Q.   I think you were assistant controller back
3  then?
4      A.   Yes.
5      Q.   Would a discussion of a borrower's ability to
6  repay have been something within your general sphere of
7  responsibility in that time frame?
8          MR. MORRIS:  Objection to the form of the
9  question.
10          THE WITNESS:  It depends on who the borrower
11 is, and at that time we did -- we had knowledge over
12 that information, so yes.
13      Q.   (BY MR. RUKAVINA)  Well, you've seen some
14 instructions or requests from Mr. Seery to you and DSI
15 to you for financial information of NexPoint and HCMFA.
16 We've gone through those documents; right?
17      A.   Yes.
18      Q.   Does that refresh your memory that there was
19 any internal discussion that you were privy to about
20 the ability of HCMFA and/or NexPoint to pay these
21 notes?
22      A.   I don't recall that specifically being asked.
23 It could have.
24      Q.   Did you ever at any point in time have any
25 employment or officer or any title or role with

Kristin Hendrix - October 27, 2021

1  NexPoint Advisors, LP?

2      A.    No.

3      Q.    Were you ever the controller or assistant

4  controller for NexPoint Advisors LP?

5      A.    No.

6      Q.    Did you ever at any point in time have any

7  employment, officer or any title or role at HCMFA?

8      A.    No.

9      Q.    Were you ever the controller or assistant

10 controller of HCMFA?

11     A.    No.

12     Q.    So you might have indirectly provided

13 services to those two as part of shared services, but

14 never directly; is that fair?

15          MR. MORRIS:  Objection to the form of the

16 question.

17          THE WITNESS:  When you say never directly,

18 meaning I was not employed by those entities?

19     Q.    (BY MR. RUKAVINA)  Correct.

20     A.    That's correct.

21     Q.    Do you have any understanding -- first of

22 all, NexPoint did not make a payment on December 31,

23 2020; correct?

24     A.    Correct.

25     Q.    Okay.  Do you have any understanding of why

Kristin Hendrix - October 27, 2021

1    not?

2        A.    Yes.

3        Q.    What's your understanding?

4        A.    Either November 30 or December 1, 2020, I

5    received a phone call from Frank Waterhouse that said,

6    no payments are going from any of the Advisors to

7    Highland.

8        Q.    Can you be more specific with what he said?

9        A.    That's what he said.

10       Q.    So he said no payments from the Advisors to

11   Highland?

12       A.    Yes.

13       Q.    Did he reference the promissory note

14   expressly?

15       A.    No.

16       Q.    But no payments means?

17       A.    Nothing.

18       Q.    That would logically in your mind include the

19   promissory note?

20       A.    Yes.

21       Q.    Did you ask him why?

22       A.    No.

23       Q.    Did he tell you why?

24       A.    No.

25       Q.    Did you, prior to January 1, 2021, did you

Kristin Hendrix - October 27, 2021

1  hear from anyone as to why Mr. Waterhouse gave that
2  instruction?
3      A.   Not that I recall.
4      Q.   Did you, after that November 30 or December 1
5  phone call, did you follow up with him or anyone else
6  about the upcoming note payment?
7      A.   I didn't have any reason to.
8      Q.   I'm going to -- let me find you a document
9  for a moment.
10          Just so the record is complete, let's include
11 this promissory note.  It's going to be Exhibit 13.
12 This is the NexPoint promissory note.
13          (Whereupon, Exhibit 13 was marked for
14          identification.)
15     Q.   (BY MR. RUKAVINA)  I take it you've seen this
16 promissory note, Exhibit 13?
17     A.   Yes.
18     Q.   And I think you testified about this before,
19 but just to summarize to save time.
20          This would have been a note that you would
21 not have papered but would have gone through legal
22 because it was a roll-up.  Is that generally accurate?
23     A.   Yes.
24     Q.   And do you have any memory at all of having
25 anything to do with papering up this loan?

Kristin Hendrix - October 27, 2021

1    A.    Not that I recall.

2    Q.    Would you have had, after 2017 and before

3  2021, any role with respect to any payments or upcoming

4  payments on this note, any role at all?

5    A.    Yes.

6    Q.    What would have been your role or roles?

7    A.    That would have been taking direction from

8  Frank Waterhouse or possibly Jim Dondero saying, go

9  ahead and make these payments that are due on these

10  term notes.

11    Q.    Would you have recorded on any books or

12  records payments that actually were made?

13    A.    Not me personally.

14    Q.    Who would have?

15    A.    Our accountant, which could have been one of

16  two different people, depending on the time frame.

17    Q.    Would you have had any role with respect to

18  recording those payments or is that just something that

19  your group would have done?

20        MR. MORRIS:  Objection to the form of the

21  question.

22        THE WITNESS:  I would not have had a role.

23  My group would have.

24    Q.    (BY MR. RUKAVINA)  What about calculating

25  amortization and/or interest payments that are due or

Kristin Hendrix - October 27, 2021

1  upcoming?  Who would have done that, you or someone

2  else?

3       A.   Our accountant.

4       Q.   Do you have any memory of doing that?

5            MR. MORRIS:  Objection to the form of the

6  question.

7            THE WITNESS:  Not during 2017 through 2019.

8       Q.   (BY MR. RUKAVINA)  What about 2020?

9       A.   No.

10      Q.   Going back to that November 30 or December 1

11 telephone call, do you recall who initiated the call?

12      A.   To me?

13      Q.   The one between you and Mr. Waterhouse.

14      A.   Frank called me.

15      Q.   Frank called you.

16           And was it just to discuss -- or just to give

17 you that instruction, no payments from the Advisors, or

18 was there other things discussed?

19      A.   I could not tell you if something else was

20 discussed on that phone call.

21      Q.   Do you remember if it was a long phone call

22 or short?

23      A.   Couldn't tell you.

24      Q.   Do you remember where you were when he called

25 you?

Kristin Hendrix - October 27, 2021

```
1        A.    At my house.

2        Q.    Did you answer on a cell phone or landline?

3        A.    My cell phone.

4        Q.    Is there any chance in hell that your cell

5   phone would still have a record of that phone call,

6   like what time it was and how long it lasted?

7              MR. MORRIS:  Objection to the form of the

8   question.

9        Q.    (BY MR. RUKAVINA)  I apologize for using

10  hell.

11             MR. MORRIS:  And to foundation.

12             THE WITNESS:  I have no idea.

13       Q.    (BY MR. RUKAVINA)  Do you have your cell

14  phone with you right now?

15       A.    In the other room.

16       Q.    I might ask you during the break to just --

17  we'll take a short break before I'm done, and I'll ask

18  you if you've had a chance to look for November and

19  December 2020 phone logs between you and

20  Mr. Waterhouse.  I would ask you to do that, please.

21       A.    Sure.

22       Q.    And I apologize, I think you said you thought

23  it was a short telephone call?

24       A.    I have no idea.

25       Q.    Did the telephone call or Mr. Waterhouse's
```

Kristin Hendrix - October 27, 2021

1  instructions surprise you in any way?

2       A.   Nothing surprises me anymore, so no.

3       Q.   Did it surprise you back in November or

4  December of 2020?

5       A.   No.

6       Q.   Did it pique your curiosity?

7       A.   Nope.

8       Q.   Just another instruction from your boss?

9       A.   Yep.

10      Q.   Exhibit 14 is going to be a document that

11  we're not sure what it is and we're not sure who

12  prepared it.  It appears to be a ledger of charges

13  against and payments on this promissory note.

14           I'm just saying that so the people on the

15  phone know what it is, but you don't have to take what

16  I said as correct.

17           (Whereupon, Exhibit 14 was marked for

18           identification.)

19      Q.   (BY MR. RUKAVINA)  So Ms. Hendrix, Exhibit 14

20  was produced by the debtor.  And I'm going to ask you,

21  do you know what this is or have you seen it before?

22  Can you help us state what it is?

23      A.   This looks like it is an amortization

24  schedule of the NexPoint Advisors term loan.

25      Q.   Would this have been something that it

77

Kristin Hendrix - October 27, 2021

1  appears to you would have been maintained internally by
2  the debtor, or does it look like it might have been
3  prepared by DSI or someone else for some other reason?
4      A.   It looks like the debtor's amortization
5  schedule that they kept.
6      Q.   Did the debtor keep an amortization schedule
7  for the NexPoint promissory note, to your knowledge?
8      A.   Yes.
9      Q.   Did the debtor keep amortization schedules
10 for other term promissory notes?
11     A.   Yes.
12     Q.   In what format, like Excel spreadsheets or
13 Word documents?  What is your recollection for NexPoint
14 specifically?
15     A.   Excel.
16     Q.   Would that have been on the shared system or
17 something?
18     A.   Yes.
19     Q.   And who would have been responsible on an
20 ongoing basis to update the NexPoint amortization
21 schedule?
22          MR. MORRIS:  Objection to the form of the
23 question.
24          THE WITNESS:  Depends on what time you're
25 asking.

Kristin Hendrix - October 27, 2021

1    Q.   (BY MR. RUKAVINA)  Let's talk about the year
2  of 2020.
3    A.   That would have been Hayley Eliason, our
4  accountant at that time.
5    Q.   What about the year 2019?
6    A.   Still Hayley.
7    MR. RUKAVINA:  I'm going to just ask, to
8  preserve the record, Mr. Morris, if he hasn't already,
9  to produce any such Excel spreadsheet in the native
10  form.
11    Q.   (BY MR. RUKAVINA)  If we look at this,
12  Ms. Hendrix -- and I'm a little confused as to what
13  these entries mean.  Maybe you could help me.  But
14  columns that say interest paid, principal paid, total
15  paid, do you know what those columns mean?
16    A.   Exactly as they state.  These are interest
17  and principal payments made on the date that's listed,
18  and then you've got a total.
19    Q.   And then they're in brackets because they're
20  negative numbers?
21    A.   Correct.
22    Q.   So here's what I'm not understanding.  Go to
23  the second page.
24    You see there's an entry under interest paid
25  12/30/29 [verbatim] that says negative 530,000 and

Kristin Hendrix - October 27, 2021

1   change but it doesn't use brackets?
2       A.    It's a negative number.  It's just a
3   formatting issue.
4       Q.    What about also on that same page in the
5   other column, principal paid, 5/31/2020, it's a
6   positive number, 575,550.
7            MR. MORRIS:  Where are you?
8            MR. RUKAVINA:  On page 2 of this exhibit.
9            MR. MORRIS:  What date?
10           MR. RUKAVINA:  May 31, 2020.  And it's the
11  column over, principal paid.  It's a positive number,
12  575,000 and change.
13           MR. MORRIS:  Got it, thank you.
14      Q.    (BY MR. RUKAVINA)  Do you see that,
15  Ms. Hendrix?
16      A.    Yes.
17      Q.    Do you have an understanding of why that
18  number would be positive?
19      A.    Actually, I think this looks like an entry to
20  me where the interest is what we call picking.  So on
21  the anniversary date of this loan, which is May, from
22  what I can tell, the accrued interest total, which is
23  that 575-, is being rolled into principal.
24           That's what I can tell from looking at it.
25      Q.    Okay.  Do you have any understanding as to

Kristin Hendrix - October 27, 2021

1 why that would have been done or why that would have
2 been done on that day?
3         MR. MORRIS:  Objection to the form of the
4 question.
5         THE WITNESS:  Because that's the anniversary
6 date of the loan.  I would assume that that's how the
7 loan is written.
8    Q.  (BY MR. RUKAVINA)  And I think that that
9 Section 1 of the promissory note does say, the unpaid
10 principal balance of this note from time to time
11 outstanding shall bear interest.
12         At the rate of 6 percent per annum from the
13 date hereof until maturity date, compounded annually on
14 the anniversary of the date of this note.
15         Do you see that?
16         MR. MORRIS:  Objection to the form of the
17 question.
18         THE WITNESS:  Yeah, I see that.
19    Q.  (BY MR. RUKAVINA)  Assuming that this is the
20 correct amortization schedule for the NexPoint note,
21 and that the numbers in here are correct, if you look
22 at the second page under the column total paid there
23 are a number of entries for 2019.
24         Do you see that, the far right column?
25    A.  At the top, yes.

Kristin Hendrix - October 27, 2021

1    Q.   For example, 1.3 million, 2.1 million,
2  1.3 million.
3         Do you see that?
4    A.   Yes.
5    Q.   Assuming that that's correct, do you have any
6  memory or understanding whether in the year 2019, or
7  why NexPoint was making these payments on this
8  promissory note?
9    A.   Without going back and reading through emails
10  I can only assume that, from looking at this, Highland,
11  the debtor, would have needed cash, and so this is one
12  way of getting cash to the debtor.
13    Q.   This is kind of like what we discussed in the
14  beginning, that Mr. Dondero on a cash needed basis
15  would just transfer money between entities?
16    A.   Yes.
17    Q.   Do you have any memory in the first half of
18  2019 whether Highland, the debtor, had any particular
19  need for cash money at that time?
20    A.   We generally always had a need for cash, so
21  yes.
22    Q.   And so if NexPoint was transferring money
23  back to Highland on this note because Highland needed
24  the money, would those have been recorded as
25  prepayments by the debtor?

Kristin Hendrix - October 27, 2021

1          MR. MORRIS:  Objection to the form of the
2   question.
3          THE WITNESS:  Yes.
4      Q.   (BY MR. RUKAVINA)  Sitting here today, do you
5   have any reason to believe based on the formatting or
6   anything on Exhibit 14 that it's not the amortization
7   schedule as it was maintained by the debtor?
8      A.   I don't have any reason to not believe that
9   it was.
10     Q.   Going to show you a few documents that I'm
11  hopefully going to burn through, but you're certainly
12  entitled to take all the time that you need.
13         So first is going to be a document that
14  Mr. Morris produced this morning.  It's not Bates
15  labeled.  I don't know why.
16         MR. MORRIS:  As I said in my email, my
17  paralegal is sick and so I wanted you to have the
18  documents.  We'll Bates stamp them later, but we have a
19  written record from my email of what we produced to
20  you.
21         MR. RUKAVINA:  You're assuming that I read my
22  emails.
23         MR. MORRIS:  Sorry about that.  I confess,
24  sometimes I don't as well.
25     Q.   (BY MR. RUKAVINA)  So I'm going to hand you

1  Exhibit 15 and I'm going to represent to you that it's
2  the email that Mr. Morris sent to me today and I've not
3  doctored it in any way.
4        (Whereupon, Exhibit 15 was marked for
5        identification.)
6        MR. MORRIS:  Do you have the email that it
7  was attached to?
8        MR. RUKAVINA:  Somewhere.  I can find it at a
9  break.
10       MR. MORRIS:  I'll let the witness testify.
11  This was attached to an email.  Not my email, but
12  another email.  But I'll let the witness testify.
13       MR. RUKAVINA:  Off the record.
14       (Off the record.)
15  Q.   (BY MR. RUKAVINA)  So you have Exhibit 15.
16       And during the break we established, I don't
17  have a copy of it right now, but you sent Exhibit 15 on
18  August 29, 2020, to Mr. Dondero by email, copying
19  Mr. Waterhouse, as well as a couple of other
20  attachments; is that correct?
21  A.   Correct.
22  Q.   Do you recall what prompted you to send that
23  email and this attachment?
24  A.   Yes.
25  Q.   What?

Kristin Hendrix - October 27, 2021

1    A.    Frank Waterhouse called me on August 29, and
2 requested that I do so.
3    Q.    Did he tell you why?
4    A.    From what I recall, this was a time when Jim
5 was trying to come up with his bargain or pop land,
6 whatever he referenced it as.  This was all information
7 that Frank said he wanted.
8    Q.    Okay.  So going back to Exhibit 15, what I'm
9 interested in is NexPoint Advisors, the 23,846,000 and
10 change number.
11         Do you see that?
12   A.    Yes.
13   Q.    Where did that number -- or where did this
14 Exhibit 15 come from, if you understand my question?
15   A.    Sure.  These numbers should all be balances
16 off of the corresponding notes that each entity owed to
17 the debtor.
18   Q.    Did you or someone prepare Exhibit 15
19 specifically for that email?  Or was Exhibit 15 already
20 existing somewhere on the system?
21   A.    I believe that we prepared it specifically
22 for this request.
23   Q.    Do you recall who?
24   A.    It was either myself or our accountant.  I
25 don't recall who put it together.

85

Kristin Hendrix - October 27, 2021

1    Q.   Okay.  And where would that 23 million and
2    change number for NexPoint have come from, an
3    amortization schedule?

4    A.   Yes.

5    Q.   And what about Highland Capital Management
6    Fund Advisors?  You see $10.5 million and change demand
7    on Exhibit 15?

8    A.   Yes.

9    Q.   Where would that $10.5 million number have
10   come from, do you remember?

11   A.   The same.  It would have come off of the
12   amortization schedules for all of their notes.

13   Q.   How was there an amortization schedule for a
14   demand note?

15   A.   Because it's accruing interest.

16   Q.   So sitting here today, you expect there would
17   be some amortization schedule like Exhibit 14 but for
18   HCMFA?

19   A.   Yes.

20   Q.   Now we're going to have an exhibit [verbatim]
21   chain that's going to be marked as Exhibit 16.

22        (Whereupon, Exhibit 16 was marked for
23        identification.)

24   MR. RUKAVINA:  For the folks on the video,
25   Exhibit 16 is the email chain that Mr. Morris used last

Kristin Hendrix - October 27, 2021

1  week regarding the Section 15(c) document.

2      Q.   (BY MR. RUKAVINA)  Are you familiar with this

3  Exhibit 16 email chain, Ms. Hendrix?

4      A.   Yes.

5      Q.   Why are you familiar with it?

6      A.   Well, I'm copied on it, and I saw it

7  yesterday.

8      Q.   Do you have any memory -- well, that's a

9  stupid question.  But prior to yesterday, did you have

10  any memory of this?

11      A.   Yes.

12      Q.   And do you recall the context or the purpose

13  of this exhibit, or this email chain?

14      A.   From what I remember this is the time where

15  information was being prepared for the retail board to

16  re-up the debtor's shared services.

17      Q.   So, here -- you're certainly welcome to read

18  it in its entirety and if you feel like you want to or

19  need to, that's fine.  But I only have one question.

20  Well, one question with two subparts.

21          I'm looking at Ms. Lauren Thedford's,

22  T-h-e-d-f-o-r-d's, email October 6, 2000 [verbatim]

23  where she says, I see the below from the 6/30

24  financials.  NPA, due to HCMLP and affiliates as of

25  June 30, 2020.

Kristin Hendrix - October 27, 2021

1        Do you see that, ma'am?

2    A.   Yes.

3    Q.   23 million 683?

4    A.   Yes.

5    Q.   And you see, HCMFA due to HCMLP as of

6 June 30, 2020, 12,286,000?

7        MR. MORRIS:  Objection to the form of the

8 question.

9    Q.   (BY MR. RUKAVINA)  Strike that.

10       It says 12,286.  What do you take that 12,286

11 to mean?

12   A.   I think that's a typo and it should have

13 said -- well, there's several things wrong with this,

14 from looking at it.

15       She left off three zeros on the end of it.

16 Should have said 12,286,000.  Secondly, that amount is

17 our due to affiliates on HCMFA's books, not just due to

18 HCMLP.

19   Q.   That was going to be my question, why that

20 12,286,000 number didn't jive with the 10,530,000

21 number on Exhibit 15?

22   A.   Yes, there's another loan due to a different

23 affiliate.

24   Q.   So that $12,286,000 amount doesn't mean that

25 it's all due to Highland; is that correct?

Kristin Hendrix - October 27, 2021

1    A.    Correct.

2    Q.    Exhibit 17 is going to be the January 7, 2021

3 notice from the debtor to NexPoint about the default.

4         (Whereupon, Exhibit 17 was marked for

5         identification.)

6    Q.    (BY MR. RUKAVINA)   You've been handed

7 Exhibit 17.  Have you seen this document before?

8    A.    Not that I believe.

9    Q.    And I think we've asked this before, but just

10 to clarify.

11        Did anyone at the debtor, including Mr. Seery

12 or DSI, discuss with you after December 31, 2020 that

13 the payment had not been made and what, if anything,

14 the debtor should do about that?

15        MR. MORRIS:   Objection to the form of the

16 question.

17        THE WITNESS:   I can't recall specific

18 conversations that may or may not have been had around

19 that topic.

20    Q.    (BY MR. RUKAVINA)   Would -- so back then you

21 were the assistant controller, on January 7; right?

22    A.    Yes.

23    Q.    Do you think that back then Mr. Seery or DSI

24 would have sought your advice or input as to what they

25 should do about the missed payment?

Kristin Hendrix - October 27, 2021

1      A.    No.

2            MR. MORRIS:  Objection to the form of the

3      question.

4            THE WITNESS:  No.

5      Q.    (BY MR. RUKAVINA)  That would have been

6      outside of your purview?

7      A.    Yes.

8      Q.    And you see in this notice in the middle, it

9      says an amount due as of January 8 in the $24,471,000

10     range.

11           Do you see that?

12     A.    Yes.

13     Q.    Do you have any idea, I take it you don't,

14     where that number came from?

15           MR. MORRIS:  Objection to the form of the

16     question.

17           THE WITNESS:  I don't know who provided that

18     number or where it came from.

19     Q.    (BY MR. RUKAVINA)  Do you have any

20     understanding as to why that number is higher than the

21     number on Exhibit 15?

22     A.    My guess would be that Exhibit 15 is just

23     principal balances.

24     Q.    Okay.

25           Exhibit 18, please.

Kristin Hendrix - October 27, 2021

1          (Whereupon, Exhibit 18 was marked for
2          identification.)
3      Q.   (BY MR. RUKAVINA)  Exhibit 18, Ms. Hendrix,
4  is an email chain between you and Mr. Waterhouse on
5  January 12, 2021.  Do you remember this email chain?
6      A.   No.
7      Q.   Do you remember on January 12 Mr. Waterhouse
8  emailing you, asking when the last amort payment due
9  and what the amount was for NexPoint?
10     A.   No.
11     Q.   When was the last time -- well, strike that.
12          Do you remember ever seeing this email
13  between then and today?
14     A.   No.
15     Q.   Do you have any present memory of any
16  communications with Mr. Waterhouse on or about
17  January 12, 2021 regarding the NexPoint default or
18  note?
19     A.   Not specific, no.
20     Q.   Any general memory?
21     A.   Not that I can pinpoint, no.
22     Q.   Were you aware that on or about January 14
23  NexPoint transferred about $1.4 million and change to
24  the debtor?
25     A.   Yes.

Kristin Hendrix - October 27, 2021

1    Q.   Were you aware of it then?

2    A.   Was I aware of what?

3    Q.   That transfer of $1.4 million and change.

4    A.   On January 14?

5    Q.   Yes.

6    A.   Yes.

7    Q.   Did you facilitate that transfer?

8    A.   Yes.

9    Q.   Who told you to make that transfer?

10   A.   Frank Waterhouse.

11   Q.   Did he tell you why?

12   A.   Nope.

13   Q.   He just said make the transfer?

14   A.   Yes.

15   Q.   Did he tell you that it was on account of the

16   NexPoint note?

17   A.   Yes.

18   Q.   Did he tell you how to, if at all, to credit

19   that note for that amount?

20   A.   No.

21   Q.   Sitting here today, you have no memory other

22   than that Frank Waterhouse told you to transfer some

23   $1.4 million on the NexPoint note?

24   A.   Right.

25   Q.   And do you recall, was that oral or written

Kristin Hendrix - October 27, 2021

1  or how would that have been?

2      A.    That was a phone call.

3      Q.    Do you recall who initiated the phone call?

4      A.    Frank called me.

5      Q.    Was that the only topic discussed in that

6  phone call to your memory?

7      A.    Yes.

8      Q.    Did you ask him why the payment or

9  anything -- did you ask him anything at all?

10     A.    No.

11     Q.    And after you made the payment -- or I'm

12 sorry, after you caused the payment to be made, did you

13 take any further steps with respect to the NexPoint

14 note?

15     A.    I forwarded the payment confirmation, showing

16 that the money was sent from NexPoint Advisors to

17 Highland, forwarded that payment confirmation from the

18 bank to Jack Donohue at DSI, letting him know.

19     Q.    Did you let Mr. Donohue or anyone at DSI know

20 about the transfer before the transfer was made?

21     A.    No.

22     Q.    And you sent that by email to Mr. Donohue?

23     A.    Yes.

24     Q.    Did Mr. Donohue thereafter have any

25 discussion with you about that in any way?

Kristin Hendrix - October 27, 2021

1    A.    I have no idea.

2    Q.    He didn't ask what this was for or anything

3 like that?

4    A.    He may have asked what the amount

5 represented.  I can't specifically recall.  But it's

6 possible.

7    Q.    Okay.  Do you recall any discussion about

8 that time, January 14, with Mr. Donohue or

9 Mr. Waterhouse or anyone as to whether that payment

10 would in any way relieve NexPoint of the default or

11 would not relieve NexPoint of the default?

12    A.    No.

13    Q.    Ms. Hendrix, I believe that I am done.  I

14 would like you, however, because it's important, to

15 check your phone.  Would you like a short, five-minute

16 restroom break and just check --

17    A.    Yeah, and I might need help figuring out how

18 to do that.

19    Q.    I'm not saying that it's possible, but I'm

20 going to ask you on the record to look for that

21 November 30 or December 1, 2020 phone call.

22         MR. MORRIS:  We're happy to do that.

23    Q.    (BY MR. RUKAVINA)  But what I would like if

24 you find it, I would like you to tell me the time, the

25 date and the length of that call.

Kristin Hendrix - October 27, 2021

1    A.    Okay.

2    Q.    Thank you.

3          We'll be back in five minutes.

4          (Off the record.)

5    Q.    (BY MR. RUKAVINA)  Ms. Hendrix, during the

6    break did you look at your phone?

7    A.    I did.

8    Q.    Did you find anything?

9    A.    Sadly, it only goes back to October 5 of

10   2021.

11   Q.    Not surprised.  Thank you.

12         Have I been courteous to you today?

13   A.    Yes.

14         MR. RUKAVINA:  I pass the witness.

15         MR. MORRIS:  Thank you.

16         MR. AIGEN:  Are we ready to move forward?

17         MR. MORRIS:  Yes.  You're a little dark

18   there.

19         MR. RUKAVINA:  Can we increase the volume on

20   that thing?

21         (Off the record.)

22                         EXAMINATION

23   Q.    (BY MR. AIGEN)  Good afternoon, Ms. Hendrix.

24   My name is Michael Aigen.  I represent Mr. Dondero,

25   HCMS and HCRE Partners in several of the adversary

Kristin Hendrix - October 27, 2021

1   proceedings today.

2          I'm going to try to ask you some questions

3   about these adversary proceedings.  I'll try to make it

4   as quick as possible so we don't keep you here.

5          You understand that you're still under oath;

6   is that correct?

7      A.   Correct.

8      Q.   First topic I want to ask you about is one of

9   the defenses in this case related to an oral agreement.

10  Let me start off with this question.

11         Are you aware that some of the defendants in

12  these adversary proceedings have raised a defense that

13  there was a subsequent oral agreement allowing the

14  notes at issue to be potentially forgiven if certain

15  events occurred?

16     A.   I've recently been made aware that this came

17  up, yes.

18     Q.   When you say recently, approximately when?

19     A.   Within the last week.

20     Q.   And where did you learn that from?

21     A.   In my speakings with John Morris just

22  preparing for today.

23         MR. AIGEN:  And John, I'm going to assume

24  that those conversations are privileged?

25         MR. MORRIS:  That's a very fair assumption.

Kristin Hendrix - October 27, 2021

1    Q.   (BY MR. AIGEN)  Other than the conversation
2  you just referred to with Mr. Morris, have you ever had
3  any other conversations with anyone about this alleged
4  oral agreement that Defendants are contending occurred?
5    A.   No.
6    Q.   So prior to that conversation with Mr. Morris
7  you weren't even aware of this alleged defense related
8  to an oral agreement.  Is that fair to say?
9    A.   That's right.
10   Q.   This is a similar question but slightly
11  different, just to sort of finish this topic.  I'm not
12  asking about this oral agreement as a defense, I'm just
13  asking more generally.
14        Other than this conversation, were you aware
15  generally of any conversations that anyone had where
16  the notes at issue might be forgiven if certain events
17  occurred?
18        MR. MORRIS:  Objection to the form of the
19  question.
20        THE WITNESS:  No.
21   Q.   (BY MR. AIGEN)  Is it fair to say that you
22  haven't had any conversations about this subsequent
23  oral agreement with anyone other than Mr. Morris?
24   A.   That's fair.
25   Q.   You never discussed it with Mr. Seery?

Kristin Hendrix - October 27, 2021

1    A.    No.

2    Q.    Never discussed it with Mr. Klos?

3    A.    No.  Well, sorry, Mr. Klos was present when

4 John and I talked about it.  But that's it.

5    Q.    Have you ever made any investigation or

6 effort in order to determine if this oral agreement

7 actually occurred?

8    A.    No.

9    Q.    If there was such an oral agreement to

10 potentially forgive the notes, do you believe that you

11 would have known about such an oral agreement as part

12 of your duties and responsibilities?

13    A.    Yes, I would hope so.

14    Q.    Why do you say that?

15    A.    That's something that should be disclosed in

16 audited financial statements, and me and my team are

17 responsible for preparing those financial statements

18 and presenting them to the auditors as fair and

19 accurate.

20    Q.    And is it fair to say that this oral

21 agreement should have been disclosed to PwC if it was

22 determined that it was material?

23    A.    Yes.

24    Q.    And have you done any sort of analysis to

25 determine whether the oral agreement at issue here

Kristin Hendrix - October 27, 2021

1    would have been material for purposes of a PwC audit?

2        A.    I've not done any work, just finding out

3    about it, but from what it sounds like, it would be

4    material.

5        Q.    That's your opinion, that it would have been

6    material; is that fair to say?

7        A.    Fair.

8        Q.    Have you had any discussions with anyone else

9    about whether the oral agreement would have been

10   material?

11       A.    No.

12       Q.    Changing topics a little bit here, are you

13   aware --

14            (Off the record.)

15       Q.    (BY MR. AIGEN)  Are you aware that a few of

16   the loans at issue here, specifically related to HCMS

17   and HCRE, were term loans as opposed to demand loans?

18       A.    Yes.

19       Q.    And are you aware that for those particular

20   loans, there were payments that were supposed to be

21   made but weren't on December 31, 2020?

22       A.    Yes.

23       Q.    Do you have any understanding as to why those

24   payments weren't made with respect to the HCMS and HCRE

25   term loans on December 31, 2020?

Kristin Hendrix - October 27, 2021

1    A.    Yes.

2    Q.    Can you tell me why?

3    A.    Sure.  It goes along with the same statement

4  as HCMFA and NPA and the phone call that I got from

5  Frank Waterhouse saying there's no payments coming from

6  any of the affiliates to the debtor.

7    Q.    I may have written that down wrong when you

8  talked about that before, but I believe your earlier

9  testimony when you described that conversation was that

10 there was no more payments coming from the Advisors,

11 not affiliates.

12        Let me ask you then, what was the

13 conversation?  Was it no more payments from affiliates

14 or Advisors?

15   A.    It could have been either.  I probably did

16 say Advisors.  But regardless, those payments would

17 have been directed to me to be made, either by Frank

18 Waterhouse or Jim Dondero.

19        And I would assume that nobody directed me to

20 make those payments because we weren't making any

21 payments from Jim's related parties.  I don't know for

22 a fact, but that's what I would assume.  Those were all

23 under the same umbrella.

24   Q.    And again, let's back up a second.

25        When you refer to Advisors, fair to say that

Kristin Hendrix - October 27, 2021

1   that does not include HCMS and HCRE; is that correct?

2       A.   When I say Advisors, I am referring to HCMFA

3   and NPA.

4       Q.   And when you use the term "affiliates,"

5   you're referring to all four; is that correct?

6       A.   Correct.

7       Q.   Just want to make sure we're on the same

8   page.

9            When you answered the previous question you

10  started to get into assumptions and things like that.

11  Let me start off with what your specific recollection

12  of that phone call was.  Tell me as best as you can

13  what you remember Frank telling you?

14      A.   I remember it as being no payments from the

15  Advisors to the debtor.

16      Q.   So you don't remember the instruction being,

17  don't make payments from the affiliates.  It was, don't

18  make payments from the Advisors; is that correct?

19      A.   Correct.

20      Q.   So is it fair to say that you don't remember

21  any instructions telling you not to make any payments

22  from HCMS or HCRE?

23      A.   That's fair.

24      Q.   So if that is the case, why weren't payments

25  made from HCMS or HCRE for December 31, 2020, payment?

Kristin Hendrix - October 27, 2021

1    A.   Sure.   Typically what would have happened is
2  Frank would be talking to Jim Dondero about making
3  these payments and getting his approval to do so,
4  because Jim Dondero is, you know, directing payments
5  out of these entities.
6         I have never -- had never been given the
7  direction to effectuate those payments by anybody.
8    Q.   Is it fair to say, then, that you're not
9  aware of any instructions from anyone saying that the
10 HCMS and HCRE payments should not be made on
11 December 31, 2020?
12   A.   That's fair.
13   Q.   So the reason the payments weren't made is
14 because you never got an affirmative instruction to
15 actually make that payment; is that correct?
16   A.   Correct.
17   Q.   And you're not aware of Mr. Dondero
18 instructing anyone that HCMS and HCRE should not have
19 made the December 31, 2020, payments; is that correct?
20   A.   I'm not aware personally, no.   Correct.
21   Q.   You say personally.   In any way are you aware
22 of such a specific instruction?
23   A.   No.
24   Q.   If that payment was to be made, who at the
25 debtor would have been responsible for making those

1  payments on behalf of HCMS and HCRE?
2         MR. MORRIS:  Objection to the form of the
3  question.
4         THE WITNESS:  The corporate accounting team.
5     Q.  (BY MR. AIGEN)  And that included you?
6     A.  Yes.
7     Q.  And in December of 2020, were you aware that
8  those payments were due on December 31, 2020?
9     A.  Yes.
10    Q.  Did you make any attempts or efforts to
11 determine whether Mr. Dondero wanted those payments to
12 be made?
13    A.  I did not, no.
14    Q.  Why not?
15    A.  That would have been something that Frank
16 Waterhouse would have done directly with Jim Dondero
17 himself.
18    Q.  Did you have any conversations with anyone
19 about whether the December 31 payments for HCMS and
20 HCRE would be made in December of 2020?
21    A.  Not that I can recall.
22    Q.  And you didn't think it was your
23 responsibility to check on those payments and find out
24 if they should have been made?
25    A.  Right, correct.

Kristin Hendrix - October 27, 2021

1    Q.   And is that because it's only your job to
2    make payments that you're told to specifically make; is
3    that correct?

4    A.   Yes, in this case, that is correct.

5    Q.   Is it fair to say then that as part of your
6    job responsibilities you've never made a payment to
7    anyone without being specifically told by Mr. Dondero
8    and Mr. Waterhouse?

9    A.   Sorry, say that again.

10   Q.   As part of your job responsibilities, have
11   you ever made a payment to anyone without the specific
12   instruction of Mr. Waterhouse or Mr. Dondero?

13       MR. MORRIS:   Objection to the form of the
14   question.

15       THE WITNESS:   Yes, we make payments all the
16   time.

17   Q.   (BY MR. AIGEN)   So why is this different in
18   that this payment was not made without the specific
19   instructions from Mr. Waterhouse and Mr. Dondero, even
20   though you believed the payment was due on December 31,
21   2020?

22   A.   The difference between making a loan payment
23   and making normal course -- or sorry, normal, ordinary
24   course, you know, overhead expense payments is that
25   something like that is not necessarily what we would

Kristin Hendrix - October 27, 2021

1   take to Jim Dondero to approve.

2           He doesn't have time to approve every single

3   overhead payment that we're making out of every single

4   entity.  That's what Frank is for.

5           Something that's once a year that's more

6   material in amount, such as a loan payment, that is

7   something that needs to get approved by Jim Dondero.

8       Q.   You say needs to get approved.  What's your

9   basis for that, something in a policy manual, something

10  someone told you?

11      A.   It's a policy that my team followed.  I don't

12  think that it's written in an actual manual anywhere,

13  but anything that's not ordinary course needs to get

14  approved by Jim Dondero.

15      Q.   Is that something that's written in a policy

16  anywhere?

17      A.   Not that I know of.

18      Q.   Were you ever told that payments in the

19  ordinary course can be made without Mr. Dondero's

20  approval but loan payments cannot?

21      A.   Yes, I do recall years ago that Frank and I,

22  possibly Jim, this was years ago, had a conversation

23  that anything ordinary course is up to Frank to

24  approve.  And this is, quite frankly, up to Frank.

25          Whatever he felt Jim needed to sign off on,

Kristin Hendrix - October 27, 2021

1   that's what Jim would sign off on.  This was not my

2   responsibility to make that decision.

3       Q.   And in December -- prior to the December 31,

4   2020, due date you didn't have any conversations with

5   anyone about whether this -- these payments that were

6   due should be made; is that correct?

7       A.   Correct.

8       Q.   And you didn't try to check with anyone to

9   see whether anyone wanted these payments to be made; is

10  that correct?

11      A.   Correct.

12      Q.   Subsequent to the payment being missed, did

13  you ever have any conversations with anyone about why

14  the payment was not made?

15      A.   Not that I recall.

16      Q.   So is it fair to say that sitting here today

17  you have no idea why the payments were not made for

18  HCMS and HCRE on December 31, 2020?

19          MR. MORRIS:  Objection to the form of the

20  question.

21          THE WITNESS:  I don't have any specific

22  evidence telling me why they weren't.  I can make

23  assumptions but that's not going to help.

24      Q.   (BY MR. AIGEN)  Well, did you ever have any

25  conversations with anyone about why those payments were

Kristin Hendrix - October 27, 2021

1  not made?

2       A.    No.

3       Q.    You have no idea why they weren't made other

4  than just speculation; is that fair to say?

5       A.    Correct.

6             MR. MORRIS:  Objection.  Asked and answered.

7             THE WITNESS:  Correct.

8       Q.    (BY MR. AIGEN)  And are you aware that with

9  respect to those two loans, some payments were actually

10 made in the next month, in January of 2021?

11      A.    Yes.

12      Q.    What role, if any, did you have with respect

13 to those payments?

14      A.    Frank Waterhouse would call me and tell me to

15 have my team effectuate a wire.

16      Q.    And you say would call you.  Do you remember

17 this conversation or are you just assuming it occurred?

18            MR. MORRIS:  Objection to the form of the

19 question.

20            THE WITNESS:  If we sent a payment out, Frank

21 would have told me to do it.  I would not have done it

22 on my own.

23      Q.    (BY MR. AIGEN)  Sitting here today, do you

24 have a specific recollection of the conversation where

25 someone told you to make the January 2021 payments?

Kristin Hendrix - October 27, 2021

1    A.   I can't tell you the exact date, but, yes, I
2  do have a recollection of Frank calling or emailing me
3  to have, I believe it was the HCRE wire sent out for
4  their payment.
5    Q.   What about the HCMS payment?
6    A.   I don't recall that one as much.
7    Q.   Other than the payment being made, do you
8  have any recollection of any other conversations about
9  why the payment was being made?
10    A.   No.
11    Q.   Are you aware of any conversations that
12  anyone had regarding whether these payments would
13  deaccelerate loans?
14    A.   No.
15    Q.   Is that something you would normally be part
16  of, conversations like that?
17    A.   No.
18    Q.   Changing topics here.  Not sure if this is an
19  area that you know anything about.
20         Are you familiar with the term, as it's used
21  at Highland, NAV ratio trigger period?
22    A.   No.
23    Q.   This may go very quick.  If I represent to
24  you that it's a term that's used in the -- in the
25  fourth amended limited partnership agreement for

Kristin Hendrix - October 27, 2021

1  Highland Capital Management, would that refresh your
2  recollection at all?
3      A.    No.
4      Q.    Fair to say, then, that you have no knowledge
5  as to whether NAV ratio trigger period was ever reached
6  at any time prior to bankruptcy buyouts?
7      A.    No, I don't know.
8      Q.    Have you ever had any conversations with
9  Nancy Dondero?
10     A.    I have not.
11     Q.    Never met her?
12     A.    No.  I may have exchanged an email with her
13  on an invoice, but that's the extent of it.  No
14  conversations.
15     Q.    In the years leading up to the bankruptcy of
16  Highland Capital, was there any time period where
17  Highland was unable to pay its salaries?
18     A.    Salaries?
19     Q.    Salaries of its employees?
20     A.    No.
21     Q.    In the time leading up to the Highland
22  bankruptcy, was there any time period where Highland
23  wasn't able to pay bonuses owed to any of its
24  employees?
25     A.    Not that I know of.  Not that I can recall.

Kristin Hendrix - October 27, 2021

1    Q.   Are you aware of any time period leading up
2 to the Highland bankruptcy where Highland was unable to
3 pay its bills?
4    A.   There's times where we would be in a cash
5 flow crunch and we would stretch our AP, but eventually
6 it would get paid.
7    Q.   And I think this is the last topic and we can
8 probably move through this pretty quickly.
9        Are you aware of any loans made by Highland
10 to any of its employees or officers that were forgiven
11 in part or all?
12    A.   Yes.
13    Q.   Which officers or employees are you aware of?
14    A.   I recall there were two employees.  I can't
15 remember one of them, but I believe another, the second
16 one, was Paul Adkins.  Again, I'm just recalling this
17 was years ago.
18    Q.   And these two are the only ones you're aware
19 of?
20    A.   Or I'm sorry, not Paul Adkins, Tim Lawler.
21 It's possible Paul Adkins was the other one, but I
22 can't tell you for sure.
23    Q.   Tim Lawler and some other employee that you
24 can't remember the name of are the only two that you're
25 aware of?

Kristin Hendrix - October 27, 2021

1      A.    Yes.

2      Q.    This other employee, I know you don't

3  remember the name.  Is there any other description that

4  you can give me, what their position was, how long they

5  worked, or is it just you remember those loans?

6      A.    I just remember we had two employee loans.

7      Q.    Approximately when was this?

8      A.    I couldn't even tell you.  All the years just

9  commingle together.

10     Q.    More than five years ago?

11     A.    Yes.

12     Q.    More than 10 years ago?

13     A.    I couldn't say.

14          MR. AIGEN:  Why don't we take a five-minute

15  break and then I'll either be done or have just a few

16  wrap-up questions.

17          MR. RUKAVINA:  Okay.

18          (Off the record.)

19                   FURTHER EXAMINATION

20     Q.    (BY MR. RUKAVINA)  Ms. Hendrix, in May of

21  2019, would you on behalf of Highland alone,

22  unilaterally, have the authority to lend to HCMFA 2.4-

23  and/or $5.0 million?

24     A.    No.

25     Q.    And would you have had any authority on

Kristin Hendrix - October 27, 2021

1  behalf of HCMFA in May of 2019 to bind HCMFA to such
2  notes?
3      A.    No.
4      Q.    Thank you, ma'am.
5                          EXAMINATION
6      Q.    (BY MR. MORRIS)  Ms. Hendrix, can you get out
7  of your pile, Exhibit Number 3.
8            And this is the email from Dave Klos to
9  corporate accounting on May 2nd concerning the
10  $2.4 million that was going to be transferred from
11  HCMLP to HCMFA?
12     A.    Yes.
13     Q.    And how did Mr. Klos characterize that
14  transfer?
15     A.    He called it a new intercompany loan.
16     Q.    What does a new intercompany loan mean to
17  you?
18     A.    That means we are creating a new loan
19  document, sending money out, tracking it as a
20  brand-new, fresh loan.
21     Q.    And he sent this email to an email group
22  called corporateaccounting@hcmlp.com.  Do I have that
23  right?
24     A.    Yes.
25     Q.    Were you included in that email group?

Kristin Hendrix - October 27, 2021

1      A.    I was.

2      Q.    Can you identify everybody else who you

3  recall being in that email group?

4      A.    Yes.

5      Q.    Who else was in that email group?

6      A.    Dave Klos, Frank Waterhouse, myself, Hayley

7  Eliason, and Blair Roeber.

8      Q.    Okay.  Did Mr. Waterhouse ever tell anybody,

9  to the best of your knowledge, in May 2019 that the

10  transaction should not be booked as a loan?

11      A.    No, not to my knowledge.

12      Q.    You testified earlier that there was, you

13  recall, a similar email the next day with respect to a

14  $5 million transaction.

15            Do you recall that?

16      A.    Yes.

17      Q.    Do you recall if that email also went to

18  corporate accounting?

19      A.    I believe so, yes.

20      Q.    And to the best of your knowledge, would

21  Mr. Waterhouse have been informed on May 3, 2019, that

22  the transaction was being booked by the corporate

23  accounting department as a loan?

24      A.    Yes.

25      Q.    Did Mr. Waterhouse tell you at that time or

Kristin Hendrix - October 27, 2021

1  at any time thereafter that it was a mistake to book it
2  as a loan?
3       A.   No.
4       Q.   Did Mr. Waterhouse tell you at that time or
5  at any time thereafter that he didn't intend to sign
6  the promissory notes?
7       A.   No.
8            MR. RUKAVINA:  Objection.  To the last
9  question, objection to form.
10           Go ahead.
11      Q.   (BY MR. MORRIS)  Okay.  The promissory notes,
12  to be clear, are the two promissory notes that you
13  testified to earlier that have been marked as exhibits
14  in this deposition for $5 million and $2.4 million
15  respectively.
16           With that definition as promissory notes, did
17  Mr. Waterhouse ever tell you at any time that it was a
18  mistake to sign those notes?
19           MR. RUKAVINA:  I'll object to the form.
20           Go ahead.
21           THE WITNESS:  No.
22      Q.   (BY MR. MORRIS)  Did Mr. Waterhouse or
23  anybody -- withdrawn.  I'll go back to the first
24  question.
25           Did Mr. Waterhouse or anybody in the world

Kristin Hendrix - October 27, 2021

1  ever tell you at any time since May of 2019 that it was
2  a mistake to issue the promissory notes as we've
3  defined them?
4      A.   No.
5      Q.   Did Mr. Waterhouse or anybody in the world
6  tell you that Mr. Waterhouse wasn't authorized to affix
7  his signature to those promissory notes?
8          MR. RUKAVINA:  And I'll object.  Assumes
9  facts not in evidence, i.e., the signature.  That's
10 what I've been objecting to.
11         But go ahead and answer.
12         THE WITNESS:  Say it again.
13     Q.   (BY MR. MORRIS)  Did Mr. Waterhouse or
14 anybody in the world tell you at any time that he
15 wasn't authorized to have his signature affixed to the
16 promissory notes?
17         MR. RUKAVINA:  Same objection.
18         THE WITNESS:  No.
19     Q.   (BY MR. MORRIS)  Did you have anything to do
20 with Highland's annual audit?
21     A.   Yes.
22     Q.   What role did you play with respect to
23 Highland's annual audit?
24     A.   I personally was in charge of completely
25 writing the entire audit report for the debtor and for

1  HCMFA.  I oversaw all other aspects of the audit my

2  team carried out.

3           Any requests from the auditors, emails with

4  questions, any issues that arose, all of that went

5  through me.

6       Q.   And did Mr. Waterhouse play a role in

7  relation to the annual audit?

8       A.   Yes.

9       Q.   What is your understanding of

10  Mr. Waterhouse's role?

11       A.   Let's see.  He was in charge of reviewing the

12  financial statements as they were done, so he saw the

13  end product.  He would sign off on the management rep

14  letter.  He signed engagement letters.

15           If there were any big issues, those got --

16  those would be brought to Frank's attention for sure.

17       Q.   Okay.  And are you a CPA?

18       A.   Yes.

19       Q.   And are you familiar with management rep

20  letters?

21       A.   Yes.

22       Q.   What is your understanding of what a

23  management rep letter is?

24       A.   That's basically telling the auditors that

25  everything in the audited financial report is accurate

Kristin Hendrix - October 27, 2021

1  to the best of their knowledge, they've presented

2  everything that they have fair and accurately, they're

3  not withholding any information.

4      Q.   And do you recall that the -- Highland's 2018

5  audit was completed in early June 2019?

6      A.   Yes.

7      Q.   And did you cause the two promissory notes

8  that we're talking about here to be delivered to

9  PricewaterhouseCoopers in connection with the audit?

10     A.   Yes.

11     Q.   And were those two promissory notes delivered

12 to PricewaterhouseCoopers because they constituted

13 subsequent events?

14     A.   Yes.

15     Q.   Do you recall whether those promissory notes

16 were described in Highland's 2018 audited financial

17 statements?

18     A.   Yes.

19     Q.   And did Mr. Waterhouse or Mr. Dondero ever

20 tell you at any time that there was a mistake in the

21 audited financial statements?

22     A.   No.

23     Q.   Did they ever tell you -- did Mr. Waterhouse

24 or Mr. Dondero or anybody in the world ever tell you at

25 any time that the two notes were mischaracterized in

Kristin Hendrix - October 27, 2021

1  the 2018 audited financial statements of Highland
2  Capital?
3      A.   No.
4      Q.   Do you know whether HCMFA also had its annual
5  financial statements audited by PricewaterhouseCoopers?
6      A.   Yes.
7      Q.   Did you play any role in connection with that
8  audit?
9      A.   Yes.
10     Q.   What role did you play in connection with
11 HCMFA's audit of the 2018 financial statements?
12     A.   Same exact role as with the debtors --
13     Q.   And --
14     A.   -- writing the audit report, overseeing all
15 other audit functions.
16     Q.   And did you and your group cause HCMFA to
17 deliver to PricewaterhouseCoopers the two promissory
18 notes that we've been discussing from May 2019?
19     A.   Yes.
20     Q.   Did Mr. Waterhouse or Mr. Dondero or anybody
21 in the world ever tell you that it was a mistake to
22 deliver those promissory notes to PwC in connection
23 with HCMFA's 2018 audit?
24     A.   No.
25     Q.   Were those notes delivered -- withdrawn.

Kristin Hendrix - October 27, 2021

1        Were those notes delivered to

2   PricewaterhouseCoopers because they constituted

3   subsequent events in connection with the 2018 audit?

4        A.   Yes.

5        Q.   Do you recall whether PricewaterhouseCoopers

6   included as a liability on HCMFA's balance sheet the

7   obligations reflected in the two promissory notes at

8   issue?

9             MR. RUKAVINA:  Objection.  Best evidence.

10            Answer.

11            THE WITNESS:  On the 2018 financials?

12       Q.   (BY MR. MORRIS)  Correct.

13       A.   Those would not have been included as

14   liabilities in the 2018 financials.

15       Q.   Do you know if HCMFA completed their audit

16   for 2019?

17       A.   No.

18       Q.   Okay.  Did the notes appear in HCMFA's 2018

19   audited financials under the subsequent events section?

20       A.   Yes.

21            MR. RUKAVINA:  Objection.  Best evidence.

22            Go ahead.

23       Q.   (BY MR. MORRIS)  Did Mr. Dondero or -- did

24   Mr. Waterhouse or Mr. Dondero or anybody in the world

25   ever tell you that it was a mistake to include

Kristin Hendrix - October 27, 2021

1  reference to these notes in HCMFA's 2018 audited
2  financial statements?
3        MR. RUKAVINA:  Same objection.
4        THE WITNESS:  No.
5     Q.  (BY MR. MORRIS)  Okay.  Do you recall, did
6  anybody in the world ever tell you that the
7  transactions described in Exhibit 3 and the other
8  document that you recall should never have been booked
9  as a loan?
10     A.  No.
11     Q.  Did anybody in the world tell you that you
12  made a mistake when you created those promissory notes?
13     A.  No.
14     Q.  Can you pull out what was marked as
15  Exhibit 16.
16        Do you understand that the Advisors provide
17  services to certain retail funds?
18     A.  Yes.
19     Q.  And do you recall that the services are
20  subject to an agreement that's subject to annual
21  review?
22     A.  Yes.
23     Q.  So looking at Exhibit 16, did you understand
24  that the retail board had asked Highland to disclose --
25  I'll just read it from the document on page 2,

Kristin Hendrix - October 27, 2021

1    Bates number ending 881.

2              There's an email from Ms. Thedford that says,

3    quote, are there any material amounts -- withdrawn.

4              Are there any material outstanding amounts

5    currently payable or due in the future, open paren,

6    e.g., notes, close paren, to HCMLP by HCMFA or NexPoint

7    Advisors or any other affiliate that provides services

8    to the funds?

9              Do you see that?

10   A.    Yes.

11   Q.    And were you generally aware that that was

12   part of the annual renewal process?

13   A.    Yes.

14   Q.    And you made some comments earlier about

15   Ms. Thedford's response on the first page.

16             Do you recall that?

17   A.    Yes.

18   Q.    And you actually were able to correct certain

19   mistakes that you perceived in her response.

20             Do I have that right?

21   A.    Correct.

22   Q.    Do you know -- do you see where it says,

23   HCMFA due to HCMLP as of June 30, 2020, let's just call

24   it $12.3 million.

25             Do you see that?

Kristin Hendrix - October 27, 2021

1    A.    Yes.

2    Q.    And above that there is a reference to the

3    6/30 financials.

4          Do you see that?

5    A.    I do.

6    Q.    Do you know what the reference to the 6/30

7    financials is?

8    A.    Yes.

9    Q.    And what is that reference?

10   A.    That is referencing the amounts on the

11   balance sheet at 6/30 that we provided for the 15(c)

12   materials to the board.

13   Q.    Okay.  And does that $12.3 million include,

14   to the best of your knowledge, the principal amount of

15   the two notes that we were talking about?

16   A.    Yes.

17         MR. RUKAVINA:  Objection.  Best evidence.

18         THE WITNESS:  Yes.

19   Q.    (BY MR. MORRIS)  And how do you know that?

20   A.    Because I kept their financials, I know for a

21   fact that it included all of their outstanding notes

22   and it most certainly included these two notes that

23   we've been talking about today.

24   Q.    And to the best of your recollection did

25   HCMFA provide the 6/30 financials to the retail board?

Kristin Hendrix - October 27, 2021

1      A.    Yes.

2      Q.    And to the best of your knowledge did

3  Mr. Dondero or Mr. Waterhouse or anybody in the world

4  ever tell you that the financial statements that were

5  provided to the retail board were erroneous in any way?

6      A.    No.

7      Q.    Did Mr. Dondero or Mr. Waterhouse or anybody

8  in the world ever tell you that the 6/30 financials

9  that were given to the retail board should not have

10 included the $7.4 million principal amount on the two

11 promissory notes?

12          MR. RUKAVINA:  Objection.  Best evidence.

13          Answer.

14          THE WITNESS:  No.

15     Q.    (BY MR. MORRIS)  Do you know whether -- are

16 you at all familiar with the Advisors' actual response

17 to the retail board in October 2020?

18     A.    Say that again, please.

19     Q.    So this email string is October 2020; right?

20     A.    Right.

21     Q.    And do you understand that this is kind of a

22 discussion between Mr. Waterhouse and Ms. Thedford as

23 to how to respond?

24     A.    Yes.

25     Q.    Have you ever seen the actual response that

Kristin Hendrix - October 27, 2021

1  was given to the retail board?

2      A.   I likely did.  I can't tell you for certain

3  that I was on the correspondence.

4      Q.   Do you recall any discussion at any time that

5  the $12.3 million number in Ms. Thedford's email should

6  be changed in the final report to the retail board?

7      A.   I don't believe so.

8      Q.   Did anybody ever tell you at any time that

9  the $12.3 million number was incorrect?

10     A.   No.

11     Q.   Did anybody ever tell you at any time that

12 that number wrongly included the $7.4 million reflected

13 in the two notes?

14     A.   No.

15     Q.   Okay.  Do you recall that earlier that

16 summer -- we looked at Exhibit 15?

17     A.   Yep.

18     Q.   And that was an attachment to an email that

19 you personally sent to Mr. Dondero.  We saw that

20 before?

21     A.   Right.

22     Q.   And this Exhibit 15, which was attached to

23 your email, identifies amounts due and owing from

24 NexPoint Advisors; right?

25     A.   Right.

Kristin Hendrix - October 27, 2021

1    Q.    And it identifies amounts due and owing for a
2 number of different entities, including HCMFA; right?
3    A.    Correct.
4    Q.    Do you know whether the amount included for
5 HCMFA on Exhibit 15 included the principal amount due
6 on the two promissory notes?
7    A.    It does.
8    Q.    Did Mr. Dondero or Mr. Waterhouse ever ask
9 you why -- withdrawn.
10        Did Mr. Dondero or Mr. Waterhouse ever ask
11 you how the $10.5 million number was calculated?
12    A.    No.
13    Q.    Did Mr. Dondero or Mr. Waterhouse ever
14 suggest to you that the number was incorrect?
15    A.    No.
16    Q.    Did Mr. Dondero or Mr. Waterhouse or anybody
17 in the world ever question the number that you gave to
18 Mr. Dondero in the summer of 2020 concerning the
19 principal amount due by HCMFA to HCMLP?
20    A.    No.
21    Q.    Have you ever made a payment -- withdrawn.
22        Have you ever caused a payment to be made in
23 connection with an intercompany loan without receiving
24 the prior approval from either Frank Waterhouse or
25 Mr. Dondero?

Kristin Hendrix - October 27, 2021

1    A.    No.

2    Q.    Has anybody ever said to you that you made a

3  mistake in applying a payment against principal or

4  interest due on an intercompany loan?

5    A.    No.

6    Q.    We saw this morning, and we produced to

7  Mr. Rukavina and he mentioned earlier, 13-week

8  forecasts?  Do you understand that?

9    A.    Yes.

10    Q.    Did you review the 13-week forecasts

11  recently?

12    A.    Yes.

13    Q.    And we're talking specifically about the

14  13-week forecasts for the November/December 2020 time

15  period.  Do you understand that?

16    A.    Yes.

17    Q.    Based on your review of those forecasts, did

18  those forecasts specifically identify the principal and

19  interest that were due on the three term notes as of

20  December 28, 2020?

21    A.    Yes.

22    Q.    And what was the purpose of creating the

23  13-week forecasts?

24    A.    Sure.  That was to keep everybody informed

25  who was on the cash call, Frank Waterhouse, Jim Seery

Kristin Hendrix - October 27, 2021

1  and others, keep everybody informed of upcoming

2  payments that were due on term loans well in advance.

3          Everybody knew about it.  It was out there

4  for everybody to see that was on these cash calls.

5      Q.   Now, is it your understanding that

6  Mr. Waterhouse -- withdrawn.

7          Did you email these forecasts -- withdrawn.

8          Did anybody email these forecasts to the best

9  of your recollection in late 2020?

10     A.   Yes.

11     Q.   And was it sent to the corporate accounting

12  group that we saw earlier?

13     A.    It was probably sent to Frank, Seery, the DSI

14  guys that were involved with the cash call.

15     Q.   Okay.  And so did you participate in the

16  creation of the 13-week forecasts?

17     A.   Yes.

18     Q.   What role did you play in the creation of the

19  13-week forecasts?

20     A.    I was responsible for creating the entire

21  thing.

22     Q.   Okay.  And based on the work that you did,

23  was one of the purposes to make sure that

24  Mr. Waterhouse was aware of all payments that were

25  coming due under the intercompany notes?

Kristin Hendrix - October 27, 2021

```
1        A.   Yes.
2        Q.   And was that information that was included on
3   the reports to Mr. Waterhouse?
4        A.   Yes.
5        Q.   And do you recall whether there were any
6   specific discussions in November or December of 2020
7   concerning those payments -- withdrawn.  That wasn't a
8   good question.
9             Did Mr. Waterhouse or -- withdrawn.
10            Did anybody on behalf of HCMS or HCRE ever
11  instruct you to make the payments that were due under
12  their term notes?
13       A.   No.
14       Q.   Did anybody on behalf of NexPoint ever
15  instruct you to make a payment that was due at year end
16  with respect to the NexPoint term note?
17       A.   No.
18       Q.   Were you authorized to make those payments
19  without the prior approval of either Mr. Waterhouse or
20  Mr. Dondero?
21       A.   No.
22       Q.   I think you testified that there were certain
23  payments that were made in January 2001 under each of
24  the three term notes.
25            Do I have that right?
```

Kristin Hendrix - October 27, 2021

1     A.    Correct.
2           MR. RUKAVINA:  2021.
3           MR. MORRIS:  Thank you very much.
4     Q.    (BY MR. MORRIS)  With that amendment, do you
5  understand my question?
6     A.    Yes.
7     Q.    Do you know why the three payments were made
8  in January of 2021 on each of three term notes?
9     A.    Because Frank Waterhouse instructed me to do
10 so.
11    Q.    And he had not instructed you to make those
12 payments prior to that time?
13    A.    Correct.
14    Q.    Did you have to prompt Frank Waterhouse in
15 January of 2021 to make those payments?
16    A.    No.
17    Q.    So based on the 13-week forecast that you
18 prepared and delivered to Mr. Waterhouse, is it your
19 understanding that Mr. Waterhouse knew as early as mid
20 November 2020 that payments would be due under the
21 three term notes at the end of the year?
22    A.    Yes.
23    Q.    And, in fact, did HCMS and HCRE and NexPoint
24 timely make their installment payments that were due at
25 year end 2018?

Kristin Hendrix - October 27, 2021

1       A.    Yes.

2       Q.    And was that done because HCMLP received the

3   instructions of somebody authorized to give the

4   instruction on behalf of those entities?

5       A.    Yes.

6       Q.    Did HCMS and HCRE and NexPoint timely make

7   the installment payments that were due at year end

8   2019?

9       A.    Yes.

10      Q.    And why did they make those payments?

11      A.    Because we were provided instruction and

12  authorization to do so.

13      Q.    Okay.  And is the only reason that the

14  payment wasn't made at year end 2020 because nobody on

15  behalf of the Advisors -- withdrawn.

16          Is the only reason that no payment was made

17  at the end of 2020 is because no one on behalf of

18  NexPoint, HCRE, or HCMS directed HCMLP to make those

19  payments?

20      A.    Correct.

21          MR. AIGEN:  Objection.  Form.

22      Q.    (BY MR. MORRIS)  And you testified earlier to

23  a call that you had with Mr. Waterhouse.  I think you

24  said it was either November 30 or December 1.

25          Do you recall that?

Kristin Hendrix - October 27, 2021

```
 1        A.    Yes.
 2        Q.    And did you personally continue to prepare
 3   the 13-week forecasts after your conversation with
 4   Mr. Waterhouse?
 5        A.    Yes.
 6        Q.    And did those 13-week forecasts continue to
 7   include the payments that were due under the three term
 8   notes at the year end?
 9        A.    Yes.
10        Q.    And that's information that you gave to
11   Mr. Waterhouse; is that right?
12        A.    Right.
13        Q.    Mr. Rukavina elicited from you the fact that
14   payments of principal hadn't been made on demand notes
15   that were executed in favor of Mr. Dondero's
16   affiliates.
17              Do you recall that?
18        A.    Yes.
19        Q.    Okay.  Was that a topic of conversation with
20   PricewaterhouseCoopers at any time?
21        A.    Yes.
22        Q.    Can you tell me about that conversation?
23        A.    Sure.  As part of our annual audit, the
24   auditors would, you know, make sure that our
25   receivables are collectible.  And if they thought for
```

Kristin Hendrix - October 27, 2021

1    any reason they weren't, then they were going to raise
2    an issue, a going concern issue.
3            That came up several years in a row with
4    HCMFA.
5        Q.   Do you recall that the three term notes at
6    issue here were all signed on May 31, 2017?
7        A.   Yes.
8        Q.   And all of those term notes involved a
9    roll-up of previously issued demand notes; is that
10   right?
11       A.   Correct.
12       Q.   Do you know why in -- at the end of May 2017
13   NexPoint, HCRE, and HCMS rolled up their demand notes
14   into individualized term notes?
15       A.   Yes.
16       Q.   What is your understanding as to why that
17   happened?
18       A.   That would get the auditors a little bit more
19   comfort over our outstanding loans, ensuring that we
20   have an amortization schedule, an underlying contract,
21   showing that payments will be coming in every year on
22   these outstanding receivables.
23       Q.   Okay.  As the person responsible for
24   preparing Highland's audit, did anybody ever tell you
25   at any time that any of the notes were not valid

Kristin Hendrix - October 27, 2021

1   obligations of the maker?

2        A.    No.

3        Q.    As the person responsible for Highland's

4   audit, did anybody ever tell you at any time that any

5   of the notes at issue should not have been signed?

6        A.    No.

7        Q.    As the person responsible for Highland's

8   audit, did anybody ever tell you at any time that any

9   of the notes at issue were signed by mistake?

10       A.    No.

11       Q.    Did anybody ever tell you at any time that --

12   withdrawn.

13            As the person responsible for Highland's

14   audit, did anybody ever tell you at any time that

15   Mr. Dondero didn't approve of any of the notes?

16       A.    No.

17       Q.    As the person responsible for Highland's

18   audit, did anybody ever tell you at any time that

19   the -- any of the notes at issue were subject to an

20   oral agreement?

21       A.    No.

22       Q.    As the person responsible for Highland's

23   audit, did anybody ever tell you at any time that any

24   of the notes were amended?

25       A.    No.

Kristin Hendrix - October 27, 2021

1  Q.  As the person responsible for Highland's
2  audit, did anybody ever tell you at any time that any
3  of the notes would be forgiven?
4  A.  No.
5  Q.  During your 15 years at Highland, has an
6  intercompany loan ever been forgiven in whole or in
7  part?
8  A.  No.
9  Q.  During your -- withdrawn.
10  Can you recall any note that Highland ever
11  held as the payee that was forgiven in whole or in part
12  in the five years prior to bankruptcy, go back to 2014?
13  A.  No.
14  Q.  Is it your understanding as the person
15  responsible for Highland's audit that the forgiveness
16  of notes, if they were in a material amount, would have
17  had to have been disclosed in the audited financial
18  statements?
19  A.  Yes.
20  Q.  So is it fair to say that any evidence of the
21  forgiveness of material amounts would have been
22  disclosed in Highland's financial statements?
23  A.  Yes.
24  MR. MORRIS:  I have no further questions.
25  MR. RUKAVINA:  I have none.

Kristin Hendrix - October 27, 2021

1          MR. AIGEN:  None.

2          MR. RUKAVINA:  Okay.  Thank you very much.

3          (Whereupon, the deposition adjourned at

4          1:19 P.M.)

5                          --oOo--

6          I declare under penalty of perjury that the

7     foregoing is true and correct.  Subscribed at

8     _____, Texas, this _____ day  of

9     _____, 2021.

10

11

12     _____

13     KRISTIN HENDRIX

14

15

16

17

18

19

20

21

22

23

24

25

135

# CERTIFICATE OF REPORTER

1

2     I, BRANDON D. COMBS, a Certified Shorthand

3  Reporter, hereby certify that the witness in the

4  foregoing deposition was by me duly sworn to tell the

5  truth, the whole truth, and nothing but the truth in the

6  within-entitled cause;

7     That said deposition was taken in shorthand by

8  me, a disinterested person, at the time and place

9  therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12     That before completion of the deposition,

13  review of the transcript was not requested.  If

14  requested, any changes made by the deponent (and

15  provided to the reporter) during the period allowed are

16  appended hereto.

17     I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto.

22     DATED: November 1, 2021

23

24  _____

25     Brandon Combs, Certified Shorthand
       Reporter No. 10927 in and for the

HCMFA APP 0584

1     State of Texas
      Dickman Davenport, Inc. Cert 312
2     4228 North Central Expressway
      Suite 101, Dallas, TX 75206
3     (214) 855-5100    (800) 445-9548
      Email: info@dickmandavenport.com
4     www.dickmandavenport.com
      My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Kristin Hendrix - October 27, 2021

**A**

**A.M** 1:22 57:22
**ability** 69:5,20
**able** 108:23
  120:18
**above-styled**
  1:21
**Absolutely** 17:8
**accent** 56:16
**access** 24:7 54:15
**accessed** 44:19
**account** 12:11
  37:7 91:15
**accountant** 16:19
  46:10 73:15
  74:3 78:4 84:24
**accounting** 11:16
  12:8,12,18
  17:14,15,16,21
  18:4 19:9 20:3
  20:12,20 21:13
  31:16,23 35:7
  40:11 45:17
  46:3 51:11,11
  51:18 56:11
  102:4 111:9
  112:18,23
  126:11
**accounts** 13:21
  14:8,15 51:24
**accrued** 79:22
**accruing** 85:15
**accurate** 72:22
  97:19 115:25
**accurately** 116:2
**action** 11:6
**activities** 39:20
**actual** 104:12
  122:16,25
**addition** 39:7
  41:21
**additional** 56:15
  56:20
**adjourned** 134:3
**Adkins** 109:16

109:20,21
**advance** 126:2
**adversary** 94:25
  95:3,12
**advice** 46:20
  88:24
**advised** 38:23
**advisor** 39:1
**Advisors** 1:10
  15:14,17,23
  27:20,23 63:6
  70:1,4 71:6,10
  74:17 76:24
  84:9 85:6 92:16
  99:10,14,16,25
  100:2,15,18
  119:16 120:7
  123:24 129:15
**Advisors'** 122:16
**affiliate** 34:25
  87:23 120:7
**affiliated** 15:11
**affiliates** 18:19
  86:24 87:17
  99:6,11,13
  100:4,17
  130:16
**affirmative**
  101:14
**affix** 50:17 114:6
**affixed** 47:5
  114:15
**afternoon** 94:23
**ago** 33:8 104:21
  104:22 109:17
  110:10,12
**agree** 55:2 57:14
  61:13
**agreed** 25:23
  26:3
**agreeing** 53:24
**agreement** 26:5
  26:15,21 95:9
  95:13 96:4,8,12
  96:23 97:6,9,11

97:21,25 98:9
  107:25 119:20
  132:20
**ahead** 73:9
  113:10,20
  114:11 118:22
**Aigen** 2:18 3:4
  94:16,23,24
  95:23 96:1,21
  98:15 102:5
  103:17 105:24
  106:8,23
  110:14 129:21
  134:1
**Akard** 1:24 2:4
**alleged** 40:16
  96:3,7
**Allocation** 38:24
  39:1
**allowed** 135:15
**allowing** 95:13
**amended** 107:25
  132:24
**amendment**
  128:4
**amort** 19:22 90:8
**amortization**
  73:25 76:23
  77:4,6,9,20
  80:20 82:6 85:3
  85:12,13,17
  131:20
**amount** 19:6,7
  26:10,12 30:12
  32:23 39:3
  43:16 48:15
  49:2 50:9 87:16
  87:24 89:9 90:9
  91:19 93:4
  104:6 121:14
  122:10 124:4,5
  124:19 133:16
**amounts** 35:8
  40:2 120:3,4
  121:10 123:23

124:1 133:21
**analysis** 97:24
**and/or** 50:13,18
  63:22 64:18
  69:20 73:25
  110:23
**anniversary**
  79:21 80:5,14
**annual** 114:20,23
  115:7 117:4
  119:20 120:12
  130:23
**annually** 80:13
**annum** 80:12
**answer** 7:6,6
  23:11,14 35:2
  39:19 51:5 52:3
  64:20 75:2
  114:11 118:10
  122:13
**answered** 41:4
  51:3 57:17
  100:9 106:6
**answering** 66:1
**answers** 42:10
  43:1 57:6
**anybody** 35:25
  40:8 101:7
  112:8 113:23
  113:25 114:5
  114:14 116:24
  117:20 118:24
  119:6,11 122:3
  122:7 123:8,11
  124:16 125:2
  126:8 127:10
  127:14 131:24
  132:4,8,11,14
  132:18,23
  133:2
**anymore** 76:2
**anytime** 21:10
  59:1
**AP** 11:17 12:23
  32:7 109:5

**apologize** 15:6
  59:7 62:16 75:9
  75:22
**appear** 118:18
**APPEARANC...**
  2:1
**appeared** 2:5,12
  2:19
**appears** 47:1
  76:12 77:1
**appended** 135:16
**applying** 125:3
**approval** 16:5,8
  48:12 49:4
  50:25 51:2
  101:3 104:20
  124:24 127:19
**approve** 48:15
  49:5 104:1,2,24
  132:15
**approved** 48:18
  48:19,21 104:7
  104:8,14
**approximately**
  95:18 110:7
**April** 12:7
**area** 107:19
**arose** 115:4
**ASAP** 60:18 64:6
**asked** 51:3 57:17
  60:10 69:22
  88:9 93:4 106:6
  119:24
**asking** 6:10 26:7
  29:17,19,24
  59:17 62:6
  64:23,25 77:25
  90:8 96:12,13
**aspects** 115:1
**assistant** 12:6
  69:2 70:3,9
  88:21
**associate** 11:18
  32:7
**assume** 6:25

Kristin Hendrix - October 27, 2021

42:11,25 44:3
48:24 57:5,18
80:6 81:10
95:23 99:19,22
**Assumes** 114:8
**assuming** 36:10
40:23 80:19
81:5 82:21
106:17
**assumption**
95:25
**assumptions**
100:10 105:23
**attached** 83:7,11
123:22
**attachment**
83:23 123:18
**attachments**
83:20
**attempts** 102:10
**attention** 115:16
**attorney** 2:5,12
2:18 135:18
**audit** 18:25 98:1
114:20,23,25
115:1,7 116:5,9
117:8,11,14,15
117:23 118:3
118:15 130:23
131:24 132:4,8
132:14,18,23
133:2,15
**audited** 97:16
115:25 116:16
116:21 117:1,5
118:19 119:1
133:17
**auditors** 97:18
115:3,24
130:24 131:18
**audits** 12:24
**August** 83:18
84:1
**author** 44:10
**authority** 36:23

50:25 51:1
110:22,25
**authorization**
129:12
**authorize** 49:17
**authorized** 114:6
114:15 127:18
129:3
**authorizing**
50:12,17
**available** 21:24
**Avenue** 2:11,17
**aware** 10:1 15:17
23:8 28:20,22
28:23 29:10
39:6 90:22 91:1
91:2 95:11,16
96:7,14 98:13
98:15,19 101:9
101:17,20,21
102:7 106:8
107:11 109:1,9
109:13,18,25
120:11 126:24

## B

**back** 13:3,6
16:12 17:12
20:9,16 22:20
24:12 26:4
29:16 44:24
45:6 50:3 52:8
55:1 60:4,18
64:3,11,19 69:2
74:10 76:3 81:9
81:23 84:8
88:20,23 94:3,9
99:24 113:23
133:12
**background**
10:12,19 16:12
29:25 67:19
**bad** 26:25
**balance** 63:8,22
80:10 118:6

121:11
**balances** 13:18
84:15 89:23
**bank** 13:20 63:7
63:21 92:18
**bankruptcy** 1:1
108:6,15,22
109:2 133:12
**bargain** 84:5
**base** 26:19,22
27:4
**based** 25:18 38:3
40:23 82:5
125:17 126:22
128:17
**basically** 23:7
115:24
**basis** 21:23 66:22
77:20 81:14
104:9
**batch** 12:22
**Bates** 82:14,18
120:1
**bear** 80:11
**beginning** 62:24
81:14
**behalf** 2:6,13,20
102:1 110:21
111:1 127:10
127:14 129:4
129:15,17
**believe** 10:24
12:7,12,16 13:4
16:18 33:3,5,24
34:2 35:8 38:4
43:13,17 50:10
58:22 82:5,8
84:21 88:8
93:13 97:10
99:8 107:3
109:15 112:19
123:7
**believed** 103:20
**best** 20:1 44:20
55:10 100:12

112:9,20 116:1
118:9,21
121:14,17,24
122:2,12 126:8
**better** 30:2 42:22
67:22
**big** 23:3 38:21
115:15
**bills** 14:6 109:3
**bind** 111:1
**birth** 10:16
**bit** 28:9 44:7 55:1
56:16 58:9,24
98:12 131:18
**bits** 7:14,17
**Blair** 32:6,6,7
112:7
**blind** 64:12
**board** 60:5 86:15
119:24 121:12
121:25 122:5,9
122:17 123:1,6
**bonus** 25:18,21
26:1,6,8,19,22
27:4
**bonuses** 108:23
**book** 113:1
**booked** 112:10
112:22 119:8
**books** 73:11
87:17
**borrower** 69:10
**borrower's** 69:5
**boss** 24:11,17
25:1 76:8
**brackets** 78:19
79:1
**brand-new**
111:20
**Brandon** 1:22
135:2,25
**break** 30:8 52:5
62:17 75:16,17
83:9,16 93:16
94:6 110:15

**briefly** 10:12
16:12
**brought** 50:2
115:16
**bunch** 63:1
**burn** 82:11
**business** 14:12
64:5
**buyouts** 108:6

## C

**calculated**
124:11
**calculating** 73:24
**call** 26:19 34:23
37:7 38:1 45:11
45:13 61:22
66:4 67:23 71:5
72:5 74:11,11
74:20,21 75:5
75:23,25 79:20
92:2,3,6 93:1
93:25 99:4
100:12 106:14
106:16 120:23
125:25 126:14
129:23
**called** 26:21
62:12 65:14
74:14,15,24
84:1 92:4
111:15,22
**calling** 107:2
**calls** 126:4
**Capital** 1:6,9
14:22,23 15:4
27:23 85:5
108:1,16 117:2
**care** 38:11
**carried** 115:2
**case** 95:9 100:24
103:4
**cash** 12:21 13:21
21:24 22:6,18
22:19 23:1,4,4

34:17 63:8
66:22,25 67:2,5
67:5 69:1 81:11
81:12,14,19,20
109:4 125:25
126:4,14
**categorize** 24:6
**cause** 1:21 22:6
116:7 117:16
135:6,20
**caused** 39:16
92:12 124:22
**cell** 75:2,3,4,13
**Central** 136:2
**CEO** 13:23 60:24
**Cert** 136:1
**certain** 14:6,18
18:19 26:13
29:2 36:16
37:15 49:13
64:20 95:14
96:16 119:17
120:18 123:2
127:22
**certainly** 82:11
86:17 121:22
**certificate** 53:14
53:18,20 135:1
**certified** 16:19
135:2,25
**certify** 135:3,17
**CFO** 13:9,13,22
23:12 25:10
**chain** 59:4,12
62:5,15,24
85:21,25 86:3
86:13 90:4,5
**chance** 75:4,18
**change** 32:11
79:1,12 84:10
85:2,6 90:23
91:3
**changed** 58:4
123:6
**changes** 43:15

44:2 49:1
135:14
**changing** 57:4
98:12 107:18
**characterize**
24:13 111:13
**charge** 13:19
18:7 114:24
115:11
**charged** 10:10
**charges** 76:12
**chase** 15:9
**check** 60:12,15
64:19 93:15,16
102:23 105:8
**checked** 63:16,16
64:22
**checking** 64:24
**checks** 13:18
**clarify** 47:14
88:10
**clear** 6:20 113:12
**clearly** 38:13
**clients** 63:6
**close** 120:6
**collect** 28:21
**collectibility**
68:23
**collectible** 130:25
**collection** 30:14
**collects** 27:3
**college** 10:20
11:10,14
**column** 79:5,11
80:22,24
**columns** 78:14,15
**Combs** 1:22
135:2,25
**come** 84:5,14
85:2,10,11
**comes** 31:8
**comfort** 131:19
**comfortable**
50:23
**coming** 16:6

48:25 99:5,10
126:25 131:21
**comma** 15:4
**comments** 120:14
**commingle** 110:9
**commission**
136:4
**common** 40:10
**communicate**
23:17
**communicated**
23:23
**communicating**
23:24
**communications**
23:22 64:10
90:16
**companies** 52:14
**company** 39:10
44:13
**compensate**
40:15
**compensation**
25:17,21 26:1,6
26:20,22 27:4
39:9,12
**competent** 24:18
24:20,21
**complete** 72:10
**completed** 116:5
118:15
**completely** 17:3
47:8 114:24
**completion**
135:12
**compliance**
17:14
**comport** 44:20
**compounded**
80:13
**computer** 47:16
135:11
**computerized**
1:24
**concern** 131:2

**concerning** 111:9
124:18 127:7
**concerns** 63:13
63:15
**condescending**
25:3
**conduct** 38:3
**confess** 82:23
**confident** 37:22
**confirm** 62:2
**confirmation**
92:15,17
**confused** 78:12
**confusion** 47:15
**connection** 116:9
117:7,10,22
118:3 124:23
**consent** 39:1,24
**consist** 26:1
**constituted**
116:12 118:2
**consulted** 46:13
**contact** 6:9,11
**contending** 96:4
**context** 31:13
44:1 59:25
86:12
**continue** 130:2,6
**contract** 131:20
**controller** 11:19
11:23 12:1,4,6
13:4 25:6 69:2
70:3,4,9,10
88:21
**conversation**
36:22 42:4 65:3
96:1,6,14 99:9
99:13 104:22
106:17,24
130:3,19,22
**conversations**
23:13 34:16,20
36:5,17 37:14
37:15 48:14
49:22 50:20

69:1 88:18
95:24 96:3,15
96:22 102:18
105:4,13,25
107:8,11,16
108:8,14
**copied** 64:12
86:6
**copies** 55:14
56:13
**copy** 83:17
**copying** 59:13
61:3 63:1 83:18
**corporate** 10:6
11:16 17:15,16
17:21 18:4 19:8
19:15 20:3,11
20:20 21:13
31:16,23 35:6
45:17 46:2
51:11,18 56:11
102:4 111:9
112:18,22
126:11
**corporateacco...**
111:22
**correct** 14:12,20
14:24 15:4,5,12
15:13,16,19,20
18:5,6 23:5,6
27:1,5 29:4
35:23 36:8,12
38:9 40:12,21
41:3,5,6,10,23
41:24 45:22,23
45:25 46:1
53:19 56:14
57:12 60:25
65:12 66:16,17
70:19,20,23,24
76:16 78:21
80:20,21 81:5
83:20,21 87:25
88:1 95:6,7
100:1,5,6,18,19

101:15,16,19
101:20 102:25
103:3,4 105:6,7
105:10,11
106:5,7 118:12
120:18,21
124:3 128:1,13
129:20 131:11
134:7
**correctly** 32:18
33:23
**correspondence**
123:3
**corresponding**
84:16
**counsel** 2:5,12,19
6:15 7:4,23,25
8:19,22 9:8,12
9:20 10:10
28:10,17 33:6
135:17
**count** 42:10 43:1
57:6
**couple** 83:19
**course** 6:9 46:18
55:3 103:23,24
104:13,19,23
**courses** 16:15,16
**court** 1:1 6:18
27:13 30:13,25
**courteous** 94:12
**CPA** 10:24 11:2
11:6,21 115:17
**create** 43:12,18
45:8 48:17
**created** 18:21
44:18,19,21
48:7 58:1
119:12
**creating** 13:21
111:18 125:22
126:20
**creation** 126:16
126:18
**credit** 91:18

**crunch** 109:5
**CSR** 1:23
**curiosity** 76:6
**current** 11:2
**currently** 11:19
120:5
**cut** 15:9

─────────
**D**
**D** 1:22 135:2
**Dallas** 1:3,25 2:4
2:18 136:2
**dark** 94:17
**date** 10:16 19:3
26:13 32:22
34:21 43:16
50:8 57:24 58:7
78:17 79:9,21
80:6,13,13,14
93:25 105:4
107:1
**dated** 30:20
31:16 135:22
**dates** 57:22
**Dave** 8:24 34:18
34:23 38:13
46:7 111:8
112:6
**Davenport** 136:1
**David** 3:14 13:1
31:16 33:17
**DAVOR** 2:5
**day** 48:15 57:25
58:6 80:2
112:13 134:8
**days** 9:23,25 10:5
28:17
**deaccelerate**
107:13
**deal** 20:21 36:25
**debtor** 14:24,25
15:1,2,3,7,10
15:19,21 16:4
18:1 21:20,21
21:22 22:1,2,5

22:14,15,18
23:1 25:7,7
26:17 28:21
29:6 38:19
39:15 53:7
54:22 55:12
59:5,19 66:8,20
68:1 76:20 77:2
77:6,9 81:11,12
81:18,25 82:7
84:17 88:3,11
88:14 90:24
99:6 100:15
101:25 114:25
**debtor's** 40:16
68:18 77:4
86:16
**debtors** 117:12
**Dec** 4:3,11
**December** 11:11
14:2,5 15:6,10
15:21 16:3
24:22 60:25
61:6,12 62:10
65:14 66:3,7,18
66:24 67:13,16
67:20 68:1,8,14
68:21 70:22
71:4 72:4 74:10
75:19 76:4
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:19,20
103:20 105:3,3
105:18 125:20
127:6 129:24
**decided** 26:2,3
40:14 52:15,18
**deciding** 23:8
**decision** 29:14
105:2
**declare** 134:6
**default** 68:16,19

88:3 90:17
93:10,11
**defaulted** 67:22
**defendants** 1:11
1:20 2:6,20
95:11 96:4
**defense** 95:12
96:7,12
**defenses** 95:9
**defined** 114:3
**definition** 113:16
**degree** 10:22
**deliver** 117:17,22
**delivered** 116:8
116:11 117:25
118:1 128:18
**demand** 4:11 5:2
18:19 19:21,25
20:4,13,17,21
21:3,4,5,8,23
22:7,13 28:22
29:11,14 46:16
62:11 66:5 85:6
85:14 98:17
130:14 131:9
131:13
**demanded** 62:11
**demanding** 24:13
**Denton** 10:15
**department**
11:17 18:2,5,8
18:12 51:12
57:12 112:23
**depend** 18:17
**depended** 49:16
**depending** 73:16
**depends** 18:16
69:10 77:24
**deponent** 135:14
**deposed** 6:13
28:2
**deposition** 1:13
1:18 7:8,9 8:1,6
8:10,15,17,20
8:23 9:14

113:14 134:3
135:4,7,12,19
**describe** 12:18
53:16
**described** 17:17
99:9 116:16
119:7
**description** 14:1
110:3
**detail** 66:12
**details** 17:5
25:14 28:7
**determine** 97:6
97:25 102:11
**determined**
97:22
**Dickman** 136:1
**difference** 103:22
**different** 19:25
54:19 73:16
87:22 96:11
103:17 124:2
**direct** 27:7
**directed** 99:17,19
129:18
**directing** 48:16
101:4
**direction** 23:12
53:21 60:23
63:2 73:7 101:7
135:11
**directions** 48:25
**directly** 40:9,22
41:12 49:1
70:14,17
102:16
**disciplinary** 11:5
**disclose** 119:24
**disclosed** 97:15
97:21 133:17
133:22
**discretionary**
26:8
**discuss** 62:9 66:4
68:4,7 74:16

Kristin Hendrix - October 27, 2021

88:12
discussed 28:8
38:4 43:13
66:21 67:9
74:18,20 81:13
92:5 96:25 97:2
discussing 66:19
67:20 117:18
discussion 9:5
50:21 61:7 65:9
66:7 69:5,19
92:25 93:7
122:22 123:4
discussions 9:8
25:20 28:11,12
28:17 40:6 60:1
61:9,11 62:13
68:22 98:8
127:6
disinterested
135:8
distinct 29:3
45:24
DISTRICT 1:2
DIVISION 1:3
doctor 42:11
doctored 83:3
doctoring 42:24
57:4
document 32:25
47:2 49:19 72:8
76:10 82:13
86:1 88:7
111:19 119:8
119:25
documentation
9:16
documentations
47:8
documents 9:18
10:7 42:6 43:7
43:9 44:3 47:9
48:5,18 49:8,13
50:2,3,11 54:11
57:7,14,20

69:16 77:13
82:10,18
doing 6:7 43:8
45:20 74:4
dollar 19:7 40:2
48:15 49:2 50:9
Dondero 2:20 5:2
15:12 21:11,20
21:21 22:6,19
23:7,14,18,23
23:24 24:2,7
34:19 35:24
36:2 40:14,20
52:12,19,22
53:7 73:8 81:14
83:18 94:24
99:18 101:2,4
101:17 102:11
102:16 103:7
103:12,19
104:1,7,14
108:9 116:19
116:24 117:20
118:23,24
122:3,7 123:19
124:8,10,13,16
124:18,25
127:20 132:15
Dondero's
104:19 130:15
Donohue 59:13
59:17,22 62:25
63:21 64:3,16
64:22 65:5,9
92:18,19,22,24
93:8
door 35:1
draft 17:24
drafted 17:1,3
drafting 16:16
17:22,23 18:12
19:16,21 20:12
29:13
drive 54:9,16
55:14

drukavina@m...
2:7
DSI 61:19 62:6,9
63:3,24 67:4
68:7,13,23
69:14 77:3
88:12,23 92:18
92:19 126:13
due 16:6 59:18
66:23 73:9,25
86:24 87:5,17
87:17,22,25
89:9 90:8 102:8
103:20 105:4,6
120:5,23
123:23 124:1,5
124:19 125:4
125:19 126:2
126:25 127:11
127:15 128:20
128:24 129:7
130:7
duly 1:19 6:2
135:4
duties 12:19
97:12
duty 20:25

_____
E
_____

E-l-l-i-n-g-t-o-n
18:9
e-signature 47:10
47:12 48:1,4,5
48:8,9,12,18
49:9,15,18 50:1
50:13,17,23
e.g 120:6
earlier 43:14
45:7 99:8
112:12 113:13
120:14 123:15
125:7 126:12
129:22
early 116:5
128:19

earn 26:23
educational
10:18
effect 54:11
67:21 68:15
effectuate 101:7
106:15
effort 97:6
efforts 102:10
either 18:21
29:13,20 31:1
34:17,23 37:3
46:7,13 50:1
54:12 58:20
62:6,9 71:4
84:24 99:15,17
110:15 124:24
127:19 129:24
135:18
electronic 54:22
electronically
56:3,12
Eliason 46:7 78:3
112:7
elicited 130:13
Ellington 4:3
18:9 60:4,9,12
60:15 61:10
email 2:7,14,22
3:14 4:3,7,21
5:1,5 23:17
31:12,15,20,23
32:1,4,20,25
33:3,25 36:3
37:10,19,25
38:14 41:17,21
42:5 48:20
50:11 54:11
59:4,12,22 60:1
60:2,3,25 61:2
61:6 62:4,8,15
62:24,25 63:11
63:14,15 64:22
82:16,19 83:2,6
83:11,11,12,18

83:23 84:19
85:25 86:3,13
86:22 90:4,5,12
92:22 108:12
111:8,21,21,25
112:3,5,13,17
120:2 122:19
123:5,18,23
126:7,8 136:3
emailing 90:8
107:2
emails 9:16,18
41:18 49:23
81:9 82:22
115:3
employed 11:21
70:18
employee 109:23
110:2,6
employees 16:3
108:19,24
109:10,13,14
employment 26:5
26:15 69:25
70:7
engagement
115:14
ensuring 131:19
entire 11:17
114:25 126:20
entirety 86:18
entities 15:11
21:16 22:6,12
22:19 70:18
81:15 101:5
124:2 129:4
entitled 82:12
entity 21:20,22
22:7 23:2 35:14
53:13 63:4,5
84:16 104:4
entries 78:13
80:23
entry 78:24 79:19
erroneous 122:5

error 38:22 39:9
39:16,21,23
40:10 44:7
established 9:11
28:8 83:16
estimate 20:10
event 135:19
events 38:21
95:15 96:16
116:13 118:3
118:19
eventually 109:5
everybody 25:13
112:2 125:24
126:1,3,4
evidence 105:22
114:9 118:9,21
121:17 122:12
133:20
exact 25:25 36:5
37:14 48:5,13
107:1 117:12
Exactly 78:16
Examination 3:3
3:4,5,6 6:3
94:22 110:19
111:5
example 81:1
Excel 77:12,15
78:9
exchanged
108:12
excluding 28:16
29:18
execute 48:18
49:5
executed 18:24
47:9 130:15
executing 19:17
execution 18:13
20:12 32:15
exhibit 3:10,12
3:14,17,19,21
3:23,25 4:1,3,7
4:11,14,17,19

4:21 5:1,5
30:14,15,18,19
30:21 31:15,18
32:21 33:1 34:4
34:11 35:21
36:20 37:19
38:12 42:15,16
43:6,21 44:18
44:19 56:19,21
59:4,9 62:14,14
62:21,23 65:13
65:18,21 72:11
72:13,16 76:10
76:17,19 79:8
82:6 83:1,4,15
83:17 84:8,14
84:18,19 85:7
85:17,20,21,22
85:25 86:3,13
87:21 88:2,4,7
89:21,22,25
90:1,3 111:7
119:7,15,23
123:16,22
124:5
exhibits 3:8 30:6
42:17 43:4
44:21 45:22
46:19 48:11,19
50:13,17 52:8
55:17,24 56:25
57:16 58:10,25
113:13
existing 84:20
expect 85:16
expense 103:24
expertise 16:18
expires 136:4
Explain 19:19
explained 6:15
31:7
explicit 60:23
explicitly 32:5
53:1
expressly 71:14

Expressway
136:2
extent 108:13
external 46:14
eye 6:9

**F**

faced 11:5
facilitate 91:7
fact 21:18 49:5
57:15 64:15
65:1 67:13,16
99:22 121:21
128:23 130:13
facts 114:9
fair 17:5 21:19
22:3 23:21 35:5
42:20 70:14
95:25 96:8,21
96:24 97:18,20
98:6,7 99:25
100:20,23
101:8,12 103:5
105:16 106:4
108:4 116:2
133:20
fairly 36:15
faithfully 57:3
familiar 27:13
65:20 66:11
86:2,5 107:20
115:19 122:16
family 23:4
far 20:14,16
24:19,21 49:7
80:24
favor 130:15
February 12:2
26:4
fee 39:1,24
feel 86:18
fell 13:24
felt 104:25
figuring 93:17
file 56:13

filed 28:24,25
29:6,8 30:13,24
files 32:25
filing 18:25
final 123:6
finance 10:22
financial 4:4
12:22 59:18
62:7 69:15
97:16,17
115:12,25
116:16,21
117:1,5,11
119:2 122:4
133:17,22
financials 12:23
37:18 41:8
60:11 86:24
118:11,14,19
121:3,7,20,25
122:8
find 31:13 72:8
83:8 93:24 94:8
102:23
finding 98:2
fine 47:8 48:2,4
86:19
finish 96:11
finished 31:10
finishing 46:14
firm 18:22 44:16
first 6:2 9:1
11:13 20:11
63:17 70:21
81:17 82:13
95:8 113:23
120:15
five 51:4 94:3
110:10 133:12
five-minute
93:15 110:14
fixing 55:15
flip 46:25
Floor 1:25 2:11
flow 109:5

flows 63:8
focus 12:17
folders 18:25
folks 62:16 67:4
85:24
follow 47:23 60:5
60:9 72:5
follow-up 4:23
followed 104:11
following 47:22
follows 6:2
forecast 67:5
128:17
forecasted 67:8
forecasts 12:21
13:21 17:18
67:5,9 125:8,10
125:14,17,18
125:23 126:7,8
126:16,19
130:3,6
foregoing 134:7
135:4
forgive 97:10
forgiven 95:14
96:16 109:10
133:3,6,11
forgiveness
133:15,21
form 14:14,21
15:24 16:22
17:6 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 37:11
38:7 39:17 41:1
41:13 45:3 46:4
47:20 48:22
49:10,20 50:4
51:14,20 52:1
53:9 55:5,19
56:4 58:16
65:16 69:8
70:15 73:20

74:5 75:7 77:22
78:10 80:3,16
82:1 87:7 88:15
89:2,15 96:18
102:2 103:13
105:19 106:18
113:9,19
129:21
**format** 77:12
**formatting** 79:3
82:5
**forth** 64:11
**forward** 64:2
94:16
**forwarded** 92:15
92:17
**found** 54:9
**foundation** 75:11
**four** 9:8,12 100:5
**fourth** 107:25
**frame** 17:12
66:19 69:7
73:16
**Frank** 4:21 7:10
7:21 8:1 13:7,8
23:13 24:5
34:19,23 35:24
38:14 52:19
53:20 60:10
63:16,18 64:10
64:23,23 65:1
67:3 71:5 73:8
74:14,15 84:1,7
91:10,22 92:4
99:5,17 100:13
101:2 102:15
104:4,21,23,24
106:14,20
107:2 112:6
124:24 125:25
126:13 128:9
128:14
**Frank's** 115:16
**frankly** 104:24
**fresh** 111:20

**Friday** 9:1,4
**function** 12:21
**functions** 117:15
**fund** 1:9 27:23
38:24 39:2,2,8
85:6
**funds** 38:23
59:18 119:17
120:8
**further** 3:5 10:23
32:15 62:1
92:13 110:19
133:24 135:17
**future** 14:7 16:5
120:5

**G**

**gears** 58:24
**general** 34:21
46:18 54:20
69:6 90:20
**generally** 13:17
13:24 19:13
34:8 35:2 43:10
72:22 81:20
96:13,15
120:11
**getting** 11:20
18:24 48:11
60:2,3 81:12
101:3
**give** 20:10 31:13
74:16 110:4
129:3
**given** 49:18
101:6 122:9
123:1
**gives** 16:19
**giving** 53:21 54:5
**Global** 38:23
39:1
**go** 10:12 17:5
44:4,24 48:1
55:1 62:24 64:2
67:4,5,11 73:8

78:22 107:23
113:10,20,23
114:11 118:22
133:12
**goes** 94:9 99:3
**going** 6:25 17:12
20:9,16 26:23
27:3 29:16 30:6
30:10,14,18
34:3 40:6 42:7
42:20 44:2
50:22 52:8
54:18 56:20
57:2 58:24 59:3
59:3 60:5,9
64:19 65:13
67:7 71:6 72:8
72:11 74:10
76:10,20 78:7
81:9 82:10,11
82:13,25 83:1
84:8 85:20,21
87:19 88:2
93:20 95:2,23
105:23 111:10
131:1,2
**good** 6:4 24:17
26:24 94:23
127:8
**governs** 26:11
**graduated** 10:21
11:9,12
**great** 53:20
**greater** 16:19
**group** 14:4 17:13
19:9,10,16 20:3
31:24 35:7,22
37:22 40:11
43:14 45:7,18
46:3 49:16
51:18 56:11
73:19,23
111:21,25
112:3,5 117:16
126:12

**guarding** 24:7
**guess** 89:22
**guys** 126:14

**H**

**H-i-l-l-i-s** 32:12
**half** 81:17
**hand** 59:3 82:25
**handed** 88:6
**handle** 20:12
50:8
**handled** 20:4,21
**happened** 20:7
21:8 36:11,11
37:21 101:1
131:17
**happening** 20:11
61:5
**happy** 23:3 93:22
**HARDT** 2:3
**HARR** 2:3
**Hayley** 32:2,14
46:7 78:3,6
112:6
**Hayley's** 46:8
**HCM** 4:4,9
**HCMF** 3:25 4:1
**HCMFA** 3:15 4:4
27:10,22 28:1
28:13 29:6
30:12,19 32:13
38:19,23 39:12
40:1,15 53:25
59:18 60:19
62:7,11 63:6,22
64:18 66:5
69:15,20 70:7
70:10 85:18
87:5 99:4 100:2
110:22 111:1,1
111:11 115:1
117:4,16
118:15 120:6
120:23 121:25
124:2,5,19

131:4
**HCMFA's** 39:8
87:17 117:11
117:23 118:6
118:18 119:1
**HCMLP** 3:15
4:19 5:6 32:13
60:24 64:4
86:24 87:5,18
111:11 120:6
120:23 124:19
129:2,18
**HCMS** 2:20
94:25 98:16,24
100:1,22,25
101:10,18
102:1,19
105:18 107:5
127:10 128:23
129:6,18
131:13
**HCRE** 2:20
94:25 98:17,24
100:1,22,25
101:10,18
102:1,20
105:18 107:3
127:10 128:23
129:6,18
131:13
**hear** 72:1
**heard** 40:17,20
**held** 12:8 133:11
**hell** 75:4,10
**help** 76:22 78:13
93:17 105:23
**helped** 12:20
**Hendrix** 1:14,18
5:5 6:1,6 30:10
30:23 56:19
57:2,8 62:23
65:13,21 76:19
78:12 79:15
86:3 90:3 93:13
94:5,23 110:20

111:6 134:13
**hereof** 80:13
**hereto** 135:16
**hi** 60:4
**higher** 89:20
**Highland** 1:6,9
10:2 11:13,21
12:5,19 13:10
14:4,4,11,22,23
15:3 16:10
17:10,13,21
18:1,11 21:5
25:6,15 26:4,9
26:24 27:2,2,22
28:12 51:7,10
51:19 65:14
66:4 71:7,11
81:10,18,23,23
85:5 87:25
92:17 107:21
108:1,16,17,21
108:22 109:2,2
109:9 110:21
117:1 119:24
133:5,10
**Highland's** 7:23
7:25 8:19,22
114:20,23
116:4,16
131:24 132:3,7
132:13,17,22
133:1,15,22
**Hillis** 32:12
**history** 11:9
**Hold** 62:18
**hope** 57:13 97:13
**hopefully** 82:11
**hoping** 68:15
**house** 75:1
**hundreds** 50:7
51:8
**hypothetically**
22:4,17
**hypotheticals**
21:17

**I**

**i.e** 114:9
**idea** 58:2,7 75:12
75:24 89:13
93:1 105:17
106:3
**identification**
30:16,22 31:19
42:18 43:5 57:1
59:10 62:22
65:19 72:14
76:18 83:5
85:23 88:5 90:2
**identifies** 123:23
124:1
**identify** 112:2
125:18
**identifying** 66:23
**image** 47:2,5,19
48:2
**imagine** 15:7
**immediately**
61:14
**important** 93:14
**Impressive** 11:23
**include** 71:18
72:10 100:1
118:25 121:13
130:7
**included** 15:14
16:9 31:24
102:5 111:25
118:6,13
121:21,22
122:10 123:12
124:4,5 127:2
**includes** 63:5,7
**including** 88:11
124:2
**income** 63:7,21
**incoming** 67:7
**incorrect** 123:9
124:14
**increase** 94:19
**incumbency**

53:13,17,19
**INDEX** 3:1
**indirect** 27:7
**indirectly** 70:12
**individualized**
131:14
**Info** 3:25 4:1
**info@dickman...**
136:3
**information** 4:9
29:25 34:13
61:14 63:3,7
64:17 65:5,11
69:12,15 84:6
86:15 116:3
127:2 130:10
**informed** 112:21
125:24 126:1
**initiated** 74:11
92:3
**ink** 49:8,13 55:3
55:8
**ink-signed** 55:11
**input** 29:25
88:24
**installment**
128:24 129:7
**instance** 1:20
20:6 23:8 35:21
**instances** 24:1
40:1,24
**instruct** 127:11
127:15
**instructed** 128:9
128:11
**instructing**
101:18
**instruction** 72:2
74:17 76:8
100:16 101:14
101:22 103:12
129:4,11
**instructions** 24:2
24:3 32:16
69:14 76:1

100:21 101:9
103:19 129:3
**instructs** 7:5
**insurance** 39:10
**insurer** 39:8
**intend** 113:5
**interco** 32:14
34:11
**intercompany**
17:22 18:13
19:17 20:4,13
20:16 21:3,8
34:12 35:7
36:19,25 37:12
40:24 53:8
111:15,16
124:23 125:4
126:25 133:6
**interest** 19:7
43:16 49:2
68:18 73:25
78:14,16,24
79:20,22 80:11
85:15 125:4,19
**interested** 84:9
135:19
**interjects** 64:4
**intermediary**
24:3
**internal** 18:21
41:8 46:13,20
69:19
**internally** 77:1
**investigation**
97:5
**invoice** 108:13
**involved** 18:12
19:16,20,24
36:21 39:20
40:9 126:14
131:8
**involvement**
19:10
**irrespective**
26:16,24

**IRS** 49:3
**issue** 79:3 95:14
96:16 97:25
98:16 114:2
118:8 131:2,2,6
132:5,9,19
**issued** 131:9
**issues** 40:7,10
60:16 61:21
115:4,15

**J**

**J-F-O-R-S-H-...**
44:10
**Jack** 59:13 60:4,8
64:6 65:2 92:18
**James** 4:8 5:1,2
61:14,15,18,21
61:25 62:3
**Jan** 4:8 5:2,5
**January** 10:17
24:24 28:20
29:6,11 62:25
64:15 71:25
88:2,21 89:9
90:5,7,17,22
91:4 93:8
106:10,25
127:23 128:8
128:15
**jealousy** 24:7
**jerk** 24:12
**JFORSHEE**
44:10
**Jim** 2:20 21:10
23:14,18 34:19
35:24 52:19,20
54:2 63:2 64:10
67:3 73:8 84:4
99:18 101:2,4
102:16 104:1,7
104:14,22,25
105:1 125:25
**Jim's** 99:21
**jive** 87:20

Kristin Hendrix - October 27, 2021

jmorris@pszjl...
2:14
**job** 6:20 11:14
17:9 20:25
24:19,22 43:11
45:1,14 103:1,6
103:10
**John** 2:12 4:7
8:24 95:21,23
97:4
**JONES** 2:10
**June** 86:25 87:6
116:5 120:23

**K**

**K-l-o-s** 8:25
**keep** 29:1 77:6,9
95:4 125:24
126:1
**kept** 54:22 55:11
56:12 77:5
121:20
**kind** 11:5 18:4
23:21 24:6,11
34:3 50:3 54:19
81:13 122:21
**Klos** 3:14 8:24,25
9:5,12 13:1,6
13:10 25:10,21
29:24 31:16
33:17 34:10,18
35:21 36:18,24
37:20 38:12
46:7 97:2,3
111:8,13 112:6
**Klos'** 13:2 41:17
**knew** 40:3 126:3
128:19
**know** 6:24 19:20
19:23 20:19
25:14,25 28:7
33:10,11,13
36:11 38:17,21
39:22,25 40:1,5
43:21 44:11

47:16 48:6,6
50:10 52:18,25
57:25 59:6
76:15,21 78:15
82:15 89:17
92:18,19 99:21
101:4 103:24
104:17 107:19
108:7,25 110:2
117:4 118:15
120:22 121:6
121:19,20
122:15 124:4
128:7 130:24
131:12
**knowledge** 27:6
36:1,4 37:14
40:11,13 52:15
69:11 77:7
108:4 112:9,11
112:20 116:1
121:14 122:2
**known** 67:14,17
97:11
**KOPF** 2:3
**Kristin** 1:14,18
5:5 6:1,6 32:1,2
32:14 57:8
61:20 134:13

**L**

**L.P** 1:6,10
**labeled** 82:15
**labels** 30:7
**laid** 24:12
**land** 84:5
**landline** 75:2
**large** 35:8
**lasted** 75:6
**late** 126:9
**Lauren** 4:22
86:21
**law** 2:5,12,19
6:18 18:22
44:16

**Lawler** 109:20
109:23
**Lawn** 2:17
**lawsuit** 28:24
29:5,8
**lawsuits** 28:1,9
28:13,25 29:17
29:21 30:1
**lawyer** 9:4
**lawyers** 44:14
**lay** 67:7
**leading** 39:20
108:15,21
109:1
**learn** 95:20
**ledger** 76:12
**left** 61:9 87:15
**legal** 7:23,25 10:9
16:13 17:14,25
18:2,5,11,21
19:10,16 28:10
46:14,20 72:21
**lend** 21:22 23:1
110:22
**length** 93:25
**let's** 10:12 11:9
12:17 14:8,18
21:17 30:8
34:25 44:24
45:13 47:14
54:19 55:1
72:10 78:1
99:24 115:11
120:23
**letter** 4:11 65:14
115:14,23
**letters** 29:11,14
115:14,20
**letting** 92:18
**liabilities** 118:14
**liability** 40:16
118:6
**license** 10:24
11:2
**limited** 107:25

**lines** 61:7
**listed** 78:17
**litigations** 27:8
**little** 28:9 44:7
55:1 58:9,24
78:12 94:17
98:12 131:18
**live** 10:14,15
**LLP** 2:17
**loan** 3:15,25 4:1
18:18 31:5
32:14 33:25
34:11,12,14,25
35:14,17,17,22
36:19,25 37:6,7
37:17,17 38:25
39:12 40:15,21
45:13,15,18,22
46:12,14 48:15
49:1,4,5,24
50:9 58:5 72:25
76:24 79:21
80:6,7 87:22
103:22 104:6
104:20 111:15
111:16,18,20
112:10,23
113:2 119:9
124:23 125:4
133:6
**loans** 35:9,12
37:4,6,13,22
38:6 39:4 41:9
41:12,19 48:14
48:17 50:7,19
50:22 51:8
53:21 66:23
67:8 98:16,17
98:17,20,25
106:9 107:13
109:9 110:5,6
126:2 131:19
**logically** 36:10
40:23 71:18
**logs** 75:19

**long** 7:20 21:24
74:21 75:6
110:4
**look** 30:17 54:15
57:7 75:18 77:2
78:11 80:21
93:20 94:6
**looked** 31:5
123:16
**looking** 56:21,23
58:10 79:24
81:10 86:21
87:14 119:23
**looks** 60:24 64:9
76:23 77:4
79:19
**loosely** 17:2
**lot** 28:25
**lots** 40:6
**LP** 15:4,15 27:20
27:23 70:1,4

**M**

**ma'am** 31:21
57:7 87:1 111:4
**machine** 1:24
**maintain** 6:9,10
**maintained** 77:1
82:7
**maker** 19:4,5
21:3 43:15
132:1
**making** 13:20
21:5 81:7 99:20
101:2,25
103:22,23
104:3
**management** 1:6
1:9 12:20 13:14
13:15 14:2,24
15:4,22 17:17
27:23 85:5
108:1 115:13
115:19,23
**manager** 12:8,12

12:18
manual 104:9,12
March 12:2
mark 59:3
marked 30:15,21
  31:18 42:17
  43:4 56:25 59:9
  62:21 65:18
  72:13 76:17
  83:4 85:21,22
  88:4 90:1
  113:13 119:14
material 97:22
  98:1,4,6,10
  104:6 120:3,4
  133:16,21
materials 121:12
maturity 80:13
MBA 10:23
  11:20
mean 7:17 13:15
  14:22,23 15:3
  19:1 35:16
  48:20 57:24
  68:24 78:13,15
  87:11,24
  111:16
meaning 27:20
  27:22 54:25
  70:18
means 27:15
  35:15 58:22
  71:16 111:18
meeting 34:17
  67:2
meetings 66:22
  66:25
memorandum
  48:20
memory 9:17
  19:14 20:9 29:3
  29:7,17,19,23
  32:20,24 34:3
  37:9 38:2 41:22
  42:1,20 43:7,10

45:24 47:4
  48:10,13 50:15
  51:1 53:23 54:4
  54:10 57:23
  58:9,20 69:18
  72:24 74:4 81:6
  81:17 86:8,10
  90:15,20 91:21
  92:6
mentioned 11:24
  13:14 22:12
  25:9 29:10 41:7
  44:25 45:21
  51:6 64:21
  125:7
merit 25:17
met 108:11
metadata 42:21
  42:21,24 43:21
  43:24 44:8,24
  56:15,20 57:4
Michael 2:18
  94:24
michael.aigen...
  2:22
mid 128:19
middle 89:8
million 30:12,20
  32:13,21 33:1
  33:19,20,25
  34:5 35:3 36:25
  37:12,12 38:18
  38:22,25 39:3,7
  39:8,11,23
  40:15,21 42:15
  42:16 43:2,3
  58:5,11,13,13
  66:9,13 81:1,1
  81:2 85:1,6,9
  87:3 90:23 91:3
  91:23 110:23
  111:10 112:14
  113:14,14
  120:24 121:13
  122:10 123:5,9

123:12 124:11
mind 71:18
minute 30:8
minutes 94:3
mischaracteriz...
  116:25
Mischaracterizes
  41:2
misleading 42:9
missed 88:25
  105:12
misspeak 30:5
mistake 51:12
  113:1,18 114:2
  116:20 117:21
  118:25 119:12
  125:3 132:9
mistakenly 51:25
mistakes 51:17
  51:19,22
  120:19
modified 44:19
  57:8
moment 72:9
Monday 9:2
monetize 68:2,10
money 13:21
  21:11,13,15,21
  21:21,22 22:5
  34:24 35:13
  37:7,17 53:21
  54:23 81:15,19
  81:22,24 92:16
  111:19
month 106:10
months 40:7
morning 6:4 9:3
  67:11 82:14
  125:6
Morris 2:12 3:6
  4:7 7:3 8:24 9:6
  9:9 14:14,21
  15:24 16:22
  18:14 19:11
  20:23 22:8,21

24:8,15 28:3
  30:2 31:10 34:6
  35:10 36:13
  38:7 39:17 41:1
  41:13 42:9 45:3
  46:4 47:20
  48:22 49:10,20
  50:4 51:3,14,20
  52:1 53:9 55:5
  55:19 56:4
  57:17 58:16
  62:18 65:16
  67:10 69:8
  70:15 73:20
  74:5 75:7,11
  77:22 78:8 79:7
  79:9,13 80:3,16
  82:1,14,16,23
  83:2,6,10 85:25
  87:7 88:15 89:2
  89:15 93:22
  94:15,17 95:21
  95:25 96:2,6,18
  96:23 102:2
  103:13 105:19
  106:6,18 111:6
  113:11,22
  114:13,19
  118:12,23
  119:5 121:19
  122:15 128:3,4
  129:22 133:24
mouth 23:21
move 9:10 21:11
  21:13,15 94:16
  109:8
moved 23:4
multiple 54:19
MUNSCH 2:3

─────────────
          N
─────────────
name 6:5 32:8
  44:12 57:18
  94:24 109:24
  110:3

Nancy 108:9
NAP 27:14
native 78:9
NAV 38:22 39:9
  39:16,20,23
  40:10 107:21
  108:5
near 14:7
necessarily 17:23
  19:10 103:25
need 9:16 14:6
  19:2 21:11
  25:14,25 34:24
  52:6 54:1 59:1
  81:19,20 82:12
  86:19 93:17
needed 21:21
  22:5,18 23:1,4
  40:1 53:12
  81:11,14,23
  104:25
needs 104:7,8,13
negative 78:20,25
  79:2
never 40:19,20
  49:12 51:12
  55:14 68:17
  70:14,17 96:25
  97:2 101:6,6,14
  103:6 108:11
  119:8
new 2:11 21:14
  32:14 34:11,25
  36:19 45:9
  111:15,16,18
NexPoint 5:6
  15:14,17,22
  16:5 27:11,15
  27:18,19,20
  28:2,13,21 63:6
  63:22 64:18
  66:8,12,20
  67:13,22 68:2
  68:15,19,24
  69:15,20 70:1,4

70:22 72:12
76:24 77:7,13
77:20 80:20
81:7,22 84:9
85:2 88:3 90:9
90:17,23 91:16
91:23 92:13,16
93:10,11 120:6
123:24 127:14
127:16 128:23
129:6,18
131:13
**NexPoint's** 16:5
16:9
**Nope** 8:7 76:7
91:12
**normal** 34:16
103:23,23
**normally** 107:15
**North** 1:24 2:3
10:22 11:13
136:2
**NORTHERN** 1:2
**note** 3:10,12,17
3:19,21,23 4:14
5:3,6 14:19
15:18 16:10,21
17:1,3,6 18:16
18:19 19:22,25
21:4,23 22:7,20
23:9 28:21
30:11,19 31:8
32:15,21 33:2
33:20 35:3,18
42:15 43:2,3,11
45:9 46:16
56:21,22 58:11
58:13,13 66:9
66:13,16,20
67:13,22 68:2,5
68:8,10,16,19
68:23,24 71:13
71:19 72:6,11
72:12,16,20
73:4 76:13 77:7

80:9,10,14,20
81:8,23 85:14
90:18 91:16,19
91:23 92:14
127:16 133:10
**notes** 4:12,19
14:9 16:16
17:22 18:13
19:17,21,21
20:4,13,17,22
21:4,8,14,14
22:13 27:3
28:14 30:24
31:1 38:11 41:7
42:7,22 43:12
45:2 46:21,22
47:6 50:1 52:10
52:16,17,24
53:1,8,25 54:5
54:12,23 55:3,8
55:11 56:2,8,10
59:2 62:11
65:15 66:5
69:21 73:10
77:10 84:16
85:12 95:14
96:16 97:10
111:2 113:6,11
113:12,16,18
114:2,7,16
116:7,11,15,25
117:18,22,25
118:1,7,18
119:1,12 120:6
121:15,21,22
122:11 123:13
124:6 125:19
126:25 127:12
127:24 128:8
128:21 130:8
130:14 131:5,8
131:9,13,14,25
132:5,9,15,19
132:24 133:3
133:16

**notice** 88:3 89:8
**notices** 28:22
**noting** 14:5
**November** 59:12
61:6 62:6,10
66:19 67:12,19
68:1,7,14,21
71:4 72:4 74:10
75:18 76:3
93:21 127:6
128:20 129:24
135:22
**November/Dec...**
125:14
**NPA** 4:17 27:18
27:19 86:24
99:4 100:3
**number** 79:2,6
79:11,18 80:23
84:10,13 85:2,9
87:20,21 89:14
89:18,20,21
111:7 120:1
123:5,9,12
124:2,11,14,17
**numbered** 1:21
**numbers** 26:1
78:20 80:21
84:15
**NY** 2:11

————————
**O**
**oOo--** 1:4
**Oak** 2:17
**oath** 6:17 95:5
**object** 113:19
114:8
**objecting** 114:10
**objection** 7:3
14:14,21 15:24
16:22 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 38:7

39:17 41:1,13
45:3 46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
65:16 69:8
70:15 73:20
74:5 75:7 77:22
80:3,16 82:1
87:7 88:15 89:2
89:15 96:18
102:2 103:13
105:19 106:6
106:18 113:8,9
114:17 118:9
118:21 119:3
121:17 122:12
129:21
**objections** 7:5
**obligations** 14:19
16:6,10 118:7
132:1
**obligor** 15:18
**obviously** 14:11
35:6 59:1
**occasion** 22:18
**occurred** 95:15
96:4,17 97:7
106:17
**Oct** 4:22
**October** 1:15,21
86:22 94:9
122:17,19
**office** 10:1 34:1
54:8 57:3
**officer** 52:13
69:25 70:7
**officers** 109:10
109:13
**oftentimes** 13:23
34:23
**oh** 67:21
**okay** 6:11 7:1,7

25:3 28:19 30:5
31:23 32:11
33:22 34:3 36:1
38:2 39:14
42:13 43:6
49:25 58:23
60:11 62:1
63:17 70:25
79:25 84:8 85:1
89:24 93:7 94:1
110:17 112:8
113:11 115:17
118:18 119:5
121:13 123:15
126:15,22
129:13 130:19
131:23 134:2
**once** 104:5
**ones** 53:2 109:18
**ongoing** 77:20
**oOo--** 134:5
**open** 120:5
**opinion** 98:5
**opposed** 23:23
39:12 49:8
52:12 98:17
**oral** 91:25 95:9
95:13 96:4,8,12
96:23 97:6,9,11
97:20,25 98:9
132:20
**orally** 37:10
50:16
**order** 97:6
**ordinary** 103:23
104:13,19,23
**original** 30:11
54:23,25 55:11
**originally** 48:7
**outcome** 27:8
**outgoing** 67:7
**outside** 18:21
89:6
**outstanding** 66:5
80:11 120:4

121:21 131:19
131:22
**overdue** 60:19
**overhead** 103:24
104:3
**oversaw** 12:22
115:1
**overseeing**
117:14
**owed** 54:23,24
59:18 84:16
108:23
**owing** 123:23
124:1

———————
**P**
**P.M** 1:22 134:4
**PACHULSKI**
2:10
**page** 3:2,8 46:25
78:23 79:4,8
80:22 100:8
119:25 120:15
**paid** 14:6 26:13
39:8 51:25
78:14,14,15,24
79:5,11 80:22
109:6
**paper** 34:25 37:6
45:14,18 49:1,4
49:24 50:22
54:22,25 55:3
55:14 56:13
**papered** 35:14,16
37:16 45:22
46:3,12 50:7
51:7 54:13
55:18 56:10
57:15 58:5
72:21
**papering** 35:17
45:13,25 72:25
**paralegal** 82:17
**paren** 120:5,6
**part** 7:9 16:2

17:9,13 25:17
26:8 27:4 44:8
70:13 97:11
103:5,10
107:15 109:11
120:12 130:23
133:7,11
**participate**
126:15
**particular** 17:13
52:11,13 56:8
81:18 98:19
**parties** 21:12
99:21 135:18
135:21
**Partners** 2:21
94:25
**partnership**
107:25
**pass** 94:14
**passwords** 47:17
**patient** 25:1
**pattern** 38:3
**Paul** 109:16,20
109:21
**pay** 14:19 21:4
21:12,13 22:7
22:13,20 39:2
40:1 68:24
69:20 108:17
108:23 109:3
**payable** 14:8,16
51:24 120:5
**payee** 133:11
**payment** 16:4
32:17 67:17
70:22 72:6
88:13,25 90:8
92:8,11,12,15
92:17 93:9
100:25 101:15
101:24 103:6
103:11,18,20
103:22 104:3,6
105:12,14

106:20 107:4,5
107:7,9 124:21
124:22 125:3
127:15 129:14
129:16
**payments** 13:20
66:23 67:8 71:6
71:10,16 73:3,4
74:17 76:13
78:17 81:7
98:20,24 99:5
99:10,13,16,20
99:21 100:14
100:17,18,21
100:24 101:3,4
101:7,10,13,19
102:1,8,11,19
102:23 103:2
103:15,24
104:18,20
105:5,9,17,25
106:9,13,25
107:12 126:2
126:24 127:7
127:11,18,23
128:7,12,15,20
128:24 129:7
129:10,19
130:7,14
131:21
**PC** 2:3
**PDF** 30:13,24
58:22
**penalty** 6:17
134:6
**people** 37:22
47:18 61:3
73:16 76:14
**perceived** 120:19
**percent** 49:14
80:12
**performance**
26:16
**period** 14:2 15:6

107:21 108:5
108:16,22
109:1 125:15
135:15
**periodically**
23:18,19
**perjury** 6:17
134:6
**person** 13:18
23:8,18 37:25
38:1 44:11 46:6
131:23 132:3,7
132:13,17,22
133:1,14 135:8
**personal** 10:5
**personally** 23:17
73:13 101:20
101:21 114:24
123:19 130:2
**phone** 38:1 71:5
72:5 74:20,21
75:2,3,5,5,14
75:19 76:15
92:2,3,6 93:15
93:21 94:6 99:4
100:12
**picking** 79:20
**pictures** 47:11
**pieces** 7:14,18
**pile** 58:25 111:7
**pin** 21:18
**pinpoint** 90:21
**pique** 76:6
**place** 135:8
**Plaintiff** 1:7 2:13
**play** 27:3 29:13
114:22 115:6
117:7,10
126:18
**please** 6:24 10:13
10:16 11:8
32:13,15,16
42:11,25 61:20
61:22 62:2 63:3
64:5 66:10

75:20 89:25
122:18
**point** 42:2 44:14
55:2 66:16
69:24 70:6
**policy** 104:9,11
104:15
**pop** 84:5
**portion** 8:9
**position** 9:7 12:8
110:4
**positive** 79:6,11
79:18
**possible** 32:17
36:21 58:15,18
65:1 93:6,19
95:4 109:21
**possibly** 41:20
55:21 58:7 73:8
104:22
**postsecondary**
10:19
**potential** 16:4
68:4,8
**potentially** 25:19
34:19 95:14
97:10
**practice** 17:20
18:11,18,23
34:16,21 48:17
49:7,9 50:20
53:7,12,16,17
**prep** 32:15
**preparation** 7:8
9:13
**prepare** 16:20
45:8 84:18
130:2
**prepared** 16:25
42:12 46:19
54:6 76:12 77:3
84:21 86:15
128:18
**preparing** 95:22
97:17 131:24

prepayments
81:25
presence 25:4
present 9:4,6,12
24:5 45:24
90:15 97:3
presented 116:1
presenting 46:14
97:18
preserve 78:8
pretty 14:11
109:8
previous 100:9
previously 17:24
48:25 131:9
Pricewaterhou...
116:9,12 117:5
117:17 118:2,5
130:20
principal 30:12
78:14,17 79:5
79:11,23 80:10
89:23 121:14
122:10 124:5
124:19 125:3
125:18 130:14
print 56:1
printed 42:8,12
42:24 47:18
55:18,22 56:7
57:4,21,22,24
57:25 58:11,14
58:21,22
printing 55:23,25
printouts 42:21
prior 9:25 10:4
19:17 28:11
35:24 40:25
55:2 65:23
71:25 86:9 96:6
105:3 108:6
124:24 127:19
128:12 133:12
privileged 9:8
95:24

privy 64:9,11
69:19
probably 9:15
17:2 49:14 50:6
58:22 61:9
63:15 99:15
109:8 126:13
proceed 61:20,25
proceeding 46:20
proceedings 95:1
95:3,12
process 31:7
32:16 45:11,12
120:12
produce 78:9
produced 1:18
17:24 33:15
34:1 59:4 67:10
76:20 82:14,19
125:6
product 115:13
production 10:1
33:15
profitability
26:25
program 47:25
programs 47:16
projections 17:18
promised 39:2
promissory 3:10
3:12,17,19,21
3:23 4:12,14
5:3 14:9 15:18
16:10,16,20
17:1,3,6,22
18:13 19:17
27:3 28:13,21
30:11,19 31:1,8
32:21 33:2
35:18 38:11
42:7 43:11,12
45:1,9 47:6
52:10,24 53:1,8
53:25 54:5,12
54:23 55:11

68:5 71:13,19
72:11,12,16
76:13 77:7,10
80:9 81:8 113:6
113:11,12,16
114:2,7,16
116:7,11,15
117:17,22
118:7 119:12
122:11 124:6
prompt 128:14
prompted 83:22
prospect 53:20
provide 7:12
9:19 15:21
30:11 42:21
59:17 63:3 64:5
64:16 119:16
121:25
provided 17:24
33:5,9,10 61:14
70:12 89:17
121:11 122:5
129:11 135:15
provides 120:7
providing 15:10
54:8 65:5
public 16:19
pull 119:14
pulled 49:3
purpose 86:12
125:22
purposes 39:5
98:1 126:23
purview 89:6
put 23:20 84:25
PwC 97:21 98:1
117:22

_____
Q
qualification
16:20
question 7:1
14:10,22 15:25
16:23 18:15

19:12 20:19,24
22:9,22 24:9,16
28:4 29:5,16
34:7 35:11
36:14,23 37:1
38:8 39:18 41:2
41:14 45:4,5
46:5 47:21
48:23 49:11,21
50:5 51:15,21
52:2,4 53:10
54:18 55:6,15
55:20 56:5
58:17 65:17
66:10 69:9
70:16 73:21
74:6 75:8 77:23
80:4,17 82:2
84:14 86:9,19
86:20 87:8,19
88:16 89:3,16
95:10 96:10,19
100:9 102:3
103:14 105:20
106:19 113:9
113:24 124:17
127:8 128:5
questions 6:21,24
7:6 8:8 61:21
95:2 110:16
115:4 133:24
quick 52:5 95:4
107:23
quickly 6:16
109:8
quite 36:21 41:20
104:24
quote 120:3

_____
R
R-o-e-b-e-r 32:10
raise 131:1
raised 95:12
range 89:10
rate 19:7 43:16

49:2 80:12
ratio 107:21
108:5
re-up 86:16
reached 108:5
read 7:9 8:9
32:18 82:21
86:17 119:25
reading 81:9
ready 94:16
real 11:14
really 35:13
67:21
reason 6:23
22:23,25 52:11
52:13 56:1,6,7
72:7 77:3 82:5
82:8 101:13
129:13,16
131:1
recall 7:19 10:8
21:6 34:15,20
36:16 37:2
44:11 46:10
50:14,20 51:17
51:23 52:4
55:25 56:7
59:22,25 60:2,3
60:8,10 63:11
64:1 65:3 66:7
67:3 68:22,25
69:22 72:3 73:1
74:11 83:22
84:4,23,25
86:12 88:17
91:25 92:3 93:5
93:7 102:21
104:21 105:15
107:6 108:25
109:14 112:3
112:13,15,17
116:4,15 118:5
119:5,8,19
120:16 123:4
123:15 127:5

referring 66:25
100:2,5
reflected 118:7
123:12
reflecting 43:15
refresh 9:17 42:1
42:20 69:18
108:1
regarding 86:1
90:17 107:12
regardless 99:16
regularly 23:24
reinforces 41:8
reissue 21:14
related 9:13
21:11 33:1
38:22 57:21
95:9 96:7 98:16
99:21 135:20
relates 32:21
64:17
relation 115:7
relieve 93:10,11
rely 42:8
remember 19:19
20:14 21:3
28:16 30:25
31:3,4 32:4
41:19 54:7
55:23 61:2,5,8
64:23,25 65:4,8
65:23 66:18
67:20 74:21,24
85:10 86:14
90:5,7,12
100:13,14,16
100:20 106:16
109:15,24
110:3,5,6
remotely 6:8
renewal 120:12
reorganized 25:7
25:15 26:17,24
27:2
rep 115:13,19,23

129:25 130:17
131:5 133:10
recalling 109:16
Receivable 4:19
receivables
130:25 131:22
received 63:13
64:21 71:5
129:2
receiving 32:4
124:23
recipient 60:25
recognize 44:12
recollection 20:2
21:7 38:20
52:21,23 54:14
55:10 64:13
67:12 77:13
100:11 106:24
107:2,8 108:2
121:24 126:9
reconciling 13:20
record 7:15,16
30:8,9 44:4,6
52:6,7 53:3
56:18 62:19,20
72:10 75:5 78:8
82:19 83:13,14
93:20 94:4,21
98:14 110:18
recorded 73:11
81:24
recording 73:18
records 10:6,6
59:18 62:7 64:5
73:12
reduced 135:10
refer 99:25
reference 71:13
119:1 121:2,6,9
referenced 34:5
84:6
referencing
33:25 121:10
referred 96:2

repaid 23:10
repay 69:6
repeat 14:10
22:10 28:15
44:22 66:10
rephrase 6:25
report 12:25 25:9
25:12 114:25
115:25 117:14
123:6
reported 1:23
13:6 36:22
reporter 135:1,3
135:15
reporters 27:13
reporting 12:22
12:23 13:22
reports 127:3
repository 54:22
55:9
represent 27:10
46:25 57:3 83:1
94:24 107:23
represented 2:4
2:11,18 93:5
representing
42:23
request 4:9 60:5
84:22
requested 63:3
63:21 64:5,17
84:2 135:13,14
requesting 63:25
requests 10:1
69:14 115:3
required 7:6 21:4
respect 26:25
29:20 43:8,17
48:10 51:12
73:3,17 92:13
98:24 106:9,12
112:13 114:22
127:16
respectfully 39:5
respecting 45:22

respectively
113:15
respond 122:23
responded 65:1
response 60:13
120:15,19
122:16,25
responsibilities
97:12 103:6,10
responsibility
69:7 102:23
105:2
responsible 14:5
17:21 31:7
45:18 77:19
97:17 101:25
126:20 131:23
132:3,7,13,17
132:22 133:1
133:15
responsive 10:6
rest 44:23
restrictive 47:17
restroom 52:6
93:16
restructured
19:21
retail 86:15
119:17,24
121:25 122:5,9
122:17 123:1,6
reveal 50:11
review 8:4 50:11
54:11 119:21
125:10,17
135:13
reviewed 9:15,19
reviewing 32:24
115:11
revised 17:6
right 12:6 13:21
14:16 25:7
27:15,20 28:18
35:22 45:9,10
47:19 49:3

56:14 65:6,7
69:16 75:14
80:24 83:17
88:21 91:24
96:9 102:25
111:23 120:20
122:19,20
123:21,24,25
124:2 127:25
130:11,12
131:10
Roeber 32:9
112:7
role 12:5,18
13:12 29:13
46:8 69:25 70:7
73:3,4,6,17,22
106:12 114:22
115:6,10 117:7
117:10,12
126:18
roles 73:6
roll-up 72:22
131:9
rolled 79:23
131:13
Romey 61:15,18
61:25 62:3
room 75:15
roughly 39:3
routine 20:4,21
20:25
routinely 21:1
row 131:3
RPR 1:23
rude 25:3
Rukavina 2:5 3:3
3:5 6:4 7:4,15
7:17 9:7,10,11
14:15,23,25
16:2,25 18:17
19:14 21:2
22:11,24 24:11
24:18 28:5 30:4
30:10,17,23

31:12,20 34:10
35:16 36:18
38:10 39:22
41:4,17 42:19
43:6 44:4,7
45:5 46:8 47:22
49:6,17,25
50:10 51:6,17
51:24 52:5,8
53:4,15 55:9,23
56:9,19 57:2,20
58:19 59:11
62:19,23 65:20
69:13 70:19
72:15 73:24
74:8 75:9,13
76:19 78:1,7,11
79:8,10,14 80:8
80:19 82:4,21
82:25 83:8,13
83:15 85:24
86:2 87:9 88:6
88:20 89:5,19
90:3 93:23 94:5
94:14,19
110:17,20
113:8,19 114:8
114:17 118:9
118:21 119:3
121:17 122:12
125:7 128:2
130:13 133:25
134:2

___

**S**

**S-e-e-r-y** 8:8
**Sadly** 94:9
**salaries** 108:17
108:18,19
**salary** 25:15
**sale** 68:4,8
**save** 55:13 72:19
**saved** 56:11
**saw** 41:8 86:6
115:12 123:19

125:6 126:12
**saying** 37:19
41:15 49:23
53:4 73:8 76:14
93:19 99:5
101:9
**says** 32:1,6 34:10
44:10,13,18
57:8,22,25
60:23 63:2 64:4
78:25 86:23
87:10 89:9
120:2,22
**scan** 55:13
**schedule** 76:24
77:5,6,21 80:20
82:7 85:3,13,17
131:20
**scheduled** 16:4,7
**schedules** 77:9
85:12
**schooling** 10:20
**Scott** 4:3 18:9
60:4,12,15
61:10,13 62:1
**Scott's** 60:13
**scratch** 17:3
**search** 10:5
**second** 7:15 44:5
62:18 78:23
80:22 99:24
109:15
**Secondly** 87:16
**section** 80:9 86:1
118:19
**see** 6:8 8:5,12,14
23:3 31:5,20
32:25 35:7
54:11 57:9,21
59:7,15,20 60:6
60:20 61:23
63:5,9 64:2,7
78:24 79:14
80:15,18,24
81:3 84:11 85:6

86:23 87:1,5
89:8,11 105:9
115:11 120:9
120:22,25
121:4 126:4
**seeing** 31:4 50:14
57:14 65:23
90:12
**seek** 46:20
**seeking** 24:3
**seen** 33:14 65:22
69:13 72:15
76:21 88:7
122:25
**Seery** 4:8 5:1 8:8
25:12,20 29:24
59:13 60:18,22
61:12 62:4,6,9
63:1,2 64:4
65:9 67:3,14,17
67:25 68:13,22
69:14 88:11,23
96:25 125:25
126:13
**Seery's** 8:10,20
**send** 29:14 32:13
34:24 37:7
53:21 59:7
60:11 62:2
63:17 83:22
**sending** 13:19
36:3 54:12
60:17 61:2
111:19
**senior** 12:8,11,11
12:12,17
**sense** 44:12 58:1
**sent** 28:22 29:11
37:17 42:9 83:2
83:17 92:16,22
106:20 107:3
111:21 123:19
126:11,13
**separate** 18:5
**served** 10:1

**services** 15:11,22
70:13,13 86:16
119:17,19
120:7
**set** 26:10,11,14
35:15 53:21
**shape** 37:10
**shared** 54:9,16
55:14 70:13
77:16 86:16
**shareholders**
39:2
**sheet** 118:6
121:11
**sheets** 63:8,22
**short** 74:22 75:17
75:23 93:15
**shorthand** 1:24
135:2,7,25
**shortly** 11:11,12
**show** 82:10
**showing** 92:15
131:21
**sick** 82:17
**sign** 52:20,20
53:7,20,22 54:3
104:25 105:1
113:5,18
115:13
**signatory** 52:14
**signature** 46:15
47:1,6,11,18
49:8,14,15
114:7,9,15
**signed** 47:9 52:10
52:11,25 55:4,8
115:14 131:6
132:5,9
**signer** 53:13
**significant** 20:20
51:19,22
**signing** 52:16,24
53:25
**similar** 32:25
34:9 38:25

96:10 112:13
**single** 104:2,3
**sitting** 30:25
33:24 42:1
50:15 53:23
54:4 55:24 82:4
85:16 91:21
105:16 106:23
**situation** 34:9
**slightly** 96:10
**SMU** 10:23
**so-called** 15:22
**somebody** 35:19
37:8 53:12,12
53:19 55:21
129:3
**soon** 32:17
**sophisticated**
14:12
**sorry** 11:12 14:24
19:15 47:8 52:4
57:21 66:2
82:23 92:12
97:3 103:9,23
109:20
**sort** 25:21 43:23
96:11 97:24
**sought** 88:24
**sound** 58:15
**sounds** 98:3
**speak** 36:2
**speaking** 13:17
43:11 44:1
**speakings** 95:21
**specific** 7:19
21:18 29:7
34:21 36:4,17
37:1,14 38:2
43:10 46:11,22
47:25 48:11,13
54:14 71:8
88:17 90:19
100:11 101:22
103:11,18
105:21 106:24

127:6
**specifically** 21:6
  21:10 23:11
  29:9 34:15 37:8
  49:12 50:12,16
  50:19 51:2 52:3
  52:19 54:1,7
  55:8 64:25 65:3
  65:4,8 68:25
  69:22 77:14
  84:19,21 93:5
  98:16 103:2,7
  125:13,18
**specifics** 22:4
**speculating** 58:9
**speculation**
  106:4
**sphere** 69:6
**spit** 48:1
**spoken** 35:23
  61:13
**spreadsheet** 78:9
**spreadsheets**
  31:6 77:12
**staff** 48:2
**stake** 27:7
**stamp** 47:19
  82:18
**standard** 46:16
  50:7 53:6,11,15
  53:16 55:3
**standing** 67:2
**STANG** 2:10
**start** 54:19 59:11
  95:10 100:11
**started** 11:13,17
  20:11 100:10
**starting** 10:19
  11:9
**starts** 59:12
**state** 1:23 6:5
  10:25 67:25
  68:14 76:22
  78:16 136:1
**stated** 48:25

135:9
**statement** 99:3
**statements** 4:5
  13:20 63:7,8,21
  63:22 97:16,17
  115:12 116:17
  116:21 117:1,5
  117:11 119:2
  122:4 133:18
  133:22
**STATES** 1:1
**status** 66:20
**stay** 26:4
**steps** 92:13
**STINSON** 2:17
**stop** 34:24
**stopped** 23:22
**stored** 56:2
**straightforward**
  26:14
**Strasburger**
  44:13,16
**Street** 1:25 2:4
**stretch** 109:5
**strike** 7:24 8:4
  15:8 38:16
  52:22 53:5
  68:12 87:9
  90:11
**string** 122:19
**stuff** 49:15
**stupid** 86:9
**subject** 16:5
  119:20,20
  132:19
**subparts** 86:20
**Subscribed** 134:7
**subsequent** 14:7
  59:25 61:12
  64:10 95:13
  96:22 105:12
  116:13 118:3
  118:19
**subsequently**
  32:11

**sued** 28:21
**suggest** 124:14
**suing** 28:5
**Suite** 2:4,17
  136:2
**summarize** 72:19
**summary** 7:12
  8:14
**summer** 123:16
  124:18
**supervision**
  135:11
**supplementally**
  9:19
**supposed** 98:20
**sure** 6:12,15
  10:21 11:4,11
  12:20 13:20
  14:11 18:22
  19:23 22:11
  26:7 28:16 31:2
  33:10,21,22
  37:5 42:3,22
  43:20 52:25
  58:18 60:16
  62:1,19 63:17
  65:4 66:11
  75:21 76:11,11
  84:15 99:3
  100:7 101:1
  107:18 109:22
  115:16 125:24
  126:23 130:23
  130:24
**Surgent** 29:24
**surprise** 76:1,3
**surprised** 94:11
**surprises** 40:8
  76:2
**suspect** 23:15
**switch** 58:24
**sworn** 1:19 6:2
  135:4
**synopsis** 7:12
  8:14

**system** 56:12
  77:16 84:20

___

**T**

**T-h-e-d-f-o-r-d's**
  86:22
**take** 25:14 30:8
  38:11 45:5 52:5
  52:20 72:15
  75:17 76:15
  82:12 87:10
  89:13 92:13
  104:1 110:14
**taken** 1:20 16:15
  17:6 45:8 135:7
**talk** 7:21,24 8:1
  8:17,20,23,25
  28:10 34:21
  44:9 66:11,15
  78:1
**talked** 9:12 97:4
  99:8
**talking** 8:19,22
  29:1 64:11
  101:2 116:8
  121:15,23
  125:13
**taxes** 14:9
**team** 13:19 17:25
  18:21 26:4 31:6
  39:15 49:15,18
  50:24 51:7
  64:16 97:16
  102:4 104:11
  106:15 115:2
**telephone** 23:17
  74:11 75:23,25
**tell** 34:13,16,24
  44:2 53:1 54:1
  54:2 55:7 60:14
  63:24 71:23
  74:19,23 79:22
  79:24 84:3
  91:11,15,18
  93:24 99:2

100:12 106:14
  107:1 109:22
  110:8 112:8,25
  113:4,17 114:1
  114:6,14
  116:20,23,24
  117:21 118:25
  119:6,11 122:4
  122:8 123:2,8
  123:11 130:22
  131:24 132:4,8
  132:11,14,18
  132:23 133:2
  135:4
**telling** 35:25
  37:11 53:24
  100:13,21
  105:22 115:24
**template** 18:20
  18:24 43:14,18
  45:8 46:17 58:4
  58:6,12
**templates** 43:12
  50:9
**term** 17:2 66:9
  66:16 67:8,13
  73:10 76:24
  77:10 98:17,25
  100:4 107:20
  107:24 125:19
  126:2 127:12
  127:16,24
  128:8,21 130:7
  131:5,8,14
**terminology**
  27:14
**TerreStar** 38:22
**test** 20:9
**testified** 6:2 45:7
  72:18 112:12
  113:13 127:22
  129:22
**testify** 83:10,12
**testifying** 6:16
**testimony** 19:8

20:1,15 26:23
41:2 51:11
56:10 99:9
135:9
**Texas** 1:2,23,25
10:15,22,25
11:13 134:8
136:1
**thank** 79:13 94:2
94:11,15 111:4
128:3 134:2
**Thedford** 4:22
120:2 122:22
**Thedford's** 86:21
120:15 123:5
**thereto** 135:21
**thing** 20:20 30:18
34:4 56:22 58:3
94:20 126:21
**things** 12:21
18:24 19:2,9
37:21,24 74:18
87:13 100:10
**think** 20:6 22:11
22:24 24:1,18
24:21 25:13
32:2 33:9 41:4
41:25 42:3
44:13,25 45:1
45:19,19,21,21
46:2 49:16 50:8
51:6 58:3 59:2
61:8,16 64:21
66:1 69:2 72:18
75:22 79:19
80:8 87:12 88:9
88:23 102:22
104:12 109:7
127:22 129:23
**Third** 2:10
**thought** 75:22
130:25
**three** 87:15
125:19 127:24
128:7,8,21

130:7 131:5
**Tim** 109:20,23
**time** 9:1,6 11:17
14:19,19 17:12
20:10 22:5,5,12
22:12 23:12
31:5 32:9 33:8
35:6 44:15
45:19 49:14
51:10,18 55:1
64:2 65:10
66:16,19 67:11
69:7,11,24 70:6
72:19 73:16
75:6 77:24 78:4
80:10,10 81:19
82:12 84:4
86:14 90:11
93:8,24 103:16
104:2 108:6,16
108:21,22
109:1 112:25
113:1,4,5,17
114:1,14
116:20,25
123:4,8,11
125:14 128:12
130:20 131:25
132:4,8,11,14
132:18,23
133:2 135:8
**timely** 128:24
129:6
**times** 9:12 29:2
51:4 109:4
**title** 12:13,14
13:2 46:11
69:25 70:7
**today** 8:23 11:23
13:10 25:6 28:2
30:25 32:16
33:24 41:19,23
42:1 50:15
53:23 54:4
55:24 65:5,8,23

82:4 83:2 85:16
90:13 91:21
94:12 95:1,22
105:16 106:23
121:23
**today's** 9:14
**told** 34:12 35:15
35:19,22 36:19
36:24 37:5,8
38:5,11,17
40:22 41:11,18
41:20 60:8 91:9
91:22 103:2,7
104:10,18
106:21,25
**top** 80:25
**topic** 88:19 92:5
95:8 96:11
109:7 130:19
**topics** 98:12
107:18
**total** 78:14,18
79:22 80:22
**track** 29:1
**tracking** 31:6
111:19
**training** 16:13
**transaction**
112:10,14,22
**transactions** 37:4
119:7
**transcript** 7:9
135:13
**transfer** 40:14
81:15 91:3,7,9
91:13,22 92:20
92:20 111:14
**transferred**
38:18 39:23
90:23 111:10
**transferring**
81:22
**transfers** 35:8
37:12 38:5
40:24

**treasury** 12:20
13:14,15 14:1
15:22 17:17
**trigger** 107:21
108:5
**triggers** 26:11
**trouble** 42:10
43:1
**true** 42:25 134:7
**trusted** 50:8
**truth** 135:5,5,5
**try** 10:5 20:10
95:2,3 105:8
**trying** 21:18
23:20 84:5
**turning** 19:22
**two** 24:4 27:25
29:18 30:1 31:1
37:18 38:4,21
42:7 43:8 46:22
52:16 53:25
54:5 57:7,16
70:13 73:16
86:20 106:9
109:14,18,24
110:6 113:12
116:7,11,25
117:17 118:7
121:15,22
122:10 123:13
124:6
**TX** 2:4,18 136:2
**typewriting**
135:10
**typical** 18:18,23
23:25
**typically** 21:10
35:1,5,6,12
47:7 52:19 54:2
101:1
**typo** 87:12

---
**U**
**Uh-huh** 27:16
33:12 47:3

**umbrella** 13:25
99:23
**unable** 108:17
109:2
**underlying**
131:20
**understand** 6:16
6:20,21,24 10:9
15:3 26:7 27:10
33:22 39:14
41:22 56:16
58:8 84:14 95:5
119:16,23
122:21 125:8
125:15 128:5
**understanding**
13:3,5 25:1
27:5,25 43:24
44:20 50:22
57:23 62:5
63:20 70:21,25
71:3 78:22
79:17,25 81:6
89:20 98:23
115:9,22 126:5
128:19 131:16
133:14
**understood** 7:1
39:11
**unfortunately**
42:4
**unilaterally**
110:22
**UNITED** 1:1
**University** 10:21
**unpaid** 80:9
**upcoming** 67:16
72:6 73:3 74:1
126:1
**update** 43:11
45:1 58:7 77:20
**updated** 43:18
**updating** 17:23
18:23 19:1,3,25
50:8

Kristin Hendrix - October 27, 2021

use 21:17 45:12
  47:19 48:12
  49:18 59:1 79:1
  100:4
usually 24:5

**V**
Vaguely 63:12
valid 131:25
valuation 39:15
various 14:15
  15:11 59:13
verbatim 27:14
  78:25 85:20
  86:22
verification 50:3
version 30:13
  42:7
versions 30:24
video 8:5,12 59:6
  62:16 85:24
videoconference
  1:19 2:19
view 41:9
volume 94:19
vs 1:8

**W**
wait 44:23
walk 10:18 11:8
walking 54:7
want 28:10 47:15
  58:25 86:18
  95:8 100:7
wanted 52:19
  54:2,9 60:12,14
  82:17 84:7
  102:11 105:9
wanting 65:10
wasn't 108:23
  114:6,15 127:7
  129:14
Waterhouse 4:21
  7:10,21 13:7,8
  23:13,22,23

24:6 29:23
34:19 35:24
36:2 37:3,5,9
38:5 47:24 49:7
50:12,16 52:10
52:23 53:24
54:5,13 60:11
62:10 63:1,18
64:3 67:3 71:5
72:1 73:8 74:13
75:20 83:19
84:1 90:4,7,16
91:10,22 93:9
99:5,18 102:16
103:8,12,19
106:14 112:6,8
112:21,25
113:4,17,22,25
114:5,6,13
115:6 116:19
116:23 117:20
118:24 122:3,7
122:22 124:8
124:10,13,16
124:24 125:25
126:6,24 127:3
127:9,19 128:9
128:14,18,19
129:23 130:4
130:11
Waterhouse's
8:1,6 47:1,6
48:11 75:25
115:10
way 11:18 12:23
14:8 21:15
35:13,15 37:8
37:10,16 56:12
58:20 60:19
76:1 81:12 83:3
92:25 93:10
101:21 122:5
135:19
ways 6:7 54:19
we'll 9:10 15:9

17:5 44:8,23
66:11,15 75:17
82:18 94:3
we're 6:7 27:22
28:16 29:1 30:6
35:19 50:22
58:9,24 59:2,3
76:11,11 85:20
93:22 100:7
104:3 116:8
125:13
we've 9:11 28:8
50:7 56:21,22
69:16 88:9
114:2 117:18
121:23
website 49:3
week 8:2,10 9:2
9:22,25 10:5
13:22 28:9,17
29:18 60:22
61:6 67:6 86:1
95:19
weekly 66:21,25
67:2
welcome 59:1
86:17
went 9:15 10:22
10:23 24:19,22
49:23 112:17
115:4
weren't 19:25
28:23 40:7,9
64:12 96:7
98:21,24 99:20
100:24 101:13
105:22 106:3
131:1
wire 34:25
106:15 107:3
withdrawn
113:23 117:25
120:3 124:9,21
126:6,7 127:7,9
129:15 132:12

133:9
withholding
116:3
within-entitled
135:6
witness 1:19 16:1
16:24 18:16
19:13 20:25
22:10,23 24:10
24:17 30:3
31:11 34:8
35:12 36:15
38:9 39:19 41:3
41:15 46:6
48:24 49:12,22
50:6 51:5,16,22
52:3 53:11 55:7
55:21 56:6
57:18 58:18
69:10 70:17
73:22 74:7
75:12 77:24
80:5,18 82:3
83:10,12 88:17
89:4,17 94:14
96:20 102:4
103:15 105:21
106:7,20
113:21 114:12
114:18 118:11
119:4 121:18
122:14 135:3
135:10
word 42:6,6 43:7
43:8 45:11 47:2
77:13
words 21:5 23:20
68:14
work 11:8 52:4
98:2 126:22
worked 11:16,18
36:6 61:19
110:5
works 35:1
world 113:25

114:5,14
116:24 117:21
118:24 119:6
119:11 122:3,8
124:17
wouldn't 36:22
37:6 53:22
wrap-up 110:16
write 60:4
writes 60:18,22
61:13,20
writing 37:10
41:14 64:3
114:25 117:14
written 80:7
82:19 91:25
99:7 104:12,15
wrong 57:5 87:13
99:7
wrongly 123:12
www.dickman...
136:4

**X**

**Y**
yeah 7:2 14:13
21:10 34:9
44:23 51:9
80:18 93:17
year 12:2 20:10
26:14 78:1,5
81:6 104:5
127:15 128:21
128:25 129:7
129:14 130:8
131:21
years 11:15,18
12:9 18:20 21:9
22:25 23:9 36:7
37:18 40:25
51:7 52:4
104:21,22
108:15 109:17
110:8,10,12

Kristin Hendrix - October 27, 2021

131:3 133:5,12
**Yep** 76:9 123:17
**yesterday** 9:2
86:7,9
**York** 2:11

**Z**

**zeros** 87:15
**ZIEHL** 2:10
**Zoom** 6:8,10

**0**

**05.02.2019** 4:1
**05.03.2019** 3:25

**1**

**1** 3:10 30:14,15
30:18 33:1 71:4
71:25 72:4
74:10 80:9
93:21 129:24
135:22
**1-31-23** 136:4
**1.3** 81:1,2
**1.4** 90:23 91:3,23
**1:19** 1:22 134:4
**10** 4:3 9:23,25
10:5 28:17 59:4
59:9 110:12
**10,530,000** 87:20
**10.5** 85:6,9
124:11
**10:11** 1:22
**10017-2024** 2:11
**101** 136:2
**11** 4:7 62:14,21
62:23
**11:27** 57:22
**110** 3:5
**111** 3:6
**12** 4:11 5:5 65:13
65:18,21 90:5,7
90:17
**12,286** 87:10,10
**12,286,000** 87:6
87:16,20,24

**12.3** 120:24
121:13 123:5,9
**12/30/29** 78:25
**13** 4:14 72:11,13
72:16
**13-week** 67:5
125:7,10,14,23
126:16,19
**14** 4:17 22:25
23:9 36:7 40:25
76:10,17,19
82:6 85:17
90:22 91:4 93:8
**14-year** 38:3
**15** 4:19 36:7 83:1
83:4,15,17 84:8
84:14,18,19
85:7 87:21
89:21,22
123:16,22
124:5 133:5
**15(c)** 4:22 86:1
121:11
**16** 4:21 85:21,22
85:25 86:3
119:15,23
**17** 5:1 11:15 52:4
88:2,4,7
**18** 5:5 89:25 90:1
90:3
**19** 59:12
**1982** 10:17

**2**

**2** 3:12,12,14,19
3:23 4:3 30:19
30:20,21 31:16
32:21 34:14
37:11 41:11,18
44:19 56:22
57:22 58:11
60:25 61:6,12
79:8 119:25
**2.1** 81:1

**2.4** 30:20 32:13
32:21 33:19
37:12 38:22
39:7 42:16 43:3
58:5,11 111:10
113:14
**2.4-** 110:22
**2.4M** 3:12,19,23
**2000** 86:22
**2001** 127:23
**2004** 10:21 11:12
**2005** 11:11 20:16
21:2,9,19
**2009** 10:23
**2014** 133:12
**2015** 10:24
**2017** 12:15 19:23
73:2 74:7 131:6
131:12
**2018** 116:4,16
117:1,11,23
118:3,11,14,18
119:1 128:25
**2019** 3:14 12:10
12:17,19,25
13:8,14 17:9,12
17:20 18:2,8,10
18:10 19:15
20:2,2 21:2,9
21:19 23:16,16
24:12,14 30:20
31:17 34:14
37:11 38:17,21
39:6,14 40:3,5
41:11,18 44:25
45:14 46:9,12
46:19 47:12,24
48:21 49:6,19
50:2 53:5,6
54:21 55:3,10
56:9,20 57:22
74:7 78:5 80:23
81:6,18 110:21
111:1 112:9,21
114:1 116:5

117:18 118:16
129:8
**2020** 4:4,11,22
12:7 14:2,5
15:6,10,21 16:3
24:22 59:12
62:6,10 65:14
66:3,7,18,19
67:13,17,20
68:1,8,14,21
70:23 71:4 74:8
75:19 76:4 78:2
79:10 83:18
86:25 87:6
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:20 103:21
105:4,18
120:23 122:17
122:19 124:18
125:14,20
126:9 127:6
128:20 129:14
129:17
**2021** 1:15,21 4:8
5:2,6 24:24
26:4 28:20
29:11 62:25
64:15 71:25
73:3 88:2 90:5
90:17 94:10
106:10,25
128:2,8,15
134:9 135:22
**21-03004-sgj** 1:8
**214** 136:3
**23** 85:1 87:3
**23,846,000** 84:9
**24,471,000** 89:9
**25** 61:6
**26** 10:17
**27** 1:15,21
**28** 125:20

**29** 83:18 84:1
**2nd** 58:5 111:9

**3**

**3** 3:10,14,17,21
4:11 31:15,18
34:4,11 35:21
36:20 37:11,19
38:12 41:11,18
44:18 56:20
65:14 66:3
111:7 112:21
119:7
**30** 3:10,12 71:4
72:4 74:10
86:25 87:6
93:21 120:23
129:24
**30-year** 19:22
**30,746,812.33**
4:14
**30.7** 66:9,13
**30.7M** 4:17
**31** 3:14 4:15
67:16 70:22
79:10 88:12
98:21,25
100:25 101:11
101:19 102:8
102:19 103:20
105:3,18 131:6
**3102** 2:17
**312** 136:1
**34th** 2:11
**3800** 2:4
**38th** 1:25

**4**

**4** 3:17 42:15,17
42:19 43:6,18
43:18 44:21,24
45:22,25 46:3
46:19 48:11,19
50:13,17 51:2
52:8 55:17,24

**Kristin Hendrix - October 27, 2021**

| | | | | |
|---|---|---|---|---|
| 57:16 | **7** | | | |

57:16
**42** 3:17,19
**4228** 136:2
**43** 3:21,23
**445-9548** 136:3

**5**
**5** 3:19 30:12 33:1
33:20,25 34:5
35:3 36:25
37:12 38:25
39:3,8 42:15,16
42:17,20 43:2,6
43:18,19 44:21
44:24 45:22,25
46:3,19 48:11
48:19 50:13,18
51:2 52:9 55:17
55:24 57:16
58:13,13 94:9
112:14 113:14
**5-** 33:19
**5.0** 110:23
**5/31/2020** 79:5
**500** 1:24 2:3
**530,000** 78:25
**56** 3:25 4:1
**575-** 79:23
**575,000** 79:12
**575,550** 79:6
**59** 4:3
**5M** 3:10,17,21

**6**
**6** 3:3,21 4:8,22
43:2,4,21 44:9
44:18 62:25
64:15 80:12
86:22
**6/30** 86:23 121:3
121:6,11,25
122:8
**62** 4:7
**65** 4:11
**683** 87:3

**7**
**7** 3:23 5:2 43:2,4
44:9,19 88:2,21
**7.4** 38:18 39:11
39:23 40:15,21
122:10 123:12
**72** 4:14
**75201** 2:4
**75206** 136:2
**75219** 2:18
**76** 4:17
**777** 2:17
**780** 2:10

**8**
**8** 3:25 56:19,24
56:25 58:10
89:9
**800** 136:3
**83** 4:19
**85** 4:21
**855-5100** 136:3
**88** 5:1
**881** 120:1

**9**
**9** 4:1 56:21,24,25
58:10
**90** 5:5
**94** 3:4
**99** 49:14

# PROMISSORY NOTE

$5,000,000.00                                                                May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand.

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



EXHIBIT 1
HCMFA-ABC 0606

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

HCMFA APP 0607

<div align="center">**PROMISSORY NOTE**</div>

$2,400,000.00                                                                May 2, 2019

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.   <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.   <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

     3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.   <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.   <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.   <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



EXHIBIT

2

HCMFA/ARP 0608

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

HCMFA APP 0609

**From:** David Klos <DKlos@HighlandCapital.com>
**To:** Corporate Accounting <CorporateAccounting@hcmlp.com>
**Subject:** HCMLP to HCMFA loan
**Date:** Thu, 2 May 2019 11:23:45 -0500
**Importance:** Normal
**Inline-Images:** image001.jpg

---

Blair,

Please send $2,400,000 from HCMLP to HCMFA. This is a new interco loan. Kristin, can you or Hayley please prep a note for execution. I'll have further instructions later today, but please process this payment as soon as possible.

**DAVID KLOS | CONTROLLER**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

C: 214.674.2926 | O: 972.419.4478 | F: 972.628.4147

dklos@highlandcapital.com | www.highlandcapital.com



CONFIDENTIAL

D-HCMFA030908

# PROMISSORY NOTE

$5,000,000.00                                                                                    May 3, 2019

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.   <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.   <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

      3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.   <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.   <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.   <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



**EXHIBIT**
10/27
4
Hendrix
HCMFA AEP 0671

7.  <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.  <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

FRANK WATERHOUSE

2

# PROMISSORY NOTE

$2,400,000.00                                                                                    May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.



EXHIBIT

HCMFA/APP 0618

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

RELATED DOCUMENTS

No family members

Not part of a conversation

Similar (56)

METADATA

| | |
|---|---|
| Doc ID | 90589 |
| Pages | 2 |
| Custodian | Hcmf |
| Bates No. | - |
| Revealed | |
| Unrevealed | |
| Tags | 20211025 Client Files |
| Filenames | HCMF loan 05.03.2019.doc |
| Author | JFORSHEE |
| Company | Strasburger |
| Title | PROMISSORY NOTE |
| Created | 5/3/2019 2:03 PM CDT |
| Modified | 5/3/2019 2:03 PM CDT |
| Accessed | 5/3/2019 2:03 PM CDT |
| Printed | 5/2/2019 11:27 AM CDT |
| Path | /HCMF loan 05.03.2019.doc |

**PROMISSORY NOTE**

$5,000,000.00                                                                                   May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand.

3.    Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind

EXHIBIT

10/27

Q

HCMFA APP 0615

Hendrix

RELATED DOCUMENTS

⋯⋯ No family members

☐ Not part of a conversation

☐ Similar (56)

METADATA

| | |
|---|---|
| Doc ID | 90594 |
| Pages | 2 |
| Custodian | Hcmf |
| Bates No. | -- |
| Revealed ⓘ | |
| Unrevealed ⓘ | |
| Tags | 2021025 Client Files |
| Filenames | HCMF loan 05.02.2019.doc |
| Author | JFOISHEE |
| Company | Strasburger |
| Title | PROMISSORY NOTE |
| Created | 5/2/2019 11:26 AM CDT |
| Modified | 5/2/2019 11:31 AM CDT |
| Accessed | 5/2/2019 11:31 AM CDT |
| Printed | 5/2/2019 11:27 AM CDT |
| Path | /HCMF loan 05.02.2019.doc |

# PROMISSORY NOTE

$2,400,000.00                                                        May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand.

3.      Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind

EXHIBIT

14/27

Hendrix

HCMFA APP 0616

# Info

**HCMF loan 05.03.2019**

N: » NexPoint » Adversaries » 21-03004 HCMFA



## Convert File Formats

These buttons allow you to change the current file formats to a new or older format.



## ndOffice Echo Backup

You can explore the backup folder with unsaved documents

## Protect Document

Control what types of changes people can make to this document.

## Inspect Document

Before publishing this file, be aware that it contains:

- Document properties, e-mail collaboration information, author's name and related dates
- Footers
- Content that cannot be checked for accessibility issues because of the current file type

## Manage Document

Check in, check out, and recover unsaved changes.

There are no unsaved changes.

## Properties ▾

| | |
|---|---|
| Size | 61.5KB |
| Pages | 2 |
| Words | 618 |
| Total Editing Time | 0 Minutes |
| Title | PROMISSORY NOTE |
| Tags | Add a tag |
| Comments | Add comments |
| Template | Normal.dotm |
| Status | Add text |
| Categories | Add a category |
| Subject | Specify the subject |
| Hyperlink Base | Add text |
| Company | Strasburger |

### Related Dates

| | |
|---|---|
| Last Modified | 5/3/2019 2:03 PM |
| Created | 5/3/2019 2:03 PM |
| Last Printed | 5/2/2019 11:27 AM |

### Related People

| | |
|---|---|
| Manager | Specify the manager |
| Author | JFORSHEE |
| | Add an author |
| Last Modified By | Kristin Hendrix |

### Related Documents

Open File Location

**Show Fewer Properties**



EXHIBIT
8

HCMFA APP 0617

Hendrix

# Info

## HCMF loan 05.02.2019

N: » NexPoint » Adversaries » 21-03004 HCMFA

### Convert File Formats

These buttons allow you to change the current file formats to a new or older format.


Convert

### ndOffice Echo Backup

You can explore the backup folder with unsaved documents


Open Backup Folder

### Protect Document

Control what types of changes people can make to this document.


Protect Document ˅

### Inspect Document

Before publishing this file, be aware that it contains:

- Document properties, e-mail collaboration information, author's name and related dates
- Footers
- Content that cannot be checked for accessibility issues because of the current file type


Check for Issues ˅

### Manage Document

Check in, check out, and recover unsaved changes.
There are no unsaved changes.


Manage Document ˅

### Properties ˅

| | |
|---|---|
| Size | 61.5KB |
| Pages | 2 |
| Words | 621 |
| Total Editing Time | 5 Minutes |
| Title | PROMISSORY NOTE |
| Tags | Add a tag |
| Comments | Add comments |
| Template | Normal.dotm |
| Status | Add text |
| Categories | Add a category |
| Subject | Specify the subject |
| Hyperlink Base | Add text |
| Company | Strasburger |

### Related Dates

| | |
|---|---|
| Last Modified | 5/2/2019 11:31 AM |
| Created | 5/2/2019 11:26 AM |
| Last Printed | 5/2/2019 11:27 AM |

### Related People

| | |
|---|---|
| Manager | Specify the manager |
| Author | JFORSHEE |
| | Add an author |
| Last Modified By | Kristin Hendrix |

### Related Documents

Open File Location

Show Fewer Properties

EXHIBIT 9
HCMFA APP 0618
Hendrix
10/25

**From:** Scott Ellington <SEllington@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Subject:** Re: HCM - HCMFA Financial Statements
**Date:** Wed, 2 Dec 2020 17:51:57 -0600
**Importance:** Normal

Yes please do.

Sent from my iPhone

On Dec 2, 2020, at 4:30 PM, Kristin Hendrix wrote:

Scott, can you confirm this is okay to proceed with providing?

Begin forwarded message:

**From:** James Seery
**Date:** December 2, 2020 at 4:27:43 PM CST
**To:** Kristin Hendrix
**Cc:** Jack Donohue , Bradley Sharp , Fred Caruso , James Romey , Frank Waterhouse , Scott Ellington , Greg Demo , Thomas Surgent
**Subject: Re: HCM - HCMFA Financial Statements**

All:

Scott and I have spoken and agree that the information should be provided to James immediately.

Kristen, please proceed with James. If anyone has any questions or issues, please call me.

Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

**From:** Jim Seery
**Date:** Wednesday, December 2, 2020 at 11:50 AM
**To:** Kristin Hendrix



HCMFA APP 0619
ACL-072954

**Cc:** Jack Donohue , Bradley Sharp , Fred Caruso , James Romey , Frank Waterhouse , Scott Ellington , Greg Demo
**Subject:** Re: HCM - HCMFA Financial Statements

This is an explicit direction from me as CEO of HCMLP to provide the requested information regarding HCFMA to James Romey.

If anyone has issued contrary direction at any time, that direction is superseded and void.

Please provide the information now.

Scott, please call me.

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery
**Date:** Wednesday, November 25, 2020 at 1:48 PM
**To:** Kristin Hendrix
**Cc:** Jack Donohue , Bradley Sharp , Fred Caruso , James Romey , Frank Waterhouse , Scott Ellington
**Subject:** Re: HCM - HCMFA Financial Statements

Can I get this ASAP.

HCFMA is way overdue.

Thank.

Sent from my iPhone

On Nov 25, 2020, at 10:56 AM, Kristin Hendrix wrote:


Hi Jack,

Scott Ellington is going to follow up with the board on this request.

Thanks,

Kristin

---

**From:** Jack Donohue
**Sent:** Thursday, November 19, 2020 11:38 AM
**To:** Kristin Hendrix
**Cc:** Jim Seery ; Bradley Sharp ; Fred Caruso ; James Romey
**Subject:** HCM - HCMFA Financial Statements

Kristin,

Jim Seery has asked me to review the financial records of HCMFA due to the funds owed the Debtor. Can you please send me the balance sheet, P&L and cash flow for 2019 and through 2020?

Thanks,

Jack

---

Jack M. Donohue, CPA

Development Specialists, Inc.

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

**http://DSIconsulting.com/**

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** 'James Seery' <jpseeryjr@gmail.com>, Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** RE: HCM - Information Request
**Date:** Wed, 6 Jan 2021 22:38:31 +0000
**Inline-Images:** image001.jpg

---

Confirmed.

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

---

**From:** James Seery [mailto:jpseeryjr@gmail.com]
**Sent:** Wednesday, January 06, 2021 5:37 PM
**To:** Frank Waterhouse
**Cc:** John A. Morris; Thomas Surgent
**Subject:** Re: HCM - Information Request

Adding Thomas

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery
**Date:** Wednesday, January 6, 2021 at 5:35 PM
**To:** Frank Waterhouse
**Cc:** John Morris
**Subject:** Re: HCM - Information Request

Frank:

I am the CEO of HCMLP and your direct supervisor. I have full authority over the Debtor's assets and operations. Indeed my appointment and authority has been court ordered by a court with full jurisdiction

EXHIBIT
tabbies 10/27
11
Hendrix

over the Debtor and its assets.

I am entitled to all information on the HCMLP owned and maintained financial and information systems from wherever it came as well as any other information in the possession of the Debtor. To the extent that the Debtor has information pursuant to a shared service agreement, any other agreement, or any other part of its business (pre or post-petition), I am entitled to it, and you are required as CFO to provide to me or deliver it as I request.

For this one time, I am providing you the courtesy of a detailed response. I will even ask counsel to confirm my authority to give this direction. No third party consents are required by you or the Debtor.

I trust this letter allays your concerns.

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Frank Waterhouse
**Date:** Wednesday, January 6, 2021 at 5:22 PM
**To:** Jim Seery
**Subject:** RE: HCM - Information Request

Jim-

I wanted to follow up on our conversation in which you requested that I provide you with certain financial information relating to the entities below. In the first instance, I don't have access to any information relating to Dugaboy. As you know, I have access to this information because, other than Dugaboy, the Debtor continues to provide shared services. I expressed reservation about whether, pursuant to the Shared Services Agreement and my confidentiality obligations, I was permitted to provide the CEO of the Debtor with this financial information, as only a few of the shared services employees are permitted access to the financial information of the former affiliates of the Debtor. You responded by saying that I would be terminated today if I didn't comply.

I'm not a lawyer, and I want to do the right thing in terms of my obligations to these third parties, which is why I asked you if I was permitted to provide the information under a court order or something.

In thinking about it and your statement that I would be terminated, if Debtor's counsel gives me authority to provide this information and approves that it is legal without me obtaining consent of the Trustees or the appropriate representatives of the non-trusts, then I will provide the access.

I will be available to discuss at 4:30 as per your request.

Thanks

Frank

---

**From:** James Seery
**Sent:** Wednesday, January 6, 2021 3:31 PM

**To:** Frank Waterhouse
**Subject:** FW: HCM - Information Request

Frank.

As discussed, after consulting with your personal counsel, please speak to me at 4:30pm Dallas time. I will send you and outlook.

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery <jpseeryjr@gmail.com>
**Date:** Wednesday, January 6, 2021 at 3:55 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>, Jack Donohue <JDonohue@DSIConsulting.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>, Bradley Sharp <bsharp@DSIConsulting.com>, Fred Caruso <fcaruso@DSIConsulting.com>, James Romey <jromey@DSIConsulting.com>, "Patrick J. O'Malley" <POMalley@DSIConsulting.com>, Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** Re: HCM - Information Request

My direction.

These are HCMLP business records. Please provided them as requested by Jack ASAP.

Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Date:** Wednesday, January 6, 2021 at 3:48 PM
**To:** Jack Donohue <JDonohue@DSIConsulting.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>, Bradley Sharp <bsharp@DSIConsulting.com>, Fred Caruso <fcaruso@DSIConsulting.com>, James Romey <jromey@DSIConsulting.com>, "Patrick J. O'Malley" <POMalley@DSIConsulting.com>
**Subject:** RE: HCM - Information Request

Jack-

I'm assuming you've received approval from these entities to release this information? Please send the approval over to us so we can review. If you haven't done so already, let us know and we will do our best to find out who exactly is representing these entities and can coordinate from there.

Thanks

HCMFA APP 0624
ACL-073048

Frank

**From:** Jack Donohue <JDonohue@DSIConsulting.com>
**Sent:** Wednesday, January 6, 2021 2:18 PM
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos
<DKlos@HighlandCapital.com>; Jim Seery <jpseeryjr@gmail.com>; Bradley Sharp
<bsharp@DSIConsulting.com>; Fred Caruso <fcaruso@DSIConsulting.com>; James Romey
<jromey@DSIConsulting.com>; Patrick J. O'Malley <POMalley@DSIConsulting.com>
**Subject:** HCM - Information Request

Kristin,

At the direction of Jim Seery, please provide DSI with the requested information for each entity below
immediately.

Entity:

• Hunter Mountain Investment Trust

• NexPoint Advisors, LP

• Dugaboy Investment Trust

• Highland Capital Mgmt Services, Inc.

• NexPoint Real Estate Partners (f/k/a HCRE Partners, LLC)

• Highland Capital Mgmt Fund Advisors, LP

• NexPoint Real Estate Partners (f/k/a HCRE Partners, LLC)

• Highland Capital Mgmt Services, Inc.

Information:

• 2015 – 2020 bank statements (monthly)

• 2015 – 2020 detailed income statements (monthly or broken out by month)

• 2015 – 2020 detailed balance sheets (monthly or broken out by month)

• 2015 – 2020 cash flows (monthly or broken out by month)

Let know if DSI can assist in gathering the data faster.

Thanks,

Jack

---

Jack M. Donohue, CPA

Development Specialists, Inc.

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

**http://DSIconsulting.com/**

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

HCMFA APP 0626

ACL-073050

## HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Frank Waterhouse, CFO

Re: Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| TOTALS | $7,400,000 | $7,577,344.55 | $110,308.52 | $7,687,653.07 |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019. Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021. Payee reserves all rights with respect to such amounts.



HCMFA APP 0627

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

HCMFA APP 0628

## Appendix A

| | |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

HCMFA APP 0629

# PROMISSORY NOTE

**$30,746,812.33**                                                                                          **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1    Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    Final Payment Date. The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same



shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9. <u>Prior Notes</u>. The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

HCMFA APP 0631

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|-----------|---------------------|---------------|-------------------------------------------------------|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

D-NNI -029141

**NPA $30.7M**

| | |
|---|---|
| **Closing Date** | 5/31/2017 |
| **Total Commitment** | $ 30,746,812 |
| **Rate** | 6.000% |
| **Maturity:** | 12/31/2047 |

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal | Total Paid |
|---|---|---|---|---|---|---|---|
| 5/31/2017 | | | | | | $ 30,746,812 | |
| 6/30/2017 | 151,628.12 | | 151,628.12 | 30,746,812.33 | | 30,746,812.33 | |
| 7/31/2017 | 156,682.39 | | 308,310.50 | 30,746,812.33 | | 30,746,812.33 | |
| 8/31/2017 | 156,682.39 | | 464,992.89 | 30,746,812.33 | | 30,746,812.33 | |
| 9/30/2017 | 151,628.12 | | 616,621.00 | 30,746,812.33 | | 30,746,812.33 | |
| 10/20/2017 | 101,085.41 | (717,706.41) | - | 30,746,812.33 | | 30,746,812.33 | (800,000.00) |
| 10/31/2017 | 55,448.17 | | 55,448.17 | 30,664,518.74 | (82,293.59) | 30,664,518.74 | |
| 11/30/2017 | 151,222.28 | | 206,670.46 | 30,664,518.74 | | 30,664,518.74 | |
| 12/5/2017 | 25,203.71 | (358,904.83) | (127,030.67) | 30,664,518.74 | | 30,664,518.74 | (1,301,504.99) |
| 12/12/2017 | 127,030.67 | | (0.00) | 29,721,918.58 | (942,600.16) | 29,721,918.58 | |
| 1/31/2018 | 151,459.64 | | 151,459.64 | 29,721,918.58 | | 29,721,918.58 | |
| 2/28/2018 | 136,802.26 | | 288,261.90 | 29,721,918.58 | | 29,721,918.58 | |
| 3/31/2018 | 151,459.64 | | 439,721.54 | 29,721,918.58 | | 29,721,918.58 | |
| 4/10/2018 | 48,857.95 | (439,721.54) | 48,857.95 | 29,721,918.58 | | 29,721,918.58 | (439,721.54) |
| 4/30/2018 | 97,715.90 | | 146,573.85 | 29,721,918.58 | | 29,721,918.58 | |
| 5/1/2018 | 4,885.79 | (146,573.85) | 4,885.79 | 29,721,918.58 | | 29,721,918.58 | (146,573.85) |
| 5/9/2018 | 39,086.36 | (879,927.65) | (835,955.50) | 29,721,918.58 | | 29,721,918.58 | (879,927.65) |
| 5/31/2018 | 107,487.49 | | (728,468.01) | 29,721,918.58 | | 29,721,918.58 | |
| 6/30/2018 | 146,573.85 | | (581,894.17) | 29,721,918.58 | | 29,721,918.58 | |
| 7/31/2018 | 151,459.64 | | (430,434.53) | 29,721,918.58 | | 29,721,918.58 | |
| 8/31/2018 | 151,459.64 | | (278,974.89) | 29,721,918.58 | | 29,721,918.58 | |
| 9/5/2018 | 24,428.97 | | (254,545.91) | 29,721,918.58 | | 29,721,918.58 | |
| 9/21/2018 | 77,434.27 | | (177,111.65) | 29,441,153.18 | (280,765.40) | 29,441,153.18 | (280,765.40) |
| 9/30/2018 | 42,042.19 | | (135,069.46) | 28,417,403.18 | (1,023,750.00) | 28,417,403.18 | (1,023,750.00) |
| 10/31/2018 | 144,811.97 | | 9,742.51 | 28,417,403.18 | | 28,417,403.18 | |
| 11/30/2018 | 140,140.62 | | 149,883.13 | 28,417,403.18 | | 28,417,403.18 | |
| 12/18/2018 | 84,084.37 | (294,695.10) | (60,727.60) | 28,417,403.18 | | 28,417,403.18 | (294,695.10) |
| 12/31/2018 | 60,727.60 | | (0.00) | 28,417,403.18 | | 28,417,403.18 | |

CONFIDENTIAL

EXHIBIT
10/27
14
HCMFA APP 0633
Hendrix

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1/31/2019 | 144,811.97 | | 144,811.97 | 28,417,403.18 | | 28,417,403.18 | |
| 2/28/2019 | 130,797.91 | | 275,609.88 | 28,417,403.18 | | 28,417,403.18 | |
| 3/29/2019 | 135,469.26 | (411,079.15) | (0.00) | 28,417,403.18 | | 28,417,403.18 | |
| 3/31/2019 | 9,231.28 | | 9,231.28 | 28,078,482.33 | (338,920.85) | 28,078,482.33 | (750,000.00) |
| 4/16/2019 | 73,850.25 | (83,081.53) | 61,818.40 | 28,078,482.33 | | 28,078,482.33 | |
| 4/30/2019 | 61,818.39 | | 0.00 | 26,861,563.86 | (1,216,918.47) | 26,861,563.86 | (1,300,000.00) |
| 5/31/2019 | 136,883.59 | (198,701.98) | 0.00 | 26,861,563.86 | 198,701.98 | 26,861,563.86 | |
| 6/4/2019 | 17,793.05 | | 0.00 | 27,060,265.84 | (282,206.95) | 27,060,265.84 | (300,000.00) |
| 6/19/2019 | 66,028.09 | (66,028.10) | (0.00) | 26,778,058.89 | (2,033,371.90) | 26,778,058.89 | (2,100,000.00) |
| 6/30/2019 | 44,742.73 | | 44,742.73 | 24,744,086.99 | | 24,744,086.99 | |
| 7/9/2019 | 36,607.69 | (81,350.42) | 87,501.31 | 24,744,086.99 | (548,649.58) | 24,744,086.99 | (630,000.00) |
| 7/31/2019 | 87,501.31 | | 0.00 | 24,195,437.41 | | 24,195,437.41 | |
| 8/13/2019 | 51,705.32 | (139,206.62) | 68,157.30 | 24,195,437.41 | (1,160,793.38) | 24,195,437.41 | (1,300,000.00) |
| 9/30/2019 | 68,157.30 | | 181,752.81 | 23,034,644.03 | | 23,034,644.03 | |
| 10/15/2019 | 113,595.50 | | 238,550.56 | 23,034,644.03 | | 23,034,644.03 | |
| 10/31/2019 | 56,797.75 | | 299,134.83 | 23,034,644.03 | | 23,034,644.03 | |
| 11/30/2019 | 60,584.27 | | 412,730.34 | 23,034,644.03 | | 23,034,644.03 | |
| 12/30/2019 | 113,595.50 | -530,112.36 | (3,786.52) | 23,034,644.03 | | 23,034,644.03 | (530,112.36) |
| 12/31/2019 | 3,786.52 | | 0.00 | 23,034,644.03 | | 23,034,644.03 | |
| 1/31/2020 | 117,382.02 | | 117,382.02 | 23,034,644.03 | | 23,034,644.03 | |
| 2/29/2020 | 109,808.99 | | 227,191.01 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2020 | 117,382.02 | | 344,573.03 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2020 | 113,595.50 | | 458,168.54 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2020 | 117,382.02 | (575,550.56) | (0.00) | 23,610,194.59 | 575,550.56 | 23,610,194.59 | |
| 6/30/2020 | 116,433.84 | | 116,433.84 | 23,610,194.59 | | 23,610,194.59 | |
| 7/31/2020 | 120,314.96 | | 236,748.80 | 23,610,194.59 | | 23,610,194.59 | |
| 8/31/2020 | 120,314.96 | | 357,063.76 | 23,610,194.59 | | 23,610,194.59 | |
| 9/30/2020 | 116,433.84 | | 473,497.60 | 23,610,194.59 | | 23,610,194.59 | |
| 10/31/2020 | 120,314.96 | | 593,812.56 | 23,610,194.59 | | 23,610,194.59 | |
| 11/30/2020 | 116,433.84 | | 710,246.40 | 23,610,194.59 | | 23,610,194.59 | |
| 12/31/2020 | 120,314.96 | | 830,561.36 | 23,610,194.59 | | 23,610,194.59 | |
| 1/14/2021 | 54,335.79 | (830,561.36) | 54,335.79 | 23,034,644.03 | (575,550.56) | 23,034,644.03 | (1,406,111.92) |
| 1/31/2021 | 64,370.79 | | 118,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 2/28/2021 | 106,022.47 | | 224,729.05 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2021 | 117,382.02 | | 342,111.07 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2021 | 113,595.50 | | 455,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2021 | 117,382.02 | | 573,088.60 | 23,034,644.03 | | 23,034,644.03 | |

CONFIDENTIAL

| Date | | | |
|---|---|---|---|
| 6/30/2021 | 113,595.50 | 686,684.10 | 23,034,644.03 |
| 7/31/2021 | 117,382.02 | 804,066.13 | 23,034,644.03 |
| 8/31/2021 | 117,382.02 | 921,448.15 | 23,034,644.03 |
| 9/30/2021 | 113,595.50 | 1,035,043.65 | 23,034,644.03 |
| 10/31/2021 | 117,382.02 | 1,152,425.67 | 23,034,644.03 |
| 11/30/2021 | 113,595.50 | 1,266,021.18 | 23,034,644.03 |
| 12/31/2021 | 117,382.02 | 1,383,403.20 | 23,034,644.03 |
| 1/31/2022 | 117,382.02 | 1,500,785.22 | 23,034,644.03 |
| 2/28/2022 | 106,022.47 | 1,606,807.69 | 23,034,644.03 |
| 3/31/2022 | 117,382.02 | 1,724,189.72 | 23,034,644.03 |
| 4/30/2022 | 113,595.50 | 1,837,785.22 | 23,034,644.03 |
| 5/31/2022 | 117,382.02 | 1,955,167.24 | 23,034,644.03 |
| 6/30/2022 | 113,595.50 | 2,068,762.75 | 23,034,644.03 |
| 7/31/2022 | 117,382.02 | 2,186,144.77 | 23,034,644.03 |
| 8/31/2022 | 117,382.02 | 2,303,526.79 | 23,034,644.03 |
| 9/30/2022 | 113,595.50 | 2,417,122.29 | 23,034,644.03 |
| 10/31/2022 | 117,382.02 | 2,534,504.32 | 23,034,644.03 |
| 11/30/2022 | 113,595.50 | 2,648,099.82 | 23,034,644.03 |
| 12/31/2022 | 117,382.02 | 2,765,481.84 | 23,034,644.03 |
| 1/31/2023 | 117,382.02 | 2,882,863.86 | 23,034,644.03 |
| 2/28/2023 | 106,022.47 | 2,988,886.34 | 23,034,644.03 |
| 3/31/2023 | 117,382.02 | 3,106,268.36 | 23,034,644.03 |
| 4/30/2023 | 113,595.50 | 3,219,863.86 | 23,034,644.03 |
| 5/31/2023 | 117,382.02 | 3,337,245.88 | 23,034,644.03 |
| 6/30/2023 | 113,595.50 | 3,450,841.39 | 23,034,644.03 |
| 7/31/2023 | 117,382.02 | 3,568,223.41 | 23,034,644.03 |
| 8/31/2023 | 117,382.02 | 3,685,605.43 | 23,034,644.03 |
| 9/30/2023 | 113,595.50 | 3,799,200.94 | 23,034,644.03 |
| 10/31/2023 | 117,382.02 | 3,916,582.96 | 23,034,644.03 |
| 11/30/2023 | 113,595.50 | 4,030,178.46 | 23,034,644.03 |
| 12/31/2023 | 117,382.02 | 4,147,560.48 | 23,034,644.03 |
| 1/31/2024 | 117,382.02 | 4,264,942.51 | 23,034,644.03 |
| 2/29/2024 | 109,808.99 | 4,374,751.49 | 23,034,644.03 |
| 3/31/2024 | 117,382.02 | 4,492,133.52 | 23,034,644.03 |
| 4/30/2024 | 113,595.50 | 4,605,729.02 | 23,034,644.03 |
| 5/31/2024 | 117,382.02 | 4,723,111.04 | 23,034,644.03 |
| 6/30/2024 | 113,595.50 | 4,836,706.55 | 23,034,644.03 |
| 7/31/2024 | 117,382.02 | 4,954,088.57 | 23,034,644.03 |

CONFIDENTIAL

D-NNI -029144

| Date | Col2 | Col3 | Col4 | Col5 |
|---|---|---|---|---|
| 8/31/2024 | 117,382.02 | 5,071,470.59 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2024 | 113,595.50 | 5,185,066.10 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2024 | 117,382.02 | 5,302,448.12 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2024 | 113,595.50 | 5,416,043.62 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2024 | 117,382.02 | 5,533,425.64 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2025 | 117,382.02 | 5,650,807.67 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2025 | 106,022.47 | 5,756,830.14 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2025 | 117,382.02 | 5,874,212.16 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2025 | 113,595.50 | 5,987,807.66 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2025 | 117,382.02 | 6,105,189.68 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2025 | 113,595.50 | 6,218,785.19 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2025 | 117,382.02 | 6,336,167.21 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2025 | 117,382.02 | 6,453,549.23 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2025 | 113,595.50 | 6,567,144.74 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2025 | 117,382.02 | 6,684,526.76 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2025 | 113,595.50 | 6,798,122.26 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2025 | 117,382.02 | 6,915,504.29 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2026 | 117,382.02 | 7,032,886.31 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2026 | 106,022.47 | 7,138,908.78 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2026 | 117,382.02 | 7,256,290.80 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2026 | 113,595.50 | 7,369,886.31 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2026 | 117,382.02 | 7,487,268.33 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2026 | 113,595.50 | 7,600,863.83 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2026 | 117,382.02 | 7,718,245.85 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2026 | 117,382.02 | 7,835,627.87 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2026 | 113,595.50 | 7,949,223.38 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2026 | 117,382.02 | 8,066,605.40 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2026 | 113,595.50 | 8,180,200.91 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2026 | 117,382.02 | 8,297,582.93 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2027 | 117,382.02 | 8,414,964.95 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2027 | 106,022.47 | 8,520,987.42 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2027 | 117,382.02 | 8,638,369.44 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2027 | 113,595.50 | 8,751,964.95 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2027 | 117,382.02 | 8,869,346.97 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2027 | 113,595.50 | 8,982,942.47 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2027 | 117,382.02 | 9,100,324.50 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2027 | 117,382.02 | 9,217,706.52 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2027 | 113,595.50 | 9,331,302.02 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 10/31/2027 | 117,382.02 | 9,448,684.04 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2027 | 113,595.50 | 9,562,279.55 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2027 | 117,382.02 | 9,679,661.57 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2028 | 117,382.02 | 9,797,043.59 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2028 | 109,808.99 | 9,906,852.58 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2028 | 117,382.02 | 10,024,234.60 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2028 | 113,595.50 | 10,137,830.11 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2028 | 117,382.02 | 10,255,212.13 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2028 | 113,595.50 | 10,368,807.63 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2028 | 117,382.02 | 10,486,189.65 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2028 | 117,382.02 | 10,603,571.68 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2028 | 113,595.50 | 10,717,167.18 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2028 | 117,382.02 | 10,834,549.20 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2028 | 113,595.50 | 10,948,144.71 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2028 | 117,382.02 | 11,065,526.73 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2029 | 117,382.02 | 11,182,908.75 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2029 | 106,022.47 | 11,288,931.22 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2029 | 117,382.02 | 11,406,313.24 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2029 | 113,595.50 | 11,519,908.75 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2029 | 117,382.02 | 11,637,290.77 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2029 | 113,595.50 | 11,750,886.27 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2029 | 117,382.02 | 11,868,268.30 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2029 | 117,382.02 | 11,985,650.32 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2029 | 113,595.50 | 12,099,245.82 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2029 | 117,382.02 | 12,216,627.84 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2029 | 113,595.50 | 12,330,223.35 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2029 | 117,382.02 | 12,447,605.37 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2030 | 117,382.02 | 12,564,987.39 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2030 | 106,022.47 | 12,671,009.86 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2030 | 117,382.02 | 12,788,391.89 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2030 | 113,595.50 | 12,901,987.39 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2030 | 117,382.02 | 13,019,369.41 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2030 | 113,595.50 | 13,132,964.92 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2030 | 117,382.02 | 13,250,346.94 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2030 | 117,382.02 | 13,367,728.96 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2030 | 113,595.50 | 13,481,324.46 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2030 | 117,382.02 | 13,598,706.49 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2030 | 113,595.50 | 13,712,301.99 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

HCMFA APP 0637

D-NNI -029146

| | | | |
|---|---|---|---|
| 12/31/2030 | 117,382.02 | 13,829,684.01 | 23,034,644.03 |
| 1/31/2031 | 117,382.02 | 13,947,066.03 | 23,034,644.03 |
| 2/28/2031 | 106,022.47 | 14,053,088.51 | 23,034,644.03 |
| 3/31/2031 | 117,382.02 | 14,170,470.53 | 23,034,644.03 |
| 4/30/2031 | 113,595.50 | 14,284,066.03 | 23,034,644.03 |
| 5/31/2031 | 117,382.02 | 14,401,448.05 | 23,034,644.03 |
| 6/30/2031 | 113,595.50 | 14,515,043.56 | 23,034,644.03 |
| 7/31/2031 | 117,382.02 | 14,632,425.58 | 23,034,644.03 |
| 8/31/2031 | 117,382.02 | 14,749,807.60 | 23,034,644.03 |
| 9/30/2031 | 113,595.50 | 14,863,403.11 | 23,034,644.03 |
| 10/31/2031 | 117,382.02 | 14,980,785.13 | 23,034,644.03 |
| 11/30/2031 | 113,595.50 | 15,094,380.63 | 23,034,644.03 |
| 12/31/2031 | 117,382.02 | 15,211,762.65 | 23,034,644.03 |
| 1/31/2032 | 117,382.02 | 15,329,144.68 | 23,034,644.03 |
| 2/29/2032 | 109,808.99 | 15,438,953.66 | 23,034,644.03 |
| 3/31/2032 | 117,382.02 | 15,556,335.69 | 23,034,644.03 |
| 4/30/2032 | 113,595.50 | 15,669,931.19 | 23,034,644.03 |
| 5/31/2032 | 117,382.02 | 15,787,313.21 | 23,034,644.03 |
| 6/30/2032 | 113,595.50 | 15,900,908.72 | 23,034,644.03 |
| 7/31/2032 | 117,382.02 | 16,018,290.74 | 23,034,644.03 |
| 8/31/2032 | 117,382.02 | 16,135,672.76 | 23,034,644.03 |
| 9/30/2032 | 113,595.50 | 16,249,268.27 | 23,034,644.03 |
| 10/31/2032 | 117,382.02 | 16,366,650.29 | 23,034,644.03 |
| 11/30/2032 | 113,595.50 | 16,480,245.79 | 23,034,644.03 |
| 12/31/2032 | 117,382.02 | 16,597,627.81 | 23,034,644.03 |
| 1/31/2033 | 117,382.02 | 16,715,009.84 | 23,034,644.03 |
| 2/28/2033 | 106,022.47 | 16,821,032.31 | 23,034,644.03 |
| 3/31/2033 | 117,382.02 | 16,938,414.33 | 23,034,644.03 |
| 4/30/2033 | 113,595.50 | 17,052,009.83 | 23,034,644.03 |
| 5/31/2033 | 117,382.02 | 17,169,391.85 | 23,034,644.03 |
| 6/30/2033 | 113,595.50 | 17,282,987.36 | 23,034,644.03 |
| 7/31/2033 | 117,382.02 | 17,400,369.38 | 23,034,644.03 |
| 8/31/2033 | 117,382.02 | 17,517,751.40 | 23,034,644.03 |
| 9/30/2033 | 113,595.50 | 17,631,346.91 | 23,034,644.03 |
| 10/31/2033 | 117,382.02 | 17,748,728.93 | 23,034,644.03 |
| 11/30/2033 | 113,595.50 | 17,862,324.43 | 23,034,644.03 |
| 12/31/2033 | 117,382.02 | 17,979,706.46 | 23,034,644.03 |
| 1/31/2034 | 117,382.02 | 18,097,088.48 | 23,034,644.03 |

CONFIDENTIAL

| Date | Col1 | Col2 | Col3 | Col4 |
|---|---|---|---|---|
| 2/28/2034 | 106,022.47 | 18,203,110.95 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2034 | 117,382.02 | 18,320,492.97 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2034 | 113,595.50 | 18,434,088.47 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2034 | 117,382.02 | 18,551,470.50 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2034 | 113,595.50 | 18,665,066.00 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2034 | 117,382.02 | 18,782,448.02 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2034 | 117,382.02 | 18,899,830.04 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2034 | 113,595.50 | 19,013,425.55 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2034 | 117,382.02 | 19,130,807.57 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2034 | 113,595.50 | 19,244,403.08 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2034 | 117,382.02 | 19,361,785.10 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2035 | 117,382.02 | 19,479,167.12 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2035 | 106,022.47 | 19,585,189.59 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2035 | 117,382.02 | 19,702,571.61 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2035 | 113,595.50 | 19,816,167.12 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2035 | 117,382.02 | 19,933,549.14 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2035 | 113,595.50 | 20,047,144.64 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2035 | 117,382.02 | 20,164,526.67 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2035 | 117,382.02 | 20,281,908.69 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2035 | 113,595.50 | 20,395,504.19 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2035 | 117,382.02 | 20,512,886.21 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2035 | 113,595.50 | 20,626,481.72 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2035 | 117,382.02 | 20,743,863.74 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2036 | 117,382.02 | 20,861,245.76 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2036 | 109,808.99 | 20,971,054.75 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2036 | 117,382.02 | 21,088,436.77 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2036 | 113,595.50 | 21,202,032.28 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2036 | 117,382.02 | 21,319,414.30 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2036 | 113,595.50 | 21,433,009.80 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2036 | 117,382.02 | 21,550,391.82 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2036 | 117,382.02 | 21,667,773.85 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2036 | 113,595.50 | 21,781,369.35 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2036 | 117,382.02 | 21,898,751.37 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2036 | 113,595.50 | 22,012,346.88 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2036 | 117,382.02 | 22,129,728.90 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2037 | 117,382.02 | 22,247,110.92 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2037 | 106,022.47 | 22,353,133.39 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2037 | 117,382.02 | 22,470,515.41 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

D-NNI -029147

| Date | | | | |
|---|---|---|---|---|
| 4/30/2037 | 113,595.50 | 22,584,110.92 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2037 | 117,382.02 | 22,701,492.94 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2037 | 113,595.50 | 22,815,088.44 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2037 | 117,382.02 | 22,932,470.47 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2037 | 117,382.02 | 23,049,852.49 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2037 | 113,595.50 | 23,163,447.99 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2037 | 117,382.02 | 23,280,830.01 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2037 | 113,595.50 | 23,394,425.52 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2037 | 117,382.02 | 23,511,807.54 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2038 | 117,382.02 | 23,629,189.56 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2038 | 106,022.47 | 23,735,212.03 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2038 | 117,382.02 | 23,852,594.06 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2038 | 113,595.50 | 23,966,189.56 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2038 | 117,382.02 | 24,083,571.58 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2038 | 113,595.50 | 24,197,167.09 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2038 | 117,382.02 | 24,314,549.11 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2038 | 117,382.02 | 24,431,931.13 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2038 | 113,595.50 | 24,545,526.63 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2038 | 117,382.02 | 24,662,908.66 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2038 | 113,595.50 | 24,776,504.16 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2038 | 117,382.02 | 24,893,886.18 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2039 | 117,382.02 | 25,011,268.20 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2039 | 106,022.47 | 25,117,290.68 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2039 | 117,382.02 | 25,234,672.70 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2039 | 113,595.50 | 25,348,268.20 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2039 | 117,382.02 | 25,465,650.22 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2039 | 113,595.50 | 25,579,245.73 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2039 | 117,382.02 | 25,696,627.75 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2039 | 117,382.02 | 25,814,009.77 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2039 | 113,595.50 | 25,927,605.28 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2039 | 117,382.02 | 26,044,987.30 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2039 | 113,595.50 | 26,158,582.80 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2039 | 117,382.02 | 26,275,964.82 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2040 | 117,382.02 | 26,393,346.85 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2040 | 109,808.99 | 26,503,155.83 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2040 | 117,382.02 | 26,620,537.86 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2040 | 113,595.50 | 26,734,133.36 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2040 | 117,382.02 | 26,851,515.38 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| Date | | | | |
|---|---|---|---|---|
| 6/30/2040 | 113,595.50 | 26,965,110.89 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2040 | 117,382.02 | 27,082,492.91 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2040 | 117,382.02 | 27,199,874.93 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2040 | 113,595.50 | 27,313,470.44 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2040 | 117,382.02 | 27,430,852.46 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2040 | 113,595.50 | 27,544,447.96 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2040 | 117,382.02 | 27,661,829.98 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2041 | 117,382.02 | 27,779,212.01 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2041 | 106,022.47 | 27,885,234.48 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2041 | 117,382.02 | 28,002,616.50 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2041 | 113,595.50 | 28,116,212.00 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2041 | 117,382.02 | 28,233,594.02 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2041 | 113,595.50 | 28,347,189.53 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2041 | 117,382.02 | 28,464,571.55 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2041 | 117,382.02 | 28,581,953.57 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2041 | 113,595.50 | 28,695,549.08 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2041 | 117,382.02 | 28,812,931.10 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2041 | 113,595.50 | 28,926,526.60 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2041 | 117,382.02 | 29,043,908.63 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2042 | 117,382.02 | 29,161,290.65 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2042 | 106,022.47 | 29,267,313.12 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2042 | 117,382.02 | 29,384,695.14 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2042 | 113,595.50 | 29,498,290.64 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2042 | 117,382.02 | 29,615,672.67 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2042 | 113,595.50 | 29,729,268.17 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2042 | 117,382.02 | 29,846,650.19 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2042 | 117,382.02 | 29,964,032.21 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2042 | 113,595.50 | 30,077,627.72 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2042 | 117,382.02 | 30,195,009.74 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2042 | 113,595.50 | 30,308,605.25 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2042 | 117,382.02 | 30,425,987.27 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2043 | 117,382.02 | 30,543,369.29 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2043 | 106,022.47 | 30,649,391.76 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2043 | 117,382.02 | 30,766,773.78 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2043 | 113,595.50 | 30,880,369.29 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2043 | 117,382.02 | 30,997,751.31 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2043 | 113,595.50 | 31,111,346.81 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2043 | 117,382.02 | 31,228,728.84 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

D-NNL-029150

| Date | Payment | Balance | | |
|---|---|---|---|---|
| 8/31/2043 | 117,382.02 | 31,346,110.86 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2043 | 113,595.50 | 31,459,706.36 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2043 | 117,382.02 | 31,577,088.38 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2043 | 113,595.50 | 31,690,683.89 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2043 | 117,382.02 | 31,808,065.91 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2044 | 117,382.02 | 31,925,447.93 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2044 | 109,808.99 | 32,035,256.92 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2044 | 117,382.02 | 32,152,638.94 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2044 | 113,595.50 | 32,266,234.45 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2044 | 117,382.02 | 32,383,616.47 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2044 | 113,595.50 | 32,497,211.97 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2044 | 117,382.02 | 32,614,593.99 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2044 | 117,382.02 | 32,731,976.02 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2044 | 113,595.50 | 32,845,571.52 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2044 | 117,382.02 | 32,962,953.54 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2044 | 113,595.50 | 33,076,549.05 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2044 | 117,382.02 | 33,193,931.07 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2045 | 117,382.02 | 33,311,313.09 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2045 | 106,022.47 | 33,417,335.56 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2045 | 117,382.02 | 33,534,717.58 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2045 | 113,595.50 | 33,648,313.09 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2045 | 117,382.02 | 33,765,695.11 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2045 | 113,595.50 | 33,879,290.61 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2045 | 117,382.02 | 33,996,672.64 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2045 | 117,382.02 | 34,114,054.66 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2045 | 113,595.50 | 34,227,650.16 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2045 | 117,382.02 | 34,345,032.18 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2045 | 113,595.50 | 34,458,627.69 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2045 | 117,382.02 | 34,576,009.71 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2046 | 117,382.02 | 34,693,391.73 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2046 | 106,022.47 | 34,799,414.20 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2046 | 117,382.02 | 34,916,796.23 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2046 | 113,595.50 | 35,030,391.73 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2046 | 117,382.02 | 35,147,773.75 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2046 | 113,595.50 | 35,261,369.26 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2046 | 117,382.02 | 35,378,751.28 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2046 | 117,382.02 | 35,496,133.30 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2046 | 113,595.50 | 35,609,728.80 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 10/31/2046 | 117,382.02 | 35,727,110.83 | 23,034,644.03 |
| 11/30/2046 | 113,595.50 | 35,840,706.33 | 23,034,644.03 |
| 12/31/2046 | 117,382.02 | 35,958,088.35 | 23,034,644.03 |
| 1/31/2047 | 117,382.02 | 36,075,470.37 | 23,034,644.03 |
| 2/28/2047 | 106,022.47 | 36,181,492.85 | 23,034,644.03 |
| 3/31/2047 | 117,382.02 | 36,298,874.87 | 23,034,644.03 |
| 4/30/2047 | 113,595.50 | 36,412,470.37 | 23,034,644.03 |
| 5/31/2047 | 117,382.02 | 36,529,852.39 | 23,034,644.03 |
| 6/30/2047 | 113,595.50 | 36,643,447.90 | 23,034,644.03 |
| 7/31/2047 | 117,382.02 | 36,760,829.92 | 23,034,644.03 |
| 8/31/2047 | 117,382.02 | 36,878,211.94 | 23,034,644.03 |
| 9/30/2047 | 113,595.50 | 36,991,807.45 | 23,034,644.03 |
| 10/31/2047 | 117,382.02 | 37,109,189.47 | 23,034,644.03 |

D-NNI_029151

CONFIDENTIAL

HCMFA APP 0643

**HCMLP Notes Receivable**
**As of 7/31/2020**

| | | |
|---|---|---|
| NexPoint Advisors | $ 23,846,944 | 30 yr Amort (issued 2017) |
| Dugaboy | 17,788,532 | 30 yr Amort (issued 2017) |
| Highland Capital Management Services | 6,677,529 | 30 yr Amort (issued 2017) |
| HCRE | 5,938,670 | 30 yr Amort (issued 2017) |
| Trussway | 1,004,993 | Due upon maturity - 11/1/2021 |
| SSP Holdings, LLC | 2,037,898 | Due upon maturity - 11/22/2022 |
| Siepe | 2,334,606 | Equity conversion option |
| Highland Capital Management Fund Advisors | 10,530,971 | Demand |
| James Dondero | 8,911,977 | Demand |
| Multi-Strategy Credit Fund | 1,269,000 | Demand |
| HCRE | 4,859,929 | Demand |
| Highland Select Equity Fund | 3,000,000 | Demand |
| Highland Capital Management Korea | 3,760,000 | Due upon maturity - 4/21/2037 |
| Highland Capital Management Services | 934,331 | Demand |
| **Total Notes Receivable** | **$ 92,895,380** | |

| | |
|---|---|
| **Demand** | 29,506,208 |



EXHIBIT
10/27
15
HCMFA SBR 0644

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:19 PM
**To:** Lauren Thedford <LThedford@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

No shared services outstanding.  The HCMFA note is a demand note.  The NexPoint note Kristin can give the end term.  There was an agreement between HCMLP and HCMFA the earliest they could demand is May 2021.  The attorneys think that BK doesn't change that but don't know for sure at the end of the day.  The response should include as I covered in the Board meeting that both entities have the full faith and backing from Jim Dondero and to my knowledge that hasn't changed.

**From:** Lauren Thedford <LThedford@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:14 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

I see the below from the 6/30 financials –

NPA: Due to HCMLP and affiliates as of June 30, 2020 - 23,683,000
HCMFA: Due to HCMLP as of June 30, 2020 - 12,286

I expect the follow-up question will be regarding terms and structure of the notes and whether any of the shared services invoices are outstanding.

Draft answer below.

> Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?
>
> **Response**: As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA. The Notes between HCMLP and NexPoint come due on [DATE]. The Notes between HCMLP and HCMFA come due on [DATE]. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of [DATE].

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:05 PM
**To:** Lauren Thedford <LThedford@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris

1

CONFIDENTIAL

HCMFA APP 0645
D-HCMFA290880

<DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

It's on the balance sheet that was provided to the board as part of the 15c materials.

**From:** Lauren Thedford <LThedford@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:04 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

Could you provide the amounts?

Thanks

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 5:53 PM
**To:** Lauren Thedford <LThedford@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

Yes

**From:** Lauren Thedford <LThedford@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 5:52 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

Good evening Frank, Klos, Kristin – please advise on the below in connection with the Board's follow-up request. Thanks!

Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HLCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?

**From:** Lauren Thedford
**Sent:** Friday, October 2, 2020 2:50 PM
**To:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Cc:** Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@Nexpointsecurities.com>; Will Mabry <WMabry@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>
**Subject:** FW: 15(c) Follow up (10_2_20).DOCX

Thomas – please see attached (and reproduced below) additional 15c follow-up questions from the Board.

2

HCMFA APP 0646
D-HCMFA290881

1. Please provide, to the extent practicable, the contingency plans with respect to the services provided under the Shared Services Agreements in the event that the outcome of the HCMLP bankruptcy proceedings were to impact the current servicing structure. For example, has the Advisers considered any outside service providers if necessary?

    Note prior question and response on related topic:

    With respect to the Estimated Adviser Profitability chart (Item A.2.a in the Board book), is the "Shared Services" line the only expenses attributable to HCMLP? Has any work been done or consideration been given to the solicitation of a third party bid on performing these services or bringing them in house to HCMFA?

    **Response**: Shared services, along with a portion of the investment professional compensation & benefits lines, are the only allocations attributable to HCMLP employees' support of the Advisers. HCMFA does not have the resources to bring these services in-house at this time, but given that HCMLP staffing levels for the provision of the shared services have remained fairly consistent and HCMLP remains capable of providing such shared services on economically reasonable terms, outsourced third-party bids have not been solicited at this time.

2. Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HLCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?

3. The Board notes the provision of the updated list of current co-investments provided by HCMFA/NexPoint Advisors and the Advisers' discussion, including the senior-level team in place, to address any potential conflicts of interest matters. With respect to the compliance function, please confirm that the Funds' Chief Compliance Officer overall will continue in his usual role with respect to the Funds. Are there any other potential conflicts outside of the specific co-investment matters identified?

Please let me know if you would like me to set up a call on Monday to discuss.

**From:** Louizos, Stacy <SLouizos@BlankRome.com>
**Sent:** Friday, October 2, 2020 1:54 PM
**To:** Dustin Norris <DNorris@NexPointSecurities.com>; Lauren Thedford <LThedford@HighlandCapital.com>
**Cc:** Jason Post <JPost@HighlandCapital.com>; Zornada, George <George.Zornada@klgates.com>; Charles.Miller@klgates.com; Jon-Luc.Dupuy@klgates.com
**Subject:** 15(c) Follow up (10_2_20).DOCX

Hi Dustin and Lauren—Please see attached follow up questions from the Trustees after the latest Board call. Happy to have a call to discuss if helpful.

Best,
Stacy

**Stacy H. Louizos | BLANKROME**
1271 Avenue of the Americas | New York, NY 10020
O: 212.885.5147 | F: 917.332.3028 | slouizos@blankrome.com
M: 203.918.3666

3

CONFIDENTIAL

HCMFA APP 0647
D-HCMFA290882

**********************************************************************************
*

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

**********************************************************************************
*

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

CONFIDENTIAL

HCMFA APP 0648
D-HCMFA290883

HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

      Re:  Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year.  Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due immediately.**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer



HCMEA APP 0049

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

HCMFA APP 0650

## Appendix A

| | |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

HCMFA APP 0651

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: NexPoint Note to HCMLP
**Date:** Tue, 12 Jan 2021 11:40:17 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

Thank you

**From:** Kristin Hendrix
**Sent:** Tuesday, January 12, 2021 11:40 AM
**To:** Frank Waterhouse
**Subject:** RE: NexPoint Note to HCMLP

Total outstanding principal is $23,610,194.59

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, January 12, 2021 11:39 AM
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: NexPoint Note to HCMLP

Thanks. What is the total principal outstanding on the note?

**From:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Sent:** Tuesday, January 12, 2021 11:38 AM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Subject:** RE: NexPoint Note to HCMLP

This is all accrued interest, as they have already met their minimum principal paydown requirement for the year.

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, January 12, 2021 11:31 AM
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: NexPoint Note to HCMLP

Whats the total principal?

**From:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Sent:** Tuesday, January 12, 2021 11:27 AM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Subject:** RE: NexPoint Note to HCMLP

It was due on 12/31 for a total of $1,406,112.



tabbies
EXHIBIT
18
Hendrix

HCMFA APP 0862    D-NNL-007578

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, January 12, 2021 11:15 AM
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** NexPoint Note to HCMLP

Kristin-

When was the last amort payment due? What was the amount?

Thanks

Frank

**FRANK WATERHOUSE | PARTNER & CHIEF FINANCIAL OFFICER**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.419.2538 | F: 972.628.4147

fwaterhouse@highlandcapital.com | www.highlandcapital.com

CONFIDENTIAL

1          IN THE UNITED STATES BANKRUPTCY COURT
2           FOR THE NORTHERN DISTRICT OF TEXAS
3                  DALLAS DIVISION
4                    --o0o--
5

6   HIGHLAND CAPITAL MANAGEMENT,      )
    L.P.,                             )
7                                     )
                  Plaintiff,          )
8                                     )
          vs.                         ) No. 21-03004-sgj
9                                     )
    HIGHLAND CAPITAL MANAGEMENT FUND  )
10  ADVISORS, L.P.,                   )
                                      )
11                Defendants.         )
12  _____

13                 DEPOSITION OF
14                   DAVID KLOS
15               October 27, 2021
16  _____

17

18          DEPOSITION OF DAVID KLOS, produced as a
19  witness, duly sworn by me via videoconference at the
20  instance of the DEFENDANTS, was taken in the
21  above-styled and numbered cause on October 27, 2021,
22  from 2:30 P.M. to 5:14 P.M., before BRANDON D. COMBS,
23  CSR, RPR, in and for the State of Texas, reported by
24  computerized machine shorthand, at 500 North Akard
25  Street, 38th Floor, Dallas, Texas.

David Klos - October 27, 2021

1                              APPEARANCES

2

3             MUNSCH, HARDT, KOPF & HARR, PC, 500 North

4    Akard Street, Suite 3800, Dallas, TX 75201, represented

5    by DAVOR RUKAVINA, Attorney at Law, appeared via

6    videoconference as counsel on behalf of the Defendants.

7             Email: drukavina@munsch.com

8

9

10            PACHULSKI, STANG, ZIEHL & JONES, 780 Third

11   Avenue, 34th Floor, New York, NY 10017-2024, represented

12   by JOHN A. MORRIS, Attorney at Law, appeared via

13   videoconference as counsel on behalf of the Plaintiff.

14            Email: jmorris@pszjlaw.com

15

16

17            STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,

18   Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney

19   at Law, appeared via videoconference as counsel on

20   behalf of the Defendants Jim Dondero, HCMS and HCRE

21   Partners.

22            Email: michael.aigen@stinson.com

23

24

25

David Klos - October 27, 2021

1                          INDEX

2                                                    PAGE

3    Examination by MR. RUKAVINA            4

4    Examination by MR. AIGEN               95

5    Examination by MR. MORRIS             109

6    Further Examination by MR. RUKAVINA   127

7

8

9

10             (No exhibits marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David Klos - October 27, 2021

```
1                        DAVID KLOS,
2       having been first duly sworn, testified as follows:
3                        EXAMINATION
4          Q.   (BY MR. RUKAVINA)  Sir, state your name for
5     the record, please.
6          A.   David Klos.
7          Q.   K-l-o-s?
8          A.   K-l-o-s.
9          Q.   What's your date of birth?
10         A.   May 6, 1982.
11         Q.   And where do you live?
12         A.   I live in Dallas.
13         Q.   What's your educational background?
14         A.   Undergraduate and graduate degrees.  I went
15    to undergrad at Boston College, graduate school at SMU,
16    with a degree in, Master's of Science in accounting and
17    MBA from SMU.
18         Q.   Do you hold any professional licenses?
19         A.   CPA in the state of Texas and, I don't know
20    if it's technically a license, but Series 27 from
21    FINRA.
22         Q.   And when did you get your CPA license?
23         A.   I don't recall specifically, but it would
24    have been probably in the '08, '09 time frame.
25         Q.   Is it current?
```

David Klos - October 27, 2021

1      A.    As far as I know.

2      Q.    Have you ever been disciplined or threatened

3   with disciplinary proceedings?

4      A.    No.

5      Q.    And your relevant work experience, please,

6   starting with college and afterwards?

7      A.    Sure.  Out of grad school I started working

8   at Deloitte in Boston.  I worked at Deloitte for

9   approximately three and a half years, between the

10  Boston office and the Dallas office.

11           And then I began working at Highland Capital

12  Management in March of 2009 and I've been at Highland

13  since then.

14     Q.    And when you joined Highland in March of

15  2009, what was your title or your role at that time?

16     A.    My title, if I remember correctly, was

17  valuation senior analyst.  I'm not certain if that was

18  exactly it, but it was something along those lines.

19     Q.    Was it in the valuation group?

20     A.    Yes.

21     Q.    And then give me your -- today you're the CFO

22  of Highland; correct?

23     A.    Correct.

24     Q.    So give me the progression from valuation

25  analyst to CFO with, to the best of your recollection,

1  the approximate year that you were promoted, et cetera?

2      A.   Sure.  I was in the valuation role from

3  basically March of 2009 to end of 2009.

4          I was then brought over to what we call the

5  corporate accounting team, so doing the accounting for

6  Highland Capital Management, LP and of the other

7  advisor-type entities, where I was primarily focused on

8  budgeting and forecasting, credit facility compliance.

9          That took from roughly 2010 until I think

10  middle of 2011, at which point I was moved over to the

11  fund accounting group, so doing hedge fund accounting,

12  which was a short role, really, for probably three or

13  four months.

14          At which point I was brought back to the

15  corporate team and also put in charge of the valuation

16  group.  I held that role in some way, shape, or form

17  more or less continuously for the next several years,

18  although certainly my role evolved and changed.

19          But in terms of the groups that I had

20  oversight over, those were the groups.  Like I said, my

21  role definitely evolved over time from 2011.

22      Q.   So by 2017 what was your title?

23      A.   So, yeah, by that time, I was, I believe,

24  controller.  I might have still been assistant

25  controller.

David Klos - October 27, 2021

1    There were a few title changes in between
2 there.  I think at one point I was manager, at one
3 point I was senior manager, at one point I was
4 assistant controller and at one point I was controller.
5    I can't remember the exact times of all of
6 those break points.
7    Q.  Let me pause you.  When you were assistant
8 controller, who was the controller?
9    A.   There was quite a bit of time where I was
10 assistant controller and we didn't have a controller.
11 I couldn't tell you the exact time frame, but there was
12 definitely an extended time frame.
13    And then in April of 2020, our existing chief
14 accounting officer left and I assumed his
15 responsibilities at that time.
16    Q.   Let me pause you.  That's a new term for me.
17 Chief accounting officer?
18    A.   Uh-huh.
19    Q.   Who was that person?
20    A.   The person that left?
21    Q.   The person that was the chief accounting
22 officer until April 2020.
23    A.   Cliff Stoops.
24    Q.   And do you have any idea or knowledge whether
25 at Highland that was like an officer-level position?

Case 21-03004-sgj  Doc 87  Filed 12/02/21  Entered 12/02/21 17:03:51  Page 664 of 831

8

David Klos - October 27, 2021

1    A.   It was not.  It was more of a term of art, I
2  would describe it.  So it -- so, yeah --
3    Q.   To the best of your recollection, when did
4  you become the controller at Highland Capital
5  Management, LP?
6    A.   I couldn't pin down a specific date.  Like I
7  said, the responsibilities were very similar.  I would
8  guess the change from assistant controller to
9  controller was probably in the, most likely in the '16,
10  '17, maybe '18 time frame.
11    Q.   Can we agree that as of May 1, 2019, you were
12  the controller at Highland?
13    A.   Yes.
14    Q.   So let's focus on that time frame, May 2019,
15  and you're the controller.  Who do you report to at
16  Highland?
17    A.   Frank Waterhouse.
18    Q.   The CFO?
19    A.   Correct.
20    Q.   No one in between you and him?
21    A.   Correct.
22    Q.   So what -- explain to me the role between the
23  chief accounting officer and the chief financial
24  officer in that time frame, '19, '20?
25         MR. MORRIS:  Objection to the form of the

Dickman Davenport, Inc
214.855.5100   www.dickmandavenport.com   800.445.9548
HCMFA APP 0661

1   question.

2           THE WITNESS:  Very little.  Like I said,

3   chief accounting officer was more of a term of art.

4   What that role actually had oversight of was our retail

5   fund accounting, institutional fund accounting,

6   operations, so loan settlement and treasury.

7           And probably another department or two that

8   I'm forgetting, but it did not have any oversight over

9   the corporate accounting group.

10      Q.   (BY MR. RUKAVINA)  And in May of 2019, as the

11  controller, what were -- what was your role or what

12  were your duties?

13      A.   In May of 2019 I was at that point still

14  overseeing the valuation group.  I was overseeing the

15  corporate accounting group, which my primary direct

16  report there was Kristin Hendrix, who really was the

17  day-to-day person.  But I certainly oversaw her.

18      Q.   By that you mean the person that answers to

19  you?

20      A.   Correct.  Sorry.  If I flipped that, I

21  apologize.  So I was overseeing that group, which had,

22  you know, fairly broad responsibilities.

23          In terms of, you know, accounting for the

24  Advisor, doing forecasts when they were called for,

25  performing the audit every year, managing cash,

David Klos - October 27, 2021

1   processing payroll, things of that nature.

2          And then at that time I was also put in

3   charge of one of the public REITs that was launching at

4   the time under the NexPoint flag.  And getting that

5   team started.

6       Q.   Did you mention that in May of 2019 you were

7   still involved with the valuation group?

8       A.   I did.

9       Q.   Did you have a title at the valuation group?

10      A.   Nothing distinct from my overall controller

11  title.  These titles were often, like I said, terms of

12  art, whether it was controller or chief accounting

13  officer.

14      Q.   What did the valuation group at Highland do?

15      A.   Well, valuation group was really a liaison

16  with both third-party pricing providers, pricing

17  services, brokers on the street, front office, members

18  at Highland.

19          To, you know, to work on valuing the

20  securities held across the platform, both for Highland

21  HCMLP managed funds as well as affiliated managed

22  funds.

23      Q.   So who did -- did you report to anyone at the

24  valuation group?  In other words, did it have its own

25  separate hierarchy kind of?

```
1       A.    Frank Waterhouse.
2       Q.    And were --
3       A.    I should clarify too, that the valuation team
4  isn't ultimately responsible for the valuations
5  themselves, but they do act in this liaison role.
6       Q.    Perhaps that's my confusion.  Is there a
7  separate group that handles just valuation?
8       A.    No.
9       Q.    Is there an outside consultancy that handled
10 that in May of 2019?
11      A.    I don't know if I would call it consultancy,
12 but there was a third-party valuation service provider
13 that would do certain of the, call it illiquid, harder
14 to value securities.
15      Q.    So would you say that you were pretty busy in
16 April, May 2019?
17           MR. MORRIS:  Objection to the form of the
18 question.
19           THE WITNESS:  I've been busy throughout my
20 career.
21      Q.    (BY MR. RUKAVINA)  In April, May, June 2019,
22 how many hours a month do you estimate you worked for
23 Highland?
24           MR. MORRIS:  Objection to the form of the
25 question.
```

David Klos - October 27, 2021

```
1              THE WITNESS:  I don't remember.  A
2    significant number.
3         Q.   (BY MR. RUKAVINA)  Certainly full-time?
4         A.   Absolutely.
5         Q.   Would you say that you were working more than
6    200 hours a month in that time frame for Highland?
7         A.    I don't know how many hours.  I should
8    clarify, we're using Highland very liberally.  When I
9    say Highland, supporting the entire apparatus,
10   platform.  Significant number of hours at that time,
11   and before and after.
12        Q.   And let's explore that a little bit.  You
13   mentioned one of the funds for NexPoint.  I'd like to
14   talk about NexPoint Advisors, LP, just NexPoint
15   Advisors, LP.
16             Did you ever have an official role or title
17   with NexPoint Advisors, LP?
18        A.   Not that I can remember.
19        Q.   Do you know if you were ever the controller
20   for that entity?
21        A.   I'm not certain.  I'm not certain.
22        Q.   But I take it that pursuant to the shared
23   services agreement you, as an employee of Highland,
24   were providing services on behalf of NexPoint?
25             MR. MORRIS:  Objection to the form of the
```

David Klos - October 27, 2021

1  question.

2          THE WITNESS:  I provided many of the same

3  services for NexPoint Advisors that I provided for

4  Highland, similar types of services.

5      Q.   (BY MR. RUKAVINA)  And briefly about Highland

6  Capital Management Fund Advisors, LP, HCMFA, did you

7  ever have like an official title or role with that

8  entity, to your knowledge?

9      A.   Again, not that I can remember.

10     Q.   Not to your knowledge, the controller ever of

11 that entity?

12     A.   I'm not certain whether I was or not.

13     Q.   But you provided services to that entity as

14 part of your role at Highland pursuant to shared

15 services?

16     A.   Similar to NexPoint as I described.

17     Q.   When you were controller of Highland, was

18 that an officer-level position at Highland?

19     A.   No.

20     Q.   When did you become the chief financial

21 officer of Highland?

22     A.   Chief financial officer?

23     Q.   Uh-huh.

24     A.   2021, March.

25     Q.   After Mr. Waterhouse was gone?

David Klos - October 27, 2021

1      A.   Yes.

2      Q.   And I'm going to ask you a little bit about

3  your compensation today at Highland.

4           You don't have to give me specific numbers

5  unless I ask you, please, but I take it you have a base

6  compensation?

7      A.   Yes, I have a base.

8      Q.   Do you have any bonus structure compensation?

9      A.   Yes, I have a bonus.

10     Q.   And what is that bonus number or whether it's

11 paid out based upon or contingent upon?

12          MR. MORRIS:  Objection to the form of the

13 question.

14          THE WITNESS:  As I understand, it's based on

15 my offer letter.

16     Q.   (BY MR. RUKAVINA)  On your what?

17     A.   My letter for extending an offer.

18     Q.   Tell me, what is your -- without having to

19 use express numbers, what is your bonus compensation?

20 When is it paid, et cetera?

21     A.   Yeah, so it's not too dissimilar from the

22 prior Highland plan that has semiannual installments

23 payable.  And then there's a, kind of an end of plan

24 bonus when -- I don't remember the specifics on exactly

25 what triggers that, but it's back-ended in the plan.

David Klos - October 27, 2021

1    Q.   Do you have an expectation as to when the
2 winding down and monetization of Highland and its
3 assets will be complete?
4    A.   That's very hard to speculate, especially
5 given the amount of litigation that's going on because
6 I don't know when that's going to play out and that's a
7 material asset.
8    Q.   Have you discussed with Mr. Seery how long
9 that might be?
10    A.   Not that I can specifically remember.
11    Q.   Do you believe it will be at least probably
12 two years, from today?
13    A.   I don't know.
14    Q.   This bonus compensation, does it or any
15 amount of it depend on how well Highland or the
16 claimant trust, how well they do vis-a-vis collecting
17 money from creditors?
18    A.   Not that I can think of.  I'd have to
19 probably go back and look and understand the back-end
20 piece to say definitively.
21    Q.   And back-end piece, does that mean whenever
22 the winding down is completed?
23    A.   Yeah, like I said, I'm not exactly -- I'm not
24 completely facile with the exact timing, if it's
25 completed 100 percent or 80 percent, what kind of

David Klos - October 27, 2021

1  qualitative considerations go into that.  But
2  substantially completed.
3      Q.   Sitting here today, do you think or believe
4  that any portion of your compensation over the next
5  however long it takes to wind down Highland depends on
6  how much Highland recovers from the litigation
7  regarding promissory notes?
8      A.   I really take exception to that question
9  because the insinuation is that it's going to somehow
10 change my answers here, and it's absolutely not.
11          How litigation, it may or may not affect my
12 ultimate compensation, but that's not going to affect
13 one iota of the answers I give you today or at any
14 time, whether I'm on or off the record.
15     Q.   Fair enough.  So you're going to testify
16 today truthfully regardless of your compensation.  I
17 got you; right?  Correct?
18     A.   I didn't follow what you just asked me.
19     Q.   You're going to testify today truthfully
20 regardless of how these events may or may not affect
21 your compensation; right?
22     A.   It's such a loaded question I can't even
23 begin to answer that.
24     Q.   So sitting here today -- I want to ask you
25 the same question I did before, and your answer to me

David Klos - October 27, 2021

1  was that you took exception to the insinuation.  Now
2  I'd like you to answer my question.
3           Which is, sitting here today, do you believe
4  that any part of your compensation in the future,
5  however long it takes to wind down Highland, is going
6  to depend on how well Highland does in these
7  litigations concerning the notes?
8      A.   I believe my ultimate compensation will
9  depend on how long this process takes, which I don't
10 know, and ultimate recoveries to trust beneficiaries
11 under the plan.
12          And so I do expect that it will vary, but I
13 would reiterate my earlier comment.
14     Q.   So sitting here today, you understand that if
15 the trust beneficiaries recover more, then you might be
16 compensated more?
17     A.   That's possible.
18     Q.   Well, sir, I'm not trying to be a smart ass,
19 but --
20          MR. MORRIS:  Actually, you're coming awfully
21 close, just to be clear, so be careful, because I'm
22 offended as well.  But continue.
23          MR. RUKAVINA:  I'm entitled to ask the man
24 about his compensation.
25          MR. MORRIS:  Right.  And your clients have

David Klos - October 27, 2021

1  $75 million, hard dollars at stake in this litigation,

2  so we should never believe anything that he says?  Is

3  that where we are now?

4      Q.   (BY MR. RUKAVINA)  Sir, again, what is your

5  bonus compensation as it relates to how well the

6  claimant trust does?  Do you remember or not?

7      A.   I don't know that that's even something that

8  I could know at this point.

9      Q.   In preparing for this deposition, I take it

10  you spoke to legal counsel, and I'm not entitled to

11  know that and I'm not asking that.

12           But did you talk to anyone else?

13      A.   I've spoken in general terms to Mr. Seery.

14      Q.   Okay.  Anyone else?

15      A.   I've spoken, again in general terms, to

16  Kristin Hendrix.

17      Q.   Anyone else?

18      A.   Not that I can think of.

19      Q.   Now, I understand you spoke to Ms. Hendrix

20  when legal counsel was present; right?

21      A.   Yes.

22      Q.   So let's exclude that conversation.

23           Did you have any conversations with

24  Ms. Hendrix regarding this deposition or this

25  litigation at which counsel was not present?

David Klos - October 27, 2021

1    A.    Not in any substance.
2    Q.    And when do you recall you might have had
3    those discussions with her?
4    A.    I'm not even sure.
5    Q.    Would it have been recently or like 9,
6    10 months ago?
7    A.    No, it would have been recently.
8    Q.    And with Mr. Seery, when did you have a
9    general conversation with Mr. Seery?
10   A.    I've had, you know, one or more general
11   conversations with Mr. Seery.  It's my understanding
12   that he was the 30(b)(6) witness, and he had questions
13   in preparation for his role in that.
14   Q.    So that would have been before last Thursday
15   that you talked to him?  I'll represent to you that
16   that's when his deposition was.
17   A.    Yeah, if I'm accepting that representation,
18   yes, prior to.
19   Q.    Other than that conversation with respect to
20   him preparing for the 30(b)(6), did you have a
21   discussion with him about this litigation as it might
22   relate to your deposition?
23   A.    I don't believe so in terms of relating to
24   this deposition.  We've talked at length about the
25   notes more generally.

David Klos - October 27, 2021

1    Q.   And we'll go through that I'm sure.

2         So other than the conversations with

3    Ms. Hendrix and Mr. Seery and, of course, with counsel

4    that I'm not entitled to know about, did you discuss

5    this deposition or what you might be asked today with

6    anyone else?

7    A.   No.

8    Q.   Okay.  Did you read all or any portions of

9    the deposition of Frank Waterhouse?

10   A.   Certainly didn't read all of it.  I have a

11   general understanding of the topics that were -- that's

12   a bad way to frame it.

13        I have a general understanding of a few

14   points that were covered in his deposition.

15   Q.   Were you provided -- were you provided the

16   exact pages of any of his deposition?

17        MR. MORRIS:  Objection.  Direct him not to

18   answer.

19        MR. RUKAVINA:  You're going to direct him not

20   to answer whether he read --

21        MR. MORRIS:  If you're asking him whether I

22   directed him to particular --

23        MR. RUKAVINA:  I didn't ask that.

24        MR. MORRIS:  Rephrase your question.

25   Q.   (BY MR. RUKAVINA)  Did you read any pages

David Klos - October 27, 2021

```
 1   from Mr. Waterhouse's deposition?
 2           MR. MORRIS:  Objection.  Asked and answered.
 3           You can answer again.
 4           THE WITNESS:  I don't recall -- I don't
 5   recall reading it.
 6       Q.   (BY MR. RUKAVINA)  So were you provided a
 7   summary of his deposition?
 8       A.   I have had discussions with Mr. Morris in
 9   preparation for this deposition.
10       Q.   That's fine.  And we can stop there.
11           Did you read or -- did you read the whole or
12   any portion of Mr. Seery's deposition?
13       A.   No, I don't believe I -- no, I don't believe
14   so.
15       Q.   Is it the same answer, that whatever you
16   discussed would have been through counsel?
17       A.   Yes.
18       Q.   Did you see any of the videotape of either
19   Mr. Waterhouse's or Mr. Seery's deposition?
20       A.   No.
21       Q.   So let's talk about the NexPoint
22   $30.7 million note.
23           You're familiar with that note; right?
24           MR. MORRIS:  Objection to the form of the
25   question.
```

David Klos - October 27, 2021

1          THE WITNESS:  Before I answer that, I'd like
2    to see the note.
3          Q.   (BY MR. RUKAVINA)  It's in here.  I'm looking
4    for the exhibit number.  It's in here somewhere.
5          A.   Yes, I'm familiar with this note.
6          Q.   Are you familiar with anything having to do
7    with the negotiation or execution of this note?
8          MR. MORRIS:  Objection to the form of the
9    question.
10         THE WITNESS:  Can you repeat.
11         Q.   (BY MR. RUKAVINA)  Yes.  Let me rephrase it.
12         Did you have anything to do, back on or about
13    May 31, 2017, with the negotiation or execution of this
14    promissory note?
15         MR. MORRIS:  Objection to the form of the
16    question.
17         THE WITNESS:  Nothing with respect to the
18    negotiation --
19         Q.   (BY MR. RUKAVINA)  I'm sorry.
20         A.   In terms of the execution, I believe I
21    coordinated with internal counsel, who drafted the
22    note, and I can't remember -- I can't recall one way or
23    the other if I assisted in actually physically
24    receiving signatures.  I just don't remember.
25         Q.   Do you remember who that internal counsel

David Klos - October 27, 2021

1  was?

2      A.    Yeah, it was Lauren Thedford, who is Highland
3  in-house counsel.

4      Q.    She's a lawyer?

5      A.    Yes.

6      Q.    Do you recall from that -- strike that.

7            Did you know on or about May 31, 2017 what
8  the purpose or reason behind Exhibit 13, this
9  promissory note, was?

10           MR. MORRIS:  Objection to the form of the
11  question.

12           THE WITNESS:  The purpose was to take
13  existing notes, which I believe were exclusively demand
14  notes, I'm not a hundred percent certain on that, and
15  roll them into a single note that would have a 30-year
16  amortization period.

17      Q.    (BY MR. RUKAVINA)  Do you know why that was
18  done?

19      A.    I believe it was done probably for a number
20  of reasons, one of which was to ensure some level of
21  cash flow back to Highland, when I say Highland,
22  Highland Capital Management, LP, on an annual basis.

23      Q.    Was that a concern at Highland Capital
24  Management, that it wasn't getting any level of cash
25  flow back?

David Klos - October 27, 2021

1      A.    It wasn't a concern of mine.  I don't know if
2  it was a concern of others.
3      Q.    Do you recall whether any auditor ever raised
4  that concern?
5      A.    The auditors did raise that in conjunction
6  with the audit that was concluding around this time.
7  So yes, they did raise it, you know, probably in the
8  May of 2017 time frame.
9      Q.    Do you know who decided that it would be a
10  30-year term note?  By that I mean 30 years.
11      A.    Jim Dondero.
12      Q.    Do you know if he decided that in connection
13  with discussions with anybody or, to your knowledge, he
14  just decided?
15      A.    As far as I know he just decided it.  I
16  believe there was a draft at one point that was for
17  20 years, and he wanted to do 30.
18      Q.    So this note is executed in May 31, 2017.
19  Did you have any further role prior to, let's say,
20  December 1, 2020 with respect to anything to do with
21  this promissory note?
22      A.    Sorry, tell me the date again.
23      Q.    From execution of the note until December 1,
24  2020?
25      A.    And the question was?

David Klos - October 27, 2021

1   Q.   Did you have any role in that time frame with
2   respect to this promissory note on behalf of Highland?
3          MR. MORRIS:  Objection to the form of the
4   question.
5          THE WITNESS:  I don't know how to answer
6   that, it's such an open-ended question.  I just don't
7   know how to respond to that.
8   Q.   (BY MR. RUKAVINA)  If payments were made on
9   this note, would you have any duty to record or credit
10  those payments?
11         MR. MORRIS:  Objection to the form of the
12  question.
13         THE WITNESS:  I wouldn't have personally in
14  my role, but my team would have been involved in the
15  recording of those.
16  Q.   (BY MR. RUKAVINA)  And when payments were due
17  on this note, did you personally have any role with
18  respect to doing anything to facilitate those payments?
19  A.   When payments were due did I have anything --
20  yes.
21  Q.   What was your role?
22  A.   So my role, as part of the corporate team,
23  part of our role is managing cash at the various
24  entities.  So I was involved in weekly cash meetings,
25  where things like upcoming, whether it's an obligation

David Klos - October 27, 2021

1  or a receipt, would be put on people's radars.

2          And we would, in connection with the 30-year

3  notes such as this one from NexPoint, we would either

4  confer with Jim or -- certainly Jim.  Also likely his

5  accountant.

6          In terms of teeing them up to make sure that

7  they were prepared from a cash flow statement to make

8  the payment.

9      Q.   What do you mean by his accountant?

10     A.   Melissa Schroth.

11     Q.   What do you mean by his?  That's a new name

12  to me.  Who is Melissa Schroth?

13     A.    I find it hard to believe that she's a new

14  name to you.  But I think her title was executive

15  accountant, and she was the keeper of Jim's -- many of

16  Jim's trusts and personal entities.

17     Q.   Was she a Highland employee?

18     A.   She was.  And when I say Highland, I should

19  be clear, Highland Capital Management, LP.

20     Q.   So when you say Jim's accountant, she was

21  still a debtor employee, just that she handled

22  primarily Jim's personal matters?

23     A.   She was still a Highland Capital Management,

24  LP employee but she did Jim's personal matters.

25     Q.    Did you have any role at either Highland

David Klos - October 27, 2021

1   Capital Management or NexPoint Advisors as to a
2   decision as to whether any prepayments on this note
3   would ever be made?
4           MR. MORRIS:  Objection to the form of the
5   question.
6           THE WITNESS:  Can you repeat.
7       Q.   (BY MR. RUKAVINA)  Let's start from scratch.
8           Do you have any memory of any payments being
9   made on this note, Exhibit 13, prior to their scheduled
10  dates of payment?
11      A.   There were payments on -- and to be clear,
12  we're talking about the original 30.7- NexPoint
13  promissory note?  There were payments that I recall
14  happening throughout 2019 on this note.
15      Q.   And we can look at Exhibit 14.
16          MR. MORRIS:  What number?
17          MR. RUKAVINA:  14, 1-4.
18      Q.   (BY MR. RUKAVINA)  And those are only
19  numbered because Ms. Hendrix, they were used for her
20  deposition.
21      A.   Sure.  Just trying to keep these in order, I
22  apologize.  Got it.
23      Q.   Do you recognize Exhibit 14?
24      A.   Generally.  I can't say that I can verify
25  that this is completely accurate.  But it looks

David Klos - October 27, 2021

1 familiar to a loan amortization schedule.

2     Q.   Would it have been maintained by Highland?

3     A.   Yes.

4     Q.   And I'll tell you that no one has yet to

5 authenticate this with a hundred percent precision, so

6 I'm not asking you to ratify these numbers, but let's

7 assume that they are what they are.

8         This does purport to show on the second page

9 a number of transfers in 2019, which goes along with

10 your recent answer.

11         Do you see those, sir?

12     A.   I do.

13     Q.   In particular, 750,000, then 1.3 million,

14 300,000, 2.1 million, 630,000, 1.3 million.

15         You see all those, sir?

16     A.   Yes, I see every one.

17     Q.   Do you have any memory, without going into

18 those transfers of those dates to the dollar, do you

19 have any memory that those transfers were made?

20     A.   Yes.  Again, not a specific recollection of

21 where I was at the time, but yes, I know that these

22 transfers were made.

23     Q.   Do you know why they were made in those

24 amounts and on those dates?

25     A.   No, not without speculating.

1    Q.   What would be your speculation if you were to
2  speculate?
3    A.   My speculation would be that it would be for
4  liquidity needs at HCMLP, Highland Capital Management,
5  LP, needing liquidity to operate.  Again, that's
6  speculation.  I don't know for a fact that that's true,
7  but that's what I would assume.
8    Q.   Who would have made those decisions in 2019
9  to transfer those funds?
10        MR. MORRIS:  Objection to the form of the
11  question.
12        THE WITNESS:  Yeah, it would have been either
13  Frank or Jim.  I can't say with certainty, but one of
14  the two.  When I say Jim, I should be clear,
15  Mr. Dondero.
16    Q.   (BY MR. RUKAVINA)  Between January and
17  July 2019, do you have any recollection that there was
18  any particular liquidity issue or need at Highland
19  Capital Management?
20    A.   Yeah, Highland was dealing with liquidity
21  problems throughout 2019.  Maybe not every single day
22  of the year, but we were continuously needing to bridge
23  liquidity.
24    Q.   And you joined Highland in 2009.  From that
25  point in time, 2009, through 2019, was there any

1  practice at the enterprise of those businesses to
2  transfer funds between each other on a basis of when
3  one needed it and one had it?
4      A.   Yes, that was a fairly, generally speaking,
5  that was a fairly common practice, of using different
6  entities within the overall structure to bridge
7  liquidity.
8      Q.   Would that have been Mr. Dondero who, in the
9  final analysis, would have made those decisions?
10     A.   Maybe not a hundred percent, but I'd say
11 the -- if not a hundred percent, certainly most.
12     Q.   And who else might have participated,
13 Mr. Waterhouse?
14     A.   Potentially Mr. Waterhouse.  And the reason I
15 hedge on that a little bit is I don't think Frank would
16 have made any of these decisions on his own either.
17 But I may have heard them from Frank via Jim.
18     Q.   So in those same years, were you ever asked
19 by Mr. Dondero or Mr. Waterhouse as to whether funds
20 should be transferred from one entity to another for
21 liquidity purposes?
22     A.   Can you ask that again, please.
23     Q.   Yes.  Trying to understand, were you part of
24 those discussions as to whether these transfers should
25 be made, or did you just learn that a decision to make

David Klos - October 27, 2021

1  them had been made and you executed them?

2      A.   Both, depending on the circumstances.

3      Q.   So sometimes you would be brought into a

4  discussion?

5      A.   Yes.

6      Q.   And can you think of any particular example?

7      A.   Of when I was brought into the discussion of

8  whether to transfer?  I can't think of an individual

9  example but we met quite regularly with Jim on cash.

10         So to the extent that either he needed cash

11  on one of his entities, he might let us know that.  Or

12  to the extent that Highland needed cash, we might let

13  him know that and ask for basically his assistance in

14  helping us to meet our own cash needs.

15     Q.   And did he usually find a way to facilitate

16  the cash need either at one of his entities or at

17  Highland?

18     A.   I suppose until October 16 of 2019.

19     Q.   Yes.  Prior to bankruptcy, do you recall any

20  instance where one entity wasn't able to transfer funds

21  to another for liquidity purposes?

22     A.   I can't think of a specific situation.  But

23  I'm sure there were situations where -- you know, cash

24  was always something that was being juggled, so I don't

25  know that necessarily liquidity could be met the same

David Klos - October 27, 2021

1   day.

2          But eventually we were able to manage through

3   those situations, you know, oftentimes through some of

4   these loans.

5      Q.   In instances that you may remember when

6   Highland Capital Management needed liquidity, do you

7   know how Mr. Dondero decided from which other entity to

8   transfer the cash?

9      A.   I can't step into his brain and think about

10  his decision-making process, but if I was going to

11  oversimplify it I would speculate that it would be

12  based on who has cash in that moment.

13     Q.   Would he ask you or someone on your team who

14  had cash?

15     A.   At times, depending on which entity we're

16  talking about.  Because my team certainly didn't have

17  responsibility for every single entity in the

18  enterprise, but we did have responsibility for some.

19     Q.   And if your team -- so -- strike that.

20          So over the general -- talking about

21  generally now, over those 10 years when there were

22  these intercompany transfers for liquidity purposes,

23  how were they booked by the debtor, by Highland Capital

24  Management?

25          MR. MORRIS:  Objection to the form of the

1 question.

2           THE WITNESS:  Help me on the direction.  So
3 this is money that Highland is receiving or money that
4 Highland is sending?

5      Q.   (BY MR. RUKAVINA)  Sending out.

6      A.   Sending out.  So this is -- in the scenario
7 that you're describing, this money that Highland is
8 sending out to meet some other corporate obligor's
9 liquidity needs?

10      Q.   Yes, sir.

11      A.   So those would be booked as a loan.  I
12 would -- I need to hedge a little bit because I'm not
13 a hundred percent certain, but I would say if not
14 exclusively via loans close to exclusively.

15      Q.   And would they -- strike that.

16           Would they usually be papered up with a
17 promissory note?

18      A.   Yes.

19      Q.   Now, why was that the general course during
20 10 years?  Was there a policy and procedure in place,
21 or would Dondero say book it as a loan, or was that
22 just the right thing to do from an accounting
23 perspective?

24           MR. MORRIS:  Objection to the form of the
25 question.

1          THE WITNESS:  At the end of the day it's at
2    the direction of Jim Dondero, so I can't tell you
3    exactly why he wanted it to be done that way.  But that
4    was certainly the practice of how it was done in those
5    situations.
6          Q.   (BY MR. RUKAVINA)  To your knowledge, did Jim
7    Dondero ever tell you or anyone else that when Highland
8    is transferring funds to one of his affiliated entities
9    that it should always be booked as a loan?
10         A.   So remembering 10 years' worth of
11   conversations, I can't remember a specific instance
12   where he would have said, always book every single
13   transaction I direct you to do as a loan.  However,
14   that was the practice.
15         Q.   Different question.
16         Do you remember that in each instance, and
17   again, that might be unfair over 10 years, but do you
18   remember in each instance when Mr. Dondero said
19   transfer money from Highland to this other entity for
20   liquidity needs that he said book it as a loan?
21         MR. MORRIS:  Objection to the form of the
22   question.
23         THE WITNESS:  I can't recall with any
24   specificity what he may or may not have specifically
25   said so long ago.

David Klos - October 27, 2021

1    Q.   (BY MR. RUKAVINA)  To your knowledge, was
2  there any written policy or procedure in place at
3  Highland Capital Management with respect to how
4  transfers from Highland to an affiliated entity should
5  be booked or treated?
6    A.   No written policy or procedure that I'm aware
7  of.
8    Q.   Is it fair to say that by May 2019, the
9  corporate accounting group had handled so many of these
10 transfers that it believed that if Highland was
11 transferring funds to another affiliated entity, it's
12 probably a loan?
13          MR. MORRIS:  Objection to the form of the
14 question.
15          THE WITNESS:  Yeah, I don't know that I can
16 answer that in terms of the corporate accounting team.
17 That just feels way too broad.
18          It was certainly the practice that when
19 somebody needed liquidity and it was appropriate from an
20 accounting perspective, that's how it would be booked.
21          And there was no reason to doubt that that was
22 the appropriate way to do it, particularly with
23 direction from either Frank or Jim.
24    Q.   (BY MR. RUKAVINA)  Is it your testimony that
25 in each instance that happened, that either Frank or

1  Jim said, this is a loan, the "this" being the transfer
2  from Highland to an affiliated entity for liquidity
3  purposes?
4          MR. MORRIS:  Objection to the form of the
5  question.
6          THE WITNESS:  I can't recall with that level
7  of specificity if those words came out of Jim's mouth.
8  But with 0 percent doubt in my mind, every single one
9  of those loans was done with the authority of Jim or
10 Frank, or both.
11     Q.  (BY MR. RUKAVINA)  So going back to this
12 Exhibit 14, now I'm going to ask you about these
13 payments coming in.
14          Assuming that these payments were actually
15 made in 2019 --
16          And I think, John, you sent me this morning,
17 or maybe last night, some bank statements?
18          MR. MORRIS:  I actually sent all of the
19 backup for all payments made, I think, under the notes
20 at issue a week or two ago.
21     Q.  (BY MR. RUKAVINA)  How would -- so assuming
22 that these payments in 2019 that NexPoint made didn't
23 technically have to be made at that point in time, how
24 would Highland have booked these payments?
25     A.  So I can't tell the column headers, so you'll

David Klos - October 27, 2021

1 have to excuse me if I flip them.

2     Q.   They'll be on the first page.  Rip the page

3 off if you need to.

4     A.   First one is interest, second one is

5 principal.  On the far right is the actual amount of

6 the payment.  So, for example, March 29, 750,000.

7        And the -- the column that has the negative

8 411,000 is the application of interest and the 338- is

9 the application of principal.

10     Q.   So again, if Highland -- strike that.

11        If NexPoint made a payment that was not

12 technically due at that point in time, it would be

13 recorded as payments on principal and interest?

14     A.   It would be recorded as it's reflected in the

15 schedule.  So there's an application of interest and an

16 application of principal.

17     Q.   So based on your understanding and

18 experience, if that payment wasn't due at that time,

19 would it have been a prepayment by NexPoint?

20        MR. MORRIS:  Objection to the form of the

21 question.

22        THE WITNESS:  Yeah, I'm not sure that it's a

23 prepayment or not.  It's certainly a payment.  It's

24 certainly voluntary.  It's not spelled out under the

25 schedule.  I don't know that it's a per se, capital P,

David Klos - October 27, 2021

1  prepayment.  I'm just not certain.
2      Q.  (BY MR. RUKAVINA)  Well, maybe without
3  respect to these specific transfers.
4          Generally, generally, if one of the Dondero
5  affiliates made a payment that wasn't scheduled, how
6  would the debtor have accounted for that payment?
7      A.  It would have recorded the payment as a
8  reduction to either or both outstanding accrued
9  interest or principal.
10     Q.  You wouldn't call those prepayments?
11     A.  I don't know the definition of prepayment.
12 It's a payment.  It's off schedule, but I don't know
13 whether it's a per se prepayment.
14     Q.  Would that be something in your experience
15 that we would look at the promissory note to maybe
16 determine?
17         MR. MORRIS:  Objection to the form of the
18 question.
19         THE WITNESS:  I don't know.
20     Q.  (BY MR. RUKAVINA)  Well, remember, I'm asking
21 you the same question just in different ways.
22         Who decides at the debtor, or how does the
23 debtor decide, if an unscheduled payment is made, how
24 to apply it?
25         MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1  question.

2      Q.  (BY MR. RUKAVINA)  And his objection is

3  valid.  And just to give you a little bit of a fine

4  point, does someone look at the promissory note to

5  decide that?  Or is there some other rule or procedure

6  that someone looks at?

7          MR. MORRIS:  Objection to the form of the

8  question.

9          THE WITNESS:  So the person -- I don't know

10 that I can specifically name a person because the role

11 probably changed over time.

12         But either our corporate accountant, or the

13 corporate accountant's boss, which was Kristin Hendrix

14 for years, would have been responsible for recording and

15 tracking those payments.

16         So some combination of the corporate

17 accountant and Kristin would have applied those

18 payments, and that rolls up through my and Frank's

19 review ultimately.

20     Q.  (BY MR. RUKAVINA)  So if I can round off this

21 discussion, I think you told me a few minutes ago that

22 in each instance that Highland was transferring money

23 out to an affiliate.

24         Whether or not you remember Dondero or

25 Waterhouse saying it's a loan, it would have been a

David Klos - October 27, 2021

```
 1  loan because that's how it always was and it was always
 2  authorized.  Generally correct?
 3          MR. MORRIS:  Objection to the form of the
 4  question.
 5          THE WITNESS:  There were a few "always" and
 6  "generallys" in there.  And like I said, when it came
 7  to liquidity needs, my recollection is that these would
 8  be handled via loans.
 9      Q.  (BY MR. RUKAVINA)  And in reverse, if a
10  Dondero entity made a payment prior to a scheduled
11  payment on a note, generally there would be credit
12  against principal and/or interest provided on that
13  note?
14          MR. MORRIS:  Objection to the form of the
15  question.
16          THE WITNESS:  Generally speaking, yes, if the
17  payment was for payment on the note.
18      Q.  (BY MR. RUKAVINA)  Well, that goes back to my
19  question.
20          Do you know how these payments on Exhibit 14
21  in 2019 were determined to be payments on these notes,
22  as opposed to a transfer from NexPoint to Highland for
23  some other reason?
24      A.  What other reason would it be, if I can be so
25  bold.
```

1    Q.   Can you think of any other reason in 2019?

2    A.   Well, Highland had -- Highland had shared

3 services and intercompany agreements with NexPoint, at

4 this time.

5         But these were not payments that could

6 possibly be confused with those payments.  These are

7 off cycle, they're larger amounts, and there's nothing

8 that they could be other than payments against the

9 loan.

10   Q.   So I asked you before, and I think you said

11 that you were speculating with respect to these

12 payments, that Highland needed money at that time.

13        Do you recall in 2019 any discussions with

14 anyone, Dondero or Waterhouse, to the effect that

15 NexPoint has excess cash so maybe NexPoint should

16 transfer some money to Highland?

17        MR. MORRIS:  Objection.  Asked and answered.

18        THE WITNESS:  Do I still answer?

19   Q.   (BY MR. RUKAVINA)  Yes.

20        MR. MORRIS:  Yes.

21        THE WITNESS:  And sorry, I got lost there.

22   Q.   (BY MR. RUKAVINA)  Yes.  So my predicate was

23 you testified before that you were assuming that these

24 payments were because of a cash need at Highland;

25 right?

David Klos - October 27, 2021

1     A.    Correct.

2     Q.    So with that predicate my question is, do you

3  recall discussing with Dondero or Waterhouse or with

4  anyone as to why NexPoint would be transferring money

5  to Highland at that time?

6     A.    Yes, I would have had conversations with

7  Mr. Dondero or Mr. Waterhouse.

8     Q.    And do you remember specifically in 2019 why

9  these transfers were made from NexPoint as opposed to

10 some other Dondero entity?

11    A.    Not with specificity, but certainly NexPoint

12 was generating cash at that time, and had the ability

13 to assist with Highland's liquidity.

14    Q.    So sitting here today, you've told me

15 generally and logically that you have no specific

16 memory why between January 2019 and August 2019, any of

17 these payments on Exhibit 14 were made by NexPoint?

18    A.    I have no specific memory, but I would say

19 with certainty that most or all of this was driven by

20 Highland HCMLP liquidity needs.

21    Q.    And most or all of this would have been

22 Highland in the first instance going to NexPoint and

23 saying, hey, can you send us some cash?

24        MR. MORRIS:   Objection to the form of the

25 question.

David Klos - October 27, 2021

1        THE WITNESS:  Yeah, the premise of that,
2  given that Mr. Dondero is in control of both sides,
3  it's a faulty premise.
4        Q.  (BY MR. RUKAVINA)  But you told me not that
5  long ago that in these weekly cash meetings that it
6  would be your team at Highland who would go to
7  Mr. Dondero and say Highland has a liquidity issue.
8        So wouldn't that liquidity issue have
9  originated with the Highland team?
10       A.  Mr. Dondero is the president of Highland.
11  He's the president of NexPoint.  We're employees of
12  Highland.  We're also shared services providers for
13  NexPoint.
14       The waters are very muddy in terms of who is
15  wearing what hat in that conversation.
16       Q.  But Mr. Dondero doesn't know that Highland
17  has a liquidity issue unless someone from the corporate
18  accounting group tells him, does he?
19       MR. MORRIS:  Objection to the form of the
20  question.  I hope that's not the case.
21       THE WITNESS:  He has the ability to know what
22  our cash position is at any given time, at that time.
23       Q.  (BY MR. RUKAVINA)  So why would you have
24  these weekly cash meetings with Mr. Waterhouse and
25  sometimes Mr. Dondero?

David Klos - October 27, 2021

1    A.  So these were cash forecasts, looking at

2  outlook.  I can tell you almost without exception,

3  maybe -- with maybe without exception, be speculating,

4  but those forecasts would be showing negative numbers

5  at Highland, virtually nonstop.

6        And so it was important, my opinion, but it

7  was probably important to Frank to make sure that he

8  was getting in front of Jim to make sure that those

9  needs were being addressed timely.

10    Q.  So I've asked that question.  I want to ask

11  you a different question.

12        For any of these payments between

13  January 2019 and August 2019 reflected on Exhibit 14,

14  do you have any personal knowledge as to whether they

15  were intended to be prepayments or not?

16        MR. MORRIS:  Objection to the form of the

17  question.

18        THE WITNESS:  I don't know whether they were

19  intended to be prepayments at that time.

20    Q.  (BY MR. RUKAVINA)  Sitting here today, seeing

21  this document as a CPA and as a sophisticated person,

22  do you read this Exhibit 14 to indicate that those

23  payments were booked as prepayments?

24        MR. MORRIS:  Objection to the form of the

25  question.

David Klos - October 27, 2021

1       THE WITNESS:  Again, the term "prepayments"
2  is the one I'm struggling with.  I can ascertain that
3  there are payments and they're off schedule.  But I
4  don't know that I can ascertain that they're
5  prepayments.
6       Q.  (BY MR. RUKAVINA)  Well, if a borrower makes
7  a payment that's ahead of schedule, how would that
8  generally be accounted for?
9       MR. MORRIS:  Objection to the form of the
10  question.
11       THE WITNESS:  It would be accounted for as a
12  reduction of principal or interest or some combination
13  of the two.
14       Q.  (BY MR. RUKAVINA)  Which would relieve the
15  borrower of having to make that at some point in the
16  future; right?
17       MR. MORRIS:  Objection to the form of the
18  question.
19       THE WITNESS:  No.  The borrower still owes
20  the money.  This is showing 23-point -- pick a date.
21  May 31, 23.034-.  That there's significant obligations
22  that are still outstanding.
23       Q.  (BY MR. RUKAVINA)  So on June 4, 2019 -- I'm
24  sorry, on June 19, 2019, the borrower made a
25  $2.1 million payment.  That's what this shows; correct?

David Klos - October 27, 2021

1    A.    I see that.

2    Q.    You're not saying that the borrower would

3 ever have to make that same $2.1 million payment again,

4 are you?

5    A.    No.  What I'm saying is, based on that 2.1-

6 payment -- and this is reading this cold.

7         But based on that 2.1- payment, 66,000 was

8 applied to interest, which left zero accrued interest

9 outstanding.  2.03- applied to principal, which left

10 24.7- and change still outstanding.

11    Q.    Well, I'm going to ask you about the

12 promissory note then, Exhibit 13, in particular

13 Section 3, where it says prepayment allowed.

14         And the first sentence says, may or -- pardon

15 me, maker may prepay in whole or in part the unpaid

16 principal or accrued interest of this note.

17         Do you see that, sir?

18    A.    Yes, I see that.

19    Q.    In your experience, can someone prepay

20 accrued interest?

21         MR. MORRIS:  Objection to the form of the

22 question.

23         THE WITNESS:  The document reads, maker may

24 prepay in whole or in part the unpaid principal or

25 accrued interest of this note.  So I read that to say

David Klos - October 27, 2021

1  that the maker may pay outstanding accrued interest, or
2  unpaid principal.
3      Q.   (BY MR. RUKAVINA)  But my question is, as I
4  understand accrued interest, it means interest that has
5  already occurred or accrued as of the date, like
6  today's date; right?
7      A.   Uh-huh.
8          MR. MORRIS:  Objection to the form of the
9  question.
10     Q.   (BY MR. RUKAVINA)  Do you agree with that?
11         Do you agree with that?  Accrued interest
12  means interest that has already come due, that has
13  actually happened because interest happens over time.
14     A.   Accrued interest --
15         MR. MORRIS:  Objection to the form of the
16  question.
17     Q.   (BY MR. RUKAVINA)  Why don't you start.  Why
18  don't you define for me accrued interest.
19     A.   Sure.  Accrued interest would be outstanding
20  and unpaid interest that -- sorry, it's hard to define
21  it without using the term.  But it's interest that's
22  accumulated in respect of a principal amount through a
23  given date.
24     Q.   So how do you prepay accrued interest?
25     A.   How do you prepay accrued interest.  Again,

David Klos - October 27, 2021

1   that's a little bit of a mental jumble.

2        Q.   Exactly.

3        A.   Well, what I'm...

4        Q.   To me one pays accrued interest.  But this

5   note says you can prepay accrued interest.  So I'm just

6   seeing whether you as a CPA, CFO and controller for

7   years agrees that one can prepay accrued interest?

8            MR. MORRIS:  Objection to the form of the

9   question.

10           THE WITNESS:  Frankly, I don't know if it's

11  possible.  That's not how I'm seeing it applied here,

12  based on the quick review of Exhibit 14.

13       Q.   (BY MR. RUKAVINA)  Well, the next sentence

14  says, any payments on this note shall be applied first

15  to unpaid accrued interest hereon, and then to unpaid

16  principal hereof.

17           Do you see that, sir?

18       A.   I see that.

19       Q.   Do you have any understanding based either on

20  your personal knowledge or in your expertise as a CPA

21  and a CFO as to what that sentence means?

22           MR. MORRIS:  Objection to the form of the

23  question.

24           THE WITNESS:  The way that I would read that

25  would be that for a payment, for example, pick a date,

David Klos - October 27, 2021

1    Exhibit 14 again, the $2.1 million payment on or about
2    June 19.  I see that a payment was made.
3            And it was -- it appears that there was
4    accrued and unpaid interest at that time of 66,000.  And
5    so the first 66,000 was applied to outstanding accrued
6    interest, to bring the balance to zero.
7            And the difference between that 66,000 and the
8    2.1 million was applied to principal.
9        Q.   (BY MR. RUKAVINA)  Do you believe, whether
10   from personal knowledge from this note, Exhibit 13, or
11   your experience at Highland or as a CPA, that one can
12   say that interest, accrued interest will be due on a
13   future date, it will accrue by that date, but I'm going
14   to pay it earlier as of that date?
15           MR. MORRIS:  Objection to the form of the
16   question.
17           THE WITNESS:  If I can rephrase back to you
18   just so I make sure I'm understanding the question.
19   You're saying could someone say, I would like to prepay
20   interest into the future.  It hasn't accrued yet, but
21   it will be accrued by end of year.
22           And I would like to be prepaid effectively
23   with respect to that interest, and then have the
24   remainder used to pay down principal.
25           The question is, can someone do that?

David Klos - October 27, 2021

1      Q.   (BY MR. RUKAVINA)  Yes.
2           MR. MORRIS:  I object to the question.
3           THE WITNESS:  I suppose it's possible, but
4    that certainly wasn't the practice if that makes sense.
5      Q.   (BY MR. RUKAVINA)  That does make sense.  I'm
6    still struggling, and again, I'm not trying to be a
7    smart aleck.  I'm still struggling with the first
8    sentence of paragraph 3, that maker may prepay accrued
9    interest.
10          And it sounds like to me like you don't
11   necessarily have a definitive answer as to what that
12   might have meant either.
13          MR. MORRIS:  Objection to the form of the
14   question.
15          THE WITNESS:  I think the document speaks for
16   itself in that sentence.
17     Q.   (BY MR. RUKAVINA)  But have you seen
18   something like this, to your recollection, in other
19   Highland promissory notes?
20     A.   Something like what?
21     Q.   Prepaying accrued interest.
22     A.   Yes, I have seen that.
23     Q.   What's your memory?  Where have you seen
24   that?
25     A.   I can't remember a specific note, but I

David Klos - October 27, 2021

1  believe that has been done in a specific circumstance.

2      Q.   So at least at Highland, you would believe

3  that that phrase, prepaying accrued interest, had some

4  established meaning at Highland?

5          MR. MORRIS:  Objection to the form of the

6  question.

7          THE WITNESS:  No, I don't agree with that.

8      Q.   (BY MR. RUKAVINA)  Okay.  You understand, of

9  course, that it's Highland's position that with respect

10  to this note, a payment was due on December 31 of 2020

11  that wasn't made; correct?

12     A.   Yes, it's my understanding -- if I can state

13  it back just so I make sure I'm getting it correctly.

14  It's my understanding that there was a payment due on

15  December 31, 2020, that wasn't made timely, yes.

16     Q.   Okay.  Do you know why that payment wasn't

17  made timely?

18     A.   By recollection, because Mr. Dondero had

19  directed people not to process payments from Highland

20  affiliates to Highland.

21     Q.   When did you learn of that?

22     A.   Early December 2020.

23     Q.   How did you learn of that?

24     A.   I don't specifically remember the

25  conversation, but I know I had conversations with both

1  Kristin and Frank.  I can't remember if those were
2  individual or collective, but we understood that to be
3  the marching orders.
4      Q.   Did you hear Mr. Dondero say anything like
5  that?
6      A.   I did not.
7      Q.   Did Mr. Waterhouse tell you that Mr. Dondero
8  said something like that to him?
9      A.   Yes.
10      Q.   Okay.  Separately, do you remember whether
11  Ms. Hendrix told you that Mr. Waterhouse told her that,
12  or would it have been kind of at the same meeting?
13      A.   I don't remember specifically.  It would have
14  been all around the same time.
15      Q.   And to the best of your recollection, what
16  words -- strike that.
17          To the best of your recollection, did
18  Mr. Waterhouse include a reference to promissory notes
19  and the Advisors when he said that Dondero told him not
20  to make payments?
21          MR. MORRIS:  Objection to the form of the
22  question.
23          THE WITNESS:  I don't remember the specific
24  words that Mr. Waterhouse used.  My clear impression
25  was that it was a very global instruction.

David Klos - October 27, 2021

1        And I should clarify also that, you know, at
2  this time, I think as we covered in my background.
3        At this point I had assumed the chief
4  accounting officer role, so I wasn't necessarily in
5  the -- in as much of the chain of command as I had been
6  previously to taking that role, where that sort of thing
7  might have come from Frank, to me, to Kristin.
8        By this time, Frank and Kristin were
9  communicating and I was sometimes in the loop, sometimes
10 not.
11      Q.   (BY MR. RUKAVINA)  Did Mr. Waterhouse tell
12 you why Dondero had told him that?
13      A.   I don't remember with any specificity.
14 However, my perception at the time was that at this
15 time the relationship between Mr. Dondero and Mr. Seery
16 was hopelessly broken, and that this was Jim Dondero,
17 you know, gearing up for a fight in the future.
18      Q.   Prior to December of 2020, had you prepared a
19 report showing potential overpayments that NexPoint and
20 HCMFA had made on account of shared services and
21 payroll reimbursement?
22      MR. MORRIS:  Objection to the form of the
23 question.
24      You can answer.
25      THE WITNESS:  I know the analysis that you're

David Klos - October 27, 2021

1   talking about.  I would not characterize it the way
2   that you characterized it.
3        Q.   (BY MR. RUKAVINA)  And we'll talk about this
4   more in November, so I really don't want to go into any
5   detail, unless you feel the need to.
6             But, so you did not prepare that analysis?
7             MR. MORRIS:  Objection to the form of the
8   question.
9             THE WITNESS:  I prepared an analysis that
10  differed from how you described it.
11       Q.   (BY MR. RUKAVINA)  How would you describe it,
12  in a nutshell?
13       A.   I would describe it as I was asked to refresh
14  a spreadsheet using certain assumptions, based on the
15  direction of Frank Waterhouse, and I updated and I sent
16  him an email.
17       Q.   Do you have any understanding that that
18  analysis was then shared with Mr. Dondero by
19  Mr. Waterhouse?
20       A.   I know that now.  I didn't know that at the
21  time.
22       Q.   Do you have any understanding -- strike that.
23            Did you have any understanding that as of
24  early December 2020 the reason why Mr. Dondero said
25  what he said to Mr. Waterhouse was because that

David Klos - October 27, 2021

1  analysis, right or wrong, suggested that the Advisors
2  had made large overpayments?
3          MR. MORRIS:  Objection to the form of the
4  question.
5          THE WITNESS:  No, that's incorrect.
6     Q.   (BY MR. RUKAVINA)  Why is that incorrect?
7     A.   Because by recollection, to the best of my
8  recollection, that analysis didn't occur until after
9  Dondero had told Frank no more payments.
10    Q.   Is that the only reason why you might suspect
11 that what I just said was incorrect?
12         MR. MORRIS:  Objection to the form of the
13 question.
14         THE WITNESS:  Yeah, I don't know how to
15 answer that.
16    Q.   (BY MR. RUKAVINA)  I'm going back, when I
17 asked you, did Waterhouse tell you why Dondero gave the
18 direction, you said no.
19         MR. MORRIS:  Objection to the form of the
20 question.
21         THE WITNESS:  Sorry, I'm not sure.  If I
22 could have the question asked again, I'd be happy to
23 answer.
24    Q.   (BY MR. RUKAVINA)  I'll ask it again.
25         Mr. Waterhouse tells you that Mr. Dondero

David Klos - October 27, 2021

1    basically said no more payments; right?

2        A.   Yes.

3        Q.   And, but he did not tell you why Mr. Dondero

4    said that?

5        A.   Not that I can recall.

6        Q.   So he might have?

7        A.   He might have.  I don't specifically

8    remember.

9        Q.   Do you recall asking him or anyone else why

10   Dondero would have said that?

11           MR. MORRIS:  Objection.  Asked and answered.

12           THE WITNESS:  I don't recall specifically

13   asking.

14       Q.   (BY MR. RUKAVINA)  Do you recall telling

15   Mr. Seery that Dondero said anything like that?

16       A.   At what point in time?

17       Q.   Prior to December 31, 2020.

18       A.   No, I did not.  I did not say that to

19   Mr. Seery.

20       Q.   In your mind was there any present

21   understanding or concern that NexPoint therefore

22   wouldn't make a scheduled December 31, 2020, payment?

23       A.   Was there any concern that they wouldn't?

24       Q.   Yeah.

25       A.   I would never use the word "concern."  At

David Klos - October 27, 2021

1  that point I wasn't even on the team anymore, so I hate

2  to say it's other people's problem, but I had my hands

3  full with plenty of other things.  It wasn't something

4  I was thinking about.

5       Q.   Do you remember here today that prior to

6  December 31, 2020, you believed that NexPoint would not

7  make the scheduled payment?

8            MR. MORRIS:  Objection to the form of the

9  question.

10           THE WITNESS:  I had no idea whether NexPoint

11 was going to make the payment.

12      Q.   (BY MR. RUKAVINA)  Were you asked prior to

13 December 31, 2020 by Mr. Seery or anyone else as to

14 whether NexPoint was going to make that payment?

15      A.   Was I asked by Mr. Seery?  Not that I can

16 remember.

17      Q.   Prior to December 31, 2020, do you recall any

18 discussion with Mr. Seery about the NexPoint note?

19           MR. MORRIS:  I'm sorry, can I have the

20 question again.

21      Q.   (BY MR. RUKAVINA)  Prior to December 31,

22 2020, do you recall any discussion that you had with

23 Mr. Seery about this NexPoint note?

24      A.   Not that I can remember.  If there was, it

25 would have been in a cash meeting, but I don't remember

David Klos - October 27, 2021

1    at all.
2        Q.    So it might have been some detail as part of
3    a larger discussion, but you don't remember any
4    specific discussion just around this note?
5        A.    No.
6        Q.    When did you learn or how did you learn that
7    the December 31 payment had not been made?
8        A.    I'm not sure, but certainly after
9    December 31.
10       Q.    Do you recall if it was before or after
11   January 7?
12       A.    I think it was after.
13       Q.    The default letter from Highland is in here,
14   if you need to see it.  I'm just telling you it's the
15   January 7.
16           Do you recall having any role with respect to
17   drafting the default letter that went out to NexPoint
18   after the failed payment?
19       A.    No, none that I can remember.
20       Q.    How do you recall learning that the note had
21   been called by Highland?
22       A.    I honestly don't remember.  I think after the
23   fact.  I couldn't tell you how far after the fact.
24       Q.    Are you aware that on or about July -- I'm
25   sorry, January 14, 2021 NexPoint made a $1.4 million

David Klos - October 27, 2021

1   and change payment?

2       A.    Yeah, I'm aware that that payment happened.

3       Q.    When did you become aware of that payment?

4       A.    I think after it happened.

5       Q.    Can you tell us, was it days, weeks, months

6   later?

7       A.    It was that day.  And if I can expand, I

8   recall getting an email, seeing a large inflow to

9   Highland, to MLP because I was on an email distribution

10  list that had those payments.

11          And I think I emailed or called Kristin and

12  asked her, is this the NexPoint note, because it was a

13  large amount of money.  And she said yes.

14      Q.    Did she tell you anything more about that

15  payment, when it had been made, why, who authorized it?

16      A.    I had that information of when it had been

17  sent.  I had a wire confirm.

18      Q.    Only important thing to you is where did that

19  money come from?

20      A.    It wasn't important to me.  It was more

21  curiosity.

22      Q.    Did you have any discussions with anyone on

23  or about that time, January 14, 2021, as to why

24  NexPoint made that payment?

25      A.    Not that I can remember.

David Klos - October 27, 2021

```
 1        Q.   Did you have any discussion with anybody on
 2   or about that time, January 14, 2021, as to how HCMLP
 3   should account for that payment?
 4        A.   No.
 5        Q.   Did you have any discussion with Mr. Seery at
 6   all about whether that payment should or shouldn't
 7   reinstate the note?
 8        A.   No discussion that I can remember.
 9        Q.   Is it fair to say that any of those
10   considerations would have been at that point in time
11   above your paygrade?
12             MR. MORRIS:  Objection to the form of the
13   question.
14             THE WITNESS:  Yeah, paygrade, I don't know
15   how to respond to that.  Like I said before, I wasn't
16   on the team at that point.  I wouldn't have been
17   involved in that determination regardless of my
18   compensation.
19        Q.   (BY MR. RUKAVINA)  So you know and you
20   remember that in early December 2020 Frank Waterhouse
21   told you that Dondero had directed no more payments by
22   the Advisors.  And you know that a payment was made on
23   January 14.
24             And that's pretty much the extent of your
25   knowledge about the missed December 31 payment?
```

1          MR. MORRIS:  Objection to the form of the

2    question.

3          THE WITNESS:  Yeah, it's a very broad

4    question.  In general terms, yes.

5      Q.   (BY MR. RUKAVINA)  Well, I'm not asking what

6    you learned since then.

7          I'm asking that as of, let's say, January 15,

8    2021 that would have been the extent of what you would

9    have known?

10     A.   Correct.  And if I can just restate and make

11   sure I understand what I'm saying.

12         It would have been my understanding that we

13   had had an instruction -- when I say "we," Kristin and

14   Frank and by default the whole corporate team -- not to

15   make payments from these affiliated entities.

16         To my knowledge, none of those payments had

17   occurred since that point.  And then on or about

18   January 14, such a payment was made and I found out

19   about that by seeing a wire confirm.

20     Q.   Well, you mentioned a couple times that you,

21   in December 2020, you weren't part of that group

22   anymore.  So do you have any understanding as to why

23   Mr. Waterhouse would have told you in particular, you

24   being Mr. Klos, about that instruction from Dondero?

25     A.   Sure.  I still was participating in cash

David Klos - October 27, 2021

1  meetings, even if it was almost in a nominal role,

2  because of some of my history that I had. So I was

3  still participating in those meetings.

4        I've worked closely with Kristin for a long

5  time, so I may have caught up with her informally. But

6  as far as day-to-day duties, I wasn't part of that team

7  anymore.

8     Q.   And is it your, did I understand you

9  correctly, is it your testimony that Mr. Waterhouse

10  informed the whole accounting group there, the

11  corporate accounting group, of Mr. Dondero's

12  instruction?

13     A.   I don't know specifically who he told, if he

14  told every single member of the team, but he certainly

15  told Kristin and Kristin was the head of the team.

16     Q.   And you don't recall anyone, after you heard

17  about that instruction, raising any concern to the

18  effect that NexPoint is going to default and be in

19  trouble if that payment isn't made?

20     A.   I don't remember any discussion to that

21  effect.

22     Q.   Do you remember anyone suggesting that they

23  ought to try to dissuade Mr. Dondero from that

24  direction?

25     A.   Not that I can remember.

David Klos - October 27, 2021

1       Q.   Do you remember any discussion at that
2  approximate point in time for your cash meetings or
3  anything else as to whether NexPoint had made any
4  prepayments on the promissory note?
5            MR. MORRIS:  Objection to the form of the
6  question.
7            THE WITNESS:  Yeah, it's very hard to -- by
8  the way, I've said yeah a few times.  I want to make
9  clear that that's just --
10      Q.   (BY MR. RUKAVINA)  That's not a yes?
11      A.   I apologize for that.
12      Q.   Understood.  Yeah means, it's not a yes.
13           MR. MORRIS:  It's a pause; it's an um.
14      Q.   (BY MR. RUKAVINA)  Germans call it flavoring
15  particle.
16      A.   Sorry, I got lost there.  If you can ask
17  again.
18      Q.   Yeah.  Do you recall in November or
19  December 2020 in your weekly meetings or anything else,
20  any discussion whatsoever concerning whether NexPoint
21  had made any prepayments on its note?
22      A.   No discussions of whether or not there had
23  been a prepayment that I can remember, no.
24      Q.   To the best of your knowledge sitting here
25  today -- strike that.

David Klos - October 27, 2021

1      For my next question, again we're assuming
2  that Exhibit 14 is what it appears to be.

3      A.   Sure, sure.

4      Q.   So with that qualification, to the best of
5  your knowledge, other than what's on Exhibit 14, can
6  you think of any other record or source or document
7  that would address whether any unscheduled payments by
8  NexPoint would or wouldn't be prepayments on the note?

9      MR. MORRIS:  Objection to the form of the
10 question.

11     THE WITNESS:  Again, with the struggle of the
12 prepayment, this is the document that I would expect to
13 explain how the payment was applied.

14     Q.   (BY MR. RUKAVINA)  But you yourself did not
15 play any role in deciding how the payment would be
16 applied?

17     A.   I'd hesitate to say no role, because the team
18 ultimately rolls up to me.

19     Q.   You personally?

20     A.   Me personally, I wouldn't have prepared these
21 schedules.

22     Q.   Or decided, you personally, as Mr. Klos, how
23 any unscheduled payments should be accounted for by
24 Highland?

25     A.   Correct, not without some -- some

David Klos - October 27, 2021

1  authoritative direction on how they should be applied.

2      Q.   And that authoritative direction would have

3  come from Mr. Waterhouse or Mr. Dondero?

4      A.   That's what I would expect.

5      Q.   Could it have come from anyone else that you

6  can think of here today?

7      A.   Not that I can think of.

8      Q.   Now we're going to switch gears and I think

9  we're going to stop discussing the NexPoint note, and

10 we're going to focus on the HCMFA two promissory notes.

11     A.   Sure.

12     Q.   So we're going to go back in time to

13 May 2019; okay?

14     A.   Sure.

15     Q.   And is it fair to say by -- that by May 2019

16 there were at least dozens if not hundreds of instances

17 of intercompany loans in the years leading up there

18 from Highland to one of the other entities?

19          MR. MORRIS:  Objection to the form of the

20 question.

21          THE WITNESS:  From Highland to one of the

22 other entities.  Can you help with other entities.

23     Q.   (BY MR. RUKAVINA)  Advisors, the trusts, any

24 of the Dondero entities?

25          MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1 question.

2 THE WITNESS: Yes, there would have been many

3 loans over the years.

4 Q. (BY MR. RUKAVINA) And do I understand that

5 most, if not all, of those loans should have been

6 papered up with a written promissory note?

7 MR. MORRIS: Objection to the form of the

8 question.

9 THE WITNESS: Should have been. To the

10 extent that they were for a promissory note, then yes.

11 Q. (BY MR. RUKAVINA) So in the May 2019 time

12 frame, was there a regular pattern or course or

13 procedure in place as to how a promissory note would be

14 physically prepared and presented for approval?

15 MR. MORRIS: Objection to the form of the

16 question.

17 THE WITNESS: Yeah, when you say a process,

18 can you please clarify that for me.

19 Q. (BY MR. RUKAVINA) Sure. Let's look at these

20 two promissory notes and maybe that will help frame the

21 question. And I apologize for not having them right

22 here.

23 A. It might be --

24 MR. MORRIS: 1 and 2.

25 MR. RUKAVINA: Yes.

David Klos - October 27, 2021

```
1        Q.   (BY MR. RUKAVINA)  Are you familiar with
2    Exhibits 1 and 2, sir?
3        A.   Yes, I am.
4        Q.   Do you remember them from back -- strike
5    that.
6             Did you have any role, to your knowledge,
7    with the preparation of Exhibits 1 and/or 2?
8        A.   With the preparation of the documents?
9        Q.   Yeah.
10       A.   No.
11       Q.   But you did have some role with these
12   promissory notes?
13       A.   Yes.
14       Q.   And I'm trying to find that email as well.
15   There's an email here from you.  I'll have it in a
16   moment.  That will help frame the question.
17            MR. MORRIS:   Exhibit 3.
18       Q.   (BY MR. RUKAVINA)  Do you recall that email,
19   sir?
20       A.   Not specifically, but it's right in front of
21   me.  I'm certain that I wrote this email.
22       Q.   You have no reason to deny or reject its
23   authenticity?
24       A.   I have no reason to reject it or question it.
25       Q.   Just give me a second.  I don't understand
```

David Klos - October 27, 2021

```
 1   what's going on with my exhibits.  I just don't
 2   understand this.
 3              (Off the record.)
 4         Q.   (BY MR. RUKAVINA)  You have Exhibit 3 in
 5   front of you?
 6         A.   I do.
 7         Q.   And it says, please send 2.4 million from
 8   HCMLP to HCMFA.  This is a new interco.
 9              Meaning intercompany; right?
10         A.   Correct.
11         Q.   This is a new intercompany loan.
12              Who told you that this was an intercompany
13   loan?
14         A.   Either Frank or Jim.  I would suspect Frank.
15         Q.   Do you have any present memory of him telling
16   you that with respect to this particular loan?
17         A.   I don't have a specific recollection, but
18   with a hundred percent certainty he or Jim would have
19   directed that.
20         Q.   Would they have directed the payment, or
21   would they have directed that it be papered as a loan,
22   or both?
23         A.   Both.
24         Q.   So in each instance -- well, let's take a
25   step back.
```

1       So certainly either Jim or Frank directed you
2   to transfer the $2.4 million; correct?
3       A.   Either Jim or Frank would have directed, yes.
4   There's 0 percent chance I would have sent this email
5   if I didn't feel a hundred percent confident that this
6   was authorized in the way that I described in the
7   email.
8       Q.   But can you also say with certainty that
9   either Dondero or Waterhouse also told you that this
10  transfer is an intercompany loan?
11      A.   With a hundred percent certainty, yes.  I
12  can't say that necessarily with respect to Dondero,
13  because I don't remember if I would have talked to him
14  specifically about it.  But, yes, this would have been
15  clear that it's a loan.
16      Q.   You say clear.  Did someone tell you that
17  it's a loan, or are you just, because of the prior
18  10 years of course and conduct, logically deciding that
19  it has to be a loan?
20          MR. MORRIS:  Objection to the form of the
21  question.
22          THE WITNESS:  So this is -- this is not just
23  a situation of past practice.  I would have known with
24  certainty that this was a loan and that's what was
25  authorized.

David Klos - October 27, 2021

1    Q.   (BY MR. RUKAVINA)  How would you have known
2    with certainty that it was a loan?
3    A.   I'll say in part because of past practice,
4    but also because of the nature of what the money was
5    going to be used for, and the background behind it.
6    Q.   So you knew that nature and that background?
7    A.   The nature and background of the 2.4 million,
8    yes.
9    Q.   So you've told me that in part -- I asked you
10   how did you know it was a loan.  You said in part past
11   practices, in part you knew the nature.  Anything else?
12   A.   I'm certain that given that I wrote this
13   email, which Frank is on, that I would have had a
14   conversation with Frank about what this was.
15   Q.   Was Jim Dondero in the corporate accounting
16   email?
17   A.   No, he wasn't.
18   Q.   So what is your understanding as to what this
19   $2.4 million was for?
20   A.   This related to -- well, to separate the
21   transaction, the 2.4- itself relates to a promissory
22   note.  That's what was executed.
23        HCMFA's use of the 2.4 million was to
24   reimburse a fund that it managed called Highland Global
25   Allocation Fund for a NAV error that had occurred

1    within that fund.

2        Q.    Who made that NAV error?

3            MR. MORRIS:  Objection to the form of the

4    question.

5            THE WITNESS:  Yeah, it's hard to answer that.

6    So the Highland Capital Management Fund Advisors is the

7    advisor to the fund, so they're the responsible party

8    for making the fund whole in the instances of NAV

9    errors.

10       Q.    (BY MR. RUKAVINA)  And did HCMFA contract out

11   with Highland for valuation services?

12           MR. MORRIS:  Objection to the form of the

13   question.

14           THE WITNESS:  I don't specifically remember

15   if they contracted for valuation services, but if you

16   tell me that they did, I'll take that at face value.

17   So yes, HCMFA utilized HCMLP for valuation services.

18       Q.    (BY MR. RUKAVINA)  Do you have any memory of

19   what human being or beings made that NAV error?

20           MR. MORRIS:  Objection to the form of the

21   question.

22           THE WITNESS:  It's -- in respect to people,

23   not particularly.  In respect to parties, Houlihan

24   Lokey was the service provider that performed the

25   valuation that resulted in the NAV error.

David Klos - October 27, 2021

1          And as I described before, the valuation
2    function was housed at HCMLP by HCMLP employees
3    supporting that through, among other people, front
4    office, compliance, other parts of the organization as
5    well.
6          Q.   (BY MR. RUKAVINA)  So it was your
7    understanding that Highland was loaning $2.4 million to
8    HCMFA for HCMFA to compensate that fund?
9          A.   Yes.
10         Q.   Did you have any understanding that Highland
11   might have been, instead of loaning that money,
12   actually paying that money to HCMFA to compensate HCMFA
13   for Highland's valuation error?
14         A.   First, not Highland's valuation error.  But
15   second, no, there's no way that that would have been
16   what that payment was for.
17         Q.   Why can you say that there's no way that that
18   would have been what that payment was for?
19         A.   First, this wasn't the first NAV error that
20   ever occurred.  There had been other NAV errors.  There
21   were other NAV errors with respect to this valuation
22   that pertain to NexPoint Advisors.
23              There was no reimbursement from HCMLP to
24   NexPoint or HCMFA, regardless of any individual being
25   identified as the person.  That had just never occurred

David Klos - October 27, 2021

1   to my knowledge.

2           Second, the amount was to meet the liquidity

3   need of HCMFA.  It wasn't to -- it wasn't to

4   dollar-for-dollar make up for the NAV error.  It was

5   that's how much money HCMFA needed.

6           Third, it was definitely Dondero's practice

7   and preference to have expenses at HCMFA for tax

8   purposes.  So if this was compensation, he would

9   ultimately not really be benefiting from the deduction

10  so.

11          That would have been a strong preference of

12  his against having it be compensation.

13          So it would have been excruciatingly clear

14  that this was a loan for liquidity for HCMFA to make

15  the fund whole, just like it had in the past NAV

16  errors.

17      Q.   How did you know that HCMFA needed

18  $2.4 million for liquidity?

19      A.   At that point I was still part of the

20  corporate team, so I had a good sense of how much cash

21  HCMFA would have had at any given moment.  And at that

22  given moment it would not have had -- I'd be shocked if

23  it had even 2.4-.

24          Probably would have had probably between

25  a million and 2 million if I had to speculate.

David Klos - October 27, 2021

1      Q.   Okay.  So you've given the reasons why this
2  was clearly a loan.

3           But you never heard Mr. Dondero say that this
4  was a loan, did you?

5      A.   I don't remember.  It's possible I did, but I
6  don't specifically remember.

7      Q.   Okay.  What about the $5 million loan on the
8  day after?  What was that $5 million for?

9      A.   That was similar but different.  So again,
10 HCMFA needed liquidity.  This time this was for --
11 related to that same fund.

12          So Highland Global Allocation Fund had
13 converted from an open-end fund, mutual fund, to a
14 closed-end mutual fund.

15          And pursuant to that conversion there was a,
16 I believe it was called a consent fee, for any
17 investors of that fund who consented to the conversion,
18 that they would receive a 3 percent fee payable by the
19 investment advisor.

20          And so at this time the bill came due on that
21 because the conversion had been completed, and the
22 accounting for how much that 3 percent was going to be
23 was complete.

24          HCMFA sure as hell didn't have 5 million
25 bucks.  Excuse my language.  Highland needed to pay

David Klos - October 27, 2021

1  HCMFA for the liquidity.  HCMFA made the payment to the
2  fund.  It wasn't dollar for dollar.  I think it was
3  like 5,019,000, or some such number.
4          But 5 million was the number that would allow
5  it to make that payment effectively to the investors of
6  Global Allocation Fund.
7      Q.   Do you have any understanding as to why
8  Highland, as opposed to some other entity, was
9  transferring $7.4 million?
10     A.   Highland as opposed to some other entity?
11     Q.   Uh-huh.
12     A.   Because Highland had the money.
13     Q.   But I think we've established earlier that in
14  the first seven months of 2019, Highland was having
15  constant liquidity issues?
16     A.   It was.
17     Q.   And that's part of the reason that NexPoint
18  was making unscheduled payments on its note; right?
19     A.   That's part of the reason NexPoint was making
20  unscheduled payments on its note, yes.
21     Q.   So your recollection is that HCMFA needed
22  $2.4 million for liquidity purposes and about
23  $5 million for the consent fee.  And Highland
24  transferred those funds because Highland had the funds?
25     A.   Yes.  And I should clarify that Highland only

HCMFA APP 0728

David Klos - October 27, 2021

1  had the funds because Mr. Dondero repaid personal notes
2  to HCMLP on the same days.
3          So he paid 2.4 million on May 2, which
4  Highland turned around and reloaned.  And he paid 4.4-
5  on May 3, and Highland sent out 5-, so there's a
6  $600,000 difference.  And my recollection, he paid the
7  other 600,000 via note repayment within a few days.
8      Q.   So this would have been part of some broader
9  transaction in Mr. Dondero's mind?
10     A.   I would not characterize it that way.
11     Q.   You established that HCMFA needed money.  You
12 established that Highland temporarily had money because
13 Dondero provided it with money.
14         But you still don't know, sir, as a fact as
15 to whether that transfer was a loan or some other
16 payment from HCMFA -- I'm sorry from HCM, from debtor
17 to HCMFA?
18         MR. MORRIS:  Objection to the form of the
19 question.  Asked and answered a million times.  It's in
20 the documents you're showing him.
21         THE WITNESS:  It was a loan.
22         MR. MORRIS:  Come on, Davor.  With all due
23 respect, it's in the document.  It's on the document.
24     Q.   (BY MR. RUKAVINA)  I'm being courteous and
25 respectful to you and I'd ask the same in return; okay?

David Klos - October 27, 2021

1    A.    Absolutely.  I apologize if I haven't been.

2    Q.    Mr. Dondero, would you agree, was the only

3 person that had the authority at the debtor to

4 authorize a transfer of 2.4- and then $5 million?

5    A.    At the debtor?

6        MR. MORRIS:  Objection to the form of the

7 question.

8    Q.    (BY MR. RUKAVINA)  Yes, at the debtor.

9    A.    No.

10    Q.    Who else could have transferred 2.4 million

11 or $5 million?

12    A.    Those are two different questions.  But if

13 you're asking who had the authority, certainly Frank

14 did as well.

15    Q.    So Frank had the authority.  Perhaps my

16 question was inartful.

17        Do you believe that Mr. Waterhouse would have

18 decided to transfer $2.4 million or $5 million without

19 Mr. Dondero's approval?

20        MR. MORRIS:  Objection to the form of the

21 question.

22        THE WITNESS:  Generally speaking, no, but I

23 don't know exactly what the form of the approval.  But

24 he certainly wouldn't have done that on his own without

25 discussing with Dondero.

David Klos - October 27, 2021

1    Q.   (BY MR. RUKAVINA)  Do you believe that
2  Mr. Waterhouse had the ability on behalf of the debtor
3  to loan $5 million without Mr. Dondero's approval?
4          MR. MORRIS:  Objection to the form of the
5  question.
6          THE WITNESS:  I think he had the technical
7  authority to.  However, I don't believe in practice
8  that he ever would.
9    Q.   (BY MR. RUKAVINA)  Same question, $2.4
10 million?
11   A.   Same answer.
12   Q.   We've established that you never really had a
13 direct employment or types of a role for NexPoint --
14 I'm sorry, for HCMFA; right?
15   A.   Again --
16   Q.   To the best of your recollection?
17   A.   Best of my recollection I can't remember how
18 the titles transferred over or whatever, but I don't
19 believe I did.
20   Q.   Do you know whether Mr. Waterhouse in 2019
21 had the authority, without Mr. Dondero's approval, to
22 borrow $7.4 million on behalf of HCMFA?
23          MR. MORRIS:  Objection to the form of the
24 question.
25          THE WITNESS:  He had the authority to enter

David Klos - October 27, 2021

1   into the note on behalf of HCMFA, yes.

2      Q.  (BY MR. RUKAVINA)  Was that something that he

3   would have done without Mr. Dondero's approval to your

4   understanding and practice at that time?

5      MR. MORRIS:  Objection to the form of the

6   question.

7      THE WITNESS:  Same answer that I gave before

8   with respect to Highland.

9      Q.  (BY MR. RUKAVINA)  So here's where I'm going

10   with all this.

11      Mr. Dondero's position, and tomorrow his

12   testimony will be, that he caused the $7.4 million to

13   be transferred not as a loan to HCMFA, but to

14   compensate HCMFA for various things including that NAV

15   error.

16      Other than perhaps you think he's lying,

17   would you have any knowledge, hearsay, document,

18   anything, to contradict Mr. Dondero's position?

19      MR. MORRIS:  Objection to the form of the

20   question.

21      THE WITNESS:  Yes.  I would point to the fact

22   that as it pertains to the $5 million note, if we're

23   separating issues, there's no other possibility of what

24   that money could be other than either a loan or equity.

25      It's not compensation.  Highland is under --

David Klos - October 27, 2021

1  HCMLP has absolutely zero obligation in respect to that
2  consent fee.  So when Highland sends $5 million to HCMFA
3  there's nothing else that it can be.  That's Point 1.
4            Point 2, we're right in the middle of an audit
5  at this point.  Jim signs rep letters at this point.
6  He's being provided balance sheets throughout 2019 that
7  indicate the loans that Highland has on its books.
8            Balance sheets are being prepared in respect
9  of annual approvals for 15(c) for retail funds in the
10  fall.  Schedules are being created for bankruptcy after
11  we file in October.
12            Nobody says this is a mistake.  Frank is on
13  all of these emails.  Frank never questions it.
14            There's absolutely no evidence from that point
15  in time to whenever this defense got raised that would
16  indicate that anybody said that these weren't exactly
17  what they say they are.
18       Q.   (BY MR. RUKAVINA)  Are you aware that in
19  February or March 2019 some $5.2 million was paid from
20  insurance that HCMFA had to the fund for the NAV error?
21       A.   The amount sounds unfamiliar, but I'm aware
22  that insurance proceeds were paid from HCMFA to the
23  fund.
24       Q.   And do you think that it's impossible for a
25  sane, rational person to conclude that HCMFA had a

David Klos - October 27, 2021

1  claim against the debtor related to that NAV error?

2          MR. MORRIS:  Objection to the form of the

3  question.

4          THE WITNESS:  If it did, I don't know how

5  that's not insurance fraud for basically double

6  collecting insurance proceeds and then collecting it

7  again.

8      Q.  (BY MR. RUKAVINA)  So you believe, sir, that

9  if insurance pays a claim you have no more right to go

10  against a person who caused the fault?

11          MR. MORRIS:  Objection to the form of the

12  question.

13          THE WITNESS:  We can speak specifically here.

14  This is about a NAV error that an insurance company

15  reimbursed HCMFA for, which it then turned around and

16  paid for the fund.

17          So if it went to collect that same, let's use

18  round numbers, $5 million from Highland that it's

19  already collected from insurance, that sounds

20  inappropriate to me.

21      Q.  (BY MR. RUKAVINA)  Okay.  But you don't know

22  whether that's allowed in Texas law or not, do you?

23          MR. MORRIS:  Objection to the form of the

24  question.

25          THE WITNESS:  No, I don't know whether it's

David Klos - October 27, 2021

1 allowed under Texas law.

2     Q.  (BY MR. RUKAVINA)  So you don't know that if
3 you're hit by someone on the street and your medical
4 insurance pays your bills, you don't know that he still
5 has to pay you for the same bills?

6       MR. MORRIS:  Objection to the form of the
7 question.  I hope I don't miss my plane.

8     Q.  (BY MR. RUKAVINA)  You don't know that under
9 Texas law if someone hits you with their car and causes
10 you medical bills and your medical insurance pays those
11 bills, that you can still sue them for the same
12 damages?

13       MR. MORRIS:  Objection to the form of the
14 question.

15       THE WITNESS:  I'm not familiar at any level
16 of specificity with Texas law.

17     Q.  (BY MR. RUKAVINA)  Again, it just sounds
18 wrong to you that you could go after someone after
19 insurance pays, but you don't know legally one way or
20 the other?

21     A.  Correct.  I'm not a lawyer or expert in Texas
22 law.  It feels wrong, yes.

23     Q.  Okay.  Going back to this email of yours,
24 Exhibit 3, do you recall whether there was a similar
25 email with respect to the $5 million note?

David Klos - October 27, 2021

1     A.    Yes, I am.  I believe Kristin sent that one.

2     Q.    Kristin sent that one?

3     A.    I believe so.

4     Q.    To whom?

5     A.    Likely the same distribution group, but

6  that's speculation.

7     Q.    Did you see such an email in the last week or

8  two?

9     A.    I'm not certain, but probably.  I have seen

10  email communication on or around May 3, but I don't

11  know specifically who all was on the email.  I'm going

12  off what I would expect to see.

13         MR. MORRIS:  If you're really interested,

14  it's right here.  It was produced to you with

15  Bates 3763.  And if you'd like to question the witness.

16         MR. RUKAVINA:  When was it produced?

17         MR. MORRIS:  I can't tell you.  It's part of

18  the same package.

19     Q.    (BY MR. RUKAVINA)  So going back to this

20  Exhibit 3, sir, why did you ask Kristin, can you or

21  Hayley please prep a note for execution?  Why them?

22         Remember, I was asking about what the course

23  or procedure was at that point in time.

24     A.    Yeah, so nomenclature, procedure, process.

25         I would say the informal process for these

David Klos - October 27, 2021

1  types of loans, they were frequent in nature, would be
2  for someone on the corporate accounting team to prepare
3  a note and have it executed.
4      Q.    Okay.   That was the standard course back
5  then?
6      A.    Again, I don't know what standard course
7  means.   That was fairly typical.
8      Q.    Why would you not have asked someone in the
9  Highland legal department to prepare a note?
10      A.    Because this was a legally reviewed document
11  as far as the form of the agreement.   It's a one-page,
12  two-paragraph form that had been used for a long time.
13          So the only thing that would change with
14  respect to these notes would be the date, the amount,
15  likely the rate.   I can't think of anything else
16  offhand that would have changed from note to note.
17      Q.    After you asked Ms. Hendrix to prepare this
18  note, did you have any further role with respect to the
19  papering, preparation, or execution of that note?
20      A.    Not that I can remember.
21      Q.    Would you have had any role in having either
22  or both of the notes actually signed electronically or
23  by ink by Mr. Waterhouse?
24      A.    Likely not, no.
25      Q.    Do you know who decided to have

David Klos - October 27, 2021

1  Mr. Waterhouse as opposed to Mr. Dondero sign these two
2  promissory notes?
3      A.   I don't.
4      Q.   On the $5 million note, do you remember if
5  you had any role with respect to its physical papering
6  or execution?
7      A.   Not that I recall.
8      Q.   To the best of your memory, your role would
9  have been done by instructing your team, hey, here is
10 these new loans, go paper it up; is that accurate?
11     A.   On the upfront side.  I suppose my role would
12 have also included on the back end making sure that the
13 actual payment had occurred.  But that would have been
14 doing that realtime, seeing the funds went out, and
15 that, most importantly, that the consent fee had been
16 paid from HCMFA to the transfer agent.
17     Q.   How did you or anyone on your team know -- so
18 obviously, you know it's a $2.4 million loan because
19 that's what Waterhouse or Dondero told you; right?
20          How did you know it was a $2.4 million loan?
21          MR. MORRIS:  Objection.  Asked and answered.
22          THE WITNESS:  I knew that the NAV error was
23 2 million, I think it was 398,000, somewhere in that
24 ballpark.  And that 2.4- had been authorized for that
25 purpose.

David Klos - October 27, 2021

1      Q.   (BY MR. RUKAVINA)  Do you know who decided
2  what the interest rate in this note would be, or that
3  it would be a demand note as opposed to a term note?
4      A.   I don't specifically know who made that
5  decision.  However, the common practice for fund
6  advisors was to put -- was for the rate to equal the, I
7  forget if it was the short-term or long-term AFR.
8           And for the note to be demand, that was just
9  the standard -- that was the standard.
10     Q.   And I think I asked this, but just if I
11  didn't.
12          For either or both of these two notes, the
13  2.4- and $5 million note, did you have any role with
14  respect to Mr. Waterhouse signing them?
15     A.   No, not that I can remember.  I don't think I
16  did.
17     Q.   And you don't remember doing anything to get
18  his signatures?
19     A.   Not that I recall.
20     Q.   Nor would that have been something that you
21  would expect that you would have a role with?
22     A.   Certainly not in this instance.  Maybe to the
23  extent that nobody else was around and it was time
24  sensitive, but that wouldn't have been the case with
25  these, I don't believe.

David Klos - October 27, 2021

1    Q.   Did you have any understanding in early May
2  of 2019 as to whether HCMFA was solvent or insolvent?
3         MR. MORRIS:  Objection to the form of the
4  question.
5         THE WITNESS:  Whether HCMFA was solvent or
6  insolvent?  I'm not a solvency expert, so I don't know
7  that I could even attempt to answer that.
8    Q.   (BY MR. RUKAVINA)  Did you have an
9  understanding as far as HCMFA goes on May 2, 2019, that
10 its liabilities exceeded its assets?
11   A.   I don't remember specifically where it stood
12 on assets versus liabilities.
13   Q.   Do you have any memory that by May 2, 2019,
14 the debtor had taken a couple prior demand notes from
15 HCMFA and made them not collectible prior to May 31,
16 2021?
17   A.   I know what you're referring to.  I wouldn't
18 characterize it that way.
19   Q.   How would you characterize it?
20   A.   I recall that there was a financial support
21 acknowledgment, I think it was the name of the
22 acknowledgment.
23        That described -- I can't remember if it
24 described those two notes specifically or just referred
25 to them, that there would not be collection sought on

David Klos - October 27, 2021

1  those until May 31 of 2021.

2      Q.   Do you remember why that document was done?

3      A.   My recollection, and it could have been done

4  for other reasons, but my recollection of it was that

5  it was primarily audit-driven.

6          For the auditors to be comfortable that these

7  notes weren't going to be just called and FA not have

8  the ability to pay them right away.

9      Q.   Because it's true in April or May of 2019

10 HCMFA didn't have the ability to pay those notes;

11 correct?

12     A.   It didn't have enough cash to pay those.

13     Q.   And I think you mentioned before that in

14 May 2019 the auditors at the Highland level were

15 talking about rolling up prior demand notes into term

16 notes so the debtor would at least get some regular

17 cash flow; correct?

18         MR. MORRIS:  Objection to the form of the

19 question.

20         THE WITNESS:  No.

21     Q.   (BY MR. RUKAVINA)  So you recall that -- I'm

22 sorry, that was 2017.  I was wrong; right?

23     A.   Correct.

24     Q.   So I guess here is my question, and I'm

25 struggling to understand this.

David Klos - October 27, 2021

1      So why would Highland be loaning an
2  additional $7.4 million in early May of 2019 to HCMFA
3  when HCMFA already was then unable to repay its debts
4  to Highland?

5      MR. MORRIS:  Objection to the form of the
6  question.

7      THE WITNESS:  Yeah, I kind of reject the
8  premise of the question, and these are all controlled
9  by Jim.  And it's completely within his power at any
10 point in time to make any payment on any of the loans,
11 depending on where priorities sit.

12     So the idea that HCMFA -- that Highland would
13 be doing a credit analysis on HCMFA, determining that it
14 was unable to make that payment and, therefore, this is
15 a bad note, is a completely foreign, preposterous
16 concept at that time.

17     Q.   (BY MR. RUKAVINA)  And in May of 2019 isn't
18 it also, sir, the case that Mr. Dondero could have,
19 right or wrong, agree or disagree, said, that 7.4- is
20 going to compensate HCMFA for the NAV error as opposed
21 to being a loan?

22     A.   No.

23     Q.   That's not possible?

24     A.   No.

25     Q.   And why is that not possible?

David Klos - October 27, 2021

1    A.    As we discussed, the 5-, there's absolutely
2 no construct where that can be compensation for an NAV
3 error.  It's not a NAV error.  It's a consent fee.
4 Highland has absolutely no responsibility for that.
5         Highland also has no responsibility for the
6 2.4-, but if you want to assume that it did, that's
7 completely not the practice.  It was Jim's preference
8 to do these via loans, and that's how it was booked.
9    Q.    You're saying on the one hand Mr. Dondero can
10 absolutely control that one entity make a loan to
11 another, irrespective of credit worthiness, but he
12 can't decide that a transfer is compensation as opposed
13 to a loan?
14         MR. MORRIS:  Objection to the form of the
15 question.  Argumentative.
16         THE WITNESS:  If he wants to call
17 $7.4 million compensation to himself or to HCMFA, I
18 just don't know how he does that.  This is me being an
19 accountant.  I don't know how that's possible.
20         If he wants to pay himself a $7.4 million
21 bonus from HCMFA, fine, he has the power to do that.  If
22 he wants Highland to inject 7.4 million of equity into
23 HCMFA, he has the power to do that.
24         But sending the 7.4 million and calling it
25 something else, I don't know how he could do that.

David Klos - October 27, 2021

```
1       Q.   (BY MR. RUKAVINA)  So it had to have been a
2   loan; correct?
3            MR. MORRIS:  Objection to the form of the
4   question.
5            THE WITNESS:  In these instances I know it to
6   have been a loan.
7       Q.   (BY MR. RUKAVINA)  Because of what
8   Mr. Waterhouse told you?
9            MR. MORRIS:  Objection to the form of the
10  question.  Asked and answered.
11           THE WITNESS:  Yeah, it was my understanding
12  that these were loans.
13      Q.   (BY MR. RUKAVINA)  You know these 7.4- to be
14  loans even though you never heard Mr. Dondero say that
15  to you?
16      A.   Yes, although to be fair, I don't know
17  whether I ever heard Mr. Dondero.  It's possible he did
18  say it.
19           MR. MORRIS:  Objection.  Withdrawn.
20      Q.   (BY MR. RUKAVINA)  You have no memory that on
21  or before May 4, 2019 you heard Mr. Dondero say that
22  the $2.4 million transfer and/or the $5 million
23  transfer to HCMFA were loans?
24      A.   I have no specific recollection, but such a
25  conversation is just off the reservation impossible.
```

David Klos - October 27, 2021

1    That there's no way -- there's no way -- there's no way
2    that it would have been described that way and there's
3    a hundred percent that it's loan.
4        Q.   Do you have any memory discussing prior --
5            MR. MORRIS:   Objection.   Asked and answered.
6    He's answered this a thousand times.
7        Q.   (BY MR. RUKAVINA)   Do you have any memory on
8    or before May 2, 2019 discussing the $2.4 million
9    transfer with Mr. Dondero at all?
10       A.   I do recall, I don't remember the time, but I
11   do remember discussing the NAV error in general terms
12   and the potential magnitude of that.   I don't remember
13   specifically when that occurred.
14       Q.   At least in your discussion with Mr. Dondero,
15   the $2.4 million loan or note was somehow linked to the
16   NAV error?
17       A.   Linked to the NAV error is strong.   It
18   related to the NAV error from the standpoint that
19   that's what Highland was loaning HCMFA the money for,
20   because HCMFA couldn't otherwise make the payment
21   itself.
22       Q.   You just said Highland was loaning the money
23   for.   Are you remembering now Mr. Dondero saying that
24   or are you just extrapolating?
25       A.   No, I'm explaining rationally what the

David Klos - October 27, 2021

1  situation was.

2      Q.   Do you remember on or before May 3, 2019

3  discussing the $5 million transfer with Mr. Dondero?

4      A.   Again, in general terms.  I couldn't tell you

5  a time period, but this was something that, between

6  Frank and I, we had put on Jim's radar that this would

7  be a cash need in the future.  I couldn't specify

8  specifically when that happened.

9      Q.   Okay.  You have no present memory of

10 discussing that issue with Mr. Dondero on or before

11 May 3, 2019?  It must have happened but you have no

12 memory?

13          MR. MORRIS:  Objection to the form of the

14 question.

15          THE WITNESS:  We discussed that there would

16 be a consent fee payable from HCMFA.  We would have

17 discussed -- and again, I don't remember where I was,

18 what day it was, the specifics around the conversation.

19          But I know that we had conversations

20 pertaining to cash, because this was a large need for --

21 cash need for HCMFA to satisfy this, and this was an

22 important payment.

23          And neither HCMFA nor Highland had the

24 wherewithal to make that payment.  The only way that

25 those could make the payment was by Jim Dondero repaying

1  loans that he owed to HCMLP.  So we absolutely discussed

2  that with Jim Dondero.

3      Q.   (BY MR. RUKAVINA)  And with respect to

4  everything that we just talked about and your

5  recollection, you still don't remember Mr. Dondero

6  saying to you or Mr. Waterhouse one way or the other

7  that one or both of these transfers were loans?

8          MR. MORRIS:  Objection to the form of the

9  question.  Asked and answered.

10         THE WITNESS:  Yeah, again --

11     Q.   (BY MR. RUKAVINA)  Just yes or no.  This is a

12 yes-or-no question.

13         MR. MORRIS:  Let him answer the question.

14         MR. RUKAVINA:  If he'll answer the question

15 I'll stop asking him --

16         MR. MORRIS:  He's allowed --

17     Q.   (BY MR. RUKAVINA)  The answer [verbatim] is,

18 do you remember --

19     A.   I don't remember Jim's exact words two and a

20 half years ago in respect to authorizing these

21 payments.  So to answer your question, no, I don't

22 specifically remember him saying these are loans.

23         But every other fact around this tells me

24 that we did have that conversation and that was the

25 conclusion and that was the direction.

David Klos - October 27, 2021

1    Q.   So it's possible that Mr. Dondero told no one
2  that these were loans but because y'all have been doing
3  it this way for 10 years, that everyone, all of you
4  CPAs, understood that it had to be a loan?
5        MR. MORRIS:  Objection to the form of the
6  question.
7    Q.   (BY MR. RUKAVINA)  My question is, is that
8  possible?
9    A.   I really don't think it's possible.  I
10 suppose people say anything is possible.  Again, two
11 and a half years ago, I'm certain that that was the
12 intent at the time and I'm sure it was communicated as
13 such.  I just don't have a specific recollection.
14       MR. RUKAVINA:  Thank you.
15       I'll pass the witness.
16       MR. MORRIS:  Michael, do you have any
17 questions?
18       MR. AIGEN:  I do.  I assume you want me to
19 start now to do my best to be done at 5:00?
20       MR. MORRIS:  Yes, please.
21                      EXAMINATION
22    Q.   (BY MR. AIGEN)  Good afternoon, Mr. Klos.  My
23 name is Michael Aigen with the Stinson law firm.  I
24 represent Mr. Dondero, HCMS, and HCRE.
25       How are you today?

David Klos - October 27, 2021

1    A.    I'm very good, thank you.

2    Q.    First topic I wanted to ask you about is the

3 defense raised by some of the defendants related to an

4 oral agreement and condition subsequent.

5         So my question for you generally is, are you

6 aware that some of the defendants in these proceedings

7 have raised a defense that there was a subsequent oral

8 agreement allowing notes to be potentially forgiven if

9 certain events occur?

10   A.    Yeah, I'm generally aware of the defenses

11 sitting here today.

12   Q.    And how are you generally aware of this

13 defense?

14   A.    I don't know with specificity.  Potentially

15 through just document flow on the bankruptcy side,

16 potentially with conversations internally or with

17 counsel.  But I generally understand them to have been

18 raised, the defenses that is.

19   Q.    And I don't want to get into conversations

20 with counsel.  I'm not allowed to do that.

21        Let me ask you, have you had any

22 conversations with anyone other than counsel about this

23 subsequent oral agreement defense?

24   A.    I have had general conversations with

25 Mr. Seery about it.  And other than that, nothing

David Klos - October 27, 2021

1   substantive.

2       Q.   And what did you discuss about this with
3   Mr. Seery?

4       A.   I've discussed with him, I hate to phrase it
5   this way, the ridiculousness of the defense.  Under
6   oath.  I've discussed my general understanding of what
7   is being asserted as a defense.

8            Which is that there was some sort of an oral
9   agreement between Jim and his sister at some point in
10  the past pertaining to forgiveness of certain
11  promissory notes that was conditional upon Highland
12  monetizing any of three PE assets for any amount above
13  cost.

14      Q.   And is it fair to say that prior to these
15  lawsuits being brought, you weren't aware of any oral
16  agreements related to the promissory notes related to
17  potential forgiveness?

18      A.   That's correct.  Not that I can remember, and
19  I think I would remember.

20      Q.   And other than your conversations with
21  Mr. Seery and counsel, you haven't had any
22  conversations with anyone else about these alleged oral
23  agreements; is that fair to say?

24      A.   I'm not sure I understand the question.

25      Q.   You told me you may have had questions with

David Klos - October 27, 2021

1   counsel about these oral agreements defense, and you
2   told me about conversations with Mr. Seery, so I'm
3   trying to close that topic.
4           Was there anyone else you had any
5   conversations with about this alleged oral agreement?
6       A.   Like I said before, nothing of substance.
7   I've probably mentioned it in passing to other
8   employees, this is what I understand is being asserted
9   in this, but nothing of substance.
10      Q.   Do you have any personal knowledge as to
11  whether Mr. Dondero or Ms. Dondero entered into any
12  type of oral agreement prior to the bankruptcy?
13      A.   No, not other than what's been pled, or
14  whatever the terminology is.
15      Q.   I want to talk a little bit about, you
16  touched on earlier, you gave some testimony about how
17  in -- there were certain term loans that had payments
18  due in December or on or about December 31, 2020.
19          Do you remember talking about that?
20      A.   Yeah, generally.
21      Q.   And I don't know if you're specifically
22  referring to these loans, but is it also your
23  understanding that HCMS and HCRE also had payments that
24  were due on December 31, 2020?
25      A.   Yes.

David Klos - October 27, 2021

1    Q.   Is it fair to say that if those payments were
2  to be made, it would have been Ms. Hendrix that would
3  have gone and effectuated those payments?
4           MR. MORRIS:  Objection to the form of the
5  question.
6           THE WITNESS:  Can you remind me the entities
7  again.
8    Q.   (BY MR. AIGEN)  Sorry.  HCMS and HCRE
9  Partners.
10    A.   HCMS, yes.  HCRE, I'm not sure, maybe.
11    Q.   Why might it have been different?
12    A.   I just don't recall who had the, you know,
13  kind of bank access to effectuate that payment.  I
14  think Kristin did but I'm not certain.
15    Q.   It wouldn't have been you; is that fair to
16  say?
17    A.   Correct.  It would not have been me.
18    Q.   And if Ms. Hendrix testified that the
19  instruction she received in December 2020 about not
20  making payments related only to the Advisors and not to
21  HMS or HCRE, would you have any reason to disagree with
22  her?
23           MR. MORRIS:  Objection to the form of the
24  question.
25           THE WITNESS:  Yeah, I was struggling with

David Klos - October 27, 2021

1  that question.  There was a lot to it.  If you don't

2  mind.

3       Q.   (BY MR. AIGEN)  Okay.  I'll repeat it.  Maybe

4  that will help.

5            MR. MORRIS:  Why don't you ask him about his

6  knowledge, instead of Kristin's.  You had her as a

7  witness.

8            I'll continue to object.  I don't know why

9  you're asking him about her knowledge.

10           MR. AIGEN:  Do you want to keep coaching him?

11           MR. MORRIS:  No, I'm trying to coach you.

12           MR. AIGEN:  Oh, thanks.  That's good.

13  Appreciate if you stop coaching your witness.

14       Q.   (BY MR. AIGEN)  If Ms. Hendrix testified that

15  the instructions she received in December 2020

16  regarding not making any more payments related only to

17  the Advisors and not to HMS or HCRE, would you have any

18  reason to disagree with her?

19           MR. MORRIS:  Objection to the form of the

20  question.

21           THE WITNESS:  I have no reason to question

22  Kristin's testimony.  I'm sure she gave truthful

23  testimony.

24       Q.   (BY MR. AIGEN)  Are you aware or not of

25  whether Ms. Hendrix was told by Mr. Waterhouse not to

David Klos - October 27, 2021

1  make payments from certain entities in December of

2  2020?

3        MR. MORRIS:  Objection to the form of the

4  question.

5        THE WITNESS:  Yeah, I'm aware, and I think I

6  spoke to that earlier of the instruction that had come

7  down from Dondero through Frank to Kristin, and I was

8  certainly aware of it.

9        And I'm -- and I think I spoke to the fact

10 that, you know, certainly hearing it from a person who,

11 as I said before, wasn't really on the team at that

12 point, it was certainly my understanding that that was a

13 global instruction at the time.

14    Q.  (BY MR. AIGEN)  And I want to get into what

15 was actually said and what you remember, so let me ask

16 you this.

17        This instruction that came down started from

18 Jim and went to Frank.  Is that your understanding?

19    A.  That's my understanding.

20    Q.  You weren't there during that discussion I

21 assume; is that correct?

22    A.  Correct, I was not.

23    Q.  And then Frank gave an instruction to

24 Kristin; is that your recollection?

25        MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

1   question.

2           THE WITNESS:  Yeah, it's my understanding

3   that Frank informed Kristin of that instruction.

4       Q.  (BY MR. AIGEN)  Were you there when Frank

5   provided this instruction to Kristin?

6       A.  I don't believe I was.

7       Q.  Then can I ask, how did you become aware that

8   Frank had given this instruction to Kristin?

9       A.  Through subsequent conversations with Frank

10  and Kristin.  As I said before, I don't recall if it

11  was the three of us or me and Frank or me and Kristin.

12  But subsequent conversations.

13      Q.  Are we talking about conversations back in

14  2020 or after the bankruptcy?

15          MR. MORRIS:  Objection to the form of the

16  question.

17          THE WITNESS:  During 2020, December of 2020.

18      Q.  (BY MR. AIGEN)  Sitting here today, can you

19  say with a hundred percent certainty that the

20  instruction related to all of the entities as opposed

21  to just Advisors?

22      A.  So as you pointed out, I was not party to the

23  direction, so I have no way of knowing with any sort of

24  specificity what the direction actually was.  I just

25  know how it was conveyed to me and how I understood it.

David Klos - October 27, 2021

1    Q.   When you say it was conveyed to you, are you
2 talking about subsequent discussions that you had with
3 Ms. Hendrix and Mr. Waterhouse after they talked to
4 each other?
5    A.   Yes.
6    Q.   Sitting here today, can you tell me for sure
7 that one of them told you that this instruction related
8 to all of the entities, as opposed to just the
9 Advisors?
10    A.   No, I can't say that with certainty, but I
11 think that that was the case.  But, again, I can't say
12 with certainty.
13    Q.   Would you defer to Mr. Waterhouse and
14 Ms. Hendrix over what the specific instructions were?
15         MR. MORRIS:  Objection to the form of the
16 question.
17         THE WITNESS:  Like I said, I wasn't part of
18 the conversation, so I would defer to people who
19 received the directions more directly.
20    Q.   (BY MR. AIGEN)  And you're not aware of
21 anything in writing or anything that reflects these
22 instructions on whether to pay or not to pay certain
23 payments in December of 2020?
24    A.   No, I'm not aware of anything in writing.
25    Q.   And let's change topics for a second here.

David Klos - October 27, 2021

1          I want to throw out a term.  Are you familiar

2 with the term "NAV ratio trigger period" as it was used

3 in --

4     A.    In a very, very general sense, yes.

5     Q.    And in a general sense what does that term

6 mean to you?

7     A.    It's a term I recognize from the limited

8 partnership agreement of HCMLP.  It's a defined term in

9 that agreement.

10     Q.    To your knowledge, was the NAV ratio trigger

11 period ever reached or triggered prior to the Highland

12 bankruptcy?

13     A.    I don't know the definition, so I don't know

14 based on the definition whether it had or hadn't.

15     Q.    Sitting here today, though, it's not your

16 belief, based on your experience, that it was

17 triggered; is that fair to say?

18          MR. MORRIS:  Objection to the form of the

19 question.

20          THE WITNESS:  I don't know the consequence of

21 being in a trigger period, I guess is what -- how I'm

22 trying to answer your question.

23     Q.    (BY MR. AIGEN)  Have you ever had any

24 conversations with Nancy Dondero?

25     A.    Yes.

David Klos - October 27, 2021

1     Q.   Generally, how many and what was the
2  reasoning?
3     A.   Probably less than five.  I think maybe only
4  one or two that I can really remember.
5     Q.   At a high level what were those conversations
6  about?
7     A.   From my recollection of my conversations with
8  her, they pertained to the DRIP, which is a dividend
9  reinvestment program that I helped.
10    Q.   And approximately when were these
11 conversations?
12    A.   I don't know.  Sometime between 2017 and
13 probably 2019.  I couldn't tell you with any
14 specificity.  These were very informal.
15    Q.   Fair to say that you've never had any
16 conversations with Nancy Dondero about any of the loans
17 at issue in this case?
18    A.   No, no, no, I've never had a conversation
19 with her like that.
20    Q.   And fair to say that you've never had any
21 conversations with Nancy Dondero about compensation for
22 Jim or any other officers at Highland?
23    A.   Correct.
24         MR. AIGEN:  Why don't we go off the record
25 for two minutes.  I think I'm either done or about

David Klos - October 27, 2021

1    done.

2              (Off the record.)

3        Q.   (BY MR. AIGEN)  You understand you're still

4    under oath?

5        A.   Yes.

6        Q.   Are you aware of any loans that Highland has

7    made to any employees or officers that were forgiven in

8    all or in part?

9        A.   Yes.

10       Q.   Can you tell me who?

11       A.   I don't know that this will be a complete

12   list, but there were a few employees in the kind of

13   late aughts, maybe 2010, 2011 frame.

14       Q.   Do you know the names?

15       A.   One was Jack Yang.  Another, I'm not sure if

16   it was forgiven or not, that's why I'm hesitating, but

17   it was Tim Lawler.  I think his was forgiven in part or

18   in full, but I'm not a hundred percent certain.

19       Q.   And any other individuals that received loans

20   that were forgiven in part that you're aware of?

21       A.   Not that I recall, but there could be others.

22   Some of this is very, very old.

23       Q.   Changing topics here a little bit, I'm going

24   to combine two entities to try to speed this up.  If

25   you need to separate, that's fine.

David Klos - October 27, 2021

1          Can you just generally explain to me what
2   services Highland Capital Management provided for
3   HCMS and HCRE?
4       A.    For HCMS -- I do need to separate these a
5   little bit.  For HCMS, really full-service accounting,
6   tax, treasury, cash payments.  I said tax.  Valuation.
7   Nothing personnel-wise because they didn't have any
8   employees.
9          That's all I can think of right off the top
10  of my head, but I could be missing some.
11      Q.    And what about HCRE?  How is that different?
12      A.    Similar, except different types of assets.
13  So more real estate, so less heavy.
14          Maybe not necessarily differences in terms of
15  the types of services, but services would have, I'd
16  say, more cash activity, more variety of investments,
17  which triggers different types of activities going on
18  at those entities.
19          But similar in terms of tax operations,
20  making payments.  HCRE didn't have employees, so no
21  payroll.  So these would be the broad areas that I
22  would think about.
23      Q.    And you mentioned making payments.  Would one
24  of those services that Highland provided for these two
25  entities include making loan payments on the term loans

David Klos - October 27, 2021

1   like the term loans at issue in these proceedings?

2           MR. MORRIS:  Objection to the form of the

3   question.

4           THE WITNESS:  I think I mentioned before, I

5   couldn't remember whether or not Kristin was authorized

6   to make payments with respect to HCRE.  I think she

7   probably was, but I don't know that with certainty.

8           But, you know, for services, certainly Kristin

9   and her team would be responsible for making those

10  payments, subject to the proper authorization.

11      Q.  (BY MR. AIGEN)  And I'm sorry if I asked this

12  before.  If it wasn't Kristin for HCRE, do you have an

13  idea who it would have been?

14      A.   If not Kristin, it would have been Melissa

15  Schroth.

16      Q.   And how were those responsibilities split up?

17  What entities was Melissa Schroth responsible for?

18      A.   Generally speaking, Melissa was more

19  responsible for entities that were really, like -- I'm

20  going to use this in the most general sense, like Jim

21  entities, Jim's trusts, Jim personally.

22          And for HCRE it was kind of in the middle.

23  When it started out it kind of was more Jim world and

24  then over time it got more complex.

25          And as entities got more complex over time

David Klos - October 27, 2021

1  they tend to get transitioned from Melissa to corporate
2  accounting.  And when they got really complex over to
3  another group of fund accountants.
4          So this is one that was, at its beginning,
5  Melissa was the, called primary accountant.  And at
6  some point in time that transitioned to the corporate
7  accounting team.  I can't remember when the cash
8  process kind of cut over.
9      Q.  Is there a list somewhere saying Melissa is
10  responsible for these, Kristin for the others, or is it
11  just more of a pattern or matter of practice?
12      A.  More of a matter of practice.  If you're
13  responsible for an entity, you're responsible.  If
14  you're not, then you're not.
15          MR. AIGEN:  That's all the questions I have.
16  Thank you for your time.
17          THE WITNESS:  Thank you.
18                      EXAMINATION
19      Q.  (BY MR. MORRIS)  Just a few, Mr. Klos.  Let's
20  pick up where Mr. Aigen left off.
21          To the best of your knowledge, did HCMS have
22  a shared services agreement with Highland?
23      A.  No, it didn't that I'm aware of.
24      Q.  But you described certain services that HCMLP
25  provided to HCMS; is that right?

David Klos - October 27, 2021

1      A.   Yes.

2      Q.   Do you know whether HCMFA ever compensated --

3  do you know whether HCMS ever compensated HCMLP for any

4  of those services that HCMLP provided?

5      A.   No, it didn't.

6      Q.   You mentioned HCRE.  To the best of your

7  knowledge, did HCRE have a shared services agreement

8  with Highland Capital Management, LP?

9      A.   No, it didn't.

10     Q.   Did HCRE provide the services that --

11  withdrawn.

12          Did HCMLP provide the services to HCRE that

13  you just described?

14     A.   Yes.

15     Q.   Did HCRE ever compensate HCMLP for any of the

16  services that HCMLP provided?

17     A.   No.

18     Q.   Okay.  Mr. Rukavina asked you some questions

19  about payments that were made on the NexPoint loan in

20  the first half of 2019.

21          Do you remember that?

22     A.   Yes, generally.

23     Q.   Okay.  Notwithstanding those payments, did

24  your group continue to carry on its books and records

25  NexPoint's obligation to make the installment payment

David Klos - October 27, 2021

1    that was due at the end of the year?

2        A.    Yes, we continued to track it through our

3    interest schedules and through cash.

4        Q.    So in the debtor's books and records is there

5    any evidence that the payments that were made in early

6    2019 were intended to relieve NexPoint's obligation to

7    make the installment payment due at the end of the

8    year?

9            MR. RUKAVINA:  Objection.  Best evidence.

10           THE WITNESS:  No, I don't believe so.

11       Q.    (BY MR. MORRIS)  Did you have a conversation

12   with anybody at any time in the year 2019 about whether

13   the payments made earlier in the year on behalf of

14   NexPoint would eliminate or suspend its obligation --

15   withdrawn.

16           Did you have any conversation with anybody --

17   I think I screwed up the dates.  Going to have to start

18   over.

19           Let me ask better questions.

20           You looked with Mr. Rukavina at certain

21   payments that were made in early 2019 with respect to

22   the NexPoint note.

23           Do I have that right?

24       A.    Yes.

25       Q.    Notwithstanding those payments, did NexPoint

David Klos - October 27, 2021

1  make the installment payment that was due at the end of

2  2019?

3         MR. RUKAVINA:  Objection.  Calls for a legal

4  conclusion.

5         THE WITNESS:  It did make the payment that

6  was due at the end of 2019.

7     Q.  (BY MR. MORRIS)  And the payment that it made

8  at the end of 2019, was that the annual installment

9  payment that was called for in the note itself?

10        MR. RUKAVINA:  Objection.  Legal conclusion.

11        THE WITNESS:  Yes, it was a payment pursuant

12  to the note.

13    Q.  (BY MR. MORRIS)  Did anybody ever tell you at

14 any time prior to the commencement of this lawsuit that

15 any prior payment by or on behalf of NexPoint relieved

16 it of any obligation to pay the installment payment due

17 at the end of 2020?

18    A.  No.

19    Q.  And did in fact -- is it your understanding

20 that Mr. Dondero specifically authorized Highland to

21 effectuate a payment on NexPoint's behalf in mid

22 January 2021?

23    A.  I don't have specific knowledge, but I know

24 that to have occurred.

25    Q.  Okay.  Did anybody ever tell you in 2021 --

David Klos - October 27, 2021

1  withdrawn.

2          Did anybody tell you in December 2020 or

3  December -- or January 2021 that NexPoint didn't have

4  to make the installment payment at year end 2020

5  because of some prior prepayment?

6      A.   No.

7      Q.   Can you think of any reason -- withdrawn.

8          Did you ever hear Mr. Dondero -- withdrawn.

9          Did you ever see anything in writing where

10 NexPoint ever contended, prior to February 1, 2021,

11 that it had no obligation to make the payment due at

12 the end of 2020 because of some prepayment issue?

13     A.   No, not that I remember.

14     Q.   Can you think of any reason why Mr. Dondero

15 would have authorized a payment by NexPoint to HCMLP on

16 account of the note in January of 2021 if he actually

17 believed at that time that no obligation was due

18 because of a prior prepayment?

19          MR. RUKAVINA:  Objection.  Speculation, lacks

20 foundation.

21          THE WITNESS:  No.

22     Q.   (BY MR. MORRIS)  Does it make any sense to

23 you as an accountant that you would pay a seven-figure

24 sum of money that you didn't think was due and owing?

25     A.   No, that does not make sense to me.

David Klos - October 27, 2021

1        Q.    Can you get Exhibit 13, please.

2        A.    Got it.

3        Q.    You were asked some questions about

4    paragraph 3.

5              Do you see that?

6        A.    Yes.

7        Q.    Does paragraph 3 mention annual installment

8    payments at all?

9        A.    No, I'm not seeing it.

10       Q.    Does paragraph 3 state in any way that a

11   prepayment as described in that paragraph would relieve

12   the maker of the obligation to make annual installment

13   payments?

14       A.    No.

15       Q.    Can you turn to the next page and look at

16   paragraph 5.

17             Are you familiar with that paragraph at all?

18       A.    No.  I mean, I've seen it before, but this

19   is, as I said before, this is a provision that probably

20   would have been in most, if not all, of these types of

21   notes.

22       Q.    Can you get Exhibit 3, please.  This is your

23   email dated May 2, 2019.

24             Do I have that right?

25       A.    Yes.

David Klos - October 27, 2021

1    Q.   And you sent it to the corporate accounting
2  email group; is that right?
3    A.   I did.
4    Q.   And to the best of your recollection, was
5  Mr. Waterhouse included in that email group?
6    A.   Yes, absolutely.
7    Q.   And did you instruct the corporate accounting
8  team to transfer $2.4 million from HCMLP to HCMFA on
9  May 2, 2019?
10    A.   Yes, specifically Blair, but yes, for the
11  team as well.
12    Q.   The whole team was aware of this?
13    A.   The whole team is on the email, and I'm
14  sending to Blair, who is the AP person, to please set
15  up the payment.
16    Q.   Is it fair to say that you're being
17  completely transparent here by including the entire
18  corporate accounting group on this email?
19    A.   Yes.
20    Q.   And did you tell the entire corporate
21  accounting group that this transaction would be a,
22  quote, new interco loan?
23    A.   Yes, that's what the email says.
24    Q.   Do you have any reason to believe that
25  Mr. Waterhouse didn't get this?

David Klos - October 27, 2021

1       A.    No, he got this.
2       Q.    And did Mr. Waterhouse tell you at any time
3   in the history of the world that this $2.4 million
4   should not have been booked as a loan?
5       A.    No.
6       Q.    Did Mr. Dondero tell you at any moment in the
7   history of the world that this transaction should not
8   have been booked as a loan?
9       A.    No.
10      Q.    You mentioned that there was an audit that
11  followed shortly thereafter?
12      A.    Yes.
13      Q.    Are you familiar with the debtor's audited
14  financial statements for the period ending 2018?
15      A.    Yes, generally.  Not total recall, but yes.
16      Q.    Are you aware that this loan was included as
17  a subsequent event in the debtor's audited financial
18  statements?
19      A.    Yes.
20          MR. RUKAVINA:  Objection.  Best evidence.
21      Q.    (BY MR. MORRIS)  Did Mr. Dondero or
22  Mr. Waterhouse or anybody ever tell you that the debtor
23  should not have included this $2.4 million loan in its
24  audited financial statements?
25          MR. RUKAVINA:  Objection.  Best evidence.

David Klos - October 27, 2021

```
 1              THE WITNESS:  No.
 2        Q.   (BY MR. MORRIS)  Okay.  And the next day
 3  there was another loan; right?
 4        A.   Yes.
 5        Q.   I'm going to show you here a document that's
 6  been produced.
 7              MR. RUKAVINA:  Would you email it to me and I
 8  can print it out for the court reporter.
 9              MR. MORRIS:  You want to come over here and
10  look --
11              MR. RUKAVINA:  I know it.  I'm just thinking
12  that we can append it to the record right now.
13              MR. MORRIS:  It's eight pages, so it's part
14  of a whole production.
15              MR. RUKAVINA:  But it's just one email?
16              MR. MORRIS:  Just one email that I'm talking
17  about.  So we're looking at Bates stamp D-CNL003763.
18              And I'll email it to you when we're done here.
19  And you're welcome to come over here if you'd like to
20  see it.
21        Q.   (BY MR. MORRIS)  Mr. Klos, can you take a
22  look at the email that I have on my screen.
23        A.   Yes.
24        Q.   And do you see that it's an email from
25  Kristin Hendrix to the corporate accounting group on
```

David Klos - October 27, 2021

1  Friday, May 3?

2       A.   Yes.

3       Q.   And were you also included in the corporate

4  accounting email string?

5       A.   Yes.

6       Q.   Can you read the email out loud, please.

7       A.    It says, Blair, please set up a wire from

8  HCMLP to HCMFA for 5 million as a new loan,

9  parentheses, 4.4 million should be coming in from Jim

10 soon.  Hayley, please add this to your loan tracker.  I

11 will paper the loan.

12      Q.   So based on that email, did you understand on

13 May 3 that HCMLP was going to loan $5 million to HCMFA?

14      A.   Yes, HCMFA.

15      Q.   And did you understand that Kristin

16 specifically told the corporate accounting group that

17 she would take responsibility for papering the loan?

18      A.   Yes, that's what she says.

19      Q.   Do you recall whether Mr. Waterhouse ever

20 objected to any aspect of Kristin's email?

21      A.   He didn't.

22      Q.   Do you recall in the history of the world

23 whether Mr. Waterhouse ever told you that this

24 $5 million transaction should not have been booked as a

25 loan?

David Klos - October 27, 2021

1    A.    No.

2    Q.    Did anybody in the history of the world ever

3 raise a question to you as to whether or not Kristin

4 was authorized to paper the loan, as she describes it

5 in this particular email?

6    A.    No.

7    Q.    Do you know if this $5 million loan was also

8 included in the debtor's audited financial statements?

9         MR. RUKAVINA:  Objection.  Best evidence.

10         THE WITNESS:  Yes.  Again, subsequent event.

11    Q.    (BY MR. MORRIS)  Okay.  And did anybody in

12 the history of the world ever tell you that Highland

13 should not have included as a subsequent event in its

14 2018 audited financial statement this $5 million loan?

15    A.    No.

16         MR. RUKAVINA:  Objection.  Best evidence.

17         THE WITNESS:  No.

18    Q.    (BY MR. MORRIS)  Do you know if HCMFA had its

19 financial statements audited?

20    A.    It did.

21    Q.    And are you generally familiar with those

22 financial statements?

23    A.    Yes.

24    Q.    Are you aware that these two loans totaling

25 $7.4 million were included in HCMFA's audited financial

David Klos - October 27, 2021

1  statements as a subsequent event for the period ended
2  December 31, 2018?
3       A.   Yes.
4            MR. RUKAVINA:  Objection.  Best evidence.
5       Q.   (BY MR. MORRIS)  Did anybody in the history
6  of the world ever tell you that HCMFA should not have
7  included as a subsequent event the borrowing of the
8  money reflected in these loans?
9            MR. RUKAVINA:  Objection.  Best evidence.
10           THE WITNESS:  No, no one said that.
11      Q.   (BY MR. MORRIS)  Do you know if HCMFA
12 included these loans as a liability on its balance
13 sheet?
14      A.   It did.
15           MR. RUKAVINA:  Objection.  Move to strike.
16 Best evidence.
17      Q.   (BY MR. MORRIS)  Did anyone in the history of
18 the world ever tell you that HCMFA should not have
19 included these loans as a liability on its balance
20 sheet?
21           MR. RUKAVINA:  Objection.  Best evidence.
22           THE WITNESS:  No.
23      Q.   (BY MR. MORRIS)  Okay.  Do you recall that in
24 October of 2020 HCMFA and NexPoint made a report to the
25 retail board?

David Klos - October 27, 2021

1    A.    Yes.

2    Q.    And are you aware that that's part of the

3  annual review process?

4    A.    Yes, it's the 15(c) process.

5    Q.    By the way, as we're talking about these

6  issues, did Mr. Waterhouse have -- was he an officer of

7  HCMFA in 2019 and 2020?

8    A.    Yes.

9    Q.    And what's your understanding as to the

10  office he held?

11    A.    Treasurer, I believe.

12    Q.    And do you know if Mr. Dondero held an

13  officer position with respect to each of the Advisors?

14    A.    He did.

15    Q.    What position did he hold?

16    A.    I don't recall with certainty, but I believe

17  president.

18    Q.    As officers of those two entities, do you

19  have any knowledge as to whether they participated in

20  the communications with the retail board in the fall of

21  2020?

22    A.    I believe Jim and Frank both did.

23    Q.    And do you know whether the retail board

24  asked the Advisors for a report on all obligations due

25  and owing to HCMLP and affiliates?

1        A.   They asked for financials, I believe as of
2    6/30 as part of that process.
3        Q.   And are you aware as to whether or not the
4    financials that were provided to the retail board
5    included, among other things, the $7.4 million in notes
6    that were -- that we're talking about here?
7        A.   Yes, those financials would have included
8    those amounts as liabilities to HCMLP.
9        Q.   Did Mr. Dondero or Mr. Waterhouse ever tell
10   you or anybody to your knowledge that the Advisors
11   should not have told the retail boards that they were
12   obligated to pay under those two notes?
13       A.   No.
14       Q.   Let's talk about loan forgiveness for a
15   moment.
16            How long have you been with the company?
17       A.   March of 2009.
18       Q.   At any time since you've been employed by
19   Highland, has Highland ever forgiven a promissory note
20   that it held where the maker was a corporate affiliate?
21       A.   Not that I can recall.
22       Q.   Have you ever heard prior -- has anybody ever
23   told you that before you joined the company, Highland
24   had ever forgiven in whole or in part any note that it
25   held where the maker was a corporate affiliate?

David Klos - October 27, 2021

1       A.   Not that I'm aware of.
2       Q.   You referred to a couple of loans that were
3  given to individuals earlier.
4            Do you remember that?
5       A.   Yes.
6       Q.   What's the biggest loan that you can recall
7  Highland ever forgiving?
8       A.   The largest one that I can remember was
9  a half-million dollars, 500,000.
10      Q.   So you have no knowledge of any loan ever
11 being forgiven where the principal amount forgiven
12 exceeded $500,000; is that right?
13      A.   Not that I'm aware of.
14      Q.   And when is the last loan that Highland
15 forgave in whole or in part to one of its officers or
16 employees that you can recall?
17      A.   I don't know a specific year, but it would
18 have been in the 2010, 2011 time frame.  Maybe 2012,
19 but I suspect '10 or '11.
20      Q.   So is it fair to say to the best of your
21 recollection and knowledge that Highland did not
22 forgive a single loan made to an officer or employee
23 for at least seven years prior to the petition date?
24      A.   There's none that I can think of.
25      Q.   Let's just turn our attention to

David Klos - October 27, 2021

1  December 2020.

2          Do you recall that you testified at length

3  about your understanding of the conversations with

4  Mr. Waterhouse and Ms. Hendrix?

5          Do you remember that?

6      A.   Yes.

7      Q.   Okay.  Are you aware of any instruction ever

8  made by Mr. Dondero or Mr. Waterhouse in November or

9  December 2020 in order to make the payments that were

10  due under the three term notes -- withdrawn.

11          There were three term notes that were due --

12  withdrawn.

13          There are three term notes at issue in this

14  case.  Do you understand that?

15      A.   Yeah, that's my understanding.

16      Q.   And one of them was issued by NexBank; is

17  that right?

18      A.   NexPoint Advisors.

19      Q.   Thank you for the clarification.

20          One was by HCRE?

21      A.   Correct.

22      Q.   And one was from HCMS; do I have that right?

23      A.   Yes.

24      Q.   And all three of those notes were executed as

25  of May 31, 2017; right?

David Klos - October 27, 2021

1    A.    Yeah, that was the effective date on all
2  three.
3    Q.    And they all rolled up previously outstanding
4  notes that were due and payable to Highland.
5       Do I have that right?
6    A.    Correct.  To the best of my recollection.
7    Q.    So we'll refer to those notes as the term
8  notes.  Is that okay?
9    A.    Sure.
10   Q.    Do you have any knowledge that Mr. Dondero or
11 Mr. Waterhouse ever instructed HCMLP to make the
12 installment payments that were due at the end of 2020
13 with respect to any of those term notes?
14   A.    No, I don't believe they provided that
15 instruction to make those payments.
16      MR. RUKAVINA:  Objection.  Move to strike.
17 Lacks foundation.
18      MR. MORRIS:  I'm asking him if he ever heard.
19      MR. RUKAVINA:  But he answered a different
20 question.  He answered a different question.
21   Q.    (BY MR. MORRIS)  Did you ever see anything in
22 writing where either Mr. Dondero or Mr. Waterhouse
23 directed HCMLP to make the annual installment payments
24 that were due at the end of 2020 with respect to any of
25 the term notes?

David Klos - October 27, 2021

1    A.    No.

2    Q.    Okay.  But to the best of your recollection,

3 in the 13-week forecast, those forecasts included the

4 installment payments that were due at the end of the

5 year; is that right?

6    A.    They did.

7    Q.    Did anybody ever tell you prior to

8 February 1, 2021, that your group had made a mistake by

9 not making the payment -- any of the payments that were

10 due under the term notes at the end of 2020?

11    A.    Not that I'm aware of.

12    Q.    Did anybody tell you prior to February 1,

13 2021, that the makers of the term notes expected

14 Highland to effectuate the payments that were due at

15 the end of the year without approval by Mr. Waterhouse

16 or Mr. Dondero?

17    A.    No.

18    Q.    Have you seen any protest in writing prior to

19 the commencement of the litigation by any of the makers

20 of the notes about a failure on the part of HCMLP to

21 perform its duties and make that payment at the end of

22 the year?

23    A.    No.

24          MR. MORRIS:  I have no further questions.

25          MR. RUKAVINA:  I have five minutes.

David Klos - October 27, 2021

1          FURTHER EXAMINATION

2     Q.   (BY MR. RUKAVINA)  Go to Exhibit 16, please,
3 1-6.

4     A.   Sure.

5     Q.   Sir, this is an email string regarding that
6 Rule 15(c) that you were talking about.  I'm just going
7 to ask you about the top email, but you're welcome to
8 read the whole.

9     A.   Uh-huh.

10     Q.   You're copied on Mr. Waterhouse's email there
11 October 6, 2020; right?

12     A.   Yes, I'm on the email.

13     Q.   And Mr. Waterhouse writes, the HCMFA note is
14 a demand note.  You would have read that; right?

15     A.   Yes.

16     Q.   Did you ever correct Mr. Waterhouse when he
17 says the HCMFA note, as opposed to notes?

18     A.   No, that's not something I would have
19 corrected from Frank.

20     Q.   Do you recall right now that you might have,
21 when you read this, realized that he made a mistake?

22     A.   It would have been such a de minimus,
23 inconsequential mistake that I don't know that I would
24 have addressed it.

25     Q.   What about two sentences over, there was an

1   agreement between HCMLP and HCMFA the earliest they
2   could demand is May 2021.
3        Did you ever write to him and say that too
4   was a mistake?
5        A.   I didn't write to him.
6        Q.   Did you realize back then when you read it
7   that he had made a mistake?
8        A.   I'm not certain.
9        Q.   Did you -- and I'm not suggesting that you
10  should have.  You're a busy man.  But did you attach
11  any significance outside of the ordinary to this email
12  exchange?
13       MR. MORRIS:  Objection to the form of the
14  question.
15       THE WITNESS:  I struggle with how to answer
16  that.  I saw that this note was in response to retail
17  15(c) follow-up on the Advisors.
18       At this point my role was different, where I
19  was dealing with really the retail funds primarily.  So
20  the fact that I'm even on this email is somewhat
21  incidental.
22       Q.   (BY MR. RUKAVINA)  But surely on October 6,
23  2020 you knew that there were four HCMFA demand notes,
24  didn't you?
25       A.   I'm sure I would have had access to that

David Klos - October 27, 2021

1  information.  I'm not sure that I was keeping track of
2  how many were outstanding at any given point in time.
3      Q.   And surely on October 6, 2020 you knew that
4  only two of them couldn't be demanded by May of 2021,
5  didn't you?
6      A.   Again, I don't know that I was even really
7  thinking about these notes at that time.
8      Q.   Even though you were preparing weekly cash
9  forecasts for Mr. Seery?
10      A.   I wasn't preparing a weekly cash forecast for
11  Mr. Seery.
12      Q.   Going to Exhibit 13, please.  Mr. Morris
13  asked you a couple questions about this.
14      A.   I'm sorry, 13?
15      Q.   Yes, sir.  And again, that paragraph 3 that
16  talks about prepayment.
17          Can you find anything in here, sir, that says
18  that a prepayment does not relieve the maker of any
19  regularly scheduled payment?
20      A.   Sorry, that's a lot to comprehend.  If you
21  could ask again.
22      Q.   Is there any provision that you can see here
23  that's to the effect that a prepayment will not relieve
24  the maker of any regularly scheduled payment?
25      A.   I don't see that specific provision.  I just

David Klos - October 27, 2021

1  read it for what is on the page.

2      Q.   Isn't it, sir, in your experience the case

3  that a promissory note, if it intended not to relieve

4  the borrower of regularly scheduled payments would say

5  that a prepayment does not relieve the borrower of

6  regularly scheduled payments?

7           MR. MORRIS:  Objection to the form of the

8  question.

9           THE WITNESS:  That's a legal question.  I

10 can't -- I don't know the answer.

11     Q.   (BY MR. RUKAVINA)  Do you remember seeing

12 promissory notes that say something like that?

13     A.   Not that I can recall.

14     Q.   You'd be surprised if that's what promissory

15 notes say?

16          MR. MORRIS:  Objection to the form of the

17 question.

18          THE WITNESS:  I don't know.

19     Q.   (BY MR. RUKAVINA)  And Mr. Morris asked you

20 about this.  I'm trying to burn through this so the man

21 can make his plane.

22          Section 2.1 talks about 30 equal annual

23 payments, annual installments.

24          You see that?

25     A.   Yes, I see that.

David Klos - October 27, 2021

1    Q.   And Mr. Morris asked you whether you see
2 anything in here that says that a prepayment relieves
3 an annual installment.
4         Do you remember that question?
5         MR. MORRIS:  Objection.  That's not what I
6 asked.
7         THE WITNESS:  I don't remember that question.
8    Q.   (BY MR. RUKAVINA)  Reading Section 2.1 and 3
9 together, what would a prepayment apply to other than
10 an annual installment?  Do you have a view on that?
11         MR. MORRIS:  Objection to the form of the
12 question.
13         THE WITNESS:  Again, I struggle with
14 prepayment.  But as I read Section 3, it would be
15 applied first to unpaid accrued interest and then to
16 unpaid principal.
17    Q.   (BY MR. RUKAVINA)  Have you ever in your
18 personal life prepaid a promissory note before -- have
19 you ever in your personal life prepaid a promissory
20 note prior to its maturity?
21         MR. MORRIS:  Objection to the form of the
22 question.
23         THE WITNESS:  I don't know.
24    Q.   (BY MR. RUKAVINA)  Sitting here today, with
25 your CPA, your MBA and you're a CFO of a large entity,

David Klos - October 27, 2021

1   you don't understand what a prepayment means?

2           MR. MORRIS:  Objection.  Argumentative.

3           I direct you not to answer.

4           You're going to have ask a different question.

5   That's an argumentative question and it's insulting.

6           MR. RUKAVINA:  What's the privilege on which

7   you're directing him not to answer?

8           MR. MORRIS:  I just said it's argumentative.

9           MR. RUKAVINA:  I'm trying to let you get to

10  your flight.

11          MR. MORRIS:  Ask a proper question.  Don't

12  make this about me.

13      Q.   (BY MR. RUKAVINA)  You were going to answer

14  my question, sir?

15          MR. MORRIS:  No, I'm directing him not to

16  answer.

17          MR. RUKAVINA:  Then we'll end this deposition

18  with a motion to compel.

19          MR. MORRIS:  Okay.  You do that.

20          MR. RUKAVINA:  I'm making a motion to compel.

21  We'll call the judge as soon as we land in New York

22  tomorrow.

23          MR. MORRIS:  You have to read the whole

24  question.  You can ask the question without the

25  verbiage; right?

David Klos - October 27, 2021

1          MR. RUKAVINA:  And I asked you on the basis
2   of what privilege are you instructing your --
3          MR. MORRIS:  Argumentative.
4          MR. RUKAVINA:  That's not a privilege.
5          MR. MORRIS:  Sir, you can rephrase your
6   question and end this right now by not being insulting
7   to my client.
8      Q.   (BY MR. RUKAVINA)  I was not trying to be
9   insulting, sir.
10          I'm asking you again, you do not, sitting
11  here today, have an understanding of what the word
12  "prepayment" for a promissory note means?
13          MR. MORRIS:  Objection to the form of the
14  question.
15          You can answer that one.
16          THE WITNESS:  In the context that you're
17  asking the question --
18      Q.   (BY MR. RUKAVINA)  No, I'm not asking any
19  context.  Sitting here today, do you have an
20  understanding of what the word "prepayment" means when
21  it comes to a borrower/lender relationship?
22          MR. MORRIS:  Objection to the form of the
23  question.
24          THE WITNESS:  Yes, I have a general
25  understanding.

David Klos - October 27, 2021

1    Q.   (BY MR. RUKAVINA)  What is your
2  understanding?
3    A.   That -- you can look at the note.
4    Q.   I'm not asking about the note.  We got to go
5  step by step.
6         What is your general understanding as to what
7  a prepayment means?
8         MR. MORRIS:  Objection to the form of the
9  question.
10         THE WITNESS:  It depends on the context and
11  it's going to depend on what the note says about
12  prepayments.  So I have a hard time answering that
13  question.
14    Q.   (BY MR. RUKAVINA)  So you would agree with me
15  that you have to look at the note before you can answer
16  that question?
17         MR. MORRIS:  Objection to the form of the
18  question.
19         THE WITNESS:  I would want to look at the
20  note before I answer the question, because prepayment
21  is a term that can be used as a defined term or in a
22  casual sense, and those two can sometimes get confused
23  and misconstrued.
24    Q.   (BY MR. RUKAVINA)  Would you agree with me
25  that in any and all circumstances a prepayment is a

David Klos - October 27, 2021

1  payment made prior to the time that it's due?

2         MR. MORRIS:  Objection to the form of the

3  question.

4         THE WITNESS:  Yes, in the most general sense

5  a prepayment, the prefix "pre" indicates that it's

6  before some other event.  So from that standpoint,

7  prepayment means it was to some extent paid early.

8         MR. RUKAVINA:  Thank you.

9         Pass the witness.

10         MR. MORRIS:  No further questions.

11         Michael?

12         MR. AIGEN:  No questions.

13         THE REPORTER:  Mr. Morris, do you want a copy

14  of the transcript?

15         MR. MORRIS:  I sure do.

16         THE REPORTER:  Mr. Aigen, do you want a copy

17  of the transcript?

18         MR. AIGEN:  Yes, we would also like a copy.

19         MR. MORRIS:  Yeah, and I'd like that rush.

20         (Whereupon, the deposition adjourned at

21         5:14 P.M.)

22                      --oOo--

23         I declare under penalty of perjury that the

24  foregoing is true and correct.  Subscribed at

25  _____, Texas, this _____ day  of

David Klos - October 27, 2021

1  _____, 2021.

2

3

4  _____

5  DAVID KLOS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

137

## CERTIFICATE OF REPORTER

1

2          I, BRANDON D. COMBS, a Certified Shorthand

3     Reporter, hereby certify that the witness in the

4     foregoing deposition was by me duly sworn to tell the

5     truth, the whole truth, and nothing but the truth in the

6     within-entitled cause;

7          That said deposition was taken in shorthand by

8     me, a disinterested person, at the time and place

9     therein stated, and that the testimony of the said

10    witness was thereafter reduced to typewriting, by

11    computer, under my direction and supervision;

12         That before completion of the deposition,

13    review of the transcript was not requested.  If

14    requested, any changes made by the deponent (and

15    provided to the reporter) during the period allowed are

16    appended hereto.

17         I further certify that I am not of counsel or

18    attorney for either or any of the parties to the said

19    deposition, nor in any way interested in the event of

20    this cause, and that I am not related to any of the

21    parties thereto.

22         DATED: November 1, 2021

23

24    _____

25    Brandon Combs, Certified Shorthand
      Reporter No. 10927 in and for the

HCMFA APP 0790

1      State of Texas
       Dickman Davenport, Inc. Cert 312
2      4228 North Central Expressway
       Suite 101, Dallas, TX 75206
3      (214) 855-5100    (800) 445-9548
       Email: info@dickmandavenport.com
4      www.dickmandavenport.com
       My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

David Klos - October 27, 2021

**A**

**ability** 42:12
43:21 78:2 88:8
88:10
**able** 31:20 32:2
**above-styled**
1:21
**absolutely** 12:4
16:10 77:1 80:1
80:14 90:1,4,10
94:1 115:6
**accepting** 19:17
**access** 99:13
128:25
**account** 53:20
60:3 113:16
**accountant** 26:5
26:9,15,20
39:12,17 90:19
109:5 113:23
**accountant's**
39:13
**accountants**
109:3
**accounted** 38:6
45:8,11 64:23
**accounting** 4:16
6:5,5,11,11
7:14,17,21 8:23
9:3,5,5,9,15,23
10:12 33:22
35:9,16,20
43:18 53:4
62:10,11 70:15
74:22 84:2
107:5 109:2,7
115:1,7,18,21
117:25 118:4
118:16
**accrue** 49:13
**accrued** 38:8
46:8,16,20,25
47:1,4,5,11,14
47:18,19,24,25
48:4,5,7,15

49:4,5,12,20,21
50:8,21 51:3
131:15
**accumulated**
47:22
**accurate** 27:25
85:10
**acknowledgment**
87:21,22
**act** 11:5
**activities** 107:17
**activity** 107:16
**actual** 37:5 85:13
**add** 118:10
**additional** 89:2
**address** 64:7
**addressed** 44:9
127:24
**adjourned**
135:20
**advisor** 9:24 71:7
74:19
**advisor-type** 6:7
**advisors** 1:10
12:14,15,17
13:3,6 27:1
52:19 55:1
60:22 65:23
71:6 72:22 86:6
99:20 100:17
102:21 103:9
121:13,24
122:10 124:18
128:17
**affect** 16:11,12
16:20
**affiliate** 39:23
122:20,25
**affiliated** 10:21
34:8 35:4,11
36:2 61:15
**affiliates** 38:5
51:20 121:25
**AFR** 86:7
**afternoon** 95:22

**agent** 85:16
**ago** 19:6 34:25
36:20 39:21
43:5 94:20
95:11
**agree** 8:11 47:10
47:11 51:7 77:2
89:19 134:14
134:24
**agreement** 12:23
84:11 96:4,8,23
97:9 98:5,12
104:8,9 109:22
110:7 128:1
**agreements** 41:3
97:16,23 98:1
**agrees** 48:7
**ahead** 45:7
**Aigen** 2:18 3:4
95:18,22,23
99:8 100:3,10
100:12,14,24
101:14 102:4
102:18 103:20
104:23 105:24
106:3 108:11
109:15,20
135:12,16,18
**Akard** 1:24 2:4
**aleck** 50:7
**alleged** 97:22
98:5
**Allocation** 70:25
74:12 75:6
**allow** 75:4
**allowed** 46:13
81:22 82:1
94:16 96:20
137:15
**allowing** 96:8
**amortization**
23:16 28:1
**amount** 15:5,15
37:5 47:22
59:13 73:2

80:21 84:14
97:12 123:11
**amounts** 28:24
41:7 122:8
**analysis** 30:9
53:25 54:6,9,18
55:1,8 89:13
**analyst** 5:17,25
**and/or** 40:12
67:7 91:22
**annual** 23:22
80:9 112:8
114:7,12 121:3
125:23 130:22
130:23 131:3
131:10
**answer** 16:23,25
17:2 20:18,20
21:3,15 22:1
25:5 28:10
35:16 41:18
50:11 53:24
55:15,23 71:5
78:11 79:7 87:7
94:13,14,17,21
104:22 128:15
130:10 132:3,7
132:13,16
133:15 134:15
134:20
**answered** 21:2
41:17 56:11
76:19 85:21
91:10 92:5,6
94:9 125:19,20
**answering**
134:12
**answers** 9:18
16:10,13
**anybody** 24:13
60:1 80:16
111:12,16
112:13,25
113:2 116:22
119:2,11 120:5

122:10,22
126:7,12
**anymore** 57:1
61:22 62:7
**AP** 115:14
**apologize** 9:21
27:22 63:11
66:21 77:1
**apparatus** 12:9
**APPEARANC...**
2:1
**appeared** 2:5,12
2:19
**appears** 49:3
64:2
**append** 117:12
**appended** 137:16
**application** 37:8
37:9,15,16
**applied** 39:17
46:8,9 48:11,14
49:5,8 64:13,16
65:1 131:15
**apply** 38:24
131:9
**Appreciate**
100:13
**appropriate**
35:19,22
**approval** 66:14
77:19,23 78:3
78:21 79:3
126:15
**approvals** 80:9
**approximate** 6:1
63:2
**approximately**
5:9 105:10
**April** 7:13,22
11:16,21 88:9
**areas** 107:21
**argumentative**
90:15 132:2,5,8
133:3
**art** 8:1 9:3 10:12

ascertain 45:2,4
asked 16:18 20:5
21:2 30:18
41:10,17 44:10
54:13 55:17,22
56:11 57:12,15
59:12 70:9
76:19 84:8,17
85:21 86:10
91:10 92:5 94:9
108:11 110:18
114:3 121:24
122:1 129:13
130:19 131:1,6
133:1
asking 18:11
20:21 28:6
38:20 56:9,13
61:5,7 77:13
83:22 94:15
100:9 125:18
133:10,17,18
134:4
aspect 118:20
ass 17:18
asserted 97:7
98:8
asset 15:7
assets 15:3 87:10
87:12 97:12
107:12
assist 42:13
assistance 31:13
assistant 6:24 7:4
7:7,10 8:8
assisted 22:23
assume 28:7 29:7
90:6 95:18
101:21
assumed 7:14
53:3
assuming 36:14
36:21 41:23
64:1
assumptions

54:14
attach 128:10
attempt 87:7
attention 123:25
attorney 2:5,12
2:18 137:18
audit 9:25 24:6
80:4 116:10
audit-driven
88:5
audited 116:13
116:17,24
119:8,14,19,25
auditor 24:3
auditors 24:5
88:6,15
aughts 106:13
August 42:16
44:13
authenticate 28:5
authenticity
67:23
authoritative
65:1,2
authority 36:9
77:3,13,15 78:7
78:21,25
authorization
108:10
authorize 77:4
authorized 40:2
59:15 69:6,25
85:24 108:5
112:20 113:15
119:4
authorizing
94:20
Avenue 2:11,17
aware 35:6 58:24
59:2,3 80:18,21
96:6,10,12
97:15 100:24
101:5,8 102:7
103:20,24
106:6,20

109:23 115:12
116:16 119:24
121:2 122:3
123:1,13 124:7
126:11
awfully 17:20

**B**
back 6:14 15:19
22:12 23:21,25
36:11 40:18
49:17 51:13
55:16 65:12
67:4 68:25
82:23 83:19
84:4 85:12
102:13 128:6
back-end 15:19
15:21
back-ended
14:25
background 4:13
53:2 70:5,6,7
backup 36:19
bad 20:12 89:15
balance 49:6
80:6,8 120:12
120:19
ballpark 85:24
bank 36:17 99:13
bankruptcy 1:1
31:19 80:10
96:15 98:12
102:14 104:12
base 14:5,7
based 14:11,14
32:12 37:17
46:5,7 48:12,19
54:14 104:14
104:16 118:12
basically 6:3
31:13 56:1 81:5
basis 23:22 30:2
133:1
Bates 83:15

117:17
began 5:11
beginning 109:4
behalf 2:6,13,20
12:24 25:2 78:2
78:22 79:1
111:13 112:15
112:21
beings 71:19
belief 104:16
believe 6:23
15:11 16:3 17:3
17:8 18:2 19:23
21:13,13 22:20
23:13,19 24:16
26:13 49:9 51:1
51:2 74:16
77:17 78:1,7,19
81:8 83:1,3
86:25 102:6
111:10 115:24
121:11,16,22
122:1 125:14
believed 35:10
57:6 113:17
beneficiaries
17:10,15
benefiting 73:9
best 5:25 8:3
52:15,17 55:7
63:24 64:4
78:16,17 85:8
95:19 109:21
110:6 111:9
115:4 116:20
116:25 119:9
119:16 120:4,9
120:16,21
123:20 125:6
126:2
better 111:19
biggest 123:6
bill 74:20
bills 82:4,5,10,11
birth 4:9

bit 7:9 12:12 14:2
30:15 33:12
39:3 48:1 98:15
106:23 107:5
Blair 115:10,14
118:7
board 120:25
121:20,23
122:4
boards 122:11
bold 40:25
bonus 14:8,9,10
14:19,24 15:14
18:5 90:21
book 33:21 34:12
34:20
booked 32:23
33:11 34:9 35:5
35:20 36:24
44:23 90:8
116:4,8 118:24
books 80:7
110:24 111:4
borrow 78:22
borrower 45:6,15
45:19,24 46:2
130:4,5
borrower/lender
133:21
borrowing 120:7
boss 39:13
Boston 4:15 5:8
5:10
brain 32:9
Brandon 1:22
137:2,25
break 7:6
bridge 29:22
30:6
briefly 13:5
bring 49:6
broad 9:22 35:17
61:3 107:21
broader 76:8
broken 53:16

brokers 10:17
brought 6:4,14
31:3,7 97:15
bucks 74:25
budgeting 6:8
burn 130:20
businesses 30:1
busy 11:15,19
128:10

**C**

call 6:4 11:11,13
38:10 63:14
90:16 132:21
called 9:24 58:21
59:11 70:24
74:16 88:7
109:5 112:9
calling 90:24
Calls 112:3
capital 1:6,9 5:11
6:6 8:4 13:6
23:22,23 26:19
26:23 27:1 29:4
29:19 32:6,23
35:3 37:25 71:6
107:2 110:8
car 82:9
career 11:20
careful 17:21
carry 110:24
case 43:20 86:24
89:18 103:11
105:17 124:14
130:2
cash 9:25 23:21
23:24 25:23,24
26:7 31:9,10,12
31:14,16,23
32:8,12,14
41:15,24 42:12
42:23 43:5,22
43:24 44:1
57:25 61:25
63:2 73:20

88:12,17 93:7
93:20,21 107:6
107:16 109:7
111:3 129:8,10
casual 134:22
caught 62:5
cause 1:21 137:6
137:20
caused 79:12
81:10
causes 82:9
**Central** 138:2
**Cert** 138:1
certain 5:17
11:13 12:21,21
13:12 23:14
33:13 38:1
54:14 67:21
70:12 83:9
95:11 96:9
97:10 98:17
99:14 101:1
103:22 106:18
109:24 111:20
128:8
certainly 6:18
9:17 12:3 20:10
26:4 30:11
32:16 34:4
35:18 37:23,24
42:11 50:4 58:8
62:14 69:1
77:13,24 86:22
101:8,10,12
108:8
certainty 29:13
42:19 68:18
69:8,11,24 70:2
102:19 103:10
103:12 108:7
121:16
**CERTIFICATE**
137:1
**Certified** 137:2
137:25

certify 137:3,17
cetera 6:1 14:20
CFO 5:21,25
8:18 48:6,21
131:25
chain 53:5
chance 69:4
change 8:8 16:10
46:10 59:1
84:13 103:25
changed 6:18
39:11 84:16
changes 7:1
137:14
**Changing** 106:23
characterize 54:1
76:10 87:18,19
characterized
54:2
charge 6:15 10:3
chief 7:13,17,21
8:23,23 9:3
10:12 13:20,22
53:3
circumstance
51:1
circumstances
31:2 134:25
claim 81:1,9
claimant 15:16
18:6
clarification
124:19
clarify 11:3 12:8
53:1 66:18
75:25
clear 17:21 26:19
27:11 29:14
52:24 63:9
69:15,16 73:13
clearly 74:2
client 133:7
clients 17:25
**Cliff** 7:23
close 17:21 33:14

98:3
closed-end 74:14
closely 62:4
coach 100:11
coaching 100:10
100:13
cold 46:6
collect 81:17
collected 81:19
collectible 87:15
collecting 15:16
81:6,6
collection 87:25
collective 52:2
college 4:15 5:6
column 36:25
37:7
combination
39:16 45:12
combine 106:24
**Combs** 1:22
137:2,25
come 47:12 53:7
59:19 65:3,5
76:22 101:6
117:9,19
comes 133:21
comfortable 88:6
coming 17:20
36:13 118:9
command 53:5
commencement
112:14 126:19
comment 17:13
commission
138:4
common 30:5
86:5
communicated
95:12
communicating
53:9
communication
83:10
communications

121:20
company 81:14
122:16,23
compel 132:18,20
compensate 72:8
72:12 79:14
89:20 110:15
compensated
17:16 110:2,3
compensation
14:3,6,8,19
15:14 16:4,12
16:16,21 17:4,8
17:24 18:5
60:18 73:8,12
79:25 90:2,12
90:17 105:21
complete 15:3
74:23 106:11
completed 15:22
15:25 16:2
74:21
completely 15:24
27:25 89:9,15
90:7 115:17
completion
137:12
complex 108:24
108:25 109:2
compliance 6:8
72:4
comprehend
129:20
computer 137:11
computerized
1:24
concept 89:16
concern 23:23
24:1,2,4 56:21
56:23,25 62:17
concerning 17:7
63:20
conclude 80:25
concluding 24:6
conclusion 94:25

112:4,10
**condition** 96:4
**conditional** 97:11
**conduct** 69:18
**confer** 26:4
**confident** 69:5
**confirm** 59:17
61:19
**confused** 41:6
134:22
**confusion** 11:6
**conjunction** 24:5
**connection** 24:12
26:2
**consent** 74:16
75:23 80:2
85:15 90:3
93:16
**consented** 74:17
**consequence**
104:20
**considerations**
16:1 60:10
**constant** 75:15
**construct** 90:2
**consultancy** 11:9
11:11
**contended**
113:10
**context** 133:16
133:19 134:10
**contingent** 14:11
**continue** 17:22
100:8 110:24
**continued** 111:2
**continuously**
6:17 29:22
**contract** 71:10
**contracted** 71:15
**contradict** 79:18
**control** 43:2
90:10
**controlled** 89:8
**controller** 6:24
6:25 7:4,4,8,8

7:10,10 8:4,8,9
8:12,15 9:11
10:10,12 12:19
13:10,17 48:6
**conversation**
18:22 19:9,19
43:15 51:25
70:14 91:25
93:18 94:24
103:18 105:18
111:11,16
**conversations**
18:23 19:11
20:2 34:11 42:6
51:25 93:19
96:16,19,22,24
97:20,22 98:2,5
102:9,12,13
104:24 105:5,7
105:11,16,21
124:3
**conversion** 74:15
74:17,21
**converted** 74:13
**conveyed** 102:25
103:1
**coordinated**
22:21
**copied** 127:10
**copy** 135:13,16
135:18
**corporate** 6:5,15
9:9,15 25:22
33:8 35:9,16
39:12,13,16
43:17 61:14
62:11 70:15
73:20 84:2
109:1,6 115:1,7
115:18,20
117:25 118:3
118:16 122:20
122:25
**correct** 5:22,23
8:19,21 9:20

16:17 40:2 42:1
45:25 51:11
61:10 64:25
68:10 69:2
82:21 88:11,17
88:23 91:2
97:18 99:17
101:21,22
105:23 124:21
125:6 127:16
135:24
**corrected** 127:19
**correctly** 5:16
51:13 62:9
**cost** 97:13
**counsel** 2:6,13,19
18:10,20,25
20:3 21:16
22:21,25 23:3
96:17,20,22
97:21 98:1
137:17
**couple** 61:20
87:14 123:2
129:13
**course** 20:3 33:19
51:9 66:12
69:18 83:22
84:4,6
**court** 1:1 117:8
**courteous** 76:24
**covered** 20:14
53:2
**CPA** 4:19,22
44:21 48:6,20
49:11 131:25
**CPAs** 95:4
**created** 80:10
**credit** 6:8 25:9
40:11 89:13
90:11
**creditors** 15:17
**CSR** 1:23
**curiosity** 59:21
**current** 4:25

**cut** 109:8
**cycle** 41:7

**D**

**D** 1:22 137:2
**D-CNL003763**
117:17
**Dallas** 1:3,25 2:4
2:18 4:12 5:10
138:2
**damages** 82:12
**date** 4:9 8:6
24:22 45:20
47:5,6,23 48:25
49:13,13,14
84:14 123:23
125:1
**dated** 114:23
137:22
**dates** 27:10 28:18
28:24 111:17
**Davenport** 138:1
**David** 1:14,18
4:1,6 136:5
**Davor** 2:5 76:22
**day** 29:21 32:1
34:1 59:7 74:8
93:18 117:2
135:25
**day-to-day** 9:17
62:6
**days** 59:5 76:2,7
**de** 127:22
**dealing** 29:20
128:19
**debtor** 26:21
32:23 38:6,22
38:23 76:16
77:3,5,8 78:2
81:1 87:14
88:16 116:22
**debtor's** 111:4
116:13,17
119:8
**debts** 89:3

**December** 24:20
24:23 51:10,15
51:22 53:18
54:24 56:17,22
57:6,13,17,21
58:7,9 60:20,25
61:21 63:19
98:18,18,24
99:19 100:15
101:1 102:17
103:23 113:2,3
120:2 124:1,9
**decide** 38:23 39:5
90:12
**decided** 24:9,12
24:14,15 32:7
64:22 77:18
84:25 86:1
**decides** 38:22
**deciding** 64:15
69:18
**decision** 27:2
30:25 86:5
**decision-making**
32:10
**decisions** 29:8
30:9,16
**declare** 135:23
**deduction** 73:9
**default** 58:13,17
61:14 62:18
**defendants** 1:11
1:20 2:6,20
96:3,6
**defense** 80:15
96:3,7,13,23
97:5,7 98:1
**defenses** 96:10
96:18
**defer** 103:13,18
**define** 47:18,20
**defined** 104:8
134:21
**definitely** 6:21
7:12 73:6

definition 38:11
104:13,14
definitive 50:11
definitively 15:20
degree 4:16
degrees 4:14
Deloitte 5:8,8
demand 23:13
86:3,8 87:14
88:15 127:14
128:2,23
demanded 129:4
deny 67:22
department 9:7
84:9
depend 15:15
17:6,9 134:11
depending 31:2
32:15 89:11
depends 16:5
134:10
deponent 137:14
deposition 1:13
1:18 18:9,24
19:16,22,24
20:5,9,14,16
21:1,7,9,12,19
27:20 132:17
135:20 137:4,7
137:12,19
describe 8:2
54:11,13
described 13:16
54:10 69:6 72:1
87:23,24 92:2
109:24 110:13
114:11
describes 119:4
describing 33:7
detail 54:5 58:2
determination
60:17
determine 38:16
determined
40:21

determining
89:13
Dickman 138:1
differed 54:10
difference 49:7
76:6
differences
107:14
different 30:5
34:15 38:21
44:11 74:9
77:12 99:11
107:11,12,17
125:19,20
128:18 132:4
direct 9:15 20:17
20:19 34:13
78:13 132:3
directed 20:22
51:19 60:21
68:19,20,21
69:1,3 125:23
directing 132:7
132:15
direction 33:2
34:2 35:23
54:15 55:18
62:24 65:1,2
94:25 102:23
102:24 137:11
directions 103:19
directly 103:19
disagree 89:19
99:21 100:18
disciplinary 5:3
disciplined 5:2
discuss 20:4 97:2
discussed 15:8
21:16 90:1
93:15,17 94:1
97:4,6
discussing 42:3
65:9 77:25 92:4
92:8,11 93:3,10
discussion 19:21

31:4,7 39:21
57:18,22 58:3,4
60:1,5,8 62:20
63:1,20 92:14
101:20
discussions 19:3
21:8 24:13
30:24 41:13
59:22 63:22
103:2
disinterested
137:8
dissimilar 14:21
dissuade 62:23
distinct 10:10
distribution 59:9
83:5
DISTRICT 1:2
dividend 105:8
DIVISION 1:3
document 44:21
46:23 50:15
64:6,12 76:23
76:23 79:17
84:10 88:2
96:15 117:5
documents 67:8
76:20
doing 6:5,11 9:24
25:18 85:14
86:17 89:13
95:2
dollar 28:18 75:2
75:2
dollar-for-dollar
73:4
dollars 18:1
123:9
Dondero 2:20
24:11 29:15
30:8,19 32:7
33:21 34:2,7,18
38:4 39:24
40:10 41:14
42:3,7,10 43:2

43:7,10,16,25
51:18 52:4,7,19
53:12,15,16
54:18,24 55:9
55:17,25 56:3
56:10,15 60:21
61:24 62:23
65:3,24 69:9,12
70:15 74:3 76:1
76:13 77:2,25
85:1,19 89:18
90:9 91:14,17
91:21 92:9,14
92:23 93:3,10
93:25 94:2,5
95:1,24 98:11
98:11 101:7
104:24 105:16
105:21 112:20
113:8,14 116:6
116:21 121:12
122:9 124:8
125:10,22
126:16
Dondero's 62:11
73:6 76:9 77:19
78:3,21 79:3,11
79:18
double 81:5
doubt 35:21 36:8
dozens 65:16
draft 24:16
drafted 22:21
drafting 58:17
DRIP 105:8
driven 42:19
drukavina@m...
2:7
due 25:16,19
37:12,18 47:12
49:12 51:10,14
74:20 76:22
98:18,24 111:1
111:7 112:1,6
112:16 113:11

113:17,24
121:24 124:10
124:11 125:4
125:12,24
126:4,10,14
135:1
duly 1:19 4:2
137:4
duties 9:12 62:6
126:21
duty 25:9

**E**

earlier 17:13
49:14 75:13
98:16 101:6
111:13 123:3
earliest 128:1
early 51:22 54:24
60:20 87:1 89:2
111:5,21 135:7
educational 4:13
effect 41:14
62:18,21
129:23
effective 125:1
effectively 49:22
75:5
effectuate 99:13
112:21 126:14
effectuated 99:3
eight 117:13
either 21:18 26:3
26:25 29:12
30:16 31:10,16
35:23,25 38:8
39:12 48:19
50:12 68:14
69:1,3,9 79:24
84:21 86:12
105:25 125:22
137:18
electronically
84:22
eliminate 111:14

email 2:7,14,22
 54:16 59:8,9
 67:14,15,18,21
 69:4,7 70:13,16
 82:23,25 83:7
 83:10,11
 114:23 115:2,5
 115:13,18,23
 117:7,15,16,18
 117:22,24
 118:4,6,12,20
 119:5 127:5,7
 127:10,12
 128:11,20
 138:3
emailed 59:11
emails 80:13
employed 122:18
employee 12:23
 26:17,21,24
 123:22
employees 43:11
 72:2 98:8 106:7
 106:12 107:8
 107:20 123:16
employment
 78:13
ended 120:1
ensure 23:20
enter 78:25
entered 98:11
enterprise 30:1
 32:18
entire 12:9
 115:17,20
entities 6:7 25:24
 26:16 30:6
 31:11,16 34:8
 61:15 65:18,22
 65:22,24 99:6
 101:1 102:20
 103:8 106:24
 107:18,25
 108:17,19,21
 108:25 121:18

entitled 17:23
 18:10 20:4
entity 12:20 13:8
 13:11,13 30:20
 31:20 32:7,15
 32:17 34:19
 35:4,11 36:2
 40:10 42:10
 75:8,10 90:10
 109:13 131:25
equal 86:6
 130:22
equity 79:24
 90:22
error 70:25 71:2
 71:19,25 72:13
 72:14,19 73:4
 79:15 80:20
 81:1,14 85:22
 89:20 90:3,3
 92:11,16,17,18
errors 71:9 72:20
 72:21 73:16
especially 15:4
established 51:4
 75:13 76:11,12
 78:12
estate 107:13
estimate 11:22
et 6:1 14:20
event 116:17
 119:10,13
 120:1,7 135:6
 137:19
events 16:20 96:9
eventually 32:2
evidence 80:14
 111:5,9 116:20
 116:25 119:9
 119:16 120:4,9
 120:16,21
evolved 6:18,21
exact 7:5,11
 15:24 20:16
 94:19

exactly 5:18
 14:24 15:23
 34:3 48:2 77:23
 80:16
**Examination** 3:3
 3:4,5,6 4:3
 95:21 109:18
 127:1
example 31:6,9
 37:6 48:25
exceeded 87:10
 123:12
exception 16:8
 17:1 44:2,3
excess 41:15
exchange 128:12
exclude 18:22
exclusively 23:13
 33:14,14
excruciatingly
 73:13
excuse 37:1 74:25
executed 24:18
 31:1 70:22 84:3
 124:24
execution 22:7,13
 22:20 24:23
 83:21 84:19
 85:6
executive 26:14
exhibit 22:4 23:8
 27:9,15,23
 36:12 40:20
 42:17 44:13,22
 46:12 48:12
 49:1,10 64:2,5
 67:17 68:4
 82:24 83:20
 114:1,22 127:2
 129:12
exhibits 3:10
 67:2,7 68:1
existing 7:13
 23:13
expand 59:7

expect 17:12
 64:12 65:4
 83:12 86:21
expectation 15:1
expected 126:13
expenses 73:7
experience 5:5
 37:18 38:14
 46:19 49:11
 104:16 130:2
expert 82:21 87:6
expertise 48:20
expires 138:4
explain 8:22
 64:13 107:1
explaining 92:25
explore 12:12
express 14:19
**Expressway**
 138:2
extended 7:12
extending 14:17
extent 31:10,12
 60:24 61:8
 66:10 86:23
 135:7
extrapolating
 92:24

────────
**F**
FA 88:7
face 71:16
facile 15:24
facilitate 25:18
 31:15
facility 6:8
fact 29:6 58:23
 58:23 76:14
 79:21 94:23
 101:9 112:19
 128:20
failed 58:18
failure 126:20
fair 16:15 35:8
 60:9 65:15

91:16 97:14,23
 99:1,15 104:17
 105:15,20
 115:16 123:20
fairly 9:22 30:4,5
 84:7
fall 80:10 121:20
familiar 21:23
 22:5,6 28:1
 67:1 82:15
 104:1 114:17
 116:13 119:21
far 5:1 24:15
 37:5 58:23 62:6
 84:11 87:9
fault 81:10
faulty 43:3
February 80:19
 113:10 126:8
 126:12
fee 74:16,18
 75:23 80:2
 85:15 90:3
 93:16
feel 54:5 69:5
feels 35:17 82:22
fight 53:17
file 80:11
final 30:9
financial 8:23
 13:20,22 87:20
 116:14,17,24
 119:8,14,19,22
 119:25
financials 122:1
 122:4,7
find 26:13 31:15
 67:14 129:17
fine 21:10 39:3
 90:21 106:25
**FINRA** 4:21
firm 95:23
first 4:2 37:2,4
 42:22 46:14
 48:14 49:5 50:7

David Klos - October 27, 2021

72:14,19,19
75:14 96:2
110:20 131:15
**five** 105:3 126:25
**flag** 10:4
**flavoring** 63:14
**flight** 132:10
**flip** 37:1
**flipped** 9:20
**Floor** 1:25 2:11
**flow** 23:21,25
26:7 88:17
96:15
**focus** 8:14 65:10
**focused** 6:7
**follow** 16:18
**follow-up** 128:17
**followed** 116:11
**follows** 4:2
**forecast** 126:3
129:10
**forecasting** 6:8
**forecasts** 9:24
44:1,4 126:3
129:9
**foregoing** 135:24
137:4
**foreign** 89:15
**forgave** 123:15
**forget** 86:7
**forgetting** 9:8
**forgive** 123:22
**forgiven** 96:8
106:7,16,17,20
122:19,24
123:11,11
**forgiveness** 97:10
97:17 122:14
**forgiving** 123:7
**form** 6:16 8:25
11:17,24 12:25
14:12 21:24
22:8,15 23:10
25:3,11 27:4
29:10 32:25

33:24 34:21
35:13 36:4
37:20 38:17,25
39:7 40:3,14
42:24 43:19
44:16,24 45:9
45:17 46:21
47:8,15 48:8,22
49:15 50:13
51:5 52:21
53:22 54:7 55:3
55:12,19 57:8
60:12 61:1 63:5
64:9 65:19,25
66:7,15 69:20
71:3,12,20
76:18 77:6,20
77:23 78:4,23
79:5,19 81:2,11
81:23 82:6,13
84:11,12 87:3
88:18 89:5
90:14 91:3,9
93:13 94:8 95:5
99:4,23 100:19
101:3,25
102:15 103:15
104:18 108:2
128:13 130:7
130:16 131:11
131:21 133:13
133:22 134:8
134:17 135:2
**found** 61:18
**foundation**
113:20 125:17
**four** 6:13 128:23
**frame** 4:24 7:11
7:12 8:10,14,24
12:6 20:12 24:8
25:1 66:12,20
67:16 106:13
123:18
**Frank** 8:17 11:1
20:9 29:13

30:15,17 35:23
35:25 36:10
44:7 52:1 53:7
53:8 54:15 55:9
60:20 61:14
68:14,14 69:1,3
70:13,14 77:13
77:15 80:12,13
93:6 101:7,18
101:23 102:3,4
102:8,9,11
121:22 127:19
**Frank's** 39:18
**Frankly** 48:10
**fraud** 81:5
**frequent** 84:1
**Friday** 118:1
**front** 10:17 44:8
67:20 68:5 72:3
**full** 57:3 106:18
**full-service** 107:5
**full-time** 12:3
**function** 72:2
**fund** 1:9 6:11,11
9:5,5 13:6
70:24,25 71:1,6
71:7,8 72:8
73:15 74:11,12
74:13,13,14,17
75:2,6 80:20,23
81:16 86:5
109:3
**funds** 10:21,22
12:13 29:9 30:2
30:19 31:20
34:8 35:11
75:24,24 76:1
80:9 85:14
128:19
**further** 3:6 24:19
84:18 126:24
127:1 135:10
137:17
**future** 17:4 45:16
49:13,20 53:17

93:7

**G**

**gearing** 53:17
**gears** 65:8
**general** 18:13,15
19:9,10 20:11
20:13 32:20
33:19 61:4
92:11 93:4
96:24 97:6
104:4,5 108:20
133:24 134:6
135:4
**generally** 19:25
27:24 30:4
32:21 38:4,4
40:2,11,16
42:15 45:8
77:22 96:5,10
96:12,17 98:20
105:1 107:1
108:18 110:22
116:15 119:21
**generallys** 40:6
**generating** 42:12
**Germans** 63:14
**getting** 10:4
23:24 44:8
51:13 59:8
**give** 5:21,24 14:4
16:13 39:3
67:25
**given** 15:5 43:2
43:22 47:23
70:12 73:21,22
74:1 102:8
123:3 129:2
**global** 52:25
70:24 74:12
75:6 101:13
**go** 15:19 16:1
20:1 43:6 54:4
65:12 81:9
82:18 85:10

105:24 127:2
134:4
**goes** 28:9 40:18
87:9
**going** 14:2 15:5,6
16:9,12,15,19
17:5 20:19
28:17 32:10
36:11,12 42:22
46:11 49:13
55:16 57:11,14
62:18 65:8,9,10
65:12 68:1 70:5
74:22 79:9
82:23 83:11,19
88:7 89:20
106:23 107:17
108:20 111:17
117:5 118:13
127:6 129:12
132:4,13
134:11
**good** 73:20 95:22
96:1 100:12
**grad** 5:7
**graduate** 4:14,15
**group** 5:19 6:11
6:16 9:9,14,15
9:21 10:7,9,14
10:15,24 11:7
35:9 43:18
61:21 62:10,11
83:5 109:3
110:24 115:2,5
115:18,21
117:25 118:16
126:8
**groups** 6:19,20
**guess** 8:8 88:24
104:21

**H**

**half** 5:9 94:20
95:11 110:20
**half-million**

123:9
hand 90:9
handled 11:9
  26:21 35:9 40:8
handles 11:7
hands 57:2
happened 35:25
  47:13 59:2,4
  93:8,11
happening 27:14
happens 47:13
happy 55:22
hard 15:4 18:1
  26:13 47:20
  63:7 71:5
  134:12
harder 11:13
HARDT 2:3
HARR 2:3
hat 43:15
hate 57:1 97:4
Hayley 83:21
  118:10
HCM 76:16
HCMFA 13:6
  53:20 65:10
  68:8 71:10,17
  72:8,8,12,12,24
  73:3,5,7,14,17
  73:21 74:10,24
  75:1,1,21 76:11
  76:16,17 78:14
  78:22 79:1,13
  79:14 80:2,20
  80:22,25 81:15
  85:16 87:2,5,9
  87:15 88:10
  89:2,3,12,13,20
  90:17,21,23
  91:23 92:19,20
  93:16,21,23
  110:2 115:8
  118:8,13,14
  119:18 120:6
  120:11,18,24

121:7 127:13
127:17 128:1
128:23
HCMFA's 70:23
  119:25
HCMLP 10:21
  29:4 42:20 60:2
  68:8 71:17 72:2
  72:2,23 76:2
  80:1 94:1 104:8
  109:24 110:3,4
  110:12,15,16
  113:15 115:8
  118:8,13
  121:25 122:8
  125:11,23
  126:20 128:1
HCMS 2:20
  95:24 98:23
  99:8,10 107:3,4
  107:5 109:21
  109:25 110:3
  124:22
HCRE 2:20
  95:24 98:23
  99:8,10,21
  100:17 107:3
  107:11,20
  108:6,12,22
  110:6,7,10,12
  110:15 124:20
he'll 94:14
head 62:15
  107:10
headers 36:25
hear 52:4 113:8
heard 30:17
  62:16 74:3
  91:14,17,21
  122:22 125:18
hearing 101:10
hearsay 79:17
heavy 107:13
hedge 6:11 30:15
  33:12

held 6:16 10:20
  121:10,12
  122:20,25
hell 74:24
help 33:2 65:22
  66:20 67:16
  100:4
helped 105:9
helping 31:14
Hendrix 9:16
  18:16,19,24
  20:3 27:19
  39:13 52:11
  84:17 99:2,18
  100:14,25
  103:3,14
  117:25 124:4
hereof 48:16
hereon 48:15
hereto 137:16
hesitate 64:17
hesitating 106:16
hey 42:23 85:9
hierarchy 10:25
high 105:5
Highland 1:6,9
  5:11,12,14,22
  6:6 7:25 8:4,12
  8:16 10:14,18
  10:20 11:23
  12:6,8,9,23
  13:4,5,14,17,18
  13:21 14:3,22
  15:2,15 16:5,6
  17:5,6 23:2,21
  23:21,22,23
  25:2 26:17,18
  26:19,23,25
  28:2 29:4,18,20
  29:24 31:12,17
  32:6,23 33:3,4
  33:7 34:7,19
  35:3,4,10 36:2
  36:24 37:10
  39:22 40:22

41:2,2,12,16,24
42:5,20,22 43:6
43:7,9,10,12,16
44:5 49:11
50:19 51:2,4,19
51:20 58:13,21
59:9 64:24
65:18,21 70:24
71:6,11 72:7,10
74:12,25 75:8
75:10,12,14,23
75:24,25 76:4,5
76:12 79:8,25
80:2,7 81:18
84:9 88:14 89:1
89:4,12 90:4,5
90:22 92:19,22
93:23 97:11
104:11 105:22
106:6 107:2,24
109:22 110:8
112:20 119:12
122:19,19,23
123:7,14,21
125:4 126:14
Highland's 42:13
  51:9 72:13,14
history 62:2
  116:3,7 118:22
  119:2,12 120:5
  120:17
hit 82:3
hits 82:9
HMS 99:21
  100:17
hold 4:18 121:15
honestly 58:22
hope 43:20 82:7
hopelessly 53:16
Houlihan 71:23
hours 11:22 12:6
  12:7,10
housed 72:2
human 71:19
hundred 23:14

28:5 30:10,11
33:13 68:18
69:5,11 92:3
102:19 106:18
hundreds 65:16

I
idea 7:24 57:10
  89:12 108:13
identified 72:25
illiquid 11:13
important 44:6,7
  59:18,20 93:22
importantly
  85:15
impossible 80:24
  91:25
impression 52:24
in-house 23:3
inappropriate
  81:20
inartful 77:16
incidental 128:21
include 52:18
  107:25
included 85:12
  115:5 116:16
  116:23 118:3
  119:8,13,25
  120:7,12,19
  122:5,7 126:3
including 79:14
  115:17
inconsequential
  127:23
incorrect 55:5,6
  55:11
INDEX 3:1
indicate 44:22
  80:7,16
indicates 135:5
individual 31:8
  52:2 72:24
individuals
  106:19 123:3

David Klos - October 27, 2021

inflow 59:8
info@dickman...
 138:3
informal 83:25
 105:14
informally 62:5
information
 59:16 129:1
informed 62:10
 102:3
inject 90:22
ink 84:23
insinuation 16:9
 17:1
insolvent 87:2,6
installment
 110:25 111:7
 112:1,8,16
 113:4 114:7,12
 125:12,23
 126:4 131:3,10
installments
 14:22 130:23
instance 1:20
 31:20 34:11,16
 34:18 35:25
 39:22 42:22
 68:24 86:22
instances 32:5
 65:16 71:8 91:5
institutional 9:5
instruct 115:7
instructed
 125:11
instructing 85:9
 133:2
instruction 52:25
 61:13,24 62:12
 62:17 99:19
 101:6,13,17,23
 102:3,5,8,20
 103:7 124:7
 125:15
instructions
 100:15 103:14

103:22
insulting 132:5
 133:6,9
insurance 80:20
 80:22 81:5,6,9
 81:14,19 82:4
 82:10,19
intended 44:15
 44:19 111:6
 130:3
intent 95:12
interco 68:8
 115:22
intercompany
 32:22 41:3
 65:17 68:9,11
 68:12 69:10
interest 37:4,8,13
 37:15 38:9
 40:12 45:12
 46:8,8,16,20,25
 47:1,4,4,11,12
 47:13,14,18,19
 47:20,21,24,25
 48:4,5,7,15
 49:4,6,12,12,20
 49:23 50:9,21
 51:3 86:2 111:3
 131:15
interested 83:13
 137:19
internal 22:21,25
internally 96:16
investment 74:19
investments
 107:16
investors 74:17
 75:5
involved 10:7
 25:14,24 60:17
iota 16:13
irrespective
 90:11
issue 29:18 36:20
 43:7,8,17 93:10

105:17 108:1
 113:12 124:13
issued 124:16
issues 75:15
 79:23 121:6

**J**

Jack 106:15
January 29:16
 42:16 44:13
 58:11,15,25
 59:23 60:2,23
 61:7,18 112:22
 113:3,16
Jim 2:20 24:11
 26:4,4 29:13,14
 30:17 31:9 34:2
 34:6 35:23 36:1
 36:9 44:8 53:16
 68:14,18 69:1,3
 70:15 80:5 89:9
 93:25 94:2 97:9
 101:18 105:22
 108:20,21,23
 118:9 121:22
Jim's 26:15,16,20
 26:22,24 36:7
 90:7 93:6 94:19
 108:21
jmorris@pszjl...
 2:14
John 2:12 36:16
joined 5:14 29:24
 122:23
JONES 2:10
judge 132:21
juggled 31:24
July 29:17 58:24
jumble 48:1
June 11:21 45:23
 45:24 49:2

**K**

K-l-o-s 4:7,8
keep 27:21

100:10
keeper 26:15
keeping 129:1
kind 10:25 14:23
 15:25 52:12
 89:7 99:13
 106:12 108:22
 108:23 109:8
Klos 1:14,18 4:1
 4:6 61:24 64:2
 95:22 109:19
 117:21 136:5
knew 70:6,11
 85:22 128:23
 129:3
know 4:19 5:1
 9:22,23 10:19
 11:11 12:7,19
 15:6,13 17:10
 18:7,8,11 19:10
 20:4 23:7,17
 24:1,7,9,12,15
 25:5,7 28:21,23
 29:6 31:11,13
 31:23,25 32:3,7
 35:15 37:25
 38:11,12,19
 39:9 40:20
 43:16,21 44:18
 45:4 48:10
 51:16,25 53:1
 53:17,25 54:20
 54:20 55:14
 60:14,19,22
 62:13 70:10
 73:17 76:14
 77:23 78:20
 81:4,21,25 82:2
 82:4,8,19 83:11
 84:6,25 85:17
 85:18,20 86:1,4
 87:6,17 90:18
 90:19,25 91:5
 91:13,16 93:19
 96:14 98:21

99:12 100:8
101:10 102:25
 104:13,13,20
 105:12 106:11
 106:14 108:7,8
 110:2,3 112:23
 117:11 119:7
 119:18 120:11
 121:12,23
 123:17 127:23
 129:6 130:10
 130:18 131:23
knowing 102:23
knowledge 7:24
 13:8,10 24:13
 34:6 35:1 44:14
 48:20 49:10
 60:25 61:16
 63:24 64:5 67:6
 73:1 79:17
 98:10 100:6,9
 104:10 109:21
 110:7 112:23
 121:19 122:10
 123:10,21
 125:10
known 61:9
 69:23 70:1
KOPF 2:3
Kristin 9:16
 18:16 39:13,17
 52:1 53:7,8
 59:11 61:13
 62:4,15,15 83:1
 83:2,20 99:14
 101:7,24 102:3
 102:5,8,10,11
 108:5,8,12,14
 109:10 117:25
 118:15 119:3
Kristin's 100:6
 100:22 118:20

**L**

L.P 1:6,10

**lacks** 113:19
125:17
**land** 132:21
**language** 74:25
**large** 55:2 59:8
59:13 93:20
131:25
**larger** 41:7 58:3
**largest** 123:8
**late** 106:13
**launching** 10:3
**Lauren** 23:2
**law** 2:5,12,19
81:22 82:1,9,16
82:22 95:23
**Lawler** 106:17
**Lawn** 2:17
**lawsuit** 112:14
**lawsuits** 97:15
**lawyer** 23:4
82:21
**leading** 65:17
**learn** 30:25 51:21
51:23 58:6,6
**learned** 61:6
**learning** 58:20
**left** 7:14,20 46:8
46:9 109:20
**legal** 18:10,20
84:9 112:3,10
130:9
**legally** 82:19
84:10
**length** 19:24
124:2
**let's** 8:14 12:12
18:22 21:21
24:19 27:7 28:6
61:7 66:19
68:24 81:17
103:25 109:19
122:14 123:25
**letter** 14:15,17
58:13,17
**letters** 80:5

**level** 23:20,24
36:6 82:15
88:14 105:5
**liabilities** 87:10
87:12 122:8
**liability** 120:12
120:19
**liaison** 10:15
11:5
**liberally** 12:8
**license** 4:20,22
**licenses** 4:18
**life** 131:18,19
**limited** 104:7
**lines** 5:18
**linked** 92:15,17
**liquidity** 29:4,5
29:18,20,23
30:7,21 31:21
31:25 32:6,22
33:9 34:20
35:19 36:2 40:7
42:13,20 43:7,8
43:17 73:2,14
73:18 74:10
75:1,15,22
**list** 59:10 106:12
109:9
**litigation** 15:5
16:6,11 18:1,25
19:21 126:19
**litigations** 17:7
**little** 9:2 12:12
14:2 30:15
33:12 39:3 48:1
98:15 106:23
107:5
**LLP** 2:17
**loaded** 16:22
**loan** 9:6 28:1
33:11,21 34:9
34:13,20 35:12
36:1 39:25 40:1
41:9 68:11,13

68:16,21 69:10
69:15,17,19,24
70:2,10 73:14
74:2,4,7 76:15
76:21 78:3
79:13,24 85:18
85:20 89:21
90:10,13 91:2,6
92:3,15 95:4
107:25 110:19
115:22 116:4,8
116:16,23
117:3 118:8,10
118:11,13,17
118:25 119:4,7
119:14 122:14
123:6,10,14,22
**loaning** 72:7,11
89:1 92:19,22
**loans** 32:4 33:14
36:9 40:8 65:17
66:3,5 80:7
84:1 85:10
89:10 90:8
91:12,14,23
94:1,7,22 95:2
98:17,22
105:16 106:6
106:19 107:25
108:1 119:24
120:8,12,19
123:2
**logically** 42:15
69:18
**Lokey** 71:24
**long** 15:8 16:5
17:5,9 34:25
43:5 62:4 84:12
122:16
**long-term** 86:7
**look** 15:19 27:15
38:15 39:4
66:19 114:15
117:10,22
134:3,15,19

**looked** 111:20
**looking** 22:3 44:1
117:17
**looks** 27:25 39:6
**loop** 53:9
**lost** 41:21 63:16
**lot** 100:1 129:20
**loud** 118:6
**LP** 6:6 8:5 12:14
12:15,17 13:6
23:22 26:19,24
29:5 110:8
**lying** 79:16

**———— M ————**
**machine** 1:24
**magnitude** 92:12
**maintained** 28:2
**maker** 46:15,23
47:1 50:8
114:12 122:20
122:25 129:18
129:24
**makers** 126:13
126:19
**making** 71:8
75:18,19 85:12
99:20 100:16
107:20,23,25
108:9 126:9
132:20
**man** 17:23
128:10 130:20
**manage** 32:2
**managed** 10:21
10:21 70:24
**Management** 1:6
1:9 5:12 6:6 8:5
13:6 23:22,24
26:19,23 27:1
29:4,19 32:6,24
35:3 71:6 107:2
110:8
**manager** 7:2,3
**managing** 9:25

25:23
**March** 5:12,14
6:3 13:24 37:6
80:19 122:17
**marching** 52:3
**marked** 3:10
**Master's** 4:16
**material** 15:7
**matter** 109:11,12
**matters** 26:22,24
**maturity** 131:20
**MBA** 4:17
131:25
**mean** 9:18 15:21
24:10 26:9,11
104:6 114:18
**meaning** 51:4
68:9
**means** 47:4,12
48:21 63:12
84:7 132:1
133:12,20
134:7 135:7
**meant** 50:12
**medical** 82:3,10
82:10
**meet** 31:14 33:8
73:2
**meeting** 52:12
57:25
**meetings** 25:24
43:5,24 62:1,3
63:2,19
**Melissa** 26:10,12
108:14,17,18
109:1,5,9
**member** 62:14
**members** 10:17
**memory** 27:8
28:17,19 42:16
42:18 50:23
68:15 71:18
85:8 87:13
91:20 92:4,7
93:9,12

David Klos - October 27, 2021

mental 48:1
mention 10:6
   114:7
mentioned 12:13
   61:20 88:13
   98:7 107:23
   108:4 110:6
   116:10
met 31:9,25
Michael 2:18
   95:16,23
   135:11
michael.aigen...
   2:22
mid 112:21
middle 6:10 80:4
   108:22
million 18:1
   21:22 28:13,14
   28:14 45:25
   46:3 49:1,8
   58:25 68:7 69:2
   70:7,19,23 72:7
   73:18,25,25
   74:7,8,24 75:4
   75:9,22,23 76:3
   76:19 77:4,10
   77:11,18,18
   78:3,10,22
   79:12,22 80:2
   80:19 81:18
   82:25 85:4,18
   85:20,23 86:13
   89:2 90:17,20
   90:22,24 91:22
   91:22 92:8,15
   93:3 115:8
   116:3,23 118:8
   118:9,13,24
   119:7,14,25
   122:5
mind 36:8 56:20
   76:9 100:2
mine 24:1
minimus 127:22

minutes 39:21
   105:25 126:25
misconstrued
   134:23
missed 60:25
missing 107:10
mistake 80:12
   126:8 127:21
   127:23 128:4,7
MLP 59:9
moment 32:12
   67:16 73:21,22
   116:6 122:15
monetization
   15:2
monetizing 97:12
money 15:17
   33:3,3,7 34:19
   39:22 41:12,16
   42:4 45:20
   59:13,19 70:4
   72:11,12 73:5
   75:12 76:11,12
   76:13 79:24
   92:19,22
   113:24 120:8
month 11:22 12:6
months 6:13 19:6
   59:5 75:14
morning 36:16
Morris 2:12 3:5
   8:25 11:17,24
   12:25 14:12
   17:20,25 20:17
   20:21,24 21:2,8
   21:24 22:8,15
   23:10 25:3,11
   27:4,16 29:10
   32:25 33:24
   34:21 35:13
   36:4,18 37:20
   38:17,25 39:7
   40:3,14 41:17
   41:20 42:24
   43:19 44:16,24

45:9,17 46:21
   47:8,15 48:8,22
   49:15 50:2,13
   51:5 52:21
   53:22 54:7 55:3
   55:12,19 56:11
   57:8,19 60:12
   61:1 63:5,13
   64:9 65:19,25
   66:7,15,24
   67:17 69:20
   71:3,12,20
   76:18,22 77:6
   77:20 78:4,23
   79:5,19 81:2,11
   81:23 82:6,13
   83:13,17 85:21
   87:3 88:18 89:5
   90:14 91:3,9,19
   92:5 93:13 94:8
   94:13,16 95:5
   95:16,20 99:4
   99:23 100:5,11
   100:19 101:3
   101:25 102:15
   103:15 104:18
   108:2 109:19
   111:11 112:7
   112:13 113:22
   116:21 117:2,9
   117:13,16,21
   119:11,18
   120:5,11,17,23
   125:18,21
   126:24 128:13
   129:12 130:7
   130:16,19
   131:1,5,11,21
   132:2,8,11,15
   132:19,23
   133:3,5,13,22
   134:8,17 135:2
   135:10,13,15
   135:19
motion 132:18,20

mouth 36:7
Move 120:15
   125:16
moved 6:10
muddy 43:14
MUNSCH 2:3
mutual 74:13,14

          N
name 4:4 26:11
   26:14 39:10
   87:21 95:23
names 106:14
Nancy 104:24
   105:16,21
nature 10:1 70:4
   70:6,7,11 84:1
NAV 70:25 71:2
   71:8,19,25
   72:19,20,21
   73:4,15 79:14
   80:20 81:1,14
   85:22 89:20
   90:2,3 92:11,16
   92:17,18 104:2
   104:10
necessarily 31:25
   50:11 53:4
   69:12 107:14
need 29:18 31:16
   33:12 37:3
   41:24 54:5
   58:14 73:3 93:7
   93:20,21
   106:25 107:4
needed 30:3
   31:10,12 32:6
   35:19 41:12
   73:5,17 74:10
   74:25 75:21
   76:11
needing 29:5,22
needs 29:4 31:14
   33:9 34:20 40:7
   42:20 44:9

negative 37:7
   44:4
negotiation 22:7
   22:13,18
neither 93:23
never 18:2 56:25
   72:25 74:3
   78:12 80:13
   91:14 105:15
   105:18,20
new 2:11 7:16
   26:11,13 68:8
   68:11 85:10
   115:22 118:8
   132:21
NexBank 124:16
NexPoint 10:4
   12:13,14,14,17
   12:24 13:3,16
   21:21 26:3 27:1
   27:12 36:22
   37:11,19 40:22
   41:3,15,15 42:4
   42:9,11,17,22
   43:11,13 53:19
   56:21 57:6,10
   57:14,18,23
   58:17,25 59:12
   59:24 62:18
   63:3,20 64:8
   65:9 72:22,24
   75:17,19 78:13
   110:19 111:14
   111:22,25
   112:15 113:3
   113:10,15
   120:24 124:18
NexPoint's
   110:25 111:6
   112:21
night 36:17
nomenclature
   83:24
nominal 62:1
nonstop 44:5

**North** 1:24 2:3
138:2
**NORTHERN** 1:2
**note** 21:22,23
22:2,5,7,14,22
23:9,15 24:10
24:18,21,23
25:2,9,17 27:2
27:9,13,14
33:17 38:15
39:4 40:11,13
40:17 46:12,16
46:25 48:5,14
49:10 50:25
51:10 57:18,23
58:4,20 59:12
60:7 63:4,21
64:8 65:9 66:6
66:10,13 70:22
75:18,20 76:7
79:1,22 82:25
83:21 84:3,9,16
84:16,18,20
85:4 86:2,3,3,8
86:13 89:15
92:15 111:22
112:9,12
113:16 122:19
122:24 127:13
127:14,17
128:16 130:3
131:18,20
133:12 134:3,4
134:11,15,20
**notes** 16:7 17:7
19:25 23:13,14
26:3 36:19
40:21 50:19
52:18 65:10
66:20 67:12
76:1 84:14,22
85:2 86:12
87:14,24 88:7
88:10,15,16
96:8 97:11,16

114:21 122:5
122:12 124:10
124:11,13,24
125:4,7,8,13,25
126:10,13,20
127:17 128:23
129:7 130:12
130:15
**Notwithstanding**
110:23 111:25
**November** 54:4
63:18 124:8
137:22
**number** 12:2,10
14:10 22:4
23:19 27:16
28:9 75:3,4
**numbered** 1:21
27:19
**numbers** 14:4,19
28:6 44:4 81:18
**nutshell** 54:12
**NY** 2:11

**O**

**o0o--** 1:4
**Oak** 2:17
**oath** 97:6 106:4
**object** 50:2 100:8
**objected** 118:20
**objection** 8:25
11:17,24 12:25
14:12 20:17
21:2,24 22:8,15
23:10 25:3,11
27:4 29:10
32:25 33:24
34:21 35:13
36:4 37:20
38:17,25 39:2,7
40:3,14 41:17
42:24 43:19
44:16,24 45:9
45:17 46:21
47:8,15 48:8,22

49:15 50:13
51:5 52:21
53:22 54:7 55:3
55:12,19 56:11
57:8 60:12 61:1
63:5 64:9 65:19
65:25 66:7,15
69:20 71:3,12
71:20 76:18
77:6,20 78:4,23
79:5,19 81:2,11
81:23 82:6,13
85:21 87:3
88:18 89:5
90:14 91:3,9,19
92:5 93:13 94:8
95:5 99:4,23
100:19 101:3
101:25 102:15
103:15 104:18
108:2 111:9
112:3,10
113:19 116:20
116:25 119:9
119:16 120:4,9
120:15,21
125:16 128:13
130:7,16 131:5
131:11,21
132:2 133:13
133:22 134:8
134:17 135:2
**obligated** 122:12
**obligation** 25:25
80:1 110:25
111:6,14
112:16 113:11
113:17 114:12
**obligations** 45:21
121:24
**obligor's** 33:8
**obviously** 85:18
**occur** 55:8 96:9
**occurred** 47:5
61:17 70:25

72:20,25 85:13
92:13 112:24
**October** 1:15,21
31:18 80:11
120:24 127:11
128:22 129:3
**offended** 17:22
**offer** 14:15,17
**offhand** 84:16
**office** 5:10,10
10:17 72:4
121:10
**officer** 7:14,17,22
8:23,24 9:3
10:13 13:21,22
53:4 121:6,13
123:22
**officer-level** 7:25
13:18
**officers** 105:22
106:7 121:18
123:15
**official** 12:16
13:7
**oftentimes** 32:3
**Oh** 100:12
**okay** 18:14 20:8
51:8,16 52:10
65:13 74:1,7
76:25 81:21
82:23 84:4 93:9
100:3 110:18
110:23 112:25
117:2 119:11
120:23 124:7
125:8 126:2
132:19
**old** 106:22
**one-page** 84:11
**oOo--** 135:22
**open-end** 74:13
**open-ended** 25:6
**operate** 29:5
**operations** 9:6
107:19

**opinion** 44:6
**opposed** 40:22
42:9 75:8,10
85:1 86:3 89:20
90:12 102:20
103:8 127:17
**oral** 96:4,7,23
97:8,15,22 98:1
98:5,12
**order** 27:21
124:9
**orders** 52:3
**ordinary** 128:11
**organization**
72:4
**original** 27:12
**originated** 43:9
**ought** 62:23
**outlook** 44:2
**outside** 11:9
128:11
**outstanding** 38:8
45:22 46:9,10
47:1,19 49:5
125:3 129:2
**overall** 10:10
30:6
**overpayments**
53:19 55:2
**oversaw** 9:17
**overseeing** 9:14
9:14,21
**oversight** 6:20
9:4,8
**oversimplify**
32:11
**owed** 94:1
**owes** 45:19
**owing** 113:24
121:25

**P**

**P** 37:25
**P.M** 1:22,22
135:21

David Klos - October 27, 2021

**PACHULSKI**
2:10
**package** 83:18
**page** 3:2 28:8
37:2,7 114:15
130:1
**pages** 20:16,25
117:13
**paid** 14:11,20
76:3,4,6 80:19
80:22 81:16
85:16 135:7
**paper** 85:10
118:11 119:4
**papered** 33:16
66:6 68:21
**papering** 84:19
85:5 118:17
**paragraph** 50:8
114:4,7,10,11
114:16,17
129:15
**pardon** 46:14
**parentheses**
118:9
**part** 13:14 17:4
25:22,23 30:23
46:15,24 58:2
61:21 62:6 70:3
70:9,10,11
73:19 75:17,19
76:8 83:17
103:17 106:8
106:17,20
117:13 121:2
122:2,24
123:15 126:20
**participated**
30:12 121:19
**participating**
61:25 62:3
**particle** 63:15
**particular** 20:22
28:13 29:18
31:6 46:12

61:23 68:16
119:5
**particularly**
35:22 71:23
**parties** 71:23
137:18,21
**Partners** 2:21
99:9
**partnership**
104:8
**parts** 72:4
**party** 71:7
102:22
**pass** 95:15 135:9
**passing** 98:7
**pattern** 66:12
109:11
**pause** 7:7,16
63:13
**pay** 47:1 49:14
49:24 74:25
82:5 88:8,10,12
90:20 103:22
103:22 112:16
113:23 122:12
**payable** 14:23
74:18 93:16
125:4
**paygrade** 60:11
60:14
**paying** 72:12
**payment** 26:8
27:10 37:6,11
37:18,23 38:5,6
38:7,12,23
40:10,11,17,17
45:7,25 46:3,6
46:7 48:25 49:1
49:2 51:10,14
51:16 56:22
57:7,11,14 58:7
58:18 59:1,2,3
59:15,24 60:3,6
60:22,25 61:18
62:19 64:13,15

68:20 72:16,18
75:1,5 76:16
85:13 89:10,14
92:20 93:22,24
93:25 99:13
110:25 111:7
112:1,5,7,9,11
112:15,16,21
113:4,11,15
115:15 126:9
126:21 129:19
129:24 135:1
**payments** 25:8
25:10,16,18,19
27:8,11,13
36:13,14,19,22
36:24 37:13
39:15,18 40:20
40:21 41:5,6,8
41:12,24 42:17
44:12,23 45:3
48:14 51:19
52:20 55:9 56:1
59:10 60:21
61:15,16 64:7
64:23 75:18,20
94:21 98:17,23
99:1,3,20
100:16 101:1
103:23 107:6
107:20,23,25
108:6,10
110:19,23
111:5,13,21,25
114:8,13 124:9
125:12,15,23
126:4,9,14
130:4,6,23
**payroll** 10:1
53:21 107:21
**pays** 48:4 81:9
82:4,10,19
**PC** 2:3
**PE** 97:12
**penalty** 135:23

people 51:19
71:22 72:3
95:10 103:18
**people's** 26:1
57:2
**percent** 15:25,25
23:14 28:5
30:10,11 33:13
36:8 68:18 69:4
69:5,11 74:18
74:22 92:3
102:19 106:18
**perception** 53:14
**perform** 126:21
**performed** 71:24
**performing** 9:25
**period** 23:16
93:5 104:2,11
104:21 116:14
120:1 137:15
**perjury** 135:23
**person** 7:19,20
7:21 9:17,18
39:9,10 44:21
72:25 77:3
80:25 81:10
101:10 115:14
137:8
**personal** 26:16
26:22,24 44:14
48:20 49:10
76:1 98:10
131:18,19
**personally** 25:13
25:17 64:19,20
64:22 108:21
**personnel-wise**
107:7
**perspective**
33:23 35:20
**pertain** 72:22
**pertained** 105:8
**pertaining** 93:20
97:10
**pertains** 79:22

petition 123:23
**phrase** 51:3 97:4
**physical** 85:5
**physically** 22:23
66:14
**pick** 45:20 48:25
109:20
**piece** 15:20,21
**pin** 8:6
**place** 33:20 35:2
66:13 137:8
**Plaintiff** 1:7 2:13
**plan** 14:22,23,25
17:11
**plane** 82:7
130:21
**platform** 10:20
12:10
**play** 15:6 64:15
**please** 4:5 5:5
14:5 30:22
66:18 68:7
83:21 95:20
114:1,22
115:14 118:6,7
118:10 127:2
129:12
**pled** 98:13
**plenty** 57:3
**point** 6:10,14 7:2
7:3,3,4 9:13
18:8 24:16
29:25 36:23
37:12 39:4
45:15 53:3
56:16 57:1
60:10,16 61:17
63:2 73:19
79:21 80:3,4,5
80:5,14 83:23
89:10 97:9
101:12 109:6
128:18 129:2
**pointed** 102:22
**points** 7:6 20:14

policy 33:20 35:2
35:6
portion 16:4
21:12
portions 20:8
position 7:25
13:18 43:22
51:9 79:11,18
121:13,15
possibility 79:23
possible 17:17
48:11 50:3 74:5
89:23,25 90:19
91:17 95:1,8,9
95:10
possibly 41:6
potential 53:19
92:12 97:17
potentially 30:14
96:8,14,16
power 89:9 90:21
90:23
practice 30:1,5
34:4,14 35:18
50:4 69:23 70:3
73:6 78:7 79:4
86:5 90:7
109:11,12
practices 70:11
pre 135:5
precision 28:5
predicate 41:22
42:2
preference 73:7
73:11 90:7
prefix 135:5
premise 43:1,3
89:8
prep 83:21
prepaid 49:22
131:18,19
preparation
19:13 21:9 67:7
67:8 84:19
prepare 54:6

84:2,9,17
prepared 26:7
53:18 54:9
64:20 66:14
80:8
preparing 18:9
19:20 129:8,10
prepay 46:15,19
46:24 47:24,25
48:5,7 49:19
50:8
prepaying 50:21
51:3
prepayment
37:19,23 38:1
38:11,13 46:13
63:23 64:12
113:5,12,18
114:11 129:16
129:18,23
130:5 131:2,9
131:14 132:1
133:12,20
134:7,20,25
135:5,7
prepayments
27:2 38:10
44:15,19,23
45:1,5 63:4,21
64:8 134:12
preposterous
89:15
present 18:20,25
56:20 68:15
93:9
presented 66:14
president 43:10
43:11 121:17
pretty 11:15
60:24
previously 53:6
125:3
pricing 10:16,16
primarily 6:7
26:22 88:5

128:19
primary 9:15
109:5
principal 37:5,9
37:13,16 38:9
40:12 45:12
46:9,16,24 47:2
47:22 48:16
49:8,24 123:11
131:16
print 117:8
prior 14:22 19:18
24:19 27:9
31:19 40:10
53:18 56:17
57:5,12,17,21
69:17 87:14,15
88:15 92:4
97:14 98:12
104:11 112:14
112:15 113:5
113:10,18
122:22 123:23
126:7,12,18
131:20 135:1
priorities 89:11
privilege 132:6
133:2,4
probably 4:24
6:12 8:9 9:7
15:11,19 23:19
24:7 35:12
39:11 44:7
73:24,24 83:9
98:7 105:3,13
108:7 114:19
problem 57:2
problems 29:21
procedure 33:20
35:2,6 39:5
66:13 83:23,24
proceedings 5:3
96:6 108:1
proceeds 80:22
81:6

process 17:9
32:10 51:19
66:17 83:24,25
109:8 121:3,4
122:2
processing 10:1
produced 1:18
83:14,16 117:6
production
117:14
professional 4:18
program 105:9
progression 5:24
promissory 16:7
22:14 23:9
24:21 25:2
27:13 33:17
38:15 39:4
46:12 50:19
52:18 63:4
65:10 66:6,10
66:13,20 67:12
70:21 85:2
97:11,16
122:19 130:3
130:12,14
131:18,19
133:12
promoted 6:1
proper 108:10
132:11
protest 126:18
provide 110:10
110:12
provided 13:2,3
13:13 20:15,15
21:6 40:12
76:13 80:6
102:5 107:2,24
109:25 110:4
110:16 122:4
125:14 137:15
provider 11:12
71:24
providers 10:16

43:12
providing 12:24
provision 114:19
129:22,25
public 10:3
purport 28:8
purpose 23:8,12
85:25
purposes 30:21
31:21 32:22
36:3 73:8 75:22
pursuant 12:22
13:14 74:15
112:11
put 6:15 10:2
26:1 86:6 93:6

**Q**
qualification
64:4
qualitative 16:1
question 9:1
11:18,25 13:1
14:13 16:8,22
16:25 17:2
20:24 21:25
22:9,16 23:11
24:25 25:4,6,12
27:5 29:11 33:1
33:25 34:15,22
35:14 36:5
37:21 38:18,21
39:1,8 40:4,15
40:19 42:2,25
43:20 44:10,11
44:17,25 45:10
45:18 46:22
47:3,9,16 48:9
48:23 49:16,18
49:25 50:2,14
51:6 52:22
53:23 54:8 55:4
55:13,20,22
57:9,20 60:13
61:2,4 63:6

64:1,10 65:20
66:1,8,16,21
67:16,24 69:21
71:4,13,21
76:19 77:7,16
77:21 78:5,9,24
79:6,20 81:3,12
81:24 82:7,14
83:15 87:4
88:19,24 89:6,8
90:15 91:4,10
93:14 94:9,12
94:13,14,21
95:6,7 96:5
97:24 99:5,24
100:1,20,21
101:4 102:1,16
103:16 104:19
104:22 108:3
119:3 125:20
125:20 128:14
130:8,9,17
131:4,7,12,22
132:4,5,11,14
132:24,24
133:6,14,17,23
134:9,13,16,18
134:20 135:3
**questions** 19:12
77:12 80:13
95:17 97:25
109:15 110:18
111:19 114:3
126:24 129:13
135:10,12
**quick** 48:12
**quite** 7:9 31:9
**quote** 115:22

_____
**R**
**radar** 93:6
**radars** 26:1
**raise** 24:5,7
119:3
**raised** 24:3 80:15

96:3,7,18
**raising** 62:17
**rate** 84:15 86:2,6
**ratify** 28:6
**ratio** 104:2,10
**rational** 80:25
**rationally** 92:25
**reached** 104:11
**read** 20:8,10,20
20:25 21:11,11
44:22 46:25
48:24 118:6
127:8,14,21
128:6 130:1
131:14 132:23
**reading** 21:5
46:6 131:8
**reads** 46:23
**real** 107:13
**realize** 128:6
**realized** 127:21
**really** 6:12 9:16
10:15 16:8 54:4
73:9 78:12
83:13 95:9
101:11 105:4
107:5 108:19
109:2 128:19
129:6
**realtime** 85:14
**reason** 23:8
30:14 35:21
40:23,24 41:1
54:24 55:10
67:22,24 75:17
75:19 99:21
100:18,21
113:7,14
115:24
**reasoning** 105:2
**reasons** 23:20
74:1 88:4
**recall** 4:23 19:2
21:4,5 22:22
23:6 24:3 27:13

31:19 34:23
36:6 41:13 42:3
56:5,9,12,14
57:17,22 58:10
58:16,20 59:8
62:16 63:18
67:18 82:24
85:7 86:19
87:20 88:21
92:10 99:12
102:10 106:21
116:15 118:19
118:22 120:23
121:16 122:21
123:6,16 124:2
127:20 130:13
**receipt** 26:1
**receive** 74:18
**received** 99:19
100:15 103:19
106:19
**receiving** 22:24
33:3
**recognize** 27:23
104:7
**recollection** 5:25
8:3 28:20 29:17
40:7 50:18
51:18 52:15,17
55:7,8 68:17
75:21 76:6
78:16,17 88:3,4
91:24 94:5
95:13 101:24
105:7 115:4
123:21 125:6
126:2
**record** 4:5 16:14
25:9 64:6 68:3
105:24 106:2
117:12
**recorded** 37:13
37:14 38:7
**recording** 25:15
39:14

**records** 110:24
111:4
**recover** 17:15
**recoveries** 17:10
**recovers** 16:6
**reduced** 137:10
**reduction** 38:8
45:12
**refer** 125:7
**reference** 52:18
**referred** 87:24
123:2
**referring** 87:17
98:22
**reflected** 37:14
44:13 120:8
**reflects** 103:21
**refresh** 54:13
**regarding** 16:7
18:24 100:16
127:5
**regardless** 16:16
16:20 60:17
72:24
**regular** 66:12
88:16
**regularly** 31:9
129:19,24
130:4,6
**reimburse** 70:24
**reimbursed**
81:15
**reimbursement**
53:21 72:23
**reinstate** 60:7
**reinvestment**
105:9
**reiterate** 17:13
**REITs** 10:3
**reject** 67:22,24
89:7
**relate** 19:22
**related** 70:20
74:11 81:1
92:18 96:3

97:16,16 99:20
100:16 102:20
103:7 137:20
**relates** 18:5
70:21
**relating** 19:23
**relationship**
53:15 133:21
**relevant** 5:5
**relieve** 45:14
111:6 114:11
129:18,23
130:3,5
**relieved** 112:15
**relieves** 131:2
**reloaned** 76:4
**remainder** 49:24
**remember** 5:16
7:5 12:1,18
13:9 14:24
15:10 18:6
22:22,24,25
32:5 34:11,16
34:18 38:20
39:24 42:8
50:25 51:24
52:1,10,13,23
53:13 56:8 57:5
57:16,24,25
58:3,19,22
59:25 60:8,20
62:20,22,25
63:1,23 67:4
69:13 71:14
74:5,6 78:17
83:22 84:20
85:4 86:15,17
87:11,23 88:2
92:10,11,12
93:2,17 94:5,18
94:19,22 97:18
97:19 98:19
101:15 105:4
108:5 109:7
110:21 113:13

123:4,8 124:5
130:11 131:4,7
**remembering**
34:10 92:23
**remind** 99:6
**rep** 80:5
**repaid** 76:1
**repay** 89:3
**repaying** 93:25
**repayment** 76:7
**repeat** 22:10 27:6
100:3
**rephrase** 20:24
22:11 49:17
133:5
**report** 8:15 9:16
10:23 53:19
120:24 121:24
**reported** 1:23
**reporter** 117:8
135:13,16
137:1,3,15
**represent** 19:15
95:24
**representation**
19:17
**represented** 2:4
2:11,18
**requested** 137:13
137:14
**reservation**
91:25
**respect** 19:19
22:17 24:20
25:2,18 35:3
38:3 41:11
47:22 49:23
51:9 58:16
68:16 69:12
71:22,23 72:21
76:23 79:8 80:1
80:8 82:25
84:14,18 85:5
86:14 94:3,20
108:6 111:21

121:13 125:13
125:24
**respectful** 76:25
**respond** 25:7
60:15
**response** 128:16
**responsibilities**
7:15 8:7 9:22
108:16
**responsibility**
32:17,18 90:4,5
118:17
**responsible** 11:4
39:14 71:7
108:9,17,19
109:10,13,13
**restate** 61:10
**resulted** 71:25
**retail** 9:4 80:9
120:25 121:20
121:23 122:4
122:11 128:16
128:19
**return** 76:25
**reverse** 40:9
**review** 39:19
48:12 121:3
137:13
**reviewed** 84:10
**ridiculousness**
97:5
**right** 16:17,21
17:25 18:20
21:23 33:22
37:5 41:25
45:16 47:6 55:1
56:1 66:21
67:20 68:9
75:18 78:14
80:4 81:9 83:14
85:19 88:8,22
89:19 107:9
109:25 111:23
114:24 115:2
117:3,12

123:12 124:17
124:22,25
125:5 126:5
127:11,14,20
132:25 133:6
**Rip** 37:2
**role** 5:15 6:2,12
6:16,18,21 8:22
9:4,11 11:5
12:16 13:7,14
19:13 24:19
25:1,14,17,21
25:22,23 26:25
39:10 53:4,6
58:16 62:1
64:15,17 67:6
67:11 78:13
84:18,21 85:5,8
85:11 86:13,21
128:18
**roll** 23:15
**rolled** 125:3
**rolling** 88:15
**rolls** 39:18 64:18
**roughly** 6:9
**round** 39:20
81:18
**RPR** 1:23
**Rukavina** 2:5 3:3
3:6 4:4 9:10
11:21 12:3 13:5
14:16 17:23
18:4 20:19,23
20:25 21:6 22:3
22:11,19 23:17
25:8,16 27:7,17
27:18 29:16
33:5 34:6 35:1
35:24 36:11,21
38:2,20 39:2,20
40:9,18 41:19
41:22 43:4,23
44:20 45:6,14
45:23 47:3,10
47:17 48:13

49:6 50:1,5,17
51:8 53:11 54:3
54:11 55:6,16
55:24 56:14
57:12,21 60:19
61:5 63:10,14
64:14 65:23
66:4,11,19,25
67:1,18 68:4
70:1 71:10,18
72:6 76:24 77:8
78:1,9 79:2,9
80:18 81:8,21
82:2,8,17 83:16
83:19 86:1 87:8
88:21 89:17
91:1,7,13,20
92:7 94:3,11,14
94:17 95:7,14
110:18 111:9
111:20 112:3
112:10 113:19
116:20,25
117:7,11,15
119:9,16 120:4
120:9,15,21
125:16,19
126:25 127:2
128:22 130:11
130:19 131:8
131:17,24
132:6,9,13,17
132:20 133:1,4
133:8,18 134:1
134:14,24
135:8
**rule** 39:5 127:6
**rush** 135:19

─────
**S**
─────
**sane** 80:25
**satisfy** 93:21
**saw** 128:16
**saying** 39:25
42:23 46:2,5

49:19 61:11
90:9 92:23 94:6
94:22 109:9
**says** 18:2 46:13
46:14 48:5,14
68:7 80:12
115:23 118:7
118:18 127:17
129:17 131:2
134:11
**scenario** 33:6
**schedule** 28:1
37:15,25 38:12
45:3,7
**scheduled** 27:9
38:5 40:10
56:22 57:7
129:19,24
130:4,6
**schedules** 64:21
80:10 111:3
**school** 4:15 5:7
**Schroth** 26:10,12
108:15,17
**Science** 4:16
**scratch** 27:7
**screen** 117:22
**screwed** 111:17
**se** 37:25 38:13
**second** 28:8 37:4
67:25 72:15
73:2 103:25
**Section** 46:13
130:22 131:8
131:14
**securities** 10:20
11:14
**see** 21:18 22:2
28:11,15,16
46:1,17,18
48:17,18 49:2
58:14 83:7,12
113:9 114:5
117:20,24
125:21 129:22

129:25 130:24
130:25 131:1
seeing 44:20 48:6
48:11 59:8
61:19 85:14
114:9 130:11
seen 50:17,22,23
83:9 114:18
126:18
Seery 15:8 18:13
19:8,9,11 20:3
53:15 56:15,19
57:13,15,18,23
60:5 96:25 97:3
97:21 98:2
129:9,11
Seery's 21:12,19
semiannual
14:22
send 42:23 68:7
sending 33:4,5,6
33:8 90:24
115:14
sends 80:2
senior 5:17 7:3
sense 50:4,5
73:20 104:4,5
108:20 113:22
113:25 134:22
135:4
sensitive 86:24
sent 36:16,18
54:15 59:17
69:4 76:5 83:1
83:2 115:1
sentence 46:14
48:13,21 50:8
50:16
sentences 127:25
separate 10:25
11:7 70:20
106:25 107:4
Separately 52:10
separating 79:23
Series 4:20

service 11:12
71:24
services 10:17
12:23,24 13:3,4
13:13,15 41:3
43:12 53:20
71:11,15,17
107:2,15,15,24
108:8 109:22
109:24 110:4,7
110:10,12,16
set 115:14 118:7
settlement 9:6
seven 75:14
123:23
seven-figure
113:23
shape 6:16
shared 12:22
13:14 41:2
43:12 53:20
54:18 109:22
110:7
sheet 120:13,20
sheets 80:6,8
shocked 73:22
short 6:12
short-term 86:7
shorthand 1:24
137:2,7,25
shortly 116:11
show 28:8 117:5
showing 44:4
45:20 53:19
76:20
shows 45:25
side 85:11 96:15
sides 43:2
sign 85:1
signatures 22:24
86:18
signed 84:22
significance
128:11
significant 12:2

12:10 45:21
signing 86:14
signs 80:5
similar 8:7 13:4
13:16 74:9
82:24 107:12
107:19
single 23:15
29:21 32:17
34:12 36:8
62:14 123:22
sir 4:4 17:18 18:4
28:11,15 33:10
46:17 48:17
67:2,19 76:14
81:8 83:20
89:18 127:5
129:15,17
130:2 132:14
133:5,9
sister 97:9
sit 89:11
sitting 16:3,24
17:3,14 42:14
44:20 63:24
96:11 102:18
103:6 104:15
131:24 133:10
133:19
situation 31:22
69:23 93:1
situations 31:23
32:3 34:5
smart 17:18 50:7
SMU 4:15,17
solvency 87:6
solvent 87:2,5
somebody 35:19
somewhat 128:20
soon 118:10
132:21
sophisticated
44:21
sorry 9:20 22:19
24:22 41:21

45:24 47:20
55:21 57:19
58:25 63:16
76:16 78:14
88:22 99:8
108:11 129:14
129:20
sort 53:6 97:8
102:23
sought 87:25
sounds 50:10
80:21 81:19
82:17
source 64:6
speak 81:13
speaking 30:4
40:16 77:22
108:18
speaks 50:15
specific 8:6 14:4
28:20 31:22
34:11 38:3
42:15,18 50:25
51:1 52:23 58:4
68:17 91:24
95:13 103:14
112:23 123:17
129:25
specifically 4:23
15:10 34:24
39:10 42:8
51:24 52:13
56:7,12 62:13
67:20 69:14
71:14 74:6
81:13 83:11
86:4 87:11,24
92:13 93:8
94:22 98:21
112:20 115:10
118:16
specificity 34:24
36:7 42:11
53:13 82:16
96:14 102:24

105:14
specifics 14:24
93:18
specify 93:7
speculate 15:4
29:2 32:11
73:25
speculating
28:25 41:11
44:3
speculation 29:1
29:3,6 83:6
113:19
speed 106:24
spelled 37:24
split 108:16
spoke 18:10,19
101:6,9
spoken 18:13,15
spreadsheet
54:14
stake 18:1
stamp 117:17
standard 84:4,6
86:9,9
standpoint 92:18
135:6
STANG 2:10
start 27:7 47:17
95:19 111:17
started 5:7 10:5
101:17 108:23
starting 5:6
state 1:23 4:4,19
51:12 114:10
138:1
stated 137:9
statement 26:7
119:14
statements 36:17
116:14,18,24
119:8,19,22
120:1
STATES 1:1
step 32:9 68:25

134:5,5
**Stinson** 2:17
95:23
**stood** 87:11
**Stoops** 7:23
**stop** 21:10 65:9
94:15 100:13
**street** 1:25 2:4
10:17 82:3
**strike** 23:6 32:19
33:15 37:10
52:16 54:22
63:25 67:4
120:15 125:16
**string** 118:4
127:5
**strong** 73:11
92:17
**structure** 14:8
30:6
**struggle** 64:11
128:15 131:13
**struggling** 45:2
50:6,7 88:25
99:25
**subject** 108:10
**Subscribed**
135:24
**subsequent** 96:4
96:7,23 102:9
102:12 103:2
116:17 119:10
119:13 120:1,7
**substance** 19:1
98:6,9
**substantially**
16:2
**substantive** 97:1
**sue** 82:11
**suggested** 55:1
**suggesting** 62:22
128:9
**Suite** 2:4,17
138:2
**sum** 113:24

**summary** 21:7
**supervision**
137:11
**support** 87:20
**supporting** 12:9
72:3
**suppose** 31:18
50:3 85:11
95:10
**sure** 5:7 6:2 19:4
20:1 26:6 27:21
31:23 37:22
44:7,8 47:19
49:18 51:13
55:21 58:8
61:11,25 64:3,3
65:11,14 66:19
74:24 85:12
95:12 97:24
99:10 100:22
103:6 106:15
125:9 127:4
128:25 129:1
135:15
**surely** 128:22
129:3
**surprised** 130:14
**suspect** 55:10
68:14 123:19
**suspend** 111:14
**switch** 65:8
**sworn** 1:19 4:2
137:4

———————
**T**
**take** 12:22 14:5
16:8 18:9 23:12
68:24 71:16
117:21 118:17
**taken** 1:20 87:14
137:7
**takes** 16:5 17:5,9
**talk** 12:14 18:12
21:21 54:3
98:15 122:14

**talked** 19:15,24
69:13 94:4
103:3
**talking** 27:12
32:16,20 54:1
88:15 98:19
102:13 103:2
117:16 121:5
122:6 127:6
**talks** 129:16
130:22
**tax** 73:7 107:6,6
107:19
**team** 6:5,15 10:5
11:3 25:14,22
32:13,16,19
35:16 43:6,9
57:1 60:16
61:14 62:6,14
62:15 64:17
73:20 84:2 85:9
85:17 101:11
108:9 109:7
115:8,11,12,13
**technical** 78:6
**technically** 4:20
36:23 37:12
**teeing** 26:6
**tell** 7:11 14:18
24:22 28:4 34:2
34:7 36:25 44:2
52:7 53:11
55:17 56:3
58:23 59:5,14
69:16 71:16
83:17 93:4
103:6 105:13
106:10 112:13
112:25 113:2
115:20 116:2,6
116:22 119:12
120:6,18 122:9
126:7,12 137:4
**telling** 56:14
58:14 68:15

**tells** 43:18 55:25
94:23
**temporarily**
76:12
**tend** 109:1
**term** 7:16 8:1 9:3
24:10 45:1
47:21 86:3
88:15 98:17
104:1,2,5,7,8
107:25 108:1
124:10,11,13
125:7,13,25
126:10,13
134:21,21
**terminology**
98:14
**terms** 6:19 9:23
10:11 18:13,15
19:23 22:20
26:6 35:16
43:14 61:4
92:11 93:4
107:14,19
**testified** 4:2
41:23 99:18
100:14 124:2
**testify** 16:15,19
**testimony** 35:24
62:9 79:12
98:16 100:22
100:23 137:9
**Texas** 1:2,23,25
4:19 81:22 82:1
82:9,16,21
135:25 138:1
**thank** 95:14 96:1
109:16,17
124:19 135:8
**thanks** 100:12
**Thedford** 23:2
**thereto** 137:21
**thing** 33:22 53:6
59:18 84:13
**things** 10:1 25:25

57:3 79:14
122:5
**think** 6:9 7:2
15:18 16:3
18:18 26:14
30:15 31:6,8,22
32:9 36:16,19
39:21 41:1,10
50:15 53:2
58:12,22 59:4
59:11 64:6 65:6
65:7,8 75:2,13
78:6 79:16
80:24 84:15
85:23 86:10,15
87:21 88:13
95:9 97:19
99:14 101:5,9
103:11 105:3
105:25 106:17
107:9,22 108:4
108:6 111:17
113:7,14,24
123:24
**thinking** 57:4
117:11 129:7
**Third** 2:10 73:6
**third-party**
10:16 11:12
**thousand** 92:6
**threatened** 5:2
**three** 5:9 6:12
97:12 102:11
124:10,11,13
124:24 125:2
**throw** 104:1
**Thursday** 19:14
**Tim** 106:17
**time** 4:24 5:15
6:21,23 7:9,11
7:12,15 8:10,14
8:24 10:2,4
12:6,10 16:14
24:6,8 25:1
28:21 29:25

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 36:23 37:12,18 | **told** 39:21 42:14 | **transfers** 28:9,18 | 83:8 85:1 86:12 | 37:17 48:19 |
| 39:11 41:4,12 | 43:4 52:11,11 | 28:19,22 30:24 | 87:24 94:19 | 49:18 51:12,14 |
| 42:5,12 43:22 | 52:19 53:12 | 32:22 35:4,10 | 95:10 105:4,25 | 54:17,22,23 |
| 43:22 44:19 | 55:9 60:21 | 38:3 42:9 94:7 | 106:24 107:24 | 56:21 61:12,22 |
| 47:13 49:4 | 61:23 62:13,14 | **transitioned** | 119:24 121:18 | 70:18 72:7,10 |
| 52:14 53:2,8,14 | 62:15 68:12 | 109:1,6 | 122:12 127:25 | 75:7 79:4 87:1 |
| 53:15 54:21 | 69:9 70:9 85:19 | **transparent** | 129:4 134:22 | 87:9 91:11 97:6 |
| 56:16 59:23 | 91:8 95:1 97:25 | 115:17 | **two-paragraph** | 98:23 101:12 |
| 60:2,10 62:5 | 98:2 100:25 | **Treasurer** | 84:12 | 101:18,19 |
| 63:2 65:12 | 103:7 118:16 | 121:11 | **TX** 2:4,18 138:2 | 102:2 112:19 |
| 66:11 74:10,20 | 118:23 122:11 | **treasury** 9:6 | **type** 98:12 | 121:9 124:3,15 |
| 79:4 80:15 | 122:23 | 107:6 | **types** 13:4 78:13 | 133:11,20,25 |
| 83:23 84:12 | **tomorrow** 79:11 | **treated** 35:5 | 84:1 107:12,15 | 134:2,6 |
| 86:23 89:10,16 | 132:22 | **trigger** 104:2,10 | 107:17 114:20 | **understood** 52:2 |
| 92:10 93:5 | **top** 107:9 127:7 | 104:21 | **typewriting** | 63:12 95:4 |
| 95:12 101:13 | **topic** 96:2 98:3 | **triggered** 104:11 | 137:10 | 102:25 |
| 108:24,25 | **topics** 20:11 | 104:17 | **typical** 84:7 | **unfair** 34:17 |
| 109:6,16 | 103:25 106:23 | **triggers** 14:25 | | **unfamiliar** 80:21 |
| 111:12 112:14 | **total** 116:15 | 107:17 | **U** | **UNITED** 1:1 |
| 113:17 116:2 | **totaling** 119:24 | **trouble** 62:19 | **Uh-huh** 7:18 | **unpaid** 46:15,24 |
| 122:18 123:18 | **touched** 98:16 | **true** 29:6 88:9 | 13:23 47:7 | 47:2,20 48:15 |
| 129:2,7 134:12 | **track** 111:2 129:1 | 135:24 | 75:11 127:9 | 48:15 49:4 |
| 135:1 137:8 | **tracker** 118:10 | **trust** 15:16 17:10 | **ultimate** 16:12 | 131:15,16 |
| **timely** 44:9 51:15 | **tracking** 39:15 | 17:15 18:6 | 17:8,10 | **unscheduled** |
| 51:17 | **transaction** | **trusts** 26:16 | **ultimately** 11:4 | 38:23 64:7,23 |
| **times** 7:5 32:15 | 34:13 70:21 | 65:23 108:21 | 39:19 64:18 | 75:18,20 |
| 61:20 63:8 | 76:9 115:21 | **truth** 137:5,5,5 | 73:9 | **upcoming** 25:25 |
| 76:19 92:6 | 116:7 118:24 | **truthful** 100:22 | **um** 63:13 | **updated** 54:15 |
| **timing** 15:24 | **transcript** 135:14 | **truthfully** 16:16 | **unable** 89:3,14 | **upfront** 85:11 |
| **title** 5:15,16 6:22 | 135:17 137:13 | 16:19 | **undergrad** 4:15 | **use** 14:19 56:25 |
| 7:1 10:9,11 | **transfer** 29:9 | **try** 62:23 106:24 | **Undergraduate** | 70:23 81:17 |
| 12:16 13:7 | 30:2 31:8,20 | **trying** 17:18 | 4:14 | 108:20 |
| 26:14 | 32:8 34:19 36:1 | 27:21 30:23 | **understand** | **usually** 31:15 |
| **titles** 10:11 78:18 | 40:22 41:16 | 50:6 67:14 98:3 | 14:14 15:19 | 33:16 |
| **today** 5:21 14:3 | 69:2,10 76:15 | 100:11 104:22 | 17:14 18:19 | **utilized** 71:17 |
| 15:12 16:3,13 | 77:4,18 85:16 | 130:20 132:9 | 30:23 47:4 51:8 | |
| 16:16,19,24 | 90:12 91:22,23 | 133:8 | 61:11 62:8 66:4 | **V** |
| 17:3,14 20:5 | 92:9 93:3 115:8 | **turn** 114:15 | 67:25 68:2 | **valid** 39:3 |
| 42:14 44:20 | **transferred** | 123:25 | 88:25 96:17 | **valuation** 5:17,19 |
| 57:5 63:25 65:6 | 30:20 75:24 | **turned** 76:4 | 97:24 98:8 | 5:24 6:2,15 |
| 95:25 96:11 | 77:10 78:18 | 81:15 | 106:3 118:12 | 9:14 10:7,9,14 |
| 102:18 103:6 | 79:13 | **two** 9:7 15:12 | 118:15 124:14 | 10:15,24 11:3,7 |
| 104:15 131:24 | **transferring** 34:8 | 29:14 36:20 | 132:1 | 11:12 71:11,15 |
| 133:11,19 | 35:11 39:22 | 45:13 65:10 | **understanding** | 71:17,25 72:1 |
| **today's** 47:6 | 42:4 75:9 | 66:20 77:12 | 19:11 20:11,13 | 72:13,14,21 |

107:6
**valuations** 11:4
**value** 11:14
71:16
**valuing** 10:19
**variety** 107:16
**various** 25:23
79:14
**vary** 17:12
**verbatim** 94:17
**verbiage** 132:25
**verify** 27:24
**versus** 87:12
**videoconference**
1:19 2:6,13,19
**videotape** 21:18
**view** 131:10
**virtually** 44:5
**vis-a-vis** 15:16
**voluntary** 37:24
**vs** 1:8

**W**

**want** 16:24 44:10
54:4 63:8 90:6
95:18 96:19
98:15 100:10
101:14 104:1
117:9 134:19
135:13,16
**wanted** 24:17
34:3 96:2
**wants** 90:16,20
90:22
**wasn't** 23:24
24:1 31:20
37:18 38:5 50:4
51:11,15,16
53:4 57:1,3
59:20 60:15
62:6 70:17
72:19 73:3,3
75:2 101:11
103:17 108:12
129:10

**Waterhouse** 8:17
11:1 13:25 20:9
30:13,14,19
39:25 41:14
42:3,7 43:24
52:7,11,18,24
53:11 54:15,19
54:25 55:17,25
60:20 61:23
62:9 65:3 69:9
77:17 78:2,20
84:23 85:1,19
86:14 91:8 94:6
100:25 103:3
103:13 115:5
115:25 116:2
116:22 118:19
118:23 121:6
122:9 124:4,8
125:11,22
126:15 127:13
127:16
**Waterhouse's**
21:1,19 127:10
**waters** 43:14
**way** 6:16 20:12
22:22 31:15
34:3 35:17,22
48:24 54:1 63:8
69:6 72:15,17
76:10 82:19
87:18 92:1,1,1
92:2 93:24 94:6
95:3 97:5
102:23 114:10
121:5 137:19
**ways** 38:21
**we'll** 20:1 54:3
125:7 132:17
132:21
**we're** 12:8 27:12
32:15 43:11,12
64:1 65:8,9,10
65:12 79:22
80:4 117:17,18

121:5 122:6
**we've** 19:24
75:13 78:12
**wearing** 43:15
**week** 36:20 83:7
**weekly** 25:24
43:5,24 63:19
129:8,10
**weeks** 59:5
**welcome** 117:19
127:7
**went** 4:14 58:17
81:17 85:14
101:18
**weren't** 61:21
80:16 88:7
97:15 101:20
**whatsoever**
63:20
**wherewithal**
93:24
**wind** 16:5 17:5
**winding** 15:2,22
**wire** 59:17 61:19
118:7
**withdrawn** 91:19
110:11 111:15
113:1,7,8
124:10,12
**within-entitled**
137:6
**witness** 1:19 9:2
11:19 12:1 13:2
14:14 19:12
21:4 22:1,10,17
23:12 25:5,13
27:6 29:12 33:2
34:1,23 35:15
36:6 37:22
38:19 39:9 40:5
40:16 41:18,21
43:1,21 44:18
45:1,11,19
46:23 48:10,24
49:17 50:3,15

51:7 52:23
53:25 54:9 55:5
55:14,21 56:12
57:10 60:14
61:3 63:7 64:11
65:21 66:2,9,17
69:22 71:5,14
71:22 76:21
77:22 78:6,5
79:7,21 81:4,13
81:25 82:15
83:15 85:22
87:5 88:20 89:7
90:16 91:5,11
93:15 94:10
95:15 99:6,25
100:7,13,21
101:5 102:2,17
103:17 104:20
108:4 109:17
111:10 112:5
112:11 113:21
117:1 119:10
119:17 120:10
120:22 128:15
130:9,18 131:7
131:13,23
133:16,24
134:10,19
135:4,9 137:3
137:10
**word** 56:25
133:11,20
**words** 10:24 36:7
52:16,24 94:19
**work** 5:5 10:19
**worked** 5:8 11:22
62:4
**working** 5:7,11
12:5
**world** 108:23
116:3,7 118:22
119:2,12 120:6
120:18
**worth** 34:10

**worthiness** 90:11
**wouldn't** 25:13
38:10 43:8
56:22,23 60:16
64:8,20 77:24
86:24 87:17
99:15
**write** 128:3,5
**writes** 127:13
**writing** 103:21
103:24 113:9
125:22 126:18
**written** 35:2,6
66:6
**wrong** 55:1 82:18
82:22 88:22
89:19
**wrote** 67:21
70:12
**www.dickman...**
138:4

**X**

**Y**

**y'all** 95:2
**Yang** 106:15
**yeah** 6:23 8:2
14:21 15:23
19:17 23:2
29:12,20 35:15
37:22 43:1
55:14 56:24
59:2 60:14 61:3
63:7,8,12,18
66:17 67:9 71:5
83:24 89:7
91:11 94:10
96:10 98:20
99:25 101:5
102:2 124:15
125:1 135:19
**year** 6:1 9:25
29:22 49:21
111:1,8,12,13

113:4 123:17
126:5,15,22
**years** 5:9 6:17
15:12 24:10,17
30:18 32:21
33:20 34:17
39:14 48:7
65:17 66:3
69:18 94:20
95:3,11 123:23
**years'** 34:10
**yes-or-no** 94:12
**York** 2:11 132:21

**Z**

**zero** 46:8 49:6
80:1
**ZIEHL** 2:10

**0**

**0** 36:8 69:4
**08** 4:24
**09** 4:24

**1**

**1** 8:11 24:20,23
66:24 67:2,7
80:3 113:10
126:8,12
137:22
**1-31-23** 138:4
**1-4** 27:17
**1-6** 127:3
**1.3** 28:13,14
**1.4** 58:25
**10** 19:6 32:21
33:20 34:10,17
69:18 95:3
123:19
**100** 15:25
**10017-2024** 2:11
**101** 138:2
**109** 3:5
**11** 123:19
**127** 3:6
**13** 23:8 27:9

46:12 49:10
114:1 129:12
129:14
**13-week** 126:3
**14** 27:15,17,23
36:12 40:20
42:17 44:13,22
48:12 49:1
58:25 59:23
60:2,23 61:18
64:2,5
**15** 61:7
**15(c)** 80:9 121:4
127:6 128:17
**16** 8:9 31:18
127:2
**17** 8:10
**18** 8:10
**19** 8:24 45:24
49:2
**1982** 4:10

**2**

**2** 66:24 67:2,7
73:25 76:3 80:4
85:23 87:9,13
92:8 114:23
115:9
**2.03-** 46:9
**2.1** 28:14 45:25
46:3 49:1,8
130:22 131:8
**2.1-** 46:5,7
**2.4** 68:7 69:2
70:7,19,23 72:7
73:18 75:22
76:3 77:10,18
78:9 85:18,20
91:22 92:8,15
115:8 116:3,23
**2.4-** 70:21 73:23
77:4 85:24
86:13 90:6
**2:30** 1:22
**20** 8:24 24:17

**200** 12:6
**2009** 5:12,15 6:3
6:3 29:24,25
122:17
**2010** 6:9 106:13
123:18
**2011** 6:10,21
106:13 123:18
**2012** 123:18
**2017** 6:22 22:13
23:7 24:8,18
88:22 105:12
124:25
**2018** 116:14
119:14 120:2
**2019** 8:11,14 9:10
9:13 10:6 11:10
11:16,21 27:14
28:9 29:8,17,21
29:25 31:18
35:8 36:15,22
40:21 41:1,13
42:8,16,16
44:13,13 45:23
45:24 65:13,15
66:11 75:14
78:20 80:6,19
87:2,9,13 88:9
88:14 89:2,17
91:21 92:8 93:2
93:11 105:13
110:20 111:6
111:12,21
112:2,6,8
114:23 115:9
121:7
**2020** 7:13,22
24:20,24 51:10
51:15,22 53:18
54:24 56:17,22
57:6,13,17,22
60:20 61:21
63:19 98:18,24
99:19 100:15
101:2 102:14

102:17,17
103:23 112:17
113:2,4,12
120:24 121:7
121:21 124:1,9
125:12,24
126:10 127:11
128:23 129:3
**2021** 1:15,21
13:24 58:25
59:23 60:2 61:8
87:16 88:1
112:22,25
113:3,10,16
126:8,13 128:2
129:4 136:1
137:22
**21-03004-sgj** 1:8
**214** 138:3
**23-point** 45:20
**23.034-** 45:21
**24.7-** 46:10
**27** 1:15,21 4:20
**29** 37:6

**3**

**3** 46:13 50:8
67:17 68:4
74:18,22 76:5
82:24 83:10,20
93:2,11 114:4,7
114:10,22
118:1,13
129:15 131:8
131:14
**30** 24:10,17
130:22
**30-year** 23:15
24:10 26:2
**30(b)(6)** 19:12,20
**30.7** 21:22
**30.7-** 27:12
**300,000** 28:14
**31** 22:13 23:7
24:18 45:21

51:10,15 56:17
56:22 57:6,13
57:17,21 58:7,9
60:25 87:15
88:1 98:18,24
120:2 124:25
**3102** 2:17
**312** 138:1
**338-** 37:8
**34th** 2:11
**3763** 83:15
**3800** 2:4
**38th** 1:25
**398,000** 85:23

**4**

**4** 3:3 45:23 91:21
**4.4** 118:9
**4.4-** 76:4
**411,000** 37:8
**4228** 138:2
**445-9548** 138:3

**5**

**5** 74:7,8,24 75:4
75:23 77:4,11
77:18 78:3
79:22 80:2
81:18 82:25
85:4 86:13
91:22 93:3
114:16 118:8
118:13,24
119:7,14
**5-** 76:5 90:1
**5,019,000** 75:3
**5.2** 80:19
**5:00** 95:19
**5:14** 1:22 135:21
**500** 1:24 2:3
**500,000** 123:9,12

**6**

**6** 4:10 127:11
128:22 129:3
**6/30** 122:2

David Klos - October 27, 2021

**600,000** 76:6,7
**630,000** 28:14
**66,000** 46:7 49:4
  49:5,7

---

**7**

**7** 58:11,15
**7.4** 75:9 78:22
  79:12 89:2
  90:17,20,22,24
  119:25 122:5
**7.4-** 89:19 91:13
**75** 18:1
**750,000** 28:13
  37:6
**75201** 2:4
**75206** 138:2
**75219** 2:18
**777** 2:17
**780** 2:10

---

**8**

**80** 15:25
**800** 138:3
**855-5100** 138:3

---

**9**

**9** 19:5
**95** 3:4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | | Case No. 19-34054-sgj11 |
| Debtor. | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § § § § § § § § § | |
| Plaintiff, | | |
| v. | | Adv. No. 21-03004 |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | | |
| Defendant. | | |

## DECLARATION OF DAVOR RUKAVINA

The undersigned, Davor Rukavina, hereby declares under penalty of perjury pursuant to the laws of the United States of America the following:

1.      My name is Davor Rukavina.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.

2.      I am an attorney duly licensed to practice law in the State of Texas.  I am lead counsel for Highland Capital Management Fund Advisors, L.P. ("HCMFA"), in the above styled and numbered Adversary Proceeding.

3.      Attached hereto as Exhibit "A" is a true and correct copy of the *Defendant's Second Set of Requests for Production to Plaintiff*, served by HCMFA on May 28, 2021.

4.      Attached hereto as Exhibit "B" is a true and correct copy of the *Debtor's Responses and Objections to Defendant's Second Set of Requests for Production*, served by Highland Capital Management, L.P. (the "<u>Plaintiff</u>"), on June 28, 2021.

5.      The first time that the Plaintiff produced the promissory notes the subject of this Adversary Proceeding, in their native Word format, was on October 26, 2021.

6.      I caused two of my employees, Julian Vasek and An Nguyen, both associates at Munsch Hardt under my direct supervision, to review the Plaintiff's production in this Adversary Proceeding for any e-mail from Mr. Frank Waterhouse to Ms. Kristin Hendrix authorizing her to affix his electronic signature to the promissory notes the subject of this Adversary Proceeding. After they originally found no such e-mail, I instructed them to search the production again just to be certain.  Again, they reported to me that, after searching again, they found no such e-mail.  I then personally reviewed all e-mails in said production from Mr. Waterhouse to anyone in April and May, 2019, and I found no such e-mail.  Accordingly, I conclude that the Plaintiff's production to HCMFA in this Adversary Proceeding does not contain any e-mail by which Mr. Waterhouse authorized Ms. Hendrix to affix his electronic signature to said notes.

7.      Included in the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* at HCMFA APP 53-449 is a true and correct copy of a deposition of Frank Waterhouse, without exhibits, taken in this Adversary Proceeding on October 19, 2021.

8.      Included in the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* at HCMFA APP 450-653 is a true and correct copy of a deposition of Kristin Hendrix, with exhibits, taken in this Adversary Proceeding on October 27, 2021.

9.      Included in the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* at HCMFA APP 654-813 is a true and correct copy of a deposition of David Klos, taken in this Adversary Proceeding on October 27, 2021.

10.     I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.

Executed: November 30, 2021.


 /s/ Davor Rukavian_____
DAVOR RUKAVINA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S SECOND SET OF REQUESTS FOR PRODUCTION TO PLAINTIFF**

**To:    Highland Capital Management, L.P., by and through its counsel of record, John Morris, Esq., Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067**

Pursuant to Federal Rule of Civil Procedure 34, as made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7034, defendant Highland Capital Management Fund Advisors, L.P. hereby serves upon plaintiff Highland Capital Management, L.P. this its *Second Set of Requests for Production to Plaintiff* (the "Requests").  Responses to the Requests must be served on or before **June 28, 2021**, on the following:

Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
3800 Ross Tower
500 N. Akard St.
Dallas, Texas 75201

EXHIBIT "A"

Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7034, electronically stored information should be produced in native format.

## I.    DEFINITIONS

In responding to these Requests, you are instructed to use the following definitions:

"Communication(s)" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) by any means, including but not limited to any meeting, conversation, discussion, conference, correspondence, message, or other written or oral transmission, exchange, or transfer of information in any form between two or more persons, including in person or by telephone, facsimile, telegraph, telex, electronic mail or other medium. The term also includes any Document transmitted or exchanged during such transmittal of information.

"Complaint" means the *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate*, filed by the Debtor in this Adversary Proceeding.

"Debtor" means Highland Capital Management, L.P. and includes all agents and representatives thereof.

"Document" means all handwritten, typed, or printed matter of any kind, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise, including, without limitation, agreements, correspondence, forecasts, memoranda, e-mails, notes, jottings, speeches, press releases, diaries, examinations, statistics, letters, telegrams, minutes, time records, payroll records, expense records, contracts, reports, studies, training manuals, canceled checks, statements, receipts, delivery tickets, returns, summaries, work orders, pamphlets, books, prospectuses, statement of operations, inter-office and intra-office communications, internal and external audit reports, internal and external accounting reports, offers, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, printed matter, computer print-outs, teletypes, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing, graphic or aural records of representations of any kind, including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures, and electronic, mechanical or electronic records or representations of any kind, including, without limitation, emails, tapes, cassettes, digital images, digital videos, videotapes, audiotapes, laser disks, disks (including CD-ROM disks), plans or other representations of anything concerning, describing, referring or relating, directly or indirectly, in whole or in part, to the subject matter of the discovery request at issue.

"HCMFA" means Highland Capital Management Fund Advisors, L.P. and includes all agents and representatives thereof.

HCMFA APP 0818

"NAV Error" means the NAV error in the Highland Global Allocation Fund referred to in that certain April 7, 2019 memo from HCMFA to the Securities and Exchange Commission that was provided to John Morris by Davor Rukavina attached to an email dated May 24, 2021.

"Notes" means those certain alleged promissory notes attached as Exhibits 1 and 2 to the Complaint.

"Related" or "related to" means, without limitation, the following: effect, concern, refer to, reflect, evidence, display, contain, show, prove, encompass, support, demonstrate, involve, and/or include, in any way legally, logically, or factually connected to the matter referred to, or have a tendency to prove or disprove the matter referred to.

## II.    REQUESTS FOR PRODUCTION

**REQUEST NO. 8**

The Debtor's compliance manual.

**RESPONSE:**


**REQUEST NO. 9**

All Microsoft Word copies of the Notes, including metadata.

**RESPONSE:**



**REQUEST NO. 10**

All email communications related to preparation of the Notes.

**RESPONSE:**



**REQUEST NO. 11**

All email communications with external auditors related to the Notes.

**RESPONSE:**

**REQUEST NO. 12**

    All email communications related to the NAV Error.

    **RESPONSE:**

**REQUEST NO. 13**

    All email communications related to any insurance claim related to the NAV Error.

    **RESPONSE:**

**REQUEST NO. 14**

    All email communications related to the payment obligations of HCMFA to Highland Global Allocation Fund for the NAV Error.

    **RESPONSE:**

    Dated at Dallas, Texas this 28th day of May, 2021.

                    **MUNSCH HARDT KOPF & HARR, P.C.**

                    By: /s/ Davor Rukavina
                        Davor Rukavina, Esq.
                        Texas Bar No. 24030781
                        Julian P. Vasek, Esq.
                        Texas Bar No. 24070790
                        3800 Ross Tower
                        500 N. Akard Street
                        Dallas, Texas 75201-6659
                        Telephone: (214) 855-7500
                        Facsimile: (214) 855-7584
                        Email: drukavina@munsch.com

                  **COUNSEL FOR HIGHLAND CAPITAL**
                  **MANAGEMENT FUND ADVISORS, L.P.**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 28th day of May, 2021, he caused a true and correct copy of this document to be served by e-mail on John Morris, Esq., counsel of record for the Debtor/Plaintiff.

/s/ Davor Rukavina
Davor Rukavina

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Debtor. | § Chapter 11<br>§<br>§<br>§ Case No. 19-34054-sgj11<br>§<br>§ |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>Defendant. | §<br>§<br>§<br>§ Adv. Proc. No. 21-03004<br>§<br>§<br>§<br>§<br>§ |

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



HCMFA APP 0822

**DEBTOR'S RESPONSES AND OBJECTIONS TO DEFENDANT'S**
**SECOND SET OF REQUESTS FOR PRODUCTION**

Highland Capital Management, L.P., ("Plaintiff" or the "Debtor") hereby responds to *Defendant's Second Set of Requests for Production to Plaintiff* (the "Requests")[2] served by Highland Capital Management Fund Advisors, L.P. ("HCMFA" or "Defendant") in the above-captioned adversary proceeding (the "Adversary Proceeding"). The Debtor's responses and objections to the Requests (the "Responses") are made pursuant to Federal Rules of Civil Procedure ("FRCP") 26, 33, and 34 as made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

## GENERAL OBJECTIONS

Unless otherwise specified, the following general objections and caveats are applicable to each and every Response and are incorporated into each Response as though set forth in full:

1.     The Responses contained herein are based upon information presently known and ascertained by the Debtor.

2.     The Debtor objects to the Requests to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other privilege or immunity. The inadvertent disclosure or production of any document that is protected from discovery by any privilege or immunity shall not constitute a waiver of any such privilege or immunity. All references in these objections and responses to the Debtor's agreement to produce documents shall be construed to mean non-privileged documents.

3.     The Debtor objects to the Requests to the extent they request information that is not reasonably or readily available to it, in its possession, custody or control, or is more

---

[2] Capitalized terms not defined herein shall have the meanings set forth in the Requests.

readily available to HCMFA from another source or for which the burden of obtaining such information is not substantially greater for HCMFA than it is for the Debtor.

4.      All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

5.      The Debtor objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

6.      The Debtor's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

7.      These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 8:**

The Debtor's compliance manual.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

The Debtor objects to Request for Production No. 8 on the grounds that it is vague, overly broad, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 9:**

All Microsoft Word copies of the Notes, including metadata.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

The Debtor objects to Request for Production No. 9 to the extent the term "metadata" is vague.  Subject to the General Objections and this specific objection, the Debtor will conduct a reasonable search for, and produce, documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 10:**

All email communications related to preparation of the Notes.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 10, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 11:**

All email communications with external auditors related to the Notes.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 11, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 12:**

All email communications related to the NAV Error.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 12, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 13:**

All email communications related to any insurance claim related to the NAV Error.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

The Debtor objects to Request for Production No. 13 on the grounds that it is vague, overly broad, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 13 to the extent they are relevant to the NAV Error and the Notes, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 14:**

All email communications related to the payment obligations of HCMFA to Highland Global Allocation Fund for the NAV Error.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

Subject to the General Objections, the Debtor will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 14, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

6

HCMFA APP 0827

Dated: June 28, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pcszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*