PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-3004-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

## HIGHLAND CAPITAL MANAGEMENT, L.P.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

# TABLE OF CONTENTS

**Page No.**

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ............................................................................................... 4

    A.    May 2019: Mr. Waterhouse (and therefore HCMFA) is told that the May 2019 transfers were treated as intercompany loans backed by promissory notes created by the Accounting Department .................................................................................................................................... 4

    B.    June 2019: HCMFA and Highland disclosed the existence of the HCMFA Notes in their respective audited financial statements ...................................................................................... 6

    C.    June 2019: HCMFA recorded the HCMFA Notes as liabilities on its balance sheet ......... 6

    D.    October 2019 through January 2020:  With Mr. Dondero still in control of both entities, the HCMFA Notes were included as assets of Highland's bankruptcy estate ............................ 7

    E.    October 2020: HCMFA informed the Retail Board of its obligations under the HCMFA Notes ............................................................................................................................................ 8

    F.    January 2020 through January 2021:  Highland continued to include the HCMFA Notes as assets of Highland's bankruptcy estate in its MORs and books and records ......................... 9

    G.    April and August 2020:  Mr. Dondero was informed that HCMFA had notes outstanding to Highland in excess of $10 million, which included the HCMFA Notes .............................. 11

    H.    December 2020: Highland demands payment under the HCMFA Notes ......................... 12

    I.    April/May 2021:  HCMFA conducts and internal investigation, concludes that Mr. Waterhouse signed the HCMFA Notes by mistake and without authority, and asks the Court to amend its Answer ................................................................................................................. 12

    J.    The Motion is devoid of credibility .................................................................................. 14

ARGUMENT ......................................................................................................................... 18

  A.    Legal Standard ................................................................................................................. 18

  B.    Leave to Amend is Not Warranted Under Rule 15 ......................................................... 19

    1.    The Proposed Amendment Was Unduly Delayed ...................................................... 19

    2.    The Proposed Amendment is Futile ........................................................................... 20

    3.    The Proposed Amendment Would Unduly Prejudice Highland .................................. 23

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Aguilar v. Wells Fargo Bank, N.A.*,
 No. 3:16-cv-211-K-BN, 2017 WL 1450622 (N.D. Dal. March 3, 2017) ................................. 18

*Allergan, Inc. v. Teva Pharmaceuticals USA, Inc.*,
 No. 2:15-cv-1455-WCB, 2017 WL 119633 (E.D.Tex. Jan. 12, 2017)..................................... 20

*American Tourmaline Fields v. International Paper Co.*,
 No. Civ.A. 3:96–CV–3363–D, 1998 WL 874825 (N.D.Tex. Dec. 7, 1998) ........................... 19

*Cypress Engine Accessories, LLC v. HDMS Ltd. Co.*,
 No. H–15–2227, 2017 WL 1710569 (S.D.Tex. May 3, 2017) ......................................... 20, 25

*Daves v. Payless Cashways, Inc.*,
 661 F.2d 1022 (5th Cir. 1981) ........................................................................................... 19

*Lightfoot v. Weissgarber*,
 763 S.W.2d 624 (Tex.App.-San Antonio 1989) .................................................................. 21

*Looney v. Irvine Sensors Corp.*,
 CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ............................ 20, 21

*Matter of Southmark Corp.*,
 88 F.3d 311 (5th Cir. 1996) ............................................................................................... 19

*Overseas Inns S.A. P.A. v. United States*,
 911 F.2d 1146 (5th Cir. 1990) ........................................................................................... 24

*Parish v. Frazier*,
 195 F.3d 761 (5th Cir. 1999) ....................................................................................... 23, 25

*Resolution Tr. Corp. v. Starkey*,
 41 F.3d 1018 (5th Cir. 1995) ....................................................................................... 20, 21

*Sabre, Inc. v. Lyn-Lea Travel Corp.*,
 No. CIV.A. 3:96-CV-2068R, 2003 WL 21339291 (N.D. Tex. June 5, 2003)......................... 18

*Southwestern Bell Telephone Co. v. City of El Paso*,
 346 F.3d 541 (5th Cir. 2003) ............................................................................................. 19

*Squyres v. Heico Companies, L.L.C.*,
 782 F.3d 224 (5th Cir. 2015) ............................................................................................. 24

*Sunburst Media Management, Inc. v. Devine*,
 No. 3:08–CV–1170–G, 2010 WL 1962499 (N.D.Tex. May 17, 2010)................................... 21

*Thomas v. Atmos Energy Corporation*,
 223 Fed. Appx. 369 (5th Cir.2007).................................................................................... 22

*Thompson v. Wichita Falls Indep. Sch. Dist.*,
 No. 7:06–CV–0191–R ECF, 2008 WL 123891 (N.D.Tex., Jan. 14, 2008)............................. 24

*United States v. Carter*,
 737 Fed. Appx. 687 (5th Cir. 2018)............................................................................... 22, 23

*Wade v. Cycle Mart, L.P.*,
 No. A–14–CV–00427–ML, 2015 WL 4404876 ................................................................ 23, 24

*Wimm v. Jack Eckerd Corp.*,
 3 F.3d 137 (5th Cir. 1993) ................................................................................................. 18

**STATUTES**

Tex. Bus. & Comm. Code § 3.308(a) .......................................................................................... 22

DOCS_NY:44789.8 36027/003

**RULES**

Fed. R. Civ. Proc. 15(a)(2)........................................................................................................... 18

DOCS_NY:44789.8 36027/003

Highland Capital Management, L.P., the reorganized debtor ("Highland" or "Plaintiff") and plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby files this objection (the "Objection") to *Defendant's Second Motion for Leave to Amend Answer* [Docket No. 82] (the "Motion"), filed by Highland Capital Management Fund Advisors, L.P. ("HCMFA" or "Defendant").  In support of its Objection, Highland states as follows:

## PRELIMINARY STATEMENT[2]

1.      A month after the close of discovery, HCMFA seeks leave to amend its Answer for a second time—effectively disavowing its prior representations to this Court in support of its First Motion for Leave to Amend—now claiming that it did not know and could not have known until the close of discovery in late October 2021 that (i) Mr. Waterhouse (HCMFA's Treasurer) allegedly did not sign or authorize the HCMFA Notes and (ii) Highland's Accounting Department prepared the HCMFA Notes based on faulty assumptions.

2.      The Motion has no basis in fact or law.  The Proposed Amendment was unduly delayed because HCMFA knew, or should have known, of the facts underlying its newest defense when the HCMFA Notes were prepared, executed, and recorded in May 2019.  Beyond that, HCMFA had countless opportunities to investigate the origin of the HCMFA Notes sitting on its own balance sheet if it actually believed they were unauthorized.  The Proposed Amendment is also futile.  HCMFA cannot rebut Highland's *prima facie* case for breach of the Notes because (i) Mr. Waterhouse has steadfastly refused to disavow the propriety of the HCMFA Notes (nor could he or HCMFA credibly do so) and (ii) there is insufficient evidence for HCMFA to rebut the presumption that the HCMFA Notes were validly executed.  The Proposed Amendment would also unduly prejudice Highland because (a) it was filed weeks after Highland announced its

---

[2] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to them below.

intention to move for summary judgment (a motion which has since been filed) and the close of

fact discovery and (b) if granted, would require Highland to re-depose HCMFA, Mr. Dondero, Mr.

