# EXHIBIT 13

Page 1

```
1        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION

3
     In re:                 :
4                           : Chapter 11
                            : Case No.
5     HIGHLAND CAPITAL MANAGEMENT, : 19-34054-sgj11
     L.P.                   :
6              Debtor.      :
     ----------------------------
7                           :
     HIGHLAND CAPITAL MANAGEMENT, :
8     L.P.                  :
                            :
9            Plaintiff,     :
                            :
10        vs.               : Adversary
                            : Proceeding No.
11    NEXPOINT ADVISORS, L.P.,    : 21-03005-sgj
     JAMES DONDERO, NANCY DONDERO,:
12     AND THE DUGABOY INVESTMENT   :
     TRUST,                 :
13                          :
             Defendants.    :
14    ----------------------------

15

16

17

18        REMOTE VIDEO DEPOSITION OF JAMES DONDERO

19                   VOLUME III

20           Thursday, November 4, 2021

21

22

23

24

25   JOB NO. 202288
```

Page 2

1
2
3
4      November 4, 2021
5      1:17 p.m. CDT
6
7
8      Remote video deposition of JAMES
9 DONDERO taken in the above-entitled matter
10 before Suzanne J. Stotz, a Certified Shorthand
11 Reporter, Certified Realtime Reporter,
12 Registered Professional Reporter, and Notary
13 Public of the State of Texas, on Thursday,
14 November 4, 2021, commencing at 1:17 p.m. CDT.
15
16
17
18
19
20
21
22
23
24
25

Page 3

1 A P P E A R A N C E S:
2
3 Attorneys for Highland Capital Management L.P.:
4   (Via videoconference)
    PACHULSKI STANG ZIEHL & JONES
5     780 Third Avenue
6     New York, New York 10017
7   BY: JOHN MORRIS, ESQ.
8     HAYLEY WINOGRAD, ESQ.
9
10 Attorneys for NexPoint Advisors, L.P.:
11   (Via videoconference)
    MUNSCH HARDT KOPF & HARR
12     500 North Akard Street
    Dallas, Texas 75201
13
14   BY: THOMAS BERGHMAN, ESQ.
15
16 Attorneys for James Dondero, Nancy Dondero,
  HCRE HCMS:
17
  (Via videoconference)
18   STINSON
    3102 Oak Lawn Avenue
19     Dallas, Texas 75219
20   BY: DEBORAH DEITSCH-PEREZ, ESQ
21   BY: MICHAEL AIGEN, ESQ.
22
23
24
25

Page 4

1 A P P E A R A N C E S (Continued):
2
3 Attorneys for Nancy Dondero:
4   (Via videoconference)
    GREENBERG TRAURIG
5     220 Ross Avenue
    Dallas, Texas 75201
6
7   BY: DANIEL ELMS, ESQ.
8
9 Attorneys for The Dugaboy Investment Trust:
10   (Via videoconference)
    HELLER, DRAPER, HAYDEN, PATRICK & HORN
11     650 Poydras Street
    New Orleans, Louisiana 70130
12
13
14   BY: DOUGLAS DRAPER, ESQ.
    MICHAEL LANDIS, ESQ.
15
16 Attorneys for The Litigation Trust:
17   (Via videoconference)
    QUINN EMANUEL URQUHART & SULLIVAN
18     51 Madison Avenue
    New York, New York 10010
19
20
  BY: ROBERT LOIGMAN, ESQ.
21     DEBORAH NEWMAN, ESQ.
22
23
24
25

Page 5

1 A P P E A R A N C E S (Continued):
2
3 ALSO PRESENT:
4   (Via Videoconference)
    JACOB ARVOLD, Videographer
5
  (Via Videoconference)
6   LA ASIA CANTY, Legal Assistant
  c/o Pachulski Stang Ziehl & Jones
7
  (Via Videoconference)
8   AARON LAWRENCE, Law Clerk
  c/o Quinn Emanuel Urquhart & Sullivan
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1           I N D E X
2
3    EXAMINATION                    Page No.
4    JAMES DONDERO
5      BY MR. MORRIS                 10
6
7
8           E X H I B I T S
9
10   Exhibit
    Name       Description       Page No.
11
    Exhibit   James Dondero Compensation    56
12   68       and Benefits Statement,
         Bates stamped D-CNL003585
13
    Exhibit   James Dondero Compensation    59
14   50       and Benefits Statement,
         Bates stamped D-CNL003587
15
    Exhibit   E-mail correspondence, Bates   95
16   53       stamped D-CNL003768 through
         D-CNL003770
17
    Exhibit   E-mail correspondence, Bates   107
18   54       stamped D-CNL003777 through
         D-CNL003779
19
    Exhibit   E-mail correspondence, Bates   116
20   56       stamped D-CNL003763
21   Exhibit   Promissory Note, Bates   119
    57       stamped D-CNL003764 through
22           D-CNL003765
23
24
25

Page 7

1        I N D E X (Continued)
2
3        E X H I B I T S (Continued)
4
5    Exhibit
    Name       Description       Page No.
6
    Exhibit   Highland Capital Management, 123
7    34       L.P., Consolidated Financial
        Statements and Supplemental
8           Information, dated December
        31, 2018, Bates stamped
9           D-CNL000212 through
        D-CNL000257
10
    Exhibit   Memorandum, dated       130
11   59       October 23, 2020, Bates
        stamped HCMFAS 000025
12          through HCMFAS 000031
13   Exhibit   Defendant James Dondero's    163
    24       Objections and Responses to
14          Plaintiff's Requests for
        Admission, Interrogatories,
15          and Requests for Production
16   Exhibit   Defendant NexPoint Advisors, 173
    27       L.P.'s Objections and
17          Responses to Plaintiff's
        Requests for Admission,
18          Interrogatories, and
        Requests for Production
19
20
21
22   (Exhibits attached to transcript.)
23
24
25

Page 8

1          JAMES DONDERO
2        THE VIDEOGRAPHER:  Good afternoon.
3    My name is Jacob Arvold.  I'm a certified
4    legal videographer in association with
5    TSG Reporting, Inc.
6        Due to the severity of COVID-19 and
7    following the practice of social
8    distancing, I will not be in the same room
9    with the witness; instead, I will record
10   this video deposition remotely.
11       The reporter, Suzanne Stotz, also
12   will not be in the same room and will swear
13   the witness remotely.
14       Do all parties stipulate to the
15   validity of video recording and remote
16   swearing and that it will be admissible in
17   the courtroom as if it had been taken
18   following Rule 30 of the Federal Rules of
19   Civil Procedures and the state's rules
20   where this case is pending?
21       MR. MORRIS:  Yes.
22       If anybody objects to that, please
23   speak up.
24       Nobody has spoken up.  So everybody
25   is deemed to have accepted that.

Page 9

1          JAMES DONDERO
2        THE VIDEOGRAPHER:  Thank you.
3        This is the start of Media Number 1,
4    Volume II [sic] of the video-recorded
5    deposition of James Dondero in the matter
6    of In Re:  Highland Capital Management,
7    L.P., in the United States Bankruptcy Court
8    for the Northern District of Texas.
9        This deposition is being held
10   remotely on November 4, 2021, at
11   approximately 1:17 p.m.
12       Counsel, please introduce
13   yourselves.
14       MR. MORRIS:  Everybody is -- is on
15   here.  I don't -- we can't take the time to
16   do that.  I'm familiar with everybody on
17   here.  Everybody's appeared in this action
18   before, and I'd like to proceed.
19       THE VIDEOGRAPHER:  All right.  The
20   appearances will be on the stenographic
21   record.
22       Will the court reporter please
23   reswear the witness.
24       THE COURT REPORTER:  Could you raise
25   your hand.

Page 10

1                    JAMES DONDERO
2              THE WITNESS:  (Complies with
3        request.)
4              J A M E S   D O N D E R O,
5     having first been duly sworn, was examined and
6     testified as follows:
7              MS. DEITSCH-PEREZ:  I only have one
8        questions.  Who's Robert Loigman?
9              MR. LOIGMAN:  I already stated for
10       the record.  I'm with Quinn Emanuel.  I'm
11       Debbie Newman's partner.
12             MS. DEITSCH-PEREZ:  Okay.  Thank
13       you.
14             MR. MORRIS:  Can we please put up on
15       the screen the document that's been marked
16       Exhibit 31.
17             MS. CANTY:  (Complies with request.)
18                    EXAMINATION
19    BY MR. MORRIS:
20       Q.    Mr. Dondero, do you understand that
21    this is a continuation of your deposition from
22    Friday?
23       A.    Yes.
24       Q.    Have you spoken with anybody about
25    your testimony since we concluded the

Page 11

1                    JAMES DONDERO
2     deposition on Friday?
3        A.    No.
4        Q.    Nobody in the world?
5        A.    Just my attorney.
6        Q.    And did you speak with your attorney
7     about the substance of the deposition on
8     Friday?  Just --
9              MS. DEITSCH-PEREZ:  I'm going to
10       direct -- I'm going to direct him not to
11       answer.
12    BY MR. MORRIS:
13       Q.    Okay.  I'm just asking you a
14    yes-or-no question.  I'm not asking for the
15    substance of any communications.
16             MS. DEITSCH-PEREZ:  Well, you're --
17       one, I'd have to talk to him to see what he
18       thinks "substance" means.
19             And to the extent that's
20       substantive, you're actually getting at the
21       content potentially of a discussion.  So
22       I'm going to direct him not to answer.
23    BY MR. MORRIS:
24       Q.    Are you going to follow your
25    counsel's advice?

Page 12

1                    JAMES DONDERO
2        A.    Yes.
3        Q.    How much time did you spend speaking
4     with your attorney since the conclusion of the
5     last deposition?
6        A.    30 minutes, 40 minutes.
7        Q.    Are you aware that Alan Johnson
8     testified in this case the other day?
9        A.    I don't know who Alan Johnson is.
10    Uh, no.
11       Q.    Okay.  Is it fair to say that you
12    have no knowledge of Mr. Johnson's testimony?
13       A.    I have no knowledge of Mr. Johnson's
14    testimony.
15       Q.    Are you aware that an expert was
16    examined by me earlier in the week in
17    connection with this case?
18       A.    I'm aware there's an expert.  I'm
19    not -- I'm not aware that you've examined,
20    deposed, or whatever you did with him.
21       Q.    Okay.  When did you speak with your
22    counsel for 30 minutes about -- following last
23    Friday's examination?
24       A.    About 40 minutes ago.
25       Q.    Okay.

Page 13

1                    JAMES DONDERO
2              MR. MORRIS:  Can we go to
3        paragraph 82 of this document --
4        Q.    -- Mr. Dondero, do you see that this
5     is your answer to the Plaintiff's Amended
6     Complaint.
7        A.    Yes.
8        Q.    And we looked at this the other day;
9     do you remember that?
10       A.    Yes.
11             MR. MORRIS:  Can we go to page--
12       paragraph 82, please.
13             MS. CANTY:  (Complies with request.)
14    BY MR. MORRIS:
15       Q.    And I just want to table set to make
16    sure we're on the same page.
17             Paragraph 82 describes the
18    agreements that you entered into with Dugaboy
19    consuming the forgiveness of certain Promissory
20    Notes subject to conditions subsequent.
21             Is that a fair overarching overview
22    of the nature of the agreements?
23       A.    Yes.
24       Q.    Okay.  And for the rest of the
25    deposition today, when I use the phrase

JAMES DONDERO

"agreements," I'm going to mean the agreements that are referred to in paragraph 82; is that fair?

A. Yes, generally. If I have any questions, I'll -- I'll ask.

Q. Thank you very much.

The agreements covered each of the notes that are the subject of the lawsuits that Highland commenced against you, HCRE Services, and NexPoint; is that right?

A. The -- yes.

Q. What are you looking at?

A. Just this note sheet that covers all the notes.

Q. Oh.

MR. MORRIS: Deborah, I would demand that that sheet be produced immediately.

MS. DEITSCH-PEREZ: Okay.

MR. MORRIS: Okay. And I would ask him to put it away.

MS. DEITSCH-PEREZ: No. He's a 30(b)(6) witness. He's entitled to have a list of the notes. He sure he is.

MR. MORRIS: I'm telling you now --



JAMES DONDERO

MS. DEITSCH-PEREZ: I'm sorry to say to you.

MR. MORRIS: I object. That is -- I have never in my life seen a witness --

MS. DEITSCH-PEREZ: I have had 30(b)(6) witnesses with whole notebooks of information.

MR. MORRIS: Okay. So let's just make sure the record is clear.

BY MR. MORRIS:

Q. Please describe for me what's on that page.

A. It's a listing of the Notes payable to Highland, what their original term and amount was, what the term is, and what the loan date was.

Q. Okay. I'm going to ask the --

MS. DEITSCH-PEREZ: No. I'm going to take a picture, and I'm going to send it to you, okay?

MR. MORRIS: Okay. And what we're going to do right now is ask him to put it away, and I'm going to ask him questions solely in his capacity as an individual,



JAMES DONDERO

okay?

Please put it away.

THE WITNESS: Isn't that what this deposition is, right? This deposition --

MS. DEITSCH-PEREZ: Well, this deposition is both.

We're going to take a break for a second. Let me think about that, but I'll --

MR. MORRIS: I object. I really object. I really object. I'm glad that this is all on the record. I object.

My request is that he put it away and answer questions in his capacity as an individual.

I don't know why we need to take a break.

MS. DEITSCH-PEREZ: Well, because I'm going to go take a picture of it and send it to you.

MR. MORRIS: I don't want you to do that, though.

MS. DEITSCH-PEREZ: Why don't you want -- okay.



JAMES DONDERO

MR. MORRIS: We can do that -- we can do that when I ask him questions as a 30(b)(6) witness.

By the way, it's still inappropriate, but --

MS. DEITSCH-PEREZ: No, it's not John.

MR. MORRIS: Okay.

MS. DEITSCH-PEREZ: It's just not. You can say it as much as you want. It doesn't make it inappropriate.

And I am going to -- I want to think for a minute about whether or not your request to have him not have it in front of him in his individual capacity is appropriate. And I'm not going to make a snap decision. I'm going to talk to my colleagues, and we'll be back on the record in a couple of minutes.

MR. MORRIS: I object, but I can't stop you.

MS. DEITSCH-PEREZ: Okay.

THE VIDEOGRAPHER: Would you like to go off the video record, Counsel?

Page 18

1      JAMES DONDERO
2      MR. MORRIS: No, no, not at all.
3      THE VIDEOGRAPHER: Okay.
4      MR. MORRIS: And just keep the --
5  keep the record going.
6      THE VIDEOGRAPHER: Yep, will do.
7      MR. MORRIS: And we're not off the
8  record?
9      THE VIDEOGRAPHER: Correct.
10     THE COURT REPORTER: Correct.
11     MS. DEITSCH-PEREZ: Okay. We're
12  back on the record.
13     THE VIDEOGRAPHER: We remained on
14  the record.
15     MS. DEITSCH-PEREZ: Okay. And this
16  part -- this -- at this point Mr. Morris
17  only taking Mr. Dondero's deposition in his
18  personal capacity, not as a 30(b)(6)
19  witness.
20     If you want to resume taking his
21  deposition as a 30(b)(6) witness, let me
22  know; and I will tell him to get his list
23  of notes.
24     MR. MORRIS: So he doesn't have it
25  in front of him right now?

Page 19

1      JAMES DONDERO
2      THE WITNESS: Correct.
3      MS. DEITSCH-PEREZ: Correct, he does
4  not.
5      MR. MORRIS: Okay. I'm going to
6  proceed; and I would ask, Deborah, that
7  somebody from your office send that to me
8  as soon as possible. I'm sure it's on an
9  e-mail somewhere and all they have to do is
10  hit send.
11  BY MR. MORRIS:
12     Q. Mr. Dondero, let's continue.
13     So you don't have that document in
14  front of you right now?
15     A. Correct.
16     Q. Okay. How many agreements did you
17  enter into with Dugaboy?
18     MS. DEITSCH-PEREZ: You mean with
19  the Dugaboy trustee?
20     We had an agreement that you were
21  going to refer to these as the agreements
22  with the Dugaboy trustee. So let's stay
23  consistent.
24  BY MR. MORRIS:
25     Q. Mr. Dondero, how many agreements did

Page 20

1      JAMES DONDERO
2  you enter into with Dugaboy trustee concerning
3  Promissory Notes?
4      A. Is your question -- is your
5  questions how many Notes were entered into?
6      Q. No. How many separate agreements
7  did you enter into?
8      A. The 2017, '18, and '19 agreements.
9      Q. Okay. I didn't ask you what
10  agreements. I asked how many agreements you
11  entered into with the Dugaboy trustee.
12     MS. DEITSCH-PEREZ: Asked and
13  answered.
14     THE WITNESS: Three major ones.
15  BY MR. MORRIS:
16     Q. Are there any minor ones?
17     A. Not that I can recall right now.
18     Q. Okay. When did you enter into your
19  first major agreement with the Dugaboy trustee?
20     A. At the end of '17.
21     Q. Meaning December 2017 or early 2018?
22     A. Yes.
23     Q. What Promissory Notes are the
24  subject of the first major agreement that you
25  entered into with the Dugaboy trust- -- with

Page 21

1      JAMES DONDERO
2  the Dugaboy trustee?
3      A. I don't remember which ones
4  specifically. I remember the amount was more
5  substantial than subsequent years.
6      Q. Do you know how many Promissory
7  Notes were the subject of your first major
8  agreement with the Dugaboy trustee?
9      A. No.
10     Q. Can you identify the maker of any
11  Note that's subject to the first major
12  agreement with the Dugaboy trustee?
13     A. Not without my list or details.
14     Q. Can you identify the principal
15  amount of any Promissory Note that was subject
16  to the first agreement that you entered into
17  with the Dugaboy trustee?
18     A. I know they were -- I know the gross
19  amount. I know they were some of the term
20  loans, but I don't know the specifics.
21     Q. Can you tell me the aggregate
22  amount -- withdrawn.
23     Can you tell me the aggregate
24  principal amount of the Notes that are the
25  subject of your first agreement with the

Page 22

JAMES DONDERO

1          JAMES DONDERO
2   Dugaboy trustee?
3      A.   I – I believe it was 30 – 30 some
4   odd million, 30 – I can't remember the
5   principal and interest, but it's only 30 – 34,
6   35, 36.  It was in that range.
7      Q.   Did your first agreement with the --
8   withdrawn.
9          Can you identify the date of any of
10  the Promissory Notes that are the subject of
11  your first agreement with the Dugaboy trustee?
12     A.   No.
13     Q.   Can you tell me the year that any of
14  the Promissory Notes that are the subject of
15  the -- withdrawn.
16         Can you tell me the year that any of
17  the Promissory Notes were entered into that are
18  the subject of your first agreement with the
19  Dugaboy trustee?
20         MS. DEITSCH-PEREZ:  Asked and
21     answered.
22         THE WITNESS:  No, not off the top of
23     my head.
24  BY MR. MORRIS:
25     Q.   When did you – did – when did you

Page 23

1   enter into the second agreement with the
2   Dugaboy trustee?
3      Q.   Was that in December of 2018 or
4   early 2019?
5      A.   Yes.
6      Q.   How many Notes are subject to your
7   second agreement with the Dugaboy trustee?
8      A.   Less than the first, but I don't
9   know how many.
10     Q.   You don't know the number of Notes
11  that are the subject of your second agreement
12  with the Dugaboy trustee; is that right?
13     A.   Correct.
14     Q.   Can you identify the maker of any
15  Notes that are the subject of your second
16  agreement with the Dugaboy trustee?
17     A.   No, I – I – no, I don't remember.
18     Q.   Okay.  So as you sit here right now,
19  you can't identify the maker of any of the
20  Notes that are the subject of the second
21  agreement with the Dugaboy trustee; is that
22  right?
23     A.   Well, it would be one of the three
24  parties or four parties here, me or NexPoint or

Page 24

1          JAMES DONDERO
2   whatever; but I don't remember --
3      Q.   Okay.
4      A.   -- off the top of my head.
5      Q.   Off the top of your head, can you
6   tell me the original principal amount of any
7   Note that's subject to your second agreement
8   with the Dugaboy trustee?
9      A.   No.  I just – no.
10     Q.   Can you identify the date on which
11  any of the Promissory Notes were executed that
12  were the subject of your second agreement with
13  the Dugaboy trustee?
14     A.   No.
15     Q.   Can you tell me the aggregate
16  principal amount of the Notes that are the
17  subject of your second agreement with the
18  Dugaboy trustee?
19     A.   Yes.  A fraction of the prior year.
20  Less than ten million.
21     Q.   Can you be anymore precise than
22  that?
23     A.   Approximately ten million, I think.
24  Just under.
25     Q.   Okay.  Did you enter into your third

Page 25

1          JAMES DONDERO
2   agreement with the Dugaboy trustee in December
3   2019 or early 2020?
4      A.   Yes.
5      Q.   That's after the petition date; do I
6   have that right?
7      A.   I – yes.
8      Q.   Did you do it before or after
9   January 9, 2020?
10     A.   Before, I believe.
11     Q.   So while you were still in control
12  of Highland but after the petition date, you
13  entered into your third agreement with the
14  Dugaboy trustee concerning Promissory Notes.
15         Do I have that right?
16     A.   Yes.
17     Q.   Did you ever inform the bankruptcy
18  court of this agreement?
19     A.   No.
20     Q.   Did you ever inform the independent
21  directors of this agreement that you entered
22  into after the petition date?
23     A.   No.
24     Q.   Can you tell me which notes are the
25  subject of your third agreement with the

Page 26

1          JAMES DONDERO
2    Dugaboy trustee?
3         A.   No.
4         Q.   Can you identify the maker on any
5    Note that's the subject of your agreement that
6    you entered into after the petition date with
7    the Dugaboy trustee?
8         A.   Not off the top of my head.
9              MS. DEITSCH-PEREZ:  I mean, John, if
10   you would let him look at his list, he
11   could tell you.
12             But if you insist on making this a
13   memory test of 18 or so different things or
14   however many there are, 13, 14, then this
15   is -- it's your deposition.  But if you
16   want more specific details, he could look
17   at the list.
18             MR. MORRIS:  Okay.  That's not even
19   an objection let alone a speaking
20   objection.
21             It is my deposition --
22             MS. DEITSCH-PEREZ:  No.
23             MR. MORRIS:  It is my deposition,
24   and I would appreciate your not making
25   gratuitous comments.

Page 27

1          JAMES DONDERO
2    BY MR. MORRIS:
3         Q.   Mr. Dondero, can you tell me the
4    aggregate value of the Notes that are the
5    subject of the third agreement that you entered
6    into with the Dugaboy trustee after the
7    petition date?
8         A.   I believe it was about a million
9    bucks.
10        Q.   And who were the makers of the Notes
11   that are the subject of the agreement with the
12   Dugaboy trustee that you entered into after the
13   petition date?
14        A.   I don't know.
15        Q.   Without the sheet that you looked at
16   earlier, you have no ability to tell me which
17   notes were the subject of which agreement that
18   you entered into with the Dugaboy trustee,
19   correct?
20             MS. DEITSCH-PEREZ:  Object to the
21   form.
22             THE WITNESS:  If I'm not certain off
23   the top of my head I can remember
24   accurately, I don't want to speculate.
25

Page 28

1          JAMES DONDERO
2    BY MR. MORRIS:
3         Q.   All right.  I don't want you to
4    speculate either.  So I'm going to ask you just
5    broad follow-up questions.
6              Can you identify any Promissory Note
7    that is the subject of any specific agreement
8    that you ever entered into with the Dugaboy
9    trustee without looking at the list?
10             MS. DEITSCH-PEREZ:  Object to the
11   form.  He's already done that to some
12   degree.
13             THE WITNESS:  I believe it covered
14   virtually all of them.  So I don't remember
15   which ones specifically in each year.
16             Generally, it was, I believe, the
17   ones incurred in that year; but I don't
18   remember which entities.  But again, the
19   ultimate result being that the term loans,
20   the demand notes, the things incurred, the
21   things outstanding were part of the
22   agreement.
23   BY MR. MORRIS:
24        Q.   Sir, you never wrote down a list of
25   the notes that are the subject of the

Page 29

1          JAMES DONDERO
2    agreements, correct?
3         A.   Correct.
4         Q.   You never asked anybody to make a
5    list of the notes that were the subject of each
6    of the agreements, correct?
7         A.   Correct.
8         Q.   You're not aware of any document
9    that was created prior to the commencement of
10   these lawsuits that identifies the Notes that
11   are the subject of the agreements, correct?
12        A.   Correct.
13        Q.   Other than the Promissory Notes that
14   are the subject of this lawsuit -- withdrawn.
15             Other than the Promissory Notes that
16   are the subject of these lawsuits, are you
17   aware of any other doc- -- Promissory Notes
18   that are the subject of an agreement with the
19   Dugaboy trustee?
20        A.   I believe there are from time to
21   time, yes.  But I -- I don't know off the top
22   of my head.
23        Q.   Can you identify the maker of any
24   Promissory Note that is the subject of any
25   agreement with the Dugaboy trustee other than

Page 30

JAMES DONDERO

1
2 the Promissory Notes that are the subject of
3 the pending lawsuits?
4    A.   Not specifically, but I believe
5 there are.
6    Q.   Okay.  Can you identify the
7 principal amount of any Promissory Note that is
8 the subject of an agreement with the Dugaboy
9 trustee that is not part of the pending
10 lawsuits?
11    A.   Not specifically.
12    Q.   Can you tell me the year in which
13 any Promissory Note was ever executed that is
14 the subject of any agreement with the Dugaboy
15 trustee other than the Promissory Notes that
16 are the subject of the pending lawsuits?
17    A.   I believe there were several, and I
18 believe there were numerous ones over the
19 years.
20    Q.   Okay.  And -- and are those
21 Promissory Notes subject to one of the three
22 agreements that we've identified or subject to
23 some other agreement with the Dugaboy trustee?
24    A.   Well, they weren't to these related
25 entities.  I -- I don't know what the

Page 31

JAMES DONDERO

1
2 agreements were specifically subject to.
3    Q.   Are you the person who entered into
4 the agreement with the Dugaboy trustee
5 concerning the notes that you are describing
6 right now?
7    A.   Yes, I guess.
8    Q.   As the person who entered into the
9 agreement with the Dugaboy trustee concerning
10 Notes that are not the subject of the pending
11 litigation, can you identify anything about
12 those Notes, whether it's the maker, the date,
13 the principal amount, anything at all?
14    A.   Not off the top of my head.
15    Q.   Okay.  What would -- what would you
16 have to look at to know?  The chart or
17 something else?
18    A.   No, not this -- not this chart.
19 This only has to do with what we thought this
20 deposition was going to be about.
21       It would be the financials of
22 Dugaboy; and then from there, the detail
23 regarding any Notes that it has.
24    Q.   Did you enter into an agreement with
25 the Dugaboy trustee to forgive a Promissory

Page 32

JAMES DONDERO

1
2 Note where Dugaboy is the maker and Highland is
3 the payee?
4    A.   Dugaboy -- can you repeat that
5 question one more time?
6    Q.   Sure.  Did you enter into an
7 agreement with the Dugaboy trustee relating to
8 any Promissory Note where Dugaboy is the maker?
9    A.   No, I don't believe so.
10    Q.   Okay.  So you don't have any
11 recollection of ever entering into an agreement
12 with the Dugaboy trustee concerning the
13 potential forgiveness of any Note that was made
14 by Dugaboy, correct?
15    A.   I -- I do not believe so.
16    Q.   Okay.  And is there a -- is there a
17 document that we could look at that would
18 refresh your recollection?
19    A.   Not beyond the financials of Dugaboy
20 and any relevant Note detail.
21    Q.   And would -- is it -- is it your
22 testimony that an agreement with Dugaboy would
23 be reflected in the Dugaboy financial
24 statements?
25    A.   No, but the Notes would be.

Page 33

JAMES DONDERO

1
2    Q.   Well, the Dugaboy Notes are
3 reflected in Highland's financial statements.
4       Do you want me to get that?
5    A.   No.  I didn't think that was -- I
6 didn't think that was the question you were
7 asking me.
8    Q.   I apologize.  Maybe it was my fault.
9       What would we have to look at in
10 order to refresh your recollection as to
11 whether or not you entered into an agreement
12 with the Dugaboy trustee concerning the
13 potential forgiveness of any Note made by
14 Dugaboy?
15    A.   Other than the ones we're talking
16 about today, right?
17    Q.   We're not talking about -- there's
18 no Promissory Note where Dugaboy is the maker
19 that is the subject of any of the pending
20 lawsuits, correct?
21    A.   Correct.
22    Q.   So I'm asking you to identify if you
23 can any Promissory Note that is the subject of
24 any agreement you have ever entered into with
25 the Dugaboy trustee that is not the subject of

Page 34

1          JAMES DONDERO
2  one of the pending lawsuits.
3          Do you understand that that's what
4  I'm trying to get at?
5          MS. DEITSCH-PEREZ: Asked and
6      answered.
7          THE WITNESS: Yes.
8  BY MR. MORRIS:
9      Q.  Okay. Can you identify any such
10  Promissory Note?
11      A.  No, not specifically as I sit here
12  today.
13      Q.  Okay. Other than the promissory --
14  withdrawn.
15          Are you familiar with the term
16  "majority interest" as used in the Highland
17  Limited Partnership Agreement?
18      A.  Yes.
19      Q.  Okay. Other than the Promissory
20  Notes that are the subject of the pending
21  lawsuits, are you aware of any other Promissory
22  Notes that are the subject of any agreement
23  with the majority interest?
24          MS. DEITSCH-PEREZ: Object to the
25      form. Asked and answered.

