# EXHIBIT 18

Page 1

1       IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2             DALLAS DIVISION

3  In re:              )Chapter 11
                    )
4  HIGHLAND CAPITAL MANAGEMENT, LP, )
                  )Case No.
5      Debtor.       )19-34054-SGJ-11
   _____)_____
6  HIGHLAND CAPITAL MANAGEMENT, LP, )
                  )
7     Plaintiff,     )
                  )
8  vs.          )Advisory Proceeding No.
                  )21-03004
9  NEXPOINT ADVISORS, LP; JAMES   )
  DONDERO; NANCY DONDERO; and THE  )
10  DUGABOY INVESTMENT TRUST,    )
                  )
11     Defendants.     )

12
      ***********************************
13         REMOTE DEPOSITION OF
            DUSTIN NORRIS
14         December 1, 2021
      ***********************************

15

16     DUSTIN NORRIS, produced as a witness at the

17  instance of the Highland Capital Management, was

18  duly sworn and deposed in the above-styled and

19  numbered cause on December 1, 2021, from

20  10:01 a.m. CST to 3:25 p.m. CST, stenographically

21  reported, pursuant to the Federal Rules of Civil

22  Procedure and the provisions stated on the record.

23   Job Number:   203362
   Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24          Texas CSR 9306
          California CSR 14407
25         Illinois CSR 084.004659

Page 2

```
 1         A P P E A R A N C E S
 2  (all attendees appearing via remote videoconference)
 3
 4  REPRESENTING HIGHLAND CAPITAL MANAGEMENT, LP:
 5   John Morris, Esq.
      Hayley Winograd, Esq.
 6   PACHULSKI STANG ZIEHL & JONES LLP
      780 Third Avenue
 7   New York City, New York  10017
 8
 9
10  REPRESENTING NEXPOINT ADVISORS, LP:
11   Davor Rukavina, Esq.
      MUNSCH HARDT KOPF & HARR, PC
12   500 North Akard Street
      Dallas, Texas  75201
13
14
15  REPRESENTING JAMES DONDERO, NANCY DONDERO, HCRE,
    and HCMS:
16
      Michael Aigen, Esq.
17   STINSON LLP
      3102 Oak Lawn Avenue
18   Dallas, Texas  75219
19
20
21  ALSO PRESENT:
22   La Asia Canty, Paralegal,
      Pachulski Stang Ziehl & Jones
23
24
25
```

Page 3

```
 1              INDEX
                              PAGE
 2
 3  EXAMINATION BY MR. MORRIS...................... 5
 4
 5
 6            EXHIBITS
 7  NUMBER      DESCRIPTION          PAGE
 8  Exhibit 185  Plaintiff's Third Amended Notice of
 9      Rule 30(b)(6) Deposition to
10      Highland Capital Management Fund
11      Advisors............................ 7
12
13
14       PREVIOUSLY MARKED EXHIBITS
15  NUMBER      DESCRIPTION          PAGE
16  Exhibit 1    Complaint for (I) Breach of
17      Contract and (II) Turnover of
18      Property of the Debtor's Estate...... 38
19  Exhibit 5    Defendant's Original Answer.......... 29
20  Exhibit 13   Defendant's Amended Answer........... 158
21  Exhibit 36   Email Chain; Bates D-HCMFA290880
22      through 290883...................... 87
23
24
25
```

Page 4

```
 1         PREVIOUSLY MARKED EXHIBITS
 2  NUMBER      DESCRIPTION          PAGE
 3  Exhibit 45   Highland Capital Management Fund
 4      Advisors, LP, Consolidated
 5      Financial Statements and
 6      Supplemental Information, 12/31/18;
 7      Bates D-CNL-002273 through 002296.... 46
 8  Exhibit 59   Supplemental 15(c) Info Request;
 9      Bates HCMFAS 000025 through 000031... 71
10  Exhibit 147  BBVA Compass Bank Statement, Date
11      Ending 5/31/19  (no Bates range)..... 51
12  Exhibit 182  Memo Dated 5/28/19 (no Bates range).. 119
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              PROCEEDINGS
 2          (On the record at 10:01 a.m. CST)
 3          (Witness duly sworn.)
 4              DUSTIN NORRIS,
 5  being first duly sworn, testified as follows:
 6              EXAMINATION
 7  BY MR. MORRIS:
 8  Q    Good morning, Mr. Norris.  As you may
 9  recall, my name is John Morris.  I'm an attorney
10  at Pachulski Stang Ziehl & Jones, and we're
11  counsel to the reorganized debtor known as
12  Highland Capital Management, LP, and we're here
13  for your deposition today.
14          Do you understand that?
15  A    Yes, sir.
16  Q    And do you understand that you're being
17  deposed today in your capacity as what's called a
18  Rule 30(b)(6) witness on behalf of Highland
19  Capital Management Fund Advisors, LP?
20  A    I do.
21  Q    Can we refer to Highland Capital
22  Management Fund Advisors, LP, as "HCMFA"?
23  A    Yes, that works.
24  Q    And can we refer to Highland Capital
25  Management, LP, as either "Highland" or "HCMLP"?
```

Page 6

Dustin Norris

1
2  A  Yes.
3  Q  Okay. Are you aware that your answers
4  today will bind HCMFA?
5  A  Generally, yes.
6  Q  Okay. Have you seen the notice that was
7  served by Highland on HCMFA in connection with
8  this deposition?
9  A  I have.
10  Q  Okay. I've -- I've examined you before;
11  right?
12  A  Yes.
13  Q  Okay. So the rules are the exact same,
14  and they are very simple. If I ask a question, I
15  would ask you to refrain from answering until I've
16  completed my question; is that fair?
17  A  Yes, it is. Thank you.
18  Q  And if I begin a question or respond
19  before you've completed your answer, will you let
20  me know that?
21  A  Yes.
22  Q  We're going to be putting documents up on
23  the screen from time to time today. If at any
24  time you believe you need to see other portions of
25  the document in order to give complete and

Page 7

Dustin Norris

1
2  accurate answers, will you let me know that?
3  A  Yes.
4  Q  If you need a break at any time, will you
5  let me know that as well?
6  A  I will.
7  Q  Okay.
8      MR. MORRIS: I would ask my
9  colleague, Ms. Canty, to put up on the
10  screen the Rule 30(b)(6) deposition
11  notice.
12      (Norris Exhibit 185 marked.)
13      (Reporter discussion off the record.)
14      MR. MORRIS: Okay. Asia, what
15  exhibit number should we put on this
16  document?
17      MS. CANTY: 185.
18      MR. MORRIS: Okay. Davor and
19  Michael, this will be Exhibit 185.
20      And if we can scroll down and show
21  it to Mr. Norris.
22  BY MR. MORRIS:
23  Q  Do you see that this is the plaintiff's
24  third amended notice of deposition for today?
25      MR. RUKAVINA: And just so you

Page 8

Dustin Norris

1
2  know, John and Dustin, I did not send this
3  to you, Dustin. All that it does is
4  changes the time of today's deposition.
5  It's identical to the last one that you
6  did get.
7      THE WITNESS: Okay. And I have the
8  last one here with me as well.
9  BY MR. MORRIS:
10  Q  Okay. So there's no -- I'll represent to
11  you that there's no difference between the one
12  that's on the screen and the one you have except
13  that the one on the screen says "Third Amended
14  Notice," and it was scheduled for 9:00 today.
15  It's scheduled for 10:00 today, the -- the time
16  that we're beginning.
17      Do you have any other documents in
18  front of you other than the deposition notice?
19  A  I do.
20  Q  What -- what other documents do you have
21  before you?
22  A  Yeah. I have the original complaint I
23  believe it's called -- forgive me if I call them
24  the wrong items --
25  Q  Uh-huh.

Page 9

Dustin Norris

1
2  A  -- but the original complaint from HCMLP.
3  I have the original answer response from HCMFA. I
4  have the amended response. I have the declaration
5  from Mr. Sauter. I have copies of the promissory
6  notes. I have the shared services agreement. I
7  have a -- incumbency certificates, which will help
8  me respond to one of your questions in the
9  30(b)(6) notice. And I have a board to the
10  memo [sic] regarding NAV error, and I have the
11  "Defendant's Second Motion for Leave to Amend
12  Answer and Brief in Support Thereof" that was
13  filed yesterday.
14      So a number of documents that -- and I
15  also have up on my screen your exhibits that I
16  believe we'll be going through in one of the --
17  let me check here -- Topic Number 5. So I have
18  open, you know, a 650-page document that was filed
19  in Docket 35 on May 24th, I believe, is the
20  correct document. So those are the materials that
21  I have.
22  Q  Excellent. I appreciate that.
23      So you've seen -- you've seen at least
24  the plaintiff's second amended notice of
25  Rule 30(b)(6) deposition before today. Do I have

Dustin Norris

1
2 that right?
3 A That's correct.
4 Q And you have that with you; right?
5 A I do.
6 Q Okay. Are you prepared to testify on
7 behalf of HCMFA today on -- in connection with
8 each of the topics in the deposition notice?
9 A Yes, I am.
10 Q All right.
11 MR. MORRIS: Let's just, for the
12 record, scroll down to make sure that the
13 topics are the same as the -- the one that
14 Mr. Norris has in front of him.
15 BY MR. MORRIS:
16 Q Do you see the first five topics on the
17 screen?
18 A I do.
19 Q All right. Can you confirm that they're
20 the same topics that you have in the second
21 amended notice of deposition?
22 A Yes. I'm looking now.
23 Yes, they all are the same.
24 Q Okay. And if we can continue to scroll
25 down, you see Topics 6, 7, and 8 up on the screen,

Dustin Norris

1
2 and 9. Are they the same as what you have?
3 A Can you scroll down for 9?
4 Q Uh-huh.
5 A They look to be the same, yes.
6 Q Okay. And let's just look at the last
7 few. How about 10 through 14? Are they the same
8 as the topics that are in your second amended
9 notice?
10 A They look to be the same, yes.
11 Q Okay. And did you do anything to prepare
12 for today's deposition?
13 A I did.
14 Q What did you do?
15 A I reviewed all of the pleadings. I
16 reviewed all of the -- the documents that were, I
17 believe, responsive to -- to help me to respond to
18 this, look through your exhibits. I had met with
19 Mr. Rukavina as counsel. I met and spoke with
20 Mr. Dondero. I spoke with Jason Post.
21 I spoke with -- I reviewed my
22 documents internally and emails, things that I
23 might have had, confirmed with our IT group that
24 they have provided all documents responsive to
25 your discovery requests.

Dustin Norris

1
2 I reviewed the depositions of
3 Mr. Seery, of Frank Waterhouse, Dave Klos, and
4 Kristin Hendrix. I met in person and by Zoom with
5 Mr. Rukavina over the last few weeks, and -- so
6 that -- that's the general -- you know, there may
7 have been other things, but that's the general
8 overview of the things that I did --
9 Q I appreciate --
10 A -- to understand the company's position.
11 Q I appreciate that.
12 So just focusing in on the people that
13 you spoke with in connection with your
14 preparation, one was Davor; right?
15 A Correct.
16 And I -- I may have -- I don't know if
17 I said it or not, but DC Sauter as well I also
18 spoke with.
19 Q Okay. So the other people are DC Sauter,
20 Jason Post, and Mr. Dondero. Do I have that
21 right?
22 A Correct.
23 Q Did you speak with Frank Waterhouse at
24 all?
25 A No, I did not.

Dustin Norris

1
2 Q Is there any particular reason you didn't
3 speak with Mr. Waterhouse?
4 A Yes.
5 Q And what -- why didn't you speak with
6 Mr. Waterhouse?
7 A My -- my -- yeah, sorry.
8 My understanding is his counsel did
9 not allow us to speak with him regarding this,
10 because HCMLP had sued him for various things, and
11 so we weren't allowed to talk with him.
12 You'll -- you'll note that DC, earlier
13 on, had spoken to him. I believe that was back in
14 April, if you look back and I'd refer you to
15 Mr. Sauter's declaration. But in preparation for
16 this, we did not speak with him. We needed to
17 wait for his deposition based on his attorney's
18 instructions.
19 Q How many times did you speak with
20 Mr. Dondero about today's deposition?
21 A Multiple times over the last few weeks.
22 Q And was Mr. Rukavina present for those
23 discussions?
24 A He was not.
25 Q Can you tell me what you discussed with

1          Dustin Norris
2   Mr. Dondero about today's deposition?
3   A    Yeah.  Discussed with him general view of
4   the company from his perspective.  We discussed
5   particularly around -- and we'll get into more
6   details on this -- but around the purpose and
7   transfer of cash, the seven-and-a-half million
8   dollars.  And I guess there were two transactions.
9          Discussed with him what he remembered
10  in discussions with Frank Waterhouse when he
11  instructed him to transfer the cash, and any
12  recollection he had regarding the notes or the --
13  the -- the promissory notes.
14         And so those were the general topics.
15         And we did talk about --
16  Q    Did Mr. --
17  A    Sorry.  Go ahead.
18  Q    Yeah, I don't mean to step on your words.
19  A    No, no.
20         We talked about the NAV error, we
21  talked about responsibility for the NAV error and
22  those aspects as well.
23  Q    Did -- did Mr. Dondero tell you when he
24  first learned of the existence of the notes?
25  A    No.

1          Dustin Norris
2   Q    Did you ask him in connection with your
3   preparation for today's deposition?
4   A    What I did ask, I asked him -- I said,
5   "Did you tell Frank Waterhouse that there should
6   be -- that this should be a loan?"
7          And his response was, "No, that I
8   never told Frank it should be a loan, and Frank
9   never asked if it should be a loan."  And that the
10  intent -- and the reason for the transfer was
11  compensation for the NAV error.
12         And so that was -- he did not know --
13  and if I -- if I remember correctly, looking at
14  his deposition, I believe he did not know about
15  the notes at that time and found out about them
16  much later.
17  Q    I know, and I'm trying to understand from
18  you if you can tell me, as HCMFA's 30(b)(6)
19  representative, whether you can share with me when
20  Mr. Dondero first learned of the existence of the
21  notes.
22  A    It -- it would have been -- I believe, if
23  my understanding is correct, it would have been
24  after they were demanded.
25  Q    After they were?

1          Dustin Norris
2   A    Demanded.
3   Q    Okay.  How about your conversations with
4   Mr. Post?  Did the subject of when he learned
5   about the existence of the notes come up?
6   A    No.  That was not -- a discussion with
7   Jason Post -- Post -- talking with Jason was more
8   around the NAV error, the events surrounding the
9   NAV error, facts and circumstances around the NAV
10  error.
11  Q    Okay.  And were your discussions with
12  Mr. Sauter limited to the investigation that he
13  undertook earlier this year that's reflected in
14  his declaration?
15  A    I would say it's not limited to that.
16  Q    What other topics did you discuss with
17  Mr. Sauter beyond the investigation that he
18  undertook that's reflected in his declaration?
19         MR. RUKAVINA:  And I would just
20  caution you, Dustin, that to the extent
21  that you and Mr. Sauter discussed factual
22  matters, that's fair game.
23         But as far as if you discussed
24  litigation strategy, that's not fair game.
25  So be careful with your answer, please,

1          Dustin Norris
2   and tell Mr. Morris what you can and can't
3   answer.
4          THE WITNESS:  Yeah.
5          So early on with Mr. Sauter,
6   discussions were around if I had any
7   knowledge of the note, if he had any
8   knowledge of the note, trying to discover
9   what the notes were, what they were
10  related to, and neither of us had
11  knowledge related to notes.
12         And then discussions around more
13  generally -- I'm trying to think back.
14  There were many discussions with
15  Mr. Sauter on the topic.
16         General facts and circumstances of
17  what he was learning from his
18  investigation in which -- all of which I
19  would refer you to his declaration.
20         And then subsequent, talking with
21  him regarding the -- I'm trying to
22  recollect the -- the key components.
23         But it was general overview of --
24  of the notes and NAV error and the
25  process.  He wasn't here during much of

Dustin Norris

1
2 that time period or involved, and so we
3 were talking together based on what he was
4 doing.
5 BY MR. MORRIS:
6 Q Who are you employed by today?
7 A NexPoint Advisors.
8 Q Do you hold any position or title with
9 HCMFA?
10 A I do.
11 Q And what's your position or title with
12 HCMFA?
13 A Executive vice president is my officer
14 role.
15 Q And when did you become an officer of
16 HCMFA?
17 A So I -- I was originally secretary -- and
18 I can't remember if I was assistant secretary, but
19 I've been involved with HCMFA since 2012. I don't
20 know if I was added as an assistant secretary at
21 that time; but for many -- for several years, I've
22 been an officer of HCMFA.
23 Q And you were an officer in 2018 and 2019;
24 is that right?
25 A Correct. I was secretary in 2018, and --

Dustin Norris

1
2 I'm looking at the incumbency certificates here --
3 and in 2019 in April became executive vice
4 president. So from January to -- January 2018 to
5 April 2019, I was secretary and then became
6 executive vice president.
7 Q When did you first learn of the existence
8 of the notes?
9 A So it was after they were demanded, and it
10 was -- so I believe the demand came in in early
11 2020 -- 2021. So January-ish 2021.
12 Q Do you have any role or any title with any
13 of the funds that are managed by either NexPoint
14 or HCMFA?
15 A I do.
16 Q Can you describe those roles or titles for
17 me, please?
18 A Yeah. I'm -- I'm the executive vice
19 president of the funds, and my role more broadly
20 is I am the head of distribution and chief product
21 strategist. And so in that role, I lead the sales
22 and business development and marketing for the
23 funds, more broadly.
24 Q And what is your title with NexPoint
25 Advisors, LP?

Dustin Norris

1
2 A I am executive vice president in the
3 officer capacity, and my role is -- as an employee
4 is head of distribution and chief product
5 strategist.
6 Q Okay. So just to summarize, you're the
7 executive vice president of NexPoint Advisors, LP;
8 correct?
9 A Correct.
10 Q And that's an officer position; correct?
11 A It is.
12 Q And when did you attain that title?
13 A Probably -- I don't have the incumbency
14 certificates, but it was probably the same time as
15 HCMFA.
16 Q Is it fair to say that it was sometime
17 before January 1st, 2018?
18 A No.
19 Q Can you give me an estimate of when that
20 was? Feel free --
21 A Yeah. The time- -- the timeline for HCMFA
22 was April 2019. I was secretary before that, and
23 I don't recall if NexPoint Advisors changed at the
24 same time.
25 Q Okay. Can I refer to HCMFA and NexPoint

Dustin Norris

1
2 Advisors, LP, together as "the advisers"?
3 A That's fine.
4 Q Okay. So is it fair to say that you were
5 the executive vice president, which was an officer
6 position, for each of the advisers as of April
7 2019?
8 A Yes.
9 Q Okay. And --
10 A I believe that's correct.
11 Q And you also serve as the executive vice
12 president of the funds that each of the advisers
13 manages. Do I have that right?
14 A Yes. Currently.
15 Q And have you held the --
16 A Yes, currently.
17 Q And when did you become the executive vice
18 president of the funds?
19 A I don't remember the exact date, if that
20 was around the same time, but I was the secretary
21 before that and assistant secretary before that,
22 dating back to 2012.
23 Q So you've been -- is it fair to say that
24 you've been an officer of the funds managed by the
25 advisers since at least 2013?

Page 22

Dustin Norris

1
2  A  I believe so. I'd have to go back and
3  look for sure, but I believe. There may have been
4  periods of time where I was not, but yes.
5  Q  Okay. Were any of those periods of time
6  when you were not, at any point since 2018 to the
7  present?
8  A  I don't believe so.
9  Q  Okay. So to the best of your
10 recollection, you've served as an executive vice
11 president of each of the funds managed by the
12 advisers since at least the beginning of 2018; is
13 that fair?
14 A  No. That's -- that's different than my
15 prior testimony that -- I was secretary until
16 April --
17 Q  I apologize. Let me restate the question.
18     You've been an officer of -- of the
19 funds managed by the advisers on a continuous
20 basis since at least the beginning of 2018; fair?
21 A  I believe that's correct, yes.
22 Q  Thank you for the question -- for -- for
23 the correction.
24     So as I think you pointed out earlier,
25 one of the topics on the 30(b)(6) notice is the

Page 23

Dustin Norris

1
2  identity of officers, directors, and employees of
3  HCMFA?
4  A  Uh-huh.
5  Q  Do you want to take a look at that topic
6  on the document that you have in front of you?
7  A  Yes.
8  Q  Okay.
9  A  That is -- which topic?
10 Q  13.
11 A  13, yes.
12 Q  Okay. So let's focus on 13 for a moment.
13     Can you -- can you identify for me
14 HCMFA's officers from January 1st, 2018, to the
15 present --
16 A  Yes.
17 Q  -- including names and titles?
18 A  Yes.
19 Q  Okay.
20 A  So from January 1st, 2018 -- and I don't
21 have -- I -- I'm assuming that the dates that I
22 have on the incumbency certificates are complete,
23 but I'm not certain, and -- if there was one in
24 between, but I'm assuming this is -- that the
25 dates I have changing is -- is effective when they

Page 24

Dustin Norris

1
2  changed.
3     But Brad Ross was president of HCMFA
4  from January 1st, 2018, until, I believe,
5  February 2018 -- sorry -- yeah, until
6  February 2018.
7     In that same time period, Brad Ross,
8  president; Trey Parker, executive vice president;
9  Frank Waterhouse, treasurer; Dustin Norris,
10 secretary.
11     And effective 26th of February --
12 Q  I apologize. What is Mr. Parker's title?
13 A  Executive vice president.
14 Q  Thank you.
15 A  And beginning February 26th, 2018, Trey
16 Parker, executive vice president; Frank
17 Waterhouse, treasurer; and Dustin Norris,
18 secretary; and no longer president, Brad Ross.
19 There's no president on the lineup.
20     So continuing on, April 11th, 2019,
21 Dustin Norris, executive vice president; Frank
22 Waterhouse, Lauren Thedford, secretary.
23 Q  And Trey Parker was no longer an officer
24 as of that time?
25 A  He was no longer an officer.

Page 25

Dustin Norris

1
2  Q  Okay.
3  A  And February 18th, 2021, Dustin Norris,
4  executive vice president; Frank Waterhouse,
5  treasurer; Brian Mitts, assistant treasurer; David
6  Willmore, secretary. So Lauren Thedford, no
7  longer secretary.
8  Q  And have there been any changes since
9  February 2021?
10 A  Yes. You have April 8, 2021, Dustin
11 Norris, executive vice president; Frank Waterhouse,
12 treasurer; Will Mabry, assistant treasurer; and
13 Stephanie Vitiello, secretary.
14     Again, I -- I don't have -- this is
15 based on what was provided to me with effective
16 dates. I don't know if there was any that were
17 missing, if that's complete, but I -- I believe
18 those are accurate.
19 Q  Is it fair to say that you're relying on
20 exclusively on the incumbency certificates to
21 identify the officers of HCMFA since January 1st,
22 2018?
23 A  For this purpose, yes.
24 Q  Do you have any other information that you
25 can share with me regarding the identity of any

Page 26

1              Dustin Norris
2  officers of HCMFA since January 1st, 2018?
3  A     I don't, no.
4  Q     Okay.  Can you identify for me HCMFA's
5  direct and indirect owners since January 1st,
6  2018?
7  A     I can, yes.  Generally Jim Dondero and
8  Mark Okada are the indirect owners through trusts.
9  They own approximately two-thirds, Jim Dondero, a
10 little less than a third, Mark Okada, with a
11 general partner that is -- that owns 1 percent.
12 Q     And who is the general partner?
13 A     It's a Strand entity that I believe is
14 owned 100 percent by Mr. Dondero.
15 Q     So Mr. Dondero controls the general
16 partner --
17 A     Right.
18 Q     -- of HCMFA?
19 A     Correct, and owns approximately two-thirds
20 of the equity.
21 Q     And is that a controlling interest to the
22 best of your knowledge?
23 A     Yes, I believe so.
24 Q     Okay.  Does HCMFA have any directors?
25 A     It does not.  It has a sole director

Page 27

1              Dustin Norris
2  through the general partners.  So HCMFA does
3  not -- Strand -- whatever the Strand entity does,
4  Jim Dondero is the sole director.
5  Q     Okay.  And what about employees?  Does
6  HCMFA have any employees?
7  A     It does have some front-office employees,
8  trading professionals.
9  Q     Are there any employees who perform any
10 services other than trading services?
11 A     Trading in front-office investment
12 analysts, portfolio managers, generally that's
13 been the structure with HCMFA, is they held --
14 they had employees that performed front-office
15 functions, and we, as I believe you're aware,
16 outsourced the back-office accounting, compliance,
17 and legal services to Highland Capital Management,
18 LP, during this time period.
19 Q     Let's go to Topic Number 12.
20 A     Okay.
21 Q     And Topic Number 12 asks for a witness who
22 can testify as to all communications that HCMFA
23 "made in the bankruptcy case concerning the notes,
24 including any pleadings, court filing, or
25 argument."

Page 28

1              Dustin Norris
2        Do you see that?
3  A     I do.
4  Q     Are you prepared to answer questions on
5  that topic?
6  A     I am.
7  Q     All right.  You're aware that obviously
8  Highland has commenced an adversary proceeding
9  against HCMFA to collect on two promissory notes;
10 right?
11 A     I am, yes, and I believe this right here
12 is the complaint filed January 22nd.
13 Q     Okay.  And you're aware that the notes
14 that are the subject of the lawsuit were dated
15 May 2nd and May 3rd, 2019, respectively; right?
16 A     Sorry.  Can you repeat that?
17 Q     You're aware that the notes that are the
18 subject of the lawsuit are dated May 2nd and
19 May 3rd, 2019, respectively; correct?
20 A     Yes.  The notes that are attached to the
21 complaint, May 2nd and May 3rd.
22 Q     Okay.  And can we refer to those two
23 notes -- those two promissory notes for the rest
24 of this deposition collectively as "the notes"?
25 A     Yes.

Page 29

1              Dustin Norris
2  Q     Okay.  And you're aware that after
3  Highland commenced this action, HCMFA filed its
4  original answer; correct?
5  A     That's correct.
6  Q     Okay.  And Topic Number 1 on your list, in
7  fact, is the answer, correct, the original answer?
8  A     That's correct.  It's Topic Number 1.
9        MR. MORRIS:  Okay.  Can we put
10 Deposition Exhibit 5 up on the screen?
11 We're going to look at the original
12 answer.
13       (Exhibit 5 tendered.)
14 BY MR. MORRIS:
15 Q     And, again, feel free to let me know if
16 there's any portion of this document that you need
17 to see.  But looking at the first page -- and
18 perhaps we can continue to scroll through it -- is
19 this the original answer that was filed on behalf
20 of HCMFA on March 1st, 2021?
21 A     I'll take your representation that it is.
22 It looks to be, yeah.
23 Q     Okay.
24 A     I was not involved in the filing of it,
25 but...

Page 30

Dustin Norris

1
2  Q    Okay. Is the copy that you have with you
3  dated March 1st, 2021?
4  A    Yes, it is.
5  Q    And if you can turn to Page 6 of 7, does
6  it appear to be the exact same as what appears on
7  the screen, showing the March 1st, 2021, date?
8  A    It does.
9  Q    And do you refer to the March 1st, 2021,
10  date, as "the answer date"?
11  A    Yes.
12  Q    Okay. HCMFA did not assert any
13  affirmative defenses in this pleading; correct?
14  A    That's my understanding.
15  Q    Okay. And HCMFA had full access to you as
16  of March 1st, 2021; correct?
17  A    Yes.
18  Q    And HCMFA had full access to Mr. Dondero
19  as of March 1st, 2021; correct?
20  A    In the term "full access," they could have
21  talked to him, yes.
22  Q    Right. And there was no restriction from
23  the bankruptcy court or otherwise on HCMFA's
24  ability to communicate with Mr. Dondero that you
25  know of; correct?

Page 31

Dustin Norris

1
2  A    None that I know of.
3  Q    And there was no restriction or limitation
4  on HCMFA's ability to speak with you at or prior
5  to March 1st, 2021; correct?
6  A    That's correct.
7  Q    How about Ms. Thedford? Are you aware of
8  any restriction or limitation on HCMFA's ability
9  to speak with her prior to March 1st, 2021?
10  A    Yes.
11  Q    Okay. And what restriction was that?
12  A    Yeah. So she was part of the Highland
13  legal team. She was an employee of HCMLP. And
14  during this time period, we had outsourced our
15  legal and compliance functions to them. And if --
16  I would refer you to Mr. Sauter's declaration and
17  the attachments and schedules. There's a very
18  strict direction from Mr. Seery that
19  individuals -- particularly on the legal team --
20  could not work on anything that would be inimical
21  to the debtor.
22  Q    Okay.
23  A    And so Ms. Thedford, on multiple
24  occasions, told us she was unable to work on
25  things, and that began back in fall of 2000- --

Page 32

Dustin Norris

1
2  fall of 2020 -- late summer 2020, actually. And
3  so she was not accessible for things like this.
4  Q    How about Mr. Post? Do you know who
5  Mr. Post was employed by in 2018 and 2019?
6  A    2018 and '19, he was employed by Highland
7  Capital Management, LP.
8  Q    Do you know whether, in your conversations
9  with him, does he have any personal knowledge
10  regarding the NAV error?
11  A    Yes.
12  Q    Was he involved in any of the issues
13  surrounding the NAV error?
14  A    He was knowledgeable -- as he was
15  chief -- chief compliance officer of the retail
16  advisers at that time, and interacted with the
17  HCMLP employees and the board regarding the NAV
18  error, he also -- in your schedules, you'll notice
19  in one of the memos, he participated in calls with
20  the SEC, and so he was -- he was involved in the
21  process of the NAV error and understood and worked
22  with the other HCMLP employees, which naturally
23  they would. We had outsourced valuation services
24  to HCMLP. We had outsourced legal and compliance
25  to HCMLP, and as such, that was all part of what

Page 33

Dustin Norris

1
2  they were working on.
3  Q    Did -- did -- were there any restrictions
4  or limitations on HCMFA's ability to speak with
5  Mr. Post prior to March 1st, 2021?
6  A    So once -- so Jason -- one important
7  component here is Jason Post did leave the debtor,
8  and working with Mr. Seery, I believe, to then
9  leave and become an employee of NexPoint Advisors,
10  and that was at the request of our retail board,
11  as there were restrictions on Mr. Post at that
12  time.
13      And as chief compliance officer of the
14  funds, the board had become very uncomfortable
15  that they had restrictions on Mr. Post. And so it
16  was in everybody's interest to allow him to become
17  an employee of NexPoint Advisors, and so that was
18  late 2020, I believe. I don't know the exact
19  date. And at that time, there were certain things
20  that Jason was able to then help the adviser with,
21  but there were still restrictions. And he had
22  limited access to his prior data. He left the
23  debtor, but he didn't have -- I believe he had
24  restrictions on what he could access in the
25  information.

Page 34

Dustin Norris

1
2  Q   Okay.  But it is fair to say that between
3  January 21st, 2021, the day that the complaint was
4  filed, and March 1st, 2021, the date that HCMFA
5  filed its original answer, HCMFA had complete and
6  unfettered access to you, to Mr. Dondero, and
7  Mr. Post; correct?
8  A   Again, the complete and unfettered access
9  on the Jason Post aspect, they could have talked
10  to him.  I'm not sure if there were any other
11  restrictions related to what he had or information
12  he had or based on his prior role of the debtor,
13  he was restricted on what he could or couldn't
14  talk about, if he had any lease agreement.  I'm
15  not certain on that.  But, yes, we could talk
16  to – or HCMFA could talk to Mr. Post.
17  Q   Okay.  And the topics that you just raised
18  are speculation on your part; correct?
19  A   It is.
20  Q   You're not aware of any restriction of –
21  you don't have any knowledge of any restriction or
22  limitation placed on HCMFA in respect of its
23  ability to communicate with Mr. Post between
24  January 21st, 2021, and March 1st, 2021; correct?
25  A   Based on my personal knowledge, no.  There

Page 35

Dustin Norris

1
2  could have been something, but –
3  Q   Okay.  I'm just asking about your
4  knowledge, not what could have been.
5     All right.  So we're going to use
6  March 1st, 2021, as the answer date.
7     Are you aware of any document that
8  HCMFA filed with the bankruptcy court prior to the
9  answer date that concerns or relates in any way to
10  the notes?
11  A   I'm thinking if I'm aware.
12     Not that I'm aware of.
13  Q   Are you aware – withdrawn.
14     Do you know what a "pleading" is, if I
15  use that phrase?
16  A   I believe so.  These are the answers that
17  we gave.  The first answer, the amended answer,
18  and the second amended answer, that – I believe
19  those are the two pleadings.  Is that correct?
20  Q   You know what?  I think my first question
21  was broad enough, because I just used the word
22  "document," so I'm going to let that sit.
23     Are you aware of any argument that
24  anybody ever made on behalf of HCMFA prior to the
25  answer date that concerned or related to any of

Page 36

Dustin Norris

1
2  the notes?
3  A   And you mean an argument to the Court?
4  Q   Yes.
5  A   Not that I'm aware of.
6  Q   Okay.  Are you aware of any statement of
7  any kind that was made to the bankruptcy court
8  prior to the answer date that concerned or related
9  in any way to the notes?
10  A   Not that I can remember.  But there's
11  obviously been a lot of documents with the Court,
12  but not that I'm aware of.
13  Q   Right.  But you – did you do anything to
14  prepare yourself to answer questions on Topic 12?
15  A   Yes.
16  Q   And do you believe that you're able to
17  competently answer my questions relating to
18  Topic 12 as HCMFA's 30(b)(6) witness?
19  A   I am.  But I guess in this regard you're
20  asking to my knowledge.  And so, I guess, that –
21  are you asking my personal knowledge or as my
22  knowledge as a representative of the company?
23  Q   All right.  I appreciate that.
24     I am only examining you today in your
25  capacity as a 30(b)(6) witness.

Page 37

Dustin Norris

1
2  A   Okay.  That makes sense.  Okay.
3  Q   And so if I use the phrase "you," just as
4  we did in the deposition notice, I'm really
5  referring to HCMFA; is that fair?
6  A   That's fair.
7  Q   Okay.  So let me just ask the questions
8  again with that clarification.
9     Are you aware, in your capacity as the
10  30(b)(6) witness today, of any document that was
11  ever filed on behalf of HCMFA prior to the answer
12  date that concerns or relates to the notes?
13  A   No.
14  Q   Are you aware, in your capacity as the
15  HCMFA 30(b)(6) witness, of any argument that was
16  ever made to the Court prior to the answer date
17  that concerns or relates in any way to the notes?
18  A   No.
19  Q   Are you aware of – again, when I use the
20  phrase "you," I'm referring to HCMFA, just to
21  shorten these questions a little bit.
22     Are you aware of any statement that
23  was ever made on your behalf to the bankruptcy
24  court prior to the answer date that concerns or
25  relates in any way to the notes?

Page 38

Dustin Norris

1
2  A    Not that I recall.
3  Q    Okay.  When did HCMFA first learn of the
4  existence of the notes?
5  A    So HCMFA's position is that they learned
6  of them when they were demanded, or after they
7  were demanded.  I don't even know that when we
8  received – or who they were sent to, but it was
9  after they were demanded.
10  Q    Okay.  And do you recall when they were
11  demanded?
12  A    I don't have the exact date.  If you could
13  remind me or show a document, that might be
14  helpful.  I don't know if you have the demand, or
15  if that's one of the documents, but I don't
16  remember the specific date.
17       MR. MORRIS:  Can we put Exhibit 1
18  up on the screen?
19       It's actually the complaint – the
20  original complaint, sir.
21       (Exhibit 1 tendered.)
22  BY MR. MORRIS:
23  Q    If you go to Exhibit 3, do you see there's
24  a demand letter there?
25  A    Yes.

