# EXHIBIT 19

Page 1

1      IN THE UNITED STATES BANKRUPTCY COURT

2       FOR THE NORTHERN DISTRICT OF TEXAS

3            DALLAS DIVISION

4
IN RE:                ) Chapter 11
5  HIGHLAND CAPITAL        ) Case No.
MANAGEMENT, LP,          ) 19-34054-
6        Debtor.      ) sgj11
-------------------------- )
7  HIGHLAND CAPITAL        )
MANAGEMENT, LP,          ) Adversary
8                   ) Proceeding
Plaintiff,     ) No.
9                   ) 21-03004
vs.              )
10                  )
HIGHLAND CAPITAL        )
11  MANAGEMENT FUND ADVISORS,   )
LP,              )
12                  )
Defendant.     )
13  ------------------------- )

14

15

16

17    REMOTE ZOOM DEPOSITION OF DENNIS C. SAUTER

18         Wednesday, November 17, 2021

19

20

21

22

23  Reported by:

24  Stacey L. Daywalt

25  JOB NO. 202810

Page 2

1
2
3              Wednesday, November 17, 2021
4              1:08 p.m.
5
6
7              Remote Zoom Deposition of DENNIS C.
8   SAUTER, held before Stacey L. Daywalt, a Court
9   Reporter and Notary Public of the District of
10  Columbia.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   A P P E A R A N C E S :
2   (All appearances via remote Zoom)
3
4       PACHULSKI STANG ZIEHL & JONES
5       Attorneys for Plaintiff
6           780 Third Avenue
7           New York, New York 10017
8       BY:   JOHN MORRIS, ESQ.
9
10      MUNSCH HARDT KOPF & HARR
11      Attorneys for Defendant
12          500 North Akard Street
13          Dallas, Texas 75201
14      BY:   DAVOR RUKAVINA, ESQ.
15
16      STINSON LLP
17      Attorneys for James Dondero and Nancy
18      Dondero
19          3102 Oak Lawn Avenue
20          Dallas, Texas 75219
21      BY:   MICHAEL AIGEN, ESQ.
22
23  ALSO PRESENT:
24
25          LA ASIA CANTY

Page 4

1              D. Sauter
2   DENNIS C. SAUTER,
3              called as a witness, having been
4   duly sworn by a Notary Public, was examined and
5   testified as follows:
6
7   EXAMINATION BY
8   MR. MORRIS:
9       Q.   Can you please state your name for
10  the record.
11      A.   Dennis Sauter.
12      Q.   Good afternoon, Mr. Sauter. My name
13  is John Morris. I'm an attorney at Pachulski
14  Stang Ziehl & Jones. We are counsel to the
15  reorganized Highland Capital Management, LP.
16      Are you aware of that?
17      A.   Yes, sir.
18      Q.   Okay. And we're here for your
19  deposition today. Correct?
20      A.   Yes, sir.
21      Q.   And I've examined you previously.
22  Is that right?
23      A.   I don't believe so.
24      Q.   Okay. Have you ever been deposed
25  before?

Page 5

1              D. Sauter
2       A.   I don't think so.
3       Q.   Okay. So very simple ground rules.
4       I'm going to ask you a series of
5   questions, and it's important that you allow me
6   to finish my question before you begin the
7   answer.
8       Is that fair?
9       A.   Yes, sir.
10      Q.   And I will certainly attempt to do
11  the same for you and -- insofar as I will
12  attempt to allow you to finish your answer
13  before I begin my question.
14      But if I fail to do that, will you
15  let me know?
16      A.   I will.
17      Q.   If there's anything that I ask you
18  that you don't understand, will you let me know
19  that?
20      A.   I will.
21      Q.   If you want to take a break at any
22  time, just let me know and I'll try to
23  accommodate you. I'd only ask that you don't
24  ask for a break while a question is pending.
25      Is that fair?

D. Sauter

1
2    A.   That's fair.
3    Q.   Okay.  Do you have a license to
4  practice law, sir?
5    A.   I do.
6    Q.   In what states are you admitted to
7  practice?
8    A.   Just Texas.
9    Q.   When did you obtain your license?
10    A.   November of 2001.
11    Q.   And did you graduate from law
12  school?
13    A.   I did.
14    Q.   Where did you graduate from law
15  school?
16    A.   Southern Methodist University.
17    Q.   And can you describe for me your
18  employment history from the time you graduated
19  law school until today.
20    A.   Sure.
21       Out of law school I began at a firm
22  called Winstead Sechrest & Minick.  And I was
23  there just till tax day, so April 15 of 2002,
24  when my group moved to a firm at the time that
25  was called Godwin Gruber.  I was at Godwin

D. Sauter

1
2  Gruber until 2006.
3       And I went in-house with a
4  development firm called St. Ives Realty.  I was
5  there until 2009.
6       And in 2009, I went back to work
7  with the group I'd worked with before but now
8  it was called Langley Weinstein.  I was with
9  Langley Weinstein until December 31 of '13.
10       And in 2014, I started at Wick
11  Phillips Gould & Martin, and I was at Wick
12  Phillips until February of 2020 when I began at
13  Nexpoint.
14    Q.   And while you were at Nexpoint -- I
15  mean, withdrawn.
16       While you were at Wick Phillips, did
17  you provide services to Highland or any of its
18  affiliates?
19    A.   I provided services primarily to
20  Nexpoint advisors and its wholly owned
21  subsidiaries.
22       I did have occasion to do a couple
23  of discrete engagements for -- I think they
24  were CLOs but managed by Highland.
25    Q.   Prior to the time that you joined

D. Sauter

1
2  Nexpoint, did you have any particular expertise
3  in a specified area of the law?
4    A.   For about the last ten years, real
5  estate.
6       It was, before that, kind of a
7  hybrid of construction related litigation,
8  landlord-tenant disputes, you know,
9  foreclosures.  It was all real estate related
10  litigation and then real estate transactional
11  work.
12    Q.   How did you come to become employed
13  by Nexpoint?
14    A.   I had worked with the folks here at
15  Nexpoint for my entire tenure at Wick Phillips,
16  and they gave me an offer and I accepted.
17    Q.   What offer did they give you?  What
18  position?
19    A.   I was hired to be general counsel of
20  real estate.
21    Q.   Are you still the general counsel of
22  real estate?
23    A.   I'm now the general counsel of
24  Nexpoint.
25    Q.   When did you become the general

D. Sauter

1
2  counsel of Nexpoint?
3    A.   I don't recall exactly, but I would
4  say April or May of this year.
5    Q.   All right.  So from approximately
6  February of 2020 until approximately April of
7  2021, you were the general counsel of real
8  estate, and since approximately April of 2021
9  you were -- you have been the general counsel
10  of Nexpoint.
11       Do I have that right?
12    A.   Correct.
13    Q.   Was there a general counsel of
14  Nexpoint during the time you served as general
15  counsel of real estate?
16    A.   There was not.
17       Generally the way things worked is
18  Scott Ellington was general counsel at Highland
19  Capital, and most of the legal department
20  reported to him.  I was the one attorney that
21  was not under him.
22       So no, there was not.
23    Q.   Okay.  To whom do you report today?
24    A.   Matt McGraner.
25    Q.   And what is Mr. McGraner's title?

Page 10

1           D. Sauter
2     A.    I believe it's managing director.
3     Q.    When did you begin reporting to
4  Mr. McGraner?
5     A.    The day I was hired.
6     Q.    What are your duties and
7  responsibilities today as the general counsel
8  of Nexpoint?
9     A.    A lot different than I anticipated
10  when I came on.
11     Q.    Fair.
12     A.    It's a little bit of everything.  I
13  get lots of questions from lots of different
14  people.
15           As you can imagine, there's been
16  quite a shuffle with the Skyview formation,
17  people leaving, people staying, and so, you
18  know, it's been fairly fluid.  So I try to
19  handle whatever somebody brings me.
20     Q.    In your capacity as general counsel,
21  do you have any responsibility for overseeing
22  Nexpoint's litigation matters?
23     A.    I do.
24     Q.    Okay.  And do you have
25  responsibility for overseeing Nexpoint's

Page 11

1           D. Sauter
2  defense of the lawsuit that Highland has
3  commenced against it?
4     MR. RUKAVINA:  Allow me to interject
5  just a little bit here, John.
6           You subpoenaed Mr. Sauter in the
7  HCMFA lawsuit.
8           Why are you asking him all about
9  this Nexpoint?
10     MR. MORRIS:  Just because he told me
11  that's where he works.
12     MR. RUKAVINA:  Yeah, that's fine.
13     I mean, I'm not trying to be rude.
14  Just –
15     MR. MORRIS:  I appreciate that.
16     MR. RUKAVINA:  – if you're –
17     (Simultaneous crosstalk.)
18     MR. MORRIS:  Duly noted.  Thank you,
19  Davor.
20     THE REPORTER:  Please watch the
21  overlap of talking.  Thank you.
22  BY MR. MORRIS:
23     Q.    Mr. Sauter, Mr. Rukavina brings up a
24  good point.
25           Are you also the general counsel of

Page 12

1           D. Sauter
2  Highland Capital Management Fund Advisors, LLP?
3     A.    I'm not.
4     Q.    You are not?
5     A.    I'm not the general counsel of
6  Highland Capital Management Fund Advisors.
7     Q.    Okay.  Can we refer to that entity
8  as HCMFA today?
9     A.    Yes, sir.
10     Q.    Do you have any title or role with
11  HCMFA today?
12     A.    I don't have any official capacity
13  with HCMFA, although I do perform work from
14  time to time for HCMFA.
15     Q.    Okay.  Does HCMFA have a general
16  counsel, to the best of your knowledge?
17     A.    It does not.
18     Q.    Does HCMFA have any officers today,
19  to the best of your knowledge?
20     A.    It does, but I'm not sure I can name
21  them off to you.
22     Q.    Okay.  What services do you provide
23  to HCMFA?
24     A.    Again, like other affiliated
25  entities, when it has legal needs that meet my

Page 13

1           D. Sauter
2  expertise, people bring it to me and I work on
3  it.
4     Q.    And what's an "affiliated entity" in
5  the way that you've used that term?
6     A.    I generally refer to HCMFA, Nexpoint
7  Advisors and the wholly owned subsidiaries of
8  Nexpoint Advisors as the affiliated entities.
9           HCMFA also owns Nexpoint Securities,
10  which is the broker dealer, and so I do work
11  with those folks from time to time as well.
12     Q.    Is there a source of affiliation
13  between Nexpoint and HCMFA?
14     A.    Yes, Mr. Dondero.
15     Q.    And he controls them both to the
16  best of your knowledge.  Is that right?
17     A.    I – I guess it depends on how you
18  define "control."
19           But yes, he is a controlling person
20  of Nexpoint Advisors, and yes, for all intents
21  and purposes, he's the controlling person of
22  HCMFA.
23     Q.    Okay.  And can we refer to HCMFA and
24  Nexpoint Advisors, LP together as "the
25  advisors"?

Page 14

D. Sauter

1
2     A.    That's fine.
3     Q.    The advisors are each advisory
4  firms.  Is that right?
5     A.    Correct.
6     Q.    And each of them provide advisory
7  services to certain funds.  Is that correct?
8     A.    Correct.
9     Q.    Okay.  Do you hold any titles with
10  any of the funds that are advised by either of
11  the advisors?
12     A.    Yes, I am general counsel for
13  Nexpoint Residential Trust and I'm general
14  counsel of Nexpoint Real Estate Finance.
15     Q.    Any others?
16     A.    No, sir.
17     Q.    Okay.  Do you have –
18     A.    Wait.  Wait.  Let me clarify.
19         I think I am general counsel of
20  Nexpoint Real Estate Advisors, and I may be
21  general counsel of each of them.  I think there
22  are nine in total.
23     Q.    Okay.  And are each of them separate
24  funds?
25     A.    Each of the advisors are – manage a

Page 15

D. Sauter

1
2  discrete business line.  They're separate
3  entities, but not necessarily funds.
4     Q.    And are each of them owned
5  indirectly or directly by Nexpoint Advisors,
6  LP?
7     A.    Yes, sir.
8     Q.    Okay.
9         When did you first meet Mr. Dondero?
10     A.    I don't recall.
11         I think I met him once at an event
12  that I was invited to years ago, maybe 2017.
13     Q.    Do you know if he holds a title at
14  HCMFA?
15     A.    I don't believe he does.
16     Q.    How about Nexpoint?  Does he hold a
17  title at Nexpoint?
18     A.    Yes, he's the president.
19     Q.    And even though he doesn't hold a
20  title at HCMFA, it's your understanding that he
21  controls HCMFA.  Is that right?
22     A.    I don't know that I would say that.
23         And again, I would need to look at
24  the organizational documents.
25     Q.    Well, as – withdrawn.

Page 16

D. Sauter

1
2         Do you know if Mr. Dondero serves as
3  the portfolio manager for any of the funds to
4  which the advisors provide advisory services?
5     A.    He does.
6         I don't know which ones.
7     Q.    We're going to talk in a little
8  while about a TerreStar NAV issue.
9         MR. MORRIS:  And Stacey, that's all
10  caps N-A-V, and it's T-E-R-R-A-S-T-A-R [sic].
11     Q.    We're going to talk a little bit
12  about a TerreStar NAV issue.
13         Are you generally familiar with
14  that?
15     A.    Generally.
16     Q.    Okay.  And is it your understanding
17  that that NAV issue, that TerreStar NAV issue,
18  related to certain equity positions that were
19  held by certain funds managed by HCMFA?
20     A.    Yes, I think it was – Global
21  Allocation Fund is the one that was
22  particularly the insured.
23     Q.    And can we refer to that as GAF?
24     A.    Yes, sir.
25     Q.    Do you know who the portfolio

Page 17

D. Sauter

1
2  manager of GAF was in 2019?
3     A.    I do not.
4     Q.    Do you know if it was Mr. Dondero?
5     A.    I do not.
6     Q.    In the course of your investigation,
7  did you ever ask who the portfolio manager of
8  GAF was?
9     A.    I did not.
10     Q.    Do you know Frank Waterhouse?
11     A.    I do.
12     Q.    When did you first meet
13  Mr. Waterhouse?
14     A.    I think I met him just before I came
15  on.  It would have been maybe December of 2019.
16     Q.    Okay.  Do you know if Mr. Waterhouse
17  holds any titles with either of the advisors?
18     A.    I believe so, but I'm not exactly
19  sure.
20         MR. RUKAVINA:  I'm going to object
21  to vague or form there.
22         What time are you specifying,
23  Mr. Morris?
24         MR. MORRIS:  I appreciate that.  Let
25  me restate the question.

Page 18

1          D. Sauter
2    BY MR. MORRIS:
3        Q.  Mr. Sauter, do you know if
4    Mr. Waterhouse held any position with either of
5    the advisors at any time in 2019?
6        A.  I believe he did, but I -- I would
7    say it was probably treasurer and CFO, but I'm
8    speculating.
9        Q.  In the course of your investigation,
10   did you try to determine what title
11   Mr. Waterhouse held with HCMFA?
12       A.  I have not.
13       Q.  Have you ever tried to determine
14   what title Mr. Waterhouse held at HCMFA at any
15   time?
16       A.  At one point I knew what it is.  I
17   just can't recall.
18       Q.  Okay.  Does -- do you know if
19   Mr. Waterhouse holds a position with HCMFA
20   today?
21       A.  I believe he does.
22       Q.  Do you have any understanding as to
23   what that position is?
24       A.  Again, I think it's CFO and/or
25   treasurer.  That's consistent, I think.

Page 19

1          D. Sauter
2        Q.  Do you have any understanding as to
3    when Mr. Waterhouse became the treasurer and/or
4    the CFO of HCMFA?
5        A.  I do not.
6        Q.  Do you know if Mr. Waterhouse holds
7    any positions with any of the funds that are
8    advised by either of the advisors?
9        A.  I believe he -- I'm speculating.  I
10   don't know for certain.
11       Q.  During the course of your -- you
12   conducted an investigation around the TerreStar
13   NAV issue.  Right?
14       A.  Correct.
15       Q.  Okay.  During the course of your
16   investigation, did you ever try to determine
17   whether Mr. Waterhouse served in any capacity
18   with any of the funds that are managed by
19   HCMFA?
20       A.  Whether he -- yes.
21       Q.  And what did you -- what information
22   did you learn in the course of your
23   investigation on that issue?
24       A.  My understanding is that the
25   valuation team was a subset of the group that

Page 20

1          D. Sauter
2    Mr. Waterhouse ran.
3        Q.  Right.
4        I'm asking you specifically about
5    whether he held positions at any of the funds.
6            Did you understand that when I asked
7    my question?
8        A.  I don't know whether he held any
9    position with the funds.
10       Q.  Okay.  And during your
11   investigation, did you make any effort to try
12   to determine whether he held any positions with
13   GAF?
14           Let's be very specific.
15       A.  I don't recall.
16       Q.  Do you know a gentleman named Will
17   Mabry?
18       A.  I do.
19       Q.  And do you know if Mr. Mabry was
20   ever employed by either of the advisors?
21       A.  I don't know who employed Mr. Mabry.
22       Q.  Do you know if he was ever employed
23   by Highland Capital Management, LP?
24       A.  I would suspect that he was employed
25   by Highland Capital Management, LP.

Page 21

1          D. Sauter
2        Q.  Okay.  And what's the basis for that
3    speculation?
4        A.  Because he's at Skyview, and I think
5    all of the employees that were at Nexpoint
6    Advisors or HCMFA remained where they were.
7        Q.  Do you know what position he held at
8    Highland in 2019?
9        A.  I don't know.
10       Q.  Do you know anything about
11   Mr. Mabry's skills or expertise, if any?
12       A.  Other than I believe he was the
13   assistant treasurer at GAF and he was on the
14   valuation team as well.
15       Q.  So your understanding is he was the
16   assistant treasurer of the fund that we have
17   defined as GAF.
18           Do I have that right?
19       A.  That's my understanding.
20       Q.  Okay.  And what's the basis for that
21   understanding?
22       A.  That's just what I recall.
23       Q.  Okay.  To the best of your
24   knowledge, does he have an accounting
25   background?

Page 22

```
 1              D. Sauter
 2      A.  I don't know.
 3      Q.  And is it your understanding that he
 4  was part of a valuation team?
 5          I think you used that term.
 6      A.  Yes, I believe he was.
 7      Q.  Okay.  And what's the basis for that
 8  understanding on your part?
 9      A.  Discussions that I've had with Frank
10  and his knowledge of the TerreStar NAV error.
11      Q.  Did Mr. Mabry tell you that he was
12  part of the valuation team?
13      A.  I don't recall.
14      Q.  Did you ask him?
15      A.  I don't recall.
16      Q.  Do you know if Mr. Mabry played any
17  role in any aspect of the TerreStar
18  investigation that was conducted by the SEC?
19      A.  I don't know.
20      Q.  Did you ask Mr. Mabry if he played
21  any role in connection with the SEC
22  investigation?
23      A.  I did not.
24      Q.  Do you know if Mr. Mabry played any
25  role in formulating HCMFA's response to the
```

Page 23

```
 1              D. Sauter
 2  SEC?
 3      A.  I do not.
 4      Q.  Did you ask him?
 5      A.  I don't recall.
 6      Q.  Do you know when he left Highland?
 7      A.  I think he was terminated with the
 8  other employees.
 9      Q.  You submitted a declaration in
10  connection with the adversary proceeding that
11  Highland commenced against the HCMFA.
12          Do I have that right?
13      A.  Yes, sir.
14      Q.  All right.  Let's take a look at
15  that, if we can put that up on the screen.
16          So from time to time, my assistant
17  Ms. Canty is going to put some documents up on
18  the screen, Mr. Sauter.  And it's very
19  important that you understand that I will give
20  you every opportunity that you believe you need
21  in order to read the document.
22          So you know, if there's something
23  that I put up there that you want to see more
24  of, just let me know and we'll just scroll
25  around.  Okay?
```

Page 24

```
 1              D. Sauter
 2      A.  Okay.
 3          (Exhibit 181, Declaration of Dennis
 4  C. Sauter, Jr., previously marked for
 5  identification.)
 6      Q.  Okay.  Do you see the first page of
 7  this document states that it's your
 8  declaration?
 9      A.  I do.
10      Q.  And if we can go to the signature
11  line, please.
12          And that's your signature there,
13  sir?
14      A.  It is.
15      Q.  And did you sign this on or about
16  May 21st, 2021?
17      A.  Yes, sir.
18      Q.  Do you remember the purpose of this
19  declaration?
20      A.  It was requesting to file an amended
21  answer.
22      Q.  Okay.  Is it fair to say that your
23  declaration sets forth the factual basis for
24  the proposed amendment?
25      A.  Yes.
```

Page 25

```
 1              D. Sauter
 2      Q.  And is it fair to say that your
 3  declaration describes the investigation that
 4  you did initially after the complaint was filed
 5  and then basically a second phase of the
 6  investigation after Mr. Waterhouse and
 7  Mr. Mabry migrated from Highland?
 8      A.  Yes.
 9      Q.  Okay.  So the purpose of your
10  investigation was to understand the origin of
11  two promissory notes.  Right?
12      A.  Yes, sir.
13      Q.  Okay.  I just want to go through to
14  the notes to make sure that the record is clear
15  that we're talking about the same thing.
16          There are certain documents that
17  we've used in other depositions so they've been
18  premarked, and I'd ask Ms. Canty to put up the
19  document that's already been marked as
20  Exhibit 54.
21          MS. CANTY:  Okay.  John, do you want
22  to let the court reporter know this current one
23  is 181, premarked 181, this declaration.
24          MR. MORRIS:  Okay.  Fine.
25          (Exhibit 54, E-mail chain with
```

Page 26

D. Sauter

1
2 attachment dated 5/2/19, D-CNL003777-779,
3 previously marked for identification.)
4    Q.    So if could just scroll down a
5 little bit.
6        Do you see there's -- do you see
7 it's -- there's an e-mail from David Klos dated
8 May 2nd?
9    A.    Yes.
10    Q.    Do you know who Mr. Klos is?
11    A.    I do.
12    Q.    And who do you understand Mr. Klos
13 to be?  What role did he play in May of 2019?
14    A.    I don't know.
15        I know he worked under Frank.
16    Q.    He worked out of -- do you see
17 there's an e-mail to a corporate accounting
18 group?
19    A.    Yes.
20    Q.    Have you ever sent or received an
21 e-mail from a Highland corporate accounting
22 e-mail chain called the corporate accounting
23 group?
24    A.    I've never sent an e-mail from the
25 corporate accounting group.

