# EXHIBIT 20

Kristin Hendrix - October 27, 2021

## 1

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
 2           FOR THE NORTHERN DISTRICT OF TEXAS
 3                    DALLAS DIVISION
 4                     --oOo--
 5
 6  HIGHLAND CAPITAL MANAGEMENT,      )
    L.P.,                            )
 7                                    )
               Plaintiff,            )
 8                                    )
          vs.                        ) No. 21-03004-sgj
 9                                    )
    HIGHLAND CAPITAL MANAGEMENT FUND  )
10  ADVISORS, L.P.,                  )
                                      )
11             Defendants.           )
12  _____
13               DEPOSITION OF
14               KRISTIN HENDRIX
15               October 27, 2021
16  _____
17
18          DEPOSITION OF KRISTIN HENDRIX, produced as a
19  witness, duly sworn by me via videoconference at the
20  instance of the DEFENDANTS, was taken in the
21  above-styled and numbered cause on October 27, 2021,
22  from 10:11 A.M. to 1:19 P.M., before BRANDON D. COMBS,
23  CSR, RPR, in and for the State of Texas, reported by
24  computerized machine shorthand, at 500 North Akard
25  Street, 38th Floor, Dallas, Texas.
```

## 2

```
 1               APPEARANCES
 2
 3          MUNSCH, HARDT, KOPF & HARR, PC, 500 North
 4  Akard Street, Suite 3800, Dallas, TX 75201, represented
 5  by DAVOR RUKAVINA, Attorney at Law, appeared as counsel
 6  on behalf of the Defendants.
 7          Email: drukavina@munsch.com
 8
 9
10          PACHULSKI, STANG, ZIEHL & JONES, 780 Third
11  Avenue, 34th Floor, New York, NY 10017-2024, represented
12  by JOHN A. MORRIS, Attorney at Law, appeared as counsel
13  on behalf of the Plaintiff.
14          Email: jmorris@pszjlaw.com
15
16
17          STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,
18  Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney
19  at Law, appeared via videoconference as counsel on
20  behalf of the Defendants Jim Dondero, HCMS and HCRE
21  Partners.
22          Email: michael.aigen@stinson.com
23
24
25
```

## 3

```
 1                    INDEX
 2                                            PAGE
 3  Examination by MR. RUKAVINA                 6
 4  Examination by MR. AIGEN                    94
 5  Further Examination by MR. RUKAVINA        110
 6  Examination by MR. MORRIS                  111
 7
 8  EXHIBITS                                   PAGE
 9
10  Exhibit 1    Promissory Note, 5M, May 3     30
11
12  Exhibit 2    Promissory Note, 2.4M, May 2   30
13
14  Exhibit 3    Email from David Klos, May 2, 2019,   31
15               HCMLP to HCMFA loan
16
17  Exhibit 4    Promissory Note, 5M, May 3     42
18
19  Exhibit 5    Promissory Note, 2.4M, May 2   42
20
21  Exhibit 6    Promissory Note, 5M, May 3     43
22
23  Exhibit 7    Promissory Note, 2.4M, May 2   43
24
25  Exhibit 8    Info, HCMF loan 05.03.2019     56
```

## 4

```
 1  Exhibit 9   Info, HCMF loan 05.02.2019        56
 2
 3  Exhibit 10  Email from Scott Ellington, Dec 2,   59
 4              2020, HCM - HCMFA financial
 5              statements
 6
 7  Exhibit 11  Email from John Morris to         62
 8              James Seery, Jan 6, 2021,
 9              HCM information request
10
11  Exhibit 12  Letter, Dec 3, 2020, Demand on    65
12              Promissory Notes
13
14  Exhibit 13  Promissory Note, $30,746,812.33,   72
15              May 31
16
17  Exhibit 14  NPA $30.7M                        76
18
19  Exhibit 15  HCMLP Notes Receivable            83
20
21  Exhibit 16  Email from Frank Waterhouse to    85
22              Lauren Thedford, Oct 6, 2020, 15(c)
23              follow-up
24
25
```

Kristin Hendrix - October 27, 2021

5

1  Exhibit 17  Email from James Seery to        88
2           James Dondero, Jan 7, 2021, demand
3           on promissory note
4
5  Exhibit 18  Email from Kristin Hendrix, Jan 12,    90
6           2021, NexPoint Note to HCMLP
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

1              KRISTIN HENDRIX,
2        having been first duly sworn, testified as follows:
3              EXAMINATION
4     Q.  (BY MR. RUKAVINA) Good morning.  If you'll
5  state your name.
6     A.  Kristin Hendrix.
7     Q.  We're doing this both ways.  You're on the
8  Zoom remotely and they can see you, but I would ask
9  that you and I maintain eye contact.  Of course, if
10  someone is asking you on the Zoom, then maintain
11  contact with them, if that's okay with you.
12     A.  Sure.
13     Q.  Have you been deposed before?
14     A.  No.
15     Q.  So I'm sure your counsel explained to you,
16  but very quickly, you understand that you're testifying
17  under oath and penalty of perjury as though you were in
18  a court of law?
19     A.  Yes.
20     Q.  And you understand my job is to ask clear
21  questions that you understand?
22     A.  Yes.
23     Q.  And if for whatever reason you don't
24  understand my questions, please let me know or ask me
25  to rephrase; otherwise, I'm going to assume that you

7

1  understood my question; okay?
2     A.  Yeah.
3        MR. MORRIS:  Objection.
4     Q.  (BY MR. RUKAVINA) Sometimes Counsel will
5  make objections.  Unless he instructs you not to
6  answer, you're still required to answer my questions.
7     A.  Okay.
8     Q.  Now, in preparation for this deposition, did
9  you read the deposition transcript or any part of it of
10  Frank Waterhouse?
11     A.  I did not.
12     Q.  Did anyone provide you a synopsis or summary
13  of it?
14     A.  Maybe a few bits and pieces, but...
15        MR. RUKAVINA:  Off the record for a second.
16        (Off the record.)
17     Q.  (BY MR. RUKAVINA) What do you mean bits and
18  pieces?
19     A.  I don't recall anything specific that was
20  said, other than it was very long.
21     Q.  Did you talk to Frank Waterhouse about it?
22     A.  Did not.
23     Q.  Other than Highland's legal counsel, did you
24  talk to anyone else about -- or -- strike that.
25        Other than Highland's legal counsel, did you

8

1  talk to anyone about Frank Waterhouse's deposition from
2  last week?
3     A.  I did not.
4     Q.  Did you review -- strike that.
5        Did you see any of the video of
6  Mr. Waterhouse's deposition?
7     A.  Nope.
8     Q.  Same questions now for Mr. Seery, S-e-e-r-y.
9        Did you read any portion or the whole of
10  Mr. Seery's deposition from last week?
11     A.  I did not.
12     Q.  See any of the video?
13     A.  No.
14     Q.  Did you see any synopsis or summary of his
15  deposition?
16     A.  No.
17     Q.  Did you talk to him about his deposition?
18     A.  I did not.
19     Q.  Other than talking to Highland's counsel, did
20  you talk to anyone about Mr. Seery's deposition?
21     A.  No.
22     Q.  Other than talking to Highland's counsel, did
23  you talk to anyone about your deposition today?
24     A.  Just John Morris and Dave Klos.
25     Q.  When did you talk to Mr. Klos, K-l-o-s?

Kristin Hendrix - October 27, 2021

---

**9**

1    A.  First time about this was last Friday.  And
2  then again Monday this week.  And yesterday.  And this
3  morning.
4    Q.  Friday was there any lawyer present during
5  your discussion with Mr. Klos?
6    A.  Yes, every time Mr. Morris was present.
7    MR. RUKAVINA: Is it your position that those
8  four discussions would be privileged, Counsel?
9    MR. MORRIS:  Yes.
10   MR. RUKAVINA:  Then we'll move on.
11   Q.  (BY MR. RUKAVINA) So we've established the
12  four times you talked to Mr. Klos with counsel present.
13  Did you do anything else related to or in preparation
14  for today's deposition?
15   A.  Yes, probably went through and reviewed some
16  emails, documentation that I may have had that I need
17  to refresh memory on.
18   Q.  These documents and emails that you might
19  have reviewed, did you supplementally provide them to
20  counsel or anyone else?
21   A.  Yes.
22   Q.  This would have been in the last week or
23  10 days?
24   A.  Yes.
25   Q.  Prior to the last week or 10 days, are you

---

**10**

1  aware that my office served requests for production on
2  Highland?
3    A.  Yes.
4    Q.  And did you do anything prior to the last
5  week or 10 days to try to search both your personal
6  records and corporate records for any responsive
7  documents?
8    A.  Not that I recall.
9    Q.  Is that something that you understand legal
10  counsel was charged with?
11   A.  Yes.
12   Q.  Let's go briefly now about your background,
13  please.
14      Where do you live?
15   A.  I live in Denton, Texas.
16   Q.  And what is your date of birth, please?
17   A.  January 26, 1982.
18   Q.  And walk me through your educational
19  background, starting with any postsecondary, if any,
20  schooling or college or anything like that.
21   A.  Sure.  Graduated in 2004 from the University
22  of North Texas with a degree in finance.  Went on to
23  get my MBA from SMU in 2009.  And then went further and
24  got my CPA license I believe in 2015.
25   Q.  In the state of Texas?

---

**11**

1    A.  Yes.
2    Q.  And has your CPA license been current since
3  then?
4    A.  Sure has.
5    Q.  Have you faced any kind of disciplinary
6  action as a CPA?
7    A.  I have not.
8    Q.  Now, please walk me through your work
9  history.  Let's say starting with after you graduated
10  college.
11   A.  Sure.  December of 2005, which was shortly --
12  sorry, 2004, shortly after I graduated from
13  North Texas, I started at Highland.  It was my first
14  real job out of college.  I have been there ever since,
15  almost 17 years now.
16      Have worked in the corporate accounting
17  department the entire time.  Started off as the AP
18  associate, and worked my way up over the years and
19  currently am the controller.
20   Q.  So even when you were getting your MBA and
21  CPA you were employed by Highland?
22   A.  Yes.
23   Q.  Impressive.  You're the controller today you
24  mentioned?
25   A.  Yes.

---

**12**

1    Q.  That's -- when did you become the controller,
2  sometime February or March of this year?
3    A.  Yes.
4    Q.  Before you became the controller, what was
5  your role at Highland?
6    A.  Right before that I was assistant controller.
7  That was I believe April of 2020.  Before that, the
8  senior accounting manager, and I held that position for
9  years.
10   Q.  So in May of 2019 would you have been the
11  senior -- you said senior account?
12   A.  Senior accounting manager I believe was my
13  title.
14   Q.  And would that have been your title in May of
15  2017?
16   A.  Yes, I believe so.
17   Q.  And let's focus now on May 2019 as the senior
18  accounting manager. How would you describe your role
19  at Highland in May of 2019?  What were your duties?
20   A.  Sure.  I helped with treasury management
21  function, cash forecasts and things like that.  And
22  oversaw the financial reporting from the last batch of
23  AP all the way to financials and reporting on
24  audits.
25   Q.  Who did you report to in May of 2019?

---

Kristin Hendrix - October 27, 2021

**13**

1    A. David Klos.
2    Q. What was Mr. Klos' title to your
3 understanding back then?
4    A. I believe he was the controller.
5    Q. And do you have an understanding as to who
6 Mr. Klos reported to back then?
7    A. Yes, Frank Waterhouse.
8    Q. Frank Waterhouse. Who was he in May of 2019?
9    A. The CFO.
10   Q. Is Mr. Klos still with Highland today?
11   A. He is.
12   Q. What is his role now?
13   A. He's now CFO.
14   Q. You mentioned treasury management as of 2019,
15 May. What do you mean by treasury management? What is
16 that?
17   A. Generally speaking, we -- it's not just me as
18 one person. We have checks and balances.
19      My team would be in charge of sending out
20 payments, reconciling bank statements, making sure
21 money is in the right accounts, creating cash forecasts
22 and reporting on those every week with the CFO and
23 oftentimes the CEO.
24      Generally that's everything that fell under
25 the umbrella.

**14**

1    Q. And would your description of treasury
2 management be the same for the December 2020 period?
3    A. Yes.
4    Q. Who at Highland or which group at Highland in
5 December of 2020 would have been responsible for noting
6 that there are certain bills that need to be paid in
7 the near or subsequent future.
8      By way of, let's say, accounts payable or
9 promissory notes or taxes or anything like that?
10   A. Can you repeat your question.
11   Q. Sure. So obviously, Highland was a pretty
12 sophisticated business; correct?
13   A. Yeah.
14     MR. MORRIS: Objection to the form.
15   Q. (BY MR. RUKAVINA) And had various accounts
16 payable; right?
17   A. Yes.
18   Q. And it had maybe, let's just say, certain
19 note obligations that it had to pay from time to time;
20 correct?
21     MR. MORRIS: Objection to the form of the
22 question. Do you mean Highland Capital?
23     MR. RUKAVINA: I mean Highland Capital
24 Management; correct, I'm sorry. The debtor.
25   Q. (BY MR. RUKAVINA) Can we say the debtor?

**15**

1    A. Yes, you can say the debtor.
2    Q. So when I say the debtor and you say the
3 debtor we understand each other to mean Highland
4 Capital Management, comma, LP; correct?
5    A. Correct.
6    Q. I apologize. In the December 2020 period, I
7 would imagine that the debtor had its own -- that
8 was -- strike that.
9      We'll cut to the chase.
10      In December of 2020, the debtor was providing
11 services to various other entities affiliated with
12 Mr. Dondero; correct?
13   A. Correct.
14   Q. That would have included NexPoint Advisors,
15 LP?
16   A. Correct.
17   Q. And you're aware that NexPoint Advisors was
18 the obligor on at least one promissory note to the
19 debtor; correct?
20   A. Correct.
21   Q. And did the debtor in December 2020 provide
22 so-called treasury management services to NexPoint
23 Advisors?
24     MR. MORRIS: Objection to the form of the
25 question.

**16**

1     THE WITNESS: Yes.
2    Q. (BY MR. RUKAVINA) As part of that, in
3 December 2020, would it have been employees of the
4 debtor that would have scheduled for potential payment,
5 subject to approval by NexPoint, NexPoint's future
6 obligations as they were coming due?
7    A. Yes, we would have scheduled, only with
8 approval.
9    Q. And would that have included NexPoint's
10 obligations on the promissory note to Highland?
11   A. Yes.
12   Q. Back to your background briefly.
13     Do you have any legal training at all?
14   A. I do not.
15   Q. Do you have any courses, have you taken any
16 courses in drafting promissory notes?
17   A. No.
18   Q. Do you believe that your expertise as a
19 certified public accountant gives you any greater
20 qualification than anyone else to prepare a promissory
21 note?
22     MR. MORRIS: Objection to the form of the
23 question.
24     THE WITNESS: No.
25   Q. (BY MR. RUKAVINA) Have you ever prepared or

Kristin Hendrix - October 27, 2021

## 17

1 drafted a promissory note?
2　A. That term is probably used loosely. I have
3 not completely drafted a promissory note from scratch,
4 no.
5　Q. And we'll go into the details. Fair to say
6 that you have taken a form promissory note and revised
7 it?
8　A. Absolutely.
9　Q. Was this part of your job in May of 2019 at
10 Highland?
11　A. Yes.
12　Q. Going back to the May 2019 time frame, were
13 you part of a particular group at Highland, like
14 accounting or legal or compliance?
15　A. Yes, corporate accounting.
16　Q. Corporate accounting. That's what you
17 described before about treasury management and
18 projections and forecasts?
19　A. Yes.
20　Q. In May of 2019, was it the practice at
21 Highland that corporate accounting would be responsible
22 for drafting intercompany promissory notes?
23　A. Not necessarily drafting, but updating a
24 draft that had been previously produced and provided by
25 our legal team, yes.

## 18

1　Q. And Highland in May -- the debtor in May of
2 2019 did have a legal department?
3　A. Yes.
4　Q. Kind of like the corporate accounting, there
5 was a separate legal department; correct?
6　A. Correct.
7　Q. And who would have been in charge of that
8 department in May of 2019?
9　A. Scott Ellington, E-l-l-i-n-g-t-o-n.
10　Q. In May of 2019 or by May of 2019 was there
11 any practice at Highland as to whether its legal
12 department would be involved with the drafting or
13 execution of any intercompany promissory notes?
14　　MR. MORRIS: Objection to the form of the
15 question.
16　　THE WITNESS: It depends on the note.
17　Q. (BY MR. RUKAVINA) What did it depend on?
18　A. Our typical practice is if we have a loan
19 with certain affiliates that it's a demand note. We
20 have a template that we have used for years that was
21 created by either our internal legal team or an outside
22 law firm, I'm not sure which.
23　　The typical practice is always updating a few
24 things on that template, getting it executed, and
25 filing it in our audit folders.

## 19

1　Q. By updating, what do you mean?
2　A. There's a few things that would need
3 updating, the date.
4　Q. Maker?
5　A. Maker.
6　Q. Amount?
7　A. The dollar amount, the interest rate.
8　Q. And is it your testimony that the corporate
9 accounting group would do these things on its own
10 without necessarily the involvement of the legal group?
11　　MR. MORRIS: Objection to the form of the
12 question.
13　　THE WITNESS: Generally, yes.
14　Q. (BY MR. RUKAVINA) Do you have any memory in
15 or before May of 2019 if the corporate -- I'm sorry, if
16 the legal group became involved in drafting or
17 executing any prior intercompany promissory notes?
18　A. Yes.
19　Q. Explain to me what you remember about that.
20　A. I do know that they were involved with
21 drafting restructured notes. So taking demand notes
22 and turning them into a 30-year amort note.
23　　That was in 2017. I know for sure that they
24 were involved in that because it was something
25 different. We weren't just updating a demand note.

## 20

1　Q. Is it your testimony that to the best of your
2 recollection by May of 2019 and in May of 2019 it would
3 have been the corporate accounting group that would
4 have handled routine intercompany demand notes?
5　A. Yes.
6　Q. And you can think of more than one instance
7 on which that happened?
8　A. Yes.
9　Q. And this is not a memory test, but going back
10 in time can you try to give an estimate of what year
11 that first started happening, that the corporate
12 accounting would handle the drafting or execution of
13 intercompany demand notes?
14　A. As far as I can remember.
15　Q. Is it your testimony that as -- maybe even
16 going back as far as 2005 there were intercompany
17 demand notes?
18　A. Yes.
19　Q. I don't know how to ask this question, but
20 was this a significant thing in corporate accounting or
21 just another routine deal when you handled demand
22 notes?
23　　MR. MORRIS: Objection to the form of the
24 question.
25　　THE WITNESS: This is a routine job duty that

Kristin Hendrix - October 27, 2021

**21**

1 we routinely did.
2 Q. (BY MR. RUKAVINA) Between 2005 and 2019, do
3 you remember any maker on these intercompany demand
4 notes actually being required to pay a demand note, in
5 other words, Highland making demand?
6 A. Not that I can specifically recall.
7 Q. Do you have any recollection as to what
8 happened to these intercompany demand notes over the
9 years between 2005 and 2019?
10 A. Yeah. Typically anytime specifically Jim
11 Dondero would need to move money between related
12 parties, he would pay down -- when I say him, he would
13 have us in corporate accounting move money around, pay
14 off notes, reissue new notes somewhere else.
15 So a way to move money around between his
16 entities.
17 Q. So let's use just hypotheticals here so that
18 I'm not trying to pin you down to any specific fact.
19 But between 2005 and 2019, is it fair to say
20 that if some Dondero entity that's not the debtor
21 needed money and the debtor had money, then Dondero
22 would have the debtor lend money to that entity on a
23 demand note basis?
24 A. So long as they have the cash available to do
25 so.

**22**

1 Q. "They" being the debtor?
2 A. Debtor, yes.
3 Q. And is it fair to say, then, again
4 hypothetically without any specifics, that if the
5 debtor maybe from time to time needed money and one of
6 these other entities had cash, then Dondero would cause
7 that other entity to pay down the demand note?
8 MR. MORRIS: Objection to the form of the
9 question.
10 THE WITNESS: Can you repeat that.
11 Q. (BY MR. RUKAVINA) Sure. So I think you
12 mentioned that from time to time these entities would
13 pay down these demand notes?
14 A. To the debtor?
15 Q. To the debtor.
16 A. Yes.
17 Q. And is that, hypothetically again, is that
18 because on occasion the debtor might have needed cash
19 and these entities had the cash, so Dondero would have
20 them pay back the note?
21 MR. MORRIS: Objection to the form of the
22 question.
23 THE WITNESS: Yes, that could be a reason.
24 Q. (BY MR. RUKAVINA) Can you think of any other
25 reason in those 14 years?

**23**

1 A. If the debtor needed cash to lend to another
2 entity.
3 Q. I see. So again, it's all one big happy
4 family, and whoever needed cash, the cash moved around;
5 correct?
6 A. Correct.
7 Q. Was it Mr. Dondero that basically was the
8 only deciding person in each instance that you're aware
9 of in those 14 years as to when a note would be made or
10 repaid?
11 A. I can't answer specifically to that. Most of
12 my direction came from our CFO at the time,
13 Frank Waterhouse. So what conversations he would have
14 with Jim Dondero, I can't answer to that. But I would
15 suspect so, yes.
16 Q. And in May of 2019 or by May of 2019, did you
17 communicate personally, by email or telephone, in
18 person, periodically with Jim Dondero?
19 A. I can't say periodically, no.
20 Q. Well, I'm not trying to put words in your
21 mouth. Is it fair to say that you kind of -- your
22 communications stopped with Mr. Waterhouse and
23 Waterhouse communicated with Dondero, as opposed to you
24 regularly communicating with Dondero?
25 A. That's typical, yes.

**24**

1 Q. Can you think of any instances in which
2 Mr. Dondero gave you any instructions or you came to
3 him seeking any instructions, without some intermediary
4 between the two of you?
5 A. No, usually Frank was present.
6 Q. Would you categorize Mr. Waterhouse as kind
7 of guarding with jealousy his access to Mr. Dondero?
8 MR. MORRIS: Objection to the form of the
9 question.
10 THE WITNESS: No.
11 Q. (BY MR. RUKAVINA) What kind of boss was he
12 in May of 2019? Was he laid back, or was he a jerk?
13 Was he demanding? How would you characterize him in
14 May of 2019?
15 MR. MORRIS: Objection to the form of the
16 question.
17 THE WITNESS: I would say he was a good boss.
18 Q. (BY MR. RUKAVINA) You think he was competent
19 as far as his job went?
20 A. Yes, very competent.
21 Q. Do you think he was competent as far as his
22 job went in December of 2020?
23 A. Yes.
24 Q. January 2021?
25 A. Yes.

Kristin Hendrix - October 27, 2021

25

1 Q. Was he patient and understanding as a boss?
2 A. Yes.
3 Q. Okay. Was he ever condescending or rude to
4 anyone in your presence?
5 A. No.
6 Q. So you're the controller today at Highland,
7 the debtor, the reorganized debtor; right?
8 A. Yes.
9 Q. And who do you report to? You mentioned
10 Mr. Klos is the CFO?
11 A. Yes.
12 Q. And do you also report to Mr. Seery?
13 A. Yes, I think everybody does.
14 Q. And I don't need to know details, but I take
15 it you're on a salary from reorganized Highland?
16 A. Yes.
17 Q. Is any part of your compensation merit or
18 bonus based?
19 A. It could potentially be.
20 Q. Have you had any discussions with Mr. Seery
21 or Mr. Klos about some sort of bonus compensation?
22 A. Yes.
23 Q. Has anything been agreed to?
24 A. Yes.
25 Q. And again, I don't need to know the exact

26

1 numbers. What would your bonus compensation consist
2 of? How would it be decided?
3 A. It's actually -- was decided when I agreed to
4 stay on the Highland team back in February 2021, so
5 it's in my employment agreement.
6 Q. So what's your bonus compensation?
7 A. I'm not sure I understand what you're asking.
8 Q. So is the bonus discretionary on the part of
9 Highland?
10 A. No, it's a set amount.
11 Q. And what triggers it or governs the set
12 amount?
13 A. Just it gets paid out on a certain date of
14 the year. It's very straightforward, set out in my
15 employment agreement.
16 Q. Is it irrespective of the performance of the
17 reorganized debtor?
18 A. Yes.
19 Q. So why do you call it a bonus instead of base
20 compensation?
21 A. That's what it's called in my agreement.
22 Q. So your base compensation and your bonus,
23 it's your testimony, you're going to earn it
24 irrespective of whether reorganized Highland does good
25 or bad with respect to its profitability?

27

1 A. Correct.
2 Q. And how Highland, reorganized Highland
3 collects these promissory notes is going to play no
4 part in your base and bonus compensation to your
5 understanding; is that correct?
6 A. To my knowledge, yes.
7 Q. So you have no direct or indirect stake in
8 the outcome of these litigations?
9 A. No.
10 Q. And you understand that I represent HCMFA and
11 NexPoint?
12 A. Yes.
13 Q. And these court reporters are not familiar
14 with some of our terminology. NAP [verbatim], if we
15 say that, that means NexPoint; right?
16 A. Uh-huh.
17 Q. You have to say yes or no.
18 A. Yes, NPA, NexPoint.
19 Q. NPA. And when we say NexPoint, you and I are
20 meaning NexPoint Advisors, LP; right?
21 A. Yes.
22 Q. And when we say HCMFA, we're meaning Highland
23 Capital Management Fund Advisors, LP, yes?
24 A. Yes.
25 Q. What is your understanding of the two

28

1 lawsuits, the one against HCMFA and the one against
2 NexPoint, that you're being deposed on today?
3 MR. MORRIS: Objection to the form of the
4 question.
5 Q. (BY MR. RUKAVINA) Who is suing who and for
6 what?
7 A. I don't know all the details.
8 Q. So we've established that you've discussed
9 these lawsuits in the last week or a little bit more
10 with legal counsel. I don't want to talk about that.
11 Prior to these recent discussions, did you
12 have any discussions with anyone at Highland about its
13 lawsuits against HCMFA and NexPoint on promissory
14 notes?
15 A. Repeat that again.
16 Q. Sure. So remember we're excluding the recent
17 discussions in the last week or 10 days with counsel;
18 right?
19 A. Okay.
20 Q. Are you aware that in January of 2021 the
21 debtor sued NexPoint to collect on a promissory note?
22 A. I'm aware that demand notices were sent.
23 Q. So until recently you weren't aware that a
24 lawsuit had been filed?
25 A. There's a lot of lawsuits filed. I can't

Kristin Hendrix - October 27, 2021

**29**

1 keep track of what is what or what we're talking about
2 at certain times.
3 　　Q. But you have no distinct memory of that?
4 　　A. Correct.
5 　　Q. And same question for the lawsuit that the
6 debtor filed against HCMFA in January.
7 　　　　Do you have any specific memory of that
8 lawsuit having been filed?
9 　　A. Not specifically.
10 　　Q. You mentioned that you're aware that on or
11 before January 2021, demand letters had been sent?
12 　　A. Yes.
13 　　Q. Did you play any role in either drafting
14 those demand letters or the decision to send them?
15 　　A. No.
16 　　Q. So going back to my question about these
17 lawsuits, do you have any memory of anyone asking
18 you -- again, excluding the last week or two.
19 　　　　Do you have any memory of anyone asking you
20 to do anything with respect to either or both of these
21 lawsuits?
22 　　A. No.
23 　　Q. You have no memory of Mr. Waterhouse,
24 Mr. Klos, Mr. Surgent, or Mr. Seery asking for any
25 background information or your input at all on these

**30**

1 two lawsuits?
2 　　MR. MORRIS: Better not have been --
3 　　THE WITNESS: No.
4 　　Q. (BY MR. RUKAVINA) Who did I say? Did I
5 misspeak? Okay.
6 　　　　Now we're going to have some exhibits here.
7 And do you have the labels?
8 　　　　Let's take a minute break off the record.
9 　　　　(Off the record.)
10 　　Q. (BY MR. RUKAVINA) Ms. Hendrix, I'm going to
11 provide to you a promissory note in the original
12 principal amount of $5 million from HCMFA. This is the
13 PDF version of this as filed with the Court for
14 collection. It's going to be Exhibit 1.
