**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S APPENDIX IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Davor Rukavina, Esq.
State Bar No. 24030781
Julian P. Vasek, Esq.
State Bar No. 24070790
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard St., Ste. 3800
Dallas, TX 75201
Tel: 214-855-7500
Fax: 214-855-7584

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

TO THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Highland Capital Management Fund Advisors, L.P. ("HCMFA"), defendant in the above-captioned adversary proceeding, and files this its appendix in opposition to *Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (Dkt. No. 91), filed by plaintiff Highland Capital Management, L.P., in support of which HCMFA would respectfully show the Court as follows:

### CONTENTS

| Description | Pages |
|---|---|
| Declaration of James Dondero | 1 – 6 |
| April 7, 2019 Amended Memorandum regarding the Treatment of the TerreStar Corporation Equity NAV Error in the Fund | 7 – 17 |
| Second Amended and Restated Shared Services Agreement | 18 – 30 |
| Declaration of Julian Vasek | 31 |
| Complaint for (I) Breach of Contract and (II) Turnover of Property of Highland's Estate (Adv. No. 21-03082-sgj) with Exhibits | 32 – 64 |

RESPECTFULLY SUBMITTED this 19th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
State Bar No. 24030781
Julian P. Vasek, Esq.
State Bar No. 24070790
500 N. Akard St., Ste. 3800
Dallas, TX 75201
Tel: 214-855-7500
Fax: 214-855-7584
E-mail: drukavina@munsch.com
E-mail: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND
CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

   The undersigned hereby certifies that, on January 19, 2022, a true and correct copy of this document, along with all exhibits, if any, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

         /s/ Davor Rukavina
         Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF JAMES DONDERO

I, James Dondero, do hereby declare as follows:

1.      My name is James Dondero. I am over the age of eighteen years and am otherwise competent to make this declaration. I am making this declaration on behalf of defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") in connection with the motion for summary judgment filed in the above-captioned adversary proceeding (the "Adversary") by plaintiff Highland Capital Management, L.P. (the "Debtor").

2.      In April and May, 2019, I was: (a) the sole director of Strand Advisors XVI, Inc., which is the general partner of HCMFA; and (b) the President of HCMFA. At that time, Frank Waterhouse ("Waterhouse") was the Treasurer of Strand Advisors XVI, Inc. As the President of HCMFA and the sole director of its general partner, I am not aware of any corporate governance documents authorizing Waterhouse to incur millions of dollars of debt on behalf of HCMFA. My

understanding of HCMFA's corporate governance, and certainly the practice at the time, was that I was the sole person who had the authority to authorize HCMFA to incur such obligations.

3.      The Adversary revolves around two promissory notes (the "Notes") allegedly signed by Waterhouse. At all relevant times, Waterhouse was both the Treasurer of HCMFA's general partner and the Chief Financial Officer of the Debtor. In both capacities he reported directly to me. Indeed, all of the individuals whose conduct led to this dispute were employees of the Debtor, not HCMFA. As pointed out above, I have no reason to believe that Waterhouse or any such other individual had the authority to cause HCMFA to issue or execute the Notes without my approval. For the reasons set forth herein, the Notes do not constitute legitimate obligations of HCMFA.

4.      HCMFA is a registered advisor that advises third-party funds as to their investments. At all relevant times, including from 2018 to present, HCMFA served as advisor to Highland Global Allocation Fund (the "Fund"). At issue are two transactions involving equity interests in TerreStar Corporation ("TerreStar") that took place in March 2018 (the "March Transactions"). In particular, an error occurred concerning the net asset value ("NAV") that was assigned to the TerreStar interests in connection with the March Transactions (the "NAV Error").

5.      The NAV Error is described in more detail in that certain April 7, 2019 *Amended Memorandum regarding the Treatment of the TerreStar Corporation Equity NAV Error in the Fund* (the "NAV Memo"), a true and correct copy of which is attached hereto at HCMFA Appx. 7 – 17. The NAV Memo was made at or near the time by—or from information transmitted by— someone with knowledge; the NAV Memo was kept in the course of HCMFA's regularly conducted business activity; and making the NAV Memo and documents like it was a regular practice of that business activity.

6.     During this time period, however, HCMFA did not perform its own valuation services. Instead, the Debtor performed such services on HCMFA's behalf pursuant to that certain *Second Amended and Restated Shared Services Agreement* (the "SSA"), a true and correct copy of which is attached hereto at HCMFA Appx. 18 – 30. Indeed, all of the "Adviser Representatives" listed in the NAV Memo—Thomas Surgent, Frank Waterhouse, Jason Post, and Lauren Thedford—were employees of the Debtor, not HCMFA. As I testified during my deposition on November 4, 2021, the Fund's board of directors was well aware of the relationship between the Debtor and HCMFA, was well aware that all valuation staff were housed at the Debtor, and was well aware that all valuation activities were performed by the Debtor. The Fund and HCMFA relied on the Debtor, and the NAV Error, including the Debtor's involvement and responsibility, was a material part of board conversations for over a year.

7.     As described in more detail in the May 28, 2019 *Memo regarding Resolution of the Fund's Net Asset Value Error*, a copy of which is included in the Debtor's summary judgment appendix at pages 02979-02980,[1] the Fund was ultimately made whole through a $5,186,496 payment from HCMFA on February 15, 2019 and a $2,398,842 payment from HCMFA on May 2, 2019. I was fully aware of these issues at the time. I believed and understood that the Debtor was liable to HCMFA for causing or failing to prevent the NAV Error.

8.     Accordingly, on May 2, 2019, I directed the Debtor to transfer $2.4 million to HCMFA, and on May 3, 2019, I directed the Debtor to transfer $5 million to HCMFA. Shortly beforehand, I personally transferred funds to the Debtor to enable it to make these payments, as the Debtor lacked sufficient funds to compensate HCMFA. My transfer of funds to the Debtor

---

[1]     For the avoidance of doubt, both this memo and the other NAV Memo were prepared by employees of the Debtor acting under the SSA. HCMFA did not have its own legal and compliance officers at the time. HCMFA only employed portfolio managers and analysts as employees. All other staff functions were at the Debtor.

repaid a loan the Debtor had made to me. That repayment provided the Debtor with the liquidity for it to compensate HCMFA for the damages the Debtor caused and HCMFA paid in connection with the NAV Error. I did not intend for the Debtor to use the funds to make a loan to HCMFA. I believed it was appropriate for the Debtor to compensate HCMFA because the Debtor's employees caused or failed to prevent the NAV Error and because of the Debtor's duties under the SSA. As I testified during my deposition on November 4, 2021, transferring these funds from the Debtor to HCMFA to settle the fallout from the NAV Error was "a critical piece of putting the issue to bed."

