# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Davor Rukavina, Esq.
State Bar No. 24030781
Julian P. Vasek, Esq.
State Bar No. 24070790
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard St., Ste. 3800
Dallas, TX 75201
Tel: 214-855-7500
Fax: 214-855-7584

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... ii

I.     SUMMARY .......................................................................................................1

II.    BACKGROUND ...............................................................................................2

    A.    THE DEBTOR CAUSED HCMFA TO INCUR SUBSTANTIAL LOSSES ...........................2

    B.    THE PERSON IN CHARGE OF BOTH THE DEBTOR AND HCMFA DIRECTED
        THE DEBTOR TO COMPENSATE HCMFA FOR ITS LOSS, NOT TO MAKE LOANS ......4

    C.    THE DEBTOR'S ACCOUNTING STAFF MISTAKENLY BOOKED THE TRANSFERS
        AS LOANS ON BEHALF OF BOTH THE DEBTOR AND HCMFA ...............................6

    D.    DESPITE THE DEBTOR'S MISTAKE, HCMFA NEVER ACTUALLY SIGNED
        THE NOTES ....................................................................................................14

III.    SUMMARY JUDGMENT STANDARD .......................................................23

IV.    ARGUMENT AND AUTHORITIES ............................................................24

    A.    THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
        WHETHER HCMFA SIGNED THE NOTES ..............................................................25

        i.    Waterhouse did not Actually Sign the Notes ...............................................26

        ii.    Even if Waterhouse Signed the Notes, He Did Not Have Authority .........27

        iii.    Even if Waterhouse Signed the Notes and had Authority,
            the Notes are Ambiguous ...........................................................................31

    B.    THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE
        NOTES WERE THE RESULT OF A MUTUAL MISTAKE ..............................................33

    C.    THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE
        DEBTOR GAVE CONSIDERATION IN EXCHANGE FOR THE NOTES ............................36

    D.    TURNOVER IS NOT AN APPROPRIATE REMEDY UNDER THESE CIRCUMSTANCES ...36

V.    CONCLUSION ...............................................................................................36

CERTIFICATE OF SERVICE .................................................................................38

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

*Allen v. Berrey*, 645 S.W.2d 550 (Tex. App.—San Antonio 1982)..................................33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................24

*Baerg Real Prop. Trust v. Garland Sol., LLC (In re Baerg Real Prop. Trust)*,
2017 Bankr. LEXIS 3191 (Bankr. N.D. Tex. Sept. 21, 2017)..................................23

*Brown v. White's Ferry, Inc.*, 280 F.R.D. 238 (D. Md. 2012)..................................10

*Capobianco v. City of N.Y.*, 422 F.3d 47 (2d Cir. 2005)..................................10

*Childers v. Pumping Systems, Inc.*, 968 F.2d 565 (5th Cir. 1992)..................................31

*Claimant ID 100218776 v. BP Expl. & Prod.*, 712 Fed. Appx. 372 (5th Cir. 2017)..................................29

*DeClaire v. G&B McIntosh Family Ltd. P.ship*, 260 S.W.3d 34
(Tex. App.—Houston [1st] 2008)..................................34

*Follenfant v. Rogers*, 359 F.2d 30 (5th Cir. 1966)..................................26

*Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007) ..................................30

*Garza v. Villarreal*, 345 S.W.3d 473 (Tex. App.—San Antonio 2011) ..................................33, 36

*Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010) ..................................30

*Gross v. GGNSC Southaven, LLC*, 817 F.3d 169 (5th Cir. 2016) ..................................16

*Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011) ..................................35

*In re Fang Operators*, 158 B.R. 643 (Bankr. N.D. Tex. 1993) ..................................36

*IRA Res., Inc. v. Griego*, 221 S.W. 3d 592 (Tex. 2007) ..................................28

*Jones v. Anderson*, 721 Fed. Appx. 333 (5th Cir. 2018)..................................25

*Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313 (5th Cir. 2016)..................................25

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930 (N.D. Tex. April 13, 2015)..................................28, 30

*Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170 (4th Cir. 1998)..................................10

*Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 171802
(N.D. Tex. Jan. 10, 2011) ........................................................................................26

*Ramirez v. Bexar County*, 2011 U.S. Dist. LEXIS 111678 (W.D. Tex. Sept. 29, 2011) ..............26

*Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018 (5th Cir. 1995) ........................................................24

*Rink-A-Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431 (Colo. App. 1982) ....................................31

*Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37 (Tex. App.—Dallas 2003) ..............................36

*S. Mansukhlal & Co v. Husein*, 14-04-00018-cv, 2004 Tex. App. LEXIS 8097
(Tex. App.—Houston [14th] Sept. 2, 2004) ..........................................................32

*Satelco, Inc. v. North Amer. Publishers, Inc. (In re Satelco, inc.),* 58 B.R. 781
(Bankr. N.D. Tex. 1986) ..........................................................................................36

*Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2-04-257-cv, 2005,
Tex. App. LEXIS 6215 (Tex. App.—Fort Worth Aug. 4, 2005) ...........................31

*Silverio v. Silverio*, 625 S.W.3d 680 (Tex. App.—El Paso 2021) ..........................................25, 27

*Smith-Gilbard v. Perry*, 332 S.W.3d 709 (Tex. App.—Dallas 2011) ..........................................33

*Strickland v. Coleman*, 824 S.W.2d 188 (Tex. App.—Houston [1st] 1991) ..........................24, 25

*Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607 (Tex. App—Houston [1st] 2004) ..................36

## **Statutes**

TEX. BUS. & COMM. CODE § 1.201 ...............................................................................................28

TEX. BUS. & COMM. CODE § 3.305 ...............................................................................................24

TEX. BUS. & COMM. CODE § 3.308 ..........................................................................................25, 27

TEX. BUS. & COMM. CODE § 3.402 ..........................................................................................27, 31

TEX. BUS. & COMM. CODE § 3.403 ...............................................................................................27

## **Rules**

Fed. R. Civ. P. 8 ..............................................................................................................................26

Fed. R. Civ. P. 11 ...............................................................................................................26

Tex. R. Civ. P. 92 ..............................................................................................................26

Tex. R. Civ. P. 93 ..............................................................................................................26

TO THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Highland Capital Management Fund Advisors, L.P. ("HCMFA"), defendant in the above-captioned adversary proceeding (the "Adversary"), and files this its brief in opposition to *Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (Dkt. No. 91, the "Motion"), filed by plaintiff Highland Capital Management, L.P. (the "Debtor"), in support of which HCMFA would respectfully show the Court as follows:

## I.    SUMMARY

1.     The notes represent a mutual mistake: the $7.4 million the Debtor transferred to HCMFA was compensation for damage the Debtor caused to HCMFA by the Debtor's own negligence and fault; it was not as a loan. Mr. Waterhouse never even signed the Notes or authorized anyone to affix his electronic signature. Even if he did, HCMFA itself never authorized Mr. Waterhouse to execute the notes, and he did not have apparent authority to bind HCMFA in light of the fact that he was also an officer of the Debtor.

2.     This led to the natural progression of one mistake after another—each by the Debtor's employees. First, those employees caused the underlying liability to a fund HCMFA manages, pursuant to which HCMFA paid out $7.4 million to third parties. Second, when Mr. Dondero directed the Debtor to transfer $7.4 million to HCMFA as compensation, the Debtor's employees assumed, without instruction or authority from HCMFA or the Debtor, that the transfers represented intercompany loans. Third, those employees papered up the transfers as loans, without authority or approval. Fourth, those employees affixed Mr. Waterhouse's electronic signature to the notes, again without authority or approval. Fifth, those employees then carried the notes as liabilities on HCMFA's books and records, and as assets on the Debtor's books and records—even then with substantial confusion and ambiguity. Sixth, because HCMFA executed two prior notes

to the Debtor in similar amounts, someone reviewing either sets of books and records could, and

did, easily confuse the unauthorized mistaken notes for the two valid notes.

3.      All of the foregoing presents numerous legal defenses to the Notes under Texas

law.  And all of the foregoing has extensive, if not compelling, evidentiary support.  Thus, genuine

issues of material fact exist as to whether the notes are even valid and collectible in the first place,

and whether they represent a mutual mistake, such that summary judgment is inappropriate and

should be denied.  It will be for the jury to decide these questions of fact and the witnesses'

credibility.

## II.      BACKGROUND

### A.      THE DEBTOR CAUSED HCMFA TO INCUR SUBSTANTIAL LOSSES

4.      HCMFA is a registered advisor that advises third-party funds as to their

investments.  HCMFA Appx 2.[1]  At all relevant times, including from 2018 to present, HCMFA

served as advisor to Highland Global Allocation Fund (the "Fund").  HCMFA Appx 2.  At issue

are two transactions involving equity interests in TerreStar Corporation ("TerreStar") that took

place in March 2018 (the "March Transactions").  HCMFA Appx 2.  In particular, an error

occurred concerning the net asset value ("NAV") that was assigned to the TerreStar interests in

connection with the March Transactions (the "NAV Error").  HCMFA Appx 2.  The NAV Error

is described in more detail in that certain April 7, 2019 *Amended Memorandum regarding the*

*Treatment of the TerreStar Corporation Equity NAV Error in the Fund* (the "NAV Memo").

HCMFA Appx 2, 7-17.