Waterhouse, and Mr. Sauter and seek other discovery.

3.      While completely ignored by HCMFA, the following undisputed facts establish

that (a) HCMFA had two and a half years and countless opportunities to investigate the origin of

the HCMFA Notes, (b) HCMFA has always treated Highland's May 2019 transfers as loans, and

(c) HCMFA concluded based on an earlier investigation that Mr. Waterhouse signed the notes, but

allegedly by mistake and without authority (conclusions based on grossly misleading statements

that this Court relied upon in granting HCMFA's First Motion to Amend):

- May 2019:  Highland transferred $7.4 million to HCMFA in two separate payments and Mr. Waterhouse (and therefore HCMFA) was explicitly told ***in writing*** that (a) the transfers would be treated as loans and (b) Highland's accounting department would prepare the promissory notes.[3]

- June 2019:  The HCMFA Notes were disclosed in both HCMFA's and Highland's audited financial statements as unqualified obligations due and owing from HCMFA to Highland.

- June 2019:  HCMFA recorded the HCMFA Notes as liabilities on its balance sheet, and Highland recorded the HCMFA Notes as assets on its balance sheet.

- October 2019 through January 2020:  While Mr. Dondero remained in control of both HCMFA and Highland, Highland filed monthly operating reports prepared by Mr. Waterhouse that included the HCMFA Notes as assets of Highland's estate.

---

[3]  As discussed below, while Kristin Hendrix does not specifically recall her communications with Mr. Waterhouse on the topic, she testified that she would never have prepared the HCMFA Notes without having received specific instructions from Mr. Waterhouse or Mr. Dondero.  *See infra* ¶ 60 n. 10.  But the Court need not resolve this issue to decide the Motion because the undisputed, documentary evidence establishes that Mr. Waterhouse, HCMFA's Treasurer, was told in writing that the transfers were being booked as loans subject to promissory notes being prepared by the accounting department.  As such, HCMFA is charged with such knowledge and should have inquired if HCMFA believed that treating the transfers as loans was improper.  Of course, HCMFA did no such thing precisely because Mr. Waterhouse knew the HCMFA Notes were prepared to document the loans.  Highland does not intend to contest every factual error proffered by HCMFA but reserves the right to do so.

- <u>October 2020</u>: HCMFA's officers reported to the Retail Board of the funds that HCMFA manages that HCMFA was obligated to Highland for the liabilities set forth on HCMFA's balance sheet, which included the HCMFA Notes.

- <u>January 2020 through January 2021</u>: Mr. Waterhouse continued to prepare and sign monthly operating reports that disclosed the HCMFA Notes as assets of Highland's estate.

- <u>April and August 2020</u>: Mr. Dondero was expressly reminded that HCMFA had notes outstanding to Highland in excess of $10 million, which included the HCMFA Notes.

- <u>December 2020</u>: Highland demanded payment on the HCMFA Notes but instead of informing Highland that it was unaware of the HCMFA Notes, HCMFA remained silent.

4.     Every one of these events is supported by documentary evidence and is an independent admission of the existence, validity, and enforceability of the HCMFA Notes. HCMFA offers no explanation for its failure to inquire as to the origin of the Notes in light of these blazing red flags. When HCMFA finally did inquire, it concluded that (a) Mr. Waterhouse was HCMFA's Chief Financial Officer "at the time he signed the Notes," and (b) Mr. Waterhouse "made a mistake in preparing and signing the Notes."[4] HCMFA reached these conclusions more than six months ago after conducting an internal investigation for the express alleged purpose of determining the origin of the HCMFA Notes.[5]

5.     HCMFA's First Motion to Amend was based on the conclusions it reached during its internal investigation. Now, HCMFA is doing an about face, ignoring all of the foregoing

---

[4] As set forth in detail below, Mr. Waterhouse "obviously disagreed" with Mr. Sauter's conclusion, but Mr. Sauter and HCMFA failed to share Mr. Waterhouse's views with the Court when HCMFA filed its First Motion to Amend to assert the "mutual mistake" defense.

[5] As described in more detail below, HCMFA had unfettered access to HCMFA's officers, including Mr. Waterhouse (who was interviewed three times), to conduct its investigation and had the HCMFA Notes in its possession since they were attached to Highland's Complaint. *See* AP 21-03004, Docket No. 1, Exs. 1 and 2 (Ex. 1, Appx. 10-15). Mr. Waterhouse has not worked for Highland since February 2021. On information and belief, since the time he left Highland, Mr. Waterhouse has effectively, indirectly worked for Mr. Dondero's entities.

undisputed evidence and disavowing its prior conclusions to assert that Mr. Waterhouse did not sign the HCMFA Notes and did not authorize the use of his electronic signature.

6.     But HCMFA could have and should have inquired years ago or done its first investigation properly.  Instead, HCMFA predictably and shamelessly blames everyone else for its own ineptitude.  In addition to the foregoing facts, the evidence will also show that (a) on June 25, 2021, Highland produced the May 2, 2019 e-mail which expressly stated that the accounting department was preparing the $2.4 million HCMFA Note and (b) on July 2, 2021, Highland produced the HCMFA Notes with the metadata.

7.     In the end, the Motion is nothing but a last-second "Hail Mary" intended to create more chaos, increase costs, delay the day of reckoning, and try to manufacture and another appellate issue.  For the reasons set forth above and below, the Motion should be denied on the grounds of (1) HCMFA's undue delay in asserting the Proposed Amendment, (2) futility, and (3) the substantial prejudice that Highland would suffer from the granting of the Motion.

## RELEVANT BACKGROUND

A.     **May 2019**: Mr. Waterhouse (and therefore HCMFA) is told that the May 2019 transfers were treated as intercompany loans backed by promissory notes created by the Accounting Department

8.     Since at least April 2019 through the present, Mr. Waterhouse has served as an officer of HCMFA, holding the title of Treasurer.  As Treasurer, Mr. Waterhouse was responsible for managing HCMFA's accounting and finance functions. Ex. 35, Appx. 153-154; Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5, Appx. 289-294.

9.     On May 2, 2019, Highland transferred $2.4 million to HCMFA.  On May 3, 2019, Highland transferred $5 million to HCMFA.  There is no dispute that Highland's accounting department treated the transfers as lending transactions and "papered" the transactions as

4

intercompany loans evidenced by promissory notes (the "HCMFA Notes"). Ex. 54, Appx. 161-164, Ex. 56, Appx. 165-166, Ex. 57, Appx. 167-169.