Page 35

1          JAMES DONDERO
2          THE WITNESS: The majority interest
3  is controlled by the 75 percent. It's
4  controlled by Dugaboy. But the majority
5  interest isn't an entity in and of itself,
6  right?
7  BY MR. MORRIS:
8      Q.  Okay. Has Dugaboy held the majority
9  interest since the time that Highland was
10  created?
11      A.  No.
12      Q.  Okay. So -- so then I'm going to
13  ask my question again.
14          Are you aware of any agreement
15  concerning any Promissory Note that is the
16  subject -- withdrawn.
17          Are you aware of any agreement with
18  the majority interest that concerns any
19  Promissory Note where Highland is the payee
20  other than the Notes that are the subject of
21  the pending lawsuit?
22          MS. DEITSCH-PEREZ: Asked and
23      answered.
24          THE WITNESS: Not specifically as I
25      sit here today, but I do believe there have

Page 36

1          JAMES DONDERO
2      been numerous notes other than to these
3      entities today where Dugaboy was the maker
4      or recipient or whatever.
5  BY MR. MORRIS:
6      Q.  So you do believe that Dugaboy was
7  the maker of a Promissory Note that's subject
8  to an agreement with the majority interest?
9          MS. DEITSCH-PEREZ: Object to the
10      form.
11          THE WITNESS: What I'm saying is I
12      believe Dugaboy had other -- made other
13      Notes and received other Notes from other
14      entities other than Highland.
15  BY MR. MORRIS:
16      Q.  Does that have anything to do with
17  Highland?
18          Maybe I wasn't clear. I'm using the
19  phrase "majority interest" as that phrase -- I
20  thought we had -- I thought we had an
21  understanding -- as that phrase is used in the
22  Highland Limited Partnership Agreement, right?
23      A.  I thought it was a definition term
24  in the Highland, L.P.
25      Q.  It is, and I just -- I'd like to

Page 37

1          JAMES DONDERO
2  move on if I can, but I just want some clarity
3  here.
4          Is there any agreement between
5  Dugaboy and the majority interest concerning
6  any Promissory Note where Dugaboy is the maker?
7          MS. DEITSCH-PEREZ: Object to the
8      form.
9          THE WITNESS: I -- I don't know what
10      you're getting at. I have a tried to
11      answer it the best I can several different
12      ways.
13          But try it one more time, and I'll
14      try and answer it just specifically yes or
15      no.
16  BY MR. MORRIS:
17      Q.  Okay. Is Dugaboy the maker on any
18  Promissory Note where Highland is the payee?
19      A.  I don't believe so at this point.
20      Q.  Was Dugaboy ever the maker on a Note
21  where Highland was the payee to the best of
22  your knowledge?
23      A.  I don't -- I just don't know what
24  the actual accounting was or could have or
25  should have been. But if it prepays a Note,

Page 38

1          JAMES DONDERO
2  instead of prepaying a Note, it could have left
3  it in an existing Note outstanding and then
4  issued a separate Note, right, instead of
5  prepaying, right?
6          So I don't know in the -- in the pas
7  past or how exactly they handled prepays
8  consistently over time. But at the moment, I
9  don't believe there's a loan going from Dugaboy
10  to Highland.
11          But I do believe over the years,
12  there were numerous loans from Dugaboy to other
13  entities other than the ones we're talking
14  about today.
15          MS. DEITSCH-PEREZ: Okay. John,
16  we've gone way far afield of the topics for
17  this deposition or anything that you ought
18  to be even asking this individual witness
19  about given what these litigations are.
20  Could we move on, please?
21          MR. MORRIS: No. Other than --
22          MS. DEITSCH-PEREZ: You're spending
23  time on things other than the --
24          MR. MORRIS: Please stop talking.
25          MS. DEITSCH-PEREZ: -- action.

Page 39

1          JAMES DONDERO
2          MR. MORRIS: Please stop talking.
3  BY MR. MORRIS:
4      Q.  Other than the Promissory Notes that
5  are the subject of the lawsuits, are you aware
6  of any other Promissory Notes that are the
7  subject of any agreement that the Dugaboy
8  trustee ever entered into as a representative
9  of the majority of Class A shareholders?
10          MS. DEITSCH-PEREZ: Asked and
11  answered. I think we've answered after the
12  sixth time.
13          THE WITNESS: Not as I sit here
14  today.
15  BY MR. MORRIS:
16      Q.  In paragraph 82 in about the fifth
17  line down, there's a statement that, quote,
18  "Nancy Dondero is representative for a majority
19  of the Class A holders of plaintiff, agree that
20  plaintiff would forgive the Notes."
21          Do you see that?
22      A.  Yes.
23      Q.  The word "plaintiff" as used in your
24  answer refers to Highland Capital Management,
25  L.P., correct?

Page 40

1          JAMES DONDERO
2      A.  I -- no -- or wait. Hold on a
3  second.
4          Yes. I guess, yes.
5      Q.  Okay. At the time you entered into
6  the agreements, did you understand that
7  Dugaboy, as a majority -- as a representative
8  of a majority of the Class A shareholders of
9  the plaintiff was the entity that entered into
10  the agreement on behalf of Highland?
11      A.  Yes.
12      Q.  And your sister Nancy is the trustee
13  of Dugaboy today, correct?
14      A.  Yes.
15      Q.  And Nancy was the trustee of Dugaboy
16  at the time you entered into each of the
17  agreements, correct?
18      A.  Yes.
19      Q.  And you knew that at the time you
20  entered each of the agreements, correct?
21      A.  Yes.
22      Q.  You knew she was acting on behalf of
23  Dugaboy, correct?
24      A.  Yes.
25      Q.  Your understanding at that time that

Page 41

1          JAMES DONDERO
2  you entered into each of the agreements with
3  the Dugaboy trustee was that Dugaboy held the
4  majority of Highland's Class A interest,
5  correct?
6      A.  Yes.
7      Q.  And that's exactly why you contacted
8  Nancy to discuss the topics that ultimately led
9  to the agreements, correct?
10      A.  Yes.
11      Q.  You specifically called Nancy
12  because you wanted her to cause Dugaboy to
13  enter into the agreements with you on behalf of
14  Highland, correct?
15      A.  Yes.
16      Q.  And just as you wanted, Nancy, in
17  fact, caused Dugaboy, as a representative of a
18  majority of the Class A shareholders of
19  plaintiff, to enter into each of the
20  agreements, correct?
21      A.  Yes.
22      Q.  Would you agree with me that the
23  Promissory Notes that are the subject of the
24  agreements were the debtor's property?
25      A.  I think I've stated numerous times

Page 42

JAMES DONDERO

1          JAMES DONDERO
2 due to them as that they would ultimately be
3 compensation; but to be a bona fide Note and to
4 have bona fide deferral at the time that they
5 were issued, they were the debtor's property.
6 And I guess they remained such until satisfied
7 or until the condition as present -- the
8 condition subsequent is either triggered or
9 impossible to be triggered.
10    Q.  Okay. Is it fair to say that the
11 Promissory Notes that are the subject of the
12 agreements were assets of the debtor at the
13 time you entered into the agreements?
14    A.  Yes.
15    Q.  At the time you entered into the
16 agreements, you understood that Dugaboy was
17 exercising control over the debtor's property,
18 correct?
19       MS. DEITSCH-PEREZ: Object to the
20    form.
21       MR. MORRIS: Withdrawn.
22 BY MR. MORRIS:
23    Q.  At the time you entered into the
24 agreements, you understood that the Dugaboy
25 trustee was going to exercise control over the

Page 43

1          JAMES DONDERO
2 debtor's property, correct?
3       MS. DEITSCH-PEREZ: Object. Object
4    to the form.
5       THE WITNESS: Exercise control? I
6    understood the trustee had the ability to
7    grant the, whatever you want to call them,
8    conditions subsequent.
9 BY MR. MORRIS:
10    Q.  On that --
11    A.  Yes.
12    Q.  And that was -- by entering into the
13 agreement, would you agree with me, that the
14 Dugaboy trustee exercised control over the
15 Promissory Notes?
16       MS. DEITSCH-PEREZ: Object to the
17    form.
18       THE WITNESS: They -- The trustee
19    exercised the rights given to it as a
20    majority of Class A holders.
21 BY MR. MORRIS:
22    Q.  Okay. And is it your understanding
23 that as part of the right, it altered the
24 characteristics of the Promissory Notes?
25       MS. DEITSCH-PEREZ: Object to the

Page 44

1          JAMES DONDERO
2    form.
3       THE WITNESS: I just want to -- I
4    believe my testimony, I granted the
5    conditions subsequent is my interpretation.
6 BY MR. MORRIS:
7    Q.  Right. And so that's fine. But
8 that's -- that's the thing that happened, but
9 I'm just asking you what the impact of that
10 was.
11       When the Dugaboy trustee entered
12 into the agreement, the result was that the
13 terms and conditions of the Promissory Note
14 were altered, correct?
15       MS. DEITSCH-PEREZ: Object to the
16    form.
17       THE WITNESS: I don't want to -- I
18    want to say I don't know to that next week.
19 BY MR. MORRIS:
20    Q.  You can't -- okay. You can't tell
21 me if your agreement with the Dugaboy trustee
22 altered the terms and conditions of the
23 Promissory Notes that were subject to the
24 agreement; you can't tell me that?
25       MS. DEITSCH-PEREZ: Object to the

Page 45

1          JAMES DONDERO
2    form.
3       THE WITNESS: Yeah. I -- again, it
4    sounds like you're trying to take me
5    towards legal terms of changing terms or
6    modification in a Note or whatever; and
7    I -- I'm not -- I don't have an opinion or
8    the expert to comment on that.
9       I can just say I knew she had the
10    ability to create conditions subsequent.
11 BY MR. MORRIS:
12    Q.  Okay. So let's take, for example,
13 the Notes that you signed.
14       Those were demand notes, right?
15    A.  Yes.
16    Q.  Okay. And after you entered into
17 the agreement with the Dugaboy trustee, instead
18 of it being a demand note, it was now a demand
19 note subject to conditions subsequent, correct?
20       MS. DEITSCH-PEREZ: Object to the
21    form.
22       THE WITNESS: Yeah, that ultimately
23    they couldn't be demanded until conditions
24    subsequent were met or unable to be met.
25

1          JAMES DONDERO
2   BY MR. MORRIS:
3       Q.   Okay.  So can you agree with me that
4   that -- that that was a change in the term of
5   the Note?
6          MS. DEITSCH-PEREZ:  Object to the
7       form.
8          THE WITNESS:  Yeah.  See, that's the
9       part I don't want to comment on.  I just
10      want to say I don't know.
11  BY MR. MORRIS:
12      Q.   Okay.  Wasn't that the purpose of
13  entering into the agreements was to change the
14  terms of the each of the Promissory Notes?
15          Wasn't that your intent?
16          MS. DEITSCH-PEREZ:  Object to the
17      form.
18          THE WITNESS:  I'd say the intent was
19      to find and make compensation appropriate
20      for industry standards and Highland in
21      particular.
22  BY MR. MORRIS:
23      Q.   And did you believe that the Notes
24  as originally drafted and signed by you or the
25  representatives of the makers didn't take that

1          JAMES DONDERO
2   into account?
3       A.   I went through this already last
4   time, but the Notes were intentionally loose
5   and, I think, anticipated the ability to adjust
6   the subsequent conditions or other things.
7       Q.   Now, you told me that each of the
8   agreements was entered into between December of
9   one year or -- actually, withdrawn.
10          If we look at paragraph 82, it says
11  that each of the agreements was made, quote,
12  "sometime between the December of the year in
13  which each note was made and February of the
14  following year."
15          Do I have that right?
16      A.   Yes.
17      Q.   Can you identify with any greater
18  specificity when you entered into the first
19  agreement with the Dugaboy trustee referenced
20  in paragraph 82?
21      A.   No.
22      Q.   It's sometime within that 90-day
23  period; does that sound right to you?
24      A.   I believe it was closer to the
25  holidays around the turn of the year, but I

1          JAMES DONDERO
2   don't have specific recollection.
3       Q.   Is that answer the same for all
4   three agreements or only for the first
5   agreement?
6       A.   That would be the same for all
7   three.
8       Q.   So then why -- why does paragraph 82
9   refer to sometime between December of the year
10  in which each note was made and February of the
11  following year if your best recollection is
12  that it happened around the holidays?
13      A.   I don't know.
14      Q.   All right.  But as you sit here
15  right now, is it your testimony that you
16  believe each of the agreements was signed --
17  was more likely signed in December rather than
18  January or February?
19          MS. DEITSCH-PEREZ:  Object to the
20      form.
21          THE WITNESS:  I think signed is a --
22      I'm not -- I'm not testifying that signed,
23      I guess.
24  BY MR. MORRIS:
25      Q.   I apologize.  Maybe that was my

1          JAMES DONDERO
2   mistake.
3          Is it your testimony that each --
4   that you entered each of the agreements with
5   the Dugaboy trustee in December rather than
6   January or February of the years indicated?
7       A.   That's the best of my recollection,
8   but there may have been one year that was
9   towards the wider end of the interval.  I can't
10  remember with more specificity.
11      Q.   Okay.  Do you know of anything that
12  memorialized the date on which you entered into
13  any of the agreements?
14      A.   No, other than -- no, other than --
15  no, other than, you know, other than travel
16  schedule or phone logs or whatever.
17      Q.   All right.  During the discussion
18  that led to the agreements, did you ever
19  provide any information to Nancy or to Dugaboy
20  concerning your compensation?
21      A.   Just -- just verbal.  I mean, she
22  knew it was low, and she knew we had reinvested
23  most everything we made back in the company
24  over the years.  And that was the -- that was,
25  I think, understanding by all involved; and it

Page 50

JAMES DONDERO

1
2 should be obvious to anybody who's looked at
3 the numbers even in hindsight.
4        MR. MORRIS:  Okay.  I move to
5     strike.
6 BY MR. MORRIS:
7     Q.    And please listen carefully to my
8 question.
9        During the discussions that led to
10 each of the agreements, did you ever provide
11 any information to your sister or Dugaboy
12 concerning your compensation?
13        MS. DEITSCH-PEREZ:  Asked and
14     answered.
15        THE WITNESS:  Not specifically.
16 BY MR. MORRIS:
17     Q.    Did you provide any general
18 information to your sister or to Dugaboy prior
19 to the entry of any of the three agreements
20 that you entered into with the Dugaboy trustee?
21     A.    I would repeat the answer that was
22 struck two questions ago.
23     Q.    That's the information that you gave
24 to her?
25     A.    Yeah.  It was – again, it was

Page 51

JAMES DONDERO

1
2 verbal, and it was – but an understanding but
3 a clear and obvious understanding.
4     Q.    I want to know exactly what
5 information you gave to your sister and to
6 Dugaboy before entering into any of the three
7 agreements with the Dugaboy trustee?
8     A.    Most of what I had made over the
9 years was rolled back into the business to
10 propel growth and initiatives.  And that my
11 actual compensation was very modest based on
12 industry standards and relevant
13 responsibilities at Highland.
14     Q.    Did you tell her anything else?
15 Withdrawn.
16        Did you tell your – Nancy or
17 Dugaboy anything else beyond what you've now
18 testified to?
19     A.    You know, I think some of what I
20 testified to earlier, that forgiveness of the
21 Notes would be a modest increase in that
22 compensation but still not be in the ZIP code
23 of fair and appropriate compensation and that
24 the value of the Notes in aggregate were de
25 minimus relative to Highland and de minimis

Page 52

JAMES DONDERO

1
2 relative to Dugaboy.
3     Q.    Did you tell her anything else?
4     A.    Anything else would have fallen into
5 the buckets I just described, but I can't
6 remember specifically as I sit here today.
7     Q.    Did you ever tell your sister or
8 Dugaboy that your salary was less than a
9 million dollars?
10     A.    I –
11        MS. DEITSCH-PEREZ:  I mean, just
12     from Highland?
13        THE WITNESS:  Repeat the question
14     again for me, please.
15 BY MR. MORRIS:
16     Q.    Did you ever tell your sister that
17 your salary was less than a million dollars a
18 year?
19     A.    I know my sister was aware that it
20 was very low, and it kind of decreased over
21 time, and I think it was paid by different
22 entities.
23        Whether it was a million or
24 2 million, I can't remember exactly what I
25 would have told her; but it would have been in

Page 53

JAMES DONDERO

1
2 that ZIP code to paint the proper picture that
3 the cash compensation for somebody in my role
4 was well below industry standards.
5     Q.    Do you recall anything else that you
6 shared with your sister concerning your
7 compensation that you haven't testified to?
8     A.    Like I said, it would generally fall
9 into those buckets as I sit here today.
10     Q.    Did your sister or Dugaboy ask you
11 any questions about your compensation before
12 entering into the three agreements that you
13 entered into with the Dugaboy trustee?
14     A.    And, again, it would fall into the
15 buckets I just described.
16     Q.    Can you – can you recall any
17 question that your sister or Dugaboy asked of
18 you concerning your compensation before
19 entering into the agreements?
20        MS. DEITSCH-PEREZ:  Asked answered.
21        THE WITNESS:  Again, I – it would
22     fall into the buckets I just described.
23 BY MR. MORRIS:
24     Q.    Did you provide any documents to
25 your sister or to Dugaboy concerning your

Page 54

JAMES DONDERO

1      JAMES DONDERO
2  compensation before entering into the
3  agreements?
4      A.  No, not that I can recall.
5      Q.  Did your sister or Dugaboy ask you
6  for any documents before entering into -- into
7  any of the agreements?
8      A.  I do not -- I do not believe so.
9      Q.  Do you recall that in the ordinary
10 course of business, Highland prepared a
11 document called a Compensation and Benefits
12 Statement for each of its employees?
13     A.  Yes.
14     Q.  And was that prepared by the Human
15 Resources Group?
16     A.  Yes.
17     Q.  And was Mark Collins the head of the
18 Human Resources Group?
19     A.  No.
20     Q.  Who was the head of the Human
21 Resources Group?
22     A.  Brian Collins.
23     Q.  I apologize to Mr. Collins.  Thank
24 you for the correction.
25         And Mr. Collins and his team were

Page 55

1      JAMES DONDERO
2  responsible for preparing the annual
3  Compensation and Benefits Statements for
4  Highland's employees, correct?
5      A.  Yes.
6      Q.  And did you instruct them to do
7  that?
8      A.  Not specifically.
9      Q.  Okay.
10     A.  They do it every year.  They do it
11 every year as a matter of course, so I guess no
12 is the answer.
13     Q.  Okay.  So in the ordinary course of
14 business, Mr. Collins and his team would
15 prepare Compensation and Benefits Statements
16 for each of Highland's employees on an annual
17 basis, right?
18     A.  Yes.
19     Q.  Okay.
20         MR. MORRIS:  Can we please put up
21 Exhibit 68.
22         MS. CANTY:  (Complies with request.)
23
24
25

Page 56

1      JAMES DONDERO
2         (Whereupon, Exhibit 68, James
3      Dondero Compensation and Benefits
4      Statement, Bates stamped D-CNL003585,
5      marked for identification, as of this
6      date.)
7  BY MR. MORRIS:
8      Q.  Do you see the document that's been
9  premarked as Exhibit 68 that's up on the
10 screen, sir?
11     A.  Yup.
12     Q.  And does this appear to be the form
13 of annual Compensation and Benefits Statement
14 that Mr. Collins and his team prepared on an
15 annual basis for Highland's employees?
16     A.  This looks like the format, yes.
17     Q.  Okay.  And the Compensation and
18 Benefits Statement was intended to set forth
19 the types and the amounts of compensation each
20 employee received each year, correct?
21     A.  Yes, generally.
22     Q.  Okay.  Did you ever disclose any
23 information on this page to Nancy or to
24 Dugaboy?
25     A.  Honestly, I don't think I've ever

Page 57

1      JAMES DONDERO
2  seen my award letters before.
3      Q.  Okay.  So you never -- so then it's
4  a fair to say you never showed this letter to
5  your sister or to Dugaboy, correct?
6      A.  Correct.
7      Q.  Okay.  Did you ever disclose to
8  Nancy or to Dugaboy the salary that's reflected
9  on this document?
10     A.  I can't remember specifically beyond
11 what I've already testified.
12     Q.  Did you ever describe for Nancy or
13 for Dugaboy the 2016 deferred compensation
14 award that's reflected on this document?
15     A.  No.  I -- by the way, I think that's
16 only 20 percent vested a year.  I think that's
17 a gross amount.  But no, I never -- I never
18 discussed that with her.
19     Q.  Okay.  Do you see in the
20 compensation award refers to 50,000 restricted
21 stock units of NXRT relating to your 2016
22 performance?
23     A.  Yes.
24     Q.  What is NXRT?
25     A.  That's the REIT that Highland used

JAMES DONDERO

2  to own million shares of that series hold at 20
3  that now trade at 70.
4      Q.   And is NexPoint REIT affiliated with
5  NexPoint Advisors, L.P.?
6      A.   Yes.
7      Q.   And do you have an understanding of
8  the nature of the relationship?
9      A.   Yes.
10     Q.   And what's -- what's your
11 understanding of the nature of the relationship
12 between NexPoint REIT and NexPoint Advisors,
13 L.P.?
14     A.   It's the external manager of the
15 REIT.
16     Q.   Okay.  Did you ever tell Nancy or
17 Dugaboy that you had received these restricted
18 stock units in 2016?
19     A.   No.  But again, the vested amount
20 would have probably been about $250,000 worth
21 at that moment.
22     Q.   And did it vest over a couple of
23 years?
24     A.   The first couple of years is vested
25 over five years.  I think now it vests over six

JAMES DONDERO

2  or seven years.  I don't remember whether the
3  2016 award was five years, six years, or seven
4  years.
5      Q.   Okay.  We talked earlier about an
6  expert that's been retained on your behalf.
7           Do you remember that?
8      A.   Yes.
9      Q.   Do you recall if you or anybody
10 acting on your behalf ever disclosed to that
11 expert the restricted stock units reflected on
12 this document?
13          MS. DEITSCH-PEREZ:  Object to the
14 form.
15          THE WITNESS:  I don't know.
16          MR. MORRIS:  Let's put up
17 Exhibit 50, please.
18          MS. CANTY:  (Complies with request.)
19          (Whereupon, Exhibit 50, James
20 Dondero Compensation and Benefits
21 Statement, Bates stamped D-CNL003587,
22 marked for identification, as of this
23 date.)
24 BY MR. MORRIS:
25     Q.   Do you see this is your benefits

JAMES DONDERO

2  statement for 2017?
3      A.   Yes.
4      Q.   Did you ever disclose any of the
5  information on this page to Nancy or to
6  Dugaboy?
7      A.   No.
8      Q.   Did you ever disclose to Nancy or to
9  Dugaboy that your base salary in 2017 was.
10         2,500,024?
11         MS. DEITSCH-PEREZ:  Object to the
12 form.
13         THE WITNESS:  Not specifically, no,
14 other than the buckets we talked about
15 earlier.
16         Like I said earlier, I'm not sure if
17 I have ever seen these before.  But I also
18 -- until it's verified, I don't want to --
19 everybody to assume that the base salary
20 came a hundred percent from Highland or if
21 it was also from some other entity.
22 Because for the purposes of this letter,
23 Brian Collins wouldn't have -- we have
24 numerous or several employees that are dual
25 employees.  And whether their base salary

JAMES DONDERO

2  came from one or multiple entities, he
3  wouldn't have differentiated in that line.
4           So I don't know whether that amount,
5  that 2.5 million came from Highland or a
6  combination of Highland/NexPoint or some
7  other entities.  I don't know.
8  BY MR. MORRIS:
9      Q.   And who made the decision as to how
10 to allocate the base salary?
11     A.   I don't know.  I -- I mean, I don't
12 know how it was split.  But my recollection of
13 my Highland base salary is that it was
14 diminishing over time.
15     Q.   And -- and as the president of
16 Highland and as the president of NexPoint, did
17 you have any say as to how your salary was
18 allocated between those two entities?
19     A.   Not that I recall.
20     Q.   Do you have any idea the basis on
21 which your salary was allocated between those
22 two entities?
23     A.   No.
24     Q.   Do you think -- do -- do you have
25 any understanding that it was allocated based

Page 62

1          JAMES DONDERO
2  on the amount of time you spent working for
3  each of those entities?
4      A.   I have no idea.
5      Q.   If your salary was $500,000 from
6  Highland in 2017 and $2 million to NexPoint,
7  can you -- can you think of any reason why it
8  would be allocated in that way?
9          MS. DEITSCH-PEREZ:  Object to the
10     form.
11         THE WITNESS:  Cash, cash
12     availability.  I -- I don't know.
13 BY MR. MORRIS:
14     Q.   Okay.  Did you devote your full time
15 and attention to Highland Capital Management,
16 L.P.?
17     A.   I spread my time as appropriate
18 across a variety of entities.
19     Q.   Can you identify for me the entities
20 that you spread your time across?
21     A.   Highland, NexPoint, HCMFA, HCRE.
22     Q.   How about Highland Management
23 Services, Inc.?
24     A.   Yes.
25     Q.   Are there any others?

Page 63

1          JAMES DONDERO
2      A.   Yes.
3      Q.   Can you identify any other companies
4  to which you devoted your time and attention?
5      A.   Not off the top of my head.  I'm
6  willing to be refreshed.  But over the years
7  there's been multiple initiatives at Highland
8  that have come and gone and private equity
9  companies that have come and gone and other
10 initiatives that have come and gone.
11     Q.   Do you see the reference to the
12 65,772 restricted stock units of the NexPoint
13 REIT there on this document?
14     A.   Yes.
15     Q.   And was that, to the best of your
16 recollection, the award that you were granted
17 in connection with your 2017 performance?
18     A.   It would have been for -- it would
19 have been the prior awards at -- it would have
20 been for the prior years' awards at NFLP.  And
21 it would have been -- it would have been the
22 same five- or seven-year vesting schedule.
23         MR. MORRIS:  Now I'm looking at my
24     phone, and I don't see, Deborah, any e-mail
25     from your firm.

Page 64

1          JAMES DONDERO
2          MS. DEITSCH-PEREZ:  Yeah.  On a
3      break, I'll take a picture of it and send
4      it to you.
5          Do you want a break now?
6          MR. MORRIS:  I really -- I really
7      don't.  And I don't know why I can't get an
8      e-mail copy rather than a photograph.  It's
9      not going to be -- it's not going to be
10     easy to read, and you know that?
11         MS. DEITSCH-PEREZ:  It'll be
12     perfectly fine.  If you can't, let me know;
13     and then I'll take the time to try and find
14     it.  But the fastest way to get it to you
15     is to take a picture of it.
16 BY MR. MORRIS:
17     Q.   Mr. Dondero, did you ever tell Nancy
18 or Dugaboy that you had received the restricted
19 stock units from the NexPoint REIT as reflected
20 on this page?
21     A.   You're -- you're saying the
22 $1.55-million number that was really 200,000
23 vested or 300,000 vested?
24     Q.   No.  I'm not talking about the
25 value.  I'm just talking about the restricted

Page 65

1          JAMES DONDERO
2  units.
3          Did you ever tell them -- let's keep
4      it -- let's keep it simple, and let's make it
5      really broad.
6          Did you ever tell Nancy or Dugaboy
7      that you received restricted stock units as
8      part of your compensation?
9      A.   I -- I don't remember.
10     Q.   Okay.  Did you ever -- because this
11 will speed it up.
12         Did you ever tell your expert that
13 you received restricted stock units as part of
14 your compensation?
15         MS. DEITSCH-PEREZ:  Object to the
16     form.
17         THE WITNESS:  I don't -- I don't
18     remember.
19 BY MR. MORRIS:
20     Q.   Did you ever direct anyone acting on
21 your behalf to share with your expert that you
22 had received restricted stock units as a form
23 of compensation?
24         MS. DEITSCH-PEREZ:  Object to the
25     form.

Page 66

1          JAMES DONDERO
2          THE WITNESS:  I not – I wasn't
3   involved.
4          MR. MORRIS:  All right.  You know,
5   what, Deborah, let's take a break; and why
6   don't you send me that document.
7          It is now 3:28.  Let's come back at
8   3:40 Eastern, and let's please be on time
9   because I'd like to try to finish this
10  today.  Thank you.
11         THE VIDEOGRAPHER:  Off the record at
12  2:28.
13         (Whereupon, a break was taken.)
14         THE VIDEOGRAPHER:  We are back on
15  the record.  The time is 2:43.
16         MR. MORRIS:  I received from counsel
17  a photograph in text message form of the
18  document that Mr. Dondero was referring to
19  at the beginning of the deposition.
20         I'm going to ask for that production
21  – for the production of that document with
22  a Bates number by the end of the day, and I
23  hope that could be accommodated.
24         MS. DEITSCH-PEREZ:  I'm not sure –
25  John, I'm not sure it will be by the end of

Page 67

1          JAMES DONDERO
2   the day because I don't know when the
3   people who do the Bates stamping leave.
4   But if it's not today, it will be tomorrow.
5          MR. MORRIS:  All right.  It's 2:44
6   in the afternoon your time.  I hope that
7   your firm has the capability of Bates
8   stamping and producing one page before the
9   close of business.
10         MS. DEITSCH-PEREZ:  Okay.  But I'm
11  not going to get – John, what difference
12  does it make whether it's tonight or
13  tomorrow?
14         MR. MORRIS:  You know what, I really
15  want to use it in the deposition now, but I
16  can't do that because – because you're not
17  able – because you – because apparently,
18  you can't even promise to do it by the end
19  of the day.
20  BY MR. MORRIS:
21  Q.   Mr. Dondero –
22         MS. DEITSCH-PEREZ:  Could you –
23  could you use it –
24         MR. MORRIS:  I'd like to –
25         MS. DEITSCH-PEREZ:  – if I sent it

Page 68

1          JAMES DONDERO
2   to you by e-mail instead.
3          MR. MORRIS:  I'd like to proceed.
4          You can e-mail it to me.  I mean, I
5   asked you to do that an hour ago.
6          MS. DEITSCH-PEREZ:  Well, the
7   easiest way to do it is to send a picture
8   is to text it; but if you give me a minute,
9   I'll figure out how to send it by e-mail.
10  Give me a second.  Let's see.
11         It just takes a second because it
12  goes into my personal e-mail first if it's
13  from my iPhone.  Okay.
14         MR. MORRIS:  Can we proceed?
15         MS. DEITSCH-PEREZ:  Yeah.  Give me a
16  minute and you'll have it.
17         Okay.  You should have it in your
18  e-mail now, John.
19         MR. MORRIS:  Thank you.  All right.
20  I'll let you know when it arrives.
21  BY MR. MORRIS:
22  Q.   Mr. Dondero, the questions now are
23  going to be both in your individual capacity
24  and in your capacity as the 30(b)(6) witness.
25         Do you understand that?