Page 39

Dustin Norris

1
2  Q    And you've seen that before; right?
3  A    I have.
4  Q    Okay.  And are you – do you see that it
5  was sent to Mr. Waterhouse?
6  A    Yes.
7  Q    And Mr. Waterhouse was the treasurer of
8  HCMFA on December 3rd, 2020; correct?
9  A    Correct.
10  Q    Okay.  So is it fair to say that HCMFA
11  knew of the existence of the notes on
12  December 3rd, 2020?
13  A    It's safe to say that Frank Waterhouse
14  received this.  I'm not sure the date exactly
15  when – when the company became aware.  Frank,
16  yes, is an officer.  He's also – the irony here,
17  he's CFO of the debtor who is demanding this, so
18  he's demanding it from himself.  I know it's
19  coming from – from who is sending it, but at this
20  time, I don't know when Mr. Dondero or other
21  officers became aware of it.  Sometime after
22  December 3rd.
23  Q    Okay.  Do you know if HCMFA ever responded
24  to this demand letter prior to the time the
25  complaint was filed on January 21st, 2021?

Page 40

Dustin Norris

1
2  A    I don't believe they did.
3  Q    So it's fair to say that nobody on behalf
4  of HCMFA ever told any representative of Highland
5  that it was previously unaware of the existence of
6  the notes?
7  A    Sorry.  Can you repeat that one more time?
8  Q    HCMFA never responded to this letter prior
9  to the commencement of the lawsuit; right?
10  A    Not to my knowledge, didn't respond to
11  HCMLP on this.
12  Q    Is there a reason why they didn't reach
13  out to Highland to let Highland know that it
14  disputed the existence of these notes?
15  A    I don't know if there's a reason, but I do
16  know, during this time period, you'll recall,
17  December and January, leading up to the actual
18  demand – or the initial complaint, there was a
19  lot going on.  We were almost in daily depositions
20  and court hearings.  There was a hearing
21  injunction handed out against Jim.  There was a
22  restraining order.  There – TRO.  There were
23  lawsuits against the advisers.  And so there was a
24  lot going on, and I think this was put back in the
25  priority line.

Page 41

Dustin Norris

1
2       Again, all of the compliance and legal
3  functions at this time, December 2020, were being
4  outsourced to HCMLP, and we were told they were
5  unable to help with anything that was inimical to
6  the debtor.  And so there were no employees of
7  HCMFA that were legal compliance professionals,
8  and so this – this was – I guess – this is my
9  speculation – was put in the back of the line, or
10  further back from the actual litigation that they
11  were defending or working against the daily
12  depositions and coordinating.
13  Q    Do you have any reason to believe, as you
14  sit here right now, that Mr. Waterhouse did not
15  receive this demand letter on or about
16  December 3rd, 2020?
17  A    I don't know.  I don't have any reason to
18  believe that, but I don't know.
19  Q    Okay.
20  A    And I don't recall what he testified to in
21  regard to receiving the demand, but we see here it
22  was sent to him.  We can assume it got sent to
23  him.
24  Q    Okay.  Let me ask the question again, and
25  I would appreciate you listening carefully to my

Dustin Norris

1 question.

2     As HCMFA's 30(b)(6) witness today,

3 does HCMFA contend that this letter was not

4 received by Mr. Waterhouse on or about

5 December 3rd, 2020?

6     MR. RUKAVINA: Well, that's not our

7 contention. We agree that it was received

8 on or about that date.

9     MR. MORRIS: Okay.

10     THE WITNESS: Yeah. That's --

11 yeah.

12 BY MR. MORRIS:

13 Q   Okay. HCMFA actually knew about the notes

14 just weeks after they were signed; correct?

15     MR. RUKAVINA: Objection; form.

16     THE WITNESS: So the debtor

17 employees who created the notes knew about

18 them, but it was not knowledge of HCMFA.

19 Those were all Highland Capital

20 Management, LP, employees.

21 BY MR. MORRIS:

22 Q   So it's your testimony that HCMFA had no

23 knowledge of the existence of the notes in

24 June 2019; is that correct?

Dustin Norris

1 A   June 2019.

2     Correct.

3 Q   As the executive vice president of HCMFA,

4 have you ever reviewed HCMFA's audited financial

5 statements?

6 A   I have not.

7 Q   Is there anybody on behalf of HCMFA who is

8 charged with the responsibility of reading HCMFA's

9 audited financial statements?

10 A   Yeah. We -- again, the key here is we

11 outsourced finance, accounting, back-office

12 functions. It includes financial statement

13 preparation. The treasurer of HCMFA is an HCMLP

14 employee, Frank Waterhouse, at that time, and at

15 all times that we're talking about. And so with

16 we -- and Frank is a professional, and his team

17 are professionals, right? We outsource to an

18 accounting group to prepare and oversee, work with

19 the auditors in preparation of those financials.

20 And so they were tasked with that. And we relied

21 on them. And there was not a specialist during

22 this time period that did that.

23 Q   Does Frank Waterhouse have any

24 responsibility, as the treasurer of HCMFA, to make

Dustin Norris

1 sure that HCMFA's audited financial statements are

2 true, accurate, and reliable?

3 A   Him and his team, yeah. We actually --

4 that's what we rely on them for.

5 Q   And did you rely on him not only in his

6 capacity as an employee of Highland, but in his

7 capacity as the treasurer of HCMFA?

8 A   Yeah, he was -- let's take the first --

9 as a -- in his capacity under the shared services

10 agreement, okay, doing accounting, books and

11 records, audited -- audit support, yes, we relied

12 on him in that capacity. And he also, as an HCMLP

13 employee, served as a treasurer of HCMFA. In that

14 role, we would expect him to oversee the

15 financials.

16     MR. MORRIS: Okay. And move to

17 strike.

18 BY MR. MORRIS:

19 Q   And I'm going to ask you very

20 specifically: As HCMFA's representative today,

21 did Frank Waterhouse have a duty as the treasurer

22 of HCMFA to make sure that HCMFA's audited

23 financial statements were true and accurate?

24 A   That -- very specific from the treasurer

Dustin Norris

1 role, I would say the treasurer role was to

2 oversee the financial aspects of the advisers.

3 Q   And was one of those aspects HCMFA's

4 audited financial statements?

5 A   As -- yeah. And he was -- again, I'll

6 reiterate, he was the CFO of Highland who was

7 tasked with creating the financial statements for

8 the advisers.

9     MR. MORRIS: Okay. I'm again going

10 to move to strike.

11 BY MR. MORRIS:

12 Q   I'm not asking about his role as CFO of

13 Highland. I'm limiting it strictly to his role as

14 the treasurer of HCMFA.

15 A   And I don't have --

16 Q   Did Frank -- let me ask my question.

17     Is any officer of HCMFA responsible

18 for making sure that HCMFA's audited financial

19 statements are true and accurate?

20 A   I don't know, but I would assume -- and I

21 don't want to make assumptions here as the

22 representative -- but I would assume that the

23 treasurer would have that role.

24 Q   Okay. And what is your assumption based

Page 46

Dustin Norris

1 on?

2 A    Based on the understanding of what a

3 A    treasurer role would be.  But I -- I don't have

4 any -- I don't have any knowledge, I'm not

5 representing that we have any roles and

6 responsibilities or defined procedures that the

7 treasurer does this, that, or the other.

8 Q    Okay.  Have you -- as you sit here right

9 now, have you ever seen HCMFA's audited financial

10 statements for the period ending December 31st,

11 2018?

12 A    I saw them in the materials that were

13 provided in your schedules, I believe.

14 Q    Okay.  Let's --

15 A    That was the first time.

16 Q    Let's take a quick look at it.

17        MR. MORRIS:  If we could put up on

18 the screen the document that's been marked

19 Exhibit 45.

20        (Exhibit 45 tendered.)

21 BY MR. MORRIS:

22 Q    Okay.  And do you see that this is the

23 first page of HCMFA's audited financial statements

24 for the period ending December 31st, 2018?

---

Page 47

Dustin Norris

1 A    I do.

2        MR. MORRIS:  Okay.  And if we could

3 just scroll, I think, to the third page.

4 BY MR. MORRIS:

5 Q    Do you see that it's signed by

6 PricewaterhouseCoopers on June 3rd, 2019?

7 A    I see that the audit opinion is signed by

8 them, yes.

9 Q    Correct.  And -- and you're aware that

10 PricewaterhouseCoopers was the outside auditor

11 retained by HCMFA to conduct the audit of HCMFA's

12 financial statements; correct?

13 A    Given that they gave an opinion, yes.

14 Q    Okay.  And you have no reason to believe

15 that the document that's up on the screen is

16 anything other than HCMFA's audited financial

17 statements for the period ending December 31st,

18 2018, do you?

19        And we're happy -- I'm happy to scroll

20 through whatever you need to see.

21 A    Yeah.  And there they're distinguishing --

22 you have an audit opinion and having audited

23 financials, I assume that you have all that is

24 here.  You showed me the first page of the

---

Page 48

Dustin Norris

1 financials, which --

2 Q    Yeah.  Yeah.  Let's --

3 A    So I'm assuming that's the --

4 Q    Let's scroll down just a little bit.

5        You can see that the next page is

6 HCMFA's balance sheet.  Do you see that?

7 A    I do.

8 Q    Okay.

9        MR. MORRIS:  Can we go to

10 "Subsequent Events"?  I think it's

11 Page 17.

12 BY MR. MORRIS:

13 Q    Have you seen this page of HCMFA's audited

14 financial statements before?

15 A    Just in preparation for this.

16 Q    Do you understand that in the "Subsequent

17 Events" section, the notes are described in the

18 audited financial statements?

19 A    There is a reference to promissory notes

20 in aggregate of $7.4 million, yes.

21 Q    And those are the two notes that Highland

22 is suing on; correct?

23 A    I would assume that's the case, because

24 the dollar amounts line up.  But I don't have the

---

Page 49

Dustin Norris

1 backup, but I would assume that's the case.

2 Q    And not only do the dollar amounts line

3 up, but do you see that the statement in

4 "Subsequent Events" specifically identifies the

5 notes as having been issued in the year 2019?

6 A    Yes.

7 Q    And are you aware of any notes that

8 anybody in the world contends were signed by HCMFA

9 between January 1st, 2019, and June 3rd, 2019,

10 other than the two notes that Highland is suing

11 on?

12 A    No.

13 Q    Okay.  So can you conclude, as HCMFA's

14 30(b)(6) witness, that the notes that are

15 described in the subsequent events are the very

16 notes that are the subject of the pending lawsuit?

17 A    That appears to be the case.

18 Q    Okay.  And so it's also fair to say, then,

19 that HCMFA does not dispute that its own audited

20 financial statements that were the subject of a

21 June 3rd, 2019, opinion by PricewaterhouseCoopers

22 disclosed the existence of the notes at issue;

23 correct?

24 A    No.  We don't dispute that that was

---

Page 50

Dustin Norris

1            Dustin Norris
2  included in the financial statements.  You know,
3  I -- I think we're going to get into it in our
4  affirmative defenses, but we dispute that the
5  notes were actually valid notes, and we would say
6  that this was an error.  These should not have
7  been included, but were included in good faith by
8  the accounting team who thought that they were
9  valid notes.
10  Q    Okay.
11  A    So --
12         MR. MORRIS:  I move to strike
13    everything other than the first portion of
14    your answer that was responsive to my
15    question.
16  BY MR. MORRIS:
17  Q    HCMFA does not dispute that it received
18  $2.4 million from Highland on May 2nd, does it?
19  A    No.
20  Q    HCMFA does not dispute that it received
21  $5 million on May 3rd, 2019, does it?
22  A    No.
23  Q    Let's just confirm that, if we can.
24         MR. MORRIS:  Can we put on the
25    screen a document that's been marked as

Page 51

Dustin Norris

1            Dustin Norris
2    Exhibit 147?
3      (Exhibit 147 tendered.)
4  BY MR. MORRIS:
5  Q    Okay.  Do you see that this is -- or at
6  least this appears to be a bank account statement?
7  A    Yes.  BBVA Compass is a bank, so I'll take
8  your representation it's a statement.
9         MR. MORRIS:  All right.  And if we
10    can just scroll down.
11         All right.  Stop right there.
12  BY MR. MORRIS:
13  Q    Do you see that there's a reference on
14  May 2nd to a 2.4-million-dollar transfer?
15  A    I do.
16  Q    Okay.  And is that consistent with your
17  testimony just now that on May 2nd, Highland
18  transferred $2.4 million to HCMFA?
19  A    That's correct.
20  Q    And lower on the page, the statement shows
21  a transfer of $5 million on May 3rd; correct?
22  A    Yes.
23  Q    And that's the payment that HCMFA
24  acknowledged -- acknowledges receiving from
25  Highland on that day; correct?

Page 52

Dustin Norris

1            Dustin Norris
2  A    Is this HCMFA's bank statement or is this
3  HCMLP's?
4  Q    No.  It's HCMLP's.
5  A    Okay.  It just says "Highland Capital
6  Management," and I'm assuming it lines up -- I'm
7  assuming this is the transfer, but --
8  Q    Okay.
9  A    -- I can't confirm an entity.  But we're
10  not denying that there was cash received those
11  dates from HCMLP.
12  Q    Okay.  And are you aware --
13         MR. MORRIS:  We can take this down
14    now.
15  BY MR. MORRIS:
16  Q    Do you recall that Topic Number 10 asks
17  for a witness who can testify about the accounting
18  of these transfers?
19  A    Uh-huh.  Yup.
20  Q    Are you prepared to testify on Topic
21  Number 10?
22  A    Yes.
23  Q    Can you tell me how HCMFA accounted for
24  these payments on its books and records?
25  A    I can, yeah.

Page 53

Dustin Norris

1            Dustin Norris
2    So my understanding of the company's
3  position is that -- and -- and it may be helpful
4  to provide some additional color leading up to the
5  accounting.  I don't know if we want to address
6  that later in our affirmative defenses, if you
7  have a preference there.
8  Q    I'd just like you to -- maybe it's my
9  question, but I just want you to focus on my
10  question.
11  A    Uh-huh.
12  Q    And that is:  First, do you know how HCMFA
13  accounted for these two payments in its books and
14  records?
15  A    Yeah.  So the HCMLP employees who were
16  tasked with creating books and records of the
17  adviser, the accounting team recorded, we -- we --
18  our position is that is an incorrect recording of
19  a payable to HCMLP.  And so there was a payable
20  booked on the balance sheet of HCMFA by the HCMLP
21  accounting team.
22         MR. MORRIS:  Okay.  I'm going to
23    move to strike.
24  BY MR. MORRIS:
25  Q    I -- I'd appreciate not having the

Page 54

Dustin Norris

1
2  commentary. Your counsel can ask those questions
3  or if it's responsive to a question. I'm just
4  asking a very simple question.
5  A     Yup.
6  Q     How – how did HCMFA record these payments
7  on its books and records?
8  A     Yeah. My understanding is they recorded a
9  payable to HCMLP, a liability.
10 Q     And do you know when HCMFA first
11 discovered that the payments were booked on its
12 books and records as a liability?
13 A     Our position is that that was revealed
14 through after the – sorry – after the demand.
15 And as we began to get additional information –
16 particularly, and I would refer you to
17 Mr. Sauter's declaration, our amended response,
18 and our second amended response that was filed
19 yesterday regarding each of those time periods.
20 But it was after the demand we found out how it
21 was booked.
22 Q     Okay. So just to simplify this: HCMFA's
23 books and records recorded the transfers on
24 May 2nd and May 3rd as liabilities from HCMFA to
25 Highland; correct?

Page 55

Dustin Norris

1
2  A     So my understanding is the audited
3  financials recorded in a subsequent event – you
4  showed me that – they recorded a subsequent
5  event. The balance sheet as of 12/31/2018 wasn't
6  amended because it was a subsequent event. But on
7  their books and records at that time, or
8  subsequent to that, they recorded a liability.
9  Q     And – and do you know if that liability
10 was recorded contemporaneously in May of 2019?
11 A     I don't know.
12 Q     But it's – it's HCMFA's position that,
13 notwithstanding the recording of the liability on
14 it's books and records, that HCMFA didn't learn of
15 that fact until after the demand letter was sent
16 in December of 2020.
17        Do I have that right?
18 A     Correct.
19 Q     Okay. Have there been any changes in
20 HCMFA's books and records since it learned of the
21 promise – of the existence of the promise –
22 withdrawn.
23        Has – has HCMFA changed its books and
24 records after learning that the payments were
25 recorded as liabilities?

Page 56

Dustin Norris

1
2  A     I'm not aware of how it's been treated
3  since then.
4  Q     Okay.
5        MR. RUKAVINA: And, John, no
6  urgency, but find some time in the near
7  future for the restroom break. The
8  morning coffee is working its magic.
9        MR. MORRIS: Happy to do it right
10 now, Davor.
11        THE WITNESS: I can use that, too.
12 I'm almost through my water bottle.
13        MR. MORRIS: All right. So, look,
14 it's 12:05. Let's just come back at 12:15
15 or 11:15.
16        THE WITNESS: Thank you.
17        MR. MORRIS: Thanks so much.
18 (Recess from 11:05 a.m. to 11:16 a.m. CST)
19 BY MR. MORRIS:
20 Q     To the best of your knowledge, has HCMFA
21 ever changed its books and records in order to
22 reverse the booking of the payments that were made
23 by Highland in May from liabilities to something
24 else?
25 A     I'm not aware of how the accounting

Page 57

Dustin Norris

1
2  entries have been done since then, but – yeah,
3  I'm not aware.
4  Q     Okay. But you'll – you'll agree that the
5  accounting for these two payments was among the
6  30(b)(6) topics, correct, Number 11 -- Number 10?
7  A     Yes.
8  Q     And as the 30(b)(6) witness for HCMFA, can
9  you confirm that, to the best of your knowledge,
10 those payments were booked as liabilities and the
11 booking of those payments as – as liabilities has
12 not changed?
13 A     To the best of my knowledge, they were
14 booked as liabilities, and I don't know how they
15 have been treated. There's not been a year-end
16 audit for 2021, and I'm sure the accountants and
17 auditors will determine based on current facts and
18 circumstances how those will be reported.
19 Q     Okay. But as of today, you have no
20 knowledge that the booking of those payments as
21 liabilities has ever been changed; correct?
22 A     Those – there's no financial statements
23 that are prepared, I believe, intra-year, during
24 the year, for audited purposes. And so, you know,
25 that – that would be, I'm sure, determined based

Page 58

1           Dustin Norris
2 on any audit needs.
3    Q    Does HCMFA maintain an accounts payable
4 ledger?
5    A    I'm sure it does.
6    Q    Did you do anything to try to ascertain
7 whether or not these notes appear as liabilities
8 on the accounts payable ledger?
9    A    As current accounts payable ledger?
10    Q    Yeah.
11    A    No.
12    Q    Did you -- other than the audited
13 financial statements, did you take any steps to
14 ascertain how these payments were recorded in
15 HCMFA's books and records, or is -- or is it only
16 on the audited financial statements?
17    A    So at the time that they were recorded, we
18 know they were recorded as liabilities on the
19 books and records.
20    Q    And when you say that it was recorded as a
21 liability in the books and records, where in the
22 books and records was it recorded as a liability?
23    A    Meaning on the balance sheet?
24    Q    Okay.  So the balance sheet is one place;
25 is that right?

Page 59

1           Dustin Norris
2    A    Yes.  We record liabilities on the balance
3 sheet.
4    Q    Okay.  Did HCMFA complete its audit for
5 2019?
6    A    I don't -- not that I'm aware of.  I don't
7 believe they had an audit for 2019.
8    Q    Okay.  Now, HCMFA contends that the
9 payments were -- should not have been booked as a
10 loan because they were supposed to be compensation
11 for the error that Highland made in connection
12 with the NAV error; correct?
13    A    Correct.
14    Q    Okay.  Did HCMFA ever issue an invoice or
15 a bill of any kind to Highland?
16    A    Not that I'm aware of.
17    Q    Okay.  Is there anything in HCMFA's books
18 and records that reflects its position that the
19 payments should not have been billed as
20 liabilities, but they should have been billed as
21 income?
22    A    As compensation?
23    Q    Yeah.
24    A    Yes.
25         Anything in their records?

Page 60

1           Dustin Norris
2    Q    Yes.
3    A    I -- I would refer you to the testimony of
4 Mr. Dondero and Mr. Waterhouse, who both testified
5 to this; Mr. Dondero that it was compensation, and
6 that Frank testified in his deposition that he
7 don't -- didn't remember Mr. Dondero saying it was
8 a loan, and that Mr. Dondero told him to get the
9 money from Highland.  And so it's -- it's -- that
10 is on the record and in the record.
11         But in HCMFA's other records, we have
12 the president of HCMLP, Jim Dondero, who made that
13 transfer and has said that that is for
14 compensation.
15         So there is -- but there is -- I
16 wouldn't -- I would be surprised to see some kind
17 of a settlement agreement or invoice with -- to
18 affiliates.
19         MR. MORRIS:  Okay.  I move to
20    strike.
21 BY MR. MORRIS:
22    Q    And my answer -- my question is really
23 simple.
24         Is there anything in HCMFA's books and
25 records that reflects its position that these

Page 61

1           Dustin Norris
2 payments were supposed to be made as compensation
3 rather than in the form of loans?
4    A    I -- I would say that the pleadings are a
5 part of our books and records now.  I would say
6 depositions.  And within that, it is well
7 documented.
8    Q    Okay.  Let me ask a different question
9 then.
10         Remember we were using the answer date
11 as being March 1st, 2021.
12    A    Correct.
13    Q    Is there anything in HCMFA's books and
14 records that was created prior to March 1st, 2021,
15 that corroborates HCMFA's position that the
16 payments were intended to be compensation and not
17 in the form of a loan?
18    A    Yeah, and I would, again, refer you to
19 DC's -- what do you call it -- declaration.  That
20 prior to that, we didn't have access to -- to,
21 largely, our books and records as that was
22 outsourced to Highland Capital Management, LP, and
23 to their employees, legal, compliance, and
24 accounting.  So our position is we did not have
25 anything at that point related to this agreement.

Page 62

Dustin Norris

1
2  MR. MORRIS:  Okay.  I move to
3  strike.
4  BY MR. MORRIS:
5  Q    And listen carefully to my question.
6      Is HCMFA aware of anything that was
7  created prior to the answer date that corroborates
8  its position today that the payments were intended
9  to be treated as compensation rather than a loan?
10  A    I -- I think as far as books and records
11  go, we have NAV error memos, we have communication
12  with the SEC.  Right?
13      There's -- there is a lot of
14  information related to the services that were
15  performed under the shared services agreement,
16  were for valuation purposes that Highland had
17  created and was responsible for the valuation
18  process, and that is a host of documents that are
19  in the record, yes.
20      MR. MORRIS:  Okay.  I -- I move to
21  strike.
22  BY MR. MORRIS:
23  Q    I'm asking about accounting.  Maybe it's
24  my fault.  Okay?  I'll -- I'll take responsibility
25  for this.  I'm asking as a matter of accounting.

Page 63

Dustin Norris

2  I'm still on 30(b)(6) Topic Number 10.
3      Is there anything in HCMFA's books and
4  records that was created before the answer date
5  that shows that the payment should have been
6  accounted for as compensation rather than a
7  loan?
8  A    As far as an accounting record, I wouldn't
9  expect there to be, because the accountant
10  function was outsourced to HCMLP, and -- and I
11  would refer you to our latest response and our
12  amended response of -- of what was discovered and
13  found throughout the process here.
14      The accountants recorded a liability
15  and they thought it should be liability.  And so,
16  no, there wasn't anything, to my knowledge, prior
17  to that that was in the accounting books and
18  records.  And I -- you know, I'm not surprised
19  there wasn't, because of the facts that you'll --
20  you'll see in our amended answers.
21  Q    Okay.  Do you know whether, if it was
22  intended to be compensation, that HCMFA's income
23  statement should have shown the inflow of the
24  $7.4 million?
25  A    I don't know how it would be reported for

Page 64

Dustin Norris

1
2  accounting purposes.  I -- I do have an accounting
3  background, but I haven't done accounting in a
4  long time.  And I'm not an expert in adviser
5  financial statements.  So I would say I don't
6  have -- and I guess -- I guess that -- stepping
7  back and answering on behalf of the company here,
8  I don't have a knowledge of how that would be
9  recorded for income statement purposes.
10  Q    Okay.
11  A    But it would -- it would be compensation
12  that would be reported --
13  Q    Okay.
14  A    -- somewhere in the financial statements.
15  Q    So it's your testimony today, as HCMFA's
16  30(b)(6) witness, that HCMFA was unaware that its
17  audited financial statements disclosed these notes
18  until after the lawsuit was commenced.
19      Do I have that right?
20  A    That's correct.
21  Q    And it's your position today, as HCMFA's
22  30(b)(6) witness, that HCMFA was unaware that the
23  payments that were made by Highland were booked as
24  liabilities until sometime after the lawsuit was
25  commenced; correct?

Page 65

Dustin Norris

1
2  A    Yes, that's correct.  The accounting
3  function was outsourced to HCMLP.
4  Q    Okay.  And there's -- was there anybody --
5  was there any officer of HCMFA who had
6  responsibility for reviewing HCMFA's balance
7  sheet?
8  A    I believe I already answered this earlier.
9  Q    I actually asked the question on the
10  audited financial statements.
11  A    Okay.
12  Q    Now I'm going to ask specifically.  Is
13  there anybody who served as an officer of HCMFA
14  who had the responsibility of making sure that
15  HCMFA's balance sheets were true and accurate?
16  A    Yes.  So Frank Waterhouse and his team,
17  Frank was the named treasurer of HCMFA, and his
18  role at HCMLP, as a service provider, would have
19  had that responsibility along with his team.
20  Q    Okay.  Let's go to the next topic,
21  Topic 11.  Do you see Topic 11 refers to
22  "communications in 2020 with any retail board --
23  A    Yes.
24  Q    -- concerning the amounts due and owing to
25  Highland"?

Page 66

Dustin Norris

1
2   A    Yes, I do.
3   Q    Okay.  HCMFA is a financial advisory firm;
4   correct?
5   A    It is.
6   Q    And it provides advisory services to
7   certain funds; correct?
8   A    It does.
9   Q    And those advisory services are provided
10  pursuant to written agreements; correct?
11  A    They are.
12  Q    And those agreements are subject to annual
13  review; correct?
14  A    They are.
15  Q    And those agreements the principal source
16  of HCMFA's revenue?
17  A    Yes, I believe so.
18  Q    Okay.  It's among the most important
19  contracts HCMFA has; correct?
20  A    Yes.
21  Q    In fact, it's the reason for HCMFA's
22  existence, is that fair, is to serve the funds?
23  A    Largely, yes.
24  Q    And the funds are managed by boards;
25  correct?

Page 67

Dustin Norris

1
2   A    Correct.
3   Q    And can we refer to the boards that manage
4   the funds that are served by the advisers as "the
5   retail board"?
6   A    Yes.
7   Q    Okay.  Did you participate -- are you
8   aware that in the fall of 2020 the retail board
9   conducted a review in connection with the
10  determination as to whether or not to renew
11  HCMFA's contracts?
12  A    I am aware, yes.
13  Q    Did you participate in that process?
14  A    I did, in some -- in some parts, yes.
15  Q    What parts did you participate in?
16  A    Yeah, so I attended the board meetings in
17  relation to -- we call this the 15(c) analysis.
18  And so it's Section 15(c) of the 1940 Act requires
19  the board to determine and renew the contracts on
20  an annual basis.  And so they look at a number of
21  factors.  And there's, I believe, certain case law
22  that dictates the things that they should look at:
23  Quality of services, performance, fees.
24          And so my aspect -- the biggest part
25  of my contribution is to talk about the

Page 68

Dustin Norris

1
2   performance of the funds, how they performed
3   during the year.  We hire an outside third party
4   to come in and talk about performance and fees.  I
5   help provide insight, talk about -- as I oversee
6   the sales and business development of the firm, I
7   talk about inflows and outflows, which help --
8   helps impact the economies of scale funds.  We
9   have certain funds that are shrinking, some that
10  are growing.  So talking about future, talking
11  about mergers, talking about different aspects of
12  that.
13          And so my -- mine is more of the sales
14  business development function and regarding the
15  services.  One of the things that we do as the
16  adviser is we, again -- they have to determine
17  that the quality of services we're providing are
18  sufficient, and so they have to get comfortable
19  with the various functions.
20  Q    Okay.  Who else on behalf of HCMFA
21  participated in the 15(c) analysis that you've
22  just described?
23  A    Yeah, so as -- again, going back to the
24  shared services agreement, I point you to the
25  services that are provided by HCMLP.  In large

Page 69

Dustin Norris

1
2   part, this process is managed and run by the HCMLP
3   employees as part of that shared services.  Legal
4   and compliance help draft the memos.  They are --
5   Q    And I'm going to interrupt you, and I
6   really apologize for doing that.  I'm not asking
7   about HCMLP.
8   A    Yeah.
9   Q    These are -- these are HCMFA's contracts;
10  correct?
11  A    They are.
12  Q    And they're the most important contracts
13  that HCMFA has; correct?
14  A    Correct.
15  Q    Okay.  So who -- which officers of HCMFA
16  are involved in the 15(c) analysis?
17  A    Yeah, one -- going back to -- to clarify
18  on your -- you know, this is the most important
19  thing, you know, that we have, it is, and as such
20  we have -- a lot of those functions, and to talk
21  about HCMFA's role, we have front-office
22  investment professionals who join those meetings
23  to talk about the funds and performance.  The
24  aspects of the adviser that we provide and source
25  is the management of the funds:  The performance,

Page 70

Dustin Norris

1 the investment selection. And then we bring in
2 HCMLP to provide the various other services. And
3 so they are a huge part of that. To say that –
4 yeah, it's not – they are legal, compliance,
5 accounting, finance, back office, settlement.
6 Those are all functions that they're providing.
7 Q I know – I appreciate that they're
8 functions that they play under the shared services
9 agreement.
10 A Yup.
11 Q Let me – let me move on.
12 A Okay. Go ahead.
13 Q In October 2020, HCMFA informed the retail
14 board that HCMFA was obligated to pay Highland the
15 outstanding principal amount due under the notes;
16 correct?
17 MR. RUKAVINA: Objection; form.
18 THE WITNESS: Yeah, the
19 obligated – I would – sorry. Can you
20 ask the question again?
21 BY MR. MORRIS:
22 Q Sure.
23 In October 2020, HCMFA informed the
24 retail board of the existence of the notes;

Page 71

Dustin Norris

1 correct?
2 A Not that I'm aware of. If you have
3 something you could – you know, a document or
4 something that you're thinking of?
5 Q So you participated in the 15(c) process,
6 and you have no knowledge of HCMFA informing the
7 retail board of the existence of the notes?
8 A Of these notes? No. And I would say that
9 there was a question from the retail board posed
10 to the advisers, which we passed along to HCMLP,
11 which included Lauren Thedford as an HCMLP
12 employee and Frank Waterhouse, is: Were there any
13 liabilities to – owed to Highland?
14 Q So let's take a look – I'm sorry. Go
15 ahead.
16 A No, go ahead.
17 Q I was going to say, let's take a look at
18 that.
19 MR. MORRIS: So if we could put up
20 on the screen Exhibit 59.
21 (Exhibit 59 tendered.)
22 BY MR. MORRIS:
23 Q Have you seen this document before, sir?
24 A I have.

Page 72

Dustin Norris

1 Q And this is the report that the advisers
2 gave to the retail board in October 2020 as part
3 of the 15(c) analysis; correct?
4 A Yes, working closely with HCMLP in the
5 accounting, compliance, and legal function did
6 draft this.
7 Q Okay. And who – who on behalf of the
8 advisers authorized the sending of this memo?
9 A I don't know that there's a formal
10 authorization. Lauren Thedford, who was the
11 secretary of the advisers and an HCMLP employee,
12 helped prepare the memo along with the rest of the
13 legal and compliance team. Thomas Surgent was
14 probably involved.
15 MR. MORRIS: Okay. I'm going to
16 move to strike.
17 BY MR. MORRIS:
18 Q I don't want to know who was probably
19 involved. I actually asked a very specific
20 question, and if you don't know, please just say
21 you don't know.
22 Who on behalf of the advisers
23 authorized the sending of this memo to the retail
24 board?

Page 73

Dustin Norris

1 A I don't know.
2 Q Did anybody on behalf of the advisers ever
3 suggest that this memo was wrong or inaccurate in
4 any way to the best of your knowledge?
5 A At that time? Is that what you mean?
6 Q Yes.
7 A No, not – not to my knowledge.
8 Q Okay. When did you see this memo for the
9 first time?
10 A I may have been copied on it at the time.
11 I don't remember if I read it, but I did review
12 it – and actually, I didn't review the whole
13 memo. I reviewed the one email that was related
14 to the note payable in this. So I don't know that
15 I read the whole memo.
16 Q So – so –
17 MR. MORRIS: Can we see how long
18 the memo is?
19 BY MR. MORRIS:
20 Q So it's two pages, and it's got some
21 charts; is that fair?
22 A That's fair.
23 Q And in October 2020, you were the
24 executive vice president of every single entity

Page 74

Dustin Norris

1  that this email is being sent to and from;
2
3  correct?
4  A  I'm looking at the entities.
5  I'm executive vice president of most
6  of the entities.
7  Q  Okay. You're the executive vice president
8  of each of the entities that are sending this
9  memo; correct?
10  A  No. Not NexPoint Securities.
11  Q  I appreciate that. Thank you for the
12  clarification.
13  Did you review this before it was
14  sent?
15  A  I don't remember.
16  Q  Did you take any steps to make sure that
17  it was accurate?
18  A  Probably not. And that wouldn't have been
19  my function. We had a legal and compliance team
20  that was – through the shared services agreement
21  that prepared memos. This is going to the board.
22  That would have all obviously gone through legal
23  and compliance. It wouldn't have been my
24  function.
25  Q  Did anybody who served as an officer or

Page 75

Dustin Norris

1
2  employee of HCMFA have any responsibility to make
3  sure that this memo was true and accurate before
4  it was sent to the retail board?
5  A  Lauren Thedford was the secretary of the
6  advisers and the funds, and I believe this has to
7  do with – and depending on the material, I think
8  this has to do with the note, and other things.
9  So the finance team, Frank Waterhouse and his team
10  at HCMLP, would have been supplying those answers.
11  Q  Okay. And why do you keep saying Frank
12  Waterhouse at HCMLP instead of Frank Waterhouse as
13  the treasurer of the entity that's sending this
14  memo?
15  A  Because Frank was the CFO of Highland who
16  was responsible for the accounting, finance,
17  back-office functions of these funds. And the
18  answer – the adviser did not have that
19  information, and intentionally hired HCMLP to
20  provide that function. And so that is how it was
21  viewed. Those were HCMLP employees, and that was
22  under the shared services agreement.
23  Q  Is it your testimony as the HCMFA 30(b)(6)
24  witness that Frank Waterhouse did not have any
25  responsibility in his capacity as the treasurer of

Page 76

Dustin Norris

1
2  HCMFA to make sure that this report was true and
3  accurate before it was sent to the retail board?
4  A  I don't know of any function or
5  requirement of his role as treasurer of HCMFA that
6  he was responsible for reviewing 15(c) memos prior
7  to going to the board.
8  Q  And other than Lauren Thedford, you can't
9  identify any officer or employee of HCMFA who had
10  any responsibility to make sure that this report
11  was true and accurate before it was sent; is that
12  correct?
13  A  No. And I can't – and I would, again, go
14  back to legal. And this is a memo that is going
15  to the board and is a legal and compliance
16  function that would have been provided services by
17  HCMLP. And that was always the case. Those
18  employees, for years, have provided the
19  legal/compliance support of memos of the 15(c)
20  process and the support for everything that went
21  into it.
22  MR. MORRIS: Okay. Move to strike.
23  BY MR. MORRIS:
24  Q  Do you know if Jim Dondero reviewed this
25  before it was sent?

Page 77

Dustin Norris

1
2  A  I don't know for sure, but I highly doubt.
3  He was never, to my knowledge, involved in
4  drafting or reviewing 15(c) memos.
5  Q  Okay. You'll agree that this memo was
6  sent by the advisers in response to the retail
7  board's questions; correct?
8  A  Correct.
9  Q  And you'll agree –
10  A  And actually, let me – let me correct
11  that.
12  It was from the advisers. I believe
13  that HCMLP employees sent it, getting back to –
14  it was sent by – technicality, but I believe
15  Lauren Thedford would have sent this.
16  Q  And why do you say that she sent it in her
17  capacity as an HCMLP employee rather than as the
18  secretary of the entity that's actually the author
19  of the memo?
20  A  Because that was the function that they
21  were providing as part of the shared services
22  agreement. And I – yeah. That was what – she's
23  part of the legal team at HCMLP, and that was the
24  service she was providing. We didn't have a legal
25  and compliance function at HCMFA.