Page 27

D. Sauter

1
2    I can't recall receiving one from
3 them either.
4    Q.    Do you see that in this e-mail
5 Mr. Klos asks to have $2.4 million transferred
6 from HCMLP to HCMFA?
7    A.    I do.
8    Q.    And do you see that he states:
9 "This is a new interco loan"?
10    A.    I do.
11    Q.    And if we can see the response
12 above, do you see how Ms. -- do you know
13 Kristin Hendrix?
14    A.    I do.
15    Q.    And who is Ms. Hendrix, to the best
16 of your knowledge.
17    A.    I believe she worked under Mr. Klos.
18    Q.    And do you see that she wrote to
19 someone named Blair and attached a copy of a
20 note?
21    A.    Yes.
22    Q.    Okay.
23    A.    That's what it says.
24    Q.    And can we go to the next page,
25 please.

Page 28

D. Sauter

1
2    And do you see that this is a
3 promissory note for $2.4 million dated May 2,
4 2019?
5    A.    I do.
6    Q.    Okay.  And can we go to the
7 signature line.
8        Do you see Mr. Waterhouse's
9 signature?
10        Do you see Mr. Waterhouse's
11 signature, sir?
12    A.    I can't verify whether that's his
13 signature, but I'll take your word for it.
14    Q.    Okay.  Can you go to the top of the
15 note, please.
16        Do you see that the maker is defined
17 to be Highland Capital Management Fund
18 Advisors, LP?
19    A.    I do see that that's what it says on
20 the first page.
21    Q.    Okay.  And this is one of the two
22 notes that was the source of your
23 investigation.  Right?  This was one of the two
24 notes that you were investigating the origins
25 of?

Page 29

D. Sauter

1
2    A.    Yes.
3    Q.    Okay.  Let's look at the next note,
4 please.
5        (Exhibit 57, Promissory Note dated
6 5/3/19, D-CNL003764-65, previously marked for
7 identification.)
8        Do you see this is a note for
9 $5 million and it's dated the next day,
10 May 3rd, 2019?
11    A.    I see that.
12    Q.    Do you see that it's -- it also
13 defines as the maker Highland Capital
14 Management Fund Advisors, LP?
15    A.    That's what it says on the first
16 page, yes.
17    Q.    Okay.  And if we can go to the
18 signature line.
19        Again, does that appear to be
20 Mr. Waterhouse's signature?
21    A.    Again, I can't verify whether that's
22 Mr. Waterhouse's signature or not.
23        But it does say that the maker is
24 Frank Waterhouse, not Highland Capital
25 Management Fund Advisors.

Page 30

```
1              D. Sauter
2     Q.   I understand.
3          But the definition of "maker" is
4  above.  Correct?
5     A.   I wouldn't – that's not how I would
6  draft a promissory note.
7     Q.   I didn't ask you how you would draft
8  it.
9          I'm just asking you whether, having
10  just looked at the document and as a lawyer
11  admitted to practice in law, would you agree
12  that the term "maker" is a defined term in this
13  document?
14         MR. RUKAVINA:  I'll just object to
15  form here and also that this witness has not
16  been called as an expert, even though he's a
17  lawyer.
18         So I'll just preserve that for the
19  record.
20         MR. MORRIS:  Fair.  That's fine.
21         THE WITNESS:  I would agree that
22  "maker" is defined on the first page, but that
23  would be an improper signature block, if it was
24  intended to be Highland Capital Management Fund
25  Advisors.
```

Page 31

```
1              D. Sauter
2  BY MR. MORRIS:
3     Q.   All right.  We're going to refer to
4  these two notes collectively as "the notes."
5          Is that okay?
6     A.   That's fine.
7     Q.   And these are the two notes that you
8  were investigating.  Right?
9     A.   Yes.
10    Q.   And it's your understanding that
11  these are the two notes that Highland Capital
12  Management is suing to collect on.  Right?
13    A.   Yes.
14    Q.   Okay.  According to your
15  declaration, if we can go to Paragraph 13, if
16  we can put that back up on the screen, as part
17  of the initial investigation – withdrawn.
18         I'm going to use the phrase "initial
19  investigation" to mean the investigation that
20  you conducted between the time the complaint
21  was filed and the time that HCMFA filed its
22  original answer on March 1st.
23         Is that okay?
24    A.   Sure.
25    Q.   And during that initial
```

Page 32

```
1              D. Sauter
2  investigation, you spoke with Jim Dondero.
3  Correct?
4     A.   I did.
5     Q.   Okay.  And according to
6  Paragraph 13, he couldn't recall the genesis of
7  the notes.  Is that right?
8     A.   That's correct.
9     Q.   Did you show him the notes?
10    A.   I don't recall.
11    Q.   Did you tell him that the notes were
12  dated May 2nd and May 3rd, 2019?
13    A.   I don't recall that either.
14    Q.   Did you do anything to try to
15  refresh his recollection about the timing of
16  the notes?
17    A.   I'm sure I did.
18         But I don't recall that conversation
19  in any detail as I'm sitting here today.
20    Q.   Did you tell him the principal
21  amount of the notes?
22    A.   Yes.
23    Q.   And even though you told him the
24  principal amount of the notes, he still had no
25  recollection as to what they related to.  Is
```

Page 33

```
1              D. Sauter
2  that right?
3     A.   He couldn't recall the genesis,
4  correct.
5     Q.   Did he have any recollection at all
6  as to what the notes related to?
7     A.   I don't – I don't believe so,
8  because if he had, then I would have been able
9  to pin it down further.
10    Q.   How many conversations did you have
11  with Mr. Dondero as part of your initial
12  investigation?
13    A.   I don't recall.
14         Two, three.
15    Q.   Was there anybody present other than
16  the two of you?
17    A.   Again, I don't recall.
18    Q.   Do you recall if they took place on
19  the phone or were they in person?
20    A.   It would have been in person.
21    Q.   And why do you say it would have
22  been in person?
23    A.   Well, now that you say that, no, it
24  probably wasn't in person because he would not
25  have been in the office at that time.
```

Page 34

D. Sauter

1   D. Sauter
2       There was obviously a lot of things
3   going on at this point.  Mr. Dondero had been
4   evicted from the building, and so that made --
5   I shouldn't say evicted.  He'd been kicked out
6   by the debtor, and so that made our
7   communications a little more difficult.
8       So I would have spoken with him on
9   the phone because I did not go over to the
10  NexBank office very often.
11      Q.   Paragraph 13 says that you also
12  spoke with "the few employees of HCMFA."
13      Do you see that in the middle of the
14  paragraph?
15      A.   Yes.
16      Q.   Can you identify the other CMFA
17  employees that you spoke with as part of your
18  initial investigation?
19      A.   I would have spoken with Dustin
20  Norris and --
21      Q.   Do you recall speaking -- I
22  apologize for interrupting.
23      Go ahead.
24      A.   And so he wasn't an HCMFA employee,
25  but Jason Post.

Page 35

1   D. Sauter
2       Q.   Do you have a recollection of
3   speaking to Mr. Norris, or are you just
4   surmising that you probably did?
5       A.   I'm surmising that I probably would
6   have.
7       There was a lot, again, that was
8   happening.  I didn't have the historical
9   knowledge of these things, and so I talked with
10  Mr. Post and Mr. Norris daily about everything
11  that was going on just to get some background
12  on all of the moving parts.
13      Q.   Okay.  Do you know if Mr. Norris
14  held any position with HCMFA in 2019?
15      A.   I don't -- I don't know for certain.
16  I believe he did.
17      I can't recall what his position
18  would have been.
19      Q.   Does he have a position with HCMFA
20  today, to the best of your knowledge?
21      A.   I believe he does.
22      Q.   And what do you understand his
23  position to be?
24      A.   I would say vice president.
25      Q.   Do you know when he became vice

Page 36

1   D. Sauter
2   president of HCMFA?
3       A.   I do not.
4       Q.   Do you know if he was vice president
5   of HCMFA in October 2020?
6       A.   I do not.
7       Q.   Do you know if Mr. Norris holds any
8   positions with DAF -- I'm sorry.
9       Do you know if Mr. Norris holds any
10  positions with GAF?
11      A.   I don't know.
12      Q.   How about Mr. Post?  Do you know if
13  Mr. Post held any positions with HCMFA in 2019?
14      A.   I don't.
15      Q.   Do you know if he holds any
16  positions with HCMFA today?
17      A.   He does not.
18      Q.   Is Mr. Post a compliance officer, to
19  the best of your knowledge?
20      A.   He was.
21      He left a week ago to take another
22  job.
23      Q.   So he was -- and who did he -- for
24  whom did he serve as the chief compliance
25  officer until a week ago?

Page 37

1   D. Sauter
2       A.   He was chief compliance officer for
3   Nexpoint Advisors.
4       He may have been the chief
5   compliance officer for HCMFA as well.
6       Q.   Okay.
7       A.   And if I had to guess, he would have
8   had those same positions back in 2019 --
9       Q.   Okay.
10      A.   -- because Thomas Surgent was the
11  chief compliance officer for HCMLP and Jason
12  worked under him.
13      And I think that started sometime in
14  2014, maybe earlier.
15      Q.   And did Mr. Norris and Mr. Post tell
16  you during your initial investigation that they
17  had no knowledge of the notes?
18      A.   Yeah, generally I don't think that
19  they were aware of the notes, or I should say
20  they weren't aware of the genesis of the notes.
21      Q.   Were they aware of the existence of
22  the notes?
23      A.   They were.
24      Q.   Did they tell you when they had
25  learned of the existence of the notes?

Page 38

D. Sauter

1
2     A.   I think it's something that I raised
3  to them because I didn't know where the notes
4  had come from.
5     Q.   Right.
6          And they told you that they were
7  aware of the notes but they didn't know the
8  genesis of them?
9     A.   I don't recall whether they were
10 aware of the notes before I asked about them.
11    Q.   Did you ask them if they were aware
12 of the notes prior to the time you showed it to
13 them?
14    A.   I would have asked them what the
15 notes were about.
16    Q.   I don't want to know what you would
17 have done.
18         I know this is hard, Mr. Sauter.
19 I'm really just asking you to search your
20 memory.
21         Do you recall asking them whether
22 they were aware of the existence of the notes
23 prior to your conversation with them?
24    A.   I don't recall if I asked whether
25 they were aware of the existence of the notes

Page 39

D. Sauter

1  prior to my conversation with them.
2
3     Q.   Now, Paragraph 13 says that
4  Mr. Dondero could not recall the genesis of the
5  notes.
6          Do you see that?
7     A.   Yes.
8     Q.   Did Mr. Dondero indicate to you that
9  he was aware of the existence of the notes even
10 though he couldn't recall the genesis of the
11 notes?
12    A.   That's not how I would characterize
13 it, but...
14    Q.   How would you characterize it?
15    A.   He suggested that I talk to
16 Mr. Waterhouse.
17    Q.   Did you ask Mr. Dondero when he
18 first learned of the existence of the notes?
19    A.   No.
20    Q.   Did he say to you anything that
21 caused you to believe that he was unaware of
22 the existence of the notes prior to the
23 commencement of the lawsuit?
24    A.   No.
25         I guess let me clarify.

Page 40

D. Sauter

1
2  He didn't make any comments that
3  made me think one way or the other.
4     Q.   And you didn't ask.
5          Is that fair?
6     A.   Correct, I did not ask.
7     Q.   So you had no information as to
8  whether or not Mr. Dondero actually knew of the
9  existence of the notes prior to the
10 commencement of the lawsuit.
11         Is that fair?
12    A.   Correct.
13    Q.   Okay.  Paragraph 13 also states that
14 you reviewed limited books and records of
15 HCMFA.
16         Do you see that?
17    A.   Yes.
18    Q.   Okay.  What books and records did
19 you review as part of your initial
20 investigation?
21    A.   I don't recall exactly what I looked
22 at or for.
23         I literally had to just go onto the
24 system and try to find anything that related to
25 the notes so I could try to find out what they

Page 41

D. Sauter

1  were.
2
3     Q.   Did you make any effort to try to
4  determine whether HCMFA had accounted for the
5  notes in its books and records?
6     A.   I did not.
7     Q.   Do you know today whether HCMFA ever
8  accounted for the notes in its books and
9  records?
10    A.   I don't know.
11    Q.   Have you ever reviewed HCMFA's
12 balance sheets?
13    A.   I think I have, but I don't -- I
14 can't recall exactly when.
15    Q.   Did you ever make any effort to
16 determine whether HCMFA carried these notes on
17 its balance sheet as liabilities?
18    A.   I did not.
19    Q.   Do you know if HCMFA ever requested
20 an extension of time to respond to the
21 complaint?
22    A.   I don't know, but I would assume so.
23    Q.   Okay.  Do you have any knowledge of
24 HCMFA having done so?
25    A.   No.

Page 42

D. Sauter

2  Q.  Okay.  Do you know if -- prior to
3  the time it filed its original answer, whether
4  HCMFA ever asked HCMLP to provide any documents
5  in connection with the adversary proceeding?
6  A.  Say that again.
7  Q.  Sure.
8      So HCMFA filed its answer on
9  March 1st, according to Paragraph 12.
10     Do I have that right?
11  A.  I believe that's right.
12  Q.  Okay.  Do you know if HCMFA ever
13  asked Highland for any documents before it
14  filed its answer?
15  A.  I don't recall.
16  Q.  So at the time HCMFA filed its
17  answer, Mr. Dondero couldn't recall the genesis
18  of the notes.  Correct?
19  A.  That's right.
20  Q.  And neither Mr. Post nor Mr. Norris
21  could recall the genesis of the notes.
22  Correct?
23  A.  Correct.
24  Q.  And HCMFA had limited access to
25  books and records.  Correct?

Page 43

D. Sauter

2  A.  Correct.
3  Q.  And HCMFA had no access to the
4  debtor's employees who had provided services to
5  HCMFA under shared services agreements.
6  Correct?
7  A.  I think our view was it was
8  potentially improper to reach out to those
9  employees on a matter that was adverse to
10  HCMLP, and so we refrained from doing so.
11  Q.  Okay.  And so under those
12  circumstances, HCMFA nevertheless filed an
13  answer that asserted no affirmative defenses.
14  Correct?
15  A.  Yes.
16  Q.  But this situation changed in
17  mid-April 2001.  Correct?
18  A.  Yes.
19  Q.  If we can scroll down to
20  Paragraph 19.
21      (Discussion was held off the
22  record.)
23  Q.  So in April 2001, the situation
24  changed because Mr. Waterhouse and other former
25  employees of Highland had migrated over to

Page 44

D. Sauter

2  Skyview so that you had access to them.  Is
3  that right?
4  A.  Correct.
5  Q.  And that's when you conducted the
6  second phase of your investigation.  Correct?
7  A.  Yes.
8  Q.  And you'll see at the end of Page 4
9  you reference that the debtor had provided
10  access to HCMFA of much of its books and
11  records.
12     Do I have that right?
13  A.  Yes.
14  Q.  Okay.  And what books and records
15  did Highland provide between March 1st and
16  mid-April when you conducted the second phase
17  of your investigation?
18     Are there any particular books and
19  records that you're referring to in that
20  sentence?
21  A.  I can't recall exactly what it was.
22     There was a process that we were
23  going through that I think -- if you'll recall,
24  that we went back and forth on obtaining access
25  to books and records, submitting written

Page 45

D. Sauter

2  requests, and those were either granted or
3  denied.  And so there were a litany of
4  documents that were sent over.
5  Q.  Can you identify any documents that
6  you reviewed as part of either the initial
7  investigation or the follow-up investigation in
8  April 2021?
9  A.  Yes.
10     I would have reviewed documents
11  related to the TerreStar NAV error.
12  Q.  And can you describe what those
13  documents are.
14  A.  Memos.
15  Q.  Okay.  Do you recall how many memos
16  you reviewed that concerned the TerreStar NAV
17  issue?
18  A.  I want to say that there were three,
19  four or five, something along those lines.
20     I think there was a memo that was
21  submitted to the board and then maybe some
22  communications with the SEC.
23  Q.  And is it your testimony that HCMFA
24  did not have those memos until after March 1st,
25  2021?

Page 46

D. Sauter

1
2    A.   I don't know whether we had access
3  to those memos, but I didn't – I wasn't able
4  to speak to Frank Waterhouse, and so I didn't
5  know to look for them.
6    Q.   And neither Mr. Dondero nor
7  Mr. Norris nor Mr. Post thought to inform you
8  about the NAV star error [sic] because they had
9  no idea what the notes related to. Correct?
10   A.   That's my recollection. That's
11 correct.
12   Q.   Okay. Other than the three to five
13 memos that you've just described, are there any
14 other documents that you recall reviewing as
15 part of your investigation?
16   A.   No.
17   Q.   Do you know to whom the memos that
18 you've just described were addressed?
19       Who were they sent to?
20   A.   I believe there was one that was
21 sent to the board.
22       And then the others, I think, were
23 just either internal communications or
24 communications with the SEC.
25   Q.   Can we scroll down to Paragraph 22,

Page 47

D. Sauter

1
2  please.
3       Actually, look at Paragraph 21
4  first.
5       According to Paragraph 21, as part
6  of the second phase of your investigation, you
7  spoke with Mr. Waterhouse and Mr. Mabry.
8  Correct?
9    A.   Yes.
10   Q.   Did you speak with anybody else as
11 part of the second phase of your investigation?
12   A.   Yes, I would have spoken with Jason
13 Post and Dustin Norris.
14   Q.   And is it fair to say based on the
15 second phase of your -- withdrawn.
16       Is it fair to say that your
17 conclusions that resulted from the second phase
18 of your investigation are set forth in
19 Paragraph 22?
20   A.   (Reviewing document.)
21       I wouldn't say all of my
22 conclusions. But yes, that's some of them.
23   Q.   Okay. Is it fair to say that, based
24 on the second phase of your investigation, you
25 concluded, among other things, "that the notes

Page 48

D. Sauter

1
2  were signed by mistake by Waterhouse without
3  authority from HCMFA"?
4    A.   Yes.
5    Q.   Okay. Let's talk about your
6  discussions with Mr. Waterhouse as part of your
7  investigation.
8       How many times did you speak with
9  him?
10   A.   Probably three.
11   Q.   And was anybody else present for any
12 of the three conversations?
13   A.   I don't recall. I don't think so.
14   Q.   Did you take any notes of your
15 conversations with Mr. Waterhouse?
16   A.   I don't recall.
17   Q.   Do you recall whether you sent
18 anybody any e-mails summarizing your
19 conversations with Mr. Waterhouse?
20   A.   I don't recall.
21   Q.   Did the three conversations take
22 place in person, on the phone or some mix
23 thereof?
24   A.   I think it would have been a mix
25 thereof.