15 　　　　(Whereupon, Exhibit 1 was marked for
16 　　　　identification.)
17 　　Q. (BY MR. RUKAVINA) Before you look at
18 Exhibit 1, I'm going to do the same thing for
19 Exhibit 2, which is a promissory note from HCMFA for
20 $2.4 million, dated May 2, 2019.
21 　　　　(Whereupon, Exhibit 2 was marked for
22 　　　　identification.)
23 　　Q. (BY MR. RUKAVINA) Again, Ms. Hendrix, these
24 are the PDF versions of these notes as filed with the
25 Court. Sitting here today, do you remember anything

**31**

1 about either or both of these two promissory notes?
2 　　A. Sure, yes.
3 　　Q. What do you remember?
4 　　A. I remember seeing them because I've recently
5 looked at them. I see them all the time in our loan
6 tracking spreadsheets. My team would have been
7 responsible for the whole process that I explained
8 before when it comes to a promissory note.
9 　　Q. And --
10 　　MR. MORRIS: Are you finished?
11 　　THE WITNESS: Yes.
12 　　Q. (BY MR. RUKAVINA) And we have an email here
13 that might give some more context to that if I can find
14 it here.
15 　　　　This will be Exhibit 3. This is an email
16 from David Klos to corporate accounting dated May 2,
17 2019.
18 　　　　(Whereupon, Exhibit 3 was marked for
19 　　　　identification.)
20 　　Q. (BY MR. RUKAVINA) Do you see this email,
21 ma'am?
22 　　A. Yes.
23 　　Q. Okay. Corporate accounting, would that email
24 group have included you?
25 　　A. Yes.

**32**

1 　　Q. And this email says, Kristin, can you or
2 Hayley. Do you think that Kristin was you?
3 　　A. I do.
4 　　Q. Do you remember receiving this email?
5 　　A. Not explicitly.
6 　　Q. So it says Blair. Who would Blair be?
7 　　A. Blair was our AP associate.
8 　　Q. What is her last name?
9 　　A. At this time it would have been Roeber,
10 R-o-e-b-e-r.
11 　　Q. Okay. And did it subsequently change?
12 　　A. Yes, it's now Hillis, H-i-l-l-i-s.
13 　　Q. Please send $2.4 million from HCMLP to HCMFA.
14 This is a new interco loan. Kristin, can you or Hayley
15 please prep a note for execution. I'll have further
16 instructions later today, but please process this
17 payment as soon as possible.
18 　　　　Did I read that correctly?
19 　　A. Yes.
20 　　Q. Do you have any memory of whether this email
21 relates to Exhibit 2, the $2.4 million promissory note?
22 　　A. It seems like it does, same date, same
23 amount.
24 　　Q. Do you have any memory, or in reviewing your
25 files did you see any similar email or document that

Kristin Hendrix - October 27, 2021

---

**33**

1 would have related to Exhibit 1, the $5 million
2 promissory note?
3     A. Yes. I believe there's another email for
4 that one.
5     Q. And do you believe that you provided that to
6 counsel?
7     A. Yes.
8     Q. Recently or some time ago?
9     A. Well, I don't think I provided it, so I'm not
10 sure when they got it. I know it has been provided.
11     Q. You know that it has?
12     A. Uh-huh.
13     Q. How do you know?
14     A. Because I've seen it.
15     Q. In the production that was produced to me?
16     A. Yes.
17     Q. And also from a David Klos?
18     A. This one, or on the -- when I say this one,
19 on the $2.4 million or the 5-?
20     Q. On the $5 million note.
21     A. I'm not sure.
22     Q. Okay. Let me make sure I understand you
23 correctly.
24       Sitting here today you believe that there is
25 another email referencing the $5 million loan that has

---

**34**

1 been produced to my office?
2     A. Yes. I believe so.
3     Q. Okay. And going off memory, did it kind of
4 say the same thing as this Exhibit 3 except that it
5 referenced $5 million?
6     MR. MORRIS: Objection to the form of the
7 question.
8     THE WITNESS: Generally, should have said the
9 similar situation, yeah.
10     Q. (BY MR. RUKAVINA) So Mr. Klos says, this is
11 a new interco loan, for Exhibit 3. Other than what he
12 told you, that this is an intercompany loan, did anyone
13 else tell you or did you have any other information on
14 May 2, 2019 that this was a loan?
15     A. I don't specifically recall these
16 conversations, but I can tell you our normal practice
17 would be we would either likely be in a cash meeting --
18 and I say "we." Would have been myself, Dave Klos,
19 Frank Waterhouse, potentially even Jim Dondero.
20     But I don't recall conversations on this
21 specific date. But general practice is we would talk
22 about it.
23     Oftentimes, Frank would either call Dave or I
24 or stop by and tell us that, we need to send money to
25 an affiliate, paper up a new loan, let's get a wire out

---

**35**

1 the door, is typically how this works.
2     Q. Is the answer generally the same for the
3 $5 million note?
4     A. Yes.
5     Q. So is it fair to say that typically,
6 obviously not every time, but typically your corporate
7 accounting group when it would see intercompany
8 transfers in large amounts would believe that they were
9 loans?
10     MR. MORRIS: Objection to the form of the
11 question.
12     THE WITNESS: Typically they were loans.
13 There's not really another way to get money from one
14 entity to another. And if they were papered as a loan,
15 that means we were told to set it up that way.
16     Q. (BY MR. RUKAVINA) What do you mean papered
17 as a loan? Aren't you papering it as a loan when
18 someone makes the promissory note?
19     A. Yes, because we're told by somebody to do
20 that.
21     Q. And in this instance, Mr. Klos on Exhibit 3
22 told the group that this was a loan; right?
23     A. Correct. But he would have spoken with
24 Frank Waterhouse or Jim Dondero prior to that, before
25 telling anybody to do that.

---

**36**

1     Q. Okay. And do you have any knowledge that he
2 did speak to Mr. Waterhouse or Mr. Dondero before
3 sending this email?
4     A. Again, I don't have specific knowledge on the
5 exact conversations, but that's always how it has
6 worked.
7     Q. That's how it was for 14 or 15 years;
8 correct?
9     A. Yes.
10     Q. But you're logically assuming that it
11 happened here. You don't know that it happened here;
12 correct?
13     MR. MORRIS: Objection to the form of the
14 question.
15     THE WITNESS: I would have to be fairly
16 certain that it did, even though I can't recall
17 specific conversations.
18     Q. (BY MR. RUKAVINA) Did you ask Mr. Klos about
19 who told him that this is a new intercompany loan on
20 Exhibit 3?
21     A. No. It's quite possible I was involved in
22 the conversation. I reported to him. I wouldn't
23 question his authority.
24     Q. Did you ask Mr. Klos who told him that the
25 $5 million deal was also an intercompany loan?

---

Kristin Hendrix - October 27, 2021

---

**37**

1    A.  I did not ask that specific question that I
2  can recall.
3    Q.  Did you ask Mr. Waterhouse whether either of
4  these transactions were loans?
5    A.  I'm sure Mr. Waterhouse is the one that told
6  us they were loans.  We wouldn't just paper up a loan,
7  send money out and call it a loan and account for it
8  that way, unless somebody specifically told us.
9    Q.  Do you have any memory of Mr. Waterhouse
10  orally or in writing or email or in any way, shape, or
11  form on or about May 2 or 3, 2019 telling you that the
12  2.4 million or $5 million transfers were intercompany
13  loans?
14    A.  No specific knowledge of exact conversations,
15  but I'm certain that those conversations were had
16  because that's the only way that we would have papered
17  up a loan, sent money out as a loan, had them on our
18  financials for two years.
19    Q.  So you're saying that this email, Exhibit 3,
20  from Mr. Klos was not enough, that there would have
21  been other things that happened to make you and other
22  people in your group confident that these were loans?
23    A.  Yes.
24    Q.  And these other things would have been in
25  person or by email?

---

**38**

1    A.  Most likely in person via phone call.
2    Q.  Okay.  So again, you have no specific memory
3  of it, but based on the 14-year pattern and conduct you
4  believe that you would have discussed these two
5  transfers with Mr. Waterhouse and he would have told
6  you these are loans?
7    MR. MORRIS:  Objection to the form of the
8  question.
9    THE WITNESS:  Correct.
10    Q.  (BY MR. RUKAVINA)  And then would he have
11  told you to take care of the promissory notes, or was
12  that Mr. Klos here in Exhibit 3?
13    A.  It could have been both.  It's clearly Dave
14  in this email, but Frank could have also said that to
15  me.
16    Q.  Now, do you -- strike that.
17    In May of 2019, did you know or were you told
18  why these $7.4 million were being transferred from the
19  debtor to HCMFA?
20    A.  Yes.  I do have recollection that -- I do
21  know that there were two big events in May 2019.
22  2.4 million was related to a TerreStar NAV error, with
23  one of the funds advised by HCMFA.  That's Global
24  Allocation Fund.
25    Similar with the $5 million loan.  There was

---

**39**

1  a consent fee that the advisor of the Global Allocation
2  Fund had promised to pay to shareholders of that fund,
3  and it was in the amount of $5 million roughly.
4    So both of these loans were for those
5  purposes respectfully.
6    Q.  And were you in May of 2019 also aware that
7  in addition to the $2.4 million, there was another more
8  than $5 million paid to that fund by HCMFA's insurer as
9  compensation for the NAV error?
10    A.  By the insurance company, yes.
11    Q.  So the $7.4 million, you understood then was
12  a loan as opposed to compensation to HCMFA?
13    A.  Yes.
14    Q.  Okay.  Did you understand in May of 2019 that
15  it had been the debtor and its valuation team that
16  caused that NAV error?
17    MR. MORRIS:  Objection to the form of the
18  question.
19    THE WITNESS:  I can't answer that.  I was not
20  involved with the activities leading up to the NAV
21  error.
22    Q.  (BY MR. RUKAVINA)  How do you know that the
23  $7.4 million were being transferred for the NAV error
24  and consent fee?
25    A.  Because I do know about both of those

---

**40**

1  instances and I do know that HCMFA needed to pay these
2  dollar amounts for both of those.
3    Q.  And you knew that in May of 2019?
4    A.  Yes.
5    Q.  How did you know that in May of 2019?
6    A.  It was lots of discussions had been going on
7  around both of these issues for months.  These weren't
8  surprises to anybody.
9    Q.  So although you weren't involved directly
10  with the NAV error issues, it was more or less common
11  knowledge in your accounting group?
12    A.  Correct.
13    Q.  Do you have any knowledge at all as to
14  whether Mr. Dondero decided to transfer these
15  $7.4 million not as a loan, but to compensate HCMFA for
16  the debtor's alleged liability?
17    A.  Have not heard of that.
18    Q.  Ever?
19    A.  Never.
20    Q.  But you also never heard Mr. Dondero say that
21  these $7.4 million were a loan; correct?
22    A.  That was not told to me directly.
23    Q.  Again, you're logically assuming that based
24  on many instances of intercompany transfers in the
25  14 years prior to that?

---

Kristin Hendrix - October 27, 2021

**41**

1    MR. MORRIS: Objection to the form of the
2 question. Mischaracterizes the testimony.
3    THE WITNESS: Correct.
4    Q. (BY MR. RUKAVINA) I think you answered
5 correct?
6    A. Correct.
7    Q. And you mentioned that after these notes, you
8 saw them on internal financials and that reinforces
9 your view that these were loans?
10    A. Correct.
11    Q. But as of May 2 and 3, 2019, no one had told
12 you directly that these are loans?
13    MR. MORRIS: Objection to the form of the
14 question. It's in writing.
15    THE WITNESS: That's not what I'm saying at
16 all.
17    Q. (BY MR. RUKAVINA) Other than Mr. Klos' email
18 or emails, no one told you on May 2 or May 3, 2019 that
19 you remember today that these were loans?
20    A. It quite possibly could have been told to me
21 in addition to this email.
22    Q. I understand. You just have no memory of
23 that today; correct?
24    A. Correct.
25    Q. Is there anything that you can think of

**42**

1 sitting here today to refresh your memory on that
2 point?
3    A. I do not think so. I'm sure there was
4 conversation that unfortunately would not be in an
5 email.
6    Q. Now, we have the Word documents, the Word
7 version of these two promissory notes, and you're going
8 to have rely on me that I printed these out as
9 Mr. Morris sent to me. If I'm misleading you on that,
10 then I'm in trouble and your answers don't count.
11    So please assume that I didn't doctor these
12 and that I printed them out as they were prepared to
13 me; okay?
14    A. Yes.
15    Q. So Exhibit 4 will be the $5 million note and
16 Exhibit 5 will be the 2.4 million.
17    (Whereupon, Exhibits 4 & 5 were marked for
18    identification.)
19    Q. (BY MR. RUKAVINA) Before I ask about 4 and
20 5, to be fair to you and refresh your memory, I'm going
21 to provide you printouts of the metadata, metadata --
22 I'm not sure how to better say that -- for both notes.
23    And again I'm representing to you that I
24 printed out the metadata without doctoring it, so
25 please assume that's true, and if it's not, your

**43**

1 answers don't count and I'm in trouble.
2    6 will be the $5 million note, and 7 will be
3 the $2.4 million note.
4    (Whereupon, Exhibits 6 & 7 were marked for
5    identification.)
6    Q. (BY MR. RUKAVINA) Okay. So Exhibit 4 and 5
7 are the Word documents. Do you have any memory of you
8 doing anything with respect to these two Word
9 documents?
10    A. I don't have specific memory, but generally
11 speaking, it was my job to update promissory note
12 templates and create promissory notes.
13    Q. So do you believe that -- we discussed
14 earlier that your group would have used a template and
15 that it would have made changes reflecting the maker,
16 amount, date, interest rate.
17    Do you believe you were the one with respect
18 to 4 and 5 that updated that template to create 4
19 and 5?
20    A. I'm sure that I was, yes.
21    Q. Well, Exhibit 6 -- do you know what metadata
22 is?
23    A. Sort of.
24    Q. What's your understanding of what metadata
25 is?

**44**

1    A. Just in context from speaking on it recently,
2 it's going to tell you who made changes to the
3 documents, is what I would assume.
4    MR. RUKAVINA: Go off the record for one
5 second.
6    (Off the record.)
7    Q. (BY MR. RUKAVINA) So a little bit of error
8 on my part. We'll have some more metadata, but we can
9 still talk about 6 and 7.
10    It says the author JFORSHEE, J-F-O-R-S-H-E-E.
11 Do you recall or do you know who that person was?
12    A. I recognize the name, and it makes sense.
13 This says Strasburger is the company. I think he was
14 one of the lawyers that we had used at some point in
15 time.
16    Q. Strasburger is a law firm?
17    A. Yes.
18    Q. And then it says, so Exhibit 6 created May 3,
19 Exhibit 7 created May 2, modified, accessed. Does that
20 to the best of your understanding comport with when
21 Exhibits 4 and 5 were actually created?
22    A. Can you repeat that.
23    Q. Yeah. We'll wait for the rest of the
24 metadata. But let's go back to 4 and 5.
25    In and by May 2019 I think you mentioned that

Kristin Hendrix - October 27, 2021

45

1 it was your job to, I think you said update promissory
2 notes?
3         MR. MORRIS:  Objection to the form of the
4 question.
5     Q.  (BY MR. RUKAVINA)  Let me take that question
6 back.
7         You testified earlier that your group would
8 have taken a template and used it to create or prepare
9 a new promissory note; right?
10    A.  Right.
11    Q.  How would you call that process?  What word
12 would you use for that process?
13    A.  Let's call it papering the loan.
14    Q.  In May of 2019, was it your job to paper the
15 loan?
16    A.  Yes.
17    Q.  Would anyone else at the corporate accounting
18 group have been responsible to paper a loan?
19    A.  At that time, I don't think so.  I think I
20 was the one doing it.
21    Q.  I think you mentioned that you think you
22 papered the loan, respecting Exhibits 4 and 5; correct?
23    A.  Correct.
24    Q.  You have no distinct present memory of
25 papering 4 and 5; correct?

46

1    A.  Correct.
2    Q.  Can you think of anyone else at the corporate
3 accounting group that would have papered 4 and 5?
4         MR. MORRIS:  Objection to the form of the
5 question.
6         THE WITNESS:  The only other person that
7 could have would either be Dave Klos or Hayley Eliason.
8    Q.  (BY MR. RUKAVINA)  What was Hayley's role in
9 May of 2019?
10    A.  She was the accountant.  I can't recall her
11 specific title.
12    Q.  Now, in May of 2019 when you papered a loan,
13 would you have consulted with either internal or
14 external legal before finishing that loan or presenting
15 it for signature or anything else?
16    A.  Not if it was just our standard demand note
17 that we already had a template on.
18    Q.  So would it have been your general course in
19 May of 2019, if you prepared Exhibits 4 and 5, not to
20 seek advice from internal or legal before proceeding
21 with these notes?
22    A.  With these two specific notes?
23    Q.  Yes.
24    A.  Yes.
25    Q.  If we flip the page, I'll represent to you

47

1 that Mr. Waterhouse's signature there appears on the
2 Word document as an image.
3    A.  Uh-huh.
4    Q.  Do you have any memory of whether there was
5 an image that someone would have affixed of
6 Mr. Waterhouse's signature to promissory notes?
7    A.  Yes.  We typically always -- he was
8 completely fine with having documentations -- sorry,
9 having documents signed or executed with his
10 e-signature.
11    Q.  Would these pictures of his signature have
12 been his e-signature in May of 2019?
13    A.  Yes.
14    Q.  So let's just clarify that because I don't
15 want there to be any confusion.
16         I know there's some computer programs out
17 there that are restrictive and have passwords before
18 any signature is printed.  And then there's some people
19 that use a stamp or an image; right?
20         MR. MORRIS:  Objection to the form of the
21 question.
22    Q.  (BY MR. RUKAVINA)  Are you following me?
23    A.  I follow you.
24    Q.  In May of 2019, did Mr. Waterhouse have any
25 specific program that would have to -- you would have

48

1 to go through before it would spit out his e-signature,
2 or was he fine with you and his staff using an image
3 like this?
4    A.  He was fine with using his e-signature, and
5 what is on these documents was that exact e-signature.
6 So I don't know if he had -- I don't know how it was
7 created originally.
8    Q.  The e-signature?
9    A.  E-signature.
10    Q.  Do you have any memory with respect to
11 Exhibits 4 and 5 of getting Mr. Waterhouse's specific
12 approval to use his e-signature?
13    A.  I don't have exact specific memory, same as
14 conversations on these loans.  But he would have had to
15 approve this loan in the dollar amount, the day.
16         He would have been the one directing us to
17 create these loans.  In past practice he has always
18 approved using his e-signature to execute documents.
19    Q.  How would he have approved Exhibits 4 and 5?
20 By that, I mean by email or memorandum?  How would he
21 have approved it in May of 2019?
22         MR. MORRIS:  Objection to the form of the
23 question.
24         THE WITNESS:  I would assume that, as I've
25 stated previously, these directions were coming

Kristin Hendrix - October 27, 2021

**49**

1 directly from him to paper a loan. These changes that
2 are made are only to the dollar amount. Interest rate
3 is pulled right off the IRS website.
4     That is his approval to paper a loan and in
5 fact execute or approve the loan.
6     Q. (BY MR. RUKAVINA)  In May of 2019, would
7 Mr. Waterhouse -- what was his practice as far as using
8 an ink signature on documents as opposed to an
9 e-signature?  Did he have a practice?
10     MR. MORRIS:  Objection to the form of the
11 question.
12     THE WITNESS:  He has never specifically said,
13 on certain documents I would like to ink it with my
14 signature.  Probably at this time, 99 percent of the
15 stuff my team got his signature on was his e-signature.
16 I think it just depended on the group and what it was.
17     Q. (BY MR. RUKAVINA)  So how would he authorize
18 you or your team to use his e-signature for any given
19 document in May of 2019?
20     MR. MORRIS:  Objection to the form of the
21 question.
22     THE WITNESS:  Through the conversations that
23 would have been had before these emails went out saying
24 paper loan.
25     Q. (BY MR. RUKAVINA)  And -- okay. So, and

**50**

1 after his e-signature was used either on these notes or
2 other documents in May of 2019, would you have brought
3 the documents back to him for any kind of verification?
4     MR. MORRIS:  Objection to the form of the
5 question.
6     THE WITNESS:  Probably not.  These are all
7 very standard.  We've papered hundreds of loans.  So I
8 think he trusted that we can handle updating a date and
9 a dollar amount on these loan templates.
10     Q. (BY MR. RUKAVINA)  Do you know or believe, or
11 your recent review of documents, did it reveal an email
12 from Mr. Waterhouse to you specifically authorizing his
13 e-signature on Exhibits 4 and/or 5?
14     A.  Not that I recall seeing, no.
15     Q.  Sitting here today, do you have any memory of
16 Mr. Waterhouse orally or otherwise specifically
17 authorizing you to affix his e-signature to Exhibits 4
18 and/or 5?
19     A.  Specifically on these loans, no, I don't
20 recall those conversations.  But, again, our practice
21 has always been we have this discussion, he's under the
22 understanding that we're going to paper the loans, he's
23 always comfortable with using his e-signature.
24     This is not something me or my team would
25 have done without that authority and approval from him.

**51**

1     Q.  But you have no memory of that authority or
2 approval, specifically for 4 and 5?
3     MR. MORRIS:  Objection.  Asked and answered
4 about five times.
5     THE WITNESS:  Same as my answer I just gave.
6     Q. (BY MR. RUKAVINA)  And I think you mentioned
7 that in your years at Highland your team papered
8 hundreds of loans?
9     A.  Yeah.
10     Q.  In your time at Highland, is it your
11 testimony that the accounting -- corporate accounting
12 department never made a mistake with respect to
13 anything that it did?
14     MR. MORRIS:  Objection to the form of the
15 question.
16     THE WITNESS:  No, I did not say that.
17     Q. (BY MR. RUKAVINA)  Do you recall any mistakes
18 in your time at the corporate accounting group at
19 Highland that had been made, any significant mistakes?
20     MR. MORRIS:  Objection to the form of the
21 question.
22     THE WITNESS:  Significant mistakes, not that
23 I can recall.
24     Q. (BY MR. RUKAVINA)  No accounts payable
25 mistakenly paid?

**52**

1     MR. MORRIS:  Objection to the form of the
2 question.
3     THE WITNESS:  I cannot specifically answer
4 that question with 17 years of work to recall, sorry.
5     MR. RUKAVINA:  Just take a quick break.  If
6 you need a restroom -- off the record.
7     (Off the record.)
8     Q. (BY MR. RUKAVINA)  Going back to Exhibits 4
9 and 5.
10     Mr. Waterhouse signed these promissory notes.
11 Is there any particular reason why he signed them as
12 opposed to Dondero or someone else?
13     A.  No particular reason. He's an officer for
14 both companies. He's a signatory.
15     Q.  Who decided, if anyone, to your knowledge,
16 that he would be the one signing the notes, these two
17 notes?
18     A.  I don't know who would have decided that, but
19 typically if Frank specifically wanted Jim Dondero to
20 sign it, he would say, take it to Jim to sign.
21     Q.  Do you have a recollection of
22 Mr. Dondero -- strike that.
23     Do you have a recollection of Mr. Waterhouse
24 signing other promissory notes?
25     A.  Yes.  I know for sure he has signed other

Kristin Hendrix - October 27, 2021

---

53

1 promissory notes. I can't tell you explicitly which
2 ones.
3     (Off the record.)
4     Q. (BY MR. RUKAVINA) Are you saying that in May
5 of 2019 -- strike that.
6     By May of 2019, was it not the standard
7 practice at the debtor that Mr. Dondero would sign
8 intercompany promissory notes?
9     MR. MORRIS: Objection to the form of the
10 question.
11     THE WITNESS: No, that's not standard
12 practice. Just needed to be somebody -- somebody who
13 is a signer for the entity on the incumbency
14 certificate.
15     Q. (BY MR. RUKAVINA) Was there a standard
16 practice, or did you just describe the standard
17 practice that it was someone on the incumbency
18 certificate?
19     A. That's correct, somebody on the incumbency
20 certificate. Frank is a great prospect to sign, with
21 giving direction to set loans up, send money out. Why
22 wouldn't he sign it.
23     Q. Do you have any memory sitting here today of
24 Mr. Waterhouse telling you or agreeing that he would be
25 signing these two promissory notes for HCMFA?

---

54

1     A. Not specifically, but he didn't need to tell
2 me. He typically would tell me if he wanted Jim to
3 sign them.
4     Q. Sitting here today, do you have any memory of
5 giving Mr. Waterhouse these two promissory notes after
6 they were prepared?
7     A. I specifically don't remember walking into
8 his office and providing it to him, but he could have
9 found it on our shared drive if he wanted to.
10     Q. Do you have any memory or in your recent
11 review of documents did you see any email to the effect
12 of you sending either or both of these promissory notes
13 to Mr. Waterhouse after they were papered up?
14     A. I don't have any specific recollection,
15 again, but he had access to look at them.
16     Q. On the shared drive?
17     A. Yes.
18     Q. In May -- I'm going to ask this question
19 multiple different ways, so let's start with kind of
20 the general.
21     In May or by May of 2019, was there a
22 repository, electronic or paper, where the debtor kept
23 original promissory notes that were owed -- where money
24 was owed to it?
25     A. Original meaning paper?

---

55

1     Q. Well, let's go back a little bit in time.
2     Would you agree that at some point prior to
3 2019 the standard course was that paper notes were ink
4 signed?
5     MR. MORRIS: Objection to the form of the
6 question.
7     THE WITNESS: I could not tell you
8 specifically when notes were or were not ink signed.
9     Q. (BY MR. RUKAVINA) Was there any repository,
10 to the best of your recollection, as of May 2019 where
11 any ink-signed original promissory notes were kept by
12 the debtor?
13     A. No. We always would scan them in, save them
14 on our shared drive. Never had paper copies.
15     Q. So that's -- fixing to ask that question
16 next.
17     So Exhibits 4 and 5, would they even have
18 been printed after they were papered up?
19     MR. MORRIS: Objection to the form of the
20 question.
21     THE WITNESS: Possibly. Somebody could have
22 printed them.
23     Q. (BY MR. RUKAVINA) Do you remember printing
24 Exhibits 4 or 5 sitting here today?
25     A. I don't recall printing them myself, no.

---

56

1     Q. Would there have been a reason to print them
2 out if, as you said, the notes were stored
3 electronically?
4     MR. MORRIS: Objection to the form of the
5 question.
6     THE WITNESS: There could be a reason. I
7 don't recall that I for any reason printed these
8 particular notes.
9     Q. (BY MR. RUKAVINA) So as of May 2019, is it
10 your testimony that notes that were papered up by the
11 corporate accounting group would have been saved
12 electronically on the system and not kept by way of
13 paper copies in some file?
14     A. Correct. That's right.
15     Q. This is additional metadata. And you
16 understand I have a bit of an accent.
17     What are we on?
18     (Off the record.)
19     Q. (BY MR. RUKAVINA) Ms. Hendrix, Exhibit 8 is
20 going to be additional metadata for the May 3, 2019,
21 note that we've been looking at, and Exhibit 9 will be
22 the same thing for the May 2 note that we've been
23 looking at.
24     That's 8. That's 9.
25     (Whereupon, Exhibits 8 & 9 were marked for

---

Kristin Hendrix - October 27, 2021

57

1    identification.)
2    Q. (BY MR. RUKAVINA) Ms. Hendrix, I'm going to
3  represent to you again that my office has faithfully
4  printed this metadata out without doctoring or changing
5  anything, and I ask you to assume that. If I'm wrong
6  on that, then your answers don't count.
7    Ma'am, as I look at these two documents, it
8  says last modified by Kristin Hendrix.
9    Do you see that?
10   A. Yes.
11   Q. And that would have -- that could have only
12  been you; correct, in that department?
13   A. I hope so, yes.
14   Q. Seeing these two documents, can you agree
15  with me now that it was in fact you that papered up
16  Exhibits 4 and 5?
17   MR. MORRIS: Objection. Asked and answered.
18   THE WITNESS: I would assume so since my name
19  is on it, yes.