9. Thus, I instructed Waterhouse to transfer the foregoing funds from the Debtor to HCMFA. I never instructed or suggested to Waterhouse that these transfers represented loans from the Debtor to HCMFA or that these transfers be drawn up as loans. Waterhouse never asked me whether these transfers were loans or should be drawn up as such. To the extent that Waterhouse understood this to be the case, I never said anything to cause him to reach such an understanding. Nor, after that discussion with Waterhouse where I instructed him to make the transfers, did either he or anyone else at the Debtor or HCMFA follow up with me to ask whether the transfers were a loan or should be papered up as such, and no one either at HCMFA or the Debtor presented me with promissory notes to sign or otherwise presented me with any document for me to approve the Notes. The internal policies and procedures at the Debtor and HCMFA, as well as ordinary practice, required that loans in amounts such as $5 million and $2.4 million would go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA, and ultimately through me for my approval, neither of which happened to my understanding, knowledge, and/or recollection.

10. Rather, unbeknownst to me at the time and until after litigation over the Notes started, HCMFA's accounting staff—who were also employees of the Debtor acting under the SSA—erroneously booked the $2.4 million and $5 million transfers from the Debtor to HCMFA as loans and erroneously papered promissory notes to reflect their incorrect understanding of the transfers. Likewise, it appears these same individuals erroneously caused the Debtor and HCMFA to reflect these transfers as loans on various financial statements and disclosures. But I was not aware of these errors until this litigation commenced. Prior to the Debtor's demand to pay these Notes until shortly before this litigation commenced, no one at the Debtor or HCMFA informed me of the Notes. To the extent that I saw any books and records or other financial documents of the Debtor or HCMFA prior to that, I would not have noticed the Notes so as to raise an issue. This is because, prior to the Notes in question, HCMFA issued two other promissory notes to the Debtor, in similar amounts, the dates of collection on which were extended through May 2021. Thus, if I saw any such records or documents, I would have naturally assumed that any reference of promissory notes from the Debtor to HCMFA was referring to these prior two notes and not the Notes in question.

11. To be clear, my intent, both as the person who controlled HCMFA and the person who controlled the Debtor, was for these transfers ($5 million and $2.4 million) to constitute compensation from the Debtor to HCMFA, not loans. Indeed, as Waterhouse informed me in early May 2019, the Debtor did not have the funds to make these transfers. Thus, I personally paid most if not all of the $7.4 million into the Debtor at about that time to enable the Debtor to make the transfers to HCMFA, again under the belief and understanding that the Debtor would use these funds to compensate HCMFA for the NAV Error and not as a loan to HCMFA.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 2022.

_____

James Dondero



**DATE:** April 7, 2019

**TO:** Securities and Exchange Commission (the "SEC")

**FROM:** Highland Capital Management Fund Advisors, L.P. (the "Adviser")

**RE:** Amended Memorandum regarding the Treatment of the TerreStar Corporation ("TerreStar") Equity NAV Error in the Fund

This memorandum is intended to provide supplemental information regarding the NAV Error in the Highland Global Allocation Fund ("GAF" or the "Fund") and reflect the discussions on the March 8, 2019 call. Attendees of the call included:

(i) SEC Staff: David Bartels, Paul Cellupica, Alison Staloch, Vince DiStefano, Dan Rooney, Christian Sandoe, Kathryn Feld and Linda Hoffman;

(ii) Adviser Representatives: Thomas Surgent, Frank Waterhouse, Jason Post and Lauren Thedford;

(iii) Independent Trustee Counsel: Stacy Louizos of Drinker Biddle & Reath LLP; and

(iv) Fund and Adviser Counsel: George Zornada and Jon-Luc Dupuy of KL Gates LLP.

In connection with the Fund's conversion from an open-end fund to a closed-end fund (the "Conversion") on February 13, 2019, the Office of the Chief Accountant ("OCA") of the SEC reviewed the Adviser's fair valuation of TerreStar equity, in particular the application of Financial Accounting Standards Board Accounting Standards Update 2011-4, Topic 820, Fair Value Measurement ("ASC 820") to two transactions in TerreStar equity that occurred in March 2018 (the "March Transactions"). The OCA provided its feedback during an exit call on February 8, 2019 and subsequently confirmed no comments to the Adviser's confirmation of understanding letter on February 14, 2019.

The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value. As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly." The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value. The "orderly" determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "NAV Error").

After incorporation of the updated valuation into the Fund's NAV, the gross NAV Error, excluding interest, the advisory fee rebate, and processing costs, amounted to approximately $6.1 million of loss to the Fund and approximately $1.4 million of losses to Shareholders over the period between March 18, 2018 and January 19, 2019 (the "NAV Restatement Period").

**Calculation of the NAV Error**

a. For each day during the NAV Restatement Period, the Adviser analyzed the impact on the Fund's NAV resulting from the revised mark relative to the original mark for TerreStar Equity. This amount includes:

(i) "Loss to Fund", which represents the sum of the overpayment of net redemptions (and resulting remaining shareholder dilution) caused by the NAV overstatement for each day in the period where the difference in marks resulted in a NAV error in accordance with the NAV Error

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

HCMFA Appx. 7

DEFENDANTS-0000084

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

Correction Procedures. This number is an estimate based on net investor activity for all shareholders for each period, as provided to the Adviser by the Fund's transfer agent, DST Asset Manager Solutions, Inc. (the "Transfer Agent"). This amount is an estimate based on all investor activity for each period, as provided by the Transfer Agent. Final numbers will be determined once an investor-by-investor analysis is performed for the entire NAV restatement period by the Adviser and the Transfer Agent.

(ii) "Loss to Shareholders", which occurred where either (i) the revised mark was higher than the original mark for the period and shareholders who redeemed during the period were underpaid (these shareholders will be made whole as part of the shareholder reprocessing exercise); or (ii) the revised mark was lower than the original mark for the period and shareholders who subscribed or reinvested shares of the Fund overpaid (these shareholders will be made whole as part of the shareholder reprocessing exercise).

(iii) "Estimated Gross Up for Additional Omnibus Accounts", which is intended to estimate the potential impact for the reprocessing of individual capital activity that is currently netted within the Omnibus accounts. The investor level detail within the Omnibus accounts is aggregated into one net investor in the detail available from the Transfer Agent. The current analysis is only looking through to the NFS Omnibus account, but there may be additional omnibus accounts that require this look-through treatment, which will be determined after an analysis of the various omnibus agreements.

(iv) "Processing fees", which refer to the rough amount the Adviser expects to have to pay the Transfer Agent to reprocess shareholder transactions as described above.

(v) "Management fee rebate", which is the excess advisory fee calculated on the higher TerreStar valuation reflected in the NAV.

(vi) "Interest", which is calculated on the daily cumulative Fund receivable at a rate of Fed Funds + 45 bps using the "Actual/360" methodology.

| Components of NAV Error | |
|---|---|
| Total NAV error | 7,442,124 |
| Interest on NAV error | 84,000 |
| Processing Fees | 244,000[1] |
| Management Fee Rebate | 47,000 |
| **Total due to Fund** | **7,817,124** |

**Treatment of the NAV Error and Resolution of Loss**

The GAF NAV Error represents a unique set of circumstances where, during the NAV Restatement period there are days in which there is (1) an original fair value mark, an (2) Updated Valuation (defined below), and (3) the price at which TerreStar was sold in a negotiated arm's length transaction to an unaffiliated third party. The latter price is greater than both the original fair value mark and the Updated Valuation, and results in a Gain above

---

[1] Updated April 1, 2019 using the most recent reprocessing fee estimate available from the Transfer Agent's special events team.