5.      During this time period, however, HCMFA did not perform its own valuation

---

[1]      "HCMFA Appx." refers to the *Defendant's Appendix in Opposition to Plaintiff's Motion for Summary Judgment*, which is being filed contemporaneously herewith.

services.  HCMFA Appx 3; Debtor Appx. 03042.[2]  Instead, HCMFA outsourced these and many

other services to the Debtor, and the Debtor performed such services on HCMFA's behalf pursuant

to that certain *Second Amended and Restated Shared Services Agreement* (the "SSA").  HCMFA

Appx 3, 18-30; Debtor Appx. 03042.  Indeed, all of the "Adviser Representatives" involved in the

NAV Error—Thomas Surgent, Frank Waterhouse, Jason Post, and Lauren Thedford—were

employees of the Debtor, not HCMFA.  HCMFA Appx 3, 7.  The Fund's board of directors was

well aware of the relationship between the Debtor and HCMFA, was well aware that the Debtor

housed all valuation staff, and was well aware that the Debtor performed all valuation activities.

HCMFA Appx 3; Debtor Appx. 03047.  The Fund and HCMFA relied on the Debtor to perform

these services, and the NAV Error, including the Debtor's involvement and responsibility, were

material aspects of board conversations for over a year.  HCMFA Appx 3.

6.      As described in more detail in the May 28, 2019 *Memo regarding Resolution of the*

*Fund's Net Asset Value Error*, Debtor Appx. 02978, HCMFA ultimately made the Fund whole

through a $5,186,496 payment from HCMFA on February 15, 2019 and a $2,398,842 payment

from HCMFA on May 2, 2019.

7.      James Dondero, the President of both the Debtor and HCMFA, was fully aware of

these issues at the time.  HCMFA Appx 1, 3.  Mr. Dondero believed and understood that the Debtor

was liable to HCMFA for causing or failing to prevent the NAV Error.  HCMFA Appx 3.

8.      The Debtor tries to deflect responsibility for the NAV Error to Houlihan Lokey.

But during his rule 12(b)(6) deposition, HCMFA's corporate representative explained the Debtor's

responsibility vis-à-vis Houlihan Lokey:

---

[2]      "Debtor Appx." refers to the Debtor's *Appendix in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment in Notes Actions* (Dkt. No. 94).

Q.     Okay.    Well, the defense—HCMFA's defense is that Highland is responsible for the TerreStar valuation issue, correct?

A.     Yes.

Q.     And there's no question that Houlihan Lokey provided services in connection with that valuation, correct?

A.     Correct.

Q.     But HCMFA has not undertaken any analysis or investigation, to the best of your knowledge, to try to determine if Houlihan Lokey was the responsible party; fair?

A.     We don't know if there is a contract or not.  At this point, we're talking about the defense of Highland's responsibility.  There's no question they were responsible for the valuations.  They were outsource provider to the valuation committee.  Every individual working and coordinating with Houlihan Lokey was an HCMFA [sic[3]] employee.  All the data and information that was provided to them came from HCMLP.  There's no question that Highland was responsible for the NAV Error.  No one ever questioned that.  That was always known.  It was all the employees that were involved.

Debtor Appx. 03043; Debtor Appx. 03053 (similar testimony).

9.     Regardless of whether Houlihan Lokey or the Debtor was the primary party responsible for the NAV Error and resulting losses, the facts remain that the Debtor caused the losses, HCMFA accepted responsibility to the Fund and paid out compensation, and Mr. Dondero reasonably believed that the Debtor was liable to HCMFA for those losses.  He acted accordingly, and the Debtor has not sued to avoid those actions.

**B.     THE PERSON IN CHARGE OF BOTH THE DEBTOR AND HCMFA DIRECTED THE DEBTOR TO COMPENSATE HCMFA FOR ITS LOSS, NOT TO MAKE LOANS**

10.     Accordingly, on May 2, 2019, Mr. Dondero—who, again, was the President of both the Debtor and HCMFA—directed the Debtor to transfer $2.4 million to HCMFA.  On May 3,

---

[3]     This reference to HCMFA instead of HCMLP is plainly a typographical error.  Two pages later, Mr. Norris testified, "Again, all employees working with Houlihan Lokey were the HCMLP employees."  Debtor Appx. 03043.  A few pages later, he testified, "But I would say every single person that interacted with the SEC, I believe, were HCMLP employees."  Debtor Appx. 03045; *see also* Debtor Appx. 03048.

2019, Mr. Dondero directed the Debtor to transfer another $5 million to HCMFA (collectively, the "Transfers"). HCMFA Appx 3. The amounts of these Transfers mirror the amounts HCMFA paid the Fund.

11.     The purpose of the Transfers was for the Debtor to compensate HCMFA for the damages HCMFA paid in connection with the NAV Error. HCMFA Appx 3-4; Debtor Appx. 03048. It was appropriate for the Debtor to compensate HCMFA because the Debtor's employees caused or failed to prevent the NAV Error and because of the Debtor's duties under the SSA. HCMFA Appx 4. As Mr. Dondero testified during his deposition on November 4, 2021, transferring these funds from the Debtor to HCMFA to settle the fallout from the NAV Error was "a critical piece of putting the issue to bed." HCMFA Appx 4; Debtor Appx. 01835.

12.     Specifically, Mr. Dondero instructed Frank Waterhouse, the Debtor's Chief Financial Officer and HCMFA's Treasurer—to make the Transfers. HCMFA Appx 4. He never instructed or suggested to Mr. Waterhouse that the Transfers were loans nor to book them that way. HCMFA Appx 4. Mr. Waterhouse never asked Mr. Dondero whether the Transfers were loans or should be drawn up as such. HCMFA Appx 4; Debtor Appx. 02129 (319:3-6). Indeed, Mr. Dondero never said anything to cause Mr. Waterhouse to reach such an understanding. HCMFA Appx 4. Mr. Waterhouse testified more than once, in fact, that he does not recall Mr. Dondero instructing him to book the Transfers as loans. Debtor Appx. 02085 (145:3), 02120 (284:4-6). Mr. Dondero simply told Mr. Waterhouse to "go get the money from Highland." Debtor Appx. 02120 (283:4-5), 02129 (318:8-10). At the same time, however, Mr. Waterhouse confirmed his understanding from his discussion with Mr. Dondero that the transfers were related to the NAV Error and resulting losses to HCMFA. Debtor Appx. 02085 (145:3-12); 02117-18.

13.     Nor did anyone else at the Debtor or HCMFA follow up with Mr. Dondero to ask whether the transfers were loans, and no one either at HCMFA or the Debtor presented Mr.

Dondero with promissory notes to sign or otherwise presented Mr. Dondero with any document to approve the Notes. HCMFA Appx 4. Nor has the Debtor identified any such evidence. At the amounts of $5 million and $2.4 million, however, internal policies and procedures would have required the Notes to go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA, and ultimately through Mr. Dondero for his approval, neither of which happened. HCMFA Appx 4.

C.    **THE DEBTOR'S ACCOUNTING STAFF MISTAKENLY BOOKED THE TRANSFERS AS LOANS ON BEHALF OF BOTH THE DEBTOR AND HCMFA**

14.    As noted above, the Notes should have gone through the Debtor' legal department for preparation, approval, and execution. *E.g.*, Debtor Appx. 02122 (291:3-16); 02122-23 (293:18 - 296:7).[4] In additional to legal, Mr. Waterhouse would have expected Mr. Dondero to approve Notes of this size, as his approval was necessary. Debtor App. 02117. Mr. Waterhouse acknowledged he lacked the requisite authority. *Id.* But none of that happened. The Notes did not go through the Debtor's legal department at all; they were prepared and signed by a mid-level Debtor employee in the accounting department, who was not an employee of HCMFA, as detailed below. Mr. Dondero was unaware of the Notes and never even saw them until just before this litigation commenced. HCMFA Appx. 5.

15.    Unbeknownst to Mr. Dondero, HCMFA's accounting staff—who were also employees of the Debtor acting under the SSA—erroneously booked the Transfers as loans and erroneously papered promissory notes to reflect their incorrect understanding of the Transfers. HCMFA Appx 5. Likewise, these same individuals erroneously caused the Debtor and HCMFA

---

[4]   Mr. Morris waived his objection to this question by insisting that the witness complete his answer. Debtor Appx. 02123 (295:12). In any event, the question was not objectionable. To the extent the Debtor asserts a more specific objection, HCMFA reserves the right to respond. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

to reflect these transfers as loans on various financial statements and disclosures.  HCMFA Appx 5.  But Mr. Dondero, the individual ultimately in charge of both entities, was not aware of these errors until this litigation commenced.  HCMFA Appx 5.  Nor could Mr. Waterhouse "recall specifically what amounts of money were moved when, for what purpose."  Debtor Appx. 02081 (126:5-7).

16.     HCMFA's corporate representative likewise testified that HCMFA was unaware of the Notes until the Debtor made its demand because it outsourced finance and corporate accounting functions to the Debtor.  Debtor Appx. 03024 (38:3-9), 03025 (42:23-43:3), 03028 (55:12-18).  At the same time, HCMFA was unaware of the errors on its financial statements, again because it outsourced finance and corporate accounting functions to the Debtor.  Debtor Appx. 03030 (64:15-65:3).