10. Highland maintained an e-mail group called "Corporate Accounting." Mr. Waterhouse was among the people included in the "Corporate Accounting" e-mail group. *See, e.g.*, Ex. 194 at 111:6-112:7, Appx. 591.

11. On May 2, 2019, David Klos, Highland's Controller, sent an e-mail to the Corporate Accounting e-mail group entitled "**HCMLP to HCMFA loan**" that said:

> Blair, **Please send $2,400,000 from HCMLP to HCMFA. This is a new interco loan. Kristin, can you or Hayley please prep a note for execution**. I'll have further instructions later today, but please process this payment as soon as possible.

Ex. 54, Appx. 161-164 (emphasis added).

12. The next day, on May 3, 2019, Ms. Hendrix sent an e-mail to the Corporate Accounting e-mail group entitled "**HCMLP Loan to HCMFA**" that said:

> Blair, **Please set up a wire from HCMLP to HCMFA for $5M as a new loan** ($4.4M should be coming in from Jim [Dondero] soon).
>
> Hayley, please add this to your loan tracker. **I will paper the loan**.

Ex. 56, Appx. 165-166 (emphases added).

13. Thus, Mr. Waterhouse (and therefore HCMFA) was contemporaneously informed in writing that (a) HCMLP was going to make two transfers to HCMFA in the aggregate amount of $7.4 million, (b) the transfers were being treated as loans, and (c) the accounting department was going to "paper the loan[s]" by creating promissory notes.

14.     There will never be any evidence that Waterhouse or HCMFA ever "corrected" Mr. Klos or Ms. Hendrix or informed them that the transfers were to be treated as compensation rather than loans.[6]

**B.     June 2019**: HCMFA and Highland disclosed the existence of the HCMFA Notes in their respective audited financial statements

15.     On June 3, 2019, just a month after the HCMFA Notes were issued, PwC completed its audit of Highland's and HCMFA's audited financial statements.   Both entities expressly disclosed the $7.4 million of loans as "subsequent events," stating:

> Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million.  The notes accrue interest at a rate of 2.39%.

Ex. 34 at 39, Appx. 147; Ex. 45 at 17; *see also* Ex. 94 at 54:9-55:7, Appx. 201.

16.     There will never be any evidence that Mr. Waterhouse, HCMFA, or Highland ever amended or "corrected" these disclosures or that these disclosures caused HCMFA to inquire into the origin of the loans.

**C.     June 2019**: HCMFA recorded the HCMFA Notes as liabilities on its balance sheet

17.     HCMFA has admitted that it carried the HCMFA Notes as liabilities on its balance sheet:

> Q:     And when you say that it was recorded as a liability in the books and records where in the books and records was it recorded as a liability?
>
> A:     Meaning on the balance sheet?
>
> Q:     Okay. So the balance sheet is one place; is that right?
>
> A:     Yes.  We recorded liabilities on the balance sheet.

---

[6] Indeed, there is no documentary evidence, and there will never be any documentary evidence, to corroborate HCMFA's contention that the May 2019 transfers were supposed to be "compensation" of any kind.  HCMFA never issued an invoice to HCMLP and HCMFA's Rule 30(b)(6) witness could not identify any document to support their defense other than HCMFA's own pleadings and deposition testimony. Ex. 192 at 59:14-16, 60:24-61:7, Appx. 466.

Ex. 192 at 58:20-59:3, Appx. 466. *See also Id*. at 54:6-9 (the May 2019 payments from Highland were "recorded [as] a payable to HCMLP, a liability"), 54:22-55:8, 55:23-56:3, 56:20-58:19, Appx. 465-466.

18.     There will never be any evidence that Mr. Waterhouse or HCMFA ever amended or corrected HCMFA's balance sheet or that the recording of the HCMFA Notes as liabilities caused HCMFA to inquire into the origin of the HCMFA Notes.

**D.     October 2019 through January 2020**:  With Mr. Dondero still in control
        of both entities, the HCMFA Notes were included as assets of Highland's
        <u>bankruptcy estate</u>

19.     Highland filed for bankruptcy on October 16, 2019 (the "<u>Petition Date</u>").  Mr. Dondero remained in control of Highland from the Petition Date until January 9, 2020.  During that time, Highland included the HCMFA Notes as assets of Highland's estate in numerous court filings.

20.     For example, in December 2019, Highland filed its *Schedules of Assets and Liabilities* [Bankr. Docket No. 247] (the "<u>Debtor's Schedules</u>") that included over $10 million in obligations from HCMFA as assets of the estate, including the HCMFA Notes.

21.     In addition, Highland also filed Monthly Operating Reports ("<u>MORs</u>") that were prepared and signed by Mr. Waterhouse (apparently using his electronic signature) that included the HCMFA Notes as assets of the estate.  *See* Bankr. Docket No. 405 (October 2019); Bankr. Docket No. 289 (November 2019); Bankr. Docket No. 418 (December 2019).

22.     There will never be any evidence that Mr. Waterhouse or Highland ever amended or corrected the Debtor's Schedules or the MORs or that those documents caused HCMFA to inquire into the origin of its obligations to Highland generally or the HCMFA Notes in particular.

7

**E.** **October 2020**: HCMFA informed the Retail Board of its obligations
under the HCMFA Notes

23.     In or around October 2020, HCMFA's officers relied on HCMFA's balance sheet to report to third parties that HCMFA owed Highland and its affiliates over $12 million, including the amounts due under the HCMFA Notes.

24.     HCMFA has contracts to manage certain funds (the "Fund Agreements"). The Fund Agreements are among the most important contracts HCMFA has and are largely the reason for HCMFA's existence. Ex. 192 at 66:3-67:6, Appx. 468.

25.     The Funds are purportedly managed by a board (the "Retail Board"). In the fall of each year, the Retail Board must determine whether to renew the Fund Agreements with HCMFA, a process referred to as a "15(c) Review." As part of the 15(c) Review process, the Retail Board requests information. Ex. 99 at 129:17-130:3, Appx. 254, Ex. 105 at 32:17-33:6, Appx. 292, 168:9-12, Appx. 326, 169:9-170:16, Appx. 326-327.

26.     Mr. Waterhouse, HCMFA's Treasurer, and Mr. Norris, HCMFA's Executive Vice President, participated in the annual 15(c) Review process with the Retail Board. Ex. 35, Appx. 153-154; Ex. 192 at 67:7-68:19, Appx. 468; Ex. 105 at 168:13-169:8, Appx. 326.

27.     In October 2020, as part of its 15(c) Review, the Retail Board asked HCMFA (and its affiliate, NexPoint) to provide certain information including the following:

> Are there any outstanding amounts currently payable or due in the
> future (e.g., notes) to HCMLP by HCMFA or NexPoint Advisors or
> any other affiliate that provides services to the Funds?