Page 69

1          JAMES DONDERO
2   A.   Okay.
3   Q.   Okay.
4   A.   It's either – it's either/or; it's
5   not one?
6   Q.   No.
7   A.   Okay.
8   Q.   You contend that the Notes are
9   subject to the – withdrawn.
10         You contend that the Notes that are
11  the subject of the agreements would be forgiven
12  upon the fulfillment of certain conditions
13  present, right?
14  A.   Right.
15         MS. DEITSCH-PEREZ:  Object to the
16  form.  He said "subsequent."
17         MR. MORRIS:  I apologize.  Let me
18  restate the question.
19  BY MR. MORRIS:
20  Q.   You contend that the Notes subject
21  to the agreement should be forgiven or would be
22  forgiven upon the fulfillment of certain
23  conditions subsequent, correct?
24  A.   Yes.
25  Q.   And to the best of your knowledge,

Page 70

1           JAMES DONDERO
2  none of those conditions have occurred as of
3  today, correct?
4      A.   To the best of my knowledge, yes.
5      Q.   Okay.  You're not aware of any facts
6  showing that any of the conditions subsequent
7  have been satisfied, fair?
8      A.   I -- yeah.  I wouldn't know.  You
9  would probably know.  I don't know.
10     Q.   I'm only asking for your knowledge.
11         One of the conditions subsequent was
12  that the Notes would be forgiven if you caused
13  Highland to sell its interest in one of three
14  portfolio companies above cost, right?
15         MS. DEITSCH-PEREZ:  Object to the
16     form.
17         THE WITNESS:  I -- yeah.  I don't
18     know if the noun is me or Highland, but
19     yeah.
20  BY MR. MORRIS:
21     Q.   Okay.  The portfolio companies at
22  issue were MGM, Cornerstone, and Trustway,
23  correct?
24     A.   Yes.
25     Q.   And prior to the petition date, you

Page 71

1           JAMES DONDERO
2  had the authority to sell any of those
3  portfolio companies at any time without having
4  to obtain approval from anyone, correct?
5         MS. DEITSCH-PEREZ:  Object to the
6     form.
7         THE WITNESS:  Yeah.  No, I can't
8     agree with that statement.
9  BY MR. MORRIS:
10     Q.   Why not?
11         Who's approval did you have to get
12  before you could sell any of those portfolio
13  companies?
14     A.   MGM, I was one board member and I
15  think an aggregate.  When I was running
16  Highland, we spoke for 18 percent of the
17  equity.  So I couldn't force the overall sale
18  of the company unilaterally.
19         There was also a shareholder's
20  agreement in place that restricted myself and
21  Anchorage and a couple of the large holders
22  from selling their shares without a disclosure
23  and approval process.  That is one example.
24         With regard to Trustway, I believe I
25  was largely unfettered.

Page 72

1           JAMES DONDERO
2         With regard to Cornerstone, a
3  majority of it -- or not a majority, but a
4  significant minority, I think, was owned by
5  both Restoration and the Old Redeemer Fund.
6      Q.   All right.  Well, let me ask you
7  this:  The conditions subsequent that are
8  embedded in the agreements, did that relate to
9  just Highland's interests in the portfolio
10  companies, or did it relate to interests held
11  by anybody else?
12     A.   It referred to a monetization in
13  creating liquidity around Highland's interests
14  that were large and illiquid portions of
15  Highland's balance sheet.
16     Q.   Okay.  So let me ask the question
17  again.
18         Prior to the petition date, did you
19  have the authority to sell Highland's interests
20  in any of the portfolio companies without
21  having to obtain the authority of anybody else?
22         MS. DEITSCH-PEREZ:  Object to the
23     form.  Asked and answered.
24         THE WITNESS:  Sub- -- subject to my
25     prior answer, I could speak for Highland

Page 73

1           JAMES DONDERO
2     prior to the bankruptcy.
3  BY MR. MORRIS:
4      Q.   Okay.  Before entering into the
5  agreements, did you or anybody acting on your
6  behalf analyze the likelihood that any of the
7  conditions subsequent would occur?
8      A.   Likelihood?  Analyze?  My
9  description of them, which was my understanding
10  of them, but my description of the assets to my
11  sister was -- to the trustee for Dugaboy was
12  that we held them for a long time.  We were
13  working towards monetization, but there wasn't
14  anything imminent regarding any of them in 2017
15  or '18.
16     Q.   Well, but the actual sale is just
17  one part of the condition subsequent, correct?
18         The other part is that it's got to
19  be sold above cost; is that correct?
20     A.   That is right.
21     Q.   Okay.  So at the time you entered
22  into each of your -- each of the three
23  agreements, had you done any analysis to
24  determine whether or not any -- whether
25  Highland's interests in any of the portfolio

Page 74

1          JAMES DONDERO
2   companies exceeded its cost?
3      A.   No, but I -- yes.  No, I did not.
4      Q.   Did you have any understanding at
5   all as to how the value of Highland's interests
6   in MGM compared to its costs at the time you
7   entered into each of these three agreements?
8      A.   No.  I mean, my understanding was I
9   knew they were substantially higher, but I
10  didn't know how much higher.
11     Q.   Okay.  So is it fair to say that the
12  time -- at the time you entered into each of
13  these agreements, you knew and understood that
14  the value of Highland's interests in MGM was
15  substantially higher than its costs?
16     A.   For MGM, yes.
17     Q.   Okay.  Did you have an understanding
18  of the relationship between value and costs
19  concerning Cornerstone at the time you entered
20  into these agreements?
21     A.   My understanding it was moderately
22  higher, and as Trustway was between substantially
23  and moderately and higher, I believe.
24     Q.   Okay.  So is it fair to say that at
25  the time you entered into each of these

Page 75

1          JAMES DONDERO
2   agreements, you believed that the value of
3   Highland's interests in each of the portfolio
4   companies exceeded its costs in varying
5   degrees?
6      A.   Varying degrees.  As a matter of
7   fact, I would adjust.  Cornerstone and
8   Trustway, I believe, were moderately higher
9   than their embedded costs or implied costs.
10  That was my understanding.
11          MGM was somewhat substantially.  But
12  all of them with a fair amount of volatility
13  and a fair amount of illiquidity.
14     Q.   Did you ever give your sister or
15  Dugaboy any information concerning how the
16  value of Highland's interests in any of the
17  portfolio companies compared to Highland's
18  costs before entering into the agreements?
19     A.   Not that I recall.
20     Q.   Do you have any reason to believe
21  that your sister or Dugaboy had any
22  understanding as to the likelihood that the
23  conditions subsequent would be satisfied at the
24  time the Dugaboy trustee entered into the three
25  agreements with you?

Page 76

1          JAMES DONDERO
2          MS. DEITSCH-PEREZ:  Object to the
3   form.
4          THE WITNESS:  I -- I remember saying
5   it would take a few years at minimum; but
6   other than expressing time, I don't believe
7   I expressed value versus cost or the
8   questions you were asking me previously.
9   BY MR. MORRIS:
10     Q.   Okay.  You never showed Nancy or
11  Dugaboy any of the Promissory Notes prior to
12  entering into any of the agreements, correct?
13     A.   Not that I recall.
14     Q.   And you never sent copies of the
15  Promissory Notes to Nancy or Dugaboy before
16  entering into any of these agreements, correct?
17     A.   Not that I recall.
18          MS. DEITSCH-PEREZ:  Object to the
19  form.
20          John, you've asked these at the last
21  deposition and actually also at the first
22  day of the deposition.
23          MR. MORRIS:  Thank you.  He's here
24  now in his 30(b)(6) capacity.  So please
25  just stop.

Page 77

1          JAMES DONDERO
2          You can object to the form of the
3   question.  I really don't appreciate it.
4   You should follow the very professional job
5   that your colleague, Michael Aigen, did the
6   other day.
7   BY MR. MORRIS:
8      Q.   Neither Nancy or Dugaboy has ever
9   asked to see copies of any of the Promissory
10  Notes before entering into any of the
11  agreements, correct?
12          MS. DEITSCH-PEREZ:  Object to the
13  form.
14          THE WITNESS:  I don't know.
15  BY MR. MORRIS:
16     Q.   Do you have any reason to believe
17  that Nancy or Dugaboy ever saw a copy of any of
18  the Promissory Notes at issue before entering
19  into the agreements?
20     A.   I don't know.
21     Q.   During your discussions with Nancy
22  and Dugaboy, did you identify the Promissory
23  Notes that were going to be the subject of each
24  agreement?
25          MS. DEITSCH-PEREZ:  Object to the

Page 78

JAMES DONDERO

1    JAMES DONDERO
2  form.
3       You know, we made an agreement that
4  you were going to refer to Nancy as the
5  Dugaboy trustee. Please stick to it.
6  Otherwise, I'm going to have to object each
7  time, and I'd rather not.
8       MR. MORRIS: I have no problem with
9  your objecting to the form of the question.
10 It's the speaking that I really do object
11 to. And I don't know why you can't control
12 yourself.
13      MS. DEITSCH-PEREZ: Because I
14 hope that --
15      MR. MORRIS: Please stop. Please
16 stop.
17      MS. DEITSCH-PEREZ: -- by telling
18 you this, you will listen.
19      MR. MORRIS: Okay. Your discussion
20 and your inability to control yourself is
21 going to cause this deposition to go longer
22 than it needs to, okay?
23      MS. DEITSCH-PEREZ: No. It's your
24 repeating questions that's going to do
25 that.

Page 79

1    JAMES DONDERO
2       MR. MORRIS: You let me know when
3  you're done.
4       MS. DEITSCH-PEREZ: I'm done.
5  BY MR. MORRIS:
6    Q.   Mr. Dondero, during your discussions
7  with the Dugaboy trustee, did you identify the
8  Promissory Notes that were going to be the
9  subject of each agreement?
10      MS. DEITSCH-PEREZ: Object to the
11 form.
12      THE WITNESS: No, not that I recall.
13 BY MR. MORRIS:
14   Q.   Do you recall -- during your
15 discussions with the Dugaboy trustee, did you
16 identify the maker of any of the Notes that
17 were the subject of any of the agreements?
18   A.   You mean Highland as the maker; is
19 that what you're saying?
20   Q.   No. I'm just asking if during your
21 discussions with the Dugaboy trustee, you ever
22 disclosed the name of the maker of any of the
23 Notes that were subject to the agreements?
24   A.   She -- she knew they were Notes due
25 to Highland from various entities. So I don't

Page 80

1    JAMES DONDERO
2  know what your question is. Did I identify
3  specifically that they were Notes due to
4  Highland? I guess the answer to that is yes,
5  but I don't know what you're asking me.
6    Q.   I'm sorry, sir. I'll take the
7  responsibility for that.
8       I'm asking you if you identified who
9  the maker of the Notes were, not who the payee
10 was.
11      MS. DEITSCH-PEREZ: You mean the
12 borrowers, John?
13      THE WITNESS: See, I don't want to
14 get stuck in my underwear on maker/borrower
15 nomenclature.
16      She was aware that they were notes
17 due to Highland from a variety of entities.
18 BY MR. MORRIS:
19   Q.   Okay. Did you identify any of those
20 entities?
21   A.   I -- yeah. She knew that some were
22 Dugaboy, some were NexPoint for sure, and some
23 were other entities.
24   Q.   So -- so there were notes where
25 Dugaboy owed the money or was the obligor or

Page 81

1    JAMES DONDERO
2  was the borrower or was the maker that are
3  subject to agreements that you entered into
4  with the Dugaboy trustee?
5    A.   No. Wait. The Dugaboy -- the
6  Dugaboy Notes weren't subject to the
7  forgiveness. It was the other notes that were
8  subject to forgiveness.
9    Q.   So it's really kind of a simple
10 question, and I'm not trying to trick you.
11      If you think back to the
12 conversations that you had with the Dugaboy
13 trustee, did you identify the entity of -- did
14 you identify who the borrowers were under the
15 Notes that were going to be subject to the
16 agreements?
17   A.   She knew they were entities -- she
18 knew there were other related entities. She
19 knew NexPoint for sure. She knew Services.
20      I can't sit here as I remember -- as
21 I sit here today and remember whether or not I
22 specifically identified HCRE or not, you know;
23 but she knew they were related entities.
24   Q.   All of the revisions of the
25 agreement are set forth in paragraph 82; is

Page 82

1          JAMES DONDERO
2    that right?
3          We could put it back up on the
4    screen if you'd like.
5          MR. MORRIS:  In fact, why don't we
6    do that.
7          MS. CANTY:  I'm sorry, John.  51 --
8    I mean, 50?
9          MR. MORRIS:  I think it's
10   Exhibit 31, paragraph 82.
11         MS. CANTY:  Oh, okay, 82.  I've got
12   you.
13         MR. MORRIS:  Thank you.
14   BY MR. MORRIS:
15     Q.   Does -- Mr. Dondero, other than
16   specifying who the portfolio companies were,
17   does paragraph 82 set forth all of the material
18   terms of each of the agreements?
19     A.   I think it sets forth the conditions
20   subsequent.
21     Q.   Is there any aspect of your
22   agreement -- withdrawn.
23         Is there any aspect of your
24   agreements with the Dugaboy trustees that's not
25   described in this paragraph?

Page 83

1          JAMES DONDERO
2    A.    I don't know if it's captured in
3    there, but there was definitely a conversation,
4    discussion that if something like MGM was
5    sold -- Anchorage is the largest holder almost
6    a majority in and of themselves.  And if it was
7    bought or taken out at a price that we couldn't
8    control or couldn't agree with and it was lower
9    than cost or -- you know, Cornerstone, again,
10   had multiple funds between our ownership and
11   control that if -- if things were sold
12   beyond -- without my support but sold below
13   cost -- and I'm not sure that's captured in
14   that paragraph, but I think that was part of
15   the understanding, also.
16     Q.   Is there any other part of the
17   understanding that's not set forth in
18   paragraph 82, Mr. Dondero?
19     A.   Not that I can think of at this --
20   let me read it one more time, please.
21     Q.   Take your time.
22     A.   I believe that generally covers it.
23     Q.   Was any provision of the agreements
24   the subject of negotiation?
25         MS. DEITSCH-PEREZ:  Object to the

Page 84

1          JAMES DONDERO
2    form.
3          THE WITNESS:  I don't believe it was
4    materially adjusted by any negotiation.  It
5    was just clarified based on discussion is
6    how I would describe it.
7    BY MR. MORRIS:
8      Q.   Is there any provision in the
9    agreements that was included at your sis- -- at
10   the Dugaboy trustee's request?
11     A.   Like I said, there was discussion
12   and clarification.  Not specifically that I
13   recall.
14     Q.   Okay.  Did the Dugaboy trustee
15   refuse to include any provision in the
16   agreement that you had proposed?
17     A.   Not that I recall.
18     Q.   Can you identify any provision of
19   the agreements that were the subject of a
20   counterproposal that the Dugaboy trustee made?
21     A.   I remember clarification discussion
22   around, you know, three companies versus two or
23   one.  I remember clarification of monetization
24   being turned to cash versus illiquid.
25         Yeah.  I mean, I remember

Page 85

1          JAMES DONDERO
2    discussion -- I remember clarification
3    discussions like that, but I don't remember --
4    it was a long time ago.  I don't remember the
5    details of anything specific like that.
6          It wasn't -- it wasn't a
7    contentious, nor should it have been a
8    contentious negotiation.
9      Q.   How long did -- do you recall how
10   long each of the conversations lasted that led
11   to the entry of each of the three agreements?
12     A.   I remember the first one being
13   longer than the second two, and then I remember
14   it being spread out periods of time.  So I
15   can't -- I can't -- I can't put an exact
16   estimate on it.
17     Q.   Okay.  I'm going to shift gears.
18         MR. MORRIS:  We can take that down
19   now, please.
20         MS. CANTY:  (Complies with request.)
21   BY MR. MORRIS:
22     Q.   Do you know of any written agreement
23   pursuant to which HCRE provided services to
24   Highland at any time?
25         MS. DEITSCH-PEREZ:  Object to the

Page 86

1          JAMES DONDERO
2     form. Asked and answered.
3          THE WITNESS: HCRE provided
4     preferred services to. Well, the
5     participants there in HCRE are, my –
6     myself and McGraner. And, you know, we
7     both provided significant other services to
8     Highland.
9   BY MR. MORRIS:
10    Q.   Okay. Is that in writing? Is there
11    a written agreement?
12         That was my question.
13         Is there a written agreement
14    pursuant to which HCRE ever provided services
15    to Highland?
16    A.   I don't believe so.
17    Q.   Did HCRE ever provide services to
18    Highland?
19    A.   I would incorporate my last two
20    answers. Not under a written agreement, but I
21    believe myself and McGraner provided a lot of
22    services.
23    Q.   And what services did you and Mr.
24    McGraner provide to Highland?
25    A.   I'd say anything real estate related

Page 87

1          JAMES DONDERO
2     on the Highland platform McGraner would have
3     input into.
4          And then I think my – my portfolio
5     management, leadership role in Highland over
6     time is well documented.
7     Q.   And how did you know if you were
8     providing services in your capacity as the
9     president of Highland or in your capacity as an
10    officer or owner of the HCRE at the time you
11    provided the services?
12    A.   Never – never really thought about
13    parsing it that way.
14    Q.   I appreciate that.
15         Do you know whether Highland Capital
16    Management Services ever provided services to
17    Highland?
18    A.   Yeah.
19         MS. DEITSCH-PEREZ: Object to the
20    form. Asked and answered.
21         THE WITNESS: Yeah. I would – not
22    in writing. I believe the services owners
23    isn't myself and McGraner. I think it was
24    myself and Okada.
25         And I would say our portfolio and

Page 88

1          JAMES DONDERO
2     leadership contributions to Highland are
3     well documented.
4   BY MR. MORRIS:
5     Q.   And my question didn't have anything
6     to do with any particular person. It's just
7     simply whether Highland Capital Management
8     Services ever provided any services to Highland
9     Capital Management, L.P.
10         MS. DEITSCH-PEREZ: Object to the
11    form.
12         THE WITNESS: The entities that
13    you're describing or you're asking
14    questions about don't have employees'
15    services in HCRE. They have ownership
16    individuals that I've described.
17         So I've tried the best I can to
18    answer your question and what the ownership
19    may have done for Highland.
20         But since there's no employee base
21    at either of those two companies, those
22    companies could not have directly provided
23    service to Highland other than, the last
24    thing I would bring up is the track-record
25    concept, you know, in terms of the

Page 89

1          JAMES DONDERO
2     performance of whatever assets are in some
3     of those start-up entities ends up being a
4     useful track record that then Highland can
5     market.
6   BY MR. MORRIS:
7     Q.   Okay. How about NexPoint, did
8     NexPoint ever provide services to Highland
9     Capital Management, L.P.?
10    A.   Yes. The real estate – yes. I
11    mean, can I just say yes or –
12    Q.   You could. That would be really
13    helpful.
14    A.   Okay. There we go.
15    Q.   Can you describe the circumstances
16    for me?
17         MS. DEITSCH-PEREZ: Finally, some
18    accord between the witness and the
19    questioner.
20   BY MR. MORRIS:
21    Q.   Can you describe the services for
22    me?
23    A.   NexPoint has a couple of attorneys
24    that are real estate experts. We have a lot of
25    different attorneys, or we did at Highland.

Page 90

JAMES DONDERO

2 But prior to the bankruptcy, none of the
3 Highland attorneys were experienced in real
4 estate.
5        So anything that required
6 transaction help on the Highland platform
7 regarding real estate, the NexPoint real estate
8 attorneys would help with.
9    Q.  Okay.  Anything else?
10   A.  I'm sure there are others.  That's
11 all I can think of off the top of my head.  I
12 just wanted to give you an example.
13   Q.  I appreciate that.
14        You're aware that Highland has sued
15 HCMFA to collect on two notes that were signed
16 by Frank Waterhouse in 2019 in the aggregate
17 amount of $7.4 million; is that right?
18   A.  Yes.
19   Q.  Okay.  And we actually went through
20 this the other day, so I don't want to belabor
21 it if I don't have.
22        But do you recall that we saw the
23 incumbency certificate which identified
24 Mr. Waterhouse as the treasurer of HCMFA as of
25 April 2019?

Page 91

JAMES DONDERO

2    A.  Yes.
3    Q.  Okay.  And do you recall that you
4 signed that incumbency certify in your capacity
5 as president of HCMFA?
6        MS. DEITSCH-PEREZ:  Object to the
7 form.
8        THE WITNESS:  Yes.
9 BY MR. MORRIS:
10   Q.  I want to talk about the first of
11 the two Notes, the $2.4 million Note.
12        Do you recall that in early May
13 2019, Highland transferred $2.4 million to
14 HCMFA?
15   A.  I don't remember a lot of specifics,
16 but I know there were two Notes as you're
17 describing.
18   Q.  Okay.  And there was -- and one of
19 them -- did you authorize the $2.4-million
20 payment?
21   A.  Yes.
22   Q.  And why did you authorize Highland
23 to transfer $2.4 million to HCMFA in early May
24 2019?
25   A.  My answer's the same for both --

Page 92

JAMES DONDERO

2 both Notes.  Essentially, it's regarding the
3 terrace start issue that we had with the
4 Fort Worth SEC.
5    Q.  Did you give anyone instructions
6 concerning the transfer of the $2.4 million?
7    A.  I instructed them to make the
8 transfer, or I was involved in the -- involved
9 in approving the transfer.
10   Q.  And who did you instruct to make the
11 transfer of $2.4 million?
12   A.  Yeah.  It would have been Frank.
13   Q.  Do you have a recollection of
14 instructing Frank to transfer $2.4 million?
15   A.  Yeah.  Generally, yes.
16   Q.  Do you have a recollection of what
17 instructions you gave him?
18   A.  It was well-known.  It was a very
19 disruptive -- the whole thing was very
20 disruptive at Highland and HCMFA.  Everybody
21 was aware of it.  The settlement, the
22 negotiations around the settlement, the
23 give-and-take, the amounts changed over time.
24        Everybody was aware of it in senior
25 management, including myself.  And putting the

Page 93

JAMES DONDERO

2 money into HCMFA to settle it was something I
3 was aware of and authorized and a critical
4 piece of putting that issue to bed.
5    Q.  Okay.  I'm just asking you if you
6 recall what instructions you gave to
7 Mr. Waterhouse concerning the transfer if you
8 recall?
9    A.  No.  I mean, like I said, I
10 authorized the movement of the money.
11   Q.  Okay.  Were you aware at that time
12 that the transfer of the $2.4 million from
13 Highland to HCMFA was booked as a loan on both
14 Highland and HCMFA's books and records?
15   A.  I was not aware at the time.
16   Q.  Okay.
17        MR. MORRIS:  Can we put up
18 Exhibit 53 please.
19        THE VIDEOGRAPHER:  Counsel, I will
20 need a media break in about five minutes.
21        MR. MORRIS:  Thank you very much.
22 Why don't we take that right now before I
23 begin my examination on this document.  How
24 long do you need?
25        THE VIDEOGRAPHER:  It will just be a

Page 94

JAMES DONDERO

1    JAMES DONDERO
2    minute, but this is the end of Media Number
3    1.
4        MR. MORRIS:  Okay.
5        THE VIDEOGRAPHER:  We are off the
6    record at 3:21.
7        MR. MORRIS:  We are off the record,
8    but don't go anywhere.
9        MS. DEITSCH-PEREZ:  What?
10       MR. MORRIS:  We're not taking a
11   break.
12       THE VIDEOGRAPHER:  Yep.  This will
13   just take a minute.  Please stand by.
14       MR. MORRIS:  Thank you.
15       THE VIDEOGRAPHER:  All right.
16   Suzanne, are you good to go?
17       THE COURT REPORTER:  I'm good.
18       THE VIDEOGRAPHER:  This is the
19   beginning of Media Number 2, Volume II
20   [sic] in the deposition of James Dondero.
21       We are back on the record at 3:22.
22       MR. MORRIS:  All right.  Can we
23   please put up Exhibit 53.
24       MS. CANTY:  Yeah.  Just one second.
25   My computer went haywire.  Give me one

Page 95

1    JAMES DONDERO
2    minute.
3        (Whereupon, Exhibit 53, E-mail
4    correspondence, Bates stamped D-CNL003768
5    through D-CNL003770, marked for
6    identification, as of this date.)
7    BY MR. MORRIS:
8        Q.  Okay.  So Mr. Dondero, do you see
9    what's on the screen here?
10       Mr. Dondero?
11       MR. MORRIS:  Deborah?
12       Apparently Mr. Dondero has left the
13   seat.
14       THE VIDEOGRAPHER:  Would you like to
15   go off record?
16       MR. MORRIS:  No.
17       THE VIDEOGRAPHER:  Okay.  We'll stay
18   on the record.
19       MR. MORRIS:  The video is still
20   rolling, right, sir?
21       THE VIDEOGRAPHER:  Yes, it is.
22       MR. MORRIS:  Thank you.
23       Hi, Michael.  If you're – if you're
24   able, can you reach out to your partner?
25       MR. AIGEN:  I had texted her.  I

Page 96

1    JAMES DONDERO
2    will try to call her, too; but I did text
3    her a couple of minutes ago.  I will try to
4    reach out again.  Hold on.
5        MS. DEITSCH-PEREZ:  I'm back.  I'm
6    lucky in that the ladies room is directly
7    across from the conference room.
8        Mr. Dondero's down at the other end
9    of the floor, so he will be back shortly.
10       And I just saw your note, John.  The
11   – the videographer said he needed a break;
12   and you said, okay, then let's take our
13   break now.  So we took a restroom break.
14       MR. MORRIS:  I think everybody on
15   the phone -- and there's a transcript of it
16   -- knows that I specifically said, how long
17   do you need.  He said one minute, and I
18   said don't go anywhere.
19       This is your time, not mine.
20       MS. DEITSCH-PEREZ:  Prior to that,
21   you said, let's take the break now.
22       MR. MORRIS:  Yeah, to allow him to
23   change the tape.  I'm not going to question
24   anybody on the call, but I'm 100 percent
25   certain that they would all tell you -- and

Page 97

1    JAMES DONDERO
2    the record will reflect, I specifically
3    said do not leave.
4        MS. DEITSCH-PEREZ:  Okay.
5    Mr. Dondero is back.
6        You have to turn -- turn the video
7    on.
8        THE WITNESS:  I'm back.
9    BY MR. MORRIS:
10       Q.  All right.  Do you see on the screen
11   there's a document that's been marked as
12   Exhibit 53?
13       A.  Yup.
14       Q.  Do you see there's an e-mail string
15   dated May 2, 2019?
16       A.  Yes.
17       Q.  And do you see that Mr. Waterhouse
18   has -- if you look at the second to the top,
19   Mr. Waterhouse's e-mail is forwarding a
20   spreadsheet to David Klos and Kristin Hendrix
21   that he described as, quote, "The support for
22   the payment to GAF by HCMFA?
23       A.  Yes.
24       Q.  What's GAF?
25       A.  That's the fund itself that owned

JAMES DONDERO

1       JAMES DONDERO
2 the TerreStar investment. The SEC wanted, I
3 believe, some payment to go to them; but they
4 all, meaning the SEC, and the SEC wanted some
5 payment to go to the fund itself for the
6 benefit of the investors.
7      Q. Okay.
8       MR. MORRIS: Can we can to the chart
9    that's attached.
10       MS. CANTY: (Complies with request.)
11 BY MR. MORRIS:
12      Q. Have you ever seen this chart
13 before, sir?
14      A. I don't believe so specifically, but
15 I understand what it is.
16      Q. And is it your understanding, based
17 on this chart, that the loss to the fund was
18 $6,068,851?
19       MS. DEITSCH-PEREZ: Object to the
20    form.
21       THE WITNESS: Yes.
22 BY MR. MORRIS:
23      Q. And there's – there's a column
24 there that's lost to fund.
25      Do you see that?

1       JAMES DONDERO
2      A. Yes.
3      Q. And is it – is it consistent with
4 your recollection that the estimated loss of
5 the fund or to the fund was approximately
6 $6 million?
7      A. Yes. There is approximately –
8 there's some other small numbers moving around,
9 but yes.
10      Q. Okay. And do you recall that HCMFA
11 informed the SEC that HCMFA would make the fund
12 whole by paying it an amount of money equal to
13 the loss?
14      A. Yes.
15      Q. And, in fact, HCMFA paid the fund
16 approximately $6 million in connection with the
17 losses sustained as a result of the NAV error,
18 correct?
19      A. I don't know details like that.
20      Q. So you're not – you're not aware of
21 the fact that HCMFA paid to the fund
22 approximately $6 million in May of 2019?
23      A. Approximately six or approximately
24 seven. I – I don't know. Whatever the
25 agreement was with the SEC to be paid to them

1       JAMES DONDERO
2 or to the fund or whatever, I – I have all
3 faith and confidence we complied with; but I
4 don't – I don't know exact numbers. I'm
5 not aware of the exact numbers.
6      Q. Do you understand that this analysis
7 shows how HCMFA was going to finance the
8 payment to the fund as a result of the NAV
9 error?
10       MS. DEITSCH-PEREZ: Object to the
11    form.
12       THE WITNESS: I'm sorry. Could you
13    repeat that question again?
14 BY MR. MORRIS:
15      Q. Sure. Do you understand that
16 this – that this chart here sets forth the
17 manner in which HCMFA is going to fund the
18 payment that it was making to GAF on account of
19 the NAV error?
20      A. I would call it more of a
21 calculation on where the amounts are coming
22 from. It doesn't appear to me that this is a
23 funding statement.
24      Q. Okay. I appreciate that.
25      So – so your interpretation of this

1       JAMES DONDERO
2 is that this shows the sources of money that
3 were going to be used to make the payment; is
4 that fair?
5       MS. DEITSCH-PEREZ: Objection to the
6    form.
7       THE WITNESS: Yeah. I think it's a
8    reconciliation between the insurance, some
9    forgiveness of fees, and then additional
10    monies that are necessary.
11 BY MR. MORRIS:
12      Q. Okay. And –
13      A. Yeah. Go ahead.
14      Q. Did HCMFA file an insurance claim in
15 connection with the NAV error?
16      A. I believe they did get – I believe
17 they did, and I believe they did get paid some
18 insurance.
19      Q. And – and if we look at the totals
20 column in the right, did HCMFA receive, to the
21 best of your recollection, approximately
22 $5 million from insurance?
23      A. Yes. I think we should work – I
24 think we should work from that column –
25      Q. Okay. So let's –

JAMES DONDERO

1    JAMES DONDERO
2    A.   -- versus the other column, yeah.
3    Q.   I apologize, Mr. Dondero.
4         So if we look at the last column,
5    the total, does that comport with your
6    recollection that HCMFA paid GAF approximately
7    $7.44 million in May of 2019 on account of the
8    NAV error?
9    A.   I think it's more than that, and I
10   think it's also the 375 below that.
11   Q.   Okay.
12   A.   And then I -- yeah, definitely those
13   two numbers in aggregate.  I don't know if it's
14   any others.
15   Q.   Okay.  And did, to the best of your
16   recollection, HCMFA make an insurance claim on
17   which it received almost $5 million as a source
18   of funding for the payment that was due to GAF?
19   A.   Yes.
20   Q.   Are you familiar with that insurance
21   claim?
22   A.   No.
23   Q.   Do you know if the insurance claim
24   made any mention of Highland?
25   A.   I have no idea.  I have no idea.