Page 78

1           Dustin Norris

2   Q    Okay.

3        MR. MORRIS:  Can we scroll down to

4   Question 2, please?

5   BY MR. MORRIS:

6   Q    Have you seen Question 2 before?

7   A    Yes.

8   Q    Do you have an understanding of what was

9   being requested by the retail board in Question

10  Number 2?

11  A    Yes.  They are asking for amounts

12  currently payable or due in the future to HCMLP by

13  HCMFA or NexPoint Advisors.

14  Q    And -- and did the advisers report to the

15  retail board in October 2020 that, quote,

16  "$12,286,000 remains outstanding to HCMLP from

17  HCMFA"?

18  A    It says it right there.  That's in the

19  memo.

20  Q    Okay.

21  A    And I would note that came from Frank

22  Waterhouse and his team, that information, the

23  accounting department at HCMLP.

24       MR. MORRIS:  Okay.  I move to

25  strike everything after the portion of

Page 79

1           Dustin Norris

2   your answer that was responsive to my

3   question.

4   BY MR. MORRIS:

5   Q    As HCMFA's 30(b)(6) witness today, have

6   you done anything to determine whether or not the

7   $12.286 million number includes the principal

8   amount of the notes?

9   A    Looking at it, we can't tell.  Because it

10  doesn't line up exactly with those notes.  There

11  were other notes that had been recorded in the

12  books for several years before.  And if you add

13  those two together, it doesn't add up.  So it's

14  not clear.

15  Q    Did you read the testimony of Mr. Klos and

16  Ms. Hendrix?  I think you said you did; right?

17  A    I did.

18  Q    Did you read the portion of their

19  testimony where they said that this number

20  includes the notes as well as certain other

21  amounts that were due and owing to certain

22  Highland affiliates?

23  A    I did -- I didn't read every single line,

24  and there were, between the two of them -- I don't

25  know -- 600 pages.  So if it's in there and you

Page 80

1           Dustin Norris

2   can point to it, then I can take your

3   representation.  But I don't remember that.

4   Q    All right.  So did anybody acting on

5   behalf of HCMFA -- withdrawn.

6        Did any officer of -- or employee of

7   HCMFA do anything to make sure the information in

8   this response was true and accurate before it was

9   sent to the retail board?

10  A    We received it from the individuals

11  responsible.  And there was no -- you know, there

12  was no reason to doubt that it was incorrect.

13  Right?  These were professionals.  We were relying

14  on them.  This is Frank Waterhouse, Dave Klos,

15  Kristen.  We anticipated this would be accurate.

16  Q    Okay.  You anticipated it.  But it's your

17  testimony that no officer or employee of HCMFA did

18  anything independently to make sure that it was

19  accurate; that they completely and 100 percent

20  just deferred and relied on somebody else under a

21  contract?

22  A    Frank Waterhouse was the treasurer.  You

23  said any -- any officer.  He was -- in his role,

24  he provided this information.  And I don't know

25  his extent of how he looked into it, but if you

Page 81

1           Dustin Norris

2   look at the email chain, it didn't look too

3   extensive.  And if you even look at this, he's

4   saying that the earliest the note between HCMLP

5   and HCMFA can come due is May 21st.  He himself

6   seems to be confused here, because as we found out

7   through discovery and in the testimony of what has

8   come out, there was an agreement -- that was a

9   separate agreement.  That wasn't related to the

10  notes at issue in this case.

11       And so I don't know the extent that

12  was gone into this, but it -- it -- there's

13  confusion even in the response.

14       MR. MORRIS:  Okay.  I move to

15  strike.

16  BY MR. MORRIS:

17  Q    Again, I was just asking about the

18  identity of anybody who was charged with the

19  responsibility of making sure that this was true

20  and accurate.

21       Is there any officer or employee of

22  HCMFA who was charged with the responsibility of

23  making sure this response was true and accurate?

24  A    Yeah.  It was sent to -- the request went

25  to Frank Waterhouse because he and his team would

Page 82

1    Dustin Norris
2  have this information. That's – that's where we
3  would get this information.
4    Q   Okay. Thank you.
5        MR. RUKAVINA: Hey, John, let me
6    just interject for a little. Let's go off
7    the record for just a minute.
8        (Discussion off the record.)
9  BY MR. MORRIS:
10    Q   Do you know, as HCMFA's 30(b)(6)
11  representative, whether the $12.286 million
12  includes the $7.5 million – withdrawn.
13        Do you know if the 12. – withdrawn.
14        As HCMFA's 30(b)(6) witness, do you
15  know whether the $12.286 million referenced in
16  Response Number 2 includes the $7.4 million in
17  principal amount on the notes?
18    A   I don't.
19    Q   Okay. Did you do anything to try to
20  answer that question before appearing for today's
21  deposition?
22    A   Yeah. We discussed this with counsel. We
23  don't have underlying backup. We couldn't talk to
24  Frank Waterhouse on this in preparation, but the
25  numbers just don't match up to principal amounts

Page 83

1    Dustin Norris
2  and what is owing. We don't have information on
3  the other notes. So discussed it with counsel,
4  but I – we don't have any backup to support or –
5    Q   Did you make – did you make any attempt
6  to speak with Ms. Thedford?
7    A   No, I didn't. And she wouldn't have that
8  information. She's an attorney and was involved
9  in the legal field, and she's no longer employed
10  there or at Skyview.
11        MR. MORRIS: I move to strike.
12  BY MR. MORRIS:
13    Q   Okay. And so you don't know what the
14  component parts of this $12.286 million number
15  are; correct?
16    A   I don't.
17    Q   Okay. Do you see the last sentence of
18  this response that says, quote: "The adviser
19  notes that both entities have the full faith and
20  support of Jim Dondero," close quote?
21    A   I do.
22    Q   Do you know what that means?
23    A   Other than what Frank Waterhouse
24  testified – and I, again, refer you to his
25  deposition – that – I believe that wording came

Page 84

1    Dustin Norris
2  from him, and he emailed that. So I would refer
3  you to his testimony.
4    Q   Well, as the 30(b)(6) witness, you were
5  asked to be prepared about communications to the
6  retail board; correct?
7    A   Yes.
8    Q   Okay. Did you do anything to try to
9  figure out what that sentence meant – that
10  sentence meant, other than reading Frank
11  Waterhouse's deposition transcript?
12    A   Knowing that it came from Frank, and Frank
13  elaborated, I didn't do any additional research.
14    Q   Did you ask Mr. Dondero if he was aware
15  that that statement was included in the report to
16  the retail board?
17    A   I did not.
18    Q   Do you know why this statement was
19  included in the report to the retail board?
20    A   I could speculate, but I don't know
21  specifically.
22    Q   Do you know if Mr. Dondero authorized the
23  advisers to inform the retail board, in October
24  of 2020, that the advisers had the full faith and
25  support of Mr. Dondero?

Page 85

1    Dustin Norris
2    A   I'm not aware, and if you look at Frank's
3  testimony, I believe he testified that he – he
4  didn't have that authority either, but I'm not
5  sure. I would refer you to his – I don't have
6  any other knowledge.
7    Q   Okay. So it's HCMFA's position that the
8  statement in the last sentence of Response
9  Number 2 was unauthorized. Do I have that
10  correctly?
11    A   I don't know that we're taking that
12  position either way. It wasn't something
13  that – that we're – was even part of the – our
14  arguments.
15    Q   I'm not asking if it's part of your
16  arguments. I'm just asking you, as a factual
17  matter, does HCMFA contend that that sentence was
18  included without authorization?
19    A   I don't have the knowledge of that.
20  That's – I'm not going to contend that.
21    Q   Okay.
22    A   It may have been. I don't know.
23    Q   Okay. So this letter was sent over a year
24  ago. Do I have that right?
25    A   What's the date on it?

Page 86

Dustin Norris

1
2     MR. MORRIS:  If we can go back to
3     the top.
4         THE WITNESS:  Yup.
5  BY MR. MORRIS:
6     Q    Okay.  Has – have the advisers ever told
7  the retail board that the response to Question
8  Number 2 was inaccurate in any way?
9     A    Specifically saying, "Hey, let me tell you
10  this memo, Question 2, let me go back, it was
11  inaccurate," no, that was never a specific
12  disclosure of the retail board.
13         However, the retail board is aware of
14  all of the facts and circumstances surrounding the
15  notes, and so they're aware of our position.
16  They're aware of – they've been demanded.
17  There's been a lawsuit involved on both notes.
18         And – and but, no, this specific
19  Number 2 is incorrect, no.  But they're aware of
20  our position and what we found out since then.
21     Q    Okay.  Earlier in 2020, before this memo
22  was sent to the retail board, HCMFA had provided
23  to the retail board its financial statements for
24  the period ending June 30, 2020; correct?
25     A    I believe that's typical in our August

Page 87

Dustin Norris

1
2  meeting as part of the 15(c) process, but – I
3  don't know if you have that in hand, but I believe
4  that was supplied.  I'm not certain.  Sometimes it
5  was 12/31 balance sheets, sometimes it was a
6  June 30th balance sheet.
7     Q    Okay.  Can we – are you aware – have you
8  seen an email exchange that preceded the – the
9  finalization of this memo to the retail board?
10     A    I believe it was part of your exhibits.
11     Q    All right.
12         MR. MORRIS:  So let's put that up
13     on the screen, Exhibit 36.
14         (Exhibit 36 tendered.)
15  BY MR. MORRIS:
16     Q    So is this the document that you've seen
17  before?
18     A    Yes.
19     Q    Okay.
20         MR. MORRIS:  And can we start at
21     the bottom of the document?
22  BY MR. MORRIS:
23     Q    Okay.  And do you know who Stacy from
24  Blank Rome is?
25     A    I do.

Page 88

Dustin Norris

1
2     Q    And who is that?
3     A    She is independent counsel for the retail
4  board, the independent directors.
5     Q    And did she provide to the people on this
6  email string certain questions that the retail
7  board had in connection with its annual 15(c)
8  review?
9     A    Yes.  These were follow-up requests.  So
10  they have a memo that she provides early on with
11  an extensive list of questions, and these were the
12  follow-up questions from the board.
13     Q    Okay.  And so it was sent to you,
14  actually; correct?
15     A    To me and Lauren.
16         MR. MORRIS:  Can we scroll up a
17     little bit, please?  Keep going.
18  BY MR. MORRIS:
19     Q    And then Lauren forwards it to certain
20  people, including you; correct?
21     A    She forwards it to Thomas and copies me.
22     Q    Uh-huh.  And – and she includes the
23  questions that are being asked by the retail
24  board; correct?
25     A    I don't know if – I don't know if that's

Page 89

Dustin Norris

1
2  all of them.  I don't know if you have the memo.
3  If you represent that is all the questions,
4  then –
5     Q    Yeah.
6     A    – then I'll take that representation,
7  but –
8     Q    And – and Question Number 2 is the same
9  Question Number 2 that we just looked at in the
10  report that was given to the retail board;
11  correct?
12     A    I don't know if it's exact, but – I don't
13  know if you want to pull that up.
14     Q    Don't you have a copy of it with you right
15  there?
16     A    I don't know if I have a copy of that.
17  Oh, I have the exhibits.  What exhibit was that?
18  I have it in PDF.
19     Q    Yeah, that's – that was 59.
20     A    I'm scrolling.  There are 650 pages here.
21         Sorry.  Which exhibit again?
22     Q    You know, let's just move on.
23         Is it fair to say that Ms. Thedford
24  forwarded to Mr. Surgent, you, and others,
25  questions that had been presented by Stacy, the

Page 90

Dustin Norris

1
2 retail board's outside counsel?
3    A    Just one correction there. She forwarded
4 it to Mr. Surgent and copied me.
5    Q    Fair enough.
6    A    I'm not on the "To" line. That would
7 be --
8         MR. MORRIS: Let's scroll down,
9    please. Let's scroll.
10 BY MR. MORRIS:
11    Q    And then -- and then she forwards it
12 further to Mr. Waterhouse, Mr. Klos, and
13 Ms. Hendrix.
14         Do you see that?
15    A    I do.
16    Q    And you're still copied on it; correct?
17    A    I am.
18    Q    And do you see that she's asking Frank,
19 Mr. Klos, and Kristin to respond to Question
20 Number 2 that concerns material outstanding
21 amounts currently payable or due in the future to
22 Highland or its affiliates by either of the
23 advisers?
24    A    Yes, it -- HCMLP will take that as a typo.
25 But yes. And that would be standard. Lauren

Page 91

Dustin Norris

1
2 would go to them as the source for that
3 information.
4    Q    Okay.
5         MR. MORRIS: And let's scroll up
6    and see the response.
7 BY MR. MORRIS:
8    Q    And do you see Mr. Waterhouse responded
9 with one word: "Yes"?
10    A    Yes, I see that.
11    Q    And then Ms. Thedford asked if
12 Mr. Waterhouse could provide the amounts.
13         Do you see that?
14    A    I do.
15    Q    And you're still copied on this email
16 chain; correct?
17    A    I am.
18    Q    So --
19    A    Which, again, is not unusual to copy me on
20 some things I wish they wouldn't. But I was
21 copied on board items fairly regularly.
22         MR. MORRIS: Okay. I move to
23    strike.
24 BY MR. MORRIS:
25    Q    I appreciate your wishes, but the question

Page 92

Dustin Norris

1
2 was simply whether or not, you know, you would
3 acknowledge that you were copied on this email.
4    A    Yup, that's my email.
5    Q    Okay. And let's see what the next
6 response is.
7         And do you see Mr. Waterhouse
8 responds -- can you read Mr. Waterhouse's
9 response?
10    A    I can. He said: "It's on the balance
11 sheet that was provided the board as part of the
12 15(c) materials."
13    Q    Okay. So everybody to whom Mr. Waterhouse
14 has sent -- withdrawn.
15         So you don't dispute, as HCMFA's
16 30(b)(6) witness, that Mr. Waterhouse informed all
17 of the recipients of his email on Tuesday,
18 October 6th, 2020, at 6:05 p.m. that the answer to
19 the retail board's Question Number 2 could be
20 found in HCMFA's balance sheet; correct?
21    A    Correct.
22    Q    Okay. Let's go --
23    A    Actually, can you go back down to the
24 answer -- the exact question?
25    Q    Of course.

Page 93

Dustin Norris

1
2         Okay.
3    A    "Are there material outstanding amounts
4 currently payable or due to the future by HCMLP to
5 HCMFA" -- yeah -- "or any other affiliate?"
6         Okay.
7    Q    Having read that, does that change your
8 answer at all?
9    A    And so -- go back to your original
10 question on whether his --
11    Q    Right. So Mr. --
12         MR. MORRIS: Can we scroll back up
13    to Mr. Waterhouse's response?
14 BY MR. MORRIS:
15    Q    Thank you for your patience, Mr. Norris.
16    A    Uh-huh.
17    Q    You'll see that Mr. Waterhouse responds at
18 6:05 p.m. on October 6th, and my question is a
19 simple one: Does HCMFA dispute that in
20 Mr. Waterhouse's email that he is telling the
21 recipients that the answer to the retail board's
22 Question Number 2 can be found in HCMFA's balance
23 sheet?
24    A    I would say the answer -- his -- his
25 response is the answer to the retail board is not

Page 94

Dustin Norris

1
2 completely accurate, because there was – there's
3 not enough there to be responsive. I think what
4 he's saying here is to Lauren, "Hey, it's on the
5 balance sheet. Can you look at it and figure it
6 out?"
7 And I – I think they go back and
8 forth, "Well, can you give us more information?"
9 And so it's – this is not responsive to the
10 question and isn't what was provided to the board,
11 but that's –
12 Q Well, let – let's see what Ms. Thedford
13 does. Ms. Thedford's the lawyer; right?
14 A She is.
15 Q Yeah. But she's also the secretary of
16 HCMFA; correct?
17 A At this time, I believe so, yes.
18 Q And you wouldn't dispute that she is
19 taking the lead on formulating the advisers'
20 response to the retail board; correct?
21 A I would not dispute that.
22 Q Okay. And do you see that she reports to
23 you and everybody else in her email that she has
24 taken information from the 6/30 financials?
25 A Yes, I see the below from the 6/30

Page 95

Dustin Norris

1
2 financials. And, again, to correct to me, I'm
3 CC'd. It's a nuance, but she's representing to
4 Frank and Dave and Kristin with a CC to me.
5 Q Okay. Does HCMFA acknowledge that the
6 information contained in the October 23rd, 2020,
7 report to the retail board with respect to
8 Question Number 2 was derived from HCMFA's
9 June 30th, 2020, financials?
10 A Sorry. One more time?
11 Q Will you agree, as HCMFA's 30(b)(6)
12 witness, that the information provided to the
13 retail board in October 2020 in response to
14 Question Number 2 was taken directly from HCMFA's
15 financial statements for the period ending
16 June 30th, 2020?
17 A Yeah. The unaudited financials, yes.
18 Q Okay. And so – so as HCMFA's 30(b)(6)
19 witness, you will agree that the $12,286,000
20 figure that was included in the former response to
21 the retail board was obtained from HCMFA's
22 unaudited financial statements for the period
23 ending June 30th, 2020; correct?
24 A It appears that way.
25 And I – I think – and, again, we're

Page 96

Dustin Norris

1
2 looking at a draft answer here. I don't have the
3 final answer. But it looks as work product that
4 she's pulling numbers from the unaudited balance
5 sheet and plugging them in here.
6 Q Okay. And we can look at the final if you
7 want, but that $12,286,000 number that was due to
8 HCMLP as of June 30th 2020, that's the exact
9 figure that was given to the retail board in the
10 final report; correct?
11 A "Final report," meaning the final memo –
12 final memos?
13 Q Yes.
14 A Yes. Yes, I believe so.
15 Q Okay.
16 MR. MORRIS: Can you scroll back up
17 to the last email?
18 BY MR. MORRIS:
19 Q So this is Mr. Waterhouse's response to
20 Ms. Thedford. And, again, Mr. Waterhouse is
21 Highland's CFO and the advisers' treasurer;
22 correct?
23 A Correct.
24 Q And at this time, Ms. Thedford is an
25 attorney at Highland, but she also serves as the

Page 97

Dustin Norris

1
2 secretary for the advisers; correct?
3 A That's correct.
4 Q And you are the executive vice president
5 for the advisers; correct?
6 A As of this date, yes.
7 Q And you had no position with Highland;
8 correct?
9 A At this time?
10 Q Correct.
11 A No position with Highland, no.
12 Q Okay. How about Mr. Post? Had he
13 transitioned from Highland to the advisers as of
14 October 6th?
15 A I don't believe so.
16 Q Okay. It happened in October, though;
17 right?
18 A I – I don't know.
19 Q Okay.
20 A Late October/November. It was late in the
21 year.
22 Q Okay. And do you know if anybody ever
23 told Mr. Waterhouse in October 2020 that there was
24 any aspect of his email that was incorrect?
25 A Not at that time, no, that I'm – not that

Page 98

Dustin Norris

1    I'm aware of.
2
3    Q    Okay.
4    A    And -- and would we have reason to doubt
5    him?  This -- he was the source of the
6    information.
7    Q    Okay.  And do you see that the last
8    sentence of his email actually refers to the last
9    sentence of Response Number 2 that was given to
10   the retail board later in October 2020?
11   A    I do.
12   Q    Did you ever ask Mr. Waterhouse anything
13   about that last sentence?
14   A    I don't believe so.
15   Q    Do you see that he says, quote:  "The
16   response should include, as I covered in the board
17   meeting, that both entities have the full faith
18   and backing from Jim Dondero, and to my knowledge
19   that hasn't changed"?
20        Do you see that?
21   A    I do.
22   Q    Do you know what board meeting he's
23   referring to?
24   A    "The response should include, as I covered
25   in the board meeting, that both entities have a

Page 99

Dustin Norris

1
2    full faith and backing."
3        So I don't know the exact board
4    meeting.  However, we do have an August board
5    meeting related to 15(c).  There's typically an
6    in-person or telephonic meeting in August, and
7    then there's a September board meeting that is
8    devoted almost exclusively to the 15(c) process.
9        And after that, there is follow-up
10   meetings -- multiple sometimes, particularly in
11   2020 during the bankruptcy proceedings that --
12   where the board was getting comfortable.  So it
13   would have been one of those meetings, but I don't
14   know which one.
15   Q    And -- and did you personally participate
16   in a board meeting where Mr. Waterhouse covered
17   the topic of the advisers having the full faith
18   and backing from Mr. Dondero?
19   A    I -- I probably would have been in most or
20   all of those board meetings, but I don't remember
21   that specifically.
22   Q    Okay.  Do you know -- do you know whether
23   anybody who's copied on this email ever questioned
24   any aspect of the last sentence of
25   Mr. Waterhouse's email at any time prior to the

Page 100

Dustin Norris

1
2    sending of the final memo on October 23rd?
3    A    Not that I'm aware of.
4    Q    You didn't; isn't that right?
5    A    I don't know that I read it, but I didn't
6    question it.  If I -- I either didn't read it or I
7    didn't question it.
8    Q    Okay.  So you have no recollection of ever
9    asking Mr. Waterhouse what he meant by the last
10   sentence of this email; correct?
11   A    No, I have no recollection.
12   Q    And you have no recollection of any
13   recipient of this email asking Mr. Waterhouse what
14   he meant by that last sentence; correct?
15   A    I don't remember.
16   Q    And you never told Mr. Waterhouse that you
17   had no knowledge of him having covered this issue
18   before the board?
19   A    You're wondering if I ever told him I had
20   no knowledge?
21   Q    Yeah.
22   A    No, I never talked to him about that.
23   Q    And to the best of your knowledge, no
24   recipient of this email ever challenged
25   Mr. Waterhouse's statement in this last sentence;

Page 101

Dustin Norris

1
2    correct?
3    A    I don't know what the conversations were
4    had between the others, but I have no knowledge of
5    that.
6    Q    Okay.
7    A    And -- and you've got -- sorry.  Go ahead.
8    Q    This email string is -- is an email string
9    devoted for the sole purpose of addressing
10   questions posed by the retail board in connection
11   with the 15(c) review; correct?
12   A    I believe so.
13   Q    Okay.  Have you ever seen HCMFA's
14   unaudited financial statements for June 30th,
15   2020?
16   A    Yes.
17   Q    And do you know if those audited --
18   unaudited financial statements included the
19   amounts due and payable under the notes?
20   A    I -- I think that -- I -- I don't
21   remember, but I think our position is it's
22   unclear, because the amounts don't agree to
23   the -- again, we have prior notes, we have these
24   notes.  The amounts don't line up.
25        So it's -- it's -- the underlying

Page 102

1          Dustin Norris
2  backing is not provided. There's no footnotes.
3  It's just a number that says due to HCMLP.
4     Q    Do you know -- do you know -- do you have
5  any recollection as to the totality of HCMFA's
6  liabilities as of June 30th, 2020?
7     A    Including this note? Or just this note?
8     Q    All -- all liabilities. What's the bottom
9  of the balance sheet?
10    A    I don't know. Do you have it? Do you
11 want to pull it up?
12    Q    I don't.
13    A    Yeah, I don't remember.
14         MR. RUKAVINA: Hey, John, it's
15 approaching 12:15. Just whenever, you
16 know --
17         MR. MORRIS: Yeah. You know what?
18 I was just about to change topics, so this
19 is a good time.
20         MR. RUKAVINA: Okay.
21         MR. MORRIS: Why don't we stop
22 here, and we'll come back at the top of
23 the hour.
24         MR. RUKAVINA: Excellent. Thank
25 you.

Page 103

1          Dustin Norris
2    (Recess from 12:11 p.m. to 1:06 p.m. CST)
3  BY MR. MORRIS:
4     Q    Mr. Norris, Topic Number 9 relates to
5  consent fees.
6         Do you understand that?
7     A    I do.
8     Q    Do you have an understanding of what a
9  "consent fee" is?
10    A    I do.
11    Q    Did you do anything to prepare for this
12 particular topic?
13    A    I did.
14    Q    What did you do to prepare for this topic?
15    A    I discussed the consent fee with
16 Mr. Dondero, with Mr. Rukavina, and with
17 Mr. Sauter.
18    Q    Okay. Mr. Sauter has no personal
19 knowledge of any consent fee that was paid in the
20 spring of 2019; correct?
21    A    No.
22    Q    Okay. What's your understanding of what a
23 "consent fee" is?
24    A    Generally or the specific consent fee
25 in -- that --

Page 104

1          Dustin Norris
2     Q    Let's start generally.
3     A    Yeah. So a "consent fee" is a fee paid to
4  a -- paid to someone who's agreeing to amend terms
5  or change the structure of the -- of a document or
6  a loan. In -- in bank loan world, or loan world,
7  if you are going to amend or extend or change the
8  terms, typically there was a consent fee paid to
9  those willing to consent.
10         Those that have voted or consented
11 receive a fee.
12    Q    Okay. And did HCMFA pay any consent fees
13 in or around April or May 2019?
14    A    It began to pay consent fees in May
15 of 2019, I believe.
16    Q    Okay. Are you looking at something as you
17 prepare your answer?
18    A    Yeah. I'm looking at Topic Number 9 that
19 says consent fee in April or May 2019.
20    Q    Okay. Thank you so much.
21         And -- and I think you testified that
22 they began paying consent fees at around that
23 time?
24    A    That's right.
25    Q    What do you mean by that?

Page 105

1          Dustin Norris
2     A    Yeah. So the consent fee was related to
3  the global allocation fund that converted from an
4  open-end fund to a closed-end fund, and there was
5  a 3 percent fee that would be paid to investors
6  that, one, consented to the conversion from an
7  open-end fund to a closed-end fund, but also held
8  their investment through the conversion.
9         The conversion was finalized in
10 February of 2019, and the consent fee was an
11 operational challenge because you had to determine
12 who the investors were that voted yes and that
13 held on to the conversion.
14         So with that, the -- the amounts that
15 were paid, there was an operational challenge to
16 determine who -- who needed to be paid, and so
17 they were deposited and then paid out over a
18 couple-month period.
19    Q    And who made the decision to pay the
20 consent fee?
21    A    So the consent fee was a collaborative
22 decision of senior management. Jim Dondero and
23 myself were involved in the decision, the
24 discussion to -- and it was a novel idea in terms
25 of converting from an open-end fund to a

Page 106

Dustin Norris

1
2  closed-end fund, and it was submitted to
3  investors.  It went through SEC review as a proxy
4  statement, and it went out to shareholders who
5  needed to vote for the proposal.
6  Q    And who paid the consent fee?  HCMFA?
7  A    My understanding is HCMFA as the adviser
8  of the global allocation fund paid the consent fee
9  to investors.
10 Q    And whose idea was it to seek consent to
11 change from an open fund to a closed-end fund?
12 A    I – I would say it was collaborative of
13 senior management.  Jim Dondero, myself, legal
14 compliance was involved.  It was, you know, Mark
15 Okada, who was a partner at the time.  There was a
16 lot of discussion involved.
17 Q    And when the decision was made to seek
18 consent to change from an open-end fund to a
19 closed-end fund, did HCMFA understand that there
20 would be costs, fees, and expenses associated with
21 that decision?
22 A    Being cost fees as in the consent fee?
23 Q    Correct.
24 A    Yes.
25 Q    And did it undertake any analysis to

Page 107

Dustin Norris

1
2  determine what the likely total fee would be?
3  A    Yeah.  I'm sure they did.
4  Q    Do you know what the total fee
5  paid – what the total consent fee paid was?
6  A    I don't have the exact amount, but it was
7  over $5 million.
8  Q    Okay.  And over what period of time were
9  the consent fees paid?
10 A    I know they were paid in May and June, and
11 there may be a portion that were paid thereafter,
12 but at least May and June of 2019.  There were
13 certain broker-dealers that reported later, and
14 when those were reported and verified, they were
15 paid out.  I don't remember the final date of the
16 last distribution.
17 Q    Okay.  And forgive me.  It's not my
18 business.  But were the consent fees paid to the
19 fund's shareholders?
20 A    They were paid to the shareholders.
21 That's correct.
22 Q    Okay.
23 A    That's consented.  The shareholders had to
24 vote, and they had to be a shareholder on
25 conversion date.

Page 108

Dustin Norris

1
2  Q    Okay.  And the decision to seek and obtain
3  consent, was that a voluntary decision by HCMFA?
4  A    To seek consent to move to a closed-end
5  fund?
6  Q    Yes.  That's not something that any
7  regulator required, was it?
8  A    No.
9  Q    It's not something that any rule or
10 anybody mandated; correct?
11 A    Not that I believe.
12 Q    Okay.  How did HCMFA fund the payment of
13 the total consent fee of over $5 million?
14 A    Yeah, from cash that it had on the balance
15 sheet.
16 Q    And where did it get the cash that was on
17 the balance sheet?
18 A    The cash came from the transaction that we
19 discussed earlier – and you showed the capital
20 coming in from Highland – which was compensation
21 for the NAV error.
22 Q    So it used the money that it received in
23 the transfers that we talked about to pay the
24 consent fee.  Do I have that right?  Or at least
25 some of it?

Page 109

Dustin Norris

1
2  A    Yes.
3  Q    And, in fact, it used approximately
4  $5 million of the moneys paid in May 2019 to pay
5  the consent fee of approximately $5 million; is
6  that fair?
7  A    At least $5 million.
8  Q    Okay.  Do you know the exact number?
9  A    Of the consent fee?
10 Q    Withdrawn.
11       Do you have a better or more precise
12 estimate of the total consent fee other than
13 $5 million?
14 A    It was over $5 million.  I don't remember
15 the exact amount, whether it was 5.6 or 5.2 –
16 Q    All right.
17 A    – because it was paid over time.
18 Q    Let's talk about the TerreStar valuation
19 issue for a few minutes, if we can.
20 A    Okay.
21 Q    Just generally, in 2018/2019, HCMFA spent
22 a fair amount of time addressing the consequences
23 of a valuation error concerning TerreStar.  Do I
24 have that right?
25 A    There was a lot in there, but there was,

Page 110

Dustin Norris

1
2 during that time, a lot of discussions with
3 TerreStar over the concerns of a valuation error
4 in 2018 and '19.
5 Q    And did it ultimately turn out that there
6 was a valuation error involving TerreStar?
7 A    There was.
8 Q    Okay. And had HCMFA retained Houlihan
9 Lokey in connection with doing the TerreStar
10 valuation?
11 A    Houlihan Lokey was involved in the
12 valuation, yes.
13 Q    And who retained Houlihan Lokey?
14 A    I don't know.
15 Q    As you sit here right now, you can't tell
16 me who retained Houlihan Lokey?
17 A    I don't know if it was HCMLP or HCMFA
18 or -- I don't know.
19 Q    Okay. Are you familiar with the firm
20 Houlihan Lokey?
21 A    I am.
22 Q    And do you know what services they
23 provided in connection with the TerreStar
24 valuation?
25 A    I do.

Page 111

Dustin Norris

1
2 Q    Can you describe for me the services that
3 were provided by Houlihan Lokey in connection with
4 the TerreStar --
5 A    And I would say I do generally. I was not
6 involved in the individual details. That was all
7 the HCMLP employees.
8       So all of the Highland employees that
9 were involved in the shared services agreement,
10 the valuation committee, valuation services were
11 the responsibility of HCMLP. Key inputs were
12 provided by HCMLP. Key estimates and
13 interpretations to Houlihan, and they used their
14 models to calculate a valuation that was then
15 approved by the valuation committee at HCMLP.
16       And so that's my general understanding
17 of the valuation process.
18 Q    Do you know how much Houlihan Lokey was
19 paid for its work?
20 A    I don't.
21 Q    Do you know if there's an engagement
22 letter pursuant to which Houlihan Lokey provided
23 these services?
24 A    I'm not aware.
25 Q    Would you dispute that HCMFA is the entity

Page 112

Dustin Norris

1
2 that retained Houlihan Lokey?
3 A    I don't know.
4 Q    Would you agree that Houlihan Lokey is
5 fairly described as an independent third-party
6 valuation consultant?
7 A    Yes, generally.
8 Q    Okay. And do you know when Houlihan Lokey
9 was retained?
10 A    I don't.
11 Q    Houlihan Lokey's retention was approved by
12 the retail board, wasn't it?
13 A    I'm not sure.
14 Q    Have you ever seen any of the work product
15 of Houlihan Lokey in connection with the TerreStar
16 valuation?
17 A    Yeah. I remember seeing the valuation
18 model.
19 Q    So Houlihan Lokey did prepare the
20 valuation model that is the subject of the
21 TerreStar valuation issue; is that fair?
22 A    Working very closely with the HCMLP
23 employees with the inputs, yes.
24 Q    Did HCMFA rely on the Houlihan Lokey
25 valuation model?

Page 113

Dustin Norris

1
2 A    I'm not sure.
3 Q    Does HCMFA contend that Houlihan Lokey
4 made any mistakes in connection with its valuation
5 services?
6 A    I'm not sure.
7 Q    Does HCMFA have a position as to whether
8 or not Houlihan Lokey made any mistakes in any of
9 the services that it performed in connection with
10 the TerreStar valuation?
11 A    I think they don't have details and would
12 retain their rights to understand what their role
13 and -- sorry. What was the original question?
14 Q    Just whether HCMFA has a position as to
15 whether or not Houlihan Lokey made any mistakes in
16 the work that it did in connection with the
17 TerreStar valuation?
18 A    Yeah. I think they're retaining their
19 rights to understand that better.
20 Q    Is there any agreement with Houlihan Lokey
21 that would give HCMFA the time to do that? Is
22 there a tolling agreement or anything like that?
23 A    Not that I'm aware of.
24 Q    Is HCMFA undertaking any analysis to
25 determine whether or not Houlihan Lokey made any

Page 114

Dustin Norris

1
2 mistakes in connection with the work that it did
3 on the TerreStar valuation?
4 A    Sorry.  One more time.
5 Q    Is HCMFA undertaking any analysis or
6 investigation to try to determine whether Houlihan
7 Lokey made any mistakes?
8 A    There are -- I don't know.  I don't know.
9 Q    You have no knowledge, as you sit here
10 today, as to whether HCMFA is undertaking any
11 analysis or investigation to try to determine
12 whether Houlihan Lokey did anything wrong in
13 connection with its valuation services; correct?
14 A    And I wasn't prepared -- I don't think
15 this is one of the topics -- you know, Houlihan
16 Lokey's, you know, involvement, and so I wasn't
17 prepared to answer that one.
18 Q    Okay.  Well, the defense -- HCMFA's
19 defense is that Highland is responsible for the
20 TerreStar valuation issue; correct?
21 A    Yes.
22 Q    And there's no question that Houlihan
23 Lokey provided services in connection with that
24 valuation; correct?
25 A    Correct.

Page 115

Dustin Norris

1
2 Q    But HCMFA has not undertaken any analysis
3 or investigation, to the best of your knowledge,
4 to try to determine if Houlihan Lokey was the
5 responsible party; fair?
6 A    We don't know if there is a contract or
7 not.  At this point, we're talking about the
8 defense of Highland's responsibility.  There's no
9 question they were responsible for the valuations.
10 They were outsource provider of the valuation
11 committee.  Every individual working and
12 coordinating with Houlihan Lokey was an HCMFA
13 employee.  All the data and information that was
14 provided to them came from HCMLP.  There's no
15 question that Highland was responsible for the NAV
16 error.  No one ever questioned that.  That was
17 always known.  It was all the employees that were
18 involved.
19      MR. RUKAVINA:  John, I'll just
20 reiterate that we did not understand your
21 topics to include Houlihan Lokey.  If you
22 need more information about that or if we
23 need to have a supplemental deposition,
24 that's fine.  But this is just not
25 something that we reasonably anticipated

Page 116

Dustin Norris

1
2 you asking about.
3      MR. MORRIS:  I think it's -- I
4 think I have the answer that I need and
5 that the executive vice president and
6 30(b)(6) witness has no knowledge of any
7 investigation or analysis that has been
8 undertaken by HCMFA to try to even
9 determine whether Houlihan Lokey is at
10 fault.
11 BY MR. MORRIS:
12 Q    Do I have that right, Mr. Norris?
13      MR. RUKAVINA:  Well, I will just
14 object that that was not your prior
15 question.
16      MR. MORRIS:  All right.  Well,
17 that's my question now.
18 BY MR. MORRIS:
19 Q    Is that correct, Mr. Norris?
20 A    I know there's been discussion with
21 counsel.
22      MR. RUKAVINA:  Well, I will
23 represent to you that we have looked for a
24 Houlihan Lokey contract and have not been
25 able to find one.  Otherwise, we would

Page 117

Dustin Norris

1
2 have produced it to you.  So if you have
3 anything like that, we'd love to see it.
4 We do not even know whether we had a
5 contract with Houlihan Lokey or not.  So
6 we'll try to find you information, John.
7 We just -- we just don't have it.
8      MR. MORRIS:  We'll get to that in a
9 moment.
10 BY MR. MORRIS:
11 Q    Has HCMFA -- withdrawn.
12      Has HCMFA ever told Houlihan Lokey
13 that it believed it made any mistake or error of
14 any kind in connection with its work on the
15 TerreStar valuation?
16 A    Again, I -- this is not a topic that we
17 reviewed, so I don't know.
18 Q    Okay.  You're not aware of anything today;
19 correct?
20 A    Again, the employees working with Houlihan
21 Lokey were the HCMLP employees.  So I don't know
22 if the debtor employees have that conversation,
23 but --
24      MR. MORRIS:  Yeah, I'm going to
25 move to strike.