Page 49

D. Sauter

1
2    Q.   Do you recall which of the three
3  conversations was the longest, which was the
4  shortest?
5       I just want to get a sense of how
6  much time you spent with Mr. Waterhouse.
7    A.   I don't, because again, there was
8  lots going on.
9       The first one was in the conference
10 room on the 11th floor at NexBank. The second
11 one was in his office. And I think the third
12 was on a phone call.
13   Q.   Did any of them last more than ten
14 minutes?
15   A.   I can't say for certain.
16       I would think so, but...
17   Q.   Okay. Did you show Mr. Waterhouse
18 either of the notes as part of either of these
19 three interviews?
20   A.   I don't recall if I did.
21       But he knew -- he knew the notes.
22   Q.   And what did he say to you that led
23 you to believe that he knew the notes?
24   A.   Because he was aware of the notes.
25       I...

Page 50

D. Sauter

2 Q. Did he tell the circumstances
3 surrounding the execution of the notes?
4 A. Yes.
5 Q. What did he tell you?
6 A. He said those notes were executed in
7 connection with the TerreStar NAV error.
8 Q. During your discussions with
9 Mr. Waterhouse, did he ever deny signing the
10 notes?
11 A. No.
12 Q. He never told you that he was
13 unaware of the existence of the notes, did he?
14 A. No.
15 Q. In fact, before signing your
16 declaration, you believed Mr. Waterhouse in
17 fact had signed the notes. Correct?
18 A. Yes.
19 Q. And that's why in Paragraph 22 you
20 specifically wrote that the notes were signed
21 by mistake by Waterhouse. Right?
22 A. Yes.
23 Q. And you understood at the time you
24 signed your declaration that Mr. Waterhouse had
25 signed the notes at a time when he was HCMFA's

Page 51

D. Sauter

2 chief financial officer. Correct?
3 A. I don't think I said that, but that
4 would have been my assumption.
5 Q. Okay. I think if we can -- give me
6 just one moment. I think I...
7 Can we go to Paragraph 29, please.
8 You'll see, according to your
9 declaration, it says: "Returning to the notes,
10 Waterhouse was the chief financial officer of
11 both the debtor and the HCMFA during the above
12 events and at the time he signed the notes."
13 Have I read that correctly?
14 A. You did.
15 Q. Does that refresh your recollection
16 that at the time you signed this declaration
17 you believed that Mr. Waterhouse was HCMFA's
18 CFO at the time he signed the notes?
19 A. It does.
20 Q. Okay. During your investigation did
21 Mr. Waterhouse ever tell you that he signed the
22 notes by mistake?
23 A. No.
24 Q. Did you ever ask Mr. Waterhouse
25 during your investigation whether he signed the

Page 52

D. Sauter

2 notes by mistake?
3 A. I guess I'd like to clarify that
4 response, if I may.
5 Q. Go right ahead.
6 A. I asked Mr. Waterhouse why he would
7 have signed it -- the notes in his personal
8 capacity.
9 And his response was, I don't know,
10 I didn't prepare them.
11 So I don't know if that gives you
12 the answer you're looking for, but there was
13 some confusion about the execution of those
14 notes.
15 Q. Okay. Did he say anything else
16 that -- on the topic of whether signing the
17 notes was a mistake?
18 A. No.
19 Q. Okay. Your declaration doesn't
20 disclose what you just described for me.
21 Correct?
22 A. Not in those exact words, no.
23 Q. Is there anything in your
24 declaration that suggests that Mr. Waterhouse
25 hadn't signed the notes?

Page 53

D. Sauter

2 A. I don't think there's anything else
3 in my declaration from --
4 Q. Okay. There's nothing --
5 (Simultaneous crosstalk.)
6 Q. I apologize.
7 A. -- from May that would suggest that
8 Mr. Waterhouse didn't sign the notes.
9 Q. There's nothing in here, in your
10 declaration, that states that Mr. Waterhouse
11 admitted that he made a mistake in signing the
12 notes. Correct?
13 A. Correct.
14 Q. There's nothing in your declaration
15 that suggests that Mr. Waterhouse in fact did
16 not sign or did not authorize the signing of
17 his signature to these notes. Correct?
18 A. Correct, because he told me he did.
19 Q. Okay. And Mr. -- he told you that
20 he had signed the notes. Correct?
21 A. Yes.
22 He said that he didn't use his
23 electronic signature then, and if his signature
24 was on them, it would have been his.
25 Q. Okay. Mr. Waterhouse never filed

Page 54

D. Sauter

1 his own declaration in support of HCMFA's
2 motion for leave to amend their answer.
3 Correct?
4 A. Correct.
5 Q. During your investigation did you
6 ask Mr. Waterhouse if he had authority to sign
7 the notes?
8 A. Probably not in those exact words.
9 Q. Okay. Did you ask him in form or
10 substance whether he was authorized to sign the
11 notes?
12 A. Yes.
13 Q. And what did he say?
14 A. I think he -- well, his response was
15 if he signed them, he was authorized to sign
16 them.
17 Q. Okay. And Mr. Waterhouse never told
18 you that he signed the notes without authority.
19 Correct?
20 A. He told me that -- I asked him if
21 Mr. Dondero had approved the notes.
22 And I don't think he could recall.
23 Q. Okay. Did Mr. Waterhouse ever tell
24 you that he signed the notes without authority?
25

Page 55

D. Sauter

1 A. No.
2 Q. Okay. Your declaration certainly
3 doesn't say that Mr. Waterhouse admitted
4 signing the notes without authority. Correct?
5 A. Correct.
6 Q. Mr. Waterhouse never filed a
7 declaration in this case stating that he had
8 filed the notes without authority. Correct?
9 A. Correct.
10 Q. Are you aware that Mr. Waterhouse
11 was deposed in this case?
12 A. I'm -- yes, I'm aware.
13 Q. Have you reviewed his deposition
14 transcript?
15 A. I have not.
16 Q. Has his testimony been described for
17 you by anybody?
18 MR. RUKAVINA: And I'll just caution
19 you, Mr. Sauter. You know, I think that's a
20 yes or no answer, but don't go into the
21 substance of any discussions with me.
22 THE WITNESS: Yes. Okay.
23 Yes.
24
25

Page 56

D. Sauter

1 BY MR. MORRIS:
2 Q. All right. Are you aware that he
3 testified that nobody has ever told him that he
4 made a mistake in signing the notes?
5 MR. RUKAVINA: Objection, form.
6 THE WITNESS: I'm not.
7 Q. Are you aware of anybody in the
8 world ever telling Mr. Waterhouse that he made
9 a mistake in signing the notes?
10 A. Yes.
11 Q. And who told him that?
12 A. Me.
13 Q. And when did you tell him that?
14 A. When we had this discussion.
15 Q. Okay. So it's your testimony that
16 you actually told Mr. Waterhouse that he made a
17 mistake in signing the notes. Right?
18 A. I asked him who had approved these
19 notes and what was the process.
20 And he said he couldn't give me any
21 process. He said the money was transferred,
22 and so we signed the notes.
23 Q. Okay. But did you tell him that he
24 made a mistake?
25

Page 57

D. Sauter

1 A. I think I implied it.
2 Q. Do you have a recollection of
3 actually telling him that he made a mistake?
4 A. That would be my recollection.
5 Obviously he disagrees with it.
6 Q. Do you know if any -- and on what
7 basis did you conclude that he made a mistake?
8 Withdrawn.
9 You have no personal knowledge of
10 anything that happened in connection with the
11 TerreStar valuation issue. Correct?
12 A. I was not personally involved in the
13 TerreStar valuation issue, correct.
14 Q. You weren't involved in any of the
15 decisions that were made in connection with the
16 TerreStar valuation. Correct?
17 A. Correct.
18 Q. You weren't made -- you weren't
19 involved and had no responsibility for HCMFA's
20 response to the SEC. Correct?
21 A. Correct.
22 Q. You had no responsibility or
23 involvement in the decision as to how HCMFA was
24 going to fund the losses to the GAF. Correct?
25

Page 58

D. Sauter

1
2    A.    Correct.
3    Q.    You had no responsibility or
4    involvement in how HCMFA reported to GAF.
5    Correct?
6    A.    Correct.
7    Q.    But nevertheless, despite having no
8    personal knowledge of those issues, you told
9    Mr. Waterhouse or implied to Mr. Waterhouse
10   that he made a mistake in executing the notes.
11   Correct?
12   A.    Correct.
13   Q.    What did Mr. Waterhouse say in
14   response?
15   A.    Not much. He just disagreed.
16   Q.    Did he just say, I disagree, and
17   that's it or did he actually -- do you recall
18   anything specific that he said?
19   A.    I think I've already testified he
20   said, we transferred the money, so I executed
21   the notes. HCMFA didn't have the money to pay
22   GAF, and so we transferred it from HCMLP and I
23   executed the notes.
24   Q.    Okay. Your declaration doesn't
25   attribute any specific statements to

Page 59

D. Sauter

1
2    Mr. Waterhouse, does it?
3    A.    It does not.
4    Q.    In fact, your declaration is just --
5    withdrawn.
6          If we can go to Paragraph 30.
7          Take a look at Paragraph 30. We'll
8    kind of parse it through.
9          The first sentence says: "It
10   appears clear that Mr. Waterhouse made a
11   mistake."
12         Do you see that?
13   A.    Yes.
14   Q.    But again, Mr. Waterhouse never
15   admitted to making a mistake. Correct?
16   A.    Correct.
17   Q.    And this is your -- this is a
18   conclusion that you're reaching in May of 2021,
19   more than two years after the fact. Correct?
20   A.    Based upon my review of the
21   documents and my discussions with Mr. Post and
22   Mr. Norris.
23   Q.    Did you ever have any discussions
24   with Mr. Dondero in May of 2021 as you were
25   preparing this document?

Page 60

D. Sauter

1
2    A.    Did I have any discussions with him
3    about this?
4    Q.    I apologize. That was a bad
5    question.
6          Did you discuss in May of 2021 the
7    issues concerning the notes with Mr. Dondero,
8    or was that just part of the initial
9    investigation?
10   A.    I don't recall.
11   Q.    And then a couple of lines down, you
12   say -- you wrote: "It appears that
13   Mr. Waterhouse assumed incorrectly that the
14   funds being paid by the debtor were a loan to
15   HCMFA."
16         Do you see that?
17   A.    Yes.
18   Q.    Did you ask Mr. Waterhouse if he
19   actually made the assumption that you're
20   attributing to him?
21   A.    Yes.
22   Q.    And did he ever admit that the
23   assumption was incorrect?
24   A.    He did not admit that the assumption
25   was incorrect.

Page 61

D. Sauter

1
2    Q.    Okay. Again, that's your own
3    conclusion. Is that fair?
4    A.    That's correct.
5    Q.    And then you continue on and you
6    write: "Third" -- withdrawn.
7          You write: "Third, it therefore
8    appears that Mr. Waterhouse prepared the notes
9    for some internal accounting or other purpose
10   but without there being actual consideration
11   for the notes and without any intention on the
12   part of the debtor and HCMFA that there be
13   notes or that there be a loan transaction."
14         Have I read that correctly?
15   A.    Yes.
16   Q.    So did Mr. Waterhouse tell you that
17   he prepared the notes for some internal
18   accounting or other purpose?
19   A.    Yes.
20   Q.    And did he tell you what the purpose
21   of the notes was?
22   A.    Yes.
23         He said if he transferred money he
24   had to have a note to go with it.
25   Q.    You state in your declaration:

Page 62

1          D. Sauter
2 "There was no" -- withdrawn.
3          You state in your declaration that
4 there was no "intention on the part of the
5 debtor and HCMFA that there be notes or that
6 there be a loan transaction."
7          Do you see that?
8     A.   Yes.
9     Q.   What's the basis for --
10          MR. RUKAVINA:  Object to the form.
11     I apologize.  I apologize, John.
12     I apologize, DC.
13     I'll just object to the form.
14 That's not what this says.
15     Go ahead.
16          MR. MORRIS:  Well, then let me
17 restate it if I read it incorrectly.
18 BY MR. MORRIS:
19     Q.   Mr. Sauter, does the last sentence
20 of your Paragraph 30 state, among other things,
21 that the notes were prepared "without any
22 intention on the part of the debtor and HCMFA
23 that there be notes or that there be a loan
24 transaction"?
25     A.   Yes.

Page 63

1          D. Sauter
2     Q.   What's the basis for your sworn
3 statement concerning the debtor's intentions?
4          MR. RUKAVINA:  Again, I'll object.
5          Just so that we're clear, Mr. Sauter
6 says "it appears that."  He does not say it is
7 a fact.  He says "it appears that."  There is a
8 distinction there.
9          MR. MORRIS:  Okay.  You've got your
10 objection.
11 BY MR. MORRIS:
12     Q.   What's the basis for your statement
13 that it appeared the debtor had no intention
14 that there would be notes or that there would
15 be a loan transaction?
16     A.   If you're talking about a
17 $7.4 million obligation, I would assume that
18 there would be a process internally on who was
19 responsible for the payment of the fees or for
20 the -- or the expenses for the NAV error.
21          Based upon my discussions with Frank
22 Waterhouse, there was no process or the legal
23 department was not involved in making a
24 determination as to whether there should be
25 notes.  It was merely a ministerial act that

Page 64

1          D. Sauter
2 accounting performed when they transferred the
3 funds to pay GAF.
4     Q.   Is it your testimony as the general
5 counsel of Nexpoint that the law department or
6 the legal department is involved in every note
7 that's executed by one of the Highland
8 affiliates?
9          MR. RUKAVINA:  Object to the form.
10          THE WITNESS:  I can't answer that.
11     Q.   Okay.  So other than the fact that
12 it didn't go past the legal department, do you
13 have any other basis for your statement that it
14 appears that the debtor had no intention that
15 there would be notes?
16     A.   Yes, there's an internal NAV error
17 correction policy that obligates the
18 responsible party to pay for it.
19          In this case it was HCMLP that made
20 the NAV error.
21     Q.   There's a policy that you're
22 referring to?
23     A.   Yes.
24     Q.   And do you know when that policy was
25 adopted?

Page 65

1          D. Sauter
2     A.   I don't know for certain.
3          But I know there was a policy in
4 place as of 2018.
5     Q.   Okay.  Other than the policy, have
6 you ever seen any memo written -- withdrawn.
7          Have you ever seen any document in
8 the world that states that HCMLP is responsible
9 for the TerreStar NAV error?
10     A.   I would say the memos that
11 acknowledged that there was a mistake.
12     Q.   And is it your recollection that the
13 memos specifically say that HCMLP was
14 responsible for the mistake?
15     A.   No, because the memos were vis-à-vis
16 HCMFA and GAF.
17     Q.   Okay.  So let me ask you the
18 question again.
19          During the course of your two
20 investigations, did you ever see a document
21 that stated that HCMLP was responsible for the
22 TerreStar NAV error?
23     A.   I don't recall.
24     Q.   You don't recall seeing one.  Is
25 that correct?

Page 66

D. Sauter

1
2     A.   That's correct.
3     Q.   Okay.
4     A.   Can we take a quick break?
5     Q.   Yeah, now would be perfectly fine.
6          Give me just one second before we go
7  off the record.
8          So it's 2:15 local time.  Can we
9  limit it to ten minutes, Mr. Sauter?
10    A.   Yeah, that would be fine.
11    Q.   Okay.  And I would ask that you're
12 still under oath, and I would ask that you not
13 speak with counsel or communicate with anybody
14 about the substance of your deposition.
15         Is that fair?
16         MR. RUKAVINA:  Don't answer that
17 question, Mr. Sauter.
18         The law is what it is, and we're not
19 going to agree to something (audio issue) than
20 the law requires.
21         MR. MORRIS:  Well, then I'm not
22 going to take a break.  How about that?
23         Let's keep going.
24         MR. RUKAVINA:  No, we're taking a
25 break and I'm going to the restroom.

Page 67

D. Sauter

1
2          MR. MORRIS:  We're not taking a
3  break, bud.  I'm not --
4          (Simultaneous crosstalk.)
5          MR. RUKAVINA:  We'll be back in ten
6  minutes.
7          MR. MORRIS:  Hey, Davor, I'm going
8  to ask your client a question.  Okay?
9          (Simultaneous crosstalk.)
10         MR. RUKAVINA:  -- but we're not --
11 I'm sorry.
12         You can ask him afterwards who he's
13 talked to and about what, but you don't get to
14 tell him that he can't talk to anyone.
15         So let's go take a piss break and be
16 back in nine minutes.
17         MR. MORRIS:  Put that on the record.
18         (Recess was taken from 2:17 p.m. to
19 2:28 p.m.)
20 BY MR. MORRIS:
21    Q.   Are you ready to proceed, Mr.
22 Sauter?
23    A.   I am.
24    Q.   During the break did you speak to
25 anybody about the substance of your testimony?

Page 68

D. Sauter

1
2     A.   I did not.
3     Q.   Okay.  Did you communicate with
4  anybody about the substance of your testimony?
5     A.   I did not.
6     Q.   I want to stick with the focus on
7  the debtor's intent as stated in Paragraph 30.
8          Before you prepared your
9  declaration, did you spend any time reviewing
10 any of the debtor's bankruptcy filings?
11    A.   Yes.
12    Q.   And are you aware that throughout
13 the bankruptcy the debtor disclosed these notes
14 as assets of the estate?
15    A.   Yes.
16    Q.   And what documents did you review
17 that led you to conclude that the debtor was
18 disclosing the notes as assets of the estate?
19 Do you recall?
20    A.   I mean, I would have known it from
21 the schedules.  I would have known it from your
22 complaint.
23    Q.   Okay.  So you reviewed the debtor's
24 schedules of assets and liabilities prior to
25 the time you signed your declaration.  Is that

Page 69

D. Sauter

1
2  right?
3     A.   Well, I didn't review them in
4  connection with my preparation of the
5  declaration, but yes, I had reviewed them.
6     Q.   And in reviewing them, did you learn
7  that the debtor had in fact carried the notes
8  as assets on its balance sheet or on its
9  schedules of assets and liabilities?
10         MR. RUKAVINA:  I'm going to object
11 to the form.
12         THE WITNESS:  I was aware that the
13 debtor sought to collect on the note from
14 HCMFA, the notes.
15 BY MR. MORRIS:
16    Q.   Are you aware that Mr. Dondero was
17 in control of Highland Capital Management, LP
18 from at least the date of the bankruptcy filing
19 in October 2019 through around January 9th,
20 2020?
21    A.   Yes.
22    Q.   Okay.  Are you aware that, while
23 Mr. Dondero was in control of the debtor during
24 that period, that Highland filed statements of
25 financial affairs and schedules of assets?

Page 70

D. Sauter

1      A.   Generally, I guess, yes.

2          But I'm not aware of a particular

3  document called statement of financial affairs.

4      Q.   Are you aware that while Mr. Dondero

5  was in control of Highland during the

6  bankruptcy, the debtor filed documents stating

7  that the notes were assets of the estate?

8      A.   I was not.

9      Q.   Okay.  Did you ever, as part of your

10  investigation, try to see how the debtor

11  treated the notes in its court filings?

12      A.   I did not, beyond the filing of the

13  complaint.

14      Q.   So you never had a conversation with

15  anybody – withdrawn.

16          Did you ever ask Mr. Waterhouse how

17  the debtor treated the notes in its books and

18  records?

19      A.   No.

20      Q.   Did you ever ask Mr. Waterhouse how

21  HCMFA treated the notes in its books and

22  records?

23      A.   No.

24      Q.   Have you been following developments

25

Page 71

D. Sauter

1  in this particular adversary proceeding?

2      A.   Yes.

3      Q.   Are you aware that both HCMFA and

4  Highland disclosed the existence of the notes

5  to their outside auditors within 30 days of

6  their execution?

7      MR. RUKAVINA:  Objection, form.

8      THE WITNESS:  Yes.

9          And it's my understanding that's why

10  the notes were prepared.

11      Q.   And what's that understanding based

12  on?

13      MR. RUKAVINA:  And now, Mr. Sauter,

14  let's be very careful here.