20   Q. (BY MR. RUKAVINA) Both of these documents
21  say last printed -- I'm sorry. If you see related
22  dates, it says last printed May 2, 2019, 11:27 A.M. Do
23  you have any memory or any understanding as to why that
24  date would be there or what last printed might mean?
25   A. I don't know why it says last printed the day

58

1  before it was created. That doesn't make any sense. I
2  have no idea.
3    Unless, the only thing I could think of is if
4  we changed this template. When I say "this," the
5  $2.4 million loan, which was papered on the 2nd, and
6  then used it for the next day for the template to
7  update the date, possibly. I have no idea.
8    Q. Well, it may be -- and I understand that you
9  don't have any memory; we're speculating a little bit.
10   It may be, looking at Exhibits 8 and 9, that
11  the $2.4 million note was printed on May 2, and then
12  after having been used as the template for the
13  $5 million note, the $5 million note would not have
14  been printed.
15   Does that sound possible?
16   MR. MORRIS: Objection to the form of the
17  question.
18   THE WITNESS: Sure, it could be possible.
19   Q. (BY MR. RUKAVINA) But you don't have any
20  memory either way?
21   A. No. And when these were printed they're
22  printed to PDF, I believe, is probably what that means.
23   Q. Okay.
24   We're going to switch gears a little bit now,
25  if you want to make a pile of those exhibits.

59

1  Obviously, you're welcome to use them anytime you need
2  to, but I think we're done with those notes.
3    Going to hand you what we're going to mark as
4  Exhibit 10, which is an email chain produced by the
5  debtor.
6    And I don't know how anyone on the video will
7  see it. I apologize. I'll have to send it to you
8  later.
9    (Whereupon, Exhibit 10 was marked for
10   identification.)
11   Q. (BY MR. RUKAVINA) Now, if you start with
12  this email chain, it starts on November 19, 2020 from
13  Jack Donohue to you, copying Mr. Seery and various
14  others.
15   Do you see that?
16   A. Yes.
17   Q. And Mr. Donohue is asking you to provide him
18  the financial records of HCMFA due to the funds owed
19  the debtor.
20   Do you see that?
21   A. Yes.
22   Q. Do you recall that email from Mr. Donohue to
23  you?
24   A. Yes.
25   Q. Do you recall any context or subsequent

60

1  discussions or how that email came to be, or do you
2  just recall getting that email?
3    A. I just recall getting the email.
4    Q. You write back, hi Jack, Scott Ellington is
5  going to follow up with the board on this request.
6    Do you see that?
7    A. Yes.
8    Q. Do you recall why you told Jack that
9  Mr. Ellington was going to follow up?
10   A. From what I recall, I had asked Frank
11  Waterhouse if it was okay to send these financials
12  over, and he wanted me to check with Scott Ellington
13  and that was Scott's response.
14   Q. And did he tell you why he wanted you to
15  check with Scott Ellington?
16   A. Just to make sure that there were no issues
17  with sending them over.
18   Q. Mr. Seery writes back, can I get this ASAP.
19  HCMFA is way overdue.
20   Do you see that?
21   A. Yes.
22   Q. And Mr. Seery writes again, it's about a week
23  later, and he says, this is an explicit direction from
24  me as CEO of HCMLP. But it looks like you are the
25  recipient of that December 2 email; correct?

Kristin Hendrix - October 27, 2021

61

1     A. Yes.
2     Q. Do you remember him sending you that email
3 and copying those people?
4     A. Yes.
5     Q. Do you remember anything happening in that
6 week between his November 25 and December 2 email along
7 the same discussion lines?
8     A. I don't remember anything. I think I was
9 probably left out of any discussions, and if there were
10 any, it was with Scott Ellington and whomever he had
11 discussions with.
12     Q. Then subsequent, on December 2, Mr. Seery
13 writes, all, Scott and I have spoken and agree that the
14 information should be provided to James immediately.
15      Would that have been James Romey, do you
16 think?
17     A. Yes.
18     Q. And who was James Romey?
19     A. He also worked for DSI.
20     Q. And then he writes, Kristin, please proceed
21 with James. If anyone has any questions or issues,
22 please call me.
23      Do you see that?
24     A. Yes.
25     Q. Did you proceed with James Romey?

62

1     A. I further made sure that Scott was okay, to
2 confirm. He said yes, please do, and I did send them
3 to James Romey.
4     Q. So Mr. Seery has some of it in this email
5 chain, but do you have any understanding as to why
6 either DSI or Mr. Seery in November of 2020 was asking
7 for the financial records of HCMFA?
8     A. I do not, other than what's in this email.
9     Q. Did you discuss with either DSI or Mr. Seery
10 or Mr. Waterhouse in November or December 2020 whether
11 the demand notes from HCMFA should be demanded, should
12 be called?
13     A. I did not have discussions.
14     Q. Next exhibit is Exhibit 11. This is another
15 email chain.
16      And I apologize to the folks on the video.
17 I'll have to get it to you during some break.
18     MR. MORRIS: Hold on one second.
19     MR. RUKAVINA: Sure. Off the record.
20     (Off the record.)
21     (Whereupon, Exhibit 11 was marked for
22     identification.)
23     Q. (BY MR. RUKAVINA) Exhibit 11, Ms. Hendrix,
24 if you'll go to the beginning of this email chain, is
25 an email on January 6, 2021, again from Mr. Donohue to

63

1 you, copying Waterhouse, Seery, a bunch of others.
2      Where he says, at the direction of Jim Seery,
3 please provide DSI with the requested information for
4 each entity below.
5      And you'll see the entity includes both of my
6 clients, NexPoint Advisors and HCMFA. And the
7 information includes bank statements, income
8 statements, balance sheets, cash flows.
9      Do you see that?
10     A. Yes.
11     Q. Do you recall this email?
12     A. Vaguely, yes.
13     Q. Did you have any concerns when you received
14 this email?
15     A. Concerns about the email, no. I probably
16 checked with -- I would have checked with Frank to make
17 sure it was okay to send this first.
18     Q. Frank Waterhouse?
19     A. Yes.
20     Q. Do you have any understanding as to why
21 Mr. Donohue requested bank statements, income
22 statements, balance sheets for NexPoint and/or HCMFA?
23     A. I do not.
24     Q. Did he or anyone at DSI tell you why they
25 were requesting that?

64

1     A. Not that I can recall.
2     Q. If we go forward in time, you'll see that
3 Mr. Waterhouse is writing back to Mr. Donohue. And
4 then Mr. Seery interjects and says, these are HCMLP
5 business records. Please provide them as requested by
6 Jack ASAP.
7      Do you see that?
8     A. Yes.
9     Q. And it looks like you were not privy to
10 subsequent communications where Frank and Jim were
11 talking back and forth about this. You were not privy
12 to those, like you weren't blind copied or anything to
13 your recollection?
14     A. No.
15     Q. Did you in fact on or after January 6, 2021,
16 provide Mr. Donohue or anyone on his team the
17 information that he had requested as it relates to
18 NexPoint and/or HCMFA?
19     A. Without going back to check, I couldn't
20 answer yes or no for certain.
21     Q. So I think you mentioned when you received
22 the email from Mr. Donohue you would have checked with
23 Frank. And what do you remember asking Frank or
24 checking with him about?
25     A. I don't remember asking him specifically. In

Kristin Hendrix - October 27, 2021

---

65

1  fact, it's possible that Frank just responded on his
2  own here to Jack. Again, would have been a
3  conversation that I can't specifically recall.
4      Q.  Sure. And you don't specifically remember
5  today providing Mr. Donohue any of that information;
6  right?
7      A.  Right.
8      Q.  You don't specifically remember today having
9  a discussion with Mr. Donohue or Seery or anyone else
10 at or about that time as to why they were wanting this
11 information?
12     A.  Correct.
13     Q.  Exhibit 12, Ms. Hendrix, is going to be the
14 December 3, 2020, letter by which Highland called the
15 notes.
16     MR. MORRIS:  Objection to the form of the
17 question if there was one.
18     (Whereupon, Exhibit 12 was marked for
19     identification.)
20     Q.  (BY MR. RUKAVINA)  Are you familiar with
21 Exhibit 12, Ms. Hendrix?
22     A.  No, I haven't seen this.
23     Q.  Prior to today, you don't remember seeing
24 this?
25     A.  No.

---

66

1      Q.  I think you're answering no?
2      A.  No, sorry, no.
3      Q.  On or before December 3, 2020, did anyone
4  discuss with you whether Highland should call the
5  demand notes that were outstanding by HCMFA?
6      A.  No.
7      Q.  Do you recall in December 2020 any discussion
8  with anyone at the debtor about the NexPoint
9  $30.7 million term note?
10     A.  Repeat your question again, please.
11     Q.  Sure. So you're familiar, and we'll talk
12 about it in some detail, with the NexPoint
13 $30.7 million note?
14     A.  Yes.
15     Q.  And again, we'll talk about it, but at that
16 point in time that was a term note; correct?
17     A.  Correct.
18     Q.  Do you remember in the December 2020 or
19 November 2020 time frame discussing with anyone at the
20 debtor the status of that NexPoint note?
21     A.  Yes, we would have discussed this on a weekly
22 basis in our cash meetings that we would have had, as
23 identifying that there are payments due on these loans
24 in December.
25     Q.  What weekly cash meetings are you referring

---

67

1  to?
2      A.  We had a standing weekly cash meeting with
3  Frank Waterhouse, myself, Jim Seery. I can't recall
4  everyone on it. Some of the DSI folks. We go through
5  cash forecasts. It's a 13-week cash forecast. We go
6  through it every week.
7      It's going to lay out incoming and outgoing
8  payments that are forecasted, of which these term loans
9  were in those forecasts, so they were discussed.
10     Q.  And Mr. Morris produced some of those to me
11 this morning. I haven't had time to go through them.
12     But it is your recollection in November and
13 December of 2020 the fact of the NexPoint term note
14 being out there was known to Mr. Seery?
15     A.  Yes.
16     Q.  And the fact of an upcoming December 31,
17 2020, payment was known to Mr. Seery?
18     A.  Yes.
19     Q.  So with that background, in November and
20 December of 2020, do you remember discussing with
21 anyone anything to the effect of, oh, it really would
22 be better if NexPoint defaulted on that note so we
23 could call it?
24     A.  No.
25     Q.  Did Mr. Seery ever state to you anything in

---

68

1  November or December of 2020 about how the debtor might
2  monetize that NexPoint note?
3      A.  No.
4      Q.  Did he discuss with you any potential sale of
5  that promissory note?
6      A.  No.
7      Q.  Did DSI ever discuss with you in November or
8  December 2020 any potential sale of that note?
9      A.  No.
10     Q.  Or how to monetize that note?
11     A.  No.
12     Q.  So -- well, strike that.
13     Did Mr. Seery or anyone at DSI, or anyone at
14 all, in November or December of 2020 state any words to
15 you to the effect that they were hoping that NexPoint
16 would default on that note?
17     A.  Never.
18     Q.  Or that it would be in the debtor's interest
19 for NexPoint to default on that note?
20     A.  No.
21     Q.  In November or December of 2020, do you
22 recall having any discussions with Mr. Seery or anyone
23 at DSI as to the collectibility of that note? And by
24 that I mean whether NexPoint can pay the note?
25     A.  I don't specifically recall. It most likely

---

Kristin Hendrix - October 27, 2021

69

1 came up in cash conversations.
2    Q. I think you were assistant controller back
3 then?
4    A. Yes.
5    Q. Would a discussion of a borrower's ability to
6 repay have been something within your general sphere of
7 responsibility in that time frame?
8      MR. MORRIS: Objection to the form of the
9 question.
10      THE WITNESS: It depends on who the borrower
11 is, and at that time we did -- we had knowledge over
12 that information, so yes.
13    Q. (BY MR. RUKAVINA) Well, you've seen some
14 instructions or requests from Mr. Seery to you and DSI
15 to you for financial information of NexPoint and HCMFA.
16 We've gone through those documents; right?
17    A. Yes.
18    Q. Does that refresh your memory that there was
19 any internal discussion that you were privy to about
20 the ability of HCMFA and/or NexPoint to pay these
21 notes?
22    A. I don't recall that specifically being asked.
23 It could have.
24    Q. Did you ever at any point in time have any
25 employment or officer or any title or role with

70

1 NexPoint Advisors, LP?
2    A. No.
3    Q. Were you ever the controller or assistant
4 controller for NexPoint Advisors LP?
5    A. No.
6    Q. Did you ever at any point in time have any
7 employment, officer or any title or role at HCMFA?
8    A. No.
9    Q. Were you ever the controller or assistant
10 controller of HCMFA?
11    A. No.
12    Q. So you might have indirectly provided
13 services to those two as part of shared services, but
14 never directly; is that fair?
15      MR. MORRIS: Objection to the form of the
16 question.
17      THE WITNESS: When you say never directly,
18 meaning I was not employed by those entities?
19    Q. (BY MR. RUKAVINA) Correct.
20    A. That's correct.
21    Q. Do you have any understanding -- first of
22 all, NexPoint did not make a payment on December 31,
23 2020; correct?
24    A. Correct.
25    Q. Okay. Do you have any understanding of why

71

1 not?
2    A. Yes.
3    Q. What's your understanding?
4    A. Either November 30 or December 1, 2020, I
5 received a phone call from Frank Waterhouse that said,
6 no payments are going from any of the Advisors to
7 Highland.
8    Q. Can you be more specific with what he said?
9    A. That's what he said.
10    Q. So he said no payments from the Advisors to
11 Highland?
12    A. Yes.
13    Q. Did he reference the promissory note
14 expressly?
15    A. No.
16    Q. But no payments means?
17    A. Nothing.
18    Q. That would logically in your mind include the
19 promissory note?
20    A. Yes.
21    Q. Did you ask him why?
22    A. No.
23    Q. Did he tell you why?
24    A. No.
25    Q. Did you, prior to January 1, 2021, did you

72

1 hear from anyone as to why Mr. Waterhouse gave that
2 instruction?
3    A. Not that I recall.
4    Q. Did you, after that November 30 or December 1
5 phone call, did you follow up with him or anyone else
6 about the upcoming note payment?
7    A. I didn't have any reason to.
8    Q. I'm going to -- let me find you a document
9 for a moment.
10      Just so the record is complete, let's include
11 this promissory note. It's going to be Exhibit 13.
12 This is the NexPoint promissory note.
13      (Whereupon, Exhibit 13 was marked for
14      identification.)
15    Q. (BY MR. RUKAVINA) I take it you've seen this
16 promissory note, Exhibit 13?
17    A. Yes.
18    Q. And I think you testified about this before,
19 but just to summarize to save time.
20      This would have been a note that you would
21 not have papered but would have gone through legal
22 because it was a roll-up. Is that generally accurate?
23    A. Yes.
24    Q. And do you have any memory at all of having
25 anything to do with papering up this loan?

Kristin Hendrix - October 27, 2021

**73**

1 A. Not that I recall.
2 Q. Would you have had, after 2017 and before
3 2021, any role with respect to any payments or upcoming
4 payments on this note, any role at all?
5 A. Yes.
6 Q. What would have been your role or roles?
7 A. That would have been taking direction from
8 Frank Waterhouse or possibly Jim Dondero saying, go
9 ahead and make these payments that are due on these
10 term notes.
11 Q. Would you have recorded on any books or
12 records payments that actually were made?
13 A. Not me personally.
14 Q. Who would have?
15 A. Our accountant, which could have been one of
16 two different people, depending on the time frame.
17 Q. Would you have had any role with respect to
18 recording those payments or is that just something that
19 your group would have done?
20 MR. MORRIS: Objection to the form of the
21 question.
22 THE WITNESS: I would not have had a role.
23 My group would have.
24 Q. (BY MR. RUKAVINA) What about calculating
25 amortization and/or interest payments that are due or

**74**

1 upcoming? Who would have done that, you or someone
2 else?
3 A. Our accountant.
4 Q. Do you have any memory of doing that?
5 MR. MORRIS: Objection to the form of the
6 question.
7 THE WITNESS: Not during 2017 through 2019.
8 Q. (BY MR. RUKAVINA) What about 2020?
9 A. No.
10 Q. Going back to that November 30 or December 1
11 telephone call, do you recall who initiated the call?
12 A. To me?
13 Q. The one between you and Mr. Waterhouse.
14 A. Frank called me.
15 Q. Frank called you.
16 And was it just to discuss -- or just to give
17 you that instruction, no payments from the Advisors, or
18 was there other things discussed?
19 A. I could not tell you if something else was
20 discussed on that phone call.
21 Q. Do you remember if it was a long phone call
22 or short?
23 A. Couldn't tell you.
24 Q. Do you remember where you were when he called
25 you?

**75**

1 A. At my house.
2 Q. Did you answer on a cell phone or landline?
3 A. My cell phone.
4 Q. Is there any chance in hell that your cell
5 phone would still have a record of that phone call,
6 like what time it was and how long it lasted?
7 MR. MORRIS: Objection to the form of the
8 question.
9 Q. (BY MR. RUKAVINA) I apologize for using
10 hell.
11 MR. MORRIS: And to foundation.
12 THE WITNESS: I have no idea.
13 Q. (BY MR. RUKAVINA) Do you have your cell
14 phone with you right now?
15 A. In the other room.
16 Q. I might ask you during the break to just --
17 we'll take a short break before I'm done, and I'll ask
18 you if you've had a chance to look for November and
19 December 2020 phone logs between you and
20 Mr. Waterhouse. I would ask you to do that, please.
21 A. Sure.
22 Q. And I apologize, I think you said you thought
23 it was a short telephone call?
24 A. I have no idea.
25 Q. Did the telephone call or Mr. Waterhouse's

**76**

1 instructions surprise you in any way?
2 A. Nothing surprises me anymore, so no.
3 Q. Did it surprise you back in November or
4 December of 2020?
5 A. No.
6 Q. Did it pique your curiosity?
7 A. Nope.
8 Q. Just another instruction from your boss?
9 A. Yep.
10 Q. Exhibit 14 is going to be a document that
11 we're not sure what it is and we're not sure who
12 prepared it. It appears to be a ledger of charges
13 against and payments on this promissory note.
14 I'm just saying that so the people on the
15 phone know what it is, but you don't have to take what
16 I said as correct.
17 (Whereupon, Exhibit 14 was marked for
18 identification.)
19 Q. (BY MR. RUKAVINA) So Ms. Hendrix, Exhibit 14
20 was produced by the debtor. And I'm going to ask you,
21 do you know what this is or have you seen it before?
22 Can you help us state what it is?
23 A. This looks like it is an amortization
24 schedule of the NexPoint Advisors term loan.
25 Q. Would this have been something that it

Kristin Hendrix - October 27, 2021

**77**

1 appears to you would have been maintained internally by
2 the debtor, or does it look like it might have been
3 prepared by DSI or someone else for some other reason?
4     A. It looks like the debtor's amortization
5 schedule that they kept.
6     Q. Did the debtor keep an amortization schedule
7 for the NexPoint promissory note, to your knowledge?
8     A. Yes.
9     Q. Did the debtor keep amortization schedules
10 for other term promissory notes?
11     A. Yes.
12     Q. In what format, like Excel spreadsheets or
13 Word documents? What is your recollection for NexPoint
14 specifically?
15     A. Excel.
16     Q. Would that have been on the shared system or
17 something?
18     A. Yes.
19     Q. And who would have been responsible on an
20 ongoing basis to update the NexPoint amortization
21 schedule?
22     MR. MORRIS: Objection to the form of the
23 question.
24     THE WITNESS: Depends on what time you're
25 asking.

**78**

1     Q. (BY MR. RUKAVINA) Let's talk about the year
2 of 2020.
3     A. That would have been Hayley Eliason, our
4 accountant at that time.
5     Q. What about the year 2019?
6     A. Still Hayley.
7     MR. RUKAVINA: I'm going to just ask, to
8 preserve the record, Mr. Morris, if he hasn't already,
9 to produce any such Excel spreadsheet in the native
10 form.
11     Q. (BY MR. RUKAVINA) If we look at this,
12 Ms. Hendrix -- and I'm a little confused as to what
13 these entries mean. Maybe you could help me. But
14 columns that say interest paid, principal paid, total
15 paid, do you know what those columns are?
16     A. Exactly as they state. These are interest
17 and principal payments made on the date that's listed,
18 and then you've got a total.
19     Q. And then they're in brackets because they're
20 negative numbers?
21     A. Correct.
22     Q. So here's what I'm not understanding. Go to
23 the second page.
24     You see there's an entry under interest paid
25 12/30/29 [verbatim] that says negative 530,000 and

**79**

1 change but it doesn't use brackets?
2     A. It's a negative number. It's just a
3 formatting issue.
4     Q. What about also on that same page in the
5 other column, principal paid, 5/31/2020, it's a
6 positive number, 575,550.
7     MR. MORRIS: Where are you?
8     MR. RUKAVINA: On page 2 of this exhibit.
9     MR. MORRIS: What date?
10     MR. RUKAVINA: May 31, 2020. And it's the
11 column over, principal paid. It's a positive number,
12 575,000 and change.
13     MR. MORRIS: Got it, thank you.
14     Q. (BY MR. RUKAVINA) Do you see that,
15 Ms. Hendrix?
16     A. Yes.
17     Q. Do you have an understanding of why that
18 number would be positive?
19     A. Actually, I think this looks like an entry to
20 me where the interest is what we call picking. So on
21 the anniversary date of this loan, which is May, from
22 what I can tell, the accrued interest total, which is
23 that 575-, is being rolled into principal.
24     That's what I can tell from looking at it.
25     Q. Okay. Do you have any understanding as to

**80**

1 why that would have been done or why that would have
2 been done on that day?
3     MR. MORRIS: Objection to the form of the
4 question.
5     THE WITNESS: Because that's the anniversary
6 date of the loan. I would assume that that's how the
7 loan is written.
8     Q. (BY MR. RUKAVINA) And I think that that
9 Section 1 of the promissory note does say, the unpaid
10 principal balance of this note from time to time
11 outstanding shall bear interest.
12     At the rate of 6 percent per annum from the
13 date hereof until maturity date, compounded annually on
14 the anniversary of the date of this note.
15     Do you see that?
16     MR. MORRIS: Objection to the form of the
17 question.
18     THE WITNESS: Yeah, I see that.
19     Q. (BY MR. RUKAVINA) Assuming that this is the
20 correct amortization schedule for the NexPoint note,
21 and that the numbers in here are correct, if you look
22 at the second page under the column total paid there
23 are a number of entries for 2019.
24     Do you see that, the far right column?
25     A. At the top, yes.

Kristin Hendrix - October 27, 2021

81

1    Q.  For example, 1.3 million, 2.1 million,
2  1.3 million.
3       Do you see that?
4    A.  Yes.
5    Q.  Assuming that that's correct, do you have any
6  memory or understanding whether in the year 2019, or
7  why NexPoint was making these payments on this
8  promissory note?
9    A.  Without going back and reading through emails
10  I can only assume that, from looking at this, Highland,
11  the debtor, would have needed cash, and so this is one
12  way of getting cash to the debtor.
13    Q.  This is kind of like what we discussed in the
14  beginning, that Mr. Dondero on a cash needed basis
15  would just transfer money between entities?
16    A.  Yes.
17    Q.  Do you have any memory in the first half of
18  2019 whether Highland, the debtor, had any particular
19  need for cash money at that time?
20    A.  We generally always had a need for cash, so
21  yes.
22    Q.  And so if NexPoint was transferring money
23  back to Highland on this note because Highland needed
24  the money, would those have been recorded as
25  prepayments by the debtor?

82

1       MR. MORRIS:  Objection to the form of the
2  question.
3       THE WITNESS:  Yes.
4    Q.  (BY MR. RUKAVINA) Sitting here today, do you
5  have any reason to believe based on the formatting or
6  anything on Exhibit 14 that it's not the amortization
7  schedule as it was maintained by the debtor?
8    A.  I don't have any reason to not believe that
9  it was.
10    Q.  Going to show you a few documents that I'm
11  hopefully going to burn through, but you're certainly
12  entitled to take all the time that you need.
13       So first is going to be a document that
14  Mr. Morris produced this morning.  It's not Bates
15  labeled.  I don't know why.
16       MR. MORRIS:  As I said in my email, my
17  paralegal is sick and so I wanted you to have the
18  documents.  We'll Bates stamp them later, but we have a
19  written record from my email of what we produced to
20  you.
21       MR. RUKAVINA:  You're assuming that I read my
22  emails.
23       MR. MORRIS:  Sorry about that.  I confess,
24  sometimes I don't as well.
25    Q.  (BY MR. RUKAVINA) So I'm going to hand you

83

1  Exhibit 15 and I'm going to represent to you that it's
2  the email that Mr. Morris sent to me today and I've not
3  doctored it in any way.
4       (Whereupon, Exhibit 15 was marked for
5       identification.)
6       MR. MORRIS:  Do you have the email that it
7  was attached to?
8       MR. RUKAVINA:  Somewhere.  I can find it at a
9  break.
10       MR. MORRIS:  I'll let the witness testify.
11  This was attached to an email.  Not my email, but
12  another email.  But I'll let the witness testify.
13       MR. RUKAVINA:  Off the record.
14       (Off the record.)
15    Q.  (BY MR. RUKAVINA) So you have Exhibit 15.
16       And during the break we established, I don't
17  have a copy of it right now, but you sent Exhibit 15 on
18  August 29, 2020, to Mr. Dondero by email, copying
19  Mr. Waterhouse, as well as a couple of other
20  attachments; is that correct?
21    A.  Correct.
22    Q.  Do you recall what prompted you to send that
23  email and this attachment?
24    A.  Yes.
25    Q.  What?

84

1    A.  Frank Waterhouse called me on August 29, and
2  requested that I do so.
3    Q.  Did he tell you why?
4    A.  From what I recall, this was a time when Jim
5  was trying to come up with his bargain or pop land,
6  whatever he referenced it as.  This was all information
7  that Frank said he wanted.
8    Q.  Okay.  So going back to Exhibit 15, what I'm
9  interested in is NexPoint Advisors, the 23,846,000 and
10  change number.
11       Do you see that?
12    A.  Yes.
13    Q.  Where did that number -- or where did this
14  Exhibit 15 come from, if you understand my question?
15    A.  Sure.  These numbers should all be balances
16  off of the corresponding notes that each entity owed to
17  the debtor.
18    Q.  Did you or someone prepare Exhibit 15
19  specifically for that email?  Or was Exhibit 15 already
20  existing somewhere on the system?
21    A.  I believe that we prepared it specifically
22  for this request.
23    Q.  Do you recall who?
24    A.  It was either myself or our accountant.  I
25  don't recall who put it together.

Kristin Hendrix - October 27, 2021

85

1 Q. Okay. And where would that 23 million and
2 change number for NexPoint have come from, an
3 amortization schedule?
4 A. Yes.
5 Q. And what about Highland Capital Management
6 Fund Advisors? You see $10.5 million and change demand
7 on Exhibit 15?
8 A. Yes.
9 Q. Where would that $10.5 million number have
10 come from, do you remember?
11 A. The same. It would have come off of the
12 amortization schedules for all of their notes.
13 Q. How was there an amortization schedule for a
14 demand note?
15 A. Because it's accruing interest.
16 Q. So sitting here today, you expect there would
17 be some amortization schedule like Exhibit 14 but for
18 HCMFA?
19 A. Yes.
20 Q. Now we're going to have an exhibit [verbatim]
21 chain that's going to be marked as Exhibit 16.
22 (Whereupon, Exhibit 16 was marked for
23 identification.)
24 MR. RUKAVINA: For the folks on the video,
25 Exhibit 16 is the email chain that Mr. Morris used last

86

1 week regarding the Section 15(c) document.
2 Q. (BY MR. RUKAVINA) Are you familiar with this
3 Exhibit 16 email chain, Ms. Hendrix?
4 A. Yes.
5 Q. Why are you familiar with it?
6 A. Well, I'm copied on it, and I saw it
7 yesterday.
8 Q. Do you have any memory -- well, that's a
9 stupid question. But prior to yesterday, did you have
10 any memory of this?
11 A. Yes.
12 Q. And do you recall the context or the purpose
13 of this exhibit, or this email chain?