2

HCMFA Appx. 8

Confidential

DEFENDANTS-0000085

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

Fair Value (defined below) which the Adviser believes should also be considered with respect to any equitable resolution of the error correction. On December 7, 2018, the Fund sold $23 million of TerreStar equity at $350 per share (above its restated December 2018 fair value mark of $274.38, as calculated under the methodology set forth in the consultation, and above the Adviser's original fair value mark of $333.12 prior to the OCA consultation). As addressed below in detail, when applying the fair valuation approach expressed to the SEC Staff during the OCA consult process (the "Updated Valuation") and determining the appropriate resolution under the NAV Error Correction Procedures (as addressed below), the Adviser believes it is equitable and appropriate also to consider a *portion* of the total gain realized on the December 7, 2018 sale in excess of the restated fair value, which total gain was approximately $4,959,992 (the "Gain above Fair Value").

The NAV Error amount of $7.8 million (including interest, rebate of Advisory fees, and processing costs) ignores the actual realized gain represented by the Gain above Fair Value. As a result of the Updated Valuation, the Loss to Fund was caused by "paper" dilution to remaining investors from a lowered NAV per share and real losses resulting from redemptions made at a NAV higher than the Updated Valuation. A significant part of the losses from the redemptions were in a practical sense compensated for by the Gain above Fair Value because the Fund's net assets increased due to the actual cash realized in the December 7, 2018 sale at a price higher than the Updated Value; while not reflected as an offset of the NAV Error in accounting, such sale benefitted remaining investors. The fair value of the remaining TerreStar equity (reflected in the Updated Value), however, was not increased to reflect the full, realized sale price or taken into account when calculating the $7.8 million of loss. Although subject to continuing assessment of valuation inputs, in the absence of negative inputs, applying the valuation methodology set forth in the OCA consult may result in the fair value of remaining TerreStar equity, over time, increasing to a price per share closer or equal to the realized sale price to any extent the weighting of the March Transactions decreases with age. Any such resulting gains would counter the "paper" losses incurred by remaining investors who continue to hold their interest in the Fund.

The NAV Error will be covered by: (i) GAF's pro rata portion of the Adviser's and the Fund's joint insurance policy and $250,000 deductible (paid by the Adviser); (ii) an additional payment and rebate of advisory fees by the Adviser; and (iii) recognizing the effect of the Gain above Fair Value (an approximately $2.3 million portion) in the correction. This later aspect is unique to GAF and arises from a sale of TerreStar equity above fair value after the shareholder approval of the conversion, and results in a write down of the remaining balance of the receivable due to the Fund. A numerical summary is as follows:

| | Loss to Fund | Loss to Shareholders | Totals |
|---|---|---|---|
| Net Loss | (6,068,851) | (1,373,272) | (7,442,124) |
| Processing, Fees, Interest | (375,000)[1] | - | (231,000) |
| Insurance Proceeds | 3,566,248 | 1,373,272 | 4,939,520 |
| Insurance Deductible paid by Adviser | 246,976 | - | 246,976 |
| Additional Payment from Adviser | 375,000[1] | - | 231,000 |
| Gain above Fair Value | 2,255,628 | - | 2,255,628 |
| Total* | - | - | - |

*The Total row should net to zero and serves solely as a check figure.

[1] As noted on page 2, processing costs were updated on April 1, 2019 based on the most recent reprocessing fee estimate available from the Transfer Agent's special events team.

Taking into account all relevant data surrounding the TerreStar investment (including the Gain above Fair Value) when applying the NAV Error Correction Procedures is particularly important in light of (i) the robust

3

HCMFA Appx. 9

DEFENDANTS-0000086

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

disclosure included in the Fund's definitive proxy statement, which made very clear the risks associated with the ongoing valuation of the TerreStar investment; and (ii) shareholder's overwhelming vote in favor of the Conversion (95% of shareholders present at the shareholder meeting voted in favor of the Conversion proposals). This shareholder affirmation suggests that shareholders chose to continue to seek exposure to the TerreStar investment. The Adviser also believes that these shareholders have invested in the Fund (as well as other funds advised by the Adviser) for these unique and opportunistic investment opportunities that provide investors with access to institutional quality strategies in a 1940 Act offering.

The following granular points were considered with respect to the realized Gain above Fair Value in the application of the NAV Error Correction Procedures:

- On December 7, 2018, and prior to incorporation of the Updated Valuation, TerreStar was marked at $333.12 per share.

- When applying the Updated Valuation to GAF over its NAV Restatement Period, TerreStar's fair value marks were restated to $274.38 per share on December 7, 2018 (different values were determined for various other dates throughout the period).

- This restated value was intended to represent fair value more accurately than the previous TerreStar fair value marks, as set forth in the OCA consultation.

- The delta between $333.12 and $274.38 per share initially resulted in a NAV Error; however, *on the same day* GAF also executed a negotiated arm's length sale of 65,591 shares of TerreStar equity at a price of $350 per share for a total of $23 million.

- If the restated fair value price per share of $274.38 is representative of TerreStar's fair value on December 7, 2018, then a determination of the total impact to shareholders within the parameters of the Fund's NAV Error Correction Procedures (as discussed below) should consider cumulatively the delta between (i) the original mark of $333.12 per share and the revised mark of $274.38 share (red in the chart below) (the "Basis of the NAV Error") *and* (ii) the December 7, 2018 sale price of $350 per share and the revised mark of $274.38, or approximately $4.96 million (green in the chart below) (the Gain above Fair Value).

- While the Basis of the NAV Error (as reflected above under "Calculation of NAV Error") represents both a paper (unrealized) loss on the records of the Fund, the redemptions processed at the higher NAV values were actual (realized) losses to the Fund that were paid out in cash to shareholders; moreover the Gain above Fair Value reflects actual (realized) gains related to the same asset (TerreStar equity).

4

**HCMFA Appx. 10**

DEFENDANTS-0000087

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)



**December 7, 2018**

- As addressed below in further detail, consideration in the resolution of the NAV Error of approximately $2.3 million of the Gain above Fair Value against the Basis of the NAV Error represents the equitable application and inclusion of all relevant data of the TerreStar price in the resolution of Loss to Fund from dilution of remaining investors. As described in above, certain material components of the NAV error were estimated and can be finalized only after an investor-by-investor analysis is performed for the entire NAV restatement period by the Adviser and the Fund's transfer agent. As such, the $2.3 million of the Gain above Fair Value that is proposed to be considered in the resolution of the loss (the "Remaining Liability") against the Basis of the NAV error could change materially, but would be limited to the total Gain above Fair Value of $4.96 million.