17.     Prior to the Debtor's demand to pay these Notes until shortly before this litigation commenced, no one at the Debtor or HCMFA informed Mr. Dondero of the Notes.  HCMFA Appx 5.  To the extent that he saw any books and records or other financial documents of the Debtor or HCMFA beforehand, he would not have noticed the Notes so as to raise an issue.  HCMFA Appx 5.  Before the Notes in question, HCMFA issued two other promissory notes to the Debtor, in similar amounts, the dates of collection on which were extended through May, 2021.  HCMFA Appx 5, 42, 45.  Thus, if Mr. Dondero saw any such records or documents, he would have naturally assumed that any reference to promissory notes referred to these prior two notes, not the Notes in question.  HCMFA Appx 5.

18.     The Debtor points to documents like the October 23, 2020 *Memo Regarding Supplemental 15(c) Information Request* (the "15(c) Memo") as evidence that HCMFA was aware of the Notes.  Debtor Appx. 00884.  Yet this document, and underlying e-mail communications culminating in the execution of this document, demonstrate the opposite.

19.    The document states that "$12,286,000 remains outstanding to HCMLP from HCMFA. . .  The earliest the Note between HCMLP and HCMFA could come due is in May, 2021."  Debtor Appx. 00885.  Logically, and certainly for purposes of summary judgment, this statement cannot refer to the Notes, as: (i) the Notes are plural, not singular; (ii) they are for materially less than $12 million; and (iii) they are demand notes subject to demand at any time. Debtor Appx. 00010-15.  In his e-mail leading up to the document, Mr. Waterhouse, who allegedly signed the Notes and who surely would have a memory of the Notes if in fact he signed them, wrote: "The HCMFA note is a demand note. . . There was an agreement between HCMLP and HCMFA the earliest they could demand is May 2021."  Debtor Appx. 00791.  Yet the Notes are not a "note," and there was no collection delay until May, 2021, thus demonstrating that Mr. Waterhouse was not referring to, nor admitting the existence of, the Notes.

20.    As HCMFA's corporate representative explained, "[h]e [Mr. Waterhouse] himself seems to be confused here, because as we found out through discovery and in the testimony of what has come out, there was an agreement—that was a separate agreement.  That wasn't related to the notes at issue in this case."  Debtor Appx. 03034 (81:5-10).[5]  Nor could it have been related. Mr. Waterhouse used the singular when there are multiple notes at issue.  Additionally, HCMFA's corporate representative explained that the numbers do not add up:

> Q.    As HCMFA's 30(b)(6) witness today, have you done anything to determine whether or not the $12.286 million number includes the principal amount of the notes?
>
> A.    Looking at it, we can't tell.  Because it doesn't line up exactly with those notes.  There were other notes that had been recorded in the books for several years before.  And if you add those two together, it doesn't add up.  So it's not clear.

---

[5]    The Court should deny Mr. Morris's motion to strike.  The answer was responsive to the question he asked, even if he did not like the answer.  When asked if Mr. Morris accurately summarized his testimony, the witness was entitled to clarify his testimony.

Debtor Appx. 03034 (79:5-14).  Indeed, the Debtor also sued HCMFA to collect on the other two

notes, copies of which are included in HCMFA's appendix.  HCMFA Appx. 31-64.

21.     To be clear, Mr. Dondero's intent, both as the person who controlled HCMFA and

the person who controlled the Debtor, was for these Transfers ($5 million and $2.4 million) to

constitute compensation from the Debtor to HCMFA for the NAV Error, not loans.  HCMFA Appx

5.  But, as Waterhouse informed Mr. Dondero in early May 2019, the Debtor did not have sufficient

funds to make these Transfers.  HCMFA Appx 5.  Thus, Mr. Dondero personally paid most if not

all of the $7.4 million into the Debtor at or around the same time to enable the Debtor to make the

Transfers to HCMFA, again under the belief and understanding that the Debtor would use these

funds to compensate HCMFA for the NAV Error, not to make a loan.  HCMFA Appx 5.

22.     Still, the Debtor's employees, acting for both the Debtor and HCMFA, erroneously

booked the Transfers as loans.  But the Debtor's own evidence—specifically, the deposition of

David Klos—demonstrates how this mistake occurred and why it is not surprising.  Mr. Klos was

the Debtor's controller, Debtor Appx. 03183 (6:22-25), and he instructed Debtor employee Kristin

Hendrix to prepare the Notes.  Debtor Appx. 03198 (68:4-13).  Mr. Klos discussed how funds

would be transferred from one affiliated entity to another as needed for liquidity:

> And you joined Highland in 2009. From that point in time, 2009, through 2019,
> was there any practice at the enterprise of those businesses to transfer funds
> between each other on a basis of when one needed it and one had it?
>
> A.     Yes, that was a fairly, generally speaking, that was a fairly common
> practice, of using different entities within the overall structure to bridge liquidity.

Debtor Appx. 03189 (29:24-30:7).  Klos also testified as to the standard practice that, where the

Debtor was transferring funds out, the transfer would be booked as a loan:

> So over the general—talking about generally now, over those 10 years when there
> were these intercompany transfers for liquidity purposes, how were they booked by
> the debtor, by Highland Capital Management?

MR. MORRIS: Objection to the form of the question.[6]

THE WITNESS: Help me on the direction. So this is money that Highland is receiving or money that Highland is sending?

Q.     (BY MR. RUKAVINA) Sending out.

A.     Sending out. So this is—in the scenario that you're describing, this money that Highland is sending out to meet some other corporate obligor's liquidity needs?

Q.     Yes, sir.

A.     So those would be booked as a loan. I would—I need to hedge a little bit because I'm not a hundred percent certain, but I would say if not exclusively via loans close to exclusively.

Q.     And would they—strike that. Would they usually be papered up with a promissory note?

A.     Yes.

Q.     Now, why was that the general course during 10 years? Was there a policy and procedure in place, or would Dondero say book it as a loan, or was that just the right thing to do from an accounting perspective?

MR. MORRIS: Objection to the form of the question.[7]

THE WITNESS: At the end of the day it's at the direction of Jim Dondero, so I can't tell you exactly why he wanted it to be done that way. But that was certainly the practice of how it was done in those situations.

Debtor Appx. 03189-90 (32:20-34:5).

23.     Thus Mr. Klos believed that the underlying transfers were loans, in part because he

believed that Mr. Waterhouse would have told him that (but could not recall for certain), and in

---

[6]     The Debtor has waived Mr. Morris's objections. "[A] party waives any objection to the admissibility of evidence on summary judgment by offering that evidence in support of its own motion. *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D. Md. 2012) (citing *Capobianco v. City of N.Y.*, 422 F.3d 47, 55 (2d Cir. 2005); *Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998)). In any event, it is unclear what Mr. Morris's objection is, and HCMFA reserves the right to respond if and when the Debtor raises a specific objection. If the objection is foundation, Mr. Rukavina laid the requisite predicate. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[7]     The Debtor has waived this objection. *Supra*, note 4. It is also unclear what the objection is, so HCMFA reserves the right to respond to a specific objection if and when the Debtor makes one. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

part because of past practice. Debtor Appx. 03199 (69:1-70:14). Mr. Klos described the usual

course at the Debtor with respect to papering intercompany loans:

> Q. (BY MR. RUKAVINA) So going back to this Exhibit 3, sir, why did you ask Kristin, can you or Hayley please prep a note for execution? Why them? Remember, I was asking about what the course or procedure was at that point in time.
>
> A. Yeah, so nomenclature, procedure, process. I would say the informal process for these types of loans, they were frequent in nature, would be for someone on the corporate accounting team to prepare a note and have it executed.
>
> Q. Okay. That was the standard course back then?
>
> A. Again, I don't know what standard course means. That was fairly typical.
>
> Q. Why would you not have asked someone in the Highland legal department to prepare a note?
>
> A. Because this was a legally reviewed document as far as the form of the agreement. It's a one-page, two-paragraph form that had been used for a long time. So the only thing that would change with respect to these notes would be the date, the amount, likely the rate. I can't think of anything else offhand that would have changed from note to note.
>
> Q. After you asked Ms. Hendrix to prepare this note, did you have any further role with respect to the papering, preparation, or execution of that note?
>
> A. Not that I can remember.
>
> Q. Would you have had any role in having either or both of the notes actually signed electronically or by ink by Mr. Waterhouse?
>
> A. Likely not, no.

Debtor Appx. 03202 (83:19-84:24).

24. Ms. Hendrix, the Debtor's senior accountant and not an employee of HCMFA,

likewise testified to the usual course when intercompany transfers occurred:

> Typically anytime specifically Jim Dondero would need to move money between related parties, he would pay down -- when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.

---

Debtor Appx. 03132 (21:10-16). Stated differently, at that time "it's all one big happy family, and whoever needed cash, the cash moved around." *Id*. 472 (23:3-6).

25.     The point is a simple one: when the Debtor's accountants saw large transfers from the Debtor to an affiliate, in this case HCMFA, they *assumed* the transfers were loans and, pursuant to their historical practice, they papered the transfers up as loans. But, as non HCMFA employees, they of course had no authority or ability to bind HCMFA on any promissory notes.