Ex. 36 at 3, Appx. 158.

28.     HCMFA's officers prepared HCMFA's response to this question. Specifically, Lauren Thedford, an attorney and HCMFA's Secretary, asked Mr. Waterhouse for responsive

information and he referred her to "the balance sheet that was provided to the [Retail Board] as part of the" 15(c) Review. *Id.* at 2, Appx. 157. *See also* Ex. 35, Appx. 153-154.

29.    As directed by Mr. Waterhouse, Ms. Thedford (a) obtained the relevant information from the Advisors' June 30, 2020 financial statements and (b) drafted a response that she shared with, among others, Mr. Waterhouse, Mr. Norris, and Jason Post (the Advisors' Chief Compliance Officer).  Ex. 36 at 1, Appx. 156.

30.    Relying on HCMFA's June 30, 2020 financial statements, Ms. Thedford sent her draft response to all of HCMFA's officers and others and reported that "$12,286,000 remains outstanding to HCMLP from HCMFA."  Ex. 36 at 1, Appx. 156.

31.    This amount necessarily included the amounts due under the HCMFA Notes because, as HCMFA has admitted, HCMFA carried the HCMFA Notes as liabilities on its balance sheet and the balance sheet was Ms. Thedford's sole source of information.  Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59:3, Appx. 465-466; Ex. 194 at 117:16-122:15, Appx. 593-594; Ex. 195 at 120:23-122:13, Appx. 648-649.

32.    On October 23, 2020, HCMFA included the substance of Ms. Thedford's draft in its final, formal response to the Retail Board.  Ex. 59 at 2, Appx 172.

33.    There will never be any evidence that HCMFA ever amended or corrected its October 2020 report to the Retail Board or that the questions posed by the Retail Board caused HCMFA to inquire into the origin of the HCMFA Notes.

F.    **January 2020 through January 2021**:  Highland continued to include the HCMFA Notes as assets of Highland's bankruptcy estate in its MORs and <u>books and records</u>

34.    In addition to its audited financial statements, and without exception, Highland's contemporaneous books and records and court filings included the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

35.     After Mr. Dondero was removed as Highland's President, Mr. Waterhouse continued to prepare Highlands MORs.  As he had while Mr. Dondero remained in control, Mr. Waterhouse continued to include the HCMFA Notes as assets of Highland's estate in the MORs.[7]

36.     Highland's "back-up" to the amounts "Due from affiliates" set forth in the MORs identified the Obligors under the Notes and included all unpaid principal and accrued interest.  *See, e.g.,* Exs. 196-198, Appx. 676-681 (the back-up to the "Due from Affiliates" amounts set forth in the MORs for December, September 2020, and January 2021).

37.     Relatedly, Highland's accounting group—of which Mr. Waterhouse was the head—had a regular practice of creating, maintaining and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries").  The Loan Summaries identified amounts owed to Highland under affiliate notes and were created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Ex. 199, Appx. 682-683 is an example of a Loan Summary.  The Loan Summaries identify HCMFA by reference to the "GL" number used in the general ledger.  *See* Ex. 199, Appx. 682-683 HCMFA ("GL 14531").

38.     The Loan Summaries were used in connection with the PwC audits and to support accounting entries and year-end balances in the ordinary course of Highland's business.  For example, Ex. 199, Appx. 682-683 ties exactly into Ex. 198, Appx. 680-681, the "back up" to the "Due from affiliates" entry in the January 2021 MOR.  Bankr. Docket No. 2020.  Klos Dec. ¶¶15-16, Ex. 210, Appx. 701-702.[8]

---

[7] *See also* Bankr. Docket No. 497 (January 2020); Bankr. Docket No. 558 (February 2020); Bankr. Docket No. 634 (March 2020); Bankr. Docket No. 686 (April 2020); Bankr. Docket No. 800 (May 2020), as amended in Bankr. Docket No. 905; Bankr. Docket No. 913 (June 2020); Bankr. Docket No. 1014 (July 2020); Bankr. Docket No. 1115 (August 2020); Bankr. Docket No. 1329 (September 2020); Bankr. Docket No. 1493 (October 2020); Bankr. Docket No. 1710 (November 2020); Bankr.  Docket No. 1949 (December 2020); and Bankr. Docket No. 2030 (January 2021).

[8] Colloquially, the Loan Summaries are the "back up" to the "back up."  To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates."  Bankr. Docket No. 2030 (balance sheet).  Ex. 198, Appx. 3243-3244 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total

39.     There will never be any evidence that Mr. Waterhouse or Highland ever amended or "corrected" the MORs or Highland's books and records or that those documents caused HCMFA to inquire into the origin of HCMFA's obligations to Highland generally or the HCMFA Notes in particular.

**G.      April and August 2020**: Mr. Dondero was again informed that HCMFA had notes outstanding to Highland in excess of $10 million, which included the <u>HCMFA Notes</u>

40.     Throughout much of 2020, Mr. Dondero attempted to create a so-called "pot plan." Toward that end, Mr. Dondero turned to Highland's accounting department for information concerning Highland's asset base.

41.     On at least two occasions, Mr. Dondero was provided with a list of HCMLP's notes receivable. These lists disclosed that HCMFA had obligations to Highland under promissory notes in excess of $10 million. Ex. 208, Appx. 684-688; Ex. 209, Appx. 689-695.

42.     If Mr. Dondero was genuinely unaware of the HCMFA Notes, these reports should have prompted immediate questions because the only other reported obligations concerned notes with principal and interest due of approximately $5.3 million as of December 31, 2018. Ex. 34 at 28, Appx. 136.

43.     There will never be any evidence that Mr. Dondero's receipt of the lists of affiliate notes caused him to inquire into the origin of HCMFA's obligations generally or the HCMFA Notes in particular even though the lists would have been materially inconsistent with any calculation of amounts due from HCMFA to Highland that did not include the HCMFA Notes.[9]

---

Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand). Ex. 199, Appx. 682-683, the Loan Summary, is the "back up" to the "back up," and is reconciled with Highland's general ledger. As can be seen, the Loan Summary specifies the outstanding principal amounts due under each Note. *See* Klos Dec. ¶¶ 15-16, Ex. 210, Appx. 701-702.

[9] In the sixth step of HCMFA's confession of ineptitude, HCMFA claims that "[c]omplicating matters, there were prior promissory notes from HCMFA to the Debtor in the amounts of $6.3 million – similar to $7.4 million – such

11

**H.** **December 2020**: Highland demands payment under the HCMFA Notes

44.     By letter dated December 3, 2020, Highland made demand on HCMFA for payment under the HCMFA Notes – and expressly identified the date and original principal amount of each of the HCMFA Notes.  Ex. 1 (Exhibit 3), Appx. 16-19.