1    JAMES DONDERO
2    Q.   Okay.  So as a -- as a matter of
3    rough math, would you agree with me that the
4    insurance procedures funded approximately
5    5 million of the $7.8 million that was the
6    total loss?
7         MS. DEITSCH-PEREZ:  Object to the
8    form.
9         THE WITNESS:  This was the amount
10   due to the investors.  I -- I -- my rough
11   recollection is there was another amount
12   that was due the SEC, but I don't remember
13   specifically.
14   BY MR. MORRIS:
15   Q.   Okay.  And do you see in the middle
16   of the page, there's a total additional payment
17   from advisor of approximately $2.4 million?
18   A.   Yes.
19   Q.   And is it your understanding that
20   that is the amount that HCMFA had to come out
21   of pocket in order to fully fund the GAF
22   payment?
23   A.   Yes, but it's clear to me also that
24   there's a forgiveness of management fees, also.
25   Q.   Okay.  But is two point -- but is

1    JAMES DONDERO
2    $2.4 million the amount of money that HCMFA
3    needed in order to fully fund the payment to
4    GAF?
5    A.   And I don't want to mince small
6    numbers; but to the extent that they gave up
7    their management fees also, like that 1939 or
8    the 39 above that -- and I don't know what that
9    47 is above that -- those are management fees
10   that would have paid salaries and expenses at
11   HCMFA also.
12        So to the extent they gave up those
13   items as part of the settlement, then HCMFA
14   would have needed more money than even the 2.4
15   that came from Highland.
16   Q.   Do you know if HCMFA ever informed
17   the SEC that Highland was responsible for the
18   NAV error?
19   A.   I -- I don't know.  We wouldn't have
20   hidden it if they would have asked.  My
21   experience with the SEC is they identify the
22   advisor; and who the advisor picks for vendors
23   the advisor's responsible for.
24        MR. MORRIS:  I move to strike
25   everything after "I don't know."

1    JAMES DONDERO
2    BY MR. MORRIS:
3    Q.   Did you ever direct anyone to inform
4    the SEC that Highland was responsible for the
5    NAV error?
6    A.   No, not that I recall.
7    Q.   Do you know if anybody acting on
8    behalf of HCMFA ever informed the SEC that
9    Highland was responsible for the NAV error?
10   A.   I don't know.
11   Q.   Do you know if HCMFA ever informed
12   GAF that Highland was responsible for the NAV
13   error?
14   A.   Yes.
15   Q.   And is that reflected in writing
16   anywhere?
17   A.   Yes.  Numerous places.
18   Q.   And what writing would that be
19   reflected in?
20   A.   The board minutes.  There were
21   conversations every board meeting for over a
22   year.  The retail board represents GAF.  They
23   were well aware of the subadvisory agreements,
24   and they were well aware that all the staff
25   regarding valuation were housed at Highland;

Page 106

JAMES DONDERO

1
2 all the valuation activities were performed by
3 Highland. And GAF and HCMFA relied on
4 Highland, and it was a material part of board
5 conversations for over a year.
6       MR. MORRIS: Okay. I move to
7    strike.
8 BY MR. MORRIS:
9    Q.  I'm asking you just about writings,
10 sir.
11       Can you identify --
12    A.  No, no, no. I'm not -- I'm not
13 going to -- I'm not going to allow that strike,
14 or I'm not answering anymore questions.
15    Q.  Well, the judge will be the
16 determiner of that. So I'd like you to answer
17 my question.
18       Is there any -- I don't want to know
19 about board meetings.
20       Is there anything in writing that
21 HCMFA provided to GAF that specifically stated
22 that Highland and not HCMFA was responsible for
23 the NAV error?
24       MS. DEITSCH-PEREZ: Asked and
25    answered.

Page 107

JAMES DONDERO

1
2       THE WITNESS: Yes. Numerous board
3    minutes.
4 BY MR. MORRIS:
5    Q.  Okay. And have those board minutes
6 been produced in this litigation?
7    A.  I don't know.
8    Q.  Okay.
9       MR. MORRIS: Let's go to the next
10    exhibit, 54.
11       MS. CANTY: (Complies with request.)
12       (Whereupon, Exhibit 54, E-mail
13    correspondence, Bates stamped D-CNL003777
14    through D-CNL003779, marked for
15    identification, as of this date.)
16 BY MR. MORRIS:
17    Q.  Do you see that on the same day, at
18 the bottom, Mr. Klos sent an e-mail to the
19 Corporate Accounting Group?
20    A.  Yes.
21    Q.  And do you see that he instructed
22 the Corporate Accounting Group to transfer
23 $2.4 million from HCMLT to HCMFA?
24    A.  Yes.
25    Q.  And do you see that he specifically

Page 108

JAMES DONDERO

1
2 informed the Corporate Accounting Group that
3 this transaction was a, quote, "New inter
4 co-loan?
5    A.  Yes.
6    Q.  Do you see that he asked
7 Christian -- Kristin or Hayley to prepare a
8 Promissory Note for discussion?
9    A.  Yes.
10    Q.  Okay. Are you aware in May 2019,
11 Frank Waterhouse was included in the e-mail
12 string identified as Corporate Accounting?
13    A.  I do not have that awareness.
14    Q.  Okay. Do you see at the top
15 Ms. Hendrix -- Ms. Hendrix's response to
16 Mr. Klos's e-mail and attaches a copy of a
17 Promissory Note?
18    A.  Yes.
19    Q.  Okay.
20       MR. MORRIS: Can we just go to the
21    attachment, please.
22       MS. CANTY: (Complies with request.)
23 BY MR. MORRIS:
24    Q.  Do you see that that is a Promissory
25 Note dated May 2, 2019, in the amount of

Page 109

JAMES DONDERO

1
2 $2.4 million that where the maker is Highland
3 Capital Management Fund Advisors, L.P.?
4    A.  Yeah.
5    Q.  Have you ever seen this before?
6    A.  I think in our last deposition.
7    Q.  Okay. Do you recall when you saw it
8 for the first time?
9    A.  Our last deposition.
10    Q.  Do you recall when you learned about
11 the existence of this document for the first
12 time?
13    A.  I believe somehow regarding the
14 litigation.
15    Q.  Okay. So you have no knowledge of
16 this Promissory Note until after the litigation
17 was commenced; do I have that right?
18    A.  Correct.
19    Q.  So you're not aware of Highland
20 having made a demand for payment on this
21 Promissory Note in December of 2020?
22    A.  Not that I recall.
23    Q.  Okay. Putting aside the question of
24 the Promissory Note, do you recall when you
25 first learned that the $2.4 million that you

Page 110

JAMES DONDERO

1        JAMES DONDERO
2 instructed to be paid to HCMFA by Highland in
3 May of 2019, do you recall when you first
4 learned that that was booked as a loan?
5    A.   I believe just generally as part of
6 this litigation, not before then.
7    Q.   Are you aware that the Corporate
8 Accounting Group created a daily list of wire
9 transfers that were being made on behalf of
10 Highland and its affiliates?
11   A.   Not -- no, not specifically.
12   Q.   Okay.  So since you did not know
13 that the $2.4 million transfer had been booked
14 as a loan, is it fair to say that you never
15 told anybody prior to the commencement of this
16 litigation that the transaction should not have
17 been booked as a loan?
18   A.   I had no conversations either way
19 prior to this litigation regarding the booking
20 of the 2.4 million.
21   Q.   Did you ever take any steps to try
22 to determine how Highland and HCMFA accounted
23 for the $2.4 million that you instructed to be
24 transferred from Highland to HCMFA in early
25 May 2019?

Page 111

1        JAMES DONDERO
2   A.   No.
3   Q.   Did you rely on Mr. Waterhouse to
4 oversee that?
5   A.   Yes.
6   Q.   Okay.  And you did so because he
7 held not only the CFO title at Highland, but he
8 also held the treasurer title at HCMFA,
9 correct?
10     MS. DEITSCH-PEREZ:  Object to the
11   form.
12     THE WITNESS:  I relied on him
13   because generally the accounting function
14   across the organization reported up through
15   him.
16 BY MR. MORRIS:
17   Q.   Let's talk about the $5 million
18 Note.
19     Do you recall that in early
20 May 2019, in fact, the next day, May 3rd,
21 Highland transferred $5 million to HCMFA?
22   A.   I -- I don't recall specifically.
23   Q.   Do you recall authorizing the
24 transfer of $5 million from Highland to HCMFA
25 in early May 2019?

Page 112

1        JAMES DONDERO
2   A.   Yes, generally.
3   Q.   Okay.  Why did you authorize
4 Highland to transfer $5 million to HCMFA in
5 early 2019?
6   A.   It was part of the overall
7 resolution of the TerreStar situation.
8   Q.   Do you recall that HCMFA paid
9 something called a consent fee equal to
10 $5 million in early May 2019?
11   A.   Well, like I said, I don't recall
12 the exact amounts or the exact amounts net of
13 insurance; but my recollection it was to
14 resolve that.
15   Q.   Do you know -- do you know -- did --
16 let's real simple.
17     Did -- did HCMFA pay a consent fee
18 in May of 2019?
19   A.   I -- I don't recall.
20   Q.   Do you know what a consent fee is?
21   A.   Yes.
22   Q.   What's a consent fee?
23   A.   It's a -- a fee to encourage
24 shareholder vote on something or shareholder
25 restitution on something, typically.

Page 113

1        JAMES DONDERO
2   Q.   And did -- do you recall if HCMFA
3 ever paid a consent fee in the year 2019?
4   A.   I don't recall.
5   Q.   Would Highland be responsible at all
6 if HCMFA paid a consent fee?
7     MS. DEITSCH-PEREZ:  Object to the
8   form.
9     THE WITNESS:  It could be.  I
10   don't -- I don't know or remember the
11   circumstances.
12 BY MR. MORRIS:
13   Q.   Is the payment of a consent fee a
14 voluntary decision by -- by HCMFA?  Is that
15 something that --
16     MS. DEITSCH-PEREZ:  Object to the
17   form.
18     MR. MORRIS:  Is that -- withdrawn.
19   That's fair.
20 BY MR. MORRIS:
21   Q.   Is the payment of a consent fee
22 required, or is that something that one can
23 exercise discretion in whether or not to make?
24     MS. DEITSCH-PEREZ:  Object to the
25   form.

Page 114

```
1            JAMES DONDERO
2       THE WITNESS:  My answer would be it
3    depends.
4  BY MR. MORRIS:
5       Q.  Do you recall whether Highland –
6    withdrawn.
7          Do you recall whether HCMFA was
8    required to make -- to make a -- to pay a
9    consent fee at any time in 2019?
10      A.  I don't recall.
11      Q.  Do you recall ever believing that
12   HCMFA paid a consent fee because of something
13   that -- because of a mistake that Highland
14   made?
15      A.  It could be.  I don't know.
16      Q.  I'm just asking if you had a
17   recollection?
18      A.  I don't have a recollection.
19      Q.  Okay.
20      MR. MORRIS:  To the videographer, I
21   think Mr. Dondero's screen has frozen.
22      MS. DEITSCH-PEREZ:  John, your
23   screen is frozen, too.
24      MR. MORRIS:  I'm –
25      MS. DEITSCH-PEREZ:  I'm also – hang
```

Page 115

```
1            JAMES DONDERO
2    on.  I've lost contact.  Give me a minute.
3       THE VIDEOGRAPHER:  Okay.  I'd like
4    us to go off record.  Do you agree?
5       MR. MORRIS:  Yeah, but please don't
6    leave.
7       MS. DEITSCH-PEREZ:  Yes, we agree.
8       THE VIDEOGRAPHER:  All right.  Off
9    the record at 3:53.
10         (Discussion held off the record.)
11      THE VIDEOGRAPHER:  We are back on
12   the record at 3:54.
13   BY MR. MORRIS:
14      Q.  Okay.  Can we put up – no.  Before
15   we do that, Mr. Dondero, can you hear me?
16         We can't hear you.  Are you on mute?
17         Are you on mute?  Can you speak?
18         You're yelling at me now.  Stop
19   yelling at me.
20      THE VIDEOGRAPHER:  I'm seeing is
21   that Mr. Dondero is on mute.
22         (Interruption.)
23      THE VIDEOGRAPHER:  We've got – do
24   you want to go off video record?
25      MR. MORRIS:  No.
```

Page 116

```
1            JAMES DONDERO
2       Can somebody help Mr. Dondero and
3    get his audio feed fixed?
4       Thank you, sir.
5       MS. DEITSCH-PEREZ:  Does this make a
6    difference?
7       MR. MORRIS:  It sure does.
8       THE WITNESS:  Hello, hello.
9       THE WITNESS:  Thank you.  All right.
10   Let's try and – let's try and finish this
11   up.
12   BY MR. MORRIS:
13      Q.  Are you ready, sir?
14      A.  Yes.
15      Q.  Were you aware in May 2019 that the
16   $5-million transfer from Highland to HCMFA was
17   booked as a loan?
18      A.  No.
19      MR. MORRIS:  Can we put up
20   Exhibit 56, please.
21      MS. CANTY:  (Complies with request.)
22         (Whereupon, Exhibit 56, E-mail
23   correspondence, Bates stamped D-CNL003763,
24   marked for identification, as of this
25   date.)
```

Page 117

```
1            JAMES DONDERO
2    BY MR. MORRIS:
3       Q.  All right.  Do you see that this is
4    an e-mail from Ms. Hendrix to the Corporate
5    Accounting Group on May 3, 2019?
6          Do you see that, sir?
7       A.  Yes.
8       Q.  And do you see that Ms. Hendrix told
9    corporate accounting to transfer $5 million as
10   a, quote, "new loan," close quote?
11      A.  Yes.
12      Q.  And did you see Ms. Hendrix also
13   said that she would, quote, "paper the loan,"
14   close quote?
15      A.  Yes.
16      Q.  Okay.  You're aware that from time
17   to time, members of the Corporate Accounting
18   Group used a template for a Promissory Note
19   that had been previously prepared by counsel,
20   correct?
21      MS. DEITSCH-PEREZ:  Object to the
22   form.
23      THE WITNESS:  I – yeah.  I'm aware
24   they have a loan template, yes.
25
```

Page 118

1          JAMES DONDERO
2  BY MR. MORRIS:
3      Q.   Okay.  Do you see there's a
4  parenthetical in the first sentence that says,
5  "(4.4M should be coming in from Jim soon)"?
6      A.   Yes.
7      Q.   Do you know what that refers to?
8      A.   My -- my educated -- boy.  My
9  educted speculation is that Highland didn't
10  have enough cash, so I probably put four into
11  Highland for Highland to send to HCMFA.  That's
12  my educated guess; but otherwise, I don't know
13  specifically.
14      Q.   And do you recall that you had taken
15  out a loan from Highland earlier in the year,
16  and this payment was credited against the
17  principal and interest then due on that Note?
18      A.   I don't have specific awareness.
19  That would make sense.
20      Q.   Okay.
21      A.   Versus -- versus creating a new loan
22  or something.
23      Q.   Okay.
24          MR. MORRIS:  Let's go to Exhibit 57,
25      please.

Page 119

1          JAMES DONDERO
2          MS. CANTY:  (Complies with request.)
3          (Whereupon, Exhibit 57, Promissory
4      Note, Bates stamped D-CNL003764 through
5      D-CNL003765, marked for identification, as
6      of this date.)
7  BY MR. MORRIS:
8      Q.   In fact, were you aware, sir, that
9  in May 2019, you paid Highland exactly
10  $7.5 million?
11      A.   Not specifically, but it makes sense
12  given the context we're discussing.
13      Q.   Okay.  So the context that we're
14  discussing was HCMFA needed $7.5 million.
15  Highland didn't have it.  So that seven -- you
16  paid $7.5 million to Highland, which was
17  applied against your outstanding note.  And
18  then Highland transferred that money to HCMFA.
19          Does that sound right to you?
20      A.   Generally, yes.
21      Q.   Okay.  So now if we look at this
22  note that's on the screen, do you see this is a
23  Promissory Note for $5 million dated May 3,
24  2019?
25      A.   Yes.

Page 120

1          JAMES DONDERO
2      Q.   And did you see this for the first
3  time when I showed it to you late last week?
4      A.   Yes.
5      Q.   And did you learn about the loan
6  from Highland to HCMFA for the first time after
7  the litigation was commenced?
8      A.   That's the first time I remember.
9      Q.   And did you learn that Highland and
10  HCMFA had booked the $5-million transfer in May
11  of 2019 as a loan for the first time after the
12  litigation was commenced?
13      A.   That is my recollection.
14      Q.   Okay.  We talked at your first
15  deposition in May about Highland's audited
16  financial statements.
17          I don't know if you have a
18  recollection of that.  Do you?
19      A.   Just generally, yes.
20      Q.   Okay.  I just want to focus on these
21  two notes.
22          For this portion of the deposition,
23  we are questioning you in your individual
24  capacity, and you're only focused on these two
25  notes from HCMFA to Highland, okay?

Page 121

1          JAMES DONDERO
2      A.   Okay.
3      Q.   Okay.  When did you first learn that
4  these notes were carried as assets on
5  Highland's balance sheet?
6      A.   Like I said, I -- my recollection is
7  that as part of the bankruptcy and part of the
8  litigation.
9      Q.   And so did you learn of it as part
10  of the bankruptcy before the litigation was
11  commenced, or did you learn that these notes
12  were carried as assets after -- only after the
13  litigation was commenced?
14      A.   I believe only after.  Especially,
15  the specificity with regard to the notes, only
16  after the litigation was commenced.
17      Q.   Okay.  When did you learn for the
18  first time that these notes were carried as
19  liabilities on HCMFA's balance sheet?
20  Withdrawn.  No foundation.
21          Are you aware that these notes have
22  been carried as liabilities on HCMFA's balance
23  sheet?
24      A.   I wasn't -- I wasn't -- I wasn't
25  aware prior to the litigation.

JAMES DONDERO

2    Q.   Okay.  Did you learn after the
3  litigation that these notes had been carried as
4  liabilities on HCMFA's balance sheets?
5    A.   Yes.
6    Q.   Okay.  Did you ever review
7  Highland's audited financial statements?
8    A.   Not with any specificity.
9    Q.   Are you aware that Highland gave
10  these Promissory Notes to PWC as part of the
11  audit process?
12    A.   I would assume they did, but I don't
13  have specific awareness.
14    Q.   Okay.  And why do you assume that
15  they did?
16    A.   As part of complete financials to
17  the extent that they were made by Kristin or
18  whoever, properly or improperly.  Once they
19  existed, they would have been part of a
20  complete audit.
21    Q.   Are you aware that these two
22  Promissory Notes were disclosed in Highland's
23  audited financial statements for the period
24  ending December 31, 2018, as subsequent events?
25    A.   No.

JAMES DONDERO

2    Q.   Okay.
3      MR. MORRIS:  Can we put up
4  Exhibit 34, please.
5      MS. CANTY:  (Complies with request.)
6      (Whereupon, Exhibit 34, Highland
7  Capital Management, L.P., Consolidated
8  Financial Statements and Supplemental
9  Information, dated December 31, 2018, Bates
10  stamped D-CNL000212 through D-CNL000257,
11  marked for identification, as of this
12  date.)
13  BY MR. MORRIS:
14    Q.   And turn to -- just if you can see,
15  sir, the first page of this is the December 31,
16  2018, financials.
17      MR. MORRIS:  And if we could go to
18  the second or third page to see
19  PricewaterhouseCoopers' signature.
20      MS. CANTY:  (Complies with request.)
21  BY MR. MORRIS:
22    Q.   And do you see that
23  PricewaterhouseCoopers signed off on the audit
24  on June 3, 2019?
25    A.   Yes.

JAMES DONDERO

2    Q.   Okay.
3      MR. MORRIS:  Can we go to page 252
4  of the document?  It's got to be -- let's
5  see the Bates.
6      MS. CANTY:  (Complies with request.)
7      MR. MORRIS:  Yeah.  Right there.
8  Okay.  Scroll just to the page before so we
9  can see the heading.
10      MS. CANTY:  (Complies with request.)
11  BY MR. MORRIS:
12    Q.   Okay.  Do you see that this is the
13  section of the audited financials entitled
14  "Subsequent Events"?
15    A.   Yes.
16    Q.   And is it your understanding that
17  the auditors include in subsequent events
18  material transactions THAT occur between the
19  end of the fiscal period in which had audit has
20  been conducted and the date that the auditors
21  sign off?
22    A.   Yes.
23    Q.   Okay.  So if you look at page 39,
24  the next to the last paragraph, do you see, it
25  says, quote, "Over the course of 2019 through

JAMES DONDERO

2  the report date, HCMFA issued Promissory Notes
3  to the partnership in the aggregate amount of
4  $7.4 million?
5    A.   Yes.
6    Q.   Okay.  And are you surprised to see
7  that in the audit report?
8      MS. DEITSCH-PEREZ:  Object to the
9  form.
10      MR. MORRIS:  Withdrawn.
11  BY MR. MORRIS:
12    Q.   Have you seen -- have you seen this
13  entry in the audit report before this moment?
14    A.   No.
15    Q.   Okay.  Are you aware that Highland
16  employees were responsible for drafting the
17  audit report?
18    A.   Responsible for drafting the audit
19  report?  I don't know if that's a fair
20  statement.
21      I think they provide the detail; but
22  my understanding, the audit report is a work
23  product of the accounting firm.  That's my
24  understanding.
25    Q.   Was there a group within Highland

Page 126

JAMES DONDERO

1    that was responsible for working with the
2    auditors in the preparation of the audit
3    reports?
4    A.    Yeah, yes.
5    Q.    Do you know what group that was?
6    A.    I believe there's a financial
7    reporting group that reports to Frank that
8    handles this interaction.
9    Q.    Are you familiar -- are you aware of
10   what role Mr. Waterhouse plays, if any, in
11   connection with Highland's annual audit, at
12   least during the time that you were serving as
13   president?
14   A.    I think he -- he coordinates -- I
15   think he has to sign off on many aspects of it,
16   you know, as a C suite executive. So he's
17   responsible for, you know, completeness,
18   integrity, et cetera.
19   And there's a certain amount of
20   reliance that PWC puts on it; but my
21   understanding is audits for the last bunch of
22   years has been pretty much a hundred percent
23   sampling and verification.
24   Q.    High- --

Page 127

JAMES DONDERO

1    A.    -- PWC.
2    Q.    I apologize, sir.
3    Highland was the sole source of
4    information that's contained in its audit
5    reports, right, to the best of your knowledge?
6    A.    No. No. When I -- the last thing I
7    said a minute ago about I believe it was a
8    hundred percent sampling and verification, I
9    think the audit firm ties back to vendors,
10   credit agreements, source documents, et cetera.
11   Highland is not the only source of
12   this information.
13   Q.    You were also responsible for the
14   audit report; is that fair?
15   A.    Yes.
16   Q.    And that's because you signed a
17   management representation letter, correct?
18   A.    Yes.
19   Q.    And do you have an understanding of
20   what management a representation letter is?
21   MS. DEITSCH-PEREZ:  Object to the
22   form. I think you've asked this in each
23   day of the deposition.
24   MR. MORRIS:  Okay. Just trying to

Page 128

JAMES DONDERO

1    get some background here.
2    THE WITNESS:  Yes, I have a general
3    understanding. They very from accounting
4    firm to accounting firm, and they very
5    depending upon the type of audit. But I
6    have a general understanding of them, yes.
7    BY MR. MORRIS:
8    Q.    Okay. And you're -- are you aware
9    that HCMFA had its financial statements audited
10   by PWC as well?
11   A.    Yes.
12   Q.    Are you aware that HCMFA disclosed
13   the May 2019 Notes in its own audited financial
14   statements?
15   A.    I assume so.
16   Q.    Have you ever --
17   A.    I don't have specific -- I don't
18   have specific awareness, but it's not reported
19   here but not on HCMFA; so I assume they are,
20   yes.
21   Q.    Okay. And do you sign Management
22   Representation Letters for HCMFA's audit as you
23   do for Highland?
24   A.    I believe so.

Page 129

JAMES DONDERO

1    Q.    Have you ever told anyone that
2    HCMFA's audited financial statements for the
3    period ending December 31, 2018, inaccurately
4    described the $7.4 million transferred from
5    Highland to HCMFA as loans?
6    MS. DEITSCH-PEREZ:  Object to the
7    form.
8    THE WITNESS:  No, I have not; but I
9    haven't been involved in any of the audit
10   functions for quite some time.
11   I don't think I was involved or
12   signed Management Representation Letters
13   for any period covered by this.
14   BY MR. MORRIS:
15   Q.    Okay. Let's switch gears.
16   The advisors have annual contracts
17   to manage certain retail funds, correct?
18   A.    Yes.
19   Q.    And the retail funds have a board
20   that decides whether to renew the contracts
21   with the advisors, correct?
22   A.    Yes.
23   Q.    And in connection with the annual
24   renewal, the advisors provide information to

Page 130

```
1            JAMES DONDERO
2  the retail board, correct?
3     A.   Yes.
4     Q.   And you've participated in meetings
5  with the retail board concerning the renewal
6  process, correct?
7     A.   Sometimes.
8     Q.   Okay.  Do you recall that in late
9  2020, the advisors provided a written memo to
10 the retail board in connection with the annual
11 15-C review process?
12    A.   No.
13    Q.   Okay.
14         MR. MORRIS:  Can we put up
15 Exhibit 59, please.
16         MS. CANTY:  (Complies with request.)
17         (Whereupon, Exhibit 59, Memorandum,
18    dated October 23, 2020, Bates stamped
19    HCMFAS 000025 through HCMFAS 000031, marked
20    for identification, as of this date.)
21 BY MR. MORRIS:
22    Q.   Do you see that this is a memo dated
23 October 23, 2020?
24    A.   Yes.
25    Q.   Is it fair to describe this memo as
```

Page 131

```
1            JAMES DONDERO
2  a memo from the advisors to the retail boards
3  concerning a supplemental 15-C information
4  request?
5     A.   Yes.
6     Q.   Okay.  As always, Mr. Dondero, you
7  can view any portion of this document.  But if
8  we could just scroll down a little bit, I just
9  want to know --
10         MS. DEITSCH-PEREZ:  Do we have a
11    copy of this document?  Is it in your book?
12         MR. MORRIS:  No.
13         MS. DEITSCH-PEREZ:  Okay.  Well,
14    then he can't actually look at it.  He's
15    looking at what's on the screen.
16         MR. MORRIS:  Please.
17 BY MR. MORRIS:
18    Q.   Mr. Dondero, do you understand what
19 I meant?
20         Will you let me know if there's any
21 portion of the document you want to see?
22    A.   Sure.  Can you -- can you just keep
23 scrolling and let me see the next page?
24    Q.   Thank you, sir.
25         MS. CANTY:  (Complies with request.)
```

Page 132

```
1            JAMES DONDERO
2          THE WITNESS:  Just stop there for a
3    second.
4          MS. CANTY:  (Complies with request.)
5          THE WITNESS:  Okay.  Keep going.
6          MS. CANTY:  (Complies with request.)
7  BY MR. MORRIS:
8     Q.   Just -- I'm going to ask you
9  questions about Section 2 just so you know, but
10 you're welcome to view any portion of this
11 document as you believe necessary.
12         MS. CANTY:  I also put it in the
13    chat, John.
14         MR. MORRIS:  Thank you.
15         THE WITNESS:  I see it.
16 BY MR. MORRIS:
17    Q.   Okay.  So --
18    A.   Can you go -- let's keep going.
19 Just I'll quickly read the whole thing.
20    Q.   No problem.
21    A.   That's it.  Okay.  Got it.  All
22 right.
23    Q.   Okay.  So now that you've seen the
24 substance of the memo, do you recall if you saw
25 it before today?
```

Page 133

```
1            JAMES DONDERO
2     A.   I've never seen it before today.
3     Q.   Okay.  So do you know who's
4  responsible for preparing a memo of this type
5  on behalf of the advisors?
6     A.   Let's go back to the front and see
7  who it's from.
8     Q.   Sure.
9          MS. CANTY:  (Complies with request.)
10 BY MR. MORRIS:
11    Q.   Is that --
12    A.   Yeah.  Now, I -- given what it is,
13 it's something that, I'm sure, comes out of
14 legal and compliance.
15    Q.   And does -- do the advisors have --
16 withdrawn.
17         Did the advisors have their own
18 legal and compliance officers as of October 23,
19 2020?
20    A.   No.
21    Q.   Did they have any -- did anybody
22 serve as the advisors' general counsel as of
23 October 23, 2020?
24    A.   My belief and recollection is the
25 Shared Services Agreements provided the legal
```

Page 134

JAMES DONDERO

1 and accounting support for all the funds listed
2 in the "to" section here.
3 As I said earlier, NexPoint has a
4 couple accountants -- I mean -- I'm sorry -- a
5 couple lawyers who do real estate transactions
6 stuff. Their -- their title -- their title
7 meaning DC's counsel, DC Sauter, who's the most
8 senior attorney there, it might be general
9 counsel; but he only does real estate
10 transactions.
11 The legal dependents of NexPoint and
12 HCMFA was on the Shared Services Agreement and
13 the Highland attorneys that performed those
14 Shared Services Agreements.
15 Q. Okay. Did anybody acting on behalf
16 of the advisors review and approve this memo
17 before it was sent to the retail funds?
18 A. I don't know.
19 Q. Is it your practice as the president
20 of the advisors to have memos sent to the
21 retail board without anybody reviewing and
22 approving the memos on behalf of the advisors?
23 MS. DEITSCH-PEREZ: Object to the
24 form.
25

Page 135

JAMES DONDERO

1 THE WITNESS: I'm not aware of what
2 standard practice was or wasn't; but again,
3 the infrastructure for something like this
4 would have been only at Highland.
5 HCMFA only had portfolio managers
6 and analysts as employees, and NexPoint
7 pretty much only had portfolio managers and
8 analysts as employees.
9 The staff functions were at
10 Highland, and Highland serviced the funds
11 via a Shared Services Agreement that was
12 still in place as of the date of this memo.
13 MR. MORRIS: Okay. Can we go down
14 to Section 2, please.
15 MS. CANTY: (Complies with request.)
16 BY MR. MORRIS:
17 Q. Looking at Section 2, do you see
18 that there's a question as to whether there are
19 any material amounts currently payable or due
20 in the future EG notes to --
21 A. Yes.
22 Q. -- the Highland by HCMFA or
23 NexPoint?
24 A. Yes.
25

Page 136

JAMES DONDERO

1 Q. Okay. In the 53 or 54 weeks since
2 this memo as was sent, do you know if it has
3 been amended or modified in any way?
4 A. I believe there was similar memos
5 like this for this year's annual -- for the
6 2021 renewal, but I do not have -- I've not
7 seen those either; and I don't know how this
8 answer would have changed.
9 Q. Okay. But at least as of
10 October 23, 2020, this is the response that the
11 advisors gave to the retail board in response
12 to Question Number 2, right?
13 MS. DEITSCH-PEREZ: Object to the
14 form.
15 THE WITNESS: As far -- as far as I
16 know, having seen it here for the first
17 time and not knowing whether this was the
18 final or if there were subsequent letters
19 and not knowing what the 2021 letter looks
20 like, on its surface that appears so; but I
21 have no awareness.
22 BY MR. MORRIS:
23 Q. Okay. And just I'll represent to
24 you, Mr. Dondero, that I obtained this letter
25

Page 137

JAMES DONDERO

1 from counsel to the advisors in response to my
2 specific request for the October 2020, 15-C
3 response. So that's how -- that's how I got it
4 just so you know.
5 A. Okay.
6 Q. So -- so were you aware in October
7 of 2020 that NexPoint informed the retail board
8 that as of June 30, 2020, it owed Highland and
9 its affiliates approximately $23.7 million?
10 MS. DEITSCH-PEREZ: Object to the
11 form.
12 THE WITNESS: I was not aware.
13 BY MR. MORRIS:
14 Q. Does that amount comport with your
15 recollection as to what was outstanding on the
16 May 31, 2017, note that NexPoint gave to
17 Highland?
18 A. I don't have awareness.
19 Q. Okay. Did NexPoint -- do you know
20 if NexPoint ever informed the retail board that
21 any -- any portion of that $23.7 million was
22 subject to any of the agreements that you
23 entered into with the Dugaboy trustee?
24 A. I -- I don't know.
25

Page 138

JAMES DONDERO

1         JAMES DONDERO
2    Q.  Did you ever instruct anybody on
3  behalf of NexPoint to advise the retail board
4  of the existence of the agreements?
5    A.  No, I do not believe so.
6    Q.  Do you know if anybody acting on
7  behalf of NexPoint has ever informed the retail
8  board that NexPoint's outstanding obligation
9  was subject to the agreements that you entered
10  into with the Dugaboy trustee?
11    A.  No.
12    Q.  Did you ever inform the retail
13  boards that any portion of this $23 million was
14  subject to offset?
15    A.  You know what, I -- let me answer
16  that and let me also adjust the last five no
17  answers I just rattled off.
18        I'm thinking in the context of the
19  time period of the date of this letter, which
20  is October of 2020.
21        Again, there would have been similar
22  letters and disclosures like this and
23  additional questions, initial requests for
24  renewal, and then subsequent questions,
25  probably multiple subsequent questions, given

Page 139

1  everything that's going on with the Highland
2  bankruptcy in 2021.
3        And I'm not aware of what those
4  letters contain. I haven't seen those letters
5  either, but those letters may include quite a
6  bit of disclosure regarding the questions that
7  you're asking me; but I don't know. But I
8  didn't specifically instruct anybody to tell
9  the board. I also didn't instruct anybody
10  specifically to not tell the board.
11        So I don't know what was told to the
12  board for the period after October 2020.
13    Q.  Okay. I appreciate that, and I can
14  only ask you what you know, right?
15        And so what may or may not be in any
16  other report is kind of irrelevant here because
17  you haven't seen those reports, right?
18    A.  Correct.
19    Q.  Okay. And so you have no basis of
20  knowing one way or the other whether any report
21  delivered to the retail board after October
22  2020 -- 2020 contains anything about the
23  agreements that you entered into with the
24  Dugaboy trustee, correct?