Page 118

```
1              Dustin Norris
2   BY MR. MORRIS:
3   Q     And I'm asking about HCMFA.
4          Did -- has HCMFA ever informed
5   Houlihan Lokey that HCMFA believes that Houlihan
6   Lokey made a mistake or error in the work that it
7   did?
8   A     There were ongoing discussions extensively
9   throughout this with Houlihan Lokey and the debtor
10  employees regarding the error and what the causes
11  were. It was extensive discussions.
12         MR. MORRIS: Okay. Move to strike.
13  BY MR. MORRIS:
14  Q     Has HCMFA ever told Houlihan Lokey that
15  HCMFA believes that Houlihan Lokey made a mistake
16  or an error in connection with its valuation
17  services?
18  A     It may have, but I'm not aware.
19  Q     Thank you.
20         Are you familiar with the report that
21  HCMFA prepared and sent to the Global Allocation
22  Fund concerning the TerreStar valuation issues?
23  A     They sent to the fund?
24  Q     Uh-huh.
25  A     What do you mean "they sent to the fund"?
```

Page 119

```
1              Dustin Norris
2   Q     They sent to the board of the fund?
3   A     Oh, the board of the fund.
4          There were a number of memos and
5   presentations. If you have one you want to pull
6   up, you can -- we can refer to it.
7   Q     Sure.
8          MR. MORRIS: Let's put up what
9   we've marked as Exhibit 182.
10         (Exhibit 182 tendered.)
11  BY MR. MORRIS:
12  Q     And while we're doing that, have you ever
13  seen a single document anywhere at any time in
14  which any representative of HCMFA took Highland to
15  task for the work that it did in connection with
16  the TerreStar valuation?
17  A     "Took them to task"? Define "take them to
18  task."
19  Q     Told them that they were the source and
20  cause of the NAV error.
21  A     The irony of all of the reporting to the
22  board, all of the valuation knowledge was from
23  HCMLP's employees. We -- we outsourced that to
24  them. There was -- there was no question that
25  they were at fault, and that's -- every employee
```

Page 120

```
1              Dustin Norris
2   involved was an HCMLP employee.
3          MR. MORRIS: I move to strike.
4   BY MR. MORRIS:
5   Q     And I'm going to ask you, sir, to listen
6   carefully to my question.
7          Have you ever seen a document that
8   HCMFA sent to Highland in which HCMFA accused
9   Highland of being the cause of the NAV error?
10  A     I have not.
11  Q     Thank you.
12         Do you see the document that's on the
13  screen?
14  A     I do.
15  Q     Before I get to that, so the NAV error
16  occurred sometime prior to May 2019; correct?
17  A     Beginning -- I don't know the specific
18  dates. I believe it began in May of 2019 --
19  sorry. May 2019 --
20  Q     That's when it ended; right?
21  A     What's that?
22  Q     That's when it ended; right? That's --
23  A     Yeah, it was before May 2019.
24  Q     Okay. So during the entire time that the
25  TerreStar NAV error was being discussed and
```

Page 121

```
1              Dustin Norris
2   analyzed and debated and communications with the
3   SEC, during that entire period, Jim Dondero was in
4   control of both HCMFA and Highland; correct?
5   A     Yes, I believe so.
6   Q     Okay. Can you identify any employee of
7   Highland who was fired as a result of any of the
8   mistakes that were made in connection with the
9   TerreStar valuation?
10  A     No.
11  Q     Can you identify --
12  A     Not that I can remember.
13  Q     Can you identify any steps that
14  Mr. Dondero took against any employee who was
15  allegedly involved in the NAV error?
16  A     That would have been an HCMLP matter. I
17  don't have any knowledge of HCMLP's hiring or
18  firing practices.
19  Q     Okay. So at no time did anybody ever tell
20  you that any disciplinary measures were imposed
21  upon any Highland employee as a result of the NAV
22  error that Highland allegedly caused; correct?
23  A     Any firing practice? Is that what you
24  said?
25  Q     Disciplinary. Firing. Anything.
```

Page 122

Dustin Norris

2 A There was a remediation process that had
3 to go into effect, which was improvement of
4 controls, and they maybe even hired additional
5 people. But it was -- and I don't -- I'm not
6 aware of any disciplinary, but there could have
7 been.
8 Q Okay. But that would just be speculation
9 on your part; correct?
10 A Yeah.
11 Q So have you seen the document that's up on
12 the screen?
13 A I have.
14 Q Did you read it before it was sent?
15 A I don't think so.
16 Q Did anybody -- did any officer or employee
17 take responsibility for making sure that --
18 withdrawn.
19 What is this document?
20 A It is titled "Resolution of the Funds Net
21 Asset Value Error."
22 Q And was -- is it your understanding that
23 the purpose of this document was to enable HCMFA
24 to explain to the Global Allocation Fund how the
25 resolution of the NAV error was being conducted?

Page 123

Dustin Norris

2 A Not to the Global Allocation Fund. This
3 is a memo to the board.
4 Q Thank you for the clarification.
5 Subject to that clarification, is my
6 description otherwise correct?
7 A I believe so. There had been a number of
8 communications with the board, and this is the
9 resolution of the whole process, or most of the
10 process.
11 Q This was a pretty big issue for HCMFA,
12 wasn't it?
13 A There was a lot of people involved. It
14 was -- there was a lot of involvement from --
15 mostly Highland Capital Management, LP, employees,
16 but it was -- there was a lot involved.
17 Q And who -- what outside counsel was
18 retained?
19 A Adviser counsel is counsel -- is -- I
20 believe it was K&L Gates for HCMFA.
21 Q And who was Highland's counsel?
22 A I don't know.
23 Q Do you know if Highland had counsel?
24 A I don't know.
25 Q Do you --

Page 124

Dustin Norris

2 A I know they had counsel they referred to
3 for SEC matters, and I don't know if they utilized
4 them here or not. They were all Highland
5 employees that worked on this. So I'm sure you
6 probably have that in your records.
7 Q Sir, can you identify any outside counsel
8 that was retained by Highland to advise it in
9 connection with the TerreStar valuation issues
10 that were the subject of an SEC investigation?
11 A I have -- I have no knowledge of that.
12 Q Okay. Did you see this memo that's up on
13 the screen that's been marked as Exhibit 182 prior
14 to the time that it was sent?
15 A I don't recall.
16 Q The NAV error was the subject of an SEC
17 investigation; correct?
18 A Correct.
19 Q Do you know if HCMFA ever told the SEC
20 orally, in writing, or otherwise that Highland
21 Capital Management, LP, was the cause of the NAV
22 error?
23 A Not that I'm aware of, but they were
24 concerned about the ultimate correction of the NAV
25 error. I don't think they were concerned about

Page 125

Dustin Norris

2 the responsible party.
3 But I would say every single person
4 that interacted with the SEC, I believe, were
5 HCMLP employees. We can see that on the other
6 memo that they have to the SEC following up on a
7 call; all HCMLP employees. So whether they told
8 them or not, they were all HCMLP employees.
9 MR. MORRIS: Okay. Move to strike
10 after the very first portion of the answer
11 that was responsive.
12 BY MR. MORRIS:
13 Q Did anybody -- did any officer or employee
14 of HCMFA ever inform the SEC that Highland Capital
15 Management, LP, was the responsible party for the
16 NAV error?
17 A Specifically, not that I'm aware of.
18 Q Okay. Was any HCMFA officer or employee
19 responsible for making sure that the memorandum up
20 on the screen that's been marked as 182 was true
21 and accurate before it was sent to the board of
22 the Highland Global Allocation Fund?
23 A I don't know that there is a -- there's a
24 specific requirement of an officer to verify the
25 accuracy.

Page 126

Dustin Norris

1
2  Q    Okay. But my question was a little bit
3  broader, and that was whether there was any
4  officer or employee who was given the
5  responsibility of making sure this document was
6  true and accurate before it was sent to the board
7  of the GAF.
8  A    I don't even know who drafted this. It
9  would have come from Highland's compliance legal
10  and accounting team with all the expertise around
11  the NAV error and all of those that were involved.
12  Q    So did you see this document at or around
13  the time it was sent to the GAF board?
14  A    I probably did.
15  Q    Do you recall telling anybody at that time
16  that you believed there were any errors in the
17  document?
18  A    I think, as I testified before, I
19  don't -- I don't remember saying it. But I
20  didn't -- I didn't say there were errors in the
21  document, no.
22  Q    Prior to the answer date of March 1st,
23  2021, did anybody acting on behalf of HCMFA ever
24  tell anybody in the world at any time that there
25  was any error in this memorandum?

Page 127

Dustin Norris

1
2  A    Not that I'm aware of.
3  Q    Did HCMFA send this memorandum --
4  withdrawn.
5       Did HCMFA intend this -- withdrawn.
6       Did HCMFA expect the GAF board to rely
7  on this memorandum?
8  A    I don't know what the intention was.
9  Q    You don't know what HCMFA's intention was
10  in sending this memorandum?
11  A    If it's addressed to the board, it could
12  be to educate. But I'm sure that the board
13  would -- would rely on or expect that that memo
14  would be accurate.
15  Q    Okay. And this is dated after all of the
16  payments have been made that we've been talking
17  about, the May 2nd and the May 3rd payments;
18  correct?
19  A    Correct.
20  Q    Take a look at the second paragraph.
21  A    Yup.
22  Q    Do you see the first sentence refers to
23  two initial determinations that were made by the
24  adviser and Houlihan Lokey?
25  A    Sorry. Which part? Just the first

Page 128

Dustin Norris

1
2  sentence of the second paragraph?
3  Q    Yeah. First of all, do you see that the
4  second paragraph refers to the adviser and
5  Houlihan Lokey?
6  A    It does.
7  Q    And do you see that the reference to
8  Houlihan Lokey includes a reference to Houlihan
9  Lokey having been approved by the board?
10  A    Yes.
11  Q    And do you understand that that means the
12  board of GAF?
13  A    Yes.
14  Q    Does that refresh your recollection that
15  the GAF board approved of the retention of
16  Houlihan Lokey as an independent third-party
17  expert valuation consultant?
18  A    It doesn't refresh my recollection, but it
19  says it there. I don't know that I have a
20  document saying they -- I haven't seen the
21  approval, the agreement.
22  Q    But you don't dispute that this memo was
23  sent to the GAF board on or about May 28th, 2019;
24  correct?
25  A    Correct.

Page 129

Dustin Norris

1
2  Q    Okay. And HCMFA told the GAF board at
3  that time that HCMFA and Houlihan Lokey, quote,
4  "initially determined that the March transactions
5  were non-orderly and should be given zero
6  weighting for purposes of fair value."
7       Is that correct?
8  A    The HCMLP, as part of the valuation -- or
9  as the outsource valuation provider, were the
10  employees that made that determination. The
11  adviser ultimately has the responsibility, but it
12  was outsourced. And those were HCMLP employees,
13  along with Houlihan Lokey, that determined the
14  March transactions were non-orderly.
15       MR. MORRIS: I'm going to move to
16  strike.
17  BY MR. MORRIS:
18  Q    And I'm going to ask you to listen
19  carefully to my question.
20       I'm asking you what HCMFA told the GAF
21  board. Did HCMFA tell the GAF board on May 28th,
22  2019, that HCMFA and Houlihan Lokey, quote,
23  "initially determined that the March transactions
24  were non-orderly and should be given zero
25  weighting for purposes of determining fair value."

Page 130

Dustin Norris

2      Is that correct?

3   A     The -- in the memo, it says that on this

4   date, there were many other conversations probably

5   around this date and on this date discussing the

6   determinations and non-orderly and that it was the

7   HCMLP employees, and the board knew that. They

8   were very aware that it was the -- the valuation

9   control environment of HCMLP that determined these

10  were non-orderly transactions.

11  Q     So this -- so this report is inaccurate,

12  according to you?

13  A     No. There's -- there's just -- your

14  question was did they tell the board. There is a

15  lot that we told the board outside of this memo.

16  This memo does say advised from Houlihan Lokey.

17  The adviser is ultimately responsible. But there

18  was a lot of communication with the board --

19  Q     Okay.

20  A     -- around this, that they knew exactly who

21  was responsible for valuation as the board

22  determining that these were market transactions

23  and orderly or non-orderly.

24  Q     Okay. I want to focus on this memo,

25  because this is the one that I have. And you'll

Page 131

Dustin Norris

2   agree with me that there's no reference to

3   Highland Capital Management, LP, anywhere in this

4   report; correct?

5   A     No, there's not, but the board knew that

6   HCMLP was preparing the valuations.

7      MR. MORRIS: All right. I move to

8   strike after the word "no."

9   BY MR. MORRIS:

10  Q     And it was the determination concerning

11  whether or not it was orderly or non-orderly, and

12  whether or not to use zero weighting that were the

13  two causes of the NAV error; correct?

14  A     Those were key portions.

15  Q     In the last sentence, in fact, that's the

16  only portions; isn't that fair?

17  A     "Initially determined" -- well, it doesn't

18  say that there's not other factors. They're the

19  only ones mentioned.

20  Q     Let me -- let me -- let me read the last

21  sentence.

22      Quote: "The orderly determination and

23  adoption of the weighted fair value methodology

24  resulted in NAV errors in the fund," and that's

25  what it's defining as the NAV error.

Page 132

Dustin Norris

2      Have I read that correctly?

3   A     You did.

4   Q     And so would you agree with me, as HCMFA's

5   30(b)(6) witness, that on May 28th, 2019, HCMFA

6   told the GAF board that the two causes of the NAV

7   error were the orderly determination and the

8   adoption of the weighted fair value methodology --

9   fair value -- fair valuation methodology?

10  A     Those were -- it doesn't say those are

11  exclusively the only factors, but those are

12  mentioned here.

13  Q     It says those two factors resulted in the

14  NAV error; correct?

15  A     Those -- no, it didn't say "the NAV

16  error." It said "in NAV errors."

17  Q     Which it's defining as the NAV error;

18  correct?

19  A     Defines as "the NAV error."

20  Q     Okay. Does HCMFA contend that there's

21  anything in this paragraph that is inaccurate?

22  A     Again, I -- I don't know that Houlihan

23  Lokey was approved by the board, but I don't know

24  of any other contention.

25  Q     Okay. And you don't -- and HCMFA doesn't

Page 133

Dustin Norris

2   dispute that Houlihan Lokey was approved by the

3   board. You're just telling me that, as you sit

4   here today, that's the one fact that you've not

5   been able to confirm; is that fair?

6   A     As far as I know, yeah.

7   Q     Okay. Let's go on to the next paragraph.

8      MR. MORRIS: If we could just

9   scroll up a little bit.

10  BY MR. MORRIS:

11  Q     I'm going to try and summarize here, but

12  if you don't think it's a fair summary, of course

13  I would encourage you to let me know.

14      Is it fair to say that, as a general

15  matter, the next paragraph describes a total loss

16  from the NAV error as being approximately

17  $7.5 million?

18  A     Yeah, including processing costs and

19  rebates and offsets, yes.

20  Q     Right. That's what the parenthetical

21  says, a total loss --

22  A     Yup.

23  Q     -- of approximately $7.5 million?

24  A     Correct.

25  Q     And the next paragraph states that that

Page 134

1         Dustin Norris
2    loss was funded with two payments. Do I have that
3    correct in the first sentence?
4    A    Correct.
5    Q    Okay. Did HCMFA pay approximately
6    $5.186 million on or around February 15, 2019, in
7    connection with the NAV error?
8    A    I believe so.
9         And if we go to the next page, it has
10   dates and payments. I think it's represented
11   there.
12   Q    Okay. Where did HCMFA get the money to
13   make that payment?
14   A    A combination of insurance proceeds and
15   cash that it had. And, again, that's detailed, I
16   believe, on the next page.
17   Q    HCMFA contends that the $7.4 million
18   transferred by Highland to HCMFA was mistakenly
19   recorded as a loan; correct?
20   A    There's -- there's two different amounts
21   that we contend were recorded as a note, a
22   combined 7.4 million, yes.
23   Q    Okay. And HCMFA contends that the
24   $7.4 million in payments was not to be a loan, but
25   was supposed to be compensation for Highland's

Page 135

1    negligent valuation services in connection with
2    the NAV error; correct?
3    A    Sorry. One more time.
4    Q    HCMFA contends that the $7.4 million in
5    payments was supposed to be compensation resulting
6    from Highland's negligent valuation services;
7    correct?
8    A    Yes, subject to all of our defenses that
9    we've laid out in our pleadings.
10   Q    Okay. When did HCMFA reach the conclusion
11   that Highland was the cause of the NAV error?
12   A    The -- there was never -- I don't think
13   there was ever a question. It was always known
14   that HCMLP employees were the ones creating the
15   valuation, overseeing the valuation, working with
16   the value -- you know, everything that was done
17   was outsourced to HCMLP.
18        And so it was discussed with the
19   board. It was discussed in-depth internally. The
20   employees were all HCMLP employees. So I can't
21   pinpoint a date, but there -- it was a known
22   factor that HCMLP was responsible.
23        MR. MORRIS: Okay. I move to
24   strike.
25

Page 136

1         Dustin Norris
2    BY MR. MORRIS:
3    Q    The only thing I'm asking you for is a
4    date. And if you don't know, the answer is "I
5    don't know." So let me try one more time.
6         Do you know when HCMFA first
7    determined that Highland was negligent?
8    A    I don't know the first date.
9    Q    Do you know if it was in 2018 or 2019?
10   A    I don't know.
11   Q    Do you know when the NAV error first --
12   was first identified?
13   A    I believe the NAV error was determined in
14   early 2019.
15   Q    Was it before or after -- I mean, the --
16   the NAV error must have been identified before
17   February 15, 2019; correct?
18   A    Correct.
19   Q    Okay.
20   A    Well, I should say whether there -- I
21   don't know. I don't remember -- we'll have to
22   look through the documents -- what the actual --
23   oh, you're saying before February 15th. Yes,
24   that's when the paid insurance proceeds came in.
25   So yes.

Page 137

1         Dustin Norris
2    Q    No question -- no question that HCMFA knew
3    before February 15, 2019, that there was a NAV
4    error; correct?
5    A    Correct.
6    Q    No question that HCMFA knew before
7    February 15, 2019, that the NAV error was caused
8    by Highland; correct?
9    A    Yeah. Like I said, it was always known
10   that these were Highland employees that were
11   outsourced through the valuation, and they were
12   the ones at fault.
13   Q    Okay. Do you know if -- if HCMFA ever
14   demanded compensation from Highland for any errors
15   or mistakes it may have made in connection with
16   the TerreStar valuation?
17   A    Yeah. Mr. Dondero told Frank to make the
18   payments to compensate for the NAV error.
19   Q    And did he do that in his capacity as the
20   person in control of HCMFA, or did he do that in
21   his capacity as the person in control of Highland?
22   A    I would imagine it would have been both.
23   Further supported, he transferred money -- of his
24   own money to HCMLP to then pay HCMFA. And so
25   he -- yes, he was on both sides of it, but he had

Page 138

Dustin Norris

1           Dustin Norris
2  the authority on both sides to make that decision.
3  Q   Okay. And so Mr. Dondero reached an
4  agreement with himself pursuant to which HCMFA
5  demanded and Highland agreed to pay the
6  $7.4 million as a consequence of Highland's
7  negligent conduct in the performance of its
8  valuation services. Do I have that right?
9  A   Sounds like there's a legal determination
10  there that needs to be made. I --
11  Q   It's a factual one, I promise.
12  A   Entering -- whether entering into an
13  agreement or not, I -- that seems like a legal
14  determination. But maybe ask the question again.
15  Q   Did somebody on behalf of Highland agree
16  to pay HCMFA $7.4 million in order to compensate
17  HCMFA for Highland's negligent services in
18  connection with the TerreStar valuation?
19  A   Yes. Mr. Dondero.
20  Q   Thank you.
21       Is there any document anywhere that
22  you have ever seen that reflects Highland's
23  agreement to pay $7.4 million as compensation to
24  HCMFA?
25  A   I haven't seen a settlement agreement or

Page 139

Dustin Norris

1  an agreement to that effect, no.
2  Q   You haven't seen anything; correct?
4  A   No.
5  Q   Have you looked?
6  A   We have. I actually wouldn't be
7  surprised -- I would be surprised to see one. And
8  it's -- my understanding is -- and the company's
9  position is that there doesn't need to be an
10  agreement. Right? We --
11  Q   I'm not asking -- I'm going to interrupt
12  you again. I'm not asking you --
13       MR. RUKAVINA: Well, John --
14       MR. MORRIS: -- anything like that.
15  I need him to answer my questions or we're
16  going to be here all night.
17       MR. RUKAVINA: John, hold on.
18  BY MR. MORRIS:
19  Q   Have you ever -- have you ever seen
20  anything --
21       MR. RUKAVINA: John, hold on. Hold
22  on.
23       MR. MORRIS: No, no. Davor,
24  please -- please --
25       MR. RUKAVINA: John, it is not our

Page 140

Dustin Norris

1  position -- it is not -- it is our
2  position that there is no settlement
3  agreement.
4       MR. MORRIS: Thank you very much.
5  BY MR. MORRIS:
6  Q   Is it your position that there is any
7  document of any kind that reflects Highland's
8  agreement to pay $7.4 million as compensation?
9  A   No. Subject to our defenses, but there's
10  none.
11  Q   Did Mr. Dondero tell Mr. Waterhouse that
12  the money that he was asking to be transferred
13  from Highland to HCMFA be transferred as
14  compensation for the NAV error?
15  A   Our position is that this was compensation
16  for the NAV error, and that was discussed.
17  Mr. Dondero told Frank. And I believe Frank even
18  testified to that, and Mr. Dondero testified to
19  that in their depositions.
20  Q   Okay. Now, you said that the February
21  payment of over $5 million was funded through
22  insurance proceeds and cash.
23       Do I have that right?
24  A   Yes.

Page 141

Dustin Norris

1  Q   And the cash portion was really just the
2  deductible?
3  A   If you want to go to Page 2, we can look
4  at the details.
5  Q   Sure. Sure.
6  A   I don't have it all by memory.
7  Q   That's fair.
8       MR. MORRIS: Let's go to the next
9  page.
10  BY MR. MORRIS:
11  Q   Looking at this, do the third and fourth
12  lines refresh your recollection --
13  A   Yes.
14  Q   -- that the February payment was funded
15  through insurance proceeds and an insurance
16  deductible paid by the adviser?
17  A   Yes, I believe that's correct.
18  Q   Okay. And Topic Number 8 on the 30(b)(6)
19  notice relates to the insurance claim; right?
20  A   Uh-huh.
21  Q   Okay. Did you do anything to familiarize
22  yourself with the insurance claim?
23  A   I did.
24  Q   And what did you do to familiarize

Page 142

Dustin Norris

1  yourself with the insurance claim?
2
3    A    I discussed with DC and Davor the
4  company's position on the insurance claim.
5    Q    Okay. I don't want to know what the
6  company's position is. I want to know what the
7  facts are.
8         Did you learn any facts in connection
9  with your diligence and your preparation to answer
10 topic – questions on Topic Number 8?
11   A    Yeah. The HCMFA policy was – was – the
12 HCMFA – HCMFA had an insurance policy with ICI
13 Mutual; and based on the NAV error, the policy
14 was – I don't know what the word is – was used
15 to seek reimbursement for the NAV error.
16   Q    Okay. So –
17        (Reporter discussion off the record.)
18 BY MR. MORRIS:
19   Q    So did HCMFA file a claim for insurance
20 coverage with ICI Mutual in connection with the
21 NAV error?
22   A    The HCMLP employees, I believe, through
23 Frank Waterhouse and his team, did that. They –
24 they managed the insurance as part of the shared
25 services agreement, and they filed with the

Page 143

Dustin Norris

1  insurance company –
2
3    Q    And – and the filing –
4    A    – on behalf of HCMFA.
5    Q    And the filing that was made, was that a
6  claim that was made on behalf of HCMFA?
7    A    I believe so, yes.
8    Q    And did HCMFA authorize the filing of that
9  claim?
10   A    Our position is that that – that is a
11 valid claim from HCMFA.
12   Q    All right. Did HCMFA authorize the filing
13 of the insurance claim?
14   A    I – I don't know.
15   Q    Did – has HCMFA ever told anybody at any
16 time that the insurance claim was not authorized
17 by HCMFA?
18   A    No.
19   Q    And HCMFA received almost $5 million on
20 account of the claim; right?
21   A    Correct.
22   Q    And HCMFA wanted to recover on its
23 insurance claim; correct?
24   A    Yes.
25   Q    Did the claim – was the claim made in

Page 144

Dustin Norris

1  writing?
2
3    A    I believe so.
4    Q    Have you seen the claim?
5    A    I don't – I don't recall seeing the
6  claim.
7    Q    In connection with the defense of this
8  lawsuit and the preparation, have you made any
9  efforts to identify the actual claim that was
10 filed on behalf of HCMFA?
11       MR. RUKAVINA: Let me interject –
12       let – let me interject. And we can talk
13       about this offline. We searched for that
14       and could not find it. We suspect it
15       might be in HCMLP's legal documents that
16       we don't have access to, but we have and
17       we continue to actively search for the
18       claim itself. We have not been able to
19       find it.
20 BY MR. MORRIS:
21   Q    Does HCMFA use an insurance broker?
22   A    I don't believe so. I think it's
23 directly with ICI Mutual. And it – we – there's
24 no broker, but it goes through HCMLP's employees.
25 Frank Waterhouse would have been the one probably

Page 145

Dustin Norris

1  interacting with ICI Mutual.
2
3    Q    HCMFA and HCMLP broke up at the end of
4  February; is that fair?
5    A    That's correct.
6    Q    At any time since the end of February, has
7  HCMFA made any effort to obtain any information
8  concerning this insurance claim from ICI Mutual?
9    A    I don't know where we got the source of –
10 of the documents, but there – there was – they
11 were searching for the ICI documents. I don't
12 know if it came from ICI or another source.
13   Q    Anybody –
14   A    I don't –
15   Q    Anybody from HCMFA reach out to ICI Mutual
16 for information relating to this insurance claim
17 at any time?
18   A    I don't – not that I'm aware of.
19   Q    Okay.
20   A    They may have, but I don't know.
21   Q    Do you know when the claim was filed?
22   A    I don't. I – I don't. I – I think it
23 may have been late 2018, but I'm not sure.
24   Q    And at the time HCMFA filed the claim for
25 insurance, it had already formed the opinion that

Page 146

Dustin Norris

1
2 Highland Capital Management, LP, was the
3 responsible party; correct?
4    A    I believe so, yes.
5    Q    Did HCMFA tell the insurance company that
6 Highland Capital Management was the responsible
7 party?
8    A    I'm not sure. Again, this was Highland
9 employees that filled out the materials and was
10 working with ICI. So I don't know if your
11 employees notified them.
12    Q    So the total estimated loss was
13 approximately $7.5 million; right? That's the top
14 number on the right?
15    A    Yes.
16    Q    Okay. And roughly two-thirds of that was
17 financed through insurance proceeds that were
18 received in February of 2019; correct?
19    A    Correct.
20    Q    And thereafter, it's HCMFA's contention
21 that Highland paid it another $7.4 million for
22 purposes of providing compensation in connection
23 with its negligent work on the -- on the TerreStar
24 valuation error; correct?
25    A    Yes, that's correct. And that lines up,

Page 147

Dustin Norris

1
2 7.4 million, with the net -- net loss that's shown
3 there, estimated loss.
4    Q    Right. So it's fair to say, then, from --
5 that it's HCMFA's position that it received
6 $7.4 million from Highland as compensation, and
7 approximately $5 million from the insurance
8 carrier as compensation for total receipts of
9 $12.4 million in connection with the NAV star --
10 with the TerreStar valuation error?
11    A    Correct.
12    Q    Okay. Why would H-- why does HCMFA
13 contend that its entitled to $12.4 million from
14 Highland and the insurance company when the total
15 loss was only $7.4 million?
16    A    Yeah, it's -- it's our position that the
17 collateral -- and I'm not an attorney. But
18 understanding our position here, that under Texas
19 law, the collateral source rule would permit you
20 to recover value from the insurance company and to
21 the individual or the -- the company that created
22 the -- or caused you harm.
23    Q    So you're -- would you agree that HCMFA
24 has profited by about $5 million as a result of
25 the NAV error under that theory?

Page 148

Dustin Norris

1
2    A    I -- I don't know that -- how the theory
3 relates to profits, but we've -- we've paid -- and
4 say, "What's the logic for this?" We paid in
5 insurance premiums for years, significant
6 insurance premiums. And so there's been a loss
7 for years and years for the insurance, and then
8 we're now hitting that insurance to say there's a
9 gain of $5 million, whatever number you threw out.
10 I would disagree with that.
11        But, yes, there was proceeds of
12 12-and-a-half million, but we've been paying in
13 insurance proceeds or premiums for a long time.
14 We're going to continue, and likely, I would
15 imagine, those premiums will go up because of the
16 claim.
17        So I -- I'm, again, not a lawyer. I
18 don't understand all the reasons why it's
19 permitted. But our position is that the
20 collateral source rule under Texas law permits you
21 to receive from the insurance -- your insurance
22 provider and from the party that did you harm.
23 And as you said, here we believe it's negligence.
24 It may be breach of contract, but we believe it's
25 negligence.

Page 149

Dustin Norris

1
2    Q    Okay. I just want to make this really
3 clean.
4        The estimated net loss from the NAV
5 error is $7.442 million; correct?
6    A    The estimated loss from the NAV error,
7 yes.
8    Q    Okay. And notwithstanding that HCMFA
9 believed that Highland was the responsible party,
10 HCMFA, nevertheless, filed a claim for insurance
11 coverage with ICI Mutual; correct?
12    A    That's correct.
13    Q    And ICI Mutual paid almost $5 million in
14 connection with that claim; correct?
15    A    Correct.
16    Q    And in addition to that almost $5 million,
17 it's HCMFA's position that it received and was
18 entitled to receive an additional $7.4 million
19 from Highland as compensation for its error;
20 correct?
21    A    Correct.
22    Q    So that notwithstanding the fact that the
23 estimated net loss was $7.44 million, HCMFA
24 received and contends that it's entitled to keep
25 $12.4 million; correct?

Page 150

Dustin Norris

1
2 A    That's correct, subject to our defenses.
3 Q    Okay.  Did -- has -- has HCMFA ever
4 informed ICI Mutual that it received $7.4 million
5 from Highland on account of the NAV error?
6 A    Not that I'm aware of.
7 Q    Has HCMFA ever told ICI Mutual that
8 Highland was at fault?
9 A    Again, I think I already answered that.  I
10 don't know.  Communication with ICI was done by
11 the HCMLP employees as part of the shared services
12 agreement, and I'm not sure if they communicated
13 that.
14       MR. MORRIS:  Okay.  I move to
15 strike.
16 BY MR. MORRIS:
17 Q    I just -- I'm just asking for your
18 knowledge, not speculation.
19       Do you have any knowledge that anyone
20 on behalf of HCMFA ever informed ICI Mutual that
21 Highland was the cause of the NAV error?
22 A    I have no knowledge.
23       MR. MORRIS:  Let's take a short
24 break.  The time now is 3:06 -- or 2:06.
25 Let's just come back at 3:20.

Page 151

Dustin Norris

1
2       (Recess from 2:07 p.m. to 2:21 p.m. CST)
3 BY MR. MORRIS:
4 Q    So we were talking a bit about the
5 insurance payment that was received in February
6 of 2019.  Do you remember that?
7 A    Yes.
8 Q    And there was a claim that was filed on
9 behalf of HCMFA that resulted in that insurance
10 proceed payment; correct?
11 A    Correct.
12 Q    And do you recall if that insurance claim
13 was filed in 2018 or 2019?
14 A    I don't recall, but I believe it was late
15 2018.  But I don't know.
16 Q    Yeah.
17 A    And as we testified, we don't have that
18 claim.  We've searched for it.  It's probably on
19 your server, as I -- Frank Waterhouse and his team
20 would have submitted that.
21 Q    Yeah.  But you haven't made any effort to
22 get it from the carrier; right?
23 A    No, not that I know of.
24 Q    Okay.  And would you agree with me that
25 it's probably extremely unlikely that an insurance

Page 152

Dustin Norris

1
2 carrier would have processed a claim of that
3 magnitude in six weeks?
4 A    I know they expedited it and they
5 specialize in -- sorry.  I'll step back.
6       I have no knowledge of how quick
7 carriers make these claims --
8 Q    All right.  Do you know --
9 A    Other than hail on my house -- hail damage
10 on my roof, I don't have personal knowledge of
11 insurance claims.
12       MR. MORRIS:  You know, I apologize,
13 but can I ask Ms. Canty to put back up on
14 the screen that last exhibit that we had?
15 I don't have the exhibit number.
16       All right.  And go to the prior
17 page.  And go to the bottom of that page.
18 BY MR. MORRIS:
19 Q    So we've put back up on the screen, I
20 think --
21       MS. CANTY:  182.
22       MR. MORRIS:  182.
23 BY MR. MORRIS:
24 Q    All right.  And do you see in the next to
25 the last paragraph, Mr. Norris, there's a

Page 153

Dustin Norris

1
2 reference to a period from March 18, 2018, to
3 January 19, 2019?
4 A    Yes.
5 Q    That's what they've defined as the NAV
6 restatement period.  Do you see that?
7 A    Yes, I do.
8 Q    Okay.  Looking at that period, does that
9 refresh your recollection at all as to when in
10 2018 HCMFA first learned about the NAV error?
11 A    No, because that was -- that was the
12 period of time when the market -- the off-market
13 or on-market transactions happened, March 18th.
14 Q    Okay.
15 A    It was sometime in between that they found
16 out that there was an error.
17 Q    Okay.  And do you know if it was the first
18 half of 2018 or the second half?
19 A    The midyear audits of some of our funds, I
20 believe, is when it first came up.
21 Q    And --
22 A    So 6/30 audits that were due 60 days
23 later.  So second half -- I believe second half of
24 2018.
25 Q    So is it fair to say sometime in August or

Page 154

Dustin Norris

1
2 September is when HCMFA first learned about it?
3 A    About -- define "it."  Is that the NAV
4 error.
5 Q    I apologize.  Let me ask the question
6 again.
7        Is it fair to say, based on the timing
8 of the audit, 60 days after June 30th would take
9 us to approximately August 31st; right?
10 A    It does.
11 Q    And so is it fair to say, then, that HCMFA
12 first learned about the NAV error sometime in
13 August of 2018 while it was preparing the
14 financials for the period ending June 30th?
15 A    No.  I don't think there was a
16 determination of whether there was a NAV error or
17 not at that point.  I think the reason they have
18 going all the way to January 19 -- 2019 is it
19 wasn't determined -- finalized if there is an
20 error or not.
21        There was a lot of discussion with the
22 SEC and auditors over whether there was or wasn't
23 an error, what the amount was, what the proper
24 valuation should be.  There was consultation with
25 the SEC, and that process lasted, I believe,

Page 155

Dustin Norris

1
2 several weeks, if not months.
3        So that is not when they found out
4 about a NAV error, but the questions over
5 valuation, yes.
6 Q    Okay.  So then let me state the question
7 differently then.
8        Is it fair to say that HCMFA first
9 learned in or about August 2018 of the valuation
10 issues?
11 A    The "about" is key here.  I don't know the
12 specific date, but around that time or earlier --
13 Q    Okay.
14 A    -- or later.  On or around that time.
15 Q    And did HCMFA conclude, at the same time
16 it learned of the valuation issues, that HCMFA was
17 the responsible party?  Or was there a gap between
18 learning about the valuation issues and making the
19 determination that Highland was the responsible
20 party?
21 A    Yeah, first you said HCMFA was the
22 responsible party, and then you said Highland.
23 Q    I apologize.  Let me try and restate that.
24        Did HCMFA conclude that Highland was
25 the responsible party at or around the same time

Page 156

Dustin Norris

1
2 that it learned of the valuation issues, or was
3 there a period during which it knew about the
4 valuation issues, but not -- had not yet formed
5 the conclusion that Highland was the responsible
6 party?
7 A    From the beginning, everybody knew who the
8 responsible party was for the valuation.  Those
9 reporting the issues, those responding to
10 auditors, those responding to SEC and the board
11 were all HCMLP employees from the beginning.  But
12 I don't have a specific date.
13        Again, as you look here, it doesn't
14 say when the NAV error was determined, but from
15 the beginning, it was the knowledge that HCMLP was
16 responsible for the valuations.
17 Q    Okay.  Do you know when HCMFA first
18 determined that the estimated loss was
19 approximately $7.4 million?
20 A    I don't, no.  I don't have specifics, but
21 it was after there was a determination there was
22 actually a NAV error.  And it may be in some of
23 the documents that you have.  I believe it may be
24 in, you know, a memo to the board or the SEC, but
25 I don't know offhand.