15      Please answer only if it's based on

16  factual information that a nonlawyer told you.

17      THE WITNESS:  Yeah.  I believe

18  Mr. Waterhouse told me that he needed a note to

19  document the transfer of funds.

20  BY MR. MORRIS:

21      Q.   Okay.  But I asked you a different

22  question, and that's simply whether or not

23  you're aware as you sit here today whether

24  HCMFA and Highland disclosed the existence of

25

Page 72

D. Sauter

1  the notes to the outside auditors.

2      MR. RUKAVINA:  I'll object again.

3      THE WITNESS:  Yes, I am aware.

4      Q.   Have you ever seen HCMFA's audited

5  financial statements?

6      A.   I don't recall.

7      I think you asked me that earlier.

8  And I may have seen them, but I don't recall

9  specifically.

10      Q.   Do you recall looking at the audited

11  financial statements as part of your

12  investigation?

13      A.   No.

14      Q.   Let's put up HCMFA's audited

15  financial statements for the period ending

16  December 31st, 2018.  And it's previously been

17  marked as Deposition Exhibit 45.

18      (Exhibit 45, Consolidated Financial

19  Statements and Supplemental Information

20  December 31, 2018, D-CNL002273-296, previously

21  marked for identification.)

22      Q.   Do you see the first page there?

23      This is the HCMFA consolidated

24  financial statements for the period ending

25

Page 73

D. Sauter

1  December 31st, 2018.

2      Do you see that?

3      A.   I do.

4      Q.   And I think you said you may have

5  seen it before.

6      Did I get that wrong?

7      A.   I said I may have.

8      In looking at this, I don't think

9  I've ever seen this document.

10      Q.   Okay.  Can we just go to the third

11  page and see the date.

12      Do you see that this is the report

13  of the independent auditors

14  PricewaterhouseCoopers?

15      A.   Yes.

16      Q.   And you do see it's dated June 3rd,

17  2019?

18      A.   Yes.

19      Q.   And do you understand that this

20  document was prepared by HCMFA's outside

21  auditors prior to Highland's bankruptcy filing?

22      A.   That's what it purports to be.

23      Q.   Okay.  And it also purports to have

24  been prepared prior to the commencement of the

25

Page 74

D. Sauter

1
2 adversary proceeding as you understand the
3 timing. Correct?
4    A.   Yep.
5    Q.   Let's go to Page 17, please.
6       Do you see there's a section in the
7 audited financial statements called Subsequent
8 Events?
9    A.   Yep.
10    Q.   Do you have any understanding as to
11 what a Subsequent Events section is in audited
12 financial statements?
13    A.   Yes.
14    Q.   What's your understanding of what
15 that section is supposed to include?
16    A.   It's intended to pick up events that
17 occurred after the date of the financials but
18 prior to the date the financials are
19 executed – or issued.
20    Q.   And do you see in the second
21 paragraph there's a description of the two
22 notes?
23    A.   Yes.
24    Q.   Okay. You were not aware that the
25 two notes were included in HCMFA's audited

Page 75

D. Sauter

1
2 financial statements for -- as subsequent
3 events at the time you executed your
4 declaration. Correct?
5    A.   Correct.
6    Q.   Now that you know that, do you think
7 HCMFA made a mistake in including these notes
8 in the audited financial statements, or does it
9 cause you to reconsider your conclusion that
10 the issuance of the notes was a mistake?
11       MR. RUKAVINA: I'll object to that
12 question based on form.
13       THE WITNESS: You're asking me for
14 my legal conclusion?
15    Q.   No, I'm not actually, but it
16 probably wasn't a great question.
17       So your conclusion was that the
18 execution of the notes was a mistake. Correct?
19    A.   Yes.
20    Q.   But HCMFA is reporting the notes as
21 part of its audited financial statements.
22 Correct?
23    A.   Yes.
24    Q.   And do you understand that these
25 financial statements have been audited by

Page 76

D. Sauter

1
2 independent – an independent outside firm
3 called PricewaterhouseCoopers?
4    A.   I assume they're audited financials.
5       And yes, what you've shown me, it
6 appears as though they were prepared by
7 PricewaterhouseCoopers.
8    Q.   Okay. Would you agree with me that
9 it's inconsistent that the notes can't be both
10 a mistake and be reported as valid obligations
11 in the audited financial statements?
12       MR. RUKAVINA: I'll object.
13       This witness is not an expert. He
14 has no personal knowledge. This is well
15 outside the scope of his factual investigation
16 in May of 2021.
17 BY MR. MORRIS:
18    Q.   You can answer, sir.
19    A.   I would agree that the two
20 statements are at odds with one another.
21    Q.   Okay. So I'm just asking you
22 whether -- now that you know that HCMFA
23 included these in the audited financial
24 statements, does that cause you to question at
25 all your conclusion that the execution of the

Page 77

D. Sauter

1
2 notes was a mistake?
3       MR. RUKAVINA: I'll again object.
4       This witness is not an expert. He's
5 not going to be a trial expert. And a motion
6 to amend has already been agreed upon and ruled
7 upon.
8 BY MR. MORRIS:
9    Q.   You can answer, sir.
10    A.   I would say that the audited
11 financials were prepared by
12 PricewaterhouseCoopers with input from the
13 accounting team.
14       And as I stated previously, I think
15 there was an -- a breakdown in the process that
16 should have occurred, and had others looked at
17 this, they wouldn't have come to the same
18 conclusion.
19    Q.   So do you believe, based on the
20 investigation that you did, that a second
21 mistake occurred not only in signing the notes
22 but including them in the audited financial
23 statements?
24       MR. RUKAVINA: Again, I'll object.
25       This witness is not an expert. He

Page 78

D. Sauter

1  has no personal knowledge.
2       THE WITNESS: Yeah, I can't tell you
3  whether that's a mistake.
4       My experience is that generally
5  accounting folks internally said that.
6       So if the accounting folks made a
7  determination that the notes should be included
8  as a subsequent event, then the auditors would
9  include it as a subsequent event.
10 BY MR. MORRIS:
11      Q.   Okay. Do you, is there anybody
12 at HCMFA who's responsible for overseeing the
13 preparation of the audited financial
14 statements?
15      A.   I think Mr. Waterhouse.
16      Q.   When did you first learn that the
17 notes had been included in the financial
18 statements?
19      Are you learning that for the first
20 time right now or did you know that before
21 today?
22      A.   I think I heard that a couple weeks
23 ago.
24      MR. RUKAVINA: Let's be careful here
25

Page 79

D. Sauter

1  again, Mr. Sauter, to exclude our
2  communications, please.
3       THE WITNESS: Okay.
4       Q.   Do you know if HCMFA ever reached
5  out to PricewaterhouseCoopers to inform them
6  that their audited financial statements were
7  incorrect?
8       A.   I don't know.
9       Q.   Do you know whether the debtor
10 included reference to the notes in its audited
11 financial statements?
12      A.   I don't.
13      Q.   Let's go back to your declaration,
14 please, Paragraph 28.
15      Okay. So Paragraph 28 says: "The
16 debtor accepted responsibility to HCMFA for
17 having caused the NAV error, and the debtor
18 ultimately, whether through insurance or its
19 own funds, compensated HCMFA for the above
20 payments."
21      Have I read that correctly?
22      A.   Correct.
23      Q.   Paragraph 28 doesn't cite any source
24 for that statement. Right?
25

Page 80

D. Sauter

1       A.   Correct.
2       Q.   Okay. You don't attribute that
3  statement to any particular person. Correct?
4       A.   That's correct.
5       Q.   What is the basis for your statement
6  that the debtor accepted responsibility to
7  HCMFA?
8       A.   It would be that the debtor's
9  employees who performed the valuation function
10 acknowledged that they had made a mistake.
11      Q.   And who are those employees?
12      A.   Well, ultimately I don't know
13 exactly who it was that came to that
14 determination, but I think it was Frank
15 Waterhouse and Thomas Surgent.
16      Q.   Did you ever interview Mr. Surgent
17 as part of your investigation?
18      A.   No, I was prohibited from speaking
19 with him.
20      Q.   So you're not aware of
21 Mr. Waterhouse ever saying that the debtor
22 accepted responsibility – withdrawn.
23      You're not aware of Mr. Surgent –
24 withdrawn.
25

Page 81

D. Sauter

1       You have no personal knowledge that
2  Mr. Surgent accepted, on behalf of the debtor,
3  responsibility for the NAV error. Correct?
4       A.   I have no personal knowledge of
5  that, correct.
6       Q.   Okay. And did Mr. Waterhouse tell
7  you that the debtor accepted responsibility to
8  HCMFA for having caused the NAV error?
9       A.   I think Mr. Waterhouse said that the
10 HCMLP employees who formed the valuation
11 committee ultimately concluded that they had
12 made a mistake and they needed to accept that.
13      Q.   Okay. It doesn't say that in your
14 declaration, does it?
15      A.   Doesn't say what?
16      Q.   That Mr. Waterhouse told you that.
17      A.   No.
18      Q.   In fact, is there any particular
19 reason why you didn't share that with the
20 court?
21      A.   No.
22      Q.   Is there anything in writing that
23 you've ever seen which states that the debtor
24 accepts responsibility to HCMFA for having
25

Page 82

D. Sauter

1 D. Sauter
2 caused the NAV error?
3    A.   Other than what I've identified, no.
4    Q.   And what you've identified is that
5 policy. Is that right?
6    A.   There's a policy and the
7 acknowledgment that the NAV error was made by
8 the HCMLP employees who were on the valuation
9 committee.
10    Q.   Okay. You're aware that shortly
11 after HCMFA paid the $7.4 million to the fund,
12 HCMFA sent the fund a written report. Is that
13 right?
14    A.   Yes.
15    Q.   Let's take a look at that, if we can
16 put that on the screen.
17         MS. CANTY: Sorry, John, you went
18 out for a second.
19         Can you say that again.
20         MR. MORRIS: Yeah.
21         If you could, I think -- I think I
22 had it listed as Exhibit 37, but it's one of
23 the new ones. It's the memo, I think, from
24 HCMFA to the funds.
25         MS. CANTY: Got it.

Page 83

1 D. Sauter
2         (Exhibit 182, Memo dated 5/28/19,
3 previously marked for identification.)
4 BY MR. MORRIS:
5    Q.   Is this one of the memos that -- and
6 again, Mr. Sauter, if you need to see more of
7 it, just let me know.
8         But is this one of the memos that
9 you saw as part of your investigation?
10    A.   I believe so.
11    Q.   Okay. And do you understand that
12 this is a memo from HCMFA to the board of the
13 Highland Global Allocation Fund?
14    A.   Yes.
15    Q.   And this is where HCMFA describes
16 for the board the resolution of the NAV error.
17 Correct?
18    A.   Correct.
19    Q.   Okay. And did you discuss this memo
20 with anybody as part of your investigation?
21    A.   I mean, other than reviewing it, no.
22    Q.   So -- and how did you obtain a copy
23 of it?
24    A.   Mr. Post.
25    Q.   So Mr. Post gave it to you.

Page 84

1 D. Sauter
2         But you didn't speak with him about
3 it in substance. Correct?
4    A.   I mean, I spoke to him about the
5 transaction and the mistake.
6         I did the same thing with Dustin
7 Norris.
8    Q.   Okay. But you didn't speak with
9 anybody about the substance of this memo.
10 Correct?
11    A.   Correct.
12    Q.   Okay. And -- but you did see this
13 memo before you signed your declaration.
14 Correct?
15    A.   Yes.
16    Q.   Okay. And do you have an
17 understanding of what this memo is?
18    A.   Yeah.
19         I'd like to take a -- I'd like to
20 see the memo in full.
21    Q.   Sure. Take your time.
22         So just tell Ms. Canty when you want
23 to see more and then she'll scroll.
24         Okay. Stop right there.
25    A.   (Reviewing document.)

Page 85

1 D. Sauter
2         Yes. Okay.
3    Q.   So then the second page is this NAV
4 error breakdown.
5         Do you see that?
6    A.   Yes.
7    Q.   All right. We'll come to that, but
8 let's go back to the first page.
9         Have you taken a look at the second
10 paragraph there that begins: "The advisor and
11 Houlihan Lokey, an independent third party
12 expert valuation consultant approved by the
13 board," have you read that paragraph?
14    A.   Yes.
15    Q.   Okay. To the best of your
16 knowledge, did HCMFA accurately define "NAV
17 error" for the board in that paragraph?
18         MR. RUKAVINA: Objection --
19         THE WITNESS: As far as I know, yes.
20         MR. RUKAVINA: This witness is not
21 an expert and has no personal knowledge.
22    Q.   Do you have any reason to believe
23 that HCMFA did not accurately describe for the
24 board the definition of "NAV error"?
25    A.   No.

Page 86

D. Sauter

1
2    Q.   Do you have any reason to believe –
3  take a look at the last sentence.
4        "The orderly determination and
5  adoption of the weighted fair valuation
6  methodology resulted in NAV errors in the
7  fund."
8        Do you see that?
9    A.   Yes.
10    Q.   And that's what's being defined as
11  the NAV error.  Correct?
12    A.   Yes.
13    Q.   Do you have any reason to believe
14  that that sentence is false or misleading in
15  any way?
16    A.   I do not.
17    Q.   Nothing you uncovered during your
18  investigation caused you to believe that that
19  sentence was false or misleading in any way.
20  Correct?
21    A.   No.
22    Q.   Okay.  And the advisor was the
23  entity that made the orderly determination.
24  Correct?
25    A.   That's what this memo says.

Page 87

D. Sauter

1
2    Q.   Okay.  Who's Houlihan Lokey?  Do you
3  know who Houlihan Lokey is?
4    A.   It's a third party valuation firm.
5    Q.   Do they have a good reputation?
6    A.   Yes.
7    Q.   And did they do the valuation of
8  TerreStar?
9    A.   That's my understanding.
10    Q.   Okay.  And were they retained by the
11  advisor or by HCMLP?
12    A.   I don't know.
13    Q.   Did you ever ask anybody who hired
14  Houlihan Lokey?
15    A.   I did not.
16    Q.   Do you know whether HCMFA utilizes
17  Houlihan Lokey's valuation services in the
18  ordinary course of its business?
19    A.   I don't know.
20        I know that Houlihan Lokey has been
21  utilized by either HCMLP, HCMFA or Nexpoint
22  Advisors in the past.
23    Q.   And to the best of your knowledge,
24  has – have those entities continued to use
25  Houlihan Lokey even after May 2019?

Page 88

D. Sauter

1
2    A.   I – I don't know.
3    Q.   Do you know whether anybody ever
4  suggested that Houlihan Lokey was responsible
5  for the valuation error?
6    A.   I don't.
7    Q.   Did you ever ask anybody if Houlihan
8  Lokey was responsible for the valuation error?
9    A.   No.
10    Q.   Do you know if – to the best of
11  your knowledge, this memo was given to the
12  board by HCMFA.  Correct?
13    A.   Yes.
14    Q.   Did – having reviewed the memo, is
15  there anything that you're aware of in this
16  memo where HCMFA tells the board that HCMLP is
17  responsible for the NAV error?
18    A.   No.
19        And I don't think that they would.
20  It would be irrelevant.
21        MR. MORRIS:  I move to strike the
22  latter portion of the answer.
23    Q.   Let's take a look at the bottom
24  paragraph there.
25        Do you see that there's a reference

Page 89

D. Sauter

1
2  to two different payments?
3    A.   Yes.
4    Q.   A payment of approximately
5  $5.2 million was made on February 15th, 2019,
6  and a second payment of approximately
7  $2.4 million was made on May 2nd.
8        Do I have that right?
9    A.   Yes.
10    Q.   Do you know what the source of
11  funding was for the first payment?
12    A.   I do not.
13    Q.   Did you ever ask anybody how
14  HCMFA – withdrawn.
15        Did you ever ask anybody what the
16  source of HCMFA's funding was to make the
17  payment on February 15th, 2019?
18    A.   Say that again.
19    Q.   Did you ever ask anybody what the
20  source of HCMFA's capital was to make that
21  payment on February 15th?
22    A.   I was told that it was a transfer
23  from HCMLP.
24    Q.   You were told that the transfer from
25  HCMLP was made in February of 2019?

Page 90

D. Sauter

1
2    A.   Yes.
3    Q.   Who told you that?
4    A.   Mr. Waterhouse.
5    Q.   Okay.  Do you know what the source
6  was -- hold on one second.
7         And do you know what the source of
8  the second payment was, that $2.4 million on
9  May 2nd, 2019?
10   A.   HCMLP.
11   Q.   Now, we saw earlier that one of the
12  notes was for $2.4 million on May 2nd.
13        Do you recall that?
14   A.   Yes.  Yes.
15   Q.   Okay.  So is it fair -- did you
16  conclude as part of your investigation that at
17  least the amount and the date of the payment
18  matched the amount and the date of the note?
19   A.   I did on the second note, yes.
20   Q.   Okay.  But the -- neither the amount
21  nor the date of the first payment matched the
22  amount or the date of the second note.
23  Correct?
24   A.   That's correct.
25   Q.   Let's take a look at the second

Page 91

D. Sauter

1
2  page.
3         Have you seen this before?
4    A.   I have.
5    Q.   Did you ever have any discussions
6  with anybody at any time during your
7  investigation about this page?
8    A.   I did at some point, and I don't
9  recall exactly when.
10   Q.   Okay.
11   A.   But probably it may have been after
12  the declaration.
13   Q.   Okay.  Do you understand that the
14  first -- I think it's a row -- shows that the
15  total estimated net loss resulting from the NAV
16  error was approximately $7.44 million?
17   A.   Yes, I see that.
18   Q.   Okay.  And do you understand that
19  this chart depicts the sources that are going
20  to be called upon to fund the $7.44 million
21  payment from HCMFA to the fund?
22   A.   I -- yes, I understand that now.
23   Q.   And do you understand that
24  approximately $5 million was going to be funded
25  through insurance proceeds?

Page 92

D. Sauter

1
2    A.   That's what it appears to show.
3    Q.   And during your investigation, were
4  you aware that HCMFA had obtained almost
5  $5 million in connection with the NAV error
6  that it was using to fund the payment to GAF?
7    A.   I subsequently learned that, yes.
8    Q.   And were you aware prior to the time
9  that you signed your declaration -- I apologize
10  if I asked this before -- withdrawn.
11        Were you aware of the almost
12  $5 million in insurance proceeds that was --
13  that were obtained by HCMFA before you signed
14  your declaration?
15   A.   I was not.
16   Q.   So that's new information for you
17  since the time you signed your declaration?
18   A.   Yes.
19   Q.   Okay.  Were you aware at the time
20  you signed your declaration that HCMFA had paid
21  an insurance deductible of almost $250,000?
22   A.   I was not.
23   Q.   Is it your understanding that after
24  the sources described in the top portion of
25  this page, that the total amount needed by the

Page 93

D. Sauter

1
2  advisor to make GAF whole was approximately
3  $2.4 million?
4         That's the 2,398,842 number there.
5    A.   I've not done the math.
6    Q.   Well, that number there matches the
7  number in the bottom paragraph of the first
8  page, if we can scroll back up.
9    A.   Yeah.  No, I understand.
10   Q.   Okay.  So that's the total payment
11  that was made on May 2nd, 2019, according to
12  this memo?
13   A.   That's total payment made to GAF.
14        What I'm unclear about is that it's
15  the total amount out of pocket from the
16  advisor, which may be different, but...
17   Q.   Do you know what the total out of
18  pocket was from the advisor?
19   A.   I don't.
20        (Simultaneous crosstalk.)
21        THE WITNESS:  -- what's listed here.
22   Q.   And do you understand that a total
23  of $7.44 million was paid by HCMFA to GAF?
24   A.   I do.
25   Q.   Okay.  And do you have any reason to

Page 94

D. Sauter

1 believe that the source of the funding is
2
3 anything other than what's set forth on this
4 page?
5     A.    I don't.
6     Q.    And the $2.4 million, that's the
7 $2.4 million that HCMFA obtained from Highland
8 on May 2nd. Correct?
9          MR. RUKAVINA: Objection.
10          The witness is not qualified to
11 answer that.
12     Q.    During the course of your
13 investigation, did you learn that Highland
14 transferred $2.4 million to HCMFA on May 2nd,
15 2019 so that it could pay GAF?
16     A.    That's what I was told.
17     Q.    Okay. Is it your conclusion that
18 Highland was responsible for the $7.44 million
19 estimated net loss resulting from the NAV
20 error?
21          MR. RUKAVINA: Objection.
22          This witness is not an expert, and
23 he has no personal knowledge.
24          THE WITNESS: Yes, I believe that
25 that's accurate.