14 A. From what I remember this is the time where
15 information was being prepared for the retail board to
16 re-up the debtor's shared services.
17 Q. So, here -- you're certainly welcome to read
18 it in its entirety and if you feel like you want to or
19 need to, that's fine. But I only have one question.
20 Well, one question with two subparts.
21 I'm looking at Ms. Lauren Thedford's,
22 T-h-e-d-f-o-r-d's, email October 6, 2000 [verbatim]
23 where she says, I see the below from the 6/30
24 financials. NPA, due to HCMLP and affiliates as of
25 June 30, 2020.

87

1 Do you see that, ma'am?
2 A. Yes.
3 Q. 23 million 683?
4 A. Yes.
5 Q. And you see, HCMFA due to HCMLP as of
6 June 30, 2020, 12,286,000?
7 MR. MORRIS: Objection to the form of the
8 question.
9 Q. (BY MR. RUKAVINA) Strike that.
10 It says 12,286. What do you take that 12,286
11 to mean?
12 A. I think that's a typo and it should have
13 said -- well, there's several things wrong with this,
14 from looking at it.
15 She left off three zeros on the end of it.
16 Should have said 12,286,000. Secondly, that amount is
17 our due to affiliates on HCMFA's books, not just due to
18 HCMLP.
19 Q. That was going to be my question, why that
20 12,286,000 number didn't jive with the 10,530,000
21 number on Exhibit 15?
22 A. Yes, there's another loan due to a different
23 affiliate.
24 Q. So that $12,286,000 amount doesn't mean that
25 it's all due to Highland; is that correct?

88

1 A. Correct.
2 Q. Exhibit 17 is going to be the January 7, 2021
3 notice from the debtor to NexPoint about the default.
4 (Whereupon, Exhibit 17 was marked for
5 identification.)
6 Q. (BY MR. RUKAVINA) You've been handed
7 Exhibit 17. Have you seen this document before?
8 A. Not that I believe.
9 Q. And I think we've asked this before, but just
10 to clarify.
11 Did anyone at the debtor, including Mr. Seery
12 or DSI, discuss with you after December 31, 2020 that
13 the payment had not been made and what, if anything,
14 the debtor should do about that?
15 MR. MORRIS: Objection to the form of the
16 question.
17 THE WITNESS: I can't recall specific
18 conversations that may or may not have been had around
19 that topic.
20 Q. (BY MR. RUKAVINA) Would -- so back then you
21 were the assistant controller, on January 7; right?
22 A. Yes.
23 Q. Do you think that back then Mr. Seery or DSI
24 would have sought your advice or input as to what they
25 should do about the missed payment?

Kristin Hendrix - October 27, 2021

**89**

1   A. No.
2   MR. MORRIS: Objection to the form of the
3 question.
4   THE WITNESS: No.
5   Q. (BY MR. RUKAVINA) That would have been
6 outside of your purview?
7   A. Yes.
8   Q. And you see in this notice in the middle, it
9 says an amount due as of January 8 in the $24,471,000
10 range.
11   Do you see that?
12   A. Yes.
13   Q. Do you have any idea, I take it you don't,
14 where that number came from?
15   MR. MORRIS: Objection to the form of the
16 question.
17   THE WITNESS: I don't know who provided that
18 number or where it came from.
19   Q. (BY MR. RUKAVINA) Do you have any
20 understanding as to why that number is higher than the
21 number on Exhibit 15?
22   A. My guess would be that Exhibit 15 is just
23 principal balances.
24   Q. Okay.
25   Exhibit 18, please.

**90**

1   (Whereupon, Exhibit 18 was marked for
2   identification.)
3   Q. (BY MR. RUKAVINA) Exhibit 18, Ms. Hendrix,
4 is an email chain between you and Mr. Waterhouse on
5 January 12, 2021. Do you remember this email chain?
6   A. No.
7   Q. Do you remember on January 12 Mr. Waterhouse
8 emailing you, asking when the last amort payment due
9 and what the amount was for NexPoint?
10   A. No.
11   Q. When was the last time -- well, strike that.
12   Do you remember ever seeing this email
13 between then and today?
14   A. No.
15   Q. Do you have any present memory of any
16 communications with Mr. Waterhouse on or about
17 January 12, 2021 regarding the NexPoint default or
18 note?
19   A. Not specific, no.
20   Q. Any general memory?
21   A. Not that I can pinpoint, no.
22   Q. Were you aware that on or about January 14
23 NexPoint transferred about $1.4 million and change to
24 the debtor?
25   A. Yes.

**91**

1   Q. Were you aware of it then?
2   A. Was I aware of what?
3   Q. That transfer of $1.4 million and change.
4   A. On January 14?
5   Q. Yes.
6   A. Yes.
7   Q. Did you facilitate that transfer?
8   A. Yes.
9   Q. Who told you to make that transfer?
10   A. Frank Waterhouse.
11   Q. Did he tell you why?
12   A. Nope.
13   Q. He just said make the transfer?
14   A. Yes.
15   Q. Did he tell you that it was on account of the
16 NexPoint note?
17   A. Yes.
18   Q. Did he tell you how to, if at all, to credit
19 that note for that amount?
20   A. No.
21   Q. Sitting here today, you have no memory other
22 than that Frank Waterhouse told you to transfer some
23 $1.4 million on the NexPoint note?
24   A. Right.
25   Q. And do you recall, was that oral or written

**92**

1 or how would that have been?
2   A. That was a phone call.
3   Q. Do you recall who initiated the phone call?
4   A. Frank called me.
5   Q. Was that the only topic discussed in that
6 phone call to your memory?
7   A. Yes.
8   Q. Did you ask him why the payment or
9 anything -- did you ask him anything at all?
10   A. No.
11   Q. And after you made the payment -- or I'm
12 sorry, after you caused the payment to be made, did you
13 take any further steps with respect to the NexPoint
14 note?
15   A. I forwarded the payment confirmation, showing
16 that the money was sent from NexPoint Advisors to
17 Highland, forwarded that payment confirmation from the
18 bank to Jack Donohue at DSI, letting him know.
19   Q. Did you let Mr. Donohue or anyone at DSI know
20 about the transfer before the transfer was made?
21   A. No.
22   Q. And you sent that by email to Mr. Donohue?
23   A. Yes.
24   Q. Did Mr. Donohue thereafter have any
25 discussion with you about that in any way?

Kristin Hendrix - October 27, 2021

93

1    A.  I have no idea.
2    Q.  He didn't ask what this was for or anything
3 like that?
4    A.  He may have asked what the amount
5 represented.  I can't specifically recall.  But it's
6 possible.
7    Q.  Okay.  Do you recall any discussion about
8 that time, January 14, with Mr. Donohue or
9 Mr. Waterhouse or anyone as to whether that payment
10 would in any way relieve NexPoint of the default or
11 would not relieve NexPoint of the default?
12    A.  No.
13    Q.  Ms. Hendrix, I believe that I am done.  I
14 would like you, however, because it's important, to
15 check your phone.  Would you like a short, five-minute
16 restroom break and just check --
17    A.  Yeah, and I might need help figuring out how
18 to do that.
19    Q.  I'm not saying that it's possible, but I'm
20 going to ask you on the record to look for that
21 November 30 or December 1, 2020 phone call.
22        MR. MORRIS:  We're happy to do that.
23    Q.  (BY MR. RUKAVINA)  But what I would like if
24 you find it, I would like you to tell me the time, the
25 date and the length of that call.

94

1    A.  Okay.
2    Q.  Thank you.
3        We'll be back in five minutes.
4        (Off the record.)
5    Q.  (BY MR. RUKAVINA)  Ms. Hendrix, during the
6 break did you look at your phone?
7    A.  I did.
8    Q.  Did you find anything?
9    A.  Sadly, it only goes back to October 5 of
10 2021.
11    Q.  Not surprised.  Thank you.
12        Have I been courteous to you today?
13    A.  Yes.
14        MR. RUKAVINA:  I pass the witness.
15        MR. MORRIS:  Thank you.
16        MR. AIGEN:  Are we ready to move forward?
17        MR. MORRIS:  Yes.  You're a little dark
18 there.
19        MR. RUKAVINA:  Can we increase the volume on
20 that thing?
21        (Off the record.)
22            EXAMINATION
23    Q.  (BY MR. AIGEN)  Good afternoon, Ms. Hendrix.
24 My name is Michael Aigen.  I represent Mr. Dondero,
25 HCMS and HCRE Partners in several of the adversary

95

1 proceedings today.
2        I'm going to try to ask you some questions
3 about these adversary proceedings.  I'll try to make it
4 as quick as possible so we don't keep you here.
5        You understand that you're still under oath;
6 is that correct?
7    A.  Correct.
8    Q.  First topic I want to ask you about is one of
9 the defenses in this case related to an oral agreement.
10 Let me start off with this question.
11        Are you aware that some of the defendants in
12 these adversary proceedings have raised a defense that
13 there was a subsequent oral agreement allowing the
14 notes at issue to be potentially forgiven if certain
15 events occurred?
16    A.  I've recently been made aware that this came
17 up, yes.
18    Q.  When you say recently, approximately when?
19    A.  Within the last week.
20    Q.  And where did you learn that from?
21    A.  In my speakings with John Morris just
22 preparing for today.
23        MR. AIGEN:  And John, I'm going to assume
24 that those conversations are privileged?
25        MR. MORRIS:  That's a very fair assumption.

96

1    Q.  (BY MR. AIGEN)  Other than the conversation
2 you just referred to with Mr. Morris, have you ever had
3 any other conversations with anyone about this alleged
4 oral agreement that Defendants are contending occurred?
5    A.  No.
6    Q.  So prior to that conversation with Mr. Morris
7 you weren't even aware of this alleged defense related
8 to an oral agreement.  Is that fair to say?
9    A.  That's right.
10    Q.  This is a similar question but slightly
11 different, just to sort of finish this topic.  I'm not
12 asking about this oral agreement as a defense, I'm just
13 asking more generally.
14        Other than this conversation, were you aware
15 generally of any conversations that anyone had where
16 the notes at issue might be forgiven if certain events
17 occurred?
18        MR. MORRIS:  Objection to the form of the
19 question.
20        THE WITNESS:  No.
21    Q.  (BY MR. AIGEN)  Is it fair to say that you
22 haven't had any conversations about this subsequent
23 oral agreement with anyone other than Mr. Morris?
24    A.  That's fair.
25    Q.  You never discussed it with Mr. Seery?

Kristin Hendrix - October 27, 2021

97

1  A. No.
2  Q. Never discussed it with Mr. Klos?
3  A. No. Well, sorry, Mr. Klos was present when
4  John and I talked about it. But that's it.
5  Q. Have you ever made any investigation or
6  effort in order to determine if this oral agreement
7  actually occurred?
8  A. No.
9  Q. If there was such an oral agreement to
10  potentially forgive the notes, do you believe that you
11  would have known about such an oral agreement as part
12  of your duties and responsibilities?
13  A. Yes, I would hope so.
14  Q. Why do you say that?
15  A. That's something that should be disclosed in
16  audited financial statements, and me and my team are
17  responsible for preparing those financial statements
18  and presenting them to the auditors as fair and
19  accurate.
20  Q. And is it fair to say that this oral
21  agreement should have been disclosed to PwC if it was
22  determined that it was material?
23  A. Yes.
24  Q. And have you done any sort of analysis to
25  determine whether the oral agreement at issue here

98

1  would have been material for purposes of a PwC audit?
2  A. I've not done any work, just finding out
3  about it, but from what it sounds like, it would be
4  material.
5  Q. That's your opinion, that it would have been
6  material; is that fair to say?
7  A. Fair.
8  Q. Have you had any discussions with anyone else
9  about whether the oral agreement would have been
10  material?
11  A. No.
12  Q. Changing topics a little bit here, are you
13  aware --
14  (Off the record.)
15  Q. (BY MR. AIGEN) Are you aware that a few of
16  the loans at issue here, specifically related to HCMS
17  and HCRE, were term loans as opposed to demand loans?
18  A. Yes.
19  Q. And are you aware that for those particular
20  loans, there were payments that were supposed to be
21  made but weren't on December 31, 2020?
22  A. Yes.
23  Q. Do you have any understanding as to why those
24  payments weren't made with respect to the HCMS and HCRE
25  term loans on December 31, 2020?

99

1  A. Yes.
2  Q. Can you tell me why?
3  A. Sure. It goes along with the same statement
4  as HCMFA and NPA and the phone call that I got from
5  Frank Waterhouse saying there's no payments coming from
6  any of the affiliates to the debtor.
7  Q. I may have written that down wrong when you
8  talked about that before, but I believe your earlier
9  testimony when you described that conversation was that
10  there was no more payments coming from the Advisors,
11  not affiliates.
12  Let me ask you then, what was the
13  conversation? Was it no more payments from affiliates
14  or Advisors?
15  A. It could have been either. I probably did
16  say Advisors. But regardless, those payments would
17  have been directed to me to be made, either by Frank
18  Waterhouse or Jim Dondero.
19  And I would assume that nobody directed me to
20  make those payments because we weren't making any
21  payments from Jim's related parties. I don't know for
22  a fact, but that's what I would assume. Those were all
23  under the same umbrella.
24  Q. And again, let's back up a second.
25  When you refer to Advisors, fair to say that

100

1  that does not include HCMS and HCRE; is that correct?
2  A. When I say Advisors, I am referring to HCMFA
3  and NPA.
4  Q. And when you use the term "affiliates,"
5  you're referring to all four; is that correct?
6  A. Correct.
7  Q. Just want to make sure we're on the same
8  page.
9  When you answered the previous question you
10  started to get into assumptions and things like that.
11  Let me start off with what your specific recollection
12  of that phone call was. Tell me as best as you can
13  what you remember Frank telling you?
14  A. I remember it as being no payments from the
15  Advisors to the debtor.
16  Q. So you don't remember the instruction being,
17  don't make payments from the affiliates. It was, don't
18  make payments from the Advisors; is that correct?
19  A. Correct.
20  Q. So is it fair to say that you don't remember
21  any instructions telling you not to make any payments
22  from HCMS or HCRE?
23  A. That's fair.
24  Q. So if that is the case, why weren't payments
25  made from HCMS or HCRE for December 31, 2020, payment?

Kristin Hendrix - October 27, 2021

---

**101**

1    A.  Sure.  Typically what would have happened is
2   Frank would be talking to Jim Dondero about making
3   these payments and getting his approval to do so,
4   because Jim Dondero is, you know, directing payments
5   out of these entities.
6         I have never -- had never been given the
7   direction to effectuate those payments by anybody.
8    Q.  Is it fair to say, then, that you're not
9   aware of any instructions from anyone saying that the
10  HCMS and HCRE payments should not be made on
11  December 31, 2020?
12   A.  That's fair.
13   Q.  So the reason the payments weren't made is
14  because you never got an affirmative instruction to
15  actually make that payment; is that correct?
16   A.  Correct.
17   Q.  And you're not aware of Mr. Dondero
18  instructing anyone that HCMS and HCRE should not have
19  made the December 31, 2020, payments; is that correct?
20   A.  I'm not aware personally, no.  Correct.
21   Q.  You say personally.  In any way are you aware
22  of such a specific instruction?
23   A.  No.
24   Q.  If that payment was to be made, who at the
25  debtor would have been responsible for making those

---

**102**

1   payments on behalf of HCMS and HCRE?
2         MR. MORRIS:  Objection to the form of the
3   question.
4         THE WITNESS:  The corporate accounting team.
5    Q.  (BY MR. AIGEN)  And that included you?
6    A.  Yes.
7    Q.  And in December of 2020, were you aware that
8   those payments were due on December 31, 2020?
9    A.  Yes.
10   Q.  Did you make any attempts or efforts to
11  determine whether Mr. Dondero wanted those payments to
12  be made?
13   A.  I did not, no.
14   Q.  Why not?
15   A.  That would have been something that Frank
16  Waterhouse would have done directly with Jim Dondero
17  himself.
18   Q.  Did you have any conversations with anyone
19  about whether the December 31 payments for HCMS and
20  HCRE would be made in December of 2020?
21   A.  Not that I can recall.
22   Q.  And you didn't think it was your
23  responsibility to check on those payments and find out
24  if they should have been made?
25   A.  Right, correct.

---

**103**

1    Q.  And is that because it's only your job to
2   make payments that you're told to specifically make; is
3   that correct?
4    A.  Yes, in this case, that is correct.
5    Q.  Is it fair to say then that as part of your
6   job responsibilities you've never made a payment to
7   anyone without being specifically told by Mr. Dondero
8   and Mr. Waterhouse?
9    A.  Sorry, say that again.
10   Q.  As part of your job responsibilities, have
11  you ever made a payment to anyone without the specific
12  instruction of Mr. Waterhouse or Mr. Dondero?
13        MR. MORRIS:  Objection to the form of the
14  question.
15        THE WITNESS:  Yes, we make payments all the
16  time.
17   Q.  (BY MR. AIGEN)  So why is this different in
18  that this payment was not made without the specific
19  instructions from Mr. Waterhouse and Mr. Dondero, even
20  though you believed the payment was due on December 31,
21  2020?
22   A.  The difference between making a loan payment
23  and making normal course -- sorry, normal, ordinary
24  course, you know, overhead expense payments is that
25  something like that is not necessarily what we would

---

**104**

1   take to Jim Dondero to approve.
2         He doesn't have time to approve every single
3   overhead payment that we're making out of every single
4   entity.  That's what Frank is for.
5         Something that's once a year that's more
6   material in amount, such as a loan payment, that is
7   something that needs to get approved by Jim Dondero.
8    Q.  You say needs to get approved.  What's your
9   basis for that, something in a policy manual, something
10  someone told you?
11   A.  It's a policy that my team followed.  I don't
12  think that it's written in an actual manual anywhere,
13  but anything that's not ordinary course needs to get
14  approved by Jim Dondero.
15   Q.  Is that something that's written in a policy
16  anywhere?
17   A.  Not that I know of.
18   Q.  Were you ever told that payments in the
19  ordinary course can be made without Mr. Dondero's
20  approval but loan payments cannot?
21   A.  Yes, I do recall years ago that Frank and I,
22  possibly Jim, this was years ago, had a conversation
23  that anything ordinary course is up to Frank to
24  approve.  And this is, quite frankly, up to Frank.
25        Whatever he felt Jim needed to sign off on,

---

Kristin Hendrix - October 27, 2021

**105**

1  that's what Jim would sign off on.  This was not my
2  responsibility to make that decision.
3      Q.  And in December -- prior to the December 31,
4  2020, due date you didn't have any conversations with
5  anyone about whether this -- these payments that were
6  due should be made; is that correct?
7      A.  Correct.
8      Q.  And you didn't try to check with anyone to
9  see whether anyone wanted these payments to be made; is
10  that correct?
11     A.  Correct.
12     Q.  Subsequent to the payment being missed, did
13  you ever have any conversations with anyone about why
14  the payment was not made?
15     A.  Not that I recall.
16     Q.  So is it fair to say that sitting here today
17  you have no idea why the payments were not made for
18  HCMS and HCRE on December 31, 2020?
19         MR. MORRIS:  Objection to the form of the
20  question.
21         THE WITNESS:  I don't have any specific
22  evidence telling me why they weren't.  I can make
23  assumptions but that's not going to help.
24     Q.  (BY MR. AIGEN)  Well, did you ever have any
25  conversations with anyone about why those payments were

**106**

1  not made?
2      A.  No.
3      Q.  You have no idea why they weren't made other
4  than just speculation; is that fair to say?
5      A.  Correct.
6         MR. MORRIS:  Objection.  Asked and answered.
7         THE WITNESS:  Correct.
8      Q.  (BY MR. AIGEN)  And are you aware that with
9  respect to those two loans, some payments were actually
10  made in the next month, in January of 2021?
11     A.  Yes.
12     Q.  What role, if any, did you have with respect
13  to those payments?
14     A.  Frank Waterhouse would call me and tell me to
15  have my team effectuate a wire.
16     Q.  And you say would call you.  Do you remember
17  this conversation or are you just assuming it occurred?
18         MR. MORRIS:  Objection to the form of the
19  question.
20         THE WITNESS:  If we sent a payment out, Frank
21  would have told me to do it.  I would not have done it
22  on my own.
23     Q.  (BY MR. AIGEN)  Sitting here today, do you
24  have a specific recollection of the conversation where
25  someone told you to make the January 2021 payments?

**107**

1      A.  I can't tell you the exact date, but, yes, I
2  do have a recollection of Frank calling or emailing me
3  to have, I believe it was the HCRE wire sent out for
4  their payment.
5      Q.  What about the HCMS payment?
6      A.  I don't recall that one as much.
7      Q.  Other than the payment being made, do you
8  have any recollection of any other conversations about
9  why the payment was being made?
10     A.  No.
11     Q.  Are you aware of any conversations that
12  anyone had regarding whether these payments would
13  deaccelerate loans?
14     A.  No.
15     Q.  Is that something you would normally be part
16  of, conversations like that?
17     A.  No.
18     Q.  Changing topics here.  Not sure if this is an
19  area that you know anything about.
20         Are you familiar with the term, as it's used
21  at Highland, NAV ratio trigger period?
22     A.  No.
23     Q.  This may go very quick.  If I represent to
24  you that it's a term that's used in the -- in the
25  fourth amended limited partnership agreement for

**108**

1  Highland Capital Management, would that refresh your
2  recollection at all?
3      A.  No.
4      Q.  Fair to say, then, that you have no knowledge
5  as to whether NAV ratio trigger period was ever reached
6  at any time prior to bankruptcy buyouts?
7      A.  No, I don't know.
8      Q.  Have you ever had any conversations with
9  Nancy Dondero?
10     A.  I have not.
11     Q.  Never met her?
12     A.  No.  I may have exchanged an email with her
13  on an invoice, but that's the extent of it.  No
14  conversations.
15     Q.  In the years leading up to the bankruptcy of
16  Highland Capital, was there any time period where
17  Highland was unable to pay its salaries?
18     A.  Salaries?
19     Q.  Salaries of its employees?
20     A.  No.
21     Q.  In the time leading up to the Highland
22  bankruptcy, was there any time period where Highland
23  wasn't able to pay bonuses owed to any of its
24  employees?
25     A.  Not that I know of.  Not that I can recall.

Kristin Hendrix - October 27, 2021

109

1    Q.  Are you aware of any time period leading up
2  to the Highland bankruptcy where Highland was unable to
3  pay its bills?
4    A.  There's times where we would be in a cash
5  flow crunch and we would stretch our AP, but eventually
6  it would get paid.
7    Q.  And I think this is the last topic and we can
8  probably move through this pretty quickly.
9        Are you aware of any loans made by Highland
10  to any of its employees or officers that were forgiven
11  in part or all?
12    A.  Yes.
13    Q.  Which officers or employees are you aware of?
14    A.  I recall there were two employees.  I can't
15  remember one of them, but I believe another, the second
16  one, was Paul Adkins.  Again, I'm just recalling this
17  was years ago.
18    Q.  And these two are the only ones you're aware
19  of?
20    A.  Or I'm sorry, not Paul Adkins, Tim Lawler.
21  It's possible Paul Adkins was the other one, but I
22  can't tell you for sure.
23    Q.  Tim Lawler and some other employee that you
24  can't remember the name of are the only two that you're
25  aware of?

110

1    A.  Yes.
2    Q.  This other employee, I know you don't
3  remember the name.  Is there any other description that
4  you can give me, what their position was, how long they
5  worked, or is it just you remember those loans?
6    A.  I just remember we had two employee loans.
7    Q.  Approximately when was this?
8    A.  I couldn't even tell you.  All the years just
9  commingle together.
10    Q.  More than five years ago?
11    A.  Yes.
12    Q.  More than 10 years ago?
13    A.  I couldn't say.
14        MR. AIGEN:  Why don't we take a five-minute
15  break and then I'll either be done or have just a few
16  wrap-up questions.
17        MR. RUKAVINA:  Okay.
18        (Off the record.)
19        FURTHER EXAMINATION
20    Q.  (BY MR. RUKAVINA)  Ms. Hendrix, in May of
21  2019, would you on behalf of Highland alone,
22  unilaterally, have the authority to lend to HCMFA 2.4-
23  and/or $5.0 million?
24    A.  No.
25    Q.  And would you have had any authority on

111

1  behalf of HCMFA in May of 2019 to bind HCMFA to such
2  notes?
3    A.  No.
4    Q.  Thank you, ma'am.
5        EXAMINATION
6    Q.  (BY MR. MORRIS)  Ms. Hendrix, can you get out
7  of your pile, Exhibit Number 3.
8        And this is the email from Dave Klos to
9  corporate accounting on May 2nd concerning the
10  $2.4 million that was going to be transferred from
11  HCMLP to HCMFA?
12    A.  Yes.
13    Q.  And how did Mr. Klos characterize that
14  transfer?
15    A.  He called it a new intercompany loan.
16    Q.  What does a new intercompany loan mean to
17  you?
18    A.  That means we are creating a new loan
19  document, sending money out, tracking it as a
20  brand-new, fresh loan.
21    Q.  And he sent this email to an email group
22  called corporateaccounting@hcmlp.com.  Do I have that
23  right?
24    A.  Yes.
25    Q.  Were you included in that email group?

112

1    A.  I was.
2    Q.  Can you identify everybody else who you
3  recall being in that email group?
4    A.  Yes.
5    Q.  Who else was in that email group?
6    A.  Dave Klos, Frank Waterhouse, myself, Hayley
7  Eliason, and Blair Roeber.
8    Q.  Okay.  Did Mr. Waterhouse ever tell anybody,
9  to the best of your knowledge, in May 2019 that the
10  transaction should not be booked as a loan?
11    A.  No, not to my knowledge.
12    Q.  You testified earlier that there was, you
13  recall, a similar email the next day with respect to a
14  $5 million transaction.
15        Do you recall that?
16    A.  Yes.
17    Q.  Do you recall if that email also went to
18  corporate accounting?
19    A.  I believe so, yes.
20    Q.  And to the best of your knowledge, would
21  Mr. Waterhouse have been informed on May 3, 2019, that
22  the transaction was being booked by the corporate
23  accounting department as a loan?
24    A.  Yes.
25    Q.  Did Mr. Waterhouse tell you at that time or

Kristin Hendrix - October 27, 2021

---

**113**

1  at any time thereafter that it was a mistake to book it
2  as a loan?
3      A. No.
4      Q. Did Mr. Waterhouse tell you at that time or
5  at any time thereafter that he didn't intend to sign
6  the promissory notes?
7      A. No.
8      MR. RUKAVINA: Objection. To the last
9  question, objection to form.
10     Go ahead.
11     Q. (BY MR. MORRIS) Okay. The promissory notes,
12 to be clear, are the two promissory notes that you
13 testified to earlier that have been marked as exhibits
14 in this deposition for $5 million and $2.4 million
15 respectively.
16     With that definition as promissory notes, did
17 Mr. Waterhouse ever tell you at any time that it was a
18 mistake to sign those notes?
19     MR. RUKAVINA: I'll object to the form.
20     Go ahead.
21     THE WITNESS: No.
22     Q. (BY MR. MORRIS) Did Mr. Waterhouse or
23 anybody -- withdrawn. I'll go back to the first
24 question.
25     Did Mr. Waterhouse or anybody in the world

---

**114**

1  ever tell you at any time since May of 2019 that it was
2  a mistake to issue the promissory notes as we've
3  defined them?
4      A. No.
5      Q. Did Mr. Waterhouse or anybody in the world
6  tell you that Mr. Waterhouse wasn't authorized to affix
7  his signature to those promissory notes?
8      MR. RUKAVINA: And I'll object. Assumes
9  facts not in evidence, i.e., the signature. That's
10 what I've been objecting to.
11     But go ahead and answer.
12     THE WITNESS: Say it again.
13     Q. (BY MR. MORRIS) Did Mr. Waterhouse or
14 anybody in the world tell you at any time that he
15 wasn't authorized to have his signature affixed to the
16 promissory notes?
17     MR. RUKAVINA: Same objection.
18     THE WITNESS: No.
19     Q. (BY MR. MORRIS) Did you have anything to do
20 with Highland's annual audit?