- Note, the benefit derived from the Gain above Fair Value compared to the amount of the total Loss to the Fund not covered by insurance inured to the benefit of all GAF shareholders on December 7, 2018 and not a subset of shareholders.

- Any shareholders subscribing into GAF subsequent to December 7, 2018 did not benefit from the Gain above Fair Value, but the approximate $17,000 of subscription proceeds paid in excess of the restated NAV will be made whole from insurance proceeds and the related deductible.

- As noted below under "Applicable Governance Standards in the Error Correction," the Adviser believes that the Gain above Fair Value should be equitably recognized in fairness under the NAV Error Correction Procedures. The analysis takes into account the "paper" dilution referenced above in resolution of the loss because the Fund's net assets increased due to *actual cash* realized in the December 7, 2018 sale at a price *higher* than the Updated Value. This sale benefitted remaining investors, however the fair value of the remaining TerreStar equity (reflected in the Updated Value) was not increased to reflect the full realized sale price.

- The factual circumstances surrounding the valuation of TerreStar equity, including:

    o The use of Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, to assist in the fair valuation;

5

**HCMFA Appx. 11**

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

o   The initial conclusion that the sales of TerreStar in March 2018 (the "March Transactions") were "non-orderly", and the ultimate conclusion of the Adviser, after conclusion of a formal audit of affiliated funds holding TerreStar, that the March Transactions should be classified as "orderly"; and

o   The consultation with the OCA.[2]

**Applicable Governance Standards in the Error Correction**

In order to determine the appropriate handling of the NAV Error, the applicable provisions of the Adviser's NAV Error Correction Procedures, in the context of provisions of the Advisory Agreement, must be considered. Based on the facts and circumstances present, the Adviser believes that the Remaining Liability may be discharged notwithstanding that such discharge decreases current NAV, provided that such discharge is considered to be equitable under application of the NAV Error Correction Procedures in light of all of the circumstances.

The Adviser's NAV Error Correction Procedures

The Fund's NAV Error Correction Procedures are internal procedures of general application and are neither disclosed nor provided to shareholders and therefore are not relied on by investors in connection with their investment in the Fund. While these procedures generally contemplate a determination of a "responsible party" for a NAV error, such a determination is with respect to which party will bear the loss rather than a determination of strict liability, and the procedures expressly contemplate that scenarios may arise where the Adviser, subject to approval of the Board of the Fund, may reach a variety of correction determinations.

The Adviser's process in taking into account the Gain above Fair Value when assessing the NAV Error is consistent with the Fund's NAV Error Correction Procedures in that:

To any extent circumstances are not expressly covered in the procedures (as is the case here), Item 9 of Section II, "Correction Procedures," states the following (emphasis added):

"9. The foregoing Procedures are designed for general application. However, *there may be situations where equity would suggest a different result under the circumstances.* Accordingly, the Adviser may, with the approval of the Board, diverge from these Procedures, as they deem appropriate, on a case by case basis.

Further and in support of such considerations here, according to Item 4 of Section I, "Definitions," in relevant part, "Fund Loss" includes a situation where a Fund "has paid excessive redemption proceeds as a result of an overstatement of net asset value." Although the definition of Fund Loss is silent on the unique circumstances present here, Item 2 of Section I provides context for analyzing the total harm in its definition of a NAV error:

"one or more errors in the computation of [NAV] that, *when considered cumulatively,* result in a difference between the originally computed NAV and the corrected NAV of at least $0.01 per share. If there are one or more errors in the computation of NAV that, *when considered cumulatively,*

---

[2] As a policy matter, a determination under these circumstances to ignore the Gain above Fair Value would result in an outcome where the Adviser's sale of an asset at a price above fair value results in an increase in Adviser liability due to the sale price not being fully reflected in the fair value of the asset afterwards (i.e., such an outcome would set precedent in effect for the penalization of the Adviser's sale of an asset at a material gain by actually increasing the Adviser's liability). The Adviser believes that its overarching duty of best execution would unfairly then operate to harm the Adviser and create a new potentially disclosable conflict of interest arising from seeking a higher sale price if it would result in increased Adviser liability.

6

**HCMFA Appx. 12**

DEFENDANTS-0000089

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

result in a difference between the originally computed NAV and the corrected NAV of less than $0.01 per share, the impact is deemed to be immaterial and no corrective adjustment will be made to the Fund or any shareholder account. This computation is based upon the *actual difference* and is not based upon the rounding of NAV to the nearest cent per share." (emphasis added)

To the extent circumstances are not expressly covered, Item 9 as discussed above should govern.

Although the definition of Fund Loss is not a bright line rule in this circumstance, it follows that these two provisions should be taken together and the Adviser should expand the scope of the NAV Error analysis to include all factors when determining the equitable resolution for all parties. This results in the consideration of the Gain above Fair Value to the NAV Error, as discussed below when taking into account the NAV Error Correction Procedures, the Advisory Agreement as discussed below, and overall recompense of shareholders.

As the NAV Error Correction Procedures are designed for general application, the procedures do not, and were not intended to, contemplate or address every possible circumstance or scenario. Given the unique circumstances that produced the Gain above Fair Value (i.e. a period during which there is (1) an original fair value mark, an (2) Updated Valuation (defined below), and (3) the mark at which TerreStar was sold in a negotiated arm's length transaction to an unaffiliated third party), this particular scenario is not explicitly addressed in the general NAV Error Correction Procedures (set forth in Exhibit 1 of the attached NAV Error Correction Procedures).

The language preceding Item 9 in the NAV Error Correction Procedures is expressly designed to address shareholders of the Fund. Item 9, however, includes language that explicitly allows for a "divergence" from those procedures in, presumably, extraordinary circumstances where it is warranted. The Adviser believes the intent of Item 9 was to provide the flexibility needed to consider the unique circumstances described above where all factors should be considered when assessing the total impact to shareholders and the Fund so that an equitable outcome to *all* parties involved can be achieved. Based on this line of reasoning and because the Gain above Fair Value also occurred during the NAV Restatement Period, the Adviser views the Gain above Fair Value as equitable partial compensation for the Fund's losses resulting from the NAV Error. In addition, as discussed below, the Adviser believes this outcome is consistent not only with the equitable application of the NAV Error Correction Procedures but with the standards governing adviser conduct in the Advisory Agreement and general principles of fairness to investors and the Adviser, as well as the Adviser's fiduciary duty of best execution in seeking to and ultimately selling TerreStar at the highest price possible. This approach has been discussed with the Board (see below).

<u>Applicable Advisory Agreement Provisions</u>

To provide additional context for the Adviser's view on the appropriate treatment of the NAV Error, the Adviser believes that it also is appropriate to examine the relationship between the Fund and Adviser under contractual obligations and representations to investors. The standards of the contractual relationship are disclosed to shareholders in the Fund's offering documents and relied upon by shareholders when investing in the Fund. Under the investment advisory agreement between the Fund and the Adviser (the "<u>Advisory Agreement</u>"), the Adviser does not act as a guarantor against all loss arising from error or mistake, but rather is responsible for error or loss arising only from the Adviser's Disabling Conduct, as defined in the Advisory Agreement.