26.     Thus began the papering up of the Transfers as loans, based on these assumptions. At the same time, both Mr. Waterhouse and Mr. Dondero confirmed that internal policies and procedures would have required the Debtor's legal department, also providing legal services to HCMFA under the SSA, to review and approve the Notes: "The internal policies and procedures at the Debtor and HCMFA, as well as ordinary practice, required that loans in amounts such as $5 million and $2.4 million would go through the Debtor's legal department, which was also providing legal services to HCMFA under the SSA …." HCMFA Appx. 4. Mr. Waterhouse likewise testified that "the team [accounting] would have worked with the legal group at Highland to draft any notes." Debtor Appx. 02122 (290:15-16).[8] In fact, Mr. Waterhouse would have expected there to be a representation, represented by a box or section on a cover document, that "legal" has reviewed or approved the document before he would sign it. Debtor Appx. 02123 (294:16-22).[9]

---

[8]     The Debtor has waived Mr. Morris's objection. *Supra*, note 4. In any event, the question was not objectionable, and Mr. Waterhouse gave the same answer in response to another question not much later. Debtor App. 02122 (291:3). "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[9]     The Debtor has waived Mr. Morris's objection. *Supra*, note 4. In any event, the question was not objectionable, and Mr. Morris waived his objection by insisting that the witness complete his answer. Debtor Appx. 02123 (295:12). "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

27.     This was not done here.  Ms. Hendrix, who prepared and signed the Notes, testified that she did not run the Notes through the legal department.  Debtor Appx. 03138 (46:18-24).  In fact, and contrary to Mr. Waterhouse's testimony, she testified that it was not standard practice for the legal department to prepare and approve intercompany notes, but that this was handled instead by the accounting department using a prior template approved by the legal department.  Debtor Appx. 03131 (18:1-19:13; 20:1-5).[10]

28.     Thus, Mr. Waterhouse instructed Mr. Klos to make the Transfers from the Debtor to HCMFA.  Debtor Appx. 00871; 03134-35 (32:13-33:4).  Mr. Waterhouse never instructed Mr. Klos to paper the Transfers as loans; at least neither one of them remembered or was able to identify any such conversation or instruction.  Debtor Appx. 03199 (69:11-15); *see* Debtor Appx. 02122 (290:4-293:11.  Mr. Klos, understanding that the Transfers were loans—but again, without any authority or instruction to make them loans—then instructed Ms. Hendrix to paper the Transfers as loans.  Debtor Appx. 00871; 03134-35 (32:13-33:4).  It was then Ms. Hendrix who actually prepared the Notes.  Debtor Appx. 03137 (42:15-43:20).

29.     Again, the point is simple: when professional accountants at the Debtor saw funds flowing from the Debtor to an affiliate, such as HCMFA, they *assumed* that the funds were a loan and papered it as such, as this is how it had been done for many years on many occasions.  But that is not how Mr. Dondero, the person in charge of both entities—intended it to be done here, and no one asked him.  HCMFA Appx. 4.  That Mr. Waterhouse, as part of the accounting group, was copied on the e-mails whereby Mr. Klos instructed Ms. Hendrix to paper the Transfers as loans does not change this result.  At most, it is evidence that Mr. Waterhouse also understood the

---

[10]     The Debtor has waived Mr. Morris's objection.  *Supra*, note 4.  In any event, the question was not objectionable, and Ms. Hendrix is competent to testify regarding the ordinary practice at the Debtor given her 17 years of employment.  Debtor Appx. 03129.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Transfers to be loans, but: (i) Mr. Dondero never instructed that they be loans; (ii) Mr. Waterhouse lacked any authority to make them loans; and (iii) at best, he *assumed*, as did the others, that the Transfers were loans.

**D.**     **DESPITE THE DEBTOR'S MISTAKE, HCMFA NEVER ACTUALLY SIGNED THE NOTES**

30.     Despite the fact that the Notes exist, at least nominally, Mr. Waterhouse does not specifically recall signing the Notes.  Debtor Appx. 02084 (141:4-7).  In fact, Mr. Waterhouse did not typically sign promissory notes.  Debtor Appx. 02085 (144:10-12).  Mr. Waterhouse did not draft the Notes and does not recall asking anyone to draft the Notes.  Debtor Appx. 02085-86 (145:23-146:7).  According to Mr. Waterhouse, "the legal group at Highland is responsible and has always been responsible for drafting promissory notes."  *Id.*  He reiterated, "The team knows to—I mean, we don't draft documents.  We're not lawyers.  We're not attorneys."  It is not what I do or accountants do."  Debtor Appx. 02086 (147:19-22).  But the Debtor has not cited any documents or communications from within the legal department related to the Notes and, as noted above, Ms. Hendrix confirmed that she did not go through the legal department in preparing the Notes.

31.     Upon examining the two notes side by side, Mr. Waterhouse realized that he could not have signed the notes:

A.     These—these—these signatures are identical, now that I stare at them, and I mean, they are so close—I mean, they're identical that, I mean, even with my chicken scratch signature, I don't know if I can—you know, I do this 100 times, could I do that as—as precisely as I see between the two notes.

Q.     Well, that is why I ask.  Mr. Waterhouse, now that you have examined them, does it seem like it is more likely that you actually electronically signed these?

MR. MORRIS: Objection to the form of the question.[11]

---

[11]     The Debtor has waived this objection.  *Supra*, note 4.  Furthermore, it is not clear exactly what the objection is, and HCMFA reserves the right to respond if an when the Debtor asserts one.  If the question is leading, there is no complete prohibition against leading questions, and, in any event, the witness was being cross

> A.      Is—I don't—I don't recall specifically. As I said before, my assistant did have a—an electronic signature, and that was used from time to time. It wasn't as common practice back in 2019. It definitely was more common practice when we had to work from home and remotely for COVID because it that made it almost impossible to, right, provide wet signatures since we're all working from home remotely.
>
> Q.      Well, going just for these two promissory notes, Mr. Waterhouse, in light of your inability to remember any details, are you sure you actually signed wither or both of these notes?
>
> MS. DANDENEAU: Objection to form.
>
> A.      I don't recall specifically signing—actually physically signing these notes. As I said before, I don't recall doing that. This—this looks like my signature, but yet these two signatures are identical.
>
> Q.      So you don't recall physically signing them, and I take it you don't recall electronically signing them either?
>
> A.      I don't recall. You know, Highland has all my emails. If that occurred, you know, you know, I don't have any of these records is what I'm saying. I don't have any of those records.

Debtor Appx. 02124 (298:10-300:4). The Debtor has never produced an email, and HCMFA is not aware of one, in which Mr. Waterhouse authorized anyone to affix his electronic signature to the Notes.

32.      Mr. Waterhouse later elaborated on the process he used in the rare circumstance when he signed documents electronically:

> Q.      And help me here. I'm not very technologically astute. When you—and I—I recognize that you do it rarely, but when you sign a document electronically, do you believe that there is an electronic record of you having authorized or signed a document electronically?
>
> MR. MORRIS: Objection to the form of the question.[12]

---

examined. *See* Fed. R. Evid. 611(c). "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[12] The Debtor waived this objection. *Supra*, note 4. Furthermore, it is not clear what the basis of the objection is, and HCMFA reserves the right to respond if and when the Debtor asserts one. The question is about the witness's belief, which is a legitimate inquiry. "Form" objections are also invalid under the Federal Rules as

> A.     I—I don't know the tech answer to that, but, you know, since I don't have—I don't ever attach my signature block electronically, my assistant would have done that, and if that is done over email like we did several times—you know, multiple, multiple times over COVID, she would attach my signature block and then email it out to whatever party.
>
> Q.     What was your assistant's name in May 2019.
>
> A.     It was Naomi Chisum.

Debtor Appx. 02129 (320:11-321:7).  The Debtor has not included any emails in its appendix with Ms. Chisum meeting this description.

33.     During his deposition, Mr. Waterhouse also testified that he did not have authority to borrow at this level as HCMFA's treasurer, nor to lend at this level as the Debtor's CFO:

> Q.     Yes.  So in your capacity as the chief financial officer of the debtor, Highland Capital Management, L.P., in May of 2019, did you believe that you unilaterally, just Frank Waterhouse, had the authority to loan on behalf of the debtor to anyone $5 million and $2.4 million?
>
> MR. MORRIS: Objection to the form of the question.[13]
>
> A.     No.
>
> Q.     Is it because loans of that amount would have had to be approved by someone else?
>
> A.     Yes.
>
> Q.     Who in '20—in May of 2019, if Highland wanted to loan 5 million or $2.4 million to someone, what would have been the internal approval procedure?
>
> MR. MORRIS: Objection to the form of the question.[14]

---

they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[13] The Debtor waived Mr. Morris's objections. *Supra*, note 4.  In any event, Mr. Waterhouse is competent to testify about his own authority or lack thereof.  *See Gross v. GGNSC Southaven, LLC*, 817 F.3d 169, 179 (5th Cir. 2016) ("holding agent was competent to testify about the scope of his own agency).  Indeed, Mr. Morris opened the door by asking nearly identical questions earlier in the same deposition.  *E.g.* Debtor Appx. 02089.  For purposes of summary judgment however, the Court must accept as true the testimony most favorable to HCMFA.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[14] *Supra*, note 4.  Furthermore, Mr. Waterhouse, as the Debtor's Chief Financial Officer, it qualified to testify about the Debtor's procedures for extending credit.  "Form" objections are also invalid under the Federal

A.      If—if we had loans of that nature that needed to be made due to their size, we would have gotten approval from the president of Highland.

Q.      And who was that individual?

A.      It was James Dondero.

Q.      Okay.  Now I'm going to ask you a similar question but for a different entity.

In May of 2019, as the treasurer of HCMFA, did you believe that you unilaterally had the ability to cause HCMFA to become the borrower of a $5 million loan and a $2.4 million loan?

MR. MORRIS: Objection to the form of the question.[15]

A.      No.

Q.      What would—what would the approval have taken place—strike that.

What would the approval process been like in May of 2019 at HCMFA for HCMFA to take out a $7.4 million loan?