45.     There will never be any evidence that (a) HCMFA responded to the Demand Letter by informing Highland that it was unaware of the existence of the HCMFA Notes or that (b) the Demand Letter caused HCMFA to inquire into the origin of the HCMFA Demand Notes.

**I.** **April/May 2021**:  HCMFA conducts an internal investigation, concludes that Mr. Waterhouse signed the HCMFA Notes by mistake and without authority, and asks the Court to amend its Answer

46.     After the Adversary Proceeding was commenced, HCMFA purportedly launched an internal "investigation to understand the origin of the" HCMFA Notes.  Dennis Sauter, an attorney and NexPoint's general counsel who also does work for Mr. Dondero's other affiliates, led the investigation.  Ex. 193 at 6:3-16, 7:10-13, Appx. 523, 12:10-13:3, Appx. 524, 24:18-25:12, Appx. 527.

47.     According to Mr. Sauter, the first phase of his investigation yielded nothing because the people who he interviewed claimed to have no knowledge of the origin of the Notes and

---

that persons subsequently reviewing books and records would naturally have assumed that HCMFA's books and records, which carried the Notes, were referring to these old notes and not something new, such that the mistake was not caught until after this litigation was commenced," Motion ¶ 3 (Step 6).  HCMFA's suggestion that someone who believed there were notes outstanding worth $6.3 million would look at books and records showing obligations of $7.4 million and think they must be referring to the same thing is as embarrassing as it is dissembling.  Indeed, no rational person would ever have made this "assumption" because, among other obvious reasons and as cited above, after May 2019, (a) Highland's audited financial statements disclosed *both* that (i) HCMFA owed Highland $5.3 million under existing notes as of 12/31/18 (Ex. 34 at 28, Appx. 136), and (ii) HCMFA also issued *new* notes for $7.4 million after the end of the fiscal year (Ex. 34 at 39, Appx. 147); (b) HCMFA's balance sheet listed more than $12 million in liabilities to Highland and affiliates; (c) HCMFA told the Retail Board that it owed Highland and affiliates more than $12 million; (d) Highland's Schedules and MORs all reported obligations from HCMFA of more than $10 million; and (e) Mr. Dondero was explicitly told that HCMFA owed Highland more than $10 million.

HCMFA had limited access to its books and records or to Mr. Waterhouse and other HCMFA officers. Ex. 181 ¶ 17, Appx. 418; Ex. 193 at 31:14-41:18, Appx. 529.

48. "The situation changed by mid-April 2021." Ex. 181 ¶ 19, Appx. 418-419. By that time, HCMFA had completed its transition to a new service provider and had access to "much of" its books and records and Highland's former employees, including Mr. Waterhouse. *Id*. ¶¶ 19-21, Appx. 418-419; Ex. 193 at 43:16-44:13, Appx. 532. Mr. Sauter used the opportunity to interview Mr. Waterhouse three times, twice in person and once on the phone. Ex. 193 at 48:5-49:12, Appx. 533.

49. During the interviews, Mr. Waterhouse never denied signing the HCMFA Notes or saying he was unaware of them, although he purportedly told Mr. Sauter that he "didn't prepare them." Ex. 193 at 50:8-52:14, Appx. 534.

50. Despite having no personal knowledge of any of the underlying facts, Mr. Sauter told Mr. Waterhouse that he made a mistake by signing the HCMFA Notes and had no authority to do so. Mr. Waterhouse "obviously disagreed" that any mistake was made, telling Mr. Sauter that "we transferred the money, so I executed the notes. HCMFA didn't have the money to pay GAF, and so we transferred it from HCMLP and I executed the notes." Mr. Waterhouse *never* admitted to making a mistake. *Id*. at 52:15-59:16, Appx. 534-536.

51. Indeed, Mr. Waterhouse bluntly told Mr. Sauter about the purpose of the HCMFA Notes:

Q: So did Mr. Waterhouse tell you that he prepared the notes for some internal accounting or other purpose?

A: Yes.

Q: And did he tell you what the purpose of the notes was?

A: Yes. He said if he transferred money he had to have a note to go with it.

*Id*. at 61:7-24, Appx. 536; *see also id*. at 56:8-23, Appx. 535 (Mr. Waterhouse could not describe "any process. He said the money was transferred, and so we signed the notes."), 71:4-20 (Mr. Waterhouse told Mr. Sauter that he needed a note for HCMFA's auditors to "document the transfer of funds.").

52.     Neither HCMFA nor Mr. Sauter disclosed any of this to the Court a few weeks later when HMCFA moved for leave to amend its Answer.[10]  Thus, the Court was never told of Mr. Waterhouse's statements to Mr. Sauter concerning the purpose of the HCMFA Notes or of his refusal to admit to having made a mistake or acting without authority.

53.     Instead, HCMFA submitted Mr. Sauter's declaration that is grossly misleading at best.  It is inconceivable that the Court would have granted HCMFA's First Motion to Amend if it had known that Mr. Waterhouse (the person whose signatures appeared on the HCMFA Notes) "obviously disagreed" with HCMFA's concocted "mistake" defense.

## J.      The Motion is devoid of credibility

54.     On November 30, 2021, HCMFA filed the Motion, seeking leave to amend its Amended Answer to add as its primary affirmative defense that Mr. Waterhouse did not sign or authorize the Notes (the "Proposed Amendment"). *See* Motion ¶ 1.  The Proposed Amendment is premised on HCMFA's contention that when Highland "finally" produced the Word versions of the Notes, HCMFA learned that Mr. Waterhouse's signature is not an "electronic signature, but rather a .jpg image of his signature affixed to the word version," Motion ¶ 4(v), and that Mr.

---

[10] On May 22, 2021, HCMFA filed its *Motion for Leave to Amend Answer* [Docket No. 32] (the "First Motion to Amend"), seeking to add as its affirmative defense that the Notes are "void" or "unenforceable" for "lack of consideration," "mutual mistake," and for the "lack of authority from Defendant to Waterhouse to executive the same for Defendant" (HCMFA's Mistake Defense") [Docket No. 48] ¶ 47.  The Court granted the First Motion to Amend based solely on Mr. Sauter's declaration – a person with no personal knowledge knowingly who failed to inform the Court of *anything* Mr. Waterhouse told him, including the purpose of the HCMFA Notes and Mr. Waterhouse's disagreement that he made any mistake at all.  *See* Ex. 181, Appx. 414-445; Ex. 193 at 58:24-59:22, Appx. 536.

14

Waterhouse testified on October 19, 2021 that (i) he "does not remember signing the Notes," (ii) "he rarely signed documents in May 2019 electronically," (iii) "he would have expected that documents he signed were approved by the legal department," and (iv) "if he signed electronically, he would have sent an e-mail authorizing the same." *Id.* ¶ 24.

55.     Not one of these assertions is contradicted by anything Mr. Waterhouse told Mr. Sauter during his investigation.  Indeed, Mr. Waterhouse expressly told Mr. Sauter that (a) *he did not* prepare the HCMFA Notes (Ex. 193. at 51:20-52:14, Appx. 534), and (b) that he could not describe any "process" that was followed.  *Id*. at 56:16-57:6, Appx. 535.