Page 140

1        JAMES DONDERO
2    A.  Right. I just want to be clear that
3  my answer's saying I did not specifically
4  instruct somebody to tell them. It doesn't
5  mean they don't know or someone else didn't
6  tell them.
7    Q.  Okay.
8    A.  So that's -- that's a clarification
9  I want to make.
10    Q.  Okay. No problem.
11        And then -- and then do you see that
12  there's a report to the retail board that HCMFA
13  had approximately $12.3 million outstanding to
14  Highland as of June 30, 2020?
15    A.  Yes.
16    Q.  Okay. So just the same type of
17  questions.
18        Do you have any knowledge as to how
19  that number was calculated?
20    A.  No.
21    Q.  Do you know if it includes the
22  $7.4 million, which is the aggregate principal
23  amount of the two notes that HCMFA issued to
24  Highland in May of 2019?
25    A.  I don't specifically, but given

Page 141

1        JAMES DONDERO
2  everything we have gone over in the last -- I
3  don't know. Probably.
4    Q.  Okay. Do you know whether anybody
5  has informed the retail board on behalf of
6  HCMFA that that $12.3 million was overstated by
7  $7.4 million?
8    A.  I -- I don't know.
9    Q.  Okay. Do you know whether -- do you
10  know whether anybody acting behalf of HCMFA
11  ever told the retail boards that the
12  $12.3 million was subject to offset of any
13  kind?
14    A.  I don't know, but I can't imagine
15  the October 21 letter didn't address some of
16  those issues because those issues I'm not sure
17  were known at this point in time.
18    Q.  Okay. If -- and we can look at
19  paragraph 1 if it helps.
20        But my question is whether you're
21  aware of anybody on behalf of HCMFA ever
22  informing the retail board in 2020 that HCMFA
23  had claims against Highland?
24        MS. DEITSCH-PEREZ: Object to the
25  form.

Page 142

1          JAMES DONDERO
2          THE WITNESS: I don't know.
3   BY MR. MORRIS:
4     Q.  Do you know whether anybody acting
5   on behalf of either the advisors informed the
6   retail board at any time in the year 2020 that
7   either advisor had claims against Highland?
8          MS. DEITSCH-PEREZ: Object to the
9   form.
10         THE WITNESS: I don't know.
11         MR. MORRIS: Okay. We can take that
12  down, please.
13         MS. CANTY: (Complies with request.)
14  BY MR. MORRIS:
15    Q.  Are you aware that the Court
16  confirmed the Debtor's Fifth Amended Complaint
17  of Reorganization in February of 2021?
18    A.  Generally.
19    Q.  And do you recall that objections to
20  the confirmation of the plan were filed by you
21  and each of the advisors, among others?
22    A.  Yes.
23    Q.  And do you recall that these
24  actions, these lawsuits to collect on the
25  notes, they were commenced before the

Page 143

1          JAMES DONDERO
2   confirmation hearing, right?
3     A.  I – I don't – I don't know.
4     Q.  All right. I'll represent to you
5   that the lawsuits were commenced on or about
6   January 22, and the confirmation hearing took
7   place, I think, on February 2 and February 3,
8   2021.
9          Does that refresh your recollection
10  at all that the lawsuits were known to you at
11  the time of confirmation?
12         MS. DEITSCH-PEREZ: Object to the
13  form.
14         THE WITNESS: Not specifically. I
15  mean, given the details you just explained,
16  I guess generally.
17  BY MR. MORRIS:
18    Q.  Okay. I'd like to refer to you
19  NexPoint and HCMFA and HCRE and Services
20  collectively as the defendants for the next set
21  of questions, okay?
22    A.  Okay.
23    Q.  And these questions are in your
24  capacity as an individual and in your 30(b)(6)
25  capacity, okay?

Page 144

1          JAMES DONDERO
2          Is that okay, sir?
3     A.  I'll do the best I can. If I – if
4   I need clarity or caveats, I'll throw them out
5   there.
6     Q.  Okay. Now, I do understand you're
7   not a 30(b)(6) witness for HCMFA today. So
8   let's make that clear.
9          MS. DEITSCH-PEREZ: Thank you.
10  BY MR. MORRIS:
11    Q.  As to HCMFA, you're just here in
12  your individual capacity as the control person,
13  okay?
14         Prior to confirmation, do you know
15  whether anyone acting on behalf of any of the
16  defendants ever disclosed to the bankruptcy
17  court the terms or the existence of your
18  agreement – agreements with the Dugaboy
19  trustee?
20    A.  I guess generally, I've testified to
21  this already. There were numerous
22  conversations with Seery, and I know Lynn had
23  conversations.
24    Q.  Sir, I apologize, but I'm going to
25  interrupt because I know you're tired; and I

Page 145

1          JAMES DONDERO
2   want to get this done. But my question had to
3   do with the disclosure to the bankruptcy court,
4   okay? Let me just try again.
5          Are you aware, sir, whether any of
6   the defendants disclosed to the bankruptcy
7   court prior to confirmation the existence of
8   the agreements that you entered into with the
9   Dugaboy trustee?
10         MS. DEITSCH-PEREZ: Object to the
11  form and to interrupting the witness.
12         THE WITNESS: I'll say yes.
13  BY MR. MORRIS:
14    Q.  Okay. Did you do that?
15    A.  Yes.
16    Q.  And did you do that as part of your
17  testimony in the hearing, or did you do it
18  through the filing of a pleading?
19         MS. DEITSCH-PEREZ: Object to the
20  form.
21         THE WITNESS: I don't – I don't
22  know about pleadings or filings. I – I
23  don't know.
24  BY MR. MORRIS:
25    Q.  Do you recall what you told the

Page 146

JAMES DONDERO

2 bankruptcy court about the agreements that you
3 entered into with the Dugaboy trustee?
4    A.   No.  I'm not -- yes.  No.  I'm
5 not -- no, I don't.  I don't want to -- I don't
6 want to start talking and have you strike it or
7 object.  So I'll just answer specifically until
8 you get to the question.
9    Q.   Yeah.  So -- so again, I'm not
10 trying to trick you.
11        Can you recall when you told the
12 bankruptcy court that you had entered into will
13 the agreements with the Dugaboy trustee?
14    A.   No.
15    Q.   Can you remember the subject matter
16 of any hearing at which you informed the
17 bankruptcy court about the existence of the
18 agreements that you entered into with the
19 Dugaboy trustee?
20    A.   I don't know where or how this works
21 legally.  But every written proposal we put
22 forward as a solution and as a plot plan,
23 always had a zero on all the affiliated notes
24 as being a zero in something that was
25 ultimately likely to be compensation.

Page 147

JAMES DONDERO

2        All of those settlement proposals,
3 some were done formally through Seery; some
4 were done indirectly; some of it were -- some
5 of them were done to the independent board;
6 some of them were done directly to Clemente.
7 But all of those documented the expectation
8 that the notes were compensation.
9    Q.   Do you believe that any of the
10 documents that you just described were ever
11 presented to the bankruptcy court?
12    A.   Yes.
13    Q.   Okay.  When and in what context were
14 those documents delivered to the bankruptcy
15 court?
16    A.   I believed that the independent
17 board and Seery were representatives of the
18 bankruptcy court in that regard.
19        So I think within a month, two
20 months of the filing, there were proposals made
21 to creditors directly and the independent
22 board; and then subsequently, once Seery became
23 president, to him.
24        And then when Seery proved
25 ineffective regarding settlements, there were

Page 148

JAMES DONDERO

2 reach outs -- reaches out to creditors directly
3 again and -- to Clemente and the committee; but
4 I think the committee already sold all their
5 stuff by that point.
6        I mean, I -- listen, I -- but I
7 consider those reach-outs and characterizations
8 of the notes as not part of settlement under
9 the estate and that is likely to be
10 compensation notifying the Court generally.
11    Q.   Okay.  Are you aware of any notice
12 that was ever given to Judge Jernigan about the
13 existence of any of the agreements that you
14 entered into with the Dugaboy trustee?
15    A.   I -- I don't know.
16    Q.   Okay.  You're not aware of any as
17 you sit here right now; is that fair?
18    A.   Yes.  I'm not aware if any of my
19 reach-outs to the people that I described ever
20 made it to Jernigan.  I don't know.
21    Q.   Okay.
22    A.   I know she asked for updates on the
23 plot plan.  I know she asked for whatever, but
24 I don't know what specificity any of the people
25 I described presented them to her.  So I don't

Page 149

JAMES DONDERO

2 know.
3    Q.   And I appreciate what you've said
4 about the proposals that you've made.  But my
5 next question's very specific.
6        Prior to the commencement of
7 litigation, did you or anybody acting on your
8 behalf ever tell Jim Seery or Matt Clemente of
9 your agreements with the Dugaboy trustee?
10    A.   I -- I don't know specifically.
11    Q.   Thank you very much.
12        THE COURT REPORTER:  I'm sorry.
13 When you get to a good point, could we just
14 take a quick break?
15        MR. MORRIS:  Yeah.  Why don't we do
16 that, and I hope to try to wrap up.  So
17 it's 5:37.  I mean, I'm going to need
18 probably, you know, another half hour or an
19 hour; but I want to try to finish.  It's
20 5:38.
21        I'm fine with if we just come back
22 at 4:45 Central Time, seven minutes.
23        THE VIDEOGRAPHER:  All right.  We're
24 off record at 4:38.
25        (Whereupon, a break was taken.)

Page 150

1    JAMES DONDERO
2    THE VIDEOGRAPHER: This is the
3    beginning of Media Number 3 in the
4    deposition of James Dondero. We are back
5    on the record. The time is 4:45.
6    BY MR. MORRIS:
7    Q. Just to finish up on the topic we
8    were on when we took the break, Mr. Dondero.
9    Prior to confirmation, do you know
10   which of the defendants ever informed the
11   bankruptcy court that any of the Promissory
12   Notes that are the subject of the lawsuits were
13   unenforceable for any reason?
14   And when I use the phrase
15   "bankruptcy court" here -- you know what, let
16   me ask a different question.
17   Prior to confirmation, do you know
18   if anybody acting on behalf of the defendants
19   ever disclosed to Judge Jernigan that any of
20   the Promissory Notes subject to the lawsuits
21   were unenforceable for any reason?
22   MS. DEITSCH-PEREZ: Object to the
23   form.
24   THE WITNESS: I don't know.
25

Page 151

1    JAMES DONDERO
2    BY MR. MORRIS:
3    Q. Prior to confirmation, did you
4    direct anybody to inform Judge Jernigan that
5    any of the Promissory Notes were unenforceable
6    for any reason?
7    A. I don't know.
8    Q. Okay. I want to direct your
9    attention to December 2020.
10   Do you recall if you had a
11   conversation with Frank Waterhouse concerning
12   payments that were due to Highland by any of
13   the companies that you directly or indirectly
14   own or control?
15   A. I'm trying to think. Generally, we
16   overpaid on shared services, so -- by a
17   significant amount, I believe 14, 15 million
18   bucks. And then there was a supposed to be an
19   overall transition settlement true-up regarding
20   the employees, the office space, you know,
21   whatever.
22   So the -- yeah, that's -- that's the
23   -- that's my general recollection.
24   Q. But did you give Mr. Waterhouse any
25   instructions as to whether to pay or not pay

Page 152

1    JAMES DONDERO
2    any amounts that were due and owing to Highland
3    under any agreement between Highland and any
4    affiliate?
5    MS. DEITSCH-PEREZ: Object to the
6    form.
7    Are you asking about the Notes or
8    the Shared Services Agreements?
9    MR. MORRIS: I'm asking about -- I'm
10   asking very broadly any payments.
11   THE WITNESS: I do remember having
12   conversations not to pay any more shared
13   services.
14   And I hope there weren't anymore
15   payments on shared services. There --
16   There was never a specific to not pay the
17   notes.
18   BY MR. MORRIS:
19   Q. So your recollection is that you
20   instructed Mr. Waterhouse not to make any
21   further payments under the shared services, and
22   that's the instruction you gave?
23   A. Yes.
24   Q. Did you ever tell anybody in
25   December of 2020 about your conversation with

Page 153

1    JAMES DONDERO
2    Mr. Waterhouse?
3    A. Not that I recall.
4    Q. Do you recall telling anybody other
5    than Mr. Waterhouse in December 2020 that no
6    payment should be made to Highland under the
7    Shared Services Agreement?
8    A. I do believe there was a team -- I
9    can't remember -- I know Dustin Norris is on
10   that team. He was aware. He was aware. And
11   as a matter of fact, I think -- yeah. He -- I
12   know he was aware for sure.
13   Q. Anybody else?
14   A. There were other people on that
15   team, but I can't remember who was on that team
16   or who was in the room at any time.
17   Q. Is there anything in writing that
18   you recall that reflects the instruction that
19   you gave to Mr. Waterhouse in December 2020
20   that we're talking about?
21   A. I believe the back-and-forth and the
22   true-up with Seery on the multiple of things
23   that I was just discussing, you know, right to
24   transition of people, it included no more
25   shared services being paid and a credit for

Page 154

JAMES DONDERO

1 overpayment on shared services. And those –
2 those spreadsheets went back and forth, and
3 Seery has copies of them also.
4     Q.   Are you aware of any payments being
5 made by the advisors to Highland after
6 November 30, 2020?
7     A.   Hopefully not on shared services. I
8 believe there were payments on principal and
9 interest on notes.
10     Q.   Were any of those payments that you
11 have in mind made before the end of calendar
12 year 2020 – withdrawn.
13         Were any of those payments that you
14 have in mind made in December 2020?
15     A.   I don't know. I don't know which
16 ones were paid and kept current. I don't know
17 which ones were cured. I don't – I don't
18 remember which ones were which.
19     Q.   Are you aware of any note that was
20 tendered by one of Highland's affiliates on
21 which payment was made in December 2020?
22     A.   I don't know. I don't know when –
23 I don't know which ones were kept current. I
24 don't know which ones were cured in December.

Page 155

JAMES DONDERO

1 I don't know which ones were cured in January
2 or February. I don't know.
3     Q.   Is it your testimony that you
4 believe that one or more of Highland affiliates
5 made a payment in December 2020 to cure – as a
6 cure payment?
7     MS. DEITSCH-PEREZ: Object to the
8 form.
9 BY MR. MORRIS:
10     Q.   I just – I'm sorry. I –
11     A.   I – I – okay.
12     Q.   Yeah. I just want to try to get
13 this as cleanly as I can. Did you –
14     A.   I believe –
15     Q.   Go ahead, sir.
16     A.   No. I'll let you go. It's better
17 if you ask me.
18     Q.   Okay. Did you direct anybody to
19 make any payment in December 2020 to Highland
20 on behalf of any affiliate that you owned or
21 controlled?
22     A.   I believe all notes are outstanding
23 and current and in good standing. I don't know
24 when they were cured.

Page 156

JAMES DONDERO

1     Q.   Are you just talking about the term
2 notes here or the demand notes as well?
3     A.   All of the above. All of the notes
4 as far as I know.
5     Q.   Are you aware that in December 2020,
6 Highland made a demand for payment under all of
7 the demand notes?
8     A.   And I believe they're all current as
9 far as interest and principal amortization. I
10 believe they've all been cured.
11     Q.   Okay. Can you identify any payment
12 that was made in December 2020 to Highland on
13 behalf of yourself or any entity that you
14 directly or indirectly own or control?
15     A.   I wouldn't have been involved in –
16 I wouldn't have been involved in normal course
17 payments. I know there were – I know for sure
18 there were cure payments in January. I don't
19 know if there were in December.
20     Q.   Okay. And that's – we'll get to
21 January. I'm just trying to finish up
22 December.
23         Are you aware of any payments made
24 in December 2020 –

Page 157

JAMES DONDERO

1     MS. DEITSCH-PEREZ: Object to the
2 form.
3 BY MR. MORRIS:
4     Q.   – by you – by you or any entity
5 directly or indirectly owned or control by you
6 to Highland?
7     A.   I don't have awareness.
8     Q.   Do you recall that early in 2021,
9 Highland gave notice of default on the three
10 term notes?
11     A.   I'm aware in – that January – yes,
12 I guess I am aware that Highland declared them
13 in default in January, yes.
14     Q.   And you're aware that in addition to
15 declaring them in default, they gave notice of
16 acceleration?
17     A.   I'm not aware of acceleration. I'm
18 aware of, I guess, default I had heard.
19     Q.   Did you ever see the
20 notice-of-default letters that Highland sent to
21 NexPoint HCRE and services?
22     A.   I don't believe I've seen all of
23 them. I think I've seen one on demand notes.
24 I don't think I've – I don't remember seeing

Page 158

1        JAMES DONDERO
2 any on term loans.
3        Q.    All right.  So as you sit here right
4 now, you don't have a recollection of having
5 seen the default notices that were sent by
6 Highland in January 2021 with respect to the
7 term notes, right?
8        MS. DEITSCH-PEREZ:  Why don't you
9     show him one.
10        THE WITNESS:  I don't recall.  Yeah.
11     I mean, I don't -- I don't recall seeing
12     any of them.
13 BY MR. MORRIS:
14        Q.    Okay.  How did you learn that
15 Highland had sent the default notices?
16        A.    I believe it was at a hearing I
17 attended in person from which I called Frank,
18 and I was surprised and annoyed that the
19 relative de minimis amounts hadn't been paid;
20 and I asked him what does it take to cure them
21 or make them current.
22        And then he told me the numbers, and
23 they were small and de minimis; and I told him
24 make sure they get paid and make sure the notes
25 are cured.

Page 159

1        JAMES DONDERO
2        Q.    Did you do anything or say anything
3 else with respect to your -- your learning
4 about the declaration of default?
5        A.    No.  It -- no.  I don't remember
6 anything else.
7        Q.    Did you ask your -- do you know
8 whether anyone acting on behalf of ever reached
9 out to Highland with respect to the payments
10 that were made in January of 2021 as cure
11 payments as you described them?
12        A.    Frank was Highland.
13        Q.    I'm asking --
14        A.    Frank -- Frank -- Frank was the
15 person I reached out to at Highland.  Who else
16 would I reach out to at Highland?
17        Q.    Did you -- did you reach out to
18 anybody else?
19        A.    No.  Just Frank.
20        Q.    Okay.  Did anybody acting on your
21 behalf reach out to anybody else?
22        A.    Not that I know of or not that I
23 thought was necessary.
24        Q.    In January of 2021, did it occur to
25 you to either communicate with or through your

Page 160

1 lawyer, with Mr. Seery, about this?
2        MS. DEITSCH-PEREZ:  Object to the
3     form.
4        THE WITNESS:  No.  I thought Frank
5     was fully empowered.
6 BY MR. MORRIS:
7        Q.    Okay.  Did you ever confirm your
8 understanding about the cure with
9 Mr. Waterhouse in writing?
10        A.    In writing?  No.  I believe it was
11 all in that phone conversation from the Court.
12 I don't -- I don't recall anything in writing,
13 but I'll check.
14        Q.    Do you recall sending him an e-mail
15 in which you confirmed with Mr. Waterhouse your
16 understanding that the debtor had agreed that
17 the payments that were being paid would
18 constitute a cure?
19        A.    No, I didn't -- no.  At the time I
20 didn't think it was necessary.  It was -- the
21 cure amount was calculated by Frank.  It was
22 paid immediately.  It was accepted.  I never --
23 I never thought to memorialize it beyond that.
24        Q.    Okay.  Did you -- did you ever ask

Page 161

1        JAMES DONDERO
2 your attorneys to confirm with Pachulski Stang
3 Ziehl & Jones or anybody acting on behalf of
4 the debtor that the payments that were made
5 would be deemed to be cure payments?
6        MS. DEITSCH-PEREZ:  I'm going to not
7     to disclose communications with counsel.
8 BY MR. MORRIS:
9        Q.    Okay.  Do you know whether your
10 lawyers or anybody acting on your behalf ever
11 sought to confirm your understanding that the
12 payments would be deemed to have cured the
13 default under the three term notes?
14        A.    Not that I'm aware of.
15        Q.    Okay.  Is there any written record
16 of your call with Mr. Waterhouse?
17        A.    If it was from my cell phone, I'm
18 sure there's a written record taking place of
19 the call taking place.
20        Q.    Right.  But did you take any notes,
21 or is there anything in writing that
22 memorialized or reflected your conversation
23 with Mr. Waterhouse in January of 2021 about
24 the cure?
25        A.    Not that I'm aware of and not that I

Page 162

1          JAMES DONDERO
2  thought was necessary.
3     Q.   Okay.  Did – did you ever tell
4  Judge Jernigan that you had made cure payments?
5     A.   I didn't know I'm allowed to have
6  ex parte conversations with her, but there's a
7  lot of things I'd like to tell her about this
8  case; but no I did not.
9     Q.   All right.  I'm not talking about
10  ex parte conversations, sir.  Let's take
11  confirmation, for example.
12        Did you or anybody acting on any of
13  the defendants' behalf ever inform
14  Judge Jernigan that Frank Waterhouse had told
15  you that the payments in January 2021 would be
16  deemed to be cure payments?
17     A.   Not that I'm aware of.
18     Q.   Thank you.
19        MR. MORRIS:  Give me one more
20  moment.  In fact, I'm going to ask for just
21  three minutes.  I'm going to check and see
22  how much more I have here.  It won't be
23  long if I have anything.  So let's go off
24  the record.
25        THE VIDEOGRAPHER:  Would you like to

Page 163

1          JAMES DONDERO
2  go off the record?
3        All right.  We're off record at
4  5:03.
5        (Whereupon, a break was taken.)
6        THE VIDEOGRAPHER:  We are back on
7  the record.  The time is 5:06.
8        MR. MORRIS:  Okay.  Asia, can you
9  please put on the screen Exhibit 24, which
10  are Mr. Dondero's written responses to
11  discovery?
12        MS. CANTY:  (Complies with request.)
13        (Whereupon, Exhibit 24, Defendant
14  James Dondero's Objections and Responses to
15  Plaintiff's Requests for Admission,
16  Interrogatories, and Requests for
17  Production, marked for identification, as
18  of this date.)
19  BY MR. MORRIS:
20     Q.   And Mr. Dondero, I don't know if you
21  have that binder in front of you, but this is
22  one of the documents that will be in there,
23  Number 24.
24     A.   Number 24?
25     Q.   Yes, sir.

Page 164

1          JAMES DONDERO
2        MS. DEITSCH-PEREZ:  Do you got it?
3        THE WITNESS:  Yes.
4  BY MR. MORRIS:
5     Q.   Have you seen this document before,
6  sir?
7     A.   No.
8     Q.   Let's go to page 15 and see if that
9  refreshes your recollection.
10        Is that your signature?
11     A.   Yes.
12        MS. DEITSCH-PEREZ:  Yeah.  It's late
13  in the day, John.
14        THE WITNESS:  Yes.
15        MR. MORRIS:  That's why I showed him
16  the signature.
17  BY MR. MORRIS:
18     Q.   Does that refresh your recollection
19  that you've seen this before?
20     A.   No.  It refreshes my recollection
21  that I signed it.
22     Q.   Okay.  And –
23     A.   Not that I recall – not that I
24  looked at it in detail in any way.
25     Q.   Okay.  Did you review it before you

Page 165

1          JAMES DONDERO
2  signed it?
3     A.   I – as I sit here today, I don't
4  remember.  So let's go through whatever
5  questions you have.
6     Q.   Okay.
7        MR. MORRIS:  Go to page 8, please.
8        MS. CANTY:  (Complies with request.)
9  BY MR. MORRIS:
10     Q.   You will see that Interrogatories 3
11  and 4 ask in substance for you to admit that
12  you never disclosed the terms or existence of
13  the agreement to Frank Waterhouse prior to the
14  commencement of the adversary proceeding.
15        Do you see that?
16        MS. DEITSCH-PEREZ:  Wait.  Object to
17  the form.  Those are two different
18  requests.
19        MR. MORRIS:  Okay.  Okay.  I was
20  trying to do this quickly.  We'll do it –
21  we'll do it – we'll do it your way?
22        MS. DEITSCH-PEREZ:  No.  I think you
23  – okay.
24  BY MR. MORRIS:
25     Q.   So let's look at Request for

Page 166

1     JAMES DONDERO
2  Admission Number 3.
3     Do you see that Highland asked you
4  to admit, quote, "that prior to the
5  commencement of the adversary proceeding, you
6  never disclosed the terms of the agreement to
7  Frank Waterhouse," close quote?
8     A.  That's on page 8, Number 3, right?
9     Q.  Correct.  And you denied that,
10 correct?
11    A.  Yes.
12    Q.  Okay.  Did you disclose the terms of
13 the agreement as we've defined that term to
14 Frank Waterhouse prior to the commencement of
15 the adversary proceeding?
16    A.  You know, what I've answered was a
17 long answer earlier that the notes were
18 compensation.  The notes were to be -- would be
19 forgiven as part of compensation, shouldn't be
20 included in any settlement.
21        Frank and his group were deeply
22 involved in all the plot plan and settlement,
23 things that went back and forth.  He knew.
24        Now, whether he knew the specifics
25 of the agreement in terms of, whether I ever

Page 167

1     JAMES DONDERO
2  discussed the MGM Cornerstone, Trustway, and
3  the specifics of the agreement with him before,
4  I don't -- I don't know.  So...
5     Q.  Do you --
6     A.  I think denying is appropriate, but
7  I'm at not saying Frank knew the specifics of
8  the agreement prior to the commencement of
9  litigation.
10    Q.  Did you tell him that you had an
11 agreement with the Dugaboy trustee?
12    A.  I told him there were mechanisms for
13 forgiving the -- or there were -- there were
14 mechanisms for the notes being compensation and
15 not being part of any kind of cement or asset
16 to the estate.
17    Q.  Okay.  Do you recall telling him
18 anything else during these conversations?
19    A.  No, I didn't -- no.  I didn't feel
20 it necessary to talk to him about the
21 specifics.
22    Q.  Okay.  And do you recall having this
23 discussion in any context other than in
24 connection with the preparation of a settlement
25 proposal?

Page 168

1     JAMES DONDERO
2     A.  There wasn't another reason -- there
3  -- no, I don't remember any other context.
4     Q.  Okay.
5     A.  But the settlements were regular and
6  ongoing --
7     Q.  Okay.
8     A.  -- in our mind, not in the
9  Stonehill's mind.
10    Q.  Okay.  Can you go -- can we go to
11 page 9, Request for Admission Number 8?
12    A.  Yes.
13    Q.  Number 8 we asked you to "admit that
14 no document was created prior to the
15 commencement of the adversary proceeding
16 concerning the existence of the agreement."
17        Have I read that right --
18    A.  I'm just reading what's on page 9,
19 admit that prior to the agreement he never
20 disclosed any other creditor.
21    Q.  No, no, no.  I'm sorry.  We're on
22 Number 8.
23        Can you read Number 8 out loud?
24    A.  Number 8, I'm sorry.  Admit that no
25 document was created prior to the commencement

Page 169

1     JAMES DONDERO
2  of the adversary proceeding concerning the
3  existence of the agreement.
4     Q.  All right.  So you've read that.
5  And so my question to you is:  Did you deny
6  that because there are settlement proposals
7  that you created that show zero value for the
8  Promissory Notes at issue?
9     A.  Yes, partly.
10    Q.  Okay.  What other documents were
11 created prior to the commencement of the
12 adversary proceeding that you contend concerned
13 the existence of the agreement?
14    A.  I'm trying to think if the LPA does.
15    Q.  Okay.  Anything else?
16    A.  No.  That would be -- that would be
17 it.
18    Q.  Okay.  Request for Admission
19 Number 9, can you identify the creditor that
20 caused you to deny the Request for Admission
21 Number 9?
22    A.  I believe all the creditors via the
23 settlement agreements; but, you know,
24 specifically Clubock, you know, and to the
25 extent Frank is a creditor, Frank.