Page 157

Dustin Norris

1
2 Q    Do you know when there was a determination
3 that there was a NAV error?
4 A    I don't know the specific time, no.
5 Q    Do you know if it was in 2019 or 2018?
6 A    I don't remember.
7 Q    Is it fair to say that it was before
8 May of 2019?
9 A    That there was a determination there was a
10 NAV error?  Yes.
11 Q    And is it fair to say that HCMFA had
12 concluded that the loss of that NAV error was
13 going to be more than a million dollars prior to
14 May 2019?
15 A    More than a million?  Probably -- yes.
16 Q    Okay.  Is there a reason that HCMFA waited
17 until May to have Highland pay it for the
18 compensation?
19 A    I think that the whole process -- as you
20 see, the resolution memo is in May to the board.
21 That was the conclusion of the overall process.
22 So our stance would be that that was when it was
23 the right time and everything was -- the right
24 time to be sent.
25        MR. MORRIS:  Okay.  Can we put up

Page 158

Dustin Norris

1
2    on the screen a document that's been
3    marked as, I think, as Exhibit 13? I
4    don't know if you're able to get that,
5    La Asia.
6        MS. CANTY: Yup, I got it.
7        MR. MORRIS: Thank you.
8        (Exhibit 13 tendered.)
9    BY MR. MORRIS:
10   Q    Are you aware, sir, that there came a
11   point in time when HCMFA amended its answer?
12   A    Yes.
13   Q    And I think topic –
14   A    Topic 2 is our amended answer.
15   Q    Okay. So that's the document that's in
16   front of you?
17   A    Yes.
18   Q    And you've seen that before; correct?
19   A    Yes.
20   Q    Okay.
21       MR. MORRIS: Can we turn to Page 5
22   of 9, please?
23       And if we can scroll to the bottom.
24   BY MR. MORRIS:
25   Q    These are HCMFA's affirmative defenses; is

Page 159

Dustin Norris

1
2    that right?
3    A    On the second amended answer, yes.
4    Q    Yes.
5    A    I'm sorry. The first amended answer, yes.
6    Q    And as of today, is it your understanding
7    that this is HCMFA's operative pleading?
8    A    No.
9    Q    Has it been amended after this time?
10   A    Yeah, we –
11       MR. RUKAVINA: Well, he doesn't
12   know what "operative pleading" means.
13       THE WITNESS: Oh.
14       MR. RUKAVINA: Yes, it is our
15   operative pleading, Dustin.
16       THE WITNESS: It is our operative
17   pleading then.
18   BY MR. MORRIS:
19   Q    And I didn't mean to trick you. I
20   apologize. I just meant to say that this has not
21   been amended as of today; correct?
22   A    We filed a – wait. Let me see what it's
23   called.
24   Q    You filed a motion for permission to amend
25   it further –

Page 160

Dustin Norris

1
2    A    Yes.
3    Q    – but that motion hasn't been granted;
4    right?
5    A    To my understanding, no.
6    Q    Okay. And you understand that your – the
7    answer that's up on the screen can't be amended
8    unless the Court grants the motion; right?
9    A    I – if you tell me that that's the
10   process, I'll take that for what it's worth. I'm
11   not an attorney. I don't know the process.
12   Q    Okay. So let's just look at this
13   document.
14       Is it fair to say that Paragraph 38
15   through 45 deals with –
16   A    I'm going to grab the –
17   Q    Yeah.
18   A    – thing here so I can see it on my desk,
19   too.
20   Q    Sure.
21   A    Okay.
22       38?
23   Q    Right.
24   A    Okay.
25   Q    Now – actually, a little background.

Page 161

Dustin Norris

1
2        This amended complaint was prepared
3    after DC Sauter conducted an investigation
4    concerning the circumstances surrounding the two
5    notes that Highland was suing on; right?
6    A    Yes. My understanding is it is after
7    he – so background, when he – we filed our
8    initial response, we didn't have access to the
9    HCMLP employees during that time period. They
10   were not permitted to talk to us about things like
11   this. And so he did the best he could to prepare
12   a response. But once they were mostly all fired
13   by HCMLP and formed their own company called
14   Skyview, he was able to talk to them on
15   particulars. As you note in his – his statement,
16   he was able to talk to Frank Waterhouse, where he
17   wasn't before, on this topic.
18   Q    Right. So by the time this document has
19   been prepared, HCMFA had copies of the notes that
20   Highland was suing on for six months; right?
21   Because the lawsuit was commenced in January, and
22   the notes were attached as exhibits to the
23   complaint; right?
24   A    Yes. This is July 6th this is filed.
25   Q    Right. Okay. So this is filed almost six

Dustin Norris

1  Dustin Norris
2  months after the complaint is filed; right?
3  A    More like a five-month -- five months and
4  a week, but yeah.
5  Q    All right.  I won't quarrel with you.
6  A    Or five and a half -- five and a half
7  months, yeah.
8  Q    Okay.
9  A    Whether you consider that --
10  Q    Okay.
11  A    -- six full months or not.
12  Q    So --
13  A    We know the dates January 22nd and
14  July 6th.
15  Q    Okay.  So for that entire time period of
16  time, there's no dispute that HCMFA had in its
17  possession copies of the notes that Highland was
18  suing on; correct?
19  A    I'm looking at the original -- you said
20  they were attached, but I --
21  Q    Yeah.
22  A    If you want to show me the original notes
23  on the original filing.
24  Q    Well, I asked you to look at the original
25  complaint.  I think -- was the original complaint

1  Dustin Norris
2  Topic Number 1?  No.  It's just the answer.
3       In looking at the answer, did you look
4  at the original complaint?
5  A    Yes.
6  Q    Do you recall seeing that the notes were
7  attached to the original complaint?
8  A    I looked at thousands of pages in
9  preparation, so I just -- I could take your word
10  for it if you say it's in there, or if you want to
11  show it to me, we can look at it.
12       MR. RUKAVINA:  They are, Dustin.
13  They are.
14       MR. MORRIS:  Yeah.  I think you'll
15  have to take my word for it.  Thank you,
16  Davor, for confirming my word.
17  BY MR. MORRIS:
18  Q    So let me just try this again to make it
19  clean.
20       Based on my representation, that
21  Mr. Rukavina has agreed with, that the notes that
22  Highland are suing on were attached to its
23  complaint in January, you would agree with me that
24  HCMFA had the notes in its possession from at
25  least the time the complaint was filed until the

1  Dustin Norris
2  time HCMFA filed this amended answer on July 6th;
3  correct?
4  A    Yes.
5  Q    And this amended answer was filed because
6  HCMFA had a -- had previously made a motion to the
7  Court for leave to amend its answer; correct?
8       MR. RUKAVINA:  That's correct,
9  Dustin.
10       He wouldn't know about that, but
11  that's all correct.
12  BY MR. MORRIS:
13  Q    Okay.  Well, you're familiar with the
14  Sauter declaration; right?
15  A    I am.
16  Q    And the Sauter declaration purports to
17  describe an investigation that Mr. Sauter
18  undertook to determine the circumstances
19  surrounding the notes; is that fair?
20  A    I don't know if I'd characterize it
21  investigation, but he was tasked with -- and I've
22  got it right here.  I would refer you to the
23  agreement on -- or his -- to his declaration on --
24  Q    How would you -- how would you
25  characterize the work that he did?  An

1  Dustin Norris
2  investigation?  An analysis?  What word do
3  you -- would you use?  Due diligence?  How would
4  you characterize the work that Mr. Sauter did
5  that's set forth in his declaration?
6  A    I -- I'm looking here.  I want to see how
7  he characterizes it.
8       I think he does a very good job of
9  explaining.
10       My investigation would be of the
11  following.  So he calls it an investigation.
12  Q    Okay.  So HCMFA would agree that after
13  Mr. Waterhouse left the employ of Highland, that
14  DC Sauter conducted an investigation into the
15  circumstances surrounding the notes that Highland
16  was suing on; correct?
17  A    Correct.
18  Q    And as part of that investigation, he
19  spoke with Mr. Waterhouse; correct?
20  A    Yes.
21  Q    And as part of that investigation, he
22  spoke with Mr. Dondero; correct?
23  A    I believe so, but let me -- let me confirm
24  in his statement.
25       Because I believe in -- yeah.

Page 166

1          Dustin Norris
2   Q    Is that correct, that he spoke with
3   Mr. Dondero in connection with his investigation?
4   A    I'm -- I'm seeing what he rep'ed to in his
5   statement.
6   Q    And does his statement say that?  I don't
7   have it in front of me.
8   A    I don't know.  That's what I'm looking at.
9   Q    And you don't know, independently of the
10  document, whether Mr. Sauter spoke with
11  Mr. Dondero as part of his investigation?
12  A    I know he did.  I know he talked
13  throughout from when we received the original
14  complaint on.  I just -- you're asking about the
15  time frame between filing the original filing.
16  And I think he may have spoken with him before
17  that, too, but I -- I just want to take a...
18       So at the time -- this is on
19  March 1st, filed the defendant's original answer.
20  At that -- at the time the debtor filed a
21  complaint, I promptly undertook an internal review
22  of the background facts concerning the notes.  I
23  had no knowledge of them since I had not been
24  employed by HCMFA.  And a few employees of HCMLP
25  had no knowledge of notes.  I also discussed the

Page 167

1          Dustin Norris
2   notes of James Dondero, formerly the CEO of the
3   debtor, Mr. Dondero.
4        So this is March 1st when that first
5   filing was made.  So he did speak with Mr. Dondero
6   prior, and then I believe the source of the
7   additional information was being able to speak
8   with Frank Waterhouse and Will Mabry.
9   Q    Okay.  And is it fair to say that the
10  amended complaint is based on Mr. Sauter's
11  investigation?
12  A    Yes, I believe so.
13  Q    Yeah.
14  A    Yes.
15  Q    That's why HCMFA amended its complaint.
16  It's because Mr. Sauter had undertaken this
17  investigation, and he learned what he believed
18  were relevant facts, and those facts are described
19  in his declaration, and they formed the basis of
20  the affirmative defenses that we're looking at now
21  in the amended answer; fair?
22  A    Let me pull up the amended answer just
23  to --
24  Q    It's up on the screen, but if you have a
25  hard copy, that's fine.

Page 168

1          Dustin Norris
2   A    Yeah.  I have a hard copy here, although I
3   may have mixed my documents.
4        Yeah, it was based on additional facts
5   that weren't available at the time of the original
6   response.
7   Q    Okay.  And is it fair to say that
8   Paragraphs 38 through 45 relate to the affirmative
9   defense that Highland was responsible for the NAV
10  error, and the $7.4 million payment was intended
11  to be compensation for Highland's negligent work?
12  A    Sorry.  Can you ask that one more time?
13  There was a couple parts there.
14  Q    No problem.
15       Is it fair to say that
16  Paragraphs 35 -- withdrawn.
17       Is it fair to say that Paragraphs 38
18  to 45 relate to HCMFA's affirmative defense that
19  the $7.4 million that was transferred from
20  Highland to HCMFA in May 2019 was intended to be
21  compensation for Highland's negligent work in
22  connection with the NAV error and not in the form
23  of a loan?
24  A    You said 38 to 42?
25  Q    38 to 45.

Page 169

1          Dustin Norris
2   A    38 to 45.
3        Yeah, it -- the NAV error items are
4   included in there as one of our defenses.
5   Q    Right.
6   A    43 and 44 and 45 discuss additional
7   defenses related to the note and who may or may
8   not have signed the note and who had authority to
9   sign the note.
10  Q    Okay.
11       MR. MORRIS:  Can you -- can we turn
12  to Paragraph 42?
13       THE WITNESS:  Yes.
14  BY MR. MORRIS:
15  Q    Do you see the first four -- first few
16  words in Paragraph 42 are, quote:  "The defendant
17  accepted responsibility for the NAV error"?
18  A    Yes.
19  Q    Okay.  "Defendant" there refers to
20  Highland Capital Management, LP; correct?
21  A    No.  I believe --
22  Q    Oh, I apologize.  I apologize.
23  A    Thank you.
24  Q    It's HCMFA; right?
25  A    HCMFA.

Page 170

Dustin Norris

1
2 Q    Okay. And is -- did -- did HCMFA accept
3 responsibility for the NAV error?
4 A    They did. They -- they are the adviser,
5 and there's already -- in the next sentence, HCMLP
6 then accepted that they had a contract with and
7 accepted responsibility.
8 Q    Okay. And so when did the plaintiff
9 accept responsibility for having caused the NAV
10 error?
11 A    Again, going back to -- this was always
12 known and communicated that it was HCMLP
13 employees. It was the valuation services they
14 were performing. The legal and compliance team
15 was all outsourced in the shared services
16 agreement.
17         And that was -- again, there's not a
18 singular determination; but Jim Dondero, as
19 president, I would say effectuated that with the
20 payment of the NAV -- for the NAV error.
21 Q    So you can't tell me when the plaintiff
22 accepted responsibility for having caused the NAV
23 error; correct?
24 A    Not a specific date.
25 Q    Okay. And it's HCMFA's position that Jim

Page 171

Dustin Norris

1
2 Dondero, in his capacity as the president of
3 Highland Capital Management, LP, accepted
4 responsibility on behalf of Highland Capital
5 Management, LP, for having caused the NAV error?
6 A    He, and in addition all of the employees
7 involved. Right? The valuation team members,
8 Frank Waterhouse was CFO, Dave Klos overseeing the
9 valuation process, they were all Highland
10 employees, and Jim Dondero as well as president
11 recognized that based on all the communications
12 and conversations they would have had.
13         MR. MORRIS: Okay. I'm going to --
14         I'm going to move to strike.
15 BY MR. MORRIS:
16 Q    And I'm going to ask you to listen
17 carefully to my question.
18         Who had the authority to accept, on
19 behalf of plaintiff, the responsibility for having
20 caused the NAV error?
21 A    Ultimately Jim Dondero, as president here,
22 had that authority.
23 Q    Okay. And then it says, quote: "The
24 plaintiff ultimately, whether through insurance or
25 its own funds, compensated the defendant."

Page 172

Dustin Norris

1
2         Do you see that?
3 A    Yes.
4 Q    Is that statement accurate?
5         MR. RUKAVINA: I'll object to
6     vagueness, given the different points in
7     time.
8 BY MR. MORRIS:
9 Q    Does HCMFA believe that that statement is
10 accurate today?
11 A    We know now. It's come out in discovery
12 that -- and it was represented that Mr. Dondero
13 transferred money to Highland who transferred it
14 to HCMFA. And I don't know -- and it says "or,"
15 "or its own funds." So it's accurate whether
16 through insurance or its own funds.
17         But at the time of this writing, we
18 didn't have all the details and have firmed up
19 those details, and I would refer you to
20 depositions and the pleadings and our additional
21 statement regarding cash and movement.
22 Q    Did Highland file an insurance claim, to
23 the best of your knowledge?
24 A    Not that I know of.
25 Q    Did you ever ask anybody, in preparation

Page 173

Dustin Norris

1
2 for today's deposition, about that sentence in
3 Paragraph 42 and whether or not Highland had ever
4 filed an insurance claim?
5 A    I didn't ask about that sentence, but we
6 did discuss whether Highland had filed an
7 insurance claim. And to our knowledge, we don't
8 know that they have. I'd, again, ask you as their
9 attorney. That would be a question for you.
10 Q    Well, with all due respect, you have
11 complete and unfettered access to the former
12 president and CFO of Highland; correct?
13 A    I do, but -- I'm sorry. You said
14 president and CEO?
15 Q    The former president and CFO.
16 A    President and -- I don't have unfettered
17 access to the former CFO.
18         MR. RUKAVINA: I'll -- I'll object
19     to that. We have been prohibited by
20     Waterhouse's attorney from discussing the
21     matter with him.
22 BY MR. MORRIS:
23 Q    You're -- you're not allowed -- did -- did
24 you -- did HCMFA ask Mr. Waterhouse at any time
25 whether Highland had filed an insurance claim?

Dustin Norris

1
2 A    Not -- not that I know of.  However, we've
3 been not permitted to talk to him related to this,
4 based on his attorney.  So --
5 Q    Well, when did --
6 A    We never really discussed -- go ahead.
7 Q    I'm sorry.
8 A    Go ahead.  You were --
9 Q    I was just going to ask:  When did that
10 prohibition go into effect?
11       MR. RUKAVINA:  John, the witness
12    wouldn't know that.  It's about three
13    months ago that the lady from Baker
14    McKenzie, Deb -- I don't know her last
15    name -- got angry at me because I tried to
16    talk to Frank and she said, "Absolutely
17    not.  You're forbidden, and you're
18    violating your ethical rules if you do."
19       MR. MORRIS:  So sometime in
20    September?
21       MR. RUKAVINA:  I would say August
22    or September.
23       MR. MORRIS:  Okay.
24 BY MR. MORRIS:
25 Q    But sometime -- but you had -- HCMFA had

Dustin Norris

1
2 complete, unfettered access to Mr. Waterhouse from
3 the time he left Highland in early March 2021
4 until at least the end of July 2021; right?
5 A    Yeah.  And I would add a point to
6 Mr. Sauter's declaration and our pleadings and the
7 depositions for the various details of what we've
8 discovered since.  However, the unfettered access
9 was also inhibited -- or -- or Mr. Sauter
10 represented this.  There was a lot going on in
11 March, April, May of 2021.
12 Q    Yeah.
13 A    And we were trying to lift out an entire
14 business and keep everything afloat, and -- as
15 you're very aware.  And so there was a lot going
16 on.
17 Q    Right.  Right.
18       Do you see -- can we go to
19 Paragraph 43, please?
20 A    Yes.
21       MR. MORRIS:  If we could just
22    scroll down to Paragraph 43, please.
23    Thank you.
24 BY MR. MORRIS:
25 Q    Now, again, this amended complaint is

Dustin Norris

1
2 filed is July 2006; correct?
3 A    July 6th, not July 2006.
4 Q    I apologize.  Let me ask the question
5 again.
6       This amended answer was filed on
7 July 6th, 2021; correct?
8 A    Correct.
9 Q    And it was filed after Mr. Sauter
10 conducted his investigation to determine the
11 circumstances surrounding the note; correct?
12 A    Uh-huh, correct.
13 Q    And it was filed after HCMFA had had in
14 its possession since January copies of the notes
15 that Highland was suing on; correct?
16 A    Correct.
17 Q    And it was filed at a time before any
18 limitation or prohibition was placed on HCMFA's
19 ability to communicate with Mr. Waterhouse since
20 the time he had left Highland; correct?
21 A    Sorry.  You want to repeat the first part
22 of that?
23 Q    Sure.
24       It was filed at a time after
25 Mr. Waterhouse left the employ of Highland but

Dustin Norris

1
2 before there was any limitation or restriction
3 imposed on HCMFA's ability to communicate with
4 Mr. Waterhouse?
5 A    Yes.  Once he left in March of 2021 is
6 when that happened.  And, again, in March, we
7 were, on both sides, the creation of Skyview, as
8 well as our employees, trying as -- doing
9 everything we could do to transition the
10 businesses and services.  And so that was an
11 important time.
12       MR. MORRIS:  Okay.  Move to strike.
13 BY MR. MORRIS:
14 Q    I just want to confirm that HCMFA had
15 unfettered access to Mr. Waterhouse between the
16 time he left Highland and the time this amended
17 answer was filed in July.
18 A    We had access to him to ask him what we
19 needed.  Unfettered in the sense of, "Hey, we can
20 access you whenever we need," no, because there
21 was a lot involved in launching and -- launching
22 of Skyview and creating all the services needed
23 for our funds since we -- HCMLP is sharing
24 services provided --
25 Q    Does Mr. Sauter have a role with HCMFA?

Page 178

Dustin Norris

1
2  A    I don't believe so.
3  Q    Do you know who authorized him to conduct
4  this investigation?
5  A    Yeah.  It would have been management,
6  Mr. Dondero, and probably our outside counsel.  At
7  the time, we had been utilizing Highland's
8  services as legal services, all the way up until
9  the end of February.
10         There were legal and compliance
11  services that were part of the shared services
12  agreement.  There was an entire legal team, entire
13  team of litigators who were unable to work on
14  this.
15         Mr. Sauter was a real estate attorney
16  for us, and he picked up the slack and was
17  assigned by Mr. Dondero to help in these causes
18  working with outside counsel, because HCMLP was
19  not providing or no longer able to provide those
20  legal services based on their -- their view, even
21  though they were contracted to do those.
22  Q    That contract ended at the end of
23  February; isn't that right?
24  A    That's correct.
25  Q    And with the exception of a couple of

Page 179

Dustin Norris

2  people, Highland's legal team migrated to Skyview
3  in early 2021; is that fair?
4  A    Yes.
5  Q    Okay.  And among the people who migrated
6  were Stephanie Vitiello; correct?
7  A    Yes.
8  Q    And Isaac Leventon; correct?
9  A    Correct.
10  Q    And he's the chief litigation guy at
11  Highland prior to the bankruptcy; right?
12  A    I -- I don't know if that was Isaac or if
13  it was Scott Ellington.  I don't know.
14  Q    And Scott -- Scott Ellington also
15  migrated; right?
16  A    Correct.
17  Q    So you had access to those folks for the
18  first six months of 2021; right?
19  A    No.  I would -- our position is that those
20  individuals were unable to work on -- even though
21  they had left, they were unable to work on
22  something of this nature.
23         I -- I believe there was also a
24  preliminary injunction still in place where Jim or
25  his employees could not talk to Scott or Isaac.  I

Page 180

Dustin Norris

2  don't remember all the specific details, but the
3  legal team at Highland -- or at Skyview was not
4  working on this.
5  Q    Okay.
6  A    It was probably professional -- I don't
7  know the standards, but they were unable to work
8  on -- on this.
9  Q    All right.  But you would agree that at
10  the time HCMFA asked the court for permission to
11  amend its answer, it did so based on Mr. Sauter's
12  investigation; correct?
13  A    Yes, and I would caveat that subject to
14  our -- our pleadings.
15  Q    Right.  And I think I moved to strike your
16  earlier answer, so let me try and ask the question
17  again.
18         Did Mr. Dondero authorize Mr. Sauter
19  to conduct the investigation?
20  A    I don't have specific knowledge of that.
21  Q    All right.  I think you used the phrase
22  "management."  Did management authorize Mr. Sauter
23  to conduct this investigation on behalf of HCMFA?
24  A    I don't know specifically who -- who would
25  have asked him to do the -- Jim and -- Jim Dondero

Page 181

Dustin Norris

2  asked him to help with the -- the legal items, and
3  stepped in and help in the absence of HCMLP's
4  help.
5  Q    Okay.  And based on that investigation
6  looking at Paragraph 43, HCMFA took the position,
7  quote:  "Waterhouse signed the two promissory
8  notes the subject of the complaint," close quote;
9  correct?
10  A    That's right.  It's our position that
11  at -- and I'd refer you to our amended pleading
12  with additional information, but it's -- it's our
13  position that Mr. Waterhouse saw the notes, was
14  confronted, discussed with DC and said, "Look,
15  that's my signature.  I signed them."
16  Q    Okay.  So that's -- and it was on the
17  basis of Mr. Waterhouse's conversation with
18  Mr. Sauter that HCMFA wrote that sentence; is that
19  fair?
20  A    I believe so.  And I would refer you to
21  Mr. Sauter's declaration as well, which goes into
22  details on that.
23  Q    And Mr. Sauter specifically said that
24  Mr. Waterhouse signed the notes; correct?
25  A    We can look at Mr. Sauter's declaration.

Page 182

Dustin Norris

1    I – I believe he said he was – Mr. Waterhouse
2    told him he signed, but –
3
4    Q    Right. And, in fact, HCMFA's position
5    throughout this entire case was that
6    Mr. Waterhouse signed the notes, but he did so by
7    mistake and without authority; correct?
8    A    That's right. And if you look at the
9    depositions, he testified of that, that he didn't
10   remember signing them, and he didn't have a
11   recollection, and Mr. Dondero never told him to
12   sign it, and he never asked him whether – or
13   he – Mr. Dondero told him never – told him
14   shouldn't be – didn't – Mr. Dondero didn't tell
15   him it was a note, and he never asked if it should
16   be a note.
17           With this – this amended pleading,
18   the thought was he mistakenly thought it was a
19   note, because that was the practice for other
20   notes or other – other transfers of this
21   nature – not of this nature, but other transfers
22   between companies, and so he had papered it up as
23   a note.
24           But if you look at the depositions,
25   you'll see that additional details came out that

Page 183

Dustin Norris

1    he told his controller, Mr. Klos, to transfer the
2    funds, and Mr. Klos then turned around and asked
3    Kristin to paper it up as a note, and to transfer
4    the cash. And Ms. Hendrix – Kristin Hendrix then
5    added Mr. Waterhouse's JPEG signature to the Word
6    document, which then was filed away.
7           So we – we, through the process of
8    depositions and discovery, were able to find more
9    information that Frank Waterhouse did not
10   remember. He didn't remember signing but said his
11   signature is on there, so he must have signed it.
12          MR. MORRIS: All right. I move to
13   strike. My question is really, really
14   simple.
15   BY MR. MORRIS:
16   Q    Up until the time that you filed the
17   motion last night, HCMFA's publicly stated
18   position has always been that Frank Waterhouse
19   signed the notes, and that he did so by mistake
20   and without authority; correct?
21   A    Correct. It says it here:
22   "Mr. Waterhouse made a mistake in preparing and
23   signing the notes for the defendant."
24   Q    Okay. Good enough.

Page 184

Dustin Norris

1    A    And then it says: "Upon information" –
2    Q    That's –
3    A    – "and belief, Waterhouse was not aware
4    that the payment from the plaintiff to defendant
5    were to compensate the defendant for the NAV
6    error."
7    Q    I'm sorry. Where are you reading from?
8    Oh, that's 44?
9    A    That's in number 44.
10   Q    Okay.
11   A    Yeah. "Waterhouse made a mistake in
12   preparing and signing the notes for the
13   defendant."
14   Q    Right. Okay.
15   A    But, again, I'll refer you to the
16   depositions and the evidence –
17          MR. MORRIS: Move to strike. It's
18   not responsive to my question.
19   BY MR. MORRIS:
20   Q    Do you see in Paragraph 47 there's a
21   reference to "lack of consideration"?
22   A    Yes.
23   Q    Okay. What does that mean?
24   A    My understanding is that there was no

Page 185

Dustin Norris

1    consideration. We – there were notes, but there
2    was no payment for those notes. The payment was
3    for compensation related to the NAV error, so
4    there was no payment – or no compensation for
5    notes that had been drafted.
6    Q    Okay. And the next defense there in
7    Paragraph 47 is "mutual mistake."
8           Do you see that?
9    A    Correct.
10   Q    Do you have any facts that support that,
11   that the mistake was mutual?
12   A    Yeah. I – I would look to the
13   depositions. And if you go to the testimony of
14   Frank and Jim Dondero and David Klos and Kristin,
15   it was a clear path and a clear record of mutual
16   mistake.
17          Jim told Frank to transfer the money
18   for the NAV error. Frank then goes, tells
19   Mr. Klos, the controller, to go and transfer the
20   money, who tells Kristin to transfer the money –
21   or to make the transfer and to paper it up.
22   Kristin then papers it up, following the process
23   that she's always followed or she said she's
24   followed for many other notes.

Page 186

Dustin Norris

1            Dustin Norris
2        She lacked the authority to do so.
3    Mr. Klos lacked the authority.  Mr. Waterhouse was
4    never told to make a note, and so the note itself
5    is drafted by an accountant without authority to
6    do so with a maker and a counterparty that is on
7    both sides of this, representing supposedly both
8    sides.
9            And our position is that the maker of
10   this -- even if you look at the document, Frank
11   Waterhouse signs as maker, not as his position.
12   He's signing as the maker.
13           And so there's various aspects of this
14   that had errors on both sides, the -- the position
15   of HCMFA where they thought they had authority and
16   the position of HCMLP.
17   Q     Anything else, sir?
18   A     I -- I would refer you to the -- again,
19   the depositions and our pleadings.  But there's --
20   there's a host of support there.
21   Q     Other than the deposition transcripts and
22   the -- and HCMFA's pleadings, are you aware of any
23   document anywhere in the world that corroborates
24   the defense of mutual mistake?
25   A     Other than the documents, the pleadings,

Page 187

Dustin Norris

1    and any schedules and other forms that are filed
2    with the court, there's -- there's plenty there.
3    Q     Okay.  What schedules are you referring
4    to?
5    A     I would say all of your supporting
6    schedules, all of your documentation, the notes
7    themselves, the -- the Word documents that we
8    received as well in discovery that have the
9    metadata showing that Kristin Hendrix applied
10   Frank Waterhouse's JPEG signature.
11   Q     Okay.
12   A     All of those items as well as, again,
13   depositions all -- of all those individuals.
14   Q     So -- so I just want to make sure that I
15   have this clear.
16          So you've got the JPEG documents.
17   You've got the deposition transcripts.  You know
18   what?  Let me restate the question.
19          You've identified the JPEG documents.
20   Other than the JPEG documents, are you aware of
21   any document in the world that was created before
22   the answer date that supports or corroborates the
23   defense of mutual mistake?
24   A     I'm -- again, I -- I'd point to the --

Page 188

Dustin Norris

1            Dustin Norris
2    let -- let me take a look here again.
3    Q     What is it you're looking at?
4    A     This is the amended complaint.
5    Q     Okay.
6    A     Which paragraph was that again?
7    Q     It's 47.
8    A     47.
9    Q     Yeah.  There's -- it's a -- there's --
10   A     Mutual mistake.
11   Q     -- one of the defenses there.  It's up on
12   the screen.
13   A     Yeah.
14   Q     There's "mutual mistake," and I just want
15   you to identify for me every document that HCMFA
16   is aware of that was created before the answer
17   date of March 1st, 2001 [sic], other than the JPEG
18   documents --
19   A     I would -- I would refer you to --
20   Q     -- that support or corroborate -- that
21   support or corroborate the defense of mutual
22   mistake?
23   A     Yeah.  And I'd also point you to DC
24   Sauter's declaration.
25   Q     Okay.  That wasn't created before the

Page 189

Dustin Norris

1    answer date; correct?
2    A     Well, you're saying -- you -- it was
3    before the answer date.
4    Q     Pardon me?
5    A     The answer date being when we did the
6    amended answer?
7    Q     No.  Let me ask the question again.
8    A     Yes, please.  Sorry.
9    Q     Can you identify any document in the
10   world, other than the JPEG documents, that support
11   or corroborate the defense of mutual mistake that
12   was created before March 1st, 2021?
13   A     I got you.
14          The JPEG documents is the Word
15   documents with the metadata.
16   Q     Correct.
17   A     There were emails that went between the
18   accounting team on how to paper it up.  That is in
19   your -- your documentation as well, and I would
20   say any other document that's in the court
21   filings.
22   Q     Can you identify them?  That's kind of --
23   that's not really helpful to me.
24   A     Yeah.  I -- there's the -- there's an

Page 190

1        Dustin Norris
2   email – and this was used in depositions.
3   There's an email that went – was David Klos
4   instructing the group – or instructing Kristin to
5   send the cash and to record a note.
6   Q     And you believe that – and it's HCMFA's
7   contention that that document supports their
8   position of mutual mistake. Do I have that right?
9   A     Again, I'm not an attorney, so tying the
10  definition as little M, little M, I'm going to
11  have to say I don't know.
12  Q     Okay. Other than the emails, the two
13  emails that you referenced and the JPEG documents,
14  can you identify any other document created before
15  May 1st – March 1st, 2021, that supports or
16  corroborates the defense of mutual mistake?
17  A     There may be a document. I – I don't
18  know.
19  Q     Okay.
20  A     And, again, as you've seen, there's a lot
21  of stuff that's come out in discovery, and it's
22  important that testimony of – of those witnesses
23  is taken into account.
24        MR. MORRIS: Okay. Move to strike
25  the last portion of that answer.