Page 95

D. Sauter

1
2 BY MR. MORRIS:
3     Q.    And that's because you believe the
4 notes were executed by mistake. Correct?
5     A.    I believe that Highland made the NAV
6 error and was responsible for making GAF whole,
7 albeit vis-à-vis HCMFA, its advisor.
8     Q.    Okay. So because Highland created
9 the NAV error, your understanding based on your
10 discussions with Mr. Post and Mr. Norris is
11 that Highland paid the $7.4 million to HCMFA
12 not as a loan but as compensation for the error
13 that it made.
14          Do I have that right?
15     A.    That would not be based on my
16 discussions with Mr. Post and Mr. Norris.
17          But yes, your conclusion is
18 accurate.
19     Q.    Okay. And let's be really clear
20 what the conclusion is.
21          It's your conclusion that because
22 Highland was negligent in making the NAV error,
23 that when it paid $7.4 million to HCMFA on
24 May 2nd and May 3rd, 2019, it did so as
25 compensation for its negligent conduct and not

Page 96

D. Sauter

1
2 as a loan. Correct?
3     A.    I didn't say negligent, and I don't
4 know that I can make that conclusion.
5          But it should have been indemnity
6 and reimbursement for the error that Highland
7 created.
8     Q.    Okay. Can you tell me why HCMFA
9 took $5 million from an insurance company at
10 the same time it was being made whole by
11 Highland?
12          MR. RUKAVINA: I'll instruct you not
13 to answer that.
14          That is attorney client privileged
15 and work product.
16     Q.    Sir, as part of your investigation,
17 did you make any assessment as to why HCMFA
18 accepted $5 million in proceed – in insurance
19 proceeds at the same time it believed that the
20 $7.4 million was being paid by Highland as
21 compensation?
22          MR. RUKAVINA: Just want to make
23 sure, Mr. Sauter, you understand that counsel
24 is asking about your investigation in May of
25 this year as referenced in your declaration and

Page 97

D. Sauter

1
2 not the investigation generally.
3          THE WITNESS: Yes.
4          And as I said, the May declaration,
5 I was unaware of the $5 million in insurance
6 payments.
7 BY MR. MORRIS:
8     Q.    Now that you're aware of it, does it
9 cause you to question your conclusion that the
10 payment made by Highland in May of 2019 was
11 compensation and not a loan?
12          MR. RUKAVINA: I instruct you not to
13 answer that, Mr. Sauter.
14          MR. MORRIS: On what basis? That
15 you don't like the question?
16          MR. RUKAVINA: No.
17          Let's be professional here, John. I
18 don't know why you've got to get –
19          (Simultaneous crosstalk.)
20          MR. MORRIS: I don't understand.
21 It's a –
22          MR. RUKAVINA: No, you – the way –
23          MR. MORRIS: It's an investigation.
24 He made a conclusion in the investigation.
25          He's now learned a new fact. I'm

D. Sauter

1
2 allowed to ask him if it changes his
3 conclusion.
4          MR. RUKAVINA:  Let me just explain
5 what I understand, what's going on here.
6          He undertook an evidentiary and
7 factual conclusion, which is fair game for you
8 to ask about.  Pardon me.
9          He's told you that he didn't know
10 about this.  His declaration says -- I'm
11 paraphrasing -- it appears that there was a
12 mistake.
13          He has never claimed to have
14 personal knowledge.  He has never claimed to be
15 an expert.  He is not going to be a trial
16 witness.  He has never testified and is not
17 testifying today that there was a mistake.
18          But most importantly, and why I'm
19 instructing him not to answer, is because the
20 issue of how this payment relates to the
21 insurance payable, which again arose after his
22 declaration and is something that he and I have
23 discussed and is my work product.  That is not
24 a part of his factual investigation.
25          So I am instructing him not to

D. Sauter

1
2 answer.  There's no point in you and I arguing
3 about it now.
4          If you feel my objection is
5 inappropriate, then you have your rights
6 intact.
7          MR. MORRIS:  All right.  I'm going
8 to continue to ask questions.
9 BY MR. MORRIS:
10     Q.    Sir, you had this document before
11 you signed your declaration.  Correct?
12     A.    I did.
13     Q.    Okay.  And your conclusion was that
14 because Highland made the NAV mistake, the
15 $7.4 million payment was supposed to be
16 compensation and not in the form of a loan.
17 Correct?
18          MR. RUKAVINA:  Objection, form.
19          THE WITNESS:  Correct.
20     Q.    Okay.  And now the document that you
21 had before you signed your declaration
22 discloses that HCMFA received almost $5 million
23 as part of the insurance proceeds in connection
24 with the NAV error.  Correct?
25     A.    Yes.

D. Sauter

1
2     Q.    Okay.  Does that cause you to change
3 the conclusion that you reached as set forth in
4 your declaration?
5     A.    I don't know enough about the
6 insurance proceeds, the insurance policy and
7 what transpired at the time to make that
8 determination.
9     Q.    Do you know if HCMFA has ever
10 informed the insurance carrier that HCMLP was
11 responsible for the NAV error?
12     A.    I do not.
13     Q.    Did you ever ask anybody?
14     A.    I did not.
15     Q.    As part of your investigation, did
16 you try to determine whether HCMFA ever told
17 the insurance company that HCMLP was
18 responsible for the NAV error?
19     A.    I think I already said I wasn't
20 aware of the insurance proceeds at the time of
21 my declaration.
22     Q.    Has HCMFA returned all or any
23 portion of the insurance proceeds to the
24 carrier?
25     A.    I wouldn't know.

D. Sauter

1
2     Q.    Have you ever asked anybody?
3     A.    No.
4          MR. RUKAVINA:  You've got to wait a
5 second, Mr. Sauter, before answering.
6          Go ahead.
7     Q.    During the course of your
8 investigation, did anybody tell you that on
9 May 3rd, 2019, HCMFA needed another $5 million?
10     A.    Not during the course of my initial
11 investigation.
12     Q.    Are you aware of that today?
13     A.    I am, yes.
14     Q.    Okay.  And do you understand that
15 that $5 million was needed in order for HCMFA
16 to pay what's called a consent fee?
17          MR. RUKAVINA:  I'm going to object.
18          And I'm going to instruct the
19 witness not to answer.
20          Again, this is attorney-client
21 privilege and work product.
22          He learned about all of this well
23 after his investigation and well after his
24 declaration.
25          MR. MORRIS:  These are facts.

Page 102

D. Sauter

1          D. Sauter
2          I don't get it.  These are facts.
3   And I'm not limited to his declaration.  He's
4   here under a subpoena.  I can ask him whatever
5   I want factually.
6          I don't understand, Davor.
7          MR. RUKAVINA:  Well, there's three
8   things.
9          You're generally right, you can ask
10  him whatever you want factually.  I'm not
11  saying that he -- I haven't prevented you from
12  asking factually.  That's issue one.
13         Issue two, he's not a trial witness.
14  His role is limited to the motion to amend,
15  which was granted by consent.
16         And issue three, the question you're
17  asking him right now, if he has any knowledge,
18  he can have only through discussions with me
19  and things he's learned from me in this
20  litigation.  He's told you he did not know
21  about this during his investigation.
22         So I'm going to stick by my
23  instruction not to answer that, Mr. Sauter.
24         MR. MORRIS:  And I'm going to tell
25  you he is a trial witness.  I will certainly be

Page 103

D. Sauter

1   calling him at trial because he conducted an
2   investigation.
3          And I don't think that I need to
4   stop asking questions as of the date of his
5   declaration.  I'm asking purely factual
6   questions.
7          So you know, if you want to continue
8   to direct him not to answer, we'll deal with
9   it, but I'm going to continue to ask him
10  factual questions.
11         MR. RUKAVINA:  To me, this is --
12         (Simultaneous crosstalk.)
13  BY MR. MORRIS:
14     Q.   Mr. Sauter, do you understand that
15  the $5 million was needed by HCMFA on May 3rd,
16  2019 to pay a consent fee?
17         MR. RUKAVINA:  I'm going to instruct
18  you not to answer that, Mr. Sauter.
19     Q.   Are you going to follow your
20  counsel's instructions?
21     A.   I am.
22     Q.   Do you know what a consent fee is,
23  sir?
24     A.   I don't.

Page 104

D. Sauter

1          D. Sauter
2      Q.   Did you ever have -- withdrawn.
3          Did anybody ever tell you that
4   Highland was responsible for any consent fee
5   that HCMFA paid?
6          MR. RUKAVINA:  You're instructed not
7   to answer that to the extent that whoever told
8   you that would be an attorney.
9   BY MR. MORRIS:
10     Q.   Okay.  Did anybody other than an
11  attorney ever tell you that Highland was
12  responsible for any consent fee ever paid by
13  HCMFA?
14     A.   That Highland was responsible for
15  paying a consent fee?
16     Q.   That Highland was responsible for
17  any consent fee that was paid by HCMFA.
18     A.   I don't believe so.
19     Q.   During your discussions as part of
20  your investigation with Mr. Norris and Mr. Post
21  and Mr. Dondero and Mr. Waterhouse, did anybody
22  tell you why Highland paid HCMFA $5 million on
23  May 3rd, 2019?
24     A.   Yes.
25     Q.   And why did -- what did they tell

Page 105

D. Sauter

1          D. Sauter
2   you?
3      A.   It was payment for a consent fee.
4      Q.   All right.  Okay.
5          And who told you that?
6      A.   Mr. Norris.
7      Q.   And did Mr. Norris tell you that
8   Highland had any responsibility for the payment
9   of that consent fee by HCMFA?
10     A.   I don't know that we got into that.
11     Q.   Okay.  Did anybody else tell you
12  that the May 3rd, 2019 $5 million payment was
13  made so that HCMFA could pay the consent fee?
14         MR. RUKAVINA:  Again, I'll instruct
15  you not to answer to the extent you learned
16  anything from an attorney.
17         THE WITNESS:  I don't believe so.
18     Q.   Okay.  Did you speak with
19  Mr. Waterhouse about the $5 million consent fee
20  that Mr. Norris mentioned to you?
21     A.   I have not spoken with
22  Mr. Waterhouse for quite some time about this,
23  since he's represented by counsel.
24     Q.   No.
25         But as part of your investigation,

Page 106

D. Sauter

1
2  after you learned from Mr. Norris that the
3  $5 million was paid so that HCMFA could pay the
4  consent fee, did you follow up with
5  Mr. Waterhouse at all?
6      A.  I didn't know about the consent fee
7  at the time of my investigation.
8      Q.  Okay.  When did Mr. Norris tell you
9  about the consent fee?
10     A.  Probably within the last six weeks.
11     Q.  And does learning about the consent
12  fee from Mr. Norris cause you to question your
13  conclusion that the $7.4 million was paid by
14  Highland to HCMFA on account of the mistake
15  that Highland made on the NAV error?
16         MR. RUKAVINA:  I'll again object
17  that this witness is not an expert and he has
18  no personal knowledge.
19     Q.  You can answer, sir.
20     A.  I wasn't aware of the consent fee.
21         I don't know much about the consent
22  fee.  I don't know what it is, who paid it, why
23  they paid it, what the consideration was for
24  it.
25         So I'm not prepared to answer that.

Page 107

D. Sauter

1
2      Q.  Okay.  Let's go back to your
3  declaration, please, Paragraph 31.
4          Is it fair to summarize this
5  paragraph as saying that because HCMFA and the
6  debtor had executed that acknowledgment, that
7  it would have been illogical for Highland to
8  lend HCMFA $7.4 million in May 2021?
9      A.  Yes.
10     Q.  Okay.  And what was the source of
11  your information for Paragraph 31?
12     A.  I'm not sure I follow.
13     Q.  So you've got the acknowledgment
14  that you attached as Exhibit 4.  Correct?
15     A.  Yes.
16     Q.  Did you discuss with anybody during
17  your investigation any of the facts or
18  conclusions that are set forth in Paragraph 31
19  or did you -- or is it based just on your
20  review of Exhibit 4?
21     A.  Based on my review.
22     Q.  Okay.  Are you aware that in
23  May 2019, Mr. Dondero contemporaneously and
24  personally paid Highland exactly $7.4 million
25  that was owed by Mr. Dondero to Highland under

Page 108

D. Sauter

1
2  a promissory note where he was the maker?
3      A.  I was not.
4      Q.  Nobody told you that as part of your
5  investigation, that the way Highland was able
6  to transfer the $7.4 million to HCMFA was to
7  get that money from Mr. Dondero on account of a
8  note that he signed?
9      A.  No one told me that.
10     Q.  You're hearing that for the first
11  time today?
12     A.  I am.
13     Q.  If Mr. Dondero paid down
14  $7.4 million in obligations that he owed to
15  Highland, would it change your view that it was
16  illogical for Highland to loan that money to
17  HCMFA in May of 2019?
18     A.  Again, without seeing the documents
19  and the timing and the details of the
20  transaction, I can't answer that.
21     Q.  Okay.  Now, the advisors have
22  contracts with the funds they advise.  Correct?
23     A.  Advisory agreements, yes.
24     Q.  And those advisory agreements are
25  subject to annual renewal.  Correct?

Page 109

D. Sauter

1
2      A.  Yes.
3      Q.  As Nexpoint's general counsel, did
4  you participate in the annual renewal process
5  in the fall of 2020?
6      A.  I would have participated in the
7  process, but only with respect to NXRT,
8  Nexpoint Residential Trust and Nexpoint Real
9  Estate Finance.
10     Q.  I see.
11     A.  I had some limited involvement in
12  the 15(c) process with respect to Nexpoint's
13  strategic opportunities fund, but very limited.
14     Q.  Do you know who the representative
15  was for HCMFA who was responsible for the 15(c)
16  annual renewal process in the fall of 2020?
17     A.  I don't.
18         I can speculate, and I would assume
19  it's Mr. -- a combination of Mr. Norris and
20  Mr. Sella (phonetic).
21     Q.  And why do you speculate that it's a
22  combination of them?
23     A.  Because they were actively involved
24  in the process just from conversations I had
25  with them.

Page 110

D. Sauter

1       Q.   Okay.  Have you ever seen any of the
2  reports that the advisors sent to the retail
3  board in connection with the 15(c) annual
4  review?
5       MR. RUKAVINA:  Now, this one,
6  Mr. Sauter, I am going to instruct you not to
7  answer.
8       MR. MORRIS:  Have you ever seen the
9  document?  That's what, you're going to
10 instruct him not to --
11      MR. RUKAVINA:  Don't answer that.
12 Don't answer that.  That relates to discovery
13 and work product privilege.
14      The document was produced to you.
15 Mr. Sauter helped me find that document.  Other
16 than that, nothing about that document and his
17 knowledge is fair game.
18      MR. MORRIS:  Well, I'm going to ask
19 my questions, and you can keep directing him
20 not to answer.
21 BY MR. MORRIS:
22      Q.   Mr. Sauter, have you ever seen any
23 of the reports that were issued by the advisors
24 to the funds?

Page 111

D. Sauter

1       A.   Could you clarify the question.
2       Q.   Sure.
3       Have you ever seen any of the
4  reports that were issued by the advisors to the
5  retail board in the fall of 2020 in connection
6  with the 15(c) review?
7       MR. RUKAVINA:  Mr. Sauter, I'm
8  instructing you not to answer that if your
9  answer involves working with me in this
10 adversary proceeding.
11      If you saw it otherwise as part of
12 business operation, that's fine.
13      THE WITNESS:  In the fall of 2020, I
14 would have had -- I would not have been
15 involved and I would not have seen anything
16 sent to the board.
17 BY MR. MORRIS:
18      Q.   All right.  Well, let's put it up on
19 the screen.  It's, I think, a document that was
20 previously marked as Deposition Exhibit 59.
21      (Exhibit 59, Memo dated 10/23/20,
22 HCMFAS 000025-031, marked for identification.)
23      Q.   Have you ever seen this document
24 before, sir?

Page 112

D. Sauter

1       A.   Could you scroll down.
2       Q.   Sure.
3       A.   (Reviewing document.)
4       Q.   We can keep going.
5       A.   All right.
6       What's the date on this?
7       Q.   October 23rd, 2020.
8       A.   I honestly don't think I would have
9  been involved in that or seen that.
10      Q.   Okay.  Did you ever ask anybody as
11 part of your investigation -- withdrawn.
12      Are you aware that the advisors were
13 asked to provide information to the retail
14 board as to the obligations that it owed to
15 Highland and its affiliates in connection with
16 the 15(c) annual review?
17      A.   I was not.
18      Q.   So is it fair to say that you never
19 saw this document as part of your
20 investigation?
21      A.   I don't think so.
22      Q.   Is it fair to say that nobody ever
23 told you about the advisors' responses to the
24 retail board in connection with the 15(c)

Page 113

D. Sauter

1  review in October of 2020?
2       A.   I think that's accurate.
3       MR. MORRIS:  We're going to do the
4  30(b)(6) deposition on December 1st?
5       MR. RUKAVINA:  I think I'm waiting
6  for you to confirm.
7       I think that's what --
8       MR. MORRIS:  Let's confirm that
9  right now.
10      I'll send you an e-mail, but I
11 just...
12      MR. RUKAVINA:  Okay.  10 a.m.,
13 Dallas?
14      MR. MORRIS:  Yeah, that sounds fair.
15 BY MR. MORRIS:
16      Q.   All right.  Let's go back to your
17 declaration, please, Paragraph 32.
18      I'm almost done, sir.
19      So you state, among other things,
20 that -- and I'm paraphrasing.  Let me know if
21 I -- if this is fair -- that as a result of
22 your investigation in April of 2019, HCMFA now
23 believes that it has affirmative defenses to
24 the notes that includes the defense of mutual

Page 114

1          D. Sauter
2  mistake.
3          Do I have that right?
4      A.  Yes.
5      Q.  Okay.  What does "mutual" – excuse
6  me – what does "mutual mistake" mean?
7          MR. RUKAVINA:  Are you asking for
8  his legal opinion or how he used it in this
9  declaration?
10         MR. MORRIS:  Only how he used it in
11 the declaration.
12         THE WITNESS:  Well, wouldn't that be
13 a legal conclusion because it's an affirmative
14 defense?
15 BY MR. MORRIS:
16     Q.  Well, I don't know.  It's in your
17 declaration.  I'm just asking you what you
18 meant when you used the phrase – withdrawn.
19         Let me ask a better question.  Maybe
20 it's my fault.
21         Mr. Sauter, what did you mean when
22 you used the phrase "mutual mistake"?
23     A.  What I meant is that there was no
24 analysis or consideration of what had
25 transpired and who is legally responsible for

Page 115

1          D. Sauter
2  the payments to the fund.
3          A transfer was made.  A note was
4  executed without any analysis.
5      Q.  And do you have anything else to add
6  to that?
7      A.  I don't think so.
8      Q.  Okay.  You also say that the notes
9  are void for lack of consideration.
10         Do I have that right?
11     A.  Yes.
12     Q.  You don't dispute that Highland paid
13 HCMFA $2.4 million on May 2nd, 2019.  Correct?
14     A.  No.
15     Q.  And you don't dispute that Highland
16 paid HCMFA $5 million on May 3rd, 2019.
17 Correct?
18     A.  I mean, I believe that's right.
19 That's what I've been told.
20         So yeah, I don't dispute that.
21     Q.  Your reference to "a lack of
22 consideration" means only that, in your
23 opinion, the money should not have been
24 transferred in the form of a loan.
25         Do I have that right?

Page 116

1          D. Sauter
2      A.  You do.
3      Q.  It does not mean that HCMFA did not
4  receive an amount of money exactly equal to the
5  principal amount of the notes.  Correct?
6      A.  Based upon what I've been told,
7  correct.
8      Q.  Okay.  You also write here that
9  Mr. Waterhouse did not "have proper authority
10 to sign the notes."
11         Do I have that right?
12     A.  Yes.
13     Q.  What does "proper" – what did you
14 mean by the phrase "proper authority"?
15     A.  I mean going through the process of
16 what I would expect to see in making a loan of
17 $7.4 million.
18     Q.  So that's just your own subjective
19 view.
20         Is that fair?
21     A.  No.
22         I mean, I think there's a legal
23 basis for that, so yeah.
24     Q.  What's your legal basis for that?
25     A.  There is a process to go through in

Page 117

1          D. Sauter
2  papering a transaction like a $7.4 million
3  loan.  And my understanding of the process, as
4  described to me by Frank Waterhouse, was not
5  the proper process.
6      Q.  Is there a policy or a law that
7  requires a particular process to be followed
8  that you're aware of?
9      A.  What I would expect is
10 communications among the various parties that
11 are involved and agreement that this should be
12 a loan rather than just transferring money and
13 sign a note.
14     Q.  You knew when you signed this
15 declaration that Mr. Waterhouse in fact was an
16 officer of HCMFA at the time his signature was
17 put on the notes.  Correct?
18     A.  Yes.
19     Q.  And is it your view that an officer
20 is not authorized to execute notes on behalf of
21 the company for which he or she works for?
22     A.  I think every company has
23 limitations on authority.
24     Q.  And what limits are you aware of on
25 Mr. Waterhouse – withdrawn.