21     A. Yes.
22     Q. What role did you play with respect to
23 Highland's annual audit?
24     A. I personally was in charge of completely
25 writing the entire audit report for the debtor and for

---

**115**

1  HCMFA. I oversaw all other aspects of the audit my
2  team carried out.
3      Any requests from the auditors, emails with
4  questions, any issues that arose, all of that went
5  through me.
6      Q. And did Mr. Waterhouse play a role in
7  relation to the annual audit?
8      A. Yes.
9      Q. What is your understanding of
10 Mr. Waterhouse's role?
11     A. Let's see. He was in charge of reviewing the
12 financial statements as they were done, so he saw the
13 end product. He would sign off on the management rep
14 letter. He signed engagement letters.
15     If there were any big issues, those got --
16 those would be brought to Frank's attention for sure.
17     Q. Okay. And are you a CPA?
18     A. Yes.
19     Q. And are you familiar with management rep
20 letters?
21     A. Yes.
22     Q. What is your understanding of what a
23 management rep letter is?
24     A. That's basically telling the auditors that
25 everything in the audited financial report is accurate

---

**116**

1  to the best of their knowledge, they've presented
2  everything that they have fair and accurately, they're
3  not withholding any information.
4      Q. And do you recall that the -- Highland's 2018
5  audit was completed in early June 2019?
6      A. Yes.
7      Q. And did you cause the two promissory notes
8  that we're talking about here to be delivered to
9  PricewaterhouseCoopers in connection with the audit?
10     A. Yes.
11     Q. And were those two promissory notes delivered
12 to PricewaterhouseCoopers because they constituted
13 subsequent events?
14     A. Yes.
15     Q. Do you recall whether those promissory notes
16 were described in Highland's 2018 audited financial
17 statements?
18     A. Yes.
19     Q. And did Mr. Waterhouse or Mr. Dondero ever
20 tell you at any time that there was a mistake in the
21 audited financial statements?
22     A. No.
23     Q. Did they ever tell you -- did Mr. Waterhouse
24 or Mr. Dondero or anybody in the world ever tell you at
25 any time that the two notes were mischaracterized in

---

Kristin Hendrix - October 27, 2021

---

**117**

1  the 2018 audited financial statements of Highland
2  Capital?
3      A.  No.
4      Q.  Do you know whether HCMFA also had its annual
5  financial statements audited by PricewaterhouseCoopers?
6      A.  Yes.
7      Q.  Did you play any role in connection with that
8  audit?
9      A.  Yes.
10     Q.  What role did you play in connection with
11  HCMFA's audit of the 2018 financial statements?
12     A.  Same exact role as with the debtors --
13     Q.  And --
14     A.  -- writing the audit report, overseeing all
15  other audit functions.
16     Q.  And did you and your group cause HCMFA to
17  deliver to PricewaterhouseCoopers the two promissory
18  notes that we've been discussing from May 2019?
19     A.  Yes.
20     Q.  Did Mr. Waterhouse or Mr. Dondero or anybody
21  in the world ever tell you that it was a mistake to
22  deliver those promissory notes to PwC in connection
23  with HCMFA's 2018 audit?
24     A.  No.
25     Q.  Were those notes delivered -- withdrawn.

---

**118**

1          Were those notes delivered to
2  PricewaterhouseCoopers because they constituted
3  subsequent events in connection with the 2018 audit?
4      A.  Yes.
5      Q.  Do you recall whether PricewaterhouseCoopers
6  included as a liability on HCMFA's balance sheet the
7  obligations reflected in the two promissory notes at
8  issue?
9          MR. RUKAVINA:  Objection.  Best evidence.
10  Answer.
11         THE WITNESS:  On the 2018 financials?
12     Q.  (BY MR. MORRIS)  Correct.
13     A.  Those would not have been included as
14  liabilities in the 2018 financials.
15     Q.  Do you know if HCMFA completed their audit
16  for 2019?
17     A.  No.
18     Q.  Okay.  Did the notes appear in HCMFA's 2018
19  audited financials under the subsequent events section?
20     A.  Yes.
21         MR. RUKAVINA:  Objection.  Best evidence.
22  Go ahead.
23     Q.  (BY MR. MORRIS)  Did Mr. Dondero or -- did
24  Mr. Waterhouse or Mr. Dondero or anybody in the world
25  ever tell you that it was a mistake to include

---

**119**

1  reference to these notes in HCMFA's 2018 audited
2  financial statements?
3          MR. RUKAVINA:  Same objection.
4          THE WITNESS:  No.
5      Q.  (BY MR. MORRIS)  Okay.  Do you recall, did
6  anybody in the world ever tell you that the
7  transactions described in Exhibit 3 and the other
8  document that you recall should never have been booked
9  as a loan?
10     A.  No.
11     Q.  Did anybody in the world tell you that you
12  made a mistake when you created those promissory notes?
13     A.  No.
14     Q.  Can you pull out what was marked as
15  Exhibit 16.
16         Do you understand that the Advisors provide
17  services to certain retail funds?
18     A.  Yes.
19     Q.  And do you recall that the services are
20  subject to an agreement that's subject to annual
21  review?
22     A.  Yes.
23     Q.  So looking at Exhibit 16, did you understand
24  that the retail board had asked Highland to disclose --
25  I'll just read it from the document on page 2,

---

**120**

1  Bates number ending 881.
2          There's an email from Ms. Thedford that says,
3  quote, are there any material amounts -- withdrawn.
4          Are there any material outstanding amounts
5  currently payable or due in the future, open paren,
6  e.g., notes, close paren, to HCMLP by HCMFA or NexPoint
7  Advisors or any other affiliate that provides services
8  to the funds?
9          Do you see that?
10     A.  Yes.
11     Q.  And were you generally aware that that was
12  part of the annual renewal process?
13     A.  Yes.
14     Q.  And you made some comments earlier about
15  Ms. Thedford's response on the first page.
16         Do you recall that?
17     A.  Yes.
18     Q.  And you actually were able to correct certain
19  mistakes that you perceived in her response.
20         Do I have that right?
21     A.  Correct.
22     Q.  Do you know -- do you see where it says,
23  HCMFA due to HCMLP as of June 30, 2020, let's just call
24  it $12.3 million.
25         Do you see that?

---

Kristin Hendrix - October 27, 2021

---

121

1    A. Yes.
2    Q. And above that there is a reference to the
3 6/30 financials.
4       Do you see that?
5    A. I do.
6    Q. Do you know what the reference to the 6/30
7 financials is?
8    A. Yes.
9    Q. And what is that reference?
10   A. That is referencing the amounts on the
11 balance sheet at 6/30 that we provided for the 15(c)
12 materials to the board.
13   Q. Okay. And does that $12.3 million include,
14 to the best of your knowledge, the principal amount of
15 the two notes that we were talking about?
16   A. Yes.
17      MR. RUKAVINA: Objection. Best evidence.
18      THE WITNESS: Yes.
19   Q. (BY MR. MORRIS) And how do you know that?
20   A. Because I kept their financials, I know for a
21 fact that it included all of their outstanding notes
22 and it most certainly included these two notes that
23 we've been talking about today.
24   Q. And to the best of your recollection did
25 HCMFA provide the 6/30 financials to the retail board?

---

122

1    A. Yes.
2    Q. And to the best of your knowledge did
3 Mr. Dondero or Mr. Waterhouse or anybody in the world
4 ever tell you that the financial statements that were
5 provided to the retail board were erroneous in any way?
6    A. No.
7    Q. Did Mr. Dondero or Mr. Waterhouse or anybody
8 in the world ever tell you that the 6/30 financials
9 that were given to the retail board should not have
10 included the $7.4 million principal amount on the two
11 promissory notes?
12      MR. RUKAVINA: Objection. Best evidence.
13      Answer.
14      THE WITNESS: No.
15   Q. (BY MR. MORRIS) Do you know whether -- are
16 you at all familiar with the Advisors' actual response
17 to the retail board in October 2020?
18   A. Say that again, please.
19   Q. So this email string is October 2020; right?
20   A. Right.
21   Q. And do you understand that this is kind of a
22 discussion between Mr. Waterhouse and Ms. Thedford as
23 to how to respond?
24   A. Yes.
25   Q. Have you ever seen the actual response that

---

123

1 was given to the retail board?
2    A. I likely did. I can't tell you for certain
3 that I was on the correspondence.
4    Q. Do you recall any discussion at any time that
5 the $12.3 million number in Ms. Thedford's email should
6 be changed in the final report to the retail board?
7    A. I don't believe so.
8    Q. Did anybody ever tell you at any time that
9 the $12.3 million number was incorrect?
10   A. No.
11   Q. Did anybody ever tell you at any time that
12 that number wrongly included the $7.4 million reflected
13 in the two notes?
14   A. No.
15   Q. Okay. Do you recall that earlier that
16 summer -- we looked at Exhibit 15?
17   A. Yep.
18   Q. And that was an attachment to an email that
19 you personally sent to Mr. Dondero. We saw that
20 before?
21   A. Right.
22   Q. And this Exhibit 15, which was attached to
23 your email, identifies amounts due and owing from
24 NexPoint Advisors; right?
25   A. Right.

---

124

1    Q. And it identifies amounts due and owing for a
2 number of different entities, including HCMFA; right?
3    A. Correct.
4    Q. Do you know whether the amount included for
5 HCMFA on Exhibit 15 included the principal amount due
6 on the two promissory notes?
7    A. It does.
8    Q. Did Mr. Dondero or Mr. Waterhouse ever ask
9 you why -- withdrawn.
10      Did Mr. Dondero or Mr. Waterhouse ever ask
11 you how the $10.5 million number was calculated?
12   A. No.
13   Q. Did Mr. Dondero or Mr. Waterhouse ever
14 suggest to you that the number was incorrect?
15   A. No.
16   Q. Did Mr. Dondero or Mr. Waterhouse or anybody
17 in the world ever question the number that you gave to
18 Mr. Dondero in the summer of 2020 concerning the
19 principal amount due by HCMFA to HCMLP?
20   A. No.
21   Q. Have you ever made a payment -- withdrawn.
22      Have you ever caused a payment to be made in
23 connection with an intercompany loan without receiving
24 the prior approval from either Frank Waterhouse or
25 Mr. Dondero?

---

Kristin Hendrix - October 27, 2021

---

125

1  A.  No.
2  Q.  Has anybody ever said to you that you made a
3  mistake in applying a payment against principal or
4  interest due on an intercompany loan?
5  A.  No.
6  Q.  We saw this morning, and we produced to
7  Mr. Rukavina and he mentioned earlier, 13-week
8  forecasts?  Do you understand that?
9  A.  Yes.
10  Q.  Did you review the 13-week forecasts
11  recently?
12  A.  Yes.
13  Q.  And we're talking specifically about the
14  13-week forecasts for the November/December 2020 time
15  period.  Do you understand that?
16  A.  Yes.
17  Q.  Based on your review of those forecasts, did
18  those forecasts specifically identify the principal and
19  interest that were due on the three term notes as of
20  December 28, 2020?
21  A.  Yes.
22  Q.  And what was the purpose of creating the
23  13-week forecasts?
24  A.  Sure.  That was to keep everybody informed
25  who was on the cash call, Frank Waterhouse, Jim Seery

---

126

1  and others, keep everybody informed of upcoming
2  payments that were due on term loans well in advance.
3        Everybody knew about it.  It was out there
4  for everybody to see that was on these cash calls.
5  Q.  Now, is it your understanding that
6  Mr. Waterhouse -- withdrawn.
7        Did you email these forecasts -- withdrawn.
8        Did anybody email these forecasts to the best
9  of your recollection in late 2020?
10  A.  Yes.
11  Q.  And was it sent to the corporate accounting
12  group that we saw earlier?
13  A.  It was probably sent to Frank, Seery, the DSI
14  guys that were involved with the cash call.
15  Q.  Okay.  And so did you participate in the
16  creation of the 13-week forecasts?
17  A.  Yes.
18  Q.  What role did you play in the creation of the
19  13-week forecasts?
20  A.  I was responsible for creating the entire
21  thing.
22  Q.  Okay.  And based on the work that you did,
23  was one of the purposes to make sure that
24  Mr. Waterhouse was aware of all payments that were
25  coming due under the intercompany notes?

---

127

1  A.  Yes.
2  Q.  And was that information that was included on
3  the reports to Mr. Waterhouse?
4  A.  Yes.
5  Q.  And do you recall whether there were any
6  specific discussions in November or December of 2020
7  concerning those payments -- withdrawn.  That wasn't a
8  good question.
9        Did Mr. Waterhouse or -- withdrawn.
10        Did anybody on behalf of HCMS or HCRE ever
11  instruct you to make the payments that were due under
12  their term notes?
13  A.  No.
14  Q.  Did anybody on behalf of NexPoint ever
15  instruct you to make a payment that was due at year end
16  with respect to the NexPoint term note?
17  A.  No.
18  Q.  Were you authorized to make those payments
19  without the prior approval of either Mr. Waterhouse or
20  Mr. Dondero?
21  A.  No.
22  Q.  I think you testified that there were certain
23  payments that were made in January 2001 under each of
24  the three term notes.
25        Do I have that right?

---

128

1  A.  Correct.
2        MR. RUKAVINA:  2021.
3        MR. MORRIS:  Thank you very much.
4  Q.  (BY MR. MORRIS)  With that amendment, do you
5  understand my question?
6  A.  Yes.
7  Q.  Do you know why the three payments were made
8  in January of 2021 on each of three term notes?
9  A.  Because Frank Waterhouse instructed me to do
10  so.
11  Q.  And he had not instructed you to make those
12  payments prior to that time?
13  A.  Correct.
14  Q.  Did you have to prompt Frank Waterhouse in
15  January of 2021 to make those payments?
16  A.  No.
17  Q.  So based on the 13-week forecast that you
18  prepared and delivered to Mr. Waterhouse, is it your
19  understanding that Mr. Waterhouse knew as early as mid
20  November 2020 that payments would be due under the
21  three term notes at the end of the year?
22  A.  Yes.
23  Q.  And, in fact, did HCMS and HCRE and NexPoint
24  timely make their installment payments that were due at
25  year end 2018?

---

Kristin Hendrix - October 27, 2021

129

1  A. Yes.
2  Q. And was that done because HCMLP received the
3  instructions of somebody authorized to give the
4  instruction on behalf of those entities?
5  A. Yes.
6  Q. Did HCMS and HCRE and NexPoint timely make
7  the installment payments that were due at year end
8  2019?
9  A. Yes.
10 Q. And why did they make those payments?
11 A. Because we were provided instruction and
12 authorization to do so.
13 Q. Okay. And is the only reason that the
14 payment wasn't made at year end 2020 because nobody on
15 behalf of the Advisors -- withdrawn.
16    Is the only reason that no payment was made
17 at the end of 2020 is because no one on behalf of
18 NexPoint, HCRE, or HCMS directed HCMLP to make those
19 payments?
20 A. Correct.
21    MR. AIGEN: Objection. Form.
22 Q. (BY MR. MORRIS) And you testified earlier to
23 a call that you had with Mr. Waterhouse. I think you
24 said it was either November 30 or December 1.
25    Do you recall that?

130

1  A. Yes.
2  Q. And did you personally continue to prepare
3  the 13-week forecasts after your conversation with
4  Mr. Waterhouse?
5  A. Yes.
6  Q. And did those 13-week forecasts continue to
7  include the payments that were due under the three term
8  notes at the year end?
9  A. Yes.
10 Q. And that's information that you gave to
11 Mr. Waterhouse; is that right?
12 A. Right.
13 Q. Mr. Rukavina elicited from you the fact that
14 payments of principal hadn't been made on demand notes
15 that were executed in favor of Mr. Dondero's
16 affiliates.
17    Do you recall that?
18 A. Yes.
19 Q. Okay. Was that a topic of conversation with
20 PricewaterhouseCoopers at any time?
21 A. Yes.
22 Q. Can you tell me about that conversation?
23 A. Sure. As part of our annual audit, the
24 auditors would, you know, make sure that our
25 receivables are collectible. And if they thought for

131

1  any reason they weren't, then they were going to raise
2  an issue, a going concern issue.
3     That came up several years in a row with
4  HCMFA.
5  Q. Do you recall that the three term notes at
6  issue here were all signed on May 31, 2017?
7  A. Yes.
8  Q. And all of those term notes involved a
9  roll-up of previously issued demand notes; is that
10 right?
11 A. Correct.
12 Q. Do you know why in -- at the end of May 2017
13 NexPoint, HCRE, and HCMS rolled up their demand notes
14 into individualized term notes?
15 A. Yes.
16 Q. What is your understanding as to why that
17 happened?
18 A. That would get the auditors a little bit more
19 comfort over our outstanding loans, ensuring that we
20 have an amortization schedule, an underlying contract,
21 showing that payments will be coming in every year on
22 these outstanding receivables.
23 Q. Okay. As the person responsible for
24 preparing Highland's audit, did anybody ever tell you
25 at any time that any of the notes were not valid

132

1  obligations of the maker?
2  A. No.
3  Q. As the person responsible for Highland's
4  audit, did anybody ever tell you at any time that any
5  of the notes at issue should not have been signed?
6  A. No.
7  Q. As the person responsible for Highland's
8  audit, did anybody ever tell you at any time that any
9  of the notes at issue were signed by mistake?
10 A. No.
11 Q. Did anybody ever tell you at any time that --
12 withdrawn.
13    As the person responsible for Highland's
14 audit, did anybody ever tell you at any time that
15 Mr. Dondero didn't approve of any of the notes?
16 A. No.
17 Q. As the person responsible for Highland's
18 audit, did anybody ever tell you at any time that
19 the -- any of the notes at issue were subject to an
20 oral agreement?
21 A. No.
22 Q. As the person responsible for Highland's
23 audit, did anybody ever tell you at any time that any
24 of the notes were amended?
25 A. No.

Kristin Hendrix - October 27, 2021

**133**

1    Q. As the person responsible for Highland's
2 audit, did anybody ever tell you at any time that any
3 of the notes would be forgiven?
4    A. No.
5    Q. During your 15 years at Highland, has an
6 intercompany loan ever been forgiven in whole or in
7 part?
8    A. No.
9    Q. During your -- withdrawn.
10     Can you recall any note that Highland ever
11 held as the payee that was forgiven in whole or in part
12 in the five years prior to bankruptcy, go back to 2014?
13    A. No.
14    Q. Is it your understanding as the person
15 responsible for Highland's audit that the forgiveness
16 of notes, if they were in a material amount, would have
17 had to have been disclosed in the audited financial
18 statements?
19    A. Yes.
20    Q. So is it fair to say that any evidence of the
21 forgiveness of material amounts would have been
22 disclosed in Highland's financial statements?
23    A. Yes.
24    MR. MORRIS: I have no further questions.
25    MR. RUKAVINA: I have none.

**134**

1    MR. AIGEN: None.
2    MR. RUKAVINA: Okay. Thank you very much.
3    (Whereupon, the deposition adjourned at
4    1:19 P.M.)
5    --oOo--
6    I declare under penalty of perjury that the
7 foregoing is true and correct. Subscribed at
8 _____, Texas, this _____ day of
9 _____, 2021.
10
11
12 _____
13 KRISTIN HENDRIX
14
15
16
17
18
19
20
21
22
23
24
25

**135**

1     CERTIFICATE OF REPORTER
2    I, BRANDON D. COMBS, a Certified Shorthand
3 Reporter, hereby certify that the witness in the
4 foregoing deposition was by me duly sworn to tell the
5 truth, the whole truth, and nothing but the truth in the
6 within-entitled cause;
7    That said deposition was taken in shorthand by
8 me, a disinterested person, at the time and place
9 therein stated, and that the testimony of the said
10 witness was thereafter reduced to typewriting, by
11 computer, under my direction and supervision;
12    That before completion of the deposition,
13 review of the transcript was not requested. If
14 requested, any changes made by the deponent (and
15 provided to the reporter) during the period allowed are
16 appended hereto.
17    I further certify that I am not of counsel or
18 attorney for either or any of the parties to the said
19 deposition, nor in any way interested in the event of
20 this cause, and that I am not related to any of the
21 parties thereto.
22    DATED: November 1, 2021
23
24    _____
25    Brandon Combs, Certified Shorthand

**136**

1    State of Texas
   Dickman Davenport, Inc. Cert 312
2    4228 North Central Expressway
   Suite 101, Dallas, TX 75206
3    (214) 855-5100  (800) 445-9548
   Email: info@dickmandavenport.com
4    www.dickmandavenport.com
   My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A**

**A.M** 1:22 57:22
**ability** 69:5,20
**able** 108:23
120:18
**above-styled**
1:21
**Absolutely** 17:8
**accent** 56:16
**access** 24:7 54:15
**accessed** 44:19
**account** 12:11
37:7 91:15
**accountant** 16:19
46:10 73:15
74:3 78:4 84:24
**accounting** 11:16
12:8,12,18
17:14,15,16,21
18:4 19:9 20:3
20:12,20 21:13
31:16,23 35:7
40:11 45:17
46:3 51:11,11
51:18 56:11
102:4 111:9
112:18,23
126:11
**accounts** 13:21
14:8,15 51:24
**accrued** 79:22
**accruing** 85:15
**accurate** 72:22
97:19 115:25
**accurately** 116:2
**action** 11:6
**activities** 39:20
**actual** 104:12
122:16,25
**addition** 39:7
41:21
**additional** 56:15
56:20
**adjourned** 134:3
**Adkins** 109:16

109:20,21
**advance** 126:2
**adversary** 94:25
95:3,12
**advice** 46:20
88:24
**advised** 38:23
**advisor** 39:1
**Advisors** 1:10
15:14,17,23
27:20,23 63:6
70:1,4 71:6,10
74:17 76:24
84:9 85:6 92:16
99:10,14,16,25
100:2,15,18
119:16 120:7
123:24 129:15
**Advisors'** 122:16
**affiliate** 34:25
87:23 120:7
**affiliated** 15:11
**affiliates** 18:19
86:24 87:17
99:6,11,13
100:4,17
130:16
**affirmative**
101:14
**affix** 50:17 114:6
**affixed** 47:5
114:15
**afternoon** 94:23
**ago** 33:8 104:21
104:22 109:17
110:10,12
**agree** 55:2 57:14
61:13
**agreed** 25:23
26:3
**agreeing** 53:24
**agreement** 26:5
26:15,21 95:9
95:13 96:4,8,12
96:23 97:6,9,11

97:21,25 98:9
107:25 119:20
132:20
**ahead** 73:9
113:10,20
114:11 118:22
**Aigen** 2:18 3:4
94:16,23,24
95:23 96:1,21
98:15 102:5
103:17 105:24
106:8,23
110:14 129:21
134:1
**Akard** 1:24 2:4
**alleged** 40:16
96:3,7
**Allocation** 38:24
39:1
**allowed** 135:15
**allowing** 95:13
**amended** 107:25
132:24
**amendment**
128:4
**amort** 19:22 90:8
**amortization**
73:25 76:23
77:4,6,9,20
80:20 82:6 85:3
85:12,13,17
131:20
**amount** 19:6,7
26:10,12 30:12
32:23 39:3
43:16 48:15
49:2 50:9 87:16
87:24 89:9 90:9
91:19 93:4
104:6 121:14
122:10 124:4,5
124:19 133:16
**amounts** 35:8
40:2 120:3,4
121:10 123:23

124:1 133:21
**analysis** 97:24
**and/or** 50:13,18
63:22 64:18
69:20 73:25
110:23
**anniversary**
79:21 80:5,14
**annual** 114:20,23
115:7 117:4
119:20 120:12
130:23
**annually** 80:13
**annum** 80:12
**answer** 7:6,6
23:11,14 35:2
39:19 51:5 52:3
64:20 75:2
114:11 118:10
122:13
**answered** 41:4
51:3 57:17
100:9 106:6
**answering** 66:1
**answers** 42:10
43:1 57:6
**anybody** 35:25
40:8 101:7
112:8 113:23
113:25 114:5
114:14 116:24
117:20 118:24
119:6,11 122:3
122:7 123:8,11
124:16 125:2
126:8 127:10
127:14 131:24
132:4,8,11,14
132:18,23
133:2
**anymore** 76:2
**anytime** 21:10
59:1
**AP** 11:17 12:23
32:7 109:5

124:1 133:21
**apologize** 15:6
59:7 62:16 75:9
75:22
**appear** 118:18
**APPEARANC...**
2:1
**appeared** 2:5,12
2:19
**appears** 47:1
76:12 77:1
**appended** 135:16
**applying** 125:3
**approval** 16:5,8
48:12 49:4
50:25 51:2
101:3 104:20
124:24 127:19
**approve** 48:15
49:5 104:1,2,24
132:15
**approved** 48:18
48:19,21 104:7
104:8,14
**approximately**
95:18 110:7
**April** 12:7
**area** 107:19
**arose** 115:4
**ASAP** 60:18 64:6
**asked** 51:3 57:17
60:10 69:22
88:9 93:4 106:6
119:24
**asking** 6:10 26:7
29:17,19,24
59:17 62:6
64:23,25 77:25
90:8 96:12,13
**aspects** 115:1
**assistant** 12:6
69:2 70:3,9
88:21
**associate** 11:18
32:7
**assume** 6:25

42:11,25 44:3
48:24 57:5,18
80:6 81:10
95:23 99:19,22
**Assumes** 114:8
**assuming** 36:10
40:23 80:19
81:5 82:21
106:17
**assumption**
95:25
**assumptions**
100:10 105:23
**attached** 83:7,11
123:22
**attachment**
83:23 123:18
**attachments**
83:20
**attempts** 102:10
**attention** 115:16
**attorney** 2:5,12
2:18 135:18
**audit** 18:25 98:1
114:20,23,25
115:1,7 116:5,9
117:8,11,14,15
117:23 118:3
118:15 130:23
131:24 132:4,8
132:14,18,23
133:2,15
**audited** 97:16
115:25 116:16
116:21 117:1,5
118:19 119:1
133:17
**auditors** 97:18
115:3,24
130:24 131:18
**audits** 12:24
**August** 83:18
84:1
**author** 44:10
**authority** 36:23

50:25 51:1
110:22,25
**authorization**
129:12
**authorize** 49:17
**authorized** 114:6
114:15 127:18
129:3
**authorizing**
50:12,17
**available** 21:24
**Avenue** 2:11,17
**aware** 10:1 15:17
23:8 28:20,22
28:23 29:10
39:6 90:22 91:1
91:2 95:11,16
96:7,14 98:13
98:15,19 101:9
101:17,20,21
102:7 106:8
107:11 109:1,9
109:13,18,25
120:11 126:24

_____

**B**

**back** 13:3,6
16:12 17:12
20:9,16 22:20
24:12 26:4
29:16 44:24
45:6 50:3 52:8
55:1 60:4,18
64:3,11,19 69:2
74:10 76:3 81:9
81:23 84:8
88:20,23 94:3,9
99:24 113:23
133:12
**background**
10:12,19 16:12
29:25 67:19
**bad** 26:25
**balance** 63:8,22
80:10 118:6

121:11
**balances** 13:18
84:15 89:23
**bank** 13:20 63:7
63:21 92:18
**bankruptcy** 1:1
108:6,15,22
109:2 133:12
**bargain** 84:5
**base** 26:19,22
27:4
**based** 25:18 38:3
40:23 82:5
125:17 126:22
128:17
**basically** 23:7
115:24
**basis** 21:23 66:22
77:20 81:14
104:9
**batch** 12:22
**Bates** 82:14,18
120:1
**bear** 80:11
**beginning** 62:24
81:14
**behalf** 2:6,13,20
102:1 110:21
111:1 127:10
127:14 129:4
129:15,17
**believe** 10:24
12:7,12,16 13:4
16:18 33:3,5,24
34:2 35:8 38:4
43:13,17 50:10
58:22 82:5,8
84:21 88:8
93:13 97:10
99:8 107:3
109:15 112:19
123:7
**believed** 103:20
**best** 20:1 44:20
55:10 100:12

112:9,20 116:1
118:9,21
121:14,17,24
122:2,12 126:8
**better** 30:2 42:22
67:22
**big** 23:3 38:21
115:15
**bills** 14:6 109:3
**bind** 111:1
**birth** 10:16
**bit** 28:9 44:7 55:1
56:16 58:9,24
98:12 131:18
**bits** 7:14,17
**Blair** 32:6,6,7
112:7
**blind** 64:12
**board** 60:5 86:15
119:24 121:12
121:25 122:5,9
122:17 123:1,6
**bonus** 25:18,21
26:1,6,8,19,22
27:4
**bonuses** 108:23
**book** 113:1
**booked** 112:10
112:22 119:8
**books** 73:11
87:17
**borrower** 69:10
**borrower's** 69:5
**boss** 24:11,17
25:1 76:8
**brackets** 78:19
79:1
**brand-new**
111:20
**Brandon** 1:22
135:2,25
**break** 30:8 52:5
62:17 75:16,17
83:9,16 93:16
94:6 110:15

**briefly** 10:12
16:12
**brought** 50:2
115:16
**bunch** 63:1
**burn** 82:11
**business** 14:12
64:5
**buyouts** 108:6

_____

**C**

**calculated**
124:11
**calculating** 73:24
**call** 26:19 34:23
37:7 38:1 45:11
45:13 61:22
66:4 67:23 71:5
72:5 74:11,11
74:20,21 75:5
75:23,25 79:20
92:2,3,6 93:21
93:25 99:4
100:12 106:14
106:16 120:23
125:25 126:14
129:23
**called** 26:21
62:12 65:14
74:14,15,24
84:1 92:4
111:15,22
**calling** 107:2
**calls** 126:4
**Capital** 1:6,9
14:22,23 15:4
27:23 85:5
108:1,16 117:2
**care** 38:11
**carried** 115:2
**case** 95:9 100:24
103:4
**cash** 12:21 13:21
21:24 22:6,18
22:19 23:1,4,4

34:17 63:8
66:22,25 67:2,5
67:5 69:1 81:11
81:12,14,19,20
109:4 125:25
126:4,14
categorize 24:6
cause 1:21 22:6
116:7 117:16
135:6,20
caused 39:16
92:12 124:22
cell 75:2,3,4,13
Central 136:2
CEO 13:23 60:24
Cert 136:1
certain 14:6,18
18:19 26:13
29:2 36:16
37:15 49:13
64:20 95:14
96:16 119:17
120:18 123:2
127:22
certainly 82:11
86:17 121:22
certificate 53:14
53:18,20 135:1
certified 16:19
135:2,25
certify 135:3,17
CFO 13:9,13,22
23:12 25:10
chain 59:4,12
62:5,15,24
85:21,25 86:3
86:13 90:4,5
chance 75:4,18
change 32:11
79:1,12 84:10
85:2,6 90:23
91:3
changed 58:4
123:6
changes 43:15

44:2 49:1
135:14
changing 57:4
98:12 107:18
characterize
24:13 111:13
charge 13:19
18:7 114:24
115:11
charged 10:10
charges 76:12
chase 15:9
check 60:12,15
64:19 93:15,16
102:23 105:8
checked 63:16,16
64:22
checking 64:24
checks 13:18
clarify 47:14
88:10
clear 6:20 113:12
clearly 38:13
clients 63:6
close 120:6
collect 28:21
collectibility
68:23
collectible 130:25
collection 30:14
collects 27:3
college 10:20
11:10,14
column 79:5,11
80:22,24
columns 78:14,15
Combs 1:22
135:2,25
come 84:5,14
85:2,10,11
comes 31:8
comfort 131:19
comfortable
50:23
coming 16:6

48:25 99:5,10
126:25 131:21
comma 15:4
comments 120:14
commingle 110:9
commission
136:4
common 40:10
communicate
23:17
communicated
23:23
communicating
23:24
communications
23:22 64:10
90:16
companies 52:14
company 39:10
44:13
compensate
40:15
compensation
25:17,21 26:1,6
26:20,22 27:4
39:9,12
competent 24:18
24:20,21
complete 72:10
completed 116:5
118:15
completely 17:3
47:8 114:24
completion
135:12
compliance
17:14
comport 44:20
compounded
80:13
computer 47:16
135:11
computerized
1:24
concern 131:2

concerning 111:9
124:18 127:7
concerns 63:13
63:15
condescending
25:3
conduct 38:3
confess 82:23
confident 37:22
confirm 62:2
confirmation
92:15,17
confused 78:12
confusion 47:15
connection 116:9
117:7,10,22
118:3 124:23
consent 39:1,24
consist 26:1
constituted
116:12 118:2
consulted 46:13
contact 6:9,11
contending 96:4
context 31:13
44:1 59:25
86:12
continue 130:2,6
contract 131:20
controller 11:19
11:23 12:1,4,6
13:4 25:6 69:2
70:3,4,9,10
88:21
conversation
36:22 42:4 65:3
96:1,6,14 99:9
99:13 104:22
106:17,24
130:3,19,22
conversations
23:13 34:16,20
36:5,17 37:14
37:15 48:14
49:22 50:20

69:1 88:18
95:24 96:3,15
96:22 102:18
105:4,13,25
107:8,11,16
108:8,14
copied 64:12
86:6
copies 55:14
56:13
copy 83:17
copying 59:13
61:3 63:1 83:18
corporate 10:6
11:16 17:15,16
17:21 18:4 19:8
19:15 20:3,11
20:20 21:13
31:16,23 35:6
45:17 46:2
51:11,18 56:11
102:4 111:9
112:18,22
126:11
corporateacco...