Section 8 of the Advisory Agreement states that "the Adviser shall not be liable for any error of judgment or mistake of law or any loss suffered by the Fund in connection with matters to which the Agreement relates," provided that nothing in the Agreement shall protect the Adviser against liability to the Fund or shareholders to which the Adviser may be subject by reason of Disabling Conduct. Section 6(a) of the Advisory Agreement defines "<u>Disabling Conduct</u>") as (i) willful misfeasance, (ii) bad faith, (iii) gross negligence or (iv) reckless disregard of the duties involved in the conduct of his position".

7

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

The Advisory Agreement also comports with Section 17(i) of the Investment Company Act of 1940, as amended (the "1940 Act"), which states that no contract or agreement can protect an investment adviser against any liability to a fund or shareholders "by reason of willful misconduct, bad faith, or gross negligence, in the performance of his duties, or by reason of reckless disregard of his obligations and duties under such contract or agreement." The Advisory Agreement's standards of liability and indemnification provisions also are consistent with common industry practice for adviser indemnity and liability provisions in advisory agreements of registered funds.

The Advisory Agreement is an exhibit to the Fund's registration statement, and the Fund's Statement of Additional information includes a description of the terms of the Advisory Agreement, including in relevant part:

> "The Investment Advisory Agreements provide that in the absence of willful misfeasance, bad faith or gross negligence in the performance (or reckless disregard) of its obligations or duties thereunder on the part of HCMFA, HCMFA shall not be subject to liability to a Fund for any error of judgment or mistake of law or for any loss suffered by the Fund in connection with the matters to which the Investment Advisory Agreement relates."

**Analysis of the Facts**

Under the NAV Error Correction Procedures (Part II, Section 9), the Adviser, with the approval of the Board, may diverge from such general procedures as they deem appropriate where equity would suggest a different result under the circumstances. As a result of and based on the facts and circumstances present, which have been addressed above, the Adviser believes that the Remaining Liability owed by the Adviser may be discharged notwithstanding that such discharge decreases current NAV. As set forth above, numerous points were considered with respect to the realized Gain above Fair Value, taking into context facts discussed in the OCA consult, the resulting fair valuation and the circumstances of the Adviser's December sale of TerreStar equity.

As noted, the Adviser under the Advisory Agreement does not act as a guarantor against all loss arising from error or mistake, but rather is responsible for error or loss arising only from the Adviser's Disabling Conduct. The Adviser believes that the record supports that it has acted consistently in good faith in the reasonable belief that its actions were in the best interests of the Fund, and have not acted at any point in a manner amounting to Disabling Conduct.[3] In addition, the Adviser's actions should be viewed within its general fiduciary duty under Section 36(a) of the 1940 Act and Section 206 of the Investment Advisers Act of 1940. In this regard the Adviser strongly asserts that it did not engage in personal misconduct, was not grossly negligent, acted in good faith and intent at all times, and in fact sought and received a price on the TerreStar equity sale at a price that significantly exceeded the assessed fair value, to the significant benefit of informed investors who chose to stay in the Fund through the conversion. In such context, the Adviser believes that, upon Board agreement, it is proper under the NAV Error Correction Procedures to acknowledge the Gain above Fair Value in the manner described.

---

[3] Although as noted in the OCA consult process, the Adviser identified a material weakness in the control environment related to assessments of non-observable inputs for certain affiliated funds and the Fund, such matter does not result in the Adviser having failed to act in good faith or in accordance with its duties to the Fund. As noted above, the Adviser does not manage the Fund as a strictly liable party, but rather is responsible for error or loss arising only from its Disabling Conduct. The Adviser believes that its conduct throughout has never reflected willful misfeasance, bad faith, gross negligence or a reckless disregard of its duties. Indeed, it has consistently sought to value TerreStar appropriately, and indeed has, in the form of actual sales reflected by the Gain above Fair Value, achieved sales of TerreStar above the original fair value as well as the fair value resulting from the OCA consult.

8

Confidential

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

**Shareholder and Fund Reprocessing**

The NAV Error totals approximately $7.8 million (including interest, rebate of Advisory fees, and processing costs). The NAV Error will be covered by: (i) GAF's pro rata portion of the Adviser's and the Fund's joint insurance policy and $250,000 deductible (paid by the Adviser); (ii) an additional payment and rebate of advisory fees by the Adviser; and (iii) the equitable determinations under the NAV Error Correction Procedures with respect to recognizing the effect of the Gain above Fair Value (an approximately $2.3 million portion) in the correction, which is unique to GAF.

In connection with this analysis, the Adviser has proposed to the Board the following process regarding the GAF NAV Error:

1.    Book a receivable for the NAV Error.

2.    Apply the insurance proceeds pro rata based on losses across the impacted funds.

3.    Adviser to pay the:

   •   Ratable share of insurance deductible across the impacted funds; and

   •   Management fee rebate, interest and processing costs across the impacted funds.

4.    Application of the Gain above Fair Value to the remaining GAF NAV Error as fair and equitable under the NAV Error Correction Procedures, and general principles of equity.

Note: items 1-3 have been completed.

**Accounting Treatment**

The Adviser notes the sale of the TerreStar equity in December 2018 is separate from the revised valuations of the asset that gave rise to the NAV Error and resulting receivable. It is the Adviser's position, however, that the gains from the sale of TerreStar equity simply cannot be ignored in an equitable and comprehensive assessment of total impact to shareholders during a specific accounting period (i.e., the NAV Restatement period).

U.S. generally accepted accounting principles ("GAAP"), however, lacks specific guidance that addresses the proper accounting treatment for striking the daily NAV of a fund where there is (1) an original fair value mark, (2) an Updated Valuation, and (3) a price at which the same asset was sold in a negotiated arm's length transaction to an unaffiliated third party. As such, whatever resolution is ultimately reached regarding the proposal outlined in this memo will dictate the accounting entries to be made in the books and records of the Fund.

If the Remaining Liability is discharged pursuant to Item 9 from Section II of the NAV Correction Procedures, the Adviser notes there is applicable accounting guidance that should be considered. ASC 405-20-40 holds that a liability has been extinguished if "the debtor is legally released from being the primary obligor under the liability, either judicially or by the creditor." In this case, without admission that the Adviser is responsible for the remaining NAV error, the Adviser is the debtor and the Fund is the creditor. The approval of this proposal would remove the liability for payment of this balance. With the extinguishment of the liability, the receivable would no longer be collectible as of the date of the approval.