MR. MORRIS: Objection to the form of the question.[16]

A.      The process would have been similar to what we just discussed in—for Highland to make a loan to others.  So, again, you know, we—we would have—either myself or someone on the team would have discussed this with the—the president and owners of—of HCMFA.

Q.      And who was that individual?

A.      That was James—Jim Dondero.

Q.      So do I understand that in May of 2019, on behalf of both the lender, Highland, and the borrower, HCMFA, Mr. Dondero would have had to approve $7.4 million in loans?

MR. MORRIS: Objection to the form of the question.[17]

---

Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[15]  *Supra*, note 4.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[16]  *Supra*, note 4.  Furthermore, Mr. Waterhouse, as HCMFA's Treasurer, is qualified to testify about HCMFA's procedures for incurring debt.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[17]  *Supra*, note 4.  Furthermore, this question is not objectionable.  It accurately summarizes Mr. Waterhouse's immediately antecedent testimony.  "Form" objections are also invalid under the Federal Rules as they fail

A. Yes.

Debtor Appx. 02117 (270:25-273:9). HCMFA's corporate representative confirmed that Mr. Waterhouse alone did not have authority to execute the notes. Debtor Appx. 03062 (192:4-21).

34. Another witness's testimony confirms that Mr. Waterhouse never signed the Notes. In May, 2019, Kristin Hendrix was the senior accounting manager at the Debtor. Debtor Appx. 03129 (12:4-16). At that time, she reported to David Klos, who reported to Mr. Waterhouse. Debtor Appx. 03129-30 (12:25-13:9). While Ms. Hendrix never drafted a promissory note from scratch, in May 2019 part of her job was taking a form note and revising it. Debtor Appx. 03131 (17:5-11). Contrary to Mr. Waterhouse's testimony, Ms. Hendrix testified that the corporate accounting group at the Debtor, not the legal group, was responsible for updating draft promissory notes so as to create new ones—*i.e.* the Debtor's own witnesses can't get their story straight. Debtor Appx. 03131 (17:20-25). As Ms. Hendrix testified:

> Our typical practice is if we have a loan with certain affiliates that it's a demand note. We have a template that we have used for years that was created by either our internal legal team or an outside law firm, I'm not sure which. The typical practice is always updating a few things on that template, getting it executed, and filing it in our audit folders.

Debtor Appx. 03131 (18:18-25). The corporate accounting group, she claimed, not the legal group, did this "updating." Debtor Appx. 03131 (19:1-13; 20:1-5). And Ms. Hendrix confirmed the general purpose of the intercompany notes:

> Typically anytime specifically Jim Dondero would need to move money between related parties, he would pay down—when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.

Debtor Appx. 03132 (21:10-16). In other words, at that time "it's all one big happy family, and whoever needed cash, the cash moved around." Debtor Appx. 03132 (23:3-6).

---

to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

35.     In May 2019, Mr. Klos sent one or two e-mails to Ms. Hendrix—emails on which Mr. Waterhouse but not Mr. Dondero or the legal department were copied—informing her that there were new intercompany loans, asking her to prepare notes for execution. Debtor Appx. 03134-35 (32:13-33:4). In her mind, this instruction comported with the general practice:

> So is it fair to say that typically, obviously not every time, but typically your corporate accounting group when it would see intercompany transfers in large amounts would believe that they were loans?
>
> MR. MORRIS: Objection to the form of the question.[18]
>
> THE WITNESS: Typically they were loans. There's not really another way to get money from one entity to another. And if they were papered as a loan, that means we were told to set it up that way.

Debtor Appx. 03135 (35:5-15). That is "how it was for 14 or 15 years." Debtor Appx. 03135 (36:7-9).

36.     Ms. Hendrix thought that the $2.4 million Note was "related to a TerreStar NAV error" and the $5 million Note was for the "consent fee." Debtor Appx. 03136 (38:17-39:5). It was never "told to [her] directly" that the funds were a loan, but she [subject to objection[19]] "assum[ed] that based on many instances of intercompany transfers in the 14 years prior." Debtor Appx. 03136 (40:20-25).

37.     Ms. Hendrix confirmed that she prepared the Notes from Word documents originally created by outside counsel. Debtor Appx. 03137 (42:15-43:20). However, Ms. Hendrix

---

[18]     The Debtor has waived objections to Ms. Hendrix's testimony by including it in the Debtor's summary judgment evidence. *Supra*, note 4. In any event, it is not clear what the Debtor's objection is, as the question is not objectionable. HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one. If the objection is foundation, Ms. Hendrix has worked in the Debtor's corporate accounting department for 17 years, holds an MBA from SMU, and is a certified public accountant. Debtor Appx. 03129. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[19]     The Debtor has waived its objection. *Supra*, note 4. Furthermore, the question did not mischaracterize Ms. Hendrix's testimony, as she answered unequivocally, "Correct." Debtor Appx. 03137. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

had no memory of papering the Notes. Debtor Appx. 03138 (45:21-46:1). It would have been her practice not to consult the legal group in preparing the Notes. Debtor Appx. 03138 (46:12-24). Ms. Hendrix confirmed that, to sign Mr. Waterhouse's name to the Notes, she used an electronic picture of his signature, which she then affixed to the Word documents, just like this:



Debtor Appx. 03137-38 (43:6-48:18).

38. On the question of whether Mr. Waterhouse authorized Ms. Hendrix to affix his signature to the Notes, Ms. Hendrix testified "I don't have exact specific memory." Debtor Appx. 03138 (48:10-15). Again, she appears to have assumed that Mr. Waterhouse must have approved the Notes and, therefore, approved her using his signature:

> He was fine with using his e-signature, and what is on these documents was that exact e-signature.
>
> * * *
>
> But he would have had to approve this loan in the dollar amount, the day. He would have been the one directing us to create these loans. In past practice he has always approved using his e-signature to execute documents.

Debtor Appx. 03138 (48:4-18). When pressed about *how* Mr. Waterhouse would have authorized her to use his electronic signature, Ms. Hendrix testified as follows [subject to objection[20]]:

> I would assume that, as I've stated previously, these directions were coming directly from him to paper a loan. These changes that are made are only to the dollar amount. Interest rate is pulled right off the IRS website. That is his approval to paper a loan and in fact execute or approve the loan.

---

[20] The Debtor has waived this objection. *Supra*, note 4. Furthermore, the question is not objectionable. Ms. Hendrix testified that Mr. Waterhouse "would have had to approve this loan", and the next question was, "How would he have approved Exhibits 4 and 5? By that, I mean by email or memorandum? How would he have approved it in May of 2019?" Debtor Appx. 01318. HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one. "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Debtor Appx. 03138-39 (48:24-49:5).

39.     Then, when asked [subject to objection[21]] "after his e-signature was used either on these notes or other documents in May of 2019, would you have brought the documents back to him for any kind of verification," Ms. Hendrix testified:

> Probably not.  These are all very standard.  We've papered hundreds of loans.  So I think he trusted that we can handle updating a date and a dollar amount on these loan templates.

Debtor Appx. 03139 (50:1-9).

40.     Ms. Hendrix also testified [subject to objection[22]], differently from Mr. Waterhouse, that "[p]robably at this time, 99 percent of the stuff my team got his signature on was his e-signature."  Debtor Appx. 03139 (49:12-16).  And, the following exchange is significant:

> Q.     (BY MR. RUKAVINA) Do you know or believe, or your recent review of documents, did it reveal an email from Mr. Waterhouse to you specifically authorizing his e-signature on Exhibits 4 and/or 5?
>
> A.     Not that I recall seeing, no.
>
> Q.     Sitting here today, do you have any memory of Mr. Waterhouse orally or otherwise specifically authorizing you to affix his e-signature to Exhibits 4 and/or 5?
>
> A.     Specifically on these loans, no, I don't recall those conversations.  But, again, our practice has always been we have this discussion, he's under the understanding that we're going to paper the loans, he's always comfortable with using his e-signature.  This is not something me or my team would have done without that authority and approval from him.

---

[21]  The Debtor has waived this objection.  *Supra*, note 4.  In any event, this question is not objectionable.  Ms. Hendrix's testimony clearly demonstrates that she electronically affixed Mr. Waterhouse's signature to the Notes. Debtor Appx. 03137-38 (43:6-48:18).  HCMFA reserves the right to respond to any specific objection if and when the Debtor asserts one.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

[22]  The Debtor has waived this objection.  *Supra*, note 4.  Furthermore, the question is not objectionable.  Ms. Hendrix testified that she regularly prepares notes, Debtor Appx. 03131 (20:1-8), and has worked in the Debtor's corporate accounting department for 17 years.  Debtor Appx. 03129 (11:14).  She would be familiar with Mr. Waterhouse's practices.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

Debtor Appx. 03139 (50:15-25).

41.     But there is no evidence that Ms. Hendrix ever showed the Notes to Waterhouse after preparing them:

> Q.     Sitting here today, do you have any memory of giving Mr. Waterhouse these two promissory notes after they were prepared?
>
> A.     I specifically don't remember walking into his office and providing it to him, but he could have found it on our shared drive if he wanted to.
>
> Q.     Do you have any memory or in your recent review of documents did you see any email to the effect of you sending either or both of these promissory notes to Mr. Waterhouse after they were papered up?
>
> A.     I don't have any specific recollection, again, but he had access to look at them.
>
> Q.     On the shared drive?
>
> A.     Yes.