56.     Tellingly, the Motion is not supported by a single contemporaneous document or a declaration from Mr. Waterhouse or any other person with personal knowledge.  Instead, like the First Motion to Amend, the Motion is supported by declarations by lawyers who were not present when the HCMFA Notes were created and who have no personal knowledge of their origin.  These declarations are nothing more than deceptive argument masquerading as fact and, unless based on personal knowledge (*e.g.*, matters relating to discovery), should be stricken from the record.

57.     Moreover, the evidence shows that HCMFA's recitation of critical facts is contradicted by the record.

58.     <u>Highland produced documents putting HCMFA on notice that the Corporate Accounting department prepared the HCMFA Notes by July 2021</u>.  There is no "gotcha" moment. Consistent with Mr. Waterhouse's statement to Mr. Sauter, early in the summer Highland produced two documents in discovery showing that the Corporate Accounting department prepared the HCMFA Notes.  First, on June 25, 2021, Highland produced Mr. Klos's May 2, 2019 e-mail in which he asked accounting personnel to prepare the one of the HCMFA notes.  Then, on July 2, 2021, Highland produced Word copies of the HCMFA Notes, which reveal that Mr. Waterhouse's

signature was "affixed" as a "picture". *See* Exhibits 211-212, Appx. 775-782. Thus, the Word copies of the HCMFA Notes from the July 2, 2021 production and the October 25, 2021 production reveal the same features regarding Mr. Waterhouse's signature, namely, that it was "affixed" as a "picture." *Compare* Ex. 211, Appx. 775-779 with Ex. 212, Appx. 780-782.[11] Accordingly, contrary to HCMFA's assertions that it only learned that Mr. Waterhouse's signature is an "image of his signature affixed to the Word version" on October 25, 2021, Motion ¶ 4(v), HCMFA had these same documents as early as July 3, 2021, and could have discovered this very feature at that time.

59. <u>No "process" ever existed requiring legal department review or approval of intercompany demand notes</u>. Notwithstanding HCMFA's argument to the contrary, the documentary evidence shows that there was nothing unusual about the Corporate Accounting department preparing intercompany demand notes without "legal department" approval. *See* Motion ¶¶ 24, 37.

60. Even Mr. Dondero admits as much. When asked to identify who drafted the promissory notes that he executed, Mr. Dondero stated that he "does not know who specifically who drafted the [n]otes, however, he believes *they were drafted by an individual in either the Highland legal or finance department*." Ex. 85, Appx. 178-185. And as the e-mail communications prove, the Corporate Accounting department prepared Mr. Dondero's notes and followed virtually the same protocol as that followed in the preparation of the HCMFA Notes. *Compare* Ex. 188, Appx. 446-447 and Ex. 190, Appx. 448-449 (e-mails between and among the

---

[11] HCMFA's contention that Highland "refused" to produce the metadata is obviously wrong (Brief ¶ 4) because HCMFA has it. The evidence shows that counsel specifically asked for the metadata for *all* of the Notes on October 15, 2021, and, after an initial refusal, Highland produced the metadata ten days later. Ironically, the only metadata that allegedly created an issue was that related to the HCMFA Notes – the very Notes for which the metadata was produced in early July before the Adversary Proceedings were consolidated for discovery purposes.

accounting group concerning the preparation of notes for Mr. Dondero) *with* Ex. 54, Appx. 161-164 and Ex. 56, Appx. 165-166 (e-mails between and among the accounting group concerning the preparation of the HCMFA Notes).[12]

61.    <u>Mr. Waterhouse used his e-signature during this time</u>.  HCMFA contends that Mr. Waterhouse "rarely signed documents in May, 2019 electronically."  Motion ¶ 24.  At the time Ms. Hendrix affixed Mr. Waterhouse's e-signature, in May 2019, "99 percent of the stuff" the Corporate Accounting group "got his signature on was his e-signature."  Ex. 194 at 49:6-16, Appx. 576.  According to Ms. Hendrix, the "practice has always been we have this discussion, he's under the understanding that we're going to paper the loans, he's always comfortable with using his e-signature." *Id.* at 50:15-25, Appx. 576.  This testimony is corroborated by two other intercompany affiliate promissory notes executed around the same time, which also contain Mr. Waterhouse's e-signature. *See* Ex. 3, Exhibits 3 and 4, Appx. 49-54.

62.    <u>There is no "*prima facie* liability for Mr. Waterhouse</u>."  Proving again that Mr. Dondero will litigate without restraint of fact or law or any semblance of propriety, HCMFA argues that Mr. Waterhouse is actually "*prima facie* liable" for the obligations under the HCMFA Notes because his signature was not affixed in a "representative capacity."  Brief ¶¶ 7-8, 13-16.  HCMFA advances this argument notwithstanding all of the evidence cited above, and the additional facts

---

[12] While the documentary evidence cited above rebuts HCMFA's speculative argument, Ms. Hendrix – the actual drafter of the HCMFA Notes -- also testified that it was Corporate Accounting's "general course" in May 2019 not to seek advice from Highland's legal department before preparing "our standard demand note that we already had a template on," including with respect to the HCMFA Notes, and that Mr. Waterhouse "was completely fine with having [] documents signed or executed" with pictures of his e-signature. Ex. 194 at 46:12-24, 47:4-13, Appx. 575. Although Ms. Hendrix does not remember the "specific" conversation she had with Mr. Waterhouse, she is "certain that those conversations were had because that's the only way that [she] would have papered up a loan, sent money out as a loan, had them on our financials for two  years." *Id.* at 37:3-18, Appx. 573. The Corporate Accounting group "wouldn't just paper up a loan, send money out and call it a loan and account for it that way, unless somebody specifically told them to." *Id.* at 37:5-8, Appx. 573.  Thus, HCMFA's assertions that there is "no evidence" that Ms. Hendrix was authorized to e-sign for Mr. Waterhouse because she wrongly "*assumed* that the transfers were loans," *see* Motion ¶ 37, grossly misrepresents Ms. Hendrix's testimony.

that (a) "maker" is defined in the HCMFA Notes as "Highland Capital Management Fund Advisors, L.P" so there is no "ambiguity" as to the identity of the "maker" (b) Mr. Waterhouse was indisputably one of HCMFA's officers when the HCMFA Notes were executed (Ex. 35, Appx. 153-154), and (c) Mr. Dondero controlled both the borrower and the lender at the time.[13]

63.     But besides all of that, this "argument" is completely irrelevant to the Motion. The HCMFA Notes were attached to Highland's original Complaint filed almost a year ago. No discovery was ever needed to enable HCMFA to advance this spurious argument.