Page 170

1          JAMES DONDERO
2     Q.   But you just testified a few minutes
3   ago, I thought, that you didn't specifically
4   tell Mr. Waterhouse of the terms of the
5   agreements to him, right? Did I miss --
6     A.   That's right. I mean, not the
7   specific terms, correct.
8     Q.   Okay. So is there any creditor to
9   whom you -- is there any creditor of Highland's
10  to whom you disclosed the existence of the
11  agreements that you entered into with the
12  Dugaboy trustee prior to the commencement of
13  the adversary proceeding?
14        MS. DEITSCH-PEREZ: Asked and
15        answered.
16        THE WITNESS: Yeah. I mean,
17        generally, all the creditors via the
18        settlement. And then we have lots of
19        one-off conversations with Clubock
20        representing UBS where the notes were
21        described as going to be forgiven
22        compensation, never part of the estate.
23  BY MR. MORRIS:
24    Q.   All right. I don't -- I don't want
25  to wrestle with you.

Page 171

1          JAMES DONDERO
2     A.   Sure.
3     Q.   I'm going to remind you that when I
4   use the word "agreements," I'm referring
5   specifically to the agreements that were set
6   forth in paragraph 82 of your answer.
7        Do you understand that?
8     A.   Yes. And so I guess my answer is
9   generally but not specifically.
10    Q.   Okay. And when you say "generally,"
11  you don't mean that you disclosed the existence
12  or terms of the agreement to any creditor.
13  What you mean is that you told all of the
14  creditors that you believed that the notes
15  should be forgiven as part of compensation.
16        Do I have that right?
17    A.   Well, that they would be forgiven as
18  part of compensation.
19    Q.   Okay. Subject to that correction,
20  are we on the same page now?
21    A.   Yes.
22    Q.   Okay. Can we go to page 12,
23  Interrogatory Number 2?
24    A.   This is still in Section 24?
25    Q.   Yes, sir.

Page 172

1          JAMES DONDERO
2        MS. DEITSCH-PEREZ: Object to the
3        form.
4        THE WITNESS: 24, I'm sorry.
5        Page 2?
6   BY MR. MORRIS:
7     Q.   Page 12.
8     A.   Page 12. Yes. Which one?
9     Q.   Number 2.
10    A.   All right.
11    Q.   You didn't identify any email
12  correspondence in response to Interrogatory
13  Number 2; is that correct?
14    A.   I don't have my e-mails. So we have
15  painfully little from the Highland estate.
16    Q.   Okay.
17    A.   I think at the time we responded, we
18  thought we might get access to things; but we
19  haven't been able to come up with anything. We
20  have -- we have no access to anything.
21    Q.   Okay. So as you sit here today, you
22  cannot identify any e-mail correspondence that
23  discusses the existence of the agreement,
24  correct?
25    A.   Not yet, no.

Page 173

1          JAMES DONDERO
2        (Whereupon, Exhibit 27, Defendant
3        NexPoint Advisors, L.P.'s Objections and
4        Responses to Plaintiff's Requests for
5        Admission, Interrogatories, and Requests
6        for Production, marked for identification,
7        as of this date.)
8   BY MR. MORRIS:
9     Q.   Let's go to Exhibit Number 27.
10    A.   Yes.
11    Q.   And if we can go to page 7.
12        MR. MORRIS: I think -- I don't know
13        who's shuffling paper.
14  BY MR. MORRIS:
15    Q.   But if we're at page 7, we're
16  looking at Interrogatory Number 3.
17        Is the reason for the denial -- and
18  I apologize. I may be going too quickly
19  because I know we're all anxious to finish, but
20  I do want to represent to you that we're
21  looking at the discovery responses of NexPoint
22  Advisors.
23    A.   Right.
24    Q.   And if we went to page 12, we'd find
25  your signature on that one, okay? So looking

Page 174

JAMES DONDERO

1
2  at --
3     A.   Yes.
4     Q.   -- Request for Admission Number 3,
5  is your answer the same on behalf of NexPoint
6  Advisors as it was for yourself as to why you
7  denied Request for Admission Number 3?
8     A.   Yes.
9     Q.   Okay.  If we can go to Request for
10  Admission Number 6, that is the same Request
11  for Admission that we talked about with respect
12  to yourself in your individual capacity a
13  moment ago.
14        Is your reason for denying Request
15  for Admission Number 6 the same reason that you
16  gave for yourself?
17     A.   Yes.
18     Q.   And looking at Request for
19  Admissions Number 7 and 8, is the reason that
20  you denied those Requests for Admissions
21  because you told Seery and the committee and
22  Clubock that you wouldn't pay anything for the
23  notes because they were supposed to be forgiven
24  as part of your compensation?
25     A.   And the independent board, yes.

Page 175

JAMES DONDERO

1
2     Q.   Okay.  Is there any other reason
3  that you denied Request for Admissions Number 7
4  and 8?
5     A.   Not that I can think of at this
6  point in time.
7        I don't think the LPA applies much
8  here, but I may be --
9        MR. MORRIS:  All right.  I have no
10  further questions.
11        THE WITNESS:  Wonderful.  Thank you.
12  Have a good evening.
13        MR. MORRIS:  Thank you.  Take care.
14        MS. DEITSCH-PEREZ:  Thank you.
15        MR. MORRIS:  Bye now.
16        THE VIDEOGRAPHER:  All right.  If
17  there are no further questions, this
18  concludes today's deposition.  Volume II
19  [sic] consists of three media.  We are off
20  the record at 5:21 p.m.
21        THE COURT REPORTER:  Everybody is
22  leaving, and I wanted to get everybody's
23  order on the record.
24        MS. DEITSCH-PEREZ:  I'd like the
25  rough.  And then the regular can be

Page 176

JAMES DONDERO

1
2  whenever you get the regular done.  No
3  special rush.
4        THE COURT REPORTER:  Okay.  Thank
5  you.
6        MS. DEITSCH-PEREZ:  You're welcome.
7        THE COURT REPORTER:  Ms. Canty, I
8  think there's a standing order for a daily
9  delivery -- or an immediate delivery for
10  your firm?
11        MS. CANTY:  Yes.
12        THE COURT REPORTER:  Okay.  I just
13  wanted to confirm that.  I'll get that out
14  tonight, then.
15        MS. CANTY:  Okay, thank you.
16        (The witness is excused.)
17        (Deposition of James Dondero
18  concluded at 5:21 p.m. CDT.)
19
20
21
22
23
24
25

Page 177

1     C E R T I F I C A T E
2
3
4        I, SUZANNE J. STOTZ, a Certified
5  Shorthand Reporter, Registered Professional
6  Reporter, Certified Realtime Reporter, and
7  Notary Public in and for the State of Texas, do
8  hereby certify that the foregoing is a true and
9  accurate transcript of the stenographic
10  above-captioned matter.
11
12
13     _____
14        SUZANNE J. STOTZ, CSR, RPR, CRR
15        Texas Certification No. 11942
16
17
18  DATED:  November 4, 2021
19
20
21  NOTE:  THE CERTIFICATE APPENDED TO THIS
22  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23  OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24  DIRECT CONTROL AND/OR DIRECTION OF THE
25  CERTIFYING COURT REPORTER.

Page 178

1      E R R A T A   S H E E T

2        I have read my testimony in the foregoing

3    transcript and believe it to be true and

4    correct to the best of my knowledge and belief

5    with the following changes:

6    PAGE    LINE        CHANGE

7    _____ _____ _____

8    _____ _____ _____

9    _____ _____ _____

10   _____ _____ _____

11   _____ _____ _____

12   _____ _____ _____

13   _____ _____ _____

14   _____ _____ _____

15   _____ _____ _____

16   _____ _____ _____

17

18   _____ _____

19   WITNESS SIGNATURE          DATE

20

21   Sworn and subscribed to before me this

22   _____ day of _____ , 2021.

23

24   Notary Public of the

25   State of _____.

**$**

**$1.55-million** 64:22

**$12.3** 140:13 141:6, 12

**$2** 62:6

**$2.4** 91:11,13,23 92:6,11,14 93:12 103:17 104:2 107:23 109:2,25 110:13,23

**$2.4-million** 91:19

**$23** 138:13

**$23.7** 137:10,22

**$250,000** 58:20

**$5** 101:22 102:17 111:17,21,24 112:4, 10 117:9 119:23

**$5-million** 116:16 120:10

**$500,000** 62:5

**$6** 99:6,16,22

**$6,068,851** 98:18

**$7.4** 90:17 125:4 129:5 140:22 141:7

**$7.44** 102:7

**$7.5** 119:10,14,16

**$7.8** 103:5

**0**

**000025** 130:19

**000031** 130:19

**1**

**1** 9:3 94:3 141:19

**100** 96:24

**12** 171:22 172:7,8 173:24

**13** 26:14

**14** 26:14 151:17

**15** 151:17 164:8

**15-C** 130:11 131:3 137:3

**17** 20:20

**18** 20:8 26:13 71:16 73:15

**19** 20:8

**1939** 104:7

**1:17** 9:11

**2**

**2** 52:24 94:19 97:15 108:25 132:9 135:15, 18 136:13 143:7 171:23 172:5,9,13

**2,500,024** 60:10

**2.4** 104:14 110:20

**2.5** 61:5

**20** 57:16 58:2

**200,000** 64:22

**2016** 57:13,21 58:18 59:3

**2017** 20:8,21 60:2,9 62:6 63:17 73:14 137:17

**2018** 20:21 23:4 122:24 123:9,16 129:4

**2019** 23:5 25:3 90:16, 25 91:13,24 97:15 99:22 102:7 108:10, 25 110:3,25 111:20, 25 112:5,10,18 113:3 114:9 116:15 117:5 119:9,24 120:11 123:24 124:25 128:14 140:24

**2020** 25:3,9 109:21 130:9,18,23 133:19, 23 136:11 137:3,8,9 138:20 139:13,23 140:14 141:22 142:6 151:9 152:25 153:5, 19 154:7,13,15,22 155:6,20 156:6,13,25

**2021** 9:10 136:7,20 139:3 142:17 143:8 157:9 158:6 159:10, 24 161:23 162:15

**21** 141:15

**22** 143:6

**23** 130:18,23 133:18, 23 136:11

**24** 163:9,13,23,24 171:24 172:4

**252** 124:3

**27** 173:2,9

**2:28** 66:12

**2:43** 66:15

**2:44** 67:5

**3**

**3** 117:5 119:23 123:24 143:7 150:3 165:10 166:2,8 173:16 174:4,7

**30** 8:18 12:6,22 22:3, 4,5 137:9 140:14 154:7

**30(b)(6)** 14:23 15:7 17:4 18:18,21 68:24 76:24 143:24 144:7

**300,000** 64:23

**31** 10:16 82:10 122:24 123:9,15 129:4 137:17

**34** 22:5 123:4,6

**35** 22:6

**36** 22:6

**375** 102:10

**39** 104:8 124:23

**3:21** 94:6

**3:22** 94:21

**3:28** 66:7

**3:40** 66:8

**3:53** 115:9

**3:54** 115:12

**3rd** 111:20

**4**

**4** 9:10 165:11

**4.4M** 118:5

**40** 12:6,24

**47** 104:9

**4:38** 149:24

**4:45** 149:22 150:5

**5**

**5** 103:5

**50** 59:17,19 82:8

**50,000** 57:20

**51** 82:7

**53** 93:18 94:23 95:3 97:12 136:2

**54** 107:10,12 136:2

**56** 116:20,22

**57** 118:24 119:3

**59** 130:15,17

**5:03** 163:4

**5:06** 163:7

**5:21** 175:20 176:18

**5:37** 149:17

**5:38** 149:20

**6**

**6** 174:10,15

**65,772** 63:12

**68** 55:21 56:2,9

**7**

**7** 173:11,15 174:19 175:3

**70** 58:3

**75** 35:3

**8**

**8** 165:7 166:8 168:11, 13,22,23,24 174:19 175:4

**82** 13:3,12,17 14:3 39:16 47:10,20 48:8 81:25 82:10,11,17 83:18 171:6

**9**

**9** 25:9 168:11,18 169:19,21

**90-day** 47:22

**A**

**ability** 27:16 43:6 45:10 47:5

**acceleration** 157:17,18

**accepted** 8:25 160:23

**access** 172:18,20

**accommodated** 66:23

**accord** 89:18

**account** 47:2 100:18 102:7

**accountants** 134:5

**accounted** 110:22

**accounting** 37:24 107:19,22 108:2,12 110:8 111:13 117:5, 9,17 125:23 128:4,5 134:2

**accurately** 27:24

**acting** 40:22 59:10 65:20 73:5 105:7 134:16 138:6 141:10 142:4 144:15 149:7 150:18 159:8,20 161:3,10 162:12

**action** 9:17 38:25

**actions** 142:24

**activities** 106:2

**actual** 37:24 51:11 73:16

**addition** 157:15

**additional** 101:9 103:16 138:23

**address** 141:15

**adjust** 47:5 75:7 138:16

**adjusted** 84:4

**admissible** 8:16

**Admission** 163:15 166:2 168:11 169:18, 20 173:5 174:4,7,10, 11,15

**Admissions** 174:19, 20 175:3

**admit** 165:11 166:4 168:13,19,24

**adversary** 165:14 166:5,15 168:15 169:2,12 170:13

**advice** 11:25

**advise** 138:3

**advisor** 103:17 104:22 142:7

**advisor's** 104:23

**advisors** 58:5,12 109:3 129:17,22,25 130:9 131:2 133:5, 15,17 134:17,21,23 136:12 137:2 142:5, 21 154:6 173:3,22 174:6

**advisors'** 133:22

**affiliate** 152:4 155:21

**affiliated** 58:4 146:23

**affiliates** 110:10 137:10 154:21 155:5

**afield** 38:16

**afternoon** 8:2 67:6

**aggregate** 21:21,23 24:15 27:4 51:24 71:15 90:16 102:13 125:3 140:22

**agree** 39:19 41:22 43:13 46:3 71:8 83:8 103:3 115:4,7

**agreed** 160:17

**agreement** 19:20 20:19,24 21:8,12,16, 25 22:7,11,18 23:2,8, 12,17,22 24:7,12,17 25:2,13,18,21,25 26:5 27:5,11,17 28:7, 22 29:18,25 30:8,14, 23 31:4,9,24 32:7,11, 22 33:11,24 34:17,22 35:14,17 36:8,22 37:4 39:7 40:10 43:13 44:12,21,24 45:17 47:19 48:5 69:21 71:20 77:24 78:3 79:9 81:25 82:22 84:16 85:22 86:11,13,20 99:25 134:13 135:12 144:18 152:3 153:7 165:13 166:6,13,25 167:3,8,11 168:16,19 169:3,13 171:12 172:23

**agreements** 13:18, 22 14:2,8 19:16,21, 25 20:6,8,10 29:2,6, 11 30:22 31:2 40:6, 17,20 41:2,9,13,20, 24 42:12,13,16,24 46:13 47:8,11 48:4, 16 49:4,13,18 50:10, 19 51:7 53:12,19 54:3,7 69:11 72:8 73:5,23 74:7,13,20 75:2,18,25 76:12,16 77:11,19 79:17,23 81:3,16 82:18,24 83:23 84:9,19 85:11 105:23 127:11 133:25 134:15 137:23 138:4,9 139:24 144:18 145:8 146:2,13,18 148:13 149:9 152:8 169:23

**170**:5,11 171:4,5

**ahead** 101:13 155:16

**Aigen** 77:5 95:25

**Alan** 12:7,9

**allocate** 61:10

**allocated** 61:18,21, 25 62:8

**allowed** 162:5

**altered** 43:23 44:14, 22

**amended** 13:5 136:4 142:16

**amortization** 156:10

**amount** 15:16 21:4, 15,19,22,24 24:6,16 30:7 31:13 57:17 58:19 61:4 62:2 75:12,13 90:17 99:12 103:9,11,20 104:2 108:25 125:3 126:20 137:15 140:23 151:17 160:22

**amounts** 56:19 92:23 100:21 112:12 135:20 152:2 158:19

**analysis** 73:23 100:6

**analysts** 135:7,9

**analyze** 73:6,8

**Anchorage** 71:21 83:5

**annoyed** 158:18

**annual** 55:2,16 56:13,15 126:12 129:17,24 130:10 136:6

**answer's** 91:25 140:3

**answering** 106:14

**answers** 86:20 138:17

**anticipated** 47:5

**anxious** 173:19

**anymore** 24:21 106:14 152:14

**apologize** 33:8 48:25 54:23 69:17 102:3 127:3 144:24 173:18

**apparently** 67:17 95:12

**appearances** 9:20

**appeared** 9:17

**appears** 136:21

**applied** 119:17

**applies** 175:7

**approval** 71:4,11,23

**approve** 134:17

**approving** 92:9 134:23

**approximately** 9:11 24:23 99:5,7,16,22, 23 101:21 102:6 103:4,17 137:10 140:13

**April** 90:25

**arrives** 68:20

**Arvold** 8:3

**Asia** 163:8

**aspect** 82:21,23

**aspects** 126:16

**asset** 167:15

**assets** 42:12 73:10 89:2 121:4,12

**association** 8:4

**assume** 60:19 122:12,14 128:16,20

**attached** 98:9

**attaches** 108:16

**attachment** 108:21

**attended** 158:17

**attention** 62:15 63:4 151:9

**attorney** 11:5,6 12:4 134:9

**attorneys** 89:23,25 90:3,8 134:14 161:2

**audio** 116:3

**audit** 122:11,20 123:23 124:19 125:7, 13,17,18,22 126:3,12 127:5,10,15 128:6,23 129:10

**audited** 120:15 122:7,23 124:13 128:10,14 129:3

**auditors** 124:17,20 126:3

**audits** 126:22

**authority** 71:2 72:19, 21

**authorize** 91:19,22 112:3

**authorized** 93:3,10

**authorizing** 111:23

**availability** 62:12

**award** 57:2,14,20 59:3 63:16

**awards** 63:19,20

**aware** 12:7,15,18,19 29:8,17 34:21 35:14, 17 39:5 52:19 70:5 80:16 90:14 92:21,24 93:3,11,15 99:20 100:5 105:23,24 108:10 109:19 110:7 116:15 117:16,23 119:8 121:21,25 122:9,21 125:15 126:10 128:9,13 135:2 137:7,13 139:4 141:21 142:15 145:5 148:11,16,18 153:10, 12 154:5,20 156:6,24 157:12,13,15,18,19 161:14,25 162:17

**awareness** 108:13 118:18 122:13 128:19 136:22 137:19 157:8

B

**back** 17:19 18:12 49:23 51:9 66:7,14

81:11 82:3 94:21 96:5,9 97:5,8 115:11 127:10 133:6 149:21 150:4 154:3 163:6 166:23

**back-and-forth** 153:21

**background** 128:2

**balance** 72:15 121:5, 19,22 122:4

**bankruptcy** 9:7 25:17 73:2 90:2 121:7,10 139:3 144:16 145:3,6 146:2,12,17 147:11, 14,18 150:11,15

**base** 60:9,19,25 61:10,13 88:20

**based** 51:11 61:25 84:5 98:16

**basis** 55:17 56:15 61:20 139:20

**Bates** 56:4 59:21 66:22 67:3,7 95:4 107:13 116:23 119:4 123:9 124:5 130:18

**bed** 93:4

**begin** 93:23

**beginning** 66:19 94:19 150:3

**behalf** 40:10,22 41:13 59:6,10 65:21 73:6 105:8 110:9 133:5 134:16,23 138:3,7 141:5,10,21 142:5 144:15 149:8 150:18 155:21 156:14 159:8,21 161:3,10 162:13 174:5

**belabor** 90:20

**belief** 133:24

**believed** 75:2 147:16 171:14

**believing** 114:11

**benefit** 98:6

**benefits** 54:11 55:3, 15 56:3,13,18 59:20, 25

**binder** 163:21

**bit** 131:8 139:7

**board** 71:14 105:20, 21,22 106:4,19 107:2,5 129:20 130:2,5,10 134:22 136:12 137:8,21 138:3,8 139:10,11, 13,22 140:12 141:5, 22 142:6 147:5,17,22 174:25

**boards** 131:2 138:13 141:11

**bona** 42:3,4

**book** 131:11

**booked** 93:13 110:4, 13,17 116:17 120:10

**booking** 110:19

**books** 93:14

**borrower** 81:2

**borrowers** 80:12 81:14

**bottom** 107:18

**bought** 83:7

**boy** 118:8

**break** 16:8,18 64:3,5 66:5,13 93:20 94:11 96:11,13,21 149:14, 25 150:8 163:5

**Brian** 54:22 60:23

**bring** 88:24

**broad** 28:5 65:5

**broadly** 152:10

**buckets** 52:5 53:9, 15,22 60:14

**bucks** 27:9 151:18

**bunch** 126:22

**business** 51:9 54:10 55:14 67:9

**Bye** 175:15

**C**

**calculated** 140:19 160:22

**calculation** 100:21

**calendar** 154:12

**call** 43:7 96:2,24 100:20 161:16,19

**called** 41:11 54:11 112:9 158:17

**Canty** 10:17 13:13 55:22 59:18 82:7,11 85:20 94:24 98:10 107:11 108:22 116:21 119:2 123:5, 20 124:6,10 130:16 131:25 132:4,6,12 133:9 135:16 142:13 163:12 165:8 176:7, 11,15

**capability** 67:7

**capacity** 15:25 16:15 17:16 18:18 68:23,24 76:24 87:8,9 91:4 120:24 143:24,25 144:12 174:12

**Capital** 9:6 39:24 62:15 87:15 88:7,9 89:9 109:3 123:7

**captured** 83:2,13

**care** 175:13

**carefully** 50:7

**carried** 121:4,12,18, 22 122:3

**case** 8:20 12:8,17 162:8

**cash** 53:3 62:11 84:24 118:10

**caused** 41:17 70:12 169:20

**caveats** 144:4

**CDT** 176:18

**cell** 161:17

**cement** 167:15

**Central** 149:22

**certificate** 90:23

**certified** 8:3

**certify** 91:4

**cetera** 126:19 127:11

**CFO** 111:7

**change** 46:4,13 96:23

**changed** 92:23 136:9

**changing** 45:5

**characteristics** 43:24

**characterizations** 148:7

**chart** 31:16,18 98:8, 12,17 100:16

**chat** 132:13

**check** 160:14 162:21

**Christian** 108:7

**circumstances** 89:15 113:11

**Civil** 8:19

**claim** 101:14 102:16, 21,23

**claims** 141:23 142:7

**clarification** 84:12, 21,23 85:2 140:8

**clarified** 84:5

**clarity** 37:2 144:4

**Class** 39:9,19 40:8 41:4,18 43:20

**cleanly** 155:14

**clear** 15:10 36:18 51:3 103:23 140:2 144:8

**Clemente** 147:6 148:3 149:8

**close** 67:9 117:10,14 166:7

**closer** 47:24

**Central** 149:22

**Clubock** 169:24 170:19 174:22

**co-loan** 108:4

**code** 51:22 53:2

**colleague** 77:5

**colleagues** 17:19

**collect** 90:15 142:24

**collectively** 143:20

**Collins** 54:17,22,23, 25 55:14 56:14 60:23

**column** 98:23 101:20,24 102:2,4

**combination** 61:6

**commenced** 14:10 109:17 120:7,12 121:11,13,16 142:25 143:5

**commencement** 29:9 110:15 149:6 165:14 166:5,14 167:8 168:15,25 169:11 170:12

**comment** 45:8 46:9

**comments** 26:25

**committee** 148:3,4 174:21

**communicate** 159:25

**communications** 11:15 161:7

**companies** 63:3,9 70:14,21 71:3,13 72:10,20 74:2 75:4, 17 82:16 84:22 88:21,22 151:13

**company** 49:23 71:18

**compared** 74:6 75:17

**compensation** 42:3 46:19 49:20 50:12 51:11,22,23 53:3,7, 11,18 54:2,11 55:3, 15 56:3,13,17,19 57:13,20 59:20 65:8, 14,23 146:25 147:8

148:10 166:18,19
167:14 170:22
171:15,18 174:24

**Complaint** 13:6
142:16

**complete** 122:16,20

**completeness**
126:18

**compliance** 133:14,
18

**complied** 100:3

**complies** 10:2,17
13:13 55:22 59:18
85:20 98:10 107:11
108:22 116:21 119:2
123:5,20 124:6,10
130:16 131:25 132:4,
6 133:9 135:16
142:13 163:12 165:8

**comport** 102:5
137:15

**computer** 94:25

**concept** 88:25

**concerned** 169:12

**concerns** 35:18

**concluded** 10:25
176:18

**concludes** 175:18

**conclusion** 12:4

**condition** 42:7,8
73:17

**conditions** 13:20
43:8 44:5,13,22
45:10,19,23 47:6
69:12,23 70:2,6,11
72:7 73:7 75:23
82:19

**conducted** 124:20

**conference** 96:7

**confidence** 100:3

**confirm** 160:8 161:2,
11 176:13

**confirmation** 142:20
143:2,6,11 144:14
145:7 150:9,17 151:3

162:11

**confirmed** 142:16
160:16

**connection** 12:17
63:17 99:16 101:15
126:12 129:24
130:10 167:24

**consent** 112:9,17,
20,22 113:3,6,13,21
114:9,12

**consistent** 19:23
99:3

**consistently** 38:8

**consists** 175:19

**Consolidated** 123:7

**constitute** 160:19

**consuming** 13:19

**contact** 115:2

**contacted** 41:7

**contained** 127:5

**contend** 69:8,10,20
169:12

**content** 11:21

**contentious** 85:7,8

**context** 119:12,13
138:18 147:13
167:23 168:3

**continuation** 10:21

**continue** 19:12

**contracts** 129:17,21

**contributions** 88:2

**control** 25:11 42:17,
25 43:5,14 78:11,20
83:8,11 144:12
151:14 156:15 157:6

**controlled** 35:3,4
155:22

**conversation** 83:3
151:11 152:25
160:12 161:22

**conversations**
81:12 85:10 105:21
106:5 110:18 144:22,

23 152:12 162:6,10
167:18 170:19

**coordinates** 126:15

**copies** 76:14 77:9
154:4

**copy** 64:8 77:17
108:16 131:11

**Cornerstone** 70:22
72:2 74:19 75:7 83:9
167:2

**corporate** 107:19,22
108:2,12 110:7
117:4,9,17

**correct** 18:9,10 19:2,
3,15 23:14 27:19
29:2,3,6,7,11,12
32:14 33:20,21 39:25
40:13,17,20,23 41:5,
9,14,20 42:18 43:2
44:14 45:19 55:4
56:20 57:5,6 69:23
70:3,23 71:4 73:17,
19 76:12,16 77:11
99:18 109:18 111:9
117:20 127:18
129:18,22 130:2,6
139:19,25 166:9,10
170:7 172:13,24

**correction** 54:24
171:19

**correspondence**
95:4 107:11 116:23
172:12,22

**cost** 70:14 73:19 74:2
76:7 83:9,13

**costs** 74:6,15,18
75:4,9,18

**counsel** 9:12 12:22
17:25 66:16 93:19
117:19 133:22 134:8,
10 137:2 161:7

**counsel's** 11:25

**counterproposal**
84:20

**couple** 17:20 58:22,
24 71:21 89:23 96:3
134:5,6

**court** 9:7,22,24 18:10

25:18 94:17 142:15
144:17 145:3,7
146:2,12,17 147:11,
15,18 148:10 149:12
150:11,15 160:12
175:21 176:4,7,12

**courtroom** 8:17

**covered** 14:8 28:13
129:14

**covers** 14:14 83:22

**COVID-19** 8:6

**create** 45:10

**created** 29:9 35:10
110:8 168:14,25
169:7,11

**creating** 72:13
118:21

**credit** 127:11 153:25

**credited** 118:16

**creditor** 168:20
169:19,25 170:8,9
171:12

**creditors** 147:21
148:2 169:22 170:17
171:14

**critical** 93:3

**cure** 155:6,7 156:19
158:20 159:10 160:9,
19,22 161:5,24
162:4,16

**cured** 154:18,25
155:2,25 156:11
158:25 161:12

**current** 154:17,24
155:24 156:9 158:21

---

**D**

**D-CNL000212**
123:10

**D-CNL000257**
123:10

**D-CNL003585** 56:4

**D-CNL003587** 59:21

**D-CNL003763**

116:23

**D-CNL003764** 119:4

**D-CNL003765** 119:5

**D-CNL003768** 95:4

**D-CNL003770** 95:5

**D-CNL003777**
107:13

**D-CNL003779**
107:14

**daily** 110:8 176:8

**date** 15:17 22:9 24:10
25:5,12,22 26:6 27:7,
13 31:12 49:12 56:6
59:23 70:25 72:18
95:6 107:15 116:25
119:6 123:12 124:20
125:2 130:20 135:13
138:19 163:18 173:7

**dated** 97:15 108:25
119:23 123:9 130:18,
22

**David** 97:20

**day** 12:8 13:8 66:22
67:2,19 76:22 77:6
90:20 107:17 111:20
127:24 164:13

**DC** 134:8

**DC's** 134:8

**de** 51:24,25 158:19,
23

**Debbie** 10:11

**Deborah** 14:17 19:6
63:24 66:5 95:11

**debtor** 42:12 160:17
161:4

**debtor's** 41:24 42:5,
17 43:2 142:16

**December** 20:21
23:4 25:2 47:8,12
48:9,17 49:5 109:21
122:24 123:9,15
129:4 151:9 152:25
153:5,19 154:15,22,
25 155:6,20 156:6,
13,20,23,25