Page 191

1        Dustin Norris
2        Let's take a short break. I may be
3   done. It's 4:09. Can we just come back
4   in six minutes?
5        THE WITNESS: Yes. Thank you.
6        MR. RUKAVINA: Sure.
7        MR. MORRIS: Thank you.
8        (Recess from 3:09 p.m. to 3:19 p.m. CST)
9   BY MR. MORRIS:
10  Q     Just a couple more questions, Mr. Norris.
11        If you can take a look again at
12  Paragraph 47 of the amended answer.
13  A     Yes.
14  Q     Do you see there's also a reference to,
15  quote, "the lack of authority from the defendant
16  to Waterhouse," close quote?
17  A     Yes.
18  Q     HCMFA does not dispute that Mr. Waterhouse
19  was an officer of HCMFA in May of 2019, does it?
20  A     No, we don't dispute that.
21  Q     And HCMFA doesn't dispute that
22  Mr. Waterhouse, in fact, served as the treasurer
23  of HCMFA in May 2019; correct?
24  A     We don't, no.
25  Q     Okay. Is the sole basis for the assertion

Page 192

1        Dustin Norris
2   that Mr. Waterhouse lacked authority was that
3   Mr. Dondero did not specifically approve it?
4   A     By nature, just the size of this note and
5   the nature of it would have required Mr. Dondero's
6   authority. And both Mr. Waterhouse and
7   Mr. Dondero testified to that in their deposition.
8   So I'd refer you to that. They both testified he
9   did not have the authority.
10        MR. MORRIS: I'm not sure that he
11  did, so I'm going to move to strike. The
12  testimony will be what the testimony will
13  be, not your characterization of it.
14  BY MR. MORRIS:
15  Q     But what about the size of the notes
16  causes HCMFA to contend that Mr. Waterhouse didn't
17  have authority?
18  A     A seven and a half million dollar note is
19  large enough to rise that Jim Dondero would have,
20  in any instance, authorized or needed to authorize
21  this, and he did not.
22  Q     And is that because a $7.4 million note is
23  a substantial obligation for HCMFA?
24  A     You know, substantial – define
25  "substantial." It's sizeable. Right? It's seven

Page 193

1        Dustin Norris
2   and a half million dollars. Overall from the
3   operating business, it was meaningful. But seven
4   and a half million dollars in any entity would
5   have required Jim Dondero's approval.
6   Q     And so can you explain to me why, if it
7   would have required his approval, nobody at HCMFA
8   noticed that it was carried on HCMFA's books and
9   records as a liability since May of 2019?
10  A     Yeah. I think it's a simple mistake.
11  There were other notes of a similar nature in
12  size. And as Mr. Dondero testified, he wasn't
13  reviewing these regularly, the balance sheet.
14  Frank Waterhouse was. The accounting team was.
15  And so the HCMFA side, there was other notes of
16  similar size and nature. It didn't occur to them
17  that there was new notes. The accounting team, as
18  we've – which is our position, created the notes,
19  added the signature of Mr. Waterhouse, and then
20  they continued to record those as liabilities on
21  the balance sheet. And –
22  Q     Is –
23  A     – that was – you had – and, again, I'd
24  refer you to our pleadings and our amended
25  pleadings and the recent pleading yesterday that

Page 194

Dustin Norris

1        Dustin Norris
2   we discovered in the discovery process. But
3   Kristin Hendrix and Dave Klos and Frank Waterhouse
4   made it very clear what the process -- and I would
5   say why -- in answer to your question, it was
6   probably a little sloppy. It may have cut
7   corners. They should have received Mr. Dondero's
8   authorization, and they didn't. And so
9   that's -- that's our position.
10  Q     Does --
11  A     And I would say these are all
12  professionals. These are good people. I don't
13  think they were dishonest. I think they made a
14  mistake. Professionals make mistakes, but this
15  was a costly mistake.
16  Q     Did -- does -- does HCMFA contest that
17  Frank Waterhouse knew, on May 2nd and May 3rd,
18  2019, that the corporate accounting group was
19  going to paper these transactions as loans?
20  A     Again, I would refer you to the actual
21  depositions and pleadings -- and our pleadings.
22  But our position is -- sorry. One more time, do
23  you want to ask the question?
24  Q     Yeah. I think you need to -- I want to
25  try to finish up, and I really appreciate your

Page 195

Dustin Norris

1        Dustin Norris
2   patience.
3        MR. RUKAVINA: And I'll just say,
4   John, that was a bit of a confusing
5   question.
6        MR. MORRIS: Okay. And that's
7   fair. Let me try again.
8   BY MR. MORRIS:
9   Q     Does HCMFA contest that Frank Waterhouse
10  knew, on May 2nd and May 3rd, 2019, that the
11  corporate accounting group was going to paper the
12  transfers from Highland as loans?
13  A     Did we contest that he knew that?
14  Q     Correct.
15  A     I think his testimony speaks -- I'll refer
16  you to his testimony. I think he testified that
17  he didn't know, right? He didn't know that
18  they -- yes, he was copied on an email, but he
19  didn't have any recollection that they were
20  papered up as a loan.
21  Q     Okay. And on the basis of that testimony,
22  does HCMFA now contend that Mr. Waterhouse didn't
23  know, in May of 2019, that these transfers were
24  papered as loans?
25  A     I would say that's part of it. I would,

Page 196

Dustin Norris

1        Dustin Norris
2   again, refer you to all the pleadings, our
3   pleadings and depositions that -- of these
4   individuals. There's -- there's a lot of support
5   there.
6   Q     Right.
7        Have you seen the emails from May 2nd
8   and May 3rd?
9   A     I can't remember if they were included in
10  your exhibits, but I know they were discussed in
11  detail in the depositions from Dave Klos and
12  Kristin and Frank.
13  Q     Right. Okay.
14       MR. MORRIS: I have no further
15  questions. This is not particularly
16  helpful. Thanks.
17       MR. RUKAVINA: Okay. I'll reserve
18  questions. Thank you.
19       MR. MORRIS: Okay. Thanks a lot.
20       MR. RUKAVINA: Thank you.
21       (Off the record at 3:25 p.m. CST)
22
23
24
25

Page 197

1        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION
3   In re:              )Chapter 11
                         )
4   HIGHLAND CAPITAL MANAGEMENT, LP, )
                         )Case No.
5        Debtor.         )19-34054-SGJ-11
    _____)
6   HIGHLAND CAPITAL MANAGEMENT, LP, )
                         )
7        Plaintiff,      )
                         )
8   vs.                  )Advisory Proceeding No.
                         )21-03004
9   NEXPOINT ADVISORS, LP; JAMES    )
    DONDERO; NANCY DONDERO; and THE )
10  DUGABOY INVESTMENT TRUST,        )
                         )
11       Defendants.     )
12
         REPORTER'S CERTIFICATION
13       REMOTE DEPOSITION OF
            DUSTIN NORRIS
14       December 1, 2021
15       I, Rebecca A. Graziano, Certified Shorthand
16  Reporter in and for the State of Texas, hereby
17  certify to the following:
18       That the witness, DUSTIN NORRIS, was duly
19  sworn and that the transcript of the oral
20  deposition is a true record of the testimony given
21  by the witness;
22       I further certify that pursuant to FRCP Rule
23  30(f)(1) that the signature of the deponent:
24       _____ was requested by the deponent or a
25  party before the completion of the deposition and

Page 198

1  returned within 30 days from date of receipt of
2  the transcript.  If returned, the attached Changes
3  and Signature Page contains any changes and the
4  reasons therefor.
5      _____ was not requested by the deponent or a
6  party before the completion of the deposition.
7      I further certify that I am neither attorney
8  nor counsel for, related to, nor employed by any
9  of the parties to the action in which this
10  testimony was taken.
11     Further, I am not a relative or employee of
12  any attorney of record in this cause, nor do I
13  have a financial interest in the action.
14     Subscribed and sworn to on this 1st day of
15  December, 2021.
16
17
18
19
20     _____
         Rebecca A. Graziano, CSR, RMR, CRR
21       Texas CSR 9306
         Expiration:  07/31/22
22       California CSR 14407
         Expiration:  09/30/22
23       Illinois CSR 084.004659
         Expiration: 05/31/23
24
25

Page 199

1           ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads    Should Read  Reason
6  ___ ___ _____    _____  _____
7  ___ ___ _____    _____  _____
8  ___ ___ _____    _____  _____
9  ___ ___ _____    _____  _____
10  ___ ___ _____    _____  _____
11  ___ ___ _____    _____  _____
12  ___ ___ _____    _____  _____
13  ___ ___ _____    _____  _____
14  ___ ___ _____    _____  _____
15  ___ ___ _____    _____  _____
16  ___ ___ _____    _____  _____
17  ___ ___ _____    _____  _____
18  ___ ___ _____    _____  _____
19  ___ ___ _____    _____  _____
20
21           _____
22           Signature of Deponent
    SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2021.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

**$**

**$12,286,000** 78:16
95:19 96:7

**$12.286** 79:7 82:11,
15 83:14

**$12.4** 147:9,13
149:25

**$2.4** 50:18 51:18

**$5** 50:21 51:21 107:7
108:13 109:4,5,7,13,
14 140:22 143:19
147:7,24 148:9
149:13,16

**$5.186** 134:6

**$7.4** 48:21 63:24
82:16 134:17,24
135:5 138:6,16,23
140:9 146:21 147:6,
15 149:18 150:4
156:19 168:10,19
192:22

**$7.44** 149:23

**$7.442** 149:5

**$7.5** 82:12 133:17,23
146:13

**1**

**1** 26:11 29:6,8 38:17,
21 163:2

**10** 11:7 52:16,21 57:6
63:2

**100** 26:14 80:19

**10:00** 8:15

**10:01** 5:2

**11** 57:6 65:21

**11:05** 56:18

**11:15** 56:15

**11:16** 56:18

**11th** 24:20

**12** 27:19,21 36:14,18
82:13

**12-and-a-half**
148:12

**12/31** 87:5

**12/31/2018** 55:5

**12:05** 56:14

**12:11** 103:2

**12:15** 56:14 102:15

**13** 23:10,11,12 158:3,
8

**14** 11:7

**147** 51:2,3

**15** 134:6 136:17
137:3,7

**15(c)** 67:17,18 68:21
69:16 71:6 72:4 76:6,
19 77:4 87:2 88:7
92:12 99:5,8 101:11

**15th** 136:23

**17** 48:12

**18** 153:2

**182** 119:9,10 124:13
125:20 152:21,22

**185** 7:12,17,19

**18th** 25:3 153:13

**19** 32:6 110:4 153:3
154:18

**1940** 67:18

**1:06** 103:2

**1st** 20:17 23:14,20
24:4 25:21 26:2,5
29:20 30:3,7,9,16,19
31:5,9 33:5 34:4,24
35:6 49:10 61:11,14
126:22 166:19 167:4
188:17 189:13
190:15

**2**

**2** 78:4,6,10 82:16 85:9
86:8,10,19 89:8,9
90:20 92:19 93:22
95:8,14 98:9 141:4
158:14

**2.4-million-dollar**
51:14

**2000-** 31:25

**2001** 188:17

**2006** 176:2,3

**2012** 18:19 21:22

**2013** 21:25

**2018** 18:23,25 19:4
20:17 22:6,12,20
23:14,20 24:4,5,6,15
25:22 26:2,6 32:5,6
46:12,25 47:19 110:4
136:9 145:23 151:13,
15 153:2,10,18,24
154:13 155:9 157:5

**2018/2019** 109:21

**2019** 18:23 19:3,5
20:22 21:7 24:20
28:15,19 32:5 42:25
43:2 47:7 49:6,10,22
50:21 55:10 59:5,7
103:20 104:13,15,19
105:10 107:12 109:4
120:16,18,19,23
128:23 129:22 132:5
134:6 136:9,14,17
137:3,7 146:18
151:6,13 153:3
154:18 157:5,8,14
168:20 191:19,23
193:9 194:18 195:10,
23

**2020** 19:11 32:2
33:18 39:8,12 41:3,
16 42:6 55:16 65:22
67:8 70:14,24 72:3
73:24 78:15 84:24
86:21,24 92:18 95:6,
9,13,16,23 96:8
97:23 98:10 99:11
101:15 102:6

**2021** 19:11 25:3,9,10
29:20 30:3,7,9,16,19
31:5,9 33:5 34:3,4,24
35:6 39:25 57:16
61:11,14 126:23
175:3,4,11 176:7
177:5 179:3,18
189:13 190:15

**21st** 34:3,24 39:25

**81:5**

**22nd** 28:12 162:13

**23rd** 95:6 100:2

**24th** 9:19

**26th** 24:11,15

**28th** 128:23 129:21
132:5

**2:06** 150:24

**2:07** 151:2

**2:21** 151:2

**2nd** 28:15,18,21
50:18 51:14,17 54:24
127:17 194:17
195:10 196:7

**3**

**3** 38:23 105:5

**30** 86:24

**30(b)(6)** 5:18 7:10
9:9,25 15:18 22:25
36:18,25 37:10,15
42:3 49:15 57:6,8
63:2 64:16,22 75:23
79:5 82:10,14 84:4
92:16 95:11,18 116:6
132:5 141:19

**30th** 87:6 95:9,16,23
96:8 101:14 102:6
154:8,14

**31st** 46:11,25 47:18
154:9

**35** 9:19 168:16

**36** 87:13,14

**38** 160:14,22 168:8,
17,24,25 169:2

**3:06** 150:24

**3:09** 191:8

**3:19** 191:8

**3:20** 150:25

**3:25** 196:21

**3rd** 28:15,19,21 39:8,
12,22 41:16 42:6
47:7 49:10,22 50:21

**51:21** 54:24 127:17
194:17 195:10 196:8

**4**

**42** 168:24 169:12,16
173:3

**43** 169:6 175:19,22
181:6

**44** 169:6 184:9,10

**45** 46:20,21 160:15
168:8,18,25 169:2,6

**47** 184:21 185:8
188:7,8 191:12

**4:09** 191:3

**5**

**5** 9:17 29:10,13
158:21

**5.2** 109:15

**5.6** 109:15

**59** 71:21,22 89:19

**6**

**6** 10:25 30:5

**6/30** 94:24,25 153:22

**60** 153:22 154:8

**600** 79:25

**650** 89:20

**650-page** 9:18

**6:05** 92:18 93:18

**6th** 92:18 93:18 97:14
161:24 162:14 164:2
176:3,7

**7**

**7** 10:25 30:5

**7.4** 134:22 147:2

**8**

**8** 10:25 25:10 141:19 142:10

**9**

**9** 11:2,3 103:4 104:18 158:22

**9:00** 8:14

**A**

**a.m.** 5:2 56:18

**ability** 30:24 31:4,8 33:4 34:23 176:19 177:3

**absence** 181:3

**Absolutely** 174:16

**accept** 170:2,9 171:18

**accepted** 169:17 170:6,7,22 171:3

**access** 30:15,18,20 33:22,24 34:6,8 61:20 144:16 161:8 173:11,17 175:2,8 177:15,18,20 179:17

**accessible** 32:3

**account** 51:6 143:20 150:5 190:23

**accountant** 63:9 186:5

**accountants** 57:16 63:14

**accounted** 52:23 53:13 63:6

**accounting** 27:16 43:12,19 44:11 50:8 52:17 53:5,17,21 56:25 57:5 61:24 62:23,25 63:8,17 64:2,3 65:2 70:6 72:6 75:16 78:23 126:10 189:19 193:14,17 194:18 195:11

**accounts** 58:3,8,9

**accuracy** 125:25

**accurate** 7:2 25:18 44:3,24 45:20 65:15 74:17 75:3 76:3,11 80:8,15,19 81:20,23 94:2 125:21 126:6 127:14 172:4,10,15

**accused** 120:8

**acknowledge** 92:3 95:5

**acknowledged** 51:24

**acknowledges** 51:24

**Act** 67:18

**acting** 80:4 126:23

**action** 29:3

**actively** 144:17

**actual** 40:17 41:10 136:22 144:9 194:20

**add** 79:12,13 175:5

**added** 18:20 183:6 193:19

**addition** 149:16 171:6

**additional** 53:4 54:15 84:13 122:4 149:18 167:7 168:4 169:6 172:20 181:12 182:25

**address** 53:5

**addressed** 127:11

**addressing** 101:9 109:22

**adoption** 131:23 132:8

**adversary** 28:8

**advise** 124:8

**advised** 130:16

**adviser** 33:20 53:17 64:4 68:16 69:24 75:18 83:18 106:7 123:19 127:24 128:4

**advisers** 21:2,6,12, 25 22:12,19 32:16 40:23 45:3,9 67:4 71:11 72:2,9,12,23 73:3 75:6 77:6,12 78:14 84:23,24 86:6 90:23 97:2,5,13 99:17

**advisers'** 94:19 96:21

**Advisors** 5:19,22 18:7 19:25 20:7,23 21:2 33:9,17 78:13

**advisory** 66:3,6,9

**affiliate** 93:5

**affiliates** 60:18 79:22 90:22

**affirmative** 30:13 50:4 53:6 158:25 167:20 168:8,18

**afloat** 175:14

**aggregate** 48:21

**agree** 42:8 57:4 77:5, 9 95:11,19 101:22 112:4 131:2 132:4 138:15 147:23 151:24 163:23 165:12 180:9

**agreed** 138:5 163:21

**agreeing** 104:4

**agreement** 9:6 34:14 44:11 60:17 61:25 62:15 68:24 70:10 74:20 75:22 77:22 81:8,9 111:9 113:20, 22 128:21 138:4,13, 23,25 139:2,10 140:4,9 142:25 150:12 164:23 170:16 178:12

**agreements** 66:10, 12,15

**ahead** 14:17 70:13 71:16,17 101:7 174:6,8

**allegedly** 121:15,22

**allocation** 105:3 106:8 118:21 122:24 123:2 125:22

**allowed** 13:11 173:23

**amend** 9:11 104:4,7 159:24 164:7 180:11

**amended** 7:24 8:13 9:4,24 10:21 11:8 35:17,18 54:17,18 55:6 63:12,20 158:11,14 159:3,5,9, 21 160:7 161:2 164:2,5 167:10,15, 21,22 175:25 176:6 177:16 181:11 182:17 188:4 189:7 191:12 193:24

**amount** 70:16 79:8 82:17 107:6 109:15, 22 154:23

**amounts** 48:25 49:3 65:24 78:11 79:21 82:25 90:21 91:12 93:3 101:19,22,24 105:14 134:20

**analysis** 67:17 68:21 69:16 72:4 106:25 113:24 114:5,11 115:2 116:7 165:2

**analysts** 27:12

**analyzed** 121:2

**angry** 174:15

**annual** 66:12 67:20 88:7

**answering** 6:15 64:7

**answers** 6:3 7:2 35:16 63:20 75:10

**anticipated** 80:15,16 115:25

**apologize** 22:17 24:12 69:6 152:12 154:5 155:23 159:20 169:22 176:4

**appearing** 82:20

**appears** 30:6 49:18

**allegedly** 51:6 95:24

**applied** 187:10

**approaching** 102:15

**approval** 128:21 193:5,7

**approve** 192:3

**approved** 111:15 112:11 128:9,15 132:23 133:2

**approximately** 26:9, 19 109:3,5 133:16,23 134:5 146:13 147:7 154:9 156:19

**April** 13:14 19:3,5 20:22 21:6 22:16 24:20 25:10 104:13, 19 175:11

**argument** 27:25 35:23 36:3 37:15

**arguments** 85:14,16

**ascertain** 58:6,14

**Asia** 7:14 158:5

**asks** 27:21 52:16

**aspect** 34:9 67:24 97:24 99:24

**aspects** 14:22 45:3,4 68:11 69:24 186:13

**assert** 30:12

**assertion** 191:25

**Asset** 122:21

**assigned** 178:17

**assistant** 18:18,20 21:21 25:5,12

**assume** 41:22 45:21, 23 47:24 48:24 49:2

**assuming** 23:21,24 48:4 52:6,7

**assumption** 45:25

**assumptions** 45:22

**attached** 28:20 161:22 162:20 163:7, 22

**attachments** 31:17

**attain** 20:12

**attempt** 83:5

**attended** 67:16

**attorney** 5:9 83:8
96:25 147:17 160:11
173:9,20 174:4
178:15 190:9

**attorney's** 13:17

**audit** 44:12 47:8,12,
23 57:16 58:2 59:4,7
154:8

**audited** 43:5,10 44:2,
12,23 45:5,19 46:10,
24 47:17,23 48:14,19
49:20 55:2 57:24
58:12,16 64:17 65:10
101:17

**auditor** 47:11

**auditors** 43:20 57:17
154:22 156:10

**audits** 153:19,22

**August** 86:25 99:4,6
153:25 154:9,13
155:9 174:21

**author** 77:18

**authority** 85:4 138:2
169:8 171:18,22
182:7 183:21 186:2,
3,5,15 191:15 192:2,
6,9,17

**authorization** 72:11
85:18 194:8

**authorize** 143:8,12
180:18,22 192:20

**authorized** 72:9,24
84:22 143:16 178:3
192:20

**aware** 6:3 27:15
28:7,13,17 29:2 31:7
34:20 35:7,11,12,13,
23 36:5,6,12 37:9,14,
19,22 39:15,21 47:10
49:8 52:12 56:2,25
57:3 59:6,16 62:6
67:8,12 71:3 84:14
85:2 86:13,15,16,19

87:7 98:2 100:3
111:24 113:23
117:18 118:18 122:6
124:23 125:17 127:2
130:8 145:18 150:6
158:10 175:15 184:4
186:22 187:21
188:16

**B**

**back** 13:13,14 17:13
21:22 22:2 31:25
40:24 41:9,10 56:14
64:7 68:23 69:17
70:6 76:14 77:13
86:2,10 92:23 93:9,
12 94:7 96:16 102:22
150:25 152:5,13,19
170:11 191:3

**back-office** 27:16
43:12 75:17

**background** 64:3
160:25 161:7 166:22

**backing** 98:18 99:2,
18 102:2

**backup** 49:2 82:23
83:4

**Baker** 174:13

**balance** 48:7 53:20
55:5 58:23,24 59:2
65:6,15 87:5,6 92:10,
20 93:22 94:5 96:4
102:9 108:14,17
193:13,21

**bank** 51:6,7 52:2
104:6

**bankruptcy** 27:23
30:23 35:8 36:7
37:23 99:11 179:11

**based** 13:17 18:3
25:15 34:12,25 45:25
46:3 57:17,25 142:13
154:7 163:20 167:10
168:4 171:11 174:4
178:20 180:11 181:5

**basis** 22:20 67:20
167:19 181:17
191:25 195:21

**BBVA** 51:7

**began** 31:25 54:15
104:14,22 120:18

**begin** 6:18

**beginning** 8:16
22:12,20 24:15
120:17 156:7,11,15

**behalf** 5:18 10:7
29:19 35:24 37:11,23
40:3 43:8 64:7 68:20
72:8,23 73:3 80:5
126:23 138:15 143:4,
6 144:10 150:20
151:9 171:4,19
180:23

**belief** 184:4

**believed** 117:13
126:16 149:9 167:17

**believes** 118:5,15

**big** 123:11

**biggest** 67:24

**bill** 59:15

**billed** 59:19,20

**bind** 6:4

**bit** 37:21 48:5 88:17
126:2 133:9 151:4
195:4

**Blank** 87:24

**board** 9:9 32:17
33:10,14 65:22 67:5,
8,16,19 70:15,25
71:8,10 72:3,25
74:21 75:4 76:3,7,15
78:9,15 80:9 84:6,16,
19,23 86:7,12,13,22,
23 87:9 88:4,7,12,24
89:10 91:21 92:11
93:25 94:10,20 95:7,
13,21 96:9 98:10,16,
22,25 99:3,4,7,12,16,
20 100:18 101:10
112:12 119:2,3,22
123:3,8 125:21
126:6,13 127:6,11,12
128:9,12,15,23
129:2,21 130:7,14,
15,18,21 131:5
132:6,23 133:3

135:20 156:10,24
157:20

**board's** 77:7 90:2
92:19 93:21

**boards** 66:24 67:3

**booked** 53:20 54:11,
21 57:10,14 59:9
64:23

**booking** 56:22
57:11,20

**books** 44:11 52:24
53:13,16 54:7,12,23
55:7,14,20,23 56:21
58:15,19,21,22 59:17
60:24 61:5,13,21
62:10 63:3,17 79:12
193:8

**bottle** 56:12

**bottom** 87:21 102:8
152:17 158:23

**Brad** 24:3,7,18

**breach** 148:24

**break** 7:4 56:7
150:24 191:2

**Brian** 25:5

**bring** 70:2

**broad** 35:21

**broader** 126:3

**broadly** 19:19,23

**broke** 145:3

**broker** 144:21,24

**broker-dealers**
107:13

**business** 19:22
68:6,14 107:18
175:14 193:3

**businesses** 177:10

**C**

**calculate** 111:14

**call** 8:23 61:19 67:17
125:7

**called** 5:17 8:23
159:23 161:13

**calls** 32:19 165:11

**Canty** 7:9,17 152:13,
21 158:6

**capacity** 5:17 20:3
36:25 37:9,14 44:7,8,
10,13 75:25 77:17
137:19,21 171:2

**capital** 5:12,19,21,24
27:17 32:7 42:20
52:5 61:22 108:19
123:15 124:21
125:14 131:3 146:2,6
169:20 171:3,4

**careful** 16:25

**carefully** 41:25 62:5
120:6 129:19 171:17

**carried** 193:8

**carrier** 147:8 151:22
152:2

**carriers** 152:7

**case** 27:23 48:24
49:2,18 67:21 76:17
81:10 182:5

**cash** 14:7,11 52:10
108:14,16,18 134:15
140:23 141:2 172:21
183:5 190:5

**caused** 121:22 137:7
147:22 170:9,22
171:5,20

**caution** 16:20

**caveat** 180:13

**CC'D** 95:3

**CEO** 167:2 173:14

**certificates** 9:7 19:2
20:14 23:22 25:20

**CFO** 39:17 45:7,13
75:15 96:21 171:17
173:12,15,17

**chain** 81:2 91:16

**challenge** 105:11,15

**challenged** 100:24

**change** 93:7 102:18 104:5,7 106:11,18

**changed** 20:23 24:2 55:23 56:21 57:12,21 98:19

**changing** 23:25

**characterization** 192:13

**characterize** 164:20,25 165:4

**characterizes** 165:7

**charged** 43:9 81:18, 22

**charts** 73:22

**check** 9:17

**chief** 19:20 20:4 32:15 33:13 179:10

**circumstances** 16:9 17:16 57:18 86:14 161:4 164:18 165:15 176:11

**claim** 141:20,23 142:2,4,19 143:6,9, 11,13,16,20,23,25 144:4,6,9,18 145:8, 16,21,24 148:16 149:10,14 151:8,12, 18 152:2 172:22 173:4,7,25

**claims** 152:7,11

**clarification** 37:8 74:12 123:4,5

**clarify** 69:17

**clean** 149:3 163:19

**clear** 79:14 185:16 187:16 194:4

**close** 83:20 181:8 191:16

**closed-end** 105:4,7 106:2,11,19 108:4

**closely** 72:5 112:22

**coffee** 56:8

**collaborative** 105:21 106:12

**collateral** 147:17,19 148:20

**colleague** 7:9

**collect** 28:9

**collectively** 28:24

**color** 53:4

**combination** 134:14

**combined** 134:22

**comfortable** 68:18 99:12

**commenced** 28:8 29:3 64:18,25 161:21

**commencement** 40:9

**commentary** 54:2

**committee** 111:10, 15 115:11

**communicate** 30:24 34:23 176:19 177:3

**communicated** 150:12 170:12

**communication** 62:11 130:18 150:10

**communications** 27:22 65:22 84:5 121:2 123:8 171:11

**companies** 182:22

**company** 14:4 36:22 39:15 64:7 143:2 146:5 147:14,20,21 161:13

**company's** 12:10 53:2 139:8 142:4,6

**Compass** 51:7

**compensate** 137:18 138:16 184:6

**compensated** 171:25

**compensation** 15:11 59:10,22 60:5, 14 61:2,16 62:9 63:6, 22 64:11 108:20 134:25 135:6 137:14 138:23 140:9,15,16

**146:22 147:6,8 149:19 157:18 168:11,21 185:4,5**

**competently** 36:17

**complaint** 8:22 9:2 28:12,21 34:3 38:19, 20 39:25 40:18 161:2,23 162:2,25 163:4,7,23,25 166:14,21 167:10,15 175:25 181:8 188:4

**complete** 6:25 23:22 25:17 34:5,8 59:4 173:11 175:2

**completed** 6:16,19

**completely** 80:19 94:2

**compliance** 27:16 31:15 32:15,24 33:13 41:2,7 61:23 69:4 70:5 72:6,14 74:19, 23 76:15 77:25 106:14 126:9 170:14 178:10

**component** 33:7 83:14

**components** 17:22

**concerned** 35:25 36:8 124:24,25

**concerns** 35:9 37:12,17,24 90:20 110:3

**conclude** 49:14 155:15,24

**concluded** 157:12

**conclusion** 135:11 156:5 157:21

**conduct** 47:12 138:7 178:3 180:19,23

**conducted** 67:9 122:25 161:3 165:14 176:10

**confirm** 10:19 50:23 52:9 57:9 133:5 165:23 177:14

**confirmed** 11:23

**confirming** 163:16

**confronted** 181:14

**confused** 81:6

**confusing** 195:4

**confusion** 81:13

**connection** 6:7 10:7 12:13 15:2 59:11 67:9 88:7 101:10 110:9,23 111:3 112:15 113:4,9,16 114:2,13,23 117:14 118:16 119:15 121:8 124:9 134:7 135:2 137:15 138:18 142:8, 20 144:7 146:22 147:9 149:14 166:3 168:22

**consent** 103:5,9,15, 19,23,24 104:3,8,9, 12,14,19,22 105:2, 10,20,21 106:6,8,10, 18,22 107:5,9,18 108:3,4,13,24 109:5, 9,12

**consented** 104:10 105:6 107:23

**consequence** 138:6

**consequences** 109:22

**consideration** 184:22 185:2

**consistent** 51:16

**consultant** 112:6 128:17

**consultation** 154:24

**contained** 95:6

**contemporaneously** 55:10

**contend** 42:4 85:17, 20 113:3 132:20 134:21 147:13 192:16 195:22

**contends** 49:9 59:8 134:17,23 135:5 149:24

**contention** 42:8 132:24 146:20 190:7

**contest** 194:16 195:9,13

**continue** 10:24 29:18 144:17 148:14

**continued** 193:20

**continuing** 24:20

**continuous** 22:19

**contract** 80:21 115:6 116:24 117:5 148:24 170:6 178:22

**contracted** 178:21

**contracts** 66:19 67:11,19 69:9,12

**contribution** 67:25

**control** 121:4 130:9 137:20,21

**controller** 183:2 185:20

**controlling** 26:21

**controls** 26:15 122:4

**conversation** 117:22 181:17

**conversations** 16:3 32:8 101:3 130:4 171:12

**conversion** 105:6,8, 9,13 107:25

**converted** 105:3

**converting** 105:25

**coordinating** 41:12 115:12

**copied** 73:11 90:4,16 91:15,21 92:3 99:23 195:18

**copies** 9:5 88:21 161:19 162:17 176:14

**copy** 30:2 89:14,16 91:19 167:25 168:2

**corners** 194:7

**corporate** 194:18 195:11

**correct** 9:20 10:3

12:15,22 15:23 18:25
20:8,9,10 21:10
22:21 26:19 28:19
29:4,5,7,8 30:13,16,
19,25 31:5,6 34:7,18,
24 35:19 39:8,9
42:15,25 43:3 47:10,
13 48:23 49:24
51:19,21,25 54:25
55:18 57:6,21 59:12,
13 61:12 64:20,25
65:2 66:4,7,10,13,19,
25 67:2 69:10,13,14
70:17 71:2 72:4 74:3,
9 76:12 77:7,8,10
83:15 84:6 86:24
88:14,20,24 89:11
90:16 91:16 92:20,21
94:16,20 95:2,23
96:10,22,23 97:2,3,5,
8,10 100:10,14
101:2,11 103:20
106:23 107:21
108:10 114:13,20,24,
25 116:19 117:19
120:16 121:4,22
122:9 123:6 124:17,
18 127:18,19 128:24,
25 129:7 130:2
131:4,13 132:14,18
133:24 134:3,4,19
135:3,8 136:17,18
137:4,5,8 139:3
141:18 143:21,23
145:5 146:3,18,19,
24,25 147:11 149:5,
11,12,14,15,20,21,25
150:2 151:10,11
158:18 159:21
162:18 164:3,7,8,11
165:16,17,19,22
166:2 169:20 170:23
173:12 176:2,7,8,11,
12,15,16,20 178:24
179:6,8,9,16 180:12
181:9,24 182:7
183:21,22 185:10
189:2,17 191:23
195:14

**correction** 22:23
90:3 124:24

**correctly** 15:13
85:10 132:2

**corroborate** 188:20,

21 189:12

**corroborates** 61:15
62:7 186:23 187:23
190:16

**cost** 106:22

**costly** 194:15

**costs** 106:20 133:18

**counsel** 5:11 11:19
13:8 54:2 82:22 83:3
88:3 90:2 116:21
123:17,19,21,23
124:2,7 178:6,18

**counterparty** 186:6

**couple** 168:13
178:25 191:10

**couple-month**
105:18

**court** 27:24 30:23
35:8 36:3,7,11 37:16,
24 40:20 160:8 164:7
180:10 187:3 189:21

**coverage** 142:20
149:11

**covered** 98:16,24
99:16 100:17

**created** 42:18 61:14
62:7,17 63:4 147:21
187:22 188:16,25
189:13 190:14
193:18

**creating** 45:8 53:16
135:15 177:22

**creation** 177:7

**CST** 5:2 56:18 103:2
151:2 191:8 196:21

**current** 57:17 58:9

**cut** 194:6

---

**D**

**daily** 40:19 41:11

**damage** 152:9

**data** 33:22 115:13

**date** 21:19 30:7,10
33:19 34:4 35:6,9,25

36:8 37:12,16,24
38:12,16 39:14 42:9
61:10 62:7 63:4
85:25 97:6 107:15,25
126:22 130:4,5
135:22 136:4,8
155:12 156:12
170:24 187:23
188:17 189:2,4,6

**dated** 28:14,18 30:3
127:15

**dates** 23:21,25 25:16
52:11 120:18 134:10
162:13

**dating** 21:22

**Dave** 12:3 80:14 95:4
171:8 194:3 196:11

**David** 25:5 185:15
190:3

**Davor** 7:18 12:14
56:10 139:23 142:3
163:16

**day** 34:3 51:25

**days** 153:22 154:8

**DC** 12:17,19 13:12
142:3 161:3 165:14
181:14 188:23

**DC's** 61:19

**deals** 160:15

**Deb** 174:14

**debated** 121:2

**debtor** 5:11 31:21
33:7,23 34:12 39:17
41:6 42:17 117:22
118:9 166:20 167:3

**December** 39:8,12,
22 40:17 41:3,16
42:6 46:11,25 47:18
55:16

**decision** 105:19,22,
23 106:17,21 108:2,3
138:2

**declaration** 9:4
13:15 16:14,18 17:19
31:16 54:17 61:19
164:14,16,23 165:5
167:19 175:6 181:21,

25 188:24

**deductible** 141:3,17

**defendant** 169:16,19
171:25 183:24 184:5,
6,14 191:15

**defendant's** 9:11
166:19

**defending** 41:11

**defense** 114:18,19
115:8 144:7 168:9,18
185:7 186:24 187:24
188:21 189:12
190:16

**defenses** 30:13 50:4
53:6 135:9 140:10
150:2 158:25 167:20
169:4,7 188:11

**deferred** 80:20

**define** 119:17 154:3
192:24

**defined** 46:7 153:5

**Defines** 132:19

**defining** 131:25
132:17

**definition** 190:10

**demand** 19:10
38:14,24 39:24 40:18
41:15,21 54:14,20
55:15

**demanded** 15:24
16:2 19:9 38:6,7,9,11
86:16 137:14 138:5

**demanding** 39:17,
18

**denying** 52:10

**department** 78:23

**depending** 75:7

**deposed** 5:17

**deposited** 105:17

**deposition** 5:13 6:8
7:10,24 8:4,18 9:25
10:8,21 11:12 13:17,
20 14:2 15:3,14
28:24 29:10 37:4
60:6 82:21 83:25

25 188:24

**deductible** 141:3,17

**defendant** 169:16,19
171:25 183:24 184:5,
6,14 191:15

**defendant's** 9:11
166:19

**defending** 41:11

**defense** 114:18,19
115:8 144:7 168:9,18
185:7 186:24 187:24
188:21 189:12
190:16

**defenses** 30:13 50:4
53:6 135:9 140:10
150:2 158:25 167:20
169:4,7 188:11

**deferred** 80:20

**define** 119:17 154:3
192:24

**defined** 46:7 153:5

**Defines** 132:19

**defining** 131:25
132:17

**definition** 190:10

**demand** 19:10
38:14,24 39:24 40:18
41:15,21 54:14,20
55:15

**demanded** 15:24
16:2 19:9 38:6,7,9,11
86:16 137:14 138:5

**demanding** 39:17,
18

**denying** 52:10

**department** 78:23

**depending** 75:7

**deposed** 5:17

**deposited** 105:17

**deposition** 5:13 6:8
7:10,24 8:4,18 9:25
10:8,21 11:12 13:17,
20 14:2 15:3,14
28:24 29:10 37:4
60:6 82:21 83:25

84:11 115:23 173:2
186:21 187:18 192:7

**depositions** 12:2
40:19 41:12 61:6
140:20 172:20 175:7
182:9,24 183:9
184:17 185:14
186:19 187:14 190:2
194:21 196:3,11