Page 118

D. Sauter

1
2    What limits are you aware of that
3    existed on Mr. Waterhouse's authority to sign
4    notes on behalf of HCMFA in May of 2019?
5        A.   I don't know what the HCMFA -- what
6    the partnership agreement says, or I should say
7    the general partnership agreement says.
8        But what I would expect is the full
9    participation of legal, accounting and then
10   perhaps Mr. Dondero.
11       Q.   Do you know if Mr. Waterhouse has
12   ever signed any other notes on behalf of HCMFA
13   or any other affiliated entity?
14       A.   I'm sure he has.
15       Q.   Did you do -- as part of your
16   investigation, before reaching your conclusion
17   that Mr. Waterhouse didn't have proper
18   authority, did you try to determine whether in
19   fact he had previously issued notes on behalf
20   of HCMFA or other affiliates?
21       A.   I can't answer your question without
22   knowing the facts surrounding the execution of
23   any particular note.
24       I mean, I think it matters the
25   amount of the note, the term of the note.

Page 119

D. Sauter

1
2    There's a number of factors that come into it.
3        Q.   But you didn't --
4        A.   So --
5        Q.   But you made no inquiry as to any of
6    those issues.  Correct?
7        A.   I made an inquiry of Mr. Waterhouse
8    as it relates to this transaction.
9        Q.   Okay.  And again, Mr. Waterhouse did
10   not admit that he was not authorized to sign
11   these notes.  Correct?
12       A.   Sorry.  He did not admit that he was
13   not authorized to sign the notes, correct.
14       Q.   Okay.
15       MR. MORRIS:  Let's just take a
16   five-minute break.  I may be done.
17       It's 4:28.  Let's just come back at
18   4:35 so I can take a break.
19       (Recess was taken from 3:29 p.m. to
20   3:37 p.m.)
21       MR. MORRIS:  Mr. Sauter, I greatly
22   appreciate your time and attention today.  I
23   have no further questions.
24       THE WITNESS:  Okay.
25       MR. RUKAVINA:  I'll pass the

Page 120

D. Sauter

1
2    witness, save my questions till trial.  Thank
3    you.
4        MR. MORRIS:  Thank you, sir.  Have a
5    good day.
6        MR. RUKAVINA:  Madam Reporter, just
7    before we're done, just to confirm, the witness
8    does want his 30 days to read and review, so
9    please send the transcript to me with exhibits.
10       THE REPORTER:  And Michael, do you
11   need a copy?
12       MR. AIGEN:  Yeah, we'll order one,
13   just regular time.  Doesn't need to be
14   expedited.
15       (Time Noted:  3:38 p.m.)
16
17
18       _____
19       DENNIS C. SAUTER
20
21   Subscribed and sworn to before me
22   this      day of         2021.
23
24   _____
25   Notary Public

Page 121

1    District of Columbia, to wit:
2        I, Stacey L. Daywalt, a Notary
3    Public of the District of Columbia, do hereby
4    certify that the within-named witness remotely
5    appeared before me at the time and place herein
6    set out, and after having been duly sworn by
7    me, according to law, was examined by Counsel.
8        I further certify that the
9    examination was recorded stenographically by me
10   and this transcript is a true record of the
11   proceedings.
12       I further certify that I am not of
13   counsel to any of the parties, nor an employee
14   of counsel, nor related to any of the parties,
15   nor in any way interested in the outcome of
16   this action.
17       As witness my hand and Notarial Seal
18   this 17th day of November, 2021.
19
20
21   _____
22   Stacey L. Daywalt, Notary Public
23   My Commission Expires:  4/14/2026
24
25

Page 122

```
1   --------------I N D E X------------------
2
      WITNESS          EXAMINATION BY      PAGE
3
4    DENNIS C. SAUTER   BY MR. MORRIS       4
5
      ------------------EXHIBITS------------------
6
7    PREVIOUSLY MARKED EXHIBITS        PAGE  LINE
8     Exhibit 181
        Declaration of Dennis C. Sauter,
9       Jr.                    24   3
10    Exhibit 54
        E-mail chain with attachment dated
11      5/2/19
        D-CNL003777-779        25   25
12
        Exhibit 57
13      Promissory Note dated 5/3/19
        D-CNL003764-65         29   5
14
        Exhibit 45
15     Consolidated Financial Statements
        and Supplemental Information
16      December 31, 2018
        D-CNL002273-296        72   19
17
        Exhibit 182
18      Memo dated 5/28/19      83   2
19     Exhibit 59
        Memo dated 10/23/20
20      HCMFAS 000025-031      111  22
21
22
23
24
25
```

Page 123

```
1   NAME OF CASE:
2   DATE OF DEPOSITION:
3   NAME OF WITNESS:
4   Reason Codes:
5      1.  To clarify the record.
6      2.  To conform to the facts.
7      3.  To correct transcription errors.
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25          _____
```

## $

**$2.4** 27:5 28:3 89:7 90:8,12 93:3 94:6,7, 14 115:13

**$250,000** 92:21

**$5** 29:9 91:24 92:5,12 96:9,18 97:5 99:22 101:9,15 103:16 104:22 105:12,19 106:3 115:16

**$5.2** 89:5

**$7.4** 63:17 82:11 95:11,23 96:20 99:15 106:13 107:8,24 108:6,14 116:17 117:2

**$7.44** 91:16,20 93:23 94:18

## 0

**000025-031** 111:23

## 1

**10** 113:13

**10/23/20** 111:22

**11th** 49:10

**12** 42:9

**13** 7:9 31:15 32:6 34:11 39:3 40:13

**15** 6:23

**15(c)** 109:12,15 110:4 111:7 112:17, 25

**15th** 89:5,17,21

**17** 74:5

**181** 24:3 25:23

**182** 83:2

**19** 43:20

**1st** 31:22 42:9 44:15 45:24 113:5

## 2

**2** 28:3

**2,398,842** 93:4

**2001** 6:10 43:17,23

**2002** 6:23

**2006** 7:2

**2009** 7:5,6

**2014** 7:10 37:14

**2017** 15:12

**2018** 65:4 72:17,21 73:2

**2019** 17:2,15 18:5 21:8 26:13 28:4 29:10 32:12 35:14 36:13 37:8 69:19 73:18 87:25 89:5,17, 25 90:9 93:11 94:15 95:24 97:10 101:9 103:17 104:23 105:12 107:23 108:17 113:23 115:13,16 118:4

**2020** 7:12 9:6 36:5 69:20 109:5,16 111:6,14 112:8 113:2

**2021** 9:7,8 24:16 45:8,25 59:18,24 60:6 76:16 107:8 120:22

**21** 47:3,5

**21st** 24:16

**22** 46:25 47:19 50:19

**23rd** 112:8

**28** 79:15,16,24

**29** 51:7

**2:15** 66:8

**2:17** 67:18

**2:28** 67:19

**2nd** 26:8 32:12 89:7 90:9,12 93:11 94:8, 14 95:24 115:13

## 3

**30** 59:6,7 62:20 68:7 71:6 120:8

**30(b)(6)** 113:5

**31** 7:9 72:21 107:3, 11,18

**31st** 72:17 73:2

**32** 113:18

**37** 82:22

**3:29** 119:19

**3:37** 119:20

**3:38** 120:15

**3rd** 29:10 32:12 73:17 95:24 101:9 103:16 104:23 105:12 115:16

## 4

**4** 44:8 107:14,20

**45** 72:18,19

**4:28** 119:17

**4:35** 119:18

## 5

**5/2/19** 26:2

**5/28/19** 83:2

**5/3/19** 29:6

**54** 25:20,25

**57** 29:5

**59** 111:21,22

## 9

**9th** 69:19

## A

**a.m.** 113:13

**accept** 81:13

**accepted** 8:16 79:17 80:7,23 81:3,8 96:18

**accepts** 81:25

**access** 42:24 43:3 44:2,10,24 46:2

**accommodate** 5:23

**account** 106:14 108:7

**accounted** 41:4,8

**accounting** 21:24 26:17,21,22,25 61:9, 18 64:2 77:13 78:6,7 118:9

**accurate** 94:25 95:18 113:3

**accurately** 85:16,23

**acknowledged** 65:11 80:11

**acknowledgment** 82:7 107:6,13

**act** 63:25

**actively** 109:23

**actual** 61:10

**add** 115:5

**addressed** 46:18

**admit** 60:22,24 119:10,12

**admitted** 6:6 30:11 53:11 55:4 59:15

**adopted** 64:25

**adoption** 86:5

**adversary** 23:10 42:5 71:2 74:2 111:11

**adverse** 43:9

**advise** 108:22

**advised** 14:10 19:8

**advisor** 85:10 86:22 87:11 93:2,16,18 95:7

**advisors** 7:20 12:2,6 13:7,8,20,24,25 14:3, 11,20,25 15:5 16:4

**advisors'** 112:24

**advisory** 14:3,6 16:4 108:23,24

**affairs** 69:25 70:4

**affiliated** 12:24 13:4, 8 118:13

**affiliates** 7:18 64:8 112:16 118:20

**affiliation** 13:12

**affirmative** 43:13 113:24 114:13

**afternoon** 4:12

**agree** 30:11,21 66:19 76:8,19

**agreed** 77:6

**agreement** 117:11 118:6,7

**agreements** 43:5 108:23,24

**ahead** 34:23 52:5 62:15 101:6

**AIGEN** 120:12

**albeit** 95:7

**Allocation** 16:21 83:13

**allowed** 98:2

**amend** 54:3 77:6 102:14

**amended** 24:20

**amendment** 24:24

**amount** 32:21,24 90:17,18,20,22 92:25 93:15 116:4,5 118:25

**analysis** 114:24 115:4

**and/or** 18:24 19:3

**annual** 108:25 109:4, 16 110:4 112:17

**answering** 101:5

**anticipated** 10:9

**apologize** 34:22
53:6 60:4 62:11,12
92:9

**appeared** 63:13

**appears** 59:10 60:12
61:8 63:6,7 64:14
76:6 92:2 98:11

**approved** 54:22
56:19 85:12

**approximately** 9:5,
6,8 89:4,6 91:16,24
93:2

**April** 6:23 9:4,6,8
43:23 45:8 113:23

**area** 8:3

**arguing** 99:2

**arose** 98:21

**asks** 27:5

**aspect** 22:17

**asserted** 43:13

**assessment** 96:17

**assets** 68:14,18,24
69:8,9,25 70:8

**assistant** 21:13,16
23:16

**assume** 41:22 63:17
76:4 109:18

**assumed** 60:13

**assumption** 51:4
60:19,23,24

**attached** 27:19
107:14

**attachment** 26:2

**attempt** 5:10,12

**attention** 119:22

**attorney** 4:13 9:20
96:14 104:8,11
105:16

**attorney-client**
101:20

**attribute** 58:25 80:3

**attributing** 60:20

**audio** 66:19

**audited** 72:5,11,15
74:7,11,25 75:8,21,
25 76:4,11,23 77:10,
22 78:14 79:7,11

**auditors** 71:6 72:2
73:14,22 78:9

**authority** 48:3 54:7,
19,25 55:5,9 116:9,
14 117:23 118:3,18

**authorize** 53:16

**authorized** 54:11,16
117:20 119:10,13

**aware** 4:16 37:19,20,
21 38:7,10,11,22,25
39:9 49:24 55:11,13
56:3,8 68:12 69:12,
16,22 70:3,5 71:4,24
72:4 74:24 80:21,24
82:10 88:15 92:4,8,
11,19 97:8 100:20
101:12 106:20
107:22 112:13 117:8,
24 118:2

## B

**back** 7:6 31:16 37:8
44:24 67:5,16 79:14
85:8 93:8 107:2
113:17 119:17

**background** 21:25
35:11

**bad** 60:4

**balance** 41:12,17
69:8

**bankruptcy** 68:10,
13 69:18 70:7 73:22

**based** 47:14,23
59:20 63:21 71:12,16
75:12 77:19 95:9,15
107:19,21 116:6

**basically** 25:5

**basis** 21:2,20 22:7
24:23 57:8 62:9 63:2,

12 64:13 80:6 97:14
116:23,24

**began** 6:21 7:12

**begin** 5:6,13 10:3

**begins** 85:10

**behalf** 81:3 117:20
118:4,12,19

**believed** 50:16 51:17
96:19

**believes** 113:24

**bit** 10:12 11:5 16:11
26:5

**Blair** 27:19

**block** 30:23

**board** 45:21 46:21
83:12,16 85:13,17,24
88:12,16 110:4
111:6,17 112:15,25

**books** 40:14,18 41:5,
8 42:25 44:10,14,18,
25 70:18,22

**bottom** 88:23 93:7

**break** 5:21,24 66:4,
22,25 67:3,15,24
119:16,18

**breakdown** 77:15
85:4

**bring** 13:2

**brings** 10:19 11:23

**broker** 13:10

**bud** 67:3

**building** 34:4

**business** 15:2 87:18
111:13

## C

**call** 49:12

**called** 4:3 6:22,25
7:4,8 26:22 30:16
70:4 74:7 76:3 91:20
101:16

**calling** 103:2

**Canty** 23:17 25:18,21
82:17,25 84:22

**capacity** 10:20 12:12
19:17 52:8

**capital** 4:15 9:19
12:2,6 20:23,25
28:17 29:13,24 30:24
31:11 69:17 89:20

**caps** 16:10

**careful** 71:15 78:25

**carried** 41:16 69:7

**carrier** 100:10,24

**case** 55:8,12 64:19

**caused** 39:21 79:18
81:9 82:2 86:18

**caution** 55:19

**CFO** 18:7,24 19:4
51:18

**chain** 25:25 26:22

**change** 100:2 108:15

**changed** 43:16,24

**characterize** 39:12,
14

**chart** 91:19

**chief** 36:24 37:2,4,11
51:2,10

**circumstances**
43:12 50:2

**cite** 79:24

**claimed** 98:13,14

**clarify** 14:18 39:25
52:3 111:2

**clear** 25:14 59:10
63:5 95:19

**client** 67:8 96:14

**CLOS** 7:24

**CMFA** 34:16

**collect** 31:12 69:13

**collectively** 31:4

**combination**
109:19,22

**commenced** 11:3
23:11

**commencement**
39:23 40:10 73:25

**comments** 40:2

**committee** 81:12
82:9

**communicate** 66:13
68:3

**communications**
34:7 45:22 46:23,24
79:3 117:10

**company** 96:9
100:17 117:21,22

**compensated** 79:20

**compensation**
95:12,25 96:21 97:11
99:16

**complaint** 25:4
31:20 41:21 68:22
70:14

**compliance** 36:18,
24 37:2,5,11

**concerned** 45:16

**conclude** 57:8 68:17
90:16

**concluded** 47:25
81:12

**conclusion** 59:18
61:3 75:9,14,17
76:25 77:18 94:17
95:17,20,21 96:4
97:9,24 98:3,7 99:13
100:3 106:13 114:13
118:16

**conclusions** 47:17,
22 107:18

**conduct** 95:25

**conducted** 19:12
22:18 31:20 44:5,16
103:2

**conference** 49:9

**confirm** 113:7,9
120:7

**confusion** 52:13

**connection** 22:21
23:10 42:5 50:7
57:11,16 69:4 92:5
99:23 110:4 111:6
112:16,25

**consent** 101:16
102:15 103:17,23
104:4,12,15,17
105:3,9,13,19 106:4,
6,9,11,20,21

**consideration** 61:10
106:23 114:24 115:9,
22

**consistent** 18:25

**consolidated** 72:19,
24

**construction** 8:7

**consultant** 85:12

**contemporaneousl
y** 107:23

**continue** 61:5 99:8
103:8,10

**continued** 87:24

**contracts** 108:22

**control** 13:18 69:17,
23 70:6

**controlling** 13:19,21

**controls** 13:15 15:21

**conversation** 32:18
38:23 39:2 70:15

**conversations**
33:10 48:12,15,19,21
49:3 109:24

**copy** 27:19 83:22
120:11

**corporate** 26:17,21,
22,25

**correct** 4:19 9:12
14:5,7,8 19:14 30:4
32:3,8 33:4 40:6,12
42:18,22,23,25 43:2,
6,14,17 44:4,6 46:9,
11 47:8 50:17 51:2
52:21 53:12,13,17,
18,20 54:4,5,20 55:5,
6,9,10 57:12,14,17,

18,21,22,25 58:2,5,6,
11,12 59:15,16,19
61:4 65:25 66:2 74:3
75:4,5,18,22 79:23
80:2,4,5 81:4,6
83:17,18 84:3,10,11,
14 86:11,20,24 88:12
90:23,24 94:8 95:4
96:2 99:11,17,19,24
107:14 108:22,25
115:13,17 116:5,7
117:17 119:6,11,13

**correction** 64:17

**correctly** 51:13
61:14 79:22

**counsel** 4:14 8:19,
21,23 9:2,7,9,13,15,
18 10:7,20 11:25
12:5,16 14:12,14,19,
21 64:5 66:13 96:23
105:23 109:3

**counsel's** 103:21

**couple** 7:22 60:11
78:23

**court** 25:22 70:12
81:21

**created** 95:8 96:7

**crosstalk** 11:17 53:5
67:4,9 93:20 97:19
103:13

**current** 25:22

**D**

**D-CNL002273-296**
72:21

**D-CNL003764-65**
29:6

**D-CNL003777-779**
26:2

**DAF** 36:8

**daily** 35:10

**Dallas** 113:14

**date** 69:18 73:12
74:17,18 90:17,18,
21,22 103:5 112:7

**dated** 26:2,7 28:3
29:5,9 32:12 73:17
83:2 111:22

**David** 26:7

**Davor** 11:19 67:7
102:6

**day** 6:23 10:5 29:9
120:5,22

**days** 71:6 120:8

**DC** 62:12

**deal** 103:9

**dealer** 13:10

**debtor** 34:6 44:9
51:11 60:14 61:12
62:5,22 63:13 64:14
68:13,17 69:7,13,23
70:7,11,18 79:10,17,
18 80:7,22 81:3,8,24
107:6

**debtor's** 43:4 63:3
68:7,10,23 80:9

**December** 7:9 17:15
72:17,21 73:2 113:5

**decision** 57:24

**decisions** 57:16

**declaration** 23:9
24:3,8,19,23 25:3,23
31:15 50:16,24 51:9,
16 52:19,24 53:3,10,
14 54:2 55:3,8 58:24
59:4 61:25 62:3 68:9,
25 69:5 75:4 79:14
81:15 84:13 91:12
92:9,14,17,20 96:25
97:4 98:10,22 99:11,
21 100:4,21 101:24
102:3 103:6 107:3
113:18 114:9,11,17
117:15

**deductible** 92:21

**defense** 11:2 113:25
114:14

**defenses** 43:13
113:24

**define** 13:18 85:16

**defined** 21:17 28:16
30:12,22 86:10

**defines** 29:13

**definition** 30:3 85:24

**denied** 45:3

**Dennis** 4:11 24:3
120:19

**deny** 50:9

**department** 9:19
63:23 64:5,6,12

**depends** 13:17

**depicts** 91:19

**deposed** 4:24 55:12

**deposition** 4:19
55:14 66:14 72:18
111:21 113:5

**depositions** 25:17

**describe** 6:17 45:12
85:23

**describes** 25:3
83:15

**description** 74:21

**detail** 32:19

**details** 108:19

**determination**
63:24 78:8 80:15
86:4,23 100:8

**determine** 18:10,13
19:16 20:12 41:4,16
100:16 118:18

**development** 7:4

**developments**
70:25

**difficult** 34:7

**direct** 103:9

**directing** 110:20

**directly** 15:5

**director** 10:2

**disagree** 58:16

**disagreed** 58:15

**disagrees** 57:6

**disclose** 52:20

**disclosed** 68:13
71:5,25

**discloses** 99:22

**disclosing** 68:18

**discovery** 110:13

**discrete** 7:23 15:2

**discuss** 60:6 83:19
107:16

**discussed** 98:23

**discussion** 43:21
56:15

**discussions** 22:9
48:6 50:8 55:22
59:21,23 60:2 63:21
91:5 95:10,16 102:18
104:19

**dispute** 115:12,15,20

**disputes** 8:8

**distinction** 63:8

**document** 23:21
24:7 25:19 30:10,13
47:20 59:25 65:7,20
70:4 71:20 73:10,21
84:25 99:10,20
110:10,15,16,17
111:20,24 112:4,20