111:22
correct 14:12,20
14:24 15:4,5,12
15:13,16,19,20
18:5,6 23:5,6
27:1,5 29:4
35:23 36:8,12
38:9 40:12,21
41:3,5,6,10,23
41:24 45:22,23
45:25 46:1
53:19 56:14
57:12 60:25
65:12 66:16,17
70:19,20,23,24
76:16 78:21
80:20,21 81:5
83:20,21 87:25
88:1 95:6,7
100:1,5,6,18,19

101:15,16,19
101:20 102:25
103:3,4 105:6,7
105:10,11
106:5,7 118:12
120:18,21
124:3 128:1,13
129:20 131:11
134:7
**correctly** 32:18
33:23
**correspondence**
123:3
**corresponding**
84:16
**counsel** 2:5,12,19
6:15 7:4,23,25
8:19,22 9:8,12
9:20 10:10
28:10,17 33:6
135:17
**count** 42:10 43:1
57:6
**couple** 83:19
**course** 6:9 46:18
55:3 103:23,24
104:13,19,23
**courses** 16:15,16
**court** 1:1 6:18
27:13 30:13,25
**courteous** 94:12
**CPA** 10:24 11:2
11:6,21 115:17
**create** 43:12,18
45:8 48:17
**created** 18:21
44:18,19,21
48:7 58:1
119:12
**creating** 13:21
111:18 125:22
126:20
**creation** 126:16
126:18
**credit** 91:18

**crunch** 109:5
**CSR** 1:23
**curiosity** 76:6
**current** 11:2
**currently** 11:19
120:5
**cut** 15:9

——————

**D**

**D** 1:22 135:2
**Dallas** 1:3,25 2:4
2:18 136:2
**dark** 94:17
**date** 10:16 19:3
26:13 32:22
34:21 43:16
50:8 57:24 58:7
78:17 79:9,21
80:6,13,13,14
93:25 105:4
107:1
**dated** 30:20
31:16 135:22
**dates** 57:22
**Dave** 8:24 34:18
34:23 38:13
46:7 111:8
112:6
**Davenport** 136:1
**David** 3:14 13:1
31:16 33:17
**DAVOR** 2:5
**day** 48:15 57:25
58:6 80:2
112:13 134:8
**days** 9:23,25 10:5
28:17
**deaccelerate**
107:13
**deal** 20:21 36:25
**debtor** 14:24,25
15:1,2,3,7,10
15:19,21 16:4
18:1 21:20,21
21:22 22:1,2,5

22:14,15,18
23:1 25:7,7
26:17 28:21
29:6 38:19
39:15 53:7
54:22 55:12
59:5,19 66:8,20
68:1 76:20 77:2
77:6,9 81:11,12
81:18,25 82:7
84:17 88:3,11
88:14 90:24
99:6 100:15
101:25 114:25
**debtor's** 40:16
68:18 77:4
86:16
**debtors** 117:12
**Dec** 4:3,11
**December** 11:11
14:2,5 15:6,10
15:21 16:3
24:22 60:25
61:6,12 62:10
65:14 66:3,7,18
66:24 67:13,16
67:20 68:1,8,14
68:21 70:22
71:4 72:4 74:10
75:19 76:4
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:19,20
103:20 105:3,3
105:18 125:20
127:6 129:24
**decided** 26:2,3
40:14 52:15,18
**deciding** 23:8
**decision** 29:14
105:2
**declare** 134:6
**default** 68:16,19

88:3 90:17
93:10,11
**defaulted** 67:22
**defendants** 1:11
1:20 2:6,20
95:11 96:4
**defense** 95:12
96:7,12
**defenses** 95:9
**defined** 114:3
**definition** 113:16
**degree** 10:22
**deliver** 117:17,22
**delivered** 116:8
116:11 117:25
118:1 128:18
**demand** 4:11 5:2
18:19 19:21,25
20:4,13,17,21
21:3,4,5,8,23
22:7,13 28:22
29:11,14 46:16
62:11 66:5 85:6
85:14 98:17
130:14 131:9
131:13
**demanded** 62:11
**demanding** 24:13
**Denton** 10:15
**department**
11:17 18:2,5,8
18:12 51:12
57:12 112:23
**depend** 18:17
**depended** 49:16
**depending** 73:16
**depends** 18:16
69:10 77:24
**deponent** 135:14
**deposed** 6:13
28:2
**deposition** 1:13
1:18 7:8,9 8:1,6
8:10,15,17,20
8:23 9:14

113:14 134:3
135:4,7,12,19
**describe** 12:18
53:16
**described** 17:17
99:9 116:16
119:7
**description** 14:1
110:3
**detail** 66:12
**details** 17:5
25:14 28:7
**determine** 97:6
97:25 102:11
**determined**
97:22
**Dickman** 136:1
**difference** 103:22
**different** 19:25
54:19 73:16
87:22 96:11
103:17 124:2
**direct** 27:7
**directed** 99:17,19
129:18
**directing** 48:16
101:4
**direction** 23:12
53:21 60:23
63:2 73:7 101:7
135:11
**directions** 48:25
**directly** 40:9,22
41:12 49:1
70:14,17
102:16
**disciplinary** 11:5
**disclose** 119:24
**disclosed** 97:15
97:21 133:17
133:22
**discretionary**
26:8
**discuss** 62:9 66:4
68:4,7 74:16

88:12
discussed 28:8
  38:4 43:13
  66:21 67:9
  74:18,20 81:13
  92:5 96:25 97:2
discussing 66:19
  67:20 117:18
discussion 9:5
  50:21 61:7 65:9
  66:7 69:5,19
  92:25 93:7
  122:22 123:4
discussions 9:8
  25:20 28:11,12
  28:17 40:6 60:1
  61:9,11 62:13
  68:22 98:8
  127:6
disinterested
  135:8
distinct 29:3
  45:24
DISTRICT 1:2
DIVISION 1:3
doctor 42:11
doctored 83:3
doctoring 42:24
  57:4
document 32:25
  47:2 49:19 72:8
  76:10 82:13
  86:1 88:7
  111:19 119:8
  119:25
documentation
  9:16
documentations
  47:8
documents 9:18
  10:7 42:6 43:7
  43:9 44:3 47:9
  48:5,18 49:8,13
  50:2,3,11 54:11
  57:7,14,20

69:16 77:13
  82:10,18
doing 6:7 43:8
  45:20 74:4
dollar 19:7 40:2
  48:15 49:2 50:9
Dondero 2:20 5:2
  15:12 21:11,20
  21:21 22:6,19
  23:7,14,18,23
  23:24 24:2,7
  34:19 35:24
  36:2 40:14,20
  52:12,19,22
  53:7 73:8 81:14
  83:18 94:24
  99:18 101:2,4
  101:17 102:11
  102:16 103:7
  103:12,19
  104:1,7,14
  108:9 116:19
  116:24 117:20
  118:23,24
  122:3,7 123:19
  124:8,10,13,16
  124:18,25
  127:20 132:15
Dondero's
  104:19 130:15
Donohue 59:13
  59:17,22 62:25
  63:21 64:3,16
  64:22 65:5,9
  92:18,19,22,24
  93:8
door 35:1
draft 17:24
drafted 17:1,3
drafting 16:16
  17:22,23 18:12
  19:16,21 20:12
  29:13
drive 54:9,16
  55:14

drukavina@m...
  2:7
DSI 61:19 62:6,9
  63:3,24 67:4
  68:7,13,23
  69:14 77:3
  88:12,23 92:18
  92:19 126:13
due 16:6 59:18
  66:23 73:9,25
  86:24 87:5,17
  87:17,22,25
  89:9 90:8 102:8
  103:20 105:4,6
  120:5,23
  123:23 124:1,5
  124:19 125:4
  125:19 126:2
  126:25 127:11
  127:15 128:20
  128:24 129:7
  130:7
duly 1:19 6:2
  135:4
duties 12:19
  97:12
duty 20:25

———————
E
———————
E-l-l-i-n-g-t-o-n
  18:9
e-signature 47:10
  47:12 48:1,4,5
  48:8,9,12,18
  49:9,15,18 50:1
  50:13,17,23
e.g 120:6
earlier 43:14
  45:7 99:8
  112:12 113:13
  120:14 123:15
  125:7 126:12
  129:22
early 116:5
  128:19

earn 26:23
educational
  10:18
effect 54:11
  67:21 68:15
effectuate 101:7
  106:15
effort 97:6
efforts 102:10
either 18:21
  29:13,20 31:1
  34:17,23 37:3
  46:7,13 50:1
  54:12 58:20
  62:6,9 71:4
  84:24 99:15,17
  110:15 124:24
  127:19 129:24
  135:18
electronic 54:22
electronically
  56:3,12
Eliason 46:7 78:3
  112:7
elicited 130:13
Ellington 4:3
  18:9 60:4,9,12
  60:15 61:10
email 2:7,14,22
  3:14 4:3,7,21
  5:1,5 23:17
  31:12,15,20,23
  32:1,4,20,25
  33:3,25 36:3
  37:10,19,25
  38:14 41:17,21
  42:5 48:20
  50:11 54:11
  59:4,12,22 60:1
  60:2,3,25 61:2
  61:6 62:4,8,15
  62:24,25 63:11
  63:14,15 64:22
  82:16,19 83:2,6
  83:11,11,12,18

83:23 84:19
  85:25 86:3,13
  86:22 90:4,5,12
  92:22 108:12
  111:8,21,21,25
  112:3,5,13,17
  120:2 122:19
  123:5,18,23
  126:7,8 136:3
emailing 90:8
  107:2
emails 9:16,18
  41:18 49:23
  81:9 82:22
  115:3
employed 11:21
  70:18
employee 109:23
  110:2,6
employees 16:3
  108:19,24
  109:10,13,14
employment 26:5
  26:15 69:25
  70:7
engagement
  115:14
ensuring 131:19
entire 11:17
  114:25 126:20
entirety 86:18
entities 15:11
  21:16 22:6,12
  22:19 70:18
  81:15 101:5
  124:2 129:4
entitled 82:12
entity 21:20,22
  22:7 23:2 35:14
  53:13 63:4,5
  84:16 104:4
entries 78:13
  80:23
entry 78:24 79:19
erroneous 122:5

Kristin Hendrix - October 27, 2021

**error** 38:22 39:9
39:16,21,23
40:10 44:7
**established** 9:11
28:8 83:16
**estimate** 20:10
**event** 135:19
**events** 38:21
95:15 96:16
116:13 118:3
118:19
**eventually** 109:5
**everybody** 25:13
112:2 125:24
126:1,3,4
**evidence** 105:22
114:9 118:9,21
121:17 122:17
133:20
**exact** 25:25 36:5
37:14 48:5,13
107:1 117:12
**Exactly** 78:16
**Examination** 3:3
3:4,5,6 6:3
94:22 110:19
111:5
**example** 81:1
**Excel** 77:12,15
78:9
**exchanged**
108:12
**excluding** 28:16
29:18
**execute** 48:18
49:5
**executed** 18:24
47:9 130:15
**executing** 19:17
**execution** 18:13
20:12 32:15
**exhibit** 3:10,12
3:14,17,19,21
3:23,25 4:1,3,7
4:11,14,17,19

4:21 5:1,5
30:14,15,18,19
30:21 31:15,18
32:21 33:1 34:4
34:11 35:21
36:20 37:19
38:12 42:15,16
43:6,21 44:18
44:19 56:19,21
59:4,9 62:14,14
62:21,23 65:13
65:18,21 72:11
72:13,16 76:10
76:17,19 79:8
82:6 83:1,4,15
83:17 84:8,14
84:18,19 85:7
85:17,20,21,22
85:25 86:3,13
87:21 88:2,4,7
89:21,22,25
90:1,3 111:7
119:7,15,23
123:16,22
124:5
**exhibits** 3:8 30:6
42:17 43:4
44:21 45:22
46:19 48:11,19
50:13,17 52:8
55:17,24 56:25
57:16 58:10,25
113:13
**existing** 84:20
**expect** 85:16
**expense** 103:24
**expertise** 16:18
**expires** 136:4
**Explain** 19:19
**explained** 6:15
31:7
**explicit** 60:23
**explicitly** 32:5
53:1
**expressly** 71:14

**Expressway**
136:2
**extent** 108:13
**external** 46:14
**eye** 6:9

**F**
**faced** 11:5
**facilitate** 91:7
**fact** 21:18 49:5
57:15 64:15
65:1 67:13,16
99:22 121:21
128:23 130:13
**facts** 114:9
**fair** 17:5 21:19
22:3 23:21 35:5
42:20 70:14
95:25 96:8,21
96:24 97:18,20
98:6,7 99:25
100:20,23
101:8,12 103:5
105:16 106:4
108:4 116:2
133:20
**fairly** 36:15
**faithfully** 57:3
**familiar** 27:13
65:20 66:11
86:2,5 107:20
115:19 122:16
**family** 23:4
**far** 20:14,16
24:19,21 49:7
80:24
**favor** 130:15
**February** 12:2
26:4
**fee** 39:1,24
**feel** 86:18
**fell** 13:24
**felt** 104:25
**figuring** 93:17
**file** 56:13

**filed** 28:24,25
29:6,8 30:13,24
**files** 32:25
**filing** 18:25
**final** 123:6
**finance** 10:22
**financial** 4:4
12:22 59:18
62:7 69:15
97:16,17
115:12,25
116:16,21
117:1,5,11
119:2 122:4
133:17,22
**financials** 12:23
37:18 41:8
60:11 86:24
118:11,14,19
121:3,7,20,25
122:8
**find** 31:13 72:8
83:8 93:24 94:8
102:23
**finding** 98:2
**fine** 47:8 48:2,4
86:19
**finish** 96:11
**finished** 31:10
**finishing** 46:14
**firm** 18:22 44:16
**first** 6:2 9:1
11:13 20:11
63:17 70:21
81:17 82:13
95:8 113:23
120:15
**five** 51:4 94:3
110:10 133:12
**five-minute**
93:15 110:14
**fixing** 55:15
**flip** 46:25
**Floor** 1:25 2:11
**flow** 109:5

**flows** 63:8
**focus** 12:17
**folders** 18:25
**folks** 62:16 67:4
85:24
**follow** 47:23 60:5
60:9 72:5
**follow-up** 4:23
**followed** 104:11
**following** 47:22
**follows** 6:2
**forecast** 67:5
128:17
**forecasted** 67:8
**forecasts** 12:21
13:21 17:18
67:5,9 125:8,10
125:14,17,18
125:23 126:7,8
126:16,19
130:3,6
**foregoing** 134:7
135:4
**forgive** 97:10
**forgiven** 95:14
96:16 109:10
133:3,6,11
**forgiveness**
133:15,21
**form** 14:14,21
15:24 16:22
17:6 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 37:11
38:7 39:17 41:1
41:13 45:3 46:4
47:20 48:22
49:10,20 50:4
51:14,20 52:1
53:9 55:5,19
56:4 58:16
65:16 69:8
70:15 73:20

74:5 75:7 77:22
78:10 80:3,16
82:1 87:7 88:15
89:2,15 96:18
102:2 103:13
105:19 106:18
113:9,19
129:21
**format** 77:12
**formatting** 79:3
82:5
**forth** 64:11
**forward** 64:2
94:16
**forwarded** 92:15
92:17
**found** 54:9
**foundation** 75:11
**four** 9:8,12 100:5
**fourth** 107:25
**frame** 17:12
66:19 69:7
73:16
**Frank** 4:21 7:10
7:21 8:1 13:7,8
23:13 24:5
34:19,23 35:24
38:14 52:19
53:20 60:10
63:16,18 64:10
64:23,23 65:1
67:3 71:5 73:8
74:14,15 84:1,7
91:10,22 92:4
99:5,17 100:13
101:2 102:15
104:4,21,23,24
106:14,20
107:2 112:6
124:24 125:25
126:13 128:9
128:14
**Frank's** 115:16
**frankly** 104:24
**fresh** 111:20

**Friday** 9:1,4
**function** 12:21
**functions** 117:15
**fund** 1:9 27:23
38:24 39:2,2,8
85:6
**funds** 38:23
59:18 119:17
120:8
**further** 3:5 10:23
32:15 62:1
92:13 110:19
133:24 135:17
**future** 14:7 16:5
120:5

**G**
**gears** 58:24
**general** 34:21
46:18 54:20
69:6 90:20
**generally** 13:17
13:24 19:13
34:8 35:2 43:10
72:22 81:20
96:13,15
120:11
**getting** 11:20
18:24 48:11
60:2,3 81:12
101:3
**give** 20:10 31:13
74:16 110:4
129:3
**given** 49:18
101:6 122:9
123:1
**gives** 16:19
**giving** 53:21 54:5
**Global** 38:23
39:1
**go** 10:12 17:5
44:4,24 48:1
55:1 62:24 64:2
67:4,5,11 73:8

78:22 107:23
113:10,20,23
114:11 118:22
133:12
**goes** 94:9 99:3
**going** 6:25 17:12
20:9,16 26:23
27:3 29:16 30:6
30:10,14,18
34:3 40:6 42:7
42:20 44:2
50:22 52:8
54:18 56:20
57:2 58:24 59:3
59:3 60:5,9
64:19 65:13
67:7 71:6 72:8
72:11 74:10
76:10,20 78:7
81:9 82:10,11
82:13,25 83:1
84:8 85:20,21
87:19 88:2
93:20 95:2,23
105:23 111:10
131:1,2
**good** 6:4 24:17
26:24 94:23
127:8
**governs** 26:11
**graduated** 10:21
11:9,12
**great** 53:20
**greater** 16:19
**group** 14:4 17:13
19:9,10,16 20:3
31:24 35:7,22
37:22 40:11
43:14 45:7,18
46:3 49:16
51:18 56:11
73:19,23
111:21,25
112:3,5 117:16
126:12

**guarding** 24:7
**guess** 89:22
**guys** 126:14

**H**
**H-i-l-l-i-s** 32:12
**half** 81:17
**hand** 59:3 82:25
**handed** 88:6
**handle** 20:12
50:8
**handled** 20:4,21
**happened** 20:7
21:8 36:11,11
37:21 101:1
131:17
**happening** 20:11
61:5
**happy** 23:3 93:22
**HARDT** 2:3
**HARR** 2:3
**Hayley** 32:2,14
46:7 78:3,6
112:6
**Hayley's** 46:8
**HCM** 4:4,9
**HCMF** 3:25 4:1
**HCMFA** 3:15 4:4
27:10,22 28:1
28:13 29:6
30:12,19 32:13
38:19,23 39:12
40:1,15 53:25
59:18 60:19
62:7,11 63:6,22
64:18 66:5
69:15,20 70:7
70:10 85:18
87:5 99:4 100:2
110:22 111:1,1
111:11 115:1
117:4,16
118:15 120:6
120:23 121:25
124:2,5,19

131:4
**HCMFA's** 39:8
87:17 117:11
117:23 118:6
118:18 119:1
**HCMLP** 3:15
4:19 5:6 32:13
60:24 64:4
86:24 87:5,18
111:11 120:6
120:23 124:19
129:2,18
**HCMS** 2:20
94:25 98:16,24
100:1,22,25
101:10,18
102:1,19
105:18 107:5
127:10 128:23
129:6,18
131:13
**HCRE** 2:20
94:25 98:17,24
100:1,22,25
101:10,18
102:1,20
105:18 107:3
127:10 128:23
129:6,18
131:13
**hear** 72:1
**heard** 40:17,20
**held** 12:8 133:11
**hell** 75:4,10
**help** 76:22 78:13
93:17 105:23
**helped** 12:20
**Hendrix** 1:14,18
5:5 6:1,6 30:10
30:23 56:19
57:2,8 62:23
65:13,21 76:19
78:12 79:15
86:3 90:3 93:13
94:5,23 110:20

111:6 134:13
**hereof** 80:13
**hereto** 135:16
**hi** 60:4
**higher** 89:20
**Highland** 1:6,9
  10:2 11:13,21
  12:5,19 13:10
  14:4,4,11,22,23
  15:3 16:10
  17:10,13,21
  18:1,11 21:5
  25:6,15 26:4,9
  26:24 27:2,2,22
  28:12 51:7,10
  51:19 65:14
  66:4 71:7,11
  81:10,18,23,23
  85:5 87:25
  92:17 107:21
  108:1,16,17,21
  108:22 109:2,2
  109:9 110:21
  117:1 119:24
  133:5,10
**Highland's** 7:23
  7:25 8:19,22
  114:20,23
  116:4,16
  131:24 132:3,7
  132:13,17,22
  133:1,15,22
**Hillis** 32:12
**history** 11:9
**Hold** 62:18
**hope** 57:13 97:13
**hopefully** 82:11
**hoping** 68:15
**house** 75:1
**hundreds** 50:7
  51:8
**hypothetically**
  22:4,17
**hypotheticals**
  21:17

**I**
**i.e** 114:9
**idea** 58:2,7 75:12
  75:24 89:13
  93:1 105:17
  106:3
**identification**
  30:16,22 31:19
  42:18 43:5 57:1
  59:10 62:22
  65:19 72:14
  76:18 83:5
  85:23 88:5 90:2
**identifies** 123:23
  124:1
**identify** 112:2
  125:18
**identifying** 66:23
**image** 47:2,5,19
  48:2
**imagine** 15:7
**immediately**
  61:14
**important** 93:14
**Impressive** 11:23
**include** 71:18
  72:10 100:1
  118:25 121:13
  130:7
**included** 15:14
  16:9 31:24
  102:5 111:25
  118:6,13
  121:21,22
  122:10 123:12
  124:4,5 127:2
**includes** 63:5,7
**including** 88:11
  124:2
**income** 63:7,21
**incoming** 67:7
**incorrect** 123:9
  124:14
**increase** 94:19
**incumbency**

53:13,17,19
**INDEX** 3:1
**indirect** 27:7
**indirectly** 70:12
**individualized**
  131:14
**Info** 3:25 4:1
**info@dickman...**
  136:3
**information** 4:9
  29:25 34:13
  61:14 63:3,7
  64:17 65:5,11
  69:12,15 84:6
  86:15 116:3
  127:2 130:10
**informed** 112:21
  125:24 126:1
**initiated** 74:11
  92:3
**ink** 49:8,13 55:3
  55:8
**ink-signed** 55:11
**input** 29:25
  88:24
**installment**
  128:24 129:7
**instance** 1:20
  20:6 23:8 35:21
**instances** 24:1
  40:1,24
**instruct** 127:11
  127:15
**instructed** 128:9
  128:11
**instructing**
  101:18
**instruction** 72:2
  74:17 76:8
  100:16 101:14
  101:22 103:12
  129:4,11
**instructions** 24:2
  24:3 32:16
  69:14 76:1

100:21 101:9
  103:19 129:3
**instructs** 7:5
**insurance** 39:10
**insurer** 39:8
**intend** 113:5
**interco** 32:14
  34:11
**intercompany**
  17:22 18:13
  19:17 20:4,13
  20:16 21:3,8
  34:12 35:7
  36:19,25 37:12
  40:24 53:8
  111:15,16
  124:23 125:4
  126:25 133:6
**interest** 19:7
  43:16 49:2
  68:18 73:25
  78:14,16,24
  79:20,22 80:11
  85:15 125:4,19
**interested** 84:9
  135:19
**interjects** 64:4
**intermediary**
  24:3
**internal** 18:21
  41:8 46:13,20
  69:19
**internally** 77:1
**investigation**
  97:5
**invoice** 108:13
**involved** 18:12
  19:16,20,24
  36:21 39:20
  40:9 126:14
  131:8
**involvement**
  19:10
**irrespective**
  26:16,24

**IRS** 49:3
**issue** 79:3 95:14
  96:16 97:25
  98:16 114:2
  118:8 131:2,2,6
  132:5,9,19
**issued** 131:9
**issues** 40:7,10
  60:16 61:21
  115:4,15

**J**
**J-F-O-R-S-H-...**
  44:10
**Jack** 59:13 60:4,8
  64:6 65:2 92:18
**James** 4:8 5:1,2
  61:14,15,18,21
  61:25 62:3
**Jan** 4:8 5:2,5
**January** 10:17
  24:24 28:20
  29:6,11 62:25
  64:15 71:25
  88:2,21 89:9
  90:5,7,17,22
  91:4 93:8
  106:10,25
  127:23 128:8
  128:15
**jealousy** 24:7
**jerk** 24:12
**JFORSHEE**
  44:10
**Jim** 2:20 21:10
  23:14,18 34:19
  35:24 52:19,20
  54:2 63:2 64:10
  67:3 73:8 84:4
  99:18 101:2,4
  102:16 104:1,7
  104:14,22,25
  105:1 125:25
**Jim's** 99:21
**jive** 87:20

jmorris@pszjl...