9

Confidential

DEFENDANTS-0000092

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

The following accounting entry would be recorded on the records of the Fund in order to extinguish the remaining Receivable due to the NAV Error:

| | |
|---|---|
| Equity of the Fund | $2,255,628 |
| Receivable due to Fund | $2,255,628 |

*To write down the remaining balance of the receivable due to the Fund*

The Adviser views this "write down" as the reduction of a portion of the approximately $5 million of Gain above Fair Value, which has been settled in cash and reflected as an increase in the net assets of the Fund as of the date of the sale. This approach represents an equitable resolution under the NAV Error Correction Procedures and has been discussed with and reviewed by the Fund's counsel, Chief Compliance Officer and Treasurer. Fund counsel believes that the proposed treatment represents an equitable and reasonable resolution under the NAV Error Correction Procedures.

Regarding the appropriate disclosure under GAAP, paragraph 11.67 of the AICPA Guide to the Audit of Investment Companies, "Regulation S-X requires disclosure of more information about transactions with [or related to] affiliates in prospectuses and annual reports to the SEC than is required under GAAP. Various rules of Regulation S-X require the financial statements of an investment company to state separately investments in affiliates, investment income from affiliates, gain or loss on sales of securities of affiliates, and management fees or other service fees payable to controlled entities and other affiliates." Here, the gain on the sale of TerreStar to an unaffiliated third party is a gain on the sale of securities of a portfolio affiliate; as such, the Adviser acknowledges its disclosure obligation in the Fund's 2019 Annual Report.

The proposed treatment of receivable recorded by the Fund would not affect the balances and disclosures in the audited financial statements previously filed for the Fund for the year ended September 30, 2018. If the Remaining Liability is not discharged, a receivable for the same amount will remain on the books and records of the Fund.

**Board Discussions**

The Board agrees in principal with the aforementioned treatment of the NAV error, subject to consultation with and review by the SEC Staff. Although the Adviser has begun shareholder reprocessing with the Fund's transfer agent, the Adviser does not intend to begin issuing payments to shareholders until all SEC Staff comments, if applicable, have been answered.

**Conclusion**

The NAV Error for the Fund totals approximately $7.8 million (including interest, rebate of Advisory fees, and processing costs); the Fund and its shareholders have received $5.2 million and will receive an additional amount of approximately $328,000 from the Adviser (i.e., shareholders who subscribed into the Fund at a price higher than the restated NAV will be made whole). The remaining approximately $2.3 million can appropriately be discharged based on the consideration of all of the circumstances and the equitable authority included in the NAV Error Correction Procedures. This equitable treatment, which includes viewing all data points on an aggregate basis and considering the totality of the circumstances, is permitted under the Fund's NAV Error Correction Procedures and aligns with the Adviser's contractual duties to the Fund.

10

HCMFA Appx. 16

Confidential                                                                                      DEFENDANTS-0000093

Confidential Treatment Requested by Highland Global Allocation Fund
Pursuant to 17 C.F.R. § 200.83 (2019)

# EXHIBIT A

## NAV Error Correction Procedures

11

HCMFA Appx. 17

Confidential

DEFENDANTS-0000094

**SECOND AMENDED AND RESTATED**
**SHARED SERVICES AGREEMENT**

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "***Agreement***") is entered into to be effective as of 8th day of February, 2013 (the "***Effective Date***") by and among Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("***HCMFA***"), and any affiliate of HCMFA that becomes a party hereto. Each of the signatories hereto is individually a "***Party***" and collectively the "***Parties***".

RECITALS

A.     During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

ARTICLE I
DEFINITIONS

"***Actual Cost***" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"***Affiliate***" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. The term "***control***" (including, with correlative meanings, the terms "***controlled by***" and "***under common control with***") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"***Agreement***" has the meaning set forth in the preamble.

"***Allocation Percentage***" has the meaning set forth in Section 4.01.

"***Applicable Margin***" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"***Change***" has the meaning set forth in Section 2.02(a).

"***Change Request***" has the meaning set forth in Section 2.02(b).

"***Code***" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

CONFIDENTIAL

"***Effective Date***" has the meaning set forth in the preamble.

"***Governmental Entity***" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"***Liabilities***" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"***Loss***" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "***Loss***" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"***New Shared Service***" has the meaning set forth in Section 2.03.

"***Party***" or "***Parties***" has the meaning set forth in the preamble.

"***Person***" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"***Quarterly Report***" has the meaning set forth in Section 5.01.

"***Recipient***" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"***Service Provider***" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"***Service Standards***" has the meaning set forth in Section 6.01.

"***Shared Assets***" shall have the meaning set forth in Section 3.02.

"***Shared Services***" shall have the meaning set forth in Section 2.01.

"***Subsidiary***" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"***Tax***" or "***Taxes***" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"***Term***" has the meaning set forth in Section 7.01.

2

HCMFA Appx. 19

CONFIDENTIAL

D-HCMFA062397

ARTICLE II
SHARED SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "**Shared Services**"), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02    Changes to the Shared Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "**Change**").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "**Change Request**") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law and regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Shared Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "**New Shared Service**").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "**Shared Service**" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

3

CONFIDENTIAL

ARTICLE III
SHARED ASSETS

Section 3.01  <u>Shared IP Rights</u>.  Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "*Shared IP Rights*") pursuant to third party intellectual property Agreements ("*Third Party IP Agreements*"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02  <u>Other Shared Assets</u>.  Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "*Future Shared Assets*" and collectively with the Shared IP Rights, the "*Shared Assets*").

ARTICLE IV
COST ALLOCATION

Section 4.01  <u>Actual Cost Allocation Formula</u>.  The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "*Allocation Percentage*" means:

(a)  To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)  To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)  All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02  <u>Non-Cash Cost Allocation</u>.  The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01  <u>Quarterly Statements</u>.  Within thirty (30) days following the end of each calendar qaurter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

CONFIDENTIAL

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "***Quarterly Report***").

Section 5.02    Settlement Payments.    At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03    Determination and Payment of Cost and Revenue Share.

(a)    Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)    Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04    Taxes.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient. Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied.    Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name.    Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings.    However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time.    Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings.    Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14.    Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property.    Recipient agrees to

5

HCMFA Appx. 22

CONFIDENTIAL                                                                                          D-HCMFA062400

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

(c)     The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

ARTICLE VI
SERVICE PROVIDER RESPONSIBILITIES

Section 6.01     <u>Service Provider General Obligations</u>.  Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "*Service Standards*").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

Section 6.02     <u>Books and Records; Access to Information</u>.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

Section 6.03     <u>Return of Property and Equipment</u>.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

ARTICLE VII
TERM AND TERMINATION

Section 7.01     <u>Term</u>.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "*Term*"), unless terminated earlier in accordance with Section 9.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

6

CONFIDENTIAL

Section 7.02    Termination.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

ARTICLE VIII
LIMITED WARRANTY

Section 8.01    Limited Warranty.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

ARTICLE IX
MISCELLANEOUS

Section 9.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.   The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

HCMFA Appx. 24

CONFIDENTIAL

D-HCMFA062402

Section 9.05 <u>Governing Law</u>. This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06 <u>Assignment</u>. Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07 <u>Headings</u>. The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08 <u>Counterparts</u>. This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts. All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09 <u>Successors and Assigns; No Third Party Beneficiaries</u>. This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10 <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device. Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