Debtor Appx. 03140 (54:4-17).  Scanning in the Notes and then saving them to the system hardly amounts to showing or giving them to the man who allegedly signed them.

42.     In fact, the Debtor's summary judgment evidence demonstrates that Ms. Hendrix did not even show the executed Notes to Mr. Waterhouse, much less ask for authority to affix his electronic signatures to the Notes.  While the Debtor points out that Mr. Waterhouse was copied on Mr. Klos' instruction to Ms. Hendrix to prepare the Notes, when she did prepare them, that same e-mail chain confirms that she did not copy Mr. Waterhouse—only Hayley Eliason and Blair Roeber.  Debtor Appx. 00871.  That same e-mail chain also confirmed that Ms. Hendrix was not authorized to sign the Notes for Mr. Waterhouse.  Mr. Klos' instruction to her was to "prep[are] a note *for execution*."  Debtor Appx. 00871 (emphasis added).  Clearly, the execution was to follow, but that execution did not occur, at least not with authority from Mr. Waterhouse or anyone else.

43.     Ms. Hendrix *assumed* that the transfers were loans and *assumed* that Mr. Waterhouse authorized her to affix his signature to the Notes because she *assumed* that he

approved of the Notes. But her testimony directly conflicts with his: whereas he testified that he rarely used electronic signatures in May 2019, would have sent an e-mail authorizing the same, and would have expected the legal department to approve a note prior to his signature, she testified that he routinely did this at that time pursuant to some generalized authority and that the accounting department routinely papered notes.

44. The fact remains that, notwithstanding her subjective assumptions, Ms. Hendrix created erroneous notes (as they appear to make Mr. Waterhouse the "maker" and, as discussed below, make him jointly and severally liable), and she was not authorized—at least there is no evidence that she was authorized—to affix images of Mr. Waterhouse's signature to the Notes. Or, if there was some generalized authority that she believed Mr. Waterhouse gave her, then the condition precedent—that the legal department approve the Notes—was not satisfied. Either way, there is no evidence whatsoever she had authority to affix his signature.

## III. SUMMARY JUDGMENT STANDARD

45. Implicitly recognizing there is contradictory evidence, the Debtor hangs its hat on the "reasonable jury" standard. But a reasonable jury can find for a party whenever there is more than a mere scintilla of evidence. *See Baerg Real Prop. Trust v. Garland Sol., LLC (In re Baerg Real Prop. Trust)*, 2017 Bankr. LEXIS 3191, *3 (Bankr. N.D. Tex. Sept. 21, 2017) ("To dispute a material fact, a plaintiff must offer more than a mere scintilla of evidence such that a 'reasonable jury could not return a verdict' for the plaintiff."). Here, HCMFA cites the testimony of five individuals in support of its defenses (Mr. Dondero, Mr. Waterhouse, Mr. Klos, Ms. Hendrix, and HCMFA's corporate representative). The Debtor cannot credibly argue that amounts to nothing, particularly in light of this directive from the United States Supreme Court:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The

> evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citations omitted). Based on the voluminous evidence HCMFA cites in this brief, which the Court must accept as true, and with respect to which the Court must draw all reasonable inferences in favor of HCMFA, there are genuine issues of material fact the preclude summary judgment, so the Court should deny the Motion.

## IV.    ARGUMENT AND AUTHORITIES

46.    As a general proposition, HCMFA does not entirely dispute the Debtor's assertion that, "[t]o prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note." Motion ¶ 132 (citing *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995)). But there is more to it than that. A promissory note is a contract, and an action on a promissory note is still "subject to all defenses available in an action on a simple contract." *Strickland v. Coleman*, 824 S.W.2d 188, 191-92 (Tex. App.—Houston [1st] 1991); TEX. BUS. & COMM. CODE § 3.305(a)(2) ("the right to enforce the obligation of a party to pay an instrument is subject to … a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract"). "Therefore, evidence is admissible that tends to prove a defense to the action on the promissory note, such as want or failure of consideration, non-performance of a condition precedent, non-delivery, delivery for a special purpose, fraud in the

inducement, or other defenses which would be available in an action on a simple contract."

*Strickland v. Coleman*, 824 S.W.2d at 192.

## A. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER HCMFA SIGNED THE NOTES

47.     The Debtor bears the burden to prove HCMFA signed the Notes because "[t]he validity of the signature on the note must be proved by the person claiming validity if validity is denied in the pleadings." *Silverio v. Silverio*, 625 S.W.3d 680, 685 (Tex. App.—El Paso 2021); TEX. BUS. & COMM. CODE § 3.308(a).  HCMFA denied that it signed the Note in the pleadings. The only allegations in the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (Dkt. No. 1, the "Complaint") regarding HCMFA's signature are paragraphs 14 and 15:

> 14. Specifically, on May 2, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note"). A true and correct copy of HCMFA's First Note is attached hereto as Exhibit 1.
>
> 15. On May 3, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "Notes"). A true and correct copy of HCMFA's Second Note is attached hereto as Exhibit 2.

Complaint ¶¶ 14, 15.  HCMFA expressly denied these allegations in its *Defendant's Amended Answer* (Dkt. No. 48, the "Answer") ("14.  The Defendant denies ¶ 14 of the Complaint.  15.  The Defendant denies ¶ 15 of the Complaint.").[23]

---

[23]    The Bankruptcy Court denied HCMFA's motion to amend its Answer to more affirmatively plead that the Notes were not signed, but HCMFA expressly argued that such amendment was not necessary and that HCMFA's prior Answer sufficiently placed the Debtor on notice under applicable law that HCMFA denied signing the Notes.  Any allegedly contradictory allegations in the Answer notwithstanding, "[r]ule 8 of the Federal Rules of Civil Procedure permits the alternative pleading of inconsistent claims and defenses …." *Jurach v. Safety Vision, LLC*, 642 Fed. Appx. 313, 317 (5th Cir. 2016).  And it is axiomatic that unsworn pleadings do not constitute competent summary judgment evidence. *E.g. Jones v. Anderson*, 721 Fed. Appx. 333, 334-35 (5th Cir. 2018).  By denying the only allegation in the Complaint regarding execution, the Answer put the Debtor to its proof on this element of its case.  Out of an abundance of caution, HCMFA is filing an objection with the District Court to the Bankruptcy Court's order, seeking the District Court's review

48.     The Debtor has failed to meet its burden of proof, and there is a genuine issue of material fact as to whether HCMFA signed the Notes, for three independent reasons, any one of which provides grounds to deny the Motion: (i) there is a genuine issue of material fact as to whether Mr. Waterhouse signed the Notes at all; (ii) even if he signed them, there is a genuine issue of material fact as to whether he had the requisite authority; and (iii) even if he had authority, the Notes are ambiguous.  For any one of these reasons, the Court should deny the Motion.

**i.     Waterhouse did not Actually Sign the Notes**

49.     The facts set out above demonstrate that Mr. Waterhouse did not actually sign the Notes—of that there can be no legitimate dispute.   In particular, the evidence conclusively demonstrates that Ms. Hendrix electronically affixed an image of Mr. Waterhouse's signature in Microsoft Word.  Debtor Appx. 03137-38 (43:6-48:18).  She herself acknowledged that her actions required Mr. Waterhouse's approval.  *Id.*  But there is no evidence Mr. Waterhouse gave her his authorization—none whatsoever.  On the contrary, Mr. Waterhouse testified that any such authorization would have been by e-mail to his administrative assistant (Debtor Appx. 02129 (320:11-321:7).  But the Debtor produced no such e-mail and Ms. Hendrix was not Mr. Waterhouse's administrative assistant.  *See id.*  Mr. Waterhouse also testified that he rarely, if at

---

of that order.  To the extent necessary, HCMFA incorporates its motion to amend and its objection to the Bankruptcy Court's denial of that motion in this Brief, and reserves all rights with respect to the same.

For the avoidance of doubt, any confusion over whether HCMFA needed to amend its Answer results from differences between the Texas Rules of Civil Procedure and the Federal Rules of Civil Procedure.  The Texas Rules require specific denials in certain instances because the Texas Rules permit general denials.  Tex. R. Civ. P. 92.  The Federal Rules, on the other hand, require specific denials nearly all the time, including here.  Fed. R. Civ. P. 8(b)(1)(B).  To the extent the Debtor attempts to argue the denial needed to be verified under Tex. R. Civ. P. 93 or relies on any other Texas procedural theory, those rules do not apply in federal court. *See Follenfant v. Rogers*, 359 F.2d 30, 31-2 (5th Cir. 1966) (Texas rule 93 "COULD NOT have any effect on the present case, since state rules of practice are not applicable to, or binding on, trials in federal courts. In matters of pleading, federal courts are not governed by the state practice, but by the Federal Rules of Civil Procedure."); *Ramirez v. Bexar County*, 2011 U.S. Dist. LEXIS 111678, *16 (W.D. Tex. Sept. 29, 2011); *Nieto v. Nationwide Prop. & Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 171802, *5 n.7 (N.D. Tex. Jan. 10, 2011); *see* Fed. R. Civ. P. 11(a) ("Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit.").

all, electronically signed documents in May, 2019. Debtor Appx. 02124 (298:10-300:14). But Mr. Waterhouse did not remember authorizing anyone to use his electronic signature. *See id.* Nor has the Debtor offered any evidence that Mr. Waterhouse ever laid eyes on the Notes electronically signed by him. On the contrary, the evidence is that Mr. Hendrix e-mailed the executed Notes to two other Debtor employees but, for some inexplicable reason, <u>not</u> Mr. Waterhouse. Debtor Appx. 00871.