## ARGUMENT

### A.     Legal Standard

64.     Although Rule 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires," such leave "is by no means automatic." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993) (quoting FED. R. CIV. P. 15(a)); *see also Aguilar v. Wells Fargo Bank, N.A.*, No. 3:16-cv-211-K-BN, 2017 WL 1450622, at *7 (N.D. Tex. March 3, 2017) ("Federal Rule of Civil Procedure 15(a)(2)'s command that '[t]he court should freely give leave when justice so requires' is not without limitation.") "There is a substantial reason to deny leave to amend if the proposed amendment would cause undue delay or prejudice to the non-movant, if it is motivated by bad faith or dilatory motives, if there have been repeated failures to cure deficiencies with prior amendment, or if the amendment is futile." *Sabre, Inc. v. Lyn-Lea Travel Corp.*, No. CIV.A. 3:96-CV-2068R, 2003 WL 21339291, at *4 (N.D. Tex. June 5, 2003); *see also Wimm*, 3 F.3d at 139. "Whether leave to amend should be granted is entrusted to the sound discretion of the [trial] court." *Wimm*, 3 F.3d at 139; *see also Aguilar*, 2017 WL 1450622, at *7.

---

[13] Mr. Dondero should be more careful in the arguments he makes as he signed two other notes on behalf of HCMFA in the exact same manner as Mr. Waterhouse. So if Mr. Waterhouse is *prima facie* liable under the HCMFA Notes, then Mr. Dondero is *prima facie* liable under the other notes that he signed on behalf of HCMFA. *See* Adv. Pro. 21-3082, Docket No. 1, Exhibits 1 and 2.

**B. Leave to Amend Is Not Warranted under Rule 15**

**1. The Proposed Amendment Was Unduly Delayed**

65. HCMFA's Proposed Amendment was unduly delayed because no new facts have come to light which would warrant the Proposed Amendment. "In the context of a motion for leave to amend, the court may deny the motion if the movant knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original [answer]." *Am. Tourmaline Fields v. Int'l Paper Co.*, No. Civ.A. 3:96–CV–3363–D, 1998 WL 874825, at *1 (N.D.Tex. Dec. 7, 1998); *see also Daves v. Payless Cashways, Inc.*, 661 F.2d 1022, 1025 (5th Cir. 1981) ("Liberality in pleading does not bestow on a litigant the privilege of neglecting [their] case for a long period of time," noting that [w]hile we must give a party a fair chance to present claims and defenses, we also must protect "a busy district court (from being) imposed upon by the presentation of theories seriatim.")

66. Here, HCMFA knew, or should have known, of the facts upon which the Proposed Amendment is based given the litany of events between May 2019 and July 2021 that should have caused HCMFA to inquire. *See generally supra*, Relevant Background.

67. HCMFA fails to offer any credible explanation for its failure to previously assert the Proposed Amendment. This is precisely type of motion courts routinely reject as "unduly delayed." *See Sw. Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 547 (5th Cir. 2003) (affirming district court's denial of motion for leave to amend pleading where movant "was aware of the [facts] that form the basis of its proposed amendment months in advance," and "does not offer a satisfactory explanation for its delay in seeking leave to amend."); *Matter of Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996) (affirming district court's denial of motion for leave to amend where movant knew of facts underlying amendment long before filing the motion); *Am. Tourmaline*, 1998 WL 874825, at *2 (denying leave to amend where movant "was clearly aware" of the facts

19

underlying its proposed amendments for nearly one year); *Allergan, Inc. v. Teva Pharms USA, Inc.*, No. 2:15-cv-1455-WCB, 2017 WL 119633, at * (E.D.Tex. Jan. 12, 2017) (denying leave to amend answer where the evidence shows that movant "was aware of the facts underlying its motion for at least four months" and "given what [movant] knew or should have known," noting that the "materials in [movant's] possession before that time should have prompted it to explore its theories" underlying the proposed amendment long before it did); *Cypress Engine Accessories, LLC v. HDMS Ltd. Co.,* No. H–15–2227, 2017 WL 1710569, at *8 (S.D.Tex. May 3, 2017) (finding motion to assert a new defense was unduly delayed where "the record undermines [movant's] explanation" that "it did not learn the relevant information" until "after it took depositions at the end of the discovery period," where "the record shows that [movant] knew at least some of this information before [the deposition]" and noting "the deposition cannot be the reason for the belated amendment.")

68.     Accordingly, the Motion is unduly delayed under Rule 15, and for this reason alone, the Motion should be denied.

## 2.     **The Proposed Amendment Is Futile**

69.     The Proposed Amendment is futile because there is a complete absence of evidence to support the notion that Mr. Waterhouse did not sign and authorize the HCMFA Notes, and all of the testimonial and documentary evidence goes the other way.

70.     A plaintiff makes its *prima facie* case for breach of a promissory note where they establish: (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995); *Looney v. Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, 2010 WL 532431 at *2 (N.D. Tex. Feb. 15, 2010). Thus, a *prima facie* case is made unless the execution of the notes has been "denied under oath," or the

20

"nonmoving party can raise a fact issue as to a defense." *Sunburst Media Mgmt. Inc. v. Devine*, No. 3:08–CV–1170–G, 2010 WL 1962499, at *3 (N.D.Tex. May 17, 2010).

71.     Highland makes its *prima facie* case for breach of the HCMFA's breach of the Notes because: (i) the HCMFA Notes are valid; (ii) HCMFA executed the Notes, in favor of Highland; and (iii) there is a balance due on the Notes. Klos Dec., ¶¶ 21-22, Ex. 210, Appx. 703, ¶ 40, Appx. 707. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a *prima facie* case of default on the notes."); *Looney*, 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a *prima facie* case that he is entitled to summary judgment on the note.").

72.     Mr. Waterhouse's testimony that he does not "remember" or "recall" signing the notes does not constitute a denial under oath that Mr. Waterhouse executed the HCMFA Notes sufficient to defeat Highland's *prima facie* case. *See, e.g.* Ex. 105 at 141:4-7, Appx. 319. (Mr. Waterhouse testifying that he did not "recall specifically signing" the Notes, but "this is my signature.").  *See Sunburst*, 2010 WL 1962499, at *4 (affiant has not "denied under oath that he executed the [] note where he stated he does "not believe" was executed, further noting "[d]isclaiming recall of an event, or professing disbelief of it, is not equivalent to affirmatively denying that the event took place."); *Lightfoot v. Weissgarber*, 763 S.W.2d 624, 628 (Tex.App. 1989), writ denied) (concluding that statements in a sworn affidavit that are made only "based upon my best recollection and belief" are not effectively sworn to on personal knowledge because they "do not positively and unqualifiedly represent the 'facts' disclosed in the affidavits to be true

21

and within the personal knowledge of the affiants"; *Thomas v. Atmos Energy Corp.*, 223 Fed. Appx. 369, 375 (5th Cir.2007) ("Those facts alleged on ... 'belief' ... are not sufficient to create a genuine issue of fact.").   At best, HCMFA argues that the testimony raises "doubt" regarding whether Mr. Waterhouse signed the HCMFA Notes (*see* Motion ¶ 17), but that is insufficient as a matter of law to rebut Highland's *prima facie* case that HCMFA breached the Notes, and for this reason alone, the Proposed Amendment is futile.