**decides** 129:21

**decision** 17:18 61:9 113:14

**declaration** 159:4

**declared** 157:13

**declaring** 157:16

**decreased** 52:20

**deemed** 8:25 161:5, 12 162:16

**deeply** 166:21

**default** 157:10,14,16, 19 158:5,15 159:4 161:13

**Defendant** 163:13 173:2

**defendants** 143:20 144:16 145:6 150:10, 18

**defendants'** 162:13

**deferral** 42:4

**deferred** 57:13

**defined** 166:13

**definition** 36:23

**degree** 28:12

**degrees** 75:5,6

**DEITSCH-PEREZ** 10:7,12 11:9,16 14:19,22 15:2,6,19 16:6,19,24 17:7,10, 23 18:11,15 19:3,18 20:12 22:20 26:9,22 27:20 28:10 34:5,24 35:22 36:9 37:7 38:15,22,25 39:10 42:19 43:3,16,25 44:15,25 45:20 46:6, 16 48:19 50:13 52:11 53:20 59:13 60:11 62:9 64:2,11 65:15, 24 66:24 67:10,22,25 68:6,15 69:15 70:15 71:5 72:22 76:2,18 77:12,25 78:13,17,23 79:4,10 80:11 83:25 85:25 87:19 88:10 89:17 91:6 94:9 96:5, 20 97:4 98:19 100:10

101:5 103:7 106:24 111:10 113:7,16,24 114:22,25 115:7 116:5 117:21 125:8 127:22 129:7 131:10, 13 134:24 136:14 137:11 141:24 142:8 143:12 144:9 145:10, 19 150:22 152:5 155:8 157:2 158:8 160:3 161:6 164:2,12 165:16,22 170:14 172:2 175:14,24 176:6

**delivered** 139:22 147:14

**delivery** 176:9

**demand** 14:17 28:20 45:14,18 109:20 156:3,7,8 157:24

**demanded** 45:23

**denial** 173:17

**denied** 166:9 174:7, 20 175:3

**deny** 169:5,20

**denying** 167:6 174:14

**dependents** 134:12

**depending** 128:6

**depends** 114:3

**deposed** 12:20

**deposition** 8:10 9:5, 9 10:21 11:2,7 12:5 13:25 16:5,7 18:17, 21 26:15,21,23 31:20 38:17 66:19 67:15 76:21,22 78:21 94:20 109:6,9 120:15,22 127:24 150:4 175:18 176:17

**describe** 15:12 57:12 84:6 89:15,21 130:25

**describes** 13:17

**describing** 31:5 88:13 91:17

**description** 73:9,10

**detail** 31:22 32:20 125:21 164:24

**details** 21:13 26:16 85:5 99:19 143:15

**determine** 73:24 110:22

**determiner** 106:16

**devote** 62:14

**devoted** 63:4

**difference** 67:11 116:6

**differentiated** 61:3

**diminishing** 61:14

**direct** 11:10,22 65:20 105:3 151:4,8 155:19

**directly** 88:22 96:6 147:6,21 148:2 151:13 156:15 157:6

**directors** 25:21

**disclose** 56:22 57:7 60:4,8 161:7 166:12

**disclosed** 59:10 79:22 122:22 128:13 144:16 145:6 150:19 165:12 166:6 168:20 170:10 171:11

**disclosure** 71:22 139:7 145:3

**disclosures** 138:22

**discovery** 163:11 173:21

**discretion** 113:23

**discuss** 41:8

**discussed** 57:18 167:2

**discusses** 172:23

**discussing** 119:12, 14 153:23

**discussion** 11:21 49:17 78:19 83:4 84:5,11,21 85:2 108:8 115:10 167:23

**discussions** 50:9 77:21 79:6,15,21

85:3

**disruptive** 92:19,20

**distancing** 8:8

**District** 9:8

**doc-** 29:17

**document** 10:15 13:3 19:13 29:8 32:17 54:11 56:8 57:9,14 59:12 63:13 66:6,18,21 93:23 97:11 109:11 124:4 131:7,11,21 132:11 164:5 168:14,25

**documented** 87:6 88:3 147:7

**documents** 53:24 54:6 127:11 147:10, 14 163:22 169:10

**dollars** 52:9,17

**Dondero** 8:1 9:1,5 10:1,20 11:1 12:1 13:1,4 14:1 15:1 16:1 17:1 18:1 19:1,12,25 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1,3 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1, 18 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1,3 57:1 58:1 59:1,20 60:1 61:1 62:1 63:1 64:1,17 65:1 66:1,18 67:1,21 68:1,22 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,6 80:1 81:1 82:1,15 83:1,18 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,20 95:1,8, 10,12 96:1 97:1,5 98:1 99:1 100:1 101:1 102:1,3 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1,

15,21 116:1,2 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1,6,18 132:1 133:1 134:1 135:1 136:1,25 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,4,8 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,20 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1,17

**Dondero's** 18:17 96:8 114:21 163:10, 14

**drafted** 46:24

**drafting** 125:16,18

**dual** 60:24

**due** 8:6 42:2 79:24 80:3,17 102:18 103:10,12 118:17 135:20 151:12 152:2

**Dugaboy** 13:18 19:17,19,22 20:2,11, 19,25 21:2,8,12,17 22:2,11,19 23:3,8,13, 17,22 24:8,13,18 25:2,14 26:2,7 27:6, 12,18 28:8 29:19,25 30:8,14,23 31:4,9,22, 25 32:2,4,7,8,12,14, 19,22,23 33:2,12,14, 18,25 35:4,8 36:3,6, 12 37:5,6,17,20 38:9, 12 39:7 40:7,13,15, 23 41:3,12,17 42:16, 24 43:14 44:11,21 45:17 47:19 49:5,19 50:11,18,20 51:6,7, 17 52:2,8 53:10,13, 17,25 54:5 56:24 57:5,8,13 58:17 60:6, 9 64:18 65:6 73:11

75:15,21,24 76:11,15
77:8,17,22 78:5 79:7,
15,21 80:22,25 81:4,
5,6,12 82:24 84:10,
14,20 137:24 138:10
139:25 144:18 145:9
146:3,13,19 148:14
149:9 167:11 170:12

**duly** 10:5

**Dustin** 153:9

**E**

**e-mail** 19:9 63:24
64:8 68:2,4,9,12,18
95:3 97:14,19
107:12,18 108:11,16
116:22 117:4 160:15
172:22

**e-mails** 172:14

**earlier** 12:16 27:16
51:20 59:5 60:15,16
118:15 134:4 166:17

**early** 20:21 23:5 25:3
91:12,23 110:24
111:19,25 112:5,10
157:9

**easiest** 68:7

**Eastern** 66:8

**easy** 64:10

**educated** 118:8,12

**educted** 118:9

**either/or** 69:4

**email** 172:11

**Emanuel** 10:10

**embedded** 72:8 75:9

**employee** 56:20
88:20

**employees** 54:12
55:4,16 56:15 60:24,
25 125:16 135:7,9
151:20

**employees'** 88:14

**empowered** 160:6

**encourage** 112:23

**end** 20:20 49:9 66:22,
25 67:18 94:2 96:8
124:19 154:12

**ending** 122:24 129:4

**ends** 89:3

**enter** 19:17 20:2,7,18
23:2 24:25 31:24
32:6 41:13,19

**entered** 13:18 20:5,
11,25 21:16 22:17
25:13,21 26:6 27:5,
12,18 28:8 31:3,8
33:11,24 39:8 40:5,9,
16,20 41:2 42:13,15,
23 44:11 45:16 47:8,
18 49:4,12 50:20
53:13 73:21 74:7,12,
19,25 75:24 81:3
137:24 138:9 139:24
145:8 146:3,12,18
148:14 170:11

**entering** 32:11 43:12
46:13 51:6 53:12,19
54:2,6 73:4 75:18
76:12,16 77:10,18

**entities** 28:18 30:25
36:3,14 38:13 52:22
61:2,7,18,22 62:3,18,
19 79:25 80:17,20,23
81:17,18,23 88:12
89:3

**entitled** 14:23 124:13

**entity** 35:5 40:9
60:21 81:13 156:14
157:5

**entry** 50:19 85:11
125:13

**equal** 99:12 112:9

**equity** 63:8 71:17

**error** 99:17 100:9,19
101:15 102:8 104:18
105:5,9,13 106:23

**Essentially** 92:2

**estate** 86:25 89:10,
24 90:4,7 134:6,10
148:9 167:16 170:22
172:15

**estimate** 85:16

**estimated** 99:4

**evening** 175:12

**events** 122:24
124:14,17

**everybody's** 9:17
175:22

**exact** 85:15 100:4,5
112:12

**examination** 10:18
12:23 93:23

**examined** 10:5
12:16,19

**exceeded** 74:2 75:4

**excused** 176:16

**executed** 24:11
30:13

**executive** 126:17

**exercise** 42:25 43:5
113:23

**exercised** 43:14,19

**exercising** 42:17

**exhibit** 10:16 55:21
56:2,9 59:17,19
82:10 93:18 94:23
95:3 97:12 107:10,12
116:20,22 118:24
119:3 123:4,6
130:15,17 163:9,13
173:2,9

**existed** 122:19

**existence** 109:11
138:4 144:17 145:7
146:17 148:13
165:12 168:16 169:3,
13 170:10 171:11
172:23

**existing** 38:3

**expectation** 147:7

**expenses** 104:10

**experience** 104:21

**experienced** 90:3

**expert** 12:15,18 45:8
59:6,11 65:12,21

**experts** 89:24

**explained** 143:15

**expressed** 76:7

**expressing** 76:6

**extent** 11:19 104:6,
12 122:17 169:25

**external** 58:14

**F**

**fact** 41:17 75:7 82:5
99:15,21 111:20
119:8 153:11 162:20

**facts** 70:5

**fair** 12:11 13:21 14:4
42:10 51:23 57:4
70:7 74:11,24 75:12,
13 101:4 110:14
113:19 125:19
127:15 130:25
148:17

**faith** 100:3

**fall** 53:8,14,22

**fallen** 52:4

**familiar** 9:16 34:15
102:20 126:10

**fastest** 64:14

**fault** 33:8

**February** 47:13
48:10,18 49:6 142:17
143:7 155:3

**Federal** 8:18

**fee** 112:9,17,20,22,23
113:3,6,13,21 114:9,
12

**feed** 116:3

**feel** 167:19

**fees** 101:9 103:24
104:7,9

**fide** 42:3,4

**figure** 68:9

**file** 101:14

**filed** 142:20

**filing** 145:18 147:20

**filings** 145:22

**final** 136:19

**Finally** 89:17

**finance** 100:7

**financial** 32:23 33:3
120:16 122:7,23
123:8 126:7 128:10,
14 129:3

**financials** 31:21
32:19 122:16 123:16
124:13

**find** 46:19 64:13
173:24

**fine** 44:7 64:12
149:21

**finish** 66:9 116:10
149:19 150:7 156:22
173:19

**firm** 63:25 67:7
125:23 127:10 128:5
176:10

**fiscal** 124:19

**five-** 63:22

**fixed** 116:3

**floor** 96:9

**focus** 120:20

**focused** 120:24

**follow** 11:24 77:4

**follow-up** 28:5

**force** 71:17

**forgive** 31:25 39:20

**forgiven** 69:11,21,22
70:12 166:19 170:21
171:15,17 174:23

**forgiveness** 13:19
32:13 33:13 51:20
81:7,8 101:9 103:24

**forgiving** 167:13

**form** 27:21 28:11
34:25 36:10 37:8
42:20 43:4,17 44:2,
16 45:2,21 46:7,17

48:20 56:12 59:14
60:12 62:10 65:16,
22,25 66:17 69:16
70:16 71:6 72:23
76:3,19 77:2,13 78:2,
9 79:11 84:2 86:2
87:20 88:11 91:7
98:20 100:11 101:6
103:8 111:11 113:8,
17,25 117:22 125:9
127:23 129:8 134:25
136:15 137:12
141:25 142:9 143:13
145:11,20 150:23
152:6 155:9 157:3
160:4 165:17 172:3

**formally** 147:3

**format** 56:16

**Fort** 92:4

**forward** 146:22

**forwarding** 97:19

**foundation** 121:20

**fraction** 24:19

**Frank** 90:16 92:12,14
108:11 126:8 151:11
158:17 159:12,14,19
160:5,22 162:14
165:13 166:7,14,21
167:7 169:25

**Friday** 10:22 11:2,8

**Friday's** 12:23

**front** 17:15 18:25
19:14 133:6 163:21

**frozen** 114:21,23

**fulfillment** 69:12,22

**full** 62:14

**fully** 103:21 104:3
160:6

**function** 111:13

**functions** 129:11
135:10

**fund** 72:5 97:25 98:5,
17,24 99:5,11,15,21
100:2,8,17 103:21
104:3 109:3

**funded** 103:4

**funding** 100:23
102:18

**funds** 83:10 129:18,
20 134:2,18 135:11

**future** 135:21

G

**GAF** 97:22,24 100:18
102:6,18 103:21
104:4 105:12,22
106:3,21

**gave** 50:23 51:5
92:17 93:6 104:6,12
122:9 136:12 137:17
152:22 153:19
157:10,16 174:16

**gears** 85:17 129:16

**general** 50:17 128:3,
7 133:22 134:9
151:23

**generally** 14:5 28:16
53:8 56:21 83:22
92:15 110:5 111:13
112:2 119:20 120:19
142:18 143:16
144:20 148:10
151:15 170:17 171:9,
10

**give** 68:8,10,15 75:14
90:12 92:5 94:25
115:2 151:24 162:19

**give-and-take** 92:23

**glad** 16:12

**good** 8:2 94:16,17
149:13 155:24
175:12

**grant** 43:7

**granted** 44:4 63:16

**gratuitous** 26:25

**greater** 47:17

**gross** 21:18 57:17

**group** 54:15,18,21
107:19,22 108:2
110:8 117:5,18
125:25 126:6,8
166:21

**growth** 51:10

**guess** 31:7 40:4 42:6
48:23 55:11 80:4
118:12 143:16
144:20 157:13,19
171:8

H

**half** 149:18

**hand** 9:25

**handled** 38:7

**handles** 126:9

**hang** 114:25

**happened** 44:8
48:12

**Hayley** 108:7

**haywire** 94:25

**HCMFA** 62:21 90:15,
24 91:5,14,23 92:20
93:2,13 97:22 99:10,
11,15,21 100:7,17
101:14,20 102:6,16
103:20 104:2,11,13,
16 105:8,11 106:3,
21,22 107:23 110:2,
22,24 111:8,21,24
112:4,8,17 113:2,6,
14 114:7,12 116:16
118:11 119:14,18
120:6,10,25 125:2
128:10,13,20 129:6
134:13 135:6,23
140:12,23 141:6,10,
21,22 143:19 144:7,
11

**HCMFA's** 93:14
121:19,22 122:4
128:23 129:3

**HCMFAS** 130:19

**HCMLT** 107:23

**HCRE** 14:10 62:21
81:22 85:23 86:3,5,
14,17 87:10 88:15
143:19 157:22

**head** 22:23 24:4,5
26:8 27:23 29:22
31:14 54:17,20 63:5

90:11

**heading** 124:9

**hear** 115:15,16

**heard** 157:19

**hearing** 143:2,6
145:17 146:16
158:16

**held** 9:9 35:8 41:3
72:10 73:12 111:7,8
115:10

**helpful** 89:13

**helps** 141:19

**Hendrix** 97:20
108:15 117:4,8,12

**Hendrix's** 108:15

**hidden** 104:20

**High-** 126:25

**higher** 74:9,10,15,22,
23 75:8

**Highland** 9:6 14:10
15:15 25:12 32:2
34:16 35:9,19 36:14,
17,22,24 37:18,21
38:10 39:24 40:10
41:14 46:20 51:13,25
52:12 54:10 57:25
60:20 61:5,13,16
62:6,15,21,22 63:7
70:13,18 71:16 72:25
79:18,25 80:4,17
85:24 86:8,15,18,24
87:2,5,9,15,17 88:2,
7,8,19,23 89:4,8,25
90:3,6,14 91:13,22
92:20 93:13,14
102:24 104:15,17
105:4,9,12,25 106:3,
4,22 109:2,19 110:2,
10,22,24 111:7,21,24
112:4 113:5 114:5,13
116:16 118:9,11,15
119:9,15,16,18
120:6,9,25 122:9
123:6 125:15,25
127:4,12 128:24
129:6 134:14 135:5,
11,23 137:9,18 139:2
140:14,24 141:23
142:7 151:12 152:2,3

153:6 154:6 155:5,20
156:7,13 157:7,10,
13,21 158:6,15
159:9,12,15,16 166:3
172:15

**Highland's** 33:3
41:4 55:4,16 56:15
72:9,13,15,19 73:25
74:5,14 75:3,16,17
120:15 121:5 122:7,
22 126:12 154:21
170:9

**Highland/nexpoint**
61:6

**hindsight** 50:3

**hit** 19:10

**hold** 40:2 58:2 96:4

**holder** 83:5

**holders** 39:19 43:20
71:21

**holidays** 47:25 48:12

**Honestly** 56:25

**hope** 66:23 67:6
78:14 149:16 152:14

**hour** 68:5 149:18,19

**housed** 105:25

**Human** 54:14,18,20

**hundred** 60:20
126:23 127:9

I

**idea** 61:20 62:4
102:25

**identification** 56:5
59:22 95:6 107:15
116:24 119:5 123:11
130:20 163:17 173:6

**identified** 30:22 80:8
81:22 90:23 108:12

**identifies** 29:10

**identify** 21:10,14
22:9 23:15,20 24:10
26:4 28:6 29:23 30:6
31:11 33:22 34:9
47:17 62:19 63:3

77:22 79:7,16 80:2, 19 81:13,14 84:18 104:21 106:11 156:12 169:19 172:11,22

**II** 9:4 94:19 175:18

**illiquid** 72:14 84:24

**illiquidity** 75:13

**imagine** 141:14

**immediately** 14:18 160:23

**imminent** 73:14

**impact** 44:9

**implied** 75:9

**impossible** 42:9

**improperly** 122:18

**inability** 78:20

**inaccurately** 129:4

**inappropriate** 17:6, 12

**include** 84:15 124:17 139:6

**included** 84:9 108:11 153:24 166:20

**includes** 140:21

**including** 92:25

**incorporate** 86:19

**increase** 51:21

**incumbency** 90:23 91:4

**incurred** 28:17,20

**independent** 25:20 147:5,16,21 174:25

**indirectly** 147:4 151:13 156:15 157:6

**individual** 15:25 16:16 17:16 38:18 68:23 120:23 143:24 144:12 174:12

**individuals** 88:16

**industry** 46:20 51:12

53:4

**ineffective** 147:25

**inform** 25:17,20 105:3 138:12 151:4 162:13

**information** 15:8 49:19 50:11,18,23 51:5 56:23 60:5 75:15 123:9 127:5,13 129:25 131:3

**informed** 99:11 104:16 105:8,11 108:2 137:8,21 138:7 141:5 142:5 146:16 150:10

**informing** 141:22

**infrastructure** 135:4

**initial** 138:23

**initiatives** 51:10 63:7,10

**input** 87:3

**insist** 26:12

**instruct** 55:6 92:10 138:2 139:9,10 140:4

**instructed** 92:7 107:21 110:2,23 152:20

**instructing** 92:14

**instruction** 152:22 153:18

**instructions** 92:5,17 93:6 151:25

**insurance** 101:8,14, 18,22 102:16,20,23 103:4 112:13

**integrity** 126:19

**intended** 56:18

**intent** 46:15,18

**intentionally** 47:4

**inter** 108:3

**interaction** 126:9

**interest** 22:5 34:16, 23 35:2,5,9,18 36:8, 19 37:5 41:4 70:13

118:17 154:10 156:10

**interests** 72:9,10,13, 19 73:25 74:5,14 75:3,16

**interpretation** 44:5 100:25

**Interrogatories** 163:16 165:10 173:5

**Interrogatory** 171:23 172:12 173:16

**interrupt** 144:25

**interrupting** 145:11

**Interruption** 115:22

**interval** 49:9

**introduce** 9:12

**investment** 98:2

**investors** 98:6 103:10

**involved** 49:25 66:3 92:8 129:10,12 156:16,17 166:22

**iphone** 68:13

**irrelevant** 139:17

**issue** 70:22 77:18 92:3 93:4 169:8

**issued** 38:4 42:5 125:2 140:23

**issues** 141:16

**items** 104:13

**J**

**Jacob** 8:3

**James** 8:1 9:1,5 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1

47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1,2 57:1 58:1 59:1,19 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,20 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,4 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,14 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1,17

**January** 25:9 48:18 49:6 143:6 155:2 156:19,22 157:12,14 158:6 159:10,24 161:23 162:15

**Jernigan** 148:12,20 150:19 151:4 162:4, 14

**Jim** 118:5 149:8

**job** 77:4

**John** 17:8 26:9 38:15 66:25 67:11 68:18 76:20 80:12 82:7

96:10 114:22 132:13 164:13

**Johnson** 12:7,9

**Johnson's** 12:12,13

**Jones** 161:3

**judge** 106:15 148:12 150:19 151:4 162:4, 14

**June** 123:24 137:9 140:14

**K**

**kind** 52:20 81:9 139:17 141:13 167:15

**Klos** 97:20 107:18

**Klos's** 108:16

**knew** 40:19,22 45:9 49:22 74:9,13 79:24 80:21 81:17,18,19,23 166:23,24 167:7

**knowing** 136:18,20 139:21

**knowledge** 12:12,13 37:22 69:25 70:4,10 109:15 127:6 140:18

**Kristin** 97:20 108:7 122:17

**L**

**L.P.** 9:7 36:24 39:25 58:5,13 62:16 88:9 89:9 109:3 123:7

**L.p.'s** 173:3

**ladies** 96:6

**large** 71:21 72:14

**largely** 71:25

**largest** 83:5

**lasted** 85:10

**late** 120:3 130:8 164:12

**lawsuit** 29:14 35:21

**lawsuits** 14:9 29:10, 16 30:3,10,16 33:20 34:2,21 39:5 142:24 143:5,10 150:12,20

**lawyer** 160:2

**lawyers** 134:6 161:10

**leadership** 87:5 88:2

**learn** 120:5,9 121:3, 9,11,17 122:2 158:14

**learned** 109:10,25 110:4

**learning** 159:3

**leave** 67:3 97:3 115:6

**leaving** 175:22

**led** 41:8 49:18 50:9 85:10

**left** 38:2 95:12

**legal** 8:4 45:5 133:14, 18,25 134:12

**legally** 146:21

**let alone** 26:19

**letter** 57:4 60:22 127:18,21 136:20,25 138:19 141:15

**letters** 57:2 128:23 129:13 136:19 138:22 139:5,6 157:21

**liabilities** 121:19,22 122:4

**life** 15:5

**likelihood** 73:6,8 75:22

**Limited** 34:17 36:22

**liquidity** 72:13

**list** 14:24 18:22 21:13 26:10,17 28:9,24 29:5 110:8

**listed** 134:2

**listen** 50:7 78:18 148:6

**listing** 15:14

**litigation** 31:11 107:6 109:14,16 110:6,16,19 120:7,12 121:8,10,13,16,25 122:3 149:7 167:9

**litigations** 38:19

**loan** 15:16 38:9 93:13 110:4,14,17 116:17 117:10,13,24 118:15, 21 120:5,11

**loans** 21:20 28:19 38:12 129:6 158:2

**logs** 49:16

**Loigman** 10:8,9

**long** 73:12 85:4,9,10 93:24 96:16 162:23 166:17

**longer** 78:21 85:13

**looked** 13:8 27:15 50:2 164:24

**loose** 47:4

**loss** 98:17 99:4,13 103:6

**losses** 99:17

**lost** 98:24 115:2

**lot** 86:21 89:24 91:15 162:7

**lots** 170:18

**loud** 168:23

**low** 49:22 52:20

**lower** 83:8

**LPA** 169:14 175:7

**lucky** 96:6

**Lynn** 144:22

---

## M

**made** 32:13 33:13 36:12 47:11,13 48:10 49:23 51:8 61:9 78:3 84:20 102:24 109:20 110:9 114:14 122:17 147:20 148:20 149:4 153:6 154:6,12,15,22 155:6 156:7,13,24

**159:10 161:4 162:4**

**major** 20:14,19,24 21:7,11

**majority** 34:16,23 35:2,4,8,18 36:8,19 37:5 39:9,18 40:7,8 41:4,18 43:20 72:3 83:6

**make** 13:15 15:10 17:12,17 29:4 46:19 65:4 67:12 92:7,10 99:11 101:3 102:16 113:23 114:8 116:5 118:19 140:9 144:8 152:20 155:20 158:21,24

**maker** 21:10 23:15, 20 26:4 29:23 31:12 32:2,8 33:18 36:3,7 37:6,17,20 79:16,18, 22 80:9 81:2 109:2

**maker/borrower** 80:14

**makers** 27:10 46:25

**makes** 119:11

**making** 26:12,24 100:18

**manage** 129:18

**management** 9:6 39:24 62:15,22 87:5, 16 88:7,9 89:9 92:25 103:24 104:7,9 109:3 123:7 127:18,21 128:22 129:13

**manager** 58:14

**managers** 135:6,8

**manner** 100:17

**Mark** 54:17

**marked** 10:15 56:5 59:22 95:5 97:11 107:14 116:24 119:5 123:11 130:19 163:17 173:6

**market** 89:5

**material** 82:17 106:4 124:18 135:20

**materially** 84:4

**math** 103:3

**Matt** 149:8

**matter** 9:5 55:11 75:6 103:2 146:15 153:11

**Mcgraner** 86:6,21,24 87:2,23

**meaning** 20:21 98:4 134:8

**means** 11:18

**meant** 131:19

**mechanisms** 167:12,14

**media** 9:3 93:20 94:2,19 150:3 175:19

**meeting** 105:21

**meetings** 106:19 130:4

**member** 71:14

**members** 117:17

**memo** 130:9,22,25 131:2 132:24 133:4 134:17 135:13 136:3

**Memorandum** 130:17

**memorialize** 160:24

**memorialized** 49:12 161:22

**memory** 26:13

**memos** 134:21,23 136:5

**mention** 102:24

**message** 66:17

**met** 45:24

**MGM** 70:22 71:14 74:6,14,16 75:11 83:4 167:2

**Michael** 77:5 95:23

**middle** 103:15

**million** 22:4 24:20,23 27:8 52:9,17,23,24 58:2 61:5 62:6 90:17

**91:11,13,23 92:6,11, 14 93:12 99:6,16,22 101:22 102:7,17 103:5,17 104:2 107:23 109:2,25 110:13,20,23 111:17, 21,24 112:4,10 117:9 119:10,14,16,23 125:4 129:5 137:10, 22 138:13 140:13,22 141:6,7,12 151:17

**mince** 104:5

**mind** 154:12,15 168:8,9

**mine** 96:19

**minimis** 51:25 158:19,23

**minimum** 76:5

**minimus** 51:25

**minor** 20:16

**minority** 72:4

**minute** 17:14 68:8,16 94:2,13 95:2 96:17 115:2 127:8

**minutes** 12:6,22,24 17:20 93:20 96:3 105:20 107:3,5 149:22 162:21 170:2

**mistake** 49:2 114:13

**moderately** 74:21, 23 75:8

**modest** 51:11,21

**modification** 45:6

**modified** 136:4

**moment** 38:8 58:21 125:13 162:20 174:13

**monetization** 72:12 73:13 84:23

**money** 80:25 93:2,10 99:12 101:2 104:2,14 119:18

**monies** 101:10

**month** 147:19

**months** 147:20

**Morris** 8:21 9:14 10:14,19 11:12,23 13:2,11,14 14:17,20, 25 15:4,9,11,22 16:11,22 17:2,9,21 18:2,4,7,16,24 19:5, 11,24 20:15 22:24 26:18,23 27:2 28:2, 23 34:8 35:7 36:5,15 37:16 38:21,24 39:2, 3,15 42:21,22 43:9, 21 44:6,19 45:11 46:2,11,22 48:24 50:4,6,16 52:15 53:23 55:20 56:7 59:16,24 61:8 62:13 63:23 64:6,16 65:19 66:4,16 67:5,14,20, 24 68:3,14,19,21 69:17,19 70:20 71:9 73:3 76:9,23 77:7,15 78:8,15,19 79:2,5,13 80:18 82:5,9,13,14 84:7 85:18,21 86:9 88:4 89:6,20 91:9 93:17,21 94:4,7,10, 14,22 95:7,11,16,19, 22 96:14,22 97:9 98:8,11,22 100:14 101:11 103:14 104:24 105:2 106:6,8 107:4,9,16 108:20,23 111:16 113:12,18,20 114:4,20,24 115:5, 13,25 116:7,9,12,19 117:2 118:2,24 119:7 123:3,13,17,21 124:3,7,11 125:10,11 127:25 128:8 129:15 130:14,21 131:12,16, 17 132:7,14,16 133:10 135:14,17 136:23 137:14 142:3, 11,14 143:17 144:10 145:13,24 149:15 150:6 151:2 152:9,18 155:10 157:4 158:13 160:7 161:8 162:19 163:8,19 164:4,15,17 165:7,9,19,24 170:23 172:6 173:8,12,14 175:9,13,15

**move** 37:2 38:20 50:4 104:24 106:6

**movement** 93:10

**moving** 99:8

**multiple** 61:2 63:7 83:10 138:25 153:22

**mute** 115:16,17,21

### N

**Nancy** 39:18 40:12, 15 41:8,11,16 49:19 51:16 56:23 57:8,12 58:16 60:5,8 64:17 65:6 76:10,15 77:8, 17,21 78:4

**nature** 13:22 58:8,11

**NAV** 99:17 100:8,19 101:15 102:8 104:18 105:5,9,12 106:23

**needed** 96:11 104:3, 14 119:14

**negotiation** 83:24 84:4 85:8

**negotiations** 92:22

**net** 112:12

**Newman's** 10:11

**Nexpoint** 14:11 23:25 58:4,5,12 61:16 62:6,21 63:12 64:19 80:22 81:19 89:7,8,23 90:7 134:4, 12 135:7,24 137:8, 17,20,21 138:3,7 143:19 157:22 173:3, 21 174:5

**Nexpoint's** 138:8

**NFLP** 63:20

**nomenclature** 80:15

**normal** 156:17

**Norris** 153:9

**Northern** 9:8

**note** 14:14 21:11,15 24:7 26:5 28:6 29:24 30:7,13 32:2,8,13,20 33:13,18,23 34:10 35:15,19 36:7 37:6, 18,20,25 38:2,3,4

42:3 44:13 45:6,18, 19 46:5 47:13 48:10 91:11 96:10 108:8, 17,25 109:16,21,24 111:18 117:18 118:17 119:4,17,22, 23 137:17 154:20