**derived** 95:8

**describe** 19:16
111:2 164:17

**describes** 133:15

**description** 123:6

**desk** 160:18

**detail** 196:11

**detailed** 134:15

**details** 14:6 111:6
113:11 141:5 172:18,
19 175:7 180:2
181:22 182:25

**determination**
67:10 129:10 131:10,
22 132:7 138:9,14
154:16 155:19
156:21 157:2,9
170:18

**determinations**
127:23 130:6

**determine** 57:17
67:19 68:16 79:6
105:11,16 107:2
113:25 114:6,11
115:4 116:9 164:18
176:10

**determined** 57:25
129:4,13,23 130:9
131:17 136:7,13
154:19 156:14,18

**determining** 129:25
130:22

**development** 19:22
68:6,14

**devoted** 99:8 101:9

**dictates** 67:22

**difference** 8:11

**differently** 155:7

**diligence** 142:9 165:3

**direct** 26:5

**direction** 31:18

**directly** 95:14 144:23

**director** 26:25 27:4

**directors** 23:2 26:24 88:4

**disagree** 148:10

**disciplinary** 121:20, 25 122:6

**disclosed** 49:23 64:17

**disclosure** 86:12

**discover** 17:8

**discovered** 54:11 63:12 175:8 194:2

**discovery** 11:25 81:7 172:11 183:9 187:9 190:21 194:2

**discuss** 16:16 169:6 173:6

**discussed** 13:25 14:3,4,9 16:21,23 82:22 83:3 103:15 108:19 120:25 135:19,20 140:17 142:3 166:25 174:6 181:14 196:10

**discussing** 130:5 173:20

**discussion** 7:13 16:6 82:8 105:24 106:16 116:20 142:17 154:21

**discussions** 13:23 14:10 16:11 17:6,12, 14 110:2 118:8,11

**dishonest** 194:13

**dispute** 49:20,25 50:4,17,20 92:15 93:19 94:18,21 111:25 128:22 133:2 162:16 191:18,20,21

**disputed** 40:14

**distinguishing** 47:22

**distribution** 19:20 20:4 107:16

**Docket** 9:19

**document** 6:25 7:16 9:18,20 23:6 29:16 35:7,22 37:10 38:13 46:19 47:16 50:25 71:4,24 87:16,21 104:5 119:13 120:7, 12 122:11,19,23 126:5,12,17,21 128:20 138:21 140:8 158:2,15 160:13 161:18 166:10 183:7 186:10,23 187:22 188:15 189:10,21 190:7,14,17

**documentation** 187:7 189:20

**documented** 61:7

**documents** 6:22 8:17,20 9:14 11:16, 22,24 36:11 38:15 62:18 136:22 144:15 145:10,11 156:23 168:3 186:25 187:8, 17,20,21 188:18 189:11,15,16 190:13

**dollar** 48:25 49:3 192:18

**dollars** 14:8 157:13 193:2,4

**Dondero** 11:20 12:20 13:20 14:2,23 15:20 26:7,9,14,15 27:4 30:18,24 34:6 39:20 60:4,5,7,8,12 76:24 83:20 84:14, 22,25 98:18 99:18 103:16 105:22 106:13 121:3,14 137:17 138:3,19 140:12,18,19 165:22 166:3,11 167:2,3,5 170:18 171:2,10,21 172:12 178:6,17 180:18,25 182:11,13, 14 185:15 192:3,7,19

193:12

**Dondero's** 192:5 193:5 194:7

**doubt** 77:2 80:12 98:4

**draft** 69:4 72:7 96:2

**drafted** 126:8 185:6 186:5

**drafting** 77:4

**due** 65:24 70:16 78:12 79:21 81:5 90:21 93:4 96:7 101:19 102:3 153:22 165:3 173:10

**duly** 5:3,5

**Dustin** 5:4 6:1 7:1 8:1,2,3 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1,20 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,9,17,21 25:1,3,10 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1

136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1,15 160:1 161:1 162:1 163:1,12 164:1,9 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1

**duty** 44:22

**E**

**earlier** 13:12 16:13 22:24 65:8 86:21 108:19 155:12 180:16

**earliest** 81:4

**early** 17:5 19:10 88:10 136:14 175:3 179:3

**economies** 68:8

**educate** 127:12

**effect** 122:3 139:2 174:10

**effective** 23:25 24:11 25:15

**effectuated** 170:19

**effort** 145:7 151:21

**efforts** 144:9

**elaborated** 84:13

**Ellington** 179:13,14

**email** 73:14 74:2 81:2 87:8 88:6 91:15 92:3, 4,17 93:20 94:23 96:17 97:24 98:8

99:23,25 100:10,13, 24 101:8 190:2,3 195:18

**emailed** 84:2

**emails** 11:22 189:18 190:12,13 196:7

**employ** 165:13 176:25

**employed** 18:6 32:5, 6 83:9 166:24

**employee** 20:3 31:13 33:9,17 43:15 44:7,14 71:13 72:12 75:2 76:9 77:17 80:6, 17 81:21 115:13 119:25 120:2 121:6, 14,21 122:16 125:13, 18 126:4

**employees** 23:2 27:5,6,7,9,14 32:17, 22 41:6 42:18,21 53:15 61:23 69:3 75:21 76:18 77:13 111:7,8 112:23 115:17 117:20,21,22 118:10 119:23 123:15 124:5 125:5, 7,8 129:10,12 130:7 135:15,21 137:10 142:22 144:24 146:9, 11 150:11 156:11 161:9 166:24 170:13 171:6,10 177:8 179:25

**enable** 122:23

**encourage** 133:13

**end** 145:3,6 175:4 178:9,22

**ended** 120:20,22 178:22

**ending** 46:11,25 47:18 86:24 95:15,23 154:14

**engagement** 111:21

**entering** 138:12

**entire** 120:24 121:3 162:15 175:13 178:12 182:5

**entities** 74:4,6,8 83:19 98:17,25

**entitled** 147:13 149:18,24

**entity** 26:13 27:3 52:9 73:25 75:13 77:18 111:25 193:4

**entries** 57:2

**environment** 130:9

**equity** 26:20

**error** 9:10 14:20,21 15:11 16:8,9,10 17:24 32:10,13,18,21 50:6 59:11,12 62:11 108:21 109:23 110:3,6 115:16 117:13 118:6,10,16 119:20 120:9,15,25 121:15,22 122:21,25 124:16,22,25 125:16 126:11,25 131:13,25 132:7,14,16,17,19 133:16 134:7 135:3,12 136:11,13,16 137:4,7,18 140:15,17 142:13,15,21 146:24 147:10,25 149:5,6,19 150:5,21 153:10,16 154:4,12,16,20,23 155:4 156:14,22 157:3,10,12 168:10,22 169:3,17 170:3,10,20,23 171:5,20 184:7 185:4,19

**errors** 126:16,20 131:24 132:16 137:14 186:14

**estate** 178:15

**estimate** 20:19 109:12

**estimated** 146:12 147:3 149:4,6,23 156:18

**estimates** 111:12

**ethical** 174:18

**event** 55:3,5,6

**events** 16:8 48:11,18 49:5,16

**everybody's** 33:16

**evidence** 184:17

**exact** 6:13 21:19 30:6 33:18 38:12 89:12 92:24 96:8 99:3 107:6 109:8,15

**EXAMINATION** 5:6

**examined** 6:10

**examining** 36:24

**Excellent** 9:22 102:24

**exception** 178:25

**exchange** 87:8

**exclusively** 25:20 99:8 132:11

**executive** 18:13 19:3,6,18 20:2,7 21:5,11,17 22:10 24:8,13,16,21 25:4,11 43:4 73:25 74:5,7 97:4 116:5

**exhibit** 7:12,15,19 29:10,13 38:17,21,23 46:20,21 51:2,3 71:21,22 87:13,14 89:17,21 119:9,10 124:13 152:14,15 158:3,8

**exhibits** 9:15 11:18 87:10 89:17 161:22 196:10

**existence** 14:24 15:20 16:5 19:7 38:4 39:11 40:5,14 42:24 49:23 55:21 66:22 70:25 71:8

**expect** 44:15 63:9 127:6,13

**expedited** 152:4

**expenses** 106:20

**expert** 64:4 128:17

**expertise** 126:10

**explain** 122:24 193:6

**explaining** 165:9

**extend** 104:7

**extensive** 81:3 88:11 118:11

**extensively** 118:8

**extent** 16:20 80:25 81:11

**extremely** 151:25

**F**

**fact** 29:7 55:15 66:21 109:3 131:15 133:4 149:22 182:4 191:22

**factor** 135:23

**factors** 67:21 131:18 132:11,13

**facts** 16:9 17:16 57:17 63:19 86:14 142:7,8 166:22 167:18 168:4 185:11

**factual** 16:21 85:16 138:11

**fair** 6:16 16:22,24 20:16 21:4,23 22:13,20 25:19 34:2 37:5,6 39:10 40:3 49:19 66:22 73:22,23 89:23 90:5 109:6,22 112:21 115:5 129:6,25 131:16,23 132:8,9 133:5,12,14 141:8 145:4 147:4 153:25 154:7,11 155:8 157:7,11 160:14 164:19 167:9,21 168:7,15,17 179:3 181:19 195:7

**fairly** 91:21 112:5

**faith** 50:7 83:19 84:24 98:17 99:2,17

**fall** 31:25 32:2 67:8

**familiar** 110:19 118:20 164:13

**familiarize** 141:22,25

**fault** 62:24 116:10 119:25 137:12 150:8

**February** 24:5,6,11,

15 25:3,9 105:10 134:6 136:17,23 137:3,7 140:21 141:15 145:4,6 146:18 151:5 178:9,23

**fee** 103:9,15,19,23,24 104:3,8,11,19 105:2,5,10,20,21 106:6,8,22 107:2,4,5 108:13,24 109:5,9,12

**feel** 20:20 29:15

**fees** 67:23 68:4 103:5 104:12,14,22 106:20,22 107:9,18

**field** 83:9

**figure** 84:9 94:5 95:20 96:9

**file** 142:19 172:22

**filed** 9:13,18 28:12 29:3,19 34:4,5 35:8 37:11 39:25 54:18 142:25 144:10 145:21,24 149:10 151:8,13 159:22,24 161:7,24,25 162:2 163:25 164:2,5 166:19,20 173:4,6,25 176:2,6,9,13,17,24 177:17 183:7,17 187:2

**filing** 27:24 29:24 143:3,5,8,12 162:23 166:15 167:5

**filings** 189:22

**filled** 146:9

**final** 96:3,6,10,11,12 100:2 107:15

**finalization** 87:9

**finalized** 105:9 154:19

**finance** 43:12 70:6 75:9,16

**financed** 146:17

**financial** 43:5,10,13 44:2,24 45:3,5,8,19 46:10,24 47:13,17 48:15,19 49:21 50:2

57:22 58:13,16 64:5,14,17 65:10 66:3 86:23 95:15,22 101:14,18

**financials** 43:20 44:16 47:24 48:2 55:3 94:24 95:2,9,17 154:14

**find** 56:6 116:25 117:6 144:14,19 183:9

**fine** 21:3 115:24 167:25

**finish** 194:25

**fired** 121:7 161:12

**firing** 121:18,23,25

**firm** 66:3 68:6 110:19

**firmed** 172:18

**five-month** 162:3

**focus** 23:12 53:9 130:24

**focusing** 12:12

**folks** 179:17

**follow-up** 88:9,12 99:9

**footnotes** 102:2

**forbidden** 174:17

**forgive** 8:23 107:17

**form** 42:16 61:3,17 70:18 168:22

**formal** 72:10

**formed** 145:25 156:4 161:13 167:19

**forms** 187:2

**formulating** 94:19

**forwarded** 89:24 90:3

**forwards** 88:19,21 90:11

**found** 15:15 54:20 63:13 81:6 86:20 92:20 93:22 153:15 155:3

**fourth** 141:12

**frame** 166:15

**Frank** 12:3,23 14:10 15:5,8 24:9,16,21 25:4,11 39:13,15 43:15,17,24 44:22 45:17 60:6 65:16,17 71:13 75:9,11,12,15, 24 78:21 80:14,22 81:25 82:24 83:23 84:10,12 90:18 95:4 137:17 140:18 142:23 144:25 151:19 161:16 167:8 171:8 174:16 183:10, 19 185:15,18,19 186:10 187:11 193:14 194:3,17 195:9 196:12

**Frank's** 85:2

**free** 20:20 29:15

**front** 8:18 10:14 23:6 158:16 166:7

**front-office** 27:7,11, 14 69:21

**full** 30:15,18,20 83:19 84:24 98:17 99:2,17 162:11

**function** 63:10 65:3 68:14 72:6 74:19,24 75:20 76:4,16 77:20, 25

**functions** 27:15 31:15 41:3 43:13 68:19 69:20 70:7,9 75:17

**fund** 5:19,22 105:3,4, 7,25 106:2,8,11,18, 19 108:5,12 118:22, 23,25 119:2,3 122:24 123:2 125:22 131:24

**fund's** 107:19

**funded** 134:2 140:22 141:15

**funds** 19:13,19,23 21:12,18,24 22:11,19 33:14 66:7,22,24 67:4 68:2,8,9 69:23, 25 75:6,17 122:20

153:19 171:25 172:15,16 177:23 183:3

**future** 56:7 68:10 78:12 90:21 93:4

---

**G**

**GAF** 126:7,13 127:6 128:12,15,23 129:2, 20,21 132:6

**gain** 148:9

**game** 16:22,24

**gap** 155:17

**Gates** 123:20

**gave** 35:17 47:14 72:3

**general** 12:6,7 14:3, 14 17:16,23 26:11, 12,15 27:2 111:16 133:14

**generally** 6:5 17:13 26:7 27:12 103:24 104:2 109:21 111:5 112:7

**give** 6:25 20:19 94:8 113:21

**global** 105:3 106:8 118:21 122:24 123:2 125:22

**good** 5:8 50:7 102:19 165:8 183:25 194:12

**grab** 160:16

**granted** 160:3

**grants** 160:8

**group** 11:23 43:19 190:4 194:18 195:11

**growing** 68:10

**guess** 14:8 36:19,20 41:8 64:6

**guy** 179:10

---

**H**

**H-** 147:12

**hail** 152:9

**half** 153:18,23 162:6 192:18 193:2,4

**hand** 87:3

**handed** 40:21

**happened** 97:16 153:13 177:6

**happy** 47:20 56:9

**hard** 167:25 168:2

**harm** 147:22 148:22

**HCMFA** 5:22 6:4,7 9:3 10:7 18:9,12,16, 19,22 19:14 20:15, 21,25 23:3 24:3 25:21 26:2,18,24 27:2,6,13,22 28:9 29:3,20 30:12,15,18 34:4,5,16,22 35:8,24 37:5,11,15,20 38:3 39:8,10,23 40:4,8 41:7 42:4,14,19,23 43:4,8,14,25 44:8,14, 23 45:15,18 47:12 49:9,20 50:17,20 51:18,23 52:23 53:12,20 54:6,10,24 55:14,23 56:20 57:8 58:3 59:4,8,14 62:6 64:16,22 65:5,13,17 66:3,19 68:20 69:13, 15 70:14,15,24 71:7 75:2,23 76:2,5,9 77:25 78:13,17 80:5, 7,17 81:5,22 85:17 86:22 93:5,19 94:16 95:5 104:12 106:6,7, 19 108:3,12 109:21 110:8,17 111:25 112:24 113:3,7,14, 21,24 114:5,10 115:2,12 116:8 117:11,12 118:3,4,5, 14,15,21 119:14 120:8 121:4 122:23 123:11,20 124:19 125:14,18 126:23 127:3,5,6 129:2,3,20, 21,22 132:5,20,25 134:5,12,17,18,23 135:5,11 136:6 137:2,6,13,20,24 138:4,16,17,24

140:14 142:11,12,19 143:4,6,8,11,12,15, 17,19,22 144:10,21 145:3,7,15,24 146:5 147:12,23 149:8,10, 23 150:3,7,20 151:9 153:10 154:2,11 155:8,15,16,21,24 156:17 157:11,16 158:11 161:19 162:16 163:24 164:2, 6 165:12 166:24 167:15 168:20 169:24,25 170:2 172:9,14 173:24 174:25 176:13 177:14,25 180:10,23 181:6,18 186:15 188:15 191:18,19,21, 23 192:16,23 193:7, 15 194:16 195:9,22

**HCMFA's** 15:18 23:14 26:4 30:23 31:4,8 33:4 36:18 38:5 42:3 43:5,9 44:2,21,23 45:4,19 46:10,24 47:12,17 48:7,14 49:14 52:2 54:22 55:12,20 58:15 59:17 60:11,24 61:13,15 63:3,22 64:15,21 65:6,15 66:16,21 67:11 69:9, 21 79:5 82:10,14 85:7 92:15,20 93:22 95:8,11,14,18,21 101:13 102:5 114:18 127:9 132:4 146:20 147:5 149:17 158:25 159:7 168:18 170:25 176:18 177:3 182:4 183:18 186:22 190:6 193:8

**HCMLP** 5:25 9:2 13:10 31:13 32:17, 22,24,25 40:11 41:4 43:14 44:13 52:11 53:15,19,20 54:9 60:12 63:10 65:3,18 68:25 69:2,7 70:3 71:11,12 72:5,12 75:10,12,19,21 76:17 77:13,17,23 78:12, 16,23 81:4 90:24 93:4 96:8 102:3

110:17 111:7,11,12, 15 112:22 115:14 117:21 120:2 121:16 125:5,7,8 129:8,12 130:7,9 131:6 135:15,18,21,23 137:24 142:22 145:3 150:11 156:11,15 161:9,13 166:24 170:5,12 177:23 178:18 186:16

**HCMLP's** 52:3,4 119:23 121:17 144:15,24 181:3

**head** 19:20 20:4

**hearing** 40:20

**hearings** 40:20

**held** 21:15 27:13 105:7,13

**helped** 72:13

**helpful** 38:14 53:3 189:24 196:16

**helps** 68:8

**Hendrix** 12:4 79:16 90:13 183:5 187:10 194:3

**Hey** 82:5 86:9 94:4 102:14 177:19

**Highland** 5:12,18,21, 24,25 6:7 27:17 28:8 29:3 31:12 32:6 40:4, 13 42:20 44:7 45:7, 14 48:22 49:11 50:18 51:17,25 52:5 54:25 56:23 59:11,15 60:9 61:22 62:16 64:23 65:25 70:15 71:14 75:15 79:22 90:22 96:25 97:7,11,13 108:20 111:8 114:19 115:15 119:14 120:8, 9 121:4,7,21,22 123:15,23 124:4,8,20 125:14,22 131:3 134:18 135:12 136:7 137:8,10,14,21 138:5,15 140:14 146:2,6,8,21 147:6, 14 149:9,19 150:5,8, 21 155:19,22,24

156:5 157:17 161:5, 20 162:17 163:22 165:13,15 168:9,20 169:20 171:3,4,9 172:13,22 173:3,6, 12,25 175:3 176:15, 20,25 177:16 179:11 180:3 195:12

**Highland's** 96:21 115:8 123:21 126:9 134:25 135:7 138:6, 17,22 140:8 168:11, 21 178:7 179:2

**highly** 77:2

**hire** 68:3

**hired** 75:19 122:4

**hiring** 121:17

**hitting** 148:8

**hold** 18:8 139:17,21

**host** 62:18 186:20

**Houlihan** 110:8,11, 13,16,20 111:3,13, 18,22 112:2,4,8,11, 15,19,24 113:3,8,15, 20,25 114:6,12,15,22 115:4,12,21 116:9,24 117:5,12,20 118:5,9, 14,15 127:24 128:5, 8,16 129:3,13,22 130:16 132:22 133:2

**hour** 102:23

**house** 152:9

**huge** 70:4

---

**I**

**ICI** 142:12,20 144:23 145:2,8,11,12,15 146:10 149:11,13 150:4,7,10,20

**idea** 105:24 106:10

**identical** 8:5

**identified** 136:12,16 187:20

**identifies** 49:5

**identify** 23:13 25:21

26:4 76:9 121:6,11, 13 124:7 144:9 188:15 189:10,23 190:14

**identity** 23:2 25:25 81:18

**imagine** 137:22 148:15

**impact** 68:8

**important** 33:6 66:18 69:12,18 177:11 190:22

**imposed** 121:20 177:3

**improvement** 122:3

**in-depth** 135:20

**in-person** 99:6

**inaccurate** 73:4 86:8,11 130:11 132:21

**include** 98:16,24 115:21

**included** 50:2,7 71:12 84:15,19 85:18 95:20 101:18 169:4 196:9

**includes** 43:13 79:7, 20 82:12,16 88:22 128:8

**including** 23:17 27:24 88:20 102:7 133:18

**income** 59:21 63:22 64:9

**incorrect** 53:18 80:12 86:19 97:24

**incumbency** 9:7 19:2 20:13 23:22 25:20

**independent** 88:3,4 112:5 128:16

**independently** 80:18 166:9

**indirect** 26:5,8

**individual** 111:6 115:11 147:21

**individuals** 31:19 80:10 179:20 187:14 196:4

**inflow** 63:23

**inflows** 68:7

**inform** 84:23 125:14

**information** 25:24 33:25 34:11 54:15 62:14 75:19 78:22 80:7,24 82:2,3 83:2,8 91:3 94:8,24 95:6,12 98:6 115:13,22 117:6 145:7,16 167:7 181:12 183:10 184:2

**informed** 70:14,24 92:16 118:4 150:4,20

**informing** 71:7

**inhibited** 175:9

**inimical** 31:20 41:5

**initial** 40:18 127:23 161:8

**initially** 129:4,23 131:17

**injunction** 40:21 179:24

**inputs** 111:11 112:23

**insight** 68:5

**instance** 192:20

**instructed** 14:11

**instructing** 190:4

**instructions** 13:18

**insurance** 134:14 136:24 140:23 141:16,20,23 142:2, 4,12,19,24 143:2,13, 16,23 144:21 145:8, 16,25 146:5,17 147:7,14,20 148:5,6, 7,8,13,21 149:10 151:5,9,12,25 152:11 171:24 172:16,22 173:4,7,25

**intend** 127:5

**intended** 61:16 62:8 63:22 168:10,20

**intent** 15:10

**intention** 127:8,9

**intentionally** 75:19

**interacted** 32:16 125:4

**interacting** 145:2

**interest** 26:21 33:16

**interject** 82:6 144:11,12

**internal** 166:21

**internally** 11:22 135:20

**interpretations** 111:13

**interrupt** 69:5 139:11

**intra-year** 57:23

**investigation** 16:12, 17 17:18 114:6,11 115:3 116:7 124:10, 17 161:3 164:17,21 165:2,10,11,14,18,21 166:3,11 167:11,17 176:10 178:4 180:12, 19,23 181:5

**investment** 27:11 69:22 70:2 105:8

**investors** 105:5,12 106:3,9

**invoice** 59:14 60:17

**involved** 18:2,19 29:24 32:12,20 69:16 72:15,20 77:3 83:8 86:17 105:23 106:14, 16 110:11 111:6,9 115:18 120:2 121:15 123:13,16 126:11 171:7 177:21

**involvement** 114:16 123:14

**involving** 110:6

**irony** 39:16 119:21

**Isaac** 179:8,12,25

**issue** 49:23 59:14 81:10 100:17 109:19

112:21 114:20 123:11

**issued** 49:6

**issues** 32:12 118:22 124:9 155:10,16,18 156:2,4,9

**items** 8:24 91:21 169:3 181:2 187:13

---

**J**

**James** 167:2

**January** 19:4 20:17 23:14,20 24:4 25:21 26:2,5 28:12 34:3,24 39:25 40:17 49:10 153:3 154:18 161:21 162:13 163:23 176:14

**January-ish** 19:11

**Jason** 11:20 12:20 16:7 33:6,7,20 34:9

**Jim** 26:7,9 27:4 40:21 60:12 76:24 83:20 98:18 105:22 106:13 121:3 170:18,25 171:10,21 179:24 180:25 185:15,18 192:19 193:5

**job** 165:8

**John** 5:9 8:2 56:5 82:5 102:14 115:19 117:6 139:13,17,21, 25 174:11 195:4

**join** 69:22

**Jones** 5:10

**JPEG** 183:6 187:11, 17,20,21 188:17 189:11,15 190:13

**July** 161:24 162:14 164:2 175:4 176:2,3, 7 177:17

**June** 42:25 43:2 47:7 49:10,22 86:24 87:6 95:9,16,23 96:8 101:14 102:6 107:10, 12 154:8,14

## K

**K&I** 123:20

**key** 17:22 43:11 111:11,12 131:14 155:11

**kind** 36:7 59:15 60:16 117:14 140:8 189:23

**Klos** 12:3 79:15 80:14 90:12,19 171:8 183:2,3 185:15,20 186:3 190:3 194:3 196:11

**knew** 39:11 42:14,18 130:7,20 131:5 137:2,6 156:3,7 194:17 195:10,13

**Knowing** 84:12

**knowledge** 17:7,8, 11 26:22 32:9 34:21, 25 35:4 36:20,21,22 40:10 42:19,24 46:5 56:20 57:9,13,20 63:16 64:8 71:7 73:5, 8 77:3 85:6,19 98:18 100:17,20,23 101:4 103:19 114:9 115:3 116:6 119:22 121:17 124:11 150:18,19,22 152:6,10 156:15 166:23,25 172:23 173:7 180:20

**knowledgeable** 32:14

**Kristen** 80:15

**Kristin** 12:4 90:19 95:4 183:4,5 185:15, 21,23 187:10 190:4 194:3 196:12

## L

**La** 158:5

**lack** 184:22 191:15

**lacked** 186:2,3 192:2

**lady** 174:13

**laid** 135:10

**large** 68:25 192:19

**largely** 61:21 66:23

**lasted** 154:25

**late** 32:2 33:18 97:20 145:23 151:14

**latest** 63:11

**launching** 177:21

**Lauren** 24:22 25:6 71:12 72:11 75:5 76:8 77:15 88:15,19 90:25 94:4

**law** 67:21 147:19 148:20

**lawsuit** 28:14,18 40:9 49:17 64:18,24 86:17 144:8 161:21

**lawsuits** 40:23

**lawyer** 94:13 148:17

**lead** 19:21 94:19

**leading** 40:17 53:4

**learn** 19:7 38:3 55:14 142:8

**learned** 14:24 15:20 16:4 38:5 55:20 153:10 154:2,12 155:9,16 156:2 167:17

**learning** 17:17 55:24 155:18

**lease** 34:14

**leave** 9:11 33:7,9 164:7

**ledger** 58:4,8,9

**left** 33:22 165:13 175:3 176:20,25 177:5,16 179:21

**legal** 27:17 31:13,15, 19 32:24 41:2,7 61:23 69:3 70:5 72:6, 14 74:19,22 76:14,15 77:23,24 83:9 106:13 126:9 138:9,13 144:15 170:14 178:8, 10,12,20 179:2 180:3 181:2

**legal/compliance** 76:19

**letter** 38:24 39:24 40:8 41:15 42:4 55:15 85:23 111:22

**Leventon** 179:8

**liabilities** 54:24 55:25 56:23 57:10, 11,14,21 58:7,18 59:2,20 64:24 71:14 102:6,8 193:20

**liability** 54:9,12 55:8, 9,13 58:21,22 63:14, 15 193:9

**lift** 175:13

**limitation** 31:3,8 34:22 176:18 177:2

**limitations** 33:4

**limited** 16:12,15 33:22

**limiting** 45:14

**lines** 52:6 141:13 146:25

**lineup** 24:19

**list** 29:6 88:11

**listen** 62:5 120:5 129:18 171:16

**listening** 41:25

**litigation** 16:24 41:10 179:10

**litigators** 178:13

**loan** 15:6,8,9 59:10 60:8 61:17 62:9 63:7 104:6 134:19,24 168:23 195:20

**loans** 61:3 194:19 195:12,24

**logic** 148:4

**Lokey** 110:9,11,13, 16,20 111:3,18,22 112:2,4,8,15,19,24 113:3,8,15,20,25 114:7,12,23 115:4, 12,21 116:9,24 117:5,12,21 118:5,6, 9,14,15 127:24

**128**:5,8,9,16 129:3, 13,22 130:16 132:23 133:2

**Lokey's** 112:11 114:16

**long** 64:4 73:18 148:13

**longer** 24:18,23,25 25:7 83:9 178:19

**looked** 80:25 89:9 116:23 139:5 163:8

**loss** 133:15,21 134:2 146:12 147:2,3,15 148:6 149:4,6,23 156:18 157:12

**lot** 36:11 40:19,24 62:13 69:20 106:16 109:25 110:2 123:13, 14,16 130:15,18 154:21 175:10,15 177:21 190:20 196:4, 19

**love** 117:3

**lower** 51:20

**LP** 5:12,19,22,25 19:25 20:7 21:2 27:18 32:7 42:21 61:22 123:15 124:21 125:15 131:3 146:2 169:20 171:3,5

## M

**Mabry** 25:12 167:8

**made** 27:23 35:24 36:7 37:16,23 56:22 59:11 60:12 61:2 64:23 105:19 106:17 113:4,8,15,25 114:7 117:13 118:6,15 121:8 127:16,23 129:10 137:15 138:10 143:5,6,25 144:8 145:7 151:21 164:6 167:5 183:23 184:12 194:4,13

**magic** 56:8

**magnitude** 152:3

**maintain** 58:3

**make** 10:12 43:25 44:23 45:22 74:16 75:2 76:2,10 80:7,18 83:5 134:13 137:17 138:2 149:2 152:7 163:18 185:22 186:4 187:15 194:14

**maker** 186:6,9,11,12

**makes** 37:2

**making** 45:19 65:14 81:19,23 122:17 125:19 126:5 155:18

**manage** 67:3

**managed** 19:13 21:24 22:11,19 66:24 69:2 142:24

**management** 5:12, 19,22,25 27:17 32:7 42:21 52:6 61:22 69:25 105:22 106:13 123:15 124:21 125:15 131:3 146:2,6 169:20 171:3,5 178:5 180:22

**managers** 27:12

**manages** 21:13

**mandated** 108:10

**March** 29:20 30:3,7, 9,16,19 31:5,9 33:5 34:4,24 35:6 61:11, 14 126:22 129:4,14, 23 153:2,13 166:19 167:4 175:3,11 177:5,6 188:17 189:13 190:15

**Mark** 26:8,10 106:14

**marked** 7:12 46:19 50:25 119:9 124:13 125:20 158:3

**market** 130:22 153:12

**marketing** 19:22

**match** 82:25

**material** 75:7 90:20 93:3

**materials** 9:20 46:13 92:12 146:9

**matter** 62:25 85:17 121:16 133:15 173:21

**matters** 16:22 124:3

**Mckenzie** 174:14

**meaning** 58:23 96:11

**meaningful** 193:3

**means** 83:22 128:11 159:12

**meant** 84:9,10 100:9, 14 159:20

**measures** 121:20

**meeting** 87:2 98:17, 22,25 99:4,5,6,7,16

**meetings** 67:16 69:22 99:10,13,20

**members** 171:7

**memo** 9:10 72:9,13, 24 73:4,9,14,16,19 74:9 75:3,14 76:14 77:5,19 78:19 86:10, 21 87:9 88:10 89:2 96:11 100:2 123:3 124:12 125:6 127:13 128:22 130:3,15,16, 24 156:24 157:20

**memorandum** 125:19 126:25 127:3, 7,10

**memory** 141:7

**memos** 32:19 62:11 69:4 74:21 76:6,19 77:4 96:12 119:4

**mentioned** 131:19 132:12

**mergers** 68:11

**met** 11:18,19 12:4

**metadata** 187:10 189:16

**methodology** 131:23 132:8,9

**Michael** 7:19

**midyear** 153:19

**migrated** 179:2,5,15

**million** 14:7 48:21 50:18,21 51:18,21 63:24 79:7 82:11,12, 15,16 83:14 107:7 108:13 109:4,5,7,13, 14 133:17,23 134:6, 17,22,24 135:5 138:6,16,23 140:9,22 143:19 146:13,21 147:2,6,7,9,13,15,24 148:9,12 149:5,13, 16,18,23,25 150:4 156:19 157:13,15 168:10,19 192:18,22 193:2,4

**mine** 68:13

**minute** 82:7

**minutes** 109:19 191:4

**missing** 25:17

**mistake** 117:13 118:6,15 182:7 183:20,23 184:12 185:8,12,17 186:24 187:24 188:10,14,22 189:12 190:8,16 193:10 194:14,15

**mistakenly** 134:18 182:18

**mistakes** 113:4,8,15 114:2,7 121:8 137:15 194:14

**Mitts** 25:5

**mixed** 168:3

**model** 112:18,20,25

**models** 111:14

**moment** 23:12 117:9

**money** 60:9 108:22 134:12 137:23,24 140:13 172:13 185:18,21

**moneys** 109:4

**months** 155:2 161:20 162:2,3,7,11 174:13 179:18

**morning** 5:8 56:8

**Morris** 5:7,9 7:8,14, 18,22 8:9 10:11,15 17:2 18:5 29:9,14 38:17,22 42:10,13,22 44:17,19 45:10,12 46:18,22 47:3,5 48:10,13 50:12,16,24 51:4,9,12 52:13,15 53:22,24 56:9,13,17, 19 60:19,21 62:2,4, 20,22 70:22 71:20,23 72:16,18 73:18,20 76:22,23 78:3,5,24 79:4 81:14,16 82:9 83:11,12 86:2,5 87:12,15,20,22 88:16,18 90:8,10 91:5,7,22,24 93:12, 14 96:16,18 102:17, 21 103:3 116:3,11, 16,18 117:8,10,24 118:2,12,13 119:8,11 120:3,4 125:9,12 129:15,17 131:7,9 133:8,10 135:24 136:2 139:14,18,23 140:5,6 141:9,11 142:18 144:20 150:14,16,23 151:3 152:12,18,22,23 157:25 158:7,9,21,24 159:18 163:14,17 164:12 169:11,14 171:13,15 172:8 173:22 174:19,23,24 175:21,24 177:12,13 183:13,16 184:18,20 190:24 191:7,9 192:10,14 195:6,8 196:14,19

**motion** 9:11 159:24 160:3,8 164:6 183:18

**move** 44:17 45:11 50:12 53:23 60:19 62:2,20 70:12 72:17 76:22 78:24 81:14 83:11 89:22 91:22 108:4 117:25 118:12 120:3 125:9 129:15 131:7 135:24 150:14 171:14 177:12 183:13 184:18 190:24 192:11

**moved** 180:15

**movement** 172:21

**multiple** 13:21 31:23 99:10

**mutual** 142:13,20 144:23 145:2,8,15 149:11,13 150:4,7,20 185:8,12,16 186:24 187:24 188:10,14,21 189:12 190:8,16

---

## N

**named** 65:17

**names** 23:17

**naturally** 32:22

**nature** 179:22 182:21 192:4,5 193:11,16

**NAV** 9:10 14:20,21 15:11 16:8,9 17:24 32:10,13,17,21 59:12 62:11 108:21 115:15 119:20 120:9,15,25 121:15,21 122:25 124:16,21,24 125:16 126:11 131:13,24,25 132:6,14,15,16,17,19 133:16 134:7 135:3, 12 136:11,13,16 137:3,7,18 140:15,17 142:13,15,21 147:9, 25 149:4,6 150:5,21 153:5,10 154:3,12,16 155:4 156:14,22 157:3,10,12 168:9,22 169:3,17 170:3,9,20, 22 171:5,20 184:6 185:4,19

**needed** 13:16 105:16 106:5 177:19,22 192:20

**negligence** 148:23, 25

**negligent** 135:2,7 136:7 138:7,17 146:23 168:11,21

**net** 122:20 147:2 149:4,23

**Nexpoint** 18:7 19:13, 24 20:7,23,25 33:9, 17 74:10 78:13

**night** 139:16 183:18

**non-orderly** 129:5, 14,24 130:6,10,23 131:11

**norris** 5:4,8 6:1 7:1, 12,21 8:1 9:1 10:1,14 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,9,17,21 25:1,3,11 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,15 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1,4 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1, 12,19 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1,25 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1

164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1,10 192:1 193:1 194:1 195:1 196:1

**note** 13:12 17:7,8 73:15 75:8 78:21 81:4 102:7 134:21 161:15 169:7,8,9 176:11 182:15,16,19, 23 183:4 186:4 190:5 192:4,18,22

**notes** 9:6 14:12,13, 24 15:15,21 16:5 17:9,11,24 19:8 27:23 28:9,13,17,20, 23,24 35:10 36:2,9 37:12,17,25 38:4 39:11 40:6,14 42:14, 18,24 48:18,20,22 49:6,8,11,15,17,23 50:5,9 58:7 64:17 70:16,25 71:8,9 79:8, 10,11,20 81:10 82:17 83:3,19 86:15,17 101:19,23,24 161:5, 19,22 162:17,22 163:6,21,24 164:19 165:15 166:22,25 167:2 176:14 181:8, 13,24 182:6,20 183:20,24 184:13 185:2,3,6,25 187:7 192:15 193:11,15,17, 18