**documents** 15:24
23:17 25:16 42:4,13
45:4,5,10,13 46:14
59:21 68:16 70:7
108:18

**Dondero** 13:14 15:9
16:2 17:4 32:2 33:11
34:3 39:4,8,17 40:8
42:17 46:6 54:22
59:24 60:7 69:16,23
70:5 104:21 107:23,
25 108:7,13 118:10

**draft** 30:6,7

**duly** 4:4 11:18

**Dustin** 34:19 47:13
84:6

**duties** 10:6

## E

**e-mail** 25:25 26:7,17, 21,22,24 27:4 113:11

**e-mails** 48:18

**earlier** 37:14 72:8 90:11

**effort** 20:11 41:3,15

**electronic** 53:23

**Ellington** 9:18

**employed** 8:12 20:20,21,22,24

**employee** 34:24

**employees** 21:5 23:8 34:12,17 43:4,9, 25 80:10,12 81:11 82:8

**employment** 6:18

**end** 44:8

**ending** 72:16,25

**engagements** 7:23

**entire** 8:15

**entities** 12:25 13:8 15:3 87:24

**entity** 12:7 13:4 86:23 118:13

**equal** 116:4

**equity** 16:18

**error** 22:10 45:11 46:8 50:7 63:20 64:16,20 65:9,22 79:18 81:4,9 82:2,7 83:16 85:4,17,24 86:11 88:5,8,17 91:16 92:5 94:20 95:6,9,12,22 96:6 99:24 100:11,18 106:15

**errors** 86:6

**estate** 8:5,9,10,20,22 9:8,15 14:14,20 68:14,18 70:8 109:9

**estimated** 91:15 94:19

**event** 15:11 78:9,10

**events** 51:12 74:8, 11,16 75:3

**evicted** 34:4,5

**evidentiary** 98:6

**exact** 52:22 54:9

**EXAMINATION** 4:7

**examined** 4:4,21

**exclude** 79:2

**excuse** 114:5

**execute** 117:20

**executed** 50:6 58:20,23 64:7 74:19 75:3 95:4 107:6 115:4

**executing** 58:10

**execution** 50:3 52:13 71:7 75:18 76:25 118:22

**exhibit** 24:3 25:20,25 29:5 72:18,19 82:22 83:2 107:14,20 111:21,22

**exhibits** 120:9

**existed** 118:3

**existence** 37:21,25 38:22,25 39:9,18,22 40:9 50:13 71:5,25

**expect** 116:16 117:9 118:8

**expedited** 120:14

**expenses** 63:20

**experience** 78:5

**expert** 30:16 76:13 77:4,5,25 85:12,21 94:22 98:15 106:17

**expertise** 8:2 13:2 21:11

**explain** 98:4

**extension** 41:20

**extent** 104:7 105:15

## F

**fact** 50:15,17 53:15 59:4,19 63:7 64:11 69:7 81:19 97:25 117:15 118:19

**factors** 119:2

**facts** 101:25 102:2 107:17 118:22

**factual** 24:23 71:17 76:15 98:7,24 103:6, 11

**factually** 102:5,10,12

**fail** 5:14

**fair** 5:8,25 6:2 10:11 24:22 25:2 30:20 40:5,11 47:14,16,23 61:3 66:15 86:5 90:15 98:7 107:4 110:18 112:19,23 113:15,22 116:20

**fairly** 10:18

**fall** 109:5,16 111:6,14

**false** 86:14,19

**familiar** 16:13

**fault** 114:20

**February** 7:12 9:6 89:5,17,21,25

**fee** 101:16 103:17,23 104:4,12,15,17 105:3,9,13,19 106:4, 6,9,12,20,22

**feel** 99:4

**fees** 63:19

**file** 24:20

**filed** 25:4 31:21 42:3, 8,14,16 43:12 53:25 55:7,9 69:24 70:7

**filing** 69:18 70:13 73:22

**filings** 68:10 70:12

**Finance** 14:14 109:9

**financial** 51:2,10 69:25 70:4 72:6,12,

16,19,25 74:7,12 75:2,8,21,25 76:11, 23 77:22 78:14,18 79:7,12

**financials** 74:17,18 76:4 77:11

**find** 40:24,25 110:16

**fine** 11:12 14:2 25:24 30:20 31:6 66:5,10 111:13

**finish** 5:6,12

**firm** 6:21,24 7:4 76:2 87:4

**firms** 14:4

**five-minute** 119:16

**floor** 49:10

**fluid** 10:18

**focus** 68:6

**folks** 8:14 13:11 78:6,7

**follow** 103:20 106:4 107:12

**follow-up** 45:7

**foreclosures** 8:9

**form** 17:21 30:15 54:10 56:6 62:10,13 64:9 69:11 71:8 75:12 99:16,18 115:24

**formation** 10:16

**formed** 81:11

**formulating** 22:25

**Frank** 17:10 22:9 26:15 29:24 46:4 63:21 80:15 117:4

**full** 84:20 118:8

**function** 80:10

**fund** 12:2,6 16:21 21:16 28:17 29:14,25 30:24 57:25 82:11,12 83:13 86:7 91:20,21 92:6 109:13 115:2

**funded** 91:24

16,19,25 74:7,12 75:2,8,21,25 76:11, 23 77:22 78:14,18 79:7,12

**funding** 89:11,16 94:2

**funds** 14:7,10,24 15:3 16:3,19 19:7,18 20:5,9 60:14 64:3 71:20 79:20 82:24 108:22 110:25

## G

**GAF** 16:23 17:2,8 20:13 21:13,17 36:10 57:25 58:4,22 64:3 65:16 92:6 93:2,13, 23 94:15 95:6

**game** 98:7 110:18

**gave** 8:16 83:25

**general** 8:19,21,23, 25 9:7,9,13,14,18 10:7,20 11:25 12:5, 15 14:12,13,19,21 64:4 109:3 118:7

**generally** 9:17 13:6 16:13,15 37:18 70:2 78:5 97:2 102:9

**genesis** 32:6 33:3 37:20 38:8 39:4,10 42:17,21

**gentleman** 20:16

**give** 8:17 23:19 51:5 56:21 66:6

**Global** 16:20 83:13

**Godwin** 6:25

**good** 4:12 11:24 87:5 120:5

**Gould** 7:11

**graduate** 6:11,14

**graduated** 6:18

**granted** 45:2 102:15

**great** 75:16

**greatly** 119:21

**ground** 5:3

**group** 6:24 7:7 19:25 26:18,23,25

Gruber 6:25 7:2

guess 13:17 37:7 39:25 52:3 70:2

**H**

handle 10:19

happened 57:11

happening 35:8

hard 38:18

HCMFA 11:7 12:8, 11,13,14,15,18,23 13:6,9,13,22,23 15:14,20,21 16:19 18:11,14,19 19:4,19 21:6 23:11 27:6 31:21 34:12,24 35:14,19 36:2,5,13, 16 37:5 40:15 41:4,7, 16,19,24 42:4,8,12, 16,24 43:3,5,12 44:10 45:23 48:3 51:11 57:24 58:4,21 60:15 61:12 62:5,22 65:16 69:14 70:22 71:4,25 72:24 75:7, 20 76:22 78:13 79:5, 17,20 80:8 81:9,25 82:11,12,24 83:12,15 85:16,23 87:16,21 88:12,16 89:14 91:21 92:4,13,20 93:23 94:7,14 95:7,11,23 96:8,17 99:22 100:9, 16,22 101:9,15 103:16 104:5,13,17, 22 105:9,13 106:3,14 107:5,8 108:6,17 109:15 113:23 115:13,16 116:3 117:16 118:4,5,12,20

HCMFA's 22:25 41:11 50:25 51:17 54:2 57:20 72:5,15 73:21 74:25 89:16,20

HCMFAS 111:23

HCMLP 27:6 37:11 42:4 43:10 58:22 64:19 65:8,13,21 81:11 82:8 87:11,21 88:16 89:23,25 90:10

100:10,17

heard 78:23

hearing 108:10

held 16:19 18:4,11,14 20:5,8,12 21:7 35:14 36:13 43:21

helped 110:16

Hendrix 27:13,15

Hey 67:7

Highland 4:15 7:17, 24 9:18 11:2 12:2,6 20:23,25 21:8 23:6, 11 25:7 26:21 28:17 29:13,24 30:24 31:11 42:13 43:25 44:15 64:7 69:17,24 70:6 71:5,25 83:13 94:7, 13,18 95:5,8,11,22 96:6,11,20 97:10 99:14 104:4,11,14, 16,22 105:8 106:14, 15 107:7,24,25 108:5,15,16 112:16 115:12,15

Highland's 73:22

hired 8:19 10:5 87:13

historical 35:8

history 6:18

hold 14:9 15:16,19 90:6

holds 15:13 17:17 18:19 19:6 36:7,9,15

honestly 112:9

Houlihan 85:11 87:2, 3,14,17,20,25 88:4,7

hybrid 8:7

**I**

idea 46:9

identification 24:5 26:3 29:7 72:22 83:3 111:23

identified 82:3,4

identify 34:16 45:5

illogical 107:7 108:16

imagine 10:15

implied 57:2 58:9

important 5:5 23:19

importantly 98:18

improper 30:23 43:8

in-house 7:3

inappropriate 99:5

include 74:15 78:10

included 74:25 76:23 78:8,18 79:11

includes 113:25

including 75:7 77:22

inconsistent 76:9

incorrect 60:23,25 79:8

incorrectly 60:13 62:17

indemnity 96:5

independent 73:14 76:2 85:11

indirectly 15:5

inform 46:7 79:6

information 19:21 40:7 71:17 72:20 92:16 107:11 112:14

informed 100:10

initial 31:17,18,25 33:11 34:18 37:16 40:19 45:6 60:8 101:10

initially 25:4

input 77:12

inquiry 119:5,7

instruct 96:12 97:12 101:18 103:18 105:14 110:7,11

instructed 104:6

instructing 98:19,25 111:9

instruction 102:23

instructions 103:21

insurance 79:19 91:25 92:12,21 96:9, 18 97:5 98:21 99:23 100:6,10,17,20,23

insured 16:22

intact 99:6

intended 30:24 74:16

intent 68:7

intention 61:11 62:4, 22 63:13 64:14

intentions 63:3

intents 13:20

interco 27:9

interject 11:4

internal 46:23 61:9, 17 64:16

internally 63:18 78:6

interrupting 34:22

interview 80:17

interviews 49:19

investigating 28:24 31:8

investigation 17:6 18:9 19:12,16,23 20:11 22:18,22 25:3, 6,10 28:23 31:17,19 32:2 33:12 34:18 37:16 40:20 44:6,17 45:7 46:15 47:6,11, 18,24 48:7 51:20,25 54:6 60:9 70:11 72:13 76:15 77:20 80:18 83:9,20 86:18 90:16 91:7 92:3 94:13 96:16,24 97:2, 23,24 98:24 100:15 101:8,11,23 102:21 103:3 104:20 105:25 106:7 107:17 108:5 112:12,21 113:23 118:16

investigations 65:20

invited 15:12

involved 57:13,15,20 63:23 64:6 109:23 111:16 112:10 117:11

involvement 57:24 58:4 109:11

involves 111:10

irrelevant 88:20

issuance 75:10

issue 16:8,12,17 19:13,23 45:17 57:12,14 66:19 98:20 102:12,13,16

issued 74:19 110:24 111:5 118:19

issues 58:8 60:7 119:6

Ives 7:4

**J**

January 69:19

Jason 34:25 37:11 47:12

Jim 32:2

job 36:22

John 4:13 11:5 25:21 62:11 82:17 97:17

joined 7:25

Jones 4:14

Jr 24:4

June 73:17

**K**

kicked 34:5

kind 8:6 59:8

Klos 26:7,10,12 27:5, 17

knew 18:16 40:8 49:21,23 117:14

knowing 118:22

**knowledge** 12:16,19 13:16 21:24 22:10 27:16 35:9,20 36:19 37:17 41:23 57:10 58:8 76:14 78:2 81:2, 5 85:16,21 87:23 88:11 94:23 98:14 102:17 106:18 110:18

**Kristin** 27:13

**L**

**lack** 115:9,21

**landlord-tenant** 8:8

**Langley** 7:8,9

**law** 6:4,11,14,19,21 8:3 30:11 64:5 66:18, 20 117:6

**lawsuit** 11:2,7 39:23 40:10

**lawyer** 30:10,17

**learn** 19:22 69:6 78:17 94:13

**learned** 37:25 39:18 92:7 97:25 101:22 102:19 105:15 106:2

**learning** 78:20 106:11

**leave** 54:3

**leaving** 10:17

**led** 49:22 68:17

**left** 23:6 36:21

**legal** 9:19 12:25 63:22 64:6,12 75:14 114:8,13 116:22,24 118:9

**legally** 114:25

**lend** 107:8

**liabilities** 41:17 68:24 69:9

**license** 6:3,9

**limit** 66:9

**limitations** 117:23

**limited** 40:14 42:24 102:3,14 109:11,13

**limits** 117:24 118:2

**lines** 45:19 60:11

**listed** 82:22 93:21

**litany** 45:3

**literally** 40:23

**litigation** 8:7,10 10:22 102:20

**LLP** 12:2

**loan** 27:9 60:14 61:13 62:6,23 63:15 95:12 96:2 97:11 99:16 108:16 115:24 116:16 117:3,12

**local** 66:8

**Lokey** 85:11 87:2,3, 14,20,25 88:4,8

**Lokey's** 87:17

**longest** 49:3

**looked** 30:10 40:21 77:16

**loss** 91:15 94:19

**losses** 57:25

**lot** 10:9 34:2 35:7

**lots** 10:13 49:8

**LP** 4:15 13:24 15:6 20:23,25 28:18 29:14 69:17

**M**

**Mabry** 20:17,19,21 22:11,16,20,24 25:7 47:7

**Mabry's** 21:11

**Madam** 120:6

**made** 34:4,6 40:3 53:11 56:5,9,17,25 57:4,8,16,19 58:10 59:10 60:19 64:19 75:7 78:7 80:11 81:13 82:7 86:23 89:5,7,25 93:11,13

95:5,13 96:10 97:10, 24 99:14 105:13 106:15 115:3 119:5,7

**make** 20:11 25:14 40:2 41:3,15 89:16, 20 93:2 96:4,17,22 100:7

**maker** 28:16 29:13, 23 30:3,12,22 108:2

**making** 59:15 63:23 95:6,22 116:16

**manage** 14:25

**managed** 7:24 16:19 19:18

**Management** 4:15 12:2,6 20:23,25 28:17 29:14,25 30:24 31:12 69:17

**manager** 16:3 17:2,7

**managing** 10:2

**March** 31:22 42:9 44:15 45:24

**marked** 24:4 25:19 26:3 29:6 72:18,22 83:3 111:21,23

**Martin** 7:11

**matched** 90:18,21

**matches** 93:6

**math** 93:5

**Matt** 9:24

**matter** 43:9

**matters** 10:22 118:24

**Mcgraner** 9:24 10:4

**Mcgraner's** 9:25

**means** 115:22

**meant** 114:18,23

**meet** 12:25 15:9 17:12

**memo** 45:20 65:6 82:23 83:2,12,19 84:9,13,17,20 86:25 88:11,14,16 93:12 111:22

**memory** 38:20

**memos** 45:14,15,24 46:3,13,17 65:10,13, 15 83:5,8

**mentioned** 105:20

**met** 15:11 17:14

**Methodist** 6:16

**methodology** 86:6

**Michael** 120:10

**mid-april** 43:17 44:16

**middle** 34:13

**migrated** 25:7 43:25

**million** 27:5 28:3 29:9 63:17 82:11 89:5,7 90:8,12 91:16, 20,24 92:5,12 93:3, 23 94:6,7,14,18 95:11,23 96:9,18,20 97:5 99:15,22 101:9, 15 103:16 104:22 105:12,19 106:3,13 107:8,24 108:6,14 115:13,16 116:17 117:2

**Minick** 6:22

**ministerial** 63:25

**minutes** 49:14 66:9 67:6,16

**misleading** 86:14,19

**mistake** 48:2 50:21 51:22 52:2,17 53:11 56:5,10,18,25 57:4,8 58:10 59:11,15 65:11,14 75:7,10,18 76:10 77:2,21 78:4 80:11 81:13 84:5 95:4 98:12,17 99:14 106:14 114:2,6,22

**mix** 48:22,24

**moment** 51:6

**money** 56:22 58:20, 21 61:23 108:7,16 115:23 116:4 117:12

**Morris** 4:8,13 11:10, 15,18,22 16:9 17:23,

24 18:2 25:24 30:20 31:2 56:2 62:16,18 63:9,11 66:21 67:2,7, 17,20 69:15 71:21 76:17 77:8 78:11 82:20 83:4 88:21 95:2 97:7,14,20,23 99:7,9 101:25 102:24 103:14 104:9 110:9, 19,22 111:18 113:4, 9,15,16 114:10,15 119:15,21 120:4

**motion** 54:3 77:5 102:14

**move** 88:21

**moved** 6:24

**moving** 35:12

**mutual** 113:25 114:5, 6,22

**N**

**N-A-V** 16:10

**named** 20:16 27:19

**NAV** 16:8,12,17 19:13 22:10 45:11,16 46:8 50:7 63:20 64:16,20 65:9,22 79:18 81:4,9 82:2,7 83:16 85:3,16,24 86:6,11 88:17 91:15 92:5 94:19 95:5,9,22 99:14,24 100:11,18 106:15

**necessarily** 15:3

**needed** 71:19 81:13 92:25 101:9,15 103:16

**negligent** 95:22,25 96:3

**net** 91:15 94:19

**Nexbank** 34:10 49:10

**Nexpoint** 7:13,14,20 8:2,13,15,24 9:2,10, 14 10:8 11:9 13:6,8, 9,13,20,24 14:13,14, 20 15:5,16,17 21:5

37:3 64:5 87:21 109:8

**Nexpoint's** 10:22,25 109:3,12

**nonlawyer** 71:17

**Norris** 34:20 35:3,10, 13 36:7,9 37:15 42:20 46:7 47:13 59:22 84:7 95:10,16 104:20 105:6,7,20 106:2,8,12 109:19

**Notary** 4:4 120:25

**note** 27:20 28:3,15 29:3,5,8 30:6 61:24 64:6 69:13 71:19 90:18,19,22 108:2,8 115:3 117:13 118:23, 25

**noted** 11:18 120:15

**notes** 25:11,14 28:22,24 31:4,7,11 32:7,9,11,16,21,24 33:6 37:17,19,20,22, 25 38:3,7,10,12,15, 22,25 39:5,9,11,18, 22 40:9,25 41:5,8,16 42:18,21 46:9 47:25 48:14 49:18,21,23,24 50:3,6,10,13,17,20, 25 51:9,12,18,22 52:2,7,14,17,25 53:8, 12,17,20 54:8,12,19, 22,25 55:5,9 56:5,10, 18,20,23 58:10,21,23 60:7 61:8,11,13,17, 21 62:5,21,23 63:14, 25 64:15 68:13,18 69:7,14 70:8,12,18, 22 71:5,11 72:2 74:22,25 75:7,10,18, 20 76:9 77:2,21 78:8, 18 79:11 90:12 95:4 113:25 115:8 116:5, 10 117:17,20 118:4, 12,19 119:11,13