  2:14
job 6:20 11:14
  17:9 20:25
  24:19,22 43:11
  45:1,14 103:1,6
  103:10
John 2:12 4:7
  8:24 95:21,23
  97:4
JONES 2:10
June 86:25 87:6
  116:5 120:23

K

K-l-o-s 8:25
keep 29:1 77:6,9
  95:4 125:24
  126:1
kept 54:22 55:11
  56:12 77:5
  121:20
kind 11:5 18:4
  23:21 24:6,11
  34:3 50:3 54:19
  81:13 122:21
Klos 3:14 8:24,25
  9:5,12 13:1,6
  13:10 25:10,21
  29:24 31:16
  33:17 34:10,18
  35:21 36:18,24
  37:20 38:12
  46:7 97:2,3
  111:8,13 112:6
Klos' 13:2 41:17
knew 40:3 126:3
  128:19
know 6:24 19:20
  19:23 20:19
  25:14,25 28:7
  33:10,11,13
  36:11 38:17,21
  39:22,25 40:1,5
  43:21 44:11

47:16 48:6,6
  50:10 52:18,25
  57:25 59:6
  76:15,21 78:15
  82:15 89:17
  92:18,19 99:21
  101:4 103:24
  104:17 107:19
  108:7,25 110:2
  117:4 118:15
  120:22 121:6
  121:19,20
  122:15 124:4
  128:7 130:24
  131:12
knowledge 27:6
  36:1,4 37:14
  40:11,13 52:15
  69:11 77:7
  108:4 112:9,11
  112:20 116:1
  121:14 122:2
known 67:14,17
  97:11
KOPF 2:3
Kristin 1:14,18
  5:5 6:1,6 32:1,2
  32:14 57:8
  61:20 134:13

L

L.P 1:6,10
labeled 82:15
labels 30:7
laid 24:12
land 84:5
landline 75:2
large 35:8
lasted 75:6
late 126:9
Lauren 4:22
  86:21
law 2:5,12,19
  6:18 18:22
  44:16

Lawler 109:20
  109:23
Lawn 2:17
lawsuit 28:24
  29:5,8
lawsuits 28:1,9
  28:13,25 29:17
  29:21 30:1
lawyer 9:4
lawyers 44:14
lay 67:7
leading 39:20
  108:15,21
  109:1
learn 95:20
ledger 76:12
left 61:9 87:15
legal 7:23,25 10:9
  16:13 17:14,25
  18:2,5,11,21
  19:10,16 28:10
  46:14,20 72:21
lend 21:22 23:1
  110:22
length 93:25
let's 10:12 11:9
  12:17 14:8,18
  21:17 30:8
  34:25 44:24
  45:13 47:14
  54:19 55:1
  72:10 78:1
  99:24 115:11
  120:23
letter 4:11 65:14
  115:14,23
letters 29:11,14
  115:14,20
letting 92:18
liabilities 118:14
liability 40:16
  118:6
license 10:24
  11:2
limited 107:25

lines 61:7
listed 78:17
litigations 27:8
little 28:9 44:7
  55:1 58:9,24
  78:12 94:17
  98:12 131:18
live 10:14,15
LLP 2:17
loan 3:15,25 4:1
  18:18 31:5
  32:14 33:25
  34:11,12,14,25
  35:14,17,17,22
  36:19,25 37:6,7
  37:17,17 38:25
  39:12 40:15,21
  45:13,15,18,22
  46:12,14 48:15
  49:1,4,5,24
  50:9 58:5 72:25
  76:24 79:21
  80:6,7 87:22
  103:22 104:6
  104:20 111:15
  111:16,18,20
  112:10,23
  113:2 119:9
  124:23 125:4
  133:6
loans 35:9,12
  37:4,6,13,22
  38:6 39:4 41:9
  41:12,19 48:14
  48:17 50:7,19
  50:22 51:8
  53:21 66:23
  67:8 98:16,17
  98:17,20,25
  106:9 107:13
  109:9 110:5,6
  126:2 131:19
logically 36:10
  40:23 71:18
logs 75:19

long 7:20 21:24
  74:21 75:6
  110:4
look 30:17 54:15
  57:7 75:18 77:2
  78:11 80:21
  93:20 94:6
looked 31:5
  123:16
looking 56:21,23
  58:10 79:24
  81:10 86:21
  87:14 119:23
looks 60:24 64:9
  76:23 77:4
  79:19
loosely 17:2
lot 28:25
lots 40:6
LP 15:4,15 27:20
  27:23 70:1,4

M

ma'am 31:21
  57:7 87:1 111:4
machine 1:24
maintain 6:9,10
maintained 77:1
  82:7
maker 19:4,5
  21:3 43:15
  132:1
making 13:20
  21:5 81:7 99:20
  101:2,25
  103:22,23
  104:3
management 1:6
  1:9 12:20 13:14
  13:15 14:2,24
  15:4,22 17:17
  27:23 85:5
  108:1 115:13
  115:19,23
manager 12:8,12

12:18
manual 104:9,12
March 12:2
mark 59:3
marked 30:15,21
  31:18 42:17
  43:4 56:25 59:9
  62:21 65:18
  72:13 76:17
  83:4 85:21,22
  88:4 90:1
  113:13 119:14
material 97:22
  98:1,4,6,10
  104:6 120:3,4
  133:16,21
materials 121:12
maturity 80:13
MBA 10:23
  11:20
mean 7:17 13:15
  14:22,23 15:3
  19:1 35:16
  48:20 57:24
  68:24 78:13,15
  87:11,24
  111:16
meaning 27:20
  27:22 54:25
  70:18
means 27:15
  35:15 58:22
  71:16 111:18
meeting 34:17
  67:2
meetings 66:22
  66:25
memorandum
  48:20
memory 9:17
  19:14 20:9 29:3
  29:7,17,19,23
  32:20,24 34:3
  37:9 38:2 41:22
  42:1,20 43:7,10

45:24 47:4
48:10,13 50:15
51:1 53:23 54:4
54:10 57:23
58:9,20 69:18
72:24 74:4 81:6
81:17 86:8,10
90:15,20 91:21
92:6
mentioned 11:24
  13:14 22:12
  25:9 29:10 41:7
  44:25 45:21
  51:6 64:21
  125:7
merit 25:17
met 108:11
metadata 42:21
  42:21,24 43:21
  43:24 44:8,24
  56:15,20 57:4
Michael 2:18
  94:24
michael.aigen...
  2:22
mid 128:19
middle 89:8
million 30:12,20
  32:13,21 33:1
  33:19,20,25
  34:5 35:3 36:25
  37:12,12 38:18
  38:22,25 39:3,7
  39:8,11,23
  40:15,21 42:15
  42:16 43:2,3
  58:5,11,13,13
  66:9,13 81:1,1
  81:2 85:1,6,9
  87:3 90:23 91:3
  91:23 110:23
  111:10 112:14
  113:14,14
  120:24 121:13
  122:10 123:5,9

123:12 124:11
mind 71:18
minute 30:8
minutes 94:3
mischaracteriz...
  116:25
Mischaracterizes
  41:2
misleading 42:9
missed 88:25
  105:12
misspeak 30:5
mistake 51:12
  113:1,18 114:2
  116:20 117:21
  118:25 119:12
  125:3 132:9
mistakenly 51:25
mistakes 51:17
  51:19,22
  120:19
modified 44:19
  57:8
moment 72:9
Monday 9:13
monetize 68:2,10
money 13:21
  21:11,13,15,21
  21:21,22 22:5
  34:24 35:13
  37:7,17 53:21
  54:23 81:15,19
  81:22,24 92:16
  111:19
month 106:10
months 40:7
morning 6:4 9:3
  67:11 82:14
  125:6
Morris 2:12 3:6
  4:7 7:3 8:24 9:6
  9:9 14:14,21
  15:24 16:22
  18:14 19:11
  20:23 22:8,21

24:8,15 28:3
30:2 31:10 34:6
35:10 36:13
38:7 39:17 41:1
41:13 42:9 45:3
46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:7
62:18 65:16
67:10 69:8
70:15 73:20
74:5 75:7,11
77:22 78:8 79:7
79:9,13 80:3,16
82:1,14,16,23
83:2,6,10 85:25
87:7 88:15 89:2
89:15 93:22
94:15,17 95:21
95:25 96:2,6,18
96:23 102:2
103:13 105:19
106:6,18 111:6
113:11,22
114:13,19
118:12,23
119:5 121:19
122:15 128:3,4
129:22 133:24
mouth 23:21
move 9:10 21:11
  21:13,15 94:16
  109:8
moved 23:4
multiple 54:19
MUNSCH 2:3

_____

N

name 6:5 32:8
  44:12 57:18
  94:24 109:24
  110:3

Nancy 108:9
NAP 27:14
native 78:9
NAV 38:22 39:9
  39:16,20,23
  40:10 107:21
  108:5
near 14:7
necessarily 17:23
  19:10 103:25
need 9:16 14:6
  19:2 21:11
  25:14,25 34:24
  52:6 54:1 59:1
  81:19,20 82:12
  86:19 93:17
needed 21:21
  22:5,18 23:1,4
  40:1 53:12
  81:11,14,23
  104:25
needs 104:7,8,13
negative 78:20,25
  79:2
never 40:19,20
  49:12 51:12
  55:14 68:17
  70:14,17 96:25
  97:2 101:6,6,14
  103:6 108:11
  119:8
new 2:11 21:14
  32:14 34:11,25
  36:19 45:9
  111:15,16,18
NexPoint 5:6
  15:14,17,22
  16:5 27:11,15
  27:18,19,20
  28:2,13,21 63:6
  63:22 64:18
  66:8,12,20
  67:13,22 68:2
  68:15,19,24
  69:15,20 70:1,4

70:22 72:12
76:24 77:7,13
77:20 80:20
81:7,22 84:9
85:2 88:3 90:9
90:17,23 91:16
91:23 92:13,16
93:10,11 120:6
123:24 127:14
127:16 128:23
129:6,18
131:13
**NexPoint's** 16:5
16:9
**Nope** 8:7 76:7
91:12
**normal** 34:16
103:23,23
**normally** 107:15
**North** 1:24 2:3
10:22 11:13
136:2
**NORTHERN** 1:2
**note** 3:10,12,17
3:19,21,23 4:14
5:3,6 14:19
15:18 16:10,21
17:1,3,6 18:16
18:19 19:22,25
21:4,23 22:7,20
23:9 28:21
30:11,19 31:8
32:15,21 33:2
33:20 35:3,18
42:15 43:2,3,11
45:9 46:16
56:21,22 58:11
58:13,13 66:9
66:13,16,20
67:13,22 68:2,5
68:8,10,16,19
68:23,24 71:13
71:19 72:6,11
72:12,16,20
73:4 76:13 77:7

80:9,10,14,20
81:8,23 85:14
90:18 91:16,19
91:23 92:14
127:16 133:10
**notes** 4:12,19
14:9 16:16
17:22 18:13
19:17,21,21
20:4,13,17,22
21:4,8,14,14
22:13 27:3
28:14 30:24
31:1 38:11 41:7
42:7,22 43:12
45:2 46:21,22
47:6 50:1 52:10
52:16,17,24
53:1,8,25 54:5
54:12,23 55:3,8
55:11 56:2,8,10
59:2 62:11
65:15 66:5
69:21 73:10
77:10 84:16
85:12 95:14
96:16 97:10
111:2 113:6,11
113:12,16,18
114:2,7,16
116:7,11,15,25
117:18,22,25
118:1,7,18
119:1,12 120:6
121:15,21,22
122:11 123:13
124:6 125:19
126:25 127:12
127:24 128:8
128:21 130:8
130:14 131:5,8
131:9,13,14,25
132:5,9,15,19
132:24 133:3
133:16

**notice** 88:3 89:8
**notices** 28:22
**noting** 14:5
**November** 59:12
61:6 62:6,10
66:19 67:12,19
68:1,7,14,21
71:4 72:4 74:10
75:18 76:3
93:21 127:6
128:20 129:24
135:22
**November/Dec...**
125:14
**NPA** 4:17 27:18
27:19 86:24
99:4 100:3
**number** 79:2,6
79:11,18 80:23
84:10,13 85:2,9
87:20,21 89:14
89:18,20,21
111:7 120:1
123:5,9,12
124:2,11,14,17
**numbered** 1:21
**numbers** 26:1
78:20 80:21
84:15
**NY** 2:11

_____

**O**
o0o-- 1:4
**Oak** 2:17
**oath** 6:17 95:5
**object** 113:19
114:8
**objecting** 114:10
**objection** 7:3
14:14,21 15:24
16:22 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 38:7

39:17 41:1,13
45:3 46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
65:16 69:8
70:15 73:20
74:5 75:7 77:22
80:3,16 82:1
87:7 88:15 89:2
89:15 96:18
102:2 103:13
105:19 106:6
106:18 113:8,9
114:17 118:9
118:21 119:3
121:17 122:12
129:21
**objections** 7:5
**obligations** 14:19
16:6,10 118:7
132:1
**obligor** 15:18
**obviously** 14:11
35:6 59:1
**occasion** 22:18
**occurred** 95:15
96:4,17 97:7
106:17
**Oct** 4:22
**October** 1:15,21
86:22 94:9
122:17,19
**office** 10:1 34:1
54:8 57:3
**officer** 52:13
69:25 70:7
**officers** 109:10
109:13
**oftentimes** 13:23
34:23
**oh** 67:21
**okay** 6:11 7:1,7

25:3 28:19 30:5
31:23 32:11
33:22 34:3 36:1
38:2 39:14
42:13 43:6
49:25 58:23
60:11 62:1
63:17 70:25
79:25 84:8 85:1
89:24 93:7 94:1
110:17 112:8
113:11 115:17
118:18 119:5
121:13 123:15
126:15,22
129:13 130:19
131:23 134:2
**once** 104:5
**ones** 53:2 109:18
**ongoing** 77:20
**oOo--** 134:5
**open** 120:5
**opinion** 98:5
**opposed** 23:23
39:12 49:8
52:12 98:17
**oral** 91:25 95:9
95:13 96:4,8,12
96:23 97:6,9,11
97:20,25 98:9
132:20
**orally** 37:10
50:16
**order** 97:6
**ordinary** 103:23
104:13,19,23
**original** 30:11
54:23,25 55:11
**originally** 48:7
**outcome** 27:8
**outgoing** 67:7
**outside** 18:21
89:6
**outstanding** 66:5
80:11 120:4

121:21 131:19
131:22
**overdue** 60:19
**overhead** 103:24
104:3
**oversaw** 12:22
115:1
**overseeing**
117:14
**owed** 54:23,24
59:18 84:16
108:23
**owing** 123:23
124:1

**P**
**P.M** 1:22 134:4
**PACHULSKI**
2:10
**page** 3:2,8 46:25
78:23 79:4,8
80:22 100:8
119:25 120:15
**paid** 14:6 26:13
39:8 51:25
78:14,14,15,24
79:5,11 80:22
109:6
**paper** 34:25 37:6
45:14,18 49:1,4
49:24 50:22
54:22,25 55:3
55:14 56:13
**papered** 35:14,16
37:16 45:22
46:3,12 50:7
51:7 54:13
55:18 56:10
57:15 58:5
72:21
**papering** 35:17
45:13,25 72:25
**paralegal** 82:17
**paren** 120:5,6
**part** 7:9 16:2

17:9,13 25:17
26:8 27:4 44:8
70:13 97:11
103:5,10
107:15 109:11
120:12 130:23
133:7,11
**participate**
126:15
**particular** 17:13
52:11,13 56:8
81:18 98:19
**parties** 21:12
99:21 135:18
135:21
**Partners** 2:21
94:25
**partnership**
107:25
**pass** 94:14
**passwords** 47:17
**patient** 25:1
**pattern** 38:3
**Paul** 109:16,20
109:21
**pay** 14:19 21:4
21:12,13 22:7
22:13,20 39:2
40:1 68:24
69:20 108:17
108:23 109:3
**payable** 14:8,16
51:24 120:5
**payee** 133:11
**payment** 16:4
32:17 67:17
70:22 72:6
88:13,25 90:8
92:8,11,12,15
92:17 93:9
100:25 101:15
101:24 103:6
103:11,18,20
103:22 104:3,6
105:12,14

106:20 107:4,5
107:7,9 124:21
124:22 125:3
127:15 129:14
129:16
**payments** 13:20
66:23 67:8 71:6
71:10,16 73:3,4
73:9,12,18,25
74:17 76:13
78:17 81:7
98:20,24 99:5
99:10,13,16,20
99:21 100:14
100:17,18,21
100:24 101:3,4
101:7,10,13,19
102:1,8,11,19
102:23 103:2
103:15,24
104:18,20
105:5,9,17,25
106:9,13,25
107:12 126:2
126:24 127:7
127:11,18,23
128:7,12,15,20
128:24 129:7
129:10,19
130:7,14
131:21
**PC** 2:3
**PDF** 30:13,24
58:22
**penalty** 6:17
134:6
**people** 37:22
47:18 61:3
73:16 76:14
**perceived** 120:19
**percent** 49:14
80:12
**performance**
26:16
**period** 14:2 15:6

107:21 108:5
108:16,22
109:1 125:15
135:15
**periodically**
23:18,19
**perjury** 6:17
134:6
**person** 13:18
23:8,18 37:25
38:1 44:11 46:6
131:23 132:3,7
132:13,17,22
133:1,14 135:8
**personal** 10:5
**personally** 23:17
73:13 101:20
101:21 114:24
123:19 130:2
**phone** 38:1 71:5
72:5 74:20,21
75:2,3,5,5,14
75:19 76:15
92:2,3,6 93:15
93:21 94:6 99:4
100:12
**picking** 79:20
**pictures** 47:11
**pieces** 7:14,18
**pile** 58:25 111:7
**pin** 21:18
**pinpoint** 90:21
**pique** 76:6
**place** 135:8
**Plaintiff** 1:7 2:13
**play** 27:3 29:13
114:22 115:6
117:7,10
126:18
**please** 6:24 10:13
10:16 11:8
32:13,15,16
42:11,25 61:20
61:22 62:2 63:3
64:5 66:10

75:20 89:25
122:18
**point** 42:2 44:14
55:2 66:16
69:24 70:6
**policy** 104:9,11
104:15
**pop** 84:5
**portion** 8:9
**position** 9:7 12:8
110:4
**positive** 79:6,11
79:18
**possible** 32:17
36:21 58:15,18
65:1 93:6,19
95:4 109:21
**possibly** 41:20
55:21 58:7 73:8
104:22
**postsecondary**
10:19
**potential** 16:4
68:4,8
**potentially** 25:19
34:19 95:14
97:10
**practice** 17:20
18:11,18,23
34:16,21 48:17
49:7,9 50:20
53:7,12,16,17
**prep** 32:15
**preparation** 7:8
9:13
**prepare** 16:20
45:8 84:18
130:2
**prepared** 16:25
42:12 46:19
54:6 76:12 77:3
84:21 86:15
128:18
**preparing** 95:22
97:17 131:24

Kristin Hendrix - October 27, 2021

**prepayments**
81:25
**presence** 25:4
**present** 9:4,6,12
24:5 45:24
90:15 97:3
**presented** 116:1
**presenting** 46:14
97:18
**preserve** 78:8
**pretty** 14:11
109:8
**previous** 100:9
**previously** 17:24
48:25 131:9
**Pricewaterhou...**
116:9,12 117:5
117:17 118:2,5
130:20
**principal** 30:12
78:14,17 79:5
79:11,23 80:10
89:23 121:14
122:10 124:5
124:19 125:3
125:18 130:14
**print** 56:1
**printed** 42:8,12
42:24 47:18
55:18,22 56:7
57:4,21,22,24
57:25 58:11,14
58:21,22
**printing** 55:23,25
**printouts** 42:21
**prior** 9:25 10:4
19:17 28:11
35:24 40:25
55:2 65:23
71:25 86:9 96:6
105:3 108:6
124:24 127:19
128:12 133:12
**privileged** 9:8
95:24

**privy** 64:9,11
69:19
**probably** 9:15
17:2 49:14 50:6
58:22 61:9
63:15 99:15
109:8 126:13
**proceed** 61:20,25
**proceeding** 46:20
**proceedings** 95:1
95:3,12
**process** 31:7
32:16 45:11,12
120:12
**produce** 78:9
**produced** 1:18
17:24 33:15
34:1 59:4 67:10
76:20 82:14,19
125:6
**product** 115:13
**production** 10:1
33:15
**profitability**
26:25
**program** 47:25
**programs** 47:16
**projections** 17:18
**promised** 39:2
**promissory** 3:10
3:12,17,19,21
3:23 4:12,14
5:3 14:9 15:18
16:10,16,20
17:1,3,6,22
18:13 19:17
27:3 28:13,21
30:11,19 31:1,8
32:21 33:2
35:18 38:11
42:7 43:11,12
45:1,9 47:6
52:10,24 53:1,8
53:25 54:5,12
54:23 55:11

68:5 71:13,19
72:11,12,16
76:13 77:7,10
80:9 81:8 113:6
113:11,12,16
114:2,7,16
116:7,11,15
117:17,22
118:7 119:12
122:11 124:6
**prompt** 128:14
**prompted** 83:22
**prospect** 53:20
**provide** 7:12
9:19 15:21
30:11 42:21
59:17 63:3 64:5
64:16 119:16
121:25
**provided** 17:24
33:5,9,10 61:14
70:12 89:17
121:11 122:5
129:11 135:15
**provides** 120:7
**providing** 15:10
54:8 65:5
**public** 16:19
7:6 8:8 61:21
**pull** 119:14
**pulled** 49:3
**purpose** 86:12
125:22
**purposes** 39:5
98:1 126:23
**purview** 89:6
**put** 23:20 84:25
**PwC** 97:21 98:1
117:22

_____

**Q**

**qualification**
16:20
**question** 7:1
14:10,22 15:25
16:23 18:15

19:12 20:19,24
22:9,22 24:9,16
28:4 29:5,16
34:7 35:11
36:14,23 37:1
38:8 39:18 41:2
41:14 45:4,5
46:5 47:21
48:23 49:11,21
50:5 51:15,21
52:2,4 53:10
54:18 55:6,15
55:20 56:5
58:17 65:17
66:10 69:9
70:16 73:21
74:6 75:8 77:23
80:4,17 82:2
84:14 86:9,19
86:20 87:8,19
88:16 89:3,16
95:10 96:10,19
100:9 102:3
103:14 105:20
106:19 113:9
113:24 124:17
127:8 128:5
**questions** 6:21,24
7:6 8:8 61:21
95:2 110:16
115:4 133:24
**quick** 52:5 95:4
107:23
**quickly** 6:16
109:8
**quite** 36:21 41:20
104:24
**quote** 120:3

_____

**R**

**R-o-e-b-e-r** 32:10
**raise** 131:1
**raised** 95:12
**range** 89:10
**rate** 19:7 43:16

49:2 80:12
**ratio** 107:21
108:5
**re-up** 86:16
**reached** 108:5
**read** 7:9 8:9
32:18 82:21
86:17 119:25
**reading** 81:9
**ready** 94:16
**real** 11:14
**really** 35:13
67:21
**reason** 6:23
22:23,25 52:11
52:13 56:1,6,7
72:7 77:3 82:5
82:8 101:13
129:13,16
131:1
**recall** 7:19 10:8
21:6 34:15,20
36:16 37:2
44:11 46:10
50:14,20 51:17
51:23 52:4
55:25 56:7
59:22,25 60:2,3
60:8,10 63:11
64:1 65:3 66:7
67:3 68:22,25
69:22 72:3 73:1
74:11 83:22
84:4,23,25
86:12 88:17
91:25 92:3 93:5
93:7 102:21
104:21 105:15
107:6 108:25
109:14 112:3
112:13,15,17
116:4,15 118:5
119:5,8,19
120:16 123:4
123:15 127:5

129:25 130:17
131:5 133:10
recalling 109:16
Receivable 4:19
receivables
130:25 131:22
received 63:13
64:21 71:5
129:2
receiving 32:4
124:23
recipient 60:25
recognize 44:12
recollection 20:2
21:7 38:20
52:21,23 54:14
55:10 64:13
67:12 77:13
100:11 106:24
107:2,8 108:2
121:24 126:9
reconciling 13:20
record 7:15,16
30:8,9 44:4,6
52:6,7 53:3
56:18 62:19,20
72:10 75:5 78:8
82:19 83:13,14
93:20 94:4,21
98:14 110:18
recorded 73:11
81:24
recording 73:18
records 10:6,6
59:18 62:7 64:5
73:12
reduced 135:10
refer 99:25
reference 71:13
119:1 121:2,6,9
referenced 34:5
84:6
referencing
33:25 121:10
referred 96:2

referring 66:25
100:2,5
reflected 118:7
123:12
reflecting 43:15
refresh 9:17 42:1
42:20 69:18
108:1
regarding 86:1
90:17 107:12
regardless 99:16
regularly 23:24
reinforces 41:8
reissue 21:14
related 9:13
21:11 33:1
38:22 57:21
95:9 96:7 98:16
99:21 135:20
relates 32:21
64:17
relation 115:7
relieve 93:10,11
rely 42:8
remember 19:19
20:14 21:3
28:16 30:25
31:3,4 32:4
41:19 54:7
55:23 61:2,5,8
64:23,25 65:4,8
65:23 66:18
67:20 74:21,24
85:10 86:14
90:5,7,12
100:13,14,16
100:20 106:16
109:15,24
110:3,5,6
remotely 6:8
renewal 120:12
reorganized 25:7
25:15 26:17,24
27:2
rep 115:13,19,23

repaid 23:10
repay 69:6
repeat 14:10
22:10 28:15
44:22 66:10
rephrase 6:25
report 12:25 25:9
25:12 114:25
115:25 117:14
123:6
reported 1:23
13:6 36:22
reporter 135:1,3
135:15
reporters 27:13
reporting 12:22
12:23 13:22
reports 127:3
repository 54:22
55:9
represent 27:10
46:25 57:3 83:1
94:24 107:23
represented 2:4
2:11,18 93:5
representing
42:23
request 4:9 60:5
84:22
requested 63:3
63:21 64:5,17
84:2 135:13,14
requesting 63:25
requests 10:1
69:14 115:3
required 7:6 21:4
respect 26:25
29:20 43:8,17
48:10 51:12
73:3,17 92:13
98:24 106:9,12
112:13 114:22
127:16
respectfully 39:5
respecting 45:22

respectively
113:15
respond 122:23
responded 65:1
response 60:13
120:15,19
122:16,25
responsibilities
97:12 103:6,10
responsibility
69:7 102:17
105:2
responsible 14:5
17:21 31:7
45:18 77:19
97:17 101:25
126:20 131:23
132:3,7,13,17
132:22 133:1
133:15
responsive 10:6
rest 44:23
restrictive 47:17
restroom 52:6
93:16
restructured
19:21
retail 86:15
119:17,24
121:25 122:5,9
122:17 123:1,6
reveal 50:11
review 8:4 50:11
54:11 119:21
125:10,17
135:13
reviewed 9:15,19
reviewing 32:24
115:11
revised 17:6