If to HCMLP, addressed to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Fax: (972) 628-4147

If to HCMFA, addressed to:

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Fax: (972) 628-4147

Section 9.11 <u>Expenses</u>. Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

8

HCMFA Appx. 25

CONFIDENTIAL

D-HCMFA062403

Section 9.12　　Waiver. No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13　　Severability. If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties. All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14　　Arbitration; Jurisdiction. Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service. The arbitrator(s) shall be duly licensed to practice law in the State of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15　　General Rules of Construction. For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

9

CONFIDENTIAL

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

10

HCMFA Appx. 27

CONFIDENTIAL                                                                      D-HCMFA062405

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:   Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:   President

**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

By:   Strand Advisors XVI, Inc., its general partner

By:_____

Name:  Brian Mitts
Title:   Assistant Secretary

11

HCMFA Appx. 28

CONFIDENTIAL                                                                 D-HCMFA062406

**<u>Annex A</u>**

**Shared Services**

<u>Compliance</u>
- General compliance
- Compliance systems

<u>Facilities</u>
- Equipment
- General Overhead
- Office Supplies
- Rent & Parking

<u>Finance & Accounting</u>
- Book keeping
- Cash management
- Cash forecasting
- Credit facility reporting
- Financial reporting
- Accounts payable
- Accounts receivable
- Expense reimbursement
- Vendor management

<u>HR</u>
- Drinks/snacks
- Lunches
- Recruiting

<u>IT</u>
- General support & maintenance (OMS, development, support)
- Telecom (cell, phones, broadband)
- WSO

<u>Legal</u>
- Corporate secretarial services
- Document review and preparation
- Litigation support
- Management of outside counsel

<u>Marketing and PR</u>
- Public relations

<u>Tax</u>
- Tax audit support
- Tax planning
- Tax prep and filing

<u>Investments</u>
- Investment research on an ad hoc basis as requested by HCMFA

CONFIDENTIAL

Valuation Committee

Trading

Trading desk services

Operations

Trade settlement

13

HCMFA Appx. 30

CONFIDENTIAL

D-HCMFA062408

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF JULIAN VASEK

I, Julian Vasek, do hereby declare as follows:

1.      My name is Julian Vasek, and I have been licensed to practice law in the State of Texas since 2009.  I am over the age of eighteen and am otherwise competent to make this declaration.  I am counsel for defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") in the above-captioned adversary proceeding brought by plaintiff Highland Capital Management, L.P. (the "Debtor").

2.      Attached hereto as HCMFA Appx. 32 - 64 is a true and correct copy of a complaint and the exhibits thereto filed by the Debtor against HCMFA on or about November 9, 2021, thereby initiating Adversary Proceeding No. 21-03082-sgj.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2022.

/s/ *Julian Vasek*
Julian Vasek

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adversary Proceeding No. |
| vs. | § § § | _____ |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § | |
| Defendant. | § § | |

## COMPLAINT FOR (I) BREACH OF CONTRACT AND
## (II) TURNOVER OF PROPERTY OF HIGHLAND'S ESTATE

1934054211109000000000000006

HCMFA Appx. 32

Plaintiff Highland Capital Management, L.P., the reorganized debtor ("Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, files this complaint (the "Complaint") against defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA" or "Defendant") and alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## PRELIMINARY STATEMENT[1]

1.      Highland brings this action against HCMFA as a result of HCMFA's defaults under two promissory notes executed by HCMFA in favor of Highland in the aggregate original principal amount of $6,300,000 and payable upon Highland's demand. Despite demand having been made, HCMFA has failed to pay amounts due and owing under the Notes and the accrued but unpaid interest thereon.

2.      As remedies, Highland seeks (a) damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Notes) and (b) turnover by HCMFA to Highland of the foregoing amounts.

## JURISDICTION AND VENUE

3.      This Adversary Proceeding arises under and relates to Highland's Bankruptcy Case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

---

[1] Capitalized terms shall take on the meanings ascribed to them below.

5.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Highland consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7.     Highland is a limited liability partnership formed under the laws of Delaware with a business address at 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

8.     Upon information and belief, HCMFA is a limited partnership with offices located in Dallas, Texas, and is organized under the laws of the state of Delaware.

## CASE BACKGROUND

9.     On October 16, 2019, Highland filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")  in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

11.     On February 22, 2021, the Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") confirming the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., as Modified* [Docket No. 1808] (the "Plan").

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

12.     The Plan went Effective (as defined in the Plan) on August 11, 2021, and Highland

is the Reorganized Debtor (as defined in the Plan) since the Effective Date. *See Notice of*

*Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland*

*Capital Management, L.P.* [Docket No. 2700].

## STATEMENT OF FACTS

**A.      The HCMFA Notes**

13.     HCMFA is the maker under a series of promissory notes in favor of Highland.

14.     Specifically, on February 26, 2014, HCMFA executed a promissory note in favor

of Highland, as payee, in the original principal amount of $4,000,000 ("HCMFA's First Note").

A true and correct copy of HCMFA's First Note is attached hereto as **Exhibit 1**.

15.     HCMFA's First Note was executed in exchange for a contemporaneous transfer

from Highland to HCMFA in the amount of $4,000,000 (the "First Payment").

16.     On February 26, 2016, HCMFA executed a promissory note in favor of Highland,

as payee, in the original principal amount of $2,300,000 ("HCMFA's Second Note", and together

with HCMFA's First Note, the "Notes").  A true and correct copy of HCMFA's Second Note is

attached hereto as **Exhibit 2.**

17.     HCMFA's Second Note was executed in exchange for a contemporaneous transfer

from Highland to HCMFA in the amount of $2,300,000 (the "Second Payment", and together with

the First Payment, the "Payments").

18.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The

accrued interest and principal of this Note shall be due and payable on demand of the Payee."

19.     Section 4 of each Note provides:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder
as it becomes due shall, at the election of the holder hereof, without notice, demand,
presentment, notice of intent to accelerate, notice of acceleration, or any other

notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

20.     Section 6 of each Note provides:

**Attorneys' Fees**. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

## B.     **Highland Agrees Not to Demand Payment under the Notes Prior to May 31, 2021**

21.     On April 15, 2019, James Dondero signed a letter on behalf of both Highland and HCMFA pursuant to which Highland agreed not to demand payment under the Notes prior to May 31, 2021 (the "Acknowledgement Letter") on the ground that "HCMFA expects that it may be unable to repay such amounts should they become due, for the period commencing today and continuing through May 31, 2021." A true and correct copy of the Acknowledgement Letter is attached hereto as **Exhibit 3**.[3]

## C.     **HCMFA's Default under Each Note**

22.     By letter dated June 2, 2021, Highland made demand on HCMFA for payment under the Notes by June 4, 2021 (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit 4**. The Demand Letter provides:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $3,143,181.93, which represents all accrued interest and principal through and including June 4, 2021.