50.    The Debtor must prove that HCMFA signed the Notes. HCMFA denied signing the Notes in its Answer, so the Debtor bears the burden to prove HCMFA signed them. *Silverio*, 625 S.W.3d at 685; TEX. BUS. & COMM. CODE § 3.308(a). There can be no question that Mr. Waterhouse did not personally sign the Notes. The only question is whether he authorized Ms. Hendrix to sign the Notes electronically for him. But the Debtor offers no evidence on this critical fact. Even if there were some circumstantial evidence from the Debtor on this fact, HCMFA has demonstrated that there is a genuine issue of disputed fact as to whether Mr. Waterhouse ever authorized Ms. Hendrix to sign the Notes electronically for him.

ii.    <u>**Even if Waterhouse Signed the Notes, He Did Not Have Authority**</u>

51.    Even if there were not a genuine issue of material fact about whether Mr. Waterhouse signed the Notes, there is a genuine issue as to whether he had authority to sign them. General contract law governs whether Mr. Waterhouse's signature binds HCMFA. *See* TEX. BUS. & COMM. CODE § 3.402(a) ("If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract."). Under the UCC as well, "an unauthorized signature is ineffective …." TEX. BUS. & COMM. CODE § 3.403.

---

52. "'Unauthorized signature' means a signature made without actual, implied, or apparent authority." TEX. BUS. & COMM. CODE § 1.201(b)(41). But "Texas law does not presume agency, and the party who alleges it has the burden of proving it." *IRA Res., Inc. v. Griego*, 221 S.W. 3d 592, 597 (Tex. 2007). The District Court has summarized the concept of actual authority as follows:

> "Actual authority usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *United Residential Props., L.P. v. Theis*, 378 S.W.3d 552, 564 (Tex. App. 2012, no pet.) (citation and internal quotation marks omitted). "'Actual authority is created through written or spoken words or conduct of the principal communicated to the agent.'" *Id.* (quoting *Walker Ins. Servs. v. Bottle Rock Power Corp*., 108 S.W.3d 538, 549-50 (Tex. App. 2003, no pet.)). The existence of an agency relationship based on actual authority "may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in question[, but] cannot be based merely on the words or deeds of the agent." *CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd*., 222 S.W.3d 889, 899 (Tex. App. 2007, pet. denied) (citing *Walker Ins. Servs*., 108 S.W.3d at 550).

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930, *26-28 (N.D. Tex. April 13, 2015).

53. The Debtor has failed to meet its burden to prove Mr. Waterhouse had actual authority to execute the Notes. Based on the rule that the agent's deeds are insufficient evidence, the fact that Mr. Waterhouse allegedly signed the Notes is irrelevant. Certainly Mr. Waterhouse does not believe he possessed authority. He testified that only Mr. Dondero could authorize borrowing at the level in question. Debtor Appx. 02117 (270:18-273:9). As for whether HCMFA intentionally conferred authority on Mr. Waterhouse, again his testimony is conclusive—it did not. *Id.* Likewise, HCMFA's president testified that Mr. Waterhouse did not have authority to sign the Notes and that he was unaware of any corporate documents that would confer such authorization. HCMFA Appx. 1-2, 4.

54. The only allegedly contrary evidence the Debtor submits to meet its burden is an Incumbency Certificate that says Mr. Waterhouse is the Treasurer of Strand Advisors XVI, Inc.,

HCMFA's general partner. Debtor Appx. 00789.[24] While it says Mr. Waterhouse is authorized to execute agreements on behalf of the General Partner, it does not unambiguously give him the same level of authority for the partnership. Instead, to the extent it confers any rights at all, it merely authorizes him "to give any party on behalf of the Partnership all notices, orders, directions, or instructions …." *Id.* But this does not unambiguously include executing agreements or borrowing money on the partnership's behalf. "The negative implication canon, *expressio unius*, which dictates that 'specification of the one implies the exclusion of the other,' further buttresses that conclusion." *Claimant ID 100218776 v. BP Expl. & Prod.*, 712 Fed. Appx. 372, 376 (5th Cir. 2017) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 93-100 (2012)). Perhaps more to the point, the incumbency certificate does not actually confer any rights, and the Debtor has not offered any documents that do. Based on the Debtor's own evidence, there is a genuine issue of material fact as to whether Mr. Waterhouse had actual authority to sign the Notes.

55. The District Court also provided a thorough summary of the concept of apparent authority:

> Apparent authority "is based on the doctrine of estoppel, and one seeking to charge the principal through apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that he purports to exercise." *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981) (citing *Sw. Title Ins. Co. v. Northland Building Corp.*, 552 S.W.2d 425, 428 (Tex. 1977); *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778-79 (Tex. 1974); *Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d 422, 427 (Tex. 1953)). To determine an agent's apparent authority, the court examines the conduct of the principal and the reasonableness of the third party's assumptions regarding the agency's authority. *Gaines*, 235 S.W.3d. at 183. "[O]nly the conduct of the principal is relevant." *Id.* at 182 (citing *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996) (per curiam)); *see also United Residential Props.*, 378 S.W.3d at 564 ("Apparent authority is based on estoppel, and only the conduct of

---

[24] To the extent the Debtor attempts to argue Mr. Dondero is not competent to testify regarding Mr. Waterhouse's authority, then the Debtor must concede that this incumbency certificate is likewise incompetent for this purpose. After all, it is simply a signed statement by Mr. Dondero.

the principal in leading a third party to believe that the agent has authority may be considered." (citations and internal quotation marks omitted)). "Declarations of the alleged agent, without more, are incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." *Gaines*, 235 S.W.3d at 183-84 (citing *Sw. Title Ins. Co.*, 552 S.W.2d at 428); *see also Huynh*, 180 S.W.3d at 623 ("Only the conduct of the principal may be considered; representations made by the agent of his authority have no effect.").

*Kirkindoll v. NCUA Bd.*, 2015 U.S. Dist. LEXIS 47930 at *26-28.

56.     The key to apparent authority is "the reasonableness of the third party's assumptions regarding the agency's authority." First of all, there is no evidence that anyone with control over the Debtor or HCMFA actually believed Mr. Waterhouse had authority. But even if they did, that belief would not have been reasonable. At the time the Debtor demanded payment and filed this lawsuit, Mr. Waterhouse was still the Debtor's CFO. Debtor Appx. 00008 (complaint dated Jan. 22, 2021); 02053 (new employment began March 1, 2021); 02054 (served as Debtor's CFO until early 2021). At all relevant times, he was on both sides of this alleged transaction. And when "there is a dual agent, operating with the consent and knowledge of both principals, the agent's knowledge is imputed to its principals." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 924 (Tex. 2010). Yet neither of the principals here consented, as Mr. Waterhouse did not have authority from either the Debtor or HCMFA to execute the Notes and both he and the principals involved knew that. There can be no apparent authority when the other party to the transaction expressly knows that the agent lacks actual authority. *See, e.g., Gaines v. Kelly*, 235 S.W.3d 179, 183-84 (Tex. 2007).

57.     There is therefore a genuine issue of material fact as to whether Waterhouse had authority to sign the Notes, so the Court should deny the Motion.

### iii. Even if Waterhouse Signed the Notes and had Authority, the Notes are Ambiguous

58.     When an "agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a fact question for the jury." *Childers v. Pumping Systems, Inc.*, 968 F.2d 565, 569 (5th Cir. 1992); *see Rink-A-Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431, 433 (Colo. App. 1982) ("Because no ambiguity exists concerning the Reichardts' status as makers on this note, the trial court was correct in entering summary judgment in favor of the Bank."). Here, because of the way Mr. Waterhouse allegedly signed the Notes, the identity of the maker is ambiguous.

59.     Under the following statute, Mr. Waterhouse is potentially liable in his individual capacity, even assuming he had authority to act for HCMFA:

> If a representative signs the name of the representative to an instrument and the signature is an authorized signature of the represented person, the following rules apply:
>
> (1)     If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.
>
> (2)     Subject to Subsection (c), the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity, or (ii) the represented person is not identified in the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.

TEX. BUS. & COMM. CODE § 3.402(b).

60.     In *Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2-04-257-cv, 2005, Tex. App. LEXIS 6215, *15-16 (Tex. App.—Fort Worth Aug. 4, 2005), the Court evaluated the following signature:

/s/ AAA Auto Glass

/s/ Jackie Holland Secretary & Treasurer

AAA Auto Glass Company

But the Court found the signature ambiguous under § 3.402(b)(1) as to Ms. Holland's individual liability versus the liability of SSH, Inc., whose name was not mentioned.  *Id.* at \*16.

61.    Mr. Waterhouse's signature on the Notes presents a similar conundrum:

**MAKER:**



FRANK WATERHOUSE

Debtor Appx. 00011, 00015.  There is no indication from the signature itself that Mr. Waterhouse intended to bind HCMFA instead of himself.

62.    "Comment 2 to [section 3.402] is also instructive; it provides that an agent is not liable under subsection (b)(1) 'if the form of the signature unambiguously shows that it is made on behalf on an identified represented person (for example, 'P, by A, Treasurer').'"  *S. Mansukhlal & Co v. Husein*, 14-04-00018-cv, 2004 Tex. App. LEXIS 8097, \*7 (Tex. App.—Houston [14th] Sept. 2, 2004).  The signatures on the Notes do not unambiguously identify HCMFA as the maker, so Mr. Waterhouse is potentially liable in his individual capacity.  He testified, however, that he did not intend to be liable and that signing the Notes in his individual capacity was a mistake.  Debtor Appx. 02126 (306:19-307:4).[25]  This results in an ambiguity as to whether Mr. Waterhouse

---

[25]    The Debtor has waived Mr. Morris's objections.  *Supra*, note 4.  Even if not, the questions are not objectionable.  Mr. Waterhouse is competent to testify regarding his own intent and whether he personally made a mistake, particularly when the issue is his own personal liability.  "Form" objections are also invalid under the Federal Rules as they fail to apprise counsel of the basis of the objection and to provide counsel an opportunity to correct any perceived objection.

intended to sign the Notes at all. Accordingly, there is a genuine issue of material fact that precludes summary judgment.

**B.** **THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE NOTES WERE THE RESULT OF A MUTUAL MISTAKE**

63. If the Notes were properly executed, then they are a result of a mutual mistake. As detailed above, Mr. Dondero intended the Transfers to compensate HCMFA for the NAV Error, not to be repaid as loans. Mr. Dondero, the only person with the authority to characterize the Transfers as loans, never gave that instruction. Lower level Debtor employees simply assumed the Transfers were loans, and Mr. Waterhouse perhaps shared this assumption, but that does not matter. Mr. Dondero was the individual who initiated the Transfers; he was the only person with authority to characterize the Transfers as loans for both the Debtor and HCMFA; and he was the very person injecting money into the Debtor to enable the Debtor to make the Transfers in the first place. At all times, he intended and understood that the Transfers were compensation for damages, not loans.

64. "A mutual mistake is one common to all parties, wherein each labors under the same misconception respecting a material fact …." *Garza v. Villarreal*, 345 S.W.3d 473, 483 (Tex. App.—San Antonio 2011) (citing *Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex. App.—San Antonio 1982)). "In order for the defense of mutual mistake to be sustained, there must be fact issues raised to show that all the parties to a contract were acting under the same understanding of the same material fact." *Id.* Put slightly differently, "[a] mutual mistake of fact occurs when the parties to an agreement have a common intention, but the written contract does not reflect the intention of the parties due to a mutual mistake." *Smith-Gilbard v. Perry*, 332 S.W.3d 709, 713 (Tex. App.—Dallas 2011). "When a party alleges that, by reason of a mutual mistake, an agreement does not express the real intentions of the parties, extrinsic evidence is admissible to

show the real agreement." *Id.*; *DeClaire v. G&B McIntosh Family Ltd. P.ship*, 260 S.W.3d 34, 47 (Tex. App.—Houston [1st] 2008) ("The parol evidence rule does not bar extrinsic proof of mutual mistake.").

65.     The Debtor's recitation of the law on mutual mistake does not materially differ. But the Debtor's argument misconceives what the Debtor's own evidence actually means under the law.     The common mistake was that the Transfers constituted a loan rather than compensation—if Mr. Waterhouse ever understood the Transfers to be loans and if he executed the Notes then, as an officer of both the Debtor and HCMFA, his mistake would be "mutual" to both of his principals.     The fact that both the Debtor and HCMFA listed the Notes on their financial statements shows that the mistake was mutual.     Debtor Appx. 00782, 00840.     The fact that the same individuals—employees of the Debtor—handled both the Debtor's and HCMFA's accounting shows that the mistake was mutual.     HCMFA Appx. 5; Debtor Appx. 03025 (42:17-21, 43:8-23).     The fact that Debtor employees prepared a memo to HCMFA's board which included the Notes show that the mistake was mutual.     It also explains why no one noticed the mistake sooner.     Mr. Waterhouse even testified that he did not always read audited financials—he relied on his accounting team for that.     Debtor Appx. 02071 (86:3-89:19).     He also testified that he was not always comfortable with the control environment.     Debtor Appx. 02077 (112:22-113:14).

66.     The natural consequence of these facts is that lower-level Debtor employees repeated the mistake in financial documents and disclosures more than once.     The repetition itself does not necessarily indicate the Transfers were loans.     And there is plenty of evidence they were not.     The Debtor initially lacked sufficient funds to make the Transfers.     HCMFA Appx. 3.     Mr. Dondero therefore personally advanced funds to the Debtor.     HCMFA Appx. 3.     As both the Debtor's and HCMFA's President, he intended the Transfers as compensation, not loans.     HCMFA

Appx. 5. As a matter of fact, the amounts of the two Transfers substantially mirrored the amounts of the prior two transfers HCMFA made to the Fund on account of the NAV error. *See* HCMFA Appx. 3. Finally, Mr. Waterhouse himself—an officer of both parties—admitted the Note is a mistake in light of the fact that his signature makes him personally liable, discussed above. Debtor Appx. 02126 (306:19-307:4).

67.     The fact that HCMFA received insurance proceeds does not change the analysis. In Texas, the "collateral source" rule is an exception to the general principle that a plaintiff is limited to single recovery for a particular injury. "Long a part of the common law of Texas and other jurisdictions, the rule precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else — a collateral source. Thus, for example, insurance payments to or for a plaintiff are not credited to damages awarded against the defendant." *Haygood v. De Escabedo*, 356 S.W.3d 390, 394–95 (Tex. 2011). There is a genuine issue of material fact as to whether the Notes resulted from a mutual mistake, so the Court should deny the Motion.

68.     The Court need not, and should not, address the issue of whether the Debtor was liable to HCMFA for the NAV Error. It doesn't matter. Both the Debtor and HCMFA, through their mutual agent and control person, Mr. Dondero, believed this to be the case. That is all that matters. The Debtor did not plead avoidance of that arrangement. Nor does the potential that HCMFA carried the Notes on its books and records lead to the conclusion that the Notes are valid—at best, this is evidence loosely supporting the Debtor's arguments, but then, if anything, it only demonstrates a genuine issue of disputed, material fact. The Court need only consider Mr. Waterhouse's statements, prior to the litigation, that there was one note from HCMFA to the Debtor, which cannot be collected through May, 2021, to demonstrate confusion on behalf of HCMFA, at a minimum, or a lack of awareness of the Notes at all.

**C.** **THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE DEBTOR GAVE CONSIDERATION IN EXCHANGE FOR THE NOTES**

69.     "'Consideration consists of either a benefit to the promisor or a detriment to the promisee.'" *Garza v. Villarreal*, 345 S.W.3d at 483 (quoting *Robinson v. Nat'l Autotech, Inc.*, 117 S.W. App.—Dallas 2003)). "A contract lacking in consideration is unenforceable." *Garza v. Villarreal*, 345 S.W.3d at 483. "Under common law, as long as something of real and legally cognizable value is given in exchange for a promise to pay under a promissory note, the note is supported by adequate consideration." *Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 614 (Tex. App—Houston [1st] 2004). But here, the Debtor did not give *anything* in exchange for the Notes. The Transfers were compensation for the NAV Error, not loans, and the Debtor has not identified any other consideration. Accordingly, there is a genuine issue of material fact as to whether the Notes are unenforceable for lack of consideration.

**D.** **TURNOVER IS NOT AN APPROPRIATE REMEDY UNDER THESE CIRCUMSTANCES**

70.     The Debtor's cause of action for turnover under section 542 is improper. This Court has "held that actions to collect prepetition accounts receivable which are based on state law contract principles do not constitute turnover actions under § 157(b)(2)(E) without a final judgment from a court of competent jurisdiction or another binding determination of liability." *In re Fang Operators*, 158 B.R. 643, 645 (Bankr. N.D. Tex. 1993) (referring to *Satelco, Inc. v. North Amer. Publishers, Inc. (In re Satelco, Inc.)*, 58 B.R. 781 (Bankr. N.D. Tex. 1986)). The Debtor has asserted a breach of contract claim attempting to collect a disputed debt under state law. Accordingly, section 542 does not apply.

## V.     CONCLUSION

71.     The Debtor's conduct caused HCMFA to suffer approximately $7.4 million in damages. Shortly thereafter, the Debtor paid HCMFA $7.4 million. But then the Debtor's

employees made a simple mistake. Based on historical practice, they booked the payments as loans instead of compensation. One of them even purported to issue promissory notes, which the Debtor now seeks to collect if the face of overwhelmingly contradictory evidence. The same Debtor employee even affixed a corporate officer's signature without his permission, when he himself admits he lacked authority to incur $7.4 million in debt. Naturally, she and others then repeated the mistake again and again in financial disclosures. But it was a mistake nonetheless. Each of the foregoing is supported by credible and admissible summary judgment evidence.

72.     For these reasons, there are genuine issues of material fact that preclude summary judgment on (a) whether HCMFA signed the notes and whether Mr. Waterhouse was authorized to sign them if he in fact did; (b) whether the notes were the result of a mutual mistake; and (c) whether the notes lacked consideration. All of these are issues for the jury. Furthermore, the turnover statute is inapplicable as a matter of law. The Court should therefore deny the Motion.

RESPECTFULLY SUBMITTED this 19th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    State Bar No. 24030781
    Julian P. Vasek, Esq.
    State Bar No. 24070790
    500 N. Akard St., Ste. 3800
    Dallas, TX 75201
    Tel: 214-855-7500
    Fax: 214-855-7584
    E-mail: drukavina@munsch.com
    E-mail: jvasek@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on January 19, 2022, a true and correct copy of this document, along with all exhibits, if any, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/ Davor Rukavina
Davor Rukavina