73.     The Proposed Amendment is also futile because there is an absence of evidence sufficient to establish that Mr. Waterhouse did not execute and authorize the HCMFA Notes.

74.     Under Texas law:

> In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument are admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is *presumed* to be authentic unless the action is to enforce the liability of the purported signer and the signer is dead or incompetent at the time of trial of the issue of validity of the signature.

TEX. BUS. & COMM. CODE § 3.308(a) (emphasis added).   "[W]hen a fact is 'presumed,' the trier of fact must find the existence of the fact unless and until evidence is introduced that supports a finding of its nonexistence." *Id.* § 1.206; *see also United States v. Carter*, 737 Fed. Appx. 687, 690 (5th Cir. 2018) (noting that "under Texas law, when a party produces a signed instrument, 'the signature is presumed to be authentic and authorized.'") (quoting Tex. Bus. & Comm. Code § 3.308(a)).

75.     HCMFA cannot meet its burden to produce evidence sufficient for a jury to find that Mr. Waterhouse did not execute and authorize the HCMFA Notes—particularly in light of Mr. Waterhouse's previously-undisclosed admissions to Mr. Sauter.  The "evidence" supporting HCMFA's Proposed Amendment consists of (i) Mr. Sauter's declaration that is based on speculation, assumptions, and supposition rather than any personal knowledge regarding the origin

of the HCMFA Notes; (ii) Mr. Waterhouse's testimony that (a) he does not "recall" signing the Notes, (Motion ¶ 23), (b) "he rarely signed documents in May, 2019 electronically," and (c) "he would have expected that documents he signed were approved by the legal department," (Motion ¶ 24); and (iii) Ms. Hendrix's testimony that she does not "have exact specific memory" of her conversation with Mr. Waterhouse in which he authorized her to issue the Notes, (Motion ¶ 33). In light of the "signature-validity presumption," this is not the type of probative evidence sufficient to convince a reasonable jury that Mr. Waterhouse did not sign and authorize the HCMFA Notes. *See Carter*, 737 Fed. Appx. at 690 (finding party failed to meet burden of "introducing competent evidence of invalidity" of signature where denial of signature consisted of "self-serving" and "vague and conclusory allegations."). As discussed *supra*, HCMFA's contention that Mr. Waterhouse did not generally sign notes electronically during this time, and that the Notes would have gone through the "legal department," is also contradicted by the record. *See* supra ¶¶ 59, 61.

76.     Accordingly, HCMFA's Proposed Amendment is futile, and for this additional reason, leave to amend is not warranted under Rule 15.

### 3.     The Proposed Amendment Would Unduly Prejudice Highland

77.     The Proposed Amendment would unduly prejudice Highland because it (a) comes after (i) Highland's Motion for Summary Judgment was filed and (ii) the close of discovery, and (iii) would force Highland to pursue more discovery at more cost and more delay.

78.     The Fifth Circuit "carefully scrutinizes[s] a party's attempt to raise new theories of recovery by amendment when the opposing party has filed a motion for summary judgment." *Parish v. Frazier*, 195 F.3d 761, 764 (5th Cir. 1999); *see also Wade v. Cycle Mart, L.P.*, No. A–14–CV–00427–ML, 2015 WL 4404876, at *2 (W.D. Tex. July 17, 2015) (same). "When a motion for leave to amend is filed after motions for summary judgment have been filed, 'to grant ... leave to amend is potentially to undermine [the opposing party's] right to prevail on a motion that

23

necessarily was prepared without reference to an unanticipated amend[ment].'" *Wade*, 2015 WL 4404876, at *2 (quoting *Overseas Inns S.A. P.A. v. United States*, 911 F.2d 1146, 1151 (5th Cir. 1990)). Granting leave to amend to assert new legal theories after the close of discovery may also "unduly prejudice the opposing party where there was no opportunity or reason to explore the factual basis of the late-plead theory during the discovery period." *Wade*, 2015 WL 4404876, at *2; *see also Thompson v. Wichita Falls Indep. Sch. Dist.,* No. 7:06–CV–0191–R ECF, 2008 WL 123891, at *4 (N.D.Tex., Jan. 14, 2008) (same).

79. Here, the Proposed Amendment would unduly prejudice Highland because it would need to reopen discovery and file a second round of dispositive motions to address HCMFA's newest (and contradictory) defense. Courts in the Fifth Circuit find undue prejudice in precisely these circumstances. *See Thompson*, 2008 WL 123891, at *4 ("Because Defendant could have raised the proposed amendment at an earlier time and since discovery was completed over eight months ago, which precludes Plaintiff from exploring during the discovery period the affirmative defense that Defendant now seeks to add, this Court determines that the motion to amend is denied."); *Wade*, 2015 WL 4404876, at *4 (denying leave to amend answer under Rule 15 where "[d]iscovery has closed, and dispositive motions have been filed and are ripe for review," noting "[u]nder these circumstances, a continuance would not only need to accommodate further discovery into the new affirmative defense, but would also need to accommodate a second round of dispositive motions …"); *Squyres v. Heico Companies, L.L.C.*, 782 F.3d 224, 239 (5th Cir. 2015) (affirming district court's denial of leave to amend where proposed amendment would cause prejudice to opposing side, where party "had already filed their summary judgment motion by the

time [movant] sought leave to amend. Thus, not only would the district court have needed to reopen discovery, but it also would have needed to allow another round of dispositive motions.").[14]

80. For this additional reason, leave to amend is not warranted under Rule 15, and the Motion should be denied.

## CONCLUSION

WHEREFORE, Highland respectfully requests that the Court (i) deny the Motion, and (iii) grant such other and further relief as the Court deems just and proper.

---

[14] *See also Parish*, 195 F.3d at 764 (affirming district court's denial of motion for leave to amend where "seven month delay" between filing the original pleading and amendment "could have been avoided by due diligence," where movant "could have raised the additional claims" at an earlier time, noting movant "filed her motion to amend on the same day defendants filed their motion for summary judgment," and movant's "attempt to broaden the issues would likely require additional discovery and another motion for summary judgment, which would unduly prejudice the defendants and raise concerns about seriatim presentation of facts and issues."); *Cypress*, 2017 WL 1710569, at *8 (denying leave to amend on ground of "undue prejudice" where "the amended answer was filed after discovery closed and two weeks before the summary judgment motions and briefs were due. Allowing this amendment would require reopening discovery and preparing new summary judgment motions and briefs. The delay and added burden and expense are prejudicial to [opposing party].")

Dated: December 30, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:44789.8 36027/003