**notebooks** 15:7

**notes** 13:20 14:9,15, 24 15:14 18:23 20:3, 5,23 21:7,24 22:10, 14,17 23:7,11,16,21 24:11,16 25:14,24 27:4,10,17 28:20,25 29:5,10,13,15,17 30:2,15,21 31:5,10, 12,23 32:25 33:2 34:20,22 35:20 36:2, 13 39:4,6,20 41:23 42:11 43:15,24 44:23 45:13,14 46:14,23 47:4 51:21,24 69:8, 10,20 70:12 76:11,15 77:10,18,23 79:8,16, 23,24 80:3,9,16,24 81:6,7,15 90:15 91:11,16 92:2 120:21,25 121:4,11, 15,18,21 122:3,10,22 125:2 128:14 135:21 140:23 142:25 146:23 147:8 148:8 150:12,20 151:5 152:7,17 154:10 155:23 156:3,4,8 157:11,24 158:7,24 161:13,20 166:17,18 167:14 169:8 170:20 171:14 174:23

**notice** 148:11 157:10,16

**notice-of-default** 157:21

**notices** 158:5,15

**notifying** 148:10

**noun** 70:18

**November** 9:10 154:7

**number** 9:3 23:11 64:22 66:22 94:2,19 136:13 140:19 150:3

163:23,24 166:2,8 168:11,13,22,23,24 169:19,21 171:23 172:9,13 173:9,16 174:4,7,10,15,19 175:3

**numbers** 50:3 99:8 100:4,5 102:13 104:6 158:22

**numerous** 30:18 36:2 38:12 41:25 60:24 105:17 107:2 144:21

**NXRT** 57:21,24

### O

**object** 15:4 16:11,12, 13 17:21 27:20 28:10 34:24 36:9 37:7 42:19 43:3,16,25 44:15,25 45:20 46:6, 16 48:19 59:13 60:11 62:9 65:15,24 69:15 70:15 71:5 72:22 76:2,18 77:2,12,25 78:6,10 79:10 83:25 85:25 87:19 88:10 91:6 98:19 100:10 103:7 111:10 113:7, 16,24 117:21 125:8 127:22 129:7 134:24 136:14 137:11 141:24 142:8 143:12 145:10,19 146:7 150:22 152:5 155:8 157:2 160:3 165:16 172:2

**objecting** 78:9

**objection** 26:19,20 101:5

**objections** 142:19 163:14 173:3

**objects** 8:22

**obligation** 138:8

**obligor** 80:25

**obtain** 71:4 72:21

**obtained** 136:25

**obvious** 50:2 51:3

**occur** 73:7 124:18 159:24

**occurred** 70:2

**October** 130:18,23 133:18,23 136:11 137:3,7 138:20 139:13,22 141:15

**odd** 22:4

**office** 19:7 151:20

**officer** 87:10

**officers** 133:18

**offset** 138:14 141:12

**Okada** 87:24

**one-off** 170:19

**ongoing** 168:6

**opinion** 45:7

**order** 33:10 103:21 104:3 175:23 176:8

**ordinary** 54:9 55:13

**organization** 111:14

**original** 15:15 24:6

**originally** 46:24

**outs** 148:2

**outstanding** 28:21 38:3 119:17 137:16 138:8 140:13 155:23

**overarching** 13:21

**overpaid** 151:16

**overpayment** 154:2

**oversee** 111:4

**overstated** 141:6

**overview** 13:21

**owed** 80:25 137:9

**owing** 152:2

**owned** 72:4 97:25 155:21 157:6

**owner** 87:10

**owners** 87:22

**ownership** 83:10 88:15,18

**P**

**p.m.** 9:11 175:20 176:18

**Pachulski** 161:2

**page--** 13:11

**paid** 52:21 99:15,21, 25 101:17 102:6 104:10 110:2 112:8 113:3,6 114:12 119:9,16 153:25 154:17 158:19,24 160:18,23

**painfully** 172:15

**paint** 53:2

**paper** 117:13 173:13

**paragraph** 13:3,12, 17 14:3 39:16 47:10, 20 48:8 81:25 82:10, 17,25 83:14,18 124:24 141:19 171:6

**parenthetical** 118:4

**parsing** 87:13

**part** 18:16 28:21 30:9 43:23 46:9 65:8,13 73:17,18 83:14,16 104:13 106:4 110:5 112:6 121:7,9 122:10,16,19 145:16 148:8 166:19 167:15 170:22 171:15,18 174:24

**parte** 162:6,10

**participants** 86:5

**participated** 130:4

**parties** 8:14 23:25

**partly** 169:9

**partner** 10:11 95:24

**partnership** 34:17 36:22 125:3

**pas** 38:6

**past** 38:7

**pay** 112:17 114:8 151:25 152:12,16 174:22

**payable** 15:14 135:20

**payee** 32:3 35:19 37:18,21 80:9

**paying** 99:12

**payment** 91:20 97:22 98:3,5 100:8, 18 101:3 102:18 103:16,22 104:3 109:20 113:13,21 118:16 153:6 154:22 155:6,7,20 156:7,12

**payments** 151:12 152:10,15,21 154:5, 9,11,14 156:18,19,24 159:9,11 160:18 161:4,5,12 162:4,15, 16

**pending** 8:20 30:3,9, 16 31:10 33:19 34:2, 20 35:21

**people** 67:3 148:19, 24 153:14,24

**percent** 35:3 57:16 60:20 71:16 96:24 126:23 127:9

**perfectly** 64:12

**performance** 57:22 63:17 89:2

**performed** 106:2 134:14

**period** 47:23 122:23 124:19 129:4,14 138:19 139:13

**periods** 85:14

**person** 31:3,8 88:6 144:12 158:17 159:15

**personal** 18:18 68:12

**petition** 25:5,12,22 26:6 27:7,13 70:25 72:18

**phone** 49:16 63:24

96:15 160:12 161:17

**photograph** 64:8 66:17

**phrase** 13:25 36:19, 21 150:14

**picks** 104:22

**picture** 15:20 16:20 53:2 64:3,15 68:7

**piece** 93:4

**place** 71:20 135:13 143:7 161:18,19

**places** 105:17

**plaintiff** 39:19,20,23 40:9 41:19

**Plaintiff's** 13:5 163:15 173:4

**plan** 142:20 146:22 148:23 166:22

**platform** 87:2 90:6

**plays** 126:11

**pleading** 145:18

**pleadings** 145:22

**plot** 146:22 148:23 166:22

**pocket** 103:21

**point** 18:16 37:19 103:25 141:17 148:5 149:13 175:6

**portfolio** 70:14,21 71:3,12 72:9,20 73:25 75:3,17 82:16 87:4,25 135:6,8

**portion** 120:22 131:7,21 132:10 137:22 138:13

**portions** 72:14

**potential** 32:13 33:13

**potentially** 11:21

**practice** 8:7 134:20 135:3

**precise** 24:21

**preferred** 86:4

**premarked** 56:9

**preparation** 126:3 167:24

**prepare** 55:15 108:7

**prepared** 54:10,14 56:14 117:19

**preparing** 55:2 133:4

**prepaying** 38:2,5

**prepays** 37:25 38:7

**present** 42:7 69:13

**presented** 147:11 148:25

**president** 61:15,16 87:9 91:5 126:14 134:20 147:23

**pretty** 126:23 135:8

**previously** 76:8 117:19

**price** 83:7

**Pricewaterhouseco opers** 123:23

**Pricewaterhouseco opers'** 123:19

**principal** 21:14,24 22:5 24:6,16 30:7 31:13 118:17 140:22 154:9 156:10

**prior** 24:19 29:9 50:18 63:19,20 70:25 72:18,25 73:2 76:11 90:2 96:20 110:15,19 121:25 144:14 145:7 149:6 150:9,17 151:3 165:13 166:4,14 167:8 168:14,19,25 169:11 170:12

**private** 63:8

**problem** 78:8 132:20 140:10

**procedures** 8:19 103:4

**proceed** 9:18 19:6 68:3,14

**proceeding** 165:14 166:5,15 168:15 169:2,12 170:13

**process** 71:23 122:11 130:6,11

**produced** 14:18 107:6

**producing** 67:8

**product** 125:23

**production** 66:20,21 163:17 173:6

**professional** 77:4

**promise** 67:18

**promissory** 13:19 20:3,23 21:6,15 22:10,14,17 24:11 25:14 28:6 29:13,15, 17,24 30:2,7,13,15, 21 31:25 32:8 33:18, 23 34:10,13,19,21 35:15,19 36:7 37:6, 18 39:4,6 41:23 42:11 43:15,24 44:13,23 46:14 76:11,15 77:9,18,22 79:8 108:8,17,24 109:16,21,24 117:18 119:3,23 122:10,22 125:2 150:11,20 151:5 169:8

**propel** 51:10

**proper** 53:2

**properly** 122:18

**property** 41:24 42:5, 17 43:2

**proposal** 146:21 167:25

**proposals** 147:2,20 149:4 169:6

**proposed** 84:16

**proved** 147:24

**provide** 49:19 50:10, 17 53:24 86:17,24 89:8 125:21 129:25

**provided** 85:23 86:3, 7,14,21 87:11,16 88:8,22 106:21 130:9

133:25

**providing** 87:8

**provision** 83:23
84:8,15,18

**purpose** 46:12

**purposes** 60:22

**pursuant** 85:23
86:14

**put** 10:14 14:21 15:23
16:3,14 55:20 59:16
82:3 85:15 93:17
94:23 115:14 116:19
118:10 123:3 130:14
132:12 146:21 163:9

**puts** 126:21

**putting** 92:25 93:4
109:23

**PWC** 122:10 126:21
127:2 128:11

**Q**

**question** 11:14 20:4
32:5 33:6 35:13 50:8
52:13 53:17 69:18
72:16 77:3 78:9 80:2
81:10 86:12 88:5,18
96:23 100:13 106:17
109:23 135:19
136:13 141:20 145:2
146:8 150:16 169:5

**question's** 149:5

**questioner** 89:19

**questioning** 120:23

**questions** 10:8 14:6
15:24 16:15 17:3
20:5 28:5 50:22
53:11 68:22 76:8
78:24 88:14 106:14
132:9 138:23,24,25
139:7 140:17 143:21,
23 165:5 175:10,17

**quick** 149:14

**quickly** 132:19
165:20 173:18

**Quinn** 10:10

**quote** 39:17 47:11
97:21 108:3 117:10,
13,14 124:25 166:4,7

**R**

**raise** 9:24

**range** 22:6

**rattled** 138:17

**reach** 95:24 96:4
148:2 159:16,17,21

**reach-outs** 148:7,19

**reached** 159:8,15

**reaches** 148:2

**read** 64:10 83:20
132:19 168:17,23
169:4

**reading** 168:18

**ready** 116:13

**real** 86:25 89:10,24
90:3,7 112:16 134:6,
10

**reason** 62:7 75:20
77:16 150:13,21
151:6 168:2 173:17
174:14,15,19 175:2

**recall** 20:17 53:5,16
54:4,9 59:9 61:19
75:19 76:13,17
79:12,14 84:13,17
85:9 90:22 91:3,12
93:6,8 99:10 105:6
109:7,10,22,24 110:3
111:19,22,23 112:8,
11,19 113:2,4 114:5,
7,10,11 118:14 130:8
132:24 142:19,23
145:25 146:11
151:10 153:3,4,18
157:9 158:10,11
160:13,15 164:23
167:17,22

**receive** 101:20

**received** 36:13 56:20
58:17 64:18 65:7,13,
22 66:16 102:17

**recipient** 36:4

**recollection** 32:11,
18 33:10 48:2,11
49:7 61:12 63:16
92:13,16 99:4 101:21
102:6,16 103:11
112:13 114:17,18
120:13,18 121:6
133:24 137:16 143:9
151:23 152:19 158:4
164:9,18,20

**reconciliation** 101:8

**record** 8:9 9:21
10:10 15:10 16:13
17:19,25 18:5,8,12,
14 66:11,15 89:4
94:6,7,21 95:15,18
97:2 115:4,9,10,12,
24 149:24 150:5
161:15,18 162:24
163:2,3,7 175:20,23

**recording** 8:15

**records** 93:14

**Redeemer** 72:5

**refer** 19:21 48:9 78:4
143:18

**reference** 63:11

**referenced** 47:19

**referred** 14:3 72:12

**referring** 66:18
171:4

**refers** 39:24 57:20
118:7

**reflect** 97:2

**reflected** 32:23 33:3
57:8,14 59:11 64:19
105:15,19 161:22

**reflects** 153:18

**refresh** 32:18 33:10
143:9 164:18

**refreshed** 63:6

**refreshes** 164:9,20

**refuse** 84:15

**regard** 71:24 72:2
121:15 147:18

**regular** 168:5 175:25
176:2

**reinvested** 49:22

**REIT** 57:25 58:4,12,
15 63:13 64:19

**relate** 72:8,10

**related** 30:24 81:18,
23 86:25

**relating** 32:7 57:21

**relationship** 58:8,11
74:18

**relative** 51:25 52:2
158:19

**relevant** 32:20 51:12

**reliance** 126:21

**relied** 106:3 111:12

**rely** 111:3

**remained** 18:13 42:6

**remember** 13:9
21:3,4 22:4 23:18
24:2 27:23 28:14,18
49:10 52:6,24 57:10
59:2,7 65:9,18 76:4
81:20,21 84:21,23,25
85:2,3,4,12,13 91:15
103:12 113:10 120:8
146:15 152:11 153:9,
15 154:19 157:25
159:5 165:4 168:3

**remind** 171:3

**remote** 8:15

**remotely** 8:10,13
9:10

**renew** 129:21

**renewal** 129:25
130:5 136:7 138:24

**Reorganization**
142:17

**repeat** 32:4 50:21
52:13 100:13

**repeating** 78:24

**report** 125:2,7,13,17,
19,22 127:15 139:17,
21 140:12

**reported** 111:14
128:19

**reporter** 8:11 9:22,
24 18:10 94:17
149:12 175:21 176:4,
7,12

**reporting** 8:5 126:8

**reports** 126:4,8
127:6 139:18

**represent** 136:24
143:4 173:20

**representation**
127:18,21 128:23
129:13

**representative**
39:8,18 40:7 41:17

**representatives**
46:25 147:17

**representing** 170:20

**represents** 105:22

**request** 10:3,17
13:13 16:14 17:15
55:22 59:18 84:10
85:20 98:10 107:11
108:22 116:21 119:2
123:5,20 124:6,10
130:16 131:4,25
132:4,6 133:9 135:16
137:3 142:13 163:12
165:8,25 168:11
169:18,20 174:4,7,9,
10,14,18 175:3

**requests** 138:23
163:15,16 165:18
173:4,5 174:20

**required** 90:5 113:22
114:8

**resolution** 112:7

**resolve** 112:14

**Resources** 54:15,
18,21

**respect** 158:6 159:3,
9 174:11

**responded** 172:17

**response** 108:15
136:11,12 137:2,4
172:12

**responses** 163:10,
14 173:4,21

**responsibilities** 51:13

**responsibility** 80:7

**responsible** 55:2 104:17,23 105:4,9,12 106:22 113:5 125:16, 18 126:2,18 127:14 133:4

**rest** 13:24

**restate** 69:18

**restitution** 112:25

**Restoration** 72:5

**restricted** 57:20 58:17 59:11 63:12 64:18,25 65:7,13,22 71:20

**restroom** 96:13

**result** 28:19 44:12 99:17 100:8

**resume** 18:20

**reswear** 9:23

**retail** 105:22 129:18, 20 130:2,5,10 131:2 134:18,22 136:12 137:8,21 138:3,7,12 139:22 140:12 141:5, 11,22 142:6

**retained** 59:6

**review** 122:6 130:11 134:17 164:25

**reviewing** 134:22

**revisions** 81:24

**rights** 43:19

**Robert** 10:8

**role** 53:3 87:5 126:11

**rolled** 51:9

**rolling** 95:20

**room** 8:8,12 96:6,7 153:16

**rough** 103:3,10 175:25

**Rule** 8:18

**rules** 8:18,19

**running** 71:15

**rush** 176:3

---

**S**

**salaries** 104:10

**salary** 52:8,17 57:8 60:9,19,25 61:10,13, 17,21 62:5

**sale** 71:17 73:16

**sampling** 126:24 127:9

**satisfied** 42:6 70:7 75:23

**Sauter** 134:8

**schedule** 49:16 63:22

**screen** 10:15 56:10 82:4 95:9 97:10 114:21,23 119:22 131:15 163:9

**scroll** 124:8 131:8

**scrolling** 131:23

**seat** 95:13

**SEC** 92:4 98:2,4 99:11,25 103:12 104:17,21 105:4,8

**section** 124:13 132:9 134:3 135:15,18 171:24

**Seery** 144:22 147:3, 17,22,24 149:8 153:22 154:4 160:2 174:21

**sell** 70:13 71:2,12 72:19

**selling** 71:22

**send** 15:20 16:21 19:7,10 64:3 66:6 68:7,9 118:11

**sending** 160:15

**senior** 92:24 134:9

**sense** 118:19 119:11

**sentence** 118:4

**separate** 20:6 38:4

**series** 58:2

**serve** 133:22

**service** 88:23

**serviced** 135:11

**services** 14:10 62:23 81:19 85:23 86:4,7, 14,17,22,23 87:8,11, 16,22 88:8,15 89:8, 21 133:25 134:13,15 135:12 143:19 151:16 152:8,13,15, 21 153:7,25 154:2,8 157:22

**serving** 126:13

**set** 13:15 56:18 81:25 82:17 83:17 143:20 171:5

**sets** 82:19 100:16

**settle** 93:2

**settlement** 92:21,22 104:13 147:2 148:8 151:19 166:20,22 167:24 169:6,23 170:18

**settlements** 147:25 168:5

**seven-year** 63:22

**severity** 8:6

**share** 65:21

**shared** 53:6 133:25 134:13,15 135:12 151:16 152:8,12,15, 21 153:7,25 154:2,8

**shareholder** 112:24

**shareholder's** 71:19

**shareholders** 39:9 40:8 41:18

**shares** 58:2 71:22

**sheet** 14:14,18 27:15 72:15 121:5,19,23

**sheets** 122:4

**shift** 85:17

**shortly** 96:9

**show** 158:9 169:7

**showed** 57:4 76:10 120:3 164:15

**showing** 70:6

**shows** 100:7 101:2

**shuffling** 173:13

**sic** 9:4 94:20 175:19

**sign** 124:21 126:16 128:22

**signature** 123:19 164:10,16 173:25

**signed** 45:13 46:24 48:16,17,21,22 90:15 91:4 123:23 127:17 129:13 164:21 165:2

**significant** 72:4 86:7 151:17

**similar** 136:5 138:21

**simple** 65:4 81:9 112:16

**simply** 88:7

**sir** 28:24 56:10 80:6 95:20 98:13 106:10 116:4,13 117:6 119:8 123:15 127:3 131:24 144:2,24 145:5 155:16 162:10 163:25 164:6 171:25

**sis-** 84:9

**sister** 40:12 50:11,18 51:5 52:7,16,19 53:6, 10,17,25 54:5 57:5 73:11 75:14,21

**sit** 23:19 34:11 35:25 39:13 48:14 52:6 53:9 81:20,21 148:17 158:3 165:3 172:21

**situation** 112:7

**sixth** 39:12

**small** 99:8 104:5 158:23

**snap** 17:18

**social** 8:7

**sold** 73:19 83:5,11,12 148:4

**sole** 127:4

**solely** 15:25

**solution** 146:22

**sought** 161:11

**sound** 47:23 119:19

**sounds** 45:4

**source** 102:17 127:4, 11,12

**sources** 101:2

**space** 151:20

**speak** 8:23 11:6 12:21 72:25 115:17

**speaking** 12:3 26:19 78:10

**special** 176:3

**specific** 26:16 28:7 48:2 85:5 118:18 122:13 128:18,19 137:3 149:5 152:16 170:7

**specifically** 21:4 28:15 30:4,11 31:2 34:11 35:24 37:14 41:11 50:15 52:6 55:8 57:10 60:13 80:3 81:22 84:12 96:16 97:2 98:14 103:13 106:21 107:25 110:11 111:22 118:13 119:11 139:9,11 140:3,25 143:14 146:7 149:10 169:24 170:3 171:5,9

**specificity** 47:18 49:10 121:15 122:8 148:24

**specifics** 21:20 91:15 166:24 167:3, 7,21

**speculate** 27:24 28:4

**speculation** 118:9

**speed** 65:11

**spend** 12:3

**spending** 38:22

**spent** 62:2

**split** 61:12

**spoke** 71:16

**spoken** 8:24 10:24

**spread** 62:17,20 85:14

**spreadsheet** 97:20

**spreadsheets** 154:3

**staff** 105:24 135:10

**stamped** 56:4 59:21 95:4 107:13 116:23 119:4 123:10 130:18

**stamping** 67:3,8

**stand** 94:13

**standard** 135:3

**standards** 46:20 51:12 53:4

**standing** 155:24 176:8

**Stang** 161:2

**start** 9:3 92:3 146:6

**start-up** 89:3

**state's** 8:19

**stated** 10:9 41:25 106:21

**statement** 39:17 54:12 56:4,13,18 59:21 60:2 71:8 100:23 125:20

**statements** 32:24 33:3 55:3,15 120:16 122:7,23 123:8 128:10,15 129:3

**States** 9:7

**stay** 19:22 95:17

**stenographic** 9:20

**steps** 110:21

**stick** 78:5

**stipulate** 8:14

**stock** 57:21 58:18 59:11 63:12 64:19 65:7,13,22

**Stonehill's** 168:9

**stop** 17:22 38:24 39:2 76:25 78:15,16 115:18 132:2

**Stotz** 8:11

**strike** 50:5 104:24 106:7,13 146:6

**string** 97:14 108:12

**struck** 50:22

**stuck** 80:14

**stuff** 134:7 148:5

**Sub-** 72:24

**subadvisory** 105:23

**subject** 13:20 14:9 20:24 21:7,11,15,25 22:10,14,18 23:7,12, 16,21 24:7,12,17 25:25 26:5 27:5,11, 17 28:7,25 29:5,11, 14,16,18,24 30:2,8, 14,16,21,22 31:2,10 33:19,23,25 34:20,22 35:16,20 36:7 39:5,7 41:23 42:11 44:23 45:19 69:9,11,20 72:24 77:23 79:9,17, 23 81:3,6,8,15 83:24 84:19 137:23 138:9, 14 141:12 146:15 150:12,20 171:19

**subsequent** 13:20 21:5 42:8 43:8 44:5 45:10,19,24 47:6 69:16,23 70:6,11 72:7 73:7,17 75:23 82:20 122:24 124:14, 17 136:19 138:24,25

**subsequently** 147:22

**substance** 11:7,15, 18 132:24 165:11

**substantial** 21:5

**substantially** 74:9,

15,22 75:11

**substantive** 11:20

**sued** 90:14

**suite** 126:17

**supplemental** 123:8 131:3

**support** 83:12 97:21 134:2

**supposed** 151:18 174:23

**surface** 136:21

**surprised** 125:6 158:18

**sustained** 99:17

**Suzanne** 8:11 94:16

**swear** 8:12

**swearing** 8:16

**switch** 129:16

**sworn** 10:5

---

**T**

**table** 13:15

**takes** 68:11

**taking** 18:17,20 94:10 161:18,19

**talk** 11:17 17:18 91:10 111:17 167:20

**talked** 59:5 60:14 120:14 174:11

**talking** 33:15,17 38:13,24 39:2 64:24, 25 146:6 153:20 156:2 162:9

**tape** 96:23

**team** 54:25 55:14 56:14 153:8,10,15

**telling** 14:25 78:17 153:4 167:17

**template** 117:18,24

**ten** 24:20,23

**tendered** 154:21

**term** 15:15,16 21:19 28:19 34:15 36:23 46:4 156:2 157:11 158:2,7 161:13 166:13

**terms** 44:13,22 45:5 46:14 82:18 88:25 144:17 165:12 166:6, 12,25 170:4,7 171:12

**terrace** 92:3

**Terrestar** 98:2 112:7

**test** 26:13

**testified** 10:6 12:8 51:18,20 53:7 57:11 144:20 170:2

**testifying** 48:22

**testimony** 10:25 12:12,14 32:22 44:4 48:15 49:3 145:17 155:4

**Texas** 9:8

**text** 66:17 68:8 96:2

**texted** 95:25

**thing** 44:8 88:24 92:19 127:7 132:19

**things** 26:13 28:20, 21 38:23 47:6 83:11 153:22 162:7 166:23 172:18

**thinking** 138:18

**thinks** 11:18

**thought** 31:19 36:20, 23 87:12 159:23 160:5,24 162:2 170:3 172:18

**throw** 144:4

**ties** 127:10

**time** 9:15 12:3 29:20, 21 32:5 35:9 37:13 38:8,23 39:12 40:5, 16,19,25 42:4,13,15, 23 47:4 52:21 61:14 62:2,14,17,20 63:4 64:13 66:8,15 67:6 71:3 73:12,21 74:6, 12,19,25 75:24 76:6 78:7 83:20,21 85:4,

14,24 87:6,10 92:23 93:11,15 96:19 109:8,12 114:9 117:16,17 120:3,6,8, 11 121:18 126:13 129:11 136:18 138:19 141:17 142:6 143:11 149:22 150:5 153:16 160:20 163:7 172:17 175:6

**times** 41:25

**tired** 144:25

**title** 111:7,8 134:7

**today** 13:25 33:16 34:12 35:25 36:3 38:14 39:14 40:13 52:6 53:9 66:10 67:4 70:3 81:21 132:25 133:2 144:7 165:3 172:21

**today's** 175:18

**told** 47:7 52:25 110:15 117:8 129:2 139:12 141:11 145:25 146:11 158:22,23 162:14 167:12 171:13 174:21

**tomorrow** 67:4,13

**tonight** 67:12 176:14

**top** 22:22 24:4,5 26:8 27:23 29:21 31:14 63:5 90:11 97:18 108:14

**topic** 150:7

**topics** 38:16 41:8

**total** 102:5 103:6,16

**totals** 101:19

**track** 89:4

**track-record** 88:24

**trade** 58:3

**transaction** 90:6 108:3 110:16

**transactions** 124:18 134:6,11

**transcript** 96:15

**transfer** 91:23 92:6, 8,9,11,14 93:7,12 107:22 110:13 111:24 112:4 116:16 117:9 120:10

**transferred** 91:13 110:24 111:21 119:18 129:5

**transfers** 110:9

**transition** 151:19 153:24

**travel** 49:15

**treasurer** 90:24 111:8

**trick** 81:10 146:10

**triggered** 42:8,9

**true-up** 151:19 153:22

**trust-** 20:25

**trustee** 19:19,22 20:2,11,19 21:2,8,12, 17 22:2,11,19 23:3,8, 13,17,22 24:8,13,18 25:2,14 26:2,7 27:6, 12,18 28:9 29:19,25 30:9,15,23 31:4,9,25 32:7,12 33:12,25 39:8 40:12,15 41:3 42:25 43:6,14,18 44:11,21 45:17 47:19 49:5 50:20 51:7 53:13 73:11 75:24 78:5 79:7,15,21 81:4, 13 84:14,20 137:24 138:10 139:25 144:19 145:9 146:3, 13,19 148:14 149:9 167:11 170:12

**trustee's** 84:10

**trustees** 82:24

**Trustway** 70:22 71:24 74:22 75:8 167:2

**TSG** 8:5

**turn** 47:25 97:6 123:14

**turned** 84:24

**type** 128:6 133:4 140:16

**types** 56:19

**typically** 112:25

---

**U**

**UBS** 170:20

**ultimate** 28:19

**ultimately** 41:8 42:2 45:22 146:25

**unable** 45:24

**understand** 10:20 34:3 40:6 68:25 98:15 100:6,15 131:18 144:6 171:7

**understanding** 36:21 40:25 43:22 49:25 51:2,3 58:7,11 61:25 73:9 74:4,8,17, 21 75:10,22 83:15,17 98:16 103:19 124:16 125:22,24 126:22 127:20 128:4,7 160:9,17 161:11

**understood** 42:16, 24 43:6 74:13

**underwear** 80:14

**unenforceable** 150:13,21 151:5

**unfettered** 71:25

**unilaterally** 71:18

**United** 9:7

**units** 57:21 58:18 59:11 63:12 64:19 65:2,7,13,22

**updates** 148:22

---

**V**

**validity** 8:15

**valuation** 105:25 106:2

**variety** 62:18 80:17

**varying** 75:4,6

**vendors** 104:22 127:10

**verbal** 49:21 51:2

**verification** 126:24 127:9

**verified** 60:18

**versus** 76:7 84:22,24 102:2 118:21

**vest** 58:22

**vested** 57:16 58:19, 24 64:23

**vesting** 63:22

**vests** 58:25

**video** 8:10,15 17:25 95:19 97:6 115:24

**video-recorded** 9:4

**view** 131:7 132:10

**virtually** 28:14

**volatility** 75:12

**Volume** 9:4 94:19 175:18

**voluntary** 113:14

**vote** 112:24

---

**W**

**wait** 40:2 81:5 165:16

**wanted** 41:12,16 90:12 98:2,4 175:22 176:13

**Waterhouse** 90:16, 24 93:7 97:17 108:11 111:3 126:11 151:11, 24 152:20 153:2,5,19 160:10,16 161:16,23 162:14 165:13 166:7, 14 170:4

**Waterhouse's** 97:19

**ways** 37:12

**week** 12:16 44:18 120:3

**weeks** 136:2

**well-known** 92:18

**wider** 49:9

**wire** 110:8

**withdrawn** 21:22 22:8,15 29:14 34:14 35:16 42:21 47:9 51:15 69:9 82:22 113:18 114:6 121:20 125:10 133:16 154:13

**witnesses** 15:7

**Wonderful** 175:11

**word** 39:23 171:4

**work** 101:23,24 125:22

**working** 62:2 73:13 126:2

**works** 146:20

**world** 11:4

**worth** 58:20 92:4

**wrap** 149:16

**wrestle** 170:25

**writing** 86:10 87:22 105:15,18 106:20 153:17 160:10,11,13 161:21

**writings** 106:9

**written** 85:22 86:11, 13,20 130:9 146:21 161:15,18 163:10

**wrote** 28:24

---

**Y**

**year** 22:13,16 24:19 28:15,17 30:12 47:9, 12,14,25 48:9,11 49:8 52:18 55:10,11 56:20 57:16 105:22 106:5 113:3 118:15 142:6 154:13

**year's** 136:6

**years** 21:5 30:19 38:11 49:6,24 51:9 58:23,24,25 59:2,3,4 63:6 76:5 126:23

**years'** 63:20

**yelling** 115:18,19

**yes-or-no** 11:14

**Yup** 56:11 97:13

---

**Z**

**Ziehl** 161:3

**ZIP** 51:22 53:2