**notice** 6:6 7:11,24 8:14,18 9:9,24 10:8, 21 11:9 22:25 32:18 37:4 141:20

**noticed** 193:8

**notified** 146:11

**notwithstanding** 55:13 149:8,22

**nuance** 95:3

**number** 7:15 9:14,17 27:19,21 29:6,8

52:16,21 57:6 63:2 67:20 78:10 79:7,19 82:16 83:14 85:9 86:8,19 89:8,9 90:20 92:19 93:22 95:8,14 96:7 98:9 102:3 103:4 104:18 109:8 119:4 123:7 141:19 142:10 146:14 148:9 152:15 163:2 184:10

**numbers** 82:25 96:4

**O**

**object** 116:14 172:5 173:18

**Objection** 42:16 70:18

**obligated** 70:15,20

**obligation** 192:23

**obtain** 108:2 145:7

**obtained** 95:21

**occasions** 31:24

**occur** 193:16

**occurred** 120:16

**October** 70:14,24 72:3 73:24 78:15 84:23 92:18 93:18 95:6,13 97:14,16,23 98:10 100:2

**October/november** 97:20

**off-market** 153:12

**offhand** 156:25

**office** 70:6

**officer** 18:13,15,22, 23 20:3,10 21:5,24 22:18 24:23,25 32:15 33:13 39:16 45:18 65:5,13 74:25 76:9 80:6,17,23 81:21 122:16 125:13,18,24 126:4 191:19

**officers** 23:2,14 25:21 26:2 39:21 69:15

**offline** 144:13

**offsets** 133:19

**Okada** 26:8,10 106:15

**on-market** 153:13

**ongoing** 118:8

**open** 9:18 106:11

**open-end** 105:4,7,25 106:18

**operating** 193:3

**operational** 105:11, 15

**operative** 159:7,12, 15,16

**opinion** 47:8,14,23 49:22 145:25

**orally** 124:20

**order** 6:25 40:22 56:21 138:16

**orderly** 130:23 131:11,22 132:7

**original** 8:22 9:2,3 29:4,7,11,19 34:5 38:20 93:9 113:13 162:19,22,23,24,25 163:4,7 166:13,15,19 168:5

**originally** 18:17

**outflows** 68:7

**outsource** 43:18 115:10 129:9

**outsourced** 27:16 31:14 32:23,24 41:4 43:12 61:22 63:10 65:3 119:23 129:12 135:18 137:11 170:15

**outstanding** 70:16 78:16 90:20 93:3

**oversee** 43:19 44:15 45:3 68:5

**overseeing** 135:16 171:8

**overview** 12:8 17:23

**owed** 71:14

**owing** 65:24 79:21 83:2

**owned** 26:14

**owners** 26:5,8

**owns** 26:11,19

**P**

**p.m.** 92:18 93:18 103:2 151:2 191:8 196:21

**Pachulski** 5:10

**pages** 73:21 79:25 89:20 163:8

**paid** 103:19 104:3,4,8 105:5,15,16,17 106:6,8 107:5,9,10, 11,15,18,20 109:4,17 111:19 136:24 141:17 146:21 148:3, 4 149:13

**paper** 183:4 185:22 189:19 194:19 195:11

**papered** 182:22 195:20,24

**papers** 185:23

**paragraph** 127:20 128:2,4 132:21 133:7,15,25 152:25 160:14 169:12,16 173:3 175:19,22 181:6 184:21 185:8 188:6 191:12

**Paragraphs** 168:8, 16,17

**Pardon** 189:5

**parenthetical** 133:20

**Parker** 24:8,16,23

**Parker's** 24:12

**part** 31:12 32:25 34:18 61:5 67:24 69:2,3 70:4 72:3 77:21,23 85:13,15

87:2,10 92:11 122:9 127:25 129:8 142:24 150:11 165:18,21 166:11 176:21 178:11 195:25

**participate** 67:7,13, 15 99:15

**participated** 32:19 68:21 71:6

**particulars** 161:15

**partner** 26:11,12,16 106:15

**partners** 27:2

**parts** 67:14,15 83:14 168:13

**party** 68:3 115:5 125:2,15 146:3,7 148:22 149:9 155:17, 20,22,25 156:6,8

**passed** 71:11

**path** 185:16

**patience** 93:15 195:2

**pay** 70:15 104:12,14 105:19 108:23 109:4 134:5 137:24 138:5, 16,23 140:9 157:17

**payable** 53:19 54:9 58:3,8,9 73:15 78:12 90:21 93:4 101:19

**paying** 104:22 148:12

**payment** 51:23 63:5 108:12 134:13 140:22 141:15 151:5, 10 168:10 170:20 184:5 185:3,5

**payments** 52:24 53:13 54:6,11 55:24 56:22 57:5,10,11,20 58:14 59:9,19 61:2, 16 62:8 64:23 127:16,17 134:2,10, 24 135:6 137:18

**PDF** 89:18

**pending** 49:17

**people** 12:12,19 88:5,20 122:5 123:13

179:2,5 194:12

**percent** 26:11,14
80:19 105:5

**perform** 27:9

**performance** 67:23
68:2,4 69:23,25
138:7

**performed** 27:14
62:15 68:2 113:9

**performing** 170:14

**period** 18:2 24:7
27:18 31:14 40:16
43:23 46:11,25 47:18
86:24 95:15,22
105:18 107:8 121:3
153:2,6,8,12 154:14
156:3 161:9 162:15

**periods** 22:4,5 54:19

**permission** 159:24
180:10

**permit** 147:19

**permits** 148:20

**permitted** 148:19
161:10 174:3

**person** 12:4 125:3
137:20,21

**personal** 32:9 34:25
36:21 103:18 152:10

**personally** 99:15

**perspective** 14:4

**phrase** 35:15 37:3,20
180:21

**picked** 178:16

**pinpoint** 135:22

**place** 58:24 179:24

**plaintiff** 170:8,21
171:19,24 184:5

**plaintiff's** 7:23 9:24

**play** 70:9

**pleading** 30:13
35:14 159:7,12,15,17
181:11 182:17
193:25

**pleadings** 11:15
27:24 35:19 61:4
135:10 172:20 175:6
180:14 186:19,22,25
193:24,25 194:21
196:2,3

**plenty** 187:3

**plugging** 96:5

**point** 22:6 61:25
68:24 80:2 115:7
154:17 158:11 175:5
187:25 188:23

**pointed** 22:24

**points** 172:6

**policy** 142:11,12,13

**portfolio** 27:12

**portion** 29:16 50:13
78:25 79:18 107:11
125:10 141:2 190:25

**portions** 6:24
131:14,16

**posed** 71:10 101:10

**position** 12:10 18:8,
11 20:10 21:6 38:5
53:3,18 54:13 55:12
59:18 60:25 61:15,24
62:8 64:21 85:7,12
86:15,20 97:7,11
101:21 113:7,14
139:9 140:2,3,7,16
142:4,6 143:10
147:5,16,18 148:19
149:17 170:25
179:19 181:6,10,13
182:4 183:19 186:9,
11,14,16 190:8
193:18 194:9,22

**possession** 162:17
163:24 176:14

**Post** 11:20 12:20
16:4,7 32:4,5 33:5,7,
11,15 34:7,9,16,23
97:12

**practice** 121:23
182:19

**practices** 121:18

**preceded** 87:8

**precise** 109:11

**preference** 53:7

**preliminary** 179:24

**premiums** 148:5,6,
13,15

**preparation** 12:14
13:15 15:3 43:14,20
48:16 82:24 142:9
144:8 163:9 172:25

**prepare** 11:11 36:14
43:19 72:13 103:11,
14 104:17 112:19
161:11

**prepared** 10:6 28:4
52:20 57:23 74:21
84:5 114:14,17
118:21 161:2,19

**preparing** 131:6
154:13 183:23
184:13

**present** 13:22 22:7
23:15

**presentations** 119:5

**presented** 89:25

**president** 18:13
19:4,6,19 20:2,7
21:5,12,18 22:11
24:3,8,13,16,18,19,
21 25:4,11 43:4
60:12 73:25 74:5,7
97:4 116:5 170:19
171:2,10,21 173:12,
14,15,16

**pretty** 123:11

**previously** 40:5
164:6

**Pricewaterhouseco
opers** 47:7,11 49:22

**principal** 66:15
70:16 79:7 82:17,25

**prior** 22:15 31:4,9
33:5,22 34:12 35:8,
24 36:8 37:11,16,24
39:24 40:8 61:14,20
62:7 63:16 76:6
99:25 101:23 116:14
120:16 124:13
126:22 152:16

157:13 167:6 179:11

**priority** 40:25

**problem** 168:14

**procedures** 46:7

**proceed** 151:10

**proceeding** 28:8

**proceedings** 5:1
99:11

**proceeds** 134:14
136:24 140:23
141:16 146:17
148:11,13

**process** 17:25 32:21
62:18 63:13 67:13
69:2 71:6 76:20 87:2
99:8 111:17 122:2
123:9,10 154:25
157:19,21 160:10,11
171:9 183:8 185:23
194:2,4

**processed** 152:2

**processing** 133:18

**produced** 117:2

**product** 19:20 20:4
96:3 112:14

**professional** 43:17
180:6

**professionals** 27:8
41:7 43:18 69:22
80:13 194:12,14

**profited** 147:24

**profits** 148:3

**prohibited** 173:19

**prohibition** 174:10
176:18

**promise** 55:21
138:11

**promissory** 9:5
14:13 28:9,23 48:20
181:7

**promptly** 166:21

**proper** 154:23

**proposal** 106:5

**provide** 53:4 68:5
69:24 70:3 75:20
88:5 91:12 178:19

**provided** 11:24
25:15 46:14 66:9
68:25 76:16,18 80:24
86:22 92:11 94:10
95:12 102:2 110:23
111:3,12,22 114:23
115:14 177:24

**provider** 65:18
115:10 129:9 148:22

**providing** 68:17 70:7
77:21,24 146:22
178:19

**proxy** 106:3

**publicly** 183:18

**pull** 89:13 102:11
119:5 167:22

**pulling** 96:4

**purports** 164:16

**purpose** 14:6 25:23
101:9 122:23

**purposes** 57:24
62:16 64:2,9 129:6,
25 146:22

**pursuant** 66:10
111:22 138:4

**put** 7:9,15 29:9 38:17
40:24 41:9 46:18
50:24 71:20 87:12
119:8 152:13,19
157:25

**putting** 6:22

---

**Q**

**quality** 67:23 68:17

**quarrel** 162:5

**question** 6:14,16,18
22:17,22 35:20 41:24
42:2 45:17 50:15
53:9,10 54:3,4 60:22
61:8 62:5 65:9 70:21
71:10 72:21 78:4,6,9
79:3 82:20 86:7,10
89:8,9 90:19 91:25

92:19,24 93:10,18,22
94:10 95:8,14 100:6,
7 113:13 114:22
115:9,15 116:15,17
119:24 120:6 126:2
129:19 130:14
135:14 137:2,6
138:14 154:5 155:6
171:17 173:9 176:4
180:16 183:14
184:19 187:19 189:8
194:5,23 195:5

**questioned** 99:23
115:16

**questions** 9:8 28:4
36:14,17 37:7,21
54:2 77:7 88:6,11,12,
23 89:3,25 101:10
139:15 142:10 155:4
191:10 196:15,18

**quick** 46:17 152:6

**quote** 78:15 83:18,20
98:15 129:3,22
131:22 169:16
171:23 181:7,8
191:15,16

---

**R**

**raised** 34:17

**reach** 40:12 135:11
145:15

**reached** 138:3

**read** 73:12,16 79:15,
18,23 92:8 93:7
100:5,6 122:14
131:20 132:2

**reading** 43:9 84:10
126:19 184:8

**real** 178:15

**reason** 13:2 15:10
40:12,15 41:13,17
47:15 66:21 80:12
98:4 154:17 157:16

**reasons** 148:18

**rebates** 133:19

**recall** 5:9 20:23 38:2,
10 40:16 41:20 52:16

124:15 126:15 144:5
151:12,14 163:6

**receipts** 147:8

**receive** 41:15 104:11
148:21 149:18

**received** 38:8 39:14
42:5,8 50:17,20
52:10 80:10 108:22
143:19 146:18 147:5
149:17,24 150:4
151:5 166:13 187:9
194:7

**receiving** 41:21
51:24

**recent** 193:25

**recess** 56:18 103:2
151:2 191:8

**recipient** 100:13,24

**recipients** 92:17
93:21

**recognized** 171:11

**recollect** 17:22

**recollection** 14:12
22:10 100:8,11,12
102:5 128:14,18
141:13 153:9 182:11
195:19

**record** 5:2 7:13
10:12 54:6 59:2
60:10 62:19 63:8
82:7,8 142:17 185:16
190:5 193:20 196:21

**recorded** 53:17 54:8,
23 55:3,4,8,10,25
58:14,17,18,20,22
63:14 64:9 79:11
134:19,21

**recording** 53:18
55:13

**records** 44:12 52:24
53:14,16 54:7,12,23
55:7,14,20,24 56:21
58:15,19,21,22
59:18,25 60:11,25
61:5,14,21 62:10
63:4,18 124:6 193:9

**recover** 143:22
147:20

**refer** 5:21,24 13:14
17:19 20:25 28:22
30:9 31:16 54:16
60:3 61:18 63:11
67:3 83:24 84:2 85:5
119:6 164:22 172:19
181:11,20 184:16
186:18 188:19 192:8
193:24 194:20
195:15 196:2

**reference** 48:20
51:13 128:7,8 131:2
153:2 184:22 191:14

**referenced** 82:15
190:13

**referred** 124:2

**referring** 37:5,20
98:23 187:4

**refers** 65:21 98:8
127:22 128:4 169:19

**reflected** 16:13,18

**reflects** 59:18 60:25
138:22 140:8

**refrain** 6:15

**refresh** 128:14,18
141:13 153:9

**regard** 36:19 41:21

**regularly** 91:21
193:13

**regulator** 108:7

**reimbursement**
142:15

**reiterate** 45:7 115:20

**relate** 168:8,18

**related** 17:10,11
34:11 35:25 36:8
61:25 62:14 73:14
81:9 99:5 105:2
169:7 174:3 185:4

**relates** 35:9 37:12,
17,25 103:4 141:20
148:3

**relating** 36:17
145:16

**relation** 67:17

**relevant** 167:18

**reliable** 44:3

**relied** 43:21 44:12
80:20

**rely** 44:5,6 112:24
127:6,13

**relying** 25:19 80:13

**remains** 78:16

**remediation** 122:2

**remember** 15:13
18:18 21:19 36:10
38:16 60:7 61:10
73:12 74:15 80:3
99:20 100:15 101:21
102:13 107:15
109:14 112:17
121:12 126:19
136:21 151:6 157:6
180:2 182:10 183:11
196:9

**remembered** 14:9

**remind** 38:13

**renew** 67:10,19

**reorganized** 5:11

**rep'ed** 166:4

**repeat** 28:16 40:7
176:21

**report** 72:2 76:2,10
78:14 84:15,19 89:10
95:7 96:10,11 118:20
130:11 131:4

**reported** 57:18 63:25
64:12 107:13,14

**reporter** 7:13 142:17

**reporting** 119:21
156:9

**reports** 94:22

**represent** 8:10 89:3
116:23

**representation**
29:21 51:8 80:3 89:6
163:20

**representative**
15:19 36:22 40:4
44:21 45:23 82:11

119:14

**represented** 134:10
172:12 175:10

**representing** 46:6
95:3 186:7

**request** 33:10 81:24

**requested** 78:9

**requests** 11:25 88:9

**required** 108:7 192:5
193:5,7

**requirement** 76:5
125:24

**requires** 67:18

**research** 84:13

**reserve** 196:17

**resolution** 122:20,
25 123:9 157:20

**respect** 34:22 95:7
173:10

**respond** 6:18 9:8
11:17 40:10 90:19

**responded** 39:23
40:8 91:8

**responding** 156:9,
10

**responds** 92:8 93:17

**response** 9:3,4 15:7
54:17,18 63:11,12
77:6 80:8 81:13,23
82:16 83:18 85:8
86:7 91:6 92:6,9
93:13,25 94:20
95:13,20 96:19 98:9,
16,24 161:8,12 168:6

**responsibilities**
46:7

**responsibility** 14:21
43:9,25 62:24 65:6,
14,19 75:2,25 76:10
81:19,22 111:11
115:8 122:17 126:5
129:11 169:17 170:3,
7,9,22 171:4,19

**responsible** 45:18
62:17 75:16 76:6
80:11 114:19 115:5,

9,15 125:2,15,19
130:17,21 135:23
146:3,6 149:9
155:17,19,22,25
156:5,8,16 168:9

**responsive** 11:17,24
50:14 54:3 79:2 94:3,
9 125:11 184:19

**rest** 28:23 72:13

**restate** 22:17 155:23
187:19

**restatement** 153:6

**restraining** 40:22

**restricted** 34:13

**restriction** 30:22
31:3,8,11 34:20,21
177:2

**restrictions** 33:3,11,
15,21,24 34:11

**restroom** 56:7

**result** 121:7,21
147:24

**resulted** 131:24
132:13 151:9

**resulting** 135:6

**retail** 32:15 33:10
65:22 67:5,8 70:14,
25 71:8,10 72:3,24
75:4 76:3 77:6 78:9,
15 80:9 84:6,16,19,
23 86:7,12,13,22,23
87:9 88:3,6,23 89:10
90:2 92:19 93:21,25
94:20 95:7,13,21
96:9 98:10 101:10
112:12

**retain** 113:12

**retained** 47:12
110:8,13,16 112:2,9
123:18 124:8

**retaining** 113:18

**retention** 112:11
128:15

**revealed** 54:13

**revenue** 66:16

**reverse** 56:22

**review** 66:13 67:9
73:12,13 74:13 88:8
101:11 106:3 166:21

**reviewed** 11:15,16,
21 12:2 43:5 73:14
76:24 117:17

**reviewing** 65:6 76:6
77:4 193:13

**rights** 113:12,19

**rise** 192:19

**role** 18:14 19:12,19,
21 20:3 34:12 44:15
45:2,13,14,24 46:4
65:18 69:21 76:5
80:23 113:12 177:25

**roles** 19:16 46:6

**Rome** 87:24

**roof** 152:10

**Ross** 24:3,7,18

**roughly** 146:16

**Rukavina** 7:25 11:19
12:5 13:22 16:19
42:7,16 56:5 70:18
82:5 102:14,20,24
103:16 115:19
116:13,22 139:13,17,
21,25 144:11 159:11,
14 163:12,21 164:8
172:5 173:18 174:11,
21 191:6 195:3
196:17,20

**rule** 5:18 7:10 9:25
108:9 147:19 148:20

**rules** 6:13 174:18

**run** 69:2

## S

**safe** 39:13

**sales** 19:21 68:6,13

**Sauter** 9:5 12:17,19
16:12,17,21 17:5,15
103:17,18 161:3
164:14,16,17 165:4,
14 166:10 167:16

175:9 176:9 177:25
178:15 180:18,22
181:18,23

**Sauter's** 13:15 31:16
54:17 167:10 175:6
180:11 181:21,25
188:24

**scale** 68:8

**scheduled** 8:14,15

**schedules** 31:17
32:18 46:14 187:2,4,
7

**Scott** 179:13,14,25

**screen** 6:23 7:10
8:12,13 9:15 10:17,
25 29:10 30:7 38:18
46:19 47:16 50:25
71:21 87:13 120:13
122:12 124:13
125:20 152:14,19
158:2 160:7 167:24
188:12

**scroll** 7:20 10:12,24
11:3 29:18 47:4,20
48:5 51:10 78:3
88:16 90:8,9 91:5
93:12 96:16 133:9
158:23 175:22

**scrolling** 89:20

**search** 144:17

**searched** 144:13
151:18

**searching** 145:11

**SEC** 32:20 62:12
106:3 121:3 124:3,
10,16,19 125:4,6,14
154:22,25 156:10,24

**secretary** 18:17,18,
20,25 19:5 20:22
21:20,21 22:15
24:10,18,22 25:6,7,
13 72:12 75:5 77:18
94:15 97:2

**section** 48:18 67:18

**Securities** 74:10

**seek** 106:10,17
108:2,4 142:15

**Seery** 12:3 31:18
33:8

**selection** 70:2

**send** 8:2 127:3 190:5

**sending** 39:19 72:9,
24 74:8 75:13 100:2
127:10

**senior** 105:22 106:13

**sense** 37:2 177:19

**sentence** 83:17
84:9,10 85:8,17 98:8,
9,13 99:24 100:10,
14,25 127:22 128:2
131:15,21 134:3
170:5 173:2,5 181:18

**separate** 81:9

**September** 99:7
154:2 174:20,22

**serve** 21:11 66:22

**served** 6:7 22:10
44:14 65:13 67:4
74:25 191:22

**server** 151:19

**serves** 96:25

**service** 65:18 77:24

**services** 9:6 27:10,
17 32:23 44:10
62:14,15 66:6,9
67:23 68:15,17,24,25
69:3 70:3,9 74:20
75:22 76:16 77:21
110:22 111:2,9,10,23
113:5,9 114:13,23
118:17 135:2,7
138:8,17 142:25
150:11 170:13,15
177:10,22,24 178:8,
11,20

**set** 165:5

**settlement** 60:17
70:6 138:25 140:3

**seven-and-a-half**
14:7

**share** 15:19 25:25

**shared** 9:6 44:10
62:15 68:24 69:3

70:9 74:20 75:22
77:21 111:9 142:24
150:11 170:15
178:11

**shareholder** 107:24

**shareholders** 106:4
107:19,20,23

**sharing** 177:23

**sheet** 48:7 53:20
55:5 58:23,24 59:3
65:7 87:6 92:11,20
93:23 94:5 96:5
102:9 108:15,17
193:13,21

**sheets** 65:15 87:5

**short** 150:23 191:2

**shorten** 37:21

**show** 7:20 38:13
162:22 163:11

**showed** 47:25 55:4
108:19

**showing** 30:7 187:10

**shown** 63:23 147:2

**shows** 51:20 63:5

**shrinking** 68:9

**sic** 9:10 188:17

**side** 193:15

**sides** 137:25 138:2
177:7 186:7,8,14

**sign** 169:9 182:12

**signature** 181:15
183:6,12 187:11
193:19

**signed** 42:15 47:6,8
49:9 169:8 181:7,15,
24 182:3,6 183:12,20

**significant** 148:5

**signing** 182:10
183:11,24 184:13
186:12

**signs** 186:11

**similar** 193:11,16

**simple** 6:14 54:4

60:23 93:19 183:15
193:10

**simplify** 54:22

**simply** 92:2

**single** 73:25 79:23
119:13 125:3

**singular** 170:18

**sir** 5:15 38:20 71:24
120:5 124:7 158:10
186:17

**sit** 35:22 41:14 46:9
110:15 114:9 133:3

**size** 192:4,15 193:12,
16

**sizeable** 192:25

**Skyview** 83:10
161:14 177:7,22
179:2 180:3

**slack** 178:16

**sloppy** 194:6

**sole** 26:25 27:4 101:9
191:25

**Sounds** 138:9

**source** 66:15 69:24
91:2 98:5 119:19
145:9,12 147:19
148:20 167:6

**speak** 12:23 13:3,5,
9,16,19 31:4,9 33:4
83:6 167:5,7

**speaks** 195:15

**specialist** 43:22

**specialize** 152:5

**specific** 38:16 44:25
72:20 86:11,18
103:24 120:17
125:24 155:12
156:12 157:4 170:24
180:2,20

**specifically** 44:21
49:5 65:12 84:21
86:9 99:21 125:17
180:24 181:23 192:3

**specifics** 156:20

**speculate** 84:20

**speculation** 34:18
41:9 122:8 150:18

**spent** 109:21

**spoke** 11:19,20,21
12:13,18 165:19,22
166:2,10

**spoken** 13:13 166:16

**spring** 103:20

**Stacy** 87:23 89:25

**stance** 157:22

**standard** 90:25

**standards** 180:7

**Stang** 5:10

**star** 147:9

**start** 87:20 104:2

**state** 155:6

**stated** 183:18

**statement** 36:6
37:22 43:13 49:4
51:6,8,20 52:2 63:23
64:9 84:15,18 85:8
100:25 106:4 161:15
165:24 166:5,6
172:4,9,21

**statements** 43:6,10
44:2,24 45:5,8,20
46:11,24 47:13,18
48:15,19 49:21 50:2
57:22 58:13,16 64:5,
14,17 65:10 86:23
95:15,22 101:14,18

**states** 133:25

**step** 14:18 152:5

**Stephanie** 25:13
179:6

**stepped** 181:3

**stepping** 64:6

**steps** 58:13 74:16
121:13

**stop** 51:11 102:21

**Strand** 26:13 27:3

**strategist** 19:21 20:5

**strategy** 16:24

**strict** 31:18

**strictly** 45:14

**strike** 44:18 45:11
50:12 53:23 60:20
62:3,21 72:17 76:22
78:25 81:15 83:11
91:23 117:25 118:12
120:3 125:9 129:16
131:8 135:25 150:15
171:14 177:12
180:15 183:14
184:18 190:24
192:11

**string** 88:6 101:8

**structure** 27:13
104:5

**stuff** 190:21

**subject** 16:4 28:14,
18 49:17,21 66:12
112:20 123:5 124:10,
16 135:9 140:10
150:2 180:13 181:8

**submitted** 106:2
151:20

**subsequent** 17:20
48:11,17 49:5,16
55:3,4,6,8

**substantial** 192:23,
24,25

**sued** 13:10

**sufficient** 68:18

**suggest** 73:4

**suing** 48:23 49:11
161:5,20 162:18
163:22 165:16
176:15

**summarize** 20:6
133:11

**summary** 133:12

**summer** 32:2

**supplemental**
115:23

**supplied** 87:4

**supplying** 75:10

**support** 9:12 44:12
76:19,20 83:4,20
84:25 185:11 186:20
188:20,21 189:11
196:4

**supported** 137:23

**supporting** 187:6

**supports** 187:23
190:7,15

**supposed** 59:10
61:2 134:25 135:6

**supposedly** 186:7

**Surgent** 72:14 89:24
90:4

**surprised** 60:16
63:18 139:7

**surrounding** 16:8
32:13 86:14 161:4
164:19 165:15
176:11

**suspect** 144:14

**sworn** 5:3,5

---

**T**

**taking** 85:11 94:19

**talk** 13:11 14:15
34:14,15,16 67:25
68:4,5,7 69:20,23
82:23 109:18 144:12
161:10,14,16 174:3,
16 179:25

**talked** 14:20,21
30:21 34:9 100:22
108:23 166:12

**talking** 16:7 17:20
18:3 43:16 68:10,11
115:7 127:16 151:4

**task** 119:15,17,18

**tasked** 43:21 45:8
53:16 164:21

**team** 31:13,19 43:17
44:4 50:8 53:17,21
65:16,19 72:14 74:19
75:9 77:23 78:22

**supplying** 75:10

81:25 126:10 142:23
151:19 170:14 171:7
178:12,13 179:2
180:3 189:19 193:14,
17

**technicality** 77:14

**telephonic** 99:6

**telling** 93:20 126:15
133:3

**tells** 185:19,21

**tendered** 29:13
38:21 46:21 51:3
71:22 87:14 119:10
158:8

**term** 30:20

**terms** 104:4,8 105:24

**Terrestar** 109:18,23
110:3,6,9,23 111:4
112:15,21 113:10,17
114:3,20 117:15
118:22 119:16
120:25 121:9 124:9
137:16 138:18
146:23 147:10

**testified** 5:5 41:20
60:4,6 83:24 85:3
104:21 126:18
140:19 151:17 182:9
192:7,8 193:12
195:16

**testify** 10:6 27:22
52:17,20

**testimony** 22:15
42:23 51:17 60:3
64:15 75:23 79:15,19
80:17 81:7 84:3 85:3
185:14 190:22
192:12 195:15,16,21

**Texas** 147:18 148:20

**Thedford** 24:22 25:6
31:7,23 71:12 72:11
75:5 76:8 77:15 83:6
89:23 91:11 94:12
96:20,24

**Thedford's** 94:13

**theory** 147:25 148:2

**Thereof** 9:12

**thing** 69:19 136:3
160:18

**things** 11:22 12:7,8
13:10 31:25 32:3
33:19 67:22 68:15
75:8 91:20 161:10

**thinking** 35:11 71:5

**third-party** 112:5
128:16

**Thomas** 72:14 88:21

**thought** 50:8 63:15
182:18 186:15

**thousands** 163:8

**threw** 148:9

**time** 6:23,24 7:4 8:4,
15 15:15 18:2,21
20:14,24 21:20 22:4,
5 24:7,24 27:18
31:14 32:16 33:12,19
39:20,24 40:7,16
41:3 43:15,23 46:16
54:19 55:7 56:6
58:17 64:4 73:6,10,
11 94:17 95:10 96:24
97:9,25 99:25 102:19
104:23 106:15 107:8
109:17,22 110:2
113:21 114:4 119:13
120:24 121:19
124:14 126:13,15,24
129:3 135:4 136:5
143:16 145:6,17,24
148:13 150:24
153:12 155:12,14,15,
25 157:4,23,24
158:11 159:9 161:9,
18 162:15,16 163:25
164:2 166:15,18,20
168:5,12 172:7,17
173:24 175:3 176:17,
20,24 177:11,16
178:7 180:10 183:17
194:22

**time-** 20:21

**timeline** 20:21

**times** 13:19,21 43:16

**timing** 154:7

**title** 18:8,11 19:12,24
20:12 24:12

**titled** 122:20

**titles** 19:16 23:17

**today** 5:13,17 6:4,23
7:24 8:14,15 9:25
10:7 18:6 36:24
37:10 42:3 44:21
57:19 62:8 64:15,21
79:5 114:10 117:18
133:4 159:6,21
172:10

**today's** 8:4 11:12
13:20 14:2 15:3
82:20 173:2

**told** 15:8 31:24 40:4
41:4 60:8 86:6 97:23
100:16,19 117:12
118:14 119:19
124:19 125:7 129:2,
20 130:15 132:6
137:17 140:18
143:15 150:7 182:3,
11,13 183:2 185:18
186:4

**tolling** 113:22

**top** 86:3 102:22
146:13

**topic** 9:17 17:15
23:5,9 27:19,21 28:5
29:6,8 36:14,18
52:16,20 63:2 65:20,
21 99:17 103:4,12,14
104:18 117:16
141:19 142:10
158:13,14 161:17
163:2

**topics** 10:8,13,16,20,
25 11:8 14:14 16:16
22:25 34:17 57:6
102:18 114:15
115:21

**total** 107:2,4,5
108:13 109:12
133:15,21 146:12
147:8,14

**totality** 102:5

**trading** 27:8,10,11

**transaction** 108:18

**transactions** 14:8
129:4,14,23 130:10,

22 153:13 194:19

**transcript** 84:11

**transcripts** 186:21
187:18

**transfer** 14:7,11
15:10 51:14,21 52:7
60:13 183:2,4
185:18,20,21,22

**transferred** 51:18
134:18 137:23
140:13,14 168:19
172:13

**transfers** 52:18
54:23 108:23 182:20,
21 195:12,23

**transition** 177:9

**transitioned** 97:13

**treasurer** 24:9,17,22
25:5,12 39:7 43:14,
25 44:8,14,22,25
45:2,15,24 46:4,8
65:17 75:13,25 76:5
80:22 96:21 191:22

**treated** 56:2 57:15
62:9

**Trey** 24:8,15,23

**trick** 159:19

**TRO** 40:22

**true** 44:3,24 45:20
65:15 75:3 76:2,11
80:8 81:19,23 125:20
126:6

**trusts** 26:8

**Tuesday** 92:17

**turn** 30:5 110:5
158:21 169:11

**turned** 183:3

**two-thirds** 26:9,19
146:16

**tying** 190:9

**typical** 86:25

**typically** 99:5 104:8

**typo** 90:24

**U**

**Uh-huh** 8:25 11:4
23:4 52:19 53:11
88:22 93:16 118:24
141:21 176:12

**ultimate** 124:24

**ultimately** 110:5
129:11 130:17
171:21,24

**unable** 31:24 41:5
178:13 179:20,21
180:7

**unaudited** 95:17,22
96:4 101:14,18

**unauthorized** 85:9

**unaware** 40:5 64:16,
22

**unclear** 101:22

**uncomfortable**
33:14

**underlying** 82:23
101:25

**understand** 5:14,16
12:10 15:17 48:17
103:6 106:19 113:12,
19 115:20 128:11
148:18 160:6

**understanding** 13:8
15:23 30:14 46:3
53:2 54:8 55:2 78:8
103:8,22 106:7
111:16 122:22 139:8
147:18 159:6 160:5
161:6 184:25

**understood** 32:21

**undertake** 106:25

**undertaken** 115:2
116:8 167:16

**undertaking** 113:24
114:5,10

**undertook** 16:13,18
164:18 166:21

**unfettered** 34:6,8
173:11,16 175:2,8
177:15,19

**unusual** 91:19

**urgency** 56:6

**utilized** 124:3

**utilizing** 178:7

**V**

**vagueness** 172:6

**valid** 50:5,9 143:11

**valuation** 32:23
62:16,17 109:18,23
110:3,6,10,12,24
111:10,14,15,17
112:6,16,17,20,21,25
113:4,10,17 114:3,
13,20,24 115:10
117:15 118:16,22
119:16,22 121:9
124:9 128:17 129:8,9
130:8,21 132:9
135:2,7,16 137:11,16
138:8,18 146:24
147:10 154:24 155:5,
9,16,18 156:2,4,8
170:13 171:7,9

**valuations** 115:9
131:6 156:16

**verified** 107:14

**verify** 125:24

**vice** 18:13 19:3,6,18
20:2,7 21:5,11,17
22:10 24:8,13,16,21
25:4 43:4 73:25 74:5,
7 97:4 116:5

**view** 14:3 178:20

**viewed** 75:21

**violating** 174:18

**Vitiello** 25:13 179:6

**voluntary** 108:3

**vote** 106:5 107:24

**voted** 104:10 105:12

**W**

**wait** 13:17 159:22

**waited** 157:16

**wanted** 143:22

**water** 56:12

**Waterhouse** 12:3,23 13:3,6 14:10 15:5 24:9,17,22 25:4,11 39:5,7,13 41:14 42:5 43:15,24 44:22 60:4 65:16 71:13 75:9,12, 24 78:22 80:14,22 81:25 82:24 83:23 90:12 91:8,12 92:7, 13,16 93:17 96:20 97:23 98:12 99:16 100:9,13,16 140:12 142:23 144:25 151:19 161:16 165:13,19 167:8 171:8 173:24 175:2 176:19,25 177:4,15 181:7,13,24 182:2,6 183:10,19,23 184:4, 12 186:3,11 191:16, 18,22 192:2,6,16 193:14,19 194:3,17 195:9,22

**Waterhouse's** 84:11 92:8 93:13,20 96:19 99:25 100:25 173:20 181:17 183:6 187:11

**week** 162:4

**weeks** 12:5 13:21 42:15 152:3 155:2

**weighted** 131:23 132:8

**weighting** 129:6,25 131:12

**Willmore** 25:6

**wishes** 91:25

**withdrawn** 35:13 55:22 80:5 82:12,13 92:14 109:10 117:11 122:18 127:4,5 168:16

**witnesses** 190:22

**wondering** 100:19

**word** 35:21 91:9 131:8 142:14 163:9, 15,16 165:2 183:6

187:8 189:15

**wording** 83:25

**words** 14:18 169:16

**work** 31:20,24 43:19 96:3 111:19 112:14 113:16 114:2 117:14 118:6 119:15 146:23 164:25 165:4 168:11, 21 178:13 179:20,21 180:7

**worked** 32:21 124:5

**working** 33:2,8 41:11 56:8 72:5 112:22 115:11 117:20 135:16 146:10 178:18 180:4

**works** 5:23

**world** 49:9 104:6 126:24 186:23 187:22 189:11

**worth** 160:10

**writing** 124:20 144:2 172:17

**written** 66:10

**wrong** 8:24 73:4 114:12

**wrote** 181:18

---

### Y

**year** 16:13 49:6 57:24 68:3 85:23 97:21

**year-end** 57:15

**years** 18:21 76:18 79:12 148:5,7

**yesterday** 9:13 54:19 193:25

**Yup** 52:19 54:5 70:11 86:4 92:4 127:21 133:22 158:6

---

### Z

**Ziehl** 5:10

**Zoom** 12:4