**November** 6:10

**number** 93:4,6,7 119:2

**NXRT** 109:7

## O

**oath** 66:12

**object** 17:20 30:14 62:10,13 63:4 64:9 69:10 72:3 75:11 76:12 77:3,24 101:17 106:16

**objection** 56:6 63:10 71:8 85:18 94:9,21 99:4,18

**obligates** 64:17

**obligation** 63:17

**obligations** 76:10 108:14 112:15

**obtain** 6:9 83:22

**obtained** 92:4,13 94:7

**obtaining** 44:24

**occasion** 7:22

**occurred** 74:17 77:16,21

**October** 36:5 69:19 112:8 113:2

**odds** 76:20

**offer** 8:16,17

**office** 33:25 34:10 49:11

**officer** 36:18,25 37:2, 5,11 51:2,10 117:16, 19

**officers** 12:18

**official** 12:12

**operation** 111:13

**opinion** 114:8 115:23

**opportunities** 109:13

**opportunity** 23:20

**order** 23:21 101:15 120:12

**orderly** 86:4,23

**ordinary** 87:18

**organizational** 15:24

**origin** 25:10

**original** 31:22 42:3

**origins** 28:24

**overlap** 11:21

**overseeing** 10:21,25 78:13

**owed** 107:25 108:14 112:15

**owned** 7:20 13:7 15:4

**owns** 13:9

## P

**p.m.** 67:18,19 119:19, 20 120:15

**Pachulski** 4:13

**paid** 60:14 82:11 92:20 93:23 95:11,23 96:20 104:5,12,17,22 106:3,13,22,23 107:24 108:13 115:12,16

**papering** 117:2

**paragraph** 31:15 32:6 34:11,14 39:3 40:13 42:9 43:20 46:25 47:3,5,19 50:19 51:7 59:6,7 62:20 68:7 74:21 79:15,16,24 85:10, 13,17 88:24 93:7 107:3,5,11,18 113:18

**paraphrasing** 98:11 113:21

**Pardon** 98:8

**parse** 59:8

**part** 22:4,8,12 31:16 33:11 34:17 40:19 45:6 46:15 47:5,11 48:6 49:18 60:8 61:12 62:4,22 70:10 72:12 75:21 80:18

83:9,20 90:16 96:16 98:24 99:23 100:15 104:19 105:25 108:4 111:12 112:12,20 118:15

**participate** 109:4

**participated** 109:6

**participation** 118:9

**parties** 117:10

**partnership** 118:6,7

**parts** 35:12

**party** 64:18 85:11 87:4

**pass** 119:25

**past** 64:12 87:22

**pay** 58:21 64:3,18 94:15 101:16 103:17 105:13 106:3

**payable** 98:21

**paying** 104:15

**payment** 63:19 89:4, 6,11,17,21 90:8,17, 21 91:21 92:6 93:10, 13 97:10 98:20 99:15 105:3,8,12

**payments** 79:21 89:2 97:6 115:2

**pending** 5:24

**people** 10:14,17 13:2

**perfectly** 66:5

**perform** 12:13

**performed** 64:2 80:10

**period** 69:24 72:16, 25

**person** 13:19,21 33:19,20,22,24 48:22 80:4

**personal** 52:7 57:10 58:8 76:14 78:2 81:2, 5 85:21 94:23 98:14 106:18

**personally** 57:13 107:24

**phase** 25:5 44:6,16 47:6,11,15,17,24

**Phillips** 7:11,12,16 8:15

**phone** 33:19 34:9 48:22 49:12

**phonetic** 109:20

**phrase** 31:18 114:18, 22 116:14

**pick** 74:16

**pin** 33:9

**piss** 67:15

**place** 33:18 48:22 65:4

**play** 26:13

**played** 22:16,20,24

**pocket** 93:15,18

**point** 11:24 18:16 34:3 91:8 99:2

**policy** 64:17,21,24 65:3,5 82:5,6 100:6 117:6

**portfolio** 16:3,25 17:7

**portion** 88:22 92:24 100:23

**position** 8:18 18:4, 19,23 20:9 21:7 35:14,17,19,23

**positions** 16:18 19:7 20:5,12 36:8,10,13, 16 37:8

**Post** 34:25 35:10 36:12,13,18 37:15 42:20 46:7 47:13 59:21 83:24,25 95:10,16 104:20

**potentially** 43:8

**practice** 6:4,7 30:11

**premarked** 25:18,23

**preparation** 69:4 78:14

**prepare** 52:10

**prepared** 61:8,17 62:21 68:8 71:11 73:21,25 76:6 77:11 106:25

**preparing** 59:25

**present** 33:15 48:11

**preserve** 30:18

**president** 15:18 35:24 36:2,4

**prevented** 102:11

**previously** 4:21 24:4 26:3 29:6 72:17,21 77:14 83:3 111:21 118:19

**Pricewaterhouseco opers** 73:15 76:3,7 77:12 79:6

**primarily** 7:19

**principal** 32:20,24 116:5

**prior** 7:25 38:12,23 39:2,22 40:9 42:2 68:24 73:22,25 74:18 92:8

**privilege** 101:21 110:14

**privileged** 96:14

**proceed** 67:21 96:18

**proceeding** 23:10 42:5 71:2 74:2 111:11

**proceeds** 91:25 92:12 96:19 99:23 100:6,20,23

**process** 44:22 56:20,22 63:18,22 77:15 109:4,7,12,16, 24 116:15,25 117:3, 5,7

**produced** 110:15

**product** 96:15 98:23 101:21 110:14

**professional** 97:17

**prohibited** 80:19

**promissory** 25:11 28:3 29:5 30:6 108:2

**proper** 116:9,13,14 117:5 118:17

**proposed** 24:24

**provide** 7:17 12:22 14:6 16:4 42:4 44:15 112:14

**provided** 7:19 43:4 44:9

**Public** 4:4 120:25

**purely** 103:6

**purports** 73:23,24

**purpose** 24:18 25:9 61:9,18,20

**purposes** 13:21

**put** 23:15,17,23 25:18 31:16 67:17 72:15 82:16 111:19 117:17

---

**Q**

**qualified** 94:10

**question** 5:6,13,24 17:25 20:7 60:5 65:18 66:17 67:8 71:23 75:12,16 76:24 97:9,15 102:16 106:12 111:2 114:19 118:21

**questions** 5:5 10:13 99:8 103:5,7,11 110:20 119:23 120:2

**quick** 66:4

---

**R**

**raised** 38:2

**ran** 20:2

**reach** 43:8

**reached** 79:5 100:3

**reaching** 59:18 118:16

**read** 23:21 51:13 61:14 62:17 79:22

85:13 120:8

**ready** 67:21

**real** 8:4,9,10,20,22 9:7,15 14:14,20 109:8

**Realty** 7:4

**reason** 81:20 85:22 86:2,13 93:25

**recall** 9:3 15:10 18:17 20:15 21:22 22:13,15 23:5 27:2 32:6,10,13,18 33:3, 13,17,18 34:21 35:17 38:9,21,24 39:4,10 40:21 41:14 42:15, 17,21 44:21,23 45:15 46:14 48:13,16,17,20 49:2,20 54:23 58:17 60:10 65:23,24 68:19 72:7,9,11 90:13 91:9

**receive** 116:4

**received** 26:20 99:22

**receiving** 27:2

**recess** 67:18 119:19

**recollection** 32:15, 25 33:5 35:2 46:10 51:15 57:3,5 65:12

**reconsider** 75:9

**record** 4:10 25:14 30:19 43:22 66:7 67:17

**records** 40:14,18 41:5,9 42:25 44:11, 14,19,25 70:19,23

**refer** 12:7 13:6,23 16:23 31:3

**reference** 44:9 79:11 88:25 115:21

**referenced** 96:25

**referring** 44:19 64:22

**refrained** 43:10

**refresh** 32:15 51:15

**regular** 120:13

**reimbursement**

96:6

**related** 8:7,9 16:18 32:25 33:6 40:24 45:11 46:9

**relates** 98:20 110:13 119:8

**remained** 21:6

**remember** 24:18

**renewal** 108:25 109:4,16

**reorganized** 4:15

**report** 9:23 73:13 82:12

**reported** 9:20 58:4 76:10

**reporter** 11:20 25:22 120:6,10

**reporting** 10:3 75:20

**reports** 110:3,24 111:5

**representative** 109:14

**represented** 105:23

**reputation** 87:5

**requested** 41:19

**requesting** 24:20

**requests** 45:2

**requires** 66:20 117:7

**Residential** 14:13 109:8

**resolution** 83:16

**respect** 109:7,12

**respond** 41:20

**response** 22:25 27:11 52:4,9 54:15 57:21 58:14

**responses** 112:24

**responsibilities** 10:7

**responsibility** 10:21,25 57:20,23 58:3 79:17 80:7,23

81:4,8,25 105:8

**responsible** 63:19 64:18 65:8,14,21 78:13 88:4,8,17 94:18 95:6 100:11,18 104:4,12,14,16 109:15 114:25

**restate** 17:25 62:17

**restroom** 66:25

**result** 113:22

**resulted** 47:17 86:6

**resulting** 91:15 94:19

**retail** 110:3 111:6 112:14,25

**retained** 87:10

**returned** 100:22

**Returning** 51:9

**review** 40:19 59:20 68:16 69:3 107:20,21 110:5 111:7 112:17 113:2 120:8

**reviewed** 40:14 41:11 45:6,10,16 55:14 68:23 69:5 88:14

**reviewing** 46:14 47:20 68:9 69:6 84:2,25 112:4

**rights** 99:5

**role** 12:10 22:17,21, 25 26:13 102:14

**room** 49:10

**row** 91:14

**rude** 11:13

**Rukavina** 11:4,12, 16,23 17:20 30:14 55:19 56:6 62:10 63:4 64:9 66:16,24 67:5,10 69:10 71:8, 14 72:3 75:11 76:12 77:3,24 78:25 85:18, 20 94:9,21 96:12,22 97:12,16,22 98:4 99:18 101:4,17 102:7 103:12,18 104:6

105:14 106:16 110:6, 12 111:8 113:6,13 114:7 119:25 120:6

**ruled** 77:6

**rules** 5:3

---

**S**

**Sauter** 4:1,11,12 5:1 6:1 7:1 8:1 9:1 10:1 11:1,6,23 12:1 13:1 14:1 15:1 16:1 17:1 18:1,3 19:1 20:1 21:1 22:1 23:1,18 24:1,4 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1,18 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1, 20 56:1 57:1 58:1 59:1 60:1 61:1 62:1, 19 63:1,5 64:1 65:1 66:1,9,17 67:1,22 68:1 69:1 70:1 71:1, 14 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,2 80:1 81:1 82:1 83:1,6 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1,23 97:1,13 98:1 99:1 100:1 101:1,5 102:1,23 103:1,15,19 104:1 105:1 106:1 107:1 108:1 109:1 110:1,7, 16,23 111:1,8 112:1 113:1 114:1,21 115:1 116:1 117:1 118:1 119:1,21 120:1,19

**save** 120:2

**schedules** 68:21,24 69:9,25

**school** 6:12,15,19,21

**scope** 76:15

**Scott** 9:18

**screen** 23:15,18 31:16 82:16 111:20

**scroll** 23:24 26:4 43:19 46:25 84:23 93:8 112:2

**search** 38:19

**SEC** 22:18,21 23:2 45:22 46:24 57:21

**Sechrest** 6:22

**section** 74:6,11,15

**Securities** 13:9

**Sella** 109:20

**send** 113:11 120:9

**sense** 49:5

**sentence** 44:20 59:9 62:19 86:3,14,19

**separate** 14:23 15:2

**series** 5:4

**serve** 36:24

**served** 9:14 19:17

**serves** 16:2

**services** 7:17,19 12:22 14:7 16:4 43:4, 5 87:17

**set** 47:18 94:3 100:3 107:18

**sets** 24:23

**share** 81:20

**shared** 43:5

**she'll** 84:23

**sheet** 41:17 69:8

**sheets** 41:12

**shortest** 49:4

**shortly** 82:10

**show** 32:9 49:17 92:2

**showed** 38:12

**shown** 76:5

**shows** 91:14

**shuffle** 10:16

**sic** 16:10 46:8

**sign** 24:15 53:8,16 54:7,11,16 116:10

117:13 118:3 119:10, 13

**signature** 24:10,12 28:7,9,11,13 29:18, 20,22 30:23 53:17,23 117:16

**signed** 48:2 50:17, 20,24,25 51:12,16, 18,21,25 52:7,25 53:20 54:16,19,25 56:23 68:25 84:13 92:9,13,17,20 99:11, 21 108:8 117:14 118:12

**signing** 50:9,15 52:16 53:11,16 55:5 56:5,10,18 77:21

**simple** 5:3

**simply** 71:23

**simultaneous** 11:17 53:5 67:4,9 93:20 97:19 103:13

**sir** 4:17,20 5:9 6:4 12:9 14:16 15:7 16:24 23:13 24:13,17 25:12 28:11 76:18 77:9 96:16 99:10 103:24 106:19 111:25 113:19 120:4

**sit** 71:24

**sitting** 32:19

**situation** 43:16,23

**skills** 21:11

**Skyview** 10:16 21:4 44:2

**sought** 69:13

**sounds** 113:15

**source** 13:12 28:22 79:24 89:10,16,20 90:5,7 94:2 107:10

**sources** 91:19 92:24

**Southern** 6:16

**speak** 46:4 47:10 48:8 66:13 67:24 84:2,8 105:18

**speaking** 34:21 35:3

80:19

**specific** 20:14 58:18, 25

**specifically** 20:4 50:20 65:13 72:10

**speculate** 109:18,21

**speculating** 18:8 19:9

**speculation** 21:3

**spend** 68:9

**spent** 49:6

**spoke** 32:2 34:12,17 47:7 84:4

**spoken** 34:8,19 47:12 105:21

**St** 7:4

**Stacey** 16:9

**Stang** 4:14

**star** 46:8

**started** 7:10 37:13

**state** 4:9 61:25 62:3, 20 113:20

**stated** 65:21 68:7 77:14

**statement** 63:3,12 64:13 70:4 79:25 80:4,6

**statements** 58:25 69:24 72:6,12,16,20, 25 74:7,12 75:2,8,21, 25 76:11,20,24 77:23 78:15,19 79:7,12

**states** 6:6 24:7 27:8 40:13 53:10 65:8 81:24

**stating** 55:8 70:7

**staying** 10:17

**stick** 68:6 102:22

**stop** 84:24 103:5

**strategic** 109:13

**strike** 88:21

**subject** 108:25

**subjective** 116:18

**submitted** 23:9 45:21

**submitting** 44:25

**subpoena** 102:4

**subpoenaed** 11:6

**Subscribed** 120:21

**subsequent** 74:7,11 75:2 78:9,10

**subsequently** 92:7

**subset** 19:25

**subsidiaries** 7:21 13:7

**substance** 54:11 55:22 66:14 67:25 68:4 84:3,9

**suggest** 53:7

**suggested** 39:15 88:4

**suggests** 52:24 53:15

**suing** 31:12

**summarize** 107:4

**summarizing** 48:18

**Supplemental** 72:20

**support** 54:2

**supposed** 74:15 99:15

**Surgent** 37:10 80:16, 17,24 81:3

**surmising** 35:4,5

**surrounding** 50:3 118:22

**suspect** 20:24

**sworn** 4:4 63:2 120:21

**system** 40:24

---

**T**

**T-E-R-R-A-S-T-A-R** 16:10

**taking** 66:24 67:2

**talk** 16:7,11 39:15 48:5 67:14

**talked** 35:9 67:13

**talking** 11:21 25:15 63:16

**tax** 6:23

**team** 19:25 21:14 22:4,12 77:13

**telling** 56:9 57:4

**tells** 88:16

**ten** 8:4 49:13 66:9 67:5

**tenure** 8:15

**term** 13:5 22:5 30:12 118:25

**terminated** 23:7

**Terrestar** 16:8,12,17 19:12 22:10,17 45:11,16 50:7 57:12, 14,17 65:9,22 87:8

**testified** 4:5 56:4 58:19 98:16

**testifying** 98:17

**testimony** 45:23 55:17 56:16 64:4 67:25 68:4

**Texas** 6:8

**thereof** 48:23,25

**thing** 25:15 84:6

**things** 9:17 34:2 35:9 47:25 62:20 102:8,19 113:20

**Thomas** 37:10 80:16

**thought** 46:7

**till** 6:23 120:2

**time** 5:22 6:18,24 7:25 9:14 12:14 13:11 17:22 18:5,15 23:16 31:20,21 33:25 38:12 41:20 42:3,16 49:6 50:23,25 51:12, 16,18 66:8 68:9,25 75:3 78:21 84:21

91:6 92:8,17,19 96:10,19 100:7,20 105:22 106:7 108:11 117:16 119:22 120:13,15

**times** 48:8

**timing** 32:15 74:3 108:19

**title** 9:25 12:10 15:13, 17,20 18:10,14

**titles** 14:9 17:17

**today** 4:19 6:19 9:23 10:7 12:8,11,18 18:20 32:19 35:20 36:16 41:7 71:24 78:22 98:17 101:12 108:11 119:22

**told** 11:10 32:23 38:6 50:12 53:18,19 54:18,21 56:4,12,17 58:8 71:17,19 81:17 89:22,24 90:3 94:16 98:9 100:16 102:20 104:7 105:5 108:4,9 112:24 115:19 116:6

**top** 28:14 92:24

**topic** 52:16

**total** 14:22 91:15 92:25 93:10,13,15, 17,22

**transaction** 61:13 62:6,24 63:15 84:5 108:20 117:2 119:8

**transactional** 8:10

**transcript** 55:15 120:9

**transfer** 71:20 89:22, 24 108:6 115:3

**transferred** 27:5 56:22 58:20,22 61:23 64:2 94:14 115:24

**transferring** 117:12

**transpired** 100:7 114:25

**treasurer** 18:7,25 19:3 21:13,16

**treated** 70:12,18,22

**trial** 77:5 98:15 102:13,25 103:2 120:2

**Trust** 14:13 109:8

U

**ultimately** 79:19 80:13 81:12

**unaware** 39:21 50:13 97:5

**unclear** 93:14

**uncovered** 86:17

**understand** 5:18 20:6 23:19 25:10 26:12 30:2 35:22 73:20 74:2 75:24 83:11 91:13,18,22,23 93:9,22 96:23 97:20 98:5 101:14 102:6 103:15

**understanding** 15:20 16:16 18:22 19:2,24 21:15,19,21 22:3,8 31:10 71:10, 12 74:10,14 84:17 87:9 92:23 95:9 117:3

**understood** 50:23

**undertook** 98:6

**University** 6:16

**utilized** 87:21

**utilizes** 87:16

V

**vague** 17:21

**valid** 76:10

**valuation** 19:25 21:14 22:4,12 57:12, 14,17 80:10 81:11 82:8 85:12 86:5 87:4, 7,17 88:5,8

**verify** 28:12 29:21

**vice** 35:24,25 36:4

**view** 43:7 108:15 116:19 117:19

**vis-à-vis** 65:15 95:7

**void** 115:9

W

**wait** 14:18 101:4

**waiting** 113:6

**watch** 11:20

**Waterhouse** 17:10, 13,16 18:4,11,14,19 19:3,6,17 20:2 25:6 29:24 39:16 43:24 46:4 47:7 48:2,6,15, 19 49:6,17 50:9,16, 21,24 51:10,17,21,24 52:6,24 53:8,10,15, 25 54:7,18,24 55:4,7, 11 56:9,17 58:9,13 59:2,10,14 60:13,18 61:8,16 63:22 70:17, 21 71:19 78:16 80:16,22 81:7,10,17 90:4 104:21 105:19, 22 106:5 116:9 117:4,15,25 118:11, 17 119:7,9

**Waterhouse's** 28:8, 10 29:20,22 118:3

**week** 36:21,25

**weeks** 78:23 106:10

**weighted** 86:5

**Weinstein** 7:8,9

**wholly** 7:20 13:7

**Wick** 7:10,11,16 8:15

**Winstead** 6:22

**withdrawn** 7:15 15:25 31:17 47:15 57:9 59:5 61:6 62:2 65:6 70:16 80:23,25 89:14 92:10 104:2 112:12 114:18 117:25

**word** 28:13

**words** 52:22 54:9

**work** 7:6 8:11 12:13 13:2,10 96:15 98:23 101:21 110:14

**worked** 7:7 8:14 9:17 26:15,16 27:17 37:12

**working** 111:10

**works** 11:11 117:21

**world** 56:9 65:8

**write** 61:6,7 116:8

**writing** 81:23

**written** 44:25 65:6 82:12

**wrong** 73:7

**wrote** 27:18 50:20 60:12

Y

**year** 9:4 96:25

**years** 8:4 15:12 59:19

Z

**Ziehl** 4:14