right 12:6 13:21
14:16 25:7
27:15,20 28:18
35:22 45:9,10
47:19 49:3

56:14 65:6,7
69:16 75:14
80:24 83:17
88:21 91:24
96:9 102:25
111:23 120:20
122:19,20
123:21,24,25
124:2 127:25
130:11,12
131:10
Roeber 32:9
112:7
role 12:5,18
13:12 29:13
46:8 69:25 70:7
73:3,4,6,17,22
106:12 114:22
115:6,10 117:7
117:10,12
126:18
roles 73:6
roll-up 72:22
131:9
rolled 79:23
131:13
Romey 61:15,18
61:25 62:3
room 75:15
roughly 39:3
routine 20:4,21
20:25
routinely 21:1
row 131:3
RPR 1:23
rude 25:3
Rukavina 2:5 3:3
3:5 6:4 7:4,15
7:17 9:7,10,11
14:15,23,25
16:2,25 18:17
19:14 21:2
22:11,24 24:11
24:18 28:5 30:4
30:10,17,23

31:12,20 34:10
35:16 36:18
38:10 39:22
41:4,17 42:19
43:6 44:4,7
45:5 46:8 47:22
49:6,17,25
50:10 51:6,17
51:24 52:5,8
53:4,15 55:9,23
56:9,19 57:2,20
58:19 59:11
62:19,23 65:20
69:13 70:19
72:15 73:24
74:8 75:9,13
76:19 78:1,7,11
79:8,10,14 80:8
80:19 82:4,21
82:25 83:8,13
83:15 85:24
86:2 87:9 88:6
88:20 89:5,19
90:3 93:23 94:5
94:14,19
110:17,20
113:8,19 114:8
114:17 118:9
118:21 119:3
121:17 122:12
125:7 128:2
130:13 133:25
134:2

**S**

**S-e-e-r-y** 8:8
**Sadly** 94:9
**salaries** 108:17
108:18,19
**salary** 25:15
**sale** 68:4,8
**save** 55:13 72:19
**saved** 56:11
**saw** 41:8 86:6
115:12 123:19

125:6 126:12
**saying** 37:19
41:15 49:23
53:4 73:8 76:14
93:19 99:5
101:9
**says** 32:1,6 34:10
44:10,13,18
57:8,22,25
60:23 63:2 64:4
78:25 86:23
87:10 89:9
120:2,22
**scan** 55:13
**schedule** 76:24
77:5,6,21 80:20
82:7 85:3,13,17
131:20
**scheduled** 16:4,7
**schedules** 77:9
85:12
**schooling** 10:20
**Scott** 4:3 18:9
60:4,12,15
61:10,13 62:1
**Scott's** 60:13
**scratch** 17:3
**search** 10:5
**second** 7:15 44:5
62:18 78:23
80:22 99:24
109:15
**Secondly** 87:16
**section** 80:9 86:1
118:19
**see** 6:8 8:5,12,14
23:3 31:5,20
32:25 35:7
54:11 57:9,21
59:7,15,20 60:6
60:20 61:23
63:5,9 64:2,7
78:24 79:14
80:15,18,24
81:3 84:11 85:6

86:23 87:1,5
89:8,11 105:9
115:11 120:9
120:22,25
121:4 126:4
**seeing** 31:4 50:14
57:14 65:23
90:12
**seek** 46:20
**seeking** 24:3
**seen** 33:14 65:22
69:13 72:15
76:21 88:7
122:25
**Seery** 4:8 5:1 8:8
25:12,20 29:24
59:13 60:18,22
61:12 62:4,6,9
63:1,2 64:4
65:9 67:3,14,17
67:25 68:13,22
69:14 88:11,23
96:25 125:25
126:13
**Seery's** 8:10,20
**send** 29:14 32:13
34:24 37:7
53:21 59:7
60:11 62:2
63:17 83:22
**sending** 13:19
36:3 54:12
60:17 61:2
111:19
**senior** 12:8,11,11
12:12,17
**sense** 44:12 58:1
**sent** 28:22 29:11
37:17 42:9 83:2
83:17 92:16,22
106:20 107:3
111:21 123:19
126:11,13
**separate** 18:5
**served** 10:1

services 15:11,22
70:13,13 86:16
119:17,19
120:7
**set** 26:10,11,14
35:15 53:21
**shape** 37:10
**shared** 54:9,16
55:14 70:13
77:16 86:16
**shareholders**
39:2
**sheet** 118:6
121:11
**sheets** 63:8,22
**short** 74:22 75:17
75:23 93:15
**shorthand** 1:24
135:2,7,25
**shortly** 11:11,12
**show** 82:10
**showing** 92:15
131:21
**sick** 82:17
**sign** 52:20,20
53:7,20,22 54:3
104:25 105:1
113:5,18
115:13
**signatory** 52:14
**signature** 46:15
47:1,6,11,18
49:8,14,15
114:7,9,15
**signed** 47:9 52:10
52:11,25 55:4,8
115:14 131:6
132:5,9
**signer** 53:13
**significant** 20:20
51:19,22
**signing** 52:16,24
53:25
**similar** 32:25
34:9 38:25

96:10 112:13
**single** 104:2,3
**sitting** 30:25
33:24 42:1
50:15 53:23
54:4 55:24 82:4
85:16 91:21
105:16 106:23
**situation** 34:9
**slightly** 96:10
**SMU** 10:23
**so-called** 15:22
**somebody** 35:19
37:8 53:12,12
53:19 55:21
129:3
**soon** 32:17
**sophisticated**
14:12
**sorry** 11:12 14:24
19:15 47:8 52:4
57:21 66:2
82:23 92:12
97:3 103:9,23
109:20
**sort** 25:21 43:23
96:11 97:24
**sought** 88:24
**sound** 58:15
**sounds** 98:3
**speak** 36:2
**speaking** 13:17
43:11 44:1
**speakings** 95:21
**specific** 7:19
21:18 29:7
34:21 36:4,17
37:1,14 38:2
43:10 46:11,22
47:25 48:11,13
54:14 71:8
88:17 90:19
100:11 101:22
103:11,18
105:21 106:24

127:6
**specifically** 21:6
21:10 23:11
29:9 34:15 37:8
49:12 50:12,16
50:19 51:2 52:3
52:19 54:1,7
55:8 64:25 65:3
65:4,8 68:25
69:22 77:14
84:19,21 93:5
98:16 103:2,7
125:13,18
**specifics** 22:4
**speculating** 58:9
**speculation**
106:4
**sphere** 69:6
**spit** 48:1
**spoken** 35:23
61:13
**spreadsheet** 78:9
**spreadsheets**
31:6 77:12
**staff** 48:2
**stake** 27:7
**stamp** 47:19
82:18
**standard** 46:16
50:7 53:6,11,15
53:16 55:3
**standing** 67:2
**STANG** 2:10
**start** 54:19 59:11
95:10 100:11
**started** 11:13,17
20:11 100:10
**starting** 10:19
11:9
**starts** 59:12
**state** 1:23 6:5
10:25 67:25
68:14 76:22
78:16 136:1
**stated** 48:25

135:9
**statement** 99:3
**statements** 4:5
13:20 63:7,8,21
63:22 97:16,17
115:12 116:17
116:21 117:1,5
117:11 119:2
122:4 133:18
133:22
**STATES** 1:1
**status** 66:20
**stay** 26:4
**steps** 92:13
**STINSON** 2:17
**stop** 34:24
**stopped** 23:22
**stored** 56:2
**straightforward**
26:14
**Strasburger**
44:13,16
**Street** 1:25 2:4
**stretch** 109:5
**strike** 7:24 8:4
15:8 38:16
52:22 53:5
68:12 87:9
90:11
**string** 122:19
**stuff** 49:15
**stupid** 86:9
**subject** 16:5
119:20,20
132:19
**subparts** 86:20
**Subscribed** 134:7
**subsequent** 14:7
59:25 61:12
64:10 95:13
96:22 105:12
116:13 118:3
118:19
**subsequently**
32:11

**sued** 28:21
**suggest** 124:14
**suing** 28:5
**Suite** 2:4,17
136:2
**summarize** 72:19
**summary** 7:12
8:14
**summer** 123:16
124:18
**supervision**
135:11
**supplementally**
9:19
**supposed** 98:20
**sure** 6:12,15
10:21 11:4,11
12:20 13:20
14:11 18:22
19:23 22:11
26:7 28:16 31:2
33:10,21,22
37:5 42:3,22
43:20 52:25
58:18 60:16
62:1,19 63:17
65:4 66:11
75:21 76:11,11
84:15 99:3
100:7 101:1
107:18 109:22
115:16 125:24
126:23 130:23
130:24
**Surgent** 29:24
**surprise** 76:1,3
**surprised** 94:11
**surprises** 40:8
76:2
**suspect** 23:15
**switch** 58:24
**sworn** 1:19 6:2
135:4
**synopsis** 7:12
8:14

**system** 56:12
77:16 84:20

————————
**T**
**T-h-e-d-f-o-r-d's**
86:22
**take** 25:14 30:8
38:11 45:5 52:5
52:20 72:15
75:17 76:15
82:12 87:10
89:13 92:13
104:1 110:14
**taken** 1:20 16:15
17:6 45:8 135:7
**talk** 7:21,24 8:1
8:17,20,23,25
28:10 34:21
44:9 66:11,15
78:1
**talked** 9:12 97:4
99:8
**talking** 8:19,22
29:1 64:11
101:2 116:8
121:15,23
125:13
**taxes** 14:9
**team** 13:19 17:25
18:21 26:4 31:6
39:15 49:15,18
50:24 51:7
64:16 97:16
102:4 104:11
106:15 115:2
**telephone** 23:17
74:11 75:23,25
**tell** 34:13,16,24
44:2 53:1 54:1
54:2 55:7 60:14
63:24 71:23
74:19,23 79:22
79:24 84:3
91:11,15,18
93:24 99:2

100:12 106:14
107:1 109:22
110:8 112:8,25
113:4,17 114:1
114:6,14
116:20,23,24
117:21 118:25
119:6,11 122:4
122:8 123:2,8
123:11 130:22
131:24 132:4,8
132:11,14,18
132:23 133:2
135:4
**telling** 35:25
37:11 53:24
100:13,21
105:22 115:24
**template** 18:20
18:24 43:14,18
45:8 46:17 58:4
58:6,12
**templates** 43:12
50:9
**term** 17:2 66:9
66:16 67:8,13
73:10 76:24
77:10 98:17,25
100:4 107:20
107:24 125:19
126:2 127:12
127:16,24
128:8,21 130:7
131:5,8,14
**terminology**
27:14
**TerreStar** 38:22
**test** 20:9
**testified** 6:2 45:7
72:18 112:12
113:13 127:22
129:22
**testify** 83:10,12
**testifying** 6:16
**testimony** 19:8

20:1,15 26:23
41:2 51:11
56:10 99:9
135:9
**Texas** 1:2,23,25
10:15,22,25
11:13 134:8
136:1
**thank** 79:13 94:2
94:11,15 111:4
128:3 134:2
**Thedford** 4:22
120:2 122:22
**Thedford's** 86:21
120:15 123:5
**thereto** 135:21
**thing** 20:20 30:18
34:4 56:22 58:3
94:20 126:21
**things** 12:21
18:24 19:2,9
37:21,24 74:18
87:13 100:10
**think** 20:6 22:11
22:24 24:1,18
24:21 25:13
32:2 33:9 41:4
41:25 42:3
44:13,25 45:1
45:19,19,21,21
46:2 49:16 50:8
51:6 58:3 59:2
61:8,16 64:21
66:1 69:2 72:18
75:22 79:19
80:8 87:12 88:9
88:23 102:22
104:12 109:7
127:22 129:23
**Third** 2:10
**thought** 75:22
130:25
**three** 87:15
125:19 127:24
128:7,8,21

130:7 131:5
**Tim** 109:20,23
**time** 9:1,6 11:17
14:19,19 17:12
20:10 22:5,5,12
22:12 23:12
31:5 32:9 33:8
35:6 44:15
45:19 49:14
51:10,18 55:1
64:2 65:10
66:16,19 67:11
69:7,11,24 70:6
72:19 73:16
75:6 77:24 78:4
80:10,10 81:19
82:12 84:4
86:14 90:11
93:8,24 103:16
104:2 108:6,16
108:21,22
109:1 112:25
113:1,4,5,17
114:1,14
116:20,25
123:4,8,11
125:14 128:12
130:20 131:25
132:4,8,11,14
132:18,23
133:2 135:8
**timely** 128:24
129:6
**times** 9:12 29:2
51:4 109:4
**title** 12:13,14
13:2 46:11
69:25 70:7
**today** 8:23 11:23
13:10 25:6 28:2
30:25 32:16
33:24 41:19,23
42:1 50:15
53:23 54:4
55:24 65:5,8,23

82:4 83:2 85:16
90:13 91:21
94:12 95:1,22
105:16 106:23
121:23
**today's** 9:14
**told** 34:12 35:15
35:19,22 36:19
36:24 37:5,8
38:5,11,17
40:22 41:11,18
41:20 60:8 91:9
91:22 103:2,7
104:10,18
106:21,25
**top** 80:25
**topic** 88:19 92:5
95:8 96:11
109:7 130:19
**topics** 98:12
107:18
**total** 78:14,18
79:22 80:22
**track** 29:1
**tracking** 31:6
111:19
**training** 16:13
**transaction**
112:10,14,22
**transactions** 37:4
119:7
**transcript** 7:9
135:13
**transfer** 40:14
81:15 91:3,7,9
91:13,22 92:20
92:20 111:14
**transferred**
38:18 39:23
90:23 111:10
**transferring**
81:22
**transfers** 35:8
37:12 38:5
40:24

treasury 12:20
13:14,15 14:1
15:22 17:17
**trigger** 107:21
108:5
**triggers** 26:11
**trouble** 42:10
43:1
**true** 42:25 134:7
**trusted** 50:8
**truth** 135:5,5,5
**try** 10:5 20:10
95:2,3 105:8
**trying** 21:18
23:20 84:5
**turning** 19:22
**two** 24:4 27:25
29:18 30:1 31:1
37:18 38:4,21
42:7 43:8 46:22
52:16 53:25
54:5 57:7,14
70:13 73:16
86:20 106:9
109:14,18,24
110:6 113:12
116:7,11,25
117:17 118:7
121:15,22
122:10 123:13
124:6
**TX** 2:4,18 136:2
**typewriting**
135:10
**typical** 18:18,23
23:25
**typically** 21:10
35:1,5,6,12
47:7 52:19 54:2
101:1
**typo** 87:12

---
**U**
**Uh-huh** 27:16
33:12 47:3

umbrella 13:25
99:23
**unable** 108:17
109:2
**underlying**
131:20
**understand** 6:16
6:20,21,24 10:9
15:3 26:7 27:10
33:22 39:14
41:22 56:16
58:8 84:14 95:5
119:16,23
122:21 125:8
125:15 128:5
**understanding**
13:3,5 25:1
27:5,25 43:24
44:20 50:22
57:23 62:5
63:20 70:21,25
71:3 78:22
79:17,25 81:6
89:20 98:23
115:9,22 126:5
128:19 131:16
133:14
**understood** 7:1
39:11
**unfortunately**
42:4
**unilaterally**
110:22
**UNITED** 1:1
**University** 10:21
**unpaid** 80:9
**upcoming** 67:16
72:6 73:3 74:1
126:1
**update** 43:11
45:1 58:7 77:20
**updated** 43:18
**updating** 17:23
18:23 19:1,3,25
50:8

**use** 21:17 45:12
  47:19 48:12
  49:18 59:1 79:1
  100:4
**usually** 24:5

---

**V**

**Vaguely** 63:12
**valid** 131:25
**valuation** 39:15
**various** 14:15
  15:11 59:13
**verbatim** 27:14
  78:25 85:20
  86:22
**verification** 50:3
**version** 30:13
  42:7
**versions** 30:24
**video** 8:5,12 59:6
  62:16 85:24
**videoconference**
  1:19 2:19
**view** 41:9
**volume** 94:19
**vs** 1:8

---

**W**

**wait** 44:23
**walk** 10:18 11:8
**walking** 54:7
**want** 28:10 47:15
  58:25 86:18
  95:8 100:7
**wanted** 52:19
  54:2,9 60:12,14
  82:17 84:7
  102:11 105:9
**wanting** 65:10
**wasn't** 108:23
  114:6,15 127:7
  129:14
**Waterhouse** 4:21
  7:10,21 13:7,8
  23:13,22,23

24:6 29:23
34:19 35:24
36:2 37:3,5,9
38:5 47:24 49:7
50:12,16 52:10
52:23 53:24
54:5,13 60:11
62:10 63:1,18
64:3 67:3 71:5
72:1 73:8 74:13
75:20 83:19
84:1 90:4,7,16
91:10,22 93:9
99:5,18 102:16
103:8,12,19
106:14 112:6,8
112:21,25
113:4,17,22,25
114:5,6,13
115:6 116:19
116:23 117:20
118:24 122:3,7
122:22 124:8
124:10,13,16
124:24 125:25
126:6,24 127:3
127:9,19 128:9
128:14,18,19
129:23 130:4
130:11
**Waterhouse's**
  8:1,6 47:1,6
  48:11 75:25
  115:10
**way** 11:18 12:23
  14:8 21:15
  35:13,15 37:8
  37:10,16 56:12
  58:20 60:19
  76:1 81:12 83:3
  92:25 93:10
  101:21 122:5
  135:19
**ways** 6:7 54:19
**we'll** 9:10 15:9

17:5 44:8,23
66:11,15 75:17
82:18 94:3
**we're** 6:7 27:22
  28:16 29:1 30:6
  35:19 50:22
  58:9,24 59:2,3
  76:11,11 85:20
  93:22 100:7
  104:3 116:8
  125:13
**we've** 9:11 28:8
  50:7 56:21,22
  69:16 88:9
  114:2 117:18
  121:23
**website** 49:3
**week** 8:2,10 9:2
  9:22,25 10:5
  13:22 28:9,17
  29:18 60:22
  61:6 67:6 86:1
  95:19
**weekly** 66:21,25
  67:2
**welcome** 59:1
  86:17
**went** 9:15 10:22
  10:23 24:19,22
  49:23 112:17
  115:4
**weren't** 19:25
  28:23 40:7,9
  64:12 96:7
  98:21,24 99:20
  100:24 101:13
  105:22 106:3
  131:1
**wire** 34:25
  106:15 107:3
**withdrawn**
  113:23 117:25
  120:3 124:9,21
  126:6,7 127:7,9
  129:15 132:12

133:9
**withholding**
  116:3
**within-entitled**
  135:6
**witness** 1:19 16:1
  16:24 18:16
  19:13 20:25
  22:10,23 24:10
  24:17 30:3
  31:11 34:8
  35:12 36:15
  38:9 39:19 41:3
  41:15 46:6
  48:24 49:12,22
  50:6 51:5,16,22
  52:3 53:11 55:7
  55:21 56:6
  57:18 58:18
  69:10 70:17
  73:22 74:7
  75:12 77:24
  80:5,18 82:3
  83:10,12 88:17
  89:4,17 94:14
  96:20 102:4
  103:15 105:21
  106:7,20
  113:21 114:12
  114:18 118:11
  119:4 121:18
  122:14 135:3
  135:10
**word** 42:6,6 43:7
  43:8 45:11 47:2
  77:13
**words** 21:5 23:20
  68:14
**work** 11:8 52:4
  98:2 126:22
**worked** 11:16,18
  36:6 61:19
  110:5
**works** 35:1
**world** 113:25

114:5,14
116:24 117:21
118:24 119:6
119:11 122:3,8
124:17
**wouldn't** 36:22
  37:6 53:22
**wrap-up** 110:16
**write** 60:4
**writes** 60:18,22
  61:13,20
**writing** 37:10
  41:14 64:3
  114:25 117:14
**written** 80:7
  82:19 91:25
  99:7 104:12,15
**wrong** 57:5 87:13
  99:7
**wrongly** 123:12
**www.dickman...**
  136:4

---

**X**

---

**Y**

**yeah** 7:2 14:13
  21:10 34:9
  44:23 51:9
  80:18 93:17
**year** 12:2 20:10
  26:14 78:1,5
  81:6 104:5
  127:15 128:21
  128:25 129:7
  129:14 130:8
  131:21
**years** 11:15,18
  12:9 18:20 21:9
  22:25 23:9 36:7
  37:18 40:25
  51:7 52:4
  104:21,22
  108:15 109:17
  110:8,10,12

---

Kristin Hendrix - October 27, 2021

131:3 133:5,12
**Yep** 76:9 123:17
**yesterday** 9:2
  86:7,9
**York** 2:11

___

**Z**

**zeros** 87:15
**ZIEHL** 2:10
**Zoom** 6:8,10

___

**0**

**05.02.2019** 4:1
**05.03.2019** 3:25

___

**1**

**1** 3:10 30:14,15
  30:18 33:1 71:4
  71:25 72:4
  74:10 80:9
  93:21 129:24
  135:22
**1-31-23** 136:4
**1.3** 81:1,2
**1.4** 90:23 91:3,23
**1:19** 1:22 134:4
**10** 4:3 9:23,25
  10:5 28:17 59:4
  59:9 110:12
**10,530,000** 87:20
**10.5** 85:6,9
  124:11
**10:11** 1:22
**10017-2024** 2:11
**101** 136:2
**11** 4:7 62:14,21
  62:23
**11:27** 57:22
**110** 3:5
**111** 3:6
**12** 4:11 5:5 65:13
  65:18,21 90:5,7
  90:17
**12,286** 87:10,10
**12,286,000** 87:6
  87:16,20,24

**12.3** 120:24
  121:13 123:5,9
**12/30/29** 78:25
**13** 4:14 72:11,13
  72:16
**13-week** 67:5
  125:7,10,14,23
  126:16,19
  128:17 130:3,6
**14** 4:17 22:25
  23:9 36:7 40:25
  76:10,17,19
  82:6 85:17
  90:22 91:4 93:8
**14-year** 38:3
**15** 4:19 36:7 83:1
  83:4,15,17 84:8
  84:14,18,19
  85:7 87:21
  89:21,22
  123:16,22
  124:5 133:5
**15(c)** 4:22 86:1
  121:11
**16** 4:21 85:21,22
  85:25 86:3
  119:15,23
**17** 5:1 11:15 52:4
  88:2,4,7
**18** 5:5 89:25 90:1
  90:3
**19** 59:12
**1982** 10:17

___

**2**

**2** 3:12,12,14,19
  3:23 4:3 30:19
  30:20,21 31:16
  32:21 34:14
  37:11 41:11,18
  44:19 56:22
  57:22 58:11
  60:25 61:6,12
  79:8 119:25
**2.1** 81:1

**2.4** 30:20 32:13
  32:21 33:19
  37:12 38:22
  39:7 42:16 43:3
  58:5,11 111:10
  113:14
**2.4-** 110:22
**2.4M** 3:12,19,23
**2000** 86:22
**2001** 127:23
**2004** 10:21 11:12
**2005** 11:11 20:16
  21:2,9,19
**2009** 10:23
**2014** 133:12
**2015** 10:24
**2017** 12:15 19:23
  73:2 74:7 131:6
  131:12
**2018** 116:4,16
  117:1,11,23
  118:3,11,14,18
  119:1 128:25
**2019** 3:14 12:10
  12:17,19,25
  13:8,14 17:9,12
  17:20 18:2,8,10
  18:10 19:15
  20:2,2 21:2,9
  21:19 23:16,16
  24:12,14 30:20
  31:17 34:14
  37:11 38:17,21
  39:6,14 40:3,5
  41:11,18 44:25
  45:14 46:9,12
  46:19 47:12,24
  48:21 49:6,19
  50:2 53:5,6
  54:21 55:3,10
  56:9,20 57:22
  74:7 78:5 80:23
  81:6,18 110:21
  111:1 112:9,21
  114:1 116:5

117:18 118:16
  129:8
**2020** 4:4,11,22
  12:7 14:2,5
  15:6,10,21 16:3
  24:22 59:12
  62:6,10 65:14
  66:3,7,18,19
  67:13,17,20
  68:1,8,14,21
  70:23 71:4 74:8
  75:19 76:4 78:2
  79:10 83:18
  86:25 87:6
  88:12 93:21
  98:21,25
  100:25 101:11
  101:19 102:7,8
  102:20 103:21
  105:4,18
  120:23 122:17
  122:19 124:18
  125:14,20
  126:9 127:6
  128:20 129:14
  129:17
**2021** 1:15,21 4:8
  5:2,6 24:24
  26:4 28:20
  29:11 62:25
  64:15 71:25
  73:3 88:2 90:5
  90:17 94:10
  106:10,25
  128:2,8,15
  134:9 135:22
**21-03004-sgj** 1:8
**214** 136:3
**23** 85:1 87:3
**23,846,000** 84:9
**24,471,000** 89:9
**25** 61:6
**26** 10:17
**27** 1:15,21
**28** 125:20

**29** 83:18 84:1
**2nd** 58:5 111:9

___

**3**

**3** 3:10,14,17,21
  4:11 31:15,18
  34:4,11 35:21
  36:20 37:11,19
  38:12 41:11,18
  44:18 56:20
  65:14 66:3
  111:7 112:21
  119:7
**30** 3:10,12 71:4
  72:4 74:10
  86:25 87:6
  93:21 120:23
  129:24
**30-year** 19:22
**30,746,812.33**
  4:14
**30.7** 66:9,13
**30.7M** 4:17
**31** 3:14 4:15
  67:16 70:22
  79:10 88:12
  98:21,25
  100:25 101:11
  101:19 102:8
  102:19 103:21
  105:3,18 131:6
**3102** 2:17
**312** 136:1
**34th** 2:11
**3800** 2:4
**38th** 1:25

___

**4**

**4** 3:17 42:15,17
  42:19 43:6,18
  43:18 44:21,24
  45:22,25 46:3
  46:19 48:11,19
  50:13,17 51:2
  52:8 55:17,24

Kristin Hendrix - October 27, 2021

57:16
**42** 3:17,19
**4228** 136:2
**43** 3:21,23
**445-9548** 136:3

**5**

**5** 3:19 30:12 33:1
33:20,25 34:5
35:3 36:25
37:12 38:25
39:3,8 42:15,16
42:17,20 43:2,6
43:18,19 44:21
44:24 45:22,25
46:3,19 48:11
48:19 50:13,18
51:2 52:9 55:17
55:24 57:16
58:13,13 94:9
112:14 113:14
**5-** 33:19
**5.0** 110:23
**5/31/2020** 79:5
**500** 1:24 2:3
**530,000** 78:25
**56** 3:25 4:1
**575-** 79:23
**575,000** 79:12
**575,550** 79:6
**59** 4:3
**5M** 3:10,17,21

**6**

**6** 3:3,21 4:8,22
43:2,4,21 44:9
44:18 62:25
64:15 80:12
86:22
**6/30** 86:23 121:3
121:6,11,25
122:8
**62** 4:7
**65** 4:11
**683** 87:3

**7**

**7** 3:23 5:2 43:2,4
44:9,19 88:2,21
**7.4** 38:18 39:11
39:23 40:15,21
122:10 123:12
**72** 4:14
**75201** 2:4
**75206** 136:2
**75219** 2:18
**76** 4:17
**777** 2:17
**780** 2:10

**8**

**8** 3:25 56:19,24
56:25 58:10
89:9
**800** 136:3
**83** 4:19
**85** 4:21
**855-5100** 136:3
**88** 5:1
**881** 120:1

**9**

**9** 4:1 56:21,24,25
58:10
**90** 5:5
**94** 3:4
**99** 49:14