---

[3] On January 22, 2021, Highland commenced a similar adversary proceeding against HCMFA for its default under two other promissory notes. [*See* Adv. Proc. 21-3004, *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*, Docket No. 1] (the "First Complaint"). The Notes that are the subject of this Complaint were not included in the First Complaint because of the Acknowledgement Letter.

**Payment is due on June 4, 2021, and failure to make payment in full on such date will constitute an event of default under the Notes.**

23.     Despite Highland's demand, HCMFA did not pay all or any portion of the amounts demanded by Highland on June 4, 2021, or at any time thereafter.

24.     As of June 4, 2021, there was an outstanding principal amount of $2,134,166.53 on HCMFA's First Note and accrued but unpaid interest in the amount of $11,288.28, resulting in a total outstanding amount as of that date of $2,145,454.81.

25.     As of June 4, 2021, there was an outstanding principal balance of $990,757.62 on HCMFA's Second Note and accrued but unpaid interest in the amount of $6,969.50, resulting in a total outstanding amount as of that date of $997,727.12.

26.     Thus, as of June 4, 2021, the total outstanding principal and accrued but unpaid interest due under the Notes was $3,143,181.93

27.     Pursuant to Section 4 of each Note, each Note is in default and is currently due and payable.

### FIRST CLAIM FOR RELIEF
#### (For Breach of Contract)

28.     Highland repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

29.     Each Note is a binding and enforceable contract.

30.     HCMFA breached each Note by failing to pay all amounts due to Highland upon Highland's demand.

31.     Pursuant to each Note, Highland is entitled to damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to Highland's costs of

collection (including all court costs and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

32. As a direct and proximate cause of HCMFA's breach of each Note, Highland has suffered damages in the total amount of at least $3,143,181.93 as of June 4, 2021, plus an amount equal to all accrued but unpaid interest from that date, plus Highland's costs of collection.

**SECOND CLAIM FOR RELIEF**
**(Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))**

33. Highland repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

34. HCMFA owes Highland an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

35. Each Note is property of Highland's estate, and the amounts due under each Note are matured and payable upon demand.

36. HCMFA has not paid the amounts due under the Notes to Highland.

37. Highland has made demand for the turnover of the amounts due under each Note.

38. As of the date of filing of this Complaint, HCMFA has not turned over to Highland all or any of the amounts due under the Notes.

39. Highland is entitled to the turnover of all amounts due under the Notes.

WHEREFORE, Highland prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial but including (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by HCMFA to Highland of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)    Such other and further relief as this Court deems just and proper.

Dated: November 9, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
               ikharasch@pszjlaw.com
               jmorris@pszjlaw.com
               gdemo@pszjlaw.com
               hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

# PROMISSORY NOTE

$4,000,000.00                                                    February 26, 2014

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. (*"Maker"*) promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP (*"Payee"*), in legal and lawful tender of the United States of America, the principal sum of FOUR MILLION and 00/100 Dollars ($4,000,000.00), together with interest, on the terms set forth below (the *"Note"*). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the mid-term *"applicable federal rate"* (1.97%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

HCMFA Appx. 43

# EXHIBIT 2

# PROMISSORY NOTE

$2,300,000.00

February 26, 2016

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, THREE HUNDRED THOUSAND and 00/100 Dollars ($2,300,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the mid-term "*applicable federal rate*" (2.62%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

HCMFA Appx. 46

# EXHIBIT 3

## Acknowledgement from HCMLP

April 15, 2019

Reference is hereby made to certain outstanding amounts loaned from HIGHLAND CAPITAL MANAGEMENT, L.P. ("HCMLP") to HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("HCMF") for funding of HCMF's ongoing operations, which are payable on demand and remained outstanding on December 31, 2018 and as of the date hereof.

HCMF expects that it may be unable to repay such amounts should they become due, for the period commencing today and continuing through May 31, 2021.

HCMLP hereby agrees to not demand payment on amounts owed by HCMF prior to May 31, 2021.

Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

By: _____

**Acknowledged By:**

Highland Capital Management Fund Advisors, L.P.
By: Strand XVI, Inc., its general partner

By: _____

# EXHIBIT 4

June 2, 2021

Highland Capital Management Fund Advisors, LP
2515 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Attention: Frank Waterhouse

      Re: Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (6/4/21) | Accrued But Unpaid Interest (6/4/21) | Total Amount Outstanding (6/4/21) |
|---|---|---|---|---|
| 2/26/2014 | $4,000,000 | $2,134,166.53 | $11,288.28 | $2,145,454.81 |
| 2/26/2016 | $2,300,000 | $990,757.62 | $6,969.50 | $997,727.12 |
| **TOTALS** | **$6,300,000** | **$3,124,924.14** | **$18,257.78** | **$3,143,181.93** |

Copies of the notes are attached hereto as **Appendix A**.

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $3,143,181.93, which represents all accrued and unpaid interest and principal through and including June 4, 2021.

**Payment is due on June 4, 2021, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix B**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee on May 2, 2019, and May 3, 2019 (the "May Notes"). Payee sent a demand letter to Maker with respect to the May Notes on December 3, 2020. A copy of such letter is attached hereto as **Appendix C**. Payee reserves all rights with respect the May Notes.

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Jeffrey Pomerantz
        John Morris
        Gregory Demo
        DC Sauter
        Davor Rukavina

HCMFA Appx. 51

# Appendix A

# PROMISSORY NOTE

$2,300,000.00

February 26, 2016

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, THREE HUNDRED THOUSAND and 00/100 Dollars ($2,300,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the mid-term "*applicable federal rate*" (2.62%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.  <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.  <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

# PROMISSORY NOTE

$4,000,000.00                                          February 26, 2014

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. (*"Maker"*) promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP (*"Payee"*), in legal and lawful tender of the United States of America, the principal sum of FOUR MILLION and 00/100 Dollars ($4,000,000.00), together with interest, on the terms set forth below (the *"Note"*). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.  <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the mid-term *"applicable federal rate"* (1.97%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.  <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.  <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

HCMFA Appx. 56

# Appendix B

**Appendix B**

ABA #:          322070381
Bank Name:     East West Bank
Account Name:  Highland Capital Management, LP
Account #:      5500014686

# Appendix C

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Frank Waterhouse, CFO

  Re: Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("<u>Maker</u>") entered into the following promissory notes (collectively, the "<u>Notes</u>"), among others,[1] in favor of Highland Capital Management, L.P. ("<u>Payee</u>"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019. Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021. Payee reserves all rights with respect to such amounts.

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

HCMFA Appx. 61

**Appendix A**

ABA #:              322070381
Bank Name:       East West Bank
Account Name:  Highland Capital Management, LP
Account #:        5500014686

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>Highland Capital Management Fund Advisors, L.P. |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Suite 3800<br>Dallas, Texas 75201  Tel.: (214) 855-7500 |
| PARTY (Check One Box Only)<br>☑ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Count 1: Breach of contract; Count 2: Turnover pursuant to 11 U.S.C. 542

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $3,143,181.93 plus interest, fees, and expenses |

Other Relief Sought

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>November 9, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

HCMFA